1

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
Brian S. Edwards (SBN 166258)
3  18400 Von Karman, Suite 300
Irvine, California  92612
4  Telephone:     (949) 553-1010
Facsimile:      (949) 553-2050
5  info@gauntlettlaw.com
jal@gauntlettlaw.com
6  bse@gauntlettlaw.com

7  Attorneys for Defendants
Akanoc Solutions, Inc.,
8  Managed Solutions Group, Inc.
and Steven Chen

9

10                  **UNITED STATES DISTRICT COURT**

11        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

12

13  LOUIS VUITTON MALLETIER, S.A.,          ) Case No.:  C 07-3952 JW
                                            )
14                                          ) Hon. James Ware
                                            )
15                       Plaintiff,         ) **DEFENDANTS' MOTION FOR SUMMARY**
                                            ) **JUDGMENT**
16                                          )
           vs.                              ) Date:   June 23, 2008
17                                          ) Time:  9:00 a.m.
                                            ) Dept.:  Courtroom 8, 4th Floor
18  AKANOC SOLUTIONS, INC., et al.,         )
                                            ) Discov. Cut-off:       April 29, 2008
19                                          ) Last Day to Hear
                                            ) Dispositive Motions: June 30, 2008
20                       Defendants.        ) Pre-Trial Conf:       Sept. 8, 2008
                                            ) Trial Date:            None Set
21  _____)

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. SUMMARY JUDGMENT IS PROPER BECAUSE VUITTON CANNOT PROVE ESSENTIAL ELEMENTS OF ITS THREE CAUSES OF ACTION ................. 1

   A.   Summary Judgment Standard ........................................................................ 1

   B.   Vuitton Cannot Prove Required Elements of Contributory Trademark Infringement ................................................................................................. 2

      1.   Element 1: Ownership of the Mark at Issue by Vuitton and Direct Infringement ............................................................................. 3

         a.   Defendants Do Not Use Vuitton's Marks ................................. 3

         b.   Vuitton Has No Evidence of Defendants' Direct Use of Marks ........................................................................................ 5

      2.   Element 2: Intentional Inducement ....................................................... 5

         a.   Vuitton Admits It Has No Evidence of Intentional Inducement .............................................................................. 5

         b.   Defendants' Established Protocols ........................................... 6

         c.   Defense Actions on the Five Domains in Complaint ........................ 8

         d.   Defendants Have Never Intentionally Induced Infringement .......................................................................... 9

         e.   No Evidence of Direct Control and Monitoring of the Instrumentality Used by a Third Party to Infringe ...................... 11

            (1)   The Stored Communications Act (18 U.S.C. § 2701, et seq.) Prohibits Defendants from Monitoring Content on Servers ................................................. 12

            (2)   No SCA Exception Allows Monitoring Server Contents ................................................................... 12

   C.   Vuitton Cannot Prove Any Elements of Vicarious Trademark Infringement ............................................................................................... 14

      1.   Element 1: Apparent or Actual Partnership ........................................... 14

      2.   Element 2: Authority to Bind Another or Exercise Joint Ownership or Control ...................................................................... 15

   D.   Vuitton Cannot Prove Contributory or Vicarious Copyright Infringement ............................................................................................... 15

      1.   Required Elements to Prove Contributory Copyright Infringement ......................................................................................... 15

i

      **2.**     **Vuitton Cannot Prove Three of the Four Required Elements of Contributory Copyright Infringement** ........................................................ 16

           **a.**     **Element 1:  Plaintiff's Actual Ownership of Copyright** ................ 16

           **b.**     **Element 2:  Defendants' Copying of Protected Elements of Plaintiff's Work** ........................................................ 16

           **c.**     **Element 3:  Knowledge (Actual or Constructive)** .......................... 17

           **d.**     **Element 4:   Material Contribution, Inducement, or Causation** ........................................................ 19

                 **(1)**     **Material Contribution** ........................................................ 19

                 **(2)**     **Inducement** ........................................................ 21

                 **(3)**     **Causation** ........................................................ 23

      **3.**     **Vuitton Cannot Prove the Two Required Elements of Vicarious Copyright Infringement** ........................................................ 23

           **a.**     **Element 1:  Right and Ability to Supervise and Control the Infringing Conduct** ........................................................ 23

            **b.**     **Element 2:   Direct Financial Interest in the Infringing Activity** ........................................................ 24

**II.**     **CONCLUSION** ........................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

*Anderson v. Liberty Lobby Inc.*,
    477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................................... 1, 2

*Atlas Copco AB v. Atlascopcoiran.com*,
    533 F. Supp. 2d 610 (E.D. Va. 2008) ................................................................ 21

*Cable News Network L.P., L.L.L.P. v. CNNews.com*,
    177 F. Supp. 2d 506 (E.D. Va. 2001) ................................................................ 21

*Celotex v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................................... 1

*DSC Comm. Corp. v. Pulse Comm., Inc.*,
    170 F.3d 1354 (Fed. Cir. 1999) ....................................................................... 16

*Dyer v. Northwest Airlines Corporations*,
    334 F. Supp. 2d 1196 (D.N.D. 2004) ................................................................ 12

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) .............................................................................. 6

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) .................................... 15

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
    456 U.S. 844, 102 S. Ct. 2182, 72 L. Ed. 2d 606 (1982) ...................................... 2

*Kling v. Hallmark Cards Inc.*,
    225 F.3d 1030 (9th Cir. 2000) ......................................................................... 16

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. (Cal.) 2002) .................................................................. 12

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1992) .................................... 1

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
    475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ...................................... 2

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ............................................................ 2, 3

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. (Cal.) 2007) ............................ 2, 14, 16, 19, 21, 23

*Quon v. Arch Wireless Operating Co., Inc.*,
    309 F. Supp. 2d 1204 (C.D. Cal. 2004) ............................................................ 12

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ................................................................ 4, 7

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984) ....................... 22

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ................................................................ 2

*Twentieth Century Music Corp. v. Aiken*,
    422 U.S. 151, 95 S. Ct. 2040, 45 L. Ed. 2d 84 (1975) ....................... 15

## DOCKETED CASES

*Internet Specialties West, Inc. v. ISPWest*,
    No. CV 05-3296 FMC AJWX, 2006 WL 4568796 (C.D. Cal. Sept. 19, 2006) .............. 19, 20

## FEDERAL RULES AND STATUTES

18 U.S.C. § 2510(15) ................................................................................ 12

18 U.S.C. § 2511(2)(a)(i) .......................................................................... 13

18 U.S.C. § 2701 et seq. (Stored Communications Act) .......................... 12

18 U.S.C. § 2701(a) ............................................................................ 12, 24

18 U.S.C. § 2701(c) .................................................................................. 12

18 U.S.C. § 2711 ....................................................................................... 12

Fed. R. Civ. P. 56 ....................................................................................... 1

Fed. R. Civ. P. 56(c) .................................................................................. 1

Fed. R. Civ. P. 56(e) .................................................................................. 1

Fed. R. Evid. 801(c) ................................................................................. 19

Fed. R. Evid. 802 ................................................................................ 20, 21

Local Rule 7-2 ........................................................................................... 1

Local Rule 56-1 ......................................................................................... 1

## MISCELLANEOUS

Tom Sheldon, Encyclopedia Of Networking, Electronic Edition (1998) ................................ 1

1    **PLEASE TAKE NOTICE** that pursuant to Fed. R. Civ. P. 56 and Civil Local Rules 56-1

2    and 7-2 of the United States District Court for the Northern District of California, Defendants

3    Managed Solutions Group, Inc. ("MSG"), Akanoc Solutions, Inc. and Steven Chen (collectively

4    "Defendants") will move on June 23, 2008 at 9:00 a.m., or as soon thereafter as counsel may be

5    heard, for summary judgment on the ground that Plaintiff Louis Vuitton Malletier ("Vuitton") cannot

6    prove essential elements of contributory trademark infringement, vicarious trademark infringement,

7    and contributory and vicarious copyright infringement.

