# EXHIBIT 1502

1                    UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

3

4   LOUIS VUITTON MALLETIER, S.A.,     )
                                       )
5              Plaintiff,              )
                                       )
6   vs.                                ) Case No. C073952JW
                                       )
7   AKANOC SOLUTIONS, INC., MANAGED    )
    SOLUTIONS GROUP, INC., STEVEN CHEN )
8   and DOES 1 through 10, inclusive,  )
                                       )
9              Defendants.             )
    _____)

10

11

12

13

14

15            Deposition of NIKOLAY LIVADKIN,

16        taken on behalf of the Defendants, at

17        18400 Von Karman, Suite 300, Irvine,

18        California, commencing at 9:28 a.m., on

19        Wednesday, April 23, 2008, before

20        Tami L. Le, CSR No. 8716, RPR.

21

22

23

24

25

EXHIBIT

1502

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1          MR. COOMBS:  Objection; ambiguous.

2          But if you understand, go ahead.

3          THE DEPONENT:  On Internet?

4     Q    BY MR. LOWE:  Yes.

5     A    Products are sold mostly from the United States

6     and from China.  But it's -- it's more complicated than

7     that because we face more and more drop shipping, which

8     means that the website operator could be based in one

9     country and the product could be shipped from another

10    country.

11    Q    Do you know where counterfeit products are

12    manufactured?  Have you learned that in the course of

13    your work?

14    A    95 percent of counterfeit products are

15    manufactured in China.

16    Q    Where else?  That you know of?

17    A    Currently, probably a small part in Thailand,

18    Turkey, Morocco.  But as I told you, 95 -- vast majority

19    are produced in China.

20    Q    What efforts does Louis Vuitton make to enforce

21    its intellectual property rights in China to stop, for

22    example, the manufacturing or sale of products in China?

23    A    We -- we have local coordinators based in -- in

24    Hong Kong, in -- and in Guangzhou.  Guangzhou is -- is

25    the capital of a province in China, which is where most

22

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

 1    of the counterfeit production is concentrated.  We make

 2    more than a hundred raids every year on production

 3    facilities.

 4         Q    In China?

 5         A    In China.  We have very close ties with Chinese

 6    customs, with Chinese police, with administrative

 7    enforcement bodies in China.  We -- we seize very

 8    important amount of products every year.

 9         Q    Do you regard your enforcement efforts in China

10    as generally effective?

11         A    I would say --

12              MR. COOMBS:  Calls for a conclusion.

13              Go ahead.

14              THE DEPONENT:  I would say that amongst the

15    companies that have similar activity as Louis Vuitton,

16    we must be the -- we must have the biggest activity in

17    terms of IPR enforcement.

18         Q    BY MR. LOWE:  And the Chinese government

19    cooperates with Louis Vuitton in enforcing its rights in

20    China?

21         A    Yes.

22         Q    Do you --

23         A    It's very difficult, but we have -- we receive

24    a certain level of cooperation, yes.

25         Q    Why is it difficult?  Why do you use that term?

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1      A      Because Chinese is a country where intellectual

2  property is probably not perceived as so important as it

3  is in western countries.  Public authorities have --

4  very often have to make an arbitrage between protecting

5  the intellectual property of -- of foreign companies

6  and -- and protecting employment in China, because

7  obviously when you raid a counterfeit facility, there

8  will be people that will be fired, so it's...

9          In some areas in China, public authorities

10 could be very reluctant to cooperate.

11     Q      But you're still able to do about a hundred

12 raids a year there?

13     A      Yeah.

14     Q      What do the Chinese authorities do to people

15 you have identified as counterfeiters there?  Do they

16 prosecute them or what?

17     A      Public enforcement, I would say, is not

18 deterrent enough.  There is -- we have faced -- we have

19 faced corruption cases where manufacturing tools are

20 seized and then a certain time after the seizure of the

21 manufacturing tools they're given back to the

22 counterfeiter against payment of some money.

23     Q      Do you obtain the assistance of Chinese

24 authorities in identifying operators of websites selling

25 counterfeit goods?

24

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    A   Very rarely.

2    Q   Why?

3    MR. COOMBS:  Calls for speculation.

4    Go ahead.

5    Q   BY MR. LOWE:  Why is it rare?

6    A   They have no interest in pursuing Internet

7  cases.  It's too complicated.

8    Q   Complicated how?

9    A   Most of the times what motivates public

10  authorities to -- to -- to take a counterfeit case is

11  the potential amount of products to be seized.  When you

12  have an Internet vendor, most of the times there is

13  almost no products to be seized so no motivation for

14  public authorities to take the case.

15    Q   Is it true that Chinese government authorities

16  have the capability of identifying users of the Internet

17  in their country?

18    A   I guess so.

19    Q   Do you know whether they have the ability to

20  identify for you the operators of websites selling

21  counterfeit products in China?

22    A   They -- they have the ability to, but as I --

23  as I just told you, they -- they do not cooperate very

24  often.

25    Q   Has your company ever brought any sort of civil

25

BARKLEY
Court Reporters

1   lawsuit in China to protect its intellectual property

2   rights?

3       A    On Internet?

4       Q    Yes.

5       A    No.

6       Q    Why not?

7       A    Because it's not deterrent.

8       Q    Why do you say that?

9       A    It would be a very long action, very costly and

10  with no effective measures at the end.  So we would

11  mostly -- we would tend to do a criminal and/or

12  administrative enforcement.

13      Q    All right.  Have you tried to use criminal

14  enforcement of your intellectual property rights in

15  China?

16      A    Yes.

17      Q    And have you done that with Internet

18  counterfeiting operations?

19      A    Yes.

20      Q    And was that effective?

21      A    Mostly not.

22      Q    And in your opinion, why is that?

23      A    Because, as I told you, actions are not

24  deterrent.  Most of the times there is no -- there is no

25  follow-up and the counterfeiter is fined and a few

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    months ago -- a few months afterwards, the counterfeiter

2    starts a new activity.

3        Q    It is true that counterfeiting of products, of

4    Louis Vuitton, for example, would be a criminal offense

5    in China?

6        A    There are thresholds.

7        Q    What are those?

8        A    I -- off the top of my head, I wouldn't be able

9    to tell you, but after a certain level of proven

10    counterfeit activity or -- or number of products that

11    could be seized potentially, the case become -- becomes

12    criminal, would be handled by -- in criminal procedures.

