1  J. Andrew Coombs (SBN 123881)
   *andy@coombspc.com*
2  Annie S. Wang (SBN 243027)
   *annie@coombspc.com*
3  J. Andrew Coombs, A Prof. Corp.
   517 E. Wilson Ave., Suite 202
4  Glendale, California 91206
   Telephone:  (818) 500-3200
5  Facsimile:   (818) 500-3201

6  Attorneys for Plaintiff Louis
   Vuitton Malletier, S.A.
7

8                    UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

10
                                      )
11  Louis Vuitton Malletier, S.A.,    )    Case No. C 07 3952 JW
                                      )
12                  Plaintiff,        )    OPPOSITION OF PLAINTIFF LOUIS
            v.                        )    VUITTON MALLETIER, S.A. TO
13                                    )    DEFENDANTS' MOTION FOR
    Akanoc Solutions, Inc., et al.    )    SUMMARY JUDGMENT
14                                    )
                    Defendants.       )    Date:    September 8, 2008
15                                    )    Time:   9:00 a.m.
                                      )    Court:  Hon. James Ware
16                                    )
                                      )
17  _____ )

18

19

20

21

22

23

24

25

26

27

28

1
2

## <u>TABLE OF CONTENTS</u>

A.    **INTRODUCTION**…………………………………………………………………...1

B.    **STATEMENT OF FACTS**………………………………………………….....2

      i.   <u>Summary</u>……………………………………………………………..2

     ii.   <u>The Underlying Direct Infringement</u>……………………………………..3

    iii.   <u>The Plaintiff's Notices</u>…………………………………...…………..4

    iv.   <u>The Defendants' Control and Inaction</u>…………………………………...5
                 a.   The ISP Defendants' Control …………………………....5
                 b.   The ISP Defendants' Inaction……………………………6
                 c.   Defendant Steven Chen………………………….………..8

C.    **ARGUMENT**…………………………………………..……………8

      i.   <u>The Standard for Summary Judgment</u>……………………………….....8

     ii.   <u>Plaintiff Claims Liability for Secondary, not Direct, Liability</u>………..…...10

    iii.   <u>Defendants Have Not Met Their Initial Burden on the Underlying Direct Infringement of Plaintiff's Copyrights and Trademarks</u>…………………...11

    iv.   <u>Defendants Have Not Met Their Initial Burden on Plaintiff's Claims for Contributory Copyright or Trademark Infringement</u>………………….…...11
                 a.   Contributory Copyright Infringement………………...12
                 b.   Contributory Trademark Infringement………………...15

     v.   <u>Defendants Have Not Met Their Initial Burden on Plaintiff's Claims for Vicarious Copyright or Trademark Infringement</u>…………………………17
                 a.   Vicarious Copyright Infringement …………………..…17
                 b.   Vicarious Trademark Infringement…………………….19

    vi.   <u>Genuine Issues of Material Fact Preclude Summary Judgment</u> …..……...21

    vii.   <u>DomainTools.com and Other Website Printouts Are Admissible and Defendants' Complete Disregard for the Discovery Process Does Not Equate to Plaintiff's Failure to Prove its Case</u>…………………………..…23

D.    **CONCLUSION**………………………………………………………………24

1

## TABLE OF AUTHORITIES

2

## CASES

3

A&M Records, Inc. v. Napster, Inc.,
239 F.3d 1004, 1021 (9th Cir. 2001)……………………………………………………13, 14, 17, 18

4

5

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). …………………………….8-9

6

Celotex Corp. v. Catrett,
477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)…………………………………..9

7

8

Ellison v. Robertson, et al.,
357 F.3d 1072, 1078 (9th Cir. 2004)…………………………………………………………………17-18

9

First National Bank of Arizona v. Cities Service Co.,
391 U.S. 253, 288-89 (1968)……………………………………………..……………………………9

10

11

Fonovisa, Inc. v. Cherry Auction, Inc., et al.,
76 F.3d 259, 264 (9th Cir. 1996)……………………………………………………………....14-15, 18

12

Government Employees Insurance Company v. Google, Inc., et al.,
330 F. Supp. 2d 700, 705 (E.D. Va. 2004)…………………………………………………………20

13

14

Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,
955 F.2d 1143, 1148-49 (7th Cir. 1992)…………………………………………………………….15

15

In re Homestore.com, Inc. Securities Litigation,
347 F. Supp. 2d, 769, 781 (C.D. Cal. 2004)……………………………………………………..23

16

17

Lockheed Martin Corp. v. Network Solutions, Inc.,
194 F.3d 980, 984 (9th Cir. 1999)…………………………………………………………………15-16

18

Lyons Partnership, L.P. v. Morris Costumes, Inc., et al.,
243 F. 3d 789, 800 (4th Cir 2001)……………………………………………………………...12

19

20

Maljack Productions, Inc. v. GoodTimes Home Video Corp.,
81 F.3d 881, 889 fn. 12 (9th Cir. 1996)……………………………………………………………23

21

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)………………………………………9

22

23

Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd., ("Grokster"),
545 U.S. 913, 930 (2005)……………………………………………………...……12, 13, 17

24

Moose Creek, Inc. v. Abercrombie & Fitch, Co.,
331 F. Supp. 2d 1214 (C.D. Cal. 2004)…………………………………………………………24

25

Perfect 10, Inc. v. Amazon.com, Inc., et al.,
508 F.3d 1146, 1169-1172 (9th Cir. 2007)……………………………………………………12-15, 17

26

27

28

Perfect 10, Inc. v. Visa International Service Association, et al.,
494 F.3d 788, 789-90, 803-807 (9th Cir. 2007) ……………………………………………..10, 14, 16, 19

Religious Technology Center v. Netcom On-Line Communication Services, Inc.,
907 F. Supp. 1361, 1374 (N.D. Cal. 1995)……………………………………………………………13

Sealy, Inc. v. Easy Living, Inc.,
743 F.2d 1378, 1382 (9th Cir. 1984)………………………………………………………………...16

Segal v. American Tel. & Tel. Co.,
606 F.2d 842, 845 (9th Cir. 1979)…………………………………………………………………...17

Valandingham v. Bojorquez,
866 F.2d 1135, 1137 (9th Cir. 1989)………………………………………………………………...9

Wilkerson v. McCarthy,
336 U.S. 53, 62 (1949)…………………………………………………...……………………………9

## RULES

Fed. R. Civ. P. 56(c)………………………………………...…………………………………8

Fed. R. Civ. P. 56(e) …………………………………………………...……………………9

Fed. R. E. 901(a)…………………………………………………………………………24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") submits this Opposition to the Motion for Summary Judgment of Defendants Akanoc Solutions, Inc. ("Akanoc"), Managed Solutions Group, Inc. ("MSG") (collectively the "ISP Defendants") and Steven Chen ("Chen"). The ISP Defendants and Chen are collectively referred to herein as Defendants.

## A.    **INTRODUCTION**

Defendants' desperation to avoid trial on the merits is amply evidenced by their repeated mischaracterization of the relevant legal standards and of the available evidence illustrating their deplorable procedures (or, more accurately, lack of any procedures) in handling notices of infringement transmitted by Louis Vuitton. Defendants' arguments fail for a variety of reasons and the propriety of denial of this motion for summary judgment is apparent in light of the record.

