**Exhibit A**

1                    GLENDALE, CALIFORNIA,

2

                TUESDAY, APRIL 8, 2008, 9:39 A.M.

3

4

5                        STEVEN CHEN,

6        having been first duly sworn by the reporter, was

7                examined and testified as follows:

8

9                         EXAMINATION

10    BY MR. COOMBS:

11        Q.   Would you state and spell your name for the

12    record, please.

13        A.   Steve Chen, S-t-e-v-e, C-h-e-n.

14        Q.   And, Mr. Chen, you understand that today you

15    are here as a witness for defendant Akanoc Solutions,

16    Inc.?

17        A.   Yes.

18        Q.   And do you have a role in connection with

19    Akanoc Solutions, Inc.?

20        A.   I'm the general manager.

21        Q.   General manager.  And how long have you been

22    general manager?

23        A.   Since the first day, probably September,

24    October of 2004.

25        Q.   And can you briefly describe for me your

1    responsibilities, what functions you perform as general

2    manager of Akanoc Solutions?

3         A.   I oversee the whole operation.  So in our

4    business, basically you run the network, the sales

5    department dealing with the customer, and that's pretty

6    much it.

7         Q.   Okay.  I'm sure we'll get into more specifics

8    as we go along.

9         A.   Right.

10        Q.   Do you have an ownership interest in Akanoc --

11        A.   Yes.

12        Q.   And what is that ownership interest?

13        A.   I'm the sole owner of Akanoc.

14        Q.   And what is the relationship of Akanoc

15   Solutions to a website operated under the name

16   DediWebHost.com?

17        A.   DediWebHost.com is a brand name of Akanoc.

18        Q.   So it does business through that Website?

19        A.   Yes, that's correct.

20        Q.   And what is the relationship between Akanoc and

21   a Website operated as Coloalacarte.com?

22        A.   It's the same thing.  It's a brand name of

23   Akanoc.

24        Q.   And how long has Akanoc used the brand name

25   DediWebHost?

1    through an -- ISP in China, they call it ICP, you know,

2    Internet Content Provider.  He research a list of those

3    people and then start contacting everybody.

4        Q.    How does he contact them?

5        A.    Just through e-mail.  And from there probably

6    we establish like 10, 15 resellers.  And from there the

7    resellers start developing business locally, and they

8    are advertising that if you want US-dedicated servers,

9    then they represent companies in the U.S. not

10   specifically for Akanoc.

11       Q.    So it's your understanding that the 10 to 15

12   resellers you just mentioned provide or obtain hosting

13   services from companies other than Akanoc?

14       A.    Yes.

15       Q.    In the United States?

16       A.    Yes, yes.

17       Q.    Are these 10 to 15 resellers located in any

18   particular region in China, or are they spread

19   throughout the country?

20       A.    I think they're spread out.

21       Q.    Mostly in the East, I would imagine?

22       A.    Yeah, along the coast.

23       Q.    You have three employees in the billing

24   department.  Can you identify them for me?

25       A.    Kathy Tseng, T-s-e-n-g; Emily Tsai, T-s-a-i,

1   serviced, then it's the support department.

2        Q.   That's the cage technicians?

3        A.   Yes.  However, Yeoh does overseeing the

4   technical department too, although he has technicians to

5   work for him.

6        Q.   Can you briefly describe for me what overseeing

7   the technical department entails?

8        A.   If something gets -- needs special attentions,

9   Mr. Yeoh is more knowledgeable than the regular cage

10  technician.

11       Q.   Troubleshooter?

12       A.   Troubleshooter, yes.

13       Q.   Does Ms. Luk report to you or to someone else

14  in Akanoc's --

15       A.   To me.

16       Q.   To you.

17            Included in the production of documents by

18  Akanoc was a mailbox entitled "security"?

19       A.   Yes.

20       Q.   Would that be e-mails generated by Ms. Luk?

21       A.   Yeah, it's either him or myself.

22       Q.   I'm sorry?  I'm --

23       A.   Either she or myself, yes.  I'm sorry.

24       Q.   So being part-time, sometimes you'll fulfill

25  that --

1    A.    Yes.

2    Q.    -- security function?

3    A.    Yes.  Yeah.  I always check the e-mail.  If

4    something that is totally out of her capacity to handle,

5    then I will step in.

6    Q.    What kind of background does Ms. Luk have in

7    terms of dealing with security and abuse issues?

8    A.    Not really a lot.  I mean, that for her -- my

9    instruction to her is basically just forwarding all the

10   complaints to the customer.

11   Q.    Does she have any other responsibility in

12   connection with security?

13   A.    No.

14   Q.    So she doesn't conduct any monitoring function,

15   for example?

16   A.    Monitoring for?

17   Q.    Monitoring for abuse issues.

18   A.    Monitoring -- the only monitoring that we will

19   see is that complaints -- the same type of complaints

20   happen to a particular server or particular IP in a very

21   short period of time, then we would -- we would do

22   something special about it, take special notice to the

23   customer to the point that we need to unplug it.

24   Q.    And is that something that Ms. Luk would do or

25   something you would do?

1      A.    We both would do it.

2      Q.    Does -- you mentioned that she would be

3   responsible forwarding complaints.  Does she evaluate

4   the complaints before she forwards them?

5      A.    If it's a basic spam complaints, there's

6   nothing that we can evaluate.  If it's a, let's say, a

7   copyright infringement, we cannot evaluate.  We just

8   forward it out.

9          Other than finding where that specific issue

10  linked to a particular IP, virtually nothing that we

11  will verify.

12     Q.    What is it -- what do you understand Ms. Luk to

13  do when she receives an IP complaint?  Let's just talk

14  about copyright and trademark complaints.

15     A.    Okay.

16     Q.    She receives an e-mail saying that -- directed

17  to abuse --

18     A.    Right.

19     Q.    -- at Akanoc.com, correct?

20     A.    Yes.

21     Q.    What does she do with it once she receives that

22  e-mail?

23     A.    Well, if it comes in with an IP address,

24  basically we just locate, you know, who owns it.  We

25  forward the whole thing to our customer.  And if there's

1  no IP address, just say domain, then we try to ping that

2  domain and see what it's resulted to. If it result to

3  our IP address, then we would, from there, find a

4  particular customer responsible for that, then we

5  forward it out.

6     Q.   How do you identify the customer who's

7  responsible for a particular IP address within Akanoc's

8  range?

9     A.   If there's IP, then we can search our database

10  who is current user.

11     Q.   I've seen references in the documents to

12  something called CPRO. Is that the database?

13     A.   Yes, that's correct.

14     Q.   CPRO is a type of software?

15     A.   That's something that we develop internally.

16     Q.   Okay. And who maintains that database?

17     A.   Create or maintain?

18     Q.   Well, that's a good point. Who created the

19  database?

20     A.   Andrew, Andrew Cheng, C-h-e-n-g.

21     Q.   Now, is Mr. Cheng one of the cage technicians?

22     A.   Well, he's a network manager, but he has the

23  background of computer science, so he creates that

24  database.

25     Q.   And when was the database created?

1     Q.    So the kind of repetitive problem that you

2   mentioned earlier that you monitor for, that's done

3   personally or manually, not automatically through the

4   CPRO database?

5     A.    No.

6     Q.    That's correct, right?

7     A.    That is correct.

8     Q.    Do you use CPRO to generate billing history

9   reports, that kind of information?

10    A.    It's not generated.  It's just there's a search

11  field that you can search and to pull those -- that

12  particular field, the history of that field.

13    Q.    Now, earlier you mentioned that if there's a

14  problem, you can, for example, unplug a server, correct?

15    A.    That's correct.

16    Q.    Is unplugging the server the kind of touching

17  the hardware that would be reflected in the CPRO?

18    A.    Yes.

19    Q.    All right.  After Ms. Luk forwards the abuse

20  complaint to the customer, does she have any further

21  responsibility in connection with that abuse report?

22    A.    Unless it's just repetitive; otherwise, we will

23  assume that customer will take care of the issue.

24    Q.    So, in other words, unless you get a follow-up

25  abuse report concerning the same domain, for example?

1      A.    Yes.

2      Q.    What happens if you get a follow-up abuse

3  report concerning the same domain?

4      A.    Then we'll start maybe -- I mean, if it's

5  something like spamming, if something that she's sure,

6  definitely sure that the problem is there, it's serious,

7  like if you receive 30 spam complaints the first day,

8  you send a complaint out, then in two days later you get

9  another batch of the 30 -- you know, wake up in the

10  morning, you have all e-mails all related to the same

11  one, then we know that's not stopping, and so in that

12  case we would take down the server, just to let the

13  customer get back to us.

14      Q.    Have Ms. Luk's responsibilities changed at all

15  during the time that she has worked on the security

16  abuse issues for Akanoc?

17      A.    Pretty much the same.

18      Q.    Are there occasions where the issues are such

19  that Ms. Luk forwards them on to you for handling as

20  opposed to dealing with them herself?

21      A.    If something is -- for instance, like customer

22  come back with a comment that, you know, being

23  technical, that "this problem is not from -- not from my

24  server," something like that effect, and I would more or

25  less, like, look into the issue.  If I don't understand,

1   then I will ask, you know, maybe Andrew or Patrick or

2   somebody else, being they are more technical than

3   myself.

4       Q.   Is it fair for me to conclude that you will

5   sometimes handle the security desk yourself when Ms. Luk

6   is unavailable and --

7       A.   Yes.

8       Q.   -- not working?

9       A.   That's correct.

10      Q.   Does it ever get assigned to Patrick or Andrew

11   as well?

12      A.   No.

13      Q.   Has Akanoc ever operated out of any locations

14   other than the two you've identified, the one in Fremont

15   and the other in San Jose?

16      A.   No.

17      Q.   Does it ever lease server capacity from any

18   other companies?

19      A.   No.

20      Q.   Can you give me the address of the location in

21   Fremont?

22      A.   45535 Northport, one word, Loop, second word,

23   East, Fremont.

24      Q.   Is that the only address in Fremont from which

25   Akanoc --

1      A.    What do you mean by "grown"?

2      Q.    Well, you said when you started you didn't have

3 that many, you didn't really need a full-time --

4      A.    Right.

5      Q.    -- person dedicated to it; is that correct?

6      A.    Well, let's put it this way:  The Akanoc IPs

7 nowadays, we probably see five, ten complaints a day.

8 Relative to Managed Solutions Group, we will see a good

9 30, 50 a day.

10     Q.    Do you have any sense of how those break down

11 between intellectual property abuse complaints and all

12 other types of complaints?

13     A.    Majority spamming, hacking; ten percent

14 IP-related issues.

15     Q.    You mentioned Managed Solutions Group.  What is

16 the relationship between Managed Solutions Group and

17 Akanoc?

18     A.    We start -- we start the hosting business with

19 Managed Solutions Group.  That was in end of 2003.  And

20 at the time I had a partner, Jacques Pham,

21 J-a-c-q-u-e-s, P-h-a-m, and so -- and before that he was

22 my Racklogic customers.  He buy hardwares from us, he

23 buy servers from us, and he grew the business to like

24 8-, 900 servers.  Then he sold the business.  And he

25 came to me one day, says "Hey, if we can work together,

1   maybe there's opportunity that, you know, we can start

2   another one."

3           And since I was selling -- you know, Racklogic

4   is selling a lot of hardwares to different hosting

5   companies, so at that time I think, Well, there might be

6   something in it.  And since Jacques is willing to put

7   his effort to start a business, push the business,

8   manage the business, in essence I just need to do the

9   operation support.

10          That last for less than a year.  I start

11  finding that it's not a really good match between myself

12  and Jacques Pham, although the business is running well.

13  But we had two different -- we had totally different

14  objectives as to how we're going to grow the business

15  itself.  So at that time I decide to separate the

16  relationship with him.

17          And so before I start talking, discussing the

18  way of separation, I start -- I set up Akanoc being the

19  backup, just in case if the move is not going well,

20  maybe we just close down MSG completely, then nobody

21  hurt.  That was my intention to set up Akanoc.  That's

22  pretty much the --

23      Q.   How does Managed Solutions' business differ

24  from Akanoc's business, if at all?

25      A.   Yeah.  From the beginning it's the same model.

1   It's offering the same thing of managed dedicated

2   servers.  We started Akanoc -- that's why Akanoc has

3   Coloalacarte.  That's one year, more or less that one

4   year prior to Akanoc DediWebHost.  Because when we first

5   have Akanoc.com, and when we actually decide to

6   separate, you know, in a peaceful way, he can still run

7   his own business and we being the backup, the back-end

8   support.

9          So Coloalacarte came with a different type of

10  business model, which is not offering a complete

11  package.  That's why Coloalacarte came in first, so we

12  don't have the conflict of interest between MSG and

13  Akanoc.

14      Q.    Are you also general manager of Managed

15  Solutions?

16      A.    Yes, that's correct.

17      Q.    And do you own 100 percent of the shares in

18  Managed Solutions?

19      A.    At this point, yes.

20      Q.    And do the back-end services that we've been

21  talking about, Ms. Luk, Mr. Yeoh, Mr. Lone, do they also

22  provide those same services for --

23      A.    Mr. Lone got nothing to do with MSG, because at

24  the time MSG is only doing -- well, hold on.  I need to

25  back up.

1           Mr. Yeoh, Ms. Luk handles the so-called back

2    end on the technical part of it, okay.  No, Ms. Luk does

3    not even handle MSG -- no, not MSG, but Managed.com,

4    okay, because when the separation is, Managed.com become

5    their own business and we only handle -- managing the

6    cage work for them.  So we don't actually take care, not

7    even the abuse, I believe.  I think that they have their

8    own people to run those to the point that I told them

9    that, "Hey, you guys need to watch out, because at this

10   point the MSG still owns the -- responsible for the IP

11   address, so you guys need to do a clear work with the

12   abuse and whatever."

13          And we have not been warn in a case that, you

14   know, from any authority, that our IP address has been

15   totally abused, so we assume that they are okay, to the

16   point that they -- Jacques Pham sold the business to

17   John Mills -- that's another party -- and John Mills

18   sold the business to WebHostPlus, and WebHostPlus move

19   everything out from us and the whole thing just fall

20   apart.

21      Q.   But that's not Managed Solutions Group; that's

22   Managed.com?

23      A.   That's correct.  That is correct.

24      Q.   So, again, coming back to Managed Solutions,

25   not Managed.com, does Juliane Luk handle security issues

1    A.    Yes.

2    Q.    Do you see that?

3    A.    Yes.

4    Q.    Do you have any reason to doubt that those are

5  the IP addresses that ARIN has assigned to Akanoc

6  Solutions?

7    A.    Yeah, these will be IP address assigned to us.

8    Q.    And ARIN -- I'm sorry, Akanoc still holds all

9  of the names -- or all of the IP addresses first

10 assigned to it?

11   A.    Yes, that's correct.

12   Q.    Has it reassigned or subdelegated any of those

13 IP addresses?

14   A.    "Reassigned" being -- being what?

15   Q.    Assigned them to its customers, resellers,

16 anyone else.

