1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   Brian S. Edwards (SBN 166258)
3  18400 Von Karman, Suite 300
   Irvine, California 92612
4  Telephone:     (949) 553-1010
   Facsimile:     (949) 553-2050
5  jal@gauntlettlaw.com
   bse@gauntlettlaw.com
6
7  Attorneys for Defendants
   Akanoc Solutions, Inc.,
8  Managed Solutions Group, Inc.
   and Steve Chen
9

10

11               **UNITED STATES DISTRICT COURT**

12      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

13

14  LOUIS VUITTON MALLETIER, S.A.,      )  Case No.: C 07-3952 JW
                                        )
15               Plaintiff,             )  Hon. James Ware
                                        )
16                                      )  **SUPPLEMENTAL DECLARATION**
                                        )  **OF JAMES A. LOWE IN SUPPORT**
17       vs.                            )  **OF DEFENDANTS' MOTION FOR**
                                        )  **SUMMARY JUDGMENT**
18                                      )
19  AKANOC SOLUTIONS, INC., et al.,     )
                                        )  Date:    September 8, 2008
20               Defendants.            )  Time:    9:00 a.m.
                                        )  Dept.:   Courtroom 8, 4th Floor
21                                      )
                                        )
22  _____ )

23

24

25

26

27

28

1    I, JAMES A. LOWE, declare:

2       1.      I am an attorney duly licensed to practice law before all courts of the State of

3    California, as well as before the United States District Court for the Northern District of California,

4    and I am a partner with the law firm of Gauntlett & Associates, counsel of record for Akanoc

5    Solutions Inc., Managed Solutions Group, Inc. and Steve Chen, the Defendants in this lawsuit.  The

6    following attached exhibits to this declaration are true and accurate copies of portions of transcripts

7    in the case and about which I have personal knowledge based upon my involvement in this case.

8       2.      **Exhibit "1509"**    Excerpts from deposition testimony of Robert Holmes

9       3.      **Exhibit "1510"**    Excerpts from deposition testimony of Will Lone

10      I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct.

12      Executed at Irvine, California on this 25th day of August 2008.

JAMES A. LOWE

SUPP. DECL. OF JAMES A. LOWE IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT
– C 07-3952 JW

# EXHIBIT 1509

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4  LOUIS VUITTON MALLETIER, S.A.,    )
                                     )
5                    PLAINTIFF       )
            VS                       )C.A. NO. C 07 3952 JW
6                                    )
   AKANOC SOLUTIONS, INC., MANAGED   )
7  SOLUTIONS GROUP, INC., STEVEN     )
   CHEN AND DOES 1 THROUGH 10,       )
8  INCLUSIVE,                        )
                     DEFENDANTS      )
9  _____)

10

11

12

13

14           ORAL DEPOSITION OF ROBERT L. HOLMES,

15  produced as a witness at the instance of the Defendants,

16  and duly sworn, was taken in the above-styled

17  and -numbered cause on the 1st day of April, 2008, from

18  9:31 AM to 6:22 PM, before Ronald R. Cope, a CSR in and

19  for the State of Texas, Registered Professional Reporter

20  and Certified Realtime Reporter, reported by machine

21  shorthand at the offices of U.S. Legal

22  Support/MillerParker, Inc., 5910 North Central

23  Expressway, 100 Premier Place, Dallas, Texas, 75206,

24  pursuant to the Federal Rules of Civil Procedure and the

25  provisions stated on the record or attached hereto.



**EXHIBIT**

**1509**

ALL-STATE® INTERNATIONAL

ROBERT L. HOLMES

BARKLEY
Court Reporters

1          MR. COOMBS:  In connection with this case?

2          MR. LOWE:  No.  Generally.

3          MR. COOMBS:  At any time?

4          MR. LOWE:  At any time.

5     Q.   (BY MR. LOWE)  You say you send things to Louis

6  Vuitton's office in New York.  Just asking if you deal

7  with anyone in New York.

