IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Louis Vuitton Malletier, S.A., | NO. C 07-03952 JW |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Akanoc Solutions, Inc. et al., | |
| Defendants. | |

## I. INTRODUCTION

Luis Vuitton Malletier, S.A., ("Plaintiff") brings this action against Akanoc Solutions, Inc. ("Akanoc"), Managed Solutions Group, Inc. ("MSGI"), and Steven Chen (collectively, "Defendants"), alleging violations of the Trademark Act, 15 U.S.C. §§ 1051, *et seq.*, and the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.*[1] Plaintiff alleges that Akanoc and MSGI, both owned and managed by Chen, knowingly allowed and encouraged certain websites to use Defendants' services for infringing Plaintiff's valid trademarks and copyrights.

Presently before the Court are Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment.[2] The Court conducted a hearing on September 8, 2008. Based on

---

[1] (First Amended Complaint For: Contributory and Vicarious Trademark Infringement; Contributory and Vicarious Copyright Infringement ¶ 1, hereafter, "Complaint," Docket Item No. 71.)

[2] (Defendants' Motion for Summary Judgment, hereafter, "Motion," Docket Item No. 47; Defendants' Supplemental Motion for Summary Judgment, hereafter, "Supplemental Motion," Docket Item No. 73.)

the papers submitted to date and oral argument, the Court GRANTS in part and DENIES in part Defendants' Motion and Supplemental Motion for Summary Judgment.

## II. BACKGROUND

Plaintiff is a French corporation that is the sole and exclusive distributor of luxury merchandise, including a variety of handbags and other goods. (Complaint ¶¶ 8-9.) Plaintiff owns various trademarks and copyrights relating to such goods. (Id. ¶¶ 13, 18; Motion at 3.)

Defendant Chen is a shareholder and officer who operates and controls Defendants Akanoc and MSGI. (Answer to First Amended Complaint ¶ 28, hereafter, "Answer," Docket Item No. 13; Complaint ¶ 28.) Defendants Akanoc and MSGI are internet service providers that provide Internet Protocol ("IP") addresses, routers that link internet traffic to websites and servers that store internet content and allow the content to be accessed through the internet.[3] Akanoc and MSGI collectively own and operate all of the hardware that is relevant to this action. MSGI owns most of the hardware and Akanoc is primarily charged with operating it. (Chen Depo. at 47-49.) Defendants sell their IP addresses and the use of their servers to customers who can then use them to host their website content. (Chen Decl. ¶¶ 5-6.)

In late 2006, Plaintiff discovered websites that it believed were selling goods that infringed its copyrights and trademarks. By "pinging" those websites and determining their IP addresses, Plaintiff came to believe that they were using IP addresses assigned to Defendants.[4] Plaintiff sent Defendants notices requesting that the offending websites be removed from Defendants' servers. After sending Defendants several notices and reminders concerning multiple sites, Plaintiff noticed

---

[3] (Declaration of J. Andrew Coombs in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, hereafter, "Coombs Decl.," Ex. A, hereafter, "Chen Depo." at 43-48, Docket Item No. 80; Declaration of Steven Chen in Support of Defendants' Motion for Summary Judgment ¶¶ 5, 48, hereafter, "Chen Decl.," Docket Item No. 48.)

[4] (Declaration of Nicolay Livadkin in Support of Memorandum in Opposition to Defendants' Motion for Summary Judgment ¶¶ 11-17, hereafter, "Livadkin Decl.," Docket Item No. 78.)

2

that the websites either remained operable or were moved to different IP addresses also owned by Defendants. (Id.)

In May 2007, shortly after Plaintiff began sending Defendants take-down notices, Plaintiff purchased items from the websites it believed were being hosted by Defendants. Each of the items Plaintiff purchased was sent using a return address located in China.[5] Based on its analysis of the purchased items, Plaintiff believes that each of them is a counterfeit replica of Plaintiff's products which infringe Plaintiff's copyrights and trademarks. (Livadkin Decl. ¶ 17.)

