J. Andrew Coombs (SBN 123881)
andy@coombspc.com
Annie S. Wang (SBN 243027)
annie@coombspc.com
J. Andrew Coombs, A Prof. Corp.
517 E. Wilson Ave., Suite 202
Glendale, California 91206
Telephone: (818) 500-3200
Facsimile: (818) 500-3201

Attorneys for Plaintiff Louis
Vuitton Malletier, S.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

| | |
|---|---|
| Louis Vuitton Malletier, S.A., <br><br> Plaintiff, <br><br> v. <br><br> Akanoc Solutions, Inc., et al. <br><br> Defendants. | Case No.: C 07 3952 JW (HRL) <br><br> OPPOSITION OF PLAINTIFF LOUIS VUITTON MALLETIER, S.A. TO DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE ALL TESTIMONY ABOUT DEFENDANTS' ALLEGED REPUTATION; DECLARATION OF J. ANDREW COOMBS, EXHIBITS IN SUPPORT |

## INTRODUCTION

Defendants' Motion in Limine No. 3 to "Exclude All Testimony About Defendants' Alleged Reputation" ("Motion No. 3") should be denied because such testimony is governed by the "law of the case" doctrine, and because it speaks not only to elements at issue in the litigation but is offered as evidence of Defendants' knowledge of infringing activity on their servers, their ability to control activity using goods and services provided by them and profits gained by them from ignoring complaints by intellectual property owners. Moreover, Defendants rely upon inapplicable cases and, worse, improperly cite unpublished decisions.

Also contrary to Defendants' assertions, Plaintiff has designated no evidence concerning third parties not involved in the litigation as bulletproof hosts.

### A. The Rules of Evidence Favor Admissibility

Motions in limine should be granted sparingly. Alliance Fin. Capital, Inc. v. Herzfeld, 2007 Bankr. LEXIS 4511, at *2 (N.D. Ga. December 17, 2007) citing Sperberg v. Goodyear Tire &

Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975); Middleby Corp. v. Hussmann Corp. 1992 U.S. Dist. LEXIS 13138, at *9-10 (N.D. Ill. August 27, 1992).  "A pretrial motion in limine forces a court to decide the merits of introducing a piece of evidence without the benefit of the context of trial." CFM Communs., LLC v. Mitts Telecasting Co., 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005); see also U.S. v. Marino, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence).

Evidence should be "excluded on a motion in limine only if the evidence is *clearly* inadmissible for any purpose" (internal quotations omitted, emphasis added).  Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., 2006 U.S. Dist. LEXIS 42159, at *14 (N.D. Cal. June 12, 2006).  This means Defendants will have to overcome the well established policies favoring admissibility.  Daubert v. Merrell Dow Pharms., 509 U.S. 579, 587 (1993) ("The Rules' basic standard of relevance thus is a liberal one.");  U.S. v. Curtin, 489 F.3d 935, 942 (9th Cir. 2007) citing Huddleston v. United States, 485 U.S. 681, 688-89 (1988) (the version of Rule 404(b) which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court version"); see also U.S. v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (relief against admissibility under Rule 403 should be granted sparingly); U.S. v. Fleming, 215 F.3d 930, 939 (9th Cir. 2000) (Rule 403 favors admissibility); U.S. v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000) ("the application of Rule 403 must be cautious and sparing"); F.R.E. 102 Adv. Comm. Notes ("rules are to be liberally construed in favor of admissibility" within the bounds of the Rules to achieve goals of "speedy, inexpensive, and fair trials designed to reach the truth").  Defendants fail to meet their burden given the probative value of the evidence, the Rules, sound case law, and in light of these policies.

## B.  The Law of the Case Precludes Defendants From Revisiting This Issue

The Court's prior consideration of Defendants' objection to evidence of "reputation" was overruled and now constitutes "law of the case" which precludes re-litigation of the issue absent very narrow exceptions not applicable here.

"The law of the case doctrine provides that 'a court is generally precluded from reconsidering an issue that has already been decided by the same court...'" U.S. v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998) citing U.S. v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted). Defendants previously objected to the "reputation" testimony. See Defendants' Evidentiary Objection to the Holmes Declaration in Support of Vuitton's Opposition to Defendants' Motion for Summary Judgment Filed August 25, 2008, ¶ 2.

The Court overruled these objections and cited this evidence in its ruling partially denying Defendants' Motion for Summary Judgment. MSJ Ruling at 6 fn. 9. None of the exceptions to the doctrine apply to Defendants' renewed objection: 1) the first decision was not *clearly erroneous*; 2) there have been no intervening changes in the law; 3) the evidence is not substantially different; 4) no other changed circumstances exist; and 5) no manifest injustice would otherwise result. Cuddy, 147 F.3d at 1114. Thus, Defendants objection has already been decided and this motion should be summarily denied as barred by the law of the case.

Defendants' arguments are similarly contrary to law and practice and Defendants' motion should be denied in its entirety.

