J. Andrew Coombs (SBN 123881)
andy@coombspc.com
Annie S. Wang (SBN 243027)
annie@coombspc.com
J. Andrew Coombs, A P. C.
517 East Wilson Avenue, Suite 202
Glendale, California 91206
Telephone: (818) 500-3200
Facsimile: (818) 500-3201

Attorneys for Plaintiff Louis
Vuitton Malletier, S.A.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

| | |
|---|---|
| Louis Vuitton Malletier, S.A., | Case No.: C 07 3952 JW (HRL) |
| Plaintiff, | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE No. |
| v. | 6 TO EXCLUDE TESTIMONY ABOUT |
| Akanoc Solutions, Inc., et al. | PINGING INTERNET DOMAINS; DECLARATION OF J. ANDREW |
| Defendants. | COOMBS, EXHIBITS IN SUPPORT |

# TABLE OF AUTHORITIES

## CASES

A & M Records, Inc. v. Napster, Inc.,
114 F. Supp. 2d 896 (N.D. Cal. 2000)....................................................................5

Alliance Fin. Capital, Inc. v. Herzfeld,
2007 Bankr. LEXIS 4511, at *2 (N.D. Ga. December 17, 2007)........................1

Beech Aircraft Corp. v. Rainey,
488 U.S. 153, 168 (1988)........ ....................................................................4

CFM Communs., LLC v. Mitts Telecasting Co.,
424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005)......................................................1

Cyber Promotions, Inc. v. Apex Global Information Servs., Inc.,
1997 U.S. Dist. LEXIS 15344 (E.D. Penn. September 30, 1997)......................5

Daubert v. Merrell Dow Pharms.,
509 U.S. 579, 587 (1993)...........................................................................2

Dellums v. Powell,
566 F.2d 231, 235 (D.C. Cir. 1977)..................................................................8

Dukes v. Wal-Mart, Inc.,
222 F.R.D. 189, 199 (N.D. Cal. 2004)..............................................................9

Export Development Canada v. Electrical Apparatus & Power, LLC,
2008 U.S. District LEXIS 93097 (S.D.N.Y. November 14, 2008)......................5

Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,
2006 U.S. Dist. LEXIS 42159, at *14 (N.D. Cal. June 12, 2006).......................2

General Atomic Co. v. Exxon Nuclear Co.,
90 F.R.D. 290, 1981 U.S. Dist. LEXIS 9374, at *60 (S.D. Cal. April 23, 1981)......................8

Huddleston v. United States,
485 U.S. 681, 688-89 (1988)...........................................................................2

In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority,
396 F. Supp. 2d 747 (S.D. Tex. 2005)..............................................................5

In re Application of US for an Order Authorizing the Installation and Use of a Pen Register,
402 F. Supp. 2d 597 (D. Md. 2005)..................................................................5

J.B. Hunt Transport, Inc. v. Adams,
2006 U.S. Dist. LEXIS 27375 (E.D. Mich. May 9, 2006)......................5, 10

Jerden v. Amstutz,
430 F.3d 1231, 1239-40 (9th Cir. 2005)...........................................................3

Kalina v. Fletcher,
522 U.S. 118, 130 (1997) ...........................................................................4

Maljack Productions, Inc, v. Goodtimes Home Video Corp.,
81 F.3d 881, 889 n.12 (9ᵗʰ Cir. 1996)...................................................................7

MGM Studios, Inc. v. Grokster, Ltd.,
454 F. Supp. 2d 966, 972 (C.D. Cal. 1996).............................................................7

Middleby Corp. v. Hussmann Corp.
1992 U.S. Dist. LEXIS 13138, at *9-10 (N.D. Ill. August 27, 1992). .....................1

Northbrook Digital LLC v. Vendio Servs., Inc.,
2008 U.S. Dist. LEXIS 54688 (D. Minn. April 4, 2008)........................................5

Perfect 10, Inc. v. Amazon.com, Inc.,
508 F.3d 1146, 1172 (9ᵗʰ Cir. 2007) ....................................................................8

Salgado v. General Motors Corp.,
150 F.3d 735, 742 (7ᵗʰ Cir. 1998)........................................................................9

Sitrick v. Dreamworks, LLC,
2006 U.S. Dist. LEXIS 97312, at *63-65 (C.D. Cal. July 20, 2006)....................3-4

Sperberg v. Goodyear Tire & Rubber Co.,
519 F.2d 708, 712 (6ᵗʰ Cir. 1975).......................................................................1

U.S. v. Alexander,
106 F.3d 874, 876 (9th Cir. 1997) ......................................................................2

U.S. v. Cruz,
363 F.3d 187, 191, 193 (2d Cir. 2004).................................................................5

U.S. v. Cuddy,
147 F.3d 1111, 1114 (9th Cir. 1998)..................................................................2, 3

U.S. v. Curtin,
489 F.3d 935, 942 (9ᵗʰ Cir. 2007) ......................................................................2

U.S. v. Fleming,
215 F.3d 930, 939 (9ᵗʰ Cir. 2000) .....................................................................2,7

U.S. v. Forest,
355 F.3d 942 (6ᵗʰ Cir. 2004)..............................................................................5

U.S. v. Ganier,
468 F.3d 920, 926 (6ᵗʰ Cir. 2006).......................................................................5

U.S. v. Garcia,
413 F.3d 201, 215 (2d Cir. 2005).......................................................................4-5

U.S. v. Hankey,
203 F.3d 1160, 1172 (9ᵗʰ Cir. 2000) ...............................................................2, 7-8

U.S. v. Marino,
200 F.3d 6, 11 (1ˢᵗ Cir. 1999) ............................................................................1

U.S. v. Mathis,
2008 U.S. District LEXIS 37618 (S.D. Ohio May 2, 2008)...................................5

U.S. v. Skinner,
2007 U.S. Dist. LEXIS 97237 (E.D. Tenn. April 26, 2007)...............................5

U.S. v. Stout,
509 F.3d 796, 806 (6th Cir. 2007). ...............................................................7

U.S. v. White,
492 F.3d 380, 401 (6th Cir. 2007)..............................................................4-5

U.S. v. Williams,
445 F.3d 724, 732 (4th Cir. 2006)................................................................2

**STATUTES/ RULES**

Fed. R. Civ. P. 26.................................................................................9-10

Fed. R. Civ. P. 37....................................................................................9

F.R.E. 102.............................................................................................2

F.R.E. 701...........................................................................................3, 6

F.R.E. 403...........................................................................................2, 7

## INTRODUCTION

Defendants' Motion in Limine No. 6 to "Exclude Testimony About Pinging Internet Domains" ("Motion No. 6") should be denied outright under the law of the case doctrine, and additionally because Defendants' arguments under Rule 701 are inapplicable by definition. There is no prejudice to Defendants who have themselves offered and relied on similar testimony during the course of this litigation.

On Defendants' Motion for Summary Judgment, the Court already considered and overruled the Defendants' objection that testimony relating to pinging should be excluded. Defendants' renewal of this argument (without reference to prior rejection of its arguments) is entirely inappropriate and ought to be summarily rejected as a waste of the Court's resources. Ruling on Motion for Summary Judgment ("MSJ Ruling") at 6 fn. 10 citing Chen Declaration in Support of Motion for Summary Judgment ("Chen Decl.") ¶¶ 13-14. As set forth in greater detail below, that ruling was entirely appropriate as further evidenced by the Defendants' own efforts to describe pinging, also by footnote in their moving papers, and having included a ping result as part of the record in support of their Motion for Summary Judgment. Declaration of J. Andrew Coombs ("Coombs Decl.") at ¶¶ 2-3, Ex. A-B, Chen Decl. at ¶¶ 11, 13-14, Ex. 1501, Declaration of Juliana Luk ("Luk Decl.").

### A. The Rules of Evidence Favor Admissibility

Motions in limine should be granted sparingly. Alliance Fin. Capital, Inc. v. Herzfeld, 2007 Bankr. LEXIS 4511, at *2 (N.D. Ga. December 17, 2007) citing Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975); Middleby Corp. v. Hussmann Corp. 1992 U.S. Dist. LEXIS 13138, at *9-10 (N.D. Ill. August 27, 1992). "A pretrial motion in limine forces a court to decide the merits of introducing a piece of evidence without the benefit of the context of trial." CFM Communs., LLC v. Mitts Telecasting Co., 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005); see also U.S. v. Marino, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence).

Evidence should be "excluded on a motion in limine only if the evidence is *clearly* inadmissible for any purpose" (internal quotations omitted, emphasis added). Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., 2006 U.S. Dist. LEXIS 42159, at *14 (N.D. Cal. June 12, 2006). This means Defendants will have to overcome the well established policies favoring admissibility. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 587 (1993) ("The Rules' basic standard of relevance thus is a liberal one."); U.S. v. Curtin, 489 F.3d 935, 942 (9th Cir. 2007) citing Huddleston v. United States, 485 U.S. 681, 688-89 (1988) ("the version of Rule 404(b) which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court version."); see also U.S. v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (relief against admissibility under Rule 403 should be granted sparingly); U.S. v. Fleming, 215 F.3d 930, 939 (9th Cir. 2000) (Rule 403 favors admissibility); U.S. v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000) ("the application of Rule 403 must be cautious and sparing"); F.R.E. 102 Adv. Comm. Notes ("rules are to be liberally construed in favor of admissibility" within the bounds of the Rules to achieve goals of "speedy, inexpensive, and fair trials designed to reach the truth"). Defendants fail to meet their burden given their similarly offered evidence, the highly probative value of the evidence, the lack of unfair prejudice, the Rules, sound case law, and in light of these policies.

