J. Andrew Coombs (SBN 123881)
*andy@coombspc.com*
Annie S. Wang (SBN 243027)
*annie@coombspc.com*
J. Andrew Coombs, A Professional Corporation
517 E. Wilson Ave., Suite 202
Glendale, California  91206
Telephone:     (818) 500-3200
Facsimile:      (818) 500-3201

Attorneys for Plaintiff
Louis Vuitton Malletier, S.A.

David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
*jal@gauntlettlaw.com*
GAUNTLETT & ASSOCIATES
18400 Von Karman, Suite 300
Irvine, California  92612
Telephone:     (949) 553-1010
Facsimile:      (949) 553-2050

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc. and Steve Chen

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

| | | |
|---|---|---|
| Louis Vuitton Malletier, S.A., | ) | Case No. C 07 3952 JW |
| | ) | |
| Plaintiff, | ) | JOINT PRETRIAL CONFERENCE |
| | ) | STATEMENT |
| v. | ) | |
| | ) | Final Pretrial Conference |
| Akanoc Solutions, Inc., et al. | ) | Date:  July 6, 2009 |
| | ) | Time:  3:00 p.m. |
| Defendants. | ) | Court:  Hon. James Ware |

Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff") and Defendants Akanoc Solutions, Inc.,

Managed Solutions Group, Inc. and Steve Chen (collectively "Defendants") submit the following

Joint Pretrial Conference Statement.

## I.   Claims and Defenses

### A.   Plaintiff's Claims

Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") claims the Defendants Managed Solutions Group, Inc., Akanoc Solutions, Inc. and their principal Steve Chen (collectively "Defendants") are liable for contributory infringement of registered trademarks and copyrights owned by Louis Vuitton.  Louis Vuitton is a manufacturer and distributor of luxury goods and it has been engaged in that business for over a hundred years.  Its trademarks, including LOUIS VUITTON, LV, the Monogram device trademark and others have been in use and registered with trademark authorities around the world for most of that time.  Certain designs have been registered as copyrights with the United States Copyright Office.  Louis Vuitton claims these trademarks and copyrights have been used to display, market, distribute and sell counterfeit and unauthorized merchandise on numerous websites hosted by Defendants and that the goods and services provided by Defendants were provided despite notice concerning the underlying counterfeiting activity.

### B.   Defenses

The Defendants deny that they or any of them engaged in any conduct that contributed to the infringement of any right of the Plaintiff.  The Defendants assert that most of the evidence relied upon by the Plaintiff is inadmissible for various reasons.  Even if the Plaintiff's proffered evidence is admitted, the Defendants assert that the Plaintiff cannot satisfy the elements of any claim of direct or contributory infringement or proof of any damages.  Akanoc Solutions, Inc. and Managed Solutions Group, Inc. are Internet hosting companies that provide access to the Internet to third party wholesale resellers of Internet hosting services.  Steve Chen is manager of the other two Defendants.  Their customers of Akanoc and MSG, in turn, resell Internet access services to third party retail users of the Internet. Akanoc and MSG bundle Internet hosting services for their wholesale customers consisting of access to a computer server, use of a group of Internet protocol (IP) addresses, and a quantity of Internet bandwidth that is obtained, in turn, from large

communications companies.  A package of these Internet access services is provided for a monthly service charge (typically $50 to $60 per month).  The wholesale customers of Akanoc and MSG are then free to resell the Internet access to their own retail customers.  To the best of the Defendants' knowledge, the third party retail users use the services for various uses including Internet telephone services, downloading software, Internet games, on-line data storage, and websites, among other uses.  The Defendants have no control over the uses made of the Internet by its wholesale customers or the retail customers of the wholesale customers and have no knowledge of the uses that may change frequently.

Akanoc and MSG never host any third party Website.  They do not design or provide any technical support to any Website. Akanoc and MSG operate like a telephone company in simply keeping the communications operating without any monitoring or control over any transmitted or stored content.  Akanoc and MSG provide only unmanaged Internet hosting services and are unlike ISPs that deal typically with individual customers or small businesses so they provide no management of content or service, except to keep the communication lines open.  No defendant participates in any business or revenue sharing with any wholesale customer or its retail customer. The low price per month for substantial bandwidth reflects the minimal services provided and competitive demands for unmanaged services.

No defendant has ever had any knowledge of any infringing conduct of any user of its services because they do not and cannot lawfully monitor customer activity.  But if anyone complains about abuse of Internet services, including alleged spamming or copyright or trademark infringement, Akanoc or MSG will notify their wholesale customer of the complaint and demand that the  customer remove the complained of content.  This is done without any investigation of the accuracy of any complaint because no defendant has the ability to verify or investigate such complaints and because there are substantial abuse reports made every day about some small fraction of the approximately 40,000 IP addresses rented to customers.  If there are repeated complaints about a customer's usage, other steps can be taken up to unplugging a server but this is not often done because there are likely to be hundreds or thousands of innocent third party users on

a server who would be harmed by such action.  Whenever the Plaintiff has complained about infringement, Akanoc or MSG has taken appropriate action, consistent with its protocol and industry practices.

