J. Andrew Coombs (SBN 123881)
*andy@coombspc.com*
Annie S. Wang (SBN 243027)
*annie@coombspc.com*
J. Andrew Coombs, A P. C.
517 East Wilson Avenue, Suite 202
Glendale, California 91206
Telephone:  (818) 500-3200
Facsimile:   (818) 500-3201

Attorneys for Plaintiff Louis
Vuitton Malletier, S.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

| | |
|---|---|
| Louis Vuitton Malletier, S.A., | ) Case No.: C 07 3952 JW (HRL) |
| Plaintiff, | ) OPPOSITION OF PLAINTIFF LOUIS |
| v. | ) VUITTON MALLETIER, S.A. TO |
| | ) DEFENDANTS' MOTION IN LIMINE |
| Akanoc Solutions, Inc., et al. | ) NO. 11 TO BAR NON-RELEVANT |
| | ) EVIDENCE AT TRIAL; DECLARATION |
| Defendants. | ) OF J. ANDREW COOMBS IN SUPPORT |
| | ) |

## INTRODUCTION

Recognizing the inevitable liability which will undoubtedly attach once any trier of fact is presented with the evidence of Defendants' systematic, pervasive and intentional participation in thousands of separate acts of direct infringement, Defendants fail to recognize any limits in their efforts to prevent the introduction of that evidence.  Throughout the litigation, Defendants have consistently obstructed discovery and delayed or failed to produce relevant, requested discovery – in some cases only doing so after repeated motion practice and orders compelling production.

Now, in the pre-trial phase, having witnessed the ordered inspection of a mere handful of servers which reveals widespread infection of their hardware with an array of illegal conduct far exceeding that which was expressly alleged in the First Amended Complaint, Defendants go to extreme lengths to prevent the presentation of Plaintiff's case.  Defendants' unsupported and ill-considered motion to "pare" down Plaintiff's allegations was denied, without the necessity of oral argument.  Docket No. 167.  Now, Defendants improperly seek essentially the same relief on the

Dockets.Justia.com

same grounds, except they purport to extend this relief to "any evidence" Plaintiff may seek to introduce at trial.

The fundamental premise of Defendants' motion is flawed: evidence of Internet offers for sale published to American consumers and evidence of completed sales is highly probative on the elements of Plaintiff's claims which, Defendants concede, entails proof of the underlying direct infringement.

Defendants' "request that the Court enter an order precluding Louis Vuitton from presenting any evidence at trial"[1] is also facially overbroad and particularly in bad faith given Defendants' stated data losses and fabricated inabilities to produce discoverable material within their possession and control, culminating in the court-ordered server inspection.[2]  Defendants produced little to no evidence, despite their obligation and ability to do so, and are now pursuing twelve (12) motions in limine in the hopes that Plaintiff's independently developed evidence will be deemed inadmissible.

Defendants improperly seek to benefit from a situation of their own making: "It is fundamental that a party that does not provide discovery cannot profit from its own failure…and may be estopped from 'supporting or opposing designated claims or defenses.'" General Atomic Co. v. Exxon Nuclear Co., 90 F.R.D. 290, 1981 U.S. Dist. LEXIS 9374, at *60 (S.D. Cal. April 23, 1981) (quoting Dellums v. Powell, 566 F.2d 231, 235 (D.C. Cir. 1977)).  This motion blatantly and unfairly seeks an advantage due to Defendants' own bad faith discovery failures and should be denied for that reason.

### A.    The Rules of Evidence Favor Admissibility

Motions in limine should be granted sparingly.  Alliance Fin. Capital, Inc. v. Herzfeld, 2007 Bankr. LEXIS 4511, at *2 (N.D. Ga. December 17, 2007) citing Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975); Middleby Corp. v. Hussmann Corp. 1992 U.S. Dist. LEXIS 13138, at *9-10 (N.D. Ill. August 27, 1992).  "A pretrial motion in limine forces a court to

---

[1] As unbelievable as it is, this entire quotation is a direct, unedited quote.  Motion No. 11, p. 4:5-6.
[2] Defendants also seek to exclude the data extracted from their own servers pursuant to Court Order in their Motion in Limine No. 12.

decide the merits of introducing a piece of evidence without the benefit of the context of trial." CFM Communs., LLC v. Mitts Telecasting Co., 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005); see also U.S. v. Marino, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence).

Evidence should be "excluded on a motion in limine only if the evidence is *clearly* inadmissible for any purpose" (internal quotations omitted, emphasis added).  Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc., 2006 U.S. Dist. LEXIS 42159, at *14 (N.D. Cal. June 12, 2006).  This means Defendants will have to overcome the well established policies favoring admissibility.  Daubert v. Merrell Dow Pharms., 509 U.S. 579, 587 (1993) ("The Rules' basic standard of relevance thus is a liberal one."); U.S. v. Curtin, 489 F.3d 935, 942 (9th Cir. 2007) citing Huddleston v. United States, 485 U.S. 681, 688-89 (1988) (the version of Rule 404(b) which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court version."); see also U.S. v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (relief against admissibility under Rule 403 should be granted sparingly); U.S. v. Fleming, 215 F.3d 930, 939 (9th Cir. 2000) (Rule 403 favors admissibility); U.S. v. Hankey, 203 F.3d 1160, 1172 (9th Cir.  2000) ("the application of Rule 403 must be cautious and sparing"); Fed. R. Evid. 102 Adv. Comm. Notes ("rules are to be liberally construed in favor of admissibility" within the bounds of the Rules to achieve goals of "speedy, inexpensive, and fair trials designed to reach the truth").  Defendants fail to meet their burden given the probative value of the evidence, the Rules, sound case law, and in light of these policies.

