**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
Brian S. Edwards (SBN 166258)
Christopher Lai (SBN 249425)
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone: (949) 553-1010
Facsimile: (949) 553-2050
jal@gauntlettlaw.com
bse@gauntlettlaw.com
cl@gauntlettlaw.com

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.
and Steve Chen

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., Plaintiff, vs. AKANOC SOLUTIONS, INC., et al., Defendants. | Case No.: C 07-3952 JW (HRL) **DEFENDANTS' REPLY TO VUITTON'S OPPOSITION TO MOTION IN LIMINE #11 TO BAR VUITTON FROM PRESENTING NON-RELEVANT EVIDENCE AT TRIAL** **[Fed.R.Evid. 401, 402]** |



Dockets.Justia.com

## I. VUITTON'S WEBSITE PRINTOUTS ARE NOT EVIDENCE OF DIRECT INFRINGEMENT UNDER COPYRIGHT ACT OR LANHAM ACT

### A. Vuitton's "Liberalized" Standard To Admit Non-Relevant Evidence Based on "Presumptions" Should Be Rejected

Vuitton's proposed "liberalized" or "flexible" approach to relevance relies on case dissents and has no basis in the law. Federal Rules of Evidence, Rule 402 plainly states that "[e]vidence which is not relevant is not admissible." *U.S. v. Komisaruk*, 885 F.2d 490, 493 (9th Cir. 1989) ("A district court may limit evidence to proof that is legally relevant. [citing Fed.R.Evid. 402].")

Vuitton attempts to get around this by arguing for a "liberalized" or "flexible' approach to admission of evidence that would allow a court to "presume" that non-relevant evidence is, in fact, admissible. [Vuitton Opp. 3:26-4:6, 7:11-8-20] Vuitton cites a *dissenting* opinion in *Tome v. United States*, 469 U.S. 45 (1995) for support. But the only issue *Tome* addressed was whether prior statements of witnesses could be admitted as non-hearsay under Federal Rules of Evidence 801(d)(1)(B). See *Tome*, 513 U.S. at 160 ("Our conclusion that Rule 801(d)(1)(B) embodies the common-law pre-motive requirement is confirmed by an examination of the Advisory Committee notes to the Federal Rules of Evidence. We have relied on those well-considered Notes as a useful guide in ascertaining the meaning of the Rules.") The Advisory Committee Notes to Rule 402 describes the exclusion of non-relevant evidence as "a presupposition involved in the very conception of a rational system of evidence."

Vuitton also cites inapposite cases interpreting Federal Rules of Evidence 403[1] and 404.[2]

---

[1]Vuitton cites *U.S. v. Williams*, 445 F.3d 724 for "relief against admissibility under **Rule 403** should be granted sparingly." [Vuitton Opp. 3:13-14] *U.S. v. Fleming*, 215 F.3d 930 (9th Cir. 2000) is cited to support Vuitton's argument that "**Rule 403** favors admissibility." [Vuitton Opp. 3:14-15] *U.S. v. Hankey*, 203 F.3d 930 (9th Cir. 2000) is cited by Vuitton for the rule that "the application of **Rule 403** must be cautious and sparing." [Vuitton Opp. 3:15-16]

[2] Vuitton also cites *U.S. v. Curtin*, 489 F.3d 935 (9th Cir. 2007) because "the version of **Rule 404(b)** which became law was intended to "plac[e] greater emphasis on admissibility than did the final Court version." [Vuitton Opp. 3:10-13] Rule 404(b) is not at issue in this motion. That rule concerns admissibility of "other crimes, wrongs, or acts" to prove specific conduct under **Rule 404(b)**. The rule applies largely to criminal cases, and certainly has no application to the instant case.

