**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
Brian S. Edwards (SBN 166258)
Christopher Lai (SBN 249425)
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone:     (949) 553-1010
Facsimile:     (949) 553-2050
jal@gauntlettlaw.com
bse@gauntlettlaw.com
cl@gauntlettlaw.com

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.
and Steve Chen

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., | ) Case No.: C 07-3952 JW (HRL) |
| | ) |
| Plaintiff, | ) |
| | ) **DEFENDANTS' OBJECTIONS TO** |
| vs. | ) **LANGUAGE OF VUITTON'S PROPOSED** |
| | ) **PERMANENT INJUNCTION** |
| | ) |
| AKANOC SOLUTIONS, INC., et al., | ) Trial Date: August 18, 2009 |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

165707.1-10562-002-8/7/2009

DEFENDANTS' OBJECTIONS TO
LANGUAGE OF VUITTON'S PROPOSED
PERMANENT INJUNCTION
– C 07-3952 JW

Dockets.Justia.com

## TABLE OF CONTENTS

**Page**

I.    OBJECTIONS TO PROPOSED PERMANENT INJUNCTION ...................................... 1

    A.    Vuitton's Proposed Injunction is Fundamentally Flawed ................................. 1

    B.    Inadequate Findings Section ..................................................................................... 2

        1.    The Proposed Findings Are Insufficient to Justify An Injunction [2:8-10] .................................................................................................................. 2

        2.    Vuitton Cannot Satisfy the Legal Standard for Issuance of a Permanent Injunction For Future Infringements. .................................. 3

        3.    Vuitton Cannot Satisfy *eBay* Four-Part Test ....................................... 4

    C.    The Proposed Permanent Injunction Violates the Restrictions on Injunctive Relief Available Against ISPs In Section 512(j) of the DMCA (17 U.S.C. § 512) ............................................................................................................. 8

    D.    General Prohibitions [pg. 2:11-21] .......................................................................... 9

        1.    The Specific Language of the Injunction Fails to Comply With the Law ....................................................................................................................... 9

    E.    Strict Compliance Obligations  (pg. 2:22-4:2) .................................................. 12

        1.    Obtain and Publish Contact Information of Customers [p. 3:3-6]........... 13

        2.    Procedures When Receiving Complaints From Vuitton [p. 3:12-4-2]........................................................................................................................ 14

            a.    Acknowledge receipt of notice of infringement [p. 3:14] ................ 14

            b.    "Assign a tracking number" [p. 3:15-16] .......................................... 14

            c.    "Notify … customer of Complaint within 24 hours" [p. 3:17-20] ........................................................................................................ 14

            d.    Take Disabling Action if Website On Servers 72 hours After Vuitton Complains  [p. 3:18-22]...................................................... 15

            e.    Bar Further Access to the Domain Name if Website On Servers 72 hours After Vuitton Complaint  [p. 3:18-24] ............... 16

            f.    "Accomplish a Permanent Stop" to Infringing Activity [p. 3:24-4:2]................................................................................................. 17

II.    CONCLUSION ............................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Dyer v. Northwest Airlines Corporations,*
 334 F.Supp.2d 1196 (D.N.D. 2004) ................................................................... 17

*eBay Inc., v. MercExchange, LLC,*
 547 U.S. 388, 126 S.Ct. 1837 (2006) ........................................................ 1, 3, 4

*Falstaff Brewing Corp. v. Miller Brewing Co.,*
 702 F.2d 770 (9th Cir.1983) ............................................................................. 16

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,*
 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974) ...................................... 10

*Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*
 955 F.2d 1143 (7th Cir. 1992) ................................................................ 7, 12, 18

*Inwood Labs., Inc. v. Ives Labs., Inc.,*
 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ...................................... 2

*Lockheed Martin Corp. v. Network Solutions, Inc.,*
 194 F.3d 980 (9th Cir. 1999) ........................................................................ 2, 16

*Lockheed Martin v. Network Solutions*
 985 F.Supp. 949 (C.D. Cal. 1997) ........................................................... 7, 12, 18

*MDT Corp. v. New York Stock Exch.,*
 858 F.Supp. 1028 (C.D.Cal.1994) ........................................................... 7, 12, 18

*MGM Studios, Inc. v. Grokster, Ltd.,*
 518 F.Supp.2d 1197 (C.D. Cal. 2007) ............................................................ 2, 4

*Pacific R. Co. v. Mower,*
 219 F.3d 1069 (9th Cir. (Or.) 2000) ................................................................... 9

*Price v. City of Stockton,*
 390 F.3d 1105 (9th Cir.2004) .................................................................. 10, 15, 16

*Schmidt v. Lessard,*
 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) ........................................ 10

*Weinberger v. Romero-Barcelo,*
 456 U.S. 305 (1982) ............................................................................................ 4

**DOCKETED**

*Microsoft Corp. v. Evans,*
 2007 WL 3034661 (E.D. Cal. Oct. 17, 2007) ................................................... 10

*Tiffany, Inc. v. Ebay, Inc.*
  2008 WL 2755787 (S.D.N.Y. July 14, 2008) ............................................................ 7, 12, 18

**FEDERAL RULES AND STATUTES**

17 U.S.C. § 512 ............................................................................................................ 8

17 U.S.C. § 512(c)(2) ............................................................................................. 8, 13

17 U.S.C. § 512(j) ............................................................................................... 2, 8, 9

17 U.S.C. § 512(j)(1)(A) ............................................................................................. 9

18 U.S.C. § 2510(12) ........................................................................................... 6, 17

18 U.S.C. § 2511(2)(a)(i) ............................................................................................ 6

18 U.S.C. § 2701(a) .................................................................................................... 6

18 U.S.C. § 2701(b) .................................................................................................... 6

18 U.S.C. § 2702(a)(1) ......................................................................................... 6, 17

Fed. R. Civ. P. 65 ..................................................................................................... 10

Fed. R. Civ. P. 65(d) .................................................................................. 1, 3, 15, 16

Fed. R. Civ. P. 65(e) ................................................................................................... 1

