1 J. Andrew Coombs (SBN 123881)
 *andy@coombspc.com*
2 Annie S. Wang (SBN 243027)
 *annie@coombspc.com*
3 J. Andrew Coombs, A Prof. Corp.
 517 E. Wilson Ave., Suite 202
4 Glendale, California 91206
 Telephone:  (818) 500-3200
5 Facsimile:   (818) 500-3201

6 Attorneys for Plaintiff Louis
 Vuitton Malletier, S.A.

7

8      UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

10

11

| | |
|---|---|
| Louis Vuitton Malletier, S.A., | Case No. C 07 3952 JW |
| Plaintiff, | PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF RICHARD GRALNIK CONCERNING ISP PRACTICES AND THE REASONABLENESS OF DEFENDANTS' POLICIES |
| v. | |
| Akanoc Solutions, Inc., et al. | |
| Defendants. | |

TO THE COURT AND TO THE DEFENDANTS:

   PLEASE TAKE NOTICE that Plaintiff Louis Vuitton Malletier, S.A. will and hereby does

move the Court to Exclude the Testimony of Richard Gralnik Concerning ISP Practices and the

Reasonableness of Defendants' Policies.

   This motion is based on this Notice of Motion, Motion to Exclude the Testimony of

Richard Gralnik Concerning ISP Practices and the Reasonableness of Defendants' Policies,

accompanying Memorandum of Points and Authorities, the Declarations and exhibits attached

thereto, the exhibits and evidence to be presented at the hearing hereon, the pleadings, records and

1   papers on file herein and such other matters and evidence as may be presented at or before the

2   hearing.

3   Dated:  August 24, 2009                    J. Andrew Coombs, A Professional Corp.

4

5                                              ____/s/ J. Andrew Coombs_____
                                               By:  J. Andrew Coombs
6                                                    Annie S. Wang
                                               Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Louis Vuitton Malletier, S.A. ("Louis Vuitton" or "Plaintiff") brings this motion to Exclude the Testimony of Richard Gralnik Concerning ISP Practices and the Reasonableness of Defendants' Policies due to Mr. Gralnik's lack of reliable knowledge, skill, training, education and expertise on these matters.

In particular, Defendants propose to have Mr. Gralnik testify to certain opinions relating to the handling of abuse complaints by webhosts. The opinions concerning which Mr. Gralnik is not qualified to offer an opinion are highlighted in the following summary of opinions outlined in his two expert reports. In his initial Expert Report dated May 18, 2009, Mr. Gralnik expressed the following five opinions:

> **1.  *It is my opinion that Akanoc/Managed Solutions Group's procedures for responding to complaints they receive about the online activities of companies they host are reasonable and are consistent with the options available.***
>
> **2.  *It is my opinion that Akanoc/Managed Solutions Group utilizes the most severe recourse an ISP can reasonably apply in response to complaints about the alleged activities of their clients.***
>
> 3.  It is my opinion that unmanaged Internet hosting is a standard business model.
>
> 4.  It is my opinion that content filtering is not feasible as a mechanism for preventing an ISP's clients from conducting whatever business they choose.
>
> 5.  It is my opinion that the information returned by a Whois query on the Internet can contain information that is incorrect.

On June 25, 2009, Mr. Gralnik signed a Supplemental Expert Report in which he expressed the following additional opinions:

> 1.  It is my opinion that resellers are an integral part of the ISP hosting industry.
>
> 2.  It is my opinion that hosting companies that have reseller programs offer substantial similar business models for resellers.

3. *It is my opinion that hosting companies follow similar procedures for responding to complaints about websites.*

4. *It is my opinion that hosting companies do not have a set period of time for responding to a complaint.*

5. It is my opinion that if a website is not accessible on the Internet then its content is not publicly available.

During his deposition, relevant portions of which are attached hereto as Exhibit B, Mr. Gralnik could identify no training or experience which qualifies him to testify concerning webhost practices or their handling of abuse complaints.  (A copy of his resume is attached as Exhibit A.)  Worse still, Mr. Gralnik could testify to only the most cursory investigation of such practices with but a couple of webhosts – chosen for no specific reason that Mr. Gralnik could identify – which consisted of a couple of calls to unidentified webhost "help desks" and a couple of additional telephone calls with Defendant Chen and/or personnel employed by Defendant Chen.

## <u>ARGUMENT</u>

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The threshold for qualification is low, a minimal foundation of knowledge, skill, and experience suffices.  <u>Hangarter v.Provident Life & Accident Ins. Co.</u>, 373 F.3d 998, 1015-16 (9th Cir. 2004.  However, the threshold still must be met.

The trial court must determine whether so-called "expert" testimony is both reliable and relevant.  <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ("Daubert I").  The court has broad discretion in assessing both requirements.  <u>See United States v. Alatorre</u>, 222 F.3d 1098, 1100 (9th Cir. 2000).  The reliability requirement ensures "that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  Those falling below this level of "intellectual rigor" should not be put forth as

experts and should not be allowed to give opinions on topics of which they are newly associated at best.

The offering party must show by a preponderance of the evidence (1) that the expert is qualified to render the opinion, and (2) that the opinion offered has adequate support.  Daubert I, 509 U.S. at 588-90.   Expert testimony is not admissible if it is speculative.  See GE v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L. Ed. 2d 508 (1997).  To satisfy the relevance requirement, the proffered expert testimony must assist the trier of fact in understanding or determining a fact in issue.  Daubert I, 509 U.S. at 591.  In assessing relevance, the court must look to the governing substantive legal standard.  See Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1320 (9th Cir. 1995) ("Daubert II").

