1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   Brian S. Edwards (SBN 166258)
3  Christopher Lai (SBN 249425)
   18400 Von Karman, Suite 300
4  Irvine, California  92612
   Telephone:      (949) 553-1010
5  Facsimile:       (949) 553-2050
   info@gauntlettlaw.com
6  jal@gauntlettlaw.com
   bse@gauntlettlaw.com
7
   Attorneys for Defendants
8  Akanoc Solutions, Inc.,
   Managed Solutions Group, Inc.
9  and Steve Chen

10                    **UNITED STATES DISTRICT COURT**

11        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

12

13  LOUIS VUITTON MALLETIER, S.A.,          )  Case No.:  C 07-3952 JW (HRL)
                                            )
14                    Plaintiff,            )
                                            )  **DEFENDANTS' [PROPOSED]**
15        vs.                               )  **SUPPLEMENTAL JURY**
                                            )  **INSTRUCTIONS**
16  AKANOC SOLUTIONS, INC., et al.,         )
                                            )
17                    Defendants.           )
                                            )
18                                          )
    _____)
19

20  TO THE COURT:

21        Defendants, Akanoc Solutions, Inc., Managed Solutions Group, Inc., and Steven Chen

22  ("Defendants") respectfully submit the following [Proposed] Supplemental Jury Instructions.

23  Dated:  August 24, 2009          **GAUNTLETT & ASSOCIATES**

24                                   By:    /s/James A. Lowe
                                            David A. Gauntlett
25                                          James A. Lowe
                                            Brian S. Edwards
26                                          Christopher Lai

27                                   Attorneys for Defendants Akanoc Solutions,
                                     Inc., Managed Solutions Group, Inc.,
28                                   and Steve Chen

# TABLE OF CONTENTS

| Title | Page |
|-------|------|
| Contributory Copyright Infringement | **4** |
| Contributory Copyright Infringement – Substantial Non-Infringing Uses | **9** |
| Contributory Copyright Infringement – Induced, Caused or Materially Contributed to Direct Infringement – Mutual Enterprise of Infringement | **11** |
| Contributory Copyright Infringement – Inducement of Direct Infringement | **13** |
| Contributory Copyright Infringement – Material Contribution – Direct Relationship to Infringing Acts | **15** |
| Contributory Copyright Infringement – Material Contribution – Services Disseminated for Purposes of Facilitating Direct Infringement | **17** |
| Contributory Copyright Infringement – Material Contribution – Content – Neutral Services | **19** |
| Contributory Copyright Infringement – Material Contribution -- Infringement | **21** |
| Defenses to Contributory Copyright Infringement – DMCA Safe Harbor – Requirements | **23** |
| Damages – Contributory Copyright Infringement Award of Statutory Damages | **29** |
| Contributory Trademark Infringement | **32** |
| Contributory Trademark Infringement – Likelihood of Confusion – Confusion Must Be Probable | **36** |
| Contributory Trademark Infringement – Likelihood of Confusion – Relative Cost of Goods | **38** |
| Contributory Trademark Infringement – Direct Control and Monitoring | **40** |
| Contributory Trademark Infringement – Willful Blindness | **42** |
| Damages – Willful Trademark Infringement | **45** |
| Contributory Trademark Infringement – Continue to Supply Infringing Product to Infringer | **47** |

| Title | Page |
|-------|------|
| Damages – Contributory Trademark Infringement – Award of Statutory Damages | **49** |
| Obligation of Rights Holder to Notify ISP – ISP Prohibited From Monitoring Content of Servers | **52** |
| Investigations by Jurors Prohibited | **55** |
| Actual Damages | **57** |
| Overview of Web Hosting | **59** |
| Copyright Infringement – Copyright Laws Do Not Apply to Copying Outside the United States | **61** |
| Direct Trademark Infringement – Extraterritorial Application of Trademark Law | **65** |
| Liability of Corporate Officers for Torts of Corporation | **68** |
| Damages for Contributory Copyright Infringement – Application of DMCA Safe Harbor | **70** |
| Contributory Trademark Infringement – Intentional Inducement | **72** |

**JURY INSTRUCTION No. ___**
CONTRIBUTORY COPYRIGHT INFRINGEMENT

You have now heard all of the evidence with respect to Plaintiff's claim that each of the defendants contributorily infringed the following copyrighted works:

| |
|---|
| *Multicolor Monogram Black Print* |
| *Multicolor Monogram White Print* |

You must first decide which, if any, of the following websites directly infringed one or both of the copyrighted works listed above: *Ape168.com, Atozbrand.com, Bag925.com, Bag4Sell.com, Bapesky.com, BigWorldShoes.com, Eshoes99.com, Eshoes99.net, GucciFendi.com, InNike.com, Luxury2Us.com, PickYourGoods.com, RRGNL.com, SoApparel.com, Sunny7Shoes.com, WatchNReplica.net, Wendy929.net.*

If no, you will be asked to sign and date the verdict form.

If yes, for each website that directly infringed one or both copyrighted works, you must decide whether each Defendant should be held liable for contributing to that infringement. You should separately consider each defendant's liability as to each copyrighted work at each website.

Vuitton must prove the following elements by a preponderance of the evidence. (Preponderance of the evidence means that you are persuaded by the evidence that it is more probably true than not true.)

ELEMENT ONE – DIRECT INFRINGEMENT

To prove that its copyrighted works were directly infringed at specific websites, you must be persuaded by a preponderance of the evidence that (1) Plaintiff is the owner of the copyrighted works, and (2) a specific accused website violated one or more of Louis Vuitton's exclusive rights as the owner of the copyrighted works to:

1.      Reproduce the copyrighted work(s); or

2.      Prepare derivative works based upon the copyrighted works; or

3.      Distribute copies of the copyrighted works to the public by sale; or

4.      Display the copyrighted works publicly.

This determination must be made separately as to each copyrighted work at each accused website.

## ELEMENT TWO – DEFEDANTS' KNOWLEDGE
## OF DIRECT INFRINGEMENT BY THIRD PARTIES AT WEBSITES

Second, for each website listed above, if any, that directly infringed one or both copyrighted works, you must also separately determine whether each Defendant is individually liable for contributing to that direct infringement. Each defendant must have had actual knowledge of *infringing conduct* by each individual website at the time of the infringement. Generalized knowledge is not sufficient. You may not infer that any Defendant had such knowledge simply because the infringing materials were stored on an Internet server.

## ELEMENT THREE – INDUCE, CAUSE OR MATERIALLY
## CONTRIBUTE TO DIRECT INFRINGEMENT

Third, the Plaintiff must prove by a preponderance of the evidence that each Defendant induced, caused, or materially contributed to the direct infringement of the copyrighted work(s) at each specific directly infringing website, if any.

You must consider the liability of each Defendant separately as to each of the above elements. If you find that Plaintiff has failed to prove any element by a preponderance of the evidence, your verdict should be for that particular Defendant.

17 U.S.C. § 106 ("Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.")

*Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir. 2004) ("To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act.")

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 795 (9th Cir. 2007) ("This court and the United States Supreme Court (Supreme Court) have announced various formulations of the same basic test for such liability. We have found that a defendant is a contributory infringer if it (1) has knowledge of a third party's infringing activity, and (2) "induces, causes, or materially contributes to the infringing conduct.")

*A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1019 (9th Cir.2001) ("[O]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer. [citations omitted] Put differently, liability exists if the defendant engages in personal conduct that encourages or assists the infringement. *Id.*

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936-937 (2005) ("[T]he inducement rule, too, is a sensible one for copyright. We adopt it here, holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.")

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 545 U.S. 913, 936 (2005) ("The rule on inducement of infringement as developed in the early cases is no different today.  Evidence of "active steps ... taken to encourage direct infringement," such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use . . . . [Emphasis added; citation and footnote omitted.]")

*Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1170 (9th Cir. 2007), ("Within the general rule that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement," *Grokster,* 545 U.S. at 930, 125 S.Ct. 2764, the Court has defined two categories of contributory liability:  "Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts . . . or on distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses."  *Id.* at 942, 125 S.Ct. 2764 (Ginsburg, J., concurring) (quoting *Sony,* 464 U.S. at 442, 104 S.Ct. 774); *see also id.* at 936-37, 125 S.Ct. 2764.  [Emphasis added.]")

*E-Pass Technologies, Inc. v. 3Com Corp.,* 473 F.3d 1213, 1222-23 (Fed.Cir.2007) (implying that in order to successfully make out an inducement of infringement claim based on direct infringement by a defendant's customers, the plaintiff should be able to point to at least one end user that infringed).

*Tiffany, Inc. v. Ebay, Inc.* 576 F.supp.2d 463, 508, 510, fn. 37 (S.D.N.Y. 2008) ("Under copyright law, generalized knowledge that copyright infringement may take place in an Internet venue is insufficient to impose contributory liability. [citing *A & M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1027 (9th Cir.2001) ("The mere existence of the Napster system, absent actual notice and Napster's demonstrated failure to remove the offending material, is insufficient to impose contributory liability."); *Hendrickson v. eBay, Inc.,* 165 F.Supp.2d 1082, 1088-90 (C.D. Cal. 2001) (holding that generalized notice of copyright infringements was insufficient to establish knowledge for the purpose of contributory liability)"].

*Tiffany, Inc. v. Ebay, Inc.* 576 F.supp.2d 463, 508 (S.D.N.Y. 2008) ("For the following reasons, the Court concludes that while eBay clearly possessed general knowledge as to counterfeiting on its website, such generalized knowledge is insufficient under the *Inwood* test to impose upon eBay an affirmative duty to remedy the problem.")

*Tiffany, Inc. v. Ebay, Inc.* 576 F.supp.2d 463, 510 (S.D.N.Y. 2008) ("[C]ourts have also rejected a standard that would reach conduct that only might be infringing. Instead, courts have required a much higher showing that a defendant knew or had reason to know of specific instances of actual infringement.")

*Perfect 10, Inc. v. Visa Int'l Service Ass'n*, No. C 04-0371 JW, 2004 WL 1773349, at *4 (N.D. Cal. Aug. 5, 2004) ("Defendants' conduct does not begin to approach the level of involvement that existed in the cases enumerated above, where material contribution was found. **In each of those cases, the defendants' conduct specifically assisted the infringing activity itself.** Here, the websites would be every bit as capable of copying and distributing Plaintiff's copyrighted works regardless of whether they employed Defendants' services. As a result, Plaintiff has not adequately pled a claim for contributory copyright infringement.") (Emphasis added.)

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996) ("Flea market proprietor liable as a contributory [copyright] infringer when it "actively strives to provide the environment and market for counterfeit recording sales to thrive.")

*Perfect 10, Inc. v. Visa Int'l Service Ass'n,* 494 F.3d 788, 798 (9th Cir. 2007) ("In *Fonovisa,* we held a flea market proprietor liable as a contributory infringer when it provided the facilities for and benefitted from the sale of pirated works. The court found that **the primary infringers and the swap meet were engaged in a mutual enterprise of infringement** and observed that it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. . . . The *Fonovisa* court found liability because the swap meet operator knowingly provided the 'site and facilities' for the infringing activity.") (Emphasis added.)

