Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc. et al.                                                    Doc. 244

Case5:07-cv-03952-JW   Document244   Filed10/27/09   Page1 of 27

1    **GAUNTLETT & ASSOCIATES**
     David A. Gauntlett (SBN 96399)
2    James A. Lowe (SBN 214383)
     Brian S. Edwards (SBN 166258)
3    Christopher Lai (SBN 249425)
     18400 Von Karman, Suite 300
4    Irvine, California 92612
     Telephone:    (949) 553-1010
5    Facsimile:    (949) 553-2050
     info@gauntlettlaw.com
6    jal@gauntlettlaw.com
     bse@gauntlettlaw.com
7    cl@gauntlettlaw.com

8    Attorneys for Defendants
     Akanoc Solutions, Inc.,
9    Managed Solutions Group, Inc.
     and Steve Chen

10

11                        **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

13

14   LOUIS VUITTON MALLETIER, S.A.,          )   Case No.: C 07-3952 JW (HRL)
                                              )
15                   Plaintiff,               )   Hon. James Ware
                                              )
16            vs.                             )   **DEFENDANTS' SUPPLEMENTAL**
                                              )   **RULE 50(a) BRIEF ON IMPOSSIBILITY**
17   AKANOC SOLUTIONS, INC., et al.,          )   **OF EXTRATERRITORIAL COPYRIGHT**
                                              )   **INFRINGEMENT**
18                   Defendants.              )
                                              )
19                                            )
     _____ )
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   NO PROOF OF COPYRIGHT INFRINGEMENT IN THE UNITED STATES ............. 1

   A.   Copyright Infringement Cannot Be Based on Extraterritorial Acts ................... 1

   B.   No Proof of Copyright Infringement in the United States ...................................... 1

II.  CHINESE    TRANSMISSION    OF    HUMANLY    UNINTELLIGIBLE
     COMPUTER CODE TO U.S. BASED INTERNET SERVERS IS NOT DIRECT
     COPYRIGHT INFRINGEMENT IN THE UNITED STATES ........................................ 2

   A.   No Direct Infringement Where No Copies Are Shown on Servers ......................... 2

   B.   Vuitton's Evidence Only Showed Copying in China ................................................ 3

   C.   No "Copies" Ever Exist on Internet Servers ............................................................ 5

        1.   Computer Code Is Not a "Material Object" ................................................. 5

        2.   Computer Code Is Not "Fixed" ...................................................................... 6

             a.   The "Embodiment" Requirement Is Not Satisfied .......................... 7

                  (1)   The Computer Code Is Not "Perceived" on the
                        Servers ...................................................................................... 7

                  (2)   The Computer Code Was Only "Perceived" on
                        Third-Party Computers ........................................................... 8

             b.   The "Duration" Requirement Is Not Satisfied ................................ 9

        3.   Vuitton's Theory of Infringement is Overly Expansive ........................... 12

             a.   Vuitton Does Not Own Copyrights in Images ................................ 12

             b.   Vuitton's Theory Would Implicate Many Innocent Internet
                  Users ............................................................................................... 13

        4.   No "Copies" Were Created on Passively Operated Servers ..................... 14

   D.   No Copies Are "Shown" On Defendants' Internet Servers ................................... 15

        1.   Computer Code Is Not "Shown" .................................................................. 15

        2.   Computer Code Is Not "Shown Publicly" ................................................... 17

   E.   No Evidence of Direct Infringement In The United States .................................... 17

III. THE FAIR USE DEFENSE APPLIES TO ANY CLAIMS OF DIRECT
     INFRINGEMENT ON DEFENDANTS' SERVERS ..................................................... 18

   A.   Purpose and Character of the Use ........................................................................... 19

B.      **Nature of the Copyrighted Work**..................................................**20**

C.      **Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole**..................................................**21**

D.      **Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work** ..................................................**21**

**IV.**      **CONCLUSION**..................................................**22**

**SUPPLEMENTAL RULE 50(a) BRIEF ON
IMPOSSIBILITY OF EXTRATERRITORIAL
COPYRIGHT INFRINGEMENT – C 07-3952 JW**

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Blazon, Inc. v. DeLuxe Game Corp.*,
  268 F. Supp. 416 (S.D.N.Y. 1965) ............................................................. 6

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) .................................................. 6, 7, 8, 9, 20

*Consumers Union of United States, Inc. v. General Signal Corp.*,
  724 F.2d 1044 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45
  (1984) ....................................................................................................... 22

*Costar Group Inc. v. Loopnet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ................................................. 9, 10, 11, 14, 20

*Harper & Row Publishers v. Nation Enterprises*,
  471 U.S. 539, 105 S.Ct. 2218 (1985) ....................................................... 20

*Kelly v. Arriba Soft Corp.*,
  336 F.3d 811 (9th Cir. 2003) ............................................................. 19, 20

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (9th Cir. (Cal.) 2002) ........................................................ 12

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*,
  780 F. Supp. 1283 (N.D. Cal. 1991) ......................................................... 21

*MAI Systems Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993) ..................................................................... 7

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  487 F.3d 701 (9th Cir. 2007) .......................................................... 2, 15, 16

*Religious Technology Center v. Netcom On-line Communication Services, Inc.*,
  907 F. Supp. 1361 (N.D. Cal. 1995) .......................................................... 14

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417, 104 S.Ct. 774 (1984) ................................................... 18, 21

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*,
  24 F.3d 1088 (9th Cir. (en banc) 1994) ..................................................... 1

*Walker v. University Books, Inc.*
  602 F.2d 859 (9th Cir. 1979) ...................................................................... 6

**FEDERAL RULES AND STATUTES**

17 U.S.C. § 101 (Copyright Act) ....................................................... 3, 5, 6, 10, 15

17 U.S.C. § 102(a)(5) .................................................................................... 13

17 U.S.C. § 106 ............................................................................................ 2, 3, 8

17 U.S.C. § 106(2) ............................................................................................. 12

17 U.S.C. § 106(5) ....................................................................................... 3, 15, 17

17 U.S.C. § 106(6) ............................................................................................... 3

17 U.S.C. § 107 ................................................................................................. 18

17 U.S.C. § 107(1) ............................................................................................. 19

17 U.S.C. § 107(1)-(4) ....................................................................................... 18

18 U.S.C. § 2511(2)(a)(i) ................................................................................... 12

18 U.S.C. § 2701(a) ........................................................................................... 12

18 U.S.C. § 2701 et seq. (Stored Communications Act) .................................... 11

Fed. R. Civ. P. 50(a) .......................................................................................... 22


OTHER AUTHORITIES

2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.02[B][1] (2008) ................. 6

BLACK'S LAW DICTIONARY (8th ed. 2004) ............................................................. 6

RANDOM HOUSE DICTIONARY (2d ed. 1993) ........................................................... 6

1  **I.      NO PROOF OF COPYRIGHT INFRINGEMENT IN THE UNITED STATES**

2      **A.      Copyright Infringement Cannot Be Based on Extraterritorial Acts**

3          Vuitton failed to prove that Defendants contributorily infringed its copyrights where Vuitton

4  has not proven a required element of its claim: direct copyright infringement in the United States.

