**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
Brian S. Edwards (SBN 166258)
Christopher Lai (SBN 249425)
18400 Von Karman, Suite 300
Irvine, California  92612
Telephone:     (949) 553-1010
Facsimile:      (949) 553-2050
info@gauntlettlaw.com
jal@gauntlettlaw.com
bse@gauntlettlaw.com
cl@gauntlettlaw.com

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.
and Steve Chen

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., | Case No.:  C 07-3952 JW |
| Plaintiff, | Hon. James Ware |
| vs. | **DEFENDANTS' SUPPLEMENTAL RULE 50(a) BRIEF ON NON-APPLICATION OF LANHAM ACT TO EXTRATERRITORIAL TRADEMARK INFRINGEMENT** |
| AKANOC SOLUTIONS, INC., et al., | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.     VUITTON'S EVIDENCE INSUFFICIENT TO SUPPORT A JURY VERDICT ........... 1

    A.     No Proof of Direct Trademark Infringement ................................................. 1

    B.     No Proof of Likelihood of Confusion ........................................................... 2

    C.     Procedural History ..................................................................................... 3

II.     THE LANHAM ACT DOES NOT APPLY EXTRATERRITORIALLY IN THIS CASE ................................................................................................................ 3

    A.     The Lanham Act Does Not Apply Extraterritorially Under Supreme Court's Test in *Steele v. Bulova Watch Co.* ............................................... 3

         1.     The Direct Infringers Are Citizens of China Operating Out Of China ................................................................................................. 5

         2.     Chinese Sales Did Not Have Substantial Effects in the United States ................................................................................................ 6

         3.     The Extraterritoriality Test In *Timberlane* Has Been Superseded By Statute Requiring Substantial Effects for Extraterritorial Application of Antitrust Laws ...................................................... 7

III.     NO DIRECT TRADEMARK INFRINGEMENT PROVEN BECAUSE NO EVIDENCE OF "USE IN COMMERCE" ...................................................... 8

    A.     Presence of Digital Data on Servers Is Not "Use in Commerce" ............. 8

         1.     No Trademarks Affixed to Goods on Servers ................................. 8

         2.     No Sale or Transportation of Goods on Servers ............................. 9

         3.     Just Raw Incomprehensible Code Is Stored on Servers ............... 10

    B.     Content-Neutral Automatic Data Processing is Not "Use in Commerce" ........... 10

         1.     Digital Data Storage and Transmission Is a Non-Trademark Use to Which Lanham Act Does Not Apply ...................................... 10

         2.     Internal Utilization of Mark Is Not a Trademark Use ................... 12

    C.     A Trademark is Used in Commerce Only When It is Affixed to Goods Sold or Transported In Commerce In the United States ........................... 14

         1.     Trademark Must be Affixed and Sold or Transported in the United States ............................................................................... 14

         2.     "Use in Commerce" Different for Trademarks and Service Marks ... 15

         3.     A Trademark Cannot Be "Used in Commerce" By Advertising ............... 16

a. Advertising Goods for Sale Bearing Trademarks Is Not Circumstantial Evidence of Use in Commerce ............................... 16

b. Advertising Goods for Sale Bearing Trademarks Is Relevant Only to Issues Other Than "Use in Commerce" ............ 18

D. No Evidence of Sale or Transportation of Goods in Commerce in the U.S. ........ 20

E. Without Proof of Direct Trademark Infringement in the U.S. There Cannot Be Contributory Infringement ...................................................... 20

IV. NO DIRECT TRADEMARK INFRINGEMENT PROVEN BECAUSE NO EVIDENCE OF "LIKELIHOOD OF CONFUSION" BY U.S. PUBLIC ........................ 21

A. No Likelihood of Confusion Because Data on Server Not Directly Viewable ............................................................................................... 21

B. Any Use of Vuitton's Trademarks Was Authorized ................................. 22

C. Vuitton Presented No Evidence to Support Finding Likelihood of Confusion .......................................................................................... 23

V. CONCLUSION ...................................................................................................... 25

**TABLE OF AUTHORITIES**

Page(s)

**FEDERAL CASES**

*1-800 Contacts, Inc. v. WhenU.Com, Inc.*,
   414 F.3d 400 (2d Cir. 2005) .................................................................. 11, 12, 15, 19

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
   126 F. Supp. 2d 328 (S.D.N.Y. 2001) ........................................................ 23

*Academy of Motion Picture Arts and Sciences v. Creative House*,
   944 F.2d 1446 (9th Cir. 1991) ..................................................................... 24

*Acme Valve & Fittings Co. v. Wayne*,
   386 F. Supp. 1162 (S.D. Tex. 1974) ............................................................ 15

*Aerogroup Intern., Inc. v. Marlboro Footworks, Ltd.*,
   955 F. Supp. 220 (S.D.N.Y. 1997) ........................................................... 5, 23

*American Rice, Inc. v. Producers Rice Mill, Inc.*,
   518 F.3d 321 (5th Cir. 2008) ......................................................................... 5

*Atlantic Richfield Co. v. Arco Globus Int'l Co.*,
   150 F.3d 189 (2d Cir. 1998) .......................................................................... 8

*Blazon, Inc. v. DeLuxe Game Corp.*,
   268 F. Supp. 416 (S.D.N.Y 1965) .............................................................. 17

*Bosley Medical Institute, Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ....................................................................... 22

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ............................................................... 17, 18

*Buti v. Perosa, S.R.L.*,
   139 F.3d 98 (2d Cir. 1998) .................................................................... 14, 16

*Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.*,
   714 F. Supp. 78 (S.D.N.Y. 1989) ................................................................. 6

*Committee for Idaho's High Desert v. Yost*,
   92 F.3d 814 (9th Cir. 1996) .................................................................... 12, 13

*Custom Mfg. and Engineering, Inc. v. Midway Services*,
   508 F.3d 641 (11th Cir. 2007) .................................................................... 22

*DaimlerChrysler AG v. Bloom*,
   315 F.3d 932 (8th Cir. 2003) ....................................................................... 11

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
   109 F.3d 1394 (9th Cir. 1997) .................................................................... 23

*E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.*,
   756 F.2d 1525 (11th Cir. 1985) ............................................................. 13

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244, 111 S.Ct. 1227 (1991) ................................................. 3, 6

*Elvis Presley Enterprises, Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ................................................................ 19

*Emergency One, Inc. v. American FireEagle, Ltd.*,
   228 F.3d 531 (4th Cir. 2000) ................................................................ 15

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
   111 F.3d 993 (2d Cir. 1997) .................................................................... 6

*G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*,
   873 F.2d 985 (7th Cir. 1989) ................................................................ 19

*Glass v. Kemper Corp.*,
   133 F.3d 999 (7th Cir. 1998) .................................................................. 4

*Interactive Products Corp. v. a2z Mobile Office Solutions*,
   326 F.3d 687 (6th Cir. 2003) ................................................................ 11

*International Cafe, S.A.L. v. Hard Rock Cafe Intern. (U.S.A.), Inc.*,
   252 F.3d 1274 (11th Cir. 2001) ........................................................... 4, 5

*Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*,
   285 F.3d 848 (9th Cir. 2002) ........................................................... 21, 24

*Knipe v. SmithKline Beecham*,
   583 F. Supp. 2d 553 (E.D. Pa. 2008) ................................................... 19

*Laurel Capital Group, Inc. v. BT Financial Corp.*,
   45 F. Supp. 2d 469 (W.D. Pa. 1999) .................................................... 17

*Leigh v. Warner Bros., Inc.*,
   212 F.3d 1210 (11th Cir. 2000) ............................................................ 16

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
   985 F. Supp. 949 (C.D. Cal. 1997) ...................................................... 10

*Lucasfilm, Ltd. v. High Frontier*,
   622 F. Supp. 931 (D.D.C. 1985) .......................................................... 11

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ........................................................ 1, 3, 20

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*,
   221 F.2d 464 (2d Cir. 1955) ................................................................. 25

*McBee v. Delica Co., Ltd.*,
   417 F.3d 107 (1st Cir. 2005) ............................................................ 7, 24

166017.7-10562-002-10/27/2009                    iv         SUPPLEMENTAL RULE 50(a) BRIEF ON EXTRA-
                                           TERRITORIAL TRADEMARK INFRINGEMENT
                                                  – C 07-3952 JW

*McGlinchy v. Shell Chemical Co.,*
   845 F.2d 802 (9th Cir. 1988).................................................................................... 8

*Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,*
   425 F. Supp. 2d 402 (S.D.N.Y. 2006)..................................................................... 15

*Millennium Enters., Inc. v. Millennium Music, Inc.,*
   33 F. Supp. 2d 907 (D. Or. 1999)............................................................................ 24

*New Kids on the Block v. New America Pub., Inc.,*
   971 F.2d 302 (9th Cir. 1992).................................................................................. 10

*Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.,*
   496 F.3d 1231 (11th Cir. 2007)............................................................................. 15

*Perfect 10, Inc. v. Visa International Service Association,*
   494 F.3d 788 (9th Cir. 2007)............................................................................... 3, 9

*Perfumebay.com Inc. v. EBAY, Inc.,*
   506 F.3d 1165 (9th Cir. 2007)............................................................................... 18

*Philip Morris, Inc. v. Imperial Tobacco Co.,*
   251 F. Supp. 362 (D. Va. 1965).............................................................................. 13

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,*
   907 F. Supp. 1361 (N.D. Cal. 1995)....................................................................... 20

*Rescuecom Corp. v. Computer Troubleshooters USA, Inc.,*
   464 F. Supp. 2d 1263 (N.D. Ga. 2005)................................................................... 14

*Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,*
   955 F. Supp. 605 (E.D. Va. 1997), *aff'd,* 170 F.3d 449 (4th Cir. 1999)...................... 13

*Saint Louis University v. Meyer,*
   625 F. Supp. 2d 827 (E.D. Mo. 2008).............................................................. 12, 13

*Southern Grouts & Mortars, Inc. v. 3M Company,*
   575 F.3d 1235 (11th Cir. 2009)............................................................................. 17

*Sports Auth., Inc. v. Prime Hospitality Corp.,*
   89 F.3d 955 (2d Cir. 1996).................................................................................... 18

*Starter Corp. v. Converse, Inc.,*
   84 F.3d 592 (2d Cir. 1996).................................................................................... 15

*Steele v. Bulova Watch Co.,*
   344 U.S. 280 (1952)........................................................................................... 4, 5

*Subafilms, Ltd. v. MGM-Pathe Communications Co.,*
   24 F.3d 1088 (9th Cir. 1994).................................................................................... 1

*Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n,*
   651 F.2d 311 (5th Cir. 1981).................................................................................. 18

*Thane Int'l v. Trek Bicycle Corp.*,
    305 F.3d 894 (9th Cir. 2002) ................................................................................... 23

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    576 F. Supp. 2d 463 (S.D.N.Y. 2008) ........................................................................ 3

*Timberlane Lumber Co. v. Bank of America, N.T. and S.A.*,
    549 F.2d 597 (9th Cir. 1976) ...................................................................................... 7

*TNT USA, Inc v. TrafiExpress, S.A. de C.V.*,
    434 F. Supp. 2d 1322 (S.D. Fla. 2006) ...................................................................... 4

*Totalplan Corp. of America v. Colborne*,
    14 F.3d 824 (2d Cir. 1994) ................................................................................. 4, 5, 6

*Vanity Fair Mills v. T. Eaton Co.*,
    234 F.2d 633 (2d Cir. 1956) ...................................................................................... 4


**DOCKETED CASES**

*A.V. By Versace, Inc. v. Gianni Versace S.p.A.*,
    Nos. 96 Civ. 9721PKLTHK, 98 Civ. 0123PKLTHK, 01 Civ. 9645PKLTHK, 2006 WL
    90062 (S.D.N.Y. Jan. 12, 2006) ................................................................................ 6

*Felix Cat Productions, Inc. v. New Line Cinema*,
    No. CV 99-9339 FMC (RCx), 2000 WL 35729983 (C.D. Cal. July 31, 2000) ........... 14

*I.H.T. Corp. v. News World Communications, Inc.*,
    No. 83 Civ. 3862-CSH, 1984 WL 604 (S.D.N.Y. July 3, 1984) ................................ 23

*Pet Stop Professional Pet Sitting Service, LLC v. Professional Pet-Sitting Service, Inc.*,
    No. 07-90-ST, 2007 WL 1876517 (D. Or. June 26, 2007) ........................................ 21


**FEDERAL RULES AND STATUTES**

15 U.S.C. § 6a ................................................................................................................ 8

15 U.S.C. § 1114 .......................................................................................................... 14

15 U.S.C. § 1127 ................................................................... 8, 9, 14, 15, 16, 17, 18, 19, 20

Fed. R. Civ. P. Rule 50(a) ....................................................................................... 3, 25


**OTHER AUTHORITIES**

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed. 2009) ................. 2, 23

1   **I.      VUITTON'S EVIDENCE INSUFFICIENT TO SUPPORT A JURY VERDICT**

2         **A.      No Proof of Direct Trademark Infringement**

3         Without proof of direct infringement there can be no contributory infringement.  *Subafilms,*

4   *Ltd. v. MGM-Pathe Communications Co.,* 24 F.3d 1088, 1092 (9th Cir. 1994) (" 'There can, by

5   definition, be no contributory liability if that conduct which is aided by the putative contributory

6   infringer is not itself infringing.' ").  Direct trademark infringement requires proof that a trademark

7   has been "used in commerce."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571

8   F.3d 873, 877 (9th Cir. 2009) ("[T]o be liable for trademark infringement, someone must '(1) **use in**

9   **commerce** (2) any word, false designation of origin, false or misleading description, or

10  representation of fact, which (3) is **likely to cause confusion** or misrepresents the characteristics of

11  his or another person's goods or services.' " (emphasis added)).  But Vuitton presented no evidence

12  of direct infringement of its trademark from which a reasonable jury could find even the first and

13  essential element of contributory trademark infringement.

14        Direct infringement was not proven because there was no trial evidence that Vuitton's

15  trademarks were *used in commerce* in the United States.  **First**, the direct infringers in this case are

16  apparently Chinese citizens operating out of China – not the United States. The Lanham Act's

17  limited extraterritorial reach does not apply to the overseas activities of foreign nationals.  **Second**,

18  no sales were made over the Internet using the Defendants' servers (or anyone else's). Vuitton's

19  investigator purchased goods via commercial email communications and Western Union money

20  transfer – not through any accused website or any e-commerce site.  Defendants cannot be liable for

21  "contributing" to purchases that did not occur over the Internet or through their services.  **Third**,

22  "use in commerce" cannot be inferred from circumstantial evidence. None of the accused websites

23  were even capable of selling products over the Internet.  But even if they could, or it was *obvious*

24  they had, or intended to do so in the future - that would not matter. "Use in commerce" requires

25  *actual "sale" or "distribution"* of goods bearing Vuitton's trademarks in commerce; neither of

26  which occurred over the Internet in this case.  **Fourth**, the fact that goods were advertised at accused

27  websites is not evidence of "use in commerce." In contrast to a service mark that can be used in

28  commerce through advertising, a trademark must be *affixed to goods* and then *sold or distributed* in

commerce in order to be "used in commerce." **Fifth**, any appearance of Vuitton's trademarks on Defendants' servers is a non-trademark use that does not violate the Lanham Act because (1) it is part of an ISP's automatic and neutral function of storing and transmitting data regardless of content; (2) it is part of a machine-linking or technical function that does not entail promoting marks; and (3) storage of computer code on Defendants' servers is not a use in public. **Sixth**, the Lanham Act also does not prohibit the transactions in evidence here because the goods involved in this case were shipped to the United States with Vuitton's express authorization and request. There was no unauthorized sale or import. The sham transactions created to bolster a lawsuit provide no evidence of trademark infringement in the United States.

> **B.     No Proof of Likelihood of Confusion**

No evidence was presented of likelihood of confusion either. Vuitton's evidence actually showed there is no possibility of confusion in this case. **First**, confusion cannot occur on the servers. The public cannot peer inside a server to view a server's contents. If they did they would see only incomprehensible computer code, not text or images. Nothing is visible to the public until and unless an end-user elsewhere downloads data and then converts it to text or images with his or her software and equipment – none of that takes place on an ISP's servers. **Second**, for the Lanham Act to apply, the *U.S. public* must be confused – not non-U.S. citizens in foreign countries including Vuitton's Paris personnel. Although Vuitton's forensic examination revealed that persons from other countries had visited the accused websites, there was no evidence that anyone in the United States other than Vuitton's investigator ever accessed the accused websites. Vuitton's investigator was obviously not confused about the source or origin of goods for sale at those websites. **Third**, there could not have been any post-sale or non-purchaser confusion because there was no opportunity for the public to be confused. Vuitton's investigator purchased items for use as evidence in this lawsuit. They were never seen in public. Post-sale confusion was never possible because none of the products at issue were ever used or displayed in an environment where the U.S. public could have been confused. **Fourth**, because there is no possibility for confusion in this case, whether the direct infringers' intended to confuse is irrelevant. *See* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:110 (4th ed. 2009) ("In the absence of likelihood of confusion, the

1    alleged infringer's intent cannot transmute a lawful act into an unlawful one.").

2       **C.    Procedural History**

3       The Defendants' Fed. R. Civ. P. Rule 50(a) motion concerning Vuitton's contributory

4    trademark infringement claim was timely filed.  [Docket No. 210]  The Court took the motions under

5    submission and requested additional briefing about whether (and if so, to what extent) the United

6    States copyright and trademark laws applied to content transmitted to Defendants' servers from

7    outside the United States.

8       This supplemental brief addresses questions the Court raised concerning Vuitton's Lanham

9    Act claim.  Defendants are filing a separate supplemental brief on extraterritorial copyright issues.

10   **II.    THE LANHAM ACT DOES NOT APPLY EXTRATERRITORIALLY IN THIS CASE**

11      **A.    The Lanham Act Does Not Apply Extraterritorially Under Supreme Court's
           Test in *Steele v. Bulova Watch Co.***

12

13      The elements of Vuitton's contributory trademark infringement claims are (1) **direct**

14   **infringement**; and (2) intentionally inducing others to infringe a mark, or continuing to supply an

15   infringing *product* to an infringer with knowledge that the infringer is mislabeling the particular

16   product supplied.  *Perfect 10, Inc. v. Visa International Service Association,* 494 F.3d 788, 806-807

17   (9th Cir. 2007) [citing *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 72

18   L.Ed.2d 606 (1982)].

19      Direct trademark infringement requires proof according to the Ninth Circuit of (1) **use in**

20   **commerce** (2) of a **trademark** that (3) is **likely to cause confusion** or misrepresents the

21   characteristics of his or another person's goods or services. *Marlyn Nutraceuticals, Inc., supra,* 571

22   F.3d at 877.  *See also Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 463, 495 (S.D.N.Y. 2008).

23      Vuitton's evidence indicates that the alleged direct infringers are Chinese citizens located in

24   China and operating exclusively out of China.  The activities of foreign citizens outside the United

25   States rarely can violate the Lanham Act.  So Vuitton's evidence cannot establish direct trademark

26   infringement upon which this Court or jury can rely.  *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244,

27   248, 111 S.Ct. 1227 (1991) ("It is a longstanding principle of American law 'that legislation of

28   Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of

1    the United States.' "); Federal statutes "presumptively lack extraterritorial reach." *Glass v. Kemper*

2    *Corp.,* 133 F.3d 999, 1000 (7th Cir. 1998).

3         Use of a U.S. trademark in a foreign country cannot form the basis of an infringement claim

4    against an American.  *Steele v. Bulova Watch Co.,* 344 U.S. 280, 292 (1952) ("The stamping of the

5    Bulova trade-mark, done in Mexico, is not an act 'within the control of Congress.'  It should not be

6    utilized as a basis for action against petitioner.  The Lanham Act, like the Sherman Act, should be

7    construed to apply only to acts done within the sovereignty of the United States.  While we do not

8    condone the piratic use of trade-marks, neither do we believe that Congress intended to make such

9    use actionable irrespective of the place it occurred.  Such extensions of power bring our legislation

10   into conflict with the laws and practices of other nations, fully capable of punishing infractions of

11   their own laws, and should require specific words to reach acts done within the territorial limits of

12   other sovereignties.").

13        Courts rarely apply the Lanham Act to infringement occurring overseas.  In *Bulova*, a case

14   Vuitton has described as a "controlling decision" [Docket No. 169, 7:6-8], the United States

15   Supreme Court considered three relevant factors, the so-called *Bulova* factors, in making this

16   determination:

17        The [*Steele v. Bulova Watch Co.*] Court concluded that the Lanham Act conferred
          jurisdiction over extraterritorial disputes involving trademark infringement and unfair
18        competition when: **1) Defendant is a United States [citizen]; 2) the foreign activity
          had substantial effects in the United States; and 3) exercising jurisdiction would
19        not interfere with the sovereignty of another nation.**

20   *International Cafe, S.A.L. v. Hard Rock Cafe Intern. (U.S.A.), Inc.,* 252 F.3d 1274, 1278 (11th Cir.

21   2001) (emphasis added).[1]

22        The absence of just one of the above factors is likely determinative and the absence of two is

23   certainly fatal to application of the Lanham Act extraterritorially.  *See Vanity Fair Mills, Inc. v. T.*

24   *Eaton Co.,* 234 F.2d 633, 643 (2d Cir. 1956) ("[T]he absence of one of the [*Bulova*] factors might

25   well be determinative and [ ] the absence of both is certainly fatal."); *see also Totalplan Corp. of*

26   *America v. Colborne*, 14 F.3d 824, 831 (2d Cir. 1994) ("Two of the three conditions necessary to

27

28   _____
     [1]*See also Vanity Fair Mills v. T. Eaton Co.,* 234 F.2d 633, 642-43 (2d Cir. 1956) (same); *TNT USA,*
     *Inc v. TrafiExpress, S.A. de C.V..* 434 F. Supp. 2d 1322, 1328 (S.D. Fla. 2006) (same).

bring appellees' conduct within the Lanham Act, United States citizenship and a substantial effect on United states commerce, have thus not been established by Totalplan. . . . [T]he absence of two of the three *Bulova* factors in this case is fatal to an argument that the conduct is governed by the Lanham Act."); *International Cafe, S.A.L.*, 252 F.3d at 1278 (same).

### 1.     The Direct Infringers Are Citizens of China Operating Out Of China

Vuitton's only evidence indicates that the alleged direct infringers are **not** United States citizens or foreigners operating from inside the United States. Vuitton ordered the products from China. The shipping labels for the allegedly infringing items are written in Chinese, were shipped from China, and list return addresses inside China.  Payment was made to individuals in China using Western Union money transfer to China, *Aerogroup Intern., Inc. v. Marlboro Footworks, Ltd.,* 955 F. Supp. 220, 227 (S.D.N.Y. 1997) ("[T]he citizenship of the [direct infringer] is the most significant factor in determining whether to apply the Lanham Act extraterritorially to a [direct infringer's] foreign activities.").

The *Bulova* Court also found the citizenship of the direct infringer to be of critical importance.  Starting with the premise that "the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears," the Court inferred such an intent based upon "the duty of the citizen in relation to his own government."  *Bulova*, 344 U.S. at 286.  The Supreme Court held that applying the Lanham Act to foreign activities of United States citizens was justified because " 'Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some of the acts are done outside the territorial limits of the United States.' "  *Id.  See Totalplan Corp. of America,* 14 F.3d at 830 ("First, none of the appellees is a United States citizen.  Thus, unlike *Bulova*, this case does not implicate the United States' 'broad power to regulate the conduct of its citizens in foreign countries.' . . . [A]ppellees' Canadian citizenship . . . is a factor weighing against extraterritorial application of the Lanham Act.").

*Bulova* held that when the direct infringer is a United States citizen, the Lanham Act "extends to reach United States citizens' infringing acts in foreign countries where some lawful acts were commenced in the United States." *American Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d

5

321, 328 n.9 (5th Cir. 2008) [citing *Steele v. Bulova Watch Co.,* 344 U.S. 280, 285-86, 73 S. Ct. 252, 97 L. Ed. 319 (1952)].  But the converse is not true. Mr. Justice Marshall explained in *E.E.O.C. v. Arabian American Oil Co.,* 499 U.S. 244, 274, 111 S. Ct. 1227, 1244 (1991) that the Lanham Act does not apply to conduct of foreign nationals outside the U.S.

> Because two different rules of construction apply depending on the national identity of the regulated parties, the same statute might be construed to apply extraterritorially to United States nationals but *not* to foreign nationals.  Compare *Steele v. Bulova Watch Co.*, *supra*, 344 U.S., at 285-287, 73 S.Ct., at 255-256 (applying Lanham Act to United States national for conduct abroad) with *Vanity Fair Mills, Inc. v. T. Eaton* Co., 234 F.2d 633, 642-643 (CA2) (declining to apply Lanham Act to foreign national for conduct abroad), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). [Marshall, dissenting]

The Lanham Act does not apply to the conduct of foreign nationals abroad even if the infringing goods are later shipped into the United States.  *See Totalplan*, 14 F.3d at 830-31 (declining to extend the Lanham Act to a foreign defendant's sales of disposable cameras abroad, even when those goods had been shipped through, and labeled with the allegedly infringing name in, the United States).

For the Lanham Act to apply, a foreign citizen must reside in the United States or direct operations from here.  *A.V. By Versace, Inc. v. Gianni Versace S.p.A.,* Nos. 96 Civ. 9721PKLTHK, 98 Civ. 0123PKLTHK, 01 Civ. 9645PKLTHK, 2006 WL 90062, at *6 (S.D.N.Y. Jan, 12, 2006) ("Alfredo could not rely on his Italian citizenship to shield him from application of the Lanham Act because there was evidence that Alfredo, who had resided in and conducted business in the United States for more than 40 years, was the controlling force behind Foldom, a New York corporation."); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993 (2d Cir. 1997) (enjoining a United States corporation from distributing infringing items abroad); *Calvin Klein Indus., Inc. v. BFK Hong Kong, Ltd.,* 714 F. Supp. 78, 80 (S.D.N.Y. 1989) (individual defendant, a United States resident alien, treated as a U.S. citizen for purposes of the Lanham Act because he was the controlling force behind the co-defendant, a New York corporation).

### 2.      Chinese Sales Did Not Have Substantial Effects in the United States

Vuitton's website printouts do not show any impacts within the United States.  The only evidence of effects in the United States are the items Vuitton itself purchased and paid for in China from several websites and had shipped into the United States in an effort to create jurisdiction.

1  Shipment of individual items into the United States at the express direction of the trademark owner

2  does not constitute substantial effects on U.S. commerce.

3       Vuitton could have easily had the products shipped to France, some other country, or not

4  shipped at all.  This is not a situation where an infringer is operating inside the United States or ships

5  out numerous products already located in the United States.  *McBee v. Delica Co., Ltd.,* 417 F.3d

6  107, 120 (1st Cir. 2005) ("The [*Bulova*] substantial effects test requires that there be **evidence of**

7  **impacts within the United States**, and these impacts must be of a sufficient character and

8  magnitude to give the United States a reasonably strong interest in the litigation." (emphasis added)).

9       *See Reebok Int'l, Ltd, Marnatech Enterprises, Inc.,* 970 F.2d 552, 554-555 (9th Cir. 1992)

10  (Substantial effects shown where infringer "organized and directed the manufacture of counterfeit

11  REEBOK shoes from the United States," and evidence presented that infringer's "sales of

12  counterfeit REEBOK shoes decreased the sale of genuine REEBOK shoes in Mexico and the United

13  States and directly decreased the value of Reebok's consolidated holdings.").

14         **3.**    **The Extraterritoriality Test In *Timberlane* Has Been Superseded By**

15               **Statute Requiring Substantial Effects for Extraterritorial Application of Antitrust Laws**

16       The Ninth Circuit is consistent with the other circuits - the Lanham Act does not apply

17  outside the U.S. unless the direct infringement has a substantial effect on United States commerce.

18  Vuitton concedes that *Bulova* is binding precedent [*See* Docket No. 169, 7:6-8] but argues the Court

19  should follow the test in *Marnatech,* 970 F.2d at 554.  In *Marnatech* the Ninth Circuit analogized the

20  Lanham Act to the Sherman Act for extraterritoriality purposes and applied the test for

21  extraterritorial application of the *antitrust* laws set forth in *Timberlane Lumber Co. v. Bank of*

22  *America, N.T. and S.A.,* 549 F.2d 597 (9th Cir. 1976).[2]  Based on the *Timberlane* test as applied to

23  the Lanham Act by *Marnatech,* Vuitton argues that only "some" effect on interstate commerce

24  
_____

25  [2]*Marnatech,* 970 F.2d at 554 ("The Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal antitrust laws set forth in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n,* 549 F.2d 597 (9th Cir.1976)

26  (*Timberlane I* ).... In *Timberlane I,* we held: first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs

27  under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial

28  authority.").

sufficiently great to present a cognizable injury to plaintiffs is required.

But Vuitton fails to mention that *Timberlane* and its tri-partite test for determining extraterritorial application of the antitrust laws has been overruled and superseded by statute – a statute that clarified the law in this area by requiring substantial effects on U.S. commerce.  [15 U.S.C. § 6a]; *see McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 813 n.8 (9th Cir. 1988) ("Prior to enactment of section 6a, the extraterritorial reach of the antitrust laws was governed in this circuit by a tripartite test: … [citing *Timberlane*].").  That statute, 15 U.S.C. § 6a, was enacted "[i]n an effort to provide a single standard for the issue of extraterritorial application of the Sherman Act."  *Id.*  Section 6a makes clear that the Sherman Act does not apply extraterritorially unless a substantial effect on interstate commerce is shown.  The antitrust laws "shall not apply … **unless (1) such conduct has a direct, substantial, and reasonably foreseeable effect** – (A) on trade or commerce … in the United States."  15 U.S.C. § 6a.  So even if the applicable test is the same as the test for determining extraterritorial application of the Sherman Act, substantial effects on interstate commerce are still required. Because no substantial effects on interstate commerce have been shown (indeed, no effects), there is no basis for applying the Lanham Act extraterritorially.[3]

## III.   NO DIRECT TRADEMARK INFRINGEMENT PROVEN BECAUSE NO EVIDENCE OF "USE IN COMMERCE"

### A.   Presence of Digital Data on Servers Is Not "Use in Commerce"

#### 1.   No Trademarks Affixed to Goods on Servers

The presence of digital data on a server is not a "use in commerce."  First, a trademark must be affixed to goods. 15 U.S.C. § 1127[4]  But there are no goods, or even images of goods, on the servers – just computer code that is incomprehensible to humans. At trial, Defendants' expert's

---

[3]This approach is consistent with other circuits that require a substantial effect on commerce for the Lanham Act to apply extraterritorially.  *See, e.g.*, *Atlantic Richfield Co. v. Arco Globus Int'l Co.,* 150 F.3d 189, 192 n.4 (2d Cir. 1998) (Second Circuit has "never applied the Lanham Act to extraterritorial conduct absent a substantial effect on United States commerce.").

[4]Section 45 of the Lanham Act (15 U.S.C. § 1127) provides: "**A mark shall be deemed to be in use in commerce**: (1) **on goods** when – (A) **it is placed in any manner on the goods** or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, **and** (B) **the goods are sold or transported in commerce** . . . ."  (Emphasis added.)

1    unchallenged testimony established that there are no images of trademarks affixed to goods on the

2    servers. Only the *end-user's computer* displays an image – not the servers. The computer code is

3    retrieved from the server by an end-user's computer (at the request of the computer user – not

4    Defendants) and downloaded to web browser software also located on the end-user's computer.  The

5    web browser software then translates the code, and the end-user's monitor displays the resulting

6    image. Vuitton presented no evidence at trial to challenge the testimony of Defendants' expert on

7    this critical point.

8         Even if there were actual images stored on defendants' servers instead of raw computer code,

9    those images would not be "goods" to which a trademark can be affixed.  An image from China of

10   goods in China to which a trademark is affixed is still neither a "good" nor a "trademark" on the

11   servers.  It is at most advertising of products offered for sale from China.  This does not satisfy any

12   requirement of the Lanham Act.

### 2.    No Sale or Transportation of Goods on Servers

14        Even after trademarks are affixed to goods, Section 45 [15 U.S.C. § 1127] requires that the

15   goods be "sold or transported in commerce."  Vuitton presented no evidence that any goods were

16   sold or transported in commerce over the Internet at all.  Vuitton's investigator testified that he

17   negotiated purchases using commercial and e-mail communications and Western Union money

18   transfers to persons in China.  So no direct trademark infringement was proven by Vuitton because

19   nothing happened in the United States except that Vuitton's investigator learned from the websites

20   that goods could be purchased in China.  That does not violate the Lanham Act.

21        Vuitton's evidence cannot support a rational jury verdict of either direct or contributory

22   liability in this case against anyone.  Certainly, Vuitton presented no evidence that Defendants

23   "directly controlled and monitored" the e-mail and Western Union communications (the means of

24   infringement).  *Perfect 10, Inc. v. Visa International Service Association,* 494 F.3d 788, 807 (9th Cir.

25   2007) ("When the alleged direct infringer supplies a service rather than a product, under the second

26   prong of th[e] [*Inwood*] test, the court must 'consider the extent of control exercised by the

27   defendant over the third party's means of infringement.' . . . For liability to attach, there must be

28   **'[d]irect control and monitoring** of the instrumentality used by a third party to infringe the

1   plaintiff's mark.' " (emphasis added)).  Vuitton's evidence showed no direct control or monitoring of

2   any instrumentality of infringement.  In fact Vuitton's complaint was that the Defendants were *not*

3   monitoring the websites.

4                    **3.       Just Raw Incomprehensible Code Is Stored on Servers**

5            There are no images of "goods" on the servers to which trademarks could be affixed – just

6   raw computer data.  No images of trademarks, visible or otherwise, are stored or displayed on the

7   servers – just computer code virtually incomprehensible to humans. (e.g. digital data in the form of

8   1's and 0's such as 100111000101).  There is no "use in commerce" under Vuitton's evidence.

9        **B.      Content-Neutral Automatic Data Processing is Not "Use in Commerce"**

10                   **1.       Digital Data Storage and Transmission Is a Non-Trademark Use to
                              Which Lanham Act Does Not Apply**

11

12           No trademark use of any Vuitton mark occurred in the alleged storage and transmission of

13   digital data using the Defendants' servers.  The only possible "use" of Vuitton's marks on the

14   servers would be as part of an ISP's automatic and neutral function of storing and transmitting data

15   regardless of its content – a non-trademark "use" that does violate the Lanham Act because it is a

16   "technical function" that does not entail promoting marks.  *Lockheed Martin Corp. v. Network

17   Solutions, Inc.,* 985 F. Supp. 949, 958 (C.D. Cal. 1997) ("[W]here as with NSI, the pure machine-

18   linking function is the only use at issue, there is no trademark use and there can be no

19   infringement.").

20           In *Lockheed Martin*, an Internet domain name registrar did not use an aircraft manufacturer's

21   "SKUNK WORKS" mark for purposes of the Lanham Act because it provided a purely "technical

22   function" of designating a set of computers on the Internet:

23           NSI's acceptance of domain name registrations is connected only with the names'
             **technical function on the Internet to designate a set of computers**. . . . NSI merely
24           uses domain names to designate host computers on the Internet.  This is the type of
             purely "nominative" function that is not prohibited by trademark law.  *See New Kids
25           on the Block v. New America Pub., Inc.,* 971 F.2d 302, 307 (9th Cir.1992) (noting that
             laws against infringement do not apply to "non-trademark use of a mark").
26           [Emphasis added.]

27   *Id*. at 957.

28           The Ninth Circuit's decision in *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d

302, 307-08 (9th Cir. 1992) explained that there is a general class of "non-trademark" uses not within the scope of the Lanham Act:

> Cases like these are best understood as involving **a non-trademark use** of a mark-a use to which the infringement laws **simply do not apply**, just as videotaping television shows for private home use does not implicate the copyright holder's exclusive right to reproduction. [citing *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 447-51, 104 S.Ct. 774, 791-93, 78 L.Ed.2d 574 (1984).] Indeed, we may generalize a class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one. [Emphasis added.]

Any "use" of Vuitton's marks on the servers is purely technical. An ISP, in providing its machine-linking function, does not use, reference or exploit any trademarks. The ISP's servers provide only content-neutral data storage and transmission. Any "use" on a server occurs not because of the characteristics of the mark itself, but as part of a technical process - providing ISP services. *See Interactive Products Corp. v. a2z Mobile Office Solutions,* 326 F.3d 687, 695 (6th Cir. 2003) ("If defendants are only using IPC's trademark in a "non-trademark" way-that is, in a way that does not identify the source of a product-then trademark infringement and false designation of origin laws do not apply.").

Like a telephone company, an ISP provides a content-neutral service to its customers; it does so to facilitate communications over the Internet – not to identify the source of goods or services. *1-800 Contacts, Inc. v. WhenU.Com, Inc*., 414 F.3d 400, 409 (2d Cir. 2005) ("[I]t is plain that WhenU is using 1-800's website address **precisely because it is a website address**, rather than because it bears any resemblance to 1-800's trademark, because the only place WhenU reproduces the address is in the SaveNow directory. . . . Thus, the appearance of 1-800's website address in the directory does not create a possibility of visual confusion with 1-800's mark.") (emphasis added); *Lucasfilm, Ltd. v. High Frontier,* 622 F. Supp. 931, 933 (D.D.C. 1985) (holding that property rights in a trademark do not extend to the use of the trademark to express ideas unconnected with the sale or offer for sale of goods or services): *DaimlerChrysler AG v. Bloom,* 315 F.3d 932, 938-39 (8th Cir. 2003) (holding that defendant's use and subsequent licensing of the toll-free number 1-800-MERCEDE(S) did not constitute trademark infringement because there was no evidence that the defendant advertised or promoted the telephone number).

1

### 2.    Internal Utilization of Mark Is Not a Trademark Use

2

The presence of a trademark within masses of data stored on Defendants' servers is also a

3

non-trademark use because it is an internal use that is not communicated to the public.  The public

4

cannot view the contents of Defendants' server.  But even if they could they would not see images of

5

trademarks affixed to goods – only computer code that is incomprehensible to humans.

6

In *1-800 Contacts*, 414 F.3d at 409 the Second Circuit held that Google's use of the

7

plaintiff's mark in its internal computer directory did not constitute an actionable trademark use.

8

The Court analogized Google's use with an individual's private thoughts.  Such a "use" cannot cause

9

consumer confusion as to the source of goods or services:

10

> A company's internal utilization of a trademark in a way that does not
> communicate it to the public is analogous to a individual's private thoughts about a

11

> trademark.   Such  conduct  simply  does  not  violate  the  Lanham  Act,  which  is
> concerned with the use of trademarks in connection with the sale of goods or services

12

> in a manner likely to lead to consumer confusion as to the source of such goods or
> services.

13

14

Other courts frame the issue in terms of whether the plaintiff's mark has been used *in public*.

15

In *Committee for Idaho's High Desert v. Yost*, 92 F.3d 814 (9th Cir. 1996) the Ninth Circuit found a

16

trademark use in part because the mark at issue was used by the defendant intending to confuse the

17

public.   The *Yost* defendants were individuals opposed to the listing of a particular snail on the

18

endangered species list.  When defendants learned that the plaintiff Committee had inadvertently

19

allowed its corporate charter to lapse, they promptly incorporated under the same name and then

20

testified at a public hearing in support of an Air Force training range, identifying themselves as

21

officers of the successor committee in the hopes of enhancing their environmentalist credentials

22

while advocating a position they knew the Committee denounced. The Court of Appeals reversed the

23

district court's dismissal of the individual defendants, finding that the act of forming the corporation

24

and publicly testifying in the corporation's name were sufficient to hold the individual officers liable

25

"for using in commerce, in connection with services, a name which is likely to confuse." *Id.* at 823.

26

In contrast, in *Saint Louis University v. Meyer,* 625 F. Supp. 2d 827, 830 (E.D. Mo. 2008) a

27

professor  formed  a  corporation  bearing  the  plaintiff  University's  registered  trademark  and

28

unregistered marks, used letterhead bearing the marks in communicating with the Secretary of

1   State's office, and a public record existed of the formation and dissolution of the corporation.  *Id.*  No

2   use in commerce was found because, in contrast to *Yost* (a case the court distinguished), no

3   trademarks were used in public:

> [Unlike *Yost*,] [i]n the instant case, there is **no evidence that defendant used the
> accused marks in public**.  Defendant told the newspaper's editor-in-chief Diana
> Benanti that he had "reserved the name" of the paper for the students' use, should
> they want it.  However, **a company's internal utilization of a trademark** in a way
> that does not communicate it to the public **is analogous to an individual's private
> thoughts** about a trademark.  **Such conduct simply does not violate the Lanham
> Act**, **which is concerned with the use of trademarks** in connection with the sale of
> goods or services **in a manner likely to lead to consumer confusion as to the
> source of such goods or services**.

9   *Id.* (emphasis added).

10      Vuitton presented no evidence that the U.S. public purchased any infringing products at any

11  accused website.  That there was *no* evidence that U.S. computer users had even visited the only

12  website "rebuilt" from data on the Defendants' hard drive (BigWorldShoes.com).  This does not

13  show a likelihood of confusion about the source of a mark at an accused website.[5]  The Lanham Act

14  is only concerned with the unauthorized use of marks in a manner **likely to lead to consumer**

15  **confusion as to the source of goods or services**.  There is no evidence of a likelihood of confusion

16  and the Lanham Act cannot apply here where there is no evidence the U.S. public ever viewed the

17  accused websites.  *See Philip Morris, Inc. v. Imperial Tobacco Co.*, 251 F. Supp. 362*, 380 (D. Va.

18  1965) (No likelihood of confusion because no evidence "**the United States public** believe[d] that

19  PLAYER'S cigarettes sold by Philip Morris in the United States are manufactured in England by

20  Imperial." (emphasis added)).[6]  Of course, since the Lanham Act does not apply to infringement

21  occurring outside of the United States, it is not relevant whether individuals located outside of the

---

[5]Uploading content to a website without more is equivalent to placing a business card under a tree in Montana – it is unlikely that the public is ever going to see it.  Even Robert Holmes, Vuitton's U.S. investigator did not testify that he found any accused website.  From its offices in Paris, Vuitton located the accused websites.  Vuitton then instructed Mr. Holmes to make purchases of specific products.

[6]*See also E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.,* 756 F.2d 1525, 1534 (11th Cir. 1985) ("Effect on public" analysis for purposes of whether to grant injunction in trademark infringement action looked at from perspective of "**the United States public.**"); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,* 955 F. Supp. 605, 613 n.4 (E.D. Va. 1997), *aff'd,* 170 F.3d 449 (4th Cir. 1999) (survey showing that over forty percent of **United States general public** recognized trademark supported conclusion that the mark was famous).

United States are confused.

**C.**  **A Trademark is Used in Commerce Only When It is Affixed to Goods Sold or Transported In Commerce In the United States**

**1.**  **Trademark Must be Affixed and Sold or Transported in the United States**

Vuitton proved no Lanham Act direct trademark infringement.  Vuitton presented no evidence that Vuitton's trademarks were affixed to goods and sold or distributed in commerce over the Internet in the United States.  No purchase was made over the Internet. Viewed in its most favorable light, Vuitton's evidence only shows that certain websites advertised goods bearing its trademarks.  But advertising is only relevant in determining if a *service mark* has been "used in commerce" under the Lanham Act.  It is not relevant to proving "use in commerce" of a trademark. *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103 (2d Cir. 1998) ("Santambrogio's mere advertising of the Fashion Cafe mark, standing alone, did not constitute 'use' of the mark within the meaning of the Lanham Act."); *Barefoot Architect, Inc. v. Bunge*, No. 2004-99, 2007 WL 4800213, at *2 (D. Virgin Islands 2007) ("[A]llegations that Barefoot used the mark for advertising and promotional purposes do not establish 'use in commerce' under the Lanham Act.")

Section 32(1) of the Lanham Act (15 U.S.C. § 1114) prohibits the "**use in commerce** [of] any reproduction, counterfeit copy of colorable imitation of a registered mark … [if] such use is likely to cause confusion … ." *Rescuecom Corp. v. Computer Troubleshooters USA, Inc.,* 464 F. Supp. 2d 1263, 1265 (N.D. Ga. 2005) ("[W]ithout 'use in commerce' there can be no violation of the Lanham Act.").

"Use in commerce" requires that the trademarks at issue be (1) affixed to goods *and* (2) the goods must be sold or transported in commerce in the United States.  The definition of "use in commerce" in 15 U.S.C. § 1127 applies in determining whether there has been a "use in commerce" for purposes of a trademark infringement action. *Felix Cat Productions, Inc. v. New Line Cinema,* No. CV 99-9339 FMC (RCx), 2000 WL 35729983, at *2 (C.D. Cal. July 31, 2000) ("The same definition of 'use in commerce' [in 15 U.S.C. § 1127 - that applies to using one's mark to identify goods in the marketplace] applies to plaintiff's . . . trademark infringement claims . . . .").  Section 45 of the Lanham Act (15 U.S.C. § 1127) provides:

**A mark shall be deemed to be in use in commerce:**
(1) **on goods when—**

(A) **it is placed** in any manner **on the goods** or their containers or the displays **associated therewith** or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale,
**and**

(B) **the goods are sold or transported in commerce** . . . .  [Emphasis added.]

*See Acme Valve & Fittings Co. v. Wayne,* 386 F. Supp. 1162, 1169 (S.D. Tex. 1974) ("A trademark on goods is considered to be used in commerce when it is placed on the goods or containers in any manner and the goods are then sold or transported in commerce . . . .").[7]

Of course the requirements of Section 1127 apply in the Internet context.  In *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.,* 425 F. Supp. 2d 402, 415 (S.D.N.Y. 2006), the trademark "ZOCOR" was purchased by defendant Canadian online pharmacies as a keyword for "Sponsored Links" from Internet search engines Google and Yahoo!.  Use of the ZOCOR trademark in this manner was not a use in commerce because "**defendants do not 'place' the ZOCOR marks on any goods or containers or displays or associated documents** . . . .  **This internal use** of the mark 'Zocor' as a key word to trigger the display of sponsored links **is not use of the mark in a trademark sense**."  *Id.* (emphasis added); *see also 1-800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 408 (2d Cir. 2005) (No use in commerce found where "WhenU does not 'use' 1-800's trademark in the manner ordinarily at issue in an infringement claim:  **it does not 'place' 1-800 trademarks on any goods or services** in order to pass them off as emanating from or authorized by 1-800.").

### 2.     "Use in Commerce" Different for Trademarks and Service Marks

Advertising is not relevant in determining use in commerce of a *trademark*, although it may

---

[7]Numerous other trademark infringement actions so hold.  *See, e.g.*, *Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.,* 496 F.3d 1231, 1242 (11th Cir. 2007) ("In order for a mark to be 'use[d] in commerce' the mark must be 'placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto.' "); *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595 (2d Cir. 1996) ("The Lanham Act . . . applies only to a mark 'use[d] in commerce', defined in 15 U.S.C. § 1127 as a mark '(1) on goods when (A) placed in any manner on the goods ... and (B) the goods are sold or transported in commerce....' "); *Emergency One, Inc. v. American FireEagle, Ltd.,* 228 F.3d 531, 536 (4th Cir. 2000) (same).

**SUPPLEMENTAL RULE 50(a) BRIEF ON EXTRA-TERRITORIAL TRADEMARK INFRINGEMENT – C 07-3952 JW**

1    be considered in determining whether a *service mark* is used in commerce.

2          Trademarks are not the same as service marks.  Trademarks concern the **sale of goods**, and

3    "include any … symbol … used by a person … to identify and distinguish his or her **goods** …"  15

4    U.S.C. § 1127 (emphasis added).  In contrast, service marks apply to the provision of *services*:  "The

5    term 'service mark' means any word, name, symbol, or device … used by a person … **to identify**

6    **and distinguish** the **services** of one person, including a unique service, from the services of others

7    and to indicate the source of the services."  15 U.S.C. § 1127 (emphasis added).  All of Vuitton's

8    marks are registered trademarks, not service marks.  Vuitton's trademarks are only applied to goods,

9    not services.  All of Vuitton's trademark registrations are for use on goods and not services.  Vuitton

10   has not made and cannot make any claim about service marks.

11         Because they serve different purposes, the two types of marks are used in commerce

12   differently.  Trademarks physically can and therefore must be affixed to goods and then transported

13   in commerce.  But a service mark cannot be affixed to goods so it can only be "used or displayed in

14   the sale or *advertising* of services and the services are rendered in commerce . . . ."  15 U.S.C.

15   § 1127; *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 n.5 (11th Cir. 2000) ("Whereas trademarks

16   identify the source of goods for sale, service marks identify the provider of services.").

### 3.    A Trademark Cannot Be "Used in Commerce" By Advertising

#### a.    Advertising Goods for Sale Bearing Trademarks Is Not Circumstantial Evidence of Use in Commerce

20         Vuitton's evidence at best only indicated that certain websites advertised goods bearing

21   Vuitton's trademarks. But advertising goods for sale, even on the Internet, does not establish use in

22   commerce of a trademark for purposes of Section 1127.  *Barefoot Architect, Inc.* 2007 WL 4800213

23   at *2 (D. Virgin Islands 2007) ("The **Defendants claim** that the 'use in commerce' element was

24   satisfied by allegations in the counterclaim that **Barefoot used the Defendants' marks in writing,**

25   **orally, and on the internet**, for advertising and promotional services. **However** . . . **allegations that**

26   **Barefoot used the mark for advertising and promotional purposes do not establish 'use in**

27   **commerce' under the Lanham Act**.") (emphasis added); *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103

28   (2d Cir. 1998) ("Santambrogio's mere advertising of the Fashion Cafe mark, standing alone, did not

1   constitute 'use' of the mark within the meaning of the Lanham Act.").

2       No use in commerce can be established even if the websites were *capable* of selling and

3   transporting goods in commerce (or even if it is assumed that they have done so).  But even that was

4   not shown by the evidence presented.  Vuitton's investigator testified that he was unable to make

5   sales through the accused websites.  Instead, he purchased products in China through an exchange of

6   emails using other commercial communications services (i.e., Yahoo.com or MSN.com) and through

7   Western Union money transfers from a 7-Eleven store in Dallas for delivery to China.

8       But even if an accused website *could have* sold and transported goods in commerce (there is

9   no evidence of this), that is *not* circumstantial evidence of use in commerce of anything appearing on

10  the website, or on a Defendant's server as stated in *Laurel Capital Group, Inc. v. BT Financial*

11  *Corp.,* 45 F. Supp. 2d 469, 478 (W.D. Pa. 1999) (italics in original; bold emphasis added):

12          When assessing the parties' activities, however, it is vital to understand the
           conceptual difficulty inherent in the wording of the Lanham Act.  For the Act to
13          apply, the *mark itself* must be used in interstate commerce; **it is insufficient that the
           parties'** *business* **is, by its nature, interstate or is one that effects interstate**
14          **commerce**.  Very few courts have taken notice of this distinction.

15  Use in commerce of a trademark cannot be presumed even if it is "obvious," from the general scope

16  of the alleged infringer's business, that goods had been sold in commerce.  *Blazon, Inc. v. DeLuxe*

17  *Game Corp.,* 268 F. Supp. 416, 429 (S.D.N.Y 1965) ("While, in the case at bar, **the defendant**

18  **company obviously deals in interstate commerce**, **it is the transportation of the item** with the

19  mark on it **rather than the general scope of the business which is determinative** under [Section

20  1127]." (emphasis added)); *see also Southern Grouts & Mortars, Inc. v. 3M Company*, 575 F.3d

21  1235, 1250 (11th Cir. 2009) (Plaintiff's speculation that 3M "could have" used plaintiff's mark as a

22  domain name to obtain strategic commercial information is insufficient to show a use in commerce

23  under § 43 of the Lanham Act).  So even if the websites at issue *could have* or even *obviously must*

24  *have* advertised and sold goods bearing Vuitton's marks in interstate commerce, that is not sufficient

25  to establish "use in commerce" under Section 1127 – for the Lanham Act to apply there must be

26  evidence of actual unauthorized sales of infringing goods in commerce (over the Internet).

27      Nor can use in commerce be established based on circumstantial evidence of a direct

28  infringer's *intent* to use a mark in commerce in the United States.  *Brookfield Communications, Inc.*

1  *v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999) ("[B]oth the express

2  statutory language [of Section 1127] and the case law which firmly establishes that **trademark**

3  **rights are not conveyed through mere intent to use a mark commercially**." (emphasis added)).

4  The use must create an association between the public and the direct infringer's use of the mark.  A

5  significant effect on the public is required:

6  > "[T]he talismanic test [in determining 'use in commerce' under the Lanham Act] is
7  > **whether or not the use was sufficiently public** to identify or distinguish the marked
   > goods in an appropriate segment of the public mind as those of the adopter of the
   > mark."

8  > . . . Although **widespread publicity of a company's mark** such as Marvel
9  > Comics's announcement to 13 million comic book readers . . . or the **mailing of**
   > **430,000 solicitation letters** with one's mark to potential subscribers of a magazine
10 > may be sufficient to **create an association among the public** between the mark and
   > [the infringer], **mere use in limited e-mail correspondence with lawyers and a few**
11 > **customers is not**.

12 *Brookfield*, 174 F.3d at 1052 (emphasis added; citation omitted).  Here there is no evidence that *any*

13 direct infringer sold any products to the public in the United States or otherwise engaged in conduct

14 necessary to create any sort of association between the direct infringer and Vuitton's marks with the

15 U.S. public. The only evidence is that Vuitton itself ordered goods in China, paid for those goods in

16 China and specifically requested shipment of goods from China to the U.S.  Vuitton only had them

17 shipped from China to the U.S. in an effort to create evidence of some U.S. connection to the

18 transaction.

19    **b.    Advertising Goods for Sale Bearing Trademarks Is Relevant Only**
          **to Issues Other Than "Use in Commerce"**
20

21    Advertisement of goods bearing trademarks can be relevant – but only to determining issues

22 other than "use in commerce" of a trademark under Section 1127.  For example, whether an

23 infringing product is advertised can help determine likelihood of confusion by showing the similarity

24 of marks.[8]  *See Sports Auth., Inc. v. Prime Hospitality Corp.,* 89 F.3d 955, 962 (2d Cir. 1996)

25 (considering the appearance of the mark in advertising in determining similarity of marks); *Sun*

26

---

27 [8]*Perfumebay.com Inc. v. EBAY, Inc.,* 506 F.3d 1165, 1173 (9th Cir. 2007) (" 'An eight-factor test –
   the so-called *Sleekcraft* factors – guides the assessment of whether a likelihood of confusion exists.'
28 *Id.* . . . The *Sleekcraft* factors are:  (1) . . .  (2) . . . (3) the similarity of the marks . . . .").

**SUPPLEMENTAL RULE 50(a) BRIEF ON EXTRA-**
                                                                 **TERRITORIAL TRADEMARK INFRINGEMENT**
                                                                 **– C 07-3952 JW**

1   *Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 318 (5th Cir. 1981) (considering

2   the presentation of trademarks in advertising in determining the similarity of the marks).

3       Courts also consider advertising in determining whether an unregistered trademark has

4   developed secondary meaning, entitling the mark to protection under the Lanham Act.  *G. Heileman*

5   *Brewing Co. v. Anheuser-Busch, Inc.,* 873 F.2d 985, 994-95 (7th Cir. 1989) (determining whether

6   "LA" in relation to low alcohol beer product was merely descriptive or had obtained secondary

7   meaning through massive advertising campaign); *see also Elvis Presley Enterprises, Inc. v. Capece,*

8   141 F.3d 188, 197 (5th Cir. 1998) ("[T]he context of the presentation of a mark, including

9   advertising, is relevant to the meaning that the mark conveys.").

10      But "use in commerce" is a separate element and involves a different inquiry than likelihood

11  of confusion or secondary meaning.  *See 1-800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400,

12  412 (2d Cir. 2005) ("Not only are 'use,' 'in commerce,' and 'likelihood of confusion' three distinct

13  elements of a trademark infringement claim . . . .").  In sharp contrast to the definition of "use in

14  commerce" for *service* marks,[9] nothing in Section 1127 provides that use in commerce of a

15  trademark can be established through advertising.  Given its explicit reference to "advertising" in

16  relation to use in commerce of a service mark, Congress' silence on this point is telling.  Had it so

17  intended, Congress obviously could have defined "use in commerce" of a trademark to include the

18  advertising of goods.  *See Knipe v. SmithKline Beecham*, 583 F. Supp. 2d 553, 575 (E.D. Pa. 2008)

19  (Congress' silence regarding preemption of state law tort claims involving prescription drugs was

20  "telling" where Congress had provided for preemption regarding such claims in similar contexts,

21  such as for medical devices.).  Congress' logic in making the distinction is sound.  Service marks can

22  only be used in advertising.  Trademarks are applied to physical goods that must be sold and

23  transported in commerce.

24

25

---

26  [9]Service marks are used in commerce through advertising. For service marks, the "use in commerce"
    requirement is met when (1) a mark is "used or displayed **in the sale or advertising of services**" and
27  (2) either (i) the services are "rendered in commerce" or (ii) the services are "rendered in more than
    one State or in the United States and a foreign country and the person rendering those services is
28  engaged in commerce in connection with the services."  15 U.S.C. § 1127.

**D.      No Evidence of Sale or Transportation of Goods in Commerce in the U.S.**

Vuitton did not satisfy the use in commerce requirement of Section 1127 for the further reason that it presented no evidence of sales of goods over the Internet. Vuitton's investigator testified that he corresponded with individuals in China via third-party e-mail services and made the purchases via Western Union money transfers to make the purchase in China. This did not take place on or through any website using Defendants' servers.  The order was placed and the transaction was completed entirely in China.

It is inappropriate for a French company complaining about Chinese counterfeiters to come to America to file a lawsuit with the declared intent to stop American ISPs from doing business with China – especially when the sales did not happen here. At most Defendants' ISP services allowed someone in China to solicit Vuitton's investigator to send an e-mail to China to purchase a product. This is insufficient to establish the sale or transportation of any infringing goods in the United States. It is no different than accessing Home Depot's website to locate a particular tool.  The fact that a tool is available can be determined online but no sale takes place there.  The actual good is sold through a separate transaction with a Home Depot employee at the store.  Even if the particular product on the website were infringing, Home Depot's webhost could not be held contributorily liable (under any recognized theory of liability) because *the sale of goods did not take place over its servers*. Similarly, here, no use in commerce occurred on Defendants' servers because the goods in this case were not sold or transported online but through e-mail/Western Union transactions with unknown persons located in China.

**E.      Without Proof of Direct Trademark Infringement in the U.S. There Cannot Be Contributory Infringement**

Use in commerce in the United States is a lynchpin in this case.  Without proof the marks were "used in commerce in the U.S.," Vuitton cannot prove direct infringement. *Marlyn Nutraceuticals, Inc.,* 571 F.3d at 877.  Without proof of direct infringement Vuitton's contributory trademark infringement claim fails.  *Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F. Supp. 1361, 1371 (N.D. Cal. 1995).

No evidence was presented of any direct infringement occurring on Defendants' servers and

no infringement to which Defendants contributed.  Any use in commerce (affixing marks to goods and then selling or transporting the goods in commerce) did not take place in the U.S. or on Defendants' servers.  The goods were made and sales took place entirely in China, apart from Defendants' servers, as a result of e-mail communications and Western Union money transfers between Vuitton's investigator and unidentified individuals in China.  No sales took place in commerce or in the U.S.  But even if they did Defendants cannot be held contributorily liable because they did not occur on Defendants' servers.  Any "use" on the servers is limited to an ISP's automatic and neutral function of storing and transmitting data regardless of its content – a non-trademark "use" that does not fall under the Lanham Act.  It is also an internal use that is not communicated to the public – the public cannot view the contents of any server.  If they could all they would see is unintelligible code.  For these reasons there is no proof of direct infringement occurring and therefore no contributory liability possible under the Lanham Act.

## IV.    NO DIRECT TRADEMARK INFRINGEMENT PROVEN BECAUSE NO EVIDENCE OF "LIKELIHOOD OF CONFUSION" BY U.S. PUBLIC

### A.    No Likelihood of Confusion Because Data on Server Not Directly Viewable

The Lanham Act prohibits copying trademarks only if doing so is likely to cause confusion.  Copying a mark for its own sake is not prohibited.  *Karl Storz Endoscopy-America, Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 853-54 (9th Cir. 2002) ("In order to prevail on its Lanham Act claims … Storz must show that Surgi-Tech 'used' Storz's trademark 'in commerce' and that the use was likely to confuse customers as to the source of the product.").

Any "use" of Vuitton's marks on the servers did not occur in a way that was likely to confuse or deceive consumers.  Even if consumers were able to observe the contents of a server (there was no evidence presented that consumers in the U.S. did) consumers would not have perceived any trademarks (or been confused) because servers do not store images - only computer code unintelligible to humans (e.g. 1000110011101).  *Pet Stop Professional Pet Sitting Service, LLC v. Professional Pet-Sitting Service, Inc.*, No. 07-90-ST, 2007 WL 1876517, at *2 (D. Or. June 26, 2007) ("The Lanham Act . . . only provides remedies for the owners of rights in trademarks and trade dress against those who infringe upon the rights by 'use in commerce' in a way that is likely to

1    confuse or deceive consumers.").

2           Text and images can be observed only after data is downloaded by a computer to his or her

3    machine and converted using his or her software.  MSG and Akanoc do not store photographic

4    images on their servers; just computer code (e.g. 101100011001).  A web browser located on a

5    *computer user's computer* – not the ISP's server, creates an image by using a program on the user's

6    machine to translate the computer code into something that can be perceived.  This process occurs

7    entirely outside of the servers, when the user utilizes web browser software on his or her own

8    computer that retrieves and translates the data.  Until that happens, a consumer cannot perceive even

9    images of infringing goods, much less be confused about their source.  *See Custom Mfg. and*

10   *Engineering, Inc. v. Midway Services*, 508 F.3d 641, 652 (11th Cir. 2007) ("Like the proverbial tree

11   falling in a forest, the unauthorized use of a trademark that is never perceived by anyone cannot be

12   said to create a likelihood of consumer confusion.").  Vuitton produced no evidence that anyone ever

13   perceived any websites or images from websites, or any goods bearing any trademarks, except its

14   own personnel.  There was certainly no evidence (other than speculation) of any likelihood of

15   consumer confusion related to anything accused in this case.

16          **B.      Any Use of Vuitton's Trademarks Was Authorized**

17          The Lanham Act prohibits only the *unauthorized* use of trademarks. *Bosley Medical Institute,*

18   *Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ("The [U.S.] Supreme Court has made it clear that

19   trademark infringement law prevents only **unauthorized uses** of a trademark in connection with a

20   commercial transaction in which the trademark is being used to confuse potential consumers."

21   [citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924)]).  The goods

22   involved in this case were shipped to the United States with Vuitton's express authorization. *None* of

23   the purchases were made by the public. Vuitton's investigator testified that he was instructed by

24   Vuitton in Paris, France to visit particular websites and thereafter to purchase products. Because the

25   accused websites were not interactive or e-commerce sites, he could not purchase products through

26   any of them.  So he negotiated purchases directly with persons in China using commercial email and

27   Western Union money transfers.

28          Vuitton's "purchases" were only sham transactions authorized by Vuitton, designed solely to

1   show a purchase in the hope of creating litigation evidence.  But these authorized purchases do not

2   satisfy use in commerce as a matter of law. *I.H.T. Corp. v. News World Communications, Inc.*, No.

3   83 Civ. 3862-CSH, 1984 WL 604, at *6 (S.D.N.Y. July 3, 1984), citing *Blue Bell, Inc. v. Jaymar-*

4   *Ruby, Inc.*, 497 F.2d 433, 437 (2d Cir. 1974) ("A trademark on goods is 'used in commerce' when it

5   is placed on the goods in any manner and the goods are then sold or transported in commerce. [citing

6   15 U.S.C. § 1127] Courts have interpreted this to mean that **the use, even if minimal, must**

7   **constitute more than 'sham transactions' designed exclusively to satisfy the trademark laws**.")

8   (emphasis added).

9        **C.    Vuitton Presented No Evidence to Support Finding Likelihood of Confusion**

10       Vuitton failed to present evidence sufficient to support a jury finding of likelihood of

11  confusion.  *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 n.3 (9th Cir. 2002) ("Trek must

12  prove a likelihood of confusion to succeed in its infringement claim . . . ."). Without proof of this

13  element of trademark infringement, no reasonable jury can find in Vuitton's favor on its claim.

14       **First**, a jury is required in trademark cases to consider all applicable *Sleekcraft* factors in

15  determining likelihood of confusion.  *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109

16  F.3d 1394, 1404 (9th Cir. 1997) ("The eight-factor *Sleekcraft* test is used in the Ninth Circuit to

17  analyze the likelihood of confusion question *in all trademark infringement cases*." (emphasis

18  added)).  In weighing the applicable *Sleekcraft* factors, a jury is entitled to consider survey evidence

19  and/or evidence of actual confusion.  4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION

20  § 23:63 (4th ed. 2009).  But Vuitton presented no survey or other non-speculative evidence at trial to

21  show the United States public was likely to be confused.  Vuitton presented no evidence relevant to

22  the *Sleekcraft* factors.

23       **Second**, the Lanham Act only protects the *U.S. public*: "The Lanham Act seeks both to

24  protect *American customers* from confusion and to protect holders of American trademarks against

25  misappropriation of their marks." *A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 126 F. Supp. 2d

26  328, 339 (S.D.N.Y. 2001) (italics added)  It is of no moment that Vuitton's forensic examination of

27  Defendants' servers uncovered evidence that persons in foreign countries may have accessed the

28  accused websites, even if they viewed images of Vuitton's trademarks or advertised products.

1  Lanham Act infringing conduct must "create confusion among **United States customers** as to the

2  source of products sold in the United States." *Aerogroup Intern., Inc. v. Marlboro Footworks,* Ltd.,

3  955 F. Supp. 220, 229 (S.D.N.Y. 1997) (emphasis added). No evidence of this was shown.

4      **Third**, as a matter of law the purchases made by Vuitton's investigator cannot evidence

5  likelihood of confusion. Robert Holmes was hired by Vuitton to purchase what he was told was

6  replica or "counterfeit" merchandise, so there was no possibility of his confusion about its source or

7  origin.  *See McBee v. Delica*, 417 F.3d 107, 128 (1st Cir. 2005) (**"[T]here is no evidence of** existing

8  **confusion** or dilution due to Delica's past sales, **since these few sales were all made to McBee's**

9  **own investigators**, **who** were brought in to assist in this litigation and therefore fully **understood**

10  **McBee's lack of any relationship with Delica**." (emphasis added)); *see also Millennium Enters.,*

11  *Inc. v. Millennium Music, Inc.,* 33 F. Supp. 2d 907, 911 (D. Or. 1999) (" 'The gravamen of … an

12  infringement … claim[] is whether the defendant has created a likelihood of confusion.'  [Citation]

13  Plaintiff can hardly argue that [the sale of a compact disc to plaintiff's agent Lufkin] 'caused a

14  likelihood of confusion' regarding plaintiff's and defendants' trade names.  Ms. Lufkin knew exactly

15  with whom she was dealing and knew that defendants were not associated in any way with

16  plaintiff.").

17      **Fourth**, there could not have been post-sale or "non-purchaser" confusion either.  Although a

18  trademark infringement action might be based on the confusion of non-purchasers, such as those

19  who observe the purchaser wearing the accused article of clothing (*see Karl Storz Endoscopy*

20  *America, Inc. v. Surgical Technologies, Inc.,* 285 F.3d 848, 854 (9th Cir. 2002)), there was no

21  suggestion or opportunity for post-sale confusion in this case.  Vuitton's investigator purchased

22  products to be evidence in this lawsuit. He did not wear or show any of the items in public.  He sent

23  all purchases to Vuitton.  Post-sale confusion was not possible in this case because no products at

24  issue were ever used or displayed in an environment where the U.S. consumers could have been

25  confused.  *See Academy of Motion Picture Arts and Sciences v. Creative House,* 944 F.2d 1446,

26  1455 (9th Cir. 1991) ("Post-sale confusion occurs when **consumers view a product** outside the

27  context in which it is originally distributed and **confuse it** with another, similar product.") (emphasis

28  added). Confusion was not possible because no consumer ever viewed any infringing products.

**Fifth**, because there was no possibility the U.S. public could have been confused, whether the alleged direct infringers intended to confuse the public is irrelevant. *See Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*, 221 F.2d 464, 466-467 (2d Cir. 1955) ("[W]here there is no likelihood of confusion … then an alleged infringer's intent becomes irrelevant, since an intent to do a wrong cannot transmute a lawful into an unlawful act.").

## V.   CONCLUSION

As set forth in this supplemental brief and in Defendants' initial Rule 50(a) brief [Docket No. 210], Vuitton failed to present evidence sufficient to permit a reasonable jury to find in its favor on its contributory trademark infringement claim.  Defendants respectfully request judgment be entered in their favor as a matter of law on that claim pursuant to Fed. R. Civ. P. 50(a).

Dated:  October 27, 2009.

**GAUNTLETT & ASSOCIATES**

By:     /s/ James A. Lowe
        David A. Gauntlett
        James A. Lowe
        Brian S. Edwards
        Christopher G. Lai

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.,
and Steve Chen