**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
Christopher Lai (SBN 249425)
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone: (949) 553-1010
Facsimile: (949) 553-2050
jal@gauntlettlaw.com
cl@gauntlettlaw.com

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.
and Steve Chen

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., | Case No.: C 07-3952 JW (HRL) |
| Plaintiff, | |
| vs. | **DECLARATION OF STEVE CHEN RE: POST-TRIAL RESPONSES TO VUITTON'S INFRINGEMENT NOTICES** |
| AKANOC SOLUTIONS, INC., et al., | |
| Defendants. | |

I, STEVE CHEN, declare:

I am the President and manager of Managed Solutions Group, Inc. ("MSG") and Akanoc Solutions, Inc. ("Akanoc"). I am also a named Defendant in this action. The facts set forth in this declaration are of my own personal knowledge and I could competently testify to them if called as a witness.

1. Since the completion of the trial, I have reviewed six notices sent by J. Andrew Coombs or Nikolay Livadkin on behalf of Louis Vuitton Malletier, S.A. listing a total of 55 websites allegedly infringing Vuitton's trademarks or copyrights. Immediately upon receiving each of these notices, I first "pinged" the domain names used by the websites and then, if the "pinging" indicated that the website was hosted on an IP address within the range assigned by ARIN to Defendants, I would promptly disable the IP addresses, making it impossible for the websites to be accessed by anyone on the Internet. I then sent emails to the Internet reseller customers notifying them that the IP addresses had been disabled. Three days later, I "pinged" the domain name again to confirm that it was either not accessible on the Internet at all or was no longer hosted on IP addresses within the range assigned to Akanoc or MSG. I reported my findings on charts that were then promptly sent to Vuitton or its counsel.

2. Since the completion of the trial, *every* website that Vuitton has complained about has been dealt with in this manner, and *every* website has been confirmed to either be completely inaccessible or hosted on an IP address not within the range of IP addresses assigned to Akanoc Solutions, Inc. or Managed Solutions Group, Inc.

3. Defendants' protocol in responding to infringement notices is to immediately disable IP addresses or to unplug Internet servers associated with allegedly infringing websites. Disabling IP addresses or Internet servers is the most severe type of response that the Defendants can take in response to notices of alleged infringement. The severity of these responses is underlined by the fact that these responses not only make all accused websites immediately inaccessible, they also make many other presumably legitimate websites and Internet services using those IP addresses and Internet servers inaccessible as well. In fact, Defendants' response protocol substantially exceeds the standard practice of other Internet service providers in the industry. I am not aware of any

1   American ISP that takes such severe steps.

2   4.   Unmanaged Internet hosting companies such as Akanoc and MSG are only able to
3   take actions *in response* to notices of alleged infringement.  They cannot prevent the use of
4   particular IP addresses or Internet servers prior to the receipt of an infringement notice because there
5   is no practical way to filter content or images and it is unlawful and a federal criminal offense to
6   monitor Internet communications or to access customers' stored content on our server.

7   5.   Akanoc and MSG are contractually and technologically precluded from filtering,
8   monitoring or limiting Internet traffic for keywords, terms or website names.  Such filtering and
9   monitoring is not practical or feasible and, to my knowledge, no other unmanaged Internet hosting
10  company filters or monitors Internet traffic.  The most drastic and practical measures that can be
11  taken in response to infringement notices are the disabling of an IP address or the unplugging of an
12  Internet server.

13  6.   Defendants have no means of verifying the accuracy of any infringement notice from
14  Vuitton.  All of the severe measures taken in response to Vuitton's infringement notices have been
15  taken without verifying the accuracy of these notices based simply on the representations of Vuitton
16  or its lawyers.

17  7.   Defendants had no prior knowledge of any alleged infringement on any of the
18  websites listed in Mr. Coombs's or Mr. Livadkin's post-trial notices.  While some of the websites
19  named in these post-trial notices may have been listed in prior notices, those websites were hosted
20  on different IP addresses at the time those prior notices were sent.

21  8.   Defendants' direct customers are Internet resellers who pay Defendants for packages
22  of Internet bandwidth and the use of an Internet server and IP addresses.  These resellers then lease
23  the use of the bandwidth, servers and IP addresses to numerous third-parties whose identities are
24  unknown to Defendants.

25  9.   To the best of my knowledge no customers of Akanoc or MSG operate websites
26  selling any merchandise. Instead they either use packages of services rented from MSG or Akanoc
27  ro operate non-website business (such as Internet data storage, telephone services or interactive
28  computer games) or they resell the Internet services obtained to other companies who then host

websites. The Defendants never know who the parties are who purchase services from the Defendants' customers. All of Vuitton's infringement complaints have been about activities of some small number of these unknown customers of Defendants' customers.

10. It is a very small portion of these unidentified third-parties, not the Internet resellers with whom the Defendants deal, who are accused of direct infringement. Because Defendants have no means of contacting these third-parties, Defendants send notices of IP disabling to their reseller customers even though those reseller customers are not accused of any direct infringement.

11. Due to the competitiveness of the Internet reselling business, Internet resellers are highly protective of their customer lists for fear that releasing such information may cause them to lose their customers to other competitors in the marketplace. As a result, Defendants are unable to obtain any information about the identities of their Internet resellers' customers.

12. Even if Defendants were able to obtain customer lists from their reseller customers, there would be no way to verify the accuracy of the customer information. The identification information of third-parties purchasing Internet hosting cannot and is not verified for accuracy.

13. Even if Defendants obtained customer lists from resellers, the list would provide very little value in deterring future infringement. In addition to the possible inaccuracy of the list itself, such a customer list would only contain information about customers whose infringement is merely alleged because Internet Service Providers do not have the ability to confirm the validity of infringement notices. Furthermore, it is impossible to create any form of "blacklist" that would prevent all Internet resellers from dealing with every alleged infringer.

14. The most effective anti-infringement method that an ISP can implement is to disable IP addresses or unplug servers upon receipt of infringement notices. Defendants have implemented

//
//
//
//
//
//

this method in responding to all of Vuitton's post-trial infringement notices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Fremont, California on November 20, 2009.

_____
STEVE CHEN