8        The Defendants move for a summary judgment in their favor on all causes of action because

9    no rational trier of fact, given the record as a whole, could find that Defendants are liable for

10   contributory trademark infringement, vicarious trademark infringement, or contributory or vicarious

11   copyright infringement.  The Plaintiff has no evidence to prove necessary elements of its claims.

12   **I.    SUMMARY JUDGMENT IS PROPER BECAUSE VUITTON CANNOT PROVE ESSENTIAL ELEMENTS OF ITS THREE CAUSES OF ACTION**

13       **A.    Summary Judgment Standard**

14

15       Summary judgment is proper where "there is no genuine issue as to any material fact and . . .

16   the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving

17   party "always bears the initial responsibility of informing the district court of the basis for its

18   motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue

19   of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

20   The non-moving party must then identify specific facts "that might affect the outcome of the suit

21   under the governing law," thus establishing that there is a genuine issue for trial.  FED. R. CIV. P.

22   56(e).

23       When evaluating a motion for summary judgment, the court views the evidence through the

24   prism of the evidentiary standard of proof that would pertain at trial.  *Anderson v. Liberty Lobby*

25   *Inc*., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The court draws all reasonable

26   inferences in favor of the non-moving party, including questions of credibility and of the weight that

27   particular evidence is accorded.  *See, e.g., Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520,

28   111 S. Ct. 2419, 115 L. Ed. 2d 447 (1992).  The court determines whether the non-moving party's

1   "specific facts," coupled with disputed background or contextual facts, are such that a reasonable

2   jury might return a verdict for the non-moving party.   *T.W. Elec. Serv., Inc. v. Pacific Elec.*

3   *Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).   In such a case, summary judgment is

4   inappropriate.   *Anderson*, 477 U.S. at 248.   Summary judgment is, however, appropriate where a

5   rational trier of fact could not find for the non-moving party based on the record as a whole.

6   *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538

7   (1986).

8         Summary judgment in favor of Defendants is proper and required here in light of the

9   uncontested evidence and lack of evidence.   No rational trier of fact could find for Vuitton because

10  Vuitton cannot prove numerous essential elements of its three causes of action.

11        **B.      Vuitton Cannot Prove Required Elements of Contributory Trademark**
           **Infringement**
12

13        In order to prove contributory trademark infringement, Vuitton must show (1) that the mark

14  at issue is owned by Vuitton and that Defendants' use of the mark is likely to cause confusion or

15  mistake among the general public[1] and (2) Defendants' intentional inducement[2] of trademark

16  infringement.   Intentional inducement can occur where a defendant "continue[s] to supply an

17  infringing product to [a direct] infringer with knowledge that the infringer is mislabeling the

18  particular product supplied.   *Inwood Labs., Inc. v. Ives Labs., Inc*., 456 U.S. 844, 855, 102 S.Ct.

19  2182, 72 L.Ed.2d 606 (1982)."   *Visa Int'l Serv. Ass'n*, 494 F.3d at 807.   But "when the alleged direct

20  infringer supplies a service rather than a product, under the second prong of this test, the court must

21  'consider the extent of control exercised by the defendant over the third party's means of

22  infringement.'   *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir.1999).

23  For liability to attach, there must be '[d]irect control and monitoring of the instrumentality used by a

24  third party to infringe the plaintiff's mark.'   *Id*."   *Id.*

25        In this case Vuitton has admitted that it has no evidence to prove the required elements

26  _____

[1]*Perfect 10, Inc. v. Cybernet Ventures, Inc*., 213 F. Supp. 2d 1146, 1187 (C.D. Cal. 2002).

27  [2]*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. (Cal.) 2007) ("To be liable for
    contributory trademark infringement, a defendant must have . . . 'intentionally induced' the primary
28  infringer to infringe.").

regardless of which test is applied.  Vuitton has admitted that it has no evidence that any Defendant continued to supply any direct infringer with any infringing product.  Vuitton also has no evidence of any infringing service or any control by the Defendants over the provision by an infringer of such service.  So Vuitton cannot prove the necessary elements of this claim regardless of whether it asserts infringement by a product or by a service.

> ### 1.    Element 1: Ownership of the Mark at Issue by Vuitton and Direct Infringement

For purposes of this motion Defendants do not contest that Vuitton owns the marks at issue here.  Vuitton does not allege that the Defendants directly infringe its marks. Rather Vuitton believes that various persons, entirely unknown to them and perhaps in China, are using its marks on products advertised on Websites in a way that is likely to cause confusion or mistake among the general public.[3]   Proof of direct infringement is a necessary predicate to establishing contributory infringement.

Vuitton has no evidence that the Defendants have ever directly infringed marks according to its only Rule 30(b)(6) witness, Nicolay Livadkin.  [Livadkin Depo 158:21-159:1, 159:18-22]  While Defendants do not contest that some use of Vuitton's trademarks has occurred, Vuitton does not know *who* may be using its marks.  Vuitton's only admissible evidence on the element of direct infringement is the testimony of two people who have viewed on the Internet replica products bearing Vuitton's marks and who on a few occasions have ordered and received such products from China.  But none of this shows that the *Defendants* have used Vuitton's marks on any product or service.

> #### a.    Defendants Do Not Use Vuitton's Marks

In the course of their business, Defendants do not use Vuitton's marks in any way.  [Chen Decl. ¶19]  Defendants are solely in the business of providing unmanaged Internet hosting services.  [Chen Decl. ¶¶2, 4]   Managed Solutions together with Akanoc Solutions are Internet service

---

[3] *Cybernet Ventures*, 213 F. Supp. 2d at 1187-88 (direct trademark infringement occurs when the "direct usage of a mark by unauthorized users can lead to the public's belief that the mark's owner sponsors or otherwise approves of the use of the trademark.").

providers providing only unmanaged Internet services to third-party resellers.  [Chen Decl. ¶¶2, 4] They rent the use of computer servers (located in San Jose, California) together with one or more Internet Protocol ("IP") addresses[4] temporarily pointed to a server along with a good connection to an Internet "pipe" permitting the customer a specified maximum quantity of data throughput ("bandwidth").  [Chen Decl. ¶5]  Defendants Managed Solutions Group, Inc. and Akanoc, Inc. together own and have available for monthly rental approximately 1,400 computer servers, approximately 30,000 IP addresses and approximately 1.2 gigabits of bandwith of Internet access. [Chen Decl. ¶7]  It is used by numerous customers, primarily resellers of such services in China,[5] for such things as e-mail, Internet telephone service (VoIP), Internet game playing, downloading program information in North America or Europe, storage of data, such as an individual's family pictures, and Webhosting.  [Chen Decl ¶7]  Defendants do not know what specific use will be made of the Internet access it provides, unless customers happen to reveal it to them. [Chen Decl. ¶5]  The defendants do not and cannot monitor the use made of their equipment and Internet access.  [Chen Decl. ¶8]  MSG and Akanoc receive a modest monthly fee via a credit card or PayPal to keep the hardware running and the Internet communications open and they respond as requested to technical operations problems.  [Chen Decl. ¶6]  Defendants only market their Internet hosting services to resellers [Lone Decl. ¶3] who then market services directly to other customers within China, including Website operators.  [Lone Decl. ¶4]  Defendants do not market or sell services directly to Website operators.  [Chen Depo 55:21-23]  MSG and Akanoc ISP servers and services are attractive to Chinese companies because they have good equipment, technical expertise, excellent connection to an Internet backbone in San Jose, competitive pricing, and personnel who can speak and read Chinese.  [Chen Decl. ¶7, Lone Decl. ¶4]

---

[4]An IP address is a "unique identification of the location of an end-user's computer, the IP address serves as a routing address for email and other data sent to that computer over the Internet from other end-users."  *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 407 fn. 4 (2d Cir. 2004).  "This IP address routing system is essential to the basic functionality of the Internet, in a similar fashion as mailing addresses and telephone numbers are essential to the functionality of the postal service and telecommunications system."  *Id*. at 409-10.

[5]Because Chinese connections to the rest of the world through the Internet are heavily restricted by its government for political censoring, the speed and quality of the transmissions are poor. Therefore, Chinese companies commonly seek to host their Internet operations in the United States. [Chen Decl. ¶7]

1

### b.   Vuitton Has No Evidence of Defendants' Direct Use of Marks

2   Vuitton admits that it has no evidence that any defendant ever used any of its trademarks.

3   Livadkin was asked, "What evidence, if any, does Louis Vuitton have that any of the defendants

4   provided web hosting services with the object of promoting its use to infringe Louis Vuitton's

5   trademarks or the trademarks of anyone?"  He responded, "Other than the information gathered from

6   the Internet, on discussion boards and from the information that was provided by our investigator

7   [Robert Holmes], I don't [have any]."  But such information does not prove Defendants' use of

8   Vuitton's marks.  Robert Holmes ("Holmes"), Vuitton's investigator, had no evidence of any

9   infringing use of Vuitton's marks and little information about the Defendants at all.  He admitted

10   that the only knowledge Vuitton has about the Defendants is reputation but that information

11   concerning "reputation is hearsay."  [Holmes Depo 190:13-14]  Without any proof of Defendants'

12   use of its trademarks, Vuitton is unable to prove this necessary element of contributory trademark

13   infringement.  At most Vuitton can establish that unknown persons used marks.

14

### 2.   Element 2:  Intentional Inducement

15   Vuitton only alleges in its Complaint that five Websites it claims have at some time been

16   using IP addresses assigned to Defendants MSG or Akanoc.  Its theory is that occasional

17   appearances of replica Vuitton products on Websites that have, in the past, used IP addresses

18   originally assigned to the Defendants but rented to third party resellers makes the Defendants liable

19   for contributory trademark infringement.  Even if Vuitton had admissible evidence to support any of

20   the links in this set of assertions,[6] such evidence would not establish any intentional inducement to

21   infringe trademarks.  Vuitton has admitted that it has absolutely no evidence to prove any intentional

22   inducement of any infringement.  Further, the Defendants' uncontested evidence is that they never

23   provided any products or services to anyone with the object of promoting its use to infringe.

24

### a.   Vuitton Admits It Has No Evidence of Intentional Inducement

25   Vuitton admits that it has no evidence of Defendants' intentional inducement of any sort of

26   infringement.   Livadkin testified that Vuitton had no evidence that "any of the defendants

27

28   [6]The inadmissibility and inadequacy of any such proffered evidence will be discussed below.

intentionally induced or caused the third-party website operators to infringe any rights of Louis Vuitton." [Livadkin Depo 171:16-172:4] Vuitton's only other disclosed witness, investigator Holmes, testified that he had "no personal knowledge" that "any of the three defendants in this case induced or caused the infringing conduct on the part of website operators." [Holmes Depo 167:11-16]

A party may be liable for continuing to supply a product knowing that the recipient is using the product to engage in trademark infringement if it is "willfully blind" to the ongoing violations. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996). But Vuitton has admitted that it has no actual evidence of Defendants' continual supply of an infringing product to an infringer with actual or constructive knowledge.

Vuitton has no evidence that "any of the defendants were willfully blind to ongoing infringement by websites using its servers." [Livadkin Depo 174:11-22] When asked whether he had "any evidence that the three Defendants in this case had any knowledge about alleged infringing activity on the websites [he] investigated on behalf of Louis Vuitton" investigator Holmes responded "the only evidence is assuming your clients are not inept." [Holmes Depo 234:22-235:5] Besides this odd assumption, Holmes admitted that he had "no direct knowledge" that Defendants had actual knowledge about alleged infringing activity on any accused infringing websites. [Holmes Depo 236:2-6]

### b.    Defendants' Established Protocols

Defendants cannot be "willfully blind" to any counterfeiting activity because Defendants have a protocol for responding to claims of counterfeiting activity or other abuses. [Chen Decl. ¶11-19] **First,** the Defendants do no business with any Website operator and, unless notified by a third party such as Vuitton, are not aware of any infringing conduct potentially occurring at a particular Website. [Chen Decl. ¶8] This is because the MSG and Akanoc services are unmanaged and the Defendants are legally prohibited from accessing the content on its equipment under the Stored Communications Act.[7] [Chen Decl. ¶8] Just as a telephone service provider is prohibited from

_____

[7] 18 U.S.C. § 2701 et seq.

listening in on or wiretapping its customers' calls, so are ISPs such as MSG and Akanoc prohibited from examining the customer content of their servers without specific authorization by the customer or a search warrant.  [Chen Decl. ¶8]  **Second,** the Defendants' only knowledge that any particular Website even uses its equipment comes only from some third-party notification or complaint.  [Chen Decl. ¶4]  **Third,** if an abuse complaint is made to the Defendants about a Website alleged to be using one of the Defendants' IP addresses, the only way to definitively determine whether that is true is **not** to view the Website but instead to "ping" the domain name used by the Website.  [Chen Decl. ¶11]  "Pinging" a domain name[8] at a computer's DOS prompt sends a request to Internet name translation servers to "return" to the inquiring computer the IP address that is being used by that domain name.[9]  [Chen Decl. ¶¶13, 14]

Fourth, when MSG or Akanoc receives a complaint that some domain is allegedly using infringing or counterfeit content (normally received via email), Juliana Luk, an Akanoc employee whose responsibility is to respond to complaint notices, or, on occasion, Steve Chen, will ping the allegedly infringing domain name.  [Luk Decl. ¶¶2, 3; Chen Decl. ¶11]  She then compares the IP address to the Defendants' list of 30,000 assigned IP addresses.  [Luk Decl. ¶4]  **Fifth,** if Ms. Luk finds that the domain is within the IP range assigned to Defendants, she sends the customer using that IP address a "takedown" email, warning them that they must remove the infringing content.  [Luk Decl. ¶5]  **Sixth,** if Defendants receive a further complaint about an IP address, Ms. Luk can request that a technician unplug the server using that address, thus making that domain nonfunctional.  [Luk Decl. ¶6]  As an unmanaged Internet host who is not able to monitor the content of the domain data on its servers, this protocol is the most reasonable and only practical method employable to combat infringement.  [Chen Decl. ¶¶11, 12, 13]  This protocol evidences Defendants' conscious efforts to respond to allegedly infringing domains, and is the total opposite of

---

[8] "A 'domain name' is an alphanumeric text representation (often a word) that identifies a numerical IP address . . . . [A] domain name is associated with a particular IP address (or group of IP addresses) only when an end-user registers the domain name.  The primary purpose of domain names is to 'mak[e] it easier for users to navigate the Internet; the real networking is done through the IP numbers.' "  *Register.com,* 356 F.3d at 410.

[9] "Ping is the equivalent to yelling in a canyon and listening for the echo.  You 'ping' another host on a network to see if that host is reachable from your host."  TOM SHELDON, ENCYCLOPEDIA OF NETWORKING, ELECTRONIC EDITION 781 (1998).

1   being "willfully blind."

2                    **c.      Defense Actions on the Five Domains in Complaint**

3        In accordance with their protocol, when the Complaint was served asserting infringing

4   activity of five specific domain names, Defendants checked the IP addresses of each site named in

5   the Complaint.  [Chen Decl. ¶17]  The Defendants found that four of the five were not within the

6   range of IP addresses assigned to Defendants and that the fifth site, wendy929.net, was not

7   functional and not able to be accessed.  [Chen Decl. ¶¶17, 18]  Finding that four of the five allegedly

8   infringing sites were out of the Defendants' range of IP addresses meant that they were hosted on

9   servers of different Internet Service Providers.  [Chen Decl. ¶18]  Defendants were therefore not

10  responsible for contacting anyone about those Websites.  [Chen Decl. ¶18]  Vuitton has evidence

11  that it sent infringement notices on these five domain names to one or another of the Defendants at

12  various times before the Complaint was filed (although notices were also misdirected to incorrect

13  email and physical addresses over many months).  [Livadkin Depo 61:23-66:18]  The Defendants do

14  not have evidence of receipt of email complaints about these domain names because their email

15  server hard drive "crashed" in approximately June 2007 and before the Complaint was served in

16  August 2007.  [Chen Decl. ¶19]  Nevertheless, evidence that the Defendants followed their normal

17  protocol for dealing with infringement complaints is that none of the allegedly infringing domains

18  were operational or using Defendants' assigned IP addresses at the time of the Complaint.  If the

19  domain names were ever using Defendants' IP addresses (and Vuitton has no admissible evidence of

20  that), the Defendants' normal protocol had eliminated that usage by the time of the Complaint.

21  [Chen Decl. ¶19]

22       Vuitton has no evidence that Defendants were "willfully blind" to infringing use of their IP

23  addresses, even assuming such use ever occurred, when Defendants (1) responded immediately to

24  the Complaint by checking the IP addresses of the Websites and (2) confirmed that the Websites

25  were either not within the Defendants' IP address range or non-functional.  Additionally, Vuitton

26  actually has no admissible evidence that any Website selling allegedly infringing merchandise has

27  ever used the Defendants' services, servers, or IP addresses.

28

### d.      Defendants Have Never Intentionally Induced Infringement

Vuitton cannot contradict the testimony of defense witnesses that Defendants do not intentionally induce any infringement in their course of business.  Defendants' business activities do not involve any infringement or inducement to infringe.  [Chen Decl. ¶20]  Internet hosting services are generally characterized as either "managed" or "unmanaged."  [Chen Decl. ¶3]  The basic difference between managed and unmanaged Internet hosting is the level of control over the server on which the data or applications are being hosted.  [Chen Decl. ¶3]  A managed hosting service generally provides complete or nearly complete care of the customers' servers and therefore charges significantly more than for unmanaged hosting.  [Chen Decl. ¶3]  Typical customers of a managed hosting service are individuals or small businesses that are technically unsophisticated or unwilling to expend the effort to control their own servers.  [Chen Decl. ¶3]  They are willing to pay extra for more service.  [Chen Decl. ¶30]  No defendant provides any "managed" hosting service.  [Chen Decl. ¶¶2, 4]

Customers of unmanaged Internet hosting services must be more technologically knowledgeable and experienced so that they can manage their operations remotely with little intervention by the hosting provider.  [Chen Decl. ¶4]  Customers of unmanaged hosting services maintain operational control over the computer server remotely and restrict access by passwords.  [Chen Decl. ¶4]  The unmanaged hosting service simply provides access to a computer server with the basic operating system as requested by the customer, uses an Internet router to point one or more temporarily assigned IP addresses to the server, and turns the system over to the customer who then assigns all passwords to access content on the server.  [Chen Decl. ¶5]  The unmanaged hosting provider has no access to the content on a server and need not even know what sort of use is made of it.  [Chen Decl. ¶5]  They charge a fee only to keep the machine operating and connected to the Internet.  [Chen Decl. ¶4]  Additional maintenance, such as reformatting the hard drive or reinstalling an operating system, is normally done only if requested and for an additional fee.  [Chen Decl. ¶6]

The customer of an unmanaged hosting service typically agrees to an "acceptable use policy" that prohibits illegal use of the server and agrees to respond to and correct unacceptable use when a

1   complaint is made, for example, of spam originating from the IP address or intellectual property

2   infringement.  [Chen Decl. ¶9]  MSG and Akanoc require agreement to an "acceptable use policy"

3   that, among other things, specifies that the services will be unmanaged and that the customer is

4   responsible for improper use or content on the servers.  [Chen Decl. ¶9]  The agreement also

5   provides that the defendants have no access to the content of servers without consent of the

6   customer.  [Chen Decl. ¶9]

7        MSG provides only unmanaged Internet hosting services, despite the use of the term

8   "managed" in its name.  [Chen Decl. ¶2, fn. 1]  Akanoc also provides only unmanaged hosting

9   services.  [Chen Decl. ¶¶2, 4]  Steve Chen is the manager for both corporations.  [Chen Decl.,

10  preamble]  Defendants are in the business of unmanaged Internet hosting [Chen Decl. ¶¶2, 4],

11  meaning they do not control the servers that their customers utilize for a variety of legal uses,

12  including e-mail, voice-over IP, Internet game playing, and personal storage for data.  [Chen Depo

13  44:24-45:13]

14       MSG's and Akanoc's regular practice is to send "take down" notices to their customers if

15  there is any complaint of activity from an IP address that violates the "acceptable use policy."  [Luk

16  Decl. ¶7]  Whenever MSG or Akanoc receives complaints of trademark or copyright infringement,

17  they immediately forward the complaint to their customer with instructions that the customer "take

18  down" the offending material.  [Luk Decl. ¶8]  The customer is warned that violation of the

19  acceptable use policy can result in termination of service.  [Luk Decl. ¶9]  Because of the high

20  number of servers and IP addresses serviced by the Defendants and because there is a constant

21  problem with people around the world sending spam or infringing or illegal material, MSG and

22  Akanoc receive thousands of complaints every month and it is impractical for them to investigate or

23  validate all complaints.  [Chen Decl. ¶10]  So all complaints are forwarded to their customers for

24  action.  [Chen Decl. ¶10]  Employee Juliana Luk's job is to send out such complaint notices daily.

25  [Luk Decl. ¶10]  Steve Chen assists in also sending out the notices.  [Chen Depo 22:13-23:5]

26       If the complaint about the same IP address is repeated within a short time or the Defendants

27  believe the customer is not responding to the complaint notice, MSG or Akanoc can only unplug the

28  server from the Internet or otherwise disable the customer's access.  [Chen Decl. ¶16]  But this is an

1    extreme action, taken only when necessary, because there may be numerous compliant customers

2    using the same server while perhaps one customer of a reseller has allowed a single IP address to be

3    misused.  [Chen Decl. ¶16]  Unplugging a server will potentially harm dozens or even hundreds of

4    end users of the same server so this action is a last resort to enforce the acceptable use policy.  [Chen

5    Decl. ¶16]

6        Further proof that Defendants do not induce Website operators to infringe is that Defendants

7    only market their unmanaged Internet hosting services to Internet hosting resellers.  [Chen Decl. ¶4]

8    They, in turn, sell their services directly to third party end customers including operators of

9    Websites.  [Chen Depo 55:21-23]  With this business model, Defendants cannot be shown to induce

10   Website operators to infringe trademarks because Defendants do not know who they are and never

11   deal directly with them.

12       Defendants have established that they do not intentionally induce any infringing conduct in

13   the course of their business and Vuitton has no evidence to prove otherwise.  With no proof of

14   Defendants' intentional inducement or contradicting Defendants' evidence, Vuitton cannot prove

15   this necessary element of contributory trademark infringement and its claim must fail.

16                    **e.      No Evidence of Direct Control and Monitoring of the
                              Instrumentality Used by a Third Party to Infringe**

17

18       Vuitton has admitted that it has no evidence of Defendants' direct control and monitoring of

19   any Website information on their servers.  When asked whether Vuitton had any evidence of

20   Defendants "operat[ing] the websites" or "somehow manifesting control over the websites,"

21   Livadkin admitted that Vuitton had "no evidence that [Defendants] directly operated [the websites]."

22   Livadkin also testified that Vuitton had no evidence that "any of the defendants monitored any of the

23   websites listed in the Complaint."  [Livadkin 175:11-176:2]

24       When asked whether he had "evidence of direct control or monitoring of the content of any

25   of the websites that you investigated for Louis Vuitton," Holmes testified that he had no evidence of

26   either direct control or monitoring of website content by Defendants.  [Holmes Depo 245:16-246:15]

27   This lack of evidence is not surprising in light of Defendants' denial of any monitoring and control

28   over Website content [Chen Decl. ¶9], particularly when federal criminal law prevents Defendants

1    from controlling and monitoring the customers' content on their servers.

2                    **(1)      The Stored Communications Act (18 U.S.C. § 2701, et seq.)
                               Prohibits Defendants from Monitoring Content on Servers**
3

4          In 1996, Congress passed the Electronic Communications Privacy Act ("ECPA") in order "to

5    ensure the security of electronic communications."  *Quon v. Arch Wireless Operating Co., Inc.*, 309

6    F. Supp. 2d 1204, 1207 (C.D. Cal. 2004).  Title II of the ECPA created the Stored Communications

7    Act ("SCA"),[10] regulating "access to stored wire and electronic communication and transactional

8    records."  *Quon,* 309 F. Supp. 2d at 1207.  "The ECPA's legislative history indicates that Congress

9    passed the SCA to prohibit a provider of an electronic communications service 'from knowingly

10   divulging the contents of any communication while in electronic storage by that service to any

11   person other than the addressee or intended recipient.' "  *Id.*

12         Section 2701(a) of the SCA (18 U.S.C. § 2701(a)) specifically prohibits "(1) intentionally

13   access[ing] without authorization a facility through which an electronic communication service is

14   provided. or (2) intentionally exceed[ing] an authorization to access that facility."

15         The SCA is undeniably applicable to Defendants and the data stored on their servers.  The

16   SCA defines an "electronic communication service" as "any service which provides to users thereof

17   the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Courts

18   have interpreted this language to mean that the SCA applies to (1) Internet service providers[11] like

19   Akanoc and MSG and (2) to websites such as any hosted on Defendants' servers.[12]

20                    **(2)      No SCA Exception Allows Monitoring Server Contents**

21         No provision of the SCA allows an ISP like MSG or Akanoc to monitor server content.

22

23   ─────────────────────
     [10]Title I of the ECPA amended the Wiretap Act to adopt for the SCA the same definitions as used in
24   the federal Wiretap Act.  *See* 18 U.S.C. § 2711.

25   [11]*Dyer v. Northwest Airlines Corporations,* 334 F. Supp. 2d 1196, 1199 (D.N.D. 2004) ("The ECPA
     definition of 'electronic communications service' clearly includes Internet service providers such as
26   America Online, as well as telecommunications companies whose cables and phone lines carry
     internet traffic.").

27   [12]*See Konop v. Hawaiian Airlines, Inc*., 302 F.3d 868, 879 (9th Cir. (Cal.) 2002) ("The parties agree
     that the relevant 'electronic communications service' is Konop's Website, and that the website was
28   in 'electronic storage.' ").

1   While there is an exception to the SCA where monitoring is "authorized,"[13] by a user of the ISP's

2   services, because they provide unmanaged hosting services, Defendants are not authorized to

3   circumvent the SCA.  Vuitton has no evidence that Defendants have ever been authorized by their

4   customers or users to monitor customer content on their servers.  Instead the law specifically outlaws

5   monitoring of the content of electronic communications stored on MSG's and Akanoc's servers.  18

6   U.S.C. § 2511(2)(a)(i) provides that "a **provider** of wire communication service to the public **shall**

7   **not utilize service observing or random monitoring** except for mechanical or service quality

8   control checks."  (Emphasis added.)

9        Defendants have never controlled or monitored the data on MSG or Akanoc's servers.  [Chen

10   Decl. ¶50]  Section III(1) of the Defendants' User Agreement[14] makes it clear that Defendants do not

11   have authority to access their customers' information stored on their servers.   Akanoc's User

12   Agreement, essentially identical to MSG's, provides at § III(1) that: "Akanoc Solutions, Inc. **will**

13   **exercise no control whatsoever over the content** of the information passing through the network or

14   on the customer's web sites."  (Emphasis added.)

15        Because they have no authority under criminal law or their customer User Agreement,

16   Defendants have never been able to control or monitor website or other information on its servers.

17   Vuitton has no evidence that Defendants can or do directly control or monitor data on their servers.

18   Defendants are bound by their own user agreement not to control or manage any data on their

19   servers.  Vuitton is therefore unable to prove this necessary element of contributory trademark

20   infringement.

21        Vuitton has no evidence of intentional inducement, continued supply of an infringing product

22   with actual or constructive knowledge, or direct control and monitoring of the instrumentality used

23   by a third party to infringe its trademarks.  No rational trier of fact could find that Defendants are

24   liable for infringement without such evidence.

---

[13]18 U.S.C. § 2701(c) provides:  "Subsection (a) of this section does not apply with respect to conduct **authorized** – (1) by the person or entity providing a wire or electronic communications service; (2) **by a user** of that service with respect to a communication of or intended for that user; or (3) in section 2703, 2704 or 2518 of this title."  (Emphasis added.)

[14]Section III(1) states that "Akanoc Solutions, Inc. will exercise no control whatsoever over the content of the information passing through the network or on the customer's web sites."

1

**C.      Vuitton Cannot Prove Any Elements of Vicarious Trademark Infringement**

2          Liability for vicarious trademark infringement requires a finding that the defendant and the

3   infringer "have an apparent or actual partnership, have authority to bind one another in transactions

4   with third parties or exercise joint ownership or control over the infringing product."  *Visa Int'l Serv.*

5   *Ass'n*, 494 F.3d at 807.   Vuitton has no ability to prove any element of vicarious trademark

6   infringement.

7                            **1.        Element 1:  Apparent or Actual Partnership**

8          Vuitton has admitted that it has no evidence of an apparent relationship or partnership

9   between Defendants and the infringing Websites.  Livadkin testified that Vuitton had no evidence

10  "that any of the defendants had an agency or partnership relationship with any of the websites listed

11  in the complaint."  [Livadkin Depo 176:3-7]  Holmes testified that he had no evidence of "any

12  agency of partnership that exists between Defendants and anyone else who is directly controlling or

13  operating the websites that are in the domains using the domain names" that he investigated on

14  behalf of Vuitton.  [Holmes 246:16-22]  Vuitton has never been able to even identify any operator of

15  an apparently infringing Website despite enforcement efforts in China including up to one-hundred

16  raids per year.  [Livadkin Depo 22:23-27:2]

17         Steve Chen has denied ever having any apparent or actual partnership with any party

18  infringing allegedly or actually Vuitton's marks.  [Chen Decl. ¶22]  MSG and Akanoc do not host

19  websites.   [Chen Depo 107:6-7]   Defendants do not design websites.   [Chen Depo 55:18-20]

20  Defendants do not act as a domain registrar.   [Chen Depo 56:17-19]   Defendants only provide

21  unmanaged Internet hosting that they market to resellers.  [Chen Depo: 55:21-23]  No Defendant has

22  any connection whatsoever to any allegedly infringing Website or operator. [Chen Decl. ¶23]

23  Defendants have no apparent or actual partnership with any website operators.  [Chen Decl. ¶24]

24  They don't even know who operates any accused Websites because they do not deal with website

25  operators.  [Chen Decl. ¶25]

26         Vuitton has no evidence of any apparent relationship or partnership between Defendants and

27  any infringing Websites, a necessary element of vicarious trademark infringement.

28

1   **2.   Element 2:   Authority to Bind Another or Exercise Joint Ownership or Control**

2

3   Vuitton has no evidence that the Defendants either have the ability to bind any operators of

4   the Websites listed on the complaint [Livadkin Depo 176:8-17, Holmes Depo 248:13-23; 249:12-17]

5   or that Defendants exercise joint ownership or control over the infringing Websites.  [Livadkin Depo

6   176:18-23, Holmes Depo 249:18-250:4]

7   Defendants have no authority to bind another or exercise joint control.  [Chen Decl. ¶26]

8   Defendants do not deal directly with website operators.   [Chen Decl. ¶25]   MSG and Akanoc

9   exclusively market their services to resellers, who then deal with various Chinese Internet users

10   including website operators.  [Chen Depo 55:21-23]  Defendants have never exerted authority to

11   bind website operators or to exercise joint ownership or control over them.  [Chen Decl. ¶26]

12   Because Vuitton has no evidence that Defendants have ever exerted authority to bind

13   Website operators of any infringing Website or that they have ever exercised joint ownership or

14   control over these operators, no rational trier of fact could find that Defendants are liable for

15   vicarious trademark infringement because Vuitton is unable to prove **any** of the necessary elements

16   of vicarious trademark infringement.

17   **D.   Vuitton Cannot Prove Contributory or Vicarious Copyright Infringement**

18   **1.   Required Elements to Prove Contributory Copyright Infringement**

19   The Copyright Act provides a fair return to authors and inventors by protecting their works

20   from exploitation by others.[15]  Vuitton has no evidence that the Defendants have exploited any of the

21   plaintiff's works.  The Defendants do no business with and receive no money from any Website and

22   Vuitton has no evidence that even the Internet hosting resellers to whom MSG and Akanoc sell ISP

23   services do any business with the Website operators listed in the Complaint.   [Chen Decl. ¶27]

24   Vuitton has no evidence to prove any contributory copyright infringement.

25   Contributory copyright infringement requires proof of (1) plaintiff's actual ownership of the

26

27   ─────────────
[15]*See Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 546, 105 S. Ct. 2218,
2223, 85 L. Ed. 2d 588 (1985); *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 156, 95 S.

28   Ct. 2040, 2043-44, 45 L. Ed. 2d 84 (1975).

copyright; (2) Defendants' copying of protected elements of the plaintiff's work; (3) Defendants' actual or constructive knowledge; and (4) material contribution, or inducement, or causation.  *DSC Comm. Corp. v. Pulse Comm., Inc.*, 170 F.3d 1354, 1359 (Fed. Cir. 1999) ("An act of direct infringement is a necessary predicate for any derivative liability . . .; absent direct infringement, there can be no contributory infringement."); *Visa Int'l Serv. Ass'n,* 494 F.3d at 795 ("[A] defendant is a contributory infringer if it (1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct.' ").

### 2. Vuitton Cannot Prove Three of the Four Required Elements of Contributory Copyright Infringement

#### a. Element 1: Plaintiff's Actual Ownership of Copyright

A claim for copyright infringement requires proof of ownership of the copyright.[16] Defendants do not dispute that Vuitton owns the copyrights at issue.  All other evidence is lacking.

#### b. Element 2: Defendants' Copying of Protected Elements of Plaintiff's Work

A claim for copyright infringement requires a showing that the defendant copied protected elements of the plaintiff's designs.  *Visa Int'l Serv. Ass'n,* 494 F.3d at 795.  But Vuitton has no evidence that any Defendant has copied protected elements of Vuitton's designs.  Vuitton's evidence potentially relevant to this case consists of computer-generated printouts allegedly representing merchandise offered or sold by one of five Websites listed in the Complaint.  Vuitton claims that the Websites sell goods allegedly incorporating protected elements of Vuitton's designs.  But even Vuitton's claimed printouts are not evidence of *Defendants'* copying Vuitton's copyrights.

In the course of their business, Defendants do not copy any of Vuitton's works in any way. [Chen Decl. ¶20]  Defendants are solely in the business of unmanaged Internet hosting as an ISP. [Chen Decl. ¶¶2, 4]  Defendants do not advertise or sell merchandise [Chen Decl. ¶20] and do not even market or sell their ISP services directly to or even have contact with Website operators.  [Chen Depo: 55:21-23; Chen Decl. ¶32]  At most Vuitton's printouts might establish that *some* party may

---

[16] *Kling v. Hallmark Cards Inc*., 225 F.3d 1030, 1037 (9th Cir. 2000).

have copied Vuitton's works.  But the printouts do not establish *who* did so.  The printouts certainly do not show that any Defendant made the asserted copy.  Moreover as discussed herein, Vuitton's printouts are inadmissible because Vuitton cannot authenticate them or establish where they came from, and they are hearsay.

Vuitton also ordered some merchandise from Websites, paying for the merchandise in China and receiving delivery of merchandise shipped from China.  Vuitton has admitted that it has no knowledge of whom it dealt with in China, either to whom it made payment or from whom it received the merchandise, because its investigations have established that names and addresses used by Chinese merchandise counterfeiters tend to be false.  [Livadkin Depo 27:19-28:21]  Vuitton's merchandise purchases therefore establish no connection to or communication with any Defendant. Actions of unknown persons in China are not even admissible in this copyright case because they cannot be tied to any Defendant in San Jose to establish relevance.  Vuitton has not sued apparent infringers in China but has instead chosen convenient targets in America.  Vuitton's novel theory of contributory liability is, however, without evidence.

Without any evidence as to who copied any of Vuitton's work or that Defendants copied any Vuitton work or contributed to the copying, the plaintiff cannot establish this necessary element of copyright infringement.

### c.  Element 3:  Knowledge (Actual or Constructive)

Vuitton has no evidence showing that Defendants had actual or even constructive knowledge of the five Websites listed in the Complaint or of any infringing conduct.  When asked whether Vuitton had "any reason to believe that any of the Defendants knew that any infringement was going on," Livadkin responded that Vuitton's evidence was limited to the attempts to contact Defendants regarding the infringing Websites.  [Livadkin Depo 138:10-139:3]  In other words, it has no evidence on this element.

Vuitton's attempts to contact the Defendants with complaints consisted of form letters or emails that may have eventually been sent to a correct address after several false starts.  [Livadkin Depo 61:23-66:18]  Whenever MSG or Akanoc received infringement complaints such as those sent by Vuitton, its practice was to send them on to their reseller customers with a demand for "take

down" of objectionable content.  [Chen Decl. ¶12]  Repeat offenses could result in a Defendant unplugging a server used by a party accused of infringing conduct.  [Chen Decl. ¶16]  When a complaint is received about any Internet abuse, the Defendants do not log on to the Internet to investigate or verify whether the infringement or spam complaint is well founded.  [Chen Decl. ¶11]  Instead, the Defendants "ping" the domain name listed in an abuse complaint to determine if it is using an IP address assigned to one of their customers.  If it is, they immediately send the complaint on to the customer with a take down demand.  [Chen Decl. ¶14]  This practical approach is for several reasons:  (1) the Defendants regularly receive too many complaints to have time to verify or investigate abuse complaints, (2) the Defendants are unable to determine who has rights in any content on the Internet, (3) the Defendants cannot easily verify complaints, and (4) opening an e-mail containing spam could be dangerous to the MSG or Akanoc servers and their customers because virus, worm, and other malware infections could be spread thereby.  [Chen Decl. ¶12]  So the Defendants simply treat all abuse complaints as justified and send them on to their customer with a take down notice.  This is the only practical way for an ISP to operate.  [Chen Decl. ¶12]

When Vuitton served its Complaint in this case, Defendants determined the IP address of each named Website by "pinging" that domain name.  [Chen Decl. ¶17]  The Defendants immediately determined that four of the five Websites listed in the Complaint were *not* using IP addresses within the range of IP addresses assigned to Defendants.  [Chen Decl. ¶17]  The Defendants found that the fifth site, wendy929.net, was not functional and could not be accessed on the Internet.  [Chen Decl. ¶17]  Because four of the five sites were out of the Defendants' range of IP addresses, and therefore hosted by a different ISP, Defendants were not responsible for contacting the Websites and could take no action against them.  The fifth site was not functional at all.  [Chen Decl. ¶18]  Despite this uncontradicted evidence, Vuitton pursued this lawsuit.  But Vuitton still has no evidence that Defendants had any actual or constructive knowledge that any actual infringement was taking place by any of the five accused Websites using its servers or IP addresses.  Even assuming that one or more infringing Websites had at some prior time used the ISP's services, the Defendants' policing practices had effectively stopped such use.  In short, the only evidence is that Vuitton's Complaint allegations are unfounded.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### d.      Element 4:  Material Contribution, Inducement, or Causation

Vuitton must prove Defendants' material contribution, inducement or causation of copyright infringement.  But it admits having no admissible evidence of Defendants' causation, material contribution or inducement of infringement [Livadkin Depo 154:12-156:4-11] other than inadmissible printouts that cannot establish this element.

### (1)      Material Contribution

In order to prove material contribution, Vuitton must show a "direct connection" between Defendants and the infringing conduct.  *Visa Int'l Serv. Ass'n*, 494 F.3d. at 796 ("The credit card companies cannot be said to materially contribute to the infringement in this case because they have no direct connection to that infringement.").

Vuitton has no evidence proving a direct connection between Defendants and the infringement.  Vuitton has admitted that the Website and Domain Tools printouts attached to the complaint were Vuitton's *only* proof of such a direct connection.  [Livadkin Depo 154:12-155:7] The website printouts, however, are inadmissible because Vuitton cannot authenticate them with testimony from any person with personal knowledge of the website's contents.[17]  The Domain Tools and Network Solutions printouts are also inadmissible hearsay because they are based on third-party or fourth-party information that is offered for the truth of their contents.[18]

### **Website Printouts**

Vuitton has attached to the Complaint and will likely offer a first type of Internet printout in an attempt to show information about the identity and content of Websites that allegedly sold counterfeit goods.   Website printouts are, however, inadmissible as evidence unless properly authenticated.   *Internet Specialties West*, 2006 WL 4568796, at *1.   To authenticate website printouts, it is not enough for the person who went to the Website and printed out the pages to authenticate them.  Someone with personal knowledge of the accuracy of the ***contents*** of the Internet

---

[17] *See Internet Specialties West, Inc. v. ISPWest*, No. CV 05-3296 FMC AJWX, 2006 WL 4568796, at *2 (C.D. Cal. Sept. 19, 2006) ("To be authenticated, someone with knowledge of the accuracy of the contents of the internet print-outs must testify.").

[18] "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  FED. R. EVID. 801(c).

1  printouts must testify.  *Id.* at *2.  In *Internet Specialties West,* 2006 WL 4568796, at *1-2, the court

2  held:

> [M]ost of plaintiff's arguments are addressed to print-outs from
> websites and the question of their admissibility.  Plaintiff properly
> contends that these print-outs are inadmissible unless properly
> authenticated.  **Defendant's argument, that they could be
> "authenticated" by the person who went to the website and
> printed out the home page, is unavailing.**  It is now well recognized
> that "Anyone can put anything on the Internet.  No website is
> monitored for accuracy and nothing contained therein is under oath or
> even subject to independent verification absent underlying
> documentation … hackers can adulterate the content on any web-site
> from any location at any time.  For these reasons, **any evidence
> procured off the Internet is adequate for almost nothing**…."
>
> To be authenticated, someone with **knowledge** of the **accuracy
> of the contents** of the **internet print-outs** must testify.  [Emphasis
> added; citation omitted.]

12  The printouts of the Websites are inadmissible because Vuitton has not authenticated them

13  with testimony from anyone associated with the Websites, let alone anyone with personal knowledge

14  to establish who maintained the Website, who authored the documents allegedly shown on the

15  Website, or who can verify the accuracy of the information shown on a Webpage.

16  <u>**Domain Tools and Network Solutions Printouts**</u>

17  Vuitton has attached to the Complaint and will also likely offer a second type of Internet

18  printout in an attempt to establish information from unknown and unidentified sources concerning a

19  variety of details about Websites, including which ISP hosts a site.  These printouts from "Domain

20  Tools" or "Network Solutions," for example, are also inadmissible because of the same lack of

21  authenticating evidence just discussed.  But additionally they are inadmissible as hearsay, double

22  hearsay, triple hearsay, and worse.  There is no basis for finding the information reliable or

23  admissible.

24  Vuitton asserts that because it has printouts from third parties allegedly reporting "WHOIS"

25  information to the effect that infringing Websites have particular IP addresses, and other printouts

26  reporting that those IP address are hosted by one of the Defendants, the information must be true.

27  But these printouts are nothing more than unauthenticated multiple hearsay and are separately

28  inadmissible for that reason.  FED. R. EVID. 802.

1     Domain registrant information in a WHOIS database is inherently unreliable because there is

2     no way to verify the accuracy of the database **or** the accuracy of the domain registrant information

3     that was input by unknown parties.   Not only have courts recognized that WHOIS database

4     information can be unreliable,[19] Livadkin himself, in his deposition testimony, admitted that the

5     "WHOIS database could not be reliable" and that a domain registrant who inputs inaccurate

6     information into the WHOIS database destroys the accuracy of the WHOIS database, and,

7     consequently, a Domain Tools printout.  [Livadkin Depo 115:21-116:20]

8     Whether or not Vuitton's Domain Tools and Network Solutions printouts list Defendants as

9     hosts of the infringing Websites, the printouts are triple hearsay[20] because the information contained

10     in them cannot be verified by the declarant (Vuitton), yet they are being offered to prove the truth of

11     the matter asserted (that the IP address and hosting information from unknown sources on those

12     printouts is true).  These printouts are inadmissible pursuant to Fed. R. Evid. 802.

13     **(2)**       **Inducement**

14     Vuitton also has no evidence that any Defendant induced anyone to infringe Vuitton's

15     copyrights, let alone that they induced infringement of copyrights by the five listed Websites.  "One

16     who distributes a device with the object of promoting its use to infringe copyright, as shown by clear

17     expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of

18     infringement by third parties."  *Visa Int'l Serv. Ass'n*, 494 F.3d. at 800.  No evidence even suggests

19     that any Defendant did anything with the object of promoting copyright infringement.

20     **(a)**       **Vuitton Admits It Has No Evidence of Inducement**

21     Vuitton has admitted that it has absolutely no evidence of Defendants' intentional

22

---

23    [19]*See Cable News Network L.P., L.L.L.P. v. CNNews.com*, 177 F. Supp. 2d 506, 526 (E.D. Va. 2001) (recognizing that [Chinese company] Maya HK provided false contact information to the WHOIS

24    database when applying for the registration of a domain name); *Atlas Copco AB v. Atlascopcoiran.com*, 533 F. Supp. 2d 610, 613 n.1 (E.D. Va. 2008) (recognizing that WHOIS

25    information for domain Atlas-Caspian.com is false and consists of the same contact email address as other domain names).

26    [20]These printouts are triple hearsay because Vuitton has admitted that it does not maintain this data [Livadkin Depo 81:16-21], nor did Livadkin even generate the printouts himself [Livadkin Depo

27    132:17-24, 133:2-10, 133:11-20, 133:21-134:4 (ape168.com); 124:19-125:3, 127:8-24, 127:25-128:9 (atozbrand.com); 115:12-19, 118:9-119:1, 119:24-120:12 (bag925.com); 100:7-16, 112:16-113:1,

28    113:2-15, 113:17-24 (eshoes99.com); 70:25-71:14 (wendy929.net)].

inducement.  Vuitton's Fed. R. Civ. P 30(b)(6) witness testified that Vuitton had no evidence that "any of the defendants intentionally induced or caused the third-party website operators to infringe any rights of Louis Vuitton." [Livadkin Depo 171:16-172:4]  Vuitton's investigator, Robert Holmes, testified that he had "no personal knowledge" that "any of the three defendants in this case induced or caused the infringing conduct on the party of website operators." [Holmes Depo 167:11-16]

### (b)   Defendants Never Induced Infringing Conduct

Vuitton has no evidence to contradict testimony that Defendants do not intentionally induce any copyright infringement in the course of their business [Chen Decl. ¶29] or that Defendants don't actively fight Internet abuse.  Defendants have never induced any infringement by Website operators because they solely market their unmanaged Internet hosting to resellers and do not even deal with Website operators.  [Chen Depo 55:21-23]  MSG and Akanoc are ISPs merely enabling Internet communication, a legitimate, lawful activity.  Copyright owners have no right absolutely to prohibit copying (and sue anyone convenient) in order to further private financial interests.[21]  Even if copyright infringement can take place using Internet services offered by the Defendants, suppliers of such services, like the manufacturers of video recording equipment, cannot be liable for contributory copyright infringement.  *Sony Corp. of America*, 464 U.S. at 442 ("[T]the sale of copying equipment, like the sale of other articles of commerce, **does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes**. Indeed, **it need merely be capable of substantial noninfringing uses.**" (emphasis added)).

There is no basis to treat the sale of ISP services differently from the sale of a video recorder. And there can be no dispute that the Defendants' Internet hosting services with 1,400 servers and 30,000 IP addresses are widely used by numerous resellers and by thousands or potentially even millions of legitimate Website operators.  [Livadkin Depo 145:6-146:7; Chen Depo 43:14-17; Chen

---

[21]*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774, 782, 78 L. Ed. 2d 574 (1984) ("The **monopoly privileges** that Congress may authorize are **neither unlimited nor primarily designed to provide a special private benefit.** Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." (emphasis added)).

22

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT – C 07-3952 JW**

Decl ¶72]  Defendants' services are not "merely capable" of noninfringing uses, but are constantly used for legitimate purposes.  Indeed, the ISP services are essential to a modern economy, both to China and to America, its principal trading partner.  Incidental harm to Vuitton from the occasional appearance on the Internet of copies of its works by Chinese counterfeiters cannot justify action against the providers of ISP services.

### (3)  Causation

Vuitton also has no evidence that any Defendant caused any copyright infringement. Livadkin testified that Vuitton had no evidence "that any of the defendants . . . caused the third-party website operators to infringe any of the rights of Louis Vuitton."  [Livadkin Depo 171:20-172:4] Holmes also testified that he did not have "any personal knowledge or evidence that any of the three defendants in this case . . . caused the infringing conduct on the part of website operators."  [Holmes Depo 167:11-16]

No rational trier of fact would find that Defendants are liable for contributory copyright infringement, and Vuitton cannot prove three required elements of contributory copyright infringement.

### 3.  Vuitton Cannot Prove the Two Required Elements of Vicarious Copyright Infringement

"To state a claim for vicarious copyright infringement, a plaintiff must allege that the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity."  *Visa Int'l Serv. Ass'n,* 494 F.3d at 802.

### a.  Element 1:  Right and Ability to Supervise and Control the Infringing Conduct

Vuitton has admitted that it has no evidence of Defendants' right and ability to supervise and control the Website information on its servers.  Livadkin testified that Vuitton had no evidence of Defendants "somehow manifesting control over the websites."  Livadkin also testified that he had no evidence that "any of the defendants monitored any of the websites listed in the Complaint." [Livadkin 175:11-176:2]  When asked whether he had "evidence of direct control or monitoring of the content of any of the websites that you investigated for Louis Vuitton," Holmes testified that he

1    had no evidence of either direct control or monitoring of website content by Defendants.  [Holmes

2    Depo 245:16-246:15]

3         More important, MSG and Akanoc **do not** have the right to supervise or control conduct or

4    content on their servers [Chen Decl ¶29], aside from prohibiting abuse in their User Agreement.  But

5    those same User Agreements disallow any monitoring of customer content or communication

6    because the hosting services are expressly unmanaged.[22]   Additionally, there is no practical or lawful

7    way for Defendants to monitor information transmitted through or stored on the servers they rent to

8    resellers. prior to receiving a notice of infringement.  [Chen Decl ¶30]  With 30,000 IP addresses

9    accessing 1,400 Internet servers constantly, there is no practical means to wiretap communication or

10   monitor content in such a way that can prevent or identify every appearance of a copyrighted work

11   or a trademark appearing on the servers.  [Chen Decl ¶31]  It is the responsibility of a copyright or

12   trademark owner to police infringement and they can then send notices to an ISP like MSG or

13   Akanoc.  [Chen Decl. ¶8]

14        More important, monitoring of content to benefit Vuitton would be a criminal and civil

15   offense.  Unlike the practice of totalitarian governments, America expressly outlaws such conduct

16   without a warrant issued upon a showing of probable cause.  Defendants are precluded from

17   supervising or controlling conduct by the federal Stored Communications Act.[23]

18        Vuitton cannot prove this necessary element of vicarious copyright infringement because it

19   has no evidence that Defendants have the duty or the ability or even the right to monitor or supervise

20   infringing content appearing on its servers.

21            **b.        Element 2:  Direct Financial Interest in the Infringing Activity**

22        Vuitton also has no evidence that the Defendants have received any direct financial interest

23   in any infringing activity.  Livadkin admitted that Vuitton did not have any evidence that "any of the

---

[22]Section III(1) of Defendants' user agreement states, for example, that:

> Akanoc Solutions, Inc. will exercise no control whatsoever over the content of the information passing through the network or on the customer's web sites.

[23]18 U.S.C. § 2701(a) specifically prohibits:

> (1) intentionally access[ing] without authorization a facility through which an electronic communication service is provided. or (2) intentionally exceed[ing] an authorization to access that facility . . . .

1 defendants receive[d] money from the sale of infringing products that may be hosted on their

2 servers." [Livadkin Depo 165:17-20] Nor did Livadkin have any evidence that "any defendants

3 receive[d] any direct compensation for the sale of infringing products." [Livadkin Depo 165:21-

4 166:3] Vuitton has no such evidence because Defendants actually have no direct financial interest in

5 infringing activity or infringing persons. [Chen Decl. ¶32] The Defendants do not create, design,

6 operate, manage, or have any information about any Website using its servers and IP addresses.

7 [Chen Decl. ¶34] Defendants derive income solely from the unmanaged Internet hosting services

8 that they market to resellers. [Chen Decl ¶32] The fixed monthly service fees they charge are not

9 based on sales or activity of any Website doing business with any of the resellers any more than a

10 telephone company makes any profit on sales calls made by its customers. [Chen Decl. ¶33] The

11 Defendants do not even know who their customers deal with or what particular use is made of the

12 Internet services provided. [Chen Decl. ¶35] Since Vuitton has no idea who operates the accused

13 Websites, there is no way to tie any of them to any Defendant.

14      Without any evidence proving Defendants' direct financial interest in the infringing activity,

15 Vuitton cannot prove this necessary element of vicarious copyright infringement. Because Vuitton

16 is unable to prove either required element of vicarious copyright infringement, no rational trier of

17 fact, given the record as a whole, could find that Defendants are liable for vicarious copyright

18 infringement. The summary judgment should therefore be granted.

19 **II.      CONCLUSION**

20      Because Vuitton has no admissible evidence to prove essential elements of its causes of

21 action, no fact finder can rationally find any Defendant liable for the conduct alleged. The Court

22 should grant summary judgment to the Defendants.

23 Dated: May 19, 2008                                **GAUNTLETT & ASSOCIATES**

24

25                                                    By:    /s/ James A. Lowe

26                                                           James A. Lowe
                                                            Brian S. Edwards
27                                                    Attorneys for Defendants Akanoc Solutions,
                                                     Inc., Managed Solutions Group, Inc., and Steven
28                                                   Chen