13    Otherwise it's administrative procedures.

14        Q    What is the nature of the administrative

15    procedures in China that you can use to enforce your

16    intellectual property rights?

17        A    Well, the authorities from -- can investigate,

18    seize products and then -- and then fine the infringer.

19        Q    You mentioned a few minutes ago that the

20    information that you obtained from Whois databases is

21    sometimes inaccurate; is that right?

22        A    Yes.

23        Q    In what way is it inaccurate, in your

24    experience?

25        A    The administrative contact, the information

27

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

```
 1    that is provided by the domain -- domain name owner,

 2    there is -- for -- for GTLD's, generic top-level

 3    domains, there is no control of the Whois -- of the

 4    accuracy of the Whois information.  So when you register

 5    a domain name, you can basically put anything, a fake

 6    name, a fake address, a fake phone number.  The only

 7    accurate information in a -- in a Whois is the e-mail

 8    address, which is --

 9        Q     E-mail address?

10        A     E-mail address, which is necessary for domain

11    name management purposes.  This is how registrant of the

12    domain name communicates with the registrar.

13        Q     So you are unable to rely upon the accuracy of

14    the information that you receive from those databases?

15        A     Most of the times not.

16              MR. COOMBS:  And move to strike to interpose

17    the objection; compound.

18        Q     BY MR. LOWE:  "Most of the time not," what do

19    you mean?  It's mostly not accurate or it mostly is

20    accurate?  I'm not sure what you meant.

21        A     It's mostly inaccurate.

22        Q     Mostly inaccurate.  And that would be true of

23    DomainTools', for example, information?

24              MR. COOMBS:  Objection; compound.

25              THE DEPONENT:  It's not related to DomainTools.
```

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1   that DomainTools may not have the current or accurate IP

2   address for a particular domain name?

3        A    I believe DomainTools' database is updated as

4   you -- as you queried.

5        Q    But if their information is inaccurate, would

6   you know that?

7             MR. COOMBS:  Objection; assumes facts not in

8   evidence, calls for speculation.

9             THE DEPONENT:  I -- I have no information about

10  inaccurate.

11       Q    BY MR. LOWE:  Have you ever noticed that

12  sometimes DomainTools will list two different IP

13  addresses for the same domain name?

14       A    I have no recollection about that.

15       Q    Okay.  So you're -- you operate -- your company

16  operates on the assumption that DomainTools' information

17  is always accurate?

18       A    Yes.

19       Q    Going to show you Exhibit 1005.

20            (Document handed to counsel and the deponent.)

21       Q    BY MR. LOWE:  Can you identify this, please?

22       A    (Reviewing document.)

23            Yes, that's an initial notification that was

24  sent from our office to Managed Solutions Group, Inc.

25       Q    And that was sent on October 16, 2006?

61

BARKLEY
Court Reporters

1      A      Uh-huh.

2      Q      And it was sent by e-mail to whom?

3      A      To abuse@webhostplus.com and Managed Solutions

4  Group, Inc.

5      Q      So it was only sent by e-mail?

6      A      Yes, as our -- all our initial notifications.

7      Q      There is an address -- a physical address on

8  this letter for Managed Solutions Group, Inc. in Fort

9  Lee, New Jersey.

10      A      Uh-huh, yes.

11      Q      But it was not mailed to that address or

12  delivered in any other physical form to that address?

13      A      No.  It says sent by e-mail.

14      Q      And this is about what website or domain name?

15      A      This is about Wendy929.net.

16      Q      How did you -- and you sent this; is that

17  right?

18      A      Yes.

19      Q      How did you obtain the information that caused

20  you to send this particular notice to these -- to this

21  website -- I'm sorry, to this ISP address,

22  webhostplus.com?

23      A      Through the -- the standard procedure that I

24  previously described.

25      Q      Do you know specifically where you obtained

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1     this information?

2         A     I -- I don't have the file in front of me so I

3     would not be able to tell you whether I used this or

4     that particular mean to identify.

5         Q     Would you think that you probably were relying

6     on information from one of these --

7         A     Yes.

8         Q     -- third-party databases, DomainTools or

9     something like that?

10        A     Yes.

11        Q     You would not have been relying on information

12    for -- from, say, Mr. Holmes; is that correct?

13        A     On this one, no.

14        Q     Now, did you ever learn that this information

15    was inaccurate in any way, the address information or

16    the IP host information?

17        A     No.

18        Q     What information do you have that leads you to

19    believe that Managed Solutions Group was ever located in

20    Lynwood -- I'm sorry, in Fort Lee, New Jersey?

21        A     That was -- that was the address that was

22    provide in the -- in the IP Whois.

23        Q     Did you learn later that that was an inaccurate

24    address?

25        A     I think Managed Solutions asserted that it

63

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1   was -- that this address was located at the third-party

2   company.

3       Q    But you never confirmed that?

4       A    I -- when we sent this letter, there was no

5   indication for us that -- that this was -- this was a

6   third-party company.

7       Q    Okay.  So Louis Vuitton was working on the

8   assumption or the belief that it was sending this notice

9   to the correct party at a correct address concerning the

10  Wendy929.net domain name?

11      A    Well, that -- that was -- that was how Managed

12  Solutions had identified itself in the publicly

13  accessible Whois database.

14      Q    Do you know if it was Managed Solutions Group

15  that did that or maybe some other person that made that

16  entry of information in that database?

17          MR. COOMBS:  Calls for speculation.

18      Q    BY MR. LOWE:  Do you have any way of knowing

19  who entered that information in the database?

20      A    I -- I'm not aware of that.

21      Q    So you don't know one way or the other who did

22  it?

23      A    No.

24      Q    Thank you.

25          Please take a look -- you can just leave that

64

BARKLEY
Court Reporters

1    stack over there for the reporter, please.

2         Please take a look at Exhibit 1006 and tell me

3    if you recognize it.

4         (Document handed to counsel and the deponent.)

5         THE DEPONENT:  (Reviewing document.)

6         That's the attachment of e-mail.

7    Q    BY MR. LOWE:  So this was -- 1006 is an

8    attachment to the e-mail that you identified in

9    Exhibit 1005?

10   A    Yes.

11   Q    All right.  So you -- the practice would be

12   that you sent the e-mail we see in 1005 and then this --

13   this letter would be an attachment to that e-mail?

14   A    Yes.

15   Q    Thank you.

16        Once again, it shows that the -- this was dated

17   the same date, October 16, 2006?

18   A    Uh-huh.

19   Q    And then addressed to Managed Solutions Group

20   in Fort Lee, New Jersey, at the abuse@webhostplus.com

21   e-mail address?

22   A    Yes.

23   Q    Why don't you stack those maybe the other way

24   around so the reporter can find them in order.  Just put

25   them down, face down.  That's it.  That would be good.

BARKLEY
Court Reporters

1    A    (Witness complies.)

2    Q    Please take a look at Exhibit 1001 and tell me

3    if you can identify that.

4    A    (Reviewing document.)

5         Yes, that was sent by -- by my office.

6    Q    On what date?

7    A    On October 25, 2006.

8    Q    To whom?

9    A    To abuse@webhostplus.com, which is the e-mail

10   provided by Managed Solutions Group, Inc. for the IP

11   address to -- to which result Wendy929.net.

12   Q    So this was -- was this a follow-up to the

13   e-mail that you identified a moment ago in Exhibit 1005?

14   A    Yes.

15   Q    Did you ever learn that Web Host Plus was not

16   the same as Managed Solutions Group, Inc.?

17   A    That was what was -- that was asserted by

18   Managed Solutions in the current action.

19   Q    But you never had any investigation that

20   confirmed that or was able to find that that was not

21   true?

22   A    No.

23   Q    So once again, your assumption has been that

24   that was the correct place to send this notice?

25   A    Yes.

66

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1          Yes, it is.

2     Q    Okay.  Let's take a look at Exhibit 1000.  Tell

3   me what this is, if you can.

4          (Document handed to counsel and the deponent.)

5          THE DEPONENT:  That's a follow-up letter of the

6   October 30th letter to Akanoc Solutions regarding

7   Wendy929.net.  Follow-up letter sent on January 23rd,

8   2007.

9     Q    BY MR. LOWE:  Is it in fact just a copy of

10  Exhibit 1004?

11    A    Yes, it's just a copy with a -- with a stamped

12  reminder and the date of posting this letter.

13    Q    And this was sent by what means?

14    A    It has been sent by, I guess, by express mail.

15    Q    And how do you know that?

16    A    Because this is our procedure.

17    Q    There's nothing on here that indicates that; is

18  that correct?

19    A    No.

20    Q    So it would have been sent, you think, by

21  express mail to the physical address on this letter?

22    A    Yes.  There's nothing in the letter saying by

23  which way it has been sent, but I have information in my

24  file which would be the -- the receipt confirmation.

25    Q    Okay.  Please take a look at Exhibit 1279.

70

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Tell me if you recognize it.

2              (Document handed to counsel and the deponent.)

3              THE DEPONENT:  (Reviewing document.)

4              This is a printout from DomainTools.

5    DomainTools' report for Wendy929.net.

6         Q    BY MR. LOWE:  How do you recognize it?

7         A    Because this is how it looks.  I've been using

8    this on a daily basis.

9         Q    Who made this printout, if you know?

10         A    Our office.

11         Q    Not you personally?

12         A    It might have been -- could have been me.

13         Q    But you don't know?

14         A    No.

15         Q    This sort of information -- let me rephrase

16    that.

17              The information on this document just looks

18    like the kind of information that would be printed out

19    from, what, DomainTools?

20         A    Yes.

21         Q    Okay.  Do you have any way of verifying the

22    accuracy of the information that is contained in this

23    printout?

24              MR. COOMBS:  Any of it or all of it?

25         Q    BY MR. LOWE:  Any of it.

BARKLEY
Court Reporters

1       Q     But that --

2       A     2007.

3       Q     That -- the date you just gave me is not shown

4    on Exhibit 1279, is it?

5       A     It is.

6       Q     No, on the exhibit itself?

7       A     On the exhibit itself it shows September 17,

8    2007.

9       Q     Where?  Where exactly?

10      A     (Indicating.)

11      Q     Okay.  Is that -- is there a different date on

12   the original documents that you were referring to in

13   your counsel's possession there?

14      A     No.  It's the same date, but it's a date when

15   the thumbnail from the website has been captured.

16      Q     Once again, all of this information came from

17   third-party DomainTools?

18      A     Uh-huh, yes.

19      Q     And not from information maintained by Louis

20   Vuitton?

21      A     No.

22      Q     Please take a look at Exhibit 1283.  Identify

23   this if you can.

24            (Document handed to counsel and the deponent.)

25            THE DEPONENT:  (Reviewing document.)

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    A    (Reviewing document.)

2         That's an e-mail notification sent on

3    February 14, 2007 from my office to

4    abuse@managedsg-inc.com, which is the e-mail address for

5    Managed Solution Group, Inc. regarding the website

6    eshoes99.com.

7    Q    Let's take a look at Exhibit 1099.

8         (Document handed to counsel and the deponent.)

9         THE DEPONENT:    (Reviewing document.)

10        Yes.

11    Q    BY MR. LOWE:  Can you identify this exhibit?

12    A    This is Whois query of -- made via DomainTools.

13    Q    Concerning eshoes99.com?

14    A    Concerning eshoes99.com.

15    Q    Did you print this out?

16    A    Nope.

17    Q    Apparently it was also done by this --

18    A    Our friend Jackie.

19    Q    Jackie?

20    A    Yeah.

21    Q    Printed out in America?

22    A    Obviously.

23    Q    Because of the way the pages are numbered?

24    A    Yes.  And it also look to me like this is

25    U.S --

100

BARKLEY
Court Reporters

1    archived since September 26, 2006.  So if you want to

2    access this history, you need to have a paid

3    subscription.

4        Q    Does Louis Vuitton have a paid subscription?

5        A    Yes, it does.

6        Q    What sort of subscription does it have?  Are

7    there different kinds?

8        A    Yes.

9        Q    Do you know what kind of subscription --

10       A    Currently we have a gold membership.

11       Q    Okay.  How long have you had a gold membership?

12       A    I think I renewed the subscription recently,

13   March.  Previously we had silver.

14       Q    March of 2008?

15       A    2008, yeah.

16       Q    Let's take a look at Exhibit 1304.

17            (Document handed to counsel and the deponent.)

18       Q    BY MR. LOWE:  Tell me what this is, if you

19   know.

20       A    This is another query for IP address

21   204.16.197.26.

22       Q    Concerning eshoes99?

23       A    To which eshoes99 resolves at the date of

24   July 20th, 2007.

25       Q    Did you print this out?

112

NIKOLAY LIVADKIN

1    A    No.

2    Q    Okay.  Please take a look at Exhibit 1414.

3         (Document handed to counsel and the deponent.)

4    Q    BY MR. LOWE:  Identify this for me if you can.

5    A    This is a query made through DomainTools,

6    again, for the domain name website eshoes99.com on

7    December 14, 2007.

8    Q    And was this printed out by you or anyone in

9    your office?

10   A    I don't think it has been printed out by me or

11   anyone in my office.

12   Q    Why is that?

13   A    Because it has -- just some American way of

14   presenting the pages, Page 1 of 3 instead of Page une de

15   trois.

16   Q    Just a moment.

17        Please take a look at Exhibit 1415.  Identify

18   this for me, if you can.

19        (Document handed to counsel and deponent.)

20        THE DEPONENT:  It's a reverse IP search made

21   using DomainTools regarding eshoes99.com.

22   Q    BY MR. LOWE:  Did you or anyone in your office

23   print this out?

24   A    No.

25        MR. LOWE:  All right.  This is probably as good

113

NIKOLAY LIVADKIN

1    A    Yes.

2    Q    Please take a look at Exhibit 1014.  Tell me

3  what that is, please.

4         (Document handed to counsel and the deponent.)

5         THE DEPONENT:  (Reviewing document.)

6         That should be -- well, that is the reminder

7  letter, the follow-up letter, of the previous one we

8  just reviewed sent on February 19th, 2007 to Akanoc

9  Solutions, Inc. regarding the website bag925.com.

10   Q    BY MR. LOWE:  This was sent by express mail?

11   A    Sent by express mail.

12   Q    Let's take a look at Exhibit 1055.

13        (Document handed to counsel and the deponent.)

14   Q    BY MR. LOWE:  Identify this if you can.

15   A    (Reviewing document.)

16        This is a printout from DomainTools report

17  query made on bag925.com.

18   Q    And did you print this out?

19   A    No.

20   Q    It was, once again, done by jackie91356?

21   A    Yes.  And it's actually a good example of how

22  Whois database could be not reliable.

23   Q    How is that?

24   A    Well, the information that has been provided --

25  that has been provided by the registrant of the domain

BARKLEY
Court Reporters

1  name to the registrar is just very -- doesn't make any

2  sense.  You see the telephone number is (000) 000-0000.

3  The address is just Guangzhou, Guangdong with some

4  invented zip code.  And the registrant's name doesn't

5  make any sense.

6          So the way this information is reported by

7  DomainTools is actually accurate because DomainTools

8  only queries this information from -- from the registrar

9  database, but then the information that has been

10  collected by the registrar during the registration

11  process is not -- obviously not authentic.

12      Q    So even though -- even if DomainTools reports

13  it correctly, if they get bad information or false

14  information, then -- then what they report is not

15  accurate?

16      A    What they report is accurate because it has

17  been queried from the Whois database, but the

18  information related to the registrant, which has been

19  input by the registrant himself, is obviously not -- not

20  correct.

21      Q    Are you aware of any occasions when hackers

22  change information on any of these databases?

23      A    On which databases, because we are talking

24  about different databases?

25      Q    Well, on any of them that we have talked about

116

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1      Q    So you've never heard of a situation where a --

2    an IP address was falsified --

3      A    No.

4      Q    -- intentionally or by a hacker?

5      A    No.

6      Q    I think I asked you this, but you didn't print

7    this last exhibit, did you?

8      A    No.

9      Q    Okay.  Please take a look at Exhibit 1311.

10          (Document handed to counsel and the deponent.)

11          THE DEPONENT:  Thank you.

12     Q    BY MR. LOWE:  Tell me what it is, if you know.

13     A    It's -- this is a Whois report, Whois query,

14   for the domain name bag925.com, made through Network

15   Solutions, Network Solutions being a domain name

16   registrar.  And it basically provides similar

17   information to the one that DomainTools provide.

18     Q    Can you tell if any -- let me rephrase the

19   question.

20          You did not print this information, did you?

21     A    It doesn't seem that it's me.

22     Q    I'm sorry?

23     A    It doesn't seem like it has been me.

24     Q    Why is that?

25     A    Because it's -- it's written -- the -- the page

118

BARKLEY
Court Reporters

1    numbers are in English.

2        Q    Okay.  So any time the page numbers are in

3    English on these reports, that would indicate it was not

4    printed in your office because the page numbers there

5    would be printed in French?

6        A    I don't know if it's an absolute rule.  If --

7    if -- if my computer is set up and the parameters are

8    modified to English parameters, it would -- it would

9    give you the same, even though it's printed in my

10   office, but I haven't modified the parameters so it

11   should be --

12       Q    So you have not modified the parameters so it

13   would print page numbers in English?

14       A    No.

15       Q    Now, is this report also an example of false

16   information reported on a database, for example, Page 2,

17   telephone numbers, addresses and so on?

18       A    Yeah, it looks like it's doing the exact same

19   registrant -- domain name registrant information as in

20   the previous report.  And to be more specific, this is

21   regarding the domain name Whois information.  I don't

22   want us to create a mixup between the domain name Whois

23   and the IP Whois.

24       Q    All right.  Please take a look at Exhibit 1313.

25            (Document handed to counsel and the deponent.)

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1              THE DEPONENT:   (Reviewing document.)

2      Q     BY MR. LOWE:   Is this another ARIN details

3  report apparently, based on the heading?

4      A     Yes.

5      Q     You did not print this?

6      A     No.

7      Q     It was not printed in your office, as far as

8  you know?

9      A     No.

10      Q     And this -- this was about bag925.com?

11      A     Bag925.com.   Do you want me to identify

12  anything else on this one?

13      Q     No.   Please look at Exhibit 1016 and tell me

14  what this is, please.

15              (Document handed to counsel and the deponent.)

16              THE DEPONENT:   (Reviewing document.)

17              This is a take-down notice addressed by my

18  office to Managed Solution Group, Inc. on February 7,

19  2007 at e-mail address abuse@webhostplus.com.

20      Q     BY MR. LOWE:   And the physical address is --

21      A     Regarding -- website.

22      Q     -- Fort Lee, New Jersey?

23      A     Yep, Fort Lee, New Jersey.

24      Q     This was concerning what domain name?

25      A     Concerning website at atozbrand.com.

120

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Solution Group.

2        Q    All right.  Please look at Exhibit 1022.

3    Identify that, if you will.

4            (Document handed to counsel and the deponent.)

5            THE DEPONENT:  (Reviewing document.)

6            This is a new -- actually, it's the same

7    notification regarding the website atozbrand sent to

8    Managed Solutions Group and this time with a new address

9    and with a specific person, sent on March 30th, 2007,

10   following -- following Rob Holmes' notification that the

11   correct address for Managed Solution Group is on

12   Northport Loop East, Fremont, California.

13           As you remember from our previous discussion,

14   because we didn't -- we weren't receiving a response to

15   the letters sent on the other addresses, we had to ask

16   Rob Holmes to check all the information -- to

17   double-check all the information and provide us with --

18   with the correct address for this company.

19       Q    BY MR. LOWE:  Please look at Exhibit 1041.

20           (Document handed to counsel and the deponent.)

21           THE DEPONENT:  (Reviewing document.)

22       Q    BY MR. LOWE:  Tell me what this is, if you

23   know.

24       A    This is a printout from -- from a Whois query

25   made on DomainTools, not made by me but by -- against,

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    again, the user identifying himself by jackie91356.

2        Q    You don't know who that is?

3        A    I don't know.

4        Q    Okay.  Once again, this is a printout about

5    atozbrand.com?

6        A    Yes.  And there's another document also, Page 2

7    and 4 -- sorry, Page 3 and 4, which is the reverse IP

8    address -- the reverse IP search for IP address

9    204.16.195.49 correspond -- to which resolves domain

10   name atozbrand.com.

11       Q    This particular report shows the various domain

12   names that resolve at the IP address that -- the same IP

13   address that atozbrand uses at that point in time?

14       A    Correct.

15       Q    And the IP address is what?

16       A    204.16.195.49.

17       Q    It appears the last two pages of this 1041 list

18   approximately 62 different domain names using that same

19   IP address?

20       A    Correct.

21       Q    Do you have any reason to believe that all 62

22   of these domains, these websites, were selling

23   counterfeit products?

24       A    I haven't -- I haven't checked them.

25       Q    So you have no idea one way or the other; is

125

BARKLEY
Court Reporters

1      A    Many.

2      Q    -- many?

3      A    Yes.

4      Q    Hundreds maybe?

5      A    Yes.

6      Q    Could you have thousands?

7      A    I guess so.

8      Q    Okay.  Please take a look at Exhibit 1426.

9           (Document handed to counsel and the deponent.)

10     Q    BY MR. LOWE:  And tell me what this is, if you

11   know.

12     A    (Reviewing document.)

13          This is a Whois search report printed out from

14   the website, Network Solutions, regarding the website

15   atozbrand.com showing similar information to the one

16   provided by DomainTools, the same type of information.

17     Q    Was this report printed by you or in your

18   office, so far as you know?

19     A    I have no recollection, but the fact that

20   it's -- again, the pages are marked in English suggests

21   that it hasn't been.

22     Q    That it was not printed in your office?

23     A    That it suggests that it hasn't been printed

24   out in our office.

25     Q    Okay.  Please take a look at Exhibit 1427.

127

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

```
 1              (Document handed to counsel and the deponent.)

 2      Q     BY MR. LOWE:  This is apparently an ARIN report

 3  printout based on the title on the document.

 4      A     Based -- yes, regarding the website

 5  atozbrand.com.

 6      Q     And --

 7      A     Resolving to an IP address 207.106.22.177.

 8      Q     Was this printed in your office or by you?

 9      A     I don't believe so.

10      Q     Please take a look at Exhibit 1428.

11              (Document handed to counsel and the deponent.)

12              THE DEPONENT:  (Reviewing document.)

13              This is --

14              MR. COOMBS:  No, there's not a question,

15  Nikolay.

16      Q     BY MR. LOWE:  Please identify it if you can.

17      A     This is an affidavit of authenticity signed by

18  Mr. John Cassillo, one of my colleagues working out of

19  our New York office.

20      Q     What was the purpose of this document, as far

21  as you know?

22      A     Purpose of this document was to certify that a

23  product that he has inspected is a counterfeit product.

24      Q     Does Mr. Cassillo routinely make such

25  determinations?
```

128

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Q    Please take a look at Exhibit 1025.  Is this

2    the e-mail to which 1024 was attached?

3         (Document handed to counsel and the deponent.)

4         THE DEPONENT:  (Reviewing document.)

5         Yes, it is.

6    Q    BY MR. LOWE:  Okay.  I'm going to show you

7    Exhibit 1027.  Tell me what this is, if you can.

8         (Document handed to counsel and the deponent.)

9         THE DEPONENT:  (Reviewing document.)

10        This is the reminder letter, follow-up letter,

11   of the previous -- previous one, Exhibit 1025, sent on

12   March 19, 2007 to Akanoc Solutions, Inc.

13   Q    BY MR. LOWE:  What's --

14   A    Regarding the website ape168.com.  It has an

15   attachment, which is actually the same letter as the one

16   in Exhibit 1025.

17   Q    Please look at Exhibit 1038 and tell me what

18   this is, if you know.

19        (Document handed to counsel and the deponent.)

20        THE DEPONENT:  (Reviewing document.)

21        This is the printout of DomainTools query for

22   the website ape168.com.

23   Q    BY MR. LOWE:  Did you make this printout?

24   A    No.

25   Q    This, once again, was done by this jackie91356?

132

NIKOLAY LIVADKIN

1      A     Correct.

2      Q     Thank you.  Please look at Exhibit 1039.

3            (Document handed to counsel and the deponent.)

4      Q     BY MR. LOWE:   Identify this one if you can.

5      A     (Reviewing document.)

6            This is -- this is a printout of a Whois query

7   made by -- made through Network Solutions regarding the

8   website ape168.com.

9      Q     Did you do this printout?

10     A     I don't remember.

11     Q     Please look at Exhibit 1317 and identify that

12  for me, if you can.

13           (Document handed to counsel and the deponent.)

14           THE DEPONENT:   (Reviewing document.)

15           This is the printout of a Whois query made

16  through Network Solutions regarding domain name

17  ape168.com.

18     Q     BY MR. LOWE:   This was also not printed by you

19  or at your office?

20     A     I don't think so.

21     Q     Please look at Exhibit 1318.

22           (Document handed to counsel and the deponent.)

23     Q     BY MR. LOWE:   Tell me what it is, if you know.

24     A     (Reviewing document.)

25           This is the printout of -- of ARIN details

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    regarding domain name ape168.com resolving to the IP

2    address 61.134.26.152.

3        Q    This was not printed by you?

4        A    I don't think so.

5        Q    Please look at Exhibit 1470.

6             (Document handed to counsel and the deponent.)

7        Q    BY MR. LOWE:  I will represent this is a copy

8    of the Complaint filed by Louis Vuitton Malletier in

9    this case.

10            MR. COOMBS:  Without the exhibit, I think.

11            MR. LOWE:  Yes, there is no exhibit.

12            MR. COOMBS:  You're right.

13       Q    BY MR. LOWE:  Have you seen this before?

14       A    Yes.

15       Q    And your company authorized the filing of this

16   Complaint?

17       A    Yes.

18       Q    Would you please look at Page 10, Paragraph 31

19   in particular.

20       A    (Witness complies.)

21       Q    Paragraph 31, would you agree, lists certain

22   websites that this Complaint alleges are infringing the

23   copyrights or trademarks of Louis Vuitton, including

24   atozbrand.com, bag925.com, ape168.com, Wendy929.net and

25   eshoes99.com; is that correct?

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

```
 1   have not been produced?

 2         MR. COOMBS:  We've produced everything -- all

 3   of the notices that were sent to the plaintiff, of which

 4   we're aware.

 5         MR. LOWE:  All right.

 6         MR. COOMBS:  That was such a final gesture.

 7   You'd think we might get out of here before the rush

 8   hour or something.

 9         MR. LOWE:  I wouldn't bet on that.  Sorry.

10   Q     There are one or two other questions I have.

11   Mr. Livadkin, what information does plaintiff have

12   showing -- what evidence, I should say, does the

13   plaintiff have showing that Akanoc Solutions, Inc.,

14   Managed Solutions Group, Inc., or Steven Chen -- I'll

15   refer to those in the future as "the defendants in this

16   case" -- that any of them had any knowledge of

17   infringement by any of the websites that were listed in

18   the Exhibit A that you looked at earlier?

19   A     Numerous attempts to contact these companies

20   and individual reception confirmation for the letters

21   that have been sent by express mail.  I believe we

22   have -- we have also confirmation by Steve Chen that he

23   has received a letter.  That's it.

24   Q     So if I understand what you're saying, the

25   evidence would be limited to correspondence from Louis
```

                                138

BARKLEY
Court Reporters

1    Vuitton to the defendants about allegedly infringing

2    websites?

3        A    Yes.

4        Q    Outside of letters sent by Louis Vuitton, do

5    you have any reason to believe -- by "you" I mean the

6    company -- have any reason to believe that any of the

7    defendants knew that any infringement was going on on

8    these websites that are listed in the 67 websites in

9    Exhibit A or the five websites listed in the Complaint?

10       A    I remember that we -- we -- we searched on

11   Internet the corporate names, Managed Solutions Group

12   and Akanoc, and there were many discussion boards that

13   were identifying these two companies that -- what we

14   call bulletproof hosts.

15       Q    What does that mean?

16       A    A bulletproof host is a -- is a -- is a host

17   that would not respond to -- to notifications from

18   trademark owners to preserve the hosting of its clients,

19   customers.

20       Q    So by "bulletproof," you mean nonresponsive?

21       A    Correct.

22       Q    Let me go back to a question that I meant to

23   ask earlier.

24            You've testified about various take-down

25   notices that you sent certainly and Mr. Coombs has

                              139

                     NIKOLAY LIVADKIN                    BARKLEY
                                                      Court Reporters

1      Q      Do you have any understanding as to how many

2  websites are operating on the servers or the -- or using

3  the IP addresses assigned to the defendants in this

4  case?

5      A      I have no precise idea.

6      Q      Do you understand from testimony that has been

7  provided by the defendants that approximately 1500

8  servers are used in their business?

9      A      I'm sure there's a high number as it is the

10  case for all -- all other major hosting companies.

11  We're dealing with -- with dozens of hosting companies

12  on a daily basis.  And some of them are much larger

13  players than Akanoc and MSG, such as Go Daddy, for

14  example.  They -- they host probably hundreds of

15  thousands of websites.

16     Q      Do you understand how many IP addresses are

17  assigned to either Akanoc or Managed Solutions?

18     A      I don't know that.

19     Q      If they have assigned to them approximately

20  30,000 IP addresses, would you agree that there's a

21  potential for a very large number of websites that could

22  use those addresses?

23            MR. COOMBS:  Calls for speculation.

24            Go ahead.

25            THE DEPONENT:  I know that there are again

145

BARKLEY
Court Reporters

1  other ISP's that host uncomparably larger number of

2  websites.  So if you're implying that the defendants

3  host so many websites that they have no ability to -- to

4  fulfill their obligations as a -- as a hosting company,

5  I can respond to that that there are other ISPs that

6  have much larger activity and they fulfill these

7  obligations very consciously (sic).

8      Q    BY MR. LOWE:  What obligations do you believe

9  that Akanoc or Managed Solutions have in this

10 connection?

11     A    Well, first, acknowledge receipt of our

12 e-mails, assign a ticket number for the claim as --

13 almost simultaneously to the reception of the e-mail and

14 then get back to us within the -- the stated period of

15 time in the letter to inform us about the action that

16 has been taken.  And generally following the -- the

17 procedure that has been assigned by the Digital

18 Millennium Corporate Act.

19     Q    And what procedure is that?

20     A    That the Digital Millennium Corporate Act

21 provides that an ISP should take -- upon notification

22 from a trademark owner, should -- should take -- should

23 take steps to -- to prevent the notified infringement

24 from -- from -- how to say in English? -- from

25 continuing.

146

BARKLEY
Court Reporters

1          MR. LOWE:  Back on the record, please.

2     Q    Mr. Livadkin, I'm going to ask you some

3  questions again about the defendants in this case.  And

4  can we agree that when I talk about the defendants,

5  we're talking about Akanoc Solutions, Inc., Managed

6  Solutions Group, Inc., and Steve Chen?

7     A    Yes.

8     Q    Okay.  What evidence does Louis Vuitton have

9  that any of the defendants induced or caused infringing

10  conduct on the part of website operators?

11     A    I don't know.

12     Q    All right.  What evidence does Louis Vuitton

13  have that any of the defendants materially contributed

14  to infringing conduct by any website operator?

15     A    The fact that the infringing websites were not

16  taken down after receiving notification from Louis

17  Vuitton.

18     Q    Anything else?

19     A    The fact that infringing activity continued

20  after filing a civil complaint.

21     Q    What evidence do you have that infringing

22  activity continued after a Complaint was filed in this

23  case?

24     A    Well, we have the different exhibits produced

25  in -- in support of the Complaint regarding the five

                         154

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1  websites that we previously reviewed.  These are --

2      Q    The ones that were attached to the Complaint?

3  Are you talking about exhibits attached to the

4  Complaint?

5      A    Yes.

6      Q    Anything else?

7      A    That's it.

8      Q    Since the Complaint was filed, what evidence

9  does Louis Vuitton have that any infringing -- that any

10  of the defendants materially contributed to infringing

11  activity or conduct by any website operator?

12      A    Isn't that the same question?

13      Q    I thought I was asking a different question,

14  but let me try and clarify it.

15          You mentioned that certain evidence included

16  exhibits to the Complaint.  So now I'm asking, after the

17  Complaint was filed, what evidence does Louis Vuitton

18  have that any of the defendants materially contributed

19  to infringing conduct after the Complaint was filed?

20          MR. COOMBS:  Jim, I'm going to make an

21  objection.  And rather than doing it every question, if

22  you're okay, it calls for conclusion and the defendant

23  (sic) hasn't had the benefit of reviewing all of the

24  defendants' document production and testimony and so

25  forth.


155

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1          So subject to that, I'm happy to let him answer

2     as best he can.

3          Q    BY MR. LOWE:  Can you answer that question?

4          A    We have the same supporting documentation as

5     the -- as the one that has been produced with the

6     Complaint.

7          Q    And nothing beyond what was produced with the

8     Complaint?

9               MR. COOMBS:  Jim, I don't have to restate my

10     objection each time?

11              MR. LOWE:  No.

12              MR. COOMBS:  Thank you.

13              THE DEPONENT:  No.

14         Q    BY MR. LOWE:  What evidence does Louis Vuitton

15     have that any of the defendants took active steps to

16     encourage trademark or copyright infringement by any of

17     the websites that were listed on that Exhibit A?

18         A    What is Exhibit A?

19              (Document handed to the deponent.)

20         Q    BY MR. LOWE:  And this is Exhibit which?  14-?

21              MR. COOMBS:  Attached to 1468.

22              MR. LOWE:  B.

23              MR. COOMBS:  B.

24              MR. LOWE:  Yes.

25              THE DEPONENT:  I'm sorry.  Can you repeat your

156

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    have to refer to it again.

2         What evidence does Louis Vuitton have that any

3    of the defendants took steps that were substantially

4    certain to lead to infringing conduct by anyone,

5    including the websites that are listed on Exhibit A to

6    Exhibit 1468B?

7      A    I'm sorry.  May I hear your question again?

8      Q    Certainly.

9         What evidence does Louis Vuitton have that any

10   of the defendants took steps that were substantially

11   certain to lead to infringing conduct by anyone,

12   including the websites that are listed on Exhibit A

13   attached to Exhibit 1468B?

14     A    I -- I'm not able to answer this question

15   about -- without my files.

16     Q    You think there's something in your files that

17   would show that?

18     A    It's possible.

19     Q    But you don't know what it is?

20     A    No.

21     Q    Okay.  What evidence does Louis Vuitton have

22   that any of the defendants actively participated in the

23   sale of infringing goods by any of the websites that are

24   listed in the Complaint or on Exhibit A attached to

25   Exhibit 1468B?

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1      A    I don't think I have any.

2      Q    What evidence does Louis Vuitton have that any

3  of the defendants are directly connected in some way to

4  the infringement by any website listed on Exhibit A to

5  Exhibit 1468B?

6      A    I don't think we have any.

7      Q    What evidence does Louis Vuitton have that any

8  of the defendants created or operated or advertised or

9  otherwise promoted the websites that are listed on

10  Exhibit A to Exhibit 1468B?

11      A    I don't think we have any.

12      Q    What evidence does Louis Vuitton have that any

13  of the defendants advertised an infringing use of its

14  servers or instructed any website operators how to

15  engage in infringing use of its servers?

16      A    May I hear the question again?

17      Q    Certainly.

18          What evidence does Louis Vuitton have that any

19  of the defendants advertised an infringing use of its

20  servers or instructed any website operators how to

21  engage in infringing use of its servers?

22      A    I don't think we have any.

23      Q    What evidence does Louis Vuitton have that any

24  of the defendants had an affirmative intent that their

25  Internet or web hosting services be used to infringe any

159

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1     Q     Well, they could perhaps do it the same way you

2     can.

3     A     Yes.

4     Q     If they know what the website is and they have

5     the -- they actually look at it as a member of the

6     public.

7     A     Yes, exactly.  That's -- I believe that's

8     enough.

9     Q     All right.  What evidence does Louis Vuitton

10    have that any of the defendants intentionally induced or

11    caused the website operators to infringe any rights of

12    Louis Vuitton?

13    A     If an infringing activity continues despite

14    notification and despite filing a civil claim, it makes

15    it a willful infringement, doesn't it?

16    Q     My question was whether Louis Vuitton has any

17    evidence of an intentional inducement or cause of

18    infringement.

19    A     Yes.

20    Q     This is not the same as perhaps some conclusion

21    about willful infringement.  What evidence does Louis

22    Vuitton have that any of the defendants intentionally

23    induced or caused the third-party website operators to

24    infringe any rights of Louis Vuitton?

25    A     I don't.

171

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Q    You don't have any information?

2    A    No.

3    Q    That's a "no"?

4    A    That's a no.

5    Q    What evidence, if any, does Louis Vuitton have

6    that any of the defendants provided web hosting services

7    with the object of promoting its use to infringe Louis

8    Vuitton's trademarks or the trademarks of anyone?

9    A    Other -- other than the information that was

10    gathered from -- from -- on Internet, on discussion

11    boards and from -- the information that was provided by

12    our investigator, I don't.

13    Q    And the information on these discussion boards

14    is just of what nature?

15    A    That -- that this -- that defendants were

16    reputated (sic) as bulletproof hosts.

17    Q    Would you agree that that sort of information

18    on the Internet is not particularly reliable?

19    A    Given our history with defendants, it

20    corroborates this information.

21    Q    So you think that the defendants have not

22    responded at all to the complaints of Louis Vuitton and

23    have never responded to any complaint of infringement?

24        MR. COOMBS:  Objection; lacks foundation.

25        THE DEPONENT:  I don't --

172

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1      Q    So Louis Vuitton in fact has no evidence of

2   that, just a conclusion?

3           MR. COOMBS:  Object; mischaracterizes his

4   testimony, argumentative.

5      Q    BY MR. LOWE:  Is that true, you have no

6   evidence to tell me about, you only have a conclusion?

7           MR. COOMBS:  Same objections.

8           THE DEPONENT:  We have the -- what evidences

9   this conclusion is -- is our numerous unsuccessful

10  attempts to -- to address the issue with defendants.

11     Q    BY MR. LOWE:  What evidence does Louis Vuitton

12  have that any of the defendants were willfully blind to

13  ongoing infringement by websites using its servers?

14     A    Well, if we assume that our notifications were

15  received, which they were, and the infringement

16  continued, then we can say that -- that this evidences

17  defendants being blind.

18     Q    So that could be a conclusion based upon that

19  set of circumstances?

20     A    That's a conclusion based on -- based upon the

21  fact that defendants received our notification but did

22  not -- did not take steps as required.

23     Q    What evidence does Louis Vuitton have that any

24  of the defendants directly controlled any of the

25  websites listed on the Complaint or on Exhibit A to

174

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Exhibit 1468B?

2        A    Can you define "direct control"?

3        Q    Well, you can define it any way you like.  Do

4    you have any evidence of any direct control?

5        A    I -- I cannot answer this question if I don't

6    know what it is about.

7        Q    Well, if they operated the websites or that

8    they caused someone else to operate the websites or they

9    somehow manifested control over the websites.

10       A    I have no evidence that they directly operated.

11       Q    Okay.  What evidence does Louis Vuitton have

12   that any of the defendants monitored any of the websites

13   listed in the Complaint or on Exhibit A to

14   Exhibit 1468B?

15       A    I -- I don't know what defendants were --

16   were -- were doing.  I -- I know what they weren't

17   doing, which was causing the websites to -- not to offer

18   infringing products.

19       Q    So you have no evidence that they monitored

20   what these websites were doing?

21       A    I -- they -- they had the ability to, but I

22   don't know if they -- they have done it.

23       Q    So you have no evidence that they had in fact

24   monitored what any of those websites were doing?

25       A    I -- I haven't been there to -- to see that.

NIKOLAY LIVADKIN

BARKLEY
Court Reporters

1    Q    So you have no evidence; is that correct?

2    A    No.  No.

3    Q    What evidence does Louis Vuitton have that any

4    of the defendants had an agency or partnership

5    relationship with any of the websites listed in the

6    Complaint or on Exhibit A to Exhibit 1468B?

7    A    I don't have such evidence.

8    Q    What evidence does Louis Vuitton have that any

9    of the defendants had the ability to bind, legally bind,

10    any operators of any websites listed on the Complaint or

11    on Exhibit A to Exhibit 1468B with any dealings with

12    third parties?

13    A    To legally bind --

14    Q    Yeah.

15    A    -- operators of the website?

16    Q    Yes.

17    A    I have no such evidence.

18    Q    What evidence does Louis Vuitton have that any

19    of the defendants exercised any joint ownership or

20    control over any of the infringing websites listed on

21    the Complaint or on Exhibit A to Exhibit 1468B or any of

22    the products that were sold on those websites?

23    A    I don't have such.

24    Q    What evidence does Louis Vuitton have that any

25    of the defendants had the right or the ability to

BARKLEY
Court Reporters

<pre>
 1              DEPOSITION OFFICER'S CERTIFICATE

 2

 3    STATE OF CALIFORNIA      }
                               }    ss.
 4    COUNTY OF ORANGE         }

 5

 6         I, TAMI L. LE, hereby certify:

 7         I am a duly qualified Certified Shorthand

 8    Reporter in the State of California, holder of

 9    Certificate Number CSR 8716 issued by the Court

10    Reporters Board of California and which is in full force

11    and effect.  (Fed. R. Civ. P. 28(a)).

12         I am authorized to administer oaths or

13    affirmations pursuant to California Code of Civil

14    Procedure, Section 2093(b) and prior to being examined,

15    the witness was first duly sworn by me.  (Fed. R. Civ.

16    P. 28(a), 30(f)(1)).

17         I am not a relative or employee or attorney or

18    counsel of any of the parties, nor am I a relative or

19    employee of such attorney or counsel, nor am I

20    financially interested in this action.  (Fed. R. Civ. P.

21    28).

22         I am the deposition officer that

23    stenographically recorded the testimony in the foregoing

24    deposition and the foregoing transcript is a true record

25                          / / /

                            204
</pre>

BARKLEY
Court Reporters

1    testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3        Before completion of the deposition, a review of

4    the transcript  [x] was  [ ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9    Dated:  May 2, 2008.

10

11

12    _____

13         TAMI L. IE
     Certified Shorthand Reporter No. 8716, RPR

14

15

16

17

18

19

20

21

22

23

24

25

205