Among the more egregious errors in the Defendants' motion include:

(i)     The statement that Defendants' own direct infringement must be proved in order to state a claim for secondary liability when it is the admitted infringement by third parties which is relevant to the analysis of Plaintiff's claims for secondary liability. Defendants' Memorandum in Support of Summary Judgment (hereinafter "Supporting Memo."), 3:14- 4:1, 5:1- 13, 16:16- 22, 17:15- 17;

(ii)    The suggestion that only intentional inducement of infringement can support a claim for contributory trademark infringement when all of the relevant authority shows that the continued provision of goods and services with knowledge of infringement can also establish contributory trademark liability apart from intentional inducement. Id. at 2:15;

(iii)   The continued assertion of irrelevant federal statutes to justify Defendants' inaction, when those same arguments have already been rejected by this Court in a discovery dispute, as a result of which the

Defendants are precluded from re-litigating those issues. Id. at 12:2-13:20, 24:14-17;

(iv) The articulation of post-litigation procedures as justification for denying claims based upon pre-litigation inaction when those procedural changes only evidence the greater (although still insufficient) degree of control the ISP Defendants can exercise when they elect to do so. Id. at 10:16-28, 17:27- 18:7; and

(v) The mischaracterization of objectionable testimony by Plaintiff's 30(b)(6) witness when that testimony was expressly offered subject to objections fails to disprove the wealth of other evidence which satisfies the claims. Id. at 3:15, 5:26-6:2, 6:11-12, 11:22-23, 14:10-17 15:3-6, 17:9, 17:20-27, 19:3-4, 19:12-13, 21:4-7, 22:1-3, 23:7-9, 23:24-27, 24:23- 25:4.

As set forth more fully below, there is abundant evidence that the Defendants' reckless and wanton provision of goods and services on a wholesale basis to those engaged in offshore illegal enterprises targeting the U.S. market supports a finding of liability, and, presents disputed issues of material fact warranting denial of summary judgment.

**B.    STATEMENT OF FACTS**

  **i.    Summary**

Plaintiff claims Contributory and Vicarious Trademark and Copyright Infringement against Defendants for failing to act even when repeatedly put on notice of abuse using its servers and Internet services. No claims for direct infringement are brought against the Defendants in this action. Rather, Plaintiff's claims for secondary liability are predicated upon undisputed underlying acts of direct infringement by website operators whose sites were hosted on servers admittedly owned and controlled by Defendants, and, to which Internet traffic is directed by Internet routers owned and controlled by Defendants.

Plaintiff identified a number of websites promoting, offering and selling counterfeit Louis Vuitton merchandise which were hosted by Defendants based on multiple corroborating sources of

information.  Declaration of Nikolay Livadkin ("Livadkin Decl.") at ¶¶ 11-19; Declaration of J. Andrew Coombs ("Coombs Decl."), ¶ 3, Ex. B, 34-37 (hereinafter "Holmes Depo.").  These websites were operated from China and offered infringing goods located in China to be shipped to consumers located in, among other places, the United States.  Declaration of Robert L. Holmes ("Holmes Decl."), ¶¶ 3-15.  Despite alleged server "crashes" and non-compliance with discovery procedures, Louis Vuitton demonstrates that Defendants hosted websites from which counterfeit products were sold and that they continued to host such sites long after notices were transmitted by or on behalf of Plaintiff.  Coombs Decl., ¶ 6.

ii.    **The Underlying Direct Infringement**

The ISP Defendants provide Internet goods and services which consists of, among other things, routers linking Internet traffic to designated websites and servers (hardware) on which Internet content can be accessed and stored.  Coombs Decl., ¶ 2, Ex A, 39:4-23, 43:14-44:11, 47:15-49:23, 58:8-59:1 (hereinafter "Chen Depo.").  That certain of Defendants' websites used these goods and services to promote, offer, display and sell counterfeit Louis Vuitton merchandise is not disputed.  Indeed, by their Motion for Summary Judgment, Defendants raise no argument to challenge the underlying elements of Plaintiff's claims of direct infringement on the websites which are implicated in this action.

Defendants do not contest Louis Vuitton's ownership rights in its copyrights and trademarks.  Supporting Memo., 3:8- 9, 16:12.  Defendants also admit that some infringing use of Louis Vuitton's properties has occurred, Supporting Memo., at p. 3:16, and that "a small fraction of Websites hosted by their customers may from time to time contain objectionable content, including possibly offering counterfeit goods for sale."  Defendants' Opposition to Motion to Compel (Docket Document 37) at 1:25- 2:1.

Even were the Defendants to try to dispute the underlying infringement occurring on the underlying websites, evidence submitted in support of this Opposition easily demonstrates the existence of disputed issues of material fact, namely: (i) Internet websites hosting offers of product embodying Louis Vuitton's underlying intellectual property rights; (Livadkin Decl., ¶¶ 12-19,

Holmes Decl., ¶¶ 3-15, Holmes Depo., 167:17- 168:13); (ii) the infringing nature of the offers appearing on those websites (Livadkin Decl., ¶ 5); and (iii) the fact such websites were hosted on servers owned by Defendants and to which Internet traffic was directed through Internet routers owned by Defendants (Holmes Decl., ¶¶ 3-15).

### iii.    The Plaintiff's Notices

Despite statutory formalities enacted ten years ago and despite industry practices following upon the enactment of those formalities, prior to the lawsuit, the ISP Defendants filed no notice with the United States Copyright Office to designate an agent for service of notices of infringement conforming with the Digital Millennium Copyright Act ("DMCA").  Chen Depo., 111:8-13; Livadkin Decl., ¶ 11.  Despite statutory requirements that an ISP publish terms of service which, among other things, specify the manner in which notices of infringement can be served, Defendant MSG maintained no active website, let alone the required terms of service.  Livadkin Decl., ¶ 11.[1]

Plaintiff sent multiple notices, by email and by hand delivery, to all known addresses for Defendants regarding a number of infringing websites.  Id., ¶¶ 11-17.  The reminder notices were only sent because the infringing offers remained accessible using Defendants' goods and services. Id.[2]  No response to any of Louis Vuitton's pre-litigation notices was ever received by Louis Vuitton.  Id.

---

[1] It appears that this dereliction compounded the difficulties associated with providing more efficient notice because certain of Louis Vuitton's notices were first transmitted after Defendant MSG spun off part of its business to Defendant Chen's erstwhile partner, Jacques Pham.  Chen Depo., 32:15-34:19, 35:1-35:23.  Because Mr. Pham's "Managed Solutions Group" operated with the same name, maintained a website and was historically associated with IP addresses assigned to Defendant MSG, a couple of Louis Vuitton's notices were addressed to the spun off entity instead of Defendant MSG.  Livadkin Decl., ¶ 11.  This error was corrected and subsequent notices were sent to Defendant MSG's address of record (Livadkin Decl., ¶¶ 12-19) although it appears those notices received no more attention than those addressed to Mr. Pham's business.

[2] Defendants do not dispute transmission of the demands.  Defendants do dispute receipt of those transmitted to Mr. Pham, but do not and cannot dispute receipt and, therefore, notice, concerning all others.  Coombs Decl., Ex. E (sample emails transmitted in response to post-litigation demands).

iv.  **The Defendants' Control and Inaction**

a.        **The ISP Defendants' Control**

Defendants do not dispute that the ISP Defendants own servers, maintain a server "environment" and operate a business using those servers in northern California accepting payment for use of their equipment and personnel.  Chen Depo., 30:13-16, 39:4-23, 43:14-44:11, 45:4, 47:15-49:23, 58:8-59:1.

The ISP Defendants hold ultimate control over those servers as they can, and do, pull the plug, "disable", "terminate" or "discontinue" service due to unacceptable behavior of which Defendants are notified by third parties, including instances where noncompliant abusers move IP Addresses within Defendants' assigned IP blocks.  Chen Depo., 28:13-29:13, 70:19-71:15, 83:5-84:9, 136:4-19; Coombs Decl., ¶ 5, Ex D (hereinafter "Lone Depo."), 24:6- 25:18; Coombs Decl., ¶ 4, Ex C (hereinafter "Luk Depo."), 14:20-22, 21:19-22:12, 35:19-36:1, 56:1-22, 66:7-67:22, 70:3-14, 73:10-74:6.  The "unplugging" process simply requires an email and about 30 minutes.  Luk Depo., 22:7-12; Chen Depo., 71:10-15, 84:10-16.  Defendants routinely inspect website content and also request password information from their "customers" to inspect and insure that complained of, offending material has been removed before reinstituting service.  Chen Depo., 23:14-23, 127:1-10, 130:4-133:12, 136:9-15; Luk Depo., 65:6-10.

Additionally, Defendants "re-set" passwords when servers are 'returned' or 'abandoned.' Fn. 3 of Magistrate Judge Lloyd's Order.  However, Defendants kept almost no records despite urging others to do so, and did not register an agent with the Copyright Office to receive complaints.  Luk Depo., 19:8-23, 31:12-32:5, 75:15-76:19; Chen Depo., 93:1-25, 111:1-13. Defendants also routinely monitor bandwidth usage of their servers, inspect content on their servers in response to abuse complaints from third parties, and in some instances, take extra precaution for certain "big" companies like Microsoft, eBay and PayPal.  Luk Depo., 22:13-24:4, 26:2-8, 49:22-24, 65:6-10, 66:4-67:22; Chen Depo., 23:14-23, 64:4-65:23, 127:1-10, 130:4-133:12, 136:9-15.

1

2

### b.    The ISP Defendants' Inaction

3

Despite the admitted control over server and router operations as evidenced by the

4

testimony outlined above, Defendants claim that they were justified in their complete inaction in

5

response to Louis Vuitton's notices.  They make this claim based on an alleged third-party arm's

6

length relationship with distributors located in the People's Republic of China.  Defendants use the

7

terms "customers", "distributors", "resellers" and "partners" interchangeably which alone creates a

8

disputed issue of material fact concerning the true nature of this relationship and the benefits

9

derived from this relationship.  Lone Depo., 14:9-16:21.

10

Evidence in support of and in opposition to this motion demonstrate that, although the ISP

11

Defendants did nothing to remove themselves from the chain of communication for abuse

12

complaints, specifically including notices of infringement, they also did nothing more than – at best

13

– forward those abuse complaints to the party associated with the relevant IP address.  Chen Depo.,

14

24:12- 25:13; Luk Depo., 20:15- 21:6.  The evidence shows that even where a follow up notice was

15

transmitted to the ISP Defendants advising them that the underlying abuse persisted, no different

16

action was taken.  Luk Depo., 31:6-15.  No different action was taken where a distributor merely

17

transferred the abusive activity to a different server owned by the ISP Defendants.  Even after the

18

litigation was filed, the evidence demonstrates that as much as a month could elapse before any

19

action other than a simple email notification would occur.  Coombs Decl., Ex. E.

20

Defendants' stated "protocol" outlined in their motion for summary judgment: to be "more

21

careful" with abuse complaints regarding "illegal issues" includes "pinging" domain names to track

22

IP Addresses using an internet program that is available to the public.  Supporting Memo., 7:6-14;

23

Luk Depo., 30:9-24, 75:24-76:15 (instructions to be "more careful" were given around September

24

2007); Chen Depo., 85:22-86:2 (on a follow up question about company policy, Defendant testified

25

that did not think there was a "general policy" on handling of abuse complaints).  Plaintiff similarly

26

used and continues to use the "pinging" method to track domain names' IP Addresses to

27

Defendants and second and triple sourced the resulting hosting information, taking more care in

28

identifying Defendants than Defendants did to identify their "customers" internally.  Livadkin
Decl., ¶ 8; Holmes Depo., 112:24-122:3.

Defendants can show no action was taken in response to Louis Vuitton's complaints prior
to litigation.  Luk Depo., 52:12-19; Chen Depo., 100:13-104:12, 108:12-22, 109:12-110:10.
Defendants' stated reformed procedures after the lawsuit was filed only show the amount of control
they have always possessed but chose not to exercise in the past.  Plaintiff's evidence demonstrates
that, whatever action or inaction followed from its notices, the underlying infringement which was
the subject of those notices persisted despite such notifications.  Livadkin Decl., ¶¶ 12-17.  The
alleged "crash" of email servers which purportedly occurred shortly before the lawsuit was filed
destroyed critical information predating the lawsuit.  Supporting Memo., 8:13-16; Chen Depo.,
108:12-22.  Though Defendant Chen states he "immediately" searched for the websites specifically
listed in the complaint after service of the lawsuit, Chen did not explain why Defendants piled
unopened mail, specifically including correspondence from Louis Vuitton, on an unoccupied desk
at Defendants' place of business for nearly an entire year.  Chen Depo., 100:13-104:12, 109:12-
111:7.  The whereabouts of the neglected mail is, apparently, still unknown.  Id., 110:7-10.
Defendants keep no files of abuse complaints or repeat infringers.  Luk Depo., 19:8-11, 31:12-32:1
(employee's faulty memory is her only record, to illustrate, Luk stated "How can I remember so
many things?").  Instead, Defendants have a history of erasing data and point to the purported
"crash" as the overused excuse for a lack of production of any documents relating to any website
content or pre-litigation related abuse complaints from Plaintiff, period.  Chen Depo., 40:3-9,
92:15-93:25, 108:12-22; Coombs Decl., ¶ 9; Supporting Memo, 8:15.

Defendants have been notified since as early as November of 2007, of additional specified
websites, most of which were the subject of discovery requests to and from Defendants and
deposition questions by Defendants which produced thousands of pages of responsive documents
by Plaintiff.  Coombs Decl., ¶ 8.  Louis Vuitton continued to bring websites to Defendants'
attention which were located on routed through IP Addresses allocated to Defendants and/or

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

located on servers owned, operated and maintained by the Defendants as discovered by pinging those websites in the manner described in the Supporting Memo.  Livadkin Decl., ¶¶ 8, 18.

Defendants' inaction allowed websites which were illegally reproducing, displaying, and distributing counterfeit goods to reside on the Defendants' servers to which Internet traffic was directed by the ISP Defendants' routers.  Coombs Decl., ¶ 6; Livadkin Decl., ¶¶ 11-19.  Some of the repeat infringers were Defendants' best "customers."  Coombs Decl., ¶ 6; Chen Depo., 60:17-24, 143:16-144:12.  Despite notice of infringement, Defendants appear to continue to do business with these same individuals, and allow them to continue to use Defendants' product and services without recourse.  Defendants' own policy of penalizing abusers is rarely enforced or simply not enforced.  Luk Depo., 33:22-34:12, 62:5-8; Chen Depo., 67:18-69:17.  Defendants enjoy the benefits of infringement and do nothing to stop it despite a right and ability to do so.

<h3 style="text-align:center">c.        Defendant Steven Chen</h3>

Defendant Chen is the sole owner and General Manager of the ISP Defendants.  Chen Depo., 7:18-8:13, 34:14-19.  As such, Chen is engaged in the day-to-day management of almost all aspects of the ISP Defendants' businesses.  Among those areas over which Chen plays an active role is the response to abuse complaints, specifically including responses to notices of infringement addressed to the "abuse" email address at each of the ISP Defendants.  Chen Depo., 22:24- 23:5.  Chen's testimony is that he actively reviews the abuse email box, selectively handles notices addressed to that mailbox and addresses follow up above and beyond the ISP Defendants more usual forwarding of complaints to China-based "distributors" for handling.  Id.

## C.    ARGUMENT

### i.    The Standard for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor.  Anderson v.

1    Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  If the evidence

2    is such that a reasonable jury could return a verdict for the nonmoving party, summary judgment is

3    not proper.  First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968).  "All that is

4    required is that sufficient evidence supporting the claimed factual dispute be shown to require a

5    jury or judge to resolve the parties' differing versions of the truth at trial."  Id. at 288-89.  If

6    reasonable minds could differ as to the import of the evidence, summary judgment is not proper.

7    Wilkerson v. McCarthy, 336 U.S. 53, 62 (1949).  The judge's function at the summary judgment

8    stage is not to weigh the evidence and determine the truth of the matter but only to determine

9    whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.

10        The party moving for summary judgment bears the initial burden of establishing the

11   absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that

12   negates an essential element of the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S.

13   317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  Alternatively, the movant can demonstrate

14   that the non-moving party cannot provide evidence to support an essential element upon which it

15   will bear the burden of proof at trial.  Id.

16        Once the moving party meets its initial burden, the non-moving party must "go beyond the

17   pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and

18   admissions on file,' [and] designate 'specific facts showing that there is a genuine issue for trial.'"

19   Id., 324 (quoting Fed. R. Civ. P. 56(e)).  The non-movant "may not rest upon the mere allegations

20   or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e); Valandingham v. Bojorquez, 866

21   F.2d 1135, 1137 (9th Cir. 1989).  However, any inferences drawn from the underlying facts must

22   be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus.

23   Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

24        Defendants fail to meet their initial burden because they cite inapplicable law and

25   mischaracterize the record.  Their motion should be denied.  Plaintiff introduces ample evidence to

26   demonstrate that there are genuine issues of material fact.  Therefore, Defendants' motion seeking

27   summary judgment should be denied in its entirety.

28

1

2

**ii.    Plaintiff Claims Liability For Secondary, not Direct, Liability**

Defendants' motion is predicated upon a fundamental misstatement of the applicable facts and law.  Inexplicably, although clearly framed as a case of secondary liability for contributory and vicarious liability under the Copyright Act and the Trademark Act, Defendants argue that proof of their *direct* infringement is required to establish liability.  Supporting Memo., 3:14-4:1, 5:1-13, 16:16-22, 17:15-17.  In doing so they rely on one unpublished decision which, when compared with any number of published decisions, including those of this Court, clearly demonstrate that it is the direct infringement by *third parties* whose illegal conduct is aided, abetted, induced or otherwise contributed to or controlled by the *secondarily liable* defendants, that constitutes the relevant analysis.  Perfect 10, Inc. v. Visa International Service Association, et al., 494 F.3d 788, 803-807 (9th Cir. 2007) (referencing underlying acts of unidentified "users", "third parties" and "offending websites" separate and apart from the defendants named in the case law).

These underlying infringements are not disputed by Defendants:

      (i)    Plaintiff owns the relevant intellectual property rights.  Supporting Memo, 3:8-9, 16:12; Livadkin Decl., Ex. A;

      (ii)    Internet websites host offers of product embodying Louis Vuitton's underlying intellectual property rights; (Livadkin Decl., ¶¶ 11-19,  Holmes Decl., ¶¶ 3-15, Holmes Depo., 34:10-37:20);

      (iii)    the offers appearing on those websites are infringing (Livadkin Decl., ¶ 5);

      (iv)    such websites were hosted on servers owned by Defendants and to which Internet traffic was directed through Internet routers owned by Defendants (Livadkin Decl., ¶¶ 8, 11-16, Holmes Decl., ¶¶ 3-15).

Arguments by Defendants concerning the absence of any direct infringement by them are irrelevant and inapplicable and amply demonstrate how fundamentally ill-conceived Defendants' arguments are in support of summary judgment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   **iii.**  **Defendants Have Not Met Their Initial Burden on the Underlying**

       **Direct Infringement of Plaintiff's Copyrights and Trademarks**

   Derivative copyright and trademark liability are predicated upon an underlying direct

infringement and damage – all of which are undisputed BY DEFENDANTS, if only because they

fail to meet their initial burden on these points by misconstruing the applicable law.  Supporting

Memo., 3:14-4:1, 5:1-13, 16:16-22, 17:15-17.  Defendants do not dispute the elements of the

underlying direct infringement by third parties – the operators of websites who counterfeit offers

were hosted on servers and to which Internet traffic was directed through routers owned by

Defendants.

   Defendants do not dispute Louis Vuitton's ownership of its copyrights or trademarks for

purposes of this motion.  Supporting Memo, 3:8-9, 16:12.  Further, Defendants are silent as to the

unauthorized and infringing character of the product offered on the Websites.  Moreover, even

were Defendants foolhardy enough to attempt such arguments, Plaintiff easily meets its burden and

demonstrates the underlying direct liability is proven by the fact that a number of websites were

unlawfully reproducing, displaying, distributing, at times altering but nonetheless selling in

commerce, counterfeit goods using and reproducing Louis Vuitton's valuable properties.  Holmes

Decl. at ¶¶ 3-15; Livadkin Decl., ¶¶ 5, 11-19 (many of the websites were advertising their products

as "replica").  The counterfeiting activities Defendants allowed to continue damage Louis

Vuitton's goodwill and undermine the value of its intellectual properties, among other things.

Livadkin Decl., ¶ 20.  Plaintiff is thus damaged and disputed issues of material fact preclude entry

of summary judgment.

   **iv.**  **Defendants Have Not Met Their Initial Burden on Plaintiff's Claims for**

       **Contributory Copyright or Trademark Infringement**

   Defendants' mischaracterization of the applicable law in support of summary judgment is

matched by their mischaracterization of the relevant record.  First, Defendants point to alleged

post-litigation practices as evidence which (even were it sufficient) cannot immunize pre-litigation

conduct.  The law does not support this conflation of practices and, to the contrary, stated

reformation of protocol in responding to abuse complaints post-litigation demonstrates a degree of control which can be (and should have been) exercised by Defendants all along.[3]  Second, Defendants conveniently ignore numerous parts of the record which amply demonstrate the willful blindness standard for contributory liability which, as outlined below, is not the only standard for secondary liability in this context, nor the only one which warrants imposition of liability on the Defendants herein.[4]

a.        <b>Contributory Copyright Infringement</b>

The Ninth Circuit has stated that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." Perfect 10, Inc. v. Amazon.com, Inc., et al., 508 F.3d 1146, 1169 (9th Cir. 2007) citing the Supreme Court decision of Metro-Goldwin-Mayer Studios, Inc. v. Grokster, Ltd., ("Grokster"), 545 U.S. 913, 930 (2005).  Prior controlling decisions have acknowledged that "services or products that facilitate access to websites throughout the world can significantly magnify the effects" of infringing conduct and that in certain instances, seeking compliance from providers may be the only meaningful way for copyright holders to protect their rights.  Perfect 10, Inc., 508 F.3d at 1172.

Defendants actively marketed their products and services to Chinese based "customers" who wanted to do business in the United States and obtained a reputation for providing dedicated servers in the United States and hosting to counterfeiters.  Holmes Depo., 148:4-20, 153:9-15; Supporting Memo., 4:8, 4:19-22, fn 5; Lone Depo., 11:18-17:23.  However, Defendants are unable to adduce any record of their conduct prior to service of the lawsuit other than stating that the one

_____

[3] Abundant authority supports the proposition that damages and injunctive relief are appropriate notwithstanding later, non-infringing behavior by the Defendants. Lyons Partnership, L.P. v. Morris Costumes, et al., 354 F.3d 789, 800 (4th Cir. 2001) ("voluntary discontinuation of challenged practices by a defendant does not necessarily moot a lawsuit…defendants 'face a heavy burden to establish mootness…because otherwise they would simply be free to "return to [their] old way" after the threat of a lawsuit has passed'…" (and cases cited therein).

[4] Defendants' argument on an "inducement" theory of liability is not applicable as Defendants are not distributing a device or software and are not de-centralized from the infringing activity in any way, as the website content is hosted on servers owned, operated, supervised and monitored by them.

1

2

registered letter they recall receiving was added to a pile of nearly an entire year's worth of

3

unopened mail.  Luk Depo., 52:12-19; Chen Depo., 100:13-104:12, 108:12-22, 109:12-110:10.

4

Plaintiff sent initial notices and when they were ignored, sent "reminder" or follow up notices, all

5

the while the infringing websites remained active and in business as Defendants did not enforce

6

their own policies of police by preference.  Livadkin Decl., ¶¶ 11-18; Luk Depo., 22:1-24:4, 26:2-

7

8, 33:22-34:12, 62:5-8, 65:3-67:22, 68:9-20, 73:3-18 (Louis Vuitton was not a "big" company that

8

Defendants' employee had even heard of); Chen Depo., 23:18-23, 67:18-69:17, 127:1-10, 130:4-

9

133:12, 136:9-19.  Accordingly, the only relevant and admissible evidence is (i) Plaintiff received

10

no response to any of its notices; and (ii) the goods and services of the ISP Defendants continued to

11

be used to facilitate access to the underlying infringing activity notwithstanding its transmission of

12

such notices to the best available addresses made available by Defendants.  Livadkin Decl., ¶¶ 12-

13

18.

14

       A defendant may be liable for contributory copyright infringement if it knew of the

15

infringing activity, and induced, caused, or materially contributed to the infringing conduct of

16

another.  Perfect 10, Inc., 508 F.3d at 1171.  Under Grokster, the Supreme Court found that an

17

actor may be contributorily liable for taking steps that are substantially certain to result in direct

18

infringement, noting that contributory infringement is rooted in tort-law concepts of imputed intent.

19

Id., citing 545 U.S. at 934-35.  On point, the Ninth Circuit has held that "a computer system

20

operator can be held contributorily liable if it has actual knowledge that specific infringing material

21

is available using its system, and can take simple measures to prevent further damage to

22

copyrighted works, yet continues to provide access to infringing works."  Id. at 1172 (citations

23

omitted); see also A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1021 (9th Cir. 2001) (in the

24

context of a provider of Internet access or services, "if a computer system operator learns of

25

specific infringing material available on his system and fails to purge such material from the

26

system, the operator knows of and contributes to direct infringement," finding liability for

27

knowledge, assistance and failure to block access to infringing content); see also Religious

28

Technology Center v. Netcom On-Line Communication Services, Inc., 907 F. Supp. 1361, 1374

(N.D. Cal. 1995) (finding electronic bulletin board operator contributorily liable for failing to delete an infringing post).  Additionally, in the <u>Perfect 10, Inc.</u> case, the Ninth Circuit was not persuaded by the fact that "Google's assistance is available to all websites, not just infringing ones."  508 F.3d at 1172.

Here, Defendants were sent multiple notices over a period of time of infringing conduct occurring on websites hosted by them but did nothing in response.  Livadkin Decl., ¶¶ 11-18; Luk Depo., 52:12-19; Chen Depo., 100:13-104:12, 108:12-22, 109:12-110:10 (putting a registered letter in a pile of unopened mail should constitute an infringing level of inaction for purposes of this analysis); Supporting Memo., 8:10-20 (Defendants can only state that they must have done something contrary to their own employee's testimony that until recently she had never seen a Louis Vuitton complaint before and had never heard of Louis Vuitton.  Luk Depo., 52:12-19, 68:9-20).

Defendants' business of knowingly providing server capacity to "customers" engaged in infringing activity is also consistent with the Ninth Circuit's jurisprudence of finding liability in the case of one who knowingly provides the "site and facilities" for the underlying infringement.  <u>Perfect 10, Inc.</u>, 494 F.3d at 789-90 (discussing findings of liability in <u>Fonovisa, Inc. v. Cherry Auction, Inc., et al.</u>, 76 F.3d 259, 264 (9th Cir. 1996), where flea market proprietor provided environment for sales to thrive and benefitted from the sale of pirated works and <u>Napster</u>, 239 F.3d at 1022, where Napster was found to have materially contributed to users' direct infringement by providing "site and facilities" for that infringement).  In finding against liability in the <u>Perfect 10, Inc. v. VISA</u> case, the Ninth Circuit Court noted that Visa did not **operate the servers on which infringing websites reside**.  <u>Id.</u> at 800 (emphasis added).  Here, such goods and services are precisely among those provided and why Defendants are liable.

Additionally, the counterfeit purchases received from various websites hosted by Defendants indicated Chinese return addresses.  Holmes Decl., ¶¶ 3-15; Livadkin Decl., ¶ 6.  Defendants are known hosts of counterfeiters.  Holmes Depo., 148:4-20, 153:5-11.  Defendants admit they market themselves specifically to Chinese "customers" who want to do business in the

United States and who want to benefit from the dedicated services of Defendants' servers which are located in the United States.  Chen Depo., 20:5-22; Supporting Memo., 4:8, 4:19-22, fn 5; Lone Depo., 11:18- 17:23.  In fact, Defendants' have made a name for themselves in China.  Lone Depo., 14:9-16 (stating that Defendants or their "partners" are the top search result "hits" for "U.S. servers" in Chinese on Google).  Thus, the specialized elements of Defendants' products and services, Defendants' acts to market themselves as an ideal environment for Chinese based businesses who want to do business in the United States, and their history for hosting counterfeiters, is consistent with the reasoning in <u>Fonovisa</u> and <u>Napster</u>, as contributing the site and facilities to an infringer's enterprise.

Defendants' do not meet their burden and disputed issues of material fact preclude liability for contributory copyright infringement.

**b.        Contributory Trademark Infringement**

Secondary liability for trademark infringement is about control.

Defendants rent IP Addresses on their servers but unquestionably retain physical possession of the servers and thus the content that resides on the servers.  Like a landlord, Defendants have a legal duty to control illegal activities on their "real estate" (IP Addresses) or in their "environment" and liability arose when Defendants failed to take action as to illegal use of their servers, even when put on notice.  Chen Depo., 45:4 (describing server space as "environment"); <u>see Lockheed Martin Corp. v. Network Solutions, Inc.</u>, 194 F.3d 980, 984 (9th Cir. 1999) (discussing extent of control and monitoring of the instrumentality used by a third party to infringe drawing from common-law responsibilities of a landlord regarding illegal activity on a rented premises).

Secondary liability for trademark infringement shares common roots in tort law with secondary liability for copyright infringement.  <u>Perfect 10, Inc.</u>, 508 F.3d at 1171, <u>citing</u> 545 U.S. at 934-35; <u>see also Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.</u>, 955 F.2d 1143, 1148-49 (7th Cir. 1992).  The record offers abundant evidence relating to Defendants' actual knowledge, ability to control, and continued supply of its product and services to infringers, to defeat Defendants' motion for summary judgment on the trademark claims.

To be liable for contributory trademark infringement, a defendant must *either* (a) intentionally induce the primary infringer to infringe *or* (ii) "continue to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. Perfect 10, Inc., 494 F.3d at 807.[5]  Where the defendant's contribution concerns the provision of services, Courts have modified the test to "consider the extent of control exercised by the defendant over the third party's means of infringement… Direct control and monitoring of the instrumentality used by a third party to infringe" permits a finding of contributory trademark infringement.  Lockheed Martin Corp., 194 F.3d at 984-85; see also Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1382 (9th Cir. 1984) (one who intentionally induces another to infringe a trademark or supplies, knowing or having reason to know the materials supplied will be used to infringe a trademark, is contributorily liable for trademark infringement).

Defendants were ultimately responsible and able to control the content that resides on their servers through content inspection, monitoring, unplugging or disabling of IP Addresses, and ultimately, terminating "customers."  Chen Depo., 28:1-29:13, 70:19-71:15, 83:5-84:9, 136:4-19; Lone Depo., 24:6- 25:18; Luk Depo., 14:20-22, 21:19-22:12, 35:19-36:1, 56:1-22, 66:7-67:22, 70:3-14, 73:10-74:6.  Defendants are able to monitor websites not only because they are publicly viewable, but when disabled, Defendants request password information to inspect the content on the server and insure that complained of, offending material has been removed before reinstituting service.  Chen Depo., 23:18-23, 127:1-10, 130:4-133:12, 136:4-19.  Additionally, Defendants have stated that they are able to "re-set" passwords when servers are 'returned' or 'abandoned.'  Fn. 3 of Magistrate Judge Lloyd's Order.  Defendants also monitor internally by unplugging abusers for moving from one IP Address owned by Defendants to another IP Address owned by Defendants, an action that would absolutely require monitoring.  Chen Depo., 136:4-19.  Thus, Defendants have, selectively, and certainly not with regard to Louis Vuitton's complaints in the past, exhibited

---

[5] While the Defendants appear to argue that intentional inducement must be proved to establish contributory trademark liability, the Defendants' own authorities do not stand for such a proposition, as is evident from the decision in Perfect 10, Inc., 494 F.3d at 807.  Moreover, even were liability so narrowly construed, Plaintiff sets forth below several disputed issues of fact relating to the ISP Defendants' inducement of infringement by the third party website operators and the alleged intermediate distributors.

not only an ability to exercise total control, but a track record of removing and disabling infringing activity for other parties.  Luk Depo., 22:19-23, 23:22-24:4, 26:2-8, 66:20-22, 68:1-8, 73:10-14; Chen Depo., 23:3-23, 127:1-10, 130:4-133:12, 136:4-19.  Here, they simply chose not to act in response to Louis Vuitton's demands.

Even after put on notice of the infringement, Defendants failed to act and admitted that their own penalties for abuse were rarely enforced or not enforced at all.  Luk Depo., 33:22-34:12, 62:5-8; Chen Depo., 67:18-69:17.  Defendants' allowance of infringing activity to continue (for some of their best "customers") promoted the sales of counterfeit goods on websites hosted by Defendants and their ultimate control and history of monitoring for other complaining entities, gives rise to liability for their failure to act in response to Louis Vuitton's complaints.[6]

### v.    Defendants Have Not Met Their Initial Burden on Plaintiff's Claims for Vicarious Copyright or Trademark Infringement

As apparent throughout, Defendants' continued mischaracterization of the applicable law and the record persists in their failed arguments against a finding of vicarious liability.

### a.    Vicarious Copyright Infringement

Vicarious copyright infringement is shown when the defendant profited directly from the infringing activity "while declining to exercise a right to stop or limit it."  Grokster, 545 U.S., 930. To succeed, a plaintiff must show the defendant had the right and ability to supervise or control the infringing activity of the direct infringer and that it derived a direct financial benefit from the infringement.  Perfect 10, Inc., 508 F.3d at 1173.  "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."  Napster, Inc., 239 F.3d at 1023.  A direct financial benefit exists where "the availability of infringing material 'acts as a "draw" for customers'".  Ellison v. Robertson, et al., 357 F.3d 1072,

---

[6] Defendants restate their failed argument regarding the Stored Communications Act and are precluded from relitigating issues already resolved against them: the Stored Communications Act simply does not apply.  Defendants are now collaterally estopped from re-litigating this issue. Segal v. American Tel. & Tel. Co., 606 F.2d 842, 845 (9th Cir. 1979) (The doctrine of issue preclusion prevents relitigation of all issues of fact or law that were actually litigated and necessarily decided in a prior proceeding.).

1078 (9th Cir. 2004) citing <u>Napster</u>, 239 at F.3d at 1023.  The Ninth Circuit expressly stated that there was not a "quantification requirement" or a requirement that the draw be "substantial", but noted the financial benefit may be found when the value of the services lies in providing access to infringing material.  <u>Ellison</u>, 357 F.3d at 1078-79.  Defendants provide the ultimate access to infringing material residing on their servers in addition to other valuable services which cater to a counterfeiting operation.

Defendants' had a legal right and practical ability to block or police use of its servers, and did so at will with the ease of sending an email.  Supporting Memo., 10:2-4, 24:4 (Defendants can prohibit abuse under their "User Agreement"); Chen Depo., 28:13-29:13, 70:19-71:15, 83:5-84:9, 136:4-19; Luk Depo., 14:20-22, 21:19-22:12, 35:19-36:1, 56:1-22, 66:7-67:22, 70:3-14, 73:10-74:6; Lone Depo., 24:6- 25:18.  Defendants were able to easily take away the tools the offending websites used to reproduce, distribute and alter infringing images over the Internet and products in commerce through the unplugging or disabling of IP Addresses, but chose not to do so for Louis Vuitton.  Luk Depo., 22:7-12; Chen Depo., 71:10-15, 84:10-16 (describing the "unplug" process as sending an email and taking about half an hour).  Defendants instead, routinely acted on behalf of other complaining parties.  Luk Depo., 22:19-23, 23:22-24:4, 26:2-8, 66:20-22, 68:1-8, 73:10-14; Chen Depo., 23:3-23, 127:1-10, 130:4-133:12, 136:4-19.  Like the swap meet owner in <u>Fonovisa</u>, Defendants not only had the right (and did in their case), to stop offending use through unplugging or disabling but through that right, had the ability to control the activities occurring on their servers.  76 F.3d at 262.

Defendants derived a direct financial benefit from the infringement through payment of use of its server space to some of their best "customers" and at times, their services, which may have partially contributed to the lack of action taken in response to Louis Vuitton's complaints.  Coombs Decl., ¶¶ 6; Chen Depo., 60:17-25, 143:16-144:6.  "Turning a blind eye to detectable acts of infringement for the sake of profit gives rise to liability."  <u>Napster</u>, 29 F.3d at 1023.  Defendants were put on notice by Louis Vuitton through a series of letters.  Livadkin Decl., ¶¶ 11-18.  Defendants' state that their "customers" agreed to acceptable uses of their services but in the same

breath state that the very same acceptable use policy prevented them from accessing content without permission from their "customers."  Supporting Memo.,10:2-6, 24:4 (quotations added).  Regardless of this internal contradiction, Defendants routinely enforced their policy in cases of Spamhaus, pornography, Microsoft intellectual property infringements, eBay fraud, and PayPal intellectual property infringements at the very least, and more "carefully" since about September 2007.  Luk Depo., 22:19-23, 23:22-24:4, 26:2-8, 66:20-22, 68:1-8, 73:10-14; Chen Depo., 23:3-23, 127:1-10, 130:4-133:12, 136:4-19.  Defendants' routinely policed their servers and as a matter of policy, would and did pull the plug on infringing websites.

Further, documents produced thus far show that some of Defendants' best "customers" were related to the infringing websites.  Coombs Decl., Ex. E; Chen Depo., 60:17-25, 143:16-144:6 (citing IT5, Alice Chen or Zhonghh.it8 as one of Defendants' best "customers" and "boysee" as well as NoraQ and Lin Lin as others).  Additionally, Defendants' advertised themselves directly to individuals located in China and boasted of their dedicated services and U.S. based servers.  Supporting Memo., 4:8, 4:19-22, fn 5; Lone Depo., 11:18- 17:23.  Defendants' hosting provided access to infringing websites which were selling counterfeit goods.  Holmes Decl., ¶¶ 3-15; Livadkin Decl., ¶¶ 11-20.  The availability of the Defendants' dedicated servers and U.S. based location, coupled with Defendants' employee's language skills, satisfies the kind of "draw" that infringers would be looking to utilize for their illegal business.  Thus, the second prong of the test is established and Plaintiff has met its burden.

Due to Defendants' ultimate ownership, possession and selective exercise of power over the content of the servers, Defendants are also liable for vicarious trademark infringement.

### b.        Vicarious Trademark Infringement

Vicarious trademark infringement is found where the "defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product."  Perfect 10, Inc., 494 F.3d at 807.  An Internet search engine's control over the appearance of another's advertisements on its search results pages which unlawfully used a trademark owner's property stated a claim for

vicarious trademark infringement. <u>Government Employees Insurance Company v. Google, Inc.</u>, et al., 330 F. Supp. 2d 700, 705 (E.D. Va. 2004). Defendants are liable under the test.

Defendants have described a "partner" relationship with its "customers." Lone Depo., 14:9-16 (describing first 20 hits on Google for particular search stating "at least 15 will be partners of ours. So they would know about our position within this industry."). Defendants send complaints to their "partners" for follow up and often trust the word of these "customers" when reinstituting service. Luk Depo., 59:14-19. Additionally, Defendants are unable to establish a "re-seller" arrangement through any contract (none were produced in this litigation) or any kind of arms-length relationship between themselves and the website operators.

Defendants also ultimately control the content on their servers and routinely exercise their unplugging, disabling and termination rights with respect to abuse of their property for other complaining parties. Luk Depo., 22:19-23, 23:22-24:4, 26:2-8, 66:20-22, 68:1-8, 73:10-14; Chen Depo., 23:3-23, 127:1-10, 130:4-133:12, 136:4-19; Lone Depo. 24:6- 25:18. However, Defendants continued to accept payment for their products and services, allowing infringements of Louis Vuitton's intellectual properties to continue without recourse, despite notice.

Defendants' sole part-time employee designated to forward abuse complaints stated that until recently she never saw a Louis Vuitton complaint and had never heard of Louis Vuitton. Luk Depo., 52:12-19, 68:9-20. Defendant Chen stated unequivocally that he received one letter from Louis Vuitton at his home, but merely took it to work and placed it on a pile of about a year's worth of unopened mail. Chen Depo., 100:13-104:12, 108:12-22, 109:12-110:10. Defendants had no formal policy in place. <u>Id.</u>, 85:22-86:2. Only as of around September 2007 did Defendants begin to institute guidelines for responding to complaints about illegal activity, and indications are that the prior policy was at best haphazard. Luk Depo., 16:18-22, 31:6-32:1, 75:24-76:15 (employee's faulty memory is Defendants' only record of abuse complaints, to illustrate, Luk stated "How can I remember so many things?"). In any case, there was no action taken as to Louis Vuitton's complaints, Livadkin Decl .at ¶¶ 12-20, and virtually no penalty enforced by Defendants, Luk Depo., 33:22-34:12, 62:5-8; Chen Depo., 67:18-69:17, allowing illegal activities to continue.

1
2
3
4

For Defendants' "partnership" with the offending parties and ownership of the servers on which the infringing content resided, and subsequent failure to act, despite notice, Defendants should be found liable for vicarious trademark infringement.

### vi.    Genuine Issues of Material Fact Preclude Summary Judgment

5
6
7
8
9
10
11

The material facts in dispute which prevent the Court from granting summary judgment in favor of Defendants mainly arise from Defendants' own contradictory assertions. Genuine issues of material facts exist within Defendants' own evidence about Defendants' knowledge, whether the complained of websites were ever hosted on Defendants' servers and the true relationship between Defendants and the website operators, at a minimum. As discovery is not yet complete, and execution of Magistrate Judge Lloyd's recent discovery order is pending, more information is expected to further support Plaintiff's claims.

12
13
14

As an example of Defendants' internal confusion, which is pervasive throughout the record, Defendants' Motion alone presents a series of clear falsities and contradictions including:

15
16

1. Defendants state they do not know what kind of activity rests on the servers and yet, can list several of those unknown uses. Supporting Memo., 4:8-12.

17
18
19

2. Defendants state they have an acceptable use policy but state they do not have a right to access content located on their servers, but then again, state they unplug "customers," in the same breath. Id. at 10:2-6, 24:3-5.

20
21
22
23

3. Defendants state that they have relationships with resellers and do not do business with any website operators, Id. at 3:25-4:1, 14:24-25, but have failed to point to any contract with any alleged distributor, many of which Defendants claim only to know by their "email" identity.

24
25
26

4. Defendants state that Louis Vuitton fails to prove its case on direct infringement when direct infringement by Defendants is not a claim in this litigation. Id. at 3:9, 3:14-4:1, 5:1-13, 16:16-22, 17:15-17.

27

5. Defendant MSG provides "unmanaged" solutions despite its name. Id. at 10:7-8.

28

6. Louis Vuitton's letters "may have eventually been sent to a correct address", Id. 17:26, even though Defendant Chen admits he received at least one notice at his home. Chen Depo., 100:13-104:12, 109:12-111:7.

7. Defendants' "conscious efforts to respond to allegedly infringing domains" included not addressing mail delivered to them personally, and instead adding it to a pile of almost an entire year's worth of unopened mail on an unoccupied desk in the office. Supporting Memo., 7:23; Chen Depo., 100:13-104:12, 109:12-111:7.

8. Defendants describe their efforts in responding to abuse complaints as "conscious", Supporting Memo., 7:23, and "practical" Id. at 18:7, when they have no record keeping of any sort relating to abuse complaints except for the faulty memory of a part-time employee who claims that until recently she had never received any complaint from Louis Vuitton. Luk Depo., 19:8-11, 31:12-32:1, 52:12-19, 68:9-20.

9. Defendants state that 4 of the 5 websites listed in the original complaint were not hosted by them, Supporting Memo., 8:5-7, when in an email they clearly state they did host one of the websites listed in the complaint. See Coombs Decl. Ex. E.

10. Defendants state Plaintiff's proof is inadmissible hearsay, Supporting Memo., 19:18- 21:12, even though they are the result of pinging, the same method used by Defendants to identify IP Addresses, Id. at 18:5, and some of the documents themselves are of the same type once identified by them. See Coombs Decl., Ex. F.

11. Defendants state they "do not and cannot monitor the use made of their equipment and Internet access", Supporting Memo., 4:13, when they clearly do. Chen Depo., 28:13-29:13, 70:19-71:15, 83:5-84:9, 136:4-19; Lone Depo., 24:6- 25:18; Luk Depo., 14:20-22, 21:19-22:12, 35:19-36:1, 56:1-22, 66:7-67:22, 70:3-14, 73:10-74:6.

The above internal contradictions are just a few of the reasons why summary judgment in favor of Defendants should be flatly denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**vii.    DomainTools.com and Similar Website Printouts Are Admissible and Defendants' Complete Disregard for the Discovery Process Does Not Equate to Plaintiff's Failure to Prove its Case**

Defendants argue that websites printouts are hearsay and are inadmissible.  Although Plaintiff's evidence does not depend solely upon such printouts and the Court should deny Defendants' motion regardless of its conclusion on this evidentiary issue, for the following reasons, website printouts, like those from DomainTools.com which neatly package the results of a number of functions, including pinging, are admissible.

First, Defendants identified "relevant web pages from ARIN.NET and DOMAINTOOLS.COM" in their initial disclosures as documents upon which they may use to support their claims or defenses in this action.  Coombs Decl., Ex. F.  Further, the Parties all use "pinging" as one method to determine the IP Address and thus the host of any particular website.  DomainTools.com merely compiles data in a digestible format and includes the result of "pinging" and a search of the resulting host.  In <u>Maljack Productions, Inc. v. GoodTimes Home Video Corp.</u>, 81 F.3d 881, 889 fn. 12 (9th Cir. 1996), the Court ruled that the authentication requirement was satisfied where the documents at issue were offered by both sides at different points in the litigation.  <u>See</u> <u>also</u> <u>In re Homestore.com, Inc. Securities Litigation,</u> 347 F. Supp. 2d, 769, 781 (C.D. Cal. 2004) (court held that the authentication requirement was met because the documents in question were produced during discovery and were offered by the party opponent).

Documents identified by Defendants in their initial disclosures and produced by Louis Vuitton in discovery are properly authenticated and found admissible.  The very same functions that Defendants undertake to locate an IP Address, on a publicly available source, are the same functions undergone through a DomainTools.com "ping" or query.  Defendants can not complain about documents they themselves identified or documents that merely reiterate the results of the same search undertaken by all.

Secondly, Plaintiff not only double checked the information but triple checked the resulting information reflected in the DomainTools.com printouts and the information reflected in the

DomainTools.com printouts were never wrong.  Holmes Depo., 112:24-122:3.  In <u>Moose Creek, Inc. v. Abercrombie & Fitch, Co.</u>, 331 F. Supp. 2d 1214 (C.D. Cal. 2004), the court considered unauthenticated internet documents submitted by plaintiffs in support of their motion for preliminary injunction for trademark infringement. The court stated: Fed. R. E. 901(a) defines a standard of admissibility that is rather general or elastic: the evidence must merely be sufficient to support a finding that the matter in question is what proponent claims.  The DomainTools.com printouts were merely a way to neatly package the information.  Holmes Depo., 114:10-14. Defendants also object to printouts from infringing websites though they bear the URL as well as a date stamp, whose ultimate significance here (the hosting information) was verified through multiple means.

The best evidence for all Internet related printouts would be Defendants' own records, but they claim to have none.  Defendants continually try to point to their own shortcomings in the discovery process and convert it into Plaintiff's failure to make a showing on an essential element. Plaintiff has proven its case despite Defendants' litigation strategy of providing no information or contradictory information.  Defendants' failure to provide documentation simply shows bad faith and an inability to prove up any defense or claim of any arms length relationship with its alleged "resellers".  No proof of any such reseller relationship has ever been produced nor has it ever been accepted as truth.  Instead, the evidence shows, and printouts such as DomainTools.com package information that supports, that Defendants continue to do business with known infringers.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendants' motion for summary judgment.

Dated:  August 18, 2008                    J. Andrew Coombs, A Professional Corp.


　　__/s/ J. Andrew Coombs_____
By:  J. Andrew Coombs
　　 Annie S. Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.