17   A.    Yes, that's what we do every day.

18   Q.    You do -- I'm sorry?

19   A.    That's what we do every day.

20   Q.    And what kind of -- are those records reflected

21 in the CPRO database we talked about earlier?

22   A.    It's not only CPRO, but also public.  You can

23 search that in the public records.

24   Q.    Let's back up for a moment.  The CPRO database

25 will reflect an assignment by Akanoc to one of its

1   customers of an IP address that was assigned to it; is

2   that correct?

3      A.   If it's a live IP, we can search it. If it's a

4   dead IP, then it's -- once it's taken out from that,

5   then CPRO will not show it.

6      Q.   So it doesn't retain historical data --

7      A.   Yes.

8      Q.   -- it's deleted?

9      A.   Yes.

10      Q.   Who handles the reassignment of IP addresses?

11      A.   Again, it's pretty much automation that we --

12   if the customer -- let's say the customer needs four

13   extra IPs. Either myself, Will Lone, Patrick, we can

14   all go into a specific interface, and we take out from

15   the available pool and attach it to the specific main

16   IPs and we submit to the process. Then we update that

17   information into the router to make that routing. And

18   when customer cancel the service, or for whatever reason

19   we need to take it out from that particular route, then

20   we use the same interface. We can go in, submit that

21   request, and then technician will go to the router and

22   then reroute it.

23      Q.   That router is a router that's owned and

24   controlled by Akanoc; is --

25      A.   That is correct.

1       A.    Right.

2       Q.    -- make some new accounts?

3       A.    Right, right.

4       Q.    Are there ever any occasions where Akanoc

5    enters into an agreement with a reseller for server

6    capacity but does not show an assignment of the IP

7    address associated with that server capacity?

8             MR. LOWE:  What do you mean by "server

9    capacity"?  You talking about IPs or something

10   different?

11            MR. COOMBS:  No, I'm talking about something

12   different now.  Let me come back to this, actually.

13   I'll withdraw the question.

14      Q.    How many servers does Akanoc operate?

15      A.    At this point?

16      Q.    Yes.

17      A.    Probably about 1400.

18      Q.    And they're all located at the data center in

19   San Jose?

20      A.    Yeah.

21      Q.    And just by sort of as a point of reference,

22   approximately how many servers did Akanoc operate in

23   March of 2007?  Or if a different date is more

24   convenient for you, you can pick that, but in that time

25   frame.

1    A.   I think we've been running from, in the last

2  year or so, we have been running anywhere between a

3  thousand to 1400.

4    Q.   How many did Akanoc start with when it started

5  business in 2004?

6    A.   Zero.  I think the first batch we probably --

7  from zero to 300, or so, fairly fast.  And from 300 to

8  500 take a lot longer period, and since then we've been

9  around that level.

10    Q.   And what percentage of the capacity on those

11  1,000 to 1400 servers is in use at any given time, is

12  active, if you will?

13    A.   Active, that's what we have.

14    Q.   Oh, that's what's active?

15    A.   Yes.

16    Q.   So you have additional server capacity that's

17  unused?

18    A.   Give and take, 50 to a hundred.

19    Q.   50 or 15?

20    A.   15 -- no, 50.  I'm sorry.  50 to a hundred.

21    Q.   And those servers hold storage capacity for

22  Websites; is that correct?

23    A.   Not specifically.

24    Q.   Describe for me what those servers do.

25    A.   This is a big question.  There are many, many

Page 45

1    applications that require users to put their servers in
2    the data center instead of just regular office.  So it's
3    not just Website.  Website I will consider probably the
4    smallest application in -- actually in our environment.
5    So, for instance, like VoIP, voiceover IP, you need
6    servers, and they all more or less like high-traffic
7    servers.  Downloads.  People, you know, put their
8    contents specifically for download purpose.  There are
9    people storing pictures, family pictures, things like
10   that.  Okay?  I mean, they have specific application for
11   that type of application.  Chat rooms, forums.  So...
12        Q.   E-mail servers?
13        A.   All e-mail servers, for sure.
14        Q.   What percentage of the server capacity that
15   you've been talking about is dedicated to Website
16   hosting?
17        A.   I have no idea.  We don't run any contents for
18   the customer.
19        Q.   Tell me how Akanoc sells its service to its
20   customers.  You mentioned packages.  Describe for me
21   what those packages consist of.
22        A.   Okay.  So if you go to the Website, they are
23   basic hardware specs to begin with.  So if it's a
24   Celeron 2.4, one gig memory, 80-gig hard drive and,
25   let's say, 600 gigabyte worth of bandwidth, that's one

1    so customer can have it.  That's pretty much it.

2            MR. LOWE:  Would you be interested in taking a

3    break sometime soon?

4            MR. COOMBS:  Now's as good as any.  Just five

5    or ten minutes?

6            MR. LOWE:  Yeah.

7            (A brief recess was taken.)

8            MR. LOWE:  I think that Mr. Chen needs to

9    clarify one of his earlier answers about the operation

10   of the servers, who operates them or owns them or --

11   BY MR. COOMBS:

12       Q.   Is that correct?

13       A.   Yes.

14       Q.   Go ahead.

15       A.   Okay.  So when you talk about Akanoc having how

16   many servers, actually, MSG owns the server itself, the

17   asset itself.  Akanoc just operates it.  MSG at this

18   point has virtually no operation besides holding assets.

19       Q.   Does MSG have any employees?

20       A.   No, not at this point.

21       Q.   Did it operate a business like Akanoc at any

22   time since the beginning of 2006?

23       A.   I think that somewhere beginning of 2006, when

24   WebHostPlus moved out completely, we made a major change

25   within the company that -- so MSG has virtually no

Page 48

1   operation since then, and we just switch everything to

2   Akanoc being the operation.  MSG just purely the asset

3   holder.

4       Q.   So earlier when you said that there were abuse

5   complaints that might come to an address like

6   Abuse@ManagedSG-inc.com, those would be then forwarded

7   to Managed.com?

8       A.   Yes.

9       Q.   And they would be doing that basically on a

10  service agreement with this other ISP?

11      A.   "Service agreement" -- I lost that.

12      Q.   Are these sites that are hosted on servers

13  controlled by Akanoc?

14          MR. LOWE:  Which ones?

15          MR. COOMBS:  The ones that are the subject of

16  Abuse@ManagedSG-Inc.com abuse complaints.

17          THE WITNESS:  Okay.  The complaint that would

18  go into ManagedSG-Inc.com would not be Akanoc IP address

19  anyway, so shouldn't have any relationship there.

20  BY MR. COOMBS:

21      Q.   So when you say that Akanoc has about

22  1400 servers at the data center, those servers are in

23  fact owned by Managed Solutions Group?

24      A.   That is correct.

25      Q.   Are any of them owned by Akanoc?

1     A.   Probably most recently, probably the last two

2 months or so we start having Akanoc acquire hardware

3 assets. Before that we never had Akanoc acquiring any

4 hardware assets.

5     Q.   Okay. Does Akanoc operate an internal network,

6 computer network, for its own employees?

7     A.   I don't quite understand. Well, we use common

8 networks. Akanoc, MSG, Racklogic, to us, network is

9 just something that we talk to each other. So there's

10 not like -- Akanoc has its own network, and then between

11 network and network you communicate with each other.

12    Q.   When you say that the three companies

13 intercommunicate, does that mean that they have one

14 collective network, or they just communicate through the

15 Internet?

16    A.   Well, I don't know how much you understand

17 this, but let me explain it in a very simple way.

18 Racklogic has a Microsoft domain controller, which means

19 most of the time, you know, all companies has a network

20 that way. Where Akanoc and MSG, basically it's

21 Linux-base network. It's like a huge work group over

22 the Internet. So there's nothing that really forms a

23 network per se.

24    Q.   Do each of the employees that we've talked

25 about today have their own work station?

1    A.    That's the window to start talking.

2    Q.    So the initial communication would be through

3    sales --

4    A.    Yes.

5    Q.    -- but then it would be followed up by a

6    technician?

7    A.    Yes.

8    Q.    And do you charge for additional services apart

9    from whatever the monthly package cost is and new

10   customer service charges?

11   A.    We had it on our menu that if you need

12   professional service, it's -- I forget.  It's like $50

13   per hour or something.

14         We never get down to that point.  The only

15   service charge that we would charge customer is when

16   they need a OS restore, not being our responsibility;

17   meaning that we deliver something in a working condition

18   to the customer and then two months later they, for

19   whatever reason, they screw up their configuration, they

20   say, "Can you restore?" always for us, because it take

21   time, so we charged the customer $25.  That's all we

22   got.

23         Yeah, I have not recall anything that customer

24   come in and says, "I want to develop this platform, can

25   you throw in your professional service based on hourly

1   basis?"   No.

2       Q.   Do you typically see any other communications

3   with your customers?  You said you oversee the

4   Sales@Akanoc.com e-mail account.  Do you see any other

5   kinds of communications with your customers after the

6   relationship has been established?

7       A.   Not that I can remember.

8       Q.   Okay.  And that's been true basically since

9   Akanoc was first formed?

10      A.   Yes.  I think there's another type of e-mail

11  that's -- periodically sales will have a promotion

12  programs, and so they put together the promotion

13  programs, deliver to all the customers, and they will

14  have some discussions based on that.

15      Q.   Earlier in your testimony you mentioned that

16  there were about 10 to 15 resellers with whom Akanoc

17  does business.  What percentage of Akanoc's overall

18  business is done with those 10 to 15 resellers?

19      A.   If I'm -- don't hold me on the exact number,

20  but give and take somewhere around -- Akanoc probably

21  has somewhere around 30 to 50 customers any given time.

22  That's pretty much the whole business.

23      Q.   Are any of those 30 to 50 customers located in

24  the United States?

25      A.   Akanoc-wise?

1    Q.    Yes.

2    A.    I can remember one in New York, but I think

3    that he later drop out too.

4    Q.    Do you remember the name?

5    A.    Jimmy Lee.

6    Q.    Are the resellers typically individuals or

7    companies?

8    A.    They will present themselves as company, right,

9    but in reality, if one guy is shooting e-mails to all

10   different e-mail addresses, I'm more intend (sic) to say

11   that maybe they just one or two.

12   Q.    So Jimmy Lee may have been an employee at a

13   company or he may have been --

14   A.    Yes.

15   Q.    -- the customer himself?

16   A.    Yes, yes.

17   Q.    Can you identify for me any of the other

18   customers that Akanoc has?

19   A.    IT5.  Boise -- Boise -- I don't know.  Boise

20   Computer or Boise something.  Nora Q has e-mail address.

21   I don't know the -- I think the company name probably

22   Linlin.

23   Q.    Can you spell that or give us a spelling --

24   A.    L-i-n-l-i-n.  L-i-n.  Double l-i-n.  Linlin.

25         More names?

1    will be monitored via MRTG and calculated," et cetera.

2    Do you see that?

3        A.    Yes.

4        Q.    Does Akanoc monitor bandwidth utilization?

5        A.    Yeah, when customer -- I mean, not really

6    monitor in the sense that every day that we look at it,

7    but when we have excessive usage, then we will base on

8    this and discuss with the customer.

9        Q.    How does Akanoc know when there is excessive

10   usage?

11       A.    Every single server has an MRTG graph

12   associated to it.

13       Q.    And that information is stored in the CPRO

14   database?

15       A.    It's not stored; it's constant.

16       Q.    So how do you see that graph?

17       A.    Manually.

18       Q.    Okay.  So using the Akanoc network you can pull

19   up the data on any particular server, this graph that

20   you're referring to?

21       A.    Yes.

22       Q.    And you just sort of do a sampling or a random

23   audit to make sure that your customer --

24       A.    Yes, that's --

25       Q.    -- is generally in compliance?

1      A.    -- correct.  Yes, yes.  When we see the total

2  bandwidth usage is getting abnormal in a sense, we will

3  go through all the switches to find out --

4      Q.    So when you see total consumption is off your

5  expectations --

6      A.    Yes, yes.

7      Q.    -- you will conduct a kind of audit?

8      A.    Yes, yes.

9      Q.    And what happens -- have you ever found that

10  kind of excess use that --

11      A.    Oh, yeah, yes.

12      Q.    How often does that happen?

13      A.    Well, every time you go through it, you

14  definitely will find somebody that is overusing it.

15      Q.    And what is the way in which Akanoc handles

16  that kind of problem?

17      A.    If it's really, really used too much, in a

18  sense.  If you over a little bit, we don't really bother

19  much, but let's say that you should -- you're supposed

20  to use 1,000 gigabyte as a standard package and you're

21  using 3,000 gigabyte, well, I mean, we need to step in,

22  we need to tell them, "Either pay or drop down your

23  usage."

24      Q.    And what is the customer's response?  Do they

25  comply?

1  from the beginning, the whole Web hosting business

2  actually -- I mean, the foundation of this business is

3  started by Jacques Pham.  So at the time he was

4  Managed.com, and before that he was United Colo, and

5  before that he was something else.  So I think that at

6  the time I was not handling anything dealing with the

7  customer:  sales end and, you know, Website and all that

8  stuff.  So pretty much he got all these things done his

9  way.  And when we have the Akanoc, when we set up the

10  Akanoc business, we basically just took the same thing,

11  copy over and then start monitoring this, and so we

12  missed that one.

13      Q.  It's what we lawyers call a cut-and-paste

14  mistake.

15      A.  I think even worse.

16      Q.  So it's a mistake?

17      A.  Yeah, yeah.

18      Q.  Paragraph 9 on the second page refers to a

19  penalty fee of $10 per violation, and I think you

20  mentioned that's one thing that may have changed --

21      A.  Right.

22      Q.  -- over the last few years?

23      A.  Yeah.

24      Q.  What is the current penalty fee?

25      A.  I don't even know because very, very seldom

1   that we actually get into so-called penalty.  I don't

2   even want to call it "penalty" myself, because a lot of

3   times -- well, let's say a customer says, "Oh, yeah, you

4   just unplug it and I respond back to you and then you

5   need to replug it.  In that case, you know, you want to

6   penalize me for $25 or something."  You know, I always

7   explain to them that it takes people to go into the cage

8   to do the physical work, document everything.  It's just

9   process fee, so.

10      Q.   I don't mean to hold you to the term

11  particularly.

12      A.   Right.

13      Q.   But whatever that fee is, it's now $25?

14      A.   I don't recall.  I don't know, because I --

15  very, very, very seldom that I run -- I personally, I

16  never -- I never charge anybody anything.  I personally

17  don't.  I've seen Juliana fighting with customers that

18  "you need to give me $25, otherwise I won't replug you,"

19  simply because that customer is just bad.

20      Q.   Whose decision is it to impose the penalty?

21  Juliana's?

22      A.   I mean, if she sends out the e-mail and says,

23  "I will unplug you" and that "you need to pay $25," in

24  some sense, I need to support her in a sense.  A lot of

25  times customer will come to me and says, "Can we waive

1    this?" and things like that.  It depends on whether I

2    want to support it or not.

3        Q.   This morning you mentioned that -- earlier this

4    morning you mentioned that you would forward abuse

5    complaints to the customer and that generally that would

6    be the end of it unless there was some repetition.

7        A.   Right.

8        Q.   Would it be your practice to impose a penalty

9    if you did have that kind of repetition?

10       A.   Even we unplug, very, very seldom that we

11   charge customer.

12       Q.   Are there specific procedures or conditions

13   where you will impose the penalty?

14       A.   Not really.  Very, very discretionary.

15       Q.   And that discretion is basically Juliana's or

16   yours?

17       A.   Yes.

18       Q.   Is it -- to the extent that this fee is

19   imposed, is it usually for a violation of the Acceptable

20   Use Policy, or are there other situations where the fee

21   might be imposed?

22       A.   It's AUP.

23       Q.   AUP being short for acceptable --

24       A.   Right.

25       Q.   -- use policy?

1       A.    Right.   Yeah.

2       Q.    Has Akanoc at any time been sued by any of its

3   customers for breach of a service agreement?

4       A.    No.

5       Q.    Has Akanoc at any time paid out any fees to its

6   customers for an alleged breach of the service

7   agreement?

8       A.    No.

9       Q.    Have there been demands made by customers for

10  payment based on Akanoc's breach of the service

11  agreement?

12      A.    No.

13      Q.    Other than forwarding abuse complaints, which

14  you described, and occasionally imposing this 10 or $25

15  fee, are there any other actions that have been taken by

16  Akanoc in response to a breach of the service agreement,

17  or AUP, by its customers?

18      A.    I lost the question.

19      Q.    Let me try it again.   Other than forwarding

20  abuse complaints or sometimes assessing that fee, are

21  there any other actions that Akanoc has taken against

22  its customers for breach of the AUP?

23      A.    Terminating the customer.

24      Q.    And what does that entail?   How do you

25  terminate a customer?

1       A.    Unplug.   Just tell customer, "We don't want you

2   as a customer."

3       Q.    You said "unplug."   What does that mean?

4       A.    "Unplug" meaning the first step that we do is

5   unplug the network connection so the server is no longer

6   available to the network.

7       Q.    Do you redirect the IP address at all?

8       A.    No.

9       Q.    Can you do that also?

10      A.    If we unplug the server, then it's done.

11      Q.    And that can be done by any one of the five

12   cage technicians?

13      A.    Yes.

14      Q.    And how long does that typically take?

15      A.    Within 30 minutes.

16      Q.    Turn your attention to the paragraph that's

17   Roman IX, page 3, called "Indemnification."   Do you see

18   that?

19      A.    Okay.

20      Q.    Has Akanoc at any time invoked that paragraph

21   to seek indemnification from its customers?

22      A.    No.

23      Q.    I'd ask you to turn to page 5 that is listed,

24   "I) Prohibited Uses."   Is that substantially the same as

25   the AUP?

1    sending -- forwarding abuse reports to your customer,

2    you could unplug the server.  Is that what these e-mails

3    are referring to?

4         A.    Yes.

5         Q.    The two e-mails, one says "Your server has been

6    unplugged"; the other says "Your IP has been disabled."

7         A.    Right.

8         Q.    Do they mean different things?

9         A.    Yes.

10        Q.    Okay.  Please explain to me what the difference

11   is.

12        A.    The server unplugged is just disconnecting the

13   server completely, regardless of -- regardless how many

14   different IPs in it.  Disabling an IP is maybe this

15   particular server has 20 different IPs and I'm only

16   taking down that particular IP.

17        Q.    So these are two different actions that

18   Akanoc --

19        A.    That's correct.

20        Q.    -- can take?

21              Does it -- are there criteria that govern when

22   it uses one as opposed to the other?

23        A.    We try very hard not to take down the whole

24   server because they may have some innocent users there

25   that we try not to damage those innocent users, let's

1   put it that way.

2      Q.   So disabling the IP can be a less dramatic step

3   than unplugging the server?

4      A.   That's correct.

5      Q.   But both of them will result in removing access

6   to the abusive Website or content or whatever --

7      A.   That is correct.

8      Q.   -- the complaint is about?

9      A.   That is correct.

10     Q.   And how long does it take -- I think earlier

11  you said that you can unplug the server in about

12  30 minutes; is that correct?

13     A.   Right.

14     Q.   How long does it take you to disable the IP?

15     A.   About 30 minutes.  Depends on how fast we can

16  process the instruction.

17     Q.   Describe for me what is involved in disabling

18  the IP.

19     A.   Same thing to the -- assigning the extra IP, as

20  I was explaining earlier.  There's another procedure

21  that we can disable or de-assigning the IPs, so that's

22  the process.

23     Q.   So you basically go into that interface and

24  make instructions to the router?

25     A.   That's correct.

1    Q.    And either thing, the unplugging or the

2  disabling of the IP, can be reversed as quickly as they

3  can be done in the first place?

4    A.    As reverse what?

5    Q.    Well, for example, you've disabled the IP.  If

6  you want to re-enable the IP, you just reverse the

7  sequence, correct?

8    A.    That might not be true, because if -- if we

9  release an IP from a server, that goes into a general

10  available pot that stores all the IPs.  And if for

11  whatever reason that the IP gets assigned to different

12  place, then no longer available.

13    Q.    Assuming that the IP is available --

14    A.    Yes.

15    Q.    -- you would go in and, again, to the interface

16  and make instructions to the router to re-establish

17  the --

18    A.    That is correct.

19    Q.    And it would take the same amount of time as

20  disabling the IP took?

21    A.    That is correct.

22    Q.    As a matter of company policy, does Akanoc have

23  a preference as between unplugging a server or disabling

24  an IP as a way of dealing with abuse complaints when

25  forwarding an abuse complaint hasn't been a sufficient

1   response?

2       A.   I don't think there's a general policy.

3       Q.   It's probably governed by whether -- the amount

4   of innocent activity that may be occurring on the same

5   server?

6       A.   Exactly, yeah.

7            In Exhibit 26, this guy only had one IP, so

8   there's nothing I can do.  In order to wake him up, this

9   is the only way.

10      Q.   So he may have been on a Coloalacarte server?

11  There may have been other IPs on the same server?

12      A.   Rephrase that one.

13      Q.   Okay.  Would this have been a dedicated server

14  with the one IP address?

15      A.   Yes.

16      Q.   Okay.

17           The "to" line says "wangkiyo@hotmail.com."  Do

18  you see that?

19      A.   Yes.

20      Q.   Do you know who that is?

21      A.   I don't know this particular person.

22      Q.   Is it a reseller?

23      A.   Yes.

24      Q.   Do you know how many servers that reseller

25  operates?

1                           STEVE CHEN,

2      having been previously duly sworn, testified further as

3      follows:

4

5                      EXAMINATION (CONTINUING)

6      BY MR. COOMBS:

7          Q.    Akanoc operates an e-mail server through its

8      Website?  Strike that.

9                How does Akanoc receive e-mails?

10         A.    It has Akanoc mail server, e-mail server.

11         Q.    And that's maintained on one of your servers?

12         A.    Yes.

13         Q.    In San Jose?

14         A.    That is correct.

15         Q.    It's my understanding that there was a point at

16     which e-mail traffic stored on that server was lost; is

17     that correct?

18         A.    Yes.

19         Q.    When did that occur?

20         A.    Somewhere in late 2006 to mid- -- I remember

21     June, June 15th we started a new server, so June 15 of

22     2007.

23         Q.    When you say you started a new server, you

24     opened up a new box, essentially?

25         A.    Yes, that's correct.

1    Q.    Was there any backup or other place in which
2    e-mails that were located on that server were stored,
3    and were there any duplicate copies, for example?
4    A.    No.
5    Q.    When I receive e-mails, they're typically
6    downloaded from a server.  They may be kept on the
7    server, but also on a work station.  Does it work that
8    way at Akanoc?
9    A.    No.  You're on the so-called POP3, so
10   everything download to your work station.  We're on
11   IMAP, so that's everything kept on the server side.
12   Q.    And that applies to both incoming and outgoing
13   e-mails?
14   A.    Yes.
15   Q.    Inbox and send box?
16   A.    Yes.
17   Q.    Is there any way in which e-mails that were
18   located on that server can be restored or recovered?
19   A.    I don't believe so.  We don't even have the
20   hardware anymore.
21   Q.    Was there an effort made at the time to recover
22   e-mails that were stored on that server?
23   A.    Probably so.  But it's -- to us, I mean, we --
24   it's not that important.  I mean, we just want to keep
25   things going.  So, to a certain point, the technician

1    A.    That is correct.

2    Q.    -- at that time?

3          And the address at the top of the page, the

4    45535 Northport Loop, is that the address for Akanoc

5    Solutions?

6    A.    That is correct.

7    Q.    This appears to have been sent both by e-mail

8    and by United States -- or hard copy mail; is that

9    correct?

10         MR. LOWE:  Objection, it doesn't state that it

11   was sent by U.S. mail.  It says by e-mail.

12   BY MR. COOMBS:

13   Q.    Does Akanoc Solutions receive infringement

14   notices by post as opposed to e-mail?

15   A.    Very seldom.

16   Q.    And are those maintained by Akanoc?  Are copies

17   of those kept?

18   A.    We had a period of time, I would say July,

19   starting July of 2006, we were merging two data centers

20   together because of the other data center lease is up

21   and we decide to merge it together.  And at the same

22   time we are gradually losing business to Managed.com all

23   the way to February to April, somewhere around there,

24   that Managed.com was sold to WebHostPlus and they made a

25   physical move of everything out from us.  So we --

1   during that period of time, the whole company is more or

2   less in turmoil, because we're losing business, we're

3   having a lot of the overhead expense and things like

4   that.

5          At the time we were also losing staffs,

6   internal staffs, who, I think at that time, there was a

7   Joe, there was Chi, and some other person that was

8   actually handling mails.  So for that period of time,

9   there were mails that gets in, receive by -- you know,

10  we had the second floor, so the first floor has a

11  general receptionist.  She may have received a letter

12  and signed up for that, and then eventually it's deliver

13  to upstairs, and then it might set on the desk and

14  whatnot.  So I think that was the time that a lot of the

15  mail was not even being open, nobody really pay

16  attention to it.

17     Q.   That's not true of e-mail, though; that's just

18  hard copy mail?

19     A.   Yes, that's correct.

20     Q.   And the period you're talking about again is

21  fall of 2006?

22     A.   To middle of, I would say, about July, August

23  time frame.  Because I remember that August of 2006 that

24  was the lease up, so we were moving -- am I right?

25  2003, '4, '5, '6 --  yes, 2006.  That was the time that

1    we're moving and everything.

2        Q.    Until when?

3        A.    To, I think it's April, March or April that

4    WebHostPlus move everything out.

5        Q.    And that is March or April of 2007?

6        A.    That is correct.

7        Q.    And the handling of hard copy correspondence of

8    what you've described, that would apply even if it came

9    by some kind of courier like Federal Express or DHL; is

10   that correct?

11       A.    Yes, at that time, yes.

12       Q.    And the procedure for responding to a notice of

13   infringement like the one evidenced by Exhibit 2 is the

14   same as you've already described with respect to

15   Exhibit 1?

16       A.    Yes.

17       Q.    And do you ever have a practice of replying to

18   individuals or companies that send abuse complaints like

19   those evidenced by Exhibit 1 or 2?

20       A.    Very seldom, very seldom.

21       Q.    Are there particular circumstances where you

22   do -- where Akanoc does, I mean?

23       A.    Legal authorities, meaning police, FBI,

24   Homeland Security, I would -- most likely I would

25   personally reply.  The general type of abuse we don't

1   reply because we -- we cannot reply in a sense that once

2   we forwarded the issues out, we don't know when it's

3   been taken care of or things like that, unless that is

4   constant, and then we need to do a precise follow-up.

5          MR. COOMBS:  I'll mark as 3 a letter dated

6   February 19th.

7          (Plaintiffs' Exhibit 3 was

8          marked for identification and

9          is annexed hereto.)

10  BY MR. COOMBS:

11     Q.   Have you seen that before?

12     A.   No, not -- I don't have any recollection.

13     Q.   Is there any way you could determine whether or

14  not Akanoc received that correspondence on or about the

15  date it bears?

16     A.   No.

17     Q.   Now, on that particular one, on the upper

18  left-hand side it says "By express mail."  Do you see

19  that?

20     A.   Yes.

21     Q.   But consistent with what you said before, this

22  was during a period of turmoil at the company --

23     A.   Yes.

24     Q.   -- and so there was nobody looking at mail; is

25  that correct?

1      A.    That's most likely true.

2      Q.    And what happened to the mail that was received

3  during that time frame?

4      A.    There was a desk that one of the girl used to

5  sit and everything just piled up there.

6      Q.    Was it ever opened or filed away?  What was

7  done with it?

8      A.    I don't recall that.  Some comes in as a letter

9  form.  It may have opened by somebody that just want

10 to -- just want to know where to put it.  But once it

11 sits on that desk, then there's virtually nobody

12 watching it.

13         MR. COOMBS:  Mark as 4 a letter dated

14 February 21, 2007.

15         (Plaintiffs' Exhibit 4 was

16         marked for identification and

17         is annexed hereto.)

18         THE WITNESS:  Same thing, I have no

19 recollection.

20 BY MR. COOMBS:

21     Q.    Does Akanoc operate an e-mail address

22 info@Akanoc.com?

23     A.    Should.

24     Q.    And who is responsible for looking at the

25 contents of that mailbox?

1   IP address.

2        Q.    I understand.   What I'm asking you is there any

3   way you can determine whether or not that Website was

4   located at an IP address --

5        A.    Yes.

6        Q.    -- controlled by Akanoc?

7        A.    In CPRO, the most that we would document is

8   "unplug this particular server," and because it relates

9   to the service record of that particular hardware, have

10  nothing to do with why or what type of cases associate

11  to that unplug.

12       Q.    So there'd be nothing in the Akanoc records one

13  way or the other to say that the site was not located in

14  an IP address that Akanoc had assigned to one of its

15  customers?

16       A.    No.   The only place that we can look for that

17  type of -- the information related to that type of issue

18  is on the abuse and security e-mail, e-mail log.

19       Q.    Which were lost in --

20       A.    Yes, that's correct.

21       Q.    -- June of 2007?

22       A.    That is correct.

23       Q.    To your knowledge, do any of your customers

24  retain information regarding the Websites hosted at

25  IP addresses they received from Akanoc?

1    A.    I don't know.

2         MR. COOMBS:  I'll mark as 6 a letter dated

3    April 20, 2007, and ask the witness if he has seen that.

4         (Plaintiffs' Exhibit 6 was

5         marked for identification and

6         is annexed hereto.)

7         THE WITNESS:  I have no recollection of this.

8    BY MR. COOMBS:

9    Q.    Would you have any way of determining whether

10   or not this letter was in fact received by you on or

11   about the day it bears?

12   A.    I remember I receive one of this from your

13   office and I took it to the office, and since it's

14   concerning Akanoc, so I pretty much just put it in the

15   pile.

16   Q.    Okay.  When you say you took it to the office,

17   that's because the Onondaga Drive address is your home

18   address?

19   A.    That is correct.

20   Q.    So you do recall receiving a letter at your

21   home?

22   A.    Yes.

23   Q.    Concerning Louis Vuitton?

24   A.    Yes.

25   Q.    When you say you took it to the office and put

1    it on a pile, what does that mean?

2        A.    I mean put it on the desk.

3        Q.    Whose desk?

4        A.    That particular -- the empty desk I was talking

5    about.  Because that was -- at that time that was the

6    place that we put all this type of letters.

7        Q.    To your knowledge, what happened with the

8    letter after you put it on the desk?

9        A.    There were -- there were too many people trying

10   to share the workload over there, so I have no idea.

11       Q.    Was there some -- were some people assigned

12   with the responsibility for handling the correspondence

13   that was put on the desk?

14       A.    I don't recall that we specifically assigned

15   anybody.  Everybody just more or less like sharing the

16   load.

17       Q.    Okay.  To the extent I understand that you

18   can't say what happened with this letter, but in terms

19   of Akanoc's policies and procedures, what should have

20   happened with this letter after it was put on the desk?

21       A.    We -- very, very seldom that we receive

22   complaint through e-mail -- I mean, through regular

23   mails, so most of the abuse issues were all resolved in

24   the e-mail format.  So this type of e-mails -- I mean,

25   letters, actually something from, like, things like

1    subpoena, we need to respond.  Or something like come in

2    from legal authority, we need to respond.  But general

3    complaints, we just don't have a lot of experience with

4    it, and we don't have any mechanism to take care of

5    letter complaints.

6         Q.    So there was no real policy to handle --

7         A.    Yes.

8         Q.    Did Akanoc have an agent for service with the

9    copyright office as of April 20th, 2007?

10        A.    No.

11        Q.    When did it first have a designated agent with

12   the copyright office?

13        A.    End of last year.

14              MR. COOMBS:  We'll mark as 7 another letter,

15   dated November 26th, 2007.

16              (Plaintiffs' Exhibit 7 was

17              marked for identification and

18              is annexed hereto.)

19   BY MR. COOMBS:

20        Q.    Have you seen that letter before?

21        A.    It came in through my attorney's e-mail, so

22   that's what I got instead of a mail.

23        Q.    Can you tell me what, if anything, Akanoc did

24   in response to receipt of this letter from your

25   attorney?

1    says, "It was still live this morning when we checked."
2    Actually, it also appears towards the bottom of the
3    first page.
4        A.    Okay.
5        Q.    Does that mean it was pinged or that the site
6    itself was --
7        A.    I forgot, I forgot.
8        Q.    Okay.  Is that something that you would have
9    written or someone else?
10       A.    Most likely it's me.
11             MR. COOMBS:  Mark this 28, a two-page document,
12   Acceptable Use Policy.
13             (Plaintiffs' Exhibit 28 was
14             marked for identification and
15             is annexed hereto.)
16   BY MR. COOMBS:
17       Q.    Take a look at that.  Is that Akanoc's --
18       A.    Looks like this is for Coloalacarte.
19       Q.    Is that any different from the Acceptable Use
20   Policy for DediWebHost?
21       A.    Probably not.
22       Q.    Has Akanoc or its brands had a different
23   Acceptable Use Policy at any time?
24       A.    Probably not.
25       Q.    And do you remember when the Acceptable Use

1      Q.   I understand.

2           Can you read the third line, the one that you

3  didn't paraphrase for us.

4      A.   So Will was asking him to provide log-in

5  information, and we will check.  If it's already been

6  resolved, then we will discuss how to take care of this

7  issue.

8      Q.   Does that reflect a new policy on the part of

9  Akanoc to inspect sites?

10     A.   No.

11     Q.   Can you explain why Will was asking you to do

12  that?

13     A.   I have no idea.

14     Q.   Did you have any discussion with Will Lone

15  concerning this infringement report, other than is

16  reflected in the e-mail exchange here?

17     A.   I think that -- I think that this is -- the

18  reason I step in, it was that whether they need to pay

19  for the $25 reactivation fee, or that's about what I

20  sent.

21     Q.   So you're basically saying he can waive the

22  $25?

23     A.   Yes, yes.  I think what it is was, by reading

24  this, I think that they shut down the Website, but they

25  forgot to e-mail us.  And so while I was checking, they

1    actually might have shut down already.

2         MR. COOMBS:  Mark as Exhibit 30 a two-page

3    e-mail dated November 29, 2007.

4         (Plaintiffs' Exhibit 30 was

5         marked for identification and

6         is annexed hereto.)

7    BY MR. COOMBS:

8         Q.   So this appears to be an e-mail exchange

9    involving security at Akanoc.com on one part; is that

10   correct?

11        A.   I don't think this is security.  I think this

12   is Will and -- oh, okay.  Yes, this is security.  Yes.

13        Q.   And the zhxiangtnk@163.com, that's the

14   customer?

15        A.   Yes.

16        Q.   And at the beginning of the exchange is a

17   request by security for log-in information; is that

18   correct?

19        A.   Yes.

20        Q.   And is that a request that you made or someone

21   else made from the security mailbox?

22        A.   Most likely myself.

23        Q.   Okay.  Does that refresh your recollection as

24   to whether or not Akanoc has adopted a policy of

25   inspecting Websites before replugging or reactivating

1    service?

2         A.    Yes, this is -- this is a different type of

3    issue.  If you go down, you know, beginning of the

4    e-mail, basically it says that it was DDOS -- we had a

5    policy that if a particular server gets DDOS, meaning

6    that huge inbound traffic just didn't try to block the

7    whole network, there's contents associate to that type

8    of DDOS.  Okay?

9         Q.    When you say "that DDOS" in that context,

10   you're talking about denial of service?

11        A.    Yes, that's correct.  And we found that

12   basically just trying out cyber police, that they don't

13   like to see adult Websites, you know, going -- servicing

14   the Chinese customer base.  So if they find anything

15   that is adult-content based, then they would DDOS it and

16   to let ISP like ourselves, you know, feel the pain,

17   per se, and eventually kick everybody out.

18             So we had a -- we first had a policy that if

19   customer-rented server gets DDOS'd, we stop it for

20   ten days.  But then customer says, "Well, I mean, we get

21   DDOS, we don't know why.  You know, it's not adult

22   content," and then sometimes when we revive it and then,

23   you know, DDOS again.  So we had this particular policy

24   that if it's being DDOS'd, if the customer claim is not

25   adult site, we want to be sure.

1    Q.    And you're sure by obtaining log-in information

2    to allow you to access the Website that has been accused

3    of hosting adult content?

4    A.    That is correct.  If they still want the

5    server.

6    Q.    Have you ever had a customer refuse to give you

7    that log-in information --

8    A.    Yes.

9    Q.    -- upon request?

10   A.    Yes.

11   Q.    And what happens in that case?

12   A.    Then just we don't replug it.

13   Q.    As I understand it, Akanoc, it receives a

14   monthly payment for the packages that it sells to its

15   customers?

16   A.    That is correct.

17   Q.    And it receives a setup fee of some sort when

18   it first --

19   A.    No.

20   Q.    No?

21   A.    Yeah, it just all comes in in one package.

22   Q.    Does that include the hardware, then?

23   A.    The hardware is a rental basis.

24   Q.    That's part of the monthly payment?

25   A.    That is.

1    she's trying to clarify is in what type of situation

2    that we will consider, you know, unplug or it's really

3    bad from our end.

4        Q.    And as I read that, simply moving an abuse

5    Website from one IP to another IP within the same

6    customer's control would not adequately respond to the

7    original abuse complaint; is that correct?

8        A.    I lost that part.

9        Q.    Well, when I say if they just move around, you

10   should still unplug, isn't that what the end rule is

11   that you're establishing with Ms. Luk?

12       A.    Right, more or less.  Yeah, I will consider

13   that -- that if the customer already know that we ARE

14   watching them on one IP and then they move the other IP,

15   personally I will just unplug it.

16       Q.    Okay.  And while you may have done that before,

17   you're describing what should be a general policy going

18   forward --

19       A.    Right.

20       Q.    Okay.

21             Mark as 32 a one-page e-mail dated

22   September 11, 2007.

23             (Plaintiffs' Exhibit 32 was

24             marked for identification and

25             is annexed hereto.)

1    back, we were thinking of forming the business together,

2    and eventually he lost the interest of this, and that's

3    about it.

4       Q.   Was he a part owner at one time?

5       A.   Not really.

6       Q.   Was he an employee at one time?

7       A.   No.

8       Q.   And he has no current involvement with Akanoc?

9       A.   No.

10      Q.   And he has not for two or three years or more?

11      A.   More than -- I think that at the time that

12   we're separating from -- with Jacques, that's pretty

13   much dissolve everything.

14      Q.   That's 2004?

15      A.   Right.

16      Q.   You said that one customer with whom you do

17   have interactions otherwise than by e-mail is IT5; is

18   that correct?

19      A.   Yes.

20      Q.   And why is that?  Is it a bigger customer or

21   more problem customer or somebody you know from other

22   circumstances?

23      A.   At one time that they were probably our biggest

24   resellers.  At the time, you know, Alice Chen was

25   actually handling the business herself, and later she

1  has babies and family issues and then so she quiet down.

2  And now if we -- send a notice that if we sent e-mail to

3  IT5, we always send it to this ZhongHH.IT8, that

4  particular account, instead of Alice Chen.  And probably

5  right now she's probably No. 5, somewhere around there,

6  not top one anymore.

7      Q.    And where is IT5 located?

8      A.    In China.  Xiamen.

9      Q.    Xiamen?

10     A.    Yeah.  It's southern part of China.

11     Q.    X-i-a-m-e-n?

12     A.    X-i-a- -- yeah.

13     Q.    Earlier I showed you a couple printouts from

14  the DediWebHost.com Website.  Do you remember that?

15     A.    Yes.

16     Q.    Who wrote the text that appears on those

17  Websites?

18     A.    The Chinese --

19     Q.    No, the English.

20     A.    Pretty much it's a copy from Managed.com, so

21  Managed.com was created by Jacques Pham, and then so we

22  just take that and just keep migrating.

23     Q.    Sort of like the service agreement?

24     A.    What attorney said?  Cut and paste?

25     Q.    You said that the correspondence, hard copy

## ERRATA SHEET

I, Steven Chen, declare under penalty of perjury that I have read the foregoing 220 pages of my deposition testimony, taken on April 8-9, 2008 at 517 E. Wilson Street, Glendale, California, and that the same is a true record of the testimony given by me at the time and place hereinabove set forth, with the following exceptions:

| Page | Line | Sentence(s) should read: | Reason for Change: |
|------|------|--------------------------|--------------------|
| 34 | 1 | Change "managed" to "unmanaged" | Reporter error |
| 44 | 20 | Add this sentence to end of sentence at line 20: "We might have 50-100 extra server capacity, not 50-100 extra server on the side." | Clarification |
| 45 | 13 | Change "All" to "Or." | Reporter error |
| 45 | 17 | Add this sentence after first sentence at line 17: "I don't know the percentage of the website hosting application." | Clarification |
| 60 | 19-20 | Change Boise to "Boysee." | Reporter spelling error |
| 115 | 3 | Change "DDOS" to "DOS." | Reporter error |
| 132 | 12 | Change "just trying out cyber police" to "just China police." | Reporter error |
| 132 | 22 | Change "revive" to "replug." | Reporter error |
| 173 | 19 | Change "max, the total max" to "mass, the total mass." | Reporter error |
| 175 | 4 | Change "auto page" to "order page." | Reporter error |
| 181 | 25 | Add this sentence at beginning of paragraph: "That's "re-allocated" not "we allocated."" | Reporter error |
| 203 | 2 | Change "we draw" to "I draw" | Reporter error |

Date: May 13, 2008

_____
Signature of Witness

_____
Steven Chen
Name Typed or Printed

10562-002-5/14/2008-161206.1

**Exhibit B**

1               IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4   LOUIS VUITTON MALLETIER, S.A.,    )
                                      )
5                       PLAINTIFF     )
            VS                        )C.A. NO. C 07 3952 JW
6                                     )
    AKANOC SOLUTIONS, INC., MANAGED   )
7   SOLUTIONS GROUP, INC., STEVEN     )
    CHEN AND DOES 1 THROUGH 10,       )
8   INCLUSIVE,                        )
                        DEFENDANTS    )
9   _____   )

10

11

12

13

14              ORAL DEPOSITION OF ROBERT L. HOLMES,

15   produced as a witness at the instance of the Defendants,

16   and duly sworn, was taken in the above-styled

17   and -numbered cause on the 1st day of April, 2008, from

18   9:31 AM to 6:22 PM, before Ronald R. Cope, a CSR in and

19   for the State of Texas, Registered Professional Reporter

20   and Certified Realtime Reporter, reported by machine

21   shorthand at the offices of U.S. Legal

22   Support/MillerParker, Inc., 5910 North Central

23   Expressway, 100 Premier Place, Dallas, Texas, 75206,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.

ROBERT L. HOLMES

1    argumentative.

2        A.   I do not know if it was March.

3        Q.   (BY MR. LOWE)   Okay.   Do you know whether or

4    not you -- let me rephrase.

5             Do you have any recollection that you

6    actually did any work connected with this lawsuit

7    anytime in 2008, even if you don't remember the exact

8    time?

9        A.   Yes, sir.

10       Q.   And what do you think that was?   What's your

11   last recollection of work that you did in this lawsuit?

12       A.   Investigating the corporate ownership of

13   associated entities in some of the purchases I made for

14   Louis Vuitton.

15       Q.   Okay.   What corporate entities were you talking

16   about or were you looking at?

17       A.   Akanoc Managed Solutions Group are the ones I

18   recall.

19       Q.   And what was that work that you did in that

20   connection to investigate those corporate entities?

21       A.   I conducted legal-owner searches.

22       Q.   By what names?

23       A.   (No verbal response.)

24       Q.   What did you do?

25       A.   I made databases (sic) and made phone calls.

ROBERT L. HOLMES

1      Q.    So you made databases?

2      A.    I'm sorry.   I conducted searches and made phone

3   calls.

4      Q.    And where did you search?  What databases or

5   what sort of information did you search?

6      A.    I typically second- and third-source all my

7   data, so I would have used a multidatabase probably

8   through Acxiom.  And I would have gone directly to the

9   State's website as well.  And I typically also call the

10   State's -- Secretary of State's office to triple-source

11   the data.

12      Q.    What do you mean "triple-source"?

13      A.    That would be a third source, to be sure.

14      Q.    So in connection with Akanoc and Managed

15   Solutions, what do you recall doing?

16      A.    I recall conducting searches and investigating

17   the relationship of several websites and entities.

18      Q.    With respect to the corporate ownership, for

19   example --

20      A.    Yes, sir.

21      Q.    -- what did you do about Akanoc and Managed

22   Solutions, precisely?

23      A.    I would have to look at a report to give you

24   specific details.

25      Q.    You have no recollection, as you sit here?

ROBERT L. HOLMES

1      A.   No, I do have recollection; but to give you

2  specific details, I would have to -- beyond telling you

3  I conducted searches and made phone calls, to give you

4  specific data, I would have to look at one of my

5  reports.

6      Q.   As you sit here though you cannot recall that

7  you did any -- anything particularly to search for that

8  information?

9           MR. COOMBS:  Objection, asked and

10 answered.

11     A.   I conducted searches, made phone calls, sir.

12     Q.   (BY MR. LOWE)  And do you remember what

13 searches you conducted or what phone calls you made or

14 to whom you made them?

15     A.   Yes.

16     Q.   Please tell me that.

17     A.   One of the things I did was I looked at a list

18 of domain names that appeared to be related to the

19 Akanoc and Managed Solutions entities, and I

20 investigated the relationships between those domain

21 names and the entities involved.  The name server on

22 many of Akanoc's and Managed Solutions' domain names

23 were common.  One of the name servers was

24 coloalacarte.com.  There was another name that showed up

25 here and there and I'm not 100-percent sure, but it was

1    something like Racklogic or something.  And these names

2    appeared in multiple places in my searches.  So I

3    investigated the relationship between these domain

4    names, and what I found were telephone numbers and fax

5    numbers and addresses.  And what I did was in some of

6    these cases, I conducted searches, Internet searches, on

7    fax numbers and on telephone numbers.  And when I

8    realized that some of these websites share the same fax

9    number and telephone number, I made phone calls and

10   asked for those specific companies to see if they

11   answered for those specific companies; and they did.

12   And some of the -- some of the websites that I found had

13   different telephone numbers, and some of them had

14   different telephone numbers and same fax numbers.  So

15   what I had done was called these companies.  And I also

16   made telephone calls to the different phone numbers as

17   well, the same phone numbers.  In some of those cases,

18   the telephone was answered by the same individual.

19       Q.    All right.  Anything else that you remember?

20       A.    Not specifically, sir, but I'm sure I did.

21       Q.    Did you provide reports to Mr. Coombs or to

22   Mr. Livadkin, or both, of your work?

23       A.    It would be my normal practice to send a report

24   to the client.  And if I'm aware of an outside counsel,

25   it would be practice to send a copy to the outside

ROBERT L. HOLMES

1          MR. LOWE:   We'll see.

2     Q.   (BY MR. LOWE)   So this might have been

3 something you printed is your testimony?

4     A.   This is something that I probably would have

5 attached to these documents here (gesturing).

6     Q.   All right.   And this would be -- what is this?

7 What is this printout?

8     A.   Again, I answered that question.   It is a

9 printout from domaintools.com, and it is a search for

10 the registrant and other data of bag4sell.com.

11     Q.   And how did you go about that search, if you

12 did that for bag4sell.com, through domaintools.com?

13     A.   I or one of my employees would open up a

14 browser, would type in www.domaintools.com, would arrive

15 to that page.   We would go to the Whois search engine on

16 that site and we would type in B-A-G, the numeral 4,

17 S-E-L-L, dot, period, C-O-M, and then we would hit

18 whatever the submit button would be, search or submit,

19 and we would receive results that would look like this.

20 That's how we would go about it.

21     Q.   And what do you understand these results to be?

22     A.   This is the registrant data and other data of

23 bag4sell.com.

24     Q.   Do you have any way of verifying the accuracy

25 of this information?

1      A.    We second- and triple-source our data.

2      Q.    Do you have any way of verifying the accuracy

3 of this information?

4      A.    Which information are you --

5      Q.    Anything that's on these two pages.

6      A.    We second- and triple-source the data.

7      Q.    What does that mean?

8      A.    We would typically go to -- say, for example,

9 we show you this page here (gesturing).  This isn't the

10 only page that we search.  We may have gone to another

11 website.  Say, for example, the IP address here -- if

12 you look about halfway down the page, the IP address,

13 204.13.66.161.  Then underneath, it says, "IP location:

14 California, Freemont, Akanoc Solutions, Inc."  That

15 right there is the IP address data.  And what we do with

16 that data to verify its accuracy, this -- this data is

17 registered with several different companies.  It's

18 registered with a company called ARIN, which is the

19 American -- the American Registry of Internet Numbers.

20 They register their data with a whole bunch of different

21 search engines as well as themselves.  There are other

22 organizations that also catalog these numbers.  And what

23 we do is we second- and triple-source this data.  The

24 first thing we do is -- because the way that number is

25 achieved is packets of information are bounced off of

ROBERT L. HOLMES

1   the physical place where that domain points to.  So say,

2   for example, if you dial a telephone number, say my

3   telephone number, it hits a telephone, and my physical

4   telephone is what it hits, and that is where that

5   telephone number is assigned.  This IP address is

6   assigned to a physical computer somewhere in this world.

7   It is registered with ARIN to be located in Freemont,

8   California at Akanoc Solutions, Inc.

9              And what we do with that data is we

10  actually ping that data through other sources.  So we do

11  not only rely on DomainTools, but we would not have

12  issued this if we didn't -- typically, with DomainTools,

13  it is a very neat easy-to-read package of information

14  that a client is able to -- is able to view.  Some of

15  the other data that we -- that we obtain is not as

16  pretty, not as easily packaged.  It may be through a DOS

17  prompt.  We ping data through DOS prompt, we may ping

18  data through a website Geek Tools or another -- or

19  ARIN's website.  They have several authorized websites.

20  You know, again, DomainTools is one of them.  And we

21  check that data.

22              And then we also check the owner of that

23  IP address to make sure not only is it the IP address

24  that that domain name actually resolves to but who is

25  the owner of that IP address.  So not only do we second-

1    and triple-source the accuracy of the reception of that

2    packet to that IP address, but we actually double- and

3    triple-source the accuracy of the owner, the registrant

4    owner, of that IP address itself with two or three

5    different sources.

6        Q.    And are you able to say, as you sit here today,

7    that you did that in this particular case?

8        A.    Yes, sir.

9        Q.    What are the other sources that you used other

10   than those you testified about?

11       A.    There are many different sources.  One -- now,

12   there are two different processes, one which is the

13   pinging of the IP address to determine the accuracy of

14   the IP address.  The first and easiest way we typically

15   use is we actually ping using DOS through a computer.

16   We will also go to -- typically, my employees will go to

17   or I will go to a website called network-tools.com.

18              There's also software.  If you go to

19   netdemon.net, there's software you can download.  And

20   when you use the NetDemon software, you can choose from

21   a drop down of several reliable sources.  And when I say

22   several, I'm saying probably about two dozen sources.

23   And what we do is -- and they're all registered with

24   ARIN as well and APNIC -- ARIN is a North American

25   organization, but there are other organizations in other

ROBERT L. HOLMES

1    regions.  And what the Net Demon software does which is

2    very reliable as well because like I said there are

3    about two dozen sources.  And the software allows us to

4    type an IP address in, ping some data, and receive a

5    packet back from physically where that -- where that

6    data is stored.  And it's in raw form, so obviously,

7    like I said, it's not as pretty as something like this,

8    as DomainTools.

9        Q.   Where does the information come from that you

10   see on -- from pinging?

11       A.   Pinging comes from the actual place that the

12   packet is bounced from.  So say, for example, if I dial

13   your telephone number and it rings, I know that that

14   telephone number rings to that telephone, and I can say

15   that beyond a shadow of a doubt.  Just like with an IP

16   address, if I type in that domain and I send a packet of

17   information -- when I say "a packet," basically the

18   computer just spits at another computer, basically, or

19   throws a rock at another computer, and that data bounces

20   back.  And that data comes back as the physical place --

21   the physical IP address of that specific location.  And

22   that IP address in this case, for bag4sell.com, would be

23   204.13.66.161.

24       Q.   You know that you actually pinged that number?

25       A.   I know if that was assigned to my office, that

1    we actually pinged that number, yes.

2        Q.   If you had done so, would you have sent a copy

3    of that record to your client?

4        A.   Yes, sir.

5        Q.   So there would be a printout of a DOS screen?

6        A.   No, sir.  This is the result right here.  Like

7    I said, again -- this is the third time I've said

8    this.  -- we second- or triple-source our data.  We

9    often give the most organized piece of data, which is

10   commonly DomainTools.  There is a lot of information

11   that is not compiled into one place.  This information

12   here -- DomainTools is a very helpful company.  There

13   are -- one, two, three, four, five -- six searches all

14   completed and generated into one report.  It would be --

15   it's our common practice to send a copy of this data,

16   because it's compiled into one place.  It's our way of

17   packaging the information, the tested information, and

18   giving it to our client in readable form.

19       Q.   You say that there are six searches.  Tell me

20   what the six searches are --

21       A.   Well --

22       Q.   -- that are reflected on this document --

23       A.   Okay.

24       Q.   -- this Exhibit 1045.

25       A.   Okay.  For example, where you see "Website

1    title," that right there -- and it says "Louis Vuitton,"

2    comma, "Chloe," comma, Cucci (sic) -- "Gucci," comma,

3    "Prada," comma, "Chanel," comma, "Fendi handbags," with

4    the underline underneath of that.  That is a link to the

5    actual website.  And that search right there, those

6    search results, that is the title of the website for

7    bag4sell.com.  And see, that information is retrieved

8    from the actual website stored on the server.  So say,

9    for example, if you went to your browser and you typed

10   in B-A-G, the numeral 4, S-E-L-L.com, you would retrieve

11   a window that would have a certain amount of data in it.

12   The title of that website or the title of that window

13   that would appear in the top bar of your window

14   screen -- not the website itself but the top bar of your

15   browser, that is the data that would appear in that

16   windows bar.  So that is one search.

17             The meta- -- sorry.  The meta description,

18   which is the next search, that says, "Louis Vuitton

19   Chloe Gucci Prada Chanel Fendi handbags.  Monogram

20   Canvas Damier Canvas" --

21   Q.   You don't have to read all of it.

22   A.   Okay.  That meta description is information

23   that is hidden inside the website so that people can

24   find that data by typing those phrases or those words

25   into a search engine such as Google, Yahoo!, msn.com,

1    aol.com, or something like that.  So that is information

2    that is programmed into the website itself.  This search

3    actually pulls that data out so it's easy for you to

4    read.

5        Q.   I would like you to go on and just identify the

6    six searches that you talked about earlier.  Without

7    going into detail about them, just tell me --

8        A.   About us?

9        Q.   Uh-huh.

10       A.   IP address, IP location, the ICANN registrar,

11   the name server.  There are more than six searches.  I

12   pointed out six, and the registrar as well.  Those are

13   six.  I named six because I illustrated to you it was

14   several searches that are compiled in one place.

15       Q.   Just a moment.

16       A.   Sure.

17       Q.   I believe you mentioned registrant.  I guess

18   I'm having a hard time seeing that on here.

19       A.   Toward the very bottom of the page under "Whois

20   record," which is in bold, you see some type face under

21   domain name, colon -- you'll see "Registrant," colon.

22       Q.   Okay.  Now, of these various searches that are

23   perhaps reported on here, which of them do you double-

24   or triple-check?

25       A.   The data that we double- and triple-check

1    specifically?  Website title, the IP address, the IP

2    location, and the Whois record, registrant.

3         Q.   Tell me how you do the additional searches for

4    each of those, please.

5         A.   The website title, we double-source that by

6    going to the subject's actual website and seeing that

7    information.  That's how we double-source the website's

8    title.  The IP address, I already explained to you; and

9    the IP location, I explained to you.  The registrant

10   data, the Whois record, fourth one I described, we will

11   go to another Whois source such as -- and I could name

12   dozens, but networksolutions.com, namesecure.com,

13   checkdomain.com, just about any Whois source.  There are

14   hundreds of them.  Typically, those would be the ones I

15   would go to next.  Again, we would also use Net Demon

16   software, because they have two dozen sources within

17   that software itself.

18        Q.   And a third source for any of this data?  What

19   would be a third source for any of the ones you just

20   listed?

21        A.   I named you -- I named you at least five

22   sources for the Whois record.  Which data are you

23   talking about?  Because I explained the IP address and

24   IP location to you a couple of times.

25        Q.   All right.  Anything else that you haven't

ROBERT L. HOLMES

1   explained the extra sourcing?

2       A.   I've explained every one thoroughly.

3       Q.   All right.  Now, all of this information that's

4   on here is secondhand?

5       A.   By "secondhand," what do you mean?

6       Q.   Well, it is a report by somebody who obtained

7   it from some other place?

8       A.   That's a very general question, but I'll

9   explain to you what I said before.

10      Q.   No.

11      A.   Okay.

12      Q.   Please answer my question.

13      A.   Okay.

14      Q.   Would you agree with me that everything that's

15   reported here on DomainTools is not information that

16   DomainTools originated but they obtained it from

17   somebody else?

18      A.   All data is secondhand.  That's why it is

19   second- and triple-sourced.

20      Q.   All right.  So you have concerns about the

21   accuracy of data?

22      A.   Never.

23      Q.   Really?

24      A.   Well, not once it is second- and

25   triple-sourced.

1    Q.    Have you had occasion to determine that data

2    from, for example, DomainTools is inaccurate?

3    A.    Never.

4    Q.    You've never had an IP address that was wrong?

5    A.    I don't recall so.  I'm just the type of person

6    that likes to be sure, and I do not like to ever show a

7    client something that I'm not 100-percent sure about.  I

8    stake my life on everything I give people.

9    Q.    Well, I'm not sure we need to have you staking

10   your life on it --

11   A.    But I do.

12   Q.    -- asking you -- well, no, actually, you're

13   not.

14   A.    No, but I do.  I take my job seriously.

15   Q.    And when have you placed your life on the line,

16   sir, in this business?  It seems to be --

17   A.    Every single day.

18   Q.    Come on, now.

19   A.    Sir, I didn't say place my life on the line.  I

20   say stake any life.  Placing and staking is two

21   different things.

22   Q.    What does that mean, then?

23          MR. COOMBS:  Argumentative.

24   A.    Sir, my word is staking my life.  I stake my

25   life on my word.  And when I give my client a report, I

1    investigated.

2        Q.   Do you know how many?

3        A.   Not off the top of my head, no.

4        Q.   And what do you understand the business of

5    Managed Solutions Group, Inc. to be?

6        A.   They play the part of host in a number of cases

7    that I've investigated.  So I can tell you about that

8    role and not necessarily the whole scope of their

9    business.

10       Q.   Do you recall how many websites they host that

11   you investigated?

12       A.   No, but their name started appearing as host

13   going back well over a year, possibly two years, even

14   before this was ever brought up from the client.

15       Q.   By two years, you mean back in 2006?

16       A.   Most likely.

17       Q.   Any earlier than that?

18       A.   I couldn't say for sure, but it could have

19   been.  It's very possible.  The name Managed Solutions

20   has been around in many communities for some time.

21       Q.   Do you know if there's a difference between

22   Managed Solutions Group and Managed Solutions?

23       A.   They're two different corporations.

24       Q.   How do you know that?

25       A.   Because the Secretary of State told me so.

ROBERT L. HOLMES

1    this list?

2         A.   Most likely, yes.

3         Q.   Okay.  But not others?  I mean, not maybe more

4    than 15?

5         A.   Oh, there could have been.  I've done -- like I

6    said, I've done hundreds of cases that may have been

7    related to, you know, any host of websites.

8         Q.   Okay.

9         A.   And again, your clients' names came up even

10   well before they were brought to my attention by Louis

11   Vuitton.

12        Q.   And when they came up, did you report that fact

13   to Louis Vuitton?

14        A.   When they came up in the past?

15        Q.   Yes.

16        A.   Well, most likely with whoever client that I

17   was investigating a particular website for, I do

18   typically tell them who the host was, so many those

19   cases it may have been tangential data at the time.

20        Q.   Would you, for example, perhaps have identified

21   some websites that were selling Louis Vuitton bags in

22   the course of other investigations and reported that

23   fact to Louis Vuitton with a suggestion that maybe they

24   would like to consider it and maybe do some further

25   investigation?

ROBERT L. HOLMES

1   they -- I don't know of their advertising practices, so

2   I don't -- yeah.  I can't testify to how they advertise

3   or if they induce --

4       Q.    You have no knowledge or no evidence that the

5   three Defendants in this case have induced or caused the

6   infringing conduct on the part of website operators?

7       A.    Well, I know they have thousands of customers

8   that sell the product.

9            MR. COOMBS:  Move to strike to interpose

10   the same objections.

11      Q.    (BY MR. LOWE)  I don't believe you answered my

12   question.  Do you have any knowledge or any evidence

13   that the three Defendants -- any of the three Defendants

14   in this case induced or caused the infringing conduct on

15   the part of website operators?

16      A.    No personal knowledge.

17      Q.    Do you have any evidence or knowledge that any

18   of the three Defendants in this lawsuit have materially

19   contributed to the infringing conduct of website

20   operators?

21            MR. COOMBS:  Same objections.

22      A.    Yes.

23      Q.    (BY MR. LOWE)  What?

24      A.    They facilitate the sale of that product by

25   hosting the space that those items are stored upon, and

1    they also advertise to Chinese businesses to sell to the

2    United States.

3        Q.   So what you're saying is that they have

4    equipment upon which the websites are hosted?

5        A.   What I'm saying is their website advertises for

6    Chinese businesses to do business with the United

7    States, and all the customers that I found that are

8    customers of these entities are selling -- are offering

9    goods that are purported to be counterfeit.

10       Q.   All of the customers?

11       A.   All the ones that I've seen.

12       Q.   How many have you seen?

13       A.   Many dozens.

14       Q.   Do you have any idea how many websites are

15    hosted by the hosting services of the three Defendants?

16       A.   Many hundreds.  The reason --

17       Q.   What is the basis --

18            Go ahead.

19       A.   Oh, I'm sorry.  The reason I say that is --

20    okay.  With an IP address, say, for example, the one

21    that I believe ends with .66.161, with that IP address,

22    when you run a reverse IP search on that specific IP

23    address, there were maybe 20 or 30 domain names stored

24    on that IP address or that resolved to that IP address.

25    With each domain that resolves to that IP address is

**Exhibit C**

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   LOUIS VUITTON MALLETIER, S.A.,    )
                                       )
 5                       Plaintiff,    )
                                       )
 6                 vs.                 ) Case No. C073952JW
                                       )
 7   AKANOC SOLUTIONS, INC., MANAGED   )
     SOLUTIONS GROUP, INC., STEVEN     )
 8   CHEN and DOES 1 through 10,       )
     inclusive,                        )
 9                                     )
                        Defendants.    )
10   _____  )
11
12
13
14
15            DEPOSITION OF JULIANA LUK
16                    VOLUME I
17              Glendale, California
18             Saturday, April 12, 2008
19
20
21
22
23
24   Reported by:  Janalee Whitacre
                   CSR No. 12223
25   NDS Job No.:  128150
```

Exhibit C                          Page 80

1   BY MS. WANG:

2       Q.    That's all right.  You work out of your home?

3       A.    Yeah, at Chino Hills.

4       Q.    In Chino Hills.  So have you ever been to the

5   business office, home office of Akanoc --

6       A.    No.

7       Q.    -- Solutions?

8             Do you ever travel to any offices of Akanoc?

9       A.    No.

10      Q.    In your job at Akanoc, do you report to anyone?

11      A.    To Steve Chen.

12      Q.    Anyone else?

13      A.    No.

14      Q.    Do you ever communicate with anyone else at

15  Akanoc?

16      A.    To the support department.

17      Q.    And this is in regards to the job that you are

18  doing for Akanoc?

19      A.    Yes.

20      Q.    And what do you communicate with the support

21  department?

22      A.    To unplug the customer's IP.

23      Q.    Do you have any technical knowledge that's

24  required for the job that you do?

25      A.    No.

Exhibit C                              Page 81

Page 16

```
1              THE WITNESS:  It depends on the workload.  So
2    the least might be about nine hours.
3    BY MS. WANG:
4         Q.   So the workload dictates how long you are
5    working for Akanoc on a part-time basis?
6         A.   Yes.
7         Q.   And by "workload," what do you mean?
8         A.   Sometimes I might receive a lot of complaints
9    on spamming, so it will take me a little bit more time
10   to notify the customers.
11        Q.   When you say you receive a lot of complaints,
12   do you mean in the mail?
13             MR. EDWARDS:  Objection, misstates prior
14   testimony.
15   BY MS. WANG:
16        Q.   How do you receive complaints?
17        A.   By e-mails.
18        Q.   And which e-mail addresses do you receive
19   complaints?
20        A.   Abuse@MSG -- ManagedSG -- oh, I can't even
21   remember.  It's the account in Akanoc.  It's the abuse
22   account.  I don't remember.
23        Q.   Do you receive e-mails for abuse@Akanoc.com?
24        A.   Yes.
25        Q.   Do you receive abuse -- I'm sorry.  Do you
```

1          MR. EDWARDS:   Objection, vague and ambiguous.

2          You can answer if you understand.

3          THE WITNESS:   I think it's called Thunderbird.

4    BY MS. WANG:

5      Q.   Is Thunderbird the e-mail program that you use

6    for Akanoc?

7      A.   Yes.

8      Q.   Do you ever print out your e-mails for Akanoc?

9      A.   No.

10     Q.   Do you ever save these Akanoc e-mails?

11     A.   No.

12     Q.   Do you ever create any files of any kind in the

13   course of your work for Akanoc?

14     A.   Only the files with the complaint letter.

15     Q.   Can you describe to me what you mean by when

16   you create the files for the complaint letter?

17     A.   It's a cover letter to send along with the

18   complaints to the customer.

19     Q.   You draft a cover letter for the complaint that

20   you send to the customer?

21     A.   I don't draft them.

22     Q.   Where do you get the cover letters?

23     A.   Akanoc send it to me.

24     Q.   Do they send you different cover letters

25   depending on the complaint?

Exhibit C                    Page 83

1    A.    Only one.

2    Q.    So Akanoc only sends you one cover letter?

3    A.    Yes.

4    Q.    Do you remember what that cover letter said?

5    A.    Saying that we received a lot of complaints

6    regarding to spamming, illegal sites, so that we want

7    the customer that they should take care of it

8    immediately.

9    Q.    Does this cover letter have specific words that

10   you take out depending on the complaints?  If one is for

11   spamming, you would write "spamming" in a specific

12   place, and if it was for an illegal site, you would

13   change "spamming" to "illegal site"?

14   A.    I don't need to change anything.

15   Q.    You send the same letter out --

16   A.    Yes.

17   Q.    -- for all complaints?

18   A.    Yes.

19   Q.    Have you always done that?

20   A.    Yes.

21   Q.    And when you say that you are warning the

22   customer --

23   A.    Yes.

24   Q.    -- what are you warning them against?

25   A.    Whatever the complaint is.

Exhibit C                    Page 84

1     Q.   And if they don't listen to your cover letter

2   or your e-mail, what happens?

3     A.   I don't know.

4     Q.   What do you mean you don't know?

5     A.   My job is just to send the warning letter and

6   that's it.  I don't need to follow up.

7     Q.   Do you ever unplug someone's IP address due to

8   nonresponse to one of your e-mails?

9          MR. EDWARDS:  Objection, vague as to "you."

10         MS. WANG:  I'm sorry.

11    Q.   Do you ever --

12         MR. EDWARDS:  Does she personally ever?

13         MS. WANG:  No.

14    Q.   Do you ever instruct anyone to unplug an IP

15   address because they didn't respond to your e-mail?

16    A.   If you can put it into two parts, then I can --

17   I think I can answer it.

18    Q.   Sure.  Let's go about it another way.

19         Do you have any idea what happens when someone

20   does not respond to a forwarded complaint?

21    A.   No.

22    Q.   So have you ever instructed someone at Akanoc

23   to unplug a customer for any reason?

24    A.   Yes.

25    Q.   And what are those reasons?

Exhibit C                    Page 85

1      A.    For example, if I receive a big lot of

2  complaint to the same IP, so it will -- because I

3  remember the IP in one or two days, it happened once,

4  over a hundred of complaints to one IP, then I remember

5  the IP and I unplug it, because that was a massive

6  spamming.

7      Q.    And when you say "I unplug it," you send an

8  e-mail to someone at Akanoc to unplug --

9      A.    To support department.

10     Q.    To the support department to unplug that

11 specific IP address?

12     A.    Um-hum.  Yes.

13     Q.    Do you ever discuss with Steve or anyone else

14 at Akanoc about specific complaints from third parties?

15     A.    Sometimes.

16     Q.    And what are those times?

17         MR. EDWARDS:  Objection, calls for narrative.

18 BY MS. WANG:

19     Q.    What kinds of situations would you discuss with

20 Steve in your job at Akanoc?

21         MR. EDWARDS:  If you recall.

22         THE WITNESS:  Massive spamming, fraud eBay

23 sites, Microsoft copyright infringement.

24 BY MS. WANG:

25     Q.    What about complaints from law enforcement?  Do

Exhibit C                              Page 86

1    you ever talk with Steve or anyone else at Akanoc about

2    those specifically?

3        A.    No.

4        Q.    Does anyone else have access to the abuse

5    e-mails account that we discussed earlier with

6    abuse@Akanoc.com and abuse@ManagedSG-Inc.com?

7        A.    I don't know.

8              MR. EDWARDS:  Excuse me, do you mean other than

9    her?

10             MS. WANG:  Yes.

11             THE WITNESS:  I don't know.

12   BY MS. WANG:

13       Q.    Do you know if Steve ever responds to e-mails

14   that are sent to those accounts?

15       A.    He does.

16       Q.    Are there any kinds of complaints that you

17   forward on to Steve for handling?

18       A.    I don't remember.

19       Q.    Is Steve the only other person who has access

20   to the accounts that you handle for Akanoc?

21       A.    I don't know.

22       Q.    You said something about Microsoft copyright

23   infringement complaints?

24       A.    Yes.

25       Q.    Was there something specific about those

Exhibit C                    Page 87

1    complaints that you felt you needed to speak to Steve

2    about?

3         A.    Microsoft is so big, so I think it's just

4    serious, I don't know.

5         Q.    Do you know how many -- can you remember how

6    many complaints Microsoft had sent to Akanoc?

7         A.    From when?

8         Q.    At any time.

9         A.    I can't remember the exact times, but maybe

10   once every two months, something like that.

11        Q.    So with the Microsoft complaints, you had been

12   receiving them on a consistent basis over a period of

13   time?

14             MR. EDWARDS:   Objection, misstates prior

15   testimony.

16   BY MS. WANG:

17        Q.    In total, how many Microsoft complaints do you

18   think you received for Akanoc?

19        A.    I can't remember.

20        Q.    Was it in the hundreds or massive amount that

21   you described with respect to the spamming issues that

22   you sometimes faced?

23        A.    Much less than that.

24        Q.    Can you estimate about how many?

25             MR. EDWARDS:   Objection, asked and answered.

Exhibit C                                    Page 88

1    A.    Yes.

2    Q.    Is there any other reason why you spoke to him

3 about these complaints specifically?

4    A.    Because I know Microsoft and eBay, they are

5 big.

6    Q.    Is that the only reason that you talked to

7 Steve about these complaints?

8    A.    Yes.

9    Q.    Did you ever read the complaints?

10    A.    No.

11    Q.    Did you read who the complaints were coming

12 from?

13    A.    Sometimes.

14         MR. EDWARDS:  I'm sorry.  Are you talking about

15 the Microsoft and eBay complaints or --

16         MS. WANG:  All.

17         MR. EDWARDS:  -- complaints in general?

18         MS. WANG:  The complaints in general.

19    Q.    Did you ever read the complaints?

20    A.    I don't read the whole complaint letter.  I

21 only try to find the domain name and the IP address so

22 that I can forward to the customer.

23    Q.    Did you at any time read the complaints to see

24 if they were from Microsoft?

25    A.    On the subject line they would say from

Exhibit C                    Page 89

1    A.    I only know how to do it with inputting the IP

2  address.   The others I don't understand and I don't want

3  to touch it.

4    Q.    So there are other boxes on that page, but you

5  don't --

6    A.    Yes.

7    Q.    But there are other boxes on that page?

8    A.    Yes.

9    Q.    Okay.   What if a complaint that you receive

10  doesn't have an IP address but just a domain name, how

11  do you handle that kind of situation?

12    A.    I -- I ping on the -- what do you call that?   A

13  CMD.   I only know how to do it.   I can't explain it.

14    Q.    So when you don't have an IP address but you

15  have a domain name, you ping the domain name?

16    A.    Yes.

17    Q.    On -- is this an Internet program?

18    A.    Yes.

19    Q.    Do you remember which one that is?

20    A.    I just know how to click to it.

21    Q.    Is it an Akanoc program?

22    A.    No.

23    Q.    It's a program that is available publicly?

24    A.    Yes.

25    Q.    Do you do any follow-up after forwarding any of

Exhibit C                    Page 90

1    the complaints to customers?

2       A.   No.

3       Q.   Do you do any follow-up after receiving the

4    spamming complaints?

5       A.   No.

6       Q.   If you receive a second complaint about the

7    same IP address or customer, do you do follow-ups then?

8       A.   No, I'll just send it like I used to do it.

9       Q.   Do you respond to a second complaint the same

10   way you would respond to a first complaint?

11      A.   Yes.

12      Q.   How do you know if a complaint that you receive

13   is a second or a third complaint as opposed to a first

14   complaint?

15      A.   I don't know.

16      Q.   You stated before that if you remember the

17   IP address or the complaint, then that would be the only

18   record that you would have that there was a repeat

19   complaint?

20         MR. EDWARDS:  Objection, misstates prior

21   testimony.

22         You can answer.

23         THE WITNESS:  Unless it is so many complaints

24   all together in one day, that would make me remember the

25   IP.  Otherwise, the next day I'll forget everything.

1    How can I remember so many things?

2    BY MS. WANG:

3        Q.   The only record you have of repeat complaints

4    is what you remember in your brain?

5        A.   Yes.

6        Q.   Was there anything that you wrote on a regular

7    basis in the subject line of the forwarded e-mails?

8        A.   I beg your pardon?

9        Q.   Did you ever have a standard line that you

10   would type into the subject line when you were

11   forwarding e-mail complaints to customers?

12       A.   No.

13       Q.   Did you use the subject line of the person who

14   sent you the complaint?

15       A.   Because I forward the complaint to the

16   customer, the subject line is already filled out, I

17   don't have to put anything there.

18       Q.   Did you ever change that subject line?

19       A.   No.

20       Q.   You stated you sent the same cover letter to

21   customers regarding these complaints that you would

22   receive.  Was there any action that you required them to

23   take in response to your e-mail?

24       A.   You mean in the covering letter?

25       Q.   Yes.

1      A.    They are supposed to resolve it within

2    24 hours.

3      Q.    Was there any other action they were supposed

4    to take, other than resolving it in 24 hours?

5      A.    I don't know.

6      Q.    Did you ever require any one of your customers

7    to do something other than resolve it within 24 hours?

8      A.    No.

9      Q.    Would you ever check to make sure that they

10   complied with your request, that they resolve the

11   problem within 24 hours?

12     A.    No.

13     Q.    Did you ever review any Website content to make

14   sure that something that someone was complaining about

15   was removed?

16     A.    No.

17     Q.    Did you ever check to see if a Website that was

18   the subject of a complaint had moved from one IP address

19   to another IP address within the block assigned to

20   Akanoc?

21     A.    No.

22     Q.    Are you familiar with a $25 penalty for

23   violation of your agreements with the customers?

24     A.    Yes.

25     Q.    And when was that penalty enforced?

Exhibit C                    Page 93

1       A.    I don't think -- it never enforced.

2       Q.    Do you know when it was supposed to be

3   enforced?

4             MR. EDWARDS:   Objection, lacks foundation.

5             THE WITNESS:   When Akanoc unplug them, I think

6   they are supposed to pay that.

7   BY MS. WANG:

8       Q.    Why would Akanoc unplug their customers?

9       A.    I don't know.

10      Q.    Did you ever decide if someone should have to

11  pay a $25 penalty for any reason?

12      A.    No.

13            MS. WANG:   Can we go off the record for a

14  second.

15            (A brief recess was taken.)

16            (Whereupon the interpreter entered the

17        room and was sworn to interpret, as needed.)

18            MS. WANG:   For the record, we have the

19  interpreter, Ms. Jackie Luk, joining us.  And should the

20  witness ever feel that she needs an interpretation, just

21  let me know and we can have Ms. Jackie Luk interpret for

22  you.

23            THE WITNESS:   Yes, thank you.

24  BY MS. WANG:

25      Q.    Just so I'm clear, your job function at Akanoc,

Exhibit C                              Page 94

1    Inc., is to receive complaints from third parties and

2    then forward them on to your customers?

3         A.   Yes.

4         Q.   When you forward the complaints on to the

5    customers, you include a standard cover letter that you

6    received right at the beginning of when you started

7    working for Akanoc?

8         A.   Yes.

9         Q.   Throughout the period of your employment with

10   Akanoc, you have not changed the cover letter that you

11   send with the complaints to these customers?

12        A.   No, I don't change.

13        Q.   Do you send anything else, other than the cover

14   letter, to the customers?

15        A.   The complaint itself I will send along with the

16   cover.

17        Q.   Anything else?

18        A.   No.

19        Q.   Do you ever communicate with the customers,

20   other than forwarding them complaints?

21        A.   Yes.

22        Q.   And what do those communications consist of?

23        A.   Due to a lot of spamming, I unplug them.

24   Sometimes customer would write to security.  If I happen

25   to read that e-mail, then I would tell them that they

Exhibit C                    Page 95

1   need to resolve it or I won't -- I won't plug it back.

2       Q.   If someone else reads an e-mail in one of the

3   abuse "in" boxes before you, do you have any way of

4   knowing that?

5            MR. EDWARDS:   Objection, calls for speculation.

6            THE WITNESS:   No.

7   BY MS. WANG:

8       Q.   You stated that Steve also has access to the

9   e-mails that you read for Akanoc?

10      A.   Yes.

11      Q.   Do you have any way to know if Steve has read

12  those e-mails before you?

13           MR. EDWARDS:   Objections, calls for

14  speculation.

15           You can answer if you know.

16           THE WITNESS:   I don't know.

17  BY MS. WANG:

18      Q.   Does a message in your "in" box ever appear --

19  strike that.

20           How can you tell if you have read an e-mail

21  that appears in your "in" box?

22      A.   It comes in bold letters, so I'll read it.   If

23  it's not in bold letters, I don't read it.

24      Q.   If someone -- strike that.

25           If Steve happened to have looked at one of the

Exhibit C                          Page 96

1        Yes.

2   BY MS. WANG:

3        Q.    Did you write the e-mail beginning with "your

4   mean he is holding a legit Chanel site"?

5        A.    I didn't write this.

6        Q.    Do you recall any part of this e-mail string

7   marked as Exhibit 29?

8        A.    No.

9        Q.    Do you receive mail from the address

10  security@Akanoc.com?

11       A.    Yes.

12       Q.    When you send messages to other people, is your

13  "from" address security@Akanoc.com?

14       A.    Yes.

15       Q.    Okay.

16            Ask the witness to review Exhibit 30 to the

17  deposition of Steven Chen.   Appears to be another e-mail

18  exchange between Will Lone and security, dated

19  November 29, 2007.

20            Do you recall ever seeing this e-mail before?

21       A.    No, never seen it before.

22       Q.    On the first page there's a message that reads,

23  "content inspection" presumably from

24  security@Akanoc.com.   Did you write that?

25       A.    No, I didn't write that.

Exhibit C                    Page 97

1     Q.    Do you remember receiving the complaint from
2  Erinda Marga from Lacoste?
3     A.    I don't recall.
4     Q.    As you can -- exhibited in the exhibit, you
5  don't remember receiving that complaint.
6     A.    I don't remember.
7     Q.    Do you remember receiving any complaints from
8  Lacoste?
9          MR. EDWARDS:   Objection, relevance.
10          THE WITNESS:   I don't remember.
11 BY MS. WANG:
12    Q.    I'm sorry, was it your testimony that you did
13 not receive any complaints from Louis Vuitton or that
14 you could not remember if you received any complaints
15 from Louis Vuitton?
16    A.    To me, never seen those letters.
17    Q.    When you said "those letters," you mean the
18 letters I showed you, or any letters from Louis Vuitton?
19    A.    Any.
20    Q.    I would ask the witness to review Exhibit 38,
21 attached to the deposition of Steven Chen, which appears
22 to be an e-mail between security and Steve Chen, dated
23 September 14th, 2007.
24          Do you recall receiving this e-mail from Steve
25 Chen?

Exhibit C                    Page 98

1    Q.   Okay.  On the first page of the exhibit there's

2  a portion that reads, "Steve Chen wrote:  give customer

3  12 hours notice; 24 hours unplug is good enough."

4    A.   Yes.

5    Q.   Did you receive that message from Steve Chen?

6    A.   Yes.

7    Q.   What did you take that message to mean?

8    A.   Send a cover letter and a complaint to the

9  customer.  That's it.  Because I don't need to follow

10  up.

11    Q.   What does "24 hours unplug is good enough" mean

12  to you?

13    A.   He's going to do it.

14    Q.   Meaning Steve Chen will unplug within 24 hours?

15    A.   Yes.

16    Q.   In referring to this specific example, did you

17  ever unplug anyone in this kind of circumstance for

18  counterfeit Websites?

19    A.   I don't.

20    Q.   Did you ever send instructions to unplug for

21  any other reason?

22    A.   Only on spamming, massive spamming.

23    Q.   Okay.

24    The complaint refers to two Websites.

25  1streplicas.com, with the number 1 s-t-r-e-p-l-i-c-a-s

1      Q.    The first line of the e-mail reads --
2    references a ticket.  Can you tell me what that means?
3      A.    Oh, it's a term.
4      Q.    What is the term in reference to?
5      A.    I just happened to read this e-mail, so he
6    explain.  So to me it's just to ignore it, and if I were
7    to answer the customer, I will say close ticket.
8    Actually, I don't have any ticket to close.
9      Q.    Okay.  So you just say "ticket," but there is
10   no actual ticket?
11     A.    There is no actual ticket.
12     Q.    When you say you ignored this, what did you
13   mean by that?
14     A.    Mostly customer never respond to us, and I --
15   and my job doesn't include to follow up, so if I
16   happen -- that this customer respond and I happen to
17   read it in the box, if they say that they resolve it, so
18   I take it as resolved.  And for courtesy, I would say,
19   okay, I shall close this ticket.
20     Q.    You just stated that most of the customers
21   never respond.  How do you know if they respond or not?
22         MR. EDWARDS:  Objection, misstates prior
23   testimony.  Is there a question pending?
24         MS. WANG:  Yeah.
25     Q.    How do you know if a customer responds?

Exhibit C                    Page 100

1    read his e-mail.

2        Q.    Is this one instance where you would follow up

3    to make sure that this problem had been addressed?

4        A.    No.

5        Q.    So when you say, "If any more complaints come

6    in, I shall have no choice but to shut it down," is that

7    an empty threat?

8        A.    Yes.

9        Q.    Okay.  If we're looking at both situations

10   between Exhibit 43 and 44, why would you in one instance

11   just close the ticket, in 43, and then in 44 say, "If I

12   have any more problems from you, I'll shut you down"?

13       A.    Because attacking or hacking, if his IP

14   continue do that, I might receive a lot of complaints.

15   Just like I said, spamming, it will come 20 or 30 pieces

16   a day.  And then I would -- I would unplug him, because

17   at that time I can remember his IP.

18            This -- the other one he says he has resolved

19   it, so I trusted him, he resolve it.  So I just say,

20   okay, fine.

21       Q.    So you had just said that if you do receive

22   more complaints, you would have unplugged the person

23   referenced in Exhibit 44?

24       A.    Yes.

25       Q.    So your threat was not empty; you would

Exhibit C                    Page 101

1    shut your servers down"?

2        A.    Yes.

3        Q.    Is that an action that you would actually take

4    if the customer did not resolve it within 12 hours?

5        A.    No.    I would leave it to Steve Chen.

6        Q.    So was it the procedure at that time that you

7    would send the e-mail with this kind of message and then

8    Steve would do -- would follow up to see whether or not

9    they had complied?

10       A.    Yes.

11              MS. WANG:    Let me mark collectively as 47 two

12   e-mails, the first one dated September 12th, 2007, from

13   security to Brian C., looks like, Roche, and the second

14   an e-mail from security to reboot@Akanoc.com and Steve

15   Chen, dated September 13th, 2007.

16              (Plaintiffs' Exhibit 47 was

17              marked for identification and

18              is annexed hereto.)

19   BY MS. WANG:

20       Q.    We'll look at the one dated September 12, 2007,

21   first.

22       A.    Yes.

23       Q.    Did you write the e-mail dated September 12th,

24   2007?

25       A.    Yes.

Exhibit C                              Page 102

Page 66

```
 1      Q.   Did you write the e-mail dated September 13th,
 2   2007?
 3      A.   Yes.
 4      Q.   Are these -- is the e-mail dated September 13th
 5   related to the e-mail dated September 12?
 6      A.   Yes.
 7      Q.   The subject line in the e-mail dated
 8   September 13th states, "Please unplug ip
 9   204.16.198.204"?
10      A.   Um-hum.  Yes.
11      Q.   So you sent this instruction to
12   reboot@Akanoc.com and Steve Chen to unplug the server?
13      A.   Yes.
14      Q.   And was that because the customer failed to
15   respond to the complaint of September 12, 2007?
16      A.   Yes.
17      Q.   Did you have to ask Steve or anybody else
18   before you made the request to have the server
19   unplugged?
20      A.   Regarding to Microsoft and eBay or PayPal,
21   around that time even the counterfeit Website I can
22   unplug.
23      Q.   Did you do that on a regular basis?
24      A.   Not regular basis, because usually I would cc
25   copy to Mr. Chen.  So if he unplug, then I don't have to
```

Exhibit C                    Page 103

1    take any action.

2        Q.    But was it your procedure, standard procedure,

3    at that time to unplug the counterfeit Website?

4        A.    At that time, yes.

5        Q.    And how long did that last?

6        A.    What do you mean by "last"?

7        Q.    I'm sorry.  How long did that procedure last

8    where you would unplug counterfeit Websites?

9        A.    I don't quite understand what you mean.

10       Q.    Do you still unplug counterfeit Websites as you

11   described?

12       A.    Yes.

13       Q.    So beginning around September of 2007, all the

14   way to the present --

15       A.    Yes.

16       Q.    -- when you receive a complaint regarding

17   counterfeit Websites, you unplug those?

18       A.    I would still send complaint to the customer,

19   cc copy to Mr. Chen, and then mostly I will leave it to

20   him because I don't -- I only work part-time.  If I

21   happen to know that the customer didn't comply, then I

22   will unplug it.  But mostly I don't.

23       Q.    What do you mean by if you happen to know the

24   customer did not reply (sic)?

25       A.    For example, if another complaint is coming in,

Exhibit C                    Page 104

1    I mean, lot of complaints coming in, then I know that

2    he -- the customer didn't comply.  And to Microsoft and

3    eBay and PayPal, these company I know they are very big,

4    you know, and so I would see if they have any complaint

5    coming in or not.  Sometimes eBay would come in --

6    within two days they will send me two complaints within

7    two days, then I know that the customer didn't comply,

8    so I will shut them down.

9        Q.    When you talk about Microsoft and eBay as these

10   big companies, would you consider Louis Vuitton a big

11   company as well?

12       A.    I don't know.

13       Q.    Have you ever heard of Louis Vuitton?

14       A.    No.

15       Q.    Have you ever heard of L.V.?

16       A.    Yeah, from my daughter.

17       Q.    What do you know about L.V.?

18       A.    From my daughter, saying that she likes -- is

19   it handbags?  Something like that.  I don't know.  I

20   never buy that.

21            MS. WANG:  Can we mark as Exhibit 48 two

22   e-mails, the first being four-pages long, dated

23   September 1st, from security to Steve Chen, and the

24   second, one page, August 28th, 2007, from security to

25   reboot@Akanoc.com and Steve Chen.

Exhibit C                    Page 105

1    significance on your decision whether to unplug someone

2    or not?

3        A.    If -- according to the covering letter, I

4    should unplug after 12 hours, but usually I don't need

5    to follow up, so I don't know whether they respond or

6    not.  But if the next day or the third day more

7    complaints coming in, that means the customer is not

8    resolving it, so I can unplug them if I have time, or

9    Steve would unplug them.

10       Q.    So I understand, you would unplug someone if

11   you were -- if you sent out an initial complaint and

12   then more complaints came in after 12 hours or 48 hours,

13   then you would unplug someone?

14       A.    Yes.

15       Q.    Sorry to do this to you.  Can we go back to 46

16   really fast, an e-mail dated September 13th.

17           MR. EDWARDS:  Are you done with 48?

18           MS. WANG:  Yes, thank you.

19           MR. EDWARDS:  All right.

20           Is this one of the two-parters or --

21           MS. WANG:  No.

22           MR. EDWARDS:  Is this a two-page e-mail?

23           MS. WANG:  Yes.

24           MR. EDWARDS:  Okay.

25   ///

Exhibit C                    Page 106

1              THE WITNESS:  Yes.

2     BY MS. WANG:

3         Q.   Did you write this e-mail to Steve Chen at the

4     top, "So I can send out the letter of cancel service to

5     spamhaus now, right?"

6         A.   Yes.

7         Q.   Is this a situation where you would not send

8     your standard cover letter?

9         A.   Yes.

10        Q.   Do you treat spamhaus complaints differently

11    than other complaints?

12        A.   Yes.

13        Q.   And how is that?

14        A.   Because I'm instructed to do so.

15        Q.   What are you instructed to do?

16        A.   Whenever spamhaus send us complaints, we just

17    unplug the service and discontinue the service to the

18    customer.

19        Q.   Below your e-mail was an e-mail from Steve Chen

20    which said, "also checked the domain name (sic)

21    watchcs.com not available now."  Do you remember reading

22    that e-mail from Steve Chen?

23        A.   Yes.

24        Q.   Is it correct to say that when you receive a

25    spamhaus complaint, Steve Chen would check the domain

Exhibit C                                  Page 107

1   name to see if it was still active before instructing

2   you to take further action on the matter?

3        A.   I don't know.

4        Q.   What happens when you would receive a spamhaus

5   complaint?

6        A.   Unplug the IP.

7        Q.   Does anybody check anything relating to the IP

8   before you unplug it?

9        A.   I don't know.

10       Q.   When you receive an e-mail like this from Steve

11  Chen that's right underneath your one-line response, is

12  that something typical that you would receive relating

13  to a spamhaus complaint?

14       A.   No.

15       Q.   Do you have any idea what Steve is talking

16  about in this e-mail that we're referencing on the top

17  of the page?

18       A.   Not very clear.

19       Q.   Okay.

20            Now is Exhibit 50, an e-mail dated

21  September 15, 2007, from security to

22  support@tooming.com.  Can you please review that.

23            (Plaintiffs' Exhibit 50 was

24            marked for identification and

25            is annexed hereto.)

Exhibit C                    Page 108

1          THE WITNESS:  Yes.

2   BY MS. WANG:

3       Q.   Okay.  Did you write this e-mail, starting

4   with, "Dear Sir"?

5       A.   Yes.

6       Q.   And you reference a "2nd note from this

7   complainant."  Is that because it happened within the

8   last couple of days preceding September 15, 2007?

9       A.   Can you repeat that?

10       Q.   I'm sorry.  When you write something like "the

11   2nd note from this complainant," does that mean you

12   received a prior complaint about the same customer

13   within the past two or three days from September 15?

14       A.   Yes.

15       Q.   When you write, "Make sure to keep all the

16   records so that if the authorities needs evidence, we

17   can provide them," what did you mean by that?

18       A.   Instruction from Steve.

19       Q.   Steve had told you to write that to the

20   customer?

21       A.   Yes, regarding to fraud or identity theft.

22       Q.   So with cases of fraud and identity theft, you

23   were given specific instructions?

24       A.   Around that period of time on or before

25   September, Mr. Chen instructed me to be more careful on

1   these fraud things, so that I would cc copy to him and

2   he would take care of it.  So I have to be very straight

3   to the customers.

4        Q.   So around this time in September of 2007, you

5   stated you were given specific instructions about

6   certain kinds of complaints.  You said fraud and

7   counterfeiting.  Were there any other kinds of

8   complaints where you were given specific instructions?

9        A.   Porn sites, terrorist sites, all those illegal

10  issues.

11       Q.   And since September of '07, you have taken --

12  you have followed those instructions relating to fraud,

13  counterfeit, these illegal Websites?

14       A.   Mostly, but all the time I will cc copy to

15  Mr. Chen.

16       Q.   So in this e-mail you're telling the customer

17  to keep all the records.  Do you keep any records as

18  well?

19       A.   No.

20       Q.   Okay.

21            MR. EDWARDS:  I'm sorry.  This was --

22            MS. WANG:  50.

23            MR. EDWARDS:  50.

24  BY MS. WANG:

25       Q.   Do you understand that you have been designated

Exhibit C                    Page 110

**Exhibit D**

```
 1                  UNITED STATES DISTRICT COURT
 2                NORTHERN DISTRICT OF CALIFORNIA
 3
 4   LOUIS VUITTON MALLETIER, S.A.,    )
                                       )
 5                 Plaintiff,          )
                                       )
 6                 vs.                 )   CASE No. C073952JW
                                       )
 7   AKANOC SOLUTIONS, INC.,           )
     MANAGED SOLUTIONS GROUP, INC.,    )
 8   SOLUTIONS GROUP, INC., STEVEN     )
     CHEN and DOES 1 through 10,       )
 9   inclusive,                        )
                                       )
10                 Defendants.         )
     _____)
11
12
13
14
                     DEPOSITION OF WILL LONE
15
                     Pleasanton, California
16
                     Tuesday, April 29, 2008
17
18
19
20
21
22
23
24   REPORTED BY:   ANDREA M. IGNACIO HOWARD
                    CSR NO. 9830
25   NDS Job No.:   128205
```

1   Q.        In what industry?

2   A.        Dragon Vision itself is an inventor capitalist,

3   VC.  It goes to any industry where it can make money.  I

4   was, myself, concentrating on the IT industry.

5   Q.        So when you worked for Dragon Vision or anyone

6   else, did you work -- before Akanoc, did you know any of

7   Akanoc's customers?

8   A.        Not one of them.

9             MR. EDWARDS:  Objection; vague and ambiguous.

10            Are you talking about Akanoc's current customers

11  or any customers they might have had in the past?

12            MR. COOMBS:  There's an answer.  It will stand.

13  Q.        During what years did you work for Etone Net?

14  A.        Time has passed, so I don't have a very clear

15  recollection.  Around 2000.

16  Q.        And where was it located?

17  A.        Shanghai, China.

18  Q.        You described your services as working with

19  Akanoc distributors.  Do you communicate with them

20  primarily by e-mail?  By voice?  In person?

21  A.        Phone, as well as e-mail.

22  Q.        Do you ever travel to PRC on Akanoc's behalf?

23  A.        Yes.

24  Q.        And how many times?

25  A.        Around three times.

1  Q.        And how long was each visit?

2  A.        One to two weeks.

3  Q.        Did you travel throughout China, or were there

4  particular areas that you visited on those three trips?

5  A.        There's an issue.  Gone everywhere, well, I went

6  to a few places.

7  Q.        Do you recall when each of those three trips

8  were?

9  A.        Between 2006 and 2007.

10  Q.        All right.

11  Just taking the most recent trip, was it one to two weeks?

12  A.        Correct.

13  Q.        And where did you travel on that trip?

14  A.        Shanghai, Nanjing, Ximan, Shenzhen.

15  Q.        Anywhere else?

16  A.        Primarily should have been just those places.

17  Q.        On the other two trips, did you visit any other

18  cities other than the four you just identified?

19  A.        Tianjin, Beijing.  Just those places.

20  Q.        On those trips, did you visit with existing

21  Akanoc distributors or prospective Akanoc distributors?

22  A.        First time, it was just by phone and e-mail  that

23  communication was -- took place.  So at the time, the

24  parties that I called upon, we had not established any

25  business dealings yet.  After the first time, a certain

1   number of those we had visited the first time became our

2   customers.

3           At the second and third visit, I visited

4   customers, and at the same time the customer pool

5   increased as well.

6   Q.      During the second and third visits, did you also

7   visit people with businesses that were not yet Akanoc

8   distributors?

9   A.      Somebody had initiated communication, but we

10  needed to meet face-to-face.  Only then could you develop

11  mutual trust.  So if you want me to point to an

12  independent person and tell you what came before and

13  after, I don't have a very clear recollection.

14  Q.      You mentioned initial communications, were those

15  usually started by the prospective customer or by Akanoc?

16  A.      We or myself, in particular, for the development

17  of the company, we would go out and seek new customers.

18  From an independent point of view, Akanoc already has a

19  reputation in Mainland China.  There will be many clients

20  or customers who would come and look for us.

21  Q.      When customers come and look for Akanoc, do they

22  do it through the website or otherwise?

23  A.      Clients looking for me, for us, that is, even

24  though there are business circles, there will be

25  communication within business circles.  When they know

1  that we provide independent server services, they will

2  come and look for us and then establish communication.

3  Q.      I guess what I'm trying to understand is, do they

4  establish communication by phone?  By personal meeting?

5  By website?  By e-mail?

6          MR. EDWARDS:  Objection; calls for speculation.

7  If you know.

8          THE WITNESS:  E-mail.

9          MR. COOMBS:  Q.  What is your understanding of

10  Akanoc's reputation in PRC in those circles or people who

11  are reaching out to Akanoc?

12  A.      Well, Google knows.  If you were to search for

13  U.S. servers, yes.  Now, this is in Chinese, quote, "U.S.

14  servers," end quote, in Chinese.  You will discover the

15  first 20 hits, at least 15 will be partners of ours.  So

16  they would know about our position within this industry.

17  Q.      Who are the first 15 partners?  Can you name any

18  of them?

19  A.      Haiyang Shu Ju.  The English name should be IDC,

20  SEA, correct.

21  Q.      Any others?

22  A.      Well, you just only wanted one?

23  Q.      No; what you can remember.

24  A.      If you allow me to go online right now, I can do

25  the search right now.

1        MR. EDWARDS:  No.

2        THE WITNESS:  I'm not Google, so I don't have any

3   basis for coming up with a ranking.

4        MR. COOMBS:  Q.  I'm not asking you to come up

5   with a ranking.  You identified roughly 15 partners that

6   would be in the first group of hits which would be a

7   source for the reputation, as you understand it.  I just

8   want to get an understanding of who those partners are.

9        MR. EDWARDS:  Objection; objection; vague as to

10   the term "partners."

11        MR. COOMBS:  It's the witness's term.

12        THE WITNESS:  Let me take a little moment to

13   recollect, and then I will tell you.

14        MR. COOMBS:  Thank you.

15        THE INTERPRETER:  Counsel, I need to go to the

16   restroom.

17        (Recess taken.)

18        MR. COOMBS:  Back on the record.

19        THE WITNESS:  Earlier I said Haiyang Shu Ju.  In

20   my impression, there's also Nuo Wang, Nuo Wang, yes.  Zong

21   Lian.

22        THE INTERPRETER:  Sorry.  Interpreter's

23   correction.  Z-H-O-N-G, L-I-A-N.

24        THE WITNESS:  Shang Wu China.  Wang Yu.

25   Zhao Mu, Yitian.

1               THE INTERPRETER:  These are two different ones,

2    Z-H-A-O, Y-I-T-I-A-N.  Interpreter's note.

3               THE WITNESS:  If you need more details, right now

4    I can't give you anything more clearer than that.

5               MR. COOMBS:  That's all I ask.

6               Your counsel has asked if we can go off the

7    record for a moment.

8               MR. EDWARDS:  Briefly.

9               (Recess taken.)

10              MR. COOMBS:  Back on the record.

11   Q.        Are these companies you've identified as partners

12   the same as the customers or distributors or something

13   else?

14   A.        They are distributors.  Sorry.  We can't say

15   distributor.  They rent our machines, and then they sell

16   it to their customers.  Reseller may be the more

17   appropriate word.

18   Q.        I guess what I was trying to understand, these

19   companies whose names you've just listed though are among

20   the customers or resellers that we've been talking about?

21   A.        Resellers.

22   Q.        Okay.  So in terms of the Google results that

23   you're describing, when you search U.S. servers, many of

24   the first search results are going to be Akanoc's

25   resellers?

1          MR. EDWARDS:  Objection; calls for speculation.

2    You can answer.

3          THE WITNESS:  Generally resellers.  The majority

4    of resellers are not only reselling our independent

5    servers, they're also reselling the independent servers of

6    other companies.

7          MR. COOMBS:  Q.  Do you transmit to potential

8    customers in PRC descriptions of the services that Akanoc

9    provides?

10   A.        Can you say the question again please, using

11   simple language?

12   Q.        How do you describe to potential customers of

13   Akanoc the services that Akanoc offers?

14   A.        Generally, I would look out for, among

15   distributors within the industry, those that are using

16   overseas servers.  Akanoc's strength is we provide Chinese

17   language services.  This is something that other

18   companies, server companies, cannot provide.

19   The machine quality, as well as our speed for connectivity

20   is also very competitive in this industry.  So what I tell

21   my potential customers is the Chinese language services

22   are fast connectivity, as well as the quality of our

23   machines and technical support capabilities.

24   Q.        And how do you communicate these features to

25   potential customers of Akanoc?

1    security@akanoc.com.  Exactly who would be responsible,

2    that's something for the security department to worry

3    about.

4    Q.      To your knowledge, has any reseller that you have

5    engaged -- I'm sorry.  Strike that.

6    Has any reseller that has engaged Akanoc's servers or

7    rented its servers, that you identified and brought on

8    board, been terminated by Akanoc, to your knowledge?

9          MR. EDWARDS:  Objection; vague and ambiguous as

10    to "terminated."

11    You can answer.

12          THE WITNESS:  The security department, based on

13    needs, will take measures to handle the situation.  At

14    this time, e-mail notification or issues about shutting

15    down a machine, sometimes the customer will have questions

16    about.  They'll ask why was the machine turned off, and

17    then I would tell them for whatever reason.

18    If there is a suspension of service, then I would tell

19    them to send an e-mail to the security department.

20          THE INTERPRETER:  Clarification.

21          THE WITNESS:  To have them directly resolve the

22    issue with security.

23          MR. COOMBS:  Q.  When talking with prospective

24    Akanoc customers, have you ever had occasion to discuss

25    with them the application of Akanoc's acceptable use

1   policy?

2   A.        I would tell them all of our machine servers

3   must be in compliance with -- with our declaration on our

4   website.

5   Q.        And do you discuss what will happen if they're

6   not?

7   A.        The second security department will take care of

8   that.

9   Q.        I'm talking about during the time that you're

10  trying to encourage them to rent a server from Akanoc.  Do

11  you have any discussion with them about how it's handled?

12  A.        I'm not too sure I understand this question.

13  Q.        You, I think, said you would inform prospective

14  customers that they are expected to abide by the terms

15  that are posted on the website.

16  Do you explain to them what may happen if they don't?

17  A.        Rarely is there a need for me to explain.  It's

18  as if they completely understand that already.

19  Q.        On your trips to PRC for Akanoc, were any of the

20  prospective customers identified people who you knew

21  before you moved to the United States?  I'm only asking

22  about meetings on behalf of Akanoc.

23  A.        Let me think about it.  No.

24  Q.        Let's go off the record for a moment.

25            (Recess taken.)