8     A.   For Louis Vuitton?

9     Q.   Yes.

10    A.   I send product to someone in New York.

11    Q.   Who is that?

12    A.   The last name is Klug.

13    Q.   Could you spell that?

14    A.   K-L-U-G, I believe.

15    Q.   First name?

16    A.   Ken.

17    Q.   And what is his relationship to Louis Vuitton?

18    A.   He is the person at Louis Vuitton that I'm

19  instructed to send product to.

20    Q.   Is he a lawyer?  Is he an investigator?  Is he

21  somebody else?  Do you know what he does for them?

22    A.   No, not specifically.

23    Q.   What do you understand that he -- his job is?

24    A.   My understanding is that he works in either the

25  legal or the security department of Louis Vuitton.  My

ROBERT L. HOLMES

BARKLEY
Court Reporters

1    direct communications typically are with Nikolay.

2        Q.    So the products that you purchase on behalf of

3    Louis Vuitton, you typically send to New York?

4        A.    Yes, sir.

5        Q.    Where else do you send them, if anywhere else?

6        A.    I would typically send them to New York, or

7    sometimes I will store them in my office.

8        Q.    Until when?  Keep them forever, or do you send

9    them somewhere eventually?

10       A.    Depends on what the client -- what the client

11   requests.  Evidence storage is an ongoing thing.  When

12   you store evidence, you preserve it for future need; and

13   future need could be now, it could be in a year, it

14   could be three years, but it's put in storage to

15   preserve the evidence.

16       Q.    All right.  So assuming that you have stored

17   the evidence, where would you then send it after it's no

18   longer needed to be in storage?  Do you send it to New

19   York?  Do you send it to Paris?  Do you send it to

20   someplace else?

21              MR. COOMBS:  Assumes facts not in

22   evidence.

23       A.    Is this hypothetical, sir?

24       Q.    (BY MR. LOWE)  Well, I'm just asking generally

25   what your process is.

ROBERT L. HOLMES

BARKLEY
Court Reporters

1        Q.    (BY MR. LOWE)   I'm talking about Louis Vuitton.

2        A.    I receive, occasionally, training to conduct

3    authentication, but it is not my job, and I avoid that

4    job because it belongs to someone else.

5        Q.    Who does that job belong to?

6        A.    It's not my job to know whose job it is.   It's

7    my job to send it to the people who authenticate the

8    product.

9        Q.    Who is that?

10       A.    I send my product -- let me see.   I sent this

11   product to Ken Klug via Fed Ex.   That is the extent of

12   my knowledge of the authentication of this product.

13       Q.    Do you know whether or not he authenticates the

14   products?

15       A.    I do not.

16       Q.    So you're just assuming that somebody does or

17   can authenticate the products?

18       A.    I didn't assume anything, sir.   I told you I

19   sent it to Ken Klug.   Whatever someone else told you is

20   what that person told you, but I didn't assume anything.

21   I told you the truth, that I sent this product to Ken

22   Klug, and that's the end of the story.

23       Q.    All right.   So you would not be testifying in

24   this lawsuit about the authenticity of any Louis Vuitton

25   product or lack of authenticity of any Louis Vuitton

                              135

                    ROBERT L. HOLMES



1    product?

2        A.   No, sir.

3        Q.   Please take a look at Exhibit 1048.  Tell me if

4    you recognize this.  It appears to be in the same

5    production sequence from Mr. Coombs' office and appears

6    to be about Bag4sell.  Do you recognize it?

7        A.   It is a search of DomainTools.

8        Q.   And do you recognize it as one that you've done

9    or not?

10       A.   No, sir.  I recognize it as a search of

11   DomainTools.

12       Q.   This is not one you've done; is that correct?

13       A.   I believe it is possibly one that I did not do.

14       Q.   Why do you say that?

15       A.   Because it was most likely printed on a

16   French-speaking computer.

17       Q.   Again, because of the page numbering at the

18   top, Page 1 sur 3?

19       A.   Yes, sir.

20           MR. COOMBS:  Are they in order?

21           THE WITNESS:  Yes.

22       Q.   (BY MR. LOWE)  I'm going to hand you

23   Exhibit 1050.  Please take a look at it.  It's fairly

24   thick.  Tell me if you recognize it.

25           THE WITNESS:  Could you do me a favor?

136

ROBERT L. HOLMES

BARKLEY
Court Reporters

1  STATE OF TEXAS      X

2  COUNTY OF DALLAS    X

3

4            I, Ronald R. Cope, a Certified Shorthand

5  Reporter duly commissioned and qualified in and for the

6  State of Texas, Registered Professional Reporter and

7  Certified Realtime Reporter, do hereby certify that

8  there came before me on the 1st day of April, 2008, at

9  U.S. Legal Support/MillerParker, Inc. Located at 5910

10 North Central Expressway, 100 Premier Place, Dallas,

11 Texas, 75206, the following named person, to-wit: ROBERT

12 L. HOLMES, who was duly sworn to testify the truth, the

13 whole truth, and nothing but the truth of knowledge

14 touching and concerning the matters in controversy in

15 this cause; and that he was thereupon examined upon oath

16 and his examination reduced to typewriting under my

17 supervision; that the deposition is a true record of the

18 testimony given by the witness.

19            I further certify that pursuant to FRCP

20 Rule 30(e) that the signature of the deponent:

21            _X_ was requested by the deponent or a

22 party before the completion of the deposition, and that

23 signature is to be before any notary public and returned

24 within 30 days from date of receipt of the transcript;

25            ___ was not requested by the deponent or a

316

ROBERT L. HOLMES

BARKLEY
Court Reporters

1    party before the completion of the deposition.

2              I further certify that I am neither

3    attorney or counsel for, nor related to or employed by

4    any of the parties to the action in which this

5    deposition is taken, and further that I am not a

6    relative or employee of any attorney or counsel employed

7    by the parties hereto, or financially interested in the

8    action.

9              CERTIFIED TO BY ME on this the 7th day of

10   April, 2008.

11

12           _Ronald R. Cope_

13   RONALD R. COPE, CSR, RPR, CRR,
     Texas CSR 1813

13   Expiration Date:  12/31/09

14   US Legal Support/MillerParker
     CRCB Registration No. 343

15   100 Premier Place
     5910 North Central Expressway

16   Dallas, Texas  75206-5190
     (214) 369-3376

17

     Charge for transcript and exhibits $ _____

18

     To be paid by Defendant James A. Lowe

19

     Job No. 68415

20

21

22

23

24

25

# EXHIBIT 1510

Page 1

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4    LOUIS VUITTON MALLETIER, S.A.,    )
                                       )
5                    Plaintiff,        )
                                       )
6                    vs.               )    CASE No. C073952JW
                                       )
7    AKANOC SOLUTIONS, INC.,           )
     MANAGED SOLUTIONS GROUP, INC.,    )
8    SOLUTIONS GROUP, INC., STEVEN     )
     CHEN and DOES 1 through 10,       )
9    inclusive,                        )
                                       )
10                   Defendants.       )
     _____)

11

12

13

14

                       DEPOSITION OF WILL LONE

15

                      Pleasanton, California

16

                      Tuesday, April 29, 2008

17

18

19

20

21

22

23

24   REPORTED BY:  ANDREA M. IGNACIO HOWARD
                   CSR NO. 9830

25   NDS Job No.:  128205

EXHIBIT
1510
ALL-STATE® INTERNATIONAL

Page 6

1    Q.        You're currently employed?

2    A.        Yes; I'm working at Akanoc.

3    Q.        What is your title at Akanoc?

4    A.        Project manager.

5    Q.        Can you describe for me the work you do as

6    project manager?  Can you describe that job for me?

7    A.        The market is Mainland China and Taiwan, the

8    places that speak Chinese.

9    Q.        I'm sorry.  You were going to describe the

10   services that you perform.

11   A.        And then we rent our independent server to our

12   vendors -- distributors.

13   THE INTERPRETER:  Interpreter's correction.  Not vendors

14   but distributors.

15         MR. COOMBS:  Q.  And what do you do as project

16   manager in connection with that?

17   A.        First of all, I need to make contact with

18   customers.  When they need to place orders, then I would

19   provide assistance where necessary and complete the work

20   of the company by assisting other divisions within the

21   company.  That's it.

22   Q.        You're compensated by Akanoc with a salary?

23   A.        Correct.

24   Q.        Do you receive any other compensation from

25   Akanoc?

Page 7

```
 1   A.        No.

 2   Q.        Do you have any other employment at this time?

 3   A.        No.

 4   Q.        When did you first become project manager at

 5   Akanoc?

 6   A.        A few years ago.  Two, three years ago.  Around

 7   that time.

 8   Q.        So around 2005?

 9   A.        Around that.  Around that.

10   Q.        Have the services that you've performed as

11   project manager changed at all between the time that you

12   started in about 2005 and the present?

13   A.        It's the same as I described earlier.  I don't

14   know what you mean by "change."

15   Q.        What I mean is do the services as project manager

16   differ from when you first started to what you do today?

17   A.        Aside from the customers increasing in number,

18   basically there's been no change.

19   Q.        Earlier the word was translated as

20   "distributors," and just now you said "customers."  Is

21   there a difference?

22             MR. EDWARDS:  Objection; vague as to, "Is there a

23   difference?"

24             THE WITNESS:  For me, the only people that I have

25   business communications with are distributors.
```

Page 13

1    number of those we had visited the first time became our

2    customers.

3              At the second and third visit, I visited

4    customers, and at the same time the customer pool

5    increased as well.

6    Q.         During the second and third visits, did you also

7    visit people with businesses that were not yet Akanoc

8    distributors?

9    A.         Somebody had initiated communication, but we

10   needed to meet face-to-face.  Only then could you develop

11   mutual trust.  So if you want me to point to an

12   independent person and tell you what came before and

13   after, I don't have a very clear recollection.

14   Q.         You mentioned initial communications, were those

15   usually started by the prospective customer or by Akanoc?

16   A.         We or myself, in particular, for the development

17   of the company, we would go out and seek new customers.

18   From an independent point of view, Akanoc already has a

19   reputation in Mainland China.  There will be many clients

20   or customers who would come and look for us.

21   Q.         When customers come and look for Akanoc, do they

22   do it through the website or otherwise?

23   A.         Clients looking for me, for us, that is, even

24   though there are business circles, there will be

25   communication within business circles.  When they know

1          THE INTERPRETER:  These are two different ones,

2     Z-H-A-O, Y-I-T-I-A-N.  Interpreter's note.

3          THE WITNESS:  If you need more details, right now

4     I can't give you anything more clearer than that.

5          MR. COOMBS:  That's all I ask.

6          Your counsel has asked if we can go off the

7     record for a moment.

8          MR. EDWARDS:  Briefly.

9          (Recess taken.)

10         MR. COOMBS:  Back on the record.

11    Q.    Are these companies you've identified as partners

12    the same as the customers or distributors or something

13    else?

14    A.    They are distributors.  Sorry.  We can't say

15    distributor.  They rent our machines, and then they sell

16    it to their customers.  Reseller may be the more

17    appropriate word.

18    Q.    I guess what I was trying to understand, these

19    companies whose names you've just listed though are among

20    the customers or resellers that we've been talking about?

21    A.    Resellers.

22    Q.    Okay.  So in terms of the Google results that

23    you're describing, when you search U.S. servers, many of

24    the first search results are going to be Akanoc's

25    resellers?

1          MR. EDWARDS:  Objection; calls for speculation.

2   You can answer.

3          THE WITNESS:  Generally resellers.  The majority

4   of resellers are not only reselling our independent

5   servers, they're also reselling the independent servers of

6   other companies.

7          MR. COOMBS:  Q.  Do you transmit to potential

8   customers in PRC descriptions of the services that Akanoc

9   provides?

10  A.      Can you say the question again please, using

11  simple language?

12  Q.      How do you describe to potential customers of

13  Akanoc the services that Akanoc offers?

14  A.      Generally, I would look out for, among

15  distributors within the industry, those that are using

16  overseas servers.  Akanoc's strength is we provide Chinese

17  language services.  This is something that other

18  companies, server companies, cannot provide.

19  The machine quality, as well as our speed for connectivity

20  is also very competitive in this industry.  So what I tell

21  my potential customers is the Chinese language services

22  are fast connectivity, as well as the quality of our

23  machines and technical support capabilities.

24  Q.      And how do you communicate these features to

25  potential customers of Akanoc?

1    to "deal with."

2              THE WITNESS:  What do you mean by an acceptance

3    policy?

4              MR. COOMBS:  Q.  Does Akanoc have a policy that

5    prohibits certain activity on its servers?

6              MR. EDWARDS:  Objection; calls for speculation.

7    You can answer.

8              THE WITNESS:  On our website, there is a legal

9    document related to this.  Resellers, if they want to rent

10   a machine, it's only after they accept the stipulations

11   stated within the document that they are allowed to rent

12   our machines.

13             MR. COOMBS:  Q.  And are there occasions when the

14   resellers do not honor those agreements?

15             MR. EDWARDS:  Objection; calls for speculation;

16   lacks foundation.

17             THE WITNESS:  That's their duty.

18             MR. COOMBS:  Q.  Well, for example, does the

19   policy, as you just described, have restrictions as it

20   relates to the use of servers for spam?

21             MR. EDWARDS:  Objection; calls for speculation;

22   lacks foundation; calls for a legal conclusion.

23             MR. COOMBS:  Q.  You can still answer the

24   question.

25             MR. EDWARDS:  You can answer.

Page 23

1   A.       I would assist, but it was not my responsibility

2   to deal with this matter or handle this matter. I would

3   assist. I would parallel the efforts of others.

4   Q.       I guess I'm trying to understand what you mean by

5   "assist" in this context.

6           You would facilitate communications in Chinese

7   consistent with what was already communicated by other

8   divisions within the company, or something else?

9   A.       I continue to say that my English is not very

10   good, but I would do my best, tell the resellers that are

11   in the security division that there may be complaints. We

12   would tell the security department about these complaints

13   and hopefully seek a resolution to the problem.

14   Q.       What kinds of resolutions have you become aware

15   of in the course of communicating on issues related to the

16   violation of the acceptable use policy?

17           MR. EDWARDS: Objection; lacks foundation; vague

18   and ambiguous as to "acceptable use policy."

19           THE WITNESS: There are specialized individuals

20   within Akanoc that are responsible for this.

21           MR. COOMBS: Q. Who are they?

22   A.       Security.

23   Q.       Anyone else?

24   A.       These or related e-mails, if they were to be sent

25   to me, I would forward that to

Page 24

1    security@akanoc.com.  Exactly who would be responsible,

2    that's something for the security department to worry

3    about.

4    Q.      To your knowledge, has any reseller that you have

5    engaged -- I'm sorry.  Strike that.

6    Has any reseller that has engaged Akanoc's servers or

7    rented its servers, that you identified and brought on

8    board, been terminated by Akanoc, to your knowledge?

9         MR. EDWARDS:  Objection; vague and ambiguous as

10   to "terminated."

11   You can answer.

12        THE WITNESS:  The security department, based on

13   needs, will take measures to handle the situation.  At

14   this time, e-mail notification or issues about shutting

15   down a machine, sometimes the customer will have questions

16   about.  They'll ask why was the machine turned off, and

17   then I would tell them for whatever reason.

18   If there is a suspension of service, then I would tell

19   them to send an e-mail to the security department.

20        THE INTERPRETER:  Clarification.

21        THE WITNESS:  To have them directly resolve the

22   issue with security.

23        MR. COOMBS:  Q.  When talking with prospective

24   Akanoc customers, have you ever had occasion to discuss

25   with them the application of Akanoc's acceptable use

```
 1   STATE OF CALIFORNIA          )

                                  )  ss:

 2   COUNTY OF ALAMEDA            )

 3

 4           I, ANDREA M. IGNACIO HOWARD, do hereby certify:

 5           That I am a duly qualified Certified Shorthand

 6   Reporter, in and for the State of California, holder of

 7   certificate number 9830, which is in full force and

 8   effect and that I am authorized to administer oaths and

 9   affirmations;

10           That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13           That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17           That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21           That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24           That prior to the completion of the foregoing

25   deposition, review of the transcript was requested.
```

1          I further certify that I am not a relative or

2    employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome

5    of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8    this 5th  day of May           , 2008 .

9

10

11   _____

12   ANDREA M. IGNACIO-HOWARD, CSR No. 9830

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    30