Due to the persistence of what it believes to be infringing websites and Defendants' perceived unresponsiveness, Plaintiff filed this suit on August 1, 2007, alleging four causes of action:[6] (1) contributory trademark infringement, (2) vicarious trademark infringement, (3) contributory copyright infringement, and (4) vicarious copyright infringement. During this litigation, Plaintiff has identified numerous additional websites that it believes are infringing its copyrights and trademarks, and that are being hosted by Defendants. (Livadkin Decl. ¶ 18.) Plaintiff has provided Defendants with notices concerning these websites, but Plaintiff believes many of them continue to hosted by Defendants. (Id.) With the Court's permission, on July 28, 2008, Plaintiff filed an Amended Complaint extending its allegations of secondary copyright and trademark infringement related to an additional seventy-two allegedly infringing websites discovered since August 2007. (See First Amended Complaint, Docket Item No. 71.)

Presently before the Court are Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment.

---

[5] (Declaration of Robert L. Holmes in Support of Memorandum in Opposition to Defendants' Motion for Summary Judgment ¶¶ 3-15, hereafter, "Holmes Decl.," Docket Item No. 79.)

[6] Plaintiff organizes its Complaint into three causes of action by treating contributory and vicarious copyright infringement as the same cause of action. (Complaint at 13.) Since contributory and vicarious copyright infringement are distinct theories of secondary liability, the Court discusses each as a separate cause of action.

3

### III. STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

In a motion for summary judgment, the moving party "bears the initial responsibility for informing the district court that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The non-moving must then "present some evidence establishing each element of [his] claims on which [he] would bear the burden of proof at trial." Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted). Conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a case, summary judgment is inappropriate. Anderson, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

**A.  Direct Trademarks and Copyrights Infringement by Third Parties**

Defendants move for summary judgment on all causes of action on the ground that Plaintiff cannot prove direct infringement of Plaintiff's trademarks and copyrights by Defendants' customers. (Defendants' Reply in Support of Motion for Summary Judgment at 2-3, hereafter, "Reply," Docket Item No. 84.)

All theories of secondary liability for copyright and trademark infringement require some underlying direct infringement by a third party. Perfect 10 v. Visa Int'l. Serv. Assoc., 494 F.3d 788, 795, 807 (9th Cir. 2007). To establish direct infringement of a copyright, a plaintiff must show: (1) ownership of a valid copyright, and (2) violation of an exclusive right under 17 U.S.C. § 106.[7] To establish direct infringement of a trademark, a plaintiff must show: (1) ownership of a valid trademark, and (2) a likelihood of confusion resulting from a defendant's alleged infringing use. Applied Info. Sciences Corp. v. eBay, Inc., 511 F.3d 966, 972 (9th Cir. 2007).

At issue is whether Plaintiff can show that there was underlying direct infringement by third parties while using Defendants' services. Plaintiff provides the declaration of its "Anti-Counterfitting Coordinator," Nicolay Livadkin. Livadkin declares as follows:

- He has had responsibility for Plaintiff's internet enforcement efforts since 2002. He analyzes products purchased from hundreds of websites each year. (Livadkin Decl. ¶¶ 1, 6.)

- Since Plaintiff's new products are sold online exclusively through two websites controlled by Plaintiff, Plaintiff strictly controls distribution. Accordingly, infringing websites commonly refer to their products as "replica" products. Plaintiff, and Livadkin in particular, can determine with a high level of accuracy whether a website is offering counterfeit products. (Livadkin Decl. ¶ 5.)

- He has never obtained a legitimate Louis Vuitton product from a website he determined was selling counterfeit products. (Livadkin Decl. ¶ 6.)

---

[7] A copyright holder has the exclusive rights to reproduction of a copyrighted work and to prepare derivative works based upon a copyrighted work. 17 U.S.C. § 106.

- Plaintiff made "evidentiary purchases" of products from websites it determined were hosted by Defendants and were selling counterfeit products. Each product purchased was deemed by Livadkin to be a counterfeit.[8] (Livadkin Decl. ¶ 17.)

Plaintiff also provides the declaration of a private detective, Robert L. Holmes. Holmes states the following:

- He has over twenty-five years of experience investigating counterfeiters over the internet and in identifying the parties involved. Prior to being hired by Plaintiff, he had heard of Defendants and, based on his research and experience, understands them to have a reputation for hosting websites that specialize in counterfeiting and spam activities.[9] (Holmes Decl. ¶¶ 1, 2.)

- From May 2007 to October 2007, he ordered Louis Vuitton bags from numerous websites that he determined were hosted by Defendants. The return address for each purchase was in China and the payees used names that indicate Chinese origin. The bags he purchased were forwarded to Plaintiff to be analyzed for their authenticity.[10] (Holmes Decl. ¶¶ 3-15.)

Based on this evidence, a reasonably jury could find that third parties have infringed Plaintiff's copyrights and trademarks. Livadkin has experience in identifying counterfeit products and in this case, has purchased products he testifies are counterfeit. Holmes has purchased "Louis Vuitton" products from websites hosted by Defendants and has forwarded those products to Plaintiff to be analyzed for authenticity. The results of these tests may prove direct infringement of Plaintiff's valid marks by third-party's websites hosted by Defendants.

Rather than provide evidence to the contrary, Defendants contend that, regardless of the Plaintiff's ability to prove direct infringement by some websites, there is no evidence that Defendants hosted those websites. (Reply at 3.) Specifically, Defendants claim that Plaintiff cannot

---

[8] Defendants object to Paragraph 17 of Livadkin's declaration on the grounds that portions of it are vague, hearsay and constitute a legal conclusion. Defendants' objection is overruled because it goes to the weight of the evidence, not its admissibility.

[9] Defendants object to Paragraph 2 of Holmes' declaration on the ground that it contains inadmissible hearsay. Defendants' objection is overruled because it goes to the weight of the evidence, not its admissibility.

[10] Defendants object to this portion of Holmes' declaration on the ground that his statements that websites were hosted by Defendants is unsubstantiated hearsay because Holmes fails to explain the "pinging," or other methods he used, for verifying a website's location. However, Defendants' describe the "pinging" method themselves, and rely on it as an effective method for identifying a website's IP address. (Chen Decl. ¶¶ 13-14.) Thus, Defendants' objection is overruled.

rely on its lawyer, Mr. Coombs, to prove that the direct infringement occurred using Defendants' services.[11] Defendants claim Mr. Coombs is an incompetent witness and all evidence derived from him is inadmissible.

However, Plaintiff does not purport to rely solely on its counsel. Livadkin and Holmes testified that they found infringing websites that were hosted by Defendants. (Livadkin Decl. ¶¶ 17; Holmes Decl. ¶¶ 3-15.) Plaintiff also provides Defendants' internal emails discussing attempts to remove websites selling counterfeit Louis Vuitton products.[12] For example, one email requests that a server must be made inoperable "due to a website famous-shop.com selling illegal counterfeit product, in particular Louis Vuitton." (Coombs Decl. Ex. E at 344.) These documents indicate that at least some infringing third-parties' websites may have been hosted by Defendants.

Finally, the issues of whether and the extent to which Defendants hosted infringing websites are still open to discovery. The Court ordered further discovery concerning this dispute on August 7, 2008, concerning sixty-seven specific websites that were allegedly using Defendants' services.[13] (Order Overruling Defendants' Objection to Order to Compel, Docket Item No. 76.) Such discovery is needed to determine if there is further evidence concerning infringing websites' use of Defendants' services.

Accordingly, the Court finds that there is a genuine issue of material fact as to whether Defendants hosted any directly infringing websites.

---

[11] (Defendants' Supplemental Motion for Summary Judgment at 3-5, hereafter, "Supplemental Motion," Docket No. 73; Defendants' Reply on Supplemental Motion for Summary Judgment at 1-7, hereafter, "Supplemental Motion," Docket No. 90.)

[12] (See Coombs Decl., Ex. E; Declaration of J. Andrew Coombs in Support of Plaintiff's Opposition to Defendants' Supplemental Motion for Summary Judgment ¶ 5, hereafter, "Supplemental Coombs Decl.," Docket Item No. 82.)

[13] Judge Lloyd ordered Defendants to produce "all responsive publicly posted internet content evidencing offers made of counterfeit Luis Vuitton merchandise and traffic logs evidencing the volume of underlying counterfeit activity," or to "permit inspection of their servers to allow plaintiff an opportunity to ascertain the same." (Order Granting Plaintiff's Motion to Compel Documents at 5, Docket Item No. 65.)

**B.     Contributory Copyright Infringement**

Defendants move for summary judgment on Plaintiff's claim for contributory copyright infringement on the grounds that Defendants had no knowledge that the direct infringement was occurring and that Defendants did not induce or provide material contribution to any direct infringement. (Motion at 17.)

Contributory copyright infringement requires (1) knowledge of another's infringement and (2) either (a) material contribution to the infringement or (b) inducement of the infringement. Perfect 10, 494 F.3d at 795.

**1.     Knowledge**

Defendants contend that Plaintiff has no evidence that Defendants had actual or constructive knowledge of infringing material on Defendants' servers or assigned IP addresses. (Reply at 8.)

Actual knowledge exists where it can be shown by a defendant's conduct or statements that it actually knew of specific instances of direct infringement. See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1020 (9th Cir. 2001). Constructive knowledge exists where it can be shown a defendant should have known of the direct infringement. Id. Generally, "the copyright holder must provide the necessary documentation to show there is likely infringement." Id. at 1021 (quoting Religious Tech. Ctr. v. Netcom On-Line Comm. Serv., Inc., 907 F. Supp. 1361, 1374 (N.D. Cal. 1995)). "[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." Id. (citing Netcom, 907 F. Supp. at 1374).

In this case, Plaintiff provides the following evidence:

- Internal emails from Defendants between August 2007 and April 2008 containing the following notice: "We have received letter complaint from legal authority that your server . . . is hosting website . . . which engaged in sale of counterfeit products. Please take down specific website immediately, or we will disconnect the abuse IP." (Coombs Decl. Ex. E at 342-377.)

- An email from Steven Chen on November 30, 2007 stating "Nora, this is Steve. You need to take care this one fast; we are under big pressure from the lawyer. For the extraIP, we can nullroute the extraIP without killing the whole server; but this one is on main IP, so if you

8

don't kill the website, we will need to kill the server. In the future, try not to put applications on the main IP." (Coombs Decl. Ex. E at 343.)

• An internal email from Defendants on December 19, 2007 stating "This [unplugging of a server] is due to a website famous-shop.com selling illegal counterfeit product, in particular Louis Vuitton." (Coombs Decl. Ex. E at 344.)

• An internal email from Steven Chen on August 8, 2007 stating "we are being suited [sic] by LV for hosting this website, ape168.com Do not let this guy stay here with LV trademark." (Coombs Decl. Ex. E at 347.)

• Letters from Plaintiff's counsel to Defendants' counsel on November 26, 2007, June 20, 2008, June 24, 2008 and July 25, 2008 identifying websites containing and selling infringing material. (Coombs Supplemental Decl. Exs. A, C, D, E.)

• Plaintiff's Anti-Counterfeiting Coordinator sent letters to Defendants' address in Fremont, California concerning various infringing websites. (Livadkin Decl. ¶ 12-16.)

• Defendant Steven Chen testified in his deposition that he received letters concerning Defendants hosting of websites selling counterfeit Louis Vuitton products. Chen further testified that Defendants "just don't have a lot of experience with [complaint letters], and we don't have any mechanism to take care of letter complaints." (Chen Depo. at 109-11.)

In an effort to rebut Plaintiff's evidence, Defendants provide testimony from Chen stating that Defendants do not know whether any websites using their services are direct infringers because Defendants "do not log on to the [i]nternet to investigate or verify whether [a] complaint is well founded." (Chen Decl. ¶ 11.) Instead, Defendants assume all complaints are justified and send a "take down" notice to their resellers. (Id. ¶ 12.) Chen further testifies that this process is the only practical approach, primarily because of the large number of complaints and Defendants' inability to determine who actually has rights to any content on the internet. (Id.)

Based on Plaintiff's evidence, however, a reasonable jury could find that Defendants had actual knowledge that infringing websites were using their services. Similarly, a reasonable jury could find that Defendants should have known that infringing websites were using their services based on Plaintiff's letters. Although Chen's testimony is evidence that Defendants may not have had any actual knowledge of any underlying direct infringement, this testimony merely serves to highlight that there are disputed issues of material fact with respect to the issue of Defendants' actual knowledge of infringement. In addition, Chen's testimony does not speak to whether Defendants *should* have known about the alleged infringing activity in light of Plaintiff's multiple letters. As

9

1 such, the Court finds that a genuine question of material fact exists regarding Defendants'
2 knowledge of direct infringement.

### 2. Material Contribution

4 Defendants contend that Plaintiff cannot prove a material contribution because Plaintiff
5 cannot prove that Defendants took active steps to encourage direct infringement. (Reply at 11.)
6 Plaintiff counters that Defendants' provision of IP addresses, server space and the ability to route
7 information through Defendants' network constitutes a material contribution. (Opposition at 14.)

8 Contributory infringement "liability exists if the defendant engages in personal conduct that
9 encourages or assists the infringement" activity. A&M Records, Inc. v. Napster, Inc., 239 F.3d
10 1004, 1019 (9th Cir. 2001). Under this standard, knowingly providing the "site and facilities" for
11 infringing activity is a material contribution. Fonovisa v. Cherry Auction, Inc., 76 F.3d 259, 264
12 (9th Cir. 1996). In the internet context, where "a computer system operator learns of specific
13 infringing material available on his system and fails to purge such material from the system, the
14 operator knows of and contributes to direct infringement." Napster, 239 F.3d at 1022. For example,
15 in Napster, the design and distribution of file-sharing software to facilitate users' exchange of
16 copyrighted music files was found to be unlawful provision of "site and facilities," such as to qualify
17 as a material contribution to copyright infringement. Id. at 1021. Computer system operators can be
18 liable where, knowing that specific infringing materials are present on their systems and able to take
19 "simple measures" to limit infringement, they continue to provide access to the infringing materials.
20 Perfect 10 v. Amazon.com, Inc., 508 F.3d 1146,1172 (9th Cir. 2007).

21 In this case, Plaintiff provides evidence that Defendants materially contribute to infringing
22 activity by failing to take simple measures to limit the known infringing activity taking place on
23 their systems. (See Opposition at 16.) For example, Plaintiff proffers the following pieces of
24 evidence:

- An email from Steven Chen on November 30, 2007 stating "For the extraIP, we can nullroute the extraIP without killing the whole server; but this one is on main IP, so if you don't kill the website, we will need to kill the server. In the future, try not to put applications on the main IP." (Coombs Decl., Ex. E at 343.)

10

• A January 11, 2008 internal email from Defendants stating "done, site deleted. and will force the reseller to delete the offender too." (Id. at 351.)

• A January 11, 2008 internal email from Defendants stating "Please disable this website too; same IP. louisvuittonbagz.com." (Id. at 352.)

• Testimony from Juliana Luk, an employee of defendant Akanoc Solutions, explaining that one of her work duties is to email Defendants' "support department" to "unplug" specific IP addresses. (Coombs Decl. Ex. C, Deposition Testimony of Juliana Luk at 21-22, hereafter, "Luk Depo.")

Plaintiff also provides the following excerpt from Defendant Chen's deposition:

•     Q: Okay. Please explain to me what the difference [between "unplugging" a server and "disabling" an IP] is.

    A: The server unplugged is just disconnecting the server completely, regardless of–regardless how many different IPs in it. Disabling an IP is maybe this particular server has 20 different IPs and I'm only taking down that particular IP.

    Q: So these are two different actions that Akanoc–

    A: That's correct.

    Q: –can take?
Does it–are there criteria that govern when it uses one as opposed to the other?

    A: We try very hard not to take down the whole server because they may have some innocent users there that we try not to damage those innocent users, let's put it that way.

    Q: So disabling the IP can be a less dramatic step than unplugging the server?

    A: That's correct.

    Q: But both of them will result in removing access to the abusive Website or content or whatever--

    A: That is correct.

    Q: –the complaint is about?

    A: That is correct.
. . .
    Q: How long does it take you to disable the IP?

    A: About 30 minutes. Depends on how fast we can process the instruction.

(Chen Depo. at 83-84.)

11

Chen's November 2007 email and both of Defendants' January 2008 emails refer to removing a single website. Luk's testimony indicates that Defendants have the ability to disable specific IP addresses without unplugging an entire server. Her testimony is corroborated by Defendant Chen's testimony that Defendants are able to take the "less dramatic step" of removing a website by disabling an IP address. Although Chen states in a declaration that unplugging servers and "otherwise disabling the customer's access" are both "extreme action," Chen only explains that unplugging an entire server is extreme because there may be "dozens or even hundreds of ultimate users of the same server." (Chen Decl. ¶ 16.) Nor does he explain what "otherwise disabling the customer's access" entails. Defendants also present no evidence indicating that removing a website by disabling an IP address is not a "simple measure" by which they can purge infringing activity using their services. To the contrary, Chen's deposition testimony describes how disabling the IP address of an infringing website is a more practical method of removing abusive websites without affecting numerous other websites.

In light of the evidence presented, the Court finds that a reasonable jury could find that Defendants do have "simple measures" at their disposal for purging infringing websites. Accordingly, the Court finds there is a genuine issue of material fact as to whether Defendants provided a material contribution to the directly infringing conduct.[14]

## C. Vicarious Copyright Infringement

Defendants move for summary judgment on Plaintiff's claim for vicarious copyright infringement on the ground that Plaintiff cannot provide sufficient evidence to establish Defendants had a "direct financial interest" in the underlying direct infringement. (Motion at 23.) Plaintiff contends that the ability to infringe without strict policing by Defendants acts as a draw, in conjunction with Defendants' Chinese language skills and competitive technology. (Opposition to Defendants' Motion for Summary Judgment at 18, hereafter, "Opposition," Docket Item No. 77.)

---

[14] Since the Court finds Plaintiff has established a genuine issue of material fact with respect to a material contribution theory of contributory copyright liability, it need not address whether Plaintiff can establish a genuine issue of material fact under an inducement theory.

12

"Whereas contributory infringement is based on tort law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior*." Perfect 10, 494 F.3d at 802 (citing Fonovisa, 76 F.3d at 261-62). Vicarious copyright infringement requires (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity. Id. (citing Ellison v. Robertson, 357 F.3d 1072, 1078 (9th Cir. 2004), and Napster, 239 F.3d at 1022).

"[T]he central question of the 'direct financial benefit' inquiry in this case is whether the infringing activity constitutes a draw for subscribers, not just an added benefit." Ellison, 357 F.3d at 1079. "There is no requirement that the draw be 'substantial'." Id. "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps . . . ." Id. "Receiving a one-time set-up fee and flat periodic payments for service . . . ordinarily would not constitute receiving a financial benefit directly attributable to the infringing activity." Id. (quoting S. Rep. 105-190, at 44 (1998)) (internal quotations omitted). To establish liability for vicarious infringement, a plaintiff must show that "customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available." Ellison, 357 F.3d at 1079. It is insufficient to merely show that a defendant's customers themselves value the ability to infringe. Id.

In this case, Plaintiff provides no evidence that any of Defendants' customers used their services because of the ability to infringe. (See Chen Depo. at 60, 143-144; Coombs Decl., Ex. D, Deposition Testimony of Will Lone, hereafter, "Lone Depo.," at 11-17.)[15] Plaintiff contends that customers are drawn to Defendants' services because Defendants turn "a blind eye to detectable acts

---

[15] In fact, there is evidence to the contrary through the deposition of Will Lone, one of Defendants' employees. Lone testified that he distinguishes Defendants' services to potential customers based on "the Chinese language services, [Defendants'] fast connectivity, as well as the quality of [Defendants'] machines and technical support capabilities." (Lone Depo. at 17.) These are the sort of factors that would act as a draw to any potential customer of an Internet service provider. However, because Mr. Lone is an employee of Defendants, his testimony may be subject to a bias challenge at trial. Thus, the Court only notes his testimony but does not rely on it to decide this issue.

13

of infringement." (Opposition at 18.) Plaintiff's contention, however, is unavailing. Plaintiff relies on evidence, discussed above, that Defendants knew about infringing activity and provided their services anyway. However, use of Defendants' services for direct infringement alone is insufficient to establish a "causal relationship" between the underlying infringing activity and Defendants' financial benefit. Ellison, 357 F.3d at 1079. Here, Plaintiff does not offer any evidence showing that Defendants made more money when they allowed infringement to continue or less money when they did not. Nor does Plaintiff offer any evidence showing that customers sought or abandoned Defendants' services based on their ability to infringe. Furthermore, Plaintiff concedes that Defendants have "unplugged" infringers in the past. (Opposition at 18-19.) By doing so, Plaintiff undermines its own contention that Defendants turn a blind eye to the infringing activity occurring on their servers.

In sum, there is no evidence that Defendants have had a "direct financial interest" in the alleged underlying direct infringement. Plaintiff has failed to offer any evidence to create trial issues of material fact with respect to whether a causal relationship exists between Defendants' profits and the alleged infringing activities by third-parties who are using Defendants' services.[16]

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Plaintiff's claim for vicarious copyright infringement.

**D.      Contributory Trademark Infringement**

Defendants move for summary judgment on Plaintiff's claim for contributory trademark infringement on the ground that there is no genuine issue of material fact as to whether Defendants have intentionally induced any direct infringement. (Reply at 4.)

"The tests for secondary trademark infringement are even more difficult to satisfy than those required to find secondary copyright infringement." Perfect 10, 494 F.3d at 806. To prove

---

[16] Since Plaintiff cannot provide any evidence that creates a triable issue of material fact regarding whether Defendants received a direct financial benefit, the Court does not consider Defendants' right and ability to supervise the infringing activity. Additionally, the outstanding discovery ordered by the Court on August 7, 2008 does not concern any direct financial benefit Defendants received from the alleged underlying infringement.

14

contributory trademark infringement, a plaintiff must establish that the defendant "(1) intentionally induced the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." Id. at 807 (internal quotations omitted); Inwood Lab. v. Ives Lab., 456 U.S. 844, 854 (1982).

Although this formulation technically requires either intentional inducement or continued sale of an infringing product, the Ninth Circuit has found the rule less restrictive in the situations involving the provision of services. Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir. 1999). In Lockheed, the Ninth Circuit held that, even though an internet service provider did not supply a "product" to infringing third parties, the court should "consider the extent of control exercised by the defendant over the third party's means of infringement" to determine if actual or constructive knowledge of the third party's infringement would give rise to contributory liability. Id. at 984. Accordingly, when a defendant offers a service instead of a product, a plaintiff can base its contributory trademark infringement claim on the "extent of control" theory or the "intentional inducement" theory. See id.

The Court first addresses contributory trademark liability under the "extent of control" theory. Under that framework, a plaintiff must prove that the defendant had knowledge and "[d]irect control and monitoring of the instrumentality used by the third party to infringe the plaintiff's mark." Lockheed, 194 F.3d at 984.

**1.    Knowledge**

As discussed above, the Court finds there is a genuine issue of material fact regarding Defendants' actual or constructive knowledge of third-parties' direct infringement.

**2.    The Extent of Control**

Defendants contend that they do not exercise direct control over any websites because (1) the Stored Communications Act prevents them from doing so, (2) Defendants only sell their services to "resellers," not individual websites, and (3) Defendants cannot and do not monitor every website that uses their services. (Motion at 11-12.)

15

1   With respect to Defendants' first contention, the Court has previously found that the Stored
2   Communications Act does not preclude Defendants from controlling and monitoring their
3   customers' websites because nothing in this case requires Defendants to delve into anything but the
4   public information of its customers. (Order Overruling Defendants' Objection to Order to Compel,
5   Docket Item No. 76.)

6   With respect to Defendants' second contention, whether Defendants deal with resellers or
7   directly with website operators is not dispositive on the issue of control. Defendants' ability to
8   directly control infringing uses of its services by terminating websites is independent from how they
9   choose to bring individual websites to their IP addresses. As discussed above, Plaintiff has
10  provided sufficient evidence to establish a genuine issue of fact with respect to Defendants' ability
11  to disable individual IP addresses and thereby remove websites using their servers. (See Chen Depo.
12  at 83-84; Luk Depo. at 21-22; Coombs Decl., Ex. E at 343, 351, 352.) Defendants also concede that
13  they have the ability to terminate websites by unplugging an entire server. (See Chen Decl. ¶ 16.)

14  Defendants' third contention is based on the Ninth Circuit's holding in Lockheed that an
15  Internet service provider was not required to "monitor the internet." 194 F.3d at 985. The defendant
16  Internet service provider in that case, however, merely provided a "rote translation service," by
17  which the defendant translated domain names into IP addresses. Id. The Ninth Circuit distinguished
18  this Internet translation service from the real estate licenses provided by the defendant flea market
19  operators to infringing sellers in Fonovisa. Id. (citing Fonovisa, 76 F.3d at 265). Unlike the Internet
20  translation provider in Lockheed, the flea market operators in Fonovisa provided the site and
21  facilities for the underlying infringing activity. Id. The guiding principle of holding a flea market
22  operator liable for contributory infringement is that a host who permits others to use his premises
23  cannot remain "wilfully blind" to their directly infringing acts. Fonovisa, 76 F.3d at 265.

24  In this case, Defendants' activity as Internet service providers is more like the flea market
25  proprietors in Fonovisa than the domain name translation service in Lockheed. Here, Defendants do
26  not simply translate domain names into IP addresses. Defendants physically host websites on their

servers and route internet traffic to and from those websites. This service is the Internet equivalent of leasing real estate. Defendants' services, combined with Defendants' ability to remove infringing websites, entails a level of involvement and control that goes beyond "rote translation." As with the flea market operators in Fonovisa, Defendants cannot remain "wilfully blind" to trademark infringement taking place on their servers.

In light of the evidence presented, a reasonable jury could find that Defendants knew third-parties were infringing Plaintiff's trademarks and remained wilfully blind despite the ability to terminate its services to those third-parties.

Accordingly, the Court DENIES Defendants' Motion for Summary Judgment on Plaintiff's claim for contributory trademark infringement.

E. **Vicarious Trademark Infringement**

Defendants move for summary judgment on Plaintiff's claim for vicarious trademark infringement on the ground that Plaintiff has not provided any evidence that could convince a rational trier of fact that any direct infringer has an actual or apparent partnership with Defendants. (Motion at 15-16.)

Vicarious trademark infringement requires "a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product." Perfect 10, 494 F.3d at 807.

Plaintiff offers the same evidence concerning Defendants' ability to control and monitor websites to show that Plaintiff has a tacit partnership with websites infringing Plaintiff's marks. Although that evidence creates a triable issue of fact concerning Defendants' ability to shut down known infringing websites, there is no evidence indicating that Defendants might have a relationship with a direct infringer that is so close as to be an actual or apparent partnership.[17] In contrast,

---

[17] Plaintiff's invocation of Defendants' employees Luk and Lone's off-hand references to customers as "partners" is insufficient to exhibit the type of behavior and relationship that can be considered an actual or apparent partnership. (See Lone Depo. at 14; Luk Depo. at 59.)

17

Defendant Chen states in his declaration that "Defendants have never known any operators of [w]ebsites alleged to infringe copyrights or trademarks being hosted on their servers because [Defendants] do not deal directly with those [w]ebsite operators, do not receive money from them, and have no connection to them whatsoever."[18] (Chen Decl. ¶ 25.) Plaintiff does not provide any evidence rebutting Chen's statements. Absent any such evidence by Plaintiff, no reasonable jury could find that Defendants had "an apparent or actual partnership" with any alleged infringing third-party's website.

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's claim for vicarious trademark infringement.

## V. CONCLUSION

The Court GRANTS in part and DENIES in part Defendants' Motion and Supplement Motion for Summary Judgment. The Court GRANTS summary judgment as to Plaintiff's claims for vicarious copyright infringement and vicarious trademark infringement. The Court DENIES summary judgment as to Plaintiff's claims for contributory copyright infringement and contributory trademark infringement.

Dated: December 23, 2008

JAMES WARE
United States District Judge

---

[18] Plaintiff objects to this portion of Chen's declaration on the grounds that it lacks foundation and constitutes an inadmissable legal conclusion. (See Docket Item No. 81.) The Court overrules these objections because Chen is testifying as to his personal knowledge and is not offering any legal conclusion.

18

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Annie S Wang annie@coombspc.com
Brian S. Edwards bse@gauntlettlaw.com
David A. Gauntlett info@gauntlettlaw.com
J. Andrew Coombs andy@coombspc.com
James A. Lowe info@gauntlettlaw.com

Dated: December 23, 2008      Richard W. Wieking, Clerk

By: /s/ JW Chambers
    Elizabeth Garcia
    Courtroom Deputy