### C. Admissibility of Reputation Evidence Is the General Rule of F.R.E. 404

While Rule 404(a) states a general rule of exclusion, Rule 404(b) is a "specialized but important application of the general rule." U.S. v. McCourt, 925 F.2d 1229, 1232 fn. 1 (9th Cir. 1991) citing Notes of Advisory Committee on Proposed Rules. "The House made clear that the version of Rule 404(b) which became law was intended to 'plac[e] greater emphasis on admissibility than did the final Court version.' The Senate echoed this theme: '[T]he use of the discretionary word 'may' with respect to the admissibility of evidence of crimes, wrongs, or other acts is not intended to confer any arbitrary discretion on the trial judge.' 'Thus, Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with *ensuring that restrictions would not be placed on the admission of such evidence.*'" U.S. v. Curtin, 489 F.3d 935, 945 (9th Cir. 2007) citing Huddleston v. United States, 485 U.S. 681, 688-89 (1988).

"Because the rule recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception, it is understood to be a rule of inclusion." U.S. v. Queen, 132 F.3d 991, 994 (4th Cir. 1997). Thus, the Court should rule on any character evidence under 404(b) in favor of admissibility.

### D. **Defendants' Sheltering of Illegal Activity is "In Issue" in the Case**

Courts of this Circuit and others have held that Rule 404 does not require exclusion of evidence "'inextricably intertwined' with, or 'intricately related' to, charged conduct that it helps the factfinder form a more complete picture of the activity." U.S. v. Hale, 448 F.3d 971, 985 (7th Cir. 2006); citing U.S. v. Paladino, 401 F.3d 471, 475 (7th Cir. 2005); U.S. v. Gougis, 432 F.3d 735, 742 (7th Cir. 2005); Stewart v. U.S., 311 F.2d 109, 112 (9th Cir. 1962) ("evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; o[r] tends logically to prove any element of the crime charged. Such evidence is admissible if it is so related to or connected with the crime charged as to establish a common scheme or purpose so associated that, proof of one tends to prove the other, or if both are connected with a single purpose and in pursuance of a single object; as well as to establish identity, guilty knowledge, intent and motive."). This law could not be more applicable than in the present case.

Here, Defendants' business model is predicated upon allowing anonymous and often offshore users to interact with the Internet with impunity from the application of local laws. This includes website operators who put whatever material they want on the world wide web without accountability, not because Defendants cannot regulate such material on their servers, but because they choose not to. This is essentially what has been described as "bulletproof hosting".[1] Counterfeiters need hosts who will let them conduct their illegal businesses without recourse or interruption. Defendants have established this kind of a business to shield and foster counterfeiters,

---

[1] Significantly, Defendants appear to attempt to include the term "bulletproof hosting" within the ambit of their motion to exclude reputation evidence. Louis Vuitton submits that evidence of Defendants' business model will support application of this widely-used term, at least as much as it does the Defendants' own euphemistic "unmanaged hosting". The term chosen to describe Defendants' business model is not reputation evidence and not properly the subject of the proposed motion to exclude in any event.

among other illegal actors, creating a safe haven for them that is not only materially essential to a websites' survival and success but also particularly attractive to a counterfeiter whose livelihood depends on staying online. The testimony regarding Defendants as bulletproof hosts speaks to Defendants' knowledge of infringing activity occurring on their equipment as well as their material contribution to contributory infringement. Thus, testimony regarding Defendants' notoriety as a bulletproof host should be admissible because it is so "inextricably intertwined" to Plaintiff's claims of contributory infringement.

## E. The Testimony is Admissible to Prove Knowledge, Control, Modus Operandi and Motive Aside From Defendants' Acts in Conformity

The testimony is also admissible under F.R.E. 404(b) as it speaks to Defendants' knowledge of infringing activity on their servers, of their modus operandi, and particularly their motive for ignoring complaints by intellectual property owners.

Aside from proving knowledge of infringing activity on its servers, the ability to control and the lack of exercise of such control, and Defendants' modus operandi of looking the other way when faced with complaints from intellectual property owners, the most compelling listed 404(b) application for the disputed testimony relates to Defendants' motive. Defendants' creation and maintenance of that notoriety as bulletproof hosts attracts a robust "business" of counterfeiters, spammers, and other individuals looking for dedicated server space and a safe-haven from the law. Defendants ignored abuse complaints, failed to penalize even those that violated their own terms of use, and continued to do business with infringers despite notice, Declaration of J. Andrew Coombs ("Coombs Decl.") at ¶¶ 2-3, Exs. A-B (Depositions of Steve Chen ("Chen Depo") and Juliana Luk ("Luk Depo.")), purposefully to create and foster its "reputation" as a bulletproof host because it was good for the bottom line.

The testimony is admissible even under the Ninth Circuit's four-part test for admission of 404(b) evidence that: (1) it must prove a material element of the offense for which the defendant is now charged; (2) in certain cases, the prior conduct must be similar to the charged conduct; (3) proof of the prior conduct must be based upon sufficient evidence; and (4) the prior conduct must

not be too remote in time.  U.S. v. Basinger, 60 F.3d 1400, 1408 (9th Cir. 1995).  Defendants' status as bulletproof hosts proves knowledge of infringing activity on their servers, control, ability to remedy violations easily and goes to prove one of the most material contributions to a counterfeiting enterprise, security and protection.  Plaintiff's witnesses are basing their testimony on personal experience both in having been ignored by Defendants on repeated occasions but also in terms of the frequency they are connected to investigations by Plaintiff's investigator for intellectual property violations.  Court's Ruling on Motion for Summary Judgment ("MSJ Ruling") 9:8-12; Coombs Decl. at ¶ 4, Ex. C (Deposition of Robert Holmes ("Holmes Depo."), p. 172-175) (describing frequency of Defendants' connections to his investigations of infringement).  The conduct complained of was within the statute of limitations and gave rise to this claim, defeating any argument that the prior conduct was too remote in time.

### F.  "Reputation" Testimony is Specifically Excepted from the Hearsay Rule and Widely Accepted in Courts

Defendants' overreaching efforts to exclude admissible evidence and to avoid the unavoidable outcome should Louis Vuitton proceed to trial on the merits is nowhere more apparent in the clearly inappropriate invocation of the hearsay rule to exclude evidence of reputation.

F.R.E. 803(21) expressly states that "[r]eputation of a person's character among associates or in the community" is not excluded by the hearsay rule.  Defendants' argument is thus flatly inconsistent with the Federal Rules and should be denied.

To the extent Mr. Livadkin's and Mr. Holmes' statements are based on personal knowledge, they are not hearsay.  MSJ Ruling 9:8-12 (Mr. Livadkin sent letters that Defendants received); Holmes Depo. at 172-175 (relaying frequency of Defendants' connections to his investigations of infringement).

Defendants' argument that "reputation" testimony is hearsay and should be excluded is almost always overruled.  This is most likely why the cases cited by Defendants are not applicable or should never have been cited by Defendants.  Parada v. Gonzales, 204 Fed. Appx. 610, 611 (9th Cir. 2006) was an unpublished opinion that the Ninth Circuit makes clear is not precedent and may

not be cited. 9th Cir. R. 36-3 (no exceptions apply). <u>Turner v. Calderon</u> involved some declarations that the Court excluded because they were "made without providing an adequate legal foundation for that knowledge" not because they were hearsay. <u>Turner v. Calderon</u>, 281 F.3d 851, 877 (9th Cir. 2002) ("Not only do some of the declarations rely heavily upon inadmissible hearsay, *but others* speak to knowledge of Savage's reputation in the community without providing an adequate legal foundation for that knowledge." (emphasis added)).

Instead, reputation by definition is a summation of what a witness has heard in the community regarding another person's character. <u>Michelson v. U.S.</u>, 335 U.S. 469, 477 (1948). Reputation type testimony is widely admissible particularly under F.R.E. 404 as described above, and it is well settled that a defendant can offer such testimony to prove his good reputation. However, "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." <u>Michelson</u>, 335 U.S. at 479. If a defendant chooses to make such assertions about a specific kind of character, the other side is almost always allowed to present contrary evidence.

Defendants have opened the door to such testimony by asserting, most recently in the Pretrial Conference Statement, that "[w]henever the Plaintiff has complained about infringement, Akanoc or MSG has taken appropriate action, consistent with its protocol and industry practices." Pretrial Conference Statement filed 2/23/09, p. 4. Defendants' assertions that they are in line with industry standards requires the admissibility of Plaintiff's offered testimony as to Defendants' reputation of being bulletproof hosts that do nothing in response to complaints.

A denial of Defendants' motion on this basis would be sound in the law and necessary in light of Defendants' statements regarding their propriety.

### G. **Impeachment**

Because Defendants elect to put Louis Vuitton to the proof of virtually every element of its case, reputation evidence is also admissible to impeach Defendants when they claim they are acting

as a responsible business, that they have no control rather than choose not to exercise any, and that they do not know what is occurring on their servers, among other things.

## H. The Evidence Is Also be Admissible as Habit, Practice or Custom Evidence Under F.R.E. 406

Evidence of a person's habit or the routine practice or custom of a business is admissible to prove conduct on a specific occasion in conformity with that habit, practice or custom. F.R.E. 406; Jones v. Southern Pac. R.R., 962 F.2d 447, 449 (5th Cir. 1992). Mr. Livadkin's and Mr. Holmes' testimony as to Defendants' status as bulletproof hosts that "would not respond to notifications from trademark owners to preserve the hosting of its clients' customers" is admissible as the kind of semi-automatic response, or lack thereof in this case, that rises to the level of habit or practice. Defendants' Motion No. 3 p. 2:10-11. It was Defendants' policy to look the other way which gave rise to Plaintiff's claims. Mr. Livadkin has corroborating personal knowledge of such facts through his history of being ignored by Defendants, even though such knowledge is unnecessary, making the evidence even more probative. F.R.E. 406, Adv. Comm. Notes (corroboration or eyewitnesses unnecessary). Defendants state they had no policy for dealing with letter complaints and ignored them for almost a year at one time. Chen Depo., 100:13-104:12, 109-111 (mail piled on unoccupied desk and Defendant Chen admitting Defendants have no mechanism to take care of letter complaints); Luk Depo., 19:8-11, 31:12-32:1 (employee's faulty memory is her only record of past complaints). Evidence of Defendants' habit and practice as bulletproof hosts should be admissible.

## I. The Probative Value of the Testimony Outweighs Any Prejudice

Relief against admissibility under Rule 403 should be granted sparingly as Rule 403 favors admissibility. U.S. v. Fleming, 215 F.3d 930, 939 (9th Cir. 2000); see also U.S. v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000). Some circuits have required that the unfair prejudice be "exceedingly great" while looking at the evidence "most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." U.S. v. Stout, 509 F.3d 796, 806 (6th Cir. 2007). "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially

outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." Hankey, 203 F.3d at 1172.

The evidence objected to by Defendants is highly probative because it illuminates the driving force behind Defendants' irresponsible and infringing business model. Defendants' status as bulletproof hosts is intertwined with the cause of action and explains Defendants' motives. Defendants offer their goods and services to anyone who will pay for them and will not take action against those users despite their violations of the law. Defendants do not enforce their own penalties, Luk Depo., 33:22-34:12, 62:5-8; Chen Depo., 67:18-69:17, they have no mechanism for handling letter complaints, and keep no records of repeat infringers because then their client base, which relies on their look-the-other-way approach, may no longer do business with them. Chen Depo., 100:13-104:12, 109-111 (mail piled on unoccupied desk and Defendant Chen admitting Defendants have no mechanism to take care of letter complaints); Luk Depo., 19:8-11, 31:12-32:1 (employee's faulty memory is her only record of past complaints). Defendants are in the business of protecting and fostering illegal activity, whether they agree or not. Defendants cannot now say that this is prejudicial when their own acts have created this status. Testimony regarding Defendants as bulletproof hosts should be admitted.

In light of the overriding policy favoring admissibility of evidence, character evidence specifically, and for the foregoing particularized reasons, Defendants' Motion No. 3 should be denied.

Dated: March 9, 2009

J. Andrew Coombs, A Professional Corp.

By:     J. Andrew Coombs
        Annie Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

## DECLARATION OF J. ANDREW COOMBS

I, J. Andrew Coombs, declare as follows:

1.     I am an attorney at law duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California. I am counsel of record for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") in an action styled <u>Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al.</u>, Case No. C 07 3952 JW. I submit this declaration in support of Plaintiff's Opposition to Defendants' Motion in Limine No. 3. Except as otherwise stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows.

2.     Attached Exhibit A is a true and accurate copy of portions of the transcript from the deposition testimony of Steve Chen, individually and as the Rule 30(b)(6) witness for each of the two corporate defendants in this matter, which took place on or about April 8-9, 2008.

3.     Attached Exhibit B is a true and accurate copy of portions of the transcript from the deposition testimony of Juliana Luk, which took place on or about April 12, 2008.

4.     Attached Exhibit C is a true and accurate copy of portions of the transcript from the deposition testimony of Robert L. Holmes, which took place on or about April 1, 2008.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of March, 2009, at Glendale, California.

_____
J. ANDREW COOMBS

**Exhibit A**

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   LOUIS VUITTON MALLETIER, S.A.,      )
                                        )
5                      Plaintiff,       )
                                        )
6                      vs.              )  Case No. C073952JW
                                        )
7   AKANOC SOLUTIONS, INC., MANAGED     )
    SOLUTIONS GROUP, INC., STEVEN       )
8   CHEN and DOES 1 through 10,         )
    inclusive,                          )
9                                       )
                       Defendants.      )
10  _____ )

11

12

13

14

15           DEPOSITION OF STEVEN CHEN

16                    VOLUME I

17            Glendale, California

18            Tuesday, April 8, 2008

19

20

21

22

23

24   Reported by:  Janalee Whitacre
                   CSR No. 12223
25   NDS Job No.:  127887

1  from the beginning, the whole Web hosting business

2  actually -- I mean, the foundation of this business is

3  started by Jacques Pham.  So at the time he was

4  Managed.com, and before that he was United Colo, and

5  before that he was something else.  So I think that at

6  the time I was not handling anything dealing with the

7  customer:  sales end and, you know, Website and all that

8  stuff.  So pretty much he got all these things done his

9  way.  And when we have the Akanoc, when we set up the

10 Akanoc business, we basically just took the same thing,

11 copy over and then start monitoring this, and so we

12 missed that one.

13     Q.   It's what we lawyers call a cut-and-paste

14 mistake.

15     A.   I think even worse.

16     Q.   So it's a mistake?

17     A.   Yeah, yeah.

18     Q.   Paragraph 9 on the second page refers to a

19 penalty fee of $10 per violation, and I think you

20 mentioned that's one thing that may have changed --

21     A.   Right.

22     Q.   -- over the last few years?

23     A.   Yeah.

24     Q.   What is the current penalty fee?

25     A.   I don't even know because very, very seldom

1  that we actually get into so-called penalty.  I don't

2  even want to call it "penalty" myself, because a lot of

3  times -- well, let's say a customer says, "Oh, yeah, you

4  just unplug it and I respond back to you and then you

5  need to replug it.  In that case, you know, you want to

6  penalize me for $25 or something."  You know, I always

7  explain to them that it takes people to go into the cage

8  to do the physical work, document everything.  It's just

9  process fee, so.

10     Q.   I don't mean to hold you to the term

11 particularly.

12     A.   Right.

13     Q.   But whatever that fee is, it's now $25?

14     A.   I don't recall.  I don't know, because I --

15 very, very, very seldom that I run -- I personally, I

16 never -- I never charge anybody anything.  I personally

17 don't.  I've seen Juliana fighting with customers that

18 "you need to give me $25, otherwise I won't replug you,"

19 simply because that customer is just bad.

20     Q.   Whose decision is it to impose the penalty?

21 Juliana's?

22     A.   I mean, if she sends out the e-mail and says,

23 "I will unplug you" and that "you need to pay $25," in

24 some sense, I need to support her in a sense.  A lot of

25 times customer will come to me and says, "Can we waive

1   this?" and things like that.  It depends on whether I

2   want to support it or not.

3       Q.    This morning you mentioned that -- earlier this

4   morning you mentioned that you would forward abuse

5   complaints to the customer and that generally that would

6   be the end of it unless there was some repetition.

7       A.    Right.

8       Q.    Would it be your practice to impose a penalty

9   if you did have that kind of repetition?

10      A.    Even we unplug, very, very seldom that we

11  charge customer.

12      Q.    Are there specific procedures or conditions

13  where you will impose the penalty?

14      A.    Not really.  Very, very discretionary.

15      Q.    And that discretion is basically Juliana's or

16  yours?

17      A.    Yes.

18      Q.    Is it -- to the extent that this fee is

19  imposed, is it usually for a violation of the Acceptable

20  Use Policy, or are there other situations where the fee

21  might be imposed?

22      A.    It's AUP.

23      Q.    AUP being short for acceptable --

24      A.    Right.

25      Q.    -- use policy?

1     A.    That is correct.

2     Q.   -- at that time?

3          And the address at the top of the page, the

4  45535 Northport Loop, is that the address for Akanoc

5  Solutions?

6     A.    That is correct.

7     Q.    This appears to have been sent both by e-mail

8  and by United States -- or hard copy mail; is that

9  correct?

10        MR. LOWE:  Objection, it doesn't state that it

11  was sent by U.S. mail.  It says by e-mail.

12  BY MR. COOMBS:

13     Q.    Does Akanoc Solutions receive infringement

14  notices by post as opposed to e-mail?

15     A.    Very seldom.

16     Q.    And are those maintained by Akanoc?  Are copies

17  of those kept?

18     A.    We had a period of time, I would say July,

19  starting July of 2006, we were merging two data centers

20  together because of the other data center lease is up

21  and we decide to merge it together.  And at the same

22  time we are gradually losing business to Managed.com all

23  the way to February to April, somewhere around there,

24  that Managed.com was sold to WebHostPlus and they made a

25  physical move of everything out from us.  So we --

1  during that period of time, the whole company is more or

2  less in turmoil, because we're losing business, we're

3  having a lot of the overhead expense and things like

4  that.

5      At the time we were also losing staffs,

6  internal staffs, who, I think at that time, there was a

7  Joe, there was Chi, and some other person that was

8  actually handling mails. So for that period of time,

9  there were mails that gets in, receive by -- you know,

10 we had the second floor, so the first floor has a

11 general receptionist. She may have received a letter

12 and signed up for that, and then eventually it's deliver

13 to upstairs, and then it might set on the desk and

14 whatnot. So I think that was the time that a lot of the

15 mail was not even being open, nobody really pay

16 attention to it.

17     Q.  That's not true of e-mail, though; that's just

18 hard copy mail?

19     A.  Yes, that's correct.

20     Q.  And the period you're talking about again is

21 fall of 2006?

22     A.  To middle of, I would say, about July, August

23 time frame. Because I remember that August of 2006 that

24 was the lease up, so we were moving -- am I right?

25 2003, '4, '5, '6 -- yes, 2006. That was the time that

1    we're moving and everything.

2        Q.    Until when?

3        A.    To, I think it's April, March or April that

4    WebHostPlus move everything out.

5        Q.    And that is March or April of 2007?

6        A.    That is correct.

7        Q.    And the handling of hard copy correspondence of

8    what you've described, that would apply even if it came

9    by some kind of courier like Federal Express or DHL; is

10   that correct?

11       A.    Yes, at that time, yes.

12       Q.    And the procedure for responding to a notice of

13   infringement like the one evidenced by Exhibit 2 is the

14   same as you've already described with respect to

15   Exhibit 1?

16       A.    Yes.

17       Q.    And do you ever have a practice of replying to

18   individuals or companies that send abuse complaints like

19   those evidenced by Exhibit 1 or 2?

20       A.    Very seldom, very seldom.

21       Q.    Are there particular circumstances where you

22   do -- where Akanoc does, I mean?

23       A.    Legal authorities, meaning police, FBI,

24   Homeland Security, I would -- most likely I would

25   personally reply.  The general type of abuse we don't

1    reply because we -- we cannot reply in a sense that once

2    we forwarded the issues out, we don't know when it's

3    been taken care of or things like that, unless that is

4    constant, and then we need to do a precise follow-up.

5              MR. COOMBS:  I'll mark as 3 a letter dated

6    February 19th.

7              (Plaintiffs' Exhibit 3 was

8              marked for identification and

9              is annexed hereto.)

10   BY MR. COOMBS:

11        Q.   Have you seen that before?

12        A.   No, not -- I don't have any recollection.

13        Q.   Is there any way you could determine whether or

14   not Akanoc received that correspondence on or about the

15   date it bears?

16        A.   No.

17        Q.   Now, on that particular one, on the upper

18   left-hand side it says "By express mail."  Do you see

19   that?

20        A.   Yes.

21        Q.   But consistent with what you said before, this

22   was during a period of turmoil at the company --

23        A.   Yes.

24        Q.   -- and so there was nobody looking at mail; is

25   that correct?

1    A.   That's most likely true.

2    Q.   And what happened to the mail that was received

3 during that time frame?

4    A.   There was a desk that one of the girl used to

5 sit and everything just piled up there.

6    Q.   Was it ever opened or filed away?  What was

7 done with it?

8    A.   I don't recall that.  Some comes in as a letter

9 form.  It may have opened by somebody that just want

10 to -- just want to know where to put it.  But once it

11 sits on that desk, then there's virtually nobody

12 watching it.

13        MR. COOMBS:  Mark as 4 a letter dated

14 February 21, 2007.

15        (Plaintiffs' Exhibit 4 was

16        marked for identification and

17        is annexed hereto.)

18        THE WITNESS:  Same thing, I have no

19 recollection.

20 BY MR. COOMBS:

21    Q.   Does Akanoc operate an e-mail address

22 info@Akanoc.com?

23    A.   Should.

24    Q.   And who is responsible for looking at the

25 contents of that mailbox?

```
 1      A.   I don't know.

 2           MR. COOMBS:  I'll mark as 6 a letter dated

 3  April 20, 2007, and ask the witness if he has seen that.

 4           (Plaintiffs' Exhibit 6 was

 5           marked for identification and

 6           is annexed hereto.)

 7           THE WITNESS:  I have no recollection of this.

 8  BY MR. COOMBS:

 9      Q.   Would you have any way of determining whether

10  or not this letter was in fact received by you on or

11  about the day it bears?

12      A.   I remember I receive one of this from your

13  office and I took it to the office, and since it's

14  concerning Akanoc, so I pretty much just put it in the

15  pile.

16      Q.   Okay.  When you say you took it to the office,

17  that's because the Onondaga Drive address is your home

18  address?

19      A.   That is correct.

20      Q.   So you do recall receiving a letter at your

21  home?

22      A.   Yes.

23      Q.   Concerning Louis Vuitton?

24      A.   Yes.

25      Q.   When you say you took it to the office and put
```

1  it on a pile, what does that mean?

2    A.    I mean put it on the desk.

3    Q.    Whose desk?

4    A.    That particular -- the empty desk I was talking

5  about.  Because that was -- at that time that was the

6  place that we put all this type of letters.

7    Q.    To your knowledge, what happened with the

8  letter after you put it on the desk?

9    A.    There were -- there were too many people trying

10  to share the workload over there, so I have no idea.

11    Q.    Was there some -- were some people assigned

12  with the responsibility for handling the correspondence

13  that was put on the desk?

14    A.    I don't recall that we specifically assigned

15  anybody.  Everybody just more or less like sharing the

16  load.

17    Q.    Okay.  To the extent I understand that you

18  can't say what happened with this letter, but in terms

19  of Akanoc's policies and procedures, what should have

20  happened with this letter after it was put on the desk?

21    A.    We -- very, very seldom that we receive

22  complaint through e-mail -- I mean, through regular

23  mails, so most of the abuse issues were all resolved in

24  the e-mail format.  So this type of e-mails -- I mean,

25  letters, actually something from, like, things like

1  subpoena, we need to respond.  Or something like come in

2  from legal authority, we need to respond.  But general

3  complaints, we just don't have a lot of experience with

4  it, and we don't have any mechanism to take care of

5  letter complaints.

6      Q.   So there was no real policy to handle --

7      A.   Yes.

8      Q.   Did Akanoc have an agent for service with the

9  copyright office as of April 20th, 2007?

10     A.   No.

11     Q.   When did it first have a designated agent with

12 the copyright office?

13     A.   End of last year.

14          MR. COOMBS:  We'll mark as 7 another letter,

15 dated November 26th, 2007.

16          (Plaintiffs' Exhibit 7 was

17          marked for identification and

18          is annexed hereto.)

19 BY MR. COOMBS:

20     Q.   Have you seen that letter before?

21     A.   It came in through my attorney's e-mail, so

22 that's what I got instead of a mail.

23     Q.   Can you tell me what, if anything, Akanoc did

24 in response to receipt of this letter from your

25 attorney?

**Exhibit B**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    LOUIS VUITTON MALLETIER, S.A.,    )
                                       )
5                       Plaintiff,     )
                                       )
6                  vs.                 )  Case No. C073952JW
                                       )
7    AKANOC SOLUTIONS, INC., MANAGED   )
     SOLUTIONS GROUP, INC., STEVEN     )
8    CHEN and DOES 1 through 10,       )
     inclusive,                        )
9                                      )
                        Defendants.    )
10   _____)

11

12

13

14

15            DEPOSITION OF JULIANA LUK

16                    VOLUME I

17             Glendale, California

18            Saturday, April 12, 2008

19

20

21

22

23

24   Reported by:  Janalee Whitacre
                   CSR No. 12223
25   NDS Job No.:  128150

```
 1            MR. EDWARDS:  Objection, vague and ambiguous.
 2            You can answer if you understand.
 3            THE WITNESS:  I think it's called Thunderbird.
 4    BY MS. WANG:
 5        Q.   Is Thunderbird the e-mail program that you use
 6    for Akanoc?
 7        A.   Yes.
 8        Q.   Do you ever print out your e-mails for Akanoc?
 9        A.   No.
10        Q.   Do you ever save these Akanoc e-mails?
11        A.   No.
12        Q.   Do you ever create any files of any kind in the
13    course of your work for Akanoc?
14        A.   Only the files with the complaint letter.
15        Q.   Can you describe to me what you mean by when
16    you create the files for the complaint letter?
17        A.   It's a cover letter to send along with the
18    complaints to the customer.
19        Q.   You draft a cover letter for the complaint that
20    you send to the customer?
21        A.   I don't draft them.
22        Q.   Where do you get the cover letters?
23        A.   Akanoc send it to me.
24        Q.   Do they send you different cover letters
25    depending on the complaint?
```

1    the complaints to customers?

2        A.    No.

3        Q.    Do you do any follow-up after receiving the

4    spamming complaints?

5        A.    No.

6        Q.    If you receive a second complaint about the

7    same IP address or customer, do you do follow-ups then?

8        A.    No, I'll just send it like I used to do it.

9        Q.    Do you respond to a second complaint the same

10    way you would respond to a first complaint?

11        A.    Yes.

12        Q.    How do you know if a complaint that you receive

13    is a second or a third complaint as opposed to a first

14    complaint?

15        A.    I don't know.

16        Q.    You stated before that if you remember the

17    IP address or the complaint, then that would be the only

18    record that you would have that there was a repeat

19    complaint?

20            MR. EDWARDS:  Objection, misstates prior

21    testimony.

22            You can answer.

23            THE WITNESS:  Unless it is so many complaints

24    all together in one day, that would make me remember the

25    IP.  Otherwise, the next day I'll forget everything.

1    How can I remember so many things?

2    BY MS. WANG:

3        Q.    The only record you have of repeat complaints

4    is what you remember in your brain?

5        A.    Yes.

6        Q.    Was there anything that you wrote on a regular

7    basis in the subject line of the forwarded e-mails?

8        A.    I beg your pardon?

9        Q.    Did you ever have a standard line that you

10   would type into the subject line when you were

11   forwarding e-mail complaints to customers?

12       A.    No.

13       Q.    Did you use the subject line of the person who

14   sent you the complaint?

15       A.    Because I forward the complaint to the

16   customer, the subject line is already filled out, I

17   don't have to put anything there.

18       Q.    Did you ever change that subject line?

19       A.    No.

20       Q.    You stated you sent the same cover letter to

21   customers regarding these complaints that you would

22   receive.  Was there any action that you required them to

23   take in response to your e-mail?

24       A.    You mean in the covering letter?

25       Q.    Yes.

1      A.    They are supposed to resolve it within

2    24 hours.

3      Q.    Was there any other action they were supposed

4    to take, other than resolving it in 24 hours?

5      A.    I don't know.

6      Q.    Did you ever require any one of your customers

7    to do something other than resolve it within 24 hours?

8      A.    No.

9      Q.    Would you ever check to make sure that they

10   complied with your request, that they resolve the

11   problem within 24 hours?

12     A.    No.

13     Q.    Did you ever review any Website content to make

14   sure that something that someone was complaining about

15   was removed?

16     A.    No.

17     Q.    Did you ever check to see if a Website that was

18   the subject of a complaint had moved from one IP address

19   to another IP address within the block assigned to

20   Akanoc?

21     A.    No.

22     Q.    Are you familiar with a $25 penalty for

23   violation of your agreements with the customers?

24     A.    Yes.

25     Q.    And when was that penalty enforced?

1      A.   I don't think -- it never enforced.

2      Q.   Do you know when it was supposed to be

3   enforced?

4           MR. EDWARDS:  Objection, lacks foundation.

5           THE WITNESS:  When Akanoc unplug them, I think

6   they are supposed to pay that.

7   BY MS. WANG:

8      Q.   Why would Akanoc unplug their customers?

9      A.   I don't know.

10     Q.   Did you ever decide if someone should have to

11  pay a $25 penalty for any reason?

12     A.   No.

13          MS. WANG:  Can we go off the record for a

14  second.

15          (A brief recess was taken.)

16          (Whereupon the interpreter entered the

17          room and was sworn to interpret, as needed.)

18          MS. WANG:  For the record, we have the

19  interpreter, Ms. Jackie Luk, joining us.  And should the

20  witness ever feel that she needs an interpretation, just

21  let me know and we can have Ms. Jackie Luk interpret for

22  you.

23          THE WITNESS:  Yes, thank you.

24  BY MS. WANG:

25     Q.   Just so I'm clear, your job function at Akanoc,

1   read his e-mail.

2     Q.   Is this one instance where you would follow up

3   to make sure that this problem had been addressed?

4     A.   No.

5     Q.   So when you say, "If any more complaints come

6   in, I shall have no choice but to shut it down," is that

7   an empty threat?

8     A.   Yes.

9     Q.   Okay.  If we're looking at both situations

10  between Exhibit 43 and 44, why would you in one instance

11  just close the ticket, in 43, and then in 44 say, "If I

12  have any more problems from you, I'll shut you down"?

13    A.   Because attacking or hacking, if his IP

14  continue do that, I might receive a lot of complaints.

15  Just like I said, spamming, it will come 20 or 30 pieces

16  a day.  And then I would -- I would unplug him, because

17  at that time I can remember his IP.

18        This -- the other one he says he has resolved

19  it, so I trusted him, he resolve it.  So I just say,

20  okay, fine.

21    Q.   So you had just said that if you do receive

22  more complaints, you would have unplugged the person

23  referenced in Exhibit 44?

24    A.   Yes.

25    Q.   So your threat was not empty; you would

# Exhibit C

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4   LOUIS VUITTON MALLETIER, S.A.,    )
                                       )
 5                       PLAINTIFF     )
                 VS                    )C.A. NO. C 07 3952 JW
 6                                     )
     AKANOC SOLUTIONS, INC., MANAGED   )
 7   SOLUTIONS GROUP, INC., STEVEN     )
     CHEN AND DOES 1 THROUGH 10,       )
 8   INCLUSIVE,                        )
                         DEFENDANTS    )
 9   _____)

10

11

12

13

14            ORAL DEPOSITION OF ROBERT L. HOLMES,

15   produced as a witness at the instance of the Defendants,

16   and duly sworn, was taken in the above-styled

17   and -numbered cause on the 1st day of April, 2008, from

18   9:31 AM to 6:22 PM, before Ronald R. Cope, a CSR in and

19   for the State of Texas, Registered Professional Reporter

20   and Certified Realtime Reporter, reported by machine

21   shorthand at the offices of U.S. Legal

22   Support/MillerParker, Inc., 5910 North Central

23   Expressway, 100 Premier Place, Dallas, Texas, 75206,

24   pursuant to the Federal Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.
```

1    A.    That's not my common practice to do that.

2    Q.    The answer is no, you wouldn't do that,

3    normally?

4    A.    I wouldn't do that, normally.

5    Q.    Have you ever done that on behalf of Louis

6    Vuitton, to look at every domain that's resolved to a

7    particular IP address just because that IP address

8    happens to cover a particular domain that Louis Vuitton

9    asked you about?

10   A.    That's a really good question, because when

11   your clients' names started appearing in my database

12   frequently, I started getting curious, and I did start

13   looking and started to see that -- again, I -- just out

14   of my own curiosity, I do, because my business is to

15   understand trends.  I do investigate things like that on

16   my own so I can understand the trends.  And even though

17   they're not part of a particular assignment, I will try

18   to understand what is going on in the industry.  So my

19   answer is yes, I would typically do that if my curiosity

20   piques me to do so.

21   Q.    How many times have you done so on behalf of

22   Louis Vuitton?

23   A.    I work 14-hour days.

24   Q.    How many times have you done so on behalf of

25   Louis Vuitton?

1    A.    Again, this is -- I don't know.  Countless.

2    Q.    More than once?

3    A.    Oh, yes.

4    Q.    More than a dozen times?

5    A.    Most likely, yes.

6    Q.    More than a hundred times?

7    A.    I would be safe to say a hundred times.

8    Q.    So let's assume there are hundreds or thousands

9    of websites that resolve to a particular address.  You

10   would look at each of those websites?

11   A.    No, sir.  I explained to you before that I

12   often -- when I find a situation like this, in order to

13   establish a trend, you have to conduct a survey.  You

14   can't -- just as if you wanted to conduct a political

15   survey or something like that, you would actually sample

16   the public just like you would -- say if we had a

17   thousand domain names, I may investigate the first 50,

18   the first hundred.  You know, depends on what I want to

19   do.  I may investigate two per page and then flip six

20   pages.  You know, what I end up doing is I end up

21   looking at the domains and looking at the trends like I

22   see here.  Llouisvuitton.com; Louis Vuitton Bagz, with a

23   Z; Lover Nike; Lux Like; LV Bags; LV-Nike.  When I see

24   names like this that are marketed toward carrying

25   counterfeit product, I do get curious and I do start

1    looking at that stuff to establish the trends.

2        Q.    Do you report that to Louis Vuitton?

3        A.    Not typically, no.

4        Q.    You just do it for your own curiosity?

5        A.    I do it for my own research, because I consider

6    myself to be an expert in this industry.

7        Q.    You mentioned a database a moment ago.  What

8    database are you talking about?

9        A.    That's my own proprietary database.

10        Q.    What does it contain?

11        A.    Data from my investigations.

12        Q.    What sort of data?

13        A.    Information that you saw on our chain of

14    custody, on our Internet Buy Summary, that type of data.

15        Q.    Anything else?

16        A.    Sure.

17        Q.    What?

18        A.    Names of cases, other data we may acquire.

19        Q.    What do you mean?  What other data?

20        A.    A lot of that is just proprietary.

21        Q.    What other data?  Tell me what other data you

22    collect in your database.

23        A.    Name servers, common name servers among

24    subjects, which also link cases together where I can

25    catalog -- I often -- happened to about -- I don't know

1    if it was as a result of your clients or other

2    typical -- you know, other people in the same business,

3    but I started to see certain people and certain name

4    servers appearing over and over and over.  And name

5    servers and hosts, those are two different roles, as

6    well, often played by the same people.  And when I

7    started seeing common name servers just like I started

8    seeing common IP addresses, I started logging those as

9    well.  So now my database, ever since possibly 2005 or

10   so, I have been cataloging name servers.  So every time

11   my employees or I conduct a Whois search or something

12   like that, not only do we catalog the IP address but we

13   will catalog the two name servers that are part of that

14   search as well.  That's an example of some of the data.

15   Some of the other data could be the registrant data, the

16   name and address of the host; some of that data could be

17   telephone numbers that are found on the website, names.

18   It's typically information that's gathered from the

19   observation of the investigation, so contact information

20   from websites, things like that.

21        Q.   What is a name server, as you understand it?

22        A.   A name server is -- a name server is a place --

23   it's actually -- it's another IP address that the packet

24   has to bounce from to get to the IP address.  So say,

25   for example, like I used the IP address as your