## B. The Law of the Case Precludes Defendants From Revisiting This Issue

The Court's prior consideration of Defendants' objection to evidence of "pinging" was overruled and now constitutes "law of the case" which precludes re-litigation of the issue absent very narrow exceptions not applicable here.

"The law of the case doctrine provides that 'a court is generally precluded from reconsidering an issue that has already been decided by the same court...'" U.S. v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998) citing U.S. v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted). Defendants previously objected to Plaintiff's pinging testimony as "unqualified expert opinion." See Defendants' Evidentiary Objection to the Holmes Declaration in Support of Vuitton's Opposition to Defendants' Motion for Summary Judgment Filed August 25, 2008.

The Court overruled these objections and cited Defendants' own testimony stating pinging was an effective method for identifying a website's IP Address and the Court considered this evidence in partially denying Defendants' Motion for Summary Judgment. MSJ Ruling at 6 fn. 10. None of the exceptions to the doctrine apply to Defendants' renewed objection: 1) the first decision was not *clearly erroneous*; 2) there have been no intervening changes in the law; 3) the evidence is not substantially different; 4) no other changed circumstances exist; and 5) no manifest injustice would otherwise result. Cuddy, 147 F.3d at 1114. Thus, Defendants objection has already been decided and this motion should be summarily denied as barred by the law of the case.

Defendants' arguments are similarly contrary to law and practice and Defendants' motion should be denied in its entirety.

## C. **The Court's Initial Ruling For Admission of Testimony Regarding Pinging Was And Remains Correct**

### 1. **Rule 701 Does Not Apply to Plaintiff's Fact Testimony**

Rule 701 bars certain types of *opinion testimony*. It has no application to fact testimony of the type described in Defendants' motion.

Defendants contend that the testimony of Nikolay Livadkin and Robert Holmes, regarding their acts of pinging and subsequent observations, should be excluded under Rule 701. Rule 701 applies only to *opinion* testimony. The act of pinging a website and the results from such an act are facts. They are not at all affected by opinion. The same results occur no matter who is executing the ping and its definition and purpose appear to be agreed upon by the Plaintiff and Defendants herein. A domain name either is or is not at a particular IP Address at any given point. Pinging testimony does not at all implicate any opinions and does not fall under the purview of F.R.E. 701.

Though Rule 701 is entitled "Opinion Testimony by Lay Witnesses" and governs a "witness' testimony in the form of opinions or inferences," it does not govern or otherwise limit lay witness testimony regarding facts, no matter the nature of the facts or observations. *See* Jerden v. Amstutz, 430 F.3d 1231, 1239-40 (9th Cir. 2005) (Rule 701 covers opinion testimony and not detailed and scientific factual observations); see also Sitrick v. Dreamworks, LLC, 2006 U.S. Dist.

LEXIS 97312, at *63-65 (C.D. Cal. July 20, 2006). Factual testimony and observation is the traditional function of the lay witness. *Cf.* Kalina v. Fletcher, 522 U.S. 118, 130 (1997) ("[t]estifying about facts is the function of the witness"); Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 168 (1988) ("traditional requirement that lay witnesses give statements of fact rather than opinion").

Mr. Livadkin's and Mr. Holmes' respective testimonies regarding pinging concern specific acts taken and observations made. These facts are completely within the realm of non-expert testimony and are not subject to limitation or exclusion by Rule 701.

## 2. "Pinging" Is Not a Subject Only Mastered by Experts in the Field and Thus Is Not Excludable Under Rule 701(c)

Testimony regarding pinging is not of the type to be excluded under Rule 701(c). Defendants suggest that the act of pinging rises to the level of expert testimony because it exceeds the understanding of the everyday lay person and cite non-binding authority outside of the Ninth Circuit to support this proposition. The rule cited by Defendants appears to require a higher standard of expert knowledge stating that "an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." U.S. v. White, 492 F.3d 380, 401 (6th Cir. 2007); U.S. v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005) citing Rule 701 Advisory Committee's Notes; see also Motion No. 6 at p. 3.

Under either definition this argument is contradicted by Defendants' own part-time employee, not identified as an expert, who testified that she has no technical knowledge or training, and completed high school as her highest level of education, yet she was able to identify a situation which required her to ping a domain name and trace an IP Address using that technique. Coombs Decl. at ¶ 4, Ex. C, Deposition of Juliana Luk ("Luk Depo.") at pp. 9-10, 14, 30; Luk Decl. Defendant Chen has also attested to pinging by himself and the part-time employee, Ms. Luk, and even attached a pinging result, yet he was not identified as an expert either. Chen Decl. ¶¶ 11, 13-14, Ex. 1501. Defendants required no such expert designation to advance this evidence when in support of their own causes, and this argument fails in light of the record.

Further contrary to Defendants' contentions, "pinging" is frequently referred to in court opinions and the term is used as a commonplace, everyday word that requires little to no explanation. See, e.g., A & M Records, Inc. v. Napster, Inc., 114 F. Supp. 2d 896 (N.D. Cal. 2000); J.B. Hunt Transport, Inc. v. Adams, 2006 U.S. Dist. LEXIS 27375 (E.D. Mich. May 9, 2006); Cyber Promotions, Inc. v. Apex Global Information Servs., Inc., 1997 U.S. Dist. LEXIS 15344 (E.D. Penn. September 30, 1997); Northbrook Digital LLC v. Vendio Servs., Inc., 2008 U.S. Dist. LEXIS 54688 (D. Minn. April 4, 2008); U.S. v. Forest, 355 F.3d 942 (6th Cir. 2004); U.S. v. Mathis, 2008 U.S. District LEXIS 37618 (S.D. Ohio May 2, 2008); Export Development Canada v. Electrical Apparatus & Power, LLC, 2008 U.S. District LEXIS 93097 (S.D.N.Y. November 14, 2008); In re Application for Pen Register and Trap/Trace Device with Cell Site Location Authority, 396 F. Supp. 2d 747 (S.D. Tex. 2005); U.S. v. Skinner, 2007 U.S. Dist. LEXIS 97237 (E.D. Tenn. April 26, 2007); In re Application of US for an Order Authorizing the Installation and Use of a Pen Register, 402 F. Supp. 2d 597 (D. Md. 2005).

Moreover, the cases Defendants cite are inapposite: they deal with complicated Medicare reimbursement procedures and specialized police investigation skills, neither of which is common information to the everyday person but instead acquired only by specialists in the respective fields. Motion No. 6 at p. 3; see also White, 492 F.3d at 403-404; Garcia, 413 F.3d at 210; U.S. v. Cruz, 363 F.3d 187, 191, 193 (2d Cir. 2004). Computers, on the other hand, are used by the vast majority of people, and Defendants' only cited authority on computer-related expert testimony even states as such before rendering inadmissible opinion testimony based on a highly technical computer-generated report. U.S. v. Ganier, 468 F.3d 920, 926 (6th Cir. 2006) ("The average layperson today may be able to interpret the outputs of popular software programs as easily as he or she interprets everyday vernacular, but the interpretation Drueck needed to apply to make sense of the software reports is more similar to the specialized knowledge police officers use to interpret slang and code words used by drug dealers."). Pinging does not rise to this level of complication and thus should not be excluded. Compare Defendants' Ex. 1501 and Coombs Decl. Ex. D with Ganier, 468 F.3 at 926, fn. 4 (example of computer printout at issue).

Because Defendants have offered evidence of pinging through their own non-expert witnesses, they should also be estopped from complaining about similar evidence offered by Plaintiff as a matter of equity. Their motion should be denied.

### D. **Plaintiff's Witnesses Have Personal Knowledge**

Defendants argue that Mr. Livadkin's and Mr. Holmes' testimony is excluded under Rule 701(a). Because Plaintiff's witnesses are still testifying as to factual issues, Rule 701 does not apply. If the Court were to consider this argument, Rule 701(a) states that lay witness opinions must be "rationally based on the perception of the witness." F.R.E. 701(a). This limitation is simply the "familiar requirement of firsthand knowledge or observation," F.R.E. 701, Notes of Advisory Committee, and Plaintiff's witnesses meet this requirement.

Mr. Livadkin and Mr. Holmes are testifying as to the process of pinging and the results produced, however, the results also speak for themselves. Both Mr. Livadkin and Mr. Holmes pinged many, if not all, of the websites. They are familiar with and have firsthand knowledge of the pinging process. The websites not personally pinged by them were done so by their employees or others at their direction and instruction. The results from the pings, and the self-authenticating reports produced, were then personally observed by Mr. Livadkin or Mr. Holmes, respectively, thereby satisfying the firsthand knowledge requirement such that their testimony regarding pinging should not be excluded.

Because Rule 701 does not apply, and Plaintiff's witnesses have the requisite knowledge in any case, Defendants' motion on this ground should also be denied.

### E. **Pinging Results are Otherwise Admissible on Their Own**

The pinging results themselves are properly authenticated and highly probative as to basic contested issues in the case. Like the document attached by Defendants in support of their Motion for Summary Judgment, a multitude of Plaintiff's exhibits are similar printouts of ping requests and reports for infringing websites hosted by Defendants. See Ex. D to Coombs Decl.; compare Ex. 1501 to Chen Decl. Thus, these documents are admissible either by stipulation or as having been offered by a party opponent. "Authentication can be accomplished by judicial admission, such as

stipulation or production of the items at issue in response to a discovery request" and where offered by the party opponent. <u>MGM Studios, Inc. v. Grokster, Ltd.</u>, 454 F. Supp. 2d 966, 972 (C.D. Cal. 1996); <u>see also</u> <u>Maljack Productions, Inc. v. Goodtimes Home Video Corp.</u>, 81 F.3d 881, 889 n.12 (9th Cir. 1996). They are also the result of a process attested to by all the parties, and their accuracy has not and can not be reasonably questioned. They are thus properly authenticated under Rule 901 as well.

This evidence shows that Defendants hosted various infringing websites on a given date, as reflected on the ping results. These documents also support the contention that despite notice, Defendants continued to host certain complained of websites, clearly failing to remedy the infringement. In light of Defendants' near complete failure to provide any documentation on hosting despite an ability to do so, the probative value of this evidence is further enhanced.

## F. Defendants Can Not Meet the High Burden under Rule 403 to Exclude this Evidence and Could Not be Prejudiced by Evidence They Themselves Offered

The highly probative nature of the challenged evidence and Defendants' failure to meet the high burden upon them under F.R.E. 403 warrants denial of this motion on grounds of excess prejudice.

Relief against admissibility under Rule 403 should be granted sparingly as Rule 403 favors admissibility. <u>U.S. v. Fleming</u>, 215 F.3d 930, 939 (9th Cir. 2000); <u>see also</u> <u>U.S. v. Hankey</u>, 203 F.3d 1160, 1172 (9th Cir. 2000). Some circuits have required that the unfair prejudice be "exceedingly great" while looking at the evidence "most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect..." <u>U.S. v. Stout</u>, 509 F.3d 796, 806 (6th Cir. 2007). Here, the probative value of the hosting information in light of its accepted accuracy, truthfulness, and prior use by the parties is extreme. Defendants can offer no evidence of unfair prejudice when they themselves have relied on such evidence, let alone make the case that is required to substantially outweigh the highly probative evidence at issue. In terms of what is fair and what is unfairly prejudicial, Plaintiff should be able to use the testimony regarding pinging as Defendants have.

Additionally, "[r]elevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." U.S. v. Hankey, 203 F.3d 1160, 1172 (9th Cir. 2000). The pinging evidence is a basic, factually based function that speaks volumes as to critical issues in the case regarding Defendants' hosting and continued hosting of infringing websites. The relevancy and probative value of such evidence can not be considered "scant" or "cumulative" but instead, in each instance, Defendants are shown to materially contribute to counterfeiting. Each ping is important not only to show the fact Defendants were hosting a website on a particular date, but when Defendants continued to host such a website, the ping also speaks to issues of willfulness and willful blindness and should be presented to the jury.

The evidence is particularly probative to the extent Defendants produced little to no similar hosting information despite an obvious ability to do so. See Defendants' Ex. 1501. The evidence is thus that much more probative and Defendants should not be rewarded for failing to cooperate in discovery and forcing Plaintiff to independently develop hosting information from reliable, accepted, publicly available means. General Atomic Co. v. Exxon Nuclear Co., 90 F.R.D. 290, 1981 U.S. Dist. LEXIS 9374, at *60 (S.D. Cal. April 23, 1981) ("It is fundamental that a party that does not provide discovery cannot profit from its own failure…and may be estopped from 'supporting or opposing designated claims or defenses.'") (quoting Dellums v. Powell, 566 F.2d 231, 235 (D.C. Cir. 1977).

Prior controlling decisions have acknowledged that "services or products that facilitate access to websites throughout the world can significantly magnify the effects" of infringing conduct and that in certain instances, seeking compliance from providers may be the only meaningful way for copyright holders to protect their rights. Perfect 10, Inc. v. Amazon.com, Inc., et al., 508 F.3d 1146, 1172 (9th Cir. 2007). The multitude of pinging results that Plaintiff has

amassed will irrefutably show that the policy behind this statement by the Ninth Circuit could not be more applicable to the Defendants in this case.

Because Defendants' legal arguments fail and because they can not present any legitimate argument of unfair prejudice to the level required by the Rule, the jury should decide for itself the weight it wishes to afford the evidence and all pinging results and references should be admissible given their highly probative value in this case.

For the foregoing reasons, Defendants' Motion No. 6 should be denied.

## G. Even Were the Proferred Evidence Considered Opinion Testimony, There Has Been Substantial Compliance With Disclosure Requirements and No Prejudice to Defendants

Granting Defendants' Motion No. 6 to exclude testimony regarding pinging would elevate form over substance in the determination of this matter. Plaintiff has substantially complied with the requirements for expert opinion disclosure, regardless of its non-designation of Mr. Livadkin and Mr. Holmes as expert witnesses, and there is no prejudice to Defendants to allow the testimony regarding pinging.

Failure to disclose under Fed. R. Civ. P. 26 does not preclude admission of the evidence or testimony if the failure was either substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); Dukes v. Wal-Mart, Inc., 222 F.R.D. 189, 199 (N.D. Cal. 2004); *see also* Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998). The court's determination of admissibility should be guided by "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." David v. Caterpillar, Inc., 324 F.3d 851, 857 (7th Cir. 2003). Further, it is Defendants' burden to show sufficient prejudice caused by the failure to disclose. Dukes, 222 F.R.D. at 199.

Fed. R. Civ. P. 26 sets a deadline for disclosure of expert witnesses 90 days before trial. Fed. R. Civ. P. 26(a)(2)(C)(ii). This timeframe was instituted in order to provide "sufficiently in advance of trial…a reasonable opportunity to prepare for effective cross examination and perhaps

arrange for expert testimony from other witnesses." Fed. R. Civ. P. 26, Notes of Advisory Committee on 1993 amendments. Plaintiff disclosed both witnesses early on in the discovery process, more than 90 days before trial, and Defendants have been sufficiently apprised of the contents of the expected testimony from Mr. Livadkin and Mr. Holmes since that time. In fact, both witnesses have also been fully deposed by Defendants, including regarding their background and experience, including their pinging of the websites at issue in this litigation. *See* Fed. R. Civ. P. 26(b)(4)(A). Further, Mr. Holmes' reports have been produced (subject to the Protective Order in this matter) and Mr. Livadkin, as an employee of the Plaintiff, is under no obligation to prepare a written report. *See* Fed. R. Civ. P. 26(a)(2)(B). Therefore, Defendants have not been prejudiced by the fact that Mr. Livadkin and Mr. Holmes were not specifically labeled as expert witnesses.

Moreover, there is no questioning the expert qualification of either witness. Mr. Holmes has been a computer forensics investigator for over 25 years. He is well versed on the process of pinging and does so on an almost daily basis. Mr. Livadkin, too, has extensive experience with pinging as the Anti-Counterfeiting Coordinator of Louis Vuitton, S.A. He is responsible for monitoring the Internet and identifying possible sources of counterfeit product bearing Plaintiff's copyrights and trademarks. As a part of his job duties, he regularly pings websites to determine the IP address. Witnesses in similar employment positions to him have testified on the issue of pinging in other cases. *See* J.B. Hunt Transport, Inc. v. Adams, 2006 U.S. Dist. LEXIS 27375, at *10-11 & fn. 7 (E.D. Mich. May 9, 2006) (Director of Litigation testified as to pinging).

Defendants have not and cannot point to sufficient prejudice they have suffered due to the mislabeling of Mr. Livadkin and Mr. Holmes. Therefore, their testimony should not be excluded under Rule 37, and Plaintiff should be allowed to correct any discrepancies that may exist.

Dated: March 9, 2009

J. Andrew Coombs, A Professional Corp.

By: J. Andrew Coombs
Annie Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

# DECLARATION OF J. ANDREW COOMBS

I, J. Andrew Coombs, declare as follows:

1. I am an attorney at law duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California. I am counsel of record for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") in an action styled <u>Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al.</u>, Case No. C 07 3952 JW. I submit this declaration in support of Plaintiff's Opposition to Defendants' Motion in Limine No. 6. Except as otherwise stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows.

2. Attached Exhibit A is a true and accurate copy of the Declaration of Steve Chen and Exhibit 1501 filed by Defendants May 19, 2008, in support of their Motion for Summary Judgment.

3. Attached Exhibit B is a true and accurate copy of the Declaration of Juliana Luk filed by Defendants May 19, 2008, in support of their Motion for Summary Judgment.

4. Attached Exhibit C is a true and accurate copy of portions of the transcript from the deposition testimony of Juliana Luk which took place on or about April 12, 2008.

5. Attached Exhibit D are true and correct copies of selected exhibits of the type objected to by Defendants by this motion.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of March, 2009, at Glendale, California.

J. ANDREW COOMBS

**EXHIBIT A**

1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   Brian S. Edwards (SBN 166258)
3  18400 Von Karman, Suite 300
4  Irvine, California  92612
   Telephone:     (949) 553-1010
5  Facsimile:     (949) 553-2050
   jal@gauntlettlaw.com
6  bse@gauntlettlaw.com

7  Attorneys for Defendants
8  Akanoc Solutions, Inc.,
   Managed Solutions Group, Inc.
9  and Steve Chen

10

11               **UNITED STATES DISTRICT COURT**

12      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

13

14 | LOUIS VUITTON MALLETIER, S.A.,          ) Case No.:  C 07-3952 JW

15 |                                         )
   |                                         ) Hon. James Ware
16 |                      Plaintiff,         )
   |                                         ) **DECLARATION OF STEVE CHEN IN**
17 |                                         ) **SUPPORT OF DEFENDANTS' MOTION**
   |                                         ) **FOR SUMMARY JUDGMENT**
18 |           vs.                           )
   |                                         ) Date:   June 23, 2008
19 |                                         ) Time:   9:00 a.m.
   | AKANOC SOLUTIONS, INC., et al.,         ) Dept.:  Courtroom 8, 4th Floor
20 |                                         )
   |                                         ) Discov. Cut-off:    April 29, 2008
21 |                      Defendants.        ) Pre-Trial Conf:     Sept. 8, 2008
   |                                         ) Trial Date:         None Set
22 | _____)

23

24

25

26

27

28

1    I, STEVE CHEN, declare as follows:

2    I am the President and manager of Managed Solutions Group, Inc. ("MSG") and Akanoc

3  Solutions, Inc. ("Akanoc"). I am also a named Defendant in this action. The facts set forth in this

4  declaration are of my own personal knowledge and I could competently testify to them if called as a

5  witness.

6    1.    I am submitting this declaration in support of Defendants' motion for summary

7  judgment with regard to plaintiff Louis Vuitton Malletier, S.A.'s ("Vuitton") complaint in this

8  action.

9    2.    MSG and Akanoc do not market or sell services directly to website operators. They

10  are Internet Service Providers ("ISP") who provide unmanaged Internet hosting services to their

11  customers, mainly resellers located in China.[1]

12    3.    Internet hosts typically provide either "managed" or "unmanaged" services. The

13  basic difference is the level of control over the server on which the data or applications are being

14  hosted. A managed hosting service generally provides complete or nearly complete care of the

15  customers' servers and therefore charges significantly more than for unmanaged hosting. Typical

16  customers of a managed hosting service are individuals or small businesses that are technically

17  unsophisticated or unwilling to expend the effort to control their own servers.

18    4.    In contrast, MSG and Akanoc provide unmanaged hosting services to third party

19  resellers. They charge a much lower fee than what is typically charged for managed Internet hosting

20  services. The fee is charged mainly to keep the machine operating and connected to the Internet.

21  Customers maintain operational control over the computer server and restrict access by passwords,

22  so customers must be technologically knowledgeable and experienced so that they can manage their

23  operations remotely with little intervention by the hosting provider. Because the reseller customers

24  have control, MSG and Akanoc have no way of knowing if a particular website hosted on their

25  servers appears to be selling counterfeit goods unless a third-party notifies them.

26    5.    MSG and Akanoc typically rent one or more computer servers with the basic

27  ────────────────

[1] MSG provides only unmanaged Internet hosting services, despite the use of the term "managed" in
28  its name.

1  operating system(s) requested by their customer together with an Internet router pointing one or

2  more temporarily assigned Internet Protocol ("IP") addresses to a server, together with a good

3  connection to an Internet "pipe" permitting the customer a specified maximum quantity of data

4  ("bandwidth"). MSG and Akanoc turn this system over to the customer who then assigns all

5  passwords to access content on the server. Unless customers happen to reveal that information to

6  them, Akanoc and MSG are not aware of any passwords or what specific use will be made of the

7  Internet access they provide.

8      6.    Like other unmanaged Internet hosts, unless the customer chooses to allow them

9  access MSG and Akanoc have no way of accessing the content being hosted on their servers. Access

10 is usually granted, if at all, for limited purposes such as reformatting the hard drive or reinstalling an

11 operating system. This additional maintenance is done only if requested and for an additional fee.

12 MSG and Akanoc receive their modest monthly fee via a credit card or PayPal to keep the hardware

13 running and the Internet communications open and they respond as requested to technical operations

14 problems.

15     7.    MSG and Akanoc together own and have available for monthly rental approximately

16 1,400 computer servers, approximately 30,000 IP addresses and approximately 1.2 gigabits of

17 bandwidth of Internet access. These servers are used by numerous resellers and by thousands or

18 potentially even millions of legitimate Website operators, many in China. Chinese companies

19 commonly seek to host their Internet operations in the United States because the speed and quality of

20 Internet transmissions in China is poor and Chinese Internet connections to the rest of the world are

21 heavily restricted by the Chinese government.

22     8.    MSG and Akanoc do not do business with any Website operators and, unless given

23 notice by a third party such as Vuitton, are not aware of any infringing conduct potentially occurring

24 on a particular site. This is because the services they provide are unmanaged and the Defendants are

25 prohibited by law from accessing or monitoring the content on their equipment under the Stored

26 Communications Act (18 U.S.C. § 2700, *et al.*). Just as a telephone service provider is prohibited

27 from listening in on or wiretapping its customers' calls, so are Internet Service Providers such as

28 MSG and Akanoc prohibited from examining the customer content of its servers without specific

10562-002-5/19/2008-161163.2

2

DECLARATION OF STEVE CHEN IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
– C 07-3952 JW

1    authorization by the customer or a search warrant. It is the responsibility of a copyright or trademark

2    owner to police infringement and they can then send notices to an ISP like MSG or Akanoc.

3        9.    The customer of an unmanaged hosting service typically agrees to an "acceptable use

4    policy" that prohibits illegal use of the server and agrees to respond to and correct unacceptable use

5    when a complaint is made, for example, of spam originating from the IP address or alleged

6    intellectual property infringement. MSG and Akanoc require agreement to such an "acceptable use

7    policy" that, among other things specifies that the services provided are unmanaged but that the

8    customer is responsible for improper use or content.

9        Section I(8) of Akanoc's agreement with customers (**Exhibit "1500"**) provides:

10           Customer will be responsible for all server management and
             administration related issues.
11

12       The acceptable use policy also provides that Akanoc and MSG have no access to the content

13   of servers without consent of the customer.

14       Section III(1) of **Exhibit "1500"** provides:

15           [Web Host] will exercise no control whatsoever over the content of the
             information passing through the network or on the customer's web
16           sites.

17

18       10.   Because of the high number of servers and IP addresses rented out by MSG and

19   Akanoc, and because there is a constant problem with people around the world sending spam or

20   infringing or illegal material, MSG and Akanoc receive thousands of complaints every month and it

21   is impractical for them to investigate or validate all complaints. All complaints concerning domains

22   or websites that are located within MSG or Akanoc's IP ranges are forwarded to their customers for

23   evaluation and action.

24       11.   MSG and Akanoc's standard protocol when they receive a complaint is as follows. If

25   notice is received about a Website that is alleged to be using one of the Defendants' IP addresses

26   (and therefore on one of their servers), we do not log on to the Internet to investigate or verify

27   whether the complaint is well founded. Either Juliana Luk or myself will "ping" the domain name

28   about which a complaint is made to determine whether the particular Website is located at an IP

1    address within the range of IP addresses assigned to Akanoc or MSG.

2        12.    Assuming the website at issue is functional and located within Akanoc or MSG's IP

3    ranges, all abuse complaints are treated as being justified and sent along to our customer with a "take

4    down" notice. This is the only practical way for an Internet Service Provider to operate. This

5    practical approach is for several reasons: (1) the Defendants regularly receive too many complaints

6    to have time to verify or investigate abuse complaints, (2) the Defendants are unable to determine

7    who has rights in any content on the Internet, (3) the Defendants cannot easily verify complaints, and

8    (4) opening an e-mail containing spam could be dangerous to the MSG or Akanoc servers and their

9    customers because virus, worm, and other malware infections could be spread thereby.

10        13.    "Pinging" a domain name on a computer's DOS prompt sends a request to Internet

11    name translation servers to return the IP address that is being used by that domain name. This is

12    done by typing in the command "ping [domain name]", which instructs a computer to send test

13    packets of information to that domain. When the computer receives the test packets back, it

14    confirms the IP address that the domain is using. Attached as **Exhibit "1501"** is a screen printout of

15    a DOS prompt showing the pinging of the domain www.cand.uscourts.gov.

16        14.    By pinging a Website it is possible to identify a domain's IP address and whether it is

17    located within the range of IP addresses assigned to a customer. If it is, Juliana Luk or I

18    immediately send the complaint on to the reseller with a demand that the offending Website be taken

19    down.

20        15.    Often "pinging" the Website will reveal that it is not located within MSG's or

21    Akanoc's IP range (the website is located within another Web hosts' range) or that the domain is

22    non-functioning. In that situation, no further action is required. As an unmanaged Internet host who

23    is not able to monitor the content of the domain data on its servers, this protocol is the only method

24    available to assist third parties to combat infringement, spamming, etc.

25        16.    Repeat complaints can result in MSG or Akanoc unplugging a server accused of

26    infringing conduct. If a complaint about the same domain is repeated within a short time (and it is

27    confirmed to be located at the same IP address within Akanoc or MSG's IP range) or there are other

28    reasons to believe the customer is not responding to the complaint notice, MSG or Akanoc can only

1  unplug the server from the Internet or otherwise disable the customer's access. Unplugging the
2  server from the Internet or otherwise disabling the customer's access is an extreme action, taken only
3  when necessary, because there may be numerous compliant customers using the same server while
4  perhaps one customer of a reseller with whom Akanoc and MSG deal has allowed a single IP
5  address to be misused.  Unplugging a server will potentially harm dozens or even hundreds of
6  ultimate users of the same server so this action is a last resort to enforce the acceptable use policy.

7      17.    Vuitton's complaint in this case was served on or about August 22, 2007. Promptly
8  thereafter I "pinged" the five websites listed in the complaint (atozbrand.com, bag925.com,
9  ape168.com, wendy929.net and eshoes99.com).  I discovered that four of the five domains were not
10  located at IP addresses within the range of IP addresses assigned to MSG or Akanoc, meaning they
11  were either never within Akanoc or MSG's IP range or were no longer within range.  The only other
12  website named in the complaint, wendy929.net, was not functional at that time and could not be
13  accessed using the Internet.

14      18.    Because the five sites were out of the Defendants range of IP addresses and therefore
15  hosted by a different ISP or were not functioning, MSG and Akanoc were not able to contact the
16  Websites or take any further action.  At the time the complaint was served, only one of the five
17  websites listed in Vuitton's complaint were located on either MSG's or Akanoc's servers but that
18  website was not functioning.

19      19.    In approximately June 2007 MSG's and Akanoc's email server hard drive "crashed"
20  and data was lost.  As a result Defendants have incomplete evidence of email complaints before that
21  time.  However, the fact that these five websites were not located within MSG's or Akanoc's IP
22  range or were non-functioning at the time the complaint was served indicates that they were either
23  never within MSG's or Akanoc's IP range or were taken down as a consequence of the standard
24  warning protocol described above.

25      20.    In the course of their business MSG and Akanoc have never used Vuitton's
26  trademarks or copied any of Vuitton's works in any way.  Defendants do not advertise or sell
27  merchandise.  Their business activities do not involve any infringement of trademark or copyrights,
28  or inducing others to infringe trademarks or copyrights.

10562-002-5/19/2008-161163.2                           5                    DECLARATION OF STEVE CHEN IN SUPPORT OF
                                                                            DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                                                            – C 07-3952 JW

1      21.     Defendants have never controlled or monitored the data on MSG or Akanoc's servers.

2  Defendants' do not monitor or have control over the content of websites being hosted on their

3  servers.

4      22.     Defendants' operations have always been entirely separate from the websites being

5  hosted on their servers. They have never had any partnership with any party allegedly or actually

6  infringing Vuitton's trademarks or copyrights.

7      23.     There has never been any connection whatsoever between any Defendant and any

8  operator of any Website being hosted on their servers.

9      24.     There has never been any partnership between any Defendant and any operator of any

10  Website being hosted on their servers.

11      25.     Defendants have never known any operators of Websites alleged to infringe

12  copyrights or trademarks being hosted on their servers because they do not deal directly with those

13  Website operators, do not receive money from them, and have no connection to them whatsoever.

14      26.     Defendants have never had any authority to bind the operators of Websites located on

15  their servers or exercise joint control over any operations at their sites.

16      27.     The Defendants have never done any business with and have never received any

17  money from any website operator alleged to have infringed any copyrights or trademarks.

18      28.     Defendants have never intentionally induced copyright infringement in the course of

19  their business.

20      29.     Defendants have never had the right to supervise or control conduct or content on

21  their servers, aside from prohibiting abuse in their User Agreement.

22      30.     There is no practical or lawful way for Defendants to monitor information transmitted

23  through or stored on the servers they rent to resellers. prior to receiving a notice of copyright

24  infringement.

25      31.     With 30,000 IP addresses accessing 1,400 Internet servers constantly, there is no

26  practical means to wiretap communication or monitor content in such a way that can prevent or

27  identify every appearance of a copyrighted work or a trademark appearing on the servers.

28      32.     Defendants have no direct financial interest in infringing activity or infringing

1  persons. They have always derived their income solely from the unmanaged Internet hosting services
2  that they market to resellers.

3      33.    The fixed monthly service fees MSG and Akanoc charge are not based on sales or
4  activity of any Website doing business with any of the resellers any more that a telephone company
5  makes any profit on sales made by its customers.

6      34.    Defendants do not create, design, operate, manage, or have any information about any
7  Website using its servers and IP addresses.

8      35.    Akanoc and MSG do not know who their customers deal with and have no knowledge
9  as to what particular use is made of the Internet hosting services provided.

10      I declare under penalty of perjury under the laws of the United States of America that the
11  foregoing is true and correct.

12      Executed at Fremont, California on this 19th day of May, 2008.

15  _____
STEVE CHEN

# EXHIBIT 1501

```
(C) Copyright 1985-2001 Microsoft Corp.

H:\>ping www.cand.uscourts.gov

Pinging www.cand.uscourts.gov [207.41.19.17] with 32 bytes of data:

Reply from 207.41.19.17: bytes=32 time=107ms TTL=112
Reply from 207.41.19.17: bytes=32 time=121ms TTL=112
Reply from 207.41.19.17: bytes=32 time=117ms TTL=112
Reply from 207.41.19.17: bytes=32 time=108ms TTL=112

Ping statistics for 207.41.19.17:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 106ms, Maximum = 121ms, Average = 112ms

H:\>
```



EXHIBIT
**1501**

EXHIBIT A                                           Page 21

**EXHIBIT B**

1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   Brian S. Edwards (SBN 166258)
3  18400 Von Karman, Suite 300
4  Irvine, California 92612
   Telephone:    (949) 553-1010
5  Facsimile:    (949) 553-2050
   jal@gauntlettlaw.com
6  bse@gauntlettlaw.com

7  Attorneys for Defendants
8  Akanoc Solutions, Inc.,
   Managed Solutions Group, Inc.
9  and Steve Chen

10

11                **UNITED STATES DISTRICT COURT**

12      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

13

14  LOUIS VUITTON MALLETIER, S.A.,        ) Case No.: C 07-3952 JW
                                          )
15                                        ) Hon. James Ware
                                          )
16              Plaintiff,                ) **DECLARATION OF JULIANA LUK IN**
                                          ) **SUPPORT OF DEFENDANTS' MOTION**
17                                        ) **FOR SUMMARY JUDGMENT**
                                          )
18        vs.                             ) Date:  June 23, 2008
                                          ) Time:  9:00 a.m.
19                                        ) Dept.: Courtroom 8, 4th Floor
    AKANOC SOLUTIONS, INC., et al.,       )
20                                        ) Discov. Cut-off:     April 29, 2008
                                          ) Last Day to Hear
21              Defendants.               ) Dispositive Motions: June 30, 2008
                                          ) Pre-Trial Conf:      Sept. 8, 2008
22  _____) Trial Date:          None Set

23

24

25

26

27

28

10562-002-5/19/2008-161234.1

I, JULIANA LUK, declare as follows:

I am an employee of Defendant Akanoc Solutions, Inc. ("Akanoc"). The facts set forth in this declaration are of my own personal knowledge, and I could competently testify to them if called as a witness.

1.    I am submitting this declaration in support of Defendants' motion for summary judgment

2.    My sole responsibility as an employee of Defendant is to respond to all types of Internet abuse issues, including complaint notices that a domain or website is allegedly using infringing or counterfeit content (normally received via email).

3.    Upon receipt of complaint notices, I ping the allegedly infringing domain name to determine the IP address of the domain.

4.    I then compare the IP address to the list of 30,000 IP addresses assigned to Defendants Akanoc Solutions, Inc. and Managed Solutions Group, Inc. in order to determine if the IP address is within their IP range.

5.    If I find that the domain is within the IP range assigned to Defendants Akanoc Solutions, Inc. and Managed Solutions Group, Inc., I send the customer assigned that IP address a "takedown" email warning them that they must remove the infringing content.

6.    If I receive a further complaint about an IP address and I recall having already sent a takedown email to the customer assigned that IP address, I will request a technician to unplug the server using that customer's IP address, thus making that domain nonfunctional.

7.    Managed Solutions Group and Akanoc Solutions' regular practice is to send "take down" notices to their customers if there is any complaint of activity from an IP address that violates the "acceptable use policy."

8.    Whenever the defendant companies receive complaints of trademark or copyright infringement, they immediately forward the complaint to their customer about the complaint with instructions that the customer "take down" the offending material.

9.    The customer is warned that violation of the acceptable use policy can result in termination of service.

1      10.    As an employee of Defendant, my entire job is to send out such complaint notices
2    daily.

3        I declare under penalty of perjury under the laws of the United States of America that the
4    foregoing is true and correct.

5        Executed at Chino Hills, California on this 19th day of May, 2008.

6

7

8                                          JULIANA LUK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     10562-002-5/19/2008-161234.1                    2        DECLARATION OF JULIANA LUK IN SUPPORT OF
                                                              DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                                                            – C 07-3952 JW

**EXHIBIT C**

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4  LOUIS VUITTON MALLETIER, S.A.,   )

                          )

5              Plaintiff,   )

                          )

6           vs.       )  Case No. C073952JW

                          )

7  AKANOC SOLUTIONS, INC., MANAGED )

    SOLUTIONS GROUP, INC., STEVEN   )

8  CHEN and DOES 1 through 10,     )

    inclusive,                  )

9                        )

                Defendants.   )

10  _____)

11

12

13

14

15          DEPOSITION OF JULIANA LUK

16               VOLUME I

17         Glendale, California

18       Saturday, April 12, 2008

19

20

21

22

23

24  Reported by:  Janalee Whitacre

               CSR No. 12223

25  NDS Job No.:  128150

1          MR. EDWARDS:  Other than counsel.

2          MS. WANG:  Okay.

3          THE WITNESS:  Oh.

4          MR. EDWARDS:  I just want to make the record

5     clear that she discussed coming here today with myself.

6     BY MS. WANG:

7          Q.    Was there anyone else that you talked to?

8          A.    No.

9          Q.    Okay.  Have you ever gone by any other names?

10         A.    No.

11         Q.    What is your current address?

12         A.    4125 Stone Mountain Drive, two words,

13    Chino Hills, California, 91709.

14         Q.    How long have you lived there?

15         A.    Ten years.

16         Q.    Have you ever been a party to a lawsuit before,

17    other than the one you mentioned 20 years ago?

18         A.    No.

19         Q.    And the next question is not to insult or

20    embarrassed you but it's just a question we have to ask.

21    Have you ever been convicted of a felony?

22         A.    No.

23         Q.    And what is the highest level of education that

24    you have completed?

25         A.    High school.

EXHIBIT C                    Page 26

1      Q.    And where was that?

2      A.    In Hong Kong.

3      Q.    Have you ever attended any trade schools?

4      A.    No.

5      Q.    Do you have any certifications?

6      A.    You mean -- certification on what?

7      Q.    Anything that you took a class for to get

8   certified.

9      A.    Oh, I just finished my GED at Mt. SAC college.

10   That is a high school as well.  It's only high school.

11      Q.    And you mentioned Mt. SAC.  Do you mean

12   Mt. San Antonio College?

13      A.    Yeah, uh-huh.

14      Q.    And when was that?

15      A.    Last November.

16      Q.    Have you had any technical training?

17      A.    No.

18      Q.    Are you currently employed?

19      A.    Yes.

20      Q.    By whom?

21      A.    BTG Apparel.

22      Q.    Anyone else?

23      A.    Oh, Akanoc.  It's part time.

24      Q.    You mean Akanoc Solutions Inc.?

25      A.    Yes.

EXHIBIT C                                    Page 27

1   BY MS. WANG:

2      Q.   That's all right.  You work out of your home?

3      A.   Yeah, at Chino Hills.

4      Q.   In Chino Hills.  So have you ever been to the

5   business office, home office of Akanoc --

6      A.   No.

7      Q.   -- Solutions?

8          Do you ever travel to any offices of Akanoc?

9      A.   No.

10     Q.   In your job at Akanoc, do you report to anyone?

11     A.   To Steve Chen.

12     Q.   Anyone else?

13     A.   No.

14     Q.   Do you ever communicate with anyone else at

15   Akanoc?

16     A.   To the support department.

17     Q.   And this is in regards to the job that you are

18   doing for Akanoc?

19     A.   Yes.

20     Q.   And what do you communicate with the support

21   department?

22     A.   To unplug the customer's IP.

23     Q.   Do you have any technical knowledge that's

24   required for the job that you do?

25     A.   No.

1   A.   I only know how to do it with inputting the IP

2   address.   The others I don't understand and I don't want

3   to touch it.

4   Q.   So there are other boxes on that page, but you

5   don't --

6   A.   Yes.

7   Q.   But there are other boxes on that page?

8   A.   Yes.

9   Q.   Okay.   What if a complaint that you receive

10   doesn't have an IP address but just a domain name, how

11   do you handle that kind of situation?

12   A.   I -- I ping on the -- what do you call that?   A

13   CMD.   I only know how to do it.   I can't explain it.

14   Q.   So when you don't have an IP address but you

15   have a domain name, you ping the domain name?

16   A.   Yes.

17   Q.   On -- is this an Internet program?

18   A.   Yes.

19   Q.   Do you remember which one that is?

20   A.   I just know how to click to it.

21   Q.   Is it an Akanoc program?

22   A.   No.

23   Q.   It's a program that is available publicly?

24   A.   Yes.

25   Q.   Do you do any follow-up after forwarding any of

**EXHIBIT D**

```
Command Prompt                                                    _ □ ×

C:\>ping www.bigworldshoes.com

Pinging www.bigworldshoes.com [205.209.161.43] with 32 bytes of data:

Reply from 205.209.161.43: bytes=32 time=72ms TTL=114
Reply from 205.209.161.43: bytes=32 time=71ms TTL=114
Reply from 205.209.161.43: bytes=32 time=71ms TTL=114
Reply from 205.209.161.43: bytes=32 time=72ms TTL=114

Ping statistics for 205.209.161.43:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 71ms, Maximum = 72ms, Average = 71ms

C:\>_
```


PLAINTIFF'S
EXHIBIT
85.2



http://www.bigworldshoes.com/

Sitemap

```
C:\Fichiers>date /t
22/01/2009
18:06

C:\Fichiers>ping www.bigworldshoes.com

Envoi d'une requête 'ping' sur www.bigworldshoes.com [205.209.161.43] avec 32 octets de données :

Réponse de 205.209.161.43 : octets=32 temps=199 ms TTL=109
Réponse de 205.209.161.43 : octets=32 temps=197 ms TTL=109
Réponse de 205.209.161.43 : octets=32 temps=207 ms TTL=109
Réponse de 205.209.161.43 : octets=32 temps=204 ms TTL=109

Statistiques Ping pour 205.209.161.43:
    Paquets : envoyés = 4, reçus = 4, perdus = 0 (perte 0%),
Durée approximative des boucles en millisecondes :
    Minimum = 197ms, Maximum = 207ms, Moyenne = 201ms

C:\Fichiers>tracert www.bigworldshoes.com

Détermination de l'itinéraire vers www.bigworldshoes.com [205.209.161.43]
avec un maximum de 30 sauts :

  1     *        1 ms        1 ms  SpeedTouch.local.net [10.0.0.138]
  2     *        *           *     Délai d'attente de la demande dépassé.
  3    40 ms    40 ms       40 ms  10.22.4.1.20
  4    41 ms    41 ms       41 ms  tengige0-13-0-1.ntstal02.Paris.francetelecom.net [193.251.126.222]
  5    42 ms    42 ms       42 ms  tengige0-13-0-0.nwtr1.Aubervilliers.opentransit.net [193.251.122.29]
  6    49 ms    50 ms       50 ms  tengige0-9-4-0.ffttr1.FrankfurtAnMain.opentransit.net [193.251.132.30]
  7    50 ms    50 ms             64.200.110.225
  8   174 ms   193 ms      193 ms  UBS-CONNECT.pwl.410.arl.smo2.ghix.net [200.170.60.82]
  9   207 ms   205 ms      205 ms  205.209.190.116
 10   200 ms   200 ms      211 ms  172.16.0.22
 11   198 ms   199 ms      198 ms  205.209.161.43

Itinéraire déterminé.
```

RDY TO
DER?
AFE
SECURE
SPEEDY
OUT HERE

RDANS
0 A N

205.209.161.43

GO

```
Command Prompt                                                    - □ ×
Microsoft Windows XP [Version 5.1.2600]
(C) Copyright 1985-2001 Microsoft Corp.                          Maxim

C:\Documents and Settings\HP_Owner>cd\

C:\>ping cn-nike.us

Pinging cn-nike.us [205.209.165.65] with 32 bytes of data:

Reply from 205.209.165.65: bytes=32 time=72ms TTL=115
Reply from 205.209.165.65: bytes=32 time=72ms TTL=115
Reply from 205.209.165.65: bytes=32 time=70ms TTL=115
Reply from 205.209.165.65: bytes=32 time=72ms TTL=115

Ping statistics for 205.209.165.65:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 70ms, Maximum = 72ms, Average = 71ms

C:\>
```



PLAINTIFF'S
EXHIBIT
95.3

Testing a New server at test.network-tools.com

**Who Owns This Domain**
Find Out Who Owns the Domain You Want.
Purchase or Make an Offer!

**Network Solutions**
Domains, Hosting, Web Sites & More. ICANN
Accred. Learn more here!

# NETWORK-TOOLS.COM

To save typing this site is available at NWTools.com | Read About Recent Changes

Anti-Spam Solution for Your Network
GFI MailEssentials blocks 98% of spam and phishing email at server level!
Free up your network from spam - get your FREE 30 day trial today!

- **Ping**
  **Lookup**
  **Trace**
  **Whois**
  **IDN Conversion**

**Express**

**DNS Records**
Click here for advanced
NSLookup DNS tool

**Network Lookup**

**URL Unencode**
**URL Encode**
**HTTP Headers**   **SSL**
**E-mail Validation**

Ads by Google

```
cn-nike.us
```

| Convert Base-10 to IP

Submit

- **Compare Hosting and E-mail Providers**
- **Privacy.net Browser Test**

Ping 205.209.165.65

[cn-nike.us]

Round trip time to 205.209.165.65: 55 ms
Round trip time to 205.209.165.65: 52 ms
Round trip time to 205.209.165.65: 52 ms
Round trip time to 205.209.165.65: 55 ms
Round trip time to 205.209.165.65: 55 ms
Round trip time to 205.209.165.65: 54 ms
Round trip time to 205.209.165.65: 52 ms
Round trip time to 205.209.165.65: 52 ms
Round trip time to 205.209.165.65: 61 ms
Round trip time to 205.209.165.65: 55 ms

Average time over 10 pings: 54.3 ms



This site is operated by The Keyword Factory, LLC of Ocean City, NJ ◆2007 | Contact This Web Site

4/29/2008 10:56 AM

EXHIBIT D

Page 33



cn-nike.us ping

**Ping Cn-nike.us**

Ping Type: | ICMP |   Update |

| | Host | IP Address | Ping Time |
|---|---|---|---|
| 1. | cn-nike.us | 205.209.165.65 | 21.82ms |
| 2. | cn-nike.us | 205.209.165.65 | 22.12ms |
| 3. | cn-nike.us | | Timed Out |
| 4. | cn-nike.us | 205.209.165.65 | 21.76ms |
| 5. | cn-nike.us | 205.209.165.65 | 21.75ms |
| 6. | cn-nike.us | 205.209.165.65 | 21.79ms |
| 7. | cn-nike.us | 205.209.165.65 | 21.81ms |

**Total Duration:** 131.05 ms
**Average Ping:** 18.72 ms

**Tools**

| cn-nike.us | Go |

○ Ping ○ Traceroute ○ DNS

**Your IP Information**

View information about your IP address using My IP Address

**IP Information in XML**

We also offer your IP information as an XML API. My IP XML

PLAINTIFF'S
EXHIBIT
95.5



```
C:\Documents and Settings\Administrator\Desktop\Excel.lnk
C:\Documents and Settings\Administrator\Desktop>date /t   & time /t
29/01/2009
11:59

C:\Documents and Settings\Administrator\Desktop>ping www.cn-nike.us

Envoi d'une requête 'ping' sur cn-nike.zyweb317.idsen.com [200.77.46.190] avec 32 octets de données :
Réponse de 200.77.46.190 : octets=32 temps=207 ms  TTL=111
Réponse de 200.77.46.190 : octets=32 temps=207 ms  TTL=111
Réponse de 200.77.46.190 : octets=32 temps=207 ms  TTL=111
Réponse de 200.77.46.190 : octets=32 temps=206 ms  TTL=111

Statistiques Ping pour 200.77.46.190:
    Paquets : envoyés = 4, reçus = 4, perdus = 0 (perte 0%),
Durée approximative des boucles en millisecondes :
    Minimum = 206ms, Maximum = 207ms, Moyenne = 206ms

C:\Documents and Settings\Administrator\Desktop>tracert www.cn-nike.us

Détermination de l'itinéraire vers cn-nike.zyweb317.idsen.com [200.77.46.190]
avec un maximum de 30 sauts :

  1     1 ms     1 ms     1 ms  SpeedTouch.local.net [10.0.0.138]
  2     *        *        *     Délai d'attente de la demande dépassé.
  3    46 ms    43 ms    43 ms  10.224.1.52
  4    43 ms    40 ms    43 ms  81.253.129.86
  5    42 ms    41 ms    43 ms  81.253.129.86
  6    52 ms    50 ms    51 ms  tengige0-3-0-3.autr1.Aubervilliers.opentransit.net [193.251.241.253]
  7    51 ms    51 ms    51 ms  tengige0-3-0-1.ffttr1.Frankfurt6m6ain.opentransit.net [193.251.241.254]
  8    62 ms    52 ms    52 ms  64.208.110.229
  9   197 ms   174 ms   193 ms  VRB-CONNECT.po1.410.ar1.sov2.gblx.net [208.178.60.02]
 10   198 ms   200 ms   202 ms  205.209.194.146
 11   209 ms   207 ms   211 ms  172.16.10.22
 12   209 ms   209 ms   208 ms  200.77.46.190

Itinéraire déterminé.
```

```
C:\>ping www.dreamyshoes.com

Pinging www.dreamyshoes.com [204.16.198.150] with 32 bytes of data:

Reply from 204.16.198.150: bytes=32 time=73ms TTL=114
Reply from 204.16.198.150: bytes=32 time=75ms TTL=114
Reply from 204.16.198.150: bytes=32 time=74ms TTL=114
Reply from 204.16.198.150: bytes=32 time=78ms TTL=114

Ping statistics for 204.16.198.150:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 73ms, Maximum = 78ms, Average = 75ms

C:\>
```



PLAINTIFF'S
EXHIBIT

tabbies

97.2



TrafficZ **DomainTools** LeaseThis.com      Welcome **HolmesPI**    My Account



## dreamyshoes.com ping

**Ping Dreamyshoes.com**

Ping Type: | ICMP     Update

| | Host | IP Address | Ping Time |
|---|---|---|---|
| 1. | dreamyshoes.com | 204.16.198.150 | 24.00ms |
| 2. | dreamyshoes.com | 204.16.198.150 | 23.33ms |
| 3. | dreamyshoes.com | 204.16.198.150 | 23.93ms |
| 4. | dreamyshoes.com | 204.16.198.150 | 22.94ms |
| 5. | dreamyshoes.com | 204.16.198.150 | 23.95ms |
| 6. | dreamyshoes.com | 204.16.198.150 | 22.96ms |
| 7. | dreamyshoes.com | 204.16.198.150 | 23.01ms |

**Total Duration:** 164.12 ms
**Average Ping:** 23.45 ms

### Tools

dreamyshoes.com     Go
◉ Ping   ○ Traceroute   ○ DNS

**Your IP Information**

View information about your IP address
using My IP Address

**IP Information in XML**

We also offer your IP information as an
XML API. My IP XML

EXHIBIT D       Page 37

71.97.62.215 recent request count: 3

**Register Domain Names**
Find & Register Domains For $10 at Register.com. Limited Time Only!
Register.com

# NETWORK-TOOLS.COM

To save typing this site is available at NWTools.com | Read About Recent Changes

Anti-Spam Solution for Your Network
GFI MailEssentials blocks 98% of spam and phishing email at server level!
Free up your network from spam - get your FREE 30 day trial today!

○ **Express**

◉ **Ping**
○ **Lookup**
○ **Trace**
○ **Whois**
IDN
Conversion

○ **DNS Records**
**Click here for advanced NSLookup DNS tool**

○ **Network Lookup**

○ **URL Unencode**
○ **URL Encode**
○ **HTTP Headers** ☐ SSL
○ **E-mail Validation**


Ads by Google

dreamyshoes.com

☐ Convert Base-10 to IP

Submit

• **Compare Hosting and E-mail Providers**

• **Privacy.net Browser Test**

Ping 204.16.198.150

[dreamyshoes.com]

Round trip time to 204.16.198.150: 60 ms
Round trip time to 204.16.198.150: 52 ms
Round trip time to 204.16.198.150: 59 ms
Round trip time to 204.16.198.150: 63 ms
Round trip time to 204.16.198.150: 53 ms
Round trip time to 204.16.198.150: 56 ms
Round trip time to 204.16.198.150: 56 ms
Round trip time to 204.16.198.150: 60 ms
Round trip time to 204.16.198.150: 52 ms
Round trip time to 204.16.198.150: 53 ms

Average time over 10 pings: 56.4 ms

EXHIBIT D



ZhangZhou Dreamyshoes Co.,Ltd - Mozilla Firefox
Fichier Édition Affichage Historique Marque-pages Outils ?
http://www.dreamyshoes.com/
C:\Program Files\Microsoft Office\OFFICE11\EXCEL.EXE
C:\Fichiers>date /t & time /t
27/01/2009
18:11
C:\Fichiers>ping www.dreamyshoes.com
Envoi d'une requête 'ping' sur www.dreamyshoes.com [204.16.198.150] avec 32 octets de données :
Réponse de 204.16.198.150 : octets=32 temps=204 ms TTL=111
Réponse de 204.16.198.150 : octets=32 temps=198 ms TTL=111
Réponse de 204.16.198.150 : octets=32 temps=197 ms TTL=111
Réponse de 204.16.198.150 : octets=32 temps=238 ms TTL=111
Statistiques Ping pour 204.16.198.150:
Paquets : envoyés = 4, reçus = 4, perdus = 0 (perte 0%),
Durée approximative des boucles en millisecondes :
Minimum = 197ms, Maximum = 238ms, Moyenne = 209ms
C:\Fichiers>tracert www.dreamyshoes.com
Détermination de l'itinéraire vers www.dreamyshoes.com [204.16.198.150]
avec un maximum de 30 sauts :
1 18 ms 23 ms 18 ms SpeedTouch.local.net [10.0.0.138]
2 * * * Délai d'attente de la demande dépassé.
3 41 ms 42 ms 41 ms 10.224.1.52
4 41 ms 42 ms 41 ms 81.253.131.118
5 44 ms 44 ms 44 ms pos0-6-0-0.auvtr1.Aubervilliers.opentransit.net [193.251.242.149]
6 52 ms 53 ms 53 ms pos0-11-1-0.ffttr1.FrankfurtAmMain.opentransit.net [193.251.242.150]
7 52 ms 51 ms 57 ms 64.208.110.229
8 192 ms 193 ms 192 ms WBS-CONNECT.po1.410.ar1.snv2.gblx.net [208.178.60.82]
9 197 ms 198 ms 198 ms 205.209.190.146
10 207 ms 215 ms 207 ms 172.16.0.22
11 199 ms 199 ms 200 ms 204.16.198.150
Itinéraire déterminé.
Démarrer
18:12
204.16.198.150

```
Command Prompt                                                    _ □ X

C:\>ping eastarbiz.com

Pinging eastarbiz.com [205.209.164.101] with 32 bytes of data:

Reply from 205.209.164.101: bytes=32 time=72ms ITL=115
Reply from 205.209.164.101: bytes=32 time=73ms ITL=115
Reply from 205.209.164.101: bytes=32 time=72ms ITL=115
Reply from 205.209.164.101: bytes=32 time=72ms ITL=115

Ping statistics for 205.209.164.101:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 72ms, Maximum = 73ms, Average = 72ms

C:\>
```

EXHIBIT D


PLAINTIFF'S
EXHIBIT
99.3
webber

Page 40

Testing a New server at test.network-tools.com



# NETWORK-TOOLS.COM

To save typing this site is available at NWTools.com | Read About Recent Changes

**Anti-Spam Solution for Your Network**
GFI MailEssentials blocks 98% of spam and phishing email at server level!
Free up your network from spam - get your FREE 30 day trial today!

- **Ping**
- **Lookup**
- **Trace**
- **Whois**
- **IDN Conversion**

- **Express**
- **DNS Records**
  Click here for advanced
  NSLookup DNS tool
- **Network Lookup**

- **URL Unencode**
- **URL Encode**
- **HTTP Headers** ☐ **SSL**
- **E-mail Validation**

Ads by Google

[eastarbiz.com]

☐ **Convert Base-10 to IP**

[ Submit ]

- **Compare Hosting and E-mail Providers**
- **Privacy.net Browser Test**

Ping 205.209.164.101

[eastarbiz.com]

Round trip time to 205.209.164.101: 55 ms
Round trip time to 205.209.164.101: 52 ms
Round trip time to 205.209.164.101: 52 ms
Round trip time to 205.209.164.101: 54 ms
Round trip time to 205.209.164.101: 55 ms
Round trip time to 205.209.164.101: 52 ms
Round trip time to 205.209.164.101: 52 ms
Round trip time to 205.209.164.101: 54 ms
Round trip time to 205.209.164.101: 55 ms
Round trip time to 205.209.164.101: 52 ms

Average time over 10 pings: 53.3 ms



SolarWinds.com                    Feedback - Ads by Google

This site is operated by The Keyword Factory, LLC of Ocean City, NJ ◆2007 | Contact This Web Site

EXHIBIT D                                                    Page 41



**DomainTools**

eastarbiz.com ping

**Ping Eastarbiz.com**

Ping Type: ICMP    Update

| | Host | IP Address | Ping Time |
|---|---|---|---|
| 1. | eastarbiz.com | 205.209.164.101 | 20.21ms |
| 2. | eastarbiz.com | 205.209.164.101 | 20.11ms |
| 3. | eastarbiz.com | 205.209.164.101 | 20.08ms |
| 4. | eastarbiz.com | 205.209.164.101 | 20.60ms |
| 5. | eastarbiz.com | 205.209.164.101 | 20.06ms |
| 6. | eastarbiz.com | | Timed Out |
| 7. | eastarbiz.com | 205.209.164.101 | 20.46ms |

**Total Duration:** 121.52 ms
**Average Ping:** 17.36 ms

**Tools**

eastarbiz.com    Go
● Ping    Traceroute    DNS

**Your IP Information**

View information about your IP address
using My IP Address

**IP Information in XML**

We also offer your IP information as an
XML API. My IP XML

PLAINTIFF'S
EXHIBIT
99.5



5/13/2008 10:57 AM

EXHIBIT D                    Page 42

```
C:\>ping www.eshoes99.net

Pinging www.eshoes99.net [204.16.192.77] with 32 bytes of data:
Reply from 204.16.192.77: bytes=32 time=73ms ITL=114
Reply from 204.16.192.77: bytes=32 time=73ms ITL=114
Reply from 204.16.192.77: bytes=32 time=73ms ITL=114
Reply from 204.16.192.77: bytes=32 time=72ms ITL=114

Ping statistics for 204.16.192.77:
    Packets: Sent = 4, Received = 4, Lost = 0 (0% loss),
Approximate round trip times in milli-seconds:
    Minimum = 72ms, Maximum = 73ms, Average = 72ms

C:\>
```



PLAINTIFF'S
EXHIBIT

109





## www.eshoes99.net ping

**Ping Www.eshoes99.net**

Ping Type: ICMP    [ Update ]

| | Host | IP Address | Ping Time |
|---|---|---|---|
| 1. | www.eshoes99.net | 204.16.192.77 | 19.98ms |
| 2. | www.eshoes99.net | 204.16.192.77 | 20.87ms |
| 3. | www.eshoes99.net | 204.16.192.77 | 21.00ms |
| 4. | www.eshoes99.net | 204.16.192.77 | 20.42ms |
| 5. | www.eshoes99.net | 204.16.192.77 | 20.38ms |
| 6. | www.eshoes99.net | 204.16.192.77 | 20.44ms |
| 7. | www.eshoes99.net | 204.16.192.77 | 20.38ms |

**Total Duration:** 143.47 ms
**Average Ping:** 20.50 ms

**Tools**

www.eshoes99.net    [ Go ]

⊙ Ping  ○ Traceroute  ○ DNS

**Your IP Information**

View information about your IP address
using My IP Address

**IP Information in XML**

We also offer your IP information as an
XML API. My IP XML

EXHIBIT D

71.97.62.215 has not accessed this page recently

# NETWORK-TOOLS.COM

To save typing this site is available at NWTools.com | Read About Recent Changes

Anti-Spam Solution for Your Network
GFI MailEssentials blocks 98% of spam and phishing email at server level!
Free up your network from spam - get your FREE 30 day trial today!

| | | |
|---|---|---|
| **Ping** | ○ **Express** | ○ **URL Unencode** |
| ○ **Lookup** | ○ **DNS Records** | ○ **URL Encode** |
| ○ **Trace** | Click here for advanced NSLookup DNS tool | ○ **HTTP Headers** □ **SSL** |
| ○ **Whois** | | ○ **E-mail Validation** |
| **IDN Conversion** | ○ **Network Lookup** | |

www.eshoes99.net

□ **Convert Base-10 to IP**

Submit

- **Compare Hosting and E-mail Providers**
- **Privacy.net Browser Test**

Ping 204.16.192.77

[www.eshoes99.net]

Round trip time to 204.16.192.77: 65 ms
Round trip time to 204.16.192.77: 53 ms
Round trip time to 204.16.192.77: 52 ms
Round trip time to 204.16.192.77: 53 ms
Round trip time to 204.16.192.77: 53 ms
Round trip time to 204.16.192.77: 51 ms
Round trip time to 204.16.192.77: 57 ms
Round trip time to 204.16.192.77: 54 ms
Round trip time to 204.16.192.77: 59 ms
Round trip time to 204.16.192.77: 56 ms

Average time over 10 pings: 55.3 ms

This site is operated by The Keyword Factory, LLC of Ocean City, NJ ©2008 | Contact This Web Site