Defendants contend they are "service providers" as that term is utilized in the Digital Millennium Copyright Act, 17 U.S.C. § 512 et seq., (DMCA) Plaintiff failed to substantially comply with notification requirements of the DMCA as to claimed infringements.  Defendants, are immune from liability for monetary relief pursuant to 17 U.S.C. § 512(a), (b), (c) and (d). Defendants' conduct is mandated by and compliant with the Stored Communications Act (18 U.S.C. §§ 2700-2712). Defendants' conduct as Internet service providers is privileged.

## II.  <u>Relief</u>

Louis Vuitton seeks entry of a permanent injunction enjoining Defendants from further contributory infringement of its intellectual property rights.  Louis Vuitton is also entitled to elect between statutory damages and actual damages under both the Copyright Act and the Trademark Act.  <u>Nintendo of America, Inc. v. Dragon Pacific Int'l, Inc., et al.</u>, 40 F.3d 1007, 1011 (9th Cir. 1994).  Under the Trademark Act, Defendants are liable for damages of up to $2,000,000 for each trademark willfully counterfeited or up to $200,000 for each trademark innocently counterfeited. Under the Copyright Act, Defendants are liable for damages of up to $150,000 for each copyright willfully infringed or up to $30,000 for each copyright innocently infringed.  In view of the wholesale nature of the counterfeiting activity (and the fact that Defendants are jointly and severally liable with each of the underlying counterfeiters whose illegal activities were aided by Defendants) and Louis Vuitton's claim that the underlying activities were willful, Louis Vuitton will seek up to either $30,000,000 or $300,000 in statutory damages.  In addition, Louis Vuitton may seek actual damages under the Copyright Act or Trademark Act in the form of profits Defendants derived from their contributory conduct.  Such actual damages are calculated based on the price charged by Defendants for server packages used to host infringing websites as well as such other service fees and charges as Defendants may levy.

Louis Vuitton will make its election at the time the matter is submitted to the jury.  Louis Vuitton will also seek its attorneys' fees and costs in connection with litigating this matter.

## III.   Undisputed Facts

1.) Louis Vuitton Malletier, S.A. is a corporation duly organized and existing under the laws of France.

2.) Akanoc Solutions, Inc. is a corporation duly organized and existing under the laws of California.

3.) Managed Solutions Group, Inc. is a corporation duly organized and existing under the laws of California.

4.) Racklogic Technologies, Inc. is a corporation duly organized and existing under the laws of California.

5.) Racklogic Technologies, Inc. supplies 95% of Akanoc Solutions, Inc.'s servers.

6.) Racklogic Technologies, Inc., Akanoc Solutions, Inc. and Managed Solutions Group, Inc. all share a business address at 45535 Northport Loop East, Fremont, California.

7.) Louis Vuitton Malletier, S.A. owns the following trademarks:

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) in a Circle Design | 286,345 |  | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 297,594 |  | 18 |
| LOUIS VUITTON | 1,045,932 | LOUIS VUITTON | 18 |

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) Design | 1,519,828 |  | 18 |
| LOUIS VUITTON MALLETIER A PARIS in Rectangle | 1,615,681 |  | 16, 18 |
| Louis Vuitton (Interlocked Letters) on Epi Leather Design | 1,655,564 |  | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Pattern Design | 1,770,131 |  | 25 |
| Louis Vuitton (Interlocked Letters) Design | 1,794,905 |  | 16, 25 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 1,875,198 |  | 16 |

| Trademark | Registration Number | Trademark Picture | Class of Goods |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) | 1,938,808 |  | 14, 24 |
| LOUIS VUITTON World Mark | 1,990,760 | LOUIS VUITTON | 16, 18, 24, 25 |
| Louis Vuitton (Interlocked Letters) Design | 2,291,907 |  | 34 |
| LOUIS VUITTON | 2,303,212 | LOUIS VUITTON | 34 |
| Louis Vuitton (Interlocked Letters) Design | 2,361,695 |  | 25 |
| LOUIS VUITTON PARIS and Damier (pattern design) | 2,378,388 |  | 18 |

8.) Each of the trademarks listed in above table is valid, effective and enforceable.

9.) Louis Vuitton Malletier, S.A. owns the following copyrights:

| **Copyright** | **Registration No.** | **Date Published** | **Date Registered** |
|---|---|---|---|

| Multicolor Monogram Black Print | VA 1-250-121 | 12/18/02 | 6/24/04 |
| Mutlicolor Monogram White Print | VA 1-250-120 | 12/18/02 | 6/24/04 |

10.) Each of the copyrights listed above is valid, effective and enforceable.

11.) Akanoc Solutions, Inc. filed an Interim Designation of Agent to Receive Notification of Claimed Infringement with the United States Copyright Office on 11/30/07 which is marked as Exhibit 54.

12.) Managed Solutions Group, Inc. filed an Interim Designation of Agent to Receive Notification of Claimed Infringement with the United States Copyright Office on 11/30/07 which is marked as Exhibit 55.

13.) The Exhibit 54 and Exhibit 55 filings were the first filings of such notices with the United States Copyright Office by any of the Defendants.

14.) Managed Solutions Group, Inc. is an Internet Service Provider based in Fremont, California.

15.) Akanoc Solutions, Inc. is an Internet Service Provider based in Fremont, California.

IV.    **Disputed Facts**

Plaintiff identifies the following disputed facts:

1.) That Defendants had actual or constructive knowledge of the infringing sites on their servers.

2.) That Defendants had the ability to stop the infringing sites.

3.) That Defendants have the ability to review content on their servers.

4.) That Defendants have authority to review content on their servers.

5.) The relationship between Defendants and their "customers."

6.) That Defendants did not respond to notices of infringement.

Louis Vuitton v. Akanoc, et al.: Joint Pretrial Conference Statement                    - 8 -

7.) That Defendants did not follow industry standards.

8.) That Defendants failed to employ responsible business practices to respond to notices of infringement received from plaintiff.

The Defendants dispute:

1.) Whether the underlying websites were infringing.

2.) Whether the underlying infringing websites, if any, were hosted by them.

3.) Whether Defendants received adequate notice of the underlying infringing websites, if any.

4.) That they have sufficient control over the websites to remove the infringing material.

5.) That Dediwebhost.com is owned and operated by Akanoc Solutions, Inc.

6.) That Akanoc.com is owned and operated by Akanoc Solutions, Inc.

7.) That Coloalacarte.com is owned and operated by Akanoc Solutions, Inc.

8.) Which, if any, trademarks were infringed?

9.) Which, if any copyrights were infringed?

10.) Who infringed Vuitton's trademarks?

11.) Who infringed Vuitton's copyrights?

12.) When did the trademark infringement take place?

13.) When did the copyright infringement took place?

14.) Whether products sold on the accused Websites infringed Vuitton's rights?

15.) Whether the products Louis Vuitton purchased were sold by an accused website using Akanoc's servers?

16.) Whether the products Louis Vuitton purchased were sold by an accused website using MSG's servers?

17.) Whether the relevant accused website was located in Akanoc's IP range at the time of sale?

18.)     Whether the relevant accused website was located in MSG's IP range at the time of sale?

19.)     Whether Akanoc acted reasonably after receiving Vuitton's notification of infringement?

20.)     Whether MSG acted reasonably or expeditiously to remove the infringing content after receiving Vuitton's notification of infringement?

21.)     Whether, for notices sent on or after November 30, 2007, Vuitton gave proper notice in writing to Akanoc or MSG as required under the Digital Millennium Copyright Act?

22.)     Whether Defendants are entitled to the protection of the "safe harbor" provision of the DMCA.

23.)     Whether, if Vuitton is able to show any direct copyright infringement, the Fair Use doctrine applies to any such infringement.

**V.      Agreed Statement of Facts**

The Parties agree that no part of this case can be tried based on upon an agreed statement of facts.

**VI.      Stipulations**

None.

**VII.      Disputed Law**

Louis Vuitton asserts that the law applicable to its claims for contributory infringement were articulated by the Court in its ruling against Defendants on their motion for summary judgment and that there is no disputed issue of law.  To the extent that the Defendants attempt to re-litigate the applicable legal standards at trial, these matters are law of the case and further litigation of these issues is precluded.  Jeffries v. Wood, 114 F.3d 1484, 1489 (9th Cir. 1997); Segal v. American Tel. & Tel. Co., 606 F.2d 842, 845 (9th Cir. 1979).

"The law of the case doctrine provides that 'a court is generally precluded from reconsidering an issue that has already been decided by the same court…'" U.S. v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998) citing U.S. v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted); see also Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993). Both the Supreme Court and the 9th Circuit have held that the law of the case doctrine applies to trial courts and precludes them from reconsidering an issue they have already decided, absent one of the five criteria discussed in Cuddy.  None of the exceptions to the doctrine apply to the Court's ruling on Defendants' Motion for Summary Judgment: 1) the first decision was not *clearly erroneous*; 2) there have been no intervening changes in the law; 3) the evidence is not substantially different; 4) no other changed circumstances exist; and 5) no manifest injustice would otherwise result. Cuddy, 147 F.3d at 1114.

"As most commonly defined, the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988) (quoting Arizona v. California, 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983)).  Law of the case differs from res judicata primarily in that res judicata is "typically applied to bar relitigation of a claim previously litigated in *another* suit, while the 'law of the case' doctrine ensures the finality of legal issues decided in an earlier proceeding in the *same* suit." Orantes-Hernandez v. Gonzales, 504 F. Supp. 2d 825, 836 (C.D. Cal. 2007).

In U.S. v. Estrada-Lucas the 9th Circuit held that "[a] decision of law in a case, once made, becomes the "law of the case," and should not be changed absent clear error in the original ruling or a change in the relevant circumstances." 51 F.2d 1261, 1263-64 (9th Cir. 1980).  "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" Christianson 486 U.S. at 816 (quoting 1B J. MOORE, J. LUCAS, & T. CURRIER, MOORE'S FEDERAL PRACTICE 118 (1984)). "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" Milgard Tempering v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990)

(quoting <u>Liberty Mutual Ins. Co. v. EEOC</u>, 691 F.2d 438, 441 (9th Cir. 1982)) (alteration in original).  The Court's ruling on the applicable legal standards of the case were absolutely necessary in denying portions of Defendants' Motion for Summary Judgment.  At this late stage, upsetting established and correct legal precedent would be unduly burdensome and prejudicial to Plaintiff and also contrary to the law of the case doctrine.  The legal standards set out in the Court's Ruling on Defendants' Motion for Summary Judgment should not be disturbed.

Defendants contend that the "law of the case" doctrine does not apply to the parties' disputed issues of law in this case because the Court, in its Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, did not specifically rule on the parties' disputed issues of law.  Also, Defendants contend that the "law of the case" doctrine does not apply in this case because this doctrine is limited to issues determined by the same court on appeal.  *United States v. Scrivner*, 189 F.3d 825, 827 (9th Cir.1999) ("The "law of the case" doctrine provides that "one panel *of an appellate court* will not as a general rule reconsider questions which *another panel* has decided on a prior appeal in the same case.") (emphasis added)

**Defendants identify the following disputed issues of law in addition to evidentiary issues:**

**2.      Whether Louis Vuitton is required to identify a direct infringer to be successful on its inducement of copyright infringement claims.**

Defendants contend Louis Vuitton is required to identify direct infringers in China. *See E-Pass Technologies, Inc. v. 3Com Corp.,* 473 F.3d 1213, 1222-23 (Fed.Cir.2007) (implying that in order to successfully make out an inducement of infringement claim based on direct infringement by a defendant's customers, the plaintiff should be able to point to at least one end user that infringed).

Louis Vuitton does not dispute that proof of an underlying direct infringement is necessary to succeed on its claims for contributory infringement.  <u>Perfect 10, Inc. v. Visa International Service Association, et al.</u>, 494 F.3d 788, 803-807 (9th Cir. 2007) (referencing underlying acts of unidentified "users", "third parties" and "offending websites" separate and apart from the defendants named in the case law).  There is no authority requiring Louis Vuitton to identify the

underlying infringer with particularity, especially where, as here, the infringer's ability to operate anonymously has been facilitated and advanced by the Defendants' own conduct.

**3.    Whether Vuitton must prove that each defendant materially contributed to direct copyright infringement by third parties.**

Defendants contend the law is clear that Vuitton must prove the each defendant materially contributed to direct copyright infringement by third parties. "[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer. [citations omitted] Put differently, liability exists if the defendant engages in personal conduct that encourages or assists the infringement. *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir.2001)

Louis Vuitton does not dispute this issue and asserts the evidence will demonstrate ample involvement by each of the named defendants.

**4.    Whether the Stored Communications Act (18 U.S.C. § 2701 et seq.) prohibits Internet Service Providers such as MSG and Akanoc from monitoring the content of their servers.**

Defendants contend that in addition the 11th Circuit has held the Stored Communications Act does not apply unless the Internet website "is configured in some way as to limit ready access by the general public".  *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1322 (11th Cir. 2006).  Evidence will demonstrate that the websites at issue are all publicly accessible and in fact depend upon the public access provided by Defendants.  In addition, the Stored Communications Act provides express limitation on liability for disclosure made pursuant to court processes.  *18 U.S.C. 2707*. Louis Vuitton has demonstrated that the Defendants authorities are inapposite, as outlined in its Reply in support of its motion to compel.  Docket No. 40.

Defendants contend MSG and Akanoc are prohibited by U.S. law from monitoring or viewing customer activity except for maintenance purposes or upon issuance of a search warrant. In 1996, Congress passed the Electronic Communications Privacy Act ("ECPA") in order "to ensure the security of electronic communications." *Quon v. Arch Wireless Operating Co., Inc.*, 309

F.Supp.2d 1204, 1207 (C.D.Cal. 2004)  Title II of the ECPA created the Stored Communications Act ("SCA").[1]  The SCA addressed "access to stored wire and electronic communication and transactional records." *Quon v. Arch Wireless Operating Co., Inc.,* 309 F.Supp.2d at 1207, citing to S.Rep. No. 99-541, at 3; 1986 U.S.C.C.A.N at 3557. "The ECPA's legislative history indicates that Congress passed the SCA to prohibit a provider of an electronic communications service 'from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient.'" *Quon v. Arch Wireless Operating Co., Inc.*, 309 F.Supp.2d at 1207, citing to S.Rep. No. 99-541, at 37; 1986 U.S.C.C.A.N at 3591.

Defendants contend the SCA prohibits Defendants from disclosing the contents of communications in electronic storage:

> A person or entity providing an electronic communication[2] service to the public **shall not** knowingly **divulge** to any person or entity the **contents** of a **communication** while **in electronic storage** by that service.[3] (emphasis added)

The Defendants contend they are subject to the SCA as electronic communication service providers defined by the SCA as "any service which provides to users thereof the ability to send or receive wire or electronic communications."[4]  MSG is governed by the SCA because they are Internet service providers whose servers, routers and cables carry Internet traffic and provide access to the Internet including the ability to send, receive and store electronic communications. *Dyer v. Northwest Airlines Corporations,* 334 F.Supp.2d 1196, 1199 (D.N.D. 2004) ("The . . .definition of 'electronic communications service' clearly includes Internet service providers such as America Online, as well as telecommunications companies whose cables and phone lines carry internet traffic.")

---

[1] Title I of the ECPA amended the Wiretap Act to adopt for the SCA the same definitions as used in the federal Wiretap Act. *See* 18 U.S.C. § 2711

[2] An " 'electronic communication' [is defined as:] any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." 18 U.S.C. § 2510(12).

[3] 18 U.S.C. § 2702(a)(1)

[4] 18 U.S.C. § 2510(15).

The Defendants contend the website files ordered produced are "electronic storage" under the SCA.  If the information sought by Louis Vuitton exists at all, it would only exist in electronic storage on the computer servers. The Ninth Circuit agrees that website information stored on a computer is "electronic storage" as defined by the SCA. *See Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 879 (9th Cir. (Cal.) 2002) ("The parties agree that the relevant 'electronic communications service' is Konop's Website, and that the website was in 'electronic storage.'")

Defendants contend section 2701(a) of the SCA creates criminal liability for obeying the Magistrate Judge's discovery order:

> Except as provided in subsection (c) of this section whoever—
> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
> (2) intentionally exceeds an authorization to access that facility;
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

Defendants contend they do not have authorization to access its customers' information on its servers. The only person who can give "authorization" under the SCA is a "user" of the service.[5]   A "user" is defined as one who uses the service and is duly authorized to do so.[6] Even being eligible to access a website or Internet service is not enough to qualify as a "user" under the SCA; one must have permission from the owner of the website and actually access the service in order to be able to give authorization under the SCA.[7]   Under this strict definition, neither the Defendants nor the Magistrate Judge can give authorization under the SCA because they are not "users" under the SCA.  The only "users" that can give authorization are the website owners.

Defendants contend the content on MSG's servers is SCA-protected because it is expressly configured **not** to be publically accessible.  This material is (1) stored on Defendants' Internet

---

[5]18 U.S.C. § 2701(c)(2)

[6]*Id.*

[7]*Konop*, 302 F.3d at 880 (holding that even a Hawaiian Airlines employee who was merely authorized to access Snow's website, but had not actually accessed it himself, was (1) not a "user" under the SCA and (2) could not give authority under the SCA to Hawaiian Airlines to access Snow's website using the employee's name.)

servers located in Defendants' secured, publicly inaccessible, San Jose, California facility[8] and (2) only accessible by Defendants' own customers because only those individual customers have the passwords[9] to access the servers.[10]

Defendants contend the Ninth Circuit has held that SCA protection applied to a website whose owner (a Hawaiian Airlines pilot) limited access to it by requiring users to input the names of Hawaiian Airlines pilots. *Konop*, 302 F.3d at 879-881. In that situation, access to the website by Hawaiian Airlines executives was found improper even when "authorized" by pilots who permitted their supervisors to use their identity to gain access to an anti-company site. *Snow v. DirecTV*, 450 F.3d 1314, 1322 (11th Cir. 2006) agreed that the *Konop* website was SCA-protected because its modest access restriction was sufficient to limit ready access by the general public.

Louis Vuitton contends that Defendants' efforts to re-litigate this issue should be summarily rejected. First, the matter has been considered and rejected by the Court in ruling upon Defendants' objections to Magistrate Judge Lloyd's order compelling production or inspection of servers and in ruling on Defendants' motion for summary judgment. Second, the defense has been waived by Defendants' failure to assert the defense in their Answer or to otherwise raise the purported defense except in response to Louis Vuitton's demands for production of documents. Third, Louis Vuitton's theory of liability is not predicated upon "monitoring" as contemplated by the Stored Communications Act.

**5.    Which *Sleekcraft* factors are relevant to the jury's determination of likelihood of confusion as to source of goods.**

---

[8]Declaration of Steve Chen in Opposition to Motion to Compel Production of Electronic Communications on Internet Servers ("Chen Decl.") ¶4.

[9]Chen Decl. ¶3

[10]The Magistrate Judge's Order states that "at the motion hearing, defendants also confirmed that their servers rotate in and out of use, that defendants initially assign passwords to their clients, and that defendants also re-set passwords when servers have been "returned" or "abandoned." (Order Granting Plaintiff's Motion to Compel Documents, fn 4, p.4) While this is true, the Magistrate Judge's order fails to mention that, while defendants do reset passwords when they reformat the hard drive and reconfigure returned or abandoned servers the passwords are then changed by customers once the servers are put back into use. Once the customers change the passwords, defendants are unable to access the server using the old password. [Chen Decl. ¶3].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants contend a likelihood of confusion must be established before liability for secondary trademark infringement can be established. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1173 (9th Cir. 2007) ("The core element of trademark infringement is whether customers are likely to be confused about the source or sponsorship of the products."). *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-349 (9th Cir. 1979) lists eight factors that may be considered by a jury to establish likelihood of confusion. The *Sleekcraft* factors are: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion into other markets." citing *McCord*, 452 F.3d at 1136, n. 9.

Defendants contend only those factors that are relevant to the particular case should be considered by the jury. *Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir. 1993) ("Because each [*Sleekcraft*] factor is not necessarily relevant to every case, this list functions as a guide and is 'neither exhaustive or exclusive."); *Brookfield Communications v. West Coast Communications,* 174 F.3d 1036, 1054 (9th Cir.1999) ("Some factors are much more helpful than others, and the relative importance of each individual factor will be case specific . . . . [I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors.")

Plaintiff states that though the likelihood of confusion is a factual determination normally made using the <u>Sleekcraft</u> eight factor test, in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination because counterfeit marks are inherently confusing, thus, "if they were used with identical products or services, likelihood of confusion would follow as a matter of course." <u>Brookfield Communs. v. W. Coast Entm't Corp.</u>, 174 F.3d 1036, 1056 (9th Cir. 1999); <u>Phillip Morris USA Inc. v. Shalabi</u>, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004); <u>see</u> <u>Lindy Pen Co. v. Bic Pen Corp.</u>, 796 F.2d 254, 256-57 (9th Cir. 1986) (reversing a district court's finding of no likelihood of confusion even though the six other likelihood of confusion factors all weighed against a finding of likelihood of confusion)); <u>Shakespeare Co. v. Silstar Corp. of Am.</u>**,** 110 F.3d

234, 241 (4th Cir. 1997) (presumption exists when intent to pass off exists); <u>Polo Fashions, Inc. v. Craftex, Inc.</u>, 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."); <u>Phillip Morris USA Inc. v. Felizardo</u>, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ("counterfeit marks are inherently confusing"); <u>Gucci America, Inc. v. Duty Free Apparel, Ltd.</u>, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("counterfeits by their very nature, cause confusion"); <u>Microsoft Corp. v. Software Wholesale Club, Inc.</u>, 129 F. Supp. 2d 995 (S.D. Tex. 2000) (multifactor test unnecessary because "in the case of a counterfeit mark, likelihood of confusion is clear").

**6.      Whether the alternative element of contributory copyright infringement, "whether a defendant continued to supply an infringing *product* to an infringer with knowledge that the infringer is mislabeling the particular product supplied," applies if a defendant allegedly supplied a *service* rather than a product.**

Defendants contend *Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 807 (9th Cir. 2007) is clear that the alternative second prong of the *Inwood Labs* test for contributory trademark infringement does not apply if the defendant supplies a service, rather than a product:

> "To be liable for contributory trademark infringement, **a defendant must have** (1) "intentionally induced" the primary infringer to infringe, or (2) **continued to supply an infringing *product* to an infringer** with knowledge that the infringer is mislabeling the particular product supplied. [citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 855 (1982)].

Defendants contend Element 2 does not apply because it is undisputed that MSG and Akanoc supply a *service.* They do not supply a product to any alleged infringers.

Louis Vuitton contends that Defendants supply goods and services which directly relate to the rampant infringing activity occurring on their servers.  As stated by the Court, "MSGI owns most of the hardware and Akanoc is primarily charged with operating it."  Judge Ware's Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, C07-03952 JW, 2:12-13 (Filed December 23, 2008) [hereinafter "Summary Judgment Ruling"].  Defendants' sell

their goods including their hardware or server space, and they also supply services by maintaining dedicated access to those goods, among other things.

Louis Vuitton states that in addition to other applicable law on the material contribution prong, current Ninth Circuit standards for contributory liability would apply to Defendants even if they provided only a service in that "a computer system operator can be held contributorily liable if it has actual knowledge that specific infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works."  Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1172 (9th Cir. 2006); see also A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1021 (9th Cir. 2001) (in the context of a provider of Internet access or services, "if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement," finding liability for knowledge, assistance and failure to block access to infringing content); see also Religious Technology Center v. Netcom On-Line Communication Services, Inc., 907 F. Supp. 1361, 1374 (N.D. Cal. 1995) (finding electronic bulletin board operator contributorily liable for failing to delete an infringing post).

**7.    Whether the "direct control and monitoring" test for contributory trademark infringement applies if the alleged direct infringer supplies a *product* rather than a service.**

Defendants contend that the direct control and monitoring test only applies if the *direct infringer* (not the defendant) supplies a *service* rather than a product.  In this case, the alleged direct infringers supply only products (alleged counterfeit goods). *Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 807 (9th Cir. 2007) explains that if the second element of contributory trademark infringement applies because the *defendant* continued to supply an infringing *product* to an infringer, and further if the *direct infringer* supplies a *service* rather than a product, for liability to attach there must be "direct control and monitoring of the instrumentality used by the third party to infringe:

> "When the alleged **direct infringer** supplies a **service** rather than a
> product, under the second prong of this test, the court must "consider

the extent of control exercised by the defendant over the third party's means of infringement." [citing *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir.1999)] **For liability to attach, there must be [d]irect control and monitoring** of the instrumentality used by a third party to infringe the plaintiff's mark." *Id.*

*Visa Int'l*, 494 F.3d at 807

Defendants contend that the 'direct control and monitoring' test does not apply not only because the defendants supply a service rather than a product.  It also does not apply because the alleged direct infringers supply a product rather than a service.

Defendants supply both goods and services to infringers.  Additionally, Louis Vuitton states that it is not precluded to show the extent of control by Defendants of the infringing means for purposes of contributory infringement depending on whether the underlying infringement is a product or service.  The standard for contributory trademark infringement is that a plaintiff must establish that the defendant (1) intentionally induced the primary infringer to infringe or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied.  Perfect 10, Inc. v. Visa Int'l Service Assoc., et al., 494 F.3d 788, 807 (9th Cir. 2007).  In Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 983 (9th Cir. 1999), "the Ninth Circuit held that even though an internet service provider did not supply a "product" to infringing third parties, the court should "consider the extent of control exercised by the defendant over the third party's means of infringement…[a]ccordingly, when a defendant offers a service instead of a product, a plaintiff can base its contributory trademark infringement claim on the "extent of control" theory or the "intentional inducement theory".  Summary Judgment Ruling 15:1-18.

**8.      Whether the "willfully blind" approach to proving contributory trademark infringement applies in this case.**

Defendants contend one way for a plaintiff to demonstrate 'direct control and monitoring' by defendants is to show that the defendants were willfully blind to infringing activity:

**Direct control and monitoring** of the instrumentality used by a third-party to infringe the plaintiff's mark can lead to liability. . . **This**

1

**second test can be met where one** knows or has reason to know of the infringing activity, and **[is] 'willfully blind' to such activity**. *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146, 1188-1189 (C.D.Cal. 2002)

2

3

4    Defendants contend the "direct control and monitoring" test does not apply here because the

5    alleged direct infringers supply a *product* rather than a *service*. See *Visa Int'l,* 494 F.3d at 807.  As

6    a result, the "willfully blind" approach does not apply here either.

7         Louis Vuitton states Defendants' contentions are at odds with principles of law already

8    articulated in this case by the Court in ruling on their motion for summary judgment.  Internet

9    service providers like the Defendants can not remain willfully blind to trademark infringement

10   taking place on their premises.  Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 265 (9th Cir.

11   1996); Summary Judgment Ruling 16:20-17:5 ("Defendants physically host websites on their

12   servers and route internet traffic to and from those websites…As with the flea market operators in

13   Fonovisa, Defendants cannot remain "willfully blind" to trademark infringement taking place on

14   their servers.").

15        **9.      Whether Louis Vuitton can prove direct infringement by showing violation of**

16   **one or more of Louis Vuitton's exclusive rights under the Copyright Act per 17 U.S.C. § 106.**

17        Defendants contend the elements of direct copyright infringement are (1) ownership of the

18   allegedly infringed material and (2) violation of an exclusive right granted to copyright holders

19   under 17 U.S.C. § 106.  *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir.2001)

20        17 U.S.C. § 106 provides that the owner of a copyright has the exclusive rights to do and to

21   authorize any of the following:

22        (1) to reproduce the copyrighted work in copies or phonorecords;

23        (2) to prepare derivative works based upon the copyrighted work;

24        (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or

25   other transfer of ownership, or by rental, lease, or lending;

26        (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

27   motion pictures and other audiovisual works, to perform the copyrighted work publicly;

28        (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

Defendants contend Louis Vuitton cannot claim violation of any exclusive rights under 17 U.S.C. § 106 (and satisfy this element of direct infringement) because it cannot identify any infringement, any direct infringers or prove that any infringement of copyrights took place at any Website hosted on Defendants' servers.

Louis Vuitton states this is not a disputed issue of law and that proof of underlying direct infringement is an element of its cause of action for contributory copyright infringement. The offer for sale, display, distribution and sale of product embodying unauthorized ("replica") copies of Louis Vuitton's copyrights will be proved.

**10. Whether Defendants are liable for statutory damages under the Copyright Act and Trademark Act and to what extent.**

Under the Copyright Act, "Where two or more persons have joined in or contributed to a single infringement of a single copyright, they are all jointly and severally liable, and in such circumstances, in a single infringement action there is but a single set of statutory damages (with one minimum) for which all such persons are liable. Even if the infringement is willful, joint and several liability has still been applied." Nimmer on Copyright §14.04 [E][2](d). If the defendant's infringement "copies from several different copyrighted works owned by the plaintiff, the applicable minimum damages can be multiplied by the number of such infringed copyrights." Nimmer on Copyright §14.04 [E](1).

The Trademark Act allows for the award of statutory damages for use of counterfeit marks per counterfeit mark per type of goods or services sold, offered for sale or distributed as the court considers just. 15 U.S.C. 1117 (c). Thus, Plaintiff contends that each of Plaintiff's trademarks that are adjudged to have been infringed would be entitled to a separate statutory damage award against Defendants should Plaintiff elect to pursue statutory damages in the trademark context.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**11.     Whether MSG's and Akanoc's computer servers are capable of substantial non-infringing uses.**

Defendants contend "Liability for contributory copyright infringement attaches when "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146, 1169 (C.D.Cal.2002), citing *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir.2001) ("Napster II").

Defendants contend because defendants' computer servers are capable of substantial non-infringing uses, they cannot be deemed to have constructive knowledge of infringing activity for purposes of liability for contributory copyright infringement. See *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020-1021 (9th Cir. 2001) ("The *Sony* Court declined to impute the requisite level of knowledge where the defendants made and sold equipment capable of both infringing and "substantial noninfringing uses. . . We are bound to follow *Sony*, and will not impute the requisite level of knowledge to Napster merely because peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights.")

See also *Perfect 10 v. Google, Inc.,* 416 F.Supp.2d 828, 853 (C.D.Cal.2006) ("Under *Sony*, Google cannot be deemed to have constructive knowledge of infringing activity since its search engine clearly is capable of commercially significant noninfringing uses.")

Defendants contend, as a result, to prevail Vuitton must prove each defendant had *actual* knowledge of direct infringement. See *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 (9th Cir. 2001) ("[A]ctual, specific knowledge of direct infringement renders *Sony's* holding of limited assistance to a defendant seeking to avoid contributory liability.")

Louis Vuitton contends that this is not an issue for decision in this case as Louis Vuitton does not challenge the technology or package of goods and services offered by Defendants but only their failure to take appropriate steps to disable specific acts of infringement as contemplated by applicable standards of contributory liability.  Louis Vuitton contends that the Court has already

ruled on the application of this doctrine (and against Defendants) on the Motion for Summary Judgment.

**12.)   Whether Defendants are entitled to the protection of the "safe harbor" provisions of the DMCA.**

Defendants contend:  The Defendants are entitled to the benefit of the "safe harbor" provisions of the DMCA, 17 U.S.C. § 512(a), (b), (c) and (d) as to some or all alleged infringements.

Louis Vuitton contends that the safe harbor provisions of the DMCA have no application to Louis Vuitton's claim for contributory copyright infringement, that the Defendants will be unable to prove their compliance with the conditions required for safe harbor immunity, and, even if they were otherwise eligible, their failure to act expeditiously to remove infringing material deprives them of this defense.

**13.   Whether Akanoc's and MSG's Internet hosting services entail the kind of 'direct control and monitoring' required to justify an extension of *Inwood's* "supplies a product" requirement to the instant action.**

Defendants contend contributory trademark infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or **supplies a product** to a third party **with actual or constructive knowledge** that the product is being used to infringe the service mark. *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 853-54 (1982)

Defendants contend that when measuring and weighing a fact pattern in the contributory infringement context without the convenient "product" mold dealt with in *Inwood Lab.*, "we consider the extent of control exercised by the defendant over the third party's means of infringement." *Hard Rock Café Licensing Corporation v. Concession Services, Inc.,* 955 F.2d 1143, 1148-49 (noting the common-law responsibilities of a landlord regarding illegal activity on a rented premises); see *Fonovisa,* 76 F.3d at 265 (adopting *Hard Rock 's* analysis). Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of *Inwood Lab.'s* "supplies a product" requirement for contributory infringement.

Defendants contend but the provision of Internet hosting services does not entail the kind of direct control and monitoring required to justify the extension of the "supplies a product" rule to Internet hosting.  See *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 985 ("In an attempt to fit under *Fonovisa's* umbrella, Lockheed characterizes NSI's service as a licensing arrangement with alleged third party infringers.  Although we accept Lockheed's argument that NSI licenses its routing service to domain-name registrants, the routing service is just that – a service. In *Fonovisa* and *Hard Rock*, by contrast, the defendants licensed *real estate* with the consequent direct control over the activity that the third party alleged infringers engaged in on the premises.")

Louis Vuitton contends the applicable standards are well supported by case law and have been articulated by the Court in ruling on Defendants' motion for summary judgment and are binding under the law of the case doctrine.

## VIII.  <u>Witnesses</u>

Plaintiff anticipates calling the following witnesses:

1.) Nikolay Livadkin, Anti-Counterfeiting Coordinator, LVMH Fashion Group

2.) Robert Holmes, Principal, IPCybercrime.com, LLC

3.) Joseph T. Murin, Senior eDiscovery Consultant, Guidance Software Inc.

4.) Phil Cooper, eDiscovery Technical Manager Professional Services Division, Guidance Software, Inc.

5.) Michael B. Wilson, Senior Enterprise Consultant, Guidance Software Inc.

6.) Steve Chen, Defendant

7.) Juliana Luk, employee of Defendant

Defendants anticipate calling the following witnesses:

1.) Steve Chen

2.) Will Lone

3.) Andrew Cheng

4.) Juliana Luk

5.) Richard Gralnik

6.) Any witness listed or called by Plaintiff.

Expert witness discovery is not yet completed nor is the time for designation for rebuttal expert testimony elapsed. Accordingly, the parties note the possibility of further witness and exhibit designations in connection with the pending expert discovery.

## IX.    Evidence

The Parties have prepared the attached lists of anticipated exhibits.

Plaintiff reserves the right to supplement as provided by the Court based on Magistrate Judge Lloyd's granting of Plaintiff's Motion to Compel Inspection and further orders regarding the same.  Plaintiff also reserves the right to supplement any new evidence obtained after the filing of its exhibit list.  Defendants object to Plaintiff's "reservation of rights" and contend that Plaintiff has thus far failed to provide to Defendants any of the files, allegedly collected during its inspection, that it intends to use as exhibits at trial.

Plaintiff anticipates using excerpts from the Deposition Transcript of Juliana Luk, as well as Defendants' Responses to Plaintiff's Requests for Admissions.

## X.    Any Other Matters

None.

Dated:  June 5, 2009                 J. Andrew Coombs, A Professional Corp.

_____/s/ Annie S. Wang_____
By:    J. Andrew Coombs
        Annie S. Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

Dated:  June 5, 2009                 Gauntlett & Associates

_____/s/ James A. Lowe_____
By:    David A. Gauntlett
        James A. Lowe
Attorneys for Defendants Akanoc Solutions, Inc.,
Managed Solutions Group, Inc. and Steve Chen