**B.** **Relevance is a Liberal Standard that Louis Vuitton Exceeds With Its on Point Evidence of Defendants' Contributory Liability Through Continued Hosting of Infringing Websites Despite Notice.**

The evidence Defendants seek to exclude meets the liberal standard of relevance consistently relied upon and cited by the United States Supreme Court.  Daubert, 509 U.S. at 587 ("basic standard of relevance…is a liberal one").  In a dissenting opinion, four justices of the Supreme Court described the Federal Rules of Evidence to have changed from the common law "in

the direction of flexibility," which, "liberalizes the rules for admission of relevant evidence." Tome v. United States, 513 U.S. 150, 174 (1995) (dissenting opinion by Justice Breyer, with whom The Chief Justice, Justice O'Connor, and Justice Thomas joined).  While the trial judge is relied upon to keep "the barely relevant, the time wasting, and the prejudicial from the jury," Id. citing United States v. Abel, 469 U.S. 45, 54 (1984), evidence that speaks directly to the elements of the claims at issue should be clearly admissible if otherwise acceptable under the Rules.  Thus, Fed. R. Evid. 401 and 402 that admit evidence that has "any tendency to make the existence of any fact that is of consequence…more probable or less probable than it would be without the evidence" is a low threshold that Louis Vuitton easily surpasses.

There can be little more relevant to this case for contributory copyright and trademark infringement than evidence of the hosting and continued hosting by Defendants of infringing websites despite notice.  Louis Vuitton seeks to introduce evidence of Defendants' advertisements and policies, counterfeit Louis Vuitton products sold by websites hosted by Defendants, instances of notice, and Defendants' continued hosting of infringing websites despite notice.  The determination of relevance here is straightforward and most all of the evidence offered by Louis Vuitton meets and exceeds the requisite showing of "any tendency."  Fed. R. Evid. 401.  Louis Vuitton's evidence is not ancillary or inconsequential to its claims, its evidence is fundamental and incriminating.

Even in light of the "broad discretion" trial judges have to determine relevance, the high probative value of the evidence offered by Louis Vuitton exceeds the standard required by the Rules to address Defendants' contributory infringement.  Wood v. Alaska, 957 F.2d 1544, 1550 (9th Cir. 1992) (discussed as part of 6th Amendment violation inquiry).  The Court should deny Defendants' Motion No. 11 in its entirety.

/ / /

/ / /

C. **Louis Vuitton's Evidence is Sufficiently Probative for a Relevance Inquiry to Prove the Elements of Direct Copyright and Trademark Infringement.**

Aside from its relevance to contributory liability, the evidence Defendants' seek to exclude by Motion No. 11 is relevant to prove direct infringement under both theories of copyright and trademark infringement.

a. **Copyright Infringement**

To prove direct copyright infringement, a plaintiff must show ownership of the copyright and a violation of one of the exclusive rights of copyright. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); 17 USC §§ 106, 501. Louis Vuitton has identified its United States Copyrights as exhibits and Defendants do not appear to challenge their validity. In light of the presumption of validity afforded to registrations, Louis Vuitton's ownership of the valid copyrights is satisfied.

Defendants' "customers" have violated several of the exclusive rights of copyright including copying and the right to distribute copies. Unlike in Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. 1990), where direct evidence of copying was unavailable, Id., here, direct evidence of copying and distribution exists in the website printouts depicting pirated copies of Plaintiff's valid copyrighted designs, admissions from some of those printouts that the products are "replica" or "mirror-images" of the real thing, and the pirated products themselves that were purchased from the infringing websites. Louis Vuitton's witness, Mr. Livadkin, has testified and anticipates testifying at trial that he is able to identify counterfeit and pirated products from their offers alone. Declaration of J. Andrew Coombs ("Coombs Decl.") at ¶ 2 (Declaration of Nikolay Livadkin at ¶¶ 5-6). There could be little more probative on direct infringement of copying and distribution than the unauthorized website offers themselves and the survey of piratical products that was purchased from the infringing websites.

While Louis Vuitton's evidence is probative to prove unlawful copying and distribution by the infringing websites that were hosted by Defendants in violation of the Copyright Act, the same evidence is also probative to prove violation of the public display right specifically. 17 USC §

106(5).  Displaying a work "publicly" means (1) displaying it in a public "place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate…a display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the…display receive it in the same place or in separate places and at the same time or at different times."  17 USC § 101.

"The concept of display is broad."  <u>Playboy Ent. v. Frena</u>, 839 F. Supp. 1552, 1556-57 (M.D. Fla. 1993) (naming a computer system specifically as a means to complete a "public display" under the Copyright Act); <u>see also</u> <u>On Command Video Corp. v. Columbia Picture Industries</u>, 777 F. Supp. 787, 789-90 (N.D. Cal. 1991) (finding non-public nature of place of viewing having no bearing on whether members of the "public" had access).  The websites stored the infringing images on Defendants' servers, the images were publicly available due to acts by the website operator and Defendants, and the websites openly displayed their infringing products for sale to the general public.  Coombs Decl. at ¶¶ 2-4.  Even if Louis Vuitton viewed, captured and printed out the website content from a non-public place, the public accessibility of the content that is located on Defendants' servers creates the violation.  This interpretation of the "public display" clause is in line with Ninth Circuit jurisprudence.  <u>Perfect 10, Inc. v Amazon.com, Inc.</u>, 508 F.3d 1146, 1159-60 (9th Cir. 2007) (endorsing "server test" that finds a public display in violation of a copyright owner's exclusive right when infringer stores and displays infringing image).  Thus, the website displays of Defendants' "customers" of the infringing offers fall squarely within the Copyright Act's definition of public display in violation of Louis Vuitton's exclusive rights.

Thus, the evidence objected to by Defendants is properly admitted and Defendants' Motion No. 11, properly denied.

**b.  <u>Trademark Counterfeiting</u>**

Willful trademark infringement occurs when one intentionally uses a counterfeit mark in commerce, knowing the mark was counterfeit, in connection with the sale, offering for sale, or distribution of goods that was likely to confuse or deceive.  See 15 U.S.C. Section 1114(1)(a);

1    Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 899 (9th

2    Cir. 1997) ("Section 1114 of the Lanham Act, which establishes the trademark counterfeiting cause

3    of action, prohibits the use of 'any reproduction, counterfeit, copy, or colorable imitation of a

4    registered mark in connection with the sale ... of any goods ... [where] such use is likely to cause

5    confusion ... or to deceive.'").

6         Controlling decisions have found sufficient contacts and effects on interstate commerce for

7    even wholly extraterritorial acts in violation of the Lanham Act.  See Steele v. Bulova Watch Co.,

8    344 U.S. 280, 286 (1952) (describing Lanham Act jurisdictional grant as "broad"); Reebok Int'l v.

9    Marnatech Enters., 970 F.2d 552, 554-55 (9th Cir. 1992) citing Ocean Garden v. Marktrade Co.,

10   953 F.2d 500, 503 (9th Cir. 1991) ("The sales of infringing goods in a foreign country may have a

11   sufficient effect on commerce to invoke Lanham Act jurisdiction.").  Therefore, the websites

12   themselves and the counterfeit and pirated purchases fulfill the prerequisite of interstate commerce

13   because the content of the websites is located in San Jose, California on Defendants' servers, the

14   website operators contracted with Defendants in San Jose and presumably send payment to San

15   Jose, and the products were purchased through various websites by Louis Vuitton's investigator in

16   Texas.  Coombs Decl. at ¶¶ 3-4.

17        There is a presumption of a likelihood of confusion, or a likelihood of confusion as a matter

18   of law, when the offending mark is a counterfeit mark, or a mark virtually identical to a previously

19   registered mark coupled with the intent to pass off or borrow from established good will.

20   Brookfield Communs. v. W. Coast Entm't Corp., 174 F.3d 1036, 1056 (9th Cir. 1999) ("In light of

21   the virtual identity of marks, if they were used with identical products or services likelihood of

22   confusion would follow as a matter of course."); Shakespeare Co. v. Silstar Corp. of Am., 110 F.3d

23   234, 241 (4th Cir. 1997) ("Our cases make clear, however, that that presumption arises only where

24   the intentional copying is motivated by an "intent to exploit the good will created by an already

25   registered trademark""); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987)

26   ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the

27   popularity of, and demand for, another's product, there is a presumption of a likelihood of

28

confusion."); see Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 256-57 (9th Cir. 1986)  (reversing

a district court's finding of no likelihood of confusion even though the six other likelihood of

confusion factors all weighed against a finding of likelihood of confusion);  Phillip Morris USA

Inc. v. Shalabi, 352 F. Supp. 1067, 1073 (C.D. Cal. 2004) citing Phillip Morris USA Inc. v.

Felizardo, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ("However, "in cases

involving counterfeit marks, it is unnecessary to perform the step-by-step examination . . . because

counterfeit marks are inherently confusing.");  Phillip Morris USA Inc. v. Felizardo, 2004 U.S.

Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ("[C]ounterfeit marks are inherently

confusing.")**;** Gucci America, Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y.

2003); ("[C]ounterfeits by their very nature, cause confusion…Indeed, confusing the customer is

the whole purpose of creating counterfeit goods."); Microsoft Corp. v. Software Wholesale Club,

Inc., 129 F. Supp. 2d 995, 1007 fn. 11 (S.D. Tex. 2000) ("However, in the case of a counterfeit

mark, likelihood of confusion is clear."); Dial-A-Mattress Operating Corp. v. Mattress Madness,

Inc., 841 F. Supp. 1339, 1346 (E.D.N.Y. 1994) ("Moreover, confusion is simply inevitable since

the parties are selling the same products in the same channels of commerce under the guise of the

identical Dial-A-Mattress mark.").  Thus, the infringing website offers and the counterfeit products

themselves are properly offered to satisfy, as a matter of law, confusing similarity.

  There is no question of the relevance of the evidence of infringing websites and their

infringing offers or the purchase of knock-off products from these websites.  Defendants' Motion

No. 11 should be denied.

   **D.**   **A Preclusion Order of the Magnitude Defendants' Seek Would be Too**
          **Sweeping.**

   Aside from its lack of merit, Defendants' Motion No. 11 seeks relief that is impermissibly

broad.  A motion in limine may properly be denied where it is too sweeping in scope. Weiss v. La

Suisse, Societe d'Assurances sur la Vie, 293 F. Supp. 2d 397, 407 (S.D.N.Y. 2003) citing Baxter

Diagnostics, Inc. v. Novatek Medical, Inc., 1998 U.S. Dist. LEXIS 15093, No. 94 Civ. 5220, 1998

WL 665138 at *3 (S.D.N.Y. Sept. 25, 1998).  Defendants' blanket request to exclude all of Louis

Vuitton's evidence, despite its facially probative value, is exactly the kind of over-inclusive relief courts have refused.  This relief is inherently unfair.  Without cause, the result of a preclusion order of the magnitude requested by Defendants would effectively rob Louis Vuitton of its constitutionally and statutorily based intellectual property rights as it would be unable to enforce them.  Such a result would be constitutionally violative and is an improper use of a motion in limine.  Defendants' motion, even if it was supported by the facts of this case, should be denied as inappropriate and improperly sweeping.

For the foregoing reasons, Defendants' Motion No. 11 should be denied.

Dated:  June 22, 2009                              J. Andrew Coombs, A Professional Corp.


_____/s/ J. Andrew Coombs_____
By:     J. Andrew Coombs
        Annie S. Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

## DECLARATION OF J. ANDREW COOMBS

I, J. Andrew Coombs, declare as follows:

1.       I am an attorney at law duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California.  I am counsel of record for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") in an action styled Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al., Case No. C 07 3952 JW.  I submit this declaration in support of Plaintiff's Opposition to Defendants' Motion in Limine No. 11.  Except as otherwise stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows.

2.       Attached Exhibit A is a true and accurate copy of an excerpt from the Declaration of Nikolay Livadkin in Support of Opposition to Defendants' Motion for Summary Judgment.

3.       Attached Exhibit B is a true and accurate copy of the Declaration of Robert Holmes in Support of Opposition to Defendants' Motion for Summary Judgment.

4.       Attached Exhibit C is a true and accurate copy of portions of the transcript from the deposition testimony of Robert L. Holmes, which took place on or about April 1, 2008.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of June, 2009, at Glendale, California.


_____/s/ J. Andrew Coombs_____
J. ANDREW COOMBS

# EXHIBIT A

1   J. Andrew Coombs  (SBN 123881)
    *andy@coombspc.com*
2   Annie S. Wang (SBN 243027)
    *annie@coombspc.com*
3   J. Andrew Coombs, A Prof. Corp.
    517 E. Wilson Ave., Suite 202
4   Glendale, California 91206
    Telephone:  (818) 500-3200
5   Facsimile:   (818) 500-3201

6   Attorneys for Plaintiff Louis
    Vuitton Malletier, S.A.
7

8                      UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

10                                    )
    Louis Vuitton Malletier, S.A.,    )    Case No.: C 07 3952 JW
11                                    )
                        Plaintiff,    )    DECLARATION OF NIKOLAY
12                                    )    LIVADKIN IN SUPPORT OF
          v.                          )    OPPOSITION TO DEFENDANTS'
13                                    )    MOTION FOR SUMMARY
    Akanoc Solutions, Inc., et al.    )    JUDGMENT; EXHIBITS THERETO
14                                    )
                        Defendants.   )    Date:  September 8, 2008
15                                    )    Time: 9:00 a.m.
                                      )    Courtroom 8, 4th Floor
16                                    )
                                      )
17  _____ )

18         I, NIKOLAY LIVADKIN, declare as follows:

19         1.      I am an Anti-Counterfeiting Coordinator with LVMH Fashion Group, a division of

20  LVMH.  I have responsibility for global Internet enforcement for brands included within LVMH

21  Fashion Group, specifically including Plaintiff, Louis Vuitton Malletier, S.A. ("Louis Vuitton").  I

22  have had responsibility for Louis Vuitton's Internet enforcement efforts since 2002.  Except as

23  otherwise expressly stated to the contrary, I have personal knowledge of the following facts and, if

24  called as a witness, I could and would competently testify as follows.

25

26

27

28

2.      Louis Vuitton has duly registered and renewed the following trademarks and copyrights with the United States Patent and Trademark Office and the United States Copyright Office, respectively:

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) in a Circle Design | 286,345 |  | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 297,594 |  | 18 |
| LOUIS VUITTON | 1,045,932 | LOUIS VUITTON | 18 |
| Louis Vuitton (Interlocked Letters) Design | 1,519,828 |  | 18 |
| LOUIS VUITTON MALLETIER A PARIS in Rectangle | 1,615,681 |  | 16, 18 |
| Louis Vuitton (Interlocked Letters) on Epi Leather Design | 1,655,564 |  | 18 |

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Pattern Design | 1,770,131 | | 25 |
| Louis Vuitton (Interlocked Letters) Design | 1,794,905 | | 16, 25 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 1,875,198 | | 16 |
| Louis Vuitton (Interlocked Letters) | 1,938,808 | | 14, 24 |
| LOUIS VUITTON World Mark | 1,990,760 | LOUIS VUITTON | 16, 18, 24, 25 |
| Louis Vuitton (Interlocked Letters) Design | 2,291,907 | | 34 |
| LOUIS VUITTON | 2,303,212 | LOUIS VUITTON | 34 |

| Trademark | Registration Number | Trademark Picture | Class of Goods |
|-----------|--------------------|--------------------|----------------|
| Louis Vuitton (Interlocked Letters) Design | 2,361,695 |  | 25 |
| LOUIS VUITTON PARIS and Damier (pattern design) | 2,378,388 |  | 18 |

| Copyright | Reg. No. | Date Published | Date Registered |
|-----------|----------|----------------|-----------------|
| Multicolor Monogram – Black Print | VA 1-250-121 | 12/18/02 | 06/24/04 |
| Multicolor Monogram – White Print | VA 1-250-120 | 12/18/02 | 06/24/04 |

3.     True and correct copies or proof of registration of all of the aforementioned properties are collectively attached hereto as Exhibit A.

4.     Counterfeiting of Louis Vuitton brands online is widespread.  A significant percentage of the overall online counterfeiting activity as it relates to the Louis Vuitton brand originates in the People's Republic of China.  In view of various practical and legal impediments to efficient and effective enforcement of trademark rights in the People's Republic of China, a significant part of Louis Vuitton's online enforcement efforts occur in end user markets, specifically including the United States.

5.      Louis Vuitton is well-positioned to identify counterfeit sales online for several reasons.  Among the more important factors is the fact that Louis Vuitton has a strictly controlled distribution network such that the only online sites which sell new authentic Louis Vuitton merchandise in the United States are eluxury.com and louisvuitton.com, controlled by Plaintiff.  Samples of offers for Louis Vuitton merchandise from those authorized sites are attached as Exhibit B and C, respectively.  Although there is a secondary market for legitimate used Louis Vuitton merchandise, in most cases counterfeit sites are easily distinguished.  First, many sites specifically self-identify their sites as offerors of "replica" merchandise.  Second, many sites offer a range of merchandise inconsistent with the more limited range of product offered by sellers in the secondary market.  Third, counterfeiters identify products in ways which distinguish their product from legitimate merchandise.  Finally, the price point of legitimate Louis Vuitton merchandise, combined with strict control over distribution which effectively eliminates any significant discounting of legitimate merchandise all aid me in confirming counterfeit offers online.

6.      Over my years of managing Louis Vuitton's online enforcement efforts, during which time I have analyzed product purchased from several hundred websites each year, I have never obtained legitimate product from a website where my initial determination was that the offered product was counterfeit.

7.      As a general rule, Louis Vuitton strives to secure voluntary compliance with its trademarks rights and the trademark laws through the service of cease and desist letters.  In every case, before a demand letter is transmitted, I insure that Louis Vuitton's file includes evidence of the infringing offer, specifically including contemporaneous printouts from the website evidencing at least some of the offers which are the subject of Louis Vuitton's demands.

8.      Each cease and desist letter is followed by a letter to the internet service provider ("ISP") which acts as host of the website offering counterfeit Louis Vuitton merchandise.  In most

cases, demand letters sent to ISPs are sent to enforce both Louis Vuitton's trademark rights and copyrights. In few cases, where only Louis Vuitton's trademark rights are concerned, I transmit such letters in the form of notices called for under the Digital Millennium Copyright Act ("DMCA"). In my experience, responsible ISPs are familiar with the standards and requirements imposed by the DMCA and are more likely to remove infringing offers where Louis Vuitton's demand addressed to the ISP are framed in the familiar format of a DMCA notice. Before sending a demand to an ISP, I ping the website to confirm the Internet Protocol ("IP") address of the website and I research the Internet, using widely accessible online records to identify the ISP to which the IP address was assigned. I insure that Louis Vuitton's files include records of those additional investigative steps before sending a demand to an ISP.

9. The initial demand to an ISP is transmitted usually by email and, if Louis Vuitton does not receive a satisfactory response within a one to two week time frame or confirm that the counterfeit offers have been deleted, a follow up is sent. The follow up refers to the initial demand, includes a copy of the initial demand and is transmitted by messenger service or by some method intended to confirm receipt of the demand at the address to which the demand has been sent. I rely upon online records to find the address to which demands are sent, specifically including "Contact Me" pages for the ISP and, more importantly, the agent for service filing under the DMCA with the United States Copyright Office.

10. My office sends hundreds of DMCA notices to ISPs based in the United States each year and the vast majority of these notices result in an immediate disabling of the counterfeit offers which the subject of the DMCA notice.

11. During the second half of 2006, I began to notice a pattern where counterfeit offers were not removed, even in response to follow up demands. Upon closer examination it appeared that most of these demands were addressed to the Defendants. In connection with that examination

I noted that (a) neither of the ISP Defendants had filed a notice with the Copyright Office designated an agent for service of DMCA notices, and (b) that one of the ISP Defendants, Managed Solutions Group, Inc. did not maintain a webpage which posted terms of service, acceptable use policy or other document listing policies for handling notices of infringement as required by the DMCA or a "Contact Us" page with appropriate contact information. Consequently, I researched the World Wide Web and noticed several postings of commercial offers by Managed Solutions Group, Inc. designating www.managed.com as the corporate website for Managed Solutions Group, Inc. I then visited the website located at www.managed.com and noted under "Contact Us", that the "corporate offices" were located at 2115 Linwood Avenue 5th Floor, Fort Lee, NJ 07024, while for network administration issues the contact electronic mail address was abuse@webhostplus.com.  As a result of (b) I was later informed from discovery in this action, that the New Jersey address to which two demands were sent as detailed below, actually belonged to a different company, Managed, Inc., which was a company "spun" out of Managed Solutions Group, Inc., a defendant in this case, and that the website www.managed.com was simply not updated to reflect the change in corporate structure.

12.     On or about October 16, 2006, I sent a letter via electronic mail to Managed Solutions Group, Inc., 2115 Linwood Ave 5th Floor, Fort Lee NJ 07024, USA at abuse@webhostplus.com regarding wendy929.net, hosted on IP address 205.209.163.83 registered to Managed Solutions Group, Inc.  After receiving no response and confirming that the objectionable material was still viewable, I sent a "reminder" or follow up electronic mail to abuse@webhostplus.com on or about October 25, 2006.  In the absence of any kind of response, I noticed that the wendy929.net was moved to a different server with IP address 204.13.69.140, registered to Akanoc Solutions, Inc. I then sent another letter and email on or about October 30, 2006, to Akanoc Solutions, Inc. at 45535 Northport loop East, Fremont, CA 94538, USA and

abuse@akanoc.com.  I never received a response to any of these letters or emails. Two reminder letters were sent, by electronic mail on or about January 17, 2007 to abuse@akanoc.com and by express mail, on January 23, 2007. Again, no response to these letters or emails was received and wendy929.net remained on Akanoc Solutions, Inc.'s server 204.13.69.140 until approximately mid-December 2007.

13.     On or about February 7, 2007, I sent a letter via electronic mail to Managed Solutions Group, Inc., 2115 Linwood Ave 5th Floor, Fort Lee, New Jersey 07024, USA on abuse@webhostplus.com regarding atozbrand.com, hosted on IP address 205.209.140.10 registered to Managed Solutions Group, Inc.  After receiving no response and confirming that the objectionable material was still viewable, I sent a follow up "reminder" letter by express mail to Managed Solutions Group Inc at 46750 Fremont Blvd, Fremont, CA 94538, USA on or about February 21, 2007.  I never received a response to any of these letters or email. On or about March 22, 2007, the express mail carrier DHL returned the February 21, 2007 follow up letter and explained that the package could not be delivered at that location. On or about March 30, 2007, I drafted a new cease and desist letter and sent it by DHL express mail to Managed Solutions Group, Inc., attn: Steve Chen, 45535 Northport Loop East, Fremont, CA 94538. DHL confirmed delivery of the letter on April 4, 2007. I received no response whatsoever to this letter but noticed on or about April 7, 2007 that atozbrand.com was moved to a different server with IP address 204.16.195.49, registered to Akanoc Solutions, Inc. on which atozbrand.com remained until approximately mid-June 2007.

14.     On or about February 9, 2007, I sent a letter via electronic mail to Akanoc Solutions Inc., 45535 Northport Loop East, Fremont, CA 95538, USA on abuse@akanoc.com regarding bag925.com, hosted on IP address 204.16.195.46, registered to Akanoc Solutions, Inc..  After receiving no response and confirming that the objectionable material was still viewable, I sent a

follow up "reminder" letter by express mail carrier DHL to Akanoc Solutions Inc. 45535 Northport

Loop East, Fremont, CA 95538, USA on or about February 19, 2007 (DHL confirmed delivery on

March 5, 2007).  I never received a response to any of these letter or email, while bag925.com

remained on various servers registered to Akanoc Solutions, Inc. until approximately mid-June

2007.

      15.     On or about October 23, 2006, I sent a letter via electronic mail to Akanoc

Solutions, Inc., 45535 Northport Loop East, Fremont, CA 95538 at abuse@akanoc.com regarding

eshoes99.com, hosted on IP address 204.16.197.26 , registered to Akanoc Solutions, Inc.  After

receiving no response and confirming that the objectionable material was still viewable, I sent a

follow up email on or about January 17, 2007 to abuse@akanoc.com and a follow up letter on

February 6, 2007 by express mail carrier Fedex to Akanoc Solutions, Inc., 45535 Northport Loop

East, Fremont, CA 95538. Fedex confirmed delivery on February 8, 2007. On or about February

14, 2007, I realized that eshoes99.com had been actually moved to another server with IP address

205.209.172.165, registered to Managed Solutions Group, Inc. and decided to send a new cease

and desist letter that same day via email to Managed Solutions Group, Inc., 46750 Fremont Blvd.

#107, Fremont, CA 94538 at abuse@managedsg-inc.com. After receiving no response and

confirming that the objectionable material was still viewable, I sent a follow up letter by express

mail carrier DHL to Managed Solutions Group, Inc. at 46750 Fremont Blvd. #107, Fremont, CA

94538, USA on or about February 23, 2007.  Still without a response or evidence of action, I

contacted DHL and was informed by DHL on March 20, 2007 that the package could not be

delivered at that location and the follow up letter was returned to me on or about March 23, 2007. I

then sent a new cease and desist letter to Managed Solutions Group, Inc., Steve Chen, 45535

Northport Loop East, Fremont, CA 94538 via express mail carrier DHL on or about March 30,

2007, delivery of which DHL confirmed on April 3, 2007. I never received a response to any of these letters or email.

16.     On or about February 21, 2007, I sent a letter via electronic mail to Akanoc Solutions Inc., 45535 Northport Loop East, Fremont, CA 94538, USA at info@akanoc.com regarding ape168.com, hosted on 204.16.197.27 registered to Akanoc Solutions, Inc.. After receiving no response and confirming that the objectionable material was still viewable, I sent a follow up or "reminder" letter by express mail carrier DHL to Akanoc Solutions Inc. at 45535 Northport Loop East, Fremont, CA 94538, USA on or about March 19, 2007. DHL confirmed delivery of the letter on March 23, 2007. I never received a response to any of these letter or email.

17.     I caused further investigation to be made concerning each of the websites which was the subject of the DMCA notices sent to the ISP Defendants, as well as other websites hosted by Defendants in this action and evidentiary purchases were made on behalf of Louis Vuitton by an investigator acting under Louis Vuitton's direction. Each of the purchases was reviewed by me and I have confirmed that each is counterfeit. Pursuant to that investigation and analysis we determined that the ISP defendants operated out of the same premises and that they appeared to be owned and operated by the same individual, the individual defendant Steven Chen. I caused a further written demand to be transmitted to Mr. Chen's attention on or about April 20, 2007, and when that, also, did not result in a disabling of the counterfeit offers, Louis Vuitton filed the present action.

18.     During the course of the litigation, Louis Vuitton has identified numerous additional websites which now total more than eighty (80) which were hosted by servers controlled by the ISP Defendants and which have each been the subject of subsequent demands to disable the infringing offers. Follow up investigation concerning those demands reveal that, notwithstanding the present litigation, in many cases the infringing offers which were the subject of Louis Vuitton's demands

remained accessible through the ISP Defendants' servers for several weeks after the initial demand was transmitted.

19.     Additionally, while investigating the infringing websites, I conducted Reverse IP Searches to determine other websites hosted at the same IP Address of an identified infringing website.  Through this process, I reviewed hundreds of websites which also sold counterfeit Louis Vuitton product while hosted by one or another of the Defendants.

20.     All of the counterfeiting activities that Defendants support and allow to continue damage Louis Vuitton's goodwill, undermine the value of its intellectual properties, and affect sales of legitimate product.  However, in this instance, and given the difficulty associated with Defendants' lack of information due to "crash", erasure or otherwise, Louis Vuitton seeks to recover statutory damages.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of July, 2008, at Paris, France

_____
NIKOLAY LIVADKIN

# EXHIBIT B

**DECLARATION OF ROBERT L. HOLMES**

I, Robert L. Holmes, declare as follows:

1.   I am a private detective and the principal of IPCybrcrime.com, LLC ("IPCybercrime"). IPCybercrime is located in Plano, Texas, and specializes in intellectual property investigations on the Internet.  I have over 25 years of experience investigating counterfeiters on the internet and identifying involved parties.  Except as otherwise stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows.

2.   Beginning in or around 2007, I began investigating a number of websites selling allegedly counterfeit goods of Louis Vuitton which were hosted at IP addresses allocated to the Defendants in this case.  I had heard of Defendants prior to receiving this assignment from Louis Vuitton as Defendants have been found by me to have hosted other infringing websites selling counterfeits of other companies' goods.  From my experience and research in investigations of online counterfeiting, I understand Defendants have a reputation for hosting websites that specialize in counterfeiting as well as spam activities.

3.   On or about May 15, 2007, I began investigating the website bag4sell.com at IP Address 204.13.66.161 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that bag4sell.com was being hosted by Akanoc Solutions, Inc.  I confirmed that bag4sell.com was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method.  On or about May 15, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about May 30, 2007.  The contact for this purchase was nina@bag4sell.com and bag4sell@gmail.com.  The return address stated the product originated from Guangdong, China.  The payee for this purchase was Jinxiu Fang.  This purchase was later forwarded for review by Louis Vuitton.

4.   On or about May 15, 2007, I began investigating the website innike.com at IP Address 205.209.165.82 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that innike.com was being hosted by Managed Solutions Group, Inc.  I confirmed that innike.com was hosted by Managed Solutions Group, Inc. using at least three different methods of verification, including the "pinging" method.  On or about May 15, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about May 30, 2007.  The contact for this purchase was innike02@yahoo.com and innike03@hotmail.com.  The return address stated the product originated from Foshan, China.  The payee for this purchase was Siyi Wang.  This purchase was later forwarded for review by Louis Vuitton.

5.   On or about May 15, 2007, I began investigating the website soapparel.com at IP Address 204.16.192.244 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that soapparel.com was being hosted by Akanoc Solutions, Inc.  I confirmed that soapparel.com was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method.  On or about May 15, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about May 30, 2007.  The contact for this purchase was "Vivian" and email address soapparel@yahoo.com.cn.  The return address stated the product originated from Guangdong, China.  The payee for this purchase was Si Yi Wang.  This purchase was later forwarded for review by Louis Vuitton.

6.   On or about May 22, 2007, I began investigating the website wendy929.net at IP Address 204.13.69.140 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that wendy929.net was being hosted by Akanoc Solutions, Inc.  I confirmed that wendy929.net was hosted by Akanoc, Solutions Inc. using at least three different methods of verification, including the "pinging" method.  On or about May 22, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about June 26, 2007.  The

contact for this purchase was bag929@126.com.  The return address stated the product originated

from Shanghai, China.  The payee for this purchase was Weiliang Zhang.  This purchase was later

forwarded for review by Louis Vuitton.

7.   On or about May 31, 2007, I began investigating the website famous-shop.com at IP

Address 205.209.143.93 which was offering suspect Louis Vuitton products.  On or about that

date, I confirmed that famous-shop.com was being hosted by Managed Solutions Group, Inc.  I

confirmed that famous-shop.com was hosted by Managed Solutions Group, Inc. using at least three

different methods of verification, including the "pinging" method.  On or about May 31, 2007, an

order was placed for a sample of Louis Vuitton product and was received by my office on or about

August 7, 2007.  The contact for this purchase was famous-shop01@hotmail.com.  The return

address was illegible, however, the payee for this purchase was Qiaolin Zhang.  This purchase was

later forwarded for review by Louis Vuitton.

8.   On or about June 5, 2007, I began investigating the website pickyourgoods.com at IP

Address 205.209.165.84 which was offering suspect Louis Vuitton products.  On or about that

date, I confirmed that pickyourgoods.com was being hosted by Managed Solutions Group, Inc.  I

confirmed that pickyourgoods.com was hosted by Managed Solutions Group, Inc. using at least

three different methods of verification, including the "pinging" method.  On or about June 5, 2007,

an order was placed for a sample of Louis Vuitton product and was received by my office on or

about June 26, 2007.  The contact for this purchase was "Rose" with email

pickyourgoods@yahoo.com.cn.  The return address stated the product originated from Xingtai,

China.  The payee for this purchase was Linxiao Wang.  This purchase was later forwarded for

review by Louis Vuitton.

9.   On or about June 28 2007, I began investigating the website watchnreplica.net at IP

Address 66.79.176.207 which was offering suspect Louis Vuitton products.  On or about that date,

I confirmed that watchnreplica.net was being hosted by Managed Solutions Group, Inc. I confirmed that watchnreplica.net was hosted by Managed Solutions Group, Inc. using at least three different methods of verification, including the "pinging" method. On or about June 27 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about July 24, 2007. The contact for this purchase was lvbagz@gmail.com. The return address was in Chinese. However, the payee for this purchase was HK NEWENDER E-BUSINESS C TSIM SHAT SUI HK. This purchase was later forwarded for review by Louis Vuitton.

10. On or about July 26, 2007, I began investigating the website replica-ebags.com at IP Address 204.16.193.146 which was offering suspect Louis Vuitton products. On or about that date, I confirmed that replica-ebags.com was being hosted by Akanoc Solutions, Inc. I confirmed that replica-ebags.com was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method. On or about July 26, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about August 14, 2007. The contact for this purchase sales@replica-ebags.com. The return address stated the product originated from Hunan, China. The payee for this purchase was T24CC.COM. This purchase was later forwarded for review by Louis Vuitton.

11. On or about July 27, 2007, I began investigating the website watchesreplica.net at IP Address 204.16.193.146 which was offering suspect Louis Vuitton products. On or about that date, I confirmed that watchesreplica.net was being hosted by Akanoc Solutions, Inc. I confirmed that watchesreplica.net was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method. On or about July 27, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about August 14, 2007. The contact for this purchase was sales@watchesreplica.net. The return address stated the product

originated from Hunan, China.  The payee for this purchase was Tujian Zhou.  This purchase was later forwarded for review by Louis Vuitton.

12. On or about October 15, 2007, I began investigating the website guccifendi.com at IP Address 204.16.194.103 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that guccifendi.com was being hosted by Akanoc Solutions, Inc.  I confirmed that guccifendi.com was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method.  On or about October 25, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about November 13, 2007.  The contact for this purchase was guccifendi68@vip.163.com.  The return address stated the product originated from Beijing, China.  The payee for this purchase was Yangla Li.  This purchase was later forwarded for review by Louis Vuitton.

13. On or about October 15, 2007, I began investigating the website luxury2us.com at IP Address 204.16.193.105 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that luxury2us.com was being hosted by Akanoc Solutions, Inc.  I confirmed that luxury2us.com was hosted by Akanoc Solutions, Inc. using at least three different methods of verification, including the "pinging" method.  On or about October 25, 2007, an order was placed for a sample of Louis Vuitton product and was received by my office on or about November 6, 2007.  The contact for this purchase was luxury2us@yahoo.com.cn.  The return address was in Chinese.  The payee for this purchase was Li Liu.  This purchase was later forwarded for review by Louis Vuitton.

14. On or about October 15, 2007, I began investigating the website rrgnl.com at IP Address 205.209.180.88 which was offering suspect Louis Vuitton products.  On or about that date, I confirmed that rrgnl.com was being hosted by Managed Solutions Group, Inc.  I confirmed that rrgnl.com was hosted by Managed Solutions Group, Inc. using at least three different methods

of verification, including the "pinging" method. On or about October 25, 2007, an order was

placed for a sample of Louis Vuitton product and was received by my office on or about November

6, 2007. The contact for this purchase nike-rrgnl@hotmail.com. The return address stated the

product originated from Shanghai, China. The payee for this purchase was Feiyong Gao. This

purchase was later forwarded for review by Louis Vuitton.

15. On or about October 15, 2007, I began investigating the website sunny7shoes.com at IP

Address 205.209.136.108 which was offering suspect Louis Vuitton products. On or about that

date, I confirmed that sunny7shoes.com was being hosted by Managed Solutions Group, Inc. I

confirmed that sunny7shoes.com was hosted by Managed Solutions Group, Inc. using at least three

different methods of verification, including the "pinging" method. On or about October 25, 2007,

an order was placed for a sample of Louis Vuitton product and was received by my office on or

about November 6, 2007. The contact for this purchase was sunny7shoes@gmail.com. The return

address stated the product originated from Guangdong, China. The payee for this purchase was

Bin Sun. This purchase was later forwarded for review by Louis Vuitton.

16. In connection with the above investigations, I also conducted Reverse IP Searches to

determine other websites hosted at the same respective IP Address. Through this process, I

reviewed hundreds of websites which also sold suspect Louis Vuitton products while hosted by one

of the Defendants.

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Executed this __31st__ day of July, 2008, at Plano, Texas.

ROBERT L. HOLMES

**EXHIBIT C**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4    LOUIS VUITTON MALLETIER, S.A.,    )
                                        )
 5                   PLAINTIFF          )
             VS                         )C.A. NO. C 07 3952 JW
 6                                      )
      AKANOC SOLUTIONS, INC., MANAGED   )
 7    SOLUTIONS GROUP, INC., STEVEN     )
      CHEN AND DOES 1 THROUGH 10,       )
 8    INCLUSIVE,                        )
                     DEFENDANTS         )
 9    _____  )

10

11

12

13

14              ORAL DEPOSITION OF ROBERT L. HOLMES,

15    produced as a witness at the instance of the Defendants,

16    and duly sworn, was taken in the above-styled

17    and -numbered cause on the 1st day of April, 2008, from

18    9:31 AM to 6:22 PM, before Ronald R. Cope, a CSR in and

19    for the State of Texas, Registered Professional Reporter

20    and Certified Realtime Reporter, reported by machine

21    shorthand at the offices of U.S. Legal

22    Support/MillerParker, Inc., 5910 North Central

23    Expressway, 100 Premier Place, Dallas, Texas, 75206,

24    pursuant to the Federal Rules of Civil Procedure and the

25    provisions stated on the record or attached hereto.
```

ROBERT L. HOLMES

1    they -- I don't know of their advertising practices, so

2    I don't -- yeah.  I can't testify to how they advertise

3    or if they induce --

4        Q.   You have no knowledge or no evidence that the

5    three Defendants in this case have induced or caused the

6    infringing conduct on the part of website operators?

7        A.   Well, I know they have thousands of customers

8    that sell the product.

9              MR. COOMBS:  Move to strike to interpose

10   the same objections.

11       Q.   (BY MR. LOWE)  I don't believe you answered my

12   question.  Do you have any knowledge or any evidence

13   that the three Defendants -- any of the three Defendants

14   in this case induced or caused the infringing conduct on

15   the part of website operators?

16       A.   No personal knowledge.

17       Q.   Do you have any evidence or knowledge that any

18   of the three Defendants in this lawsuit have materially

19   contributed to the infringing conduct of website

20   operators?

21             MR. COOMBS:  Same objections.

22       A.   Yes.

23       Q.   (BY MR. LOWE)  What?

24       A.   They facilitate the sale of that product by

25   hosting the space that those items are stored upon, and

ROBERT L. HOLMES

1   they also advertise to Chinese businesses to sell to the

2   United States.

3       Q.   So what you're saying is that they have

4   equipment upon which the websites are hosted?

5       A.   What I'm saying is their website advertises for

6   Chinese businesses to do business with the United

7   States, and all the customers that I found that are

8   customers of these entities are selling -- are offering

9   goods that are purported to be counterfeit.

10      Q.   All of the customers?

11      A.   All the ones that I've seen.

12      Q.   How many have you seen?

13      A.   Many dozens.

14      Q.   Do you have any idea how many websites are

15  hosted by the hosting services of the three Defendants?

16      A.   Many hundreds.  The reason --

17      Q.   What is the basis --

18           Go ahead.

19      A.   Oh, I'm sorry.  The reason I say that is --

20  okay.  With an IP address, say, for example, the one

21  that I believe ends with .66.161, with that IP address,

22  when you run a reverse IP search on that specific IP

23  address, there were maybe 20 or 30 domain names stored

24  on that IP address or that resolved to that IP address.

25  With each domain that resolves to that IP address is

ROBERT L. HOLMES