[Opposition 3:10-20] But those cases are not helpful in determining the scope of admissibility under Rule 402. In contrast to Rules 403 and 404, Rule 402 of the Federal Rules of Evidence plainly states that "evidence which is not relevant is inadmissible." There is nothing about Rules 403 and 404 that broaden the scope of admissible evidence under Rule 402. Rule 402 is clear that non-relevant evidence is inadmissible, and a district court has the power to exclude such evidence at trial. *U.S. v. Komisaruk*, 885 F.2d 490, 493 (9th Cir.1989)

**B. The Copyright Act Does Not Apply Because Alleged Direct Infringement of Vuitton's Copyrights Did Not Occur In the United States**

**1. Vuitton's Exhibits Cannot Prove Direct Copyright Infringement**

The elements of Vuitton's contributory copyright infringement claims are (1) **direct infringement** by a primary infringer, (2) knowledge of direct infringement, and (3) inducing, causing or materially contributing to the infringement. *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 380 F.3d 1154, 1160 (9th Cir. 2004); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'")

Direct copyright infringement requires proof of (1) ownership of the allegedly infringed material and (2) violation of an exclusive right granted to copyright holders under 17 U.S.C. § 106.[3] *Ellison v. Robertson*, 357 F.3d at 1076; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.") *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F.Supp. 1361, 1371 (N.D.Cal.1995) ('[T]here can be no contributory infringement by a defendant without direct infringement by another.').

There is no violation of 17 U.S.C. § 106 because the alleged **direct** infringement occurred

[3] "[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work . . . ." 17 U.S.C. § 106.

outside the United States. U.S. copyright laws do not prohibit copying outside the United States. That is where all alleged copying occurred. *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1092 (9th Cir.1994) ("**The Copyright laws do not apply extraterritorially**, so each of the rights conferred under the five section 106 categories must be read as extending no farther than the United States borders."); *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 387 (9th Cir.1995) ("After the district court rendered its decision, **an en banc panel** of this court rejected these theories on the applicability of U.S. copyright law. We **held that in order for U.S. copyright law to apply, at least one alleged infringement must be completed *entirely* within the United States, and that mere authorization of extraterritorial infringement was not a completed act of infringement in the United States**.")

Infringement must occur and be completed entirely within the United States. *Los Angeles News Service v. Reuters Television Intern. (USA) Ltd.*, 340 F.3d 926, 928 (9th Cir. 2003) ("[A]lthough the district court was correct to hold **that the Copyright Act does not apply extraterritorially**, an exception may apply where an act of infringement is **completed *entirely* within the United States** and that such infringing act enabled further exploitation abroad."); *Rondor Music Inetern. Inc. v. TVT Records LLC*, 2006 WL 5105272, *8 (C.D.Cal. Aug. 21, 2006) ("The Copyright Act does not apply extraterritorially. [citing *Subafilms*] For the Act to apply, **at least one alleged infringement must be completed *entirely* within the United States**." (emphasis added));

In this case the following undisputed facts show that the direct infringements involved in this case did not occur entirely within the United States:

1. The alleged direct infringers are Chinese citizens operating websites from China.

2. The allegedly infringing products were likely manufactured in China.

3 The allegedly infringing products were shipped from China at Vuitton's specific request, not from inside the United States.

3. The return addresses for all of the allegedly infringing products is in China.

4. Vuitton investigated the websites from its offices in Paris, France. [Livadkin Depo. 17:19-19:15]. (See **Exhibit 1588** to the Supplemental Declaration of James A. Lowe)

5. The website printouts described on Exhibit 1550 indicate they were viewed and printed out in Paris, France. (See **Exhibit 1589** to the Supplemental Declaration of James A. Lowe for examples of website printouts where the page numbers are written in French (e.g. "1 sur 2" for page 1 of 2). Vuitton investigator Robert Holmes confirmed that this indicates the exhibits were printed by Vuitton in France. (See **Exhibit 1587** to the Supplemental Declaration of James A. Lowe) [Holmes Depo. 54:4-8; 55:8-15; 137:24-138:5].

6. Vuitton requested the allegedly infringing products be shipped to the United States, so any act of bringing a product into the United States was expressly authorized by Vuitton.

7. Vuitton paid for allegedly infringing products via Western Union by transferring money to China.

The only relevant evidence in this case to prove direct infringement shows that any alleged infringement of Vuitton's copyrighted work was completed entirely *outside* the United States. Vuitton offers allegedly counterfeit bags, belts, etc. that Vuitton purchased from China by Vuitton. The orders were made by e-mail and payment was sent by Vuitton via Western Union to addresses in China. Vuitton then requested and authorized the Chinese sellers ship the merchandise to them in the United States, presumably to create evidence for this lawsuit. But the alleged infringement and counterfeiting was entirely completed in China and then shipped to the United States with the authorization of the copyright owner. All related exhibits are inadmissible. The exhibits described in Exhibit 1550 are properly excluded because they only show that Vuitton printed out screen shots of websites outside the United States.

### 2. Website Printouts Are Not Relevant to Prove Violation of Display Right Under Copyright Act

#### a. Direct Infringers Never Sold Right to View "Display" of Copyrighted Works

Even if the alleged direct infringement had occurred entirely within the United States, the website printouts listed as part of Exhibit 1550 are not relevant (even if otherwise admissible) to prove violation of Vuitton's Section 106 display rights. 17 USC § 106(5). A copyright owner's display right is violated where a copyrighted work is displayed "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social

acquaintances is gathered." *Broadcast Music, Inc. v. Claire's Boutiques, Inc.*, 949 F.2d 1482, 1487-88 (7th Cir.1991) Vuitton concedes that the website content was "viewed, captured and printed out . . . from a non-public place." [Opp. 6:14-15] The website printouts themselves do not prove that any website was displayed "to the public" or at all.

Vuitton cites *Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146 (9th Cir. 2007) but that case does not hold that infringing content located on a web host's servers automatically violates a copyright holder's display right. In *Amazon.com*, search engine Google was sued for direct copyright infringement for providing in-line linking to **websites selling access to displays of infringing images of Perfect 10 models on their computers**. *Id.* at 1157. The websites selling the infringing images generated revenue for Google through Google's Adsense program. Under this program, the owner of a website registered with Google to become an AdSense "partner." *Id.* at 1156. AdSense participants agreed to share the revenues that flowed from such advertising with Google. *Id.* The court found that "some website owners in the AdSense program had infringing Perfect 10 images on their websites" and that "[t]he AdSense program increased the commercial nature of Google's use of Perfect 10's images." *Id.* at 1166. Google violated the display right because its Adsense "partners" were selling unauthorized access to "displays" of Perfect 10 images. They were selling the right to view a "display" of Perfect 10's copyrighted works.

*Amazon.com* is not helpful to Vuitton because here the alleged direct infringers are alleged to have copied and sold *products* from inside China. It is undisputed that third parties never purchased the right to view a "display" of a Vuitton copyrighted work. And unlike Google, the alleged direct infringers never received a direct financial benefit from the "display" of infringing images on the Internet. The website printouts are not relevant because they do not evidence violation of the display right by any direct infringers in this case.

**b. Web Host Not Contributorily Liable For Infringing Content On Its Servers**

Further, the *Defendants* cannot be held liable for *contributory* copyright infringement simply because infringing content was placed on their servers. For liability to attach the Defendants must act in concert with a direct infringer:

> "In order to deemed a contributory [copyright] infringer, the authorization or assistance must bear some direct relationship to the infringing acts, **and the person rendering such assistance or giving such authorization must be acting in concert with the infringer**.
>
> *Nimmer on Copyright*, § 12.04[A][3][a]

This is shown where a defendant induces, causes or materially contributes to the direct infringement. *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)

Courts have found inducement liability where a party takes **"active steps ... to encourage direct infringement,**" *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) or **"actively strives to provide the environment and market for counterfeit recording sales to thrive."** *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) Other courts define the standard as **"actively and knowingly aid[ing] and abet[ting] another's direct infringement**" *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (C.A.Fed.1988) See also *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 412-413 (C.A.5 1963) (**demonstrations by sales staff of infringing uses** supported inducement liability); *Haworth Inc. v. Herman Miller Inc.*, 37 U.S.P.Q.2d 1080, 1090, 1994 WL 875931 (W.D.Mich.1994) (evidence that **defendant "demonstrate[d] and recommend[ed] infringing configurations"** of its product supported inducement liability).

Defendants materially contribute to direct infringement only if they are "**engaged in a mutual enterprise of infringement**" with direct infringers. *Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788, 798 (9th Cir.2007). Or their servers are **"engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy**." *Id.* at 801. Or their systems are "engineered for infringement" such that the **"sole purpose"** of their business "is to **provide a forum for easy copyright infringement.**" Id. at 799, n. 10 ("Perfect 10 does not contend that Defendants' payment systems were **engineered for infringement** in this way, and **we decline to radically expand *Napster's* cursory treatment of "material contribution" to cover a credit card payment system that was not so designed.**") *Id.*

In *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 495 (S.D.N.Y. 2008), a case under the analogous Lanham Act, the online auction site *www.ebay.com* did not contributorily infringe

Tiffany's trademarks even though it provided significant support to sellers of infringing Tiffany products that used its auction site, and reaped significant profits from sellers of infringing Tiffany goods, including the following:

- Seminars and workshops to educate eBay sellers on growing their business. *Id.* at 475.
- Marketing advice to eBay sellers about creating the "perfect" listing to attract buyers. *Id.*
- "Advanced Selling" program that provides eBay sellers with data and research to help them identify "hot sales opportunities." *Id.*
- Distributing marketing calendars so that its sellers can list goods to coincide with eBay promotions (Tr. 409:2-409:19; Pl.'s Ex. 985), as well as "expert" consultants, whom eBay sellers may call to receive advice on growing their business. *Id.*
- Implementing a "Main Street Program," which encourages sellers to lobby government officials regarding regulations and legislation that may affect their sales and eBay's business. *Id.* at 475-76.
- Providing sellers who sell large quantities of merchandise with dedicated account managers; special newsletters with further information on eBay promotions; advanced selling education; reimbursements of 25% of the cost of qualifying advertisements; and access to health care benefits, business liability insurance, and working lines of credit to finance their business. *Id.* at 476.
- Earning $4.1 million in revenue between April 2000 and August 2005 off sales of Tiffany jewelry. *Id.* at 481.
- Actively advertising the availability of Tiffany jewelry on its website. *Id.* at 480.

The *Tiffany* court concluded that although the above gave eBay *general knowledge* of counterfeiting on its website, such generalized knowledge was still insufficient under the *Inwood* test to impose upon eBay an affirmative duty to remedy counterfeiting on its website. The court held that

"without **specific knowledge** or reason to know, eBay is under no affirmative duty to ferret out potential infringement." *Id.* at 515. So the mere fact that infringing content appears on a website or on computer servers is insufficient to impose contributory liability.

### C. The Lanham Act Does Not Apply Extraterritorially Under Supreme Court's Test in *Steele v. Bulova Watch Co.*

The elements of Vuitton's contributory trademark infringement claims are (1) **direct infringement**; and (2) intentionally inducing others to infringe a mark, or continuing to supply an infringing *product* to an infringer with knowledge that the infringer is mislabeling the particular product supplied. *Perfect 10, Inc. v. Visa International Service Association*, 494 F.3d 788, 806-807 (9th Cir.2007) [citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)].

Direct trademark infringement requires proof of (1) ownership of a valid trademark, which requires proof of (a) a valid mark entitled to protection under the Lanham Act and (b) **use of the mark by a direct infringer *in commerce*** 'in connection with the sale ... or advertising of goods or services,' without the plaintiff's consent;" and (2) a likelihood of confusion as to source, sponsorship or approval of the goods or services at issue. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 495 (S.D.N.Y. 2008).

As set forth above, it is undisputed the alleged direct infringers are Chinese citizens located in China and operating exclusively out of China. *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227 (1991) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."); *Steele v. Bulova Watch Co.*, 344 U.S. 280, 292 (1952) ("The stamping of the Bulova trade-mark done in Mexico, is not an act 'within the control of Congress.' It should not be utilized as a basis for action against petitioner. **The Lanham Act, like the Sherman Act, should be construed to apply only to acts done within the sovereignty of the United States**.")

Courts rarely apply the Lanham Act to infringement occurring overseas. In *Bulova*, a case Vuitton describes as a "controlling decision" in its Opposition [7:6-8], the United States Supreme Court considered three relevant factors, the so-called *Bulova* factors, in making this determination:

> The [*Steele v. Bulova Watch Co.*] Court concluded that the Lanham Act conferred jurisdiction over extraterritorial disputes involving trademark infringement and unfair competition when: **1) Defendant is a United States [citizen]; 2) the foreign activity had substantial effects in the United States; and 3) exercising jurisdiction would not interfere with the sovereignty of another nation.**

*International Cafe, S.A.L. v. Hard Rock Cafe Intern. (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001) [citing *Steele v. Bulova Watch Co.*,]; *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642-43 (2d Cir. 1956) (same); TNT USA, Inc v. TrafiExpress, S.A. de C.V.. 434 F.Supp.2d 1322, 1328 (S.D.Fla.2006) (same).

### 1. The Alleged Direct Infringers Are Citizens of China

It is undisputed that the alleged direct infringers are **not** United States citizens or located inside the United States. Vuitton ordered the products from China. The shipping labels for the allegedly infringing items are written in Chinese, were shipped from China, and list return addresses inside China. Payment was made to indviduals in China to Vuitton's Western Union transfer.

The *Bulova* Court found the citizenship of the infringer to be of critical importance.[4] Starting with the premise that "the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears," the Court inferred such an intent based upon "the duty of the citizen in relation to his own government." *Id.* at 286. The Supreme Court felt that applying the Lanham Act to foreign activities of United States citizens was justified because "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States." *Id.* See *Totalplan Corp. of America,* 14 F.3d at 830 ("First, none of the appellees is a United States citizen. Thus, unlike in *Bulova*, this case does not implicate the United States' "broad power to regulate the conduct of its citizens in foreign countries." . . . [A]ppellees' Canadian citizenship . . . is a factor weighing against extraterritorial application of the Lanham Act.").

[4] The United States Supreme Court affirmed the *Steele* approach to extraterritorial jurisdiction under the Lanham Act in a Title VII case. See *E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 252, 111 S.Ct. 1227, 1232 (1991)

**2. Chinese Website Did Not Have Substantial Effects in the United States**

Even if admitted, the website printouts do not show any impacts within the United States. The only evidence of effects in the United States are the several items Vuitton itself purchased from China and had shipped into the United States in an attempt to create jurisdiction. These effects are not substantial, and were created by Vuitton itself, not the direct infringers. Vuitton could have easily had the products shipped to France, some other country, or not shipped. This is not a situation where an infringer is operating inside the United States or ships out numerous products already located in the United States. *McBee v. Delica Co., Ltd.*, 417 F.3d 107, 120 (1st Cir. 2005) ("The [*Bulova*] substantial effects test requires that there be evidence of impacts within the United States, and these impacts must be of a sufficient character and magnitude to give the United States a reasonably strong interest in the litigation.")

See *Reebok Int'l, Ltd, Marnatech Enterprises, Inc.*, 970 F.3d 552, 554-555 (9th Cir.1992) (Substantial effects shown where infringer "organized and directed the manufacture of counterfeit REEBOK shoes from the United States," and evidence presented that infringer's "sales of counterfeit REEBOK shoes decreased the sale of genuine REEBOK shoes in Mexico and the United States and directly decreased the value of Reebok's consolidated holdings.") Vuitton's witness, Nikolay Livadkin, testified that Vuitton's sales actually *increased* in the United States during the relevant time frame. (See **Exhibit 1588** to the Supplemental Declaration of James A. Lowe) [Livadkin Depo. 42:6-43:1] Vuitton has no evidence to prove any economic impact in the United States on Vuitton as a result of any direct infringement allegedly occurring at any infringing website in this case. Any alleged infringement has either a positive effect on Vuitton in the United States (advertising perhaps?) or a neutral effect.

**3. Exercising Jurisdiction Would Interfere With the Sovereignty of Another Nation**

The third *Bulova* factor also cannot be satisfied. China clearly has a strong interest in enforcing its own trademark and copyright laws against infringement by its own citizens inside China. All of the copyrighted works and trademarks at issue are registered in China. At his deposition in this case, Nikolay Livadkin discussed Vuitton's efforts to combat infringement inside

China. [See Livadkin Depo. 22:23-24:8; included in Exhibit 1502 that was filed under seal on June 19, 2008 (Doc. 57).]

### 4. Absence of Two *Bulova* Factors is Fatal to Application of Lanham Act to Direct Infringement in This Case

Absence of two of the *Bulova* factors is "certainly fatal" to proof of direct infringement under the Lanham Act in this case:

> Two of the three conditions necessary to bring appellees' conduct within the Lanham Act, United States citizenship and a substantial effect on United States commerce, have thus not been established by Totalplan. As was the case in *Vanity Fair*, **the absence of two of the three *Bulova* factors in this case is fatal to an argument that the conduct is governed by the Lanham Act**. Therefore, we need not reach the third factor, the existence of a conflict with foreign trademark law.
>
> *Totalplan Corp. of America v. Colborne*, 14 F.3d 824, 831 (2d Cir.1994)

In *Vanity Fair*, 234 F.2d at 642-43 the court found that absence of the first *Bulova* factor could be fatal, but that absence of two factors was "certainly fatal" to application of the Lanham Act to extraterritorial infringements:

> We do not think that the *Bulova* case lends support to plaintiff; to the contrary, we think that the rationale of the Court was so thoroughly based on the power of the United States to govern 'the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed', **that the absence of one of the above factors might well be determinative and that the absence of both is certainly fatal [to extraterritorial application of the Lanham Act].**

### 5. Ninth Circuit Has Never Applied Lanham Act Extraterritorially Where Foreign Citizens Conduct Operations Overseas

Consistent with *Bulova*, the Ninth Circuit has only applied the Lanham Act extraterritorially in situations where the direct infringer is either a U.S. citizen or is directing foreign operations from within the United States. *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 554-555 (9th Cir. 1992) (defendant "organized and directed the sale of counterfeit REEBOK shoes from the United States."); *Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 504 (9th Cir.1991) ("The [Lanham Act] injunction would be effective against Marktrade because it is a U.S. corporation

which orchestrated its infringing activities from the United States."); *Reebok Int'l, Ltd. v. Marnatech Enterprises, Inc.*, 737 F.Supp. 1515 (S.D.Cal.1989) ("It appears the defendants' activities in the United States were the controlling force behind their Mexican distribution of counterfeit REEBOK footwear.")

## II. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter an order precluding Louis Vuitton from presenting any non-relevant evidence at trial, including the Vuitton trial exhibits listed in Exhibit 1550 to the accompanying Declaration of James A. Lowe and similar evidence.

Dated: June 29, 2009

**GAUNTLETT & ASSOCIATES**

By: /s/James A. Lowe
David A. Gauntlett
James A. Lowe
Brian S. Edwards
Christopher Lai

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.,
and Steve Chen