**OTHER AUTHORITIES**

*Nimmer on Copyright*, § 12.04[A][3][a] .................................................................... 2

1    Pursuant to the Court's Final Pretrial Conference Order dated July 15, 2009 [Document No.

2    189] Defendants Managed Solutions Group, Inc., Akanoc Solutions, Inc. and Steve Chen hereby

3    object to the language of plaintiff Louis Vuitton Malletier's ("Vuitton") proposed permanent

4    injunction:

5    **I.     OBJECTIONS TO PROPOSED PERMANENT INJUNCTION**

6        **A.     Vuitton's Proposed Injunction is Fundamentally Flawed**

7        Vuitton's proposed injunction reveals a fundamental misunderstanding of the technology, the

8    law and the nature of the business at issue in this case. The proposed injunction, even if Vuitton can

9    prove at trial any past contributory infringement by any defendant, contravenes applicable statute

10   and case law on direct and contributory infringement of copyrights and trademarks as well as the law

11   restricting issuance of any prohibitory injunction. Vuitton's injunction language is vague and

12   indefinite as to what conduct would be prohibited so as to deny defendants clear direction and the

13   Court any ability to determine a violation. The injunction language improperly imposes on

14   defendants vast duties of future Internet policing of Vuitton's many marks and works. It seeks to

15   make defendants liable for unknown (and unknowable) acts of alleged infringement by unknown and

16   unidentified third-parties.

17       Vuitton falsely assumes that the defendants have the technical or practical means to

18   accomplish the permanent "barring" of whatever third-party conduct Vuitton complains about in the

19   future, displaying an unconcern with Internet or ISP technical operations. These problems are in

20   addition to Vuitton ignoring the legal limits on an ISP's duty to take action on infringement

21   complaints to say nothing about the criminal prohibition on ISP monitoring of Internet

22   communication and server content.  The bottom line is that the proposed injunction cannot be

23   complied with and, if it were entered, guarantees that the defendants will immediately be accused of

24   violating it if they do not simply go out of business.

25       Vuitton's proposed injunction does not comply with the requirements of F.R.Civ.P. 65(d) and

26   (e) and does not meet the requirements of *eBay Inc., v. MercExchange, LLC,* 547 U.S. 388, 391, 126

27   S.Ct. 1837 (2006). There is no suggestion of irreparable harm necessary to justify any injunction.

28   Vuitton perhaps ignores these legal requirements because its real objective is to  put defendants out

of business.  It is entirely improper to seek a permanent injunction concerning *future* conduct at currently *unknown* websites not parties to this suit, appears to assume that any appearance by certain domain names on defendants' servers is an infringement without the need for Vuitton to prove any direct or contributory infringement. It would also make Vuitton the sole arbiter of what is "infringing."[1]

The injunction terms also ignores the limitations on injunctive relief against ISPs in Section 512(j) of the Digital Millennium Copyright Act ("DMCA") and would require the defendants to engage in conduct that Congress has made criminal under the Stored Communications Act.  The proposed injunction is impossible, impractical and illegal and should be denied entirely.

**B.      Inadequate Findings Section**

**1.      The Proposed Findings Are Insufficient to Justify An Injunction [2:8-10]**

Vuitton's proposed injunction is based on an incorrect premise.  Paragraph 4 of the Findings states the injunction is issuing because of "the continued provision of Internet hosting and routing services to direct infringers [after notice]." [pg. 2:8-10]  But, even if this were proven, such a finding cannot support liability for direct or contributory infringement, and cannot justify the sweeping injunction proposed by Vuitton.[2]

Entitlement to an injunction requires that Vuitton prove, in addition to establishing all

---

[1]Even if Vuitton proves at trial that infringement occurred at a particular website, a permanent injunction even as to that website is barred unless Vuitton can ***prove*** the direct infringement ***will*** continue on defendants' servers at that website in the future: **"Irreparable harm cannot be established solely on the fact of past infringement**. Additionally, it must also be true that **the mere likelihood of future infringement** by a defendant **does not** by itself **allow** for an **inference of irreparable harm**. … [T]he onus is on Plaintiffs** to explain **why future infringements would cause irreparable harm. It cannot be presumed**."  *MGM Studios, Inc. v. Grokster, Ltd.,* 518 F.Supp.2d 1197, 1214-15 (C.D. Cal. 2007).

[2]For contributory copyright liability to attach, in addition to proving direct infringement the defendants must **act in concert** with a direct infringer:  "In order to deemed a contributory [copyright] infringer, the authorization or assistance must bear some direct relationship to the infringing acts, **and the person rendering such assistance or giving such authorization must be acting in concert with the infringer**."  *Nimmer on Copyright,* § 12.04[A][3][a].

For contributory trademark liability to attach, in addition to proving direct infringement the defendants must either intentionally induce a third party to infringe or directly control and monitor the instrumentality (the website) used by the direct infringer to infringe. *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 853-54, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606 (1982); *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 983, 985 (9th Cir. 1999)

1  elements of direct and contributory liability, that it will suffer irreparable injury if the injunction

2  does not issue.  *eBay Inc., v. MercExchange, LLC,* 547 U.S. 388, 391, 126 S.Ct. 1837 (2006)  But

3  Vuitton cannot possibly prove irreparable injury as to *future* infringements allegedly occurring at

4  websites *it does not identify*, based upon past infringements at different websites.  Just because

5  Vuitton sends a complaint about a website does not establish that direct infringement (and

6  irreparable injury) has occurred. [p. 3:12-4:2] Direct infringement (and irreparable injury) by

7  unknown parties in the future cannot be presumed simply because a website uses a defendant's

8  server. [p. 2:14-21]  Vuitton's injunction language would make Vuitton the sole arbiter of future

9  infringement apparently based on the assumption that Vuitton can determine future direct

10 infringement (perhaps because of seeing a domain name on a third-party report listing an IP address

11 being used by that domain) without establishing the identity of a direct infringer, establishing the

12 elements of direct infringement, and without establishing any significant relationship between an

13 alleged direct infringer and one of the defendants. For example, Vuitton seems to assume that if a

14 named domain in the past sold infringing goods, that it must always in the future be presumed be

15 selling infringing goods.  This disregards possible changes in merchandise or even site ownership.

16      Vuitton's basis for a permanent injunction boils down to this: Defendants must be

17 contributorily liable if they provide ISP services to certain unnamed websites after a notice from

18 Vuitton. [p. 2:8-10] Based on this assertion, (1) any website about which Vuitton provides a future

19 notice is automatically infringing and (2) defendants are automatically contributorily liable for

20 hosting the website without further evidence. [p. 2:8-10]  This sounds fanciful, but no other possible

21 bases exist for finding defendants in contempt.

22      Vuitton's proposed language does not meet the requirements of F.R.Civ.P. 65(d) because it

23 does not "state the reasons why [the injunction] is issued," does not state its terms specifically," and

24 does not "describe in reasonable detail—and not by referring to the complaint or other document—

25 the act or acts restrained or required."

26          **2.      Vuitton Cannot Satisfy the Legal Standard for Issuance of a Permanent
                       Injunction For Future Infringements.**

27

28      Vuitton must satisfy a four-part test to be entitled to a permanent injunction in this case even

if liability is proven at trial. In *eBay Inc., v. MercExchange, LLC,* 547 U.S. 388, 126 S.Ct. 1837 (2006), the Supreme Court unanimously held that a mere finding of infringement (there, of a patent) does **not** automatically entitle the owner of an intellectual property right to receive an injunction. Rather, like any other plaintiff, the owner of an infringed property right must satisfy a four-part test to invoke a federal court's equitable powers. Vuitton must prove **(1) irreparable injury (2) the remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) an injunction is warranted because the balance of hardships favors Vuitton; and (4) the public interest would not be disserved by a permanent injunction**. *Id.* at 391

*Grokster, Ltd.,* 518 F.Supp.2d 1197, confirmed that this standard applies in copyright cases. The Ninth Circuit has applied the *eBay* factors to Lanham Act claims. *Reno Air Racing Ass'n., Inc. v. McCord.* 452 F.3d 1126, 1137-38 (9th Cir. 2006).

The *Grokster* court quoted the Supreme Court's admonishment in *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) that "[a]n injunction should issue only where the intervention of a court of equity is essential in order effectually to protect property rights against injuries otherwise irremediable. . .." and continued:

> As recently confirmed by the Supreme Court [in *eBay*], **Plaintiffs must meet their burden with respect to the traditional four-part test**. … Further, the Supreme Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.

*Grokster,* 518 F.Supp.2d at 1208 (internal quotes and citations omitted).

### 3.   Vuitton Cannot Satisfy *eBay* Four-Part Test

***Irreparable Harm:*** The *Grokster* court confirmed that post-*eBay* "there can be no presumption of irreparable harm in the permanent injunction context" even if a plaintiff is successful on the merits. *Id.* at 1211   Moreover, **"[i]rreparable harm cannot be established solely on the fact of past infringement**. Additionally, it must also be true that the mere likelihood of future infringement by a defendant does not by itself allow for an inference of irreparable harm. … **[T]he onus is on Plaintiffs to explain why future infringements would cause irreparable harm.** It cannot be presumed." *Id.* at 1214-1215

At trial Vuitton will be unable to prove irreparable harm caused by websites listed in its first amended complaint. Among other considerations, Vuitton has admitted that it cannot identify any lost sales from the past infringement alleged in this case. Despite its complaints about alleged "counterfeiters" in this case, Louis Vuitton sales have been increasing dramatically in the period of this lawsuit. Attached as exhibits to the supporting Declaration of James Lowe are excerpts from the public financial reports of LVMH, Louis Vuitton's parent company. These reports show Louis Vuitton quarter by quarter "double-digit organic revenue growth," "strong momentum continued" and "excellent performance in Europe, U.S. and Asia, especially China. For example, in the latest quarterly report (Quarter 1, 2009) LVMH reports "good momentum in fashion and leather goods" in Asia, in the U.S. and in Europe. "Louis Vuitton:  Double digit revenue growth. All regions showing positive revenue growth in Euros. Continued strong momentum in Europe and Asia." This reported positive revenue growth is occurring during the worst world wide recession in memory.[3]

Since Vuitton cannot establish any actual damages it seeks in this case only statutory damages. Since Vuitton cannot show any damages over the past several years, it is speculative and unreasonable for Vuitton to assert that it will be irreparably injured by future "counterfeiters." It is just as likely that Vuitton is actually benefitting from counterfeiters' advertising. But even if Vuitton could show harm at all, that does not prove irreparable injury as to purported future infringements. Unless Vuitton can prove that it will be irreparably harmed by actual infringements occurring in the future at particular websites (and it cannot), its proposed injunction should be denied out of hand.

Vuitton's trial proofs will also fail regarding the remaining factors:

***Monetary Damages Inadequate to Compensate for Injury:*** Vuitton has made no effort to demonstrate that only equity can provide "compensation" for a harm beyond money damages. Where, as here, there is no injury, discussion of compensation makes no sense. Vuitton cannot establish that an injunction must issue to increase its revenue growth beyond "double digits."

***Balance of Hardships:*** Vuitton's proposed injunction attempts to abdicate Vuitton's duty to police its marks and copyrighted works and force the defendants to do so for them. In doing so,

---

[3]Unsurprisingly Vuitton has recently filed a motion in limine to exclude these financial reports.

1   Vuitton ignores the fact that there is no lawful or practical way for Defendants to monitor

2   information transmitted through or stored on the servers they rent to resellers.  With 40,000 IP

3   addresses accessing 1,500 Internet servers constantly, there is no practical means to wiretap

4   communication or monitor content in such a way that can prevent or identify every appearance of a

5   copyrighted work or a trademark appearing on the servers.  Such monitoring would not only be

6   unlawful but would be a criminal offense.

7        MSG and Akanoc are prohibited by U.S. law from monitoring or viewing customer activity

8   except for maintenance purposes or upon issuance of a search warrant. Section 2511(2)(a)(i) of the

9   Stored Communications Act, 18 U.S.C. § 2511(2)(a)(i) ("**[A] provider** of wire communication

10  service to the public **shall not utilize service observing or** random **monitoring** except for

11  mechanical or service quality control checks."(emphasis added))  Additionally, section 2702(a)(1) of

12  the SCA, 18 U.S.C. § 2702(a)(1), then prohibits Defendants from disclosing the contents of

13  communications in electronic storage to Vuitton or anyone else:

14          A person or entity providing an electronic communication[4] service to
            the public **shall not** knowingly **divulge** to any person or entity the
15          **contents** of a **communication** while **in electronic storage** by that
            service. (emphasis added)
16

17       The monitoring Vuitton demands in its injunction is a criminal act. Sections 2701(a) and (b)

18  of the SCA , 18 U.S.C. § 2701(a) and (b), create the criminal offense of accessing communications

19  in electronic storage:

20          (a) Offense. Except as provided in subsection (c) of this section
            whoever—
21          (1) intentionally accesses without authorization a facility through
            which an electronic communication service is provided; or
22          (2) intentionally **exceeds an authorization** to access that facility;
            and thereby **obtains**, alters, or prevents authorized **access to a wire or**
23          **electronic communication while it is in electronic storage** in such
            system shall be punished as provided in subsection (b) of this section.
24          * * *

25          (b) Punishment. The punishment for an offense under subsection (a) of

26  ──────────────────────
    [4]An " 'electronic communication' [is defined as:] any transfer of signs, signals, writing, images,
27  sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio,
    electromagnetic, photoelectronic or photooptical system that affects interstate or foreign
28  commerce..." 18 U.S.C. § 2510(12).

1    this section is-
     (2) in any other case—
2    (A) a fine under this title or **imprisonment for not more than 1 year**
     or both, **in the case of a first offense** under this paragraph.

3

4         Vuitton has no right to demand and this Court cannot order the defendants to perform

5    criminal acts, regardless of any alleged benefits to Vuitton for doing so.  The defendants simply are

6    prohibited from doing the monitoring or "service observing" that would be necessary to prevent an

7    infringer from communicating or storing allegedly infringing works or marks on its Internet servers.

8    This is why Vuitton can show no precedent for the suit it brings or the relief it demands. This

9    plaintiff is not entitled to drive the defendants out of business or to seek enormous damages because

10   the defendants will not commit crimes to protect the sales of its luxury goods.

11        It is not the responsibility of any ISP to police its servers for infringing material. Every court

12   that has considered the issue has held that it is the responsibility of a copyright or trademark owner

13   to identify infringement and then send notices to an ISP.  *Lockheed Martin v. Network Solutions* 985

14   F.Supp. 949 (C.D. Cal. 1997) (a domain registrar has "no affirmative duty to police the Internet in

15   search of potentially infringing uses of domain names."); *Tiffany, Inc. v. Ebay, Inc.*, 2008 WL

16   2755787, at *47 (S.D.N.Y. July 14, 2008) ("[W]hile the Court is sympathetic to Tiffany's

17   frustrations in this regard, the fact remains that rights holders bear the principal responsibility to

18   police their trademarks."); *see MDT Corp. v. New York Stock Exch.,* 858 F.Supp. 1028, 1034

19   (C.D.Cal.1994) ("The owner of a trade name must do its own police work."); *Hard Rock Cafe*

20   *Licensing Corp. v. Concession Services, Inc.*  955 F.2d 1143, 1149 (7th Cir. 1992) (defendants are

21   not required "to be more dutiful guardians of [trademark plaintiffs'] commercial interests).

22        The proposed permanent injunction shifts the burden of policing Vuitton's marks onto

23   defendants. It requires that defendants monitor their servers for specific domains in violation of

24   federal law in order to "bar further access to the domain name on any server owned by Defendant(s)

25   or any of them." [3:22-23] As other courts have recognized, it is obviously far less burdensome on

26   Vuitton, like every other rights holder, to police its own intellectual property on the Internet and give

27   DMCA-complaint notice of infringement.

28        ***Public Interest:*** The public interest does not favor Vuitton.  There is no possibility MSG and

1   Akanoc could ever comply with Vuitton's proposed permanent injunction. Because the inevitable

2   result of failing to comply is a contempt sanction, Vuitton's real purpose appears to be shutting

3   down lawful ISP businesses.  Vuitton likely wants to put these defendants out of business in order to

4   use them as object lessons when threatening other ISPs.  Provision of ISP services is not only

5   legitimate, it is necessary to the modern economy.  Shutting down an ISP that provides such services

6   to the public hardly favors the public interest.

7   **C.**      **The Proposed Permanent Injunction Violates the Restrictions on Injunctive Relief Available Against ISPs In Section 512(j) of the DMCA (17 U.S.C. § 512)**

8

9   Vuitton's proposed injunction violates the restrictions on injunctions in Section 512(j) of the

10  Digital Millennium Copyright Act ("DMCA").   Section 512(j) limits the form and scope of

11  injunctive relief against Internet Service Providers, like the defendants, who qualify for safe harbor

12  under the Act.[5]

13      With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), **the court may grant injunctive relief with respect to a service provider only in one or more of the following forms**:

14

15

16      (i) An order restraining the service provider from **providing access to infringing material** or activity residing **at a particular online site** on the provider's system or network.

17

18      (ii) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and **is identified in the order**, by terminating the accounts of the subscriber or account holder that are specified in the order.

19

20

---

21  [5]On November 26, 2007 MSG's and Akanoc's Interim Designations of Agent to Receive Notification of Claimed Infringement, were received by the U.S. Copyright Office. MSG and

22  Akanoc became eligible to receive the protections afforded by the DMCA.  *See* 17 U.S.C. § 512(c)(2):  **Designated agent**. – The limitations on liability established in this subsection apply to

23  a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including

24  on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

25      (A) the name, address, phone number, and electronic mail address of the agent.

26      (B) other contact information which the Register of Copyrights may deem appropriate.

27  The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, in both electronic and hard copy formats, and may require

28  payment of a fee by service providers to cover the costs of maintaining the directory.

1     (iii) Such other injunctive relief as the court may consider necessary to
prevent or restrain infringement of copyrighted material specified in
the order of the court **at a particular online location**, if such relief is
the least burdensome to the service provider among the forms of relief
comparably effective for that purpose.

17 U.S.C. § 512(j)(1)(A).

   Section 512(j) explains that injunctive relief against an ISP is limited to prohibiting access to a particular website.  This standard implicitly acknowledges the realities of the on-line world and the fact that Internet hosts cannot "accomplish a permanent stop to complained-of infringing activity" [p. 4:1-2] or "insure that [infringement] is not resumed on servers or using facilities owned by [the ISP]. [p. 3:10-11] Section 512(j) also recognizes that rights-holders such as Vuitton must police their own works on the Internet.  ISPs cannot be, and *are* not, expected to do the policing job for rights holders, including even Louis Vuitton.

  **D.**  **General Prohibitions [pg. 2:11-21]**

    **1.**  **The Specific Language of the Injunction Fails to Comply With the Law**

   Paragraph 4(a) of the proposed injunction [pg. 2:11-21] is a "catch-all" provision that appears to cover any real or imaginary infringing activity, even if Vuitton does not give notice.  It burdens MSG and Akanoc with the impossible task of locating potentially infringing content, and determining if that content is "unauthorized."  Paragraph 4(a) does not require Vuitton even to give notice of an infringing site or make a complaint as required under the DMCA or otherwise. This is a "gotcha" provision with the apparent intent to capture all possible activity in order to be able to impose additional conditions under paragraph (b) so that the defendants cannot avoid being "found in violation of paragraph (a) of this Injunction." [pg. 2:22-23]

   "Federal Rule of Civil Procedure 65(d) requires that an injunction "state its terms specifically" and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."[6] An injunction must provide a fair and precisely

---

[6] *Pacific R. Co. v. Mower,* 219 F.3d 1069, 1072-73 (9th Cir. (Or.) 2000) "Federal Rule of Civil Procedure 65 requires that an injunction "be specific in terms" and "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). … The injunction issued against Mower does not even come close to satisfying Rule 65's specificity requirements; it provides little, if any, guidance to Mower regarding **how he should determine what particular information is confidential or privileged**.") *Id.* at 1077

                  DEFENDANTS' OBJECTIONS TO
LANGUAGE OF VUITTON'S PROPOSED
PERMANENT INJUNCTION
– C 07-3952 JW

1   drawn notice of what the injunction actually prohibits as required by Fed.R.Civ.P. 65.[7]

2       The Ninth Circuit has further held that "an injunction must be narrowly tailored ... to remedy

3   only the **specific harms** shown by the plaintiffs, **rather than 'to enjoin all possible breaches of the**

4   **law**.'" *Price v. City of Stockton,* 390 F.3d 1105, 1117 (9th Cir.2004); *Microsoft Corp. v. Evans,* 2007

5   WL 3034661 (E.D. Cal. Oct. 17, 2007) (same), citing *Iconix, Inc. v. Tokuda,* 457 F.Supp.2d 969,

6   998-999 (N.D.Cal.2006) ("Plaintiff has succeeded only in showing irreparable harm arising out of

7   **past acts of copyright infringement**. The Court must therefore **narrowly tailor its** preliminary

8   **injunction to remedy that particular harm**.")

9       The General Prohibitions are improper cannot be included in even a justified injunction.  The

10   terms are not stated with sufficient specificity and the language far exceeds the scope of any

11   infringement (even if Vuitton prevails at trial).  Rather than tailor its injunction to remedy the

12   specific harms at issue, Vuitton improperly seeks to enjoin all possible infringements by asking the

13   Court to restrict defendants as to alleged future harms involving websites having no connection to

14   this case.  Vuitton asks the Court to restrict MSG and Akanoc, as to:

15       • **"knowingly infringing, either directly or contributorily, in any manner,**

16         **including generally,"** The meaning of this phrase is unclear and open-ended.  It does

17         not qualify as a "fair and precisely drawn notice of what the injunction actually

18         prohibits." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck*

19         *Drivers,* 415 U.S. 423, 444, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)

20       • **"any unauthorized product,"**   The scope far exceeds the requirement that an

21         injunction "remedy only the specific harms shown by the plaintiff."  Vuitton has not

22         shown irreparable injury at any unnamed website that may or may not infringe the

23         "Louis Vuitton Properties" sometime in the future.  The language is also neither fair

24

---

25   [7]*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 444,
    94 S.Ct. 1113, 39 L.Ed.2d 435 (1974) (stating that the party enjoined should "receive fair and
26   precisely drawn notice of what the injunction actually prohibits"); . *Schmidt v. Lessard,* 414 U.S.
    473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974) ("The specificity provisions of Rule 65(d) are "no
27   mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the
    part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation
28   on a decree too vague to be understood.").

DEFENDANTS' OBJECTIONS TO
LANGUAGE OF VUITTON'S PROPOSED
PERMANENT INJUNCTION
– C 07-3952 JW

1   or precisely drawn.  The defendants cannot determine what is an "unauthorized

2   product."  MSG or Akanoc are not experts on Vuitton's marks and copyrights and

3   products.  If this injunction issued the defendants would be unable to tell if a

4   particular product is "unauthorized."  MSG and Akanoc would therefore have no idea

5   if they were actually in violation of the injunction and would be entirely at the mercy

6   of Vuitton.

7   • **"which features any of the Louis Vuitton Properties, copies of the Louis Vuitton**

8   **Properties, or confusingly similar reproductions of the Louis Vuitton**

9   **Properties,"** again MSG and Akanoc have no expertise on the genuineness of

10   Vuitton products for sale on the Internet, or what "copies" of "Louis Vuitton

11   Properties" are, or what a "confusingly similar reproduction" of a Louis Vuitton

12   Property might be.

13   • **"Restrained and enjoined from … hosting websites that are engaged in**

14   **manufacture, import, advertisement, offer for sale, sale or distribution of**

15   **Unauthorized Products,"** apparently including unnamed websites not involved in

16   this case or found by the jury to be involved in infringement in this case.  MSG and

17   Akanoc are ISPs – they have no way of knowing if a particular website is infringing

18   Vuitton's marks and copyrighted works.   This is an attempted unconstitutional

19   expansion of the Copyright Act and Lanham Act to extraterritorial acts outside of the

20   United States.

21   Vuitton's overbroad language covers *future* infringement at any website (not just those

22   involved in this case). The Eastern District of California recently rejected similar overreaching

23   language in a proposed injunction, explaining that it was not sufficiently specific and exceeded the

24   scope of the infringement:

25   > [T]he proposed injunction would cover infringement of any other
>       works now or hereafter protected by any of Plaintiff's trademarks or
26   >       copyrights.  It would also cover the use of names, logos, or "other
>       variations thereof," terminology which is not sufficiently specific.
27   >       These aspects of the injunction would be unclear and also would
>       exceed the scope of the infringement. *Microsoft Corp. v. Evans,* 2007
28   >       WL 3034661 (E.D. Cal. Oct. 17, 2007)

11                    **DEFENDANTS' OBJECTIONS TO**
                                                                                          **LANGUAGE OF VUITTON'S PROPOSED**
                                                                                          **PERMANENT INJUNCTION**
                                                                                          **– C 07-3952 JW**

E.    **Strict Compliance Obligations  (pg. 2:22-4:2)**

Beginning at page 2:22, the proposed injunction requires defendants to "strictly comply" with obligations that no ISP can, or has ever been required to, comply with.

**First**, the strict compliance obligations improperly apply to **any website in the future that Vuitton gives notice of, even if that website actually contains no infringing content**. [pg. 3:12-4:2]  The proposed injunction eliminates the requirement that Vuitton prove direct infringement (and therefore suffer irreparable harm) as to alleged future infringements occurring at as yet unknown websites.  Instead, under the proposed language Vuitton simply sends an email from which alone direct infringement and irreparable harm are presumed.  As written MSG and Akanoc could be held in contempt for failing to permanently remove a website that does not presently exist and never sells *any* counterfeit products, simply because someone at Vuitton may have believed it did.

**Second,** because the strict compliance obligations relate directly to potential *future* infringements at unknown websites not involved in this action, the same problems regarding the lack of specificity of the language of the injunction and the fact that the injunction exceeds the scope of the infringement (discussed above under the "General Prohibitions" section above) applies.

**Third**, the proposed injunction would require defendants to undertake a probably impossible job of monitoring the Internet for any sign that certain websites had reappeared on their servers.[8] But this is Vuitton's job.[9]  No ISP can operate their business saddled with these burdensome and

---

[8]  MSG and Akanoc must "bar further access to the domain name on any server owned by Defendant(s) or any of them." [pg. 3:22-23]  Without any notice from Vuitton, they are required to "[t]ake such additional action … if activity complained of resumes on any server owned by Defendants … as may be required to accomplish a permanent stop to the complained of infringing activity." [pg. 3:24-4:2]

[9]  See *Hard Rock Café Lic. Corp. v. Concession Svcs, Inc.,* 955 F.2d 1143, 1149 (7th Cir. 1992) (defendants are not required "to be more dutiful guardians of [trademark plaintiffs'] commercial interests; *MDT Corp. v. New York Stock Exch.,* 858 F.Supp. 1028, 1034 (C.D.Cal.1994) ("The owner of a trade name must do its own police work."); *Lockheed Martin v. Network Solutions* 985 F.Supp. 949 (C.D. Cal. 1997) (a domain registrar has "no affirmative duty to police the internet in search of potentially infringing uses of domain names."); *Tiffany, Inc. v. Ebay, Inc.* 2008 WL 2755787 at *47 (S.D.N.Y. 2008).

Whether Defendants are best situated, or it is cheaper for Defendants to police trademark infringement, it is not their legal responsibility to do so.  *Tiffany, Inc.* at *47 ("[E]ven if it were true that eBay is best situated to staunch the tide of trademark infringement to which Tiffany and countless other rights owners are subjected, that is not the law.")

1    impossible requirements.

2           Vuitton's injunction language appears to be an effort to make every outrageous demand it

3    can think of rather than any serious effort to prohibit real harm. For example, Vuitton demands the

4    Court require MSG and Akanoc to:

5                    **1.      Obtain and Publish Contact Information of Customers [p. 3:3-6]**

6           Paragraph (b)(ii) [p. 3:3-6] requires MSG and Akanoc to "**obtain and publish on their**

7    **website(s) complete and accurate contact information** (including but not limited to name, current

8    and valid email and physical addresses, telephone and facsimile numbers) … **for their customers**."

9           This outrageous demand is calculated to put defendants out of business. **First,** the defendants

10   have no way of obtaining this information, and cannot be responsible for its accuracy. The

11   defendants only do business with Internet hosting resellers, not website operators. The information

12   would not be useful because defendants' customers do not operate infringing websites.  Resellers

13   cannot practically or legally be required to provide such information.  **Second,** this is fundamental

14   trade secret information that is the source of all business and must be protected. Publishing this

15   information would likely drive the defendants' customers away or else invite competitors to steal

16   them.  **Third,** it is clearly intended to allow Vuitton (and anyone else, including defendants'

17   competitors) to harass customers.  **Fourth**, it goes far beyond the requirements of the DMCA.  The

18   DMCA requires only that ISPs designate an agent to receive notifications of claimed infringement

19   and posts the name, address, phone number, and electronic mail address *of the agent* on its website

20   and with the Copyright office.[10]   There is no basis in the law for requiring an ISP or any other

21   business to post contact information for its customers on a website. Aside from the blatantly

22   _____

23   [10]17 U.S.C. § 512(c)(2):   **Designated agent**.--The limitations on liability established in this
     subsection apply to a service provider only if the service provider has designated an agent to receive

24   notifications of claimed infringement described in paragraph (3), by making available through its
     service, including on its website in a location accessible to the public, and by providing to the

25   Copyright Office, substantially the following information:

         (A) the name, address, phone number, and electronic mail address of the agent.

26       (B) other contact information which the Register of Copyrights may deem appropriate.

27   The Register of Copyrights shall maintain a current directory of agents available to the public for
     inspection, including through the Internet, in both electronic and hard copy formats, and may require

28   payment of a fee by service providers to cover the costs of maintaining the directory.

outrageous nature of this demand, it would violate the privacy rights of all customers.  **Fifth**, no business can be required to publicly publish all contact information about its customers.

### 2.      Procedures When Receiving Complaints From Vuitton [p. 3:12-4-2]

Paragraph (b)(iv) [p. 3:12-6] requires a substantial and unworkable set of procedures beyond what is done in the industry and is fundamentally unworkable.  They include:

### a.      Acknowledge receipt of notice of infringement [p. 3:14]

Paragraph (iv)(1) requires MSG and Akanoc to "promptly acknowledge" receipt of "notice of infringement."   Requiring an ISP to acknowledge receipt is not required under the DMCA, is not typical in the industry, and is burdensome because of the many notices of various types (spam, counterfeiting, illegal content) that are received each day.   To hold MSG or Akanoc in contempt if they fail to "promptly" acknowledge receipt is unreasonable.

### b.      "Assign a tracking number" [p. 3:15-16]

Paragraph (iv)(2) requires MSG and Akanoc to "assign a tracking number" to be used on all correspondence. This requirement is not typical in the industry, is a burden on a small business and would entail substantial record keeping obligations without any real benefit.

### c.      "Notify … customer of Complaint within 24 hours" [p. 3:17-20]

Paragraph (iv)(3) requires MSG and Akanoc to "notify their customer(s) of the Complaint within twenty-four (24) hours of receipt." Ordinarily this is not a problem, but some days when there are other activities going on this could be difficult to meet.  For example if there are major technical problems (such a denial of service attack, "ddos" when personnel and technical resources must be used elsewhere to help business operating), or when law enforcement requires defendants' help because of a warrant or subpoena (periodically defendants are contacted by FBI, CIA or Homeland Security for assistance), or when major spam attacks occur, or when customers are having technical difficulties. There are limited personnel to do all the work and it is impractical to give Vuitton complaints absolute priority, especially if failure to do so results in contempt of court.

There is no requirement under any statute or case that take-down notices be sent out in a specific period of time.  MSG and Akanoc get the complaint notices out as soon as possible, often in less than 24 hours. But to mandate this, under penalty of contempt, ignores the realities of the ISP

1   business model and is inherently unreasonable.

2               d.      **Take Disabling Action if Website On Servers 72 hours After**
                        **Vuitton Complains [p. 3:18-22]**
3

4       Paragraph (iv)(3) also requires that MSG and Akanoc "disable access to the infringing

5   content" if "activity complained of is still accessible … seventy-two (72) hours after customer

6   notification."

7       **First**, it is unclear what "infringing content" is being referenced.  Fed.R.Civ.P. 65(d) requires

8   that the terms of an injunction be stated with specificity.  The proposed language also does not

9   appear to be narrowly tailored to remedy only specific harms, but to enjoin all possible

10  counterfeiting of its intellectual properties now or in the future. *Price v. City of Stockton,* 390 F.3d

11  1105, 1117 (9th Cir.2004) ("[A]n injunction must be narrowly tailored ... to remedy only the **specific**

12  **harms** shown by the plaintiffs, **rather than 'to enjoin all possible breaches of the law**.'")

13      **Second**, placing a 72 hour time-limit on this process is unworkable in practice, as sometimes

14  customers may not respond immediately.  Disabling access to infringing content requires either

15  disabling the IP address or unplugging an entire server.  Either action would likely disrupt service to

16  other legitimate Internet operations.   In the defendants experience, a single IP address can be used

17  by up to a hundred separate websites or other domains.  Multiple IP addresses are usually directed to

18  a single server (a minimum of ten are provided by defendants with each server rental) so a thousand

19  or more Internet users could be taken out of service simply because a single domain is not

20  immediately responsive to an unverified Vuitton complaint.  There is no basis in the DMCA or the

21  law for imposing this draconian requirement.  Allegedly infringing websites are normally taken

22  down by the customer within 72 hours, but on those occasions where that is not possible defendants

23  should not punish a thousand or more innocent Internet users to meet an arbitrary deadline (and

24  avoid a contempt citation).

25      **Third**, the harsh consequences to innocent parties of taking down an entire server within 72

26  hours of notice in all cases is heightened by the fact that the injunction applies to *any* website

27  Vuitton decides to complain about, even if the website does not contain infringing content.  The only

28

1   requirement is that Vuitton give notice, and everyone's guilt is presumed.[11]  No specific finding of

2   actual infringement and irreparable harm need be made by Vuitton before defendants are required to

3   unplug servers or disable IP addresses.

4               **e.      Bar Further Access to the Domain Name if Website On Servers 72
                          hours After Vuitton Complaint  [p. 3:18-24]**
5

6           Paragraph (iv)(3) also requires that MSG and Akanoc "bar further access to the domain name

7   on any server owned by Defendant(s)" if "activity complained of is still accessible … seventy-two

8   (72) hours after customer notification."

9           **First**, it is unclear what "activity" is being "complained of."  Fed.R.Civ.P. 65(d) requires that

10  the terms of an injunction be stated with specificity.  The proposed language is not narrowly tailored

11  to remedy only specific harms, but improperly seeks to enjoin all possible infringement by anyone of

12  all Vuitton's intellectual properties at any time in the future.  *Price v. City of Stockton,* 390 F.3d

13  1105, 1117 (9th Cir.2004) ("[A]n injunction must be narrowly tailored ... to remedy only the **specific**

14  **harms** shown by the plaintiffs, **rather than 'to enjoin all possible breaches of the law**.'")

15          **Second**, it would be impossible for defendants to comply with this requirement.  Defendants

16  cannot block, disable or control any of the domain names on their 1,500 servers.  They further have

17  no way of knowing in advance what domain name might be used on their servers or with any of their

18  40,000 IP addresses. See *Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 782 n.7 (9th

19  Cir.1983) ("Generally, impossibility is a complete defense to a charge of contempt.")

20          Vuitton has no evidence that any ISP has the ability to block access by a domain.  Vuitton

21  would have to get a domain registrar (responsible to ICANN) to disable a domain name.  The

22  defendants are not domain registrars (unlike some industry giants like Yahoo!).  Only a domain

23  registrar can stop the use of a domain name.  But *Lockheed Martin v. Network Solutions*, 194 F.3d at

24  985 teaches that an IP owner cannot hold a registrar liable for failing to control an abusive domain

25  name (even if the registrar is in the U.S.).

26          **Third,** after a domain name is taken down or disabled it can easily reappear on a different IP

27

28  ───────────────
    [11]This may be a French legal concept but it is not followed in America.

1  address assigned to another ISP or even one assigned to defendants.  So barring further access to the

2  domain name on their servers would require defendants to monitor communications and storage on

3  their servers. But MSG and Akanoc are prohibited by federal law from monitoring or viewing

4  customer activity except for maintenance purposes or upon issuance of a search warrant.  The Stored

5  Communications Act ("SCA") prohibits Defendants from disclosing the contents of communications

6  in electronic storage:

> A person or entity providing an electronic communication[12] service to the public **shall not** knowingly **divulge** to any person or entity the **contents** of a **communication** while **in electronic storage** by that service.[13] (emphasis added)

10  MSG and Akanoc are governed by the SCA because they are Internet Service Providers

11  whose servers, routers and cables carry Internet traffic and provide access to the Internet including

12  the ability to send, receive and store electronic communications.  *Dyer v. Northwest Airlines*

13  *Corporations,* 334 F.Supp.2d 1196, 1199 (D.N.D. 2004) ("The . . .definition of 'electronic

14  communications service' clearly includes Internet service providers such as America Online, as well

15  as telecommunications companies whose cables and phone lines carry internet traffic.")

16  **f.   "Accomplish a Permanent Stop" to Infringing Activity [p. 3:24-4:2]**

18  Paragraph (v) requires that MSG and Akanoc "take such additional action . . . to accomplish

19  a permanent stop to the complained of infringing activity."

20  This is an open ended and impossible task designed to guarantee failure by the defendants

21  and permanently put them out of business.

22  **First**, defendants cannot know in advance what reseller an infringer might use to access

23  defendants' servers or what IP addresses will be used.  Nor can they monitor content (legally or

24  practically) to prevent some domain from using their facilities.

---

[12]An " 'electronic communication' [is defined as:] any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." 18 U.S.C. § 2510(12).

[13]18 U.S.C. § 2702(a)(1)

DEFENDANTS' OBJECTIONS TO
LANGUAGE OF VUITTON'S PROPOSED
PERMANENT INJUNCTION
– C 07-3952 JW

1    **Second**, defendants have no way to "accomplish a permanent stop" to infringement. If this

2    were remotely possible, there would be no infringing activity anywhere in the world. There would be

3    no spam, phishing, child porn, or any other conduct that governments around the try to stop.  There

4    would be no "ddos" attacks, no bot nets, no hacking of computer systems, etc.  But the Internet is

5    complex and impossible to fully control.

6        **Third**, MSG and Akanoc should not be held in contempt for failing to permanently stop

7    infringement at another ISP's servers. The language of the proposed injunction assumes that a

8    domain will only resurface on *defendants'* servers.  This might happen but often a domain that is

9    taken down will reappear at an IP address assigned to a different ISP.  The original ISP cannot do

10   anything. A notice must be sent to the subsequent ISP.  The proposed injunction is improper because

11   it would hold defendants in contempt even when a domain moves to another ISP's servers.

12       **Fourth**, the language of the injunction attempts to transfer the burden of policing the Internet

13   onto defendants' shoulders.  The cases that have considered the issue have all concluded that the

14   rights-holder must police its own intellectual property on the Internet.  See *Hard Rock Café Lic.*

15   *Corp. v. Concession Svcs, Inc.,* 955 F.2d 1143, 1149 (7th Cir. 1992) (defendants are not required "to

16   be more dutiful guardians of [trademark plaintiffs'] commercial interests); *MDT Corp. v. New York*

17   *Stock Exch.,* 858 F.Supp. 1028, 1034 (C.D.Cal.1994) ("The owner of a trade name must do its own

18   police work."); *Lockheed Martin v. Network Solutions* 985 F.Supp. 949 (C.D. Cal. 1997) (a domain

19   registrar has "no affirmative duty to police the internet in search of potentially infringing uses of

20   domain names."); *Tiffany, Inc. v. Ebay, Inc.* 2008 WL 2755787 at *47 (S.D.N.Y. 2008).

21       **Fifth**, even if the defendants could do what Vuitton demands or even if they go out of

22   business, Vuitton cannot possibly suggest that this would stop any counterfeiter from continuing to

23   operate on the Internet. Infringers do not need the defendants to continue doing all the business they

24   desire. The Internet is vast, counterfeiters operate throughout the world, and many means exist to

25   make, advertise, sell, and deliver counterfeit goods. Vuitton's high prices drive the demand for

26   counterfeit goods and countless people are willing to meet that demand. Infringement will not stop

27   or be affected for even a nanosecond without the defendants' Internet services. Vuitton is chasing a

28   rainbow and destroying the defendants business will not accomplish anything useful.

DEFENDANTS' OBJECTIONS TO
LANGUAGE OF VUITTON'S PROPOSED
PERMANENT INJUNCTION
– C 07-3952 JW

## II.     CONCLUSION

The proposed injunction is entirely unjustified and the terms are impossible, impractical and illegal, even if Vuitton establishes liability at trial.


Dated:  August 7, 2009                                    **GAUNTLETT & ASSOCIATES**


By:     /s/James A. Lowe
        David A. Gauntlett
        James A. Lowe
        Brian S. Edwards
        Christopher Lai

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.,
and Steve Chen