Mr. Gralnik fails to satisfy either standard to testify: he has neither the training, education nor experience to qualify as an expert and his minimal, seemingly random investigation of webhost practices fails to demonstrate adequate support for the highlighted opinions, above.

As evidenced by Mr. Gralnik's resume, attached as Exhibit A, Mr. Gralnik has worked with computers for over twenty years.  What Mr. Gralnik has not done is any work in the Internet industry.

```
                                   10
         7    Q   Have you at any time worked for an ISP?
         8    A   No.
         9    Q   Have you at any time provided expert testimony
        10  on behalf of an ISP before this matter?
        11    A   No.
        12    Q   Have you at any time prepared an expert report
        13  without having provided testimony concerning ISP
        14  practices or the subject matter of this litigation?
        15    A   No.
        16    Q   Have you at any time worked for an ISP?
        17    A   No.
        18    Q   Is there anything on your resume that you would
        19  draw to my attention as evidencing expertise and the
        20  issue of internet service provider practices?
        21    A   To that specific topic, not that I can think of
        22  at the moment.
        23    Q   Is there anything in your professional
        24  experience that's not reflected on your C.V. that will
        25  reflect expertise in that subject matter?
                                   11
         1    A   I have expertise and experience in the internet
         2  itself.  As far as the practices of specific businesses
```

1         3  that use the internet, no.

2  Deposition of Richard Gralnik ("Gralnik Depo"), June 29, 2009, 10:7-11:3

3       Mr. Gralnik then continues to testify concerning work experience with the Internet which

4 confirms that none has any relationship to websites, website hosting or practices adopted by

5 businesses working in that arena.  Declaration of J. Andrew Coombs ("Coombs Decl.") at Ex. B

6 pp. 11:4-13:18.  In particular, one job (from the 1980s) predated the Internet as we now know it,

7 specifically including the World Wide Web and the second, with Hewlett Packard did not concern

8 web hosting:

<div align="center">13</div>

```
 6  Q   Did that internet connectivity involve any kind
 7 of retail services along the lines provide by
 8 web-hosting services?
 9    A   No.
10    Q   Did it involve the response to abuse
11 complaints?
12    A   No.
13    Q   Does any of the work outlined in your resume or
14 not reflected in your resume reflect any experience in
15 dealing with abuse complaints?
16    A   No.
17    Q   Did you have any such experience?
18    A   No.
```

16 *Id.* at p. 13:6-18.

17      Mr. Gralnik is clearly not an expert on web-hosting practices and responses to abuse

18 complaints.

19      But even were Mr. Gralnik considered an expert on webhost business practices and abuse

20 response, his preparation to testify in this matter is woefully deficient:

<div align="center">34</div>

```
10    Q   Have you looked at the SePRO database?
11    A   I haven't seen it directly, no.
12    Q   So you couldn't say from firsthand what kind of
13 data is maintained in the SePRO database or whether it
14 would enable the kind of tracking you just described?
15    A   No.  The information I have about SePRO is
16 based on exhibits that were provided to me from other
17 people.
18    Q   Who?
19    A   I believe it was Mr. Wilson's report.  I have
20 that as an exhibit.
21    Q   That's the only version of the SePRO report
22 you've seen?
23    A   Yes.
24    Q   Do you know who Juliana Luk is, L-u-k?
```

```
                        25     A   I can't think of that as I sit here, no.
                                                   35
                        1     Q   You've never talked to her in connection with
                        2  this matter?
                        3     A   No, I have not.
```

*Id.* at pp. 34:10-35:3.

Mr. Gralnik then testifies to his review of Defendants' terms of service and the fact that he did not discuss the remedies for violation of those terms of service with Defendants' employees that were interviewed (Steve Chen and Andrew Cheng).  From the discussion which follows at 37:15-39:5 it is clear that Mr. Gralnik did not interview anyone with the Defendants concerning their actual practices as they related to abuse complaints.  This is borne out elsewhere in the deposition where he does describe his actual preparation.

```
                                                   41
                        23    Q   You testified earlier that among other things,
                        24  you interviewed Steve Chen in preparation for this
                        25  expert report?
                                                   42
                        1     A   Yes.
                        2     Q   Did you interview him once or more than once?
                        3     A   I think I talked to him twice.
                        4     Q   And was it in person or telephonic?
                        5     A   Telephone.
                        6     Q   And how long were the communications?
                        7     A   I think I talked to Steve about 45 minutes.
                        8     Q   On both occasions or each or -- I'm sorry.  In
                        9  total?
                        10    A   I'm sorry.  I don't recall the exact length of
                        11  the conversation.  I think it was a total of 45 minutes.
                        12    Q   And that was before you prepared your expert
                        13  report here?
                        14    A   Yes.
                        15    Q   Have you had any conversations with him since
                        16  then?
                        17    A   I think I spoke to him once about getting in
                        18  touch with Andrew Chang.
                        19    Q   And that's it.
                        20    A   As I recall sitting here now.
                        21    Q   And you spoke with Andrew Chang how many times?
                        22    A   I think just the one time.
                        23    Q   And how long was that conversation?
                        24    A   I believe that was also about a half hour, 45
                        25  minutes.
```

*Id.* at pp. 41:23-42:25.

Mr. Gralnik's preparation with reference to the practices of the industry was, if anything, even more cursory despite the fact that he had no experience or training with webhost practices.

43
```
 6   Q   You also interviewed Eric Willis and Eric
 7   Bursley with Rackspace; is that correct?
 8   A   Yes.
 9   Q   And those were telephonic interviews as well?
10   A   Yes.
11   Q   And how long were each of those interviews?
12   A   20 minutes, half an hour I think.
```
*Id.* at p. 43:6-12.

Mr. Gralnik's choice of Rackspace appears to have been based on somewhat random

considerations.

44
```
 9   What research did you do to identify Rackspace
10   as one of the largest ISPs in the country?
11    A   Searches on Google, reading their web page,
12   looking at various materials that talked about different
13   companies available.
```
*Id.* at p. 44:9-13.

His review of limited written review from two other ISPs was similarly random.  Coombs

Decl. at Ex. B. pp. 44:14-45:20.  Apart from this nominal investigation, Mr. Gralnik spoke with the

help desk at a couple of additional ISPs.  *Id.* at pp. 52:5-53:6.  These companies **did not explain** to

Mr. Gralnik what their procedures were in responding to abuse complaints.

53
```
 7   Q   Did they describe what procedures were employed
 8   internally to track the complaints once they were
 9   received?
10   A   No, they didn't.
11   Q   Did they describe what personnel was dedicated
12   to dealing with abuse complaints?
13   A   No.
14   Q   Did they describe what training those employees
15   obtained?
16   A   No.
17   Q   Did they describe what procedures were employed
18   to deal with recidivist complaints, repetition, where
19   they had multiple problems concerning the same customer?
20   A   I don't recall talking about recidivist
21   specifically, but we did talk about escalating a process
22   where if there wasn't an adequate response, that they
23   would go to a more severe form of action.
24   Q   Did any of them discuss terminating customers?
25   A   I believe they did, yes.
```
54
```
 1   Q   Do you remember which ones?
 2   A   I believe it was Go Daddy.  I think Site5,
 3   maybe HostGator.  I'd have to check.
```

*Id.* at pp. 53:7-54:3

<div style="margin-left:2em">

55

10 Q   Okay.  What criteria did they use in making the
11 decision to terminate customers in response to abuse
12 complaints?
13   A   They wouldn't tell me.
14   Q   I think you said that the ISP generally
15 wouldn't tell you what investigation they would do in
16 response to receipt of an abuse complaint; is that
17 correct?
18   A   I'm thinking about Go Daddy right now, that
19 they have an abuse department and would not describe
20 what safeguards or steps their security or abuse
21 department would take in response to these.  But let's
22 see.  They didn't say they would actually shut down the
23 site.  They said they have their own safeguards.  They
24 wouldn't tell me what those safeguards were.
25   Q   They didn't tell you what timeline they would

56

1 respond to abuse complaints?
2   A   None of the companies I spoke to talked about
3 timelines or particular amounts of time they would allow
4 to lapse before they took action, and I don't recall
5 seeing anything in any of the acceptable use policies
6 that spelled out any kind of time periods in response
7 either.
8   Q   Are you familiar with the Digital Millennium
9 Copyright Act?
10   A   I know of it.
11   Q   Are you familiar with the phrase "expeditious
12 removal"?
13   A   No, I'm not.

</div>

*Id.* at 55:10-56:13.

Finally, conducted interviews and a chat session which were no more revealing.  Mr. Gralnik did not even secure the full name of the individuals with whom he communicated for a total of about an hour.

Mr. Gralnik's paltry preparation is evident from his inability to confirm the opinions concerning which stated he would testify.

<div style="margin-left:2em">

77

22 Q   So you're unable to form any conclusion
23 concerning the reasonableness or the procedures of
24 Akanoc as reflected by the fact that there are 16
25 websites hosted on Akanoc servers five months after

78

1 notification to Akanoc?
2   A   I can't say anything about what actions were
3 taken or what may have happened in the intervening five
4 months.

</div>

5   Q   You've had no discussion with anyone acting on
6   behalf of defendants, specifically including Mr. Chen or
7   Mr. Chang, concerning what was done in response to these
8   notifications?
9   A   No, I haven't asked that.

Id. at pp. 77:22-78:9.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its Motion to exclude Mr. Gralnik's testimony on ISP practices and his opinions on the reasonableness of Defendants' policies.

Dated:  August 24, 2009                    J. Andrew Coombs, A Professional Corp.


___/s/ J. Andrew Coombs_____
By:  J. Andrew Coombs
    Annie Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

### DECLARATION OF J. ANDREW COOMBS

I, J. Andrew Coombs, declare as follows:

1.      I am an attorney at law duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California.  I am counsel of record for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") in an action styled Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al., Case No. C 07 3952 JW.  I submit this declaration in support of Plaintiff's motion to Exclude the Testimony of Richard Gralnik Concerning ISP Practices and the Reasonableness of Defendants' Policies.  Except as otherwise stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows.

2.      Attached Exhibit A is a copy of Exhibit 1530 and identified by Defendants as curriculum vitae for Mr. Gralnik.

3.      Attached as Exhibit B are true and accurate copies of portions of the transcript from the deposition testimony of Richard Gralnik which took place on or about June 29, 2009.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 24th day of August, 2009, at San Jose, California.


_____/s/ J. Andrew Coombs_____
J. ANDREW COOMBS

**Exhibit A**

# RICHARD GRALNIK

**ONLINESECURITY**
**5870 WEST JEFFERSON BLVD. SUITE A**
**LOS ANGELES, CALIFORNIA 90016**
**310-815-8855 x.218 · RICHARD@ONLINESECURITY.COM**

## SUMMARY

Computer forensic investigator. Litigation Support Consultant. Expert Witness.

## PROFESSIONAL EXPERIENCE

**ONLINESECURITY** LOS ANGELES, CA. **2004-PRESENT**
Computer forensic investigations and litigation support
- ❑ Apply forensic applications and procedures to analyze electronic evidence in support of civil litigation including
  - o Theft of Intellectual Property
  - o Fraud
  - o Sexual Harassment
  - o Wrongful dismissal
  - o Payroll Disputes (class action)
  - o Willful destruction of company assets
  - o Patent Infringement
  - o Divorce
- ❑ Consult with attorneys on writing preservation letters to protect evidence
- ❑ Create interrogatory questions for discovery submissions
- ❑ Write requests for production of various forms of electronic evidence
- ❑ Develop lines of questioning for deposition of designated PMK's, PMQ's and opposing experts.
- ❑ Attend depositions of designated PMK's, PMQ's and opposing experts, Advise attorneys on significance of answers to questions and suggest additional questions during proceedings
- ❑ Conduct forensic acquisitions of hard disk drives, removable memory devices, cell phones, PDAs and other electronic media
- ❑ Coordinate restoration of files and electronic data discovery from backup tapes
- ❑ File declarations in support of litigation claims, challenges to opposing motions and procedures
- ❑ Project manager and case coordinator between attorneys, clients and investigators
- ❑ Testify as an expert witness

**I.T. SYSTEM SERVICES** STUDIO CITY, CA. **2002-2004**
Information Security and General Computer Consultant
- ❑ Designed, implemented and supported VPN-based telecommuting networks including installation of firewall appliances and client software
- ❑ Designed, created and taught 5-day network management application course. Updated material and taught new class on later version of the application.
- ❑ Conducted security audits addressing physical and cyber-security concerns. Presented report to management on findings and recommendations for remediation.
- ❑ Conducted penetration testing and vulnerability assessments utilizing standard tools and other methods. Presented report to management on findings and recommendations for remediation.



EXHIBIT
ALL-STATE LEGAL
**1530**

EXHIBIT 1530 DATE 6|29|09
WITNESS Gralnik
DAMARIS MARTINEZ, CSR

EXHIBIT A Page 10

**Richard Grainik** **Page 2**

- ❑ Installed, configured and supported secure end-user systems for SMB and SOHO users including personal firewalls, anti-virus software, anti-spyware and spam blocking software, and operating system patching. Trained users on security awareness and best practices.

**HEWLETT-PACKARD COMPANY** TORRANCE, CA. **1990 – 2002**

(Acquired Trinagy, Inc. in 2001. Formerly known as DeskTalk Systems, Inc.)
Vendor of OpenView Performance Insight, a leading network management performance analysis application.

**TECHNICAL MARKETING ENGINEER/LEAD TRAINER** **1997 – 2002**

- ❑ Designed and built a mechanism for monitoring distributed processes and automatically activating fail-over to a secondary system. This became the standard architecture for other implementations in the field.
- ❑ Developed training curriculum, designed, created and taught five-day courses on administration and custom reporting solution development. Trained over 400 people including employees, resellers and customers in classes in 10 states and 8 countries. Received 2 excellence awards.
- ❑ Designed and built automated capability to identify which elements to monitor or ignore based on provisioning data in database. Dynamic element filtering reduced polling traffic up to 50%.
- ❑ Wrote and installed system for linking reports based on content and automating report generation. Solution adopted by engineering as prototype for standard report linking and automated report generation process used in TREND.
- ❑ Established pre-sales support group. Assessed customer networks, demonstrated and installed application for evaluation. Defined presentation strategies and materials and wrote standard text for RFP response library. Presented at tradeshows including "longest demo in the history of Interop" that led to first sale to banking industry.
- ❑ Wrote first user and administrator manuals for TREND. Reviewed later versions for content, accuracy and organization.

**SENIOR ANALYST** **1990 – 1997**

Prior to becoming a software vendor, DeskTalk was a network consulting firm for companies in the $50,000,000 - $200,000,000 range. Key projects included:

- ❑ Redesigned Unix system vendor's nation-wide network. Documented interviews, existing and proposed architectures, IP addressing scheme, DNS configuration, migration plan. Point of contact throughout implementation. New topology reduced traffic levels, improved response time, reduced operating costs, eliminated redundant connections.
- ❑ Completed protocol compliance testing of new TCP/IP implementation for network components vendor. Designed, implemented and executed test scenarios. Project included use of routers, bridges, hubs, and three different protocol decode and analysis tools. Documented setup, procedure, results of each test. Reported any bugs discovered. Successful completion led to release of premier third-party TCP/IP suite sold for personal computers.
- ❑ Designed router-based network for large law enforcement organization. Design incorporated high speed land lines, microwave communications, integration with legacy platforms, connections to national and international law enforcement networks and databases, and plans for migration from the existing switched network.
- ❑ Managed corporate network. Obtained IP network number and vendor enterprise number, registered domain name. Designed and implemented IP subnet addressing scheme. Setup and

**Richard Gralnik** **Page 3**

maintained DNS including offsite secondary server. Established and maintained Internet link. Technical contact for networking issues.

**INDEPENDENT CONSULTANT.** LOS ANGELES, CA. **1989-1990**
**PROGRAMMER**
□ Wrote SNA LU6.2 and BSC communications applications in FORTRAN linking credit reporting company to TRW, TransUnion and Equifax systems for real-time queries. Automated online queries reduced credit report preparation time from two days to five minutes.

**PRIME COMPUTER, INC.** NATICK, MA. **1983 – 1989**
**SENIOR MARKETING SUPPORT SPECIALIST**
□ Promoted from local general pre-sales analyst focused on databases and programming languages to senior analyst to data communications specialist for the Western United States.
□ Technical lead for introduction of TCP/IP on Prime platforms. Directed interoperability testing with other implementations.
□ Technical lead on RFP response to county-wide mobile digital network implementation
□ Beta support and coordinator for implementation of Oracle RDBMS-based multi-platform remote transaction processing system.
□ Reverse engineered a terminal emulation application and wrote user and administrator manuals for the software. Received an Excellence Award for this project

**INQUIRY PROCESSING CENTER.** TORRANCE, CA. **1982-1983**
**PROGRAMMER/OPERATIONS MANAGER**
□ Wrote and maintained software applications written in COBOL and PL/1.
□ Ran production processes on IBM 370-158 mainframe under MVS operating system.
□ Wrote and maintained JCL operation control programs.

**DIGITAX MICRO SYSTEMS, INC.** MANHATTAN BEACH, CA. **1981-1982**
**PROGRAMMER**
□ Designed and wrote interactive income tax package in BASIC on IBM PC.
□ Developed parameter driven process for printing IRS-compliant tax forms on blank paper.

## EXPERT WITNESS TESTIMONY

**ARBITRATION: COUNTY OF LOS ANGELES**
**JURY TRIAL: CALIFORNIA SUPERIOR COURT, COUNTY OF LOS ANGELES**
**EVIDENTIARY HEARING: CALIFORNIA SUPERIOR COURT, COUNTY OF ORANGE**
**DEPOSITION: CALIFORNIA SUPERIOR COURT, COUNTY OF LOS ANGELES**
**DEPOSITION: UNITED STATES DISTRICT COURT, CALIFORNIA SOUTHERN DIVISION**
**DEPOSITION: UNITED STATES DISTRICT COURT, CALIFORNIA CENTRAL DIVISION**
**PRELIMINARY HEARING: ARKANSAS CIRCUIT COURT, PULASKI COUNTY SECOND DIVISION**

**Richard Gralnik**                                                                                      **Page 4**

## PROFESSIONAL TRAINING

REGIONAL COMPUTER FORENSIC GROUP CONFERENCE  GEORGE MASON UNIVERSITY, FAIRFAX, VA. 2005, 2007

APPLYING MICROSOFT SECURITY GUIDANCE  QUICKSTART, LOS ANGELES, CA.

ENCASE COMPUTER & ENTERPRISE INVESTIGATIONS CONFERENCE  GUIDANCE SOFTWARE, PASADENA, CA.

ENCASE INCIDENT RESPONSE, FORENSIC ANALYSIS AND DISCOVERY  GUIDANCE SOFTWARE, PASADENA, CA.

CISCO SECURE VPN  SABERTECH, GLENDALE, CA.

ADVANCED CISCO PIX FIREWALL  SABERTECH, GLENDALE, CA.

CISSP PREPARATION, CERTTEST, GRAPEVINE, TX.

## PROFESSIONAL ASSOCIATIONS

HIGH TECHNOLOGY CRIME INVESTIGATION ASSOCIATION  SOUTHERN CALIFORNIA CHAPTER

INFORMATION SYSTEMS SECURITY ASSOCIATION  LOS ANGELES CHAPTER

INSTITUTE OF COMPUTER FORENSIC PROFESSIONALS  AFFILIATE MEMBER

SECRET SERVICE ELECTRONIC CRIMES TASK FORCE  LOS ANGELES CHAPTER

FBI INFRAGARD NATIONAL MEMBERS ALLIANCE  LOS ANGELES CHAPTER, CHAIR OF INFORMATION AND TELECOMMUNICATIONS SECTOR 2003-2006

## EDUCATION

BA, Economics (High Honors) • 1981 • *University of California, Santa Barbara*
Degree completed at University of Leeds, England
Certificate of Competence in Data Processing (4.0 G.P.A.) • 1984 • *El Camino College, Torrance, CA.*

**Exhibit B**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


LOUIS VUITTON MALLETIER, S.A.,     )
                                   )
                Plaintiff,         )
                                   )
vs.                                ) CASE No. C073952JW
                                   )
AKANOC SOLUTIONS, INC., MANAGED    )
SOLUTIONS GROUP, INC., STEVEN CHEN )
and DOES 1 through 10, inclusive,  )
                                   )
                Defendants.        )
_____)




DEPOSITION OF RICHARD GRALNIK

Glendale, California

Monday, June 29, 2009




Reported by:  Damaris Martinez
              CSR No. 12925
NDS Job No.:  132459

87142611-6561-4ffe-a9fe-7d11d9e4f48e

1    material supplied today?

2        A    Yes, they are.

3        Q    I'm going to give you a document previously

4    marked as Defendants' Exhibit 1530.

5            Is that a copy of your C.V.?

6        A    Yes, it is.

7        Q    Have you at any time worked for an ISP?

8        A    No.

9        Q    Have you at any time provided expert testimony

10   on behalf of an ISP before this matter?

11       A    No.

12       Q    Have you at any time prepared an expert report

13   without having provided testimony concerning ISP

14   practices or the subject matter of this litigation?

15       A    No.

16       Q    Have you at any time worked for an ISP?

17       A    No.

18       Q    Is there anything on your resume that you would

19   draw to my attention as evidencing expertise and the

20   issue of internet service provider practices?

21       A    To that specific topic, not that I can think of

22   at the moment.

23       Q    Is there anything in your professional

24   experience that's not reflected on your C.V. that will

25   reflect expertise in that subject matter?

1       A    I have expertise and experience in the internet

2    itself.  As far as the practices of specific businesses

3    that use the internet, no.

4       Q    Okay.  What is the nature of your expertise and

5    experience dealing with the internet itself?

6       A    I've worked as a networking consultant

7    specifically for a couple of companies in the past,

8    doing network design and implementation that often

9    included network connectivity to the internet or dealing

10   with information traveling to or from the internet.

11      Q    And what were those two companies?

12      A    Prime Computer.

13      Q    And the other?

14      A    The other is Desk Talk, D-e-s-k T-a-l-k,

15   Systems.

16      Q    Were you employed by either of those companies?

17      A    Yes, I was.

18      Q    I see Prime Computers, 1983 through 1989?

19      A    That's correct.

20      Q    That's essentially before the worldwide web; is

21   that correct?

22      A    Yes.

23      Q    And when did you work for Desk Top -- Talk?

24      A    From 1990 until -- they were bought by

25   Hewlett Packard in 2001.  But I was with the company

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

Page 12

1  through the buyout and worked for Hewlett Packard for

2  about a year or so after the buyout.  So that contiguous

3  period.

4      Q    So that would be largely included within the

5  description of services and expertise under the Hewlett

6  Packard entry on your C.V.; is that correct?

7      A    Yes.

8      Q    While at Hewlett Packard, did you have any

9  responsibility for operating their web presence?

10     A    No.

11     Q    You were engaged in working on their intranet

12  and its connection to the internet?

13     A    I was involved with working on the network

14  management software.

15     Q    Could you elaborate a little bit on how that

16  pertains to the subject matter of this litigation?

17     A    The company I worked for before it was bought

18  by Hewlett Packard was a network consulting company.

19  And our business focused primarily around the design

20  implementation of computer networks, which paralleled in

21  structure the way the internet is implemented or

22  connected to the internet.

23          And the company evolved into a network

24  management software company which monitored the

25  performance of networks that, again, either paralleled

Page 13

1   the construction of the internet in terms of

2   architecture, or use the internet as part of their

3   construction.

4         And in the course of that work, I was involved

5   quite a bit with internet-type activity.

6   Q    Did that internet connectivity involve any kind

7   of retail services along the lines provide by

8   web-hosting services?

9   A    No.

10  Q    Did it involve the response to abuse

11  complaints?

12  A    No.

13  Q    Does any of the work outlined in your resume or

14  not reflected in your resume reflect any experience in

15  dealing with abuse complaints?

16  A    No.

17  Q    Did you have any such experience?

18  A    No.

19  Q    Under "Online Security," which I -- are you

20  employed by Online Security?

21  A    Yes, I am.

22  Q    In your declaration, I think you used the word

23  "associate."  I was wondering if there was a difference

24  or a reason for using that term as opposed to

25  "employed"?

Page 34

1    and Andrew Chang, you know, they receive a complaint and

2    they would go through this procedure of whatever website

3    the complaint was about, pinging it, getting the IP

4    address back, looking it up, see if it was in their

5    address space, and then looking it up further to see who

6    it was assigned to and if it was still active in their

7    space.  And then taking the next steps, as far as the

8    notification or the disabling of the IP address or the

9    disconnecting of the machine.

10        Q    Have you looked at the SePRO database?

11        A    I haven't seen it directly, no.

12        Q    So you couldn't say from firsthand what kind of

13   data is maintained in the SePRO database or whether it

14   would enable the kind of tracking you just described?

15        A    No.  The information I have about SePRO is

16   based on exhibits that were provided to me from other

17   people.

18        Q    Who?

19        A    I believe it was Mr. Wilson's report.  I have

20   that as an exhibit.

21        Q    That's the only version of the SePRO report

22   you've seen?

23        A    Yes.

24        Q    Do you know who Juliana Luk is, L-u-k?

25        A    I can't think of that as I sit here, no.

EXHIBIT B

1       Q     You've never talked to her in connection with

2   this matter?

3       A     No, I have not.

4       Q     To your knowledge, it's either Steve Chen or

5   Andrew Chang who handle security complaints on behalf of

6   the defendants in this matter?

7       A     If I recall, I think her name comes up in one

8   of the deposition transcripts I reviewed.  I'd have to

9   go back and look at it to refresh my memory.  But I

10  think I have seen that name before.

11      Q     Yeah.  Well, I guess what I'm asking is what is

12  your understanding of who handled the abuse complaints

13  addressed to the defendants in this matter?

14      A     Steve Chen, Andrew Chang, I believe, had

15  participated in that.  Again, I don't remember the

16  specific details of the testimony, but I think they did

17  mention somebody else.

18      Q     Have you looked at the terms of service or

19  acceptable use policies for the defendants?

20      A     Yes, I have.

21      Q     Do they have any other procedures available to

22  them under those terms of service or acceptable use

23  policies to address abuse complaints other than what

24  you've described today?

25      A     If I recall, there were a list of a few options

Page 41

1    expressed in your report.

2          About two-thirds of the way down the table for

3    web pages, you identify a net policy hyphen com under

4    score world sports document.  Do you see that?

5    A    Yes.

6    Q    It's my understanding that's an amicus brief

7    filed in some litigation about 10 years ago; is that

8    correct?

9    A    I believe so, yes.

10   Q    And on whose behalf was the amicus brief filed?

11   A    I'd have to look at it.  I don't remember.

12   Q    And what was it about that amicus brief that

13   you thought made it germane to the opinions expressed in

14   this expert report?

15   A    Can I look at it again, please?

16         If I remember correctly, it was basically

17   background information about the process of domain name

18   registration and the nature of domain names.

19   Q    And having looked at the amicus brief, does it

20   refresh your recollection on whose behalf it was filed?

21   A    No, it doesn't.

22   Q    That's fine.

23         You testified earlier that among other things,

24   you interviewed Steve Chen in preparation for this

25   expert report?

87142611-6561-4ffe-a9fe-7d11d9e4f48e

1   A   Yes.

2   Q   Did you interview him once or more than once?

3   A   I think I talked to him twice.

4   Q   And was it in person or telephonic?

5   A   Telephone.

6   Q   And how long were the communications?

7   A   I think I talked to Steve about 45 minutes.

8   Q   On both occasions or each or -- I'm sorry.  In

9   total?

10  A   I'm sorry.  I don't recall the exact length of

11  the conversation.  I think it was a total of 45 minutes.

12  Q   And that was before you prepared your expert

13  report here?

14  A   Yes.

15  Q   Have you had any conversations with him since

16  then?

17  A   I think I spoke to him once about getting in

18  touch with Andrew Chang.

19  Q   And that's it.

20  A   As I recall sitting here now.

21  Q   And you spoke with Andrew Chang how many times?

22  A   I think just the one time.

23  Q   And how long was that conversation?

24  A   I believe that was also about a half hour, 45

25  minutes.

1    Q    And that was telephonic as well?

2    A    Yes, it was.

3    Q    Did you know either of them before you were

4    engaged as an expert in this matter?

5    A    No.

6    Q    You also interviewed Eric Willis and Eric

7    Bursley with Rackspace; is that correct?

8    A    Yes.

9    Q    And those were telephonic interviews as well?

10   A    Yes.

11   Q    And how long were each of those interviews?

12   A    20 minutes, half an hour I think.

13   Q    And there are notes reflecting your

14   conversations with Mr. Willis and Bursley included in

15   the materials you produced today?

16   A    Yes.

17   Q    And did you know Mr. Willis or Mr. Bursley

18   before you were retained as an expert in this matter?

19   A    No.

20   Q    How did you come to contact them concerning

21   this?

22   A    I called Rackspace with questions about the

23   nature of their business, and those were the two people

24   I spoke to in the process of getting my questions

25   answered.

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

87142611-6561-4ffe-a9fe-7d11d9e4f48e

1    Q    And why Rackspace as opposed to another entity?

2    A    Rackspace, to my knowledge, is one of the

3  largest ISPs in the country.  Based on that, I decided

4  they were a good company to talk to as representative of

5  typical practices in the industry.

6    Q    Did -- was Rackspace suggested to you by

7  anyone?

8    A    No.

9    Q    What research did you do to identify Rackspace

10  as one of the largest ISPs in the country?

11    A    Searches on Google, reading their web page,

12  looking at various materials that talked about different

13  companies available.

14    Q    In your written materials you refer to an

15  acceptable use policy published by ServerBeach.

16        Do you recall that?

17    A    Yes.

18    Q    Do you have any understanding as to any

19  relationship between ServerBeach and Rackspace?

20    A    It's my understanding I don't know of any

21  relationship between them.

22    Q    You also at some point provided some material

23  concerning PEER 1; is that correct?

24    A    Yes.

25    Q    And you relied upon that material in support of

1    your expert opinions in this matter?

2        A    Yes.

3        Q    And do you have any understanding of a

4    relationship between PEER 1 and Rackspace?

5        A    My understanding is that they're competitors.

6        Q    And how is it that you came to look at

7    ServerBeach's acceptable use policy rather than

8    Rackspace's?

9        A    Just from the website.

10        Q    And it was happenstance, or was there a

11    particular reason you selected ServerBeach?

12        A    Again, ServerBeach is a well-known hosting

13    company on the internet that I felt was representative

14    of a typical company.

15        Q    And PEER 1, how did you come to select them as

16    a company to approach concerning a sales proposal?

17        A    I believe PEER 1 is actually the company that

18    ServerBeach -- is related to ServerBeach.

19        Q    You got to PEER 1 through ServerBeach?

20        A    Yes.

21        Q    Did you have an agenda in anticipation of any

22    of the interviews that you described on page 9 of your

23    report?

24        A    Yes.

25        Q    And did you -- was that in writing?

Page 52

1   or by the customer, whereas scalable implies the

2   capacity and size of the system.  A small system can be

3   managed and large system can be unmanaged, or vice

4   versa.

5        Q    When you spoke with other ISPs, not Akanoc or

6   Managed Solutions, did you discuss with them their

7   procedures for logging complaints received, abuse

8   complaints?

9        A    I believe I did.

10       Q    Okay.  Tell me what they told you.

11       A    May I look at my notes, please?

12       Q    I'm sorry.  It's easier for you to find out --

13       A    What was the question, again, please?

14       Q    I was asking what the other ISPs you spoke

15   with -- how they described their procedures in response

16   to a -- an abuse complaint?

17       A    Okay.  The notes I'm looking at right now are

18   handwritten notes from talking to people at Rackspace,

19   Go Daddy, and a company called VeriSign.

20            I also have as part of my supplemental report,

21   online conversations and a phone call that I had with

22   people from a company called The Planet, Site5,

23   HostGator, and Go Daddy.  And they were pretty much

24   consistent in terms of their responses to abuse

25   complaints in terms of notifying the customer about a

1   problem with the site, about what if -- you know, they

2   actually wouldn't say if there was any investigation

3   that they did of it.  The ones that said they did an

4   investigation would not give me any details of what that

5   meant; that their ultimate sanction was to basically to

6   shut the site down.

7        Q    Did they describe what procedures were employed

8   internally to track the complaints once they were

9   received?

10       A    No, they didn't.

11       Q    Did they describe what personnel was dedicated

12  to dealing with abuse complaints?

13       A    No.

14       Q    Did they describe what training those employees

15  obtained?

16       A    No.

17       Q    Did they describe what procedures were employed

18  to deal with recidivist complaints, repetition, where

19  they had multiple problems concerning the same customer?

20       A    I don't recall talking about recidivist

21  specifically, but we did talk about escalating a process

22  where if there wasn't an adequate response, that they

23  would go to a more severe form of action.

24       Q    Did any of them discuss terminating customers?

25       A    I believe they did, yes.

1     Q     Do you remember which ones?

2     A     I believe it was Go Daddy.  I think Site5,

3  maybe HostGator.  I'd have to check.

4     Q     Where would you check?

5     A     In the notes from those conversations.

6     Q     And are those not what are in front of you now?

7     A     No.  Those were just part of my supplemental

8  report.

9     Q     Okay.  Are there additional notes that are

10  included here that would reflect those conversations?

11     A     Yes.

12           For example, I've got here -- well, the

13  conversation was their acceptable use policies.  I'm

14  looking right now in my supplemental report, at the

15  acceptable use policy of a hosting facility called

16  The Planet, and they list six steps that they would take

17  in response to a violation, which if I check my notes, I

18  believe pretty much match the Akanoc six steps as well;

19  issue a written or verbal warning; suspend posting

20  privileges; suspend the account; terminate the account;

21  bill the user for administrative costs or re-activation

22  charges; bring legal action to enjoin violations,

23  collect damages and so on.

24     Q     I think the question was, you indicated your

25  notes of your conversation with Go Daddy would reflect

Page 55

1    what -- their procedure in terms of terminating

2    customers.  And I don't recall those being attached to

3    your report.

4            Would they be otherwise in this production?

5        A    There was -- actually, Go Daddy it wasn't an

6    online chat.  They didn't have that facility on their

7    website.  But I spoke with someone directly and wrote

8    down notes when I spoke to them, which should be in

9    here.  Here it is.

10       Q    Okay.  What criteria did they use in making the

11   decision to terminate customers in response to abuse

12   complaints?

13       A    They wouldn't tell me.

14       Q    I think you said that the ISP generally

15   wouldn't tell you what investigation they would do in

16   response to receipt of an abuse complaint; is that

17   correct?

18       A    I'm thinking about Go Daddy right now, that

19   they have an abuse department and would not describe

20   what safeguards or steps their security or abuse

21   department would take in response to these.  But let's

22   see.  They didn't say they would actually shut down the

23   site.  They said they have their own safeguards.  They

24   wouldn't tell me what those safeguards were.

25       Q    They didn't tell you what timeline they would

87142611-6561-4ffe-a9fe-7d11d9e4f48e

Page 56

1    respond to abuse complaints?

2        A    None of the companies I spoke to talked about

3    timelines or particular amounts of time they would allow

4    to lapse before they took action, and I don't recall

5    seeing anything in any of the acceptable use policies

6    that spelled out any kind of time periods in response

7    either.

8        Q    Are you familiar with the Digital Millennium

9    Copyright Act?

10       A    I know of it.

11       Q    Are you familiar with the phrase "expeditious

12   removal"?

13       A    No, I'm not.

14       Q    Are you aware of the requirement that ISPs

15   record an agent for service with the United States

16   Copyright Act under that legislation?

17       A    No, I'm not.

18       Q    Do you know whether or not the defendants in

19   this action have registered under -- recorded under that

20   act?

21       A    I don't know.

22       Q    Did both Akanoc and Managed Solutions have

23   published terms of use?

24       A    I believe so, yes.

25       Q    I think you were looking at one of them earlier

1    that correct?

2        A    I guess that would be the right number of

3    months, yes.

4        Q    And does it seem to you reasonable and

5    consistent with the procedures that you've found from

6    other ISPs that after five months, those domains should

7    continue to be hosted on Akanoc servers?

8        A    I don't know the history of those domains or

9    whether they were notified and came back, whether they

10   were not notified at all.  I have no information about

11   what was done with those particular domain names.

12       Q    What circumstances would make it reasonable and

13   consistent for those domain names to be hosted on Akanoc

14   servers more than five months after notification by

15   Louis Vuitton?

16       A    All I can say about the list is that that name

17   came up with an IP address in Akanoc's space on the

18   specific date when the list was prepared, which if I can

19   remember correctly was May 28th.

20            What happened between January and May, I have

21   no information.

22       Q    So you're unable to form any conclusion

23   concerning the reasonableness or the procedures of

24   Akanoc as reflected by the fact that there are 16

25   websites hosted on Akanoc servers five months after

Network Deposition Services, Inc. • networkdepo.com • 866-NET-DEPO

1  notification to Akanoc?

2     A    I can't say anything about what actions were

3  taken or what may have happened in the intervening five

4  months.

5     Q    You've had no discussion with anyone acting on

6  behalf of defendants, specifically including Mr. Chen or

7  Mr. Chang, concerning what was done in response to these

8  notifications?

9     A    No, I haven't asked that.

10          MR. COOMBS:  Mark as Exhibit 605 a one-page

11  e-mail dated May 18, 2009 from Eric Willis to Richard at

12  Online Security dot com.

13          (Plaintiff's Exhibit 605 was marked for

14          identification by the reporter and is

15          attached hereto.)

16  BY MR. COOMBS:

17     Q    Is that an e-mail that you received on or about

18  May 18, 2009?

19     A    Yes.

20     Q    And it reflects a transmission of a quote from

21  Rackspace for hosting package?

22     A    Yes.

23     Q    Last sentence says "As you requested, I did not

24  add a firewall."

25          Why did you not request a firewall?  Is that