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.04[A][3][a] (2008): "In order to be deemed a contributory infringer, the authorization or assistance must bear some direct relationship to the infringing acts, and **the person rendering** such **assistance or giving** such **authorization must be acting in concert with the infringer**." (Emphasis added.)

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F. Supp. 949, 962 (C.D. Cal. 1997), *aff'd,* 194 F.3d 980 (9th Cir. 1999) ("In *Fonovisa,* the Ninth Circuit adopted *Hard Rock*'s analogy between landlord/tenant vicarious liability and trademark law contributory liability in order to extend the *Inwood* standard to the flea market context. *Fonovisa,* 76 F.3d at 265. There, too, the court found that **the flea market operator provided more than space, and was directly and substantially involved in the businesses of the infringing vendors**. *Id.* at 264.") (Emphasis added.)

18 U.S.C. §2511(2)(a)(i) provides that "a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks."

18 U.S.C. § 2702(a)(1) prohibits disclosure of the content of communications in electronic storage:

> A person or entity providing an electronic communication[1] service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service.

18 U.S.C. 2511(2)(a)(i) provides:

> [A] provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

Pursuant to 18 U.S.C. § 2510(17), the term "electronic storage" in Section 2702 is defined broadly as follows:

> (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for the purposes of backup protection of such communication.[2]

*Quon v. Arch Wireless Operating Co., Inc.*, 309 F.Supp.2d 1204, 1207 (C.D.Cal. 2004)  Title II of the ECPA created the Stored Communications Act ("SCA"). ("The ECPA's legislative history indicates that Congress passed the SCA to prohibit a provider of an electronic communications service 'from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient.'")

*Dyer v. Northwest Airlines Corporations,* 334 F.Supp.2d 1196, 1199 (D.N.D. 2004)  ("The ECPA definition of 'electronic communications service' clearly includes Internet service providers such as America Online, as well as telecommunications companies whose cables and phone lines carry internet traffic.")

*Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 879 (9th Cir. (Cal.) 2002) ("The parties agree that the relevant 'electronic communications service' is Konop's Website, and that the website was in 'electronic storage.'")

---

[1]An "electronic communication" is defined as: any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." 18 U.S.C. § 2510(12).

[2]Either part of the definition of "electronic storage" is sufficient under the SCA. *Quon,* 309 F.Supp.2d at 1207, citing to S.Rep. No. 99-541, at 35; 1986 U.S.C.C.A.N at 3590.

**JURY INSTRUCTION No. _____**

CONTRIBUTORY COPYRIGHT INFRINGEMENT -
SUBSTANTIAL NON-INFRINGING USES

You must also determine whether the defendants' computer servers and services are capable of substantial non-infringing uses. If you find that the computer servers and services are capable of substantial non-infringing uses, the defendants cannot be held liable for contributory copyright infringement unless, in addition to all of the other required elements, you also find that each defendant had actual, specific knowledge of direct infringement occurring at the time at each accused website using their servers.

If you find substantial non-infringing uses but the infringing uses are substantial, the defendants may also avoid liability by showing it would have been disproportionately costly to eliminate or at least reduce substantially the infringing uses.

*A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020-1021 (9th Cir. 2001) ("The *Sony* Court refused to hold the manufacturer and retailers of video tape recorders liable for contributory infringement despite evidence that such machines could be and were used to infringe plaintiffs' copyrighted television shows. *Sony* stated that if liability "is to be imposed on petitioners in this case, it must rest on the fact that they have sold equipment with constructive knowledge of the fact that their customers may use that equipment to make unauthorized copies of copyrighted material." *Id.* at 439, 104 S.Ct. 774 (emphasis added). The *Sony* Court declined to impute the requisite level of knowledge where the defendants made and sold equipment capable of both infringing and "substantial noninfringing uses." *Id.* at 442 (adopting a modified "staple article of commerce" doctrine from patent law). See also *Universal City Studios, Inc. v. Sony Corp.,* 480 F.Supp. 429, 459 (C.D.Cal.1979) ("This court agrees with defendants that their knowledge was insufficient to make them contributory infringers."), rev'd, 659 F.2d 963 (9th Cir.1981), rev'd, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); Alfred C. Yen, Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment, 88 Geo. L.J. 1833, 1874 & 1893 n.210 (2000) (suggesting that, after *Sony*, most Internet service providers lack "the requisite level of knowledge" for the imposition of contributory liability").

We are bound to follow *Sony*, and will not impute the requisite level of knowledge to Napster merely because peer-to-peer file sharing technology may be used to infringe plaintiffs' copyrights. See 464 U.S. at 436, 104 S.Ct. 774 (rejecting argument that merely supplying the "'means' to accomplish an infringing activity" leads to imposition of liability).

*Perfect 10 v. Google, Inc.,* 416 F.Supp.2d 828, 853 (C.D.Cal.2006) ("Under *Sony*, Google cannot be deemed to have constructive knowledge of infringing activity since its search engine clearly is capable of commercially significant noninfringing uses.")

*A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 (9th Cir. 2001) ("It is apparent from the record that Napster has knowledge, both actual and constructive, of direct infringement. Napster claims that it is nevertheless protected from contributory liability by the teaching of *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). We disagree. We observe that Napster's actual, specific knowledge of direct infringement renders Sony 's holding of limited assistance to Napster. We are compelled to make a clear distinction between the architecture of the Napster system and Napster's conduct in relation to the operational capacity of the system.")

*In re Aimster Copyright Litigation,* 334 F.3d 643, 655 (9th Cir. 2007) ("Even when there are non-infringing uses of an Internet file-sharing service, moreover, if the infringing uses are substantial then to avoid liability as a contributory infringer the provider of the service must show that it would have been disproprortionately costly for him to eliminate or at least reduce substantially the infringing uses.")

**JURY INSTRUCTION No. _____**

CONTRIBUTORY COPYRIGHT INFRINGEMENT –
INDUCED, CAUSED OR MATERIALLY CONTRIBUTED TO DIRECT INFRINGEMENT –
MUTUAL ENTERPRISE OF INFRINGEMENT

A defendant induced, caused or materially contributed to infringing conduct at a particular website if that defendant actively strived to provide the environment and market for counterfeiting sales to thrive, such that the defendant and the operator(s) of a particular website were engaged in a mutual enterprise of infringement.  A defendant must be directly and substantially involved in the businesses of the infringing website operator(s), and cannot be liable unless the defendant acted in concert with the direct infringer to sell items that infringed plaintiff's copyrights.

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir. 1996) (flea market proprieter liable as a contributory [copyright] infringer when it **"actively strives to provide the environment and market for counterfeit recording sales to thrive."**)

*Perfect 10, Inc. v. Visa International Service Association,* 494 F.3d 788, 798 (9th Cir.2007) ("In *Fonovisa*, we held a flea market proprieter liable as a contributory infringer when it provided the facilities for and benefitted from the sale of pirated works. The court found that **the primary infringers and the swap meet were engaged in a mutual enterprise of infringement** and observed that it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet. . . The *Fonovisa* court found liability because the swap meet operator knowingly provided the "site and facilities" for the infringing activity.")

*Nimmer on Copyright*, § 12.04[A][3][a]: "In order to deemed a contributory infringer, the authorization or assistance must bear some direct relationship to the infringing acts, **and the person rendering such assistance or giving such authorization must be acting in concert with the infringer**."

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F.Supp. 949, 962 (C.D.Cal.1997) *affd. Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980 (9th Cir.1999) ("In *Fonovisa*, the Ninth Circuit adopted *Hard Rock*'s analogy between landlord/tenant vicarious liability and trademark law contributory liability in order to extend the *Inwood* standard to the flea market context. *Fonovisa*, 76 F.3d at 265. **There, too, the court found that the flea market operator provided more than space, and was directly and substantially involved in the businesses of the infringing vendors**. *Id.* at 264.")

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *3 (N.D.Cal.2004) ("**Examples of material contribution** from recent Internet case law **include providing an online index of copyrighted songs to facilitate their transfer between software users**, *A & M Records v. Napster,* 239 F.3d 1004, 1021 (9th Cir.2001), and **providing a bulletin board system allowing Internet users to upload and download copyrighted video games**, *Sega Enters. v. MAPHIA,* 948 F.Supp. 923, 933 (N.D.Cal.1996). In non-Internet cases, contributory infringement has traditionally been found where defendant **swap-meet owners provided infringing vendors at the swap-meet with "space, utilities, parking, advertising, plumbing, and customers**." *UMG Recordings, Inc. v. Sinnott,* 300 F.Supp.2d 993, 1001 (E.D.Cal.2004) (citing *Fonovisa, Inc. v. Cherry Auction. Inc.,* 76 F.3d 259, 264 (9th Cir.1996)). **All of these acts were directly tied to not only the business operations of the infringers, but specifically to their infringing conduct**.")

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *4 (N.D.Cal.2004) ("Defendants' conduct does not begin to approach the level of involvement that existed in the cases enumerated above, where material contribution was found. **In each of those cases, the defendants' conduct specifically assisted the infringing activity itself.** Here, the websites would be every bit as capable of copying and distributing Plaintiff's copyrighted works regardless of whether they employed Defendants' services. As a result, Plaintiff has not adequately pled a claim for contributory copyright infringement.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. _____**

CONTRIBUTORY COPYRIGHT INFRINGMENT – INDUCEMENT
OF DIRECT INFRINGEMENT

You may find that a defendant induced a third party to infringe plaintiff's copyright(s) if you find that defendant provided web hosting services with the intent to promote their use to infringe, as shown by a clear expression or other affirmative steps taken to foster infringement of plaintiff's copyrights at a particular website. Purposeful, culpable expression and conduct by an individual defendant must be shown.  Mere knowledge of actual infringing uses or knowledge of potential infringement is not enough to subject a defendant to liability.

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936-937 (2005) ("[T]he inducement rule, too, is a sensible one for copyright. We adopt it here, holding that **one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties**. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as Sony did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, **mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability.** Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves. **The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.**

14

**JURY INSTRUCTION No. _____**

CONTRIBUTORY COPYRIGHT INFRINGEMENT – MATERIAL CONTRIBUTION –
DIRECT RELATIONSHIP TO INFRINGING ACTS

To be held liable as a contributory infringer, it is not enough that a defendant contributed to the general business of the infringer.  To materially contribute to copyright infringement any assistance must bear a direct relationship to the specific infringing acts occurring at a particular website.

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *3 (N.D.Cal.2004) ("To have engaged in contributory copyright infringement, it is **not sufficient for the Defendants to merely have contributed to the general business of the infringer**. To have materially contributed to copyright infringement, "**the ... assistance must bear some direct relationship to the infringing acts.**" 3-12 Nimmer on Copyright § 12.04[A][2][a] (2004); *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) ( "One who directly contributes to another's infringement should be held accountable."); *MGM Studios, Inc. v. Grokster, Ltd.,* 259 F.Supp.2d 1029, 1042 (C.D.Cal.2003) (**The Defendants' assistance "must bear a direct relationship to the infringing acts.**"). In addition, the contributing conduct must be substantial. *Religious Tech. Ctr. v. Netcom On-line Comm. Servs.,* 907 F.Supp. 1361, 1375 (N.D.Cal.1995).")

*Nimmer on Copyright*, § 12.04[A][3][a]: "In order to deemed a contributory infringer, the authorization or assistance must bear some direct relationship to the infringing acts, and the person rendering such assistance or giving such authorization must be acting in concert with the infringer."

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *3 (N.D.Cal.2004) ("**Examples of material contribution** from recent Internet case law **include providing an online index of copyrighted songs to facilitate their transfer between software users**, *A & M Records v. Napster,* 239 F.3d 1004, 1021 (9th Cir.2001), and **providing a bulletin board system allowing Internet users to upload and download copyrighted video games**, *Sega Enters. v. MAPHIA,* 948 F.Supp. 923, 933 (N.D.Cal.1996). In non-Internet cases, contributory infringement has traditionally been found where defendant **swap-meet owners provided infringing vendors at the swap-meet with "space, utilities, parking, advertising, plumbing, and customers**." *UMG Recordings, Inc. v. Sinnott,* 300 F.Supp.2d 993, 1001 (E.D.Cal.2004) (citing *Fonovisa, Inc. v. Cherry Auction. Inc.,* 76 F.3d 259, 264 (9th Cir.1996)). **All of these acts were directly tied to not only the business operations of the infringers, but specifically to their infringing conduct.**")

**JURY INSTRUCTION No. ____**

CONTRIBUTORY COPYRIGHT INFRINGEMENT – MATERIAL CONTRIBUTION –
SERVICES DISSEMINATED FOR PURPOSES OF FACILITATING DIRECT
INFRINGEMENT

A defendant materially contributes to copyright infringement if the defendant's equipment was expressly engineered, and the defendant's services were disseminated and promoted, explicitly for the purpose of facilitating the exchange of counterfeit goods.

*A&M Records, Inc. v Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001) ("Napster was a file sharing program which, while capable of non-infringing use, was **expressly engineered to enable the easy exchange of pirated music** and was widely so used.")

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 799 n. 10 (9th Cir. 2007) ("In fact, as virtually every interested college student knew-and as the program's creator expressly admitted-**the sole purpose of the Napster program was to provide a forum for easy copyright infringement.** [citation omitted] **Perfect 10 does not contend** that Defendants' payment systems were **engineered for infringement** in this way, and we decline to radically expand Napster's cursory treatment of "material contribution" to cover a credit card payment system that was not so designed

*Perfect 10, Inc. v. Visa International Service Association,* 494 F.3d 788, 801 (9th Cir.2007) ("**The software systems** in *Napster* and *Grokster* **were engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted music** and reducing legitimate sales of such music to the extent. **Most** *Napster* and *Grokster* **users** understood this and **used those systems to purloin copyrighted music**. . . Perfect 10 does not allege that Defendants **created or promote their payment systems** as a means **to break laws**.")

1

**JURY INSTRUCTION No. \_\_\_\_**

2

CONTRIBUTORY COPYRIGHT INFRINGEMENT - MATERIAL CONTRIBUTION –
CONTENT – NEUTRAL SEVICES

3

4

5      You may not find that a defendant materially contributes to direct infringement at a

6  particular website if it provides content-neutral ISP services. A defendant provides content-neutral

7  ISP services if they are not concerned with the content of websites located on their servers (that is,

8  they do not promote websites, require certain content on websites, or hold out certain merchants

9  as being providers of a certain quality of product).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *3 (N.D.Cal.2004) ("Unlike

2

[*Perfect 10, Inc. v. Cybernet Ventures, Inc.*] Defendants provide **content-neutral services**.

3

Defendants **do not promote** the **websites** that use their services. **Nor do Defendants have**

4

**content-specific regulations** with which merchants  must comply before using Defendants
services, as Cybernet did. Defendants do not hold out certain merchants as being providers of a
particular quality of product. Defendants are **concerned solely with the financial aspects of the**
**websites, not their content.**"

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. _____**

CONTRIBUTORY COPYRIGHT INFRINGEMENT – MATERIAL
CONTRIBUTION – INFRINGEMENT


You may not find that a defendant materially contributes to direct infringement at a particular website if (1) the website can continue to operate effectively by moving to a different IP address after being taken down or disabled or (2) the direct infringement could continue to occur without using the defendant's services.

1  *Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 797-798 (9th Cir.2007) ("We
2  acknowledge that Defendants' payment systems make it easier for such an infringement to be
   profitable, and that they therefore have the effect of increasing such infringement, but **because
3  infringement of Perfect 10's copyrights can occur without using Defendants' payment
   system**, we hold that payment processing . . . **does not constitute a "material contribution"**
4  under the test for contributory infringement of copyrights.")

5  *Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 2004 WL 1773349, *4 (N.D.Cal.2004) ("Plaintiff
   alleges that because Defendants provide essential financial services to the alleged infringers, they
6  are materially contributing. There are two flaws with this argument. **The first flaw is the
   assumption that the services Defendants provide are essential to the functioning of the
7  allegedly infringing websites.** Plaintiff asserts, "acceptance of MasterCard and Visa is necessary
   to an Internet merchant's commercial viability." This statement is belied by facts from the
8  Plaintiff's own complaint. **Plaintiff itself was blacklisted by Visa and had its merchant account
9  revoked, yet it still continues to operate its website and accept Visa and Mastercard as
   payment through an intermediate payment service.** The allegedly infringing websites could
10 employ intermediate payment services if Defendants terminated their merchant accounts. The
   websites could also use alternate forms of payment such as personal checks, money orders, debit
11 cards, or other credit card providers. **There is no reason to believe that the allegedly infringing
   websites could not continue to infringe and operate effectively if Visa and Mastercard were
12 to terminate their financial services.**")

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY INSTRUCTION No. ____**

DEFENSES TO CONTRIBUTORY COPYRIGHT INFRINGEMENT –
DMCA SAFE HARBOR – REQUIREMENTS

Federal law exempts Internet Service Providers such as Managed Solutions Group, Inc. and Akanoc Solutions, Inc. from contributory copyright infringement claims that result from the conduct of their customers when they meet certain criteria. To qualify for safe harbor protection regarding infringing material on websites stored on their servers, Managed Solutions Group, Inc. and Akanoc Solutions, Inc. must prove by a preponderance of the evidence that:

(1) they are providers of online services or network access, or are the operator of facilities therefore;

(2) they adopted and reasonably implemented a termination policy for subscribers and account holders who are repeat infringers;

(3) they accommodate and do not interfere with standard technical measures that copyright owners use to protect their works;

(4) any contributory infringement is by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider;

(5) they lacked actual knowledge of the infringing material or were not aware of facts or circumstances from which infringing activity was apparent on its system or network and/or acted expeditiously to remove or disable access to the material upon obtaining such knowledge or awareness;

(6) they did not receive a financial benefit directly attributable to the infringing activity, if they had the right and ability to control such activity. An ability of Managed Solutions Group, Inc. and Akanoc Solutions, Inc. to remove or block access to materials posted on websites or stored on their servers is not sufficient to demonstrate that they receive a direct financial benefit;

(7) they responded expeditiously to remove or disable access to infringing material upon notification from the copyright owner; and

(8) they properly designated an agent to receive such notification.

In determining whether the ISP defendants complied with (1) and (6) above, it is enough if the ISP defendants did what they could reasonably be asked to do to under the circumstances to prevent the use of their services by repeat infringers.

An ISP defendant's failure to comply with (7) above is excused if the plaintiff fails to provide adequate notice of claimed infringement in writing to the defendants' designated agent

that complies with the following:

    1. A physical or electronic signature of a person authorized to act on its behalf;

    2. Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

    3. Identification of the material claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;

    4. Information reasonably sufficient to permit the applicable service provider (MSG or Akanoc) to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted;

    5. A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

    6. A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

    Any failure by the defendants to comply with any of the above safe harbor requirements is irrelevant to and should not be considered by you in determining the defendants' liability for contributory copyright or trademark infringement. But if a defendant does comply with the above safe harbor requirements, you may not find that defendant liable for contributory copyright infringement.

*See* 15 U.S.C. 512(k)(1)(B):

> Definitions.--(1) Service provider

> (B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

*Tur v. YouTube, Inc.*, 2007 WL 1893635 *2-3 (C.D.Cal. June 20, 2007) ("To be eligible for any of the four safe harbors at §§ 512(a)-(d), a service provider must first meet the threshold conditions set out in § 512(i) ...". Accordingly, YouTube must prove that:

> (1) it has adopted and reasonably implemented a termination policy for subscribers and account holders who are repeat infringers, 17 U.S.C. § 521(i)(1)(A)

> (2) accommodates and does not interfere with "standard technical measures" that copyright owners use to protect their works, 17 U.S.C. § 512(i)(1)(B)

> (3) its infringement is "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider," 17 U.S.C. § 512(c)(1);

> (4) it lacked actual knowledge of the infringing material or was not aware of facts or circumstances from which infringing activity was apparent on its system or network and/or acted expeditiously to remove or disable access to the material upon obtaining such knowledge or awareness, 17 U.S.C. § 512(c)(1)(A)(i)-(iii);

> (5) it did "not receive a financial benefit directly attributable to the infringing activity," if it had "the right and ability to control such activity," 17 U.S.C. § 512(c)(1)(B);

> (6) it responded expeditiously to remove or disable access to infringing material upon notification from the copyright owner, 17 U .S.C. § 512(c)(1)(C); and

> (7) it has properly designated an agent to receive such notification, 17 U.S.C. § 512(c)(2).

*Tur v. YouTube, Inc.*, 2007 WL 1893635 *3 (C.D.Cal. June 20, 2007) ("With regard to 17 U.S.C. § 512(c)(1)(B), YouTube maintains it does not receive a financial benefit directly attributable to the allegedly infringing activity and that it does not have the right or ability to control said activity. As the statute makes clear, a provider's receipt of a financial benefit is only implicated where the provider also "has the right and ability to control the infringing activity." 17 U.S.C. § 512(c)(1)(B), See *Perfect 10, Inc. v. CCBill LLC.,* 2007 WL 1557475 at *11. As such, if YouTube does not have

1  the right and ability to control the alleged infringing activity, the Court need not engage in the

2  "financial benefit analysis.")

3

4  *Tur v. YouTube, Inc.*, 2007 WL 1893635 *3 (C.D.Cal. June 20, 2007) ("The 'right and ability to

5  control' infringing activity, as the concept is used in the DMCA, has been held to mean "something

6  more" than just the ability of a service provider to remove or block access to materials posted on its

7  website or stored in its system." *Hendrickson v. Ebay, Inc.,* 165 F.Supp.2d 1082, 1093 (C.

8  D.Cal.2001); see also *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146, 1183

9  (C.D.Cal.2002); see also *Corbis Corp. v. Amazon.com, Inc.,* 351 F.Supp.2d 1090 (W.D.Wash.2004).

10 Rather, the requirement presupposes some antecedent ability to limit or filter copyrighted material.

11 Fonavisa at 263; see also *MGM, Inc. v. Grockster,* 545 U.S. 913, 926.")

12 *Ellison v. Robertson,* 357 F.3d 1072, 1080 (9th Cir.2004) (Section 512(i)(1)(A) requires service
13 providers to: (1) adopt a policy that provides for the termination of service access for repeat
    copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable
14 manner; and (3) inform its subscribers of the policy.")

15 *In re Aimster Copyright Litigation,* 252 F.Supp.2d 634, 659 (N.D.Ill.2002), aff'd, 334 F.3d 643
    (7th Cir.2004) (repeat infringer policy communicated when users informed they "may have their
16 access to all services terminated" for repeated copyright violations) (emphasis added); *Perfect 10,
    Inc. v. CCBill, LLC,* 340 F.Supp.2d 1077, 1088-89 (C.D.Cal.2004) (policy stating user's access
17 may be terminated deemed sufficient communication).

18 *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1112 (9th Cir. 2007) ("In order to substantially
19 comply with § 512(c)(3)'s requirements, a notification must do more than identify infringing files.
    The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to
20 represent the copyright holder, and that he has a good-faith belief that the use is infringing. This
    requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A
21 user could have content removed, or may have his access terminated entirely. If the content
    infringes, justice has been done. But if it does not, speech protected under the First Amendment
22 could be removed. We therefore do not require a service provider to start potentially invasive
23 proceedings if the complainant is unwilling to state under penalty of perjury that he is an
    authorized representative of the copyright owner, and that he has a good-faith belief that the
24 material is unlicensed.")

25 *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1109 (9th Cir.2007) ("The statute does not define
26 "reasonably implemented." We hold that a service provider "implements" a policy if it has a
    working notification system, a procedure for dealing with DMCA-compliant notifications, and if it
27 does not actively prevent copyright owners from collecting information needed to issue such
    notifications. . . An implementation is reasonable if, under "appropriate circumstances," the
28 service provider terminates users who repeatedly or blatantly infringe copyright.")

*Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1118 (9th Cir.2007) ("In this case, Perfect 10 provides almost no evidence about the alleged direct financial benefit to CWIE. Perfect 10 only alleges that "CWIE 'hosts' websites for a fee." This allegation is insufficient to show that the infringing activity was "a draw" as required by *Ellison.* 357 F.3d at 1079. Furthermore, the legislative history expressly states that "receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity.' " H.R. Rep., at 54. Perfect 10 has not raised a genuine issue of material fact that CWIE receives a direct financial benefit from infringing activity. Because CWIE does not receive a direct financial benefit, CWIE meets the requirements of § 512(c).")

*Rossi v. Motion Picture Ass'n of America Inc.,* 391 F.3d 1000, 1003 (9th Cir.2004) ("When a copyright owner suspects his copyright is being infringed, he must follow the notice and takedown provisions set forth in § 512(c)(3) of the DMCA, which provide in part:

> (A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:
>
> (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
>
> (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
>
> (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.
>
> (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.
>
> (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law. 17 U.S.C. § 512(c) (emphasis added)."

*Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 715, fn. 4 (9th Cir. 2007) ("The failure of a service provider's conduct to qualify for limitation of liability under [the DMCA] shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.")

*Costar Group, Inc. v. Loopnet, Inc.,* 373 F.3d 544, 552 (4th Cir. 2004) ("CoStar argues that because the DMCA supplanted *Netcom,* Loopnet must rely for its defnse exclusively on the

27

immunity conferred by the DMCA. This argument, however, is belied by the plain language of the DMCA itself: . . . Other defenses not affected: The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense. . .  Thus the statute specifically provides that despite a failure to meet the safe-harbor conditions in § 512(c) and (i), an ISP is still entitled to all other arguments under the law- whether by way of an affirmative defense or through an argument that conduct simply does not constitute a prima facie case of infringement under the copyright act."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. ____**

DAMAGES – CONTRIBUTORY COPYRIGHT INFRINGEMENT
AWARD OF STATUTORY DAMAGES

If you find that a defendant contributorily infringed either the *Multicolor Monogram Black Print* copyrighted work and/or the *Multicolor Monogram White Print* copyrighted work, you must determine the amount of statutory damages the Plaintiff can recover against that particular defendant.

The Copyright Act permits recovery of one award of statutory damages for each copyrighted work contributorily infringed by defendants, regardless of how many times that copyrighted work was infringed. Even if you find that a particular copyrighted work was infringed multiple times at multiple websites, Vuitton can recover only a single statutory damages award.

If the same products violated Vuitton's copyrighted work and one or more of its trademarks, Vuitton is not entitled to receive a separate statutory damages award under the Lanham Act for the same infringement.

If you find the contributory infringement was not willful, you must award damages between $750 and $30,000 per copyrighted work. If the infringement is willful the award can be increased up to $150,000 per copyrighted work. But if the defendant did contributorily infringe a copyright but was unaware and had no reason to believe that its acts constituted copyright infringement, the award of statutory damages can be reduced to a sum of not less than $200 per copyrighted work.

"Willfulness" under the Copyright Act requires proof that (1) the defendant was actually aware of the infringing activity, or (2) the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights.

The amount of statutory damages awarded should not be disproportionate to the actual damages Louis Vuitton suffered, if any, as a result of the infringement.

17 U.S.C. 504(c)(1) and (2) provide:

(c) Statutory Damages.--

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of **not less than $750 or more than $30,000 as the court considers just**. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) **In a case where the** copyright owner sustains the burden of proving, and the court finds, that **infringement was committed willfully**, **the court** in its discretion **may increase** the award of statutory damages to a sum of **not more than $150,000**. **In a case where** the infringer sustains the burden of proving, and the court finds, that **such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200**.

*Island Software and Computer Service, Inc. v. Microsoft Corp.,* 413 F.3d 257, 262-263 (2d Cir. 2005) ("Once an act of infringement under the Copyright Act has been proven, a plaintiff may, in lieu of an award of actual damages and profits, request that statutory damages under 17 U.S.C. § 504(c) be awarded. If a plaintiff so elects, the district court will grant anywhere between $750 and *263 $30,000 for each copyright infringed. See 17 U.S.C. § 504(c)(1). If the defendant's infringement was willful, however, the district court may also, in its discretion, enhance the statutory damages award to as much as $150,000 per infringed work. 17 U.S.C. § 504(c)(2).")

*Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 143-144 (5th Cir. 1992) (emphasis added) ("Under this section [504(c)(1) of the Copyright Act], the total number of "awards" of statutory damages (each ranging from $5,000 to $20,000) that a plaintiff may recover in any given action depends on the number of [copyrighted] works that are infringed and the number of individual liable infringers, regardless of the number of infringements of those works.")

McCarthy on Trademarks and Unfair Competition, Fourth Edition, Ch. 30 Remedies for Infringement and Unfair Competition (March 2009) ("Under the Copyright Act, one does not multiply the minimum and maximum limits by the number of infringing copies. For infringement of a single copyrighted work by a single infringer, the statutory ceiling and floor dollar limits apply, no matter how many acts of infringement are involved in the lawsuit, and regardless of whether the acts were separate, isolated, or occurred in a related series.")

*Nintendo of America, Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007, 1011 (9th Cir. 1994) (Upholding damages award under Lanham Act and Copyright Act because "Nintendo did not recover the same type of damages under both acts.")

*Nintendo of America, Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007, 1011 (9th Cir. 1994) ("This case [*Manufacturers' Technologies*] is distinguishable on the grounds that the plaintiff sought the same type of damages under both acts.  By contrast, here Nintendo recovered statutory damages under the Copyright Act [and actual damages under the Lanham Act].")

1

2
*Yurman Studio, Inc. v. Castaneda,* Slip Copy, 2008 WL 4949775, *2 (S.D.N.Y. 2008) ("At the end of the day, statutory damages should bear some relation to actual damages suffered.")

3

4
*New Line Cinema Corp. v. Russ Berrie & Co.,* 161 F.Supp.2d 293, 303 (S.D.N.Y.2001) ("[S]tatutory damages should be commensurate with the actual damages incurred and, thus, the proper departure point is [defendant's] stipulated gross revenue.")

5

6
*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 315 F.Supp.2d 511, 520 (S.D.N.Y. 2004) ("To the extent possible, statutory damages should be woven out of the same bolt of cloth as actual damages.")

7

8
*Island Software and Computer Service, Inc. v. Microsoft Corp.,* 413 F.3d 257, 262-263 (2d Cir. 2005) ("To prove "willfulness" under the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights. [citations omitted] Willfulness in this context means that the defendant recklessly disregarded the possibility that its conduct represented infringement.") (citation and internal quotation marks omitted.").

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**JURY INSTRUCTION No. _____**

2

CONTRIBUTORY TRADEMARK INFRINGEMENT

3

You have heard all of the evidence with respect to Plaintiff's claim that the Defendants

4

contributorily infringed the following fifteen (15) separate trademarks:

| TRADEMARK | CLASS OF GOODS |
| --- | --- |
| Louis Vuitton (Interlocked Letters) in a Circle Design | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 18 |
| LOUIS VUITTON | 18 |
| Louis Vuitton (Interlocked Letters) Design | 18 |
| LOUIS VUITTON MALLETIER A PARIS in Rectangle | 16, 18 |
| Louis Vuitton (Interlocked Letters) on Epi Leather Design | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Pattern Design | 25 |
| Louis Vuitton (Interlocked Letters) Design | 16, 25 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 16 |
| Louis Vuitton (Interlocked Letters) | 14, 24 |
| LOUIS VUITTON World Mark | 16, 18, 24, 25 |
| Louis Vuitton (Interlocked Letters) Design | 34 |
| LOUIS VUITTON | 34 |
| Louis Vuitton (Interlocked Letters) Design | 25 |
| LOUIS VUITTON PARIS and Damier (pattern design) | 18 |

20

You must decide if each accused website directly infringed each of these trademarks and if

21

so, whether individually Managed Solutions Group, Inc., Akanoc Solutions, Inc. and Steve Chen

22

each contributed to that infringement. You should consider each defendant's contributory liability as

23

to each trademark and each accused website separately.

24

A trademark is any word, name, symbol, device, or any combination thereof, used by a

25

person to identify and distinguish that person's goods from those of others and to indicate the source

26

of the goods.

27

To establish contributory trademark infringement by each of the defendants in this case as to

28

each trademark directly infringed by each accused website, Louis Vuitton must prove several

32

1   elements.  Each element must be proven by a preponderance of the evidence. Preponderance of the

2   evidence means that you are persuaded by the evidence that it is more probably true than not true.

3                               ELEMENT ONE – DIRECT INFRINGEMENT

4           Plaintiff must first prove as to each of its fifteen trademarks that it was directly infringed by a

5   specific third party or parties.  To prove direct trademark infringement, Plaintiff must first prove that

6   each trademark is (1) valid (2) entitled to protection under the Lanham Act, and (3) used by

7   _____ **[website(s)]** in interstate commerce in connection with the sale or advertising of

8   goods or services without Vuitton's consent by specific accused websites:  *Ape168.com,*

9   *Atozbrand.com*, *Bag925.com*, *Bag4Sell.com*, *Bapesky.com*, *BigWorldShoes.com*, *Eshoes99.com,*

10  *Eshoes99.net*, *GucciFendi.com*, *InNike.com*, *Luxury2Us.com*, *PickYourGoods.com*, *RRGNL.com*,

11  *SoApparel.com*, *Sunny7Shoes.com*, *WatchNReplica.net*, *Wendy929.net*.

12          This must be proven as to each accused website individually.

13          Louis Vuitton must also prove that the use of each trademark at each accused website would

14  be likely to confuse consumers about the source of goods. I will suggest some factors you should

15  consider in determining this issue. The presence or absence of any particular factor that I suggest

16  should not necessarily resolve whether there was a likelihood of confusion, because you must

17  consider all relevant evidence in determining this. As you consider the likelihood of confusion, you

18  should examine the following:

19          1.      Strength or weakness of each trademark.

20          2.      The alleged direct infringer's use of each trademark.

21          3.      Actual Confusion.  If use by a direct seller using a particular trademark has led to

22  instances of actual confusion, this strongly suggests a likelihood of confusion.  If, by contrast, there

23  are none or only a few isolated instances of actual confusion you may find that there has not been

24  substantial actual confusion.

25          4.      The Alleged Direct Sellers Intent.  Knowing use by a direct seller of each the

26  plaintiff's trademark to identify similar goods may show an intent to derive benefit from the

27  reputation of each of plaintiff's trademarks, suggesting an intent to cause a likelihood of confusion.

28          5.      Marketing/Advertising Channels.  If the plaintiff's goods are likely to be sold in the

same or similar stores or outlets, or advertised in similar media as those of the accused websites, this may increase the likelihood of confusion.  Conversely if they are *not* sold in the same or similar stores or outlets, or advertised in similar media, this may decrease the likelihood of confusion.

6.      Purchaser's Degree of Care.  The more sophisticated the potential buyers of the goods or the more costly the goods, the more careful and discriminating the reasonably prudent purchaser exercising ordinary caution may be.  They may be less likely to be confused by similarities in the products.

ELEMENT TWO – INTENTIONAL INDUCEMENT

To prevail on its contributory trademark infringement claim, in addition to satisfying the element of direct infringement as to each trademark and each alleged direct infringer, the plaintiff must prove by a preponderance of the evidence that each individual defendant either (1) intentionally induced specific direct infringers to infringe each of the trademarks at each particular website, or (2) continued to supply an infringing product to direct infringers knowing or having reason to know that the direct infringers are mislabeling the particular product supplied.

Regarding (2) above, for liability to attach each individual defendant must know or have reason to know of specific instances of actual infringement involving the trademark at issue occurring at each accused website.  Generalized knowledge by a defendant that infringement is taking place at websites located on their Internet servers is not enough.

If you find that a specific direct infringer supplies *services* rather than *products* to the public, it is sufficient for Plaintiff to prove that a defendant directly controlled and monitored the specific website at all relevant times.

You must consider the liability of each defendant separately as to each trademark and each accused website. If you find that all of the elements on which Louis Vuitton has the burden of proof has been proved, your verdict should be for Louis Vuitton.  If, on the other hand, Louis Vuitton has failed to prove any of these elements as to any defendant, your verdict should be for the particular defendant.

Ninth Circuit Model Jury Instructions §§ 15:1 and 15.16

*Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F.Supp.2d 463, 495 (S.D.N.Y. 2008) ("In order to prevail on a trademark infringement claim, a plaintiff must establish that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) 'in connection with the sale ... or advertising of goods or services,' (5) without the plaintiff's consent.")

*Perfumebay.com Inc. v. EBAY, Inc.,* 506 F.3d 1165, 1173 (9th Cir. 2007) ("The core element of trademark infringement is whether customers are likely to be confused about the source or sponsorship of the products.")

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 807 (9th Cir. 2007) ("To be liable for contributory trademark infringement, a defendant must have (1) "intentionally induced" the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied. [citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)] When the alleged ***direct infringer*** supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by the defendant over the third party's means of infringement.'" [citing *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir.1999)]. For liability to attach, there must be "[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark." *Id.*)

*Perfect 10, Inc. v. Visa Intern. Service Ass'n,* 494 F.3d 788, 807 (9th Cir. 2007) ("[A] defendant must have ... continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied.") (emphasis added).

*Metro Pub., Ltd. v. San Jose Mercury News,* 987 F.2d 637, 640 (9th Cir. 1993) ("Because each [*Sleekcraft*] factor is not necessarily relevant to every case, this list functions as a guide and is 'neither exhaustive or exclusive.")

*Brookfield Communications v. West Coast Communications,* 174 F.3d 1036, 1054 (9th Cir.1999) ("Some factors are much more helpful than others, and the relative importance of each individual factor will be case specific . . . . [I]t is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors.")

*Tiffany, Inc. v. Ebay, Inc.* 576 F.supp.2d 463, 508 (S.D.N.Y. 2008) ("For the following reasons, the Court concludes that while eBay clearly possessed general knowledge as to counterfeiting on its website, such generalized knowledge is insufficient under the *Inwood* test to impose upon eBay an affirmative duty to remedy the problem.")

*Tiffany, Inc. v. Ebay, Inc.* 576 F.supp.2d 463, 510 (S.D.N.Y. 2008) ("[C]ourts have also rejected a standard that would reach conduct that only might be infringing. Instead, courts have required a much higher showing that a defendant knew or had reason to know of specific instances of actual infringement.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. \_\_\_\_**

CONTRIBUTORY TRADEMARK INFRINGEMENT –
LIKELIHOOD OF CONFUSION – CONFUSION MUST BE PROBABLE


A "likelihood" of confusion requires that the confusion be probable, not simply a possibility. The allegedly infringing conduct must be likely to confound an appreciable number of reasonably prudent purchasers exercising ordinary care.

*Murray v. Cable Nat. Broadcasting Co.,* 86 F.3d 858 (9th Cir.1996) ("A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or associated with, the services of another provider. [citing *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1217 (9th Cir.1987)]. **The confusion must "be probable, not simply a possibility."**")

*Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1151 (9th Cir.2002) ("To constitute trademark infringement, use of a mark must be **likely to confuse an *appreciable* number of people** as to the source of the product. [citing *Int'l Ass'n. of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 201 (1st Cir.1996)] [T]he law has long demanded a showing that the allegedly infringing conduct carries with it a **likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care**." [italics in original])

**JURY INSTRUCTION No. \_\_\_\_**

CONTRIBUTORY TRADEMARK INFRINGEMENT –
LIKELIHOOD OF CONFUSION – RELATIVE COST OF GOODS

In considering whether a third party's use of the plaintiff's trademark(s) is likely to cause confusion about the source of the goods, you should consider the relative cost of the plaintiff's goods. If they are relatively expensive, this factor weighs heavily against finding a likelihood of confusion.

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1060 (9th Cir.1999) ("**Likelihood of confusion is determined on the basis of a "reasonably prudent consumer**." What is expected of this reasonably prudent consumer depends on the circumstances. **We expect him to be more discerning-and less easily confused-when he is purchasing expensive items**, see, e.g., *Official Airline Guides*, 6 F.3d at 1393 (noting that confusion was unlikely among advertisers when the products in question cost from $2,400 to $16,000) . . . [W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely.")

*E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1293 (9th Cir. 1992) ("When goods are **expensive**, it is assumed that buyers will exercise greater care in their purchases.")

*Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.,* 644 F.2d 769, 771-772 (9th Cir. 1981) ("Vuitton, a French company, is owned and controlled by members of the Vuitton family. It is engaged in the sale and distribution of **expensive** luggage, handbags, and related items.")

*Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass'n,* 208 F.Supp.2d 1058 (C.D.Cal.2000), *affd.* ("Based on the relatively high cost, the Court finds that consumers seeking association services will be very discerning and not easily confused. . . . The Court finds that **consumers seeking association services are highly discerning and not easily confused. This factor weighs heavily against finding a likelihood of confusion**.")

1

**JURY INSTRUCTION No. ____**

2

CONTRIBUTORY TRADEMARK INFRINGEMENT
DIRECT CONTROL AND MONITORING

3

4

5        You may find defendants liable for contributory trademark infringement if you find

6   that a defendant (1) had knowledge of websites directly infringing plaintiff's trademarks, and (2)

7   directly controlled and monitored those websites.

8        As to (1) above, you may not infer knowledge of direct infringement simply because

9   a defendant was notified of potential infringement occurring at particular websites.

10

11        As to (2) above, direct control and monitoring means more than a relatively passive

12   degree of control and monitoring. It refers to actual control over operations at infringing websites

13   including advertising and promoting infringing businesses and providing customers to infringing

14   websites.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 983, 985 (9th Cir. 1999) ("Contributory infringement occurs when the defendant either intentionally induces a third party to infringe the plaintiff's mark or supplies a product to a third party with actual or constructive knowledge that the product is being used to infringe the service mark. Lockheed alleges only the latter basis for contributory infringement liability **and therefore must prove that NSI supplies a product to third parties with actual or constructive knowledge that its product is being used to infringe "Skunk Works.".** . . . **Direct control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark permits the expansion of *Inwood Lab's* "supplies a product" requirement for contributory infringement**.")

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* WL 5383905, *9 (N.D. Cal. Dec. 23, 2008) ("The Court first addresses contributory trademark liability under the "extent of control" theory. Under that framework, a plaintiff must prove that the defendant had **knowledge** and **"[d]irect control and monitoring** of the instrumentality used by the third party to infringe the plaintiff's mark." [citing to *Lockheed*, 194 F.3d at 984].

*Perfect 10, Inc. v. Visa International Service Association,* 494 F.3d 788, 799 (9th Cir.2007) ("The actual display, location, and distribution of infringing images in this case occurs on websites that organize, display, and transmit information over the wires and wireless instruments that make up the Internet. The *websites* are the "site" of the infringement, not Defendants' payment networks.")

*Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 985 (9th Cir.1999) ("Where domain names are used to infringe, the infringement does not result from NSI's publication of the domain name list, but from the registrant's use of the name on a web site or other Internet form of communication in connection with goods and services.")

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 964 (C.D.Cal.1997), *affd. Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980 (9th Cir.1999) ("In holding that the degree of uncertainty over infringing uses of domain names makes it inappropriate to impose contributory liability on NSI, the Court is not making new trademark rules for the Internet. **Contributory infringement doctrine has always treated uncertainty as relevant to the question of an alleged contributory infringer's knowledge.** See *Mini Maid*, 967 F.2d at 1521 (instructing district court to consider extent and nature of alleged infringement in determining whether to impute knowledge to alleged contributory infringer); Restatement (Third) of Unfair Competition § 26 cmt. a (1993) (noting that a person's liability for contributory infringement "depends upon the nature of the business relationship between the person and the direct infringer and the knowledge attributable to the person on the basis of that relationship"). *A trademark owner's demand letter is insufficient to resolve this inherent uncertainty.* [citing *Coca-Cola Co. v. Snow Crest Beverages,* 64 F.Supp. 980 (D.Mass.1946), aff'd, 162 F.2d 280 (1st Cir.1947)]."

*Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F.Supp.2d 678, 689-690 (D.Md.2001) ("Moreover, liability in the flea-market cases rested on more than the relatively passive degree of control and monitoring usually exercised by a landlord. **The flea-market operators not only exercised considerable actual control over the operations of their vendors; they also actively supported the infringing businesses of their vendors-by advertising and promoting the flea markets and by providing the vendors their customers**. See *Hard Rock Cafe Licensing Corp.*, 955 F.2d at 1148; *Fonovisa, Inc.,* 76 F.3d at 264).

# JURY INSTRUCTION No. _____

### CONTRIBUTORY TRADEMARK INFRINGEMENT
### WILLFUL BLINDNESS

You may infer that a defendant had actual knowledge that a product was being used to infringe the plaintiff's trademark if you find that the particular defendant was willfully blind to counterfeit goods bearing plaintiff's trademark being sold on the defendant's premises. To be willfully blind, each defendant must suspect wrongdoing and deliberately fail to investigate. It requires more than mere negligence or mistake and does not exist unless the defendant knew of a high probability of illegal conduct and purposely contrived to avoid learning of it. Willful blindness cannot be based one a defendant's failure to take reasonable precautions against counterfeiting, or a defendant's failure to monitor websites located on computer servers for infringing content, or a defendant's failure to keep a website from returning to the defendants' Internet servers after being taken down or disabled.

Any failure by a defendant to designate an agent for notification of infringement with the Patent and Trademark Office, adopt and reasonably implement a repeat infringer policy, or comply with any other requirement for safe harbor under the Digital Millennium Copyright Act is irrelevant and should not be considered by you in determining whether a defendant was willfully blind.

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 855 (1982) ("To be liable for contributory trademark infringement, the defendants must have either "induced a third party to infringe the plaintiff's mark or supplied a product to a third party with actual or constructive knowledge that the product is being used to infringe the [mark].")

*Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992) ("Willful blindness" is equivalent to actual knowledge for purposes of the Lanham Act. . . .To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate. The district court, however, made little mention of CSI's state of mind and focused almost entirely on CSI's failure to take precautions against counterfeiting. . . But CSI has no affirmative duty to take reasonable precautions against the sale of counterfeits.")

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 985 F. Supp. 949, 962, n. 7 (C.D.Cal.1997), *affd. Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir.1999) ("Even though Internet service providers directly provide the storage and communications facilities for Internet communication, they cannot be held liable merely for failing to monitor the information posted on their computers for tortious content.")

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 510 (S.D.N.Y.2008) ("Were Tiffany to prevail in its argument that eBay was willfully blind, the "reason to know" standard of the *Inwood* test would be inflated into an affirmative duty to take precautions against potential counterfeiters, even when eBay had no specific knowledge of the individual counterfeiters. **The law explicitly precludes such an expansion of the "reason to know" standard.")**

*Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992) (A party "has no affirmative duty to take precautions against the sale of counterfeits. [T]he "reason to know" part of the [*Inwood Labs*] standard for contributory liability … does not impose any duty to seek out and prevent violations."

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 463, 514-515 (S.D.N.Y.2008) ("eBay did not analyze its data, or research and evaluate the number of "Tiffany" listings removed from its website. Nor did it track the number of sellers suspended because they had posted infringing listings. Nevertheless, the fact that eBay did not take these additional steps is immaterial, because **without specific knowledge or reason to know, eBay is under no affirmative duty to ferret out potential infringement**. Willful blindness requires "more than mere negligence or mistake" and does not lie unless the **defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it,** for example, by failing to inquire further out of fear of the result of the inquiry.")

*Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 715, fn. 4 (9th Cir. 2007) ("The failure of a service provider's conduct to qualify for limitation of liability under [the DMCA] shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.")

*Costar Group, Inc. v. Loopnet, Inc.,* 373 F.3d 544, 552 (4th Cir. 2004) ("CoStar argues that because the DMCA supplanted *Netcom*, Loopnet must rely for its defnse exclusively on the immunity conferred by the DMCA. This argument, however, is belied by the plain language of the DMCA itself: . . . Other defenses not affected: The failure of a service provider's conduct to

qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense. . .  Thus the statute specifically provides that despite a failure to meet the safe-harbor conditions in § 512(c) and (i), an ISP is still entitled to all other arguments under the law- whether by way of an affirmative defense or through an argument that conduct simply does not constitute a prima facie case of infringement under the copyright act."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. \_\_\_\_**

DAMAGES—WILLFUL TRADEMARK INFRINGEMENT

If you find that a defendant contributorily infringed any of Louis Vuitton's trademarks you must also determine whether that defendant's conduct was intentional or willful. Willfulness carries a connotation of a deliberate intent to deceive. In order to find that a defendant's contributory infringement was intentional or willful, you must find by clear and convincing evidence that the defendant(s) deliberately intended to deceive Louis Vuitton's customers.

Ninth Circuit Model Civil Jury Instruction 15.27 Trademark Damages – Intentional Infringement

*Collegenet, Inc. v. XAP Corp.,* 483 F.Supp.2d 1058, 1065 (D.Or.2007) ("A finding of willful misconduct under the Lanham Act must be supported by clear and convincing evidence. [citing *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.,* 294 F.3d 227, 229 (1st Cir.2002); *Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd.,* 50 F.3d 189, 208 (3d Cir.1995); *Castrol, Inc. v. Pennzoil Quaker State Co.,* 169 F.Supp.2d 332, 341 & n. 8 (D.N.J.2001)].")

*Lindy Pen Co., Inc. v. Bic Pen Corp.,* 982 F.2d 1400, 1406 (9th Cir.1993) ("Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as "deliberate," "false," "misleading," or "fraudulent" to conduct that meets this standard.")

**JURY INSTRUCTION No. ____**

CONTRIBUTORY TRADEMARK INFRINGEMENT —CONTINUE TO SUPPLY
INFRINGING PRODUCT TO INRINGER

You may not find a defendant liable for continuing to supply its product or service to an infringing website operator whom it knows or has reason to know is engaging in trademark infringement if, after becoming aware of infringing activities, appropriate steps are taken to cut off the supply of its product or service to the alleged infringer.

1

2

*Tiffany (NJ) Inc. v. Ebay, Inc.* 576 F.Supp.2d 463 (S.D.N.Y 2008) ("The *Inwood* test requires a plaintiff to prove that the defendant continued to supply its product to an infringer once it had knowledge of the infringement. **Courts have routinely declined to impose liability where a defendant**, once it possesses sufficient knowledge, **takes "appropriate steps" to cut off the supply of its product or service to the infringer**.")

3

4

5

*AT & T v. Winback & Conserve Program,* 42 F.3d 1421, 1433 n. 14 (3d Cir.1994) (contributory liability could not be imposed where the defendant "took appropriate steps" "in the instances where [plaintiff] brought objectionable acts ... to the attention of [defendant]") (internal citation and quotation marks omitted)

6

7

8

9

10

11

12

*Procter & Gamble Co. v. Haugen,* 317 F.3d 1121, 1129-30 (10th Cir. 2003) ("**In *Inwood***, . . . [t]o maintain a successful action for contributory infringement, **the plaintiff had to show that the generic pharmaceutical maker "in fact, continued to supply [the pills] to pharmacists whom the [generic manufacturer] knew were mislabeling generic drugs**." Id. at 855, 102 S.Ct. 2182. In *Inwood*, the Court agreed with the findings of the district court and concluded that the plaintiff could not make this showing.. . . .Similarly here, **P & G cannot establish that Amway "continued to supply" any products to the Distributor upon discovery of the Satanic message**. In fact, as the district court noted, Amway did not instruct the Distributor Defendants to spread the rumor, and, in fact, "upon learning of the subject message, Amway suggested that [one of the Distributor Defendants] issue a retraction," which he did.")

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**JURY INSTRUCTION No. ____**

2

DAMAGES—CONTRIBUTORY TRADEMARK INFRINGEMENT—
AWARD OF STATUTORY DAMAGES

3

4

5    If you find that a defendant contributorily infringed a trademark, you must determine if the

6  plaintiff can recover statutory damages against that defendant and, if so, the amount of statutory

7  damages recoverable.

8    To recover statutory damages, the plaintiff must prove that the buying public was either

9  actually deceived or actually confused as to the source of goods bearing each counterfeit

10  trademark.

11    The law permits recovery of only one award of statutory damages for each trademark

12  infringed for each type of goods or services sold.  This means that the statutory award cannot be

13  multiplied by the number of counterfeit items that were sold or offered for sale.

14    If the same products that violated Vuitton's trademark(s) also violated Vuitton's

15  copyrighted works, Vuitton is not entitled to receive a separate statutory damages award under the

16  Copyright Act for the same infringement.

17    If you find that a defendant contributorily infringed but that defendant's infringement of a

18  particular trademark was not willful, you must award damages between $1,000 and $200,000 per

19  trademark. If you find the infringement of that mark was willful, you can award up to $1,000,000

20  per trademark infringed. "Willfulness" under the law requires proof that a defendant acted

21  voluntarily and intentionally and with the specific intent to commit such an act of infringement.

22

23

24

25

26

27

28

15 U.S.C.A. § 1117(c) provides:

(c) Statutory damages for use of counterfeit marks

In a case involving the use of a counterfeit mark (as defined in section 1116(d) of this title) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."

McCarthy on Trademarks and Unfair Competition, Fourth Edition, Ch. 30:95 Remedies for Infringement and Unfair Competition (March 2009) ("The counterfeiting statutory damage provision limits the statutory minimum and maximum "per counterfeit mark per type of goods or services sold or offered for sale." This probably means the statutory award cannot be multiplied by the number of counterfeit items sold or offered for sale.")

*Audi AG v. D'Amato,* 469 F.3d 534, 542 (6th Cir. 2006) ("[A]lthough proof that the buying public was actually deceived is necessary to recover *statutory damages* under the Lanham Act, only a "likelihood of confusion" must be shown in order to obtain *equitable relief*, which is at issue in this appeal." [citing *Frisch's Restaurants v. Elby's Big Boy,* 670 F.2d 642, 647 (6th Cir. 1982)] ) (italics in original); *Volkswagen AG v. Dorling Kindersley Pub., Inc.* --- F.Supp.2d ----, 2009 WL 909573, *4 (E.D.Mich.2009) ("A plaintiff must demonstrate a likelihood of confusion to obtain equitable relief; a plaintiff must demonstrate actual confusion to recover statutory damages."); *Trenton Corp. v. Superior Corrosion Control, Inc.*, 2007 WL 268792, *3 (E.D.Mich.2007) ("Although proof that the buying public was actually deceived is necessary to recovery statutory damages under the Lanham Act, only a likelihood of confusion must be shown in order to obtain equitable relief.")

*Nintendo of America, Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007, 1011 (9th Cir. 1994) (Upholding damages award under Lanham Act and Copyright Act because "Nintendo did not recover the same type of damages under both acts.")

*Nintendo of America, Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007, 1011 (9th Cir. 1994) ("This case [*Manufacturers' Technologies*] is distinguishable on the grounds that the plaintiff sought the same type of damages under both acts.  By contrast, here Nintendo recovered statutory damages under the Copyright Act [and actual damages under the Lanham Act].")

*Adobe Systems, Inc. v. Taveira,* 2009 WL 506861, *5, fn. 3 (N.D.Cal. Feb. 27, 2009) ("Effective October 13, 2008, Congress raised the range for statutory damages under the Lanham Act to $1,000.00-$200,000.00 and provided for damages of up to two million dollars per violation for willful infringement [up from $1 million ceiling]. **[But if the] infringement occur[s] before**

**October 18, 2008, the effective date of these amendments, the Court applies the *prior* version of section 1117."**).

**JURY INSTRUCTION No. \_\_\_\_**

OBLIGATION OF RIGHTS HOLDER TO NOTIFY ISP –
ISP PROHIBITED FROM MONITORING CONTENT OF SERVERS

Defendants Managed Solutions Group, Inc. and Akanoc Solutions, Inc. are Internet Service Providers.  Federal law prohibits Internet service providers from knowingly divulging to any person or entity the contents of a communication while in electronic storage by that service.   Internet service providers are also prohibited by federal law from observing or monitoring websites or other stored content on their servers for anything other than mechanical or service quality control checks.

The owner of a trademark or copyright must do its own policing to identify possible infringements.   Internet Service Providers like Managed Solutions Group, Inc. and Akanoc Solutions, Inc. are not required to monitor the Internet or monitor websites using their servers to locate infringing material.

*Lockheed Martin v. Network Solutions* 985 F.Supp. 949 (C.D. Cal. 1997) (a domain registrar has "no affirmative duty to police the internet in search of potentially infringing uses of domain names."); *Tiffany, Inc. v. Ebay, Inc.* 2008 WL 2755787 at *47 (S.D.N.Y. 2008); *See MDT Corp. v. New York Stock Exch.,* 858 F.Supp. 1028, 1034 (C.D.Cal.1994) ("The owner of a trade name must do its own police work."); *see also Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,* 955 F.2d 1143, 1149 (7th Cir.1992) (defendants are not required "to be more dutiful guardians of [trademark plaintiffs'] commercial interests).

*Tiffany, Inc. v. Ebay, Inc.* 2008 WL 2755787 at *47 (S.D.N.Y. 2008) ("[E]ven if it were true that eBay is best situated to staunch the tide of trademark infringement to which Tiffany and countless other rights owners are subjected, that is not the law.")

18 U.S.C. §2511(2)(a)(i) provides that "a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks."

18 U.S.C. § 2702(a)(1) prohibits disclosure of the content of communications in electronic storage:

> A person or entity providing an electronic communication[3] service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service.

18 U.S.C. 2511(2)(a)(i) provides:

> ...[A] provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

Pursuant to 18 U.S.C. § 2510(17), the term "electronic storage" in Section 2702 is defined broadly as follows:

> (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for the purposes of backup protection of such communication.[4]

---

[3] An "electronic communication" is defined as: any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." 18 U.S.C. § 2510(12).

[4] Either part of the definition of "electronic storage" is sufficient under the SCA. *Quon,* 309 F.Supp.2d at 1207, citing to S.Rep. No. 99-541, at 35; 1986 U.S.C.C.A.N at 3590.

18 U.S.C. § 2702(b) allows an Internet Service Provider to divulge the contents of a communication under the following limited circumstances--

> (1) to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient;

> (2) as otherwise authorized in section 2517, 2511(2)(a), or 2703 of this title;

> (3) with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;

> (4) to a person employed or authorized or whose facilities are used to forward such communication to its destination;

> (5) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;

> (6) to the National Center for Missing and Exploited Children, in connection with a report submitted thereto under section 227 of the Victims of Child Abuse Act of 1990 (42 U.S.C. 13032);

> (7) to a law enforcement agency--

>> (A) if the contents--

>>> (i) were inadvertently obtained by the service provider; and

>>> (ii) appear to pertain to the commission of a crime; or

> (8) to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency.

*Quon v. Arch Wireless Operating Co., Inc.*, 309 F.Supp.2d 1204, 1207 (C.D.Cal. 2004)  Title II of the ECPA created the Stored Communications Act ("SCA"). ("The ECPA's legislative history indicates that Congress passed the SCA to prohibit a provider of an electronic communications service 'from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient.'")

*Dyer v. Northwest Airlines Corporations,* 334 F.Supp.2d 1196, 1199 (D.N.D. 2004)  ("The ECPA definition of 'electronic communications service' clearly includes Internet service providers such as America Online, as well as telecommunications companies whose cables and phone lines carry internet traffic.")

*Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 879 (9th Cir. (Cal.) 2002) ("The parties agree that the relevant 'electronic communications service' is Konop's Website, and that the website was in 'electronic storage.'")

# JURY INSTRUCTION No. ____

## INVESTIGATIONS BY JURORS PROHIBITED

In reaching your verdict, you may only consider the testimony of witnesses in this courtroom and the exhibits received into evidence during the trial. You are instructed to disregard anything you may see or hear outside the court or when the court is not in session.

You are specifically prohibited from using the Internet to conduct your own investigation of the parties or any other aspect related to this case, including any search, review or investigation of the following:

1.  Louis Vuitton

2.  Purses, handbags, luggage, belts or watches

3.  Akanoc Solutions, Inc.

4.  Managed Solutions Group, Inc.

5.  Steve Chen

6.  Nikolay Livadkin

7.  Robert Holmes

8.  Any website identified by an exhibit or mentioned during the trial

9.  The general subjects of counterfeiting and on-line counterfeiting, and

10. The testimony of any witness

You are also specifically prohibited from reading any media articles or reports, including any Internet, press, radio, or television articles or reports concerning any issue related in any manner to this specific case or the subject matter involved in this case.

Complying with this instruction is very important. Any failure to comply can have serious consequences for the parties and their right to a fair trial. If you feel that you may have violated this instruction, even innocently, or learn that any other juror may have done so, you must let me know immediately. In that event, at the earliest opportunity please tell Mr. Davis, our Courtroom Deputy Clerk, or Ms. Rodriguez our court reporter, that you need to speak with me about an urgent matter.

9th Circuit Model Rule 1.7

56

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY INSTRUCTION No. ____

### ACTUAL DAMAGES

I will now instruct you on the law with respect to the award of damages in this case.  The fact that I instruct you on the law regarding damages does not mean that the Court believes you should award damages. That is a matter for you to decide.

There are two separate damage assessments which you must make.  First, if you decide that any of the defendants contributorily infringed one or more of plaintiff's copyrighted works you must decide how much to award to plaintiff because of that infringement.

Next, if you find that any of the defendants contributorily infringed one or more of plaintiff's trademarks you must decide how much to award to plaintiff because of that infringement.

### DAMAGES FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT

You must decide separately whether plaintiff has proven, by a preponderance of the evidence, that each defendant contributorily infringed each asserted copyrighted work.  If you find that a defendant contributorily infringed at least one copyrighted work, you must determine the amount of damages to be awarded plaintiff for each copyrighted work that was contributorily infringed.  The amount of those damages must be adequate to compensate plaintiff for the contributory infringement.   Plaintiff Louis Vuitton bears the burden of proving by a preponderance of the evidence the amount of damages it has suffered as a direct result of the contributory infringement.

### DAMAGES FOR CONTRIBUTORY TRADEMARK INFRINGEMENT

You must decide separately whether plaintiff has proven, by a preponderance of the evidence, that each defendant contributorily infringed each asserted trademark.  If you find that a defendant contributorily infringed at least one trademark at issue, you must determine the amount of damages to be awarded plaintiff for each trademark that was contributorily infringed.  The amount of those damages must be adequate to compensate plaintiff for the contributory infringement. Plaintiff Louis Vuitton bears the burden of proving by a preponderance of the evidence the amount of damages it has suffered as a direct result of the contributory infringement.

1    9th Circuit Model Rule 1.7

1

**JURY INSTRUCTION No. ____**

2

OVERVIEW OF WEB HOSTING

3

    I will now give you a brief overview of how the Internet operates and the terminology you

4

will be hearing during the course of this trial.  The following is meant to assist you in understanding

5

the evidence in this case; it is not evidence in itself.

6

    During the course of the trial you may hear some of the witnesses refer to Internet Protocol

7

addresses or IP addresses.  An IP address is literally the location of a Website on the Internet at a

8

particular point in time.  It is a 7 or 8 digit number (e.g. 56.234.277) that marks the location of a

9

Website or other content on the Internet much like a street address denotes the location of a house or

10

building within a city.  A single IP address can host a single Website or thousands of Websites.  The

11

operator of a Website can move his or her site from one IP address to another, much like a business

12

can move its operations from one street address to another.

13

    Allocation of IP addresses in the United States and Canada is controlled by the American

14

Registry for Internet Numbers ("ARIN"), a non-profit corporation.  The nature of the services ARIN

15

provides is described in ARIN's mission statement:

16

17

        Applying the principles of stewardship, ARIN, a nonprofit corporation, allocates Internet Protocol resources; develops consensus-based policies; and facilitates the advancement of the Internet through information and educational outreach.

18

19

    ARIN does not allocate and assign IP addresses directly to Website operators like ebay.com

20

and youtube.com.  ARIN allocates blocks of IP addresses to individual web hosting companies or

21

Internet Service Providers ("ISP").  An ISP is a company that offers its customers access to the

22

Internet. The ISP connects its customers using a data transmission technology appropriate for

23

delivering Internet Protocol datagrams, such as dial-up, DSL, cable modem or dedicated high-speed

24

interconnects. ISPs may also provide other services unique to each particular ISP.

25

    Many ISPs re-allocate the IP addresses assigned them by ARIN to resellers or industry

26

website operators such as ebay.com and youtube.com to put up Websites or to use for program

27

downloading, Internet telephone services, video services, games, data back-up and other

28

applications.  Some Internet hosting companies re-allocate or "rent" their assigned IP addresses and

1   Internet bandwidth to third party resellers and Internet hosting companies who in turn re-allocate

2   those addresses to website operators and other end users.

**JURY INSTRUCTION No. ____**

COPYRIGHT INFRINGEMENT  –  COPYRIGHT LAWS DO NOT APPLY
TO COPYING OUTSIDE THE UNITED STATES

The United States copyright laws do not prohibit or apply to copying outside the United States.  In order for U.S. copyright law to apply, at least one alleged copyright infringement must be completed entirely within the United States.  A third party's action in copying that takes place outside of the United States is not a completed act of infringement within the United States.  If you find that copying of Louis Vuitton's work occurred outside the United States then you must find for the defendants and against the plaintiff on the claim of contributory copyright infringement.

1    *Subafilms, Ltd. v. MGM-Pathe Communications Co.,* 24 F.3d 1088, 1092 (9th Cir.1994)

2    ("**The Copyright laws do not apply extraterritorially**, so each of the rights conferred under the

3    five section 106 categories must be read as extending no farther than the United States borders.");

4

5    *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 387 (9th Cir.1995)

6    ("After the district court rendered its decision, **an en banc panel** of this court rejected these theories

7    on the applicability of U.S. copyright law. We **held that in order for U.S. copyright law to apply,**

8    **at least one alleged infringement must be completed entirely within the United States, and that**

9    **mere authorization of extraterritorial infringement was not a completed act of infringement in**

10   **the United States**.")

11

12   *Los Angeles News Service v. Reuters Television Intern. (USA) Ltd.,* 340 F.3d 926, 928 (9th

13   Cir. 2003) ("[A]lthough the district court was correct to hold **that the Copyright Act does not**

14   **apply extraterritorially**, an exception may apply where an act of infringement is **completed**

15   **entirely within the United States** and that such infringing act enabled further exploitation

16   abroad.");

17

18   *Rondor Music Intern. Inc. v. TVT Records LLC,* 2006 WL 5105272, *8 (C.D.Cal. Aug. 21,

19   2006) ("The Copyright Act does not apply extraterritorially. [citing Subafilms] For the Act to apply,

20   **at least one alleged infringement must be completed entirely within the United States**."

21   (emphasis added));

22

23   *Subafilms, Ltd. v. MGM-Pathe Communications Co.,* 24 F.3d 1088, 1093 (9th Cir.1994)

24   ("Accepting the proposition that a direct infringement is a prerequisite to third party liability, the

25   further question arises whether the direct infringement on which liability is premised must take place

26   within the United States. Given the undisputed axiom that United States copyright law has no

27   extraterritorial application, it would seem to follow necessarily that a primary activity outside the

28   boundaries of the United States, not constituting an infringement cognizable under the Copyright

1   Act, cannot serve as the basis for holding liable under the Copyright Act one who is merely related

2   to that activity within the United States.")

3
4   *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1089 (9th Cir.1994) ("In

5   this case, we consider the "vexing question" of whether a claim for infringement can be brought

6   under the Copyright Act, 17 U.S.C. § 101 et seq. (1988), when the assertedly infringing conduct

7   consists solely of the authorization within the territorial boundaries of the United States of acts that

8   occur entirely abroad. We hold that such allegations do not state a claim for relief under the

9   copyright laws of the United States.")

10  *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1094 (9th Cir.1994)

11  ("Because the copyright laws do not apply extraterritorially, each of the rights conferred under the

12  five section 106 categories must be read as extending "no farther than the [United States'] borders.")

13
14  *Iverson v. Grant,* 946 F.Supp. 1404, 1412 (D.S.D.1996) ("Because United States copyright

15  laws do not have extraterritorial operation, and because it is undisputed that **Grant co-authored**

16  **both books while she was residing in Toronto, Canada**, this Court lacks subject matter

17  jurisdiction over plaintiffs' claims against Grant in both Counts I and II. See Subafilms, 24 F.3d at

18  1095-98. **This Court also lacks subject matter jurisdiction** over the claims against defendant

19  Rodwell **since it is undisputed** that **at the time defendant Rodwell co-authored these two books**

20  with defendant Grant, **he resided in Agincourt, Ontario, Canada**.")

21  *Iverson v. Grant,* 946 F.Supp. 1404, 1413 (D.S.D.1996) ("Furthermore, even if there was

22  evidence that parent company Prentice-Hall had sufficient control or financial interests in Prentice-

23  Hall Canada which would tie the authorization to Prentice-Hall**, this Court lacks jurisdiction over**

24  **an authorization within the United States of activities in Canada**. See Subafilms, 24 F.3d at

25  1095-98. Therefore, this Court lacks subject matter jurisdiction over the claims against Prentice-Hall

26  stemming from Count II of plaintiffs' complaint.")

27
28

*DSU Medical Corp. v. JMS Co.,* Ltd., 471 F.3d 1293, 1305 (Fed.Cir. 2006. ("Unlike direct infringement, which must take place within the United States, induced infringement does not require any activity by the indirect infringer in this country, **as long as the direct infringement occurs here**.")

**JURY INSTRUCTION No. _____**

DIRECT TRADEMARK INFRINGEMENT – EXTRATERRITORIAL

APPLICATION OF TRADEMARK LAW


If you find that direct trademark infringement occurs outside the United States, you must determine if (1) each *direct* infringer is a U.S. citizen, and (2) if the infringing conduct of each direct infringer had a substantial effect on United States commerce.

The conduct of the direct infringer had a substantial effect on United States commerce if Louis Vuitton presents evidence of impacts within the United States that are of such a sufficient character and magnitude to give the United States a reasonably strong interest in the trademark infringement.

1    *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, (1991) ("It is a

2    longstanding principle of American law that legislation of Congress, unless a contrary intent

3    appears, is meant to apply only within the territorial jurisdiction of the United States.")

4

5    *Steele v. Bulova Watch Co.,* 344 U.S. 280, 292 (1952) ("The stamping of the Bulova trade-

6    mark done in Mexico, is not an act 'within the control of Congress.'  It should not be utilized as a

7    basis for action against petitioner.  **The Lanham Act, like the Sherman Act, should be construed**

8    **to apply only to acts done within the sovereignty of the United States**.")

9

10   *McBee v. Delica Co., Ltd.,* 417 F.3d 107, 120 (1st Cir. 2005) ("The [*Bulova*] substantial

11   effects test requires that there be evidence of impacts within the United States, and these impacts

12   must be of a sufficient character and magnitude to give the United States a reasonably strong

13   interest in the litigation.")

14

15   *Totalplan Corp. of America v. Colborne,* 14 F.3d 824, 830 (2d Cir.1994) [citing Steele v.

16   Bulova Watch Co.,]; **"[U]nder Bulova,** three factors were relevant to a determination of the

17   extraterritorial reach of the Lanham Act: **(1) whether the defendant was a United States citizen;**

18   **2) whether the defendant's conduct had a substantial effect on United States commerce; and**

19   **3) whether there was a conflict with trademark rights established under foreign law.**"

20

21   *International Cafe, S.A.L. v. Hard Rock Cafe Intern. (U.S.A.), Inc.,* 252 F.3d 1274, 1278 (11th

22   Cir.2001) ("The [U.S. Supreme] Court concluded that the Lanham Act conferred jurisdiction over
     extraterritorial disputes involving trademark infringement and unfair competition when: 1)

23   Defendant is a United States corporation; 2) the foreign activity had substantial effects in the
     United States; and 3) exercising jurisdiction would not interfere with the sovereignty of another

24   nation.") [citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 286-87, 73 S.Ct. 252, 255-56, 97 L.Ed.

25   319 (1952)].

26   *Totalplan Corp. of America v. Colborne,* 14 F.3d 824, 831 (2d Cir.1994) ("Two of the three
     conditions necessary to bring appellees' conduct within the Lanham Act, United States citizenship

27   and a substantial effect on United States commerce, have thus not been established by Totalplan.
     As was the case in *Vanity Fair,* **the absence of two of the three *Bulova* factors in this case is**

28   **fatal to an argument that the conduct is governed by the Lanham Act**.  Therefore, we need

not reach the third factor, the existence of a conflict with foreign trademark law.")

*Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 642-43 (2d Cir. 1956) ("We do not think that the *Bulova* case lends support to plaintiff; to the contrary, we think that the rationale of the Court was so thoroughly based on the **power of the United States to govern 'the conduct of its own citizens upon the high seas or even in foreign countries** when the rights of other nations or their nationals are not infringed', **that the absence of one of the above factors might well be determinative and that the absence of both is certainly fatal [to extraterritorial application of the Lanham Act]."**)

**JURY INSTRUCTION No. \_\_\_\_**

LIABILITY OF CORPORATE OFFICERS FOR

TORTS OF CORPORATION

An officer of a corporation is not personally liable for contributory trademark infringement even though infringing acts of the corporation may have been committed under his direction where his actions are within the scope of his duties as a corporate officer.

For a corporate officer to be personally liable for contributing to trademark infringement or copyright infringement he must have acted deliberately and with knowledge that the acts of the corporation would constitute constitute trademark infringement.

Therefore, if you find that defendants Akanoc Solutions, Inc., or Managed Solutions Group, Inc. are liable for contributory trademark infringement or contributory copyright infringement, you may not find the defendant Steve Chen personally liable for those acts unless you also find that he directed those acts with the knowledge that the acts would be wrongful.

1   *Coastal Abstract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725, 734 (9th

2   Cir.1999) ("A corporate officer or director is, in general, personally liable for all torts which he

3   authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the

4   corporation and not on his own behalf." [citing *Transgro, Inc. v. Ajac Transmission Parts Corp.,*

5   768 F.2d 1001, 1021 (9th Cir.1985) (internal quotations omitted), cert. denied, 474 U.S. 1059, 106

6   S.Ct. 802, 88 L.Ed.2d 778 (1986)]

7

8   *Microsoft Corp. v. Suncrest Ent.,* 2006 WL 1329881 (N.D.Cal. May 16, 2006) (holding that

9   sole shareholder, owner, and officer of corporation was not personally liable for trademark

10  infringement because the evidence did not establish that she personally participated in purchasing

11  decisions.).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY INSTRUCTION No. ____**

DAMAGES FOR CONTRIBUTORY COPYRIGHT INFRINGEMENT –
APPLICATION OF DMCA SAFE HARBOR


Managed Solutions Group, Inc. and Akanoc Solutions, Inc. cannot be liable for contributory copyright infringement if you find that they (1) did not have actual knowledge that the material or an activity using the material on the system or network is infringing;  (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or (iii) upon obtaining such knowledge or awareness, act expeditiously to remove, or disable access to, the material; (B) did not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and (C) upon notification of claimed infringement as described in paragraph (3), responded expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

If you find that Managed Solutions Group, Inc. and Akanoc Solutions, Inc. have met these requirements you must find for the defendants and against plaintiff on Vuitton's claim of contributory copyright infringement.

17 U.S.C. § 512(i)(1)(A) ("(i) Conditions for eligibility.-- (1) Accommodation of technology.-- The limitations on liability established by this section shall apply to a service provider only if the service provider-- (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and (B) accommodates and does not interfere with standard technical measures.")

*Ellison v. Robertson,* 357 F.3d 1072, 1080 (9th Cir.2004) ("Section 512(i)(1)(A) requires service providers to: (1) adopt a policy that provides for the termination of service access for repeat copyright infringers in appropriate circumstances; (2) implement that policy in a reasonable manner; and (3) inform its subscribers of the policy.")

17 U.S.C. § 512(c)(1)(A) ("(c) Information residing on systems or networks at direction of users.-- (1) In general.--**A service provider shall not be liable for monetary relief**, or, except as provided in subsection (j), for injunctive or other equitable relief, **for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider**, if the service provider--(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;  (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material; (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.")

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JURY INSTRUCTION No. _____**

CONTRIBUTORY TRADEMARK INFRINGEMENT –
INTENTIONAL INDUCEMENT

In determining whether each defendant intentionally induced infringement at particular websites, it is sufficient if you find that each defendant intentionally persuaded or influenced a direct infringer to infringe at a particular website.

WEBSTER'S NEW COLLEGIATE DICTIONARY 615 (9th Edition 1984) ("**in-duce**: 1 a: **to move by persuasion or influence**; LEAD ON.  b : to call forth or bring about by influence or stimulation. 2. EFFECT, CAUSE b : to cause the formation of.")

*Rolex Watch, U.S.A., Inc. v. Michel Co.,* 179 F.3d 704, 712 (9th Cir. 1999) ("*Inwood* involved an allegation that a generic drug manufacturer-distributor distributed drugs to pharmacists **in such a way that** *induced* **the pharmacists to mislabel the generic drugs** under a registered trademark.")

73