5  Vuitton's fatal problem is that the alleged counterfeiters in this case – the individuals that produced

6  the actual, tangible counterfeit items – reside and operate in China.  In other words, Vuitton's

7  problem is that the only direct copyright infringement occurred in China, not the United States.

8  "[W]holly extraterritorial acts of infringement cannot support a claim under the Copyright Act."

9  *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1095 (9th Cir. (en banc) 1994).

10 "[W]e are unwilling to overturn over eighty years of consistent jurisprudence on the extraterritorial

11 reach of the copyright laws."   *Id.*   The Ninth Circuit aptly quoted Professor Nimmer on the

12 consequent impossibility of contributory infringement.

13          "Given the undisputed axiom that United States copyright law has no
           extraterritorial application, it would seem to follow necessarily that a
14         primary activity outside the boundaries of the United States, not
           constituting an infringement cognizable under the Copyright Act,
15         cannot serve as the basis for holding liable under the Copyright Act
           one who is merely related to that activity within the United States."  3
16         Nimmer, § 12.04[A][3][b], at 12-86

17 *Subafilms*, 24 F.3d at 1093.  Therefore the mere authorization of actions outside the United States

18 cannot support a claim for infringement under the Act or contributory infringement.   At most,

19 Vuitton's evidence might support an inference that the defendants somehow authorized infringing

20 acts that took place in China.  That is entirely insufficient to support a jury verdict.

21      **B.      No Proof of Copyright Infringement in the United States**

22          Attempting to circumvent the extraterritoriality problem, Vuitton argues that the direct

23 copyright infringement in this case occurred on Defendants' Internet servers in San Jose, California.

24 Neither the evidence nor the law support Vuitton's novel and far-fetched theory.   Obviously

25 Defendants' Internet servers cannot be used to store any physical bags or items that might infringe

26 Vuitton's copyrights ("patterns on fabric/leather.").  The defendants' servers can only store humanly

27 unintelligible computer code that is transmitted by unknown third parties.  But the storage of such

28 digital data code is not sufficient to prove direct infringement under the Copyright Act because

1    Vuitton does not own any copyrights in images or the computer code that comprises those images or

2    anything else stored on Defendants' servers.  By wrongly basing its entire direct infringement theory

3    on the "infringement" of copyrights it does not own, Vuitton has failed to show direct infringement

4    occurring on Defendants' servers.  Without direct infringement in the U.S. there can be no

5    contributory copyright infringement.

6         Vuitton's claim that direct infringement has occurred on Defendants' Internet servers also

7    fails for three additional reasons.  **First**, computer code on an Internet server does not fall within the

8    legal definition of an infringing "copy."  Without an infringing "copy" there is no direct copyright

9    infringement and without direct copyright infringement, there can be no contributory copyright

10   infringement.  **Second**, no computer code is ever "shown" on the servers themselves.  Without

11   "showing" there can be no direct copyright infringement, and, consequently, no contributory

12   copyright infringement.  **Third**, the storage of computer code on Internet servers qualifies as fair

13   use, meaning that by definition, this storage cannot be direct copyright infringement and again no

14   possible contributory infringement.

15   **II.    CHINESE TRANSMISSION OF HUMANLY UNINTELLIGIBLE COMPUTER**
16   **CODE TO U.S. BASED INTERNET SERVERS IS NOT DIRECT COPYRIGHT**
     **INFRINGEMENT IN THE UNITED STATES**

17        **A.    No Direct Infringement Where No Copies Are Shown on Servers**

18        Vuitton presented no evidence from which a reasonable jury could find that direct copyright

19   infringement occurred on the Defendants' Internet servers.  Vuitton's evidence, even in its best light,

20   shows that unknown persons in China uploaded digital data to the hard drives of Internet servers in

21   the U.S.  There is no evidence, however, of any unauthorized "showing" or "copying" of any

22   copyrighted work in the United States.

23        Vuitton's evidence establishes that no direct infringement occurred on Defendants' servers in

24   the United States and no right under 17 U.S.C. § 106 has been violated.  This is because no

25   unauthorized "copies" have been made or "shown" on the servers.

26        Direct copyright infringement requires proof that "the alleged [direct] infringers violate at

27   least one exclusive right granted to copyright holders under 17 U.S.C. § 106."  *Perfect 10, Inc. v.*

28   *Amazon.com, Inc.,* 487 F.3d 701, 715 (9th Cir. 2007).  Vuitton has not explained what right under

1    Section 106 it asserts has been infringed.  But there is no exclusive right under Section 106 for

2    digital transmission of images so the transmission of digital data from China cannot form the basis of

3    direct infringement.  In 1995, Congress created a limited right for digital **audio** transmissions over

4    the Internet.  17 U.S.C. § 106(6).  Congress, however, has not explicitly created a corresponding

5    right in digital transmissions of visual images over the Internet.

6         If Vuitton is asserting a right under 17 U.S.C. § 106(5), that section only provides that a

7    copyright owner has the exclusive right "to display the copyrighted work publicly."  The Copyright

8    Act explains that "display" for purpose of the Section 106 display right means "to ***show*** a ***copy*** of it,

9    either directly or by means of a film, slide, television image, or any other device or process…."  17

10   U.S.C. § 101.  There is no evidence of any showing of a copy on Defendants' servers.

11        **B.     Vuitton's Evidence Only Showed Copying in China**

12        Vuitton asserts copyright infringement of two registered works consisting of material

13   patterns on handbags and the like.  Exhibit 449 is the copyright registration of "Multicolor

14   Monogram – White Print."  The Nature of the Work Copyrighted is listed as "Fabric/leather print."

15   Exhibit 450 is the registration of "Multicolor Monogram – Black Print," listed also as "Fabric/leather

16   print."  Both are listed as "2-Dimensional Artwork."  Vuitton did not register its works in the

17   categories of "reproduction of artwork" or "photograph."  Vuitton's registered rights are limited.

18        Vuitton's witnesses testified that the copyrighted works appear originally on Vuitton

19   handbags made of fabric or leather but that the 2-dimensional artwork was then copied by unknown

20   persons in China onto fabric or leather that was then used on "counterfeit" handbags that are

21   apparently made and sold in China.  That conduct cannot violate U.S. copyrights because it all

22   occurs outside the U.S.

23        No evidence suggested that the "counterfeit" handbags incorporating the works were made or

24   sold without authorization in the United States.  The only evidence of sale was that Vuitton's

25   investigator, Robert Holmes, placed orders for specific products through e-mails not transmitted

26   through the Defendants' systems but rather through commercial e-mail services such as yahoo.com

27   or msn.com.  He then completed the purchases by going to a 7-Eleven store and arranging to wire

28   money through Western Union to unidentified persons in China.  He thereafter received delivery of

1    products from someone else in China through the U.S. Postal Service or a package delivery service.

2        The only connection made by any Vuitton witness between the sellers of bags to the

3    Defendants was an alleged viewing by Vuitton personnel of websites having small (mostly

4    "thumbnail") photographs of handbags for sale.  These website photographs allegedly were found by

5    searching on Google.com for sellers of Vuitton merchandise.  Some such websites were alleged to

6    be accessing the Internet by using Internet Protocol (IP) addresses assigned to a Defendant and

7    allegedly storing digital website content on Internet servers rented by the Defendants to intermediary

8    reseller companies in China or elsewhere.

9        Consequently the only "copying" of anything that occurred in the United States (under the

10   most favorable view of Vuitton's evidence) would have been copies of computer data stored on U.S.

11   servers.  Certainly no physical handbags or any "fabric/leather prints" were stored or transmitted

12   through a U.S.-based Internet server.  Indeed, no "images" were stored, just digital data in the form

13   of 0s and 1s.

14       Vuitton's evidence, at most, could establish that some unknown person in China created a

15   physical handbag of "fabric/leather," copying the copyrighted "2-dimensional artwork" in the

16   process.  Then some unknown person in China took a photograph of that copied handbag.  Then

17   unknown persons in China converted the photograph into digital data, inserted that data into a

18   webpage, and ultimately transmitted the data through the Internet to store the digital data on a server

19   in the U.S.

20       The data stored in the U.S. was not a handbag; it was not even a photograph of a Vuitton

21   handbag.  The stored data was several steps removed from the alleged copyright infringement on the

22   "counterfeit" bag.  What Vuitton's investigation found was only digital data created from a copy of a

23   photograph that was made of an actual fabric/leather copy of the work.  It was only digital databits

24   from the conversion of a photograph of a copied handbag, all of which had been accompanied in

25   China entirely beyond the reach of U.S. copyright law.  Storing that digital data on a U.S. server was

26   not copying for infringement purposes.

27       Vuitton failed to present evidence that could support a jury verdict of direct infringement of

28   any U.S. copyright and therefore no basis exists for a finding of contributory copyright infringement.

## C. No "Copies" Ever Exist on Internet Servers

Direct copyright infringement requires proof that an infringing "copy" exists on an Internet server. Vuitton has failed to show direct infringement because no "copies" of an infringing work ever exist on Defendants' Internet servers. No material fixed object (or copy) was created by the transmission of digital data. The Copyright Act (17 U.S.C. § 101) defines **"copies"** as:

> Material objects . . . in which a work is fixed . . ., and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.

In order for something to be a "copy," it must be **"fixed."** 17 U.S.C. § 101 provides that:

> A work is "fixed" in a tangible medium of expression when its embodiment . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

Defendants are Internet service providers who lease their servers to customers who are located in China and elsewhere. These customers then, in turn, lease these servers to other users who can transmit digital data (computer code) to the servers in the U.S. This computer code is virtually unintelligible to humans (e.g., 101110000110001). Before this data can be converted to any intelligible form it must be processed by computer programs on an end user's computer located elsewhere in the world, and not by programs on the server. It is undisputed that the Defendants do not store any "images" on their servers. They store unintelligible computer code created by and transmitted by third parties located in China. This code is not a "copy" under the Copyright Act because it is not a "material object," nor is it "fixed" on the server.

### 1. Computer Code Is Not a "Material Object"

Under the Copyright Act, a "copy" must be a "material object." 17 U.S.C. § 101. But the computer code created by third parties in China and transmitted for storage on Defendants' servers is not a "material object" such as a handbag or fabric or leather and, therefore, it cannot be a "copy." It must be remembered that the only copyrights at issue in this case are "2-dimensional artwork" in the form of "fabric/leather prints." The computer code is as unlike that as possible and cannot be considered a "material object."

For the purposes of the Copyright Act, a "material object" must be "tangible." *Walker v.*

5

1    *University Books, Inc*., 602 F.2d 859, 863 (9th Cir. 1979) ("A copy must of necessity consist of

2    some tangible material object upon which the work is 'fixed.' "); *Blazon, Inc. v. DeLuxe Game*

3    *Corp*., 268 F. Supp. 416, 434 (S.D.N.Y. 1965) (finding no copying without a 'tangible object that is

4    a reproduction of the original work."); *see* 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON

5    COPYRIGHT § 8.02[B][1] (2008).

6        The computer code to which Vuitton points is not "tangible."  "Tangible" is defined as

7    **"capable of being touched; discernible by the touch."**  RANDOM HOUSE DICTIONARY 1941 (2d ed.

8    1993).   Black's Law Dictionary defines tangible as **"having or possessing physical form."**

9    BLACK'S LAW DICTIONARY 1494 (8th ed. 2004).  A series of 1's and 0's on a computer hard drive

10   stored in the form of magnetic orientations is not tangible because it is not capable of being touched,

11   nor does it have any physical form.   While a computer hard drive itself is a tangible item, the

12   relevant issue is not whether a hard drive is tangible; it is whether *the computer code stored on the*

13   *hard drive* is tangible.  The computer code itself is not capable of being touched, nor does it have

14   any physical form.  Not surprisingly, no case has ever specifically held that unintelligible computer

15   code is either "tangible" or is a "material object."    Without being tangible, the computer code

16   transmitted to Defendants' servers cannot be a "material object."  If it is not a "material object," it is

17   not a "copy" under the Copyright Act.  Therefore there can be no direct copyright infringement that

18   occurred on the servers in the United States.

19                    **2.       Computer Code Is Not "Fixed"**

20       Even if the jury could find that unintelligible computer code is a "material object," it is still

21   not a "copy." This is because a "copy" must also be "fixed," meaning that it is "sufficiently

22   permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period

23   of more than transitory duration."  17 U.S.C. § 101.

24       This definition of "fixed" includes two distinct requirements: the "embodiment" requirement

25   and the "duration" requirement. *Cartoon Network LP, LLLP v. CSC Holdings, Inc*., 536 F.3d 121,

26   127 (2d Cir. 2008).  Computer code on an ISP server is not "fixed" because it satisfies neither the

27   "embodiment requirement" nor the "duration requirement."

28

### a.      The "Embodiment" Requirement Is Not Satisfied

In order for computer code to be a "copy" it must be "embodied." *Id.* In order to satisfy the "embodiment" requirement, computer code must be "embodied in a medium, i.e., placed in a medium such that it can be perceived, reproduced, etc., from that medium." *Id.*

### (1)      The Computer Code Is Not "Perceived" on the Servers

The computer code that comprises digital images is not "embodied" on Defendants' Internet servers because it is not "perceived" on Defendants' servers. At most, computer code merely sits passively on a computer server's hard drive. Only in the event that this code is requested by a third party user somewhere in cyberspace, then the user's web browser downloads the code to the user's machine and interprets it on the user's computer using hardware and software on the user's computer. No "embodiment" exists on the Internet server itself because the code is not "perceived" on the Internet server.

Data stored on a computer is not "embodied," and is therefore not a "copy" if it is not processed in a computer's random-access memory ("RAM"). *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993). In *MAI Systems*, the court found that the object code of a computer's operating system (a computer program integral to a computer's operation) must be processed by that computer's RAM in order to operate the machine. *Id.* (holding that a computer operating system was "copied"[1] for the purposes of the Copyright Act when it was loaded from a computer's hard drive into a computer's RAM)).

The computer code at issue here, however, does not comprise an operating system or even a computer program at all. The code at issue can only be converted to comprise digital images by a user. This code on the hard drive is not necessary to a computer's operation, does not operate on the server, and is not "embodied" under the Copyright Act because it is never loaded into the server's RAM. So it is not a "copy" under the Copyright Act. It is merely data stored in a dormant form and perhaps downloaded occasionally.

---

[1]*MAI Systems* did not provide a sufficient analysis of what constitutes a "copy" because the court only addressed the "embodiment" requirement, not the "duration" requirement. *Cartoon Network*, 536 F.3d at 128 ("The *MAI Systems* court referenced the "transitory duration" language but did not discuss or analyze it.").

1    Because it focused on the copying into RAM, *MAI Systems* implies that computer code

2    merely stored on a hard drive, with nothing more, is not "embodied" and is therefore *not* a "copy"

3    under the Copyright Act.  *MAI Systems* implies that an *additional* process, such as the loading of a

4    program into a computer's RAM, is needed in order for "embodiment" to occur.   Moreover, even if

5    computer code is loaded into RAM, it *still* may not be "fixed" under the Copyright Act.   *Cartoon*

6    *Network,* 536 F.3d at 128 ("We do not read *MAI Systems* as holding that, as a matter of law, loading

7    a program into a form of RAM *always* results in copying.").  Vuitton, however, did not provide any

8    evidence that the computer code at issue was ever loaded into the server's RAM.

9                          **(2)    The Computer Code Was Only "Perceived" on Third-Party**
                                    **Computers**
10

11    Vuitton's evidence is that web browser software located on a *third-party computer user's*

12    *computer* – not the ISP's server, must act on the data to create text or an image by translating the

13    computer code into something that can be seen.  Until that occurs, no "embodiment" has occurred,

14    no display has taken place, no "copy" has been made, and no exercise of any section 106 exclusive

15    rights has occurred.  This "embodiment" in the third-party user's own web browser is similar to the

16    process of transferring software from a permanent storage device into a computer's RAM.   In both

17    cases, something extra is needed to perceive the computer code so that it is "embodied" – here it is a

18    third party's web browser, loaded in RAM with the downloaded data; in *MAI Systems* it was object

19    code loaded into the computer's RAM.  Computer code stored on a hard drive is not a "copy" until it

20    is "embodied" by someone.

21    Unlike in *MAI Systems*, where the operating system software was first "embodied" in the

22    computer's RAM and then was used to view system logs on the computer itself, no computer image

23    files on Defendants' servers were ever "embodied" on the servers.  All potential "embodiment" of

24    the data could only be done on third party user's web browsers.  Vuitton showed no evidence of such

25    "embodiment" occurring on Defendants' servers.  Vuitton's evidence proved that *additional*

26    computer programs are necessary to "perceive" this computer code stored on Defendants' servers so

27    that it could be "embodied."

28    Vuitton's expert, Michael Wilson, admitted that he had to use several computer programs not

located on Defendants' servers over a 10- to 20-hour period to be able to "rebuild" even a single website and perceive images on the servers such as they would be seen by an end-user. Vuitton's Exhibit 593.31, created by its expert witness, only demonstrates images that had been translated and perceived after (1) Defendants took certain servers offline, (2) Vuitton's expert copied the contents of Defendants' servers to another computer, and (3) Vuitton's expert viewed and perceived the multiple computer code using computer programs on his own computer at his workplace. Wilson testified that additional computer programs were necessary to perceive the computer code stored on Defendants' servers. In other words, Wilson's testimony confirmed that no computer code was ever "embodied" on Defendants' servers and that additional programs *that are not on the server* must be used to perceive the code.

No "copy" can exist on an Internet server unless satisfies **both** the "embodiment" **and** the "duration" requirement. Because the computer code on Defendants' servers does not satisfy the "embodiment" requirement, no "copy" ever existed on Defendants' servers, and no copyright infringement occurred on the servers.

### b. The "Duration" Requirement Is Not Satisfied

In order for computer code to be a "copy" it must also satisfy the "duration" requirement. That is, it must be "embodied for a period of more than transitory duration." *Cartoon Network*, 536 F.3d at 127. The computer code at issue here, however, does not satisfy the "duration" requirement.

In *Costar Group Inc. v. Loopnet, Inc.*, 373 F.3d 544 (4th Cir. 2004), the only case known to determine whether direct copyright infringement occurs on Internet servers,[2] the Fourth Circuit held that computer code uploaded to an ISP's server by a third party does not satisfy the "duration" requirement; namely, it is not "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration" and is therefore not a "copy" for purposes of the Copyright Act.

In *Costar*, the plaintiff claimed that direct infringement of its copyrighted photographs occurred on the Defendant ISP's Internet servers because copyrighted real estate images, uploaded

---

[2] *Costar* is not only the most pertinent case on this subject, it is the only case that discusses the "duration" requirement at it relates to computer code stored on Internet servers.

by third parties onto the servers, were "copies" under the Copyright Act. *Id*. at 546. The court held that, because "the ISP provides a system that automatically transmits users' material," the images did not satisfy the "duration" requirement, were not "fixed" on the server, and, therefore, were not "copies" *Id.* at 551. The court reasoned that, an Internet service provider functions as does a traditional telephone company when it transmits the contents of its users' conversations. **Even if temporary electronic copies may be made in this transmission process, they are not "fixed" in the sense that they are "of more than transitory duration**." *Id*. (emphasis added).

The *Costar* court held that a copy of an image is not "fixed" on an ISP's server in such a scenario because a server **"automatically receives a subscriber's infringing material and transmits it to the Internet at the instigation of the subscriber."** *Id*. The Court held that "when an electronic infrastructure is designed and managed as a **conduit of information and data** that connects users over the Internet, the owner and manager of the conduit hardly 'copies' the information and data in the sense that it fixes a copy in its system of more than transitory duration." *Id.* at 550-51 (emphasis added).

The same reasoning applies here. Just as in *Costar*, the Defendants' servers are merely "conduits of information and data" that do nothing more than relay computer code that is unintelligible to humans. This automatic relay begins with unknown third parties, transmitting computer code to Defendants' servers from China, and ends when other third-party Internet users use their locally installed and operated computer hardware and programs to transmit the computer code bit by bit to their personal computer, assemble it, and interpret it with their own software so that a text or image appears on a monitor. No binary computer code on an Internet server satisfies the "duration" requirement; it is never "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."[3]

By classifying them as just "conduits," the *Costar* court distinguished Internet servers from other types of computers. Internet servers are a specialized type of computer whose sole purpose is transmitting digital information over the Internet between third parties around the globe. In contrast,

---

[3] 17 U.S.C. § 101.

10

other computers, such as desktop or laptop computers used by individuals for personal use, do not

solely act as conduits. "Copies" may be made on these *other* types of computers because it may be

possible for computer code to be "sufficiently permanent or stable to permit it to be perceived,

reproduced, or otherwise communicated for a period of more than transitory duration." This is not

the case, however, with Internet servers. The *Costar* court confirmed this, noting that:

> When the copyrighted software is downloaded onto the computer,
> because it may be used to serve the computer or the computer owner, it
> no longer remains transitory. This, however, is **unlike an ISP**, which
> provides a system that **automatically receives a subscriber's
> infringing material and transmits it to the Internet at the
> instigation of the subscriber**.

*Costar,* 373 F.3d at 551 (emphasis added).

To further illustrate why data on Internet servers does not satisfy the "duration" requirement,

it is appropriate to analogize Internet servers to another type of conduit: Post Offices. Just as

Internet servers are "conduits" for Internet data, post offices are conduits for mail and packages. If,

for instance, a copyright-infringing item made and sent from China is relayed by a U.S. Post Office

to its final destination, no direct copyright infringement occurs at the Post Office – it occurred in

China only. It does not matter whether the package sits in the Post Office for a few minutes or for

days. The Post Office is only a conduit along the route.

An infringing work sent to a Post Office would never be "embodied" nor would it satisfy the

"duration" requirement while located in the Post Office. This would mean that no "copy" that is

"fixed" exists at the Post Office and, consequently, that no direct copyright infringement ever occurs

at the Post Office.

Both Post Offices and ISPs, in their roles as conduits, are also similarly restricted from even

perceiving the contents of the items that pass through them. Post Office employees cannot search

ordinarily any items that go through it because Federal law prohibits such unauthorized mail

searches. Similarly, no employee at an ISP can search or monitor any information that goes through

an Internet server because the federal Stored Communications Act[4] prohibits ISP's from accessing,

---

[4] 18 U.S.C. § 2701 et seq.

1  examining or monitoring the data that is sent through their servers.[5] The Defendants are prohibited

2  by federal criminal law from examining the data transmitted or stored on their Internet servers.

3      Even if a conduit such as a Post Office or ISP receives notice that it received or stored an

4  infringing work, such notice does not establish direct infringement occurring at either place.

5  Vuitton's investigator Holmes testified that "counterfeit" products he ordered were delivered to him

6  by the U.S. Postal Service.  Vuitton did not suggest that the Post Office was a contributory infringer

7  in storing and transmitting actual counterfeit handbags for the obvious reason that such a suggestion

8  would be absurd.  But the facts are no different when applied to an ISP's receipt and transmission of

9  digital information that is supposed to be a copy of a copy of a copy of the very items delivered by

10  the Post Office.

11              **3.    Vuitton's Theory of Infringement is Overly Expansive**

12                  **a.    Vuitton Does Not Own Copyrights in Images**

13      Vuitton's theory of copyright infringement is overly expansive.  "Copies" do not exist on

14  Defendants' Internet servers because digital images of bags are not "copies" at all.  Vuitton does not

15  even claim to own copyrights to any digital images,[6] it only claims copyrights in fabric/leather

16  patterns used on its physical products.  Infringement of Vuitton's copyrights may occur when

17  unauthorized copies of Vuitton's *bags* are made in China using fabrics/lather.  But in analyzing

18  whether infringement occurs on Defendants' Internet servers, the issue is not whether these bags

19  violate Vuitton's copyrights in the United States; it is whether electronic data converted from

20  *pictures* taken by others of counterfeit bags infringe Vuitton's copyrights.

21      Vuitton has overlooked this distinction between pictures and bags, between data and material

22  objects, but this distinction is significant.  The copyrights of any images on Defendants' servers are

23  _____

24  [5]Section 2701(a) of **the SCA** (18 U.S.C. § 2701(a)) specifically **prohibits "(1) intentionally access[ing]** without authorization a facility through which an electronic communication service is provided or (2) intentionally exceed[ing] an authorization to access that facility."  18 U.S.C.

25  § 2511(2)(a)(i) provides that "**a provider of wire communication service to the public shall not utilize service observing or random monitoring** except for mechanical or service quality control

26  checks." (Emphasis added.) *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 879 (9th Cir. (Cal.) 2002) ("The parties agree that the relevant 'electronic communications service' is Konop's Website,

27  and that the website was in 'electronic storage.' ").

28  [6]Vuitton has never argued that the images on Defendants' servers are derivative works.  *See* 17 U.S.C. § 106(2).

held by the *users who created those images*,[7] not by Vuitton.  Vuitton's entire claim is premised on its belief that infringement of its own copyrights occurred on Defendants' Internet servers.  But this cannot be true because Vuitton has no copyrights of any images; it did not claim to have authored the photographs (new original works) that were converted to data.

No copyright infringement occurs on Defendants' servers when unknown persons in China (1) make counterfeit bags in China, (2) take pictures of counterfeit bags in China, (3) transmit digital images of these pictures of counterfeit bags from China to Defendants' servers and (4) have those images viewed by unknown third parties around the world.  There have been cases where owners of copyrights *in actual images* allege infringement when copies of their photo images are made, but there are no cases that involve the type of tangential and remote claims that Vuitton makes here.

### b.   Vuitton's Theory Would Implicate Many Innocent Internet Users

If Vuitton's overly expansive view of "copying" were applied to the Internet as a whole, it would implicate countless individuals whose conduct is wholly innocent by any rational analysis.

For instance, assume that two women take a trip to Europe.  While there, woman #1 purchases a "counterfeit" Vuitton bag from a street vendor and has woman #2 take a picture of her with her newly purchased bag and then email it to their friends.  Under Vuitton's expansive theory of "copying," an unauthorized "copy" is made when woman #2 takes a camera phone picture of woman #1 holding a counterfeit Vuitton bag.  Then, when woman #2 emails the photo on the bag through an e-mail server to her friends, another unauthorized "copy" is made.  Then, when the friends download the image to their own computers, more unauthorized "copies" are made.[8] But this makes no sense.  In this example, it is clear that the only unauthorized "copy" was created when the counterfeit bag was manufactured, not when woman #1 purchased it, not when woman #2 took a picture of the bag, not when woman #2 sent it through e-mail servers and not when it was viewed by each recipient of the e-mail.  No one would think to argue in those circumstances that yet another person was liable

---

[7]Generally, a photographer automatically owns the copyright in an image at the moment it is created or "fixed."  17 U.S.C. § 102(a)(5).

[8]This hypothetical does not assume that both women and their friends would be liable for direct copyright infringement.  It merely illustrates the limits of what constitutes a "copy" under the Copyright Act and how Vuitton's expansive theories exceed these limits.

for contributory copyright infringement because they used, loaned (or even rented) the camera phone that was used to take the picture and allowed it to be transmitted over the Internet using the lender's e-mail account (and IP address). No one would rationally argue that the ISP hosting the e-mail service used by these people would then be liable for contributory copyright infringement. The absurdity of such an interpretation of U.S. copyright law should make even a lawyer blush.

### 4. No "Copies" Were Created on Passively Operated Servers

Vuitton has not shown that "copies" exist on Defendants' servers because Defendants operate their servers only passively. Defendants do nothing to create a "copy" on their servers. The only volitional act occurred when unknown third parties in China transmit computer code from China.

The distinction between passive and active conduct affects the analysis as to whether "copies" exist on servers under the Copyright Act. Simply put, the more passive the act, the less likely that "copies" are created. *Costar*, 373 F.3d at 555 ("ISPs, when passively storing material at the direction of users in order to make that material available to other users upon their request, do not 'copy.' "). Courts have recognized that copies cannot be created on passively run ISP servers because finding otherwise would "lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Religious Technology Center v. Netcom On-line Communication Services, Inc*., 907 F. Supp. 1361, 1372 (N.D. Cal. 1995).

This emphasis on passive versus active is especially important in this case. The only "active" copying occurred in China. It occurred when individuals in China actively made the actual bags, i.e., actual "copies" that Vuitton claims infringe its copyrights and trademarks. People in China take photos in China of the Chinese bags in China convert it to digital data and then transmit computer code from China. These are all "active" acts that occur *in China*.

The only thing Defendants do is passively operate their servers. They just keep the power on. They do not actively control the servers or the use made by customers. They do not and cannot lawfully monitor the content. They do not specifically invite infringers to store computer code on their servers. This is no different from someone making an unauthorized photocopy of a manuscript, then dropping it on someone's desk or placing it in someone's mailbox. The "copy" was made on

1   the photocopy machine; no "copy" is created on the desk or in the mailbox.   Similarly here, the only

2   "copies" here were made in China, not on Defendants' servers.

3        Direct copyright infringement in the United States is a necessary element of contributory

4   copyright infringement.  But Vuitton never demonstrated that infringing "copies" were ever made in

5   the U.S. on Defendants' Internet servers nor did it produce any other evidence of direct infringement

6   in the United States.  Vuitton's failure to prove direct infringement in the United States is alone fatal

7   to any claim for contributory copyright infringement.

8        **D.**    **No Copies Are "Shown" On Defendants' Internet Servers**

9        Even if the Court could find that infringing "copies" exist on Internet servers, direct

10  infringement cannot occur unless these "copies" are also "shown publicly."  To establish a violation

11  of its rights under 17 U.S.C. § 106(5), Vuitton must prove three things: (1) that a "copy" existed on

12  Defendants' servers, (2) that Defendants' servers "showed" this "copy," and (3) that the "copy" was

13  shown "publicly."   Computer code, however, is never "shown" on Defendants' servers for the

14  purposes of the Copyright Act.

15       **1.**    **Computer Code Is Not "Shown"**

16  To "display" a work means:

17       to show a copy of it, either directly or by means of a film, slide,
18       television image, or any other device or process or, in the case of a
     motion picture or other audiovisual work, to show individual images
19       nonsequentially.

20  17 U.S.C. § 101.

21       Based on the plain language of the statute, a person "shows a photographic image (assuming

22  the photograph is copyrighted) by using a computer to fill a computer screen with a copy of the

23  photographic image fixed in the computer's memory."  *Perfect 10, Inc. v. Amazon.com, Inc.,* 487

24  F.3d at 716.  But that did not occur on Defendants' servers according to Vuitton's evidence.

25       In *Perfect 10, Inc.*, 487 F.3d at 717, the court found that Google did not "show" a "copy" of a

26  work by providing HTML instructions (lines of text, not photographic images) that did not cause

27  infringing images to appear.  For infringing images to appear, a computer user's web browser had to

28  interact with the HTML instructions to locate and display an image:

15

> **Google does not**, however, **display a copy** of full size photographic images **for purposes of the Copyright Act** . . . . Instead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. **Providing these HTML instructions is not equivalent to showing a copy. First, the HTML instructions are lines of text, not a photographic image. Second, HTML instructions do not themselves cause infringing images to appear on the user's computer screen.** The HTML merely gives the address of the image to the user's browser. **The browser then interacts** with the computer that stores the infringing image. **It is this interaction that causes an infringing image to appear on the user's computer screen.**

*Id.* at 717 (emphasis added).

Like Google's HTML instructions, the computer code on Defendants' servers is not a copy of anything.  It is a series of zeroes and ones (e.g., 1110010101000); not photographic images.  As in *Perfect 10,* the computer code on Defendants' servers does not itself cause an infringing image to appear – a copy of an infringing image cannot appear **without the action of the computer user's web browser software** or other image-viewing software.  The approximately 1,500 Internet servers at Defendants' data center are stacked, one on top of another, on "server racks" and these servers are not attached to any viewing devices, such as computer monitors.  In other words, the evidence shows no means by which any images can be "shown" on Defendants' servers unless a third-party downloads the computer code to web browser software located on an end-user's machine, uses web browser software to translate the code and uses the end-user's monitor to show the resulting text or image.  None of this ever occurs on Defendants' servers.

Vuitton has admitted that, as to the computer code comprising digital images, its entire claim of direct infringement in the United States rests on its assertion that infringement occurs on Defendants' servers.  Vuitton concedes that it "makes no claim or allegation concerning any purported infringement by Internet consumers who view websites on Defendants' servers."[9]  This means that, for the purposes of analyzing whether any direct copyright infringement occurs in the United States, the only issue is whether anything is "shown" *on Defendants' servers*.  Vuitton's own expert testified that he was only able to view the contents of Defendants' servers *after* he copied the

---

[9]Vuitton's Opposition to Defendants' Rule 50(a) Motion for Judgment as a Matter of Law Regarding Contributory Copyright Infringement 4:24-5:2.

hard drives and viewed the contents on his own computer by using multiple specialized forensic software programs to translate the digital data into text and images. As for the servers themselves, nothing is ever "shown" on them because nothing can be seen on them without the assistance of web browser software or other image-viewing software and the servers are not attached to monitors that are obviously necessary to "show" anything.

**2.      Computer Code Is Not "Shown Publicly"**

Even if a jury could find that computer code is somehow "shown" on a server, it is not "shown publicly." In order to show a violation of a copyright holder's display rights, a "copy" must be shown "publicly." 17 U.S.C. § 106(5). The contents of Defendants' servers are not shown publicly because (1) the contents of the servers are password-protected by Defendants' customers, (2) the computer code stored on the servers is not visible or apparent from looking at the exterior or interior of the servers themselves, and (3) the data center that houses the servers is inside a private, high-security building that is not available to the public (even if it is just "blocks from the courthouse."). There is no evidence that any accused image was ever shown or seen on the servers.

No right under 17 U.S.C. § 106(5) is violated because, not only is the computer code stored on Defendants' servers not "shown," it is not shown "publicly."

**E.      No Evidence of Direct Infringement In The United States**

Vuitton has provided no evidence from which a reasonable jury could find that direct copyright infringement occurred in the United States. The only way to show direct infringement on Defendants' servers located in San Jose is to show that **an unauthorized "copy" that is "fixed" on Defendants' servers is "shown" on those servers, in the United States**. But no evidence can establish those points. As *Costar* demonstrates, no copyright infringement occurs on Internet servers because unintelligible computer code on Internet servers is not a "copy" because it is not "fixed" under the Copyright Act.

Furthermore, the only evidence of *any* viewing of the alleged images occurred either outside the United States (e.g., in France), or occurred with the express authorization of the copyright owner, or both. So **Vuitton presented no evidence of *any unauthorized* viewing of any infringing image in the United States.** The only persons viewing the accused images were Vuitton personnel who

were clearly authorized to do so.  A copyright owner may not view its own works and then sue the party that allowed it to be done.  That is the sum of Vuitton's evidence.

Vuitton avoids confronting its lack of evidence by repeatedly alleging "mass counterfeiting," sending of infringement notices, and the fact that Defendants' data center is located "a few blocks from the courthouse."  None of this is relevant in determining whether *direct infringement* has occurred on Defendants' Internet servers in the United States.  The only relevant inquiry is whether unintelligible computer code stored on an Internet server is a "copy" that is "fixed" and whether this code is "shown publicly."  The unintelligible computer code transmitted by third parties from China is not a "copy" because it not a "material object" and not "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."  This code is also not "shown" or "shown publicly" on the servers.  As *Costar* holds, no direct infringement has occurred on Defendants' Internet servers because unintelligible computer code stored on an Internet server is not "fixed" under the Copyright Act and nothing is shown on the servers.  Without proof of the necessary element of any direct copyright infringement, the claim of contributory copyright infringement must fail.

## III.    THE FAIR USE DEFENSE APPLIES TO ANY CLAIMS OF DIRECT INFRINGEMENT ON DEFENDANTS' SERVERS

Even if a jury could reasonably find that the computer code on Defendants' servers is a "copy" that is "shown" on Defendants' servers, such a "showing" would qualify as "fair use."  The fair use of a copyrighted work is not an infringement of copyright.  17 U.S.C. § 107.  It is an ""equitable rule of reason" analysis to particular claims of infringement."  *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 792 (1984).  Courts must consider four non-exclusive factors in assessing fair use: (1) the purpose and character of the use including whether the use is of a commercial nature; (2) the nature of the copyrighted work; (3) the amount of and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107(1)-(4).  These factors weigh in favor of finding fair use.

1

      **A.**     **Purpose and Character of the Use**

2        The first factor when analyzing fair use is "the purpose and character of the use, including

3 whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C.

4 § 107(1).  In determining whether this first fair use factor is satisfied, courts look at whether the new

5 work is "transformative," namely, whether the use "adds something new, with a further purpose or

6 different character."  *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 818 (9th Cir. 2003).  If so, the more

7 transformative the new work, the less important the other factors, including commercialism, become.

8 *Id.*  This first fair use factor weighs in favor of Defendants because, if there is any use on their

9 servers, because such use is "transformative."

10       In *Kelly*, the Ninth Circuit held that an Internet search engine that displayed and used

11 thumbnail images of an artist's copyrighted images in a searchable database was a transformative

12 use.  The Court held that the use of these thumbnails was "more incidental and less exploitative in

13 nature than more traditional types of commercial use."  *Id*.  It found that "Arriba was neither using

14 Kelly's images to directly promote its web site nor trying to profit by selling Kelly's images. Instead,

15 Kelly's images were among thousands of images in Arriba's search engine database."  *Id*.  The Ninth

16 Circuit noted that the purpose of Kelly's works was aesthetic, but that "Arriba's use of the images

17 serves a different function than Kelly's use – improving access to information on the internet versus

18 artistic expression."  *Id*. at 819.

19       This case parallels *Kelly*.  First, the search engine in *Kelly* was not using the infringing

20 thumbnails to promote its services nor did it use the thumbnails for profit.  *Id.* at 818.  Here,

21 Defendants do not use any infringing works to promote its services nor did they profit from any

22 infringing works.  Baseless assertions notwithstanding, Vuitton has not shown any evidence that

23 Defendants have used any digital images to promote their business or has profited from these

24 images.

25       Second, the *Kelly* court recognized that the images at issue in *Kelly* were few compared to

26 the "thousands of images in Arriba's search engine database."  *Id*.  Here, Vuitton's complaints

27 involve only a fraction of the total data on Defendants' servers using tens of thousands of IP

28 addresses.  Vuitton has only provided evidence that no more than a dozen websites infringed its

1    rights, yet its own expert witness admitted that Defendants' servers could potentially store huge

2    amounts of computer code related to *millions* of websites, none of which are shown to infringe

3    anyone's rights.

4         Third, the *Kelly* court recognized that "Arriba's use of the images serves a different function

5    than [the artist's] use – improving access to information on the internet versus artistic expression."

6    *Id.* at 819.  Here, Defendants' Internet servers serve an entirely different function as well – routing

7    information in a "system that is necessary for the functioning of the Internet."  *Costar*, 373 F.3d at

8    548.  As the Second Circuit has recognized, the placement of computer code on an ISP's server is

9    merely "incidental" to the purpose and function of the server.  The main purpose of an Internet

10   server is providing Internet access, necessary communication throughout the world.  *Cartoon*

11   *Network*, 536 F.3d at 131 (distinguishing the "incidental" copying on Internet servers from the

12   "instrumental" copying on Digital Video Recorders (DVRs) that have only one purpose – copying

13   copyrighted television transmissions).

14        This first and most significant fair use factor weighs heavily in favor of finding that, if there

15   is any use on Defendants' servers, it is not infringing because it is transformative.

16        **B.     Nature of the Copyrighted Work**

17        "Published works are more likely to qualify as fair use."  *Kelly,* 336 F.3d at 820; *see Harper*

18   *& Row Publishers v. Nation Enterprises,* 471 U.S. 539, 564, 105 S.Ct. 2218, 2233 (1985) ("The fact

19   that a work is unpublished is a critical element of its 'nature' " suggesting that prepublication

20   exploitation of the work would be unfair.).  Vuitton has, of course, published photos many times of

21   the copyrighted works at issue in this case.

22        It is important to recall that Vuitton does not sell images or pictures or computer code.  They

23   sell physical products like handbags that incorporate the copyrighted patterns in their physical

24   structure (prints on fabric or leather).  All of Vuitton's publication of pictures of its handbags is

25   intended to advertise their products.  Even a photograph of an infringing product likely serves

26   Vuitton's advertising purposes.  Of course, Vuitton can object to counterfeiting of its physical

27   products – but only when they are made or sold (i.e., in China).  Complaining about computer code

28   that could be translated by a user's web browser into a digital image of a photograph taken by an

1   unknown person of a bag made by another unknown person severely misses the mark.  This supports

2   the application of the fair use doctrine when the transformative use is so distant from the rights

3   Vuitton protects.  This factor weighs in favor of finding fair use.

4       **C.      Amount and Substantiality of the Portion Used in Relation to the Copyrighted
            Work as a Whole**

5

6       In *Sony*, the Supreme Court held that a VCR owner "had been invited to witness [the

7   television program] in its entirety free of charge, the fact that the entire work is reproduced . . . does

8   not have its ordinary effect of militating against a finding of fair use."  *Sony*, 464 U.S. at 449-50, 104

9   S.Ct. at 792.  Likewise, Vuitton invites computer users to view numerous images of its copyrighted

10  works at authorized websites such as *www.LouisVuitton.com*.  Because Vuitton allows computer

11  users to view the works free of charge for its own advertising purposes, even if the same works are

12  stored on Defendants' servers, that does not militate against a finding of fair use.  Indeed the viewing

13  of product images (Vuitton's photos or others') is likely to be beneficial advertising.

14      **D.      Effect of the Use Upon the Potential Market for or Value of the Copyrighted
            Work**

15

16      This factor also supports a finding of fair use.  To defeat fair use under this factor "requires

17  proof either that the particular use is harmful, or that if it should become widespread, it would

18  adversely affect the potential market for the copyrighted work."  *Sony,* 464 U.S. at 451, 104 S.Ct. at

19  793.  Vuitton has not met this burden.  There is no evidence that any storage on Defendants' server

20  hard drives of code that might be translated into digital images of someone's photos of bags is

21  harmful to Vuitton even if the practice became widespread.  *Lewis Galoob Toys, Inc. v. Nintendo of*

22  *America, Inc.*, 780 F. Supp. 1283, 1294 (N.D. Cal. 1991) ("A fair use will frequently suppress

23  demand for a work, but as long as it does so without supplanting demand, the indirect detrimental

24  effect on the market is not the subject of copyright protection.").  Demand for Vuitton's products has

25  not been suppressed.  Vuitton had no evidence of lost or reduced sales.  Worse, Vuitton successfully

26  objected to defense evidence that demand for Vuitton products has increased by double digits in

27  every quarter during the alleged infringement.  If there has been any effect on demand for Vuitton's

28  products bearing the copyrighted works, it was more likely than not to be positive.  The additional

1   advertising may well have increased sales.  The most favorable interpretation of the evidence for

2   Vuitton is that the alleged infringement had no effect on demand whatsoever.

3         Any claim Vuitton might have that it has suffered harm because the value or "goodwill"

4   associated with its works suffer when they are viewed at accused websites should be rejected

5   because indirect harm is not compensated by U.S. copyright laws:

6           The Copyright Act was not designed to prevent such indirect negative
            effects of copying.  The fourth factor is aimed at the copier who
7           attempts to usurp the demand for the original work.  The copyright
            laws are intended to prevent copiers from taking the owner's
8           intellectual property, and are **not aimed at recompensing damages
            which may flow indirectly from copying.**

9

10  *Consumers Union of United States, Inc. v. General Signal Corp.,* 724 F.2d 1044, 1050 (2d Cir.

11  1983), *cert. denied*, 469 U.S. 823 (1984) (emphasis added; citations omitted).

12        As demonstrated by application of the foregoing four-part test, any "use" of computer code

13  or even of digital images stored on Defendants' servers qualifies as "fair use" and therefore does not

14  directly or contributorily infringe Vuitton's copyrighted works.

15  **IV.    CONCLUSION**

16        Vuitton failed to present evidence sufficient to permit a reasonable jury to find in its favor on

17  its contributory copyright infringement claim because it did not show evidence of direct copyright

18  infringement occurring on Defendants' Internet servers or any direct infringement within the United

19  States.  Defendants respectfully request judgment be entered in their favor as a matter of law on that

20  claim pursuant to Fed. R. Civ. P. 50(a).

21  Dated:  October 27, 2009                          **GAUNTLETT & ASSOCIATES**

22

23                                          By:     s/James A. Lowe
24                                                  David A. Gauntlett
                                                    James A. Lowe
25                                                  Brian S. Edwards
                                                    Christopher Lai
26
                                                    Attorneys for Defendants
27                                                  Akanoc Solutions, Inc.,
                                                    Managed Solutions Group, Inc.
28                                                  and Steve Chen