1                    UNITED STATES DISTRICT COURT          ORIGINAL

2                   NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION          FILED

4                                                  DEC - 7 2009

5   LOUIS VUITTON MALLETIER, S.A.,  )        RICHARD W. WIEKING
                                    )      CLERK, U.S. DISTRICT COURT
6                 PLAINTIFF,        )  C-07-03952-JW (HRL) CALIFORNIA

7          V.                       )     AUGUST 25, 2009

8   AKANOC SOLUTIONS, INC.,         )     VOLUMES 8 AND 9
                                    )
9   MANAGED SOLUTIONS GROUP, INC.,  )     PAGES 1 - 231
    STEVEN CHEN AND DOES 1 THROUGH  )
10  10, INCLUSIVE,                  )
                                    )
11                DEFENDANTS.       )
    _____ )

12

13              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES WARE
14          UNITED STATES DISTRICT JUDGE

15  A P P E A R A N C E S:

16

    OR THE PLAINTIFFS:   J. ANDREW COOMBS, A PROF. CORP.
17                       BY:  J. ANDREW COOMBS, ESQ.
                              ANNIE S. WANG, ESQ.
18                       517 E. WILSON AVE., SUITE 202
                         GLENDALE, CA  91206
19                       TEL:  (818) 500-3200

20  ALSO APPEARING:      RUTH ADLER
                         NIKOLAY LIVADKIN
21

    FOR THE DEFENDANTS:  GAUNTLETT & ASSOCIATES
22                       BY:  JAMES A. LOWE, ESQ.
                         18400 VON KARMAN, SUITE 300
23                       IRVINE, CA  92612
                         TEL:  (949) 553-1010

24

    OFFICIAL REPORTER PRO TEM:    JANA L. RIDENOUR, CSR
25                                LICENSE NUMBER 9302

1

2                    <u>EXAMINATION INDEX</u>

3     STEVEN CHEN
            CROSS BY MR. COOMBS (CONTINUED) . . . . .     4
4           REDIRECT BY MR. LOWE  . . . . . . . . . .    47
            FURTHER REDIRECT BY MR. LOWE  . . . . . .    62
5
      ANDREW CHENG
6           DIRECT BY MR. LOWE  . . . . . . . . . . .    65
            CROSS BY MS. WANG . . . . . . . . . . . .    87
7
      RICHARD GRALNIK
8           DIRECT BY MR. LOWE  . . . . . . . . . . .    90
            CROSS BY MR. COOMBS . . . . . . . . . . .   155
9           REDIRECT BY MR. LOWE  . . . . . . . . . .   177
            RECROSS BY MR. COOMBS . . . . . . . . . .   200
10          FURTHER REDIRECT BY MR. LOWE  . . . . . .   210
            FURTHER RECROSS BY MR. COOMBS . . . . . .   215

11

12

13

14

15                    <u>EXHIBIT INDEX</u>

16                               IDENT.        EVIDENCE

17    PAGE 4                      625
      PAGE 8                      626
18    PAGE 14                     627
      PAGE 230     (ALL DOMAIN TOOLS REPORTS ARE ADMITTED)

19

20

21

22

23    REPORTER NOTE:  ALL QUOTED EXCERPTS IN THIS TRANSCRIPT
      WERE REPORTED AND TYPED "AS READ."

24

25

1   SAN JOSE, CALIFORNIA                    AUGUST 25, 2009

2                    P R O C E E D I N G S

3               (WHEREUPON, AT 9:05 A.M., THE FOLLOWING

4   PROCEEDINGS WERE HELD IN OPEN COURT, OUT OF THE PRESENCE

5   OF THE JURY:)

6               THE COURT:  GOOD MORNING, ALL.

7               I HAVE TWO STUDENTS IN THE BACK.  YOU WERE

8   SUPPOSED TO GET INTO CHAMBERS AND LET US KNOW WHEN YOU

9   WERE HERE.  COME FORWARD.  COME TO THE SIDEBAR.

10              (WHEREUPON, A DISCUSSION WAS HELD AT THE

11  SIDEBAR, NOT HEREIN REPORTED.)

12              THE COURT:  READY TO RESUME?

13              MR. COOMBS:  YES, YOUR HONOR.

14              THE COURT:  SUMMON THE JURY.

15              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

16  HELD IN OPEN COURT, IN THE PRESENCE OF THE JURY:)

17              THE COURT:  GOOD MORNING, MEMBERS.  I HOPE YOU

18  HAD A PLEASANT TIME OFF.  NO?

19              WELL, YOU MAY RESUME YOUR EXAMINATION.

20              MR. COOMBS:  THANK YOU, YOUR HONOR.

21                      **STEVEN CHEN,**

22  BEING CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS,

23  HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND

24  TESTIFIED FURTHER AS FOLLOWS:

25  ///

1              CROSS-EXAMINATION (CONTINUED)

2   BY MR. COOMBS:

3   Q.    GOOD MORNING, MR. CHEN.

4   A.    GOOD MORNING.

5   Q.    WHEN WE BROKE FRIDAY AFTERNOON, I THINK WE WERE

6   SPEAKING ABOUT THAT 8168.COM.  I THINK YOU SEE ANOTHER

7   IP DOMAIN NAME BAG925.COM.

8              YOU SEE THAT, MR. CHEN?

9   A.    YES.

10  Q.    AND DOES THAT -- IS IT CORRECT THAT WAS ONE OF THE

11  DOMAIN NAMES THAT WAS ALLEGED IN THE COMPLAINT THAT YOU

12  HAD SAID WAS SERVED ON YOU ON THE 20TH, BUT IN FACT ON

13  THE 15TH?

14  A.    YES.

15  Q.    NOW, SEE IF THAT WORKS.  ALL RIGHT.

16             (WHEREUPON, EXHIBIT 625 WAS MARKED FOR

17             IDENTIFICATION.)

18             NOW, I'M PUTTING UP ON THE SCREEN A DOCUMENT

19  THAT WE WILL MARK AS EXHIBIT 626 -- I'M SORRY, 625 --

20  AND ASK YOU, MR. CHEN:  DOES THAT APPEAR TO BE A PING

21  RESPONSE REGARDING THE DOMAIN NAME WWW.BAG925.COM?

22  A.    YES.

23  Q.    AND IT APPEARS IT WAS DONE YESTERDAY; CORRECT?

24  A.    IT WAS DONE YESTERDAY?

25  Q.    YES.

1    A.    I DON'T KNOW.

2    Q.    OKAY.  WELL, I'LL ASK YOU:  THE IP ADDRESS

3    THAT'S IDENTIFIED THERE, IT'S A LITTLE HAZY, BUT

4    205.209.137.172, THAT'S AN IP ADDRESS ASSIGNED TO

5    MANAGED SOLUTIONS GROUP?

6    A.    THAT IS CORRECT.

7    Q.    THAT WOULD CREATE THAT DOMAIN NAME, AND THAT

8    WEBSITE AT THAT DOMAIN NAME IS CURRENTLY HOSTED ON A

9    SERVER OWNED BY MANAGED SOLUTIONS GROUP?

10   A.    YES.

11   Q.    AND THAT IS PART OF THE AKANOC SOLUTIONS SERVICES

12   PROVIDED TO ITS CUSTOMERS?

13   A.    YES.

14             MR. LOWE:  OBJECTION, YOUR HONOR.  IT LACKS

15   FOUNDATION AS TO DATE.  I DON'T BELIEVE THERE'S A DATE

16   YOU CAN SEE.

17             THE COURT:  I PRESUME COUNSEL WAS REFERRING TO

18   SOMETHING ON THE DOCUMENT FOR THE DATE, BUT I'LL SUSTAIN

19   THE OBJECTION.

20             IT DOES APPEAR TO ME, HOWEVER, THAT THE

21   QUESTION ASKS WHETHER OR NOT THAT DOMAIN NAME IS WITHIN

22   THE GROUP ASSIGNED TO THAT COMPANY, AS I UNDERSTAND IT,

23   AND THAT CAN BE ANSWERED "YES" OR "NO," IRRESPECTIVE OF

24   THE DATE OF THIS DOCUMENT.  BUT IT IS FAIR, SINCE YOU

25   REFERRED TO IT AS HAVING BEEN DONE YESTERDAY, TO CLARIFY

1    WHERE THAT DATE CAN BE DISCERNED FROM THE DOCUMENT.

2              MR. COOMBS:   THANK YOU, YOUR HONOR.

3              I'M SORRY, YOUR HONOR, IT APPEARS THAT I HAD

4    THE FIRST PAGE AS THE SECOND PAGE, SO I WILL PULL THE UP

5    THE SECOND PAGE AND PUT IT UP ON THE MONITOR.

6    BY MR. COOMBS:

7    Q.    THIS IS A PING FOR BAG925.COM, AND I BELIEVE YOU

8    SAID FROM YOUR DIRECT TESTIMONY YOU PING WITH THE

9    WWW DOT-DOMAIN NAME, AND WITHOUT IT YOU COULD GET

10   DIFFERENT RESULTS; CORRECT?

11   A.    THAT IS CORRECT.

12   Q.    AND, IN FACT, AS AN EXCESSIVE CAUTION ON YOUR

13   PART, YOU DO BOTH WHEN YOU ARE CHECKING WHETHER A DOMAIN

14   IS HOSTED ON ONE OF THE SERVERS OWNED BY THE DEFENDANTS?

15   A.    THAT'S CORRECT.

16   Q.    AND A SECOND PAGE HERE REFLECTS A DIFFERENT PING

17   FOR THAT 925.COM; CORRECT?

18   A.    YES, THAT'S CORRECT.

19   Q.    AND IT INDICATES THE SAME IP ADDRESS AS FOR

20   WWW.BAG925.COM; CORRECT?

21   A.    THAT'S RIGHT.

22   Q.    AND THAT PING REPORT TOWARD THE TOP -- AND I HOPE

23   I DON'T MOVE THIS AROUND TOO MUCH.  CAN YOU TELL ME WHAT

24   DATE IS INDICATED WHERE MY PEN IS POINTED?

25   A.    IT'S BLURRY, BUT IT LOOKS LIKE IT'S AUGUST 25,

1    2009.

2    Q.    ALL RIGHT.  THANK YOU.

3         SO BOTH BAG925.COM AND WWW.BAG925.COM APPEAR TO BE

4    HOSTED ON DEFENDANT'S SERVERS AS ESSENTIALLY TODAY; IS

5    THAT CORRECT?

6    A.    YES, THAT'S CORRECT.

7    Q.    AND THAT'S BORNE OUT BY THE OTHER PORTION OF THE

8    EXHIBIT I HAVE MARKED, WHICH IS NOW IN FRONT OF YOU, AND

9    WHICH HAS THE WHOIS ARIN RESULT FOR THAT IP ADDRESS;

10   CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    NOW, ON THAT PORTION OF THE REPORT YOU WILL SEE

13   RA ABUSE HANDLE -- I'M SORRY, R ABUSE HANDLE, R TECH

14   HANDLE OR ABUSE HANDLE OR TECH HANDLE.  CAN YOU TELL US

15   WHAT THOSE REFER TO?

16   A.    "ABUSE" IS FOR ABUSE ISSUE TECH; "TECH HANDLE" IS

17   FOR TECH -- TECH ISSUES.

18   Q.    SO, AS I UNDERSTOOD YOUR TESTIMONY, THE

19   INFORMATION PERTAINING TO THOSE HANDLES SHOULD BE

20   CONTACT -- CURRENT CONTACT INFORMATION FOR MANAGED

21   SOLUTIONS GROUP; IS THAT CORRECT?

22   A.    THAT IS CORRECT.

23   Q.    SO IT SHOULD BE -- I THINK YOU SAID ABUSE.MANAGER

24   SG-INC.COM FOR THE E-MAIL ADDRESS?

25   A.    YES.

1  Q.    AND THAT WOULD BE THE NORTHPOINT LOOP ADDRESS IN

2  FREMONT FOR THE MAILING ADDRESS; IS THAT CORRECT?

3  A.    THAT'S CORRECT.

4  Q.    OKAY.  NOW, LET'S MARK AS 626 A ONE-PAGE ARIN

5  WHOIS DATABASE SEARCH FOR THE HANDLE ABUSE 429-ARIN.

6          MR. LOWE:  EXCUSE ME, YOUR HONOR.  I OBJECT TO

7  THIS.  WE HAVE NOT SEEN THESE EXHIBITS BEFORE.  THEY

8  WERE NOT PROVIDED IN DISCOVERY.  APPARENTLY, THEY HAVE

9  BEEN CREATED IN THE LAST DAY OR TWO.

10         THE COURT:  EVEN IF YOU ARE USING IT FOR

11 IMPEACHMENT, PROVIDE COUNSEL WITH THE DOCUMENTS YOU ARE

12 USING IN THIS EXAMINATION.

13         MR. COOMBS:  MY APOLOGY.

14         MR. LOWE:  I WOULD ASK HE HAND US ALL THE

15 DOCUMENTS HE INTENDS TO USE TODAY SO WE DON'T SEE THEM

16 ON THE SCREEN FOR THE FIRST TIME TODAY.

17         THE COURT:  OF COURSE.  THAT IS A COURTESY TO

18 DO THAT, COUNSEL.

19         MR. COOMBS:  YES, YOUR HONOR.  I APOLOGIZE.

20         (WHEREUPON, EXHIBIT 626 WAS MARKED FOR

21         IDENTIFICATION.)

22 BY MR. COOMBS:

23 Q.    NOW, CAN YOU TELL ME WHAT MAILING ADDRESS IS

24 INDICATED ON THAT WHO -- I'M SORRY, ARIN SEARCH RESULT?

25         THE COURT:  MAILING ADDRESS OR E-MAIL?

1    BY MR. COOMBS:

2    Q.    I'M SORRY.  THAT'S NOT THE ONE I WAS PUTTING UP.

3    THIS IS 626.  LET ME ZOOM IT OUT A BIT.

4          CAN YOU TELL ME WHAT THAT IS, MR. CHEN?

5    A.    IT LOOKS LIKE IT IS THE OLD ADDRESS WHEN WE FIRST

6    SET UP THE COMPANY, THE 46750 FREMONT BOULEVARD.

7    Q.    NOW, AS I UNDERSTOOD YOUR TESTIMONY, MANAGED

8    SOLUTIONS GROUP AKANOC, THEY HAVEN'T BEEN AT THAT

9    ADDRESS FOR MANY YEARS NOW?

10   A.    MANY YEARS.

11   Q.    AND I'LL JUST SCROLL UP, IF I CAN, AND CAN YOU

12   READ THE DATE THAT APPEARS AT THE BOTTOM RIGHT-HAND

13   CORNER OF THAT PAGE?

14   A.    AUGUST 24, 2009.

15   Q.    THANK YOU.

16         BAG925.COM, THAT WAS IN THE ORIGINAL COMPLAINT

17   SERVED IN AUGUST OF 2007; CORRECT?

18   A.    EXCUSE ME?

19   Q.    THAT WAS ONE OF THE --

20         THE COURT:  "THAT" BEING -- SAY THE NAME

21   AGAIN.

22   BY MR. COOMBS:

23   Q.    BAG925.COM WAS ONE OF THE WEBSITES THAT WAS

24   ALLEGED IN THE ORIGINAL COMPLAINT SERVED ON YOU IN

25   AUGUST OF 2007?

1    A.    I BELIEVE SO.

2    Q.    NOW, IN YOUR DIRECT TESTIMONY, I BELIEVE YOU SAID

3    THAT YOU PROVIDE PACKAGES TO YOUR CUSTOMERS, BUT YOU

4    REALLY DON'T KNOW WHAT YOUR CUSTOMERS DO WITH THOSE

5    PACKAGES; IS THAT CORRECT?

6    A.    NO, WE DON'T.

7    Q.    AND I THINK YOU HAVE HEARD TESTIMONY TO THE EFFECT

8    THAT THE DOMAIN NAME REGISTRATION WHOIS INFORMATION

9    ABOUT DOMAIN NAME OPERATORS IS OFTEN INCORRECT OR

10   MISLEADING.  DO YOU RECALL THAT TESTIMONY?

11   A.    DOMAIN NAME REGISTRAR CUSTOMER INFORMATION?

12   Q.    THAT'S CORRECT.

13   A.    I HAVE NO IDEA.  I PERSONALLY PUT IN MY

14   INFORMATION CORRECTLY.

15   Q.    I'M NOT SPEAKING OF YOUR INFORMATION, BUT WHEN ONE

16   OF YOUR CUSTOMERS HAS A WEBSITE HOSTED ON ITS SERVERS --

17   I THINK YOU SAID YOU HAD STUDIED DOMAIN TOOLS FOR ABOUT

18   A MONTH OR SO EARLIER ON IN THIS LITIGATION; DIDN'T YOU

19   SAY SOMETHING TO THAT EFFECT?

20   A.    ONLY THE IP INFORMATION SECTION.

21   Q.    BUT YOU DIDN'T REALLY LOOK AT THE WHOIS

22   INFORMATION AS IT RELATED TO THE DOMAIN NAME OPERATORS?

23   A.    (NO AUDIBLE RESPONSE.)

24   Q.    OKAY.  WELL, IF YOU DON'T KNOW WHAT YOUR CUSTOMERS

25   DO WITH THE CAPACITY YOU PROVIDE, HOW IS IT THAT YOU CAN

1    SAY THEY THEMSELVES AREN'T THE ONES OPERATING THE

2    WEBSITES HOSTED ON YOUR SERVERS?

3    A.    WHAT'S THAT GOT TO DO WITH -- I LOST THE QUESTION

4    BECAUSE THE WEBSITE HAS NOTHING TO DO WITH MY CUSTOMER.

5    Q.    HOW DO YOU KNOW THAT, IF YOU DON'T KNOW WHAT YOUR

6    CUSTOMERS DO WITH IT?

7    A.    MOST OF THE CUSTOMERS THAT I DEAL WITH, WE -- I

8    DEAL WITH THEM AT MORE LIKE TECHNICAL LEVEL, AND THEY

9    ARE JUST HOSTING RESELLERS.

10   Q.    BUT YOU SAID YOU DON'T EVEN KNOW WHETHER THEY ARE

11   DOING WEBSITES AS OPPOSED TO OTHER INTERNET

12   APPLICATIONS.  HOW CAN YOU SAY THEY THEMSELVES ARE NOT

13   OPERATING THE WEBSITES OR SOMEBODY WORKING FOR THEM

14   OPERATING THE WEBSITES THAT ARE ON THEIR SERVERS?

15   A.    I DIDN'T SAY THEY DON'T OPERATE WEBSITES; I SAID I

16   DON'T KNOW WHETHER THEY OPERATE A WEBSITE OR NOT.

17   Q.    SO IT COULD BE THAT THEY DO IN FACT OPERATE

18   WEBSITES THAT ARE ON THOSE SERVERS?

19   A.    YES.

20   Q.    IT COULD BE THAT SOMEBODY CONNECTED WITH THEM

21   OPERATES THOSE WEBSITES ON THOSE SERVERS?

22   A.    MAYBE.

23   Q.    COULD BE A FAMILY MEMBER, FOR EXAMPLE?

24   A.    MAYBE.

25   Q.    NOW, IN YOUR DIRECT TESTIMONY, YOU SPOKE A LITTLE

1    BIT ABOUT SECONDARY AND PRIMARY IP NUMBERS.  DO YOU

2    REMEMBER THAT?  WELL, I THINK YOU SAID THAT WHEN SOMEONE

3    BUYS A PACKAGE FROM YOU, THEY GET A PRIMARY IP NUMBER;

4    CORRECT?

5    A.    MAIN IP NUMBER, YES.

6    Q.    I'M SORRY.  I'M TRYING TO REMEMBER TO USE THAT

7    TERM INSTEAD OF PRIMARY.  AND IN ADDITION TO THE MAIN IP

8    NUMBER, THEY MAY REQUEST AN ALLOCATION OF ADDITIONAL

9    SECONDARY IP NUMBERS?

10   A.    EXTRA.

11   Q.    OKAY.  I WILL TRY TO REMEMBER THE "MAIN" AND

12   "EXTRA."

13         OKAY.  NOW, I THINK YOU SAID THAT THIS WAS

14   DONE IN PART BECAUSE THE DEFENDANTS ARE REQUIRED TO

15   JUSTIFY THEIR USE OF THE IP ALLOCATIONS THAT THEY HAVE?

16   A.    YES.

17   Q.    AND I THINK YOU ALSO SAID THAT THERE'S LIKE A

18   MINIMUM USAGE OF AROUND 80 PERCENT OR SO.  WAS THAT WHAT

19   YOU TESTIFIED TO?

20   A.    THAT IS IF YOU WANT TO APPLY NEW IP ADDRESSES FROM

21   ARIN.

22   Q.    I THINK YOU SAID, THOUGH, THAT THE NUMBER OF IP

23   ADDRESSES ASSIGNED TO THE DEFENDANTS HAD DECREASED FROM

24   ABOUT 40 TO 30,000.  DID I MISUNDERSTAND?

25   A.    YES, THAT'S AFTER THE SEPARATION.  WE GAVE ROUGHLY

1    16,000 TO JACQUES PHAM.   JACQUES, J-A-C-Q-U-E-S, PHAM,

2    P-H-A-M.

3    Q.    LET'S PULL UP EXHIBIT 25.

4          I'LL ASK MS. ADLER TO TURN TO PAGE 2, AND

5    SCROLL DOWN TO PARAGRAPH 5-B.

6          CAN YOU READ PARAGRAPH 5-B FOR US, MR. CHEN?

7    A.    "APPLICANT IS RESPONSIBLE FOR THE TIMELY AND

8    ACCURATE MAINTENANCE OF DIRECTORY SERVICES DATA AS WELL

9    AS ANY ORGANIZATION TO WHICH IT FURTHER SUBDELEGATES

10   NUMBER RESOURCES."

11   Q.    I UNDERSTAND THAT TO MEAN THAT THE ENTITY TO WHICH

12   IP ADDRESSES ARE ALLOCATED IS REQUIRED TO MAINTAIN

13   CORRECT CONTACT INFORMATION IN THE ARIN DATABASE; IS

14   THAT YOUR UNDERSTANDING AS WELL?

15   A.    YES.

16   Q.    AND THAT APPLIES WHETHER OR NOT THE NAMES HAVE

17   BEEN SUBDELEGATED OR ASSIGNED OR ALLOCATED TO SOMEONE

18   ELSE ACTUALLY USING THE IP ADDRESSES?

19   A.    I DON'T UNDERSTAND THE WORD OF "SUBDELEGATE."

20   Q.    WELL, AS I UNDERSTAND IT, THE DEFENDANTS WILL

21   ASSIGN IP ADDRESSES TO THEIR CUSTOMERS.   WE WERE JUST

22   TALKING ABOUT THAT.

23   A.    THAT'S RIGHT.

24   Q.    AND I UNDERSTAND THAT TO BE SUBDELEGATING.

25   A.    YES.

1    Q.    SO THAT THIS CLAUSE WOULD APPLY REGARDLESS OF

2    WHETHER OR NOT THE DEFENDANTS ARE ASSIGNING IP ADDRESSES

3    TO THEIR CUSTOMERS?

4    A.    THAT'S CORRECT.

5              (WHEREUPON, EXHIBIT 627 WAS MARKED FOR

6              IDENTIFICATION.)

7    BY MR. COOMBS:

8    Q.    OKAY.  I HAVE JUST MARKED AS 627 A FOUR-PAGE

9    PRINTOUT FROM THE KNOWLEDGE BASE ON THE ARIN WEBSITE.

10   JUST FOCUSING ON THE TOP FIRST PARAGRAPH OF THAT

11   PRINTOUT, COULD YOU READ THE FIRST -- THE SENTENCE THAT

12   ENDS ON THE FOURTH LINE OF THAT?

13   A.    THE FOURTH LINE?

14   Q.    COULD YOU READ THE FIRST FOUR LINES OF THAT

15   PORTION?  MAYBE IT WOULD BE EASIER IF I DID IT THIS WAY.

16   I HAVE HIGHLIGHTED A PORTION OF THIS.  COULD YOU JUST

17   READ THIS FOR US?  COULD YOU READ IT INTO THE RECORD,

18   PLEASE.  COULD YOU READ IT OUT LOUD?

19   A.    "ARIN'S STEWARDSHIP OF INTERNET NUMBER" --

20             THE COURT:  WHY DON'T YOU READ IT?  DON'T --

21   YOU HAVE THE DOCUMENT.  YOU ARE MUCH BETTER ABLE TO

22   SEE IT.

23             MR. COOMBS:  YES.  THANK YOU, YOUR HONOR.

24   BY MR. COOMBS:

25   Q.    I'M READING FROM EXHIBIT 627 AND THE FIRST PORTION

1    OF WHICH FOLLOWS:  "ARIN'S STEWARDSHIP OF

2              INTERNET NUMBER RESOURCES REQUIRES

3              CONSISTENT COHESIVE UNDERSTANDING

4              OF WHO HOLDS RESOURCES, WHO IS

5              RESPONSIBLE FOR THE MAINTENANCE

6              OF THOSE RESOURCES, AND HOW THOSE

7              RESOURCES ARE BEING UTILIZED.  TO

8              THAT END, ARIN USES IDENTIFIERS

9              IN ITS DATABASE TO DENOTE

10             DELEGATED NUMBER RESOURCES,

11             ORGANIZATIONS, AND THE CONTACTS

12             WHO ARE RESPONSIBLE FOR THE

13             MANAGEMENT OF THE RESOURCES AND

14             THEIR RECORDS."

15             YOU SEE THAT, MR. CHEN?

16   A.   YES.

17   Q.   AND I UNDERSTAND THAT TO BE AN EXPLANATION OF WHY

18   IT'S IMPORTANT THAT THE ARIN DATABASE ACCURATELY REFLECT

19   THE INFORMATION TO THOSE WHO HAVE RECEIVED IP ADDRESSES.

20             MR. LOWE:  OBJECTION, YOUR HONOR.  HIS

21   UNDERSTANDING IS NOT RELEVANT.  HE SHOULD ASK A

22   QUESTION.

23             THE COURT:  SUSTAINED.

24   BY MR. COOMBS:

25   Q.   DO YOU UNDERSTAND THAT TO EXPLAIN THE REASONS WHY

1    IT'S IMPORTANT TO HAVE ACCURATE CONTACT INFORMATION IN

2    THE ARIN DATABASE?

3    A.    NEVER STUDIED THAT.

4    Q.    BUT YOU, IN FACT, USE THE ARIN DATABASE YOURSELF

5    AT TIMES; CORRECT?

6    A.    THAT'S CORRECT.

7    Q.    NOW, LET'S PULL UP EXHIBIT 1613 THAT WAS MARKED ON

8    FRIDAY DURING YOUR DIRECT EXAMINATION.  I THINK THIS IS

9    A DOCUMENT THAT YOU SAID WAS PREPARED IN CONNECTION WITH

10   YOUR INVESTIGATION OF DOMAIN TOOLS.

11         IF WE COULD SCROLL DOWN A LITTLE BIT.

12         NOW, THIS PING RESPONSE THAT'S INDICATED ON

13   THE PORTION THAT'S SHOWN ON YOUR SCREEN RIGHT NOW --

14   A.    YES.

15   Q.    -- THAT'S A CUT AND PASTE FROM THE DOS COMMAND

16   PROMPT; RIGHT?

17   A.    THAT'S CORRECT.

18   Q.    AND WHAT DATE WAS THAT PING TEST DONE?

19   A.    IT'S THE SAME DAY.

20   Q.    AS WHAT?

21   A.    AS WHEN I PULLED THE DOMAIN TOOL SCREEN SHOT.  AND

22   I ALSO MADE THAT DOS SCREEN SHOT.

23   Q.    AND WHAT DATE WAS THAT?

24   A.    IF YOU SCROLL UP, THERE'S A DATE ON THE E-MAIL.

25   Q.    SO IT'S THE DATE OF THE E-MAIL?

1    A.    YES.

2    Q.    IT WOULD BE THE DATE OF BOTH OF THOSE SEARCHES

3    THAT ARE INDICATED?

4    A.    THAT'S CORRECT.

5    Q.    AND WHAT DOMAIN NAME DID YOU PING, AS INDICATED AT

6    THE BOTTOM OF THAT E-MAIL?

7    A.    ESHOES99.NET.

8    Q.    AND I THINK YOU DID SAY THAT THE RESULTS FOR

9    ESHOES99.NET MIGHT BE DIFFERENT FROM THE RESULTS FOR

10   ESHOES -- I'M SORRY, WWW.ESHOES99.NET?

11   A.    YES.

12   Q.    DO YOU KNOW WHICH OF THOSE TWO DOMAIN NAMES WAS

13   PINGED AS PART OF THE DOMAIN TOOLS REPORT?

14   A.    I PINGED BOTH.

15   Q.    HOW DID YOU PING BOTH USING DOMAIN TOOLS?

16   A.    PING BOTH USING DOMAIN TOOLS?

17   Q.    CORRECT.

18   A.    NO, I DON'T EVEN KNOW WHETHER THE DOMAIN TOOL IS

19   PULLING UP WWW OR WITHOUT WWW.

20   Q.    SO IT'S QUITE POSSIBLE THAT THE WWW.ESHOES99.NET

21   AND THAT THE PING WAS FOR A DIFFERENT WEBSITE AT SIMPLY

22   ESHOES99.NET?

23   A.    YES, IN THIS.

24   Q.    SO THIS MAY, IN FACT, NOT SHOW ANY UNRELIABILITY

25   IN THE DOMAIN TOOLS SEARCH RESULTS?

1    A.    I HAVE SEVERAL OF THIS, NOT JUST ONE.

2    Q.    WHERE ARE THEY?  I HAVE NOT SEEN THEM.

3    A.    I WAS NOT -- I WAS NOT BEING ASKED TO PROVIDE

4    THAT.

5    Q.    NOW, I THINK YOU HAVE TESTIFIED THAT YOU DON'T

6    EVALUATE THE VALIDITY OF COMPLAINTS THAT ARE SENT TO

7    YOU.  YOU FORWARD THEM ON TO CUSTOMERS FOR THEIR

8    HANDLING; IS THAT CORRECT?

9    A.    MOST OF THE TIME.

10   Q.    AND THEN YOU ALSO TESTIFIED THAT YOU HANDLE SOME

11   COMPLAINTS A LITTLE DIFFERENTLY.  YOU VIEWED, FOR

12   EXAMPLE, INTELLECTUAL PROPERTY INFRINGEMENT ABUSE

13   COMPLAINTS AS MORE IN THE NATURE OF BUSINESS DISPUTES,

14   THEREFORE, LESS PRESSING THAN SOME TECHNICAL THAT MIGHT

15   COME IN?

16   A.    NOT A QUESTION OF ISSUE; IT JUST -- I'M NOT

17   PUTTING MYSELF IN MIDDLE OF BUSINESS DISPUTE.

18   Q.    ALL RIGHT.  BUT YOU DID AGREE WITH ME AT THE

19   BEGINNING OF YOUR TESTIMONY THAT COUNTERFEITING IS

20   ILLEGAL; IT'S A CRIME, OR CAN BE?

21   A.    IT IS A ISSUE THAT BY -- BY BUSINESS PARTIES, NOT

22   BY LEGAL AUTHORITY.

23   Q.    WHAT OTHER BUSINESS DISPUTES ARE YOU AWARE OF THAT

24   ARE PUNISHED THROUGH THE CRIMINAL SYSTEM?

25        MR. LOWE:  YOUR HONOR, I WOULD OBJECT TO THIS

1   LINE QUESTIONING.  WHETHER THEY ARE CRIMES OR NOT IS NOT

2   AN ISSUE IN THIS CASE.

3          THE COURT:  SUSTAINED.

4   BY MR. COOMBS:

5   Q.   ISN'T IT TRUE THAT WHEN A COPYRIGHT INFRINGEMENT

6   ABUSE CLAIM IS TRANSMITTED TO YOU AT YOUR

7   STEVE@AKANOC.COM E-MAIL ADDRESS, THAT THEY ARE STATED TO

8   UNDER PENALTY OF PERJURY?

9   A.   YES.

10  Q.   AND YOU UNDERSTAND THAT THAT IS DONE BECAUSE THE

11  LAW REQUIRES -- DOESN'T REQUIRE, BUT IT PROVIDES CERTAIN

12  ADDITIONAL PROTECTIONS, IF THE INITIAL CLAIM IS STATED

13  UNDER PENALTY OF PERJURY?

14  A.   YES.

15  Q.   IS IT NORMAL FOR YOU TO RECEIVE NOTICES OF OTHER

16  FORMS OF BUSINESS DISPUTE UNDER PENALTY OF PERJURY?

17  A.   I RAN INTO TIMES THAT I HAVE ALL THE CORRECT LEGAL

18  COMPLAINTS AND WIND UP IT'S A -- JUST A *EX PARTE*

19  DISPUTE.

20  Q.   NOW, IN YOUR DIRECT EXAMINATION, I THINK YOU SAID

21  YOUR PROCEDURES IN RESPONSE TO ABUSE COMPLAINTS HAVEN'T

22  REALLY CHANGED SINCE 2006; IS THAT CORRECT?

23  A.   NOT IN PRINCIPLE.  NOTHING REALLY CHANGED.

24  Q.   OKAY.  SO WE SHOULDN'T INFER ANYTHING FROM THE

25  FACT THAT YOU FIRST FILED THE DMC NOTICE WITH THE

1   COPYRIGHT OFFICE AFTER THE LITIGATION WAS FILED?

2   A.   SHOULDN'T CHANGE ANYTHING.

3   Q.   OKAY.  YOU REMEMBER THAT I TOOK YOUR DEPOSITION,

4   MR. CHEN, IN APRIL OF 2008?

5   A.   YES.

6   Q.   OKAY.  I'M GOING TO READ TO YOU SOME QUESTIONS AND

7   ANSWERS AND ASK YOU IF THESE QUESTIONS AND ANSWERS WERE

8   IN FACT GIVEN AT THAT DEPOSITION.

9           "QUESTION:" --

10          AND THIS IS BEGINNING AT PAGE 194.

11          MR. LOWE:  EXCUSE ME, YOUR HONOR.  PERHAPS WE

12   COULD PROVIDE THE WITNESS WITH A COPY?

13          MR. COOMBS:  I'M SORRY.  DO YOU HAVE THE

14   ORIGINAL?

15          MR. LOWE:  GIVE US A MOMENT.

16          (WITNESS PROVIDED A COPY OF THE DEPOSITION.)

17          MR. COOMBS:  IN VOLUME I -- I'M SORRY, VOLUME

18   II, PAGE 194 --

19          THE WITNESS:  PAGE WHAT?

20          MR. COOMBS:  194.

21          THE WITNESS:  LINE?

22   BY MR. COOMBS:

23   Q.   BEGINNING AT LINE 5:

24          "QUESTION:  NOW, IF THAT HAPPENS,

25          DO YOU DO ANYTHING YOURSELF OR

1    DOES MANAGED SOLUTIONS DO

2    ANYTHING TO VERIFY THAT THE

3    OFFENDING SITE WAS IN FACT

4    REMOVED AS REPRESENTED BY THE

5    CUSTOMER?"

6    "ANSWER:  THE NEWEST PROCEDURE

7    THAT WE IMPOSE RIGHT NOW IS

8    QUITE SIMPLE.  WE WANT EVERYBODY

9    TO MAKE SURE THE DOMAIN NAME

10   DOES NOT RESULT TO OUR IP SO WE

11   JUST NEED TO PING.  IF IT'S

12   STILL WITHIN OUR IP, THEN WE

13   WILL CONSIDER IT STILL THERE;

14   IF IT'S NOT, THEN WE WOULD

15   REVIVE THE IP.  THAT'S THE

16   NEWEST PROCEDURE THAT WE HAVE

17   RIGHT NOW."

18   "QUESTION:  WHEN WAS THAT

19   PROCEDURE IMPLEMENTED?"

20   "ANSWER:  PROBABLY FEBRUARY,

21   MARCH."

22   "QUESTION:  OF 2008?"

23   "ANSWER:  OF 2008.  THAT'S

24   CORRECT."

25   WERE THOSE QUESTIONS ASKED AND ANSWERS GIVEN

1    DURING YOUR DEPOSITION?

2    A.    YES.

3    Q.    AND I THINK FEBRUARY/MARCH OF 2008 WAS AFTER THE

4    COMPLAINT IN THIS ACTION, WAS IT NOT?

5    A.    YES.

6    Q.    THANK YOU.

7          LET'S TURN BACK TO 1598, PLEASE.  AND IF WE

8    COULD SCROLL DOWN TO PAGE 3 TO THE ENTRY FOR

9    LOVERNIKE.COM.

10         DO YOU SEE THAT ENTRY, MR. CHEN?

11   A.    YES.

12   Q.    AND IN THAT, YOU INDICATE THAT THE WEBSITE WAS NOT

13   FUNCTIONING; IS THAT CORRECT?

14   A.    THAT'S CORRECT.

15   Q.    AND THIS WAS BASED ON A STUDY OF YOUR E-MAIL LOGS;

16   IS THAT CORRECT?

17   A.    THAT'S CORRECT.

18   Q.    SO TELL ME, WHAT DO YOU DO -- HOW IS IT THAT YOU

19   COME TO THE CONCLUSION THAT A WEBSITE IS NOT FUNCTIONAL?

20   A.    TRY TO PING -- TRY TO USE A BROWSER TO GET INTO

21   THE WEBSITE.

22   Q.    IF A WEBSITE IS FUNCTIONING, YOU CAN LOOK AT IT

23   LIKE ANYBODY ELSE; IS THAT CORRECT?

24   A.    THAT'S CORRECT.

25   Q.    SO, BASICALLY, YOU ARE SAYING IT RETURNS THE KIND

1    OF ERROR MESSAGES THAT WE HAVE HEARD FROM OTHER

2    WITNESSES DURING THE CASE?

3    A.    THAT'S CORRECT.

4    Q.    "PAGE NOT FOUND" OR SOMETHING TO THAT EFFECT?

5    A.    THAT IS CORRECT.

6    Q.    SO THIS INDICATES THAT ON OR SOON AFTER THE 26TH

7    OF NOVEMBER, THE WEBSITE LOVERNIKE.COM WAS NOT

8    FUNCTIONING; IS THAT CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    CAN YOU TELL US WHAT DATE THAT CHECK WAS DONE?

11   A.    SHOULD BE ON THE 26TH OR SOMEWHERE AROUND THERE,

12   IN THE TWO DAYS.

13   Q.    LOOKS AS THOUGH, WHERE YOU DID FIND THE WEBSITE ON

14   YOUR SERVERS, THAT A TAKEDOWN NOTICE WAS SENT ON THE

15   29TH; CORRECT?  IF YOU LOOK ABOVE AND BELOW "LOVERNIKE,"

16   YOU WILL SEE A FEW THAT SAY "TAKEDOWN NOTICE SENT ON

17   11/29." DO YOU SEE THOSE?

18   A.    YES.

19   Q.    IT SUGGESTS TO ME, AT LEAST, THAT YOU LOOKED AT

20   THESE WEBSITES BETWEEN THE 26TH, WHEN THE LETTER WAS

21   SENT, AND THE 29TH, WHEN THE TAKEDOWN NOTICES WERE SENT.

22   IS THAT A REASONABLE INTERPRETATION?

23   A.    IT'S A BIG BATCH SO I MUST HAVE WORKED ON IT IN --

24   IN THAT COUPLE DAYS.

25   Q.    OKAY.  BUT BY THE 29TH, YOU HAD LOOKED AT

1    LOVERNIKE.COM AND CONCLUDED IT DID NOT ACTUALLY RESULT

2    IN A WEBSITE?

3    A.    THAT IS CORRECT.

4    Q.    CAN WE PULL UP EXHIBIT 616 AND SCROLL TO PAGE 14.

5    SCROLL DOWN.

6         DO YOU SEE THE HIGHLIGHTED ENTRIES,

7    PARTICULARLY THE FIRST ONE ON 11/30?  CAN YOU READ TO US

8    THE ENTRY BESIDE THE 133131 TICKET NUMBER?

9    A.    133131?

10   Q.    CORRECT.

11   A.    "133131, UNPLUGGED PER STEVE DUE TO COUNTERFEIT

12   PRODUCT, THIRD COMPLAINT WWW.LOVERNIKE.COM,

13   205.209.185.226."

14   Q.    THAT DOMAIN NAME IS THE SAME DOMAIN NAME WE WERE

15   JUST TALKING ABOUT; CORRECT?

16   A.    THAT IS CORRECT.

17   Q.    THAT SUGGESTS THAT THE WEBSITE WAS IN FACT

18   FUNCTIONAL ON THE 30TH OF NOVEMBER; IS THAT NOT CORRECT?

19   A.    IF IT'S AFTER THE UNPLUGGED, THEN IT WILL NOT BE

20   FUNCTION.

21   Q.    IN FACT, WHEN YOU SAY "WEBSITE NOT FUNCTIONAL," IT

22   WAS ONLY NOT FUNCTIONAL BECAUSE YOU HAD IN FACT

23   UNPLUGGED THE SERVER ON WHICH THE WEBSITE WAS FOUND?

24   A.    MAY.  THE RECORD IS JUST SHOWING AT THAT

25   PARTICULAR TIME IT WAS NOT FUNCTION.  WHETHER I DID

1    ANYTHING TO IT, I HAVE NO RECOLLECTION.

2    Q.   WELL, DOESN'T THIS INDICATE THAT YOU UNPLUGGED IT

3    BECAUSE LOVERNIKE.COM WAS ON THE SERVER AT THAT TIME?

4    A.   RIGHT.

5    Q.   THANK YOU.

6         YOU DON'T ACTUALLY UNPLUG SERVERS IF THE

7    WEBSITE IS NOT THERE, DO YOU?

8    A.   IF WEBSITE IS NOT THERE, THEN I DON'T NEED TO.

9    Q.   NOW, HOW MANY -- THERE'S A LIST THAT WE HAVE,

10   ABOUT THREE OR FOUR PAGES.  YOU MAY WANT TO TURN -- I

11   THINK YOU HAVE A BINDER WITH 1598 IN IT.

12        BUT THERE WERE SEVERAL TAKEDOWN NOTICES SENT

13   ON THE 29TH IN RESPONSE TO THE NOVEMBER 26TH LETTER; IS

14   THAT NOT CORRECT?

15   A.   COULD YOU REPEAT A QUESTION?

16   Q.   IF YOU LOOK AT PAGES -- FROM THE BOTTOM OF PAGE 1

17   UNTIL PAGE 5, YOU WILL SEE A LIST OF DOMAIN NAMES THAT

18   WERE THE SUBJECT OF THE NOVEMBER 26TH LETTER.  DO YOU

19   SEE THAT?

20   A.   YES.

21   Q.   AND YOU WILL SEE THAT SEVERAL OF THEM WERE THE

22   SUBJECT OF TAKEDOWN NOTICES SENT ON NOVEMBER 29TH.  DO

23   YOU SEE THAT?

24   A.   THAT'S CORRECT.

25   Q.   HOW MANY OF THOSE WERE SENT TO THE SAME CUSTOMER?

1    A.    I HAVE NO RECOLLECTION.

2    Q.    ALL RIGHT.  MAYBE WE CAN HELP YOU WITH THAT.

3          LET'S PULL UP EXHIBIT 550.  IF YOU COULD

4    SCROLL JUST TO THE HEADER.  OOPS.

5          YOU SEE THAT THAT IS SENT TO ZHONGHH; CORRECT?

6    A.    YES.

7    Q.    AND I THINK YOU TESTIFIED FRIDAY THAT ZHONGHH IS

8    ALICE CHEN'S ACCOUNT; IS THAT CORRECT?

9    A.    YES.

10   Q.    AND IT SAYS THAT YOU'VE RECEIVED A COMPLAINT

11   REGARDING SERVER 204.16.193.107 MAIN IP 204.13.69.210.

12   YOU SEE THAT?

13   A.    YES.

14   Q.    AND IT'S REGARDING THE WEBSITE BAG4SELL.COM?

15   A.    THAT'S CORRECT.

16   Q.    SO THAT'S ONE THAT WAS SENT TO MS. CHEN.

17         LET'S TURN TO EXHIBIT 554, AND LET'S EXPAND

18   THE HEADER ON THIS ONE.

19         THAT'S ALSO SENT TO ZHONGHH; CORRECT?

20   A.    THAT'S CORRECT.

21   Q.    AND THAT'S THE SAME DAY?

22   A.    YES.

23   Q.    AND IT'S SENT CONCERNING MAIN IP -- THIS IS A

24   SLIGHTLY DIFFERENT MAIN IP; IT'S 205.209.136.90?

25   A.    THAT'S CORRECT.

1  Q.   SO IT'S TWO THAT WERE SENT ON THE SAME DAY TO

2  MS. CHEN.

3            LET'S TURN TO EXHIBIT 555.

4            NOW, ON FRIDAY I THINK YOU SAID CHENDAN IS

5  ALSO MS. CHEN; IS THAT CORRECT?

6  A.   YES.

7  Q.   SO THAT'S THREE NOTICES THAT WERE SENT ON

8  NOVEMBER 29TH TO MS. CHEN; CORRECT?

9  A.   YES.

10  Q.   THAT'S CONCERNING DREAMYSHOES; CORRECT?

11  A.   CORRECT.

12  Q.   LET'S TURN TO 557.

13            THIS ONE WAS SENT TO ZHONGHH AS WELL?

14  A.   YES.

15  Q.   MS. CHEN?

16  A.   YES.

17  Q.   ON NOVEMBER 29TH; CORRECT?

18  A.   YES.

19  Q.   LET'S TURN TO EXHIBIT 559.

20            THIS ONE IS BEING SENT TO ZHONGHH AS WELL, SO

21  THAT'S MS. CHEN ON NOVEMBER 29TH AS WELL; IS THAT

22  CORRECT?

23  A.   YES.

24  Q.   AND LET'S TURN TO 560.

25            THAT'S TO CHENDAN, MS. CHEN, AGAIN?

1    A.    YES.

2    Q.    AND THAT'S NOVEMBER 29TH, 2007.

3          AND LET'S TURN TO EXHIBIT 562.

4          THAT'S ZHONGHH; THAT'S MS. CHEN, AGAIN?

5    A.    YES.

6    Q.    DIFFERENT WEBSITE; CORRECT?

7    A.    YES.

8    Q.    AND THAT'S THE SAME DAY?

9    A.    YES.

10   Q.    LET'S TURN TO 564.

11         MS. CHEN AGAIN ON THE SAME DAY CONCERNING YET

12   ANOTHER WEBSITE, CORRECT?

13   A.    YES.

14   Q.    LET'S TURN TO 582.

15         ZHONGHH AGAIN, NOVEMBER 29TH, 2007, CONCERNING

16   PRO-JORDAN?

17   A.    YES.

18   Q.    SO I HAVE GOT NINE NOTICES SENT TO ONE CUSTOMER

19   CONCERNING NINE DIFFERENT WEBSITES ON SEVERAL DIFFERENT

20   EXTRA IP NUMBERS?

21   A.    YES.

22   Q.    WOULD IT SURPRISE YOU TO KNOW THAT YOU SENT NINE

23   NOTICES TO ANOTHER ONE OF YOUR CUSTOMERS THAT SAME DAY

24   CONCERNING NINE DIFFERENT WEBSITES ON NINE DIFFERENT

25   EXTRA IP'S CONTROLLED BY THEM?

1   A.   NO.

2   Q.   DID YOU TAKE ANY ACTION CONCERNING THIS EXTENSIVE

3   INFRINGEMENT OCCURRING ON MS. CHEN'S SERVERS ALL AT ONE

4   TIME, OTHER THAN SENDING THE NOTICES THAT ARE DESCRIBED

5   HERE?

6   A.   WE HOLD THE SAME PRINCIPLE.  IF THEY DON'T

7   RESPOND, WE DO WHAT WE NEED TO DO; IF THEY RESPOND IN

8   ANY WAY OF RESOLVING THE ISSUE, WE VERIFY THAT.  THAT'S

9   WHAT WE CAN DO.

10   Q.   SO THE ANSWER IS "NO"?  YOU ASSUME THAT SHE

11   RESPONDED, AND THAT WAS THE END OF THE MATTER?

12   A.   WE DON'T ASSUME.  WE VERIFY IT.

13   Q.   OKAY.  SO WHAT DID YOU DO TO VERIFY THAT THESE

14   WEBSITES WERE IN FACT DEALT WITH AS PROPOSED IN THE

15   VARIOUS EXHIBITS WE HAVE JUST LOOKED AT?

16   A.   LOOKING AT NOVEMBER BATCH, THAT'S THE FIRST TIME

17   IN MY LIFE, IN MY HOSTING BUSINESS LIFE, THAT I EVER

18   RECEIVED A BIG BATCH OF COMPLAINTS AND DOMAINS ALL AT

19   THE SAME TIME.  SO FOR THIS PARTICULAR BATCH WILL COME

20   OUT THE INFORMATION THAT I DO HAVE EVERYTHING THAT I

21   SENT OUT, AND SO I DID NOT TAKE LIKE THE SECOND BATCH,

22   THEN I START DOCUMENTING WHAT I DID EXACTLY FOR

23   FOLLOW-UP.

24       SO THE FIRST BATCH I HAVE NO RECOLLECTION, BUT

25   AT LEAST THIS SHOWS IF I SENT OUT THIS DOCUMENTS, IT'S A

1   SUMMARY OF ALL THE E-MAILS THAT I SENT OUT.

2   Q.   MR. CHEN, I -- MAYBE I WAS NOT CLEAR ON MY

3   QUESTION. DID YOU FINE MS. CHEN BECAUSE OF THIS

4   EXTENSIVE INFRINGEMENT THAT WAS IDENTIFIED ON HER SERVER

5   ON NOVEMBER 27TH?

6   A.   IF I VERIFY --

7   Q.   MR. CHEN, DID YOU FINE -- DID YOU IMPOSE ANY KIND

8   OF MONEY PENALTY ON MS. CHEN FOR THE VARIOUS

9   INFRINGEMENTS THAT WERE ON HER SERVER AT THE END OF

10   NOVEMBER 2007?

11   A.   NO.

12   Q.   DID YOU SUSPEND MS. CHEN -- I MEAN THE CUSTOMER,

13   MS. CHEN -- AS A RESULT OF THE VARIOUS INFRINGEMENTS

14   IDENTIFIED ON HER SERVER AT THE END OF NOVEMBER, 2007?

15   A.   NO.

16   Q.   DID YOU TERMINATE HER?

17   A.   NO.

18   Q.   OF COURSE NOT.

19        THE COURT: DON'T -- YOUR COMMENT IS

20   ARGUMENTATIVE.

21        MR. COOMBS: I'M SORRY.

22   BY MR. COOMBS:

23   Q.   LET'S GO BACK TO EXHIBIT 554.

24        THIS IS ONE OF THE E-MAILS WE WERE JUST

25   LOOKING AT, AND IT'S BUYMYSHOES.NET WHICH IS LOCATED ON

1   IP 205.209.136.90, MAIN IP 205.209.136.90. SO THEY ARE

2   THE SAME IP NUMBER, ACTUALLY, AREN'T THEY?

3   A.   YES.

4   Q.   AND THIS IS THAT EXTRA MAIN ISSUE WE WERE TALKING

5   ABOUT A LITTLE EARLIER?

6   A.   NO, THIS IS JUST ONE IP. THIS IS ON THEIR MAIN

7   IP.

8   Q.   AND IF WE GO BACK TO 1598, ON THE TOP OF PAGE 2

9   YOU WILL SEE THE FIRST ENTRY IS BUYMYSHOES.NET AND IT

10  INDICATES A TAKEDOWN NOTICE SENT ON NOVEMBER 29TH, 2007.

11  DO YOU SEE THAT?

12  A.   YES.

13  Q.   AND THE TAKEDOWN NOTICE REFERRED TO THERE IS THE

14  E-MAIL THAT WE WERE JUST LOOKING AT; IS THAT NOT

15  CORRECT?

16  A.   THAT'S CORRECT.

17  Q.   LET'S LOOK AT EXHIBIT 564.

18       NOW, THAT IS ALSO HOSTED ON THE SAME MAIN IP;

19  IS THAT CORRECT?

20  A.   YES.

21  Q.   WHEN YOU SAY IN THE NEXT LINE "DIFFERENT IP," ARE

22  YOU TALKING ABOUT THE "EXTRA IP" OR THE "MAIN IP"? IF

23  YOU LOOK NEXT TO -- ON THE LINE CONCERNING

24  BUYMYSHOES.NET, IT SAYS, YOU KNOW, "1/3/08, DIFFERENT IP

25  NOTICE SENT" -- "TAKEDOWN NOTICE SENT 1/14/08." DO YOU

1   SEE THAT.

2   A.   WE ONLY CHECK THE --

3   Q.   I'M JUST ASKING YOU IF YOU SEE THE ENTRY I'M

4   REFERRING TO.

5   A.   WHAT DO YOU WANT ME TO LOOK AT?

6           THE COURT:   THE CURSOR IS NOT IN THE RIGHT

7   COLUMN.   IT'S THE NEXT -- THAT COLUMN.

8   BY MR. COOMBS:

9   Q.   DO YOU SEE WHERE IT SAYS "1/3/08, DIFFERENT IP"?

10  A.   YES.

11  Q.   IS THE DIFFERENT IP THERE A DIFFERENT EXTRA IP OR

12  A DIFFERENT MAIN IP?

13  A.   DIFFERENT IP FOR THE DOMAIN ITSELF.

14  Q.   SO THE MAIN IP, IN FACT, COULD BE THE SAME?

15  A.   I DON'T KNOW.

16  Q.   YOU DON'T KNOW -- BECAUSE YOU ARE REALLY ONLY

17  LOOKING AT THE EXTRA IP?

18  A.   YES.

19  Q.   NOW, LET'S PULL UP EXHIBIT 557 THAT WE WERE

20  LOOKING AT A MOMENT AGO.

21          THIS IS ONE OF THE NOTICES TO MS. CHEN ON

22  NOVEMBER 29TH; CORRECT?

23  A.   YES.

24  Q.   AND IT'S THE MAIN IP ENDING IN DOT NINE ZERO.

25          LET'S LOOK AT EXHIBIT 549.   LET'S ENLARGE THE

1    FIRST PART OF THIS E-MAIL.

2         THIS IS ALSO SENT TO MS. CHEN; CORRECT?

3    A.    YES.

4    Q.    AND IT CONCERNS THE SAME DOMAIN NAME,

5    GUCCIFENDI.COM?

6    A.    YES.

7    Q.    AND THIS IS INDICATING THAT IF THEY DON'T DEAL

8    WITH IT, YOU WILL DISABLE THE SERVER WITHIN 15 MINUTES;

9    CORRECT?

10   A.    THAT'S CORRECT.

11   Q.    AND THIS IS BECAUSE SHE SIMPLY MOVED IT FROM ONE

12   OF HER MAIN IP'S TO A DIFFERENT ONE?

13   A.    YES.

14   Q.    NOW, ONE OF THE ISSUES WE WERE TALKING ABOUT WAS

15   THE NOTICE DATE OF 1/3/08, WHICH IS INDICATED BESIDE

16   MANY OF THE ENTRIES FOR 11/26.  DO YOU SEE THAT?

17   A.    (NO AUDIBLE RESPONSE.)

18   Q.    WELL, JUST LOOK AT -- I WILL PULL UP 1598,

19   BUYMYSHOES.  AGAIN, IF YOU MOVE OVER TO THE FOURTH

20   COLUMN, IT SAYS "1/3/08."  IT'S A NOTICE DATE; CORRECT?

21   A.    YES.

22   Q.    AND WE WERE TALKING A LITTLE BIT ABOUT WHAT KIND

23   OF NOTICE, IF ANY, THAT WAS.  AND I WANTED TO HAVE YOU

24   TAKE A LOOK AT 628, WHICH IS A PORTION OF THE SECOND

25   REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED TO AKANOC

1    SOLUTIONS, INC. DO YOU SEE THAT, MR. CHEN?

2    A.    YES.

3    Q.    LET ME TURN TO THE FOURTH AND FINAL PAGE OF THAT

4    DOCUMENT, WHICH IS A PROOF OF SERVICE, AND ASK YOU IF

5    THE DATE ON THE PROOF OF SERVICE IS THE DATE OF THAT

6    NOTICE THAT YOU WERE TALKING ABOUT.

7         LOOK TOWARDS THE BOTTOM. IT SAYS "EXECUTED

8    ON" AND HAS A DATE. DO YOU SEE THAT?

9    A.    JANUARY 3RD, 2008.

10   Q.    AND THAT'S THE DATE THAT WE WERE JUST TALKING

11   ABOUT ON 1598; CORRECT?

12   A.    YES.

13   Q.    DO YOU HAVE ANY QUESTION IN YOUR MIND THAT THE

14   DOMAIN NAMES LISTED AS BEING SUBJECT OF A NOTICE ON

15   1/3/08 WERE THE DOMAIN NAMES LISTED IN THE REQUEST FOR

16   PRODUCTION OF DOCUMENTS?

17   A.    I DON'T RECALL.

18   Q.    ALL RIGHT.

19        LET'S JUST PULL UP THE FIRST PART OF EXHIBIT A

20   AND JUST TAKE A MOMENT TO LOOK AT THE FIRST COUPLE OF

21   NAMES.

22        THE COURT: YOU NEED TO ZOOM IN ON THAT AND

23   USE THE AUTOFOCUS.

24        MR. COOMBS: WE DON'T NEED TOO MANY OF THESE

25   NAMES, I DON'T THINK.

1              IS THAT ADEQUATELY FOCUSED, YOUR HONOR?

2              THE COURT:  YES.

3    BY MR. COOMBS:

4    Q.    ALL RIGHT.  THE FIRST DOMAIN NAME ON THAT LIST IS

5    315EC.COM.  DO YOU SEE THAT?

6    A.    YES.

7    Q.    NOW, LET'S GO BACK TO EXHIBIT 1598, AND ON THE

8    FIRST PAGE ABOUT HALFWAY DOWN IS 315EC.COM, ONE OF THE

9    DOMAIN NAMES THAT WAS THE SUBJECT OF A NOTICE ON 1/3/08,

10   ACCORDING TO THIS CHART?

11   A.    YES.

12   Q.    LET'S LOOK AT THE SECOND ONE -- AND I WILL ONLY DO

13   A COUPLE OF THESE BECAUSE I THINK IT WILL HOPEFULLY BE

14   SUFFICIENT.

15             THE SECOND ONE IS APE168.COM; IS THAT CORRECT?

16   A.    (NO AUDIBLE RESPONSE.)

17   Q.    I'M SORRY?

18   A.    YES.

19   Q.    YOUR EYES ARE FASTER THAN MINE.

20             ALL RIGHT.  THEN GOING BACK TO 1598, ACCORDING

21   TO THE CHART, THE APE168.COM WAS ALSO THE SUBJECT OF A

22   NOTICE ON JANUARY 3RD, 2008; IS THAT CORRECT?

23   A.    YES.

24   Q.    THANK YOU.

25             NOW, IF WE CONTINUE ON, WE HAVE -- ON PAGE 5

1   OF 1598, WE HAVE SOME DOMAINS WHICH ARE -- WE HAVE SOME

2   DOMAINS THAT WERE FIRST THE SUBJECT OF NOTICE IN THE

3   REQUEST FOR PRODUCTION, ACCORDING TO THIS; IS THAT

4   CORRECT?

5           THE COURT:  I'M NOT SURE I UNDERSTAND YOUR

6   QUESTION.

7           MR. COOMBS:  I'M SORRY.  I WILL MOVE ON, YOUR

8   HONOR.

9   BY MR. COOMBS:

10  Q.   PULL UP EXHIBIT 13.

11          AND IS THIS THE NOTICE THAT WAS SENT ON

12  MARCH 3, 2008?

13  A.   YES.

14  Q.   LET'S GO TO EXHIBIT 482.

15          AND IS THIS THE NOTICE THAT WAS SENT ON

16  APRIL 7, 2008, SUMMARIZED IN YOUR 1598 CHART?

17  A.   YES.

18  Q.   AND THE WEBSITE REFERRED TO THERE IS ESHOES99.NET;

19  CORRECT?

20  A.   YES.

21  Q.   AND ESHOES99.NET IS NOT THE SAME AS ESHOES99.COM;

22  CORRECT?

23  A.   THAT'S CORRECT.

24  Q.   LET'S PULL UP EXHIBIT 483.

25          AND IS THAT THE NOTICE THAT IS SUMMARIZED

1    UNDER THE DATE JUNE 20, 2008 IN YOUR 1598 EXHIBIT?

2    A.    YES.

3    Q.    LET'S PULL UP EXHIBIT 485.

4          IS THAT THE NOTICE SUMMARIZED UNDER THE DATE

5    JUNE 24, 2008?

6    A.    YES.

7    Q.    AND LET'S PULL UP EXHIBIT 488.

8          AND IS THAT THE EXHIBIT SUMMARIZED UNDER THE

9    DATE JULY 25, 2008?

10   A.    YES.

11   Q.    AND I THINK, WHEN YOU TESTIFIED ON FRIDAY, YOU

12   SAID THAT YOU JUST IMMEDIATELY DISABLED MANY OF THE --

13   IF NOT ALL OF THE DOMAIN NAMES THAT WERE LISTED IN THAT

14   LETTER BECAUSE THEY APPEARED TO BE ALL ON THE SAME IP

15   AND COULD NOT REALLY BE FUNCTIONING WEBSITES; IS THAT

16   CORRECT?

17   A.    IT'S A LONG STATEMENT.

18   Q.    ALL RIGHT.  LET ME BREAK IT DOWN.  I'M SORRY.

19          ACTUALLY, LET'S GO BACK TO 1598, PAGE 9.

20          NOW, IS IT CORRECT TO SAY THAT WITH RESPECT TO

21   THE DOMAIN NAMES THAT ARE IDENTIFIED IN THE JULY 25

22   LETTER, THE RESPONSE INDICATED ON YOUR CHART IS "IP

23   ADDRESS DISABLED ON 7/30/2008"?

24   A.    YES.

25   Q.    THERE WAS NO NOTICE SENT TO THE CUSTOMER IN THAT

1    CASE?

2    A.    NO.

3    Q.    WHY NOT?

4    A.    TOO MUCH WORK.  JUST WAY TOO MUCH WORK.

5    Q.    SO IT'S NOT BECAUSE IT WOULD BE DIFFICULT TO HAVE

6    A HUNDRED WEBSITES HOSTED ON ONE IP ADDRESS?

7    A.    TECHNICALLY, I JUST DON'T SEE THAT'S ANY GOOD FOR

8    THE SERVER TO PERFORM.

9    Q.    SO IT WOULD BE POOR PERFORMING WEBSITES IF THERE

10   WERE THAT MANY AT ONE IP ADDRESS?

11   A.    MAYBE.  NEVER TRIED IT.

12   Q.    NOW, LET'S GO BACK TO 488 FOR A MOMENT, AND GO

13   DOWN TO THE NEXT PAGE.

14           AND YOU WILL SEE THAT MANY -- AFTER THE

15   FIRST -- WELL, MANY OF THE ONES THAT START ON THIS

16   PAGE -- ACTUALLY, ALL OF THEM -- ARE AT THE SAME IP

17   ADDRESS, 204.13.65.49; IS THAT CORRECT?

18   A.    YEAH, I THINK I DISABLED THAT ONE, TOO.

19   Q.    WHO OWNED THAT IP ADDRESS?  WHO WAS THE CUSTOMER?

20   A.    I HAVE NO RECOLLECTION.

21   Q.    IS THERE ANY WAY YOU COULD GO BACK AND FIND OUT

22   NOW?

23   A.    SURE.

24   Q.    HOW?

25   A.    BY E-MAIL.

1   Q.    WHAT E-MAIL?

2   A.    THAT E-MAIL THAT I SENT TO THE CUSTOMER I DISABLED

3   THIS IP BECAUSE POOR PLANNING.  OR I CAN GO TO MY

4   SUPPORT DEPARTMENT, BECAUSE IF I DISABLE THE IP, THE

5   SUPPORT DEPARTMENT MUST HAVE SOME SORT OF RECORD THERE.

6   Q.    LET'S PULL UP EXHIBIT 489, AND I'LL ASK YOU IF

7   THAT IS THE NOTICE SENT SEPTEMBER 19, 2008 THAT IS

8   SUMMARIZED ON PAGE 19 OF 1598?

9   A.    YES.

10  Q.    NOW, THE ONLY ADDITIONAL DEMANDS INDICATED IN YOUR

11  SUMMARY ARE THE ONES SENT IN JANUARY OF 2009 AND

12  FEBRUARY OF 2009; IS THAT CORRECT?

13  A.    CAN YOU REPHRASE THAT?

14  Q.    LET'S PULL UP EXHIBIT 1598 AGAIN, AND TURN TO

15  PAGE 19.

16        OKAY.  THE LAST DEMANDS THAT WERE RECEIVED

17  BEFORE TODAY FROM LOUIS VUITTON, AT LEAST AS SUMMARIZED

18  ON 1598, ARE JANUARY 30TH, 2009 AND FEBRUARY 4TH, 2009;

19  IS THAT CORRECT?

20  A.    I DON'T RECALL THAT PARTICULAR DATE AND INCIDENCE,

21  BUT I ASSUME THAT THE RECORD IS SHOWING JANUARY 30TH AND

22  FEBRUARY 4.

23  Q.    AND IN RESPONSE TO THOSE DEMANDS, IT APPEARS AS

24  THOUGH TAKEDOWN NOTICES WERE SENT ON OR ABOUT THE 2ND OF

25  FEBRUARY; IS THAT CORRECT?

1    A.    YES.

2    Q.    LET'S PUT UP EXHIBIT 608, TURNING TO THE SECOND

3    PAGE.

4          I'M SORRY.  BEFORE YOU DO THAT, GO BACK.

5          THIS IS A LETTER FROM YOUR ATTORNEYS IN THIS

6    ACTION; IS THAT CORRECT?

7    A.    YES.

8    Q.    ADDRESSED TO ME?

9          THE COURT:  WE CAN SEE THAT.  GO AHEAD.  ASK

10   YOUR QUESTION.

11   BY MR. COOMBS:

12   Q.    ALL RIGHT.  TURN TO PAGE 2 OF THE EXHIBIT, PLEASE,

13   AND CONTINUE DOWN.  IT SAYS:  "AS OF

14              FEBRUARY 9, 2009, OUR CLIENTS

15              HAVE NOT BEEN ABLE TO IDENTIFY

16              ANY OF THESE WEBSITES USING AN

17              IP ADDRESS ASSIGNED TO MANAGED

18              SOLUTIONS GROUP, INC., OR

19              AKANOC SOLUTIONS, INC.  THESE

20              WEBSITES ARE EITHER INACCESSIBLE

21              OR APPEAR TO BE USING IP

22              ADDRESSES THAT ARE ASSIGNED TO

23              OTHER UNKNOWN PARTIES.  YOUR

24              FEBRUARY 4, 2009 LETTER LISTED

25              73 WEBSITES, ALL OF WHICH WERE

1          ALSO LISTED IN THE JANUARY 30,

2          2009 LETTER.  AS OF FEBRUARY 9,

3          ALL 73 WEBSITES ARE EITHER

4          INACCESSIBLE OR APPEAR TO BE

5          USING IP ADDRESSES THAT ARE

6          ASSIGNED TO OTHER UNKNOWN

7          PARTIES."

8          SO THESE SITES WERE IN FACT ON SERVERS BEFORE

9    FEBRUARY 9; IS THAT NOT CORRECT?

10   A.    MAY.  YES.

11   Q.    YES.

12         LET'S TURN TO EXHIBIT 592.  WE WILL ROTATE

13   THAT AND ZOOM IN A LITTLE BIT.

14         LET'S START WITH THE ROW THREE LINES ABOVE THE

15   HIGHLIGHTED ONE.  IT SAYS, "REMOVED 204.13.65.49 FROM

16   205.209.143.107 HOSTING 100 COUNTERFEIT PRODUCT SITES."

17   DO YOU SEE THAT?

18   A.    YES.

19   Q.    IS THAT THE ACTION TAKEN IN RESPONSE TO THE

20   JULY 25 LETTER THAT WE WERE TALKING ABOUT EARLIER THIS

21   MORNING?

22   A.    I DON'T EXACTLY RECALL -- REMEMBER THE DATE AS

23   THAT DATE, BUT YES, THAT'S ONE PARTICULAR WEBSITE -- NO

24   ONE PARTICULAR IP THAT HAS HUNDRED WEBSITES ON IT ON THE

25   COMPLAINT.  I DIDN'T EVEN CHECK WHETHER THEY ARE LIVE,

1    GOOD, ANYTHING; I JUST DISABLE IP.

2    Q.    ALL RIGHT.  BUT THAT ACTION -- THIS IS AN ENTRY IN

3    THE CPRO LOG MAINTAINED BY THE DEFENDANTS; CORRECT?

4    A.    YES.

5    Q.    AND THAT ACTION THAT WE WERE JUST LOOKING AT IS

6    THE ACTION TAKEN IN RESPONSE TO THE JULY 25 LETTER, GIVE

7    OR TAKE A DAY OR TWO?

8    A.    YES.

9    Q.    ALL RIGHT.  NOW LOOKING DOWN FIVE ROWS FROM THE

10   HIGHLIGHTED SECTION, IT SAYS, "REMOVE 205.209.177.131

11   FROM 205.209.143.107 DUE TO LV COMPLAINTS HOSTING 45

12   COUNTERFEITERS."  DO YOU SEE THAT?

13   A.    YES.

14   Q.    AND THAT INDICATES THAT ON OR ABOUT FEBRUARY 2ND,

15   45 WEBSITES ON THAT IP WERE REMOVED FROM -- THAT IP WAS

16   REMOVED BECAUSE OF 45 COUNTERFEIT WEBSITE COMPLAINTS?

17   A.    YES.

18   Q.    AND IS THE PRIMARY IP -- I'M SORRY, THE MAIN IP

19   FOR BOTH ENTRIES, ISN'T THAT THE SAME?  ISN'T THAT

20   CORRECT?

21   A.    YES.

22   Q.    THAT WOULD INDICATE IT'S THE SAME CUSTOMER;

23   CORRECT?

24   A.    YES.

25   Q.    AND DO YOU, AS YOU SIT HERE TODAY, REMEMBER

1   WHETHER ANY OF THE WEBSITES THAT WERE THE SUBJECT OF THE

2   7/25 TAKEDOWN WERE THE SAME AS THE SUBJECT OF THE

3   FEBRUARY 2 TAKEDOWN?

4   A.   (NO AUDIBLE RESPONSE.)

5   Q.   THERE WERE A HUNDRED WEBSITES THAT WERE TAKEN DOWN

6   FROM THAT IP IN LATE JULY; CORRECT?

7   A.   YES.

8   Q.   DO YOU KNOW WHETHER ANY OF THE ONES TAKEN DOWN IN

9   EARLY FEBRUARY WERE THE SAME WEBSITES?

10  A.   WHEN I LOOK AT THAT LIST, I DON'T EVEN WANT TO

11  LOOK AT THE DETAILS.  IT'S WAY TOO MUCH WORK TO VERIFY

12  EACH INDIVIDUAL ONE.

13  Q.   ALL RIGHT.  LET'S PULL UP EXHIBIT 1598 AGAIN, AND

14  GO TO PAGE 9.

15       IF WE SCROLL DOWN A LITTLE BIT TO -- FOR

16  EXAMPLE, ALIJORDAN.COM, DO YOU SEE THAT, A LITTLE OVER

17  HALF?

18  A.   YES.

19  Q.   AND IT'S ONE OF THE WEBSITES THAT WAS HOSTED ON

20  THAT IP ADDRESS THAT WAS TAKEN DOWN ON JULY 25; CORRECT?

21  A.   YES.

22  Q.   AND THEN IT SAYS HERE IT WAS THE SUBJECT OF

23  ANOTHER NOTICE ON JANUARY 30TH, 2009.  DO YOU SEE THAT?

24  A.   YES.

25  Q.   OKAY.  AND IT INDICATES THAT THE ADDRESS WAS

1    DISABLED ON FEBRUARY 2, 2009?

2    A.    YES.

3    Q.    SO IT WAS THE SAME WEBSITE IDENTIFIED IN EACH OF

4    THOSE SUBSEQUENT NOTIFICATIONS; CORRECT?

5    A.    THAT WAS WHEN I HAVE TWO SEPARATE COMPLAINTS.

6    THIS IS AFTER WE COMPILE EVERYTHING TO SEE THE HISTORY

7    OF A PARTICULAR DOMAIN.  SO WHEN YOU DEALING WITH TWO

8    DIFFERENT COMPLAINTS WHERE I LOOK AT ONE IP HAS 40-SOME,

9    I WOULD NOT EVEN CHECK WHICH DOMAIN IS ON THE IP; I JUST

10   DISABLED IT.

11   Q.    BUT IT'S TRUE THAT IN TERMS OF JUST ALIJORDAN.COM,

12   WE ARE TALKING ABOUT THE SAME WEBSITE; CORRECT?

13   A.    YES.

14   Q.    WE ARE TALKING ABOUT THE SAME MAIN IP NUMBER;

15   CORRECT?

16   A.    YES.

17   Q.    WE ARE TALKING ABOUT THE SAME CUSTOMER; CORRECT?

18   A.    SAME IP NUMBER.

19   Q.    SAME MAIN IP ADDRESS?

20   A.    I DON'T KNOW.

21   Q.    WELL --

22   A.    AT THE TIME WHEN IT HAPPENS, I HAVE NO WAY OF

23   REMEMBER SOMETHING LIKE FIVE, SIX MONTHS AGO.  HOW CAN I

24   REMEMBER?  WHEN I DEAL WITH THIS TYPE OF ISSUE, LIKE,

25   IT'S A DAILY HAPPENING.

1    Q.    SO HOW CAN YOU ESCALATE THE REMEDIES FOR

2    VIOLATION -- STRIKE THAT.

3          ON FRIDAY YOU SAID THAT, YOU KNOW, YOU CAN

4    WARN THE CUSTOMER, YOU CAN SUSPEND THE CUSTOMER, YOUR

5    TERMS OF USE; REMEMBER THAT?  WE HAD A DISCUSSION ABOUT

6    A NUMBER OF DIFFERENT THINGS THAT YOUR CONTRACT ALLOWS

7    FOR; CORRECT?

8    A.    YES.

9    Q.    AND DO YOU ESCALATE AT ALL?  DO YOU EVER DO

10   ANYTHING MORE THAN EITHER WARN THE CUSTOMER OR DISABLE

11   THE IP WHICH IS THE SUBJECT OF THE COMPLAINT?

12   A.    IF A CUSTOMER -- WHEN WE FORWARD THE COMPLAINT ON

13   A PARTICULAR IP AND LATER HE MOVE THAT DOMAIN TO A

14   DIFFERENT IP WITHIN THE SAME SERVER WITHIN JUST A

15   FOLLOW-UP PERIOD, WE -- RIGHT AWAY WE ESCALATE THAT BY

16   TURNING -- BY UNPLUG THE WHOLE SERVER.  IT'S PROVEN.

17   IT'S A STANDARD PROCEDURE.

18   Q.    BUT THAT FOLLOW-UP PERIOD IS THAT VERY SHORT

19   PERIOD OF TIME YOU TESTIFIED TO DURING YOUR DEPOSITION,

20   A MATTER OF A FEW DAYS; CORRECT?

21   A.    IF WE TELL THE CUSTOMER TO --

22   Q.    MR. CHEN, YOU USED THE PHRASE "FOLLOW-UP PERIOD."

23   WHAT IS THAT FOLLOW-UP PERIOD?

24   A.    TO RESOLVE THE FIRST PROBLEM, THE FIRST COMPLAINT.

25          THE COURT:  I THINK YOU MEAN TO ASK HOW LONG

1   IS THE FOLLOW-UP PERIOD.

2   BY MR. COOMBS:

3   Q.    HOW LONG IS THAT FOLLOW-UP PERIOD?

4            MR. COOMBS:  YES.  THANK YOU.

5            THE WITNESS:  WE DON'T CARE HOW LONG.  WE

6   CARE.  IF THE FIRST COMPLAINT HAS NOT BEEN CLOSED, THEN

7   WE WOULD CHASE THAT.  WE WANT TO CHASE THE RESULT OF THE

8   FIRST COMPLAINT.  IF THE FIRST COMPLAINT COME BACK

9   WITHOUT ANY RESPONSE, THEN WE UNPLUG IT.  WE WOULD

10   DISABLE THE IP.

11            IF THE CUSTOMER RESPONDED, WE MOVE THE DOMAIN

12   NAME, AND HENCE THIS PARTICULAR IP -- THIS PARTICULAR

13   DOMAIN IS NOT FUNCTION ON THAT PARTICULAR IP ANYMORE.

14   WE WOULD VERIFY THAT WHERE IS THE DOMAIN NOTES.  THEN IF

15   IT HAPPENS TO BE ON A DIFFERENT IP ON THE SAME SERVER,

16   WE SEE THAT RECORD, WE UNPLUG THE WHOLE SERVER RIGHT

17   AWAY.

18   BY MR. COOMBS:

19   Q.    HOW LONG DOES IT STAY UNPLUGGED?

20   A.    TIL THEY MOVE THE DOMAIN OUT OF THE NETWORK.

21   Q.    SO THERE'S NO SUSPENSION BEYOND THE PERIOD THAT'S

22   REQUIRED FOR THE CUSTOMER TO ENSURE THAT THE ACTIVITY IS

23   MOVED?

24   A.    WE DON'T EVEN KNOW WHEN WE UNPLUG ONE -- DISABLE

25   ONE IP HOW MANY PEOPLE GOING TO BE AFFECTED, NOT TO

1    MENTION WE UNPLUG THE WHOLE SERVER.

2    Q.    WE WERE TALKING A LITTLE EARLIER ABOUT DMC COUNTER

3    NOTIFICATIONS, THE DMC AGENCY AND PROCEDURES.  HAVE YOU

4    EVER RECEIVED A COUNTER NOTIFICATION UNDER THE DMC ACT?

5    A.    DON'T UNDERSTAND THAT TERM.

6    Q.    OKAY.  SO YOU HAVE NOT SEEN A SITUATION WHERE

7    SOMEBODY HAS FILED A FORMAL RESPONSE TO A DMC NOTICE

8    SENT TO ONE OF THE DEFENDANTS?

9    A.    NO.

10   Q.    AND ON FRIDAY YOU WERE TESTIFYING THAT YOU HAD HAD

11   PHONE CALLS WITH DIFFERENT PEOPLE WHO WERE COMPLAINING

12   ABOUT ACTIVITY THAT HAD IN FACT ALREADY BEEN REMOVED

13   FROM YOUR SERVERS; REMEMBER THAT?

14   A.    YES.

15   Q.    HAD YOU EVER RECEIVED SUCH A CALL FROM LOUIS

16   VUITTON OR ANYONE ACTING FOR LOUIS VUITTON?

17   A.    NO.

18          MR. COOMBS:  I HAVE NO FURTHER QUESTIONS, YOUR

19   HONOR.

20          THE COURT:  ANY REDIRECT?

21          MR. LOWE:  YES, YOUR HONOR.

22                REDIRECT EXAMINATION

23   BY MR. LOWE:

24   Q.    MR. CHEN, I WOULD LIKE TO START WITH YOUR LOOKING

25   AT EXHIBIT 1598, PAGE 9, AND THE ALIJORDAN ENTRY THAT

1   MR. COOMBS WAS TALKING ABOUT.

2   A.   PAGE 9?

3   Q.   PAGE 9 OF 1598, YOUR SUMMARY.

4   A.   YES.

5   Q.   OKAY.  YOU SEE THE LINE ABOUT ALIJORDAN HE WAS

6   ASKING YOU ABOUT?

7   A.   YES.

8   Q.   OKAY.  SO ACCORDING TO THIS, YOU GOT THE FIRST

9   NOTICE ON JULY 25, '08, AND YOU DISABLED THE IP ADDRESS.

10  IS THAT WHAT IT SAYS?

11  A.   YES.

12  Q.   NOW, YOU DID THIS APPARENTLY FOR ALIJORDAN THREE

13  TIMES OVER THE COURSE OF A YEAR OR SO?

14  A.   YES.

15  Q.   THE SECOND TIME --

16  A.   I THINK IT IS ONLY -- ACCORDING TO THIS RECORD,

17  ONLY TWICE.

18  Q.   OKAY.  THE SECOND TIME, YOU GOT A NOTICE

19  CONCERNING THIS WEBSITE ON JANUARY 30TH, '09; RIGHT?

20  A.   YES.

21  Q.   AND UNDER THAT DATE THERE'S A NOTATION.  WHAT DOES

22  THAT NOTATION MEAN?

23  A.   DIFFERENT IP.

24  Q.   WHAT DOES THAT MEAN?

25  A.   DIFFERENT IP THAN THE FIRST NOTICE, THE JULY 25TH

1    NOTICE.

2    Q.    OKAY.  SO FOR THIS PARTICULAR ONE, THEY WERE ON

3    DIFFERENT IP ADDRESSES; IT CAME BACK IN DIFFERENT

4    PLACES?

5    A.    YES, THAT'S CORRECT.

6    Q.    YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT

7    WEBSITES THAT LOUIS VUITTON COMPLAINED ABOUT THAT WERE

8    ON IP'S THAT WERE BEING USED BY ALICE CHEN.  DO YOU

9    RECALL THAT?

10   A.    YES.

11   Q.    WHAT SORT OF -- WHAT SIZE OF CUSTOMER IS SHE FOR

12   THE DEFENDANT'S BUSINESS?

13   A.    AS IN 2007 -- AROUND THAT TIME, 2007, EARLY 2008,

14   I THINK SHE IS THE LARGEST OF OUR CUSTOMERS.

15   Q.    AND HOW MANY SERVERS WOULD SHE BE LEASING FROM YOU

16   AT THAT TIME?

17   A.    AROUND A HUNDRED.

18   Q.    AND THE FACT THAT YOU HAD A DOZEN COMPLAINTS ABOUT

19   WEBSITES THAT WERE USING THESE HUNDRED SERVERS, WHAT

20   DOES THAT MEAN TO YOU IN TERMS OF WHETHER SHE WAS A GOOD

21   CUSTOMER OR A BAD CUSTOMER?

22   A.    SO FAR, SHE PROBABLY HAS PROBABLY 30 OR 40 SERVERS

23   WITH ME RIGHT NOW.  I STILL CONSIDER SHE IS A GOOD

24   CUSTOMER.

25   Q.    WHY?

1    A.    ALWAYS RESPOND TO ISSUES; ALWAYS RESPOND TO

2    COMMUNICATIONS; PAY HER BILL.

3    Q.    DO YOU HAVE ANY REASON TO BELIEVE THAT SHE IS

4    TRYING TO HELP ANYBODY WITH A COUNTERFEIT WEBSITE?

5    A.    I DON'T THINK SO.

6    Q.    HAVE YOU TALKED TO HER ABOUT THIS SITUATION?

7    A.    SHE IS LIKE --

8         THE COURT:   WELL, I NEED TO BE CAREFUL HERE.

9    THERE'S NO OBJECTION, BUT THIS MIGHT CALL FOR HEARSAY

10   INFORMATION, SO -- I'M ALWAYS CONCERNED WHENEVER WE ARE

11   NOW GOING TO QUOTE WHAT SOMEONE ELSE IS ABOUT TO SAY.

12   BY MR. LOWE:

13   Q.    MR. CHEN, I DON'T WANT YOU TO TELL ME ANYTHING SHE

14   MAY HAVE TOLD YOU.  I JUST WANT TO KNOW IF, IN RESOLVING

15   SOME OF THESE ISSUES, YOU EVER PERSONALLY TALKED TO HER.

16        THE COURT:   THAT WOULD REQUIRE A "YES" OR "NO"

17   ANSWER.

18        THE WITNESS:   E-MAIL COMMUNICATION?

19   BY MR. LOWE:

20   Q.    JUST E-MAILS THAT YOU ARE DEALING WITH ON THESE?

21   A.    YES.

22   Q.    OKAY.  DID YOU THINK THAT WAS SUFFICIENT?

23   A.    YES.

24   Q.    WHY?

25   A.    SPECIFICALLY, WHEN I SAID, "MOVE THIS DOMAIN OUT,"

1    SHE RESPONDED.  I SHOULDN'T SAY "SHE" RESPONDED, BUT I

2    SHOULD SAY "HER COMPANY" RESPONDED.

3    Q.    NOW, SHE WAS RUNNING OR LEASING, SAY, A HUNDRED

4    SERVERS AROUND THAT TIME.  HOW MANY DOMAIN -- I'M SORRY,

5    HOW MANY IP ADDRESSES WOULD BE ASSOCIATED WITH THOSE

6    SERVERS, GENERALLY, OR APPROXIMATELY?

7    A.    A THOUSAND.

8    Q.    OKAY.  AND DO YOU HAVE ANY IDEA WHETHER SHE IS

9    USING ALL OF THOSE HERSELF OR IS SHE RESELLING, AS FAR

10   AS YOU UNDERSTAND?

11   A.    A LOT OF RESELLINGS.

12   Q.    NOW, MR. COOMBS ASKED YOU ABOUT -- LOOKS LIKE NINE

13   COMPLAINTS DURING THIS PERIOD OF TIME CONCERNING

14   SERVERS, THE HUNDRED SERVERS, AND A THOUSAND IP

15   ADDRESSES USED BY ALICE CHEN.

16   A.    YES.

17   Q.    CONSIDERING THE AMOUNT OF THE QUANTITIES INVOLVED,

18   DO YOU REGARD THE --

19         THE COURT:  THAT IS GOING TO CALL FOR A "YES"

20   OR "NO," SO PHRASE IT AS A DIRECT QUESTION.

21   BY MR. LOWE:

22   Q.    CAN YOU TELL US WHETHER -- WHAT YOU WOULD CONSIDER

23   AN EXTENSIVE INFRINGEMENT, SUCH AS MR. COOMBS WAS ASKING

24   YOU ABOUT, IN LIGHT OF THE NUMBER OF SERVERS AND THE

25   NUMBER OF IP ADDRESSES ALICE CHEN USED?

1    A.    I CAN'T -- I DON'T REALLY KNOW MUCH OF MY CUSTOMER

2    SO I CAN'T DEFINE THE SO-CALLED SERIOUSNESS OF THE

3    OFFENSE.

4    Q.    SO WHY DID YOU NOT FINE HER OR TERMINATE HER OR

5    SUSPEND HER AS A CUSTOMER BECAUSE YOU GOT THESE NINE

6    COMPLAINTS FROM LOUIS VUITTON SAYING THAT THERE WAS SOME

7    INFRINGING ACTIVITY ON CERTAIN WEBSITES?

8    A.    IF I REMEMBER CORRECTLY FROM THE DISCUSSION JUST

9    NOW, THEY ONLY INVOLVE THREE SERVERS ON THE MAIN IP'S

10   FOR THE NINE COMPLAINTS.  AND SO I TERMINATE A CUSTOMER

11   HAVING A HUNDRED SERVERS WITH US WHERE SHE RESELL

12   EVERYTHING TO HER CUSTOMER?  DOESN'T LOOK LIKE THAT'S A

13   CORRECT BUSINESS PROPOSITION.

14   Q.    NOW, YOU WERE ASKED FRIDAY AND MAYBE THIS MORNING

15   ABOUT CERTAIN ADDITIONAL ACTIONS THAT YOU HAVE TAKEN

16   THAT ARE NOT SHOWN ON EXHIBIT 1598.  DO YOU RECALL THAT?

17   A.    YES.

18   Q.    ONCE AGAIN, WHERE DID YOU GET THE INFORMATION FOR

19   THIS EXHIBIT 1598?

20   A.    IT'S ALL THE E-MAIL THAT I PROVIDE, THE E-MAIL TO

21   YOUR OFFICE.  AND BASED ON THAT E-MAILS, WE COMPILE THIS

22   SUMMARY REPORT.

23   Q.    SO IS IT POSSIBLE THAT YOU TOOK ADDITIONAL ACTIONS

24   BEYOND WHAT YOUR E-MAIL SHOWED?

25   A.    YES.

1  Q.   NOW, I WOULD LIKE TO GO BACK TO SOMETHING YOU WERE

2  TESTIFYING ABOUT, I THINK ON FRIDAY.

3         COULD WE SEE EXHIBIT 99.2.

4         NOW, THIS APPEARS TO BE A DOMAIN TOOLS REPORT

5  FOR EASTARBIZ.COM; IS THAT RIGHT?

6  A.   YES.

7  Q.   AND WHAT IS THIS -- ON THIS FIRST PAGE, WHAT DO

8  YOU UNDERSTAND THIS IP HISTORY ADDRESS TO MEAN?

9  A.   THAT MEANS THAT THE DOMAIN TOOLS SOMEHOW HAD A WAY

10  TO TRACK WHERE THIS PARTICULAR DOMAIN HOSTED ON ANY

11  PARTICULAR IP AT ANY PARTICULAR TIME.

12  Q.   OKAY.  IT HAS DATES AND IP ADDRESSES?

13  A.   YES.

14  Q.   YOU WERE ASKED -- ON EXHIBIT 1598, YOU WERE ASKED,

15  I THINK ON FRIDAY, ABOUT THE NOTICE YOU RECEIVED ON

16  NOVEMBER 26, '07, JANUARY 3RD, '08, AND MARCH 3RD, '08

17  CONCERNING EASTARBIZ.COM.

18         COULD YOU LOOK DOWN AT THE DATES ON THE BOTTOM

19  OF THIS -- GOING BACK TO 99.2, WOULD YOU LOOK AT THE

20  BOTTOM IP ADDRESSES THERE SHOWING THE ADDRESSES BETWEEN

21  OCTOBER 21, 2007 AND MARCH 9, '08.  DO YOU SEE THOSE?

22  A.   YES.

23  Q.   WHAT DOES THAT SECOND COLUMN AFTER THE DATE

24  INDICATE?

25  A.   IT SAYS "NON-RESOLVABLE."

1    Q.    WHAT DOES THAT MEAN TO YOU?

2    A.    I DON'T REALLY KNOW WHAT DOES IT MEAN ON THIS

3    PARTICULAR REPORT, BECAUSE I --

4    Q.    WHAT DOES "NON-RESOLVABLE" MEAN TO YOU?

5    A.    NON-RESOLVABLE MEANING THAT WHEN YOU ARE TYPING A

6    DOMAIN NAME TO THE BROWSER, WHEN YOU ARE TYPING

7    WWW.EASTARBIZ.COM, IT'S NOT COMING UP.

8    Q.    IT DOESN'T COME UP.  IT'S NOT OPERATING?

9    A.    YES.

10   Q.    SO ACCORDING TO THIS, DURING THOSE PERIODS OF

11   TIME, IT WASN'T RESOLVABLE?

12   A.    IT'S NOT RESOLVABLE.  YES, THAT'S CORRECT.

13   Q.    HOW ABOUT THE IP ADDRESSES THAT ARE LISTED IN

14   THOSE LAST TWO ENTRIES FOR THIS?

15   A.    AS I PREVIOUSLY EXPLAINED -- I MEAN, ALTHOUGH YOU

16   HAVE AN IP ADDRESS, IT DOESN'T MEAN THAT THE WEBSITE IS

17   ALWAYS FUNCTION.  IT CAN BE TURN ON, TURN OFF, TURN ON,

18   TURN OFF.  BUT ON THE RECORD, YOU ALWAYS -- AS LONG AS

19   THE MAIN SERVER HAS THAT REGISTERED, THAT IP ADDRESS, IT

20   WILL SHOW, BUT THE SWITCH ON THE WEBSITE SERVER CAN BE

21   TURNED ON AND OFF.

22   Q.    SO I BELIEVE MR. COOMBS ASKED YOU IF YOU COULDN'T

23   ASSUME THAT EASTARBIZ.COM WAS ON YOUR SERVERS DURING

24   THAT ENTIRE PERIOD OF TIME.  DO YOU RECALL THAT

25   QUESTION?

1    A.    YES.

2    Q.    DOES THIS SUGGEST WHETHER OR NOT IT WAS IN FACT

3    SOMETHING YOU COULD ASSUME, IF IT'S NOT RESOLVABLE?

4    A.    I CAN'T ASSUME ANYTHING UNLESS I'M CHECKING ON THE

5    WEBSITE EVERY TWO HOURS.

6    Q.    NOW I WOULD LIKE TO GO TO EXHIBIT 69.3.

7          THIS IS WHAT; CAN YOU TELL ME?

8    A.    ANOTHER IP HISTORY.

9    Q.    FROM A DOMAIN TOOLS?

10   A.    DOMAIN TOOLS.

11   Q.    AND IT'S CONCERNING WHICH DOMAIN NAME?

12   A.    THIS APE168.COM.

13   Q.    OKAY.  LOOKING DOWN AT THE IP ADDRESS HISTORY

14   LISTING, THE THIRD ENTRY ON HERE, IT APPEARS TO BE

15   AUGUST 19, 2007.  DO YOU SEE THAT?

16   A.    YES.

17   Q.    AND WHAT DOES IT SAY THE STATUS OF THAT WEBSITE

18   WAS AT THAT TIME?

19   A.    NOT RESOLVABLE.

20   Q.    OKAY.  AND THAT WAS AROUND THE TIME THAT YOU GOT

21   NOTICE OF THIS AND THE COMPLAINT IN THIS CASE?

22   A.    YES.

23   Q.    THE NEXT ENTRY, DATED AUGUST 20TH, 2008, INDICATES

24   WHAT?

25   A.    IT SAYS "NEW."

1          MR. COOMBS: OBJECTION. FOUNDATION, YOUR

2   HONOR.

3          MR. LOWE: YOUR HONOR, I'M JUST HAVING HIM

4   READ FROM DEFENDANT'S EXHIBIT --

5          THE COURT: YOU HAVE ASKED A COUPLE OF TIMES

6   WHAT THOSE THINGS MEAN, WHICH MAY BE FOUNDATIONAL. IF

7   YOU CAN -- A COUPLE OF TIMES YOU FRAMED IT AS WHAT DOES

8   HE UNDERSTAND IT TO MEAN -- WHICH MAY BE DIFFERENT THAN

9   WHAT THE REPORTER WHO WROTE THIS INTENDED BY IT -- BUT

10  ASKING HIM TO READ THE ENTRY IS PERMISSIBLE.

11  BY MR. COOMBS:

12  Q.   THE FORTH ENTRY THAT STARTS OFF WITH "NEW," WHAT

13  DO YOU UNDERSTAND THAT TO BE INDICATING?

14  A.   I DON'T REALLY KNOW, BUT IT LOOKS LIKE IT'S A NEW

15  SETUP IP BECAUSE IT BROKE. IN BETWEEN THE THIRD ENTRY

16  AT THE VERY END HAS A "NONE," AND THEN BEGINNING OF THE

17  FOURTH ENTRY IT HAS ANOTHER "NONE," SO THEN IT NEED TO

18  COME UP WITH SOMETHING TO SHOW THAT -- HOW TO -- WHAT

19  THE RELATIONSHIP BETWEEN THE LAST VISIBLE IP VERSUS THE

20  NEW IP.

21  Q.   AND IS THAT NEW IP ADDRESS IN YOUR RANGE?

22  A.   NO.

23  Q.   I WOULD LIKE YOU TO LOOK AT EXHIBIT 73.1. AND

24  ONCE AGAIN, WHAT DO YOU UNDERSTAND THIS TO BE?

25  A.   IT'S BAG925.COM IP HISTORY.

1    Q.    FROM DOMAIN TOOLS AGAIN?

2    A.    YES.

3    Q.    I WOULD LIKE YOU TO LOOK AT THE LAST IP HISTORY

4    LISTING FOR THAT DOMAIN NAME.  WHAT DO YOU UNDERSTAND

5    THAT TO MEAN, THE ONE THAT'S DATED, APPARENTLY, OCTOBER

6    21ST, 2007?

7    A.    NOT RESOLVABLE.

8    Q.    AND THEN THERE'S AN IP ADDRESS NEXT TO IT?

9    A.    YES.

10   Q.    IS THAT IN YOUR RANGE?

11   A.    NO, THAT'S NOT.

12   Q.    NOW, IF YOU GO BACK TO EXHIBIT 1598, ON THE FIRST

13   PAGE OF THIS BAG925.COM -- I THINK IT'S THE THIRD ITEM

14   LISTED -- YOU HAVE A NOTICE DATE AND SOME ENTRIES ABOUT

15   WHAT YOU FOUND; IS THAT CORRECT?

16   A.    YES.

17   Q.    AND WHAT DID YOU FIND WITH RESPECT TO BAG925 ON

18   BOTH OF THE DATES THAT YOU GOT COMPLAINTS, MORE OR LESS?

19   A.    IP ADDRESS NOT IN RANGE.

20           MR. LOWE:  NO FURTHER QUESTIONS, YOUR HONOR.

21           THE COURT:  ANY REQUEST FOR RECROSS?

22           MR. COOMBS:  NO, YOUR HONOR.

23           THE COURT:  I WANTED TO CLARIFY ONE MATTER,

24   AND THIS MIGHT PROVOKE QUESTIONS FROM THE ATTORNEYS,

25   MR. CHEN.

1          THIS ACTUALLY COMES FROM ONE OF OUR JURORS AND

2    THAT HAS TO DO WITH THE PROCESS OF DISABLING A DOMAIN

3    NAME.  ARE YOU TECHNICALLY QUALIFIED YOURSELF TO GO INTO

4    THE SERVER ROOM AND DO THE TASK OF DISABLING A DOMAIN

5    NAME?

6          THE WITNESS:  NOT DOMAIN NAME, BUT IP ADDRESS.

7          THE COURT:  AN IP ADDRESS.  YOU KNOW HOW TO DO

8    THAT YOURSELF?

9          THE WITNESS:  YES.

10         THE COURT:  AND YOU ALSO HAVE STAFF THAT IS

11   ABLE TO DO THAT?

12         THE WITNESS:  YES.  I ONLY COVER THE WEEKEND

13   TIME WHEN THE STAFF IS NOT AVAILABLE.

14         THE COURT:  ALL RIGHT.  SO IF THERE'S STAFF

15   THERE, YOU WOULD DIRECT YOUR STAFF TO DO IT?

16         THE WITNESS:  YES.

17         THE COURT:  AND THERE WERE ACTUALLY THREE

18   LAYERS OF DISABLING THAT WERE AVAILABLE, I UNDERSTOOD

19   YOU TO SAY, THAT YOU WOULD DISABLE ACCESS AT THE ROUTER?

20         THE WITNESS:  YES.

21         THE COURT:  WHAT IS THAT?

22         THE WITNESS:  OKAY.  SO THE -- IF IT'S AN

23   EXTRA IP SITUATION, THEN WE CAN GO INTO THE ROUTER.

24   FIRST, WHEN WE DEPLOY A SERVER, WE NEED TO ASSIGN A MAIN

25   IP.  THAT MAIN IP WILL NEVER CHANGE, AND ANY EXTRA IP WE

1    PICK UP FROM THE AVAILABLE POOL THAT WE CAN ASSIGN THOSE

2    IP ATTACHED TO THAT PARTICULAR MAIN IP.  SO WITH A

3    ROUTER, WE CAN ALWAYS CHANGE THE EXTRA IP.

4         THE COURT:  SO THAT AT THE ROUTER, THEN, IF

5    SOMEONE IS USING AN EXTRA IP IN A WAY THAT YOU WOULD

6    WISH TO DISABLE THAT IP ADDRESS, YOU COULD DO THAT AT

7    THE ROUTER?

8         THE WITNESS:  YES.

9         THE COURT:  AND YOU ARE ABLE ALSO TO GO TO THE

10   SERVER AND DISABLE THE ENTIRE SERVER?

11        THE WITNESS:  YES.  THAT'S BASICALLY

12   DISCONNECT THE NETWORK CABLE.

13        THE COURT:  AND THERE WERE OCCASIONS ALSO WHEN

14   YOU WOULD YOURSELF GO ONTO THE INTERNET USING A BROWSER

15   LIKE ANY MEMBER OF THE PUBLIC WOULD TO SEE WHAT WAS AT A

16   PARTICULAR DOMAIN NAME?

17        THE WITNESS:  YES.

18        THE COURT:  BUT YOU COULDN'T DO THAT FROM

19   WITHIN YOUR OWN SERVER SYSTEM?

20        THE WITNESS:  NO.

21        THE COURT:  THE FINAL QUESTION THAT I HAVE,

22   AND IT HAS TO DO WITH 1598, WHICH WE HAVE BEEN USING --

23   AND ACTUALLY, IT'S UP ON THE SCREEN STILL.

24        ONE OF THE PARTIES ASKED ABOUT YOUR CUSTOMERS.

25   THIS SHOWS A COMPLAINT THAT IS ADDRESSED AND INDEXED BY

1    THE VARIOUS DOMAIN NAMES.  DID YOU EVER TAKE THE VARIOUS

2    DOMAIN NAMES AND CROSS-REFERENCE THEM TO YOUR CUSTOMER

3    LIST TO DECIDE WHETHER OR NOT YOU HAD A CUSTOMER THAT

4    WAS REGULARLY INVOLVED IN COMPLAINTS?

5            THE WITNESS:  NOT REALLY.  THIS IS SOMETHING

6    THAT WE PUT TOGETHER FOR THE PRESENTATION.

7            THE COURT:  ALL RIGHT.  NOW, DO YOU HAVE A

8    CUSTOMER LIST?

9            THE WITNESS:  IT'S IN OUR DATABASE.

10           THE COURT:  ALL RIGHT.  BUT YOU DON'T HAVE IT

11   HERE FOR US?  YOU HAVEN'T PRODUCED A CUSTOMER LIST SO WE

12   COULD SEE A LIST OVER A PERIOD OF TIME OF WHO YOUR

13   CUSTOMERS WERE?

14           THE WITNESS:  NO.

15           THE COURT:  AND DID YOU EVER HISTORICALLY

16   SEARCH FOR DOMAIN NAMES IN YOUR CUSTOMER LIST TO SEE

17   WHICH CUSTOMERS WERE ASSOCIATED WITH WHICH DOMAIN

18   NAMES?

19           THE WITNESS:  I CAN ONLY -- I ONLY KNOW ONE

20   CUSTOMER FROM CHINA THAT THEY ARE ACTUALLY A DOMAIN

21   REGISTRAR, AND THEY MIGHT HAVE -- THEY MIGHT ASSOCIATE

22   TO A LOT OF DOMAINS THEMSELVES.  THE REST OF THE

23   CUSTOMERS, AS I KNOW, THEY ALL RESELLERS; THEY DON'T OWN

24   DOMAIN NAMES THEMSELVES.

25           THE COURT:  I SEE.  BUT THERE WOULD BE AN

1    ASSOCIATION BETWEEN THE CUSTOMER AND A DOMAIN NAME EVEN

2    IF THEY RESOLD IT?  IN OTHER WORDS, YOUR SERVER WOULD BE

3    MADE AVAILABLE TO YOUR CUSTOMER, AND THEY COULD POST TO

4    THAT SERVER THEIR OWN CONTENT OR THEY COULD SELL THEIR

5    ABILITY TO POST CONTENT TO SOMEONE ELSE, AND THAT THIRD

6    PERSON COULD SAVE INFORMATION TO THE SERVER; IS THAT

7    CORRECT?

8         THE WITNESS:  NO.  THE DOMAIN IS OWNED BY THE

9    DOMAIN OPERATORS OR THE DOMAIN OWNERS SO ANYBODY CAN GO

10   TO DOMAIN REGISTRAR AND REGISTER THEIR DOMAINS.  THAT

11   DOMAIN IS THEN -- IF YOU RENT A SERVER WITH AN IP

12   ADDRESS, THAT DOMAIN THEN BE PUT ON THAT PARTICULAR IP

13   ADDRESS.  SO IT'S NOT -- IT'S NOT THE IP OWNER OWNING

14   THE DOMAIN.  THE DOMAIN CAN GO ANYWHERE YOU WANT TO PUT

15   ON IT.

16        THE COURT:  BUT I'M TRYING TO CLARIFY WHAT IS

17   ACTUALLY ON YOUR SERVER.  YOUR SERVER WOULD HAVE -- AS

18   YOU HAVE TALKED ABOUT -- THE DESCRIPTION OF YOUR

19   SERVICES.  WOULD IT HAVE A HARD DISK DRIVE?

20        THE WITNESS:  YES.

21        THE COURT:  INFORMATION COULD BE SAVED ON THAT

22   DISK DRIVE?

23        THE WITNESS:  YES.

24        THE COURT:  WHEN YOUR SERVICE IS GIVEN TO ONE

25   OF YOUR CUSTOMERS, THAT CUSTOMER WOULD THEN HAVE THE

1   ABILITY TO SAVE INFORMATION ONTO THAT DISK, WHICH WOULD

2   BE ACCESSIBLE USING THE INTERNET?

3            THE WITNESS:  YES.

4            THE COURT:  OR THAT CUSTOMER, INSTEAD OF

5   ACTUALLY SAVING INFORMATION THEMSELVES, COULD SELL THE

6   RIGHT TO STORE INFORMATION TO YET A THIRD PERSON, WHICH

7   WOULD BE STORED ON YOUR SERVERS?

8            THE WITNESS:  YES.

9            THE COURT:  IF THERE WERE COUNTERFEIT GOODS

10  BEING ADVERTISED, THE LOCATION OF THE INFORMATION THAT

11  WOULD BE SEEN ON THE INTERNET WOULD BE ON THE HARD DISK

12  THAT IS ON YOUR SERVER?

13           THE WITNESS:  YES.

14           THE COURT:  THANK YOU.  I HAVE NO FURTHER

15  QUESTIONS OF THE WITNESS.

16           DO EITHER OF YOU WISH TO CLARIFY, BASED ON THE

17  COURT'S QUESTIONS?

18           MR. LOWE:  I DO HAVE A COUPLE OF QUESTIONS.

19           THE COURT:  VERY WELL.

20                 **FURTHER REDIRECT EXAMINATION**

21  BY MR. LOWE:

22  Q.   MR. CHEN, THE COURT, I THINK, INITIALLY ASKED YOU

23  IF YOU CAN DISABLE A DOMAIN NAME.  CAN YOU DO THAT?

24  A.   NO.

25  Q.   WHY?

1    A.    BECAUSE THAT'S CONTROLLED BY -- AT THE DOMAIN

2    REGISTRAR AND MAIN SERVER LEVEL.

3    Q.    AND YOU ARE NOT A DOMAIN REGISTRAR?

4    A.    NO.

5    Q.    SO ALL YOU CAN DO IS DISABLE AN IP ADDRESS THAT

6    SOMEBODY IS USING?

7    A.    YES.

8    Q.    YOU INDICATED THAT THE CUSTOMER LIST WAS ON YOUR

9    DATABASE.  IS THIS THE CPRO DATABASE?

10    A.    YES.

11    Q.    WAS THAT PROVIDED TO LOUIS VUITTON IN THE COURSE

12    OF THIS LITIGATION?

13    A.    YES.

14            MR. LOWE:  THANK YOU.

15            THE COURT:  ANY FURTHER QUESTIONS?

16            MR. COOMBS:  NO, YOUR HONOR.  THANK YOU.

17            THE COURT:  I WAS JUDGING FROM THE BODY

18    LANGUAGE.  VERY WELL.

19            IT'S ABOUT 10:35.  WE WILL TAKE OUR

20    MID-MORNING BREAK.  WE WILL COME BACK AT ABOUT A

21    QUARTER OF THE HOUR.

22            (RECESS FROM 10:35 TO 10:50 A.M.)

23            THE CLERK:  PLEASE REMAIN SEATED.  COME TO

24    ORDER.

25            THE COURT:  BEFORE WE SUMMON THE JURY,

1    MS. GARCIA ALERTED ME THAT MAYBE I HAD GIVEN YOU -- THE

2    DATE WAS NOT CORRECT ON IT.  OUR LAST SESSION WAS

3    FRIDAY.  WHAT DATE WAS FRIDAY?

4              MR. LOWE:  THE 21ST, YOUR HONOR.

5              THE COURT:  SO MAYBE I'M A DAY BEHIND IN MY --

6    OH, YES, 8/21.  I THINK I MIGHT HAVE MISDATED THE LAST

7    REPORT.  I'LL LOOK AT THAT AND GIVE YOU A BETTER

8    DOCUMENT.

9              WE ARE NOW ON TUESDAY, THE 25TH, AND AS OF THE

10   END OF THE MORNING, WE ONLY HAVE 900 OR SO MINUTES LEFT

11   IN OUR TRIAL, AND THAT SHOULD CORRESPOND TO IT.  AS OF

12   FRIDAY, WE HAD 1080 LEFT; AS OF THURSDAY, 1440.  THAT'S

13   RIGHT.

14             I GAVE YOU AS OF AUGUST 20TH, WE HAD 1440

15   MINUTES LEFT.  SO FRIDAY MORNING YOU WOULD HAVE STARTED

16   AT 1440, AND AT THE END OF THE DAY YOU WOULD HAVE 1080.

17             LET ME MAKE SURE I GAVE YOU FRIDAY.  I THOUGHT

18   I WAS GIVING YOU FRIDAY, SO THAT'S WHERE I'M A LITTLE

19   BIT CONFUSED.  I'LL CHECK THAT.

20             SUMMON THE JURY.

21             (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

22   HELD IN OPEN COURT, IN THE PRESENCE OF THE JURY:)

23             THE COURT:  VERY WELL.  CALL YOUR NEXT

24   WITNESS.

25             MR. LOWE:  DEFENSE CALLS ANDREW CHENG.

1        THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

2                 ANDREW CHENG,

3    BEING CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS,

4    HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED

5    AS FOLLOWS:

6        THE CLERK:  PLEASE BE SEATED.

7        WILL YOU PLEASE STATE YOUR FULL NAME AND SPELL

8    YOUR LAST NAME FOR THE RECORD.

9        THE WITNESS:  ANDREW CHENG, C-H-E-N-G.

10                DIRECT EXAMINATION

11   BY MR. LOWE:

12   Q.    MR. CHENG, HOW ARE YOU EMPLOYED?

13   A.    EXCUSE ME?

14   Q.    HOW ARE YOU EMPLOYED?

15   A.    I AM EMPLOYED WITH AKANOC.

16   Q.    AND WHAT IS YOUR POSITION WITH AKANOC?

17   A.    I'M AN ENGINEER.

18   Q.    SPECIFICALLY, WHAT ARE YOUR RESPONSIBILITIES FOR

19   AKANOC SOLUTIONS?

20   A.    MY MAIN RESPONSIBILITY IS TO MAKE SURE THAT THE

21   ROUTERS ARE UP AND RUNNING.

22   Q.    WHAT SORT OF AN ENGINEER DO YOU -- WHAT SORT OF

23   ENGINEERING WORK DO YOU DO?  HOW WOULD YOU CHARACTERIZE

24   THAT, GENERALLY?

25   A.    NETWORK ENGINEERING.

1    Q.    HOW LONG HAVE YOU WORKED FOR AKANOC?

2    A.    I BELIEVE OVER FIVE YEARS.

3    Q.    NOW, WHAT IS IT THAT YOU DO AS A NETWORK ENGINEER

4    FOR AKANOC?   CAN YOU EXPLAIN THAT JUST A LITTLE BIT MORE

5    THAN "KEEP THE ROUTERS RUNNING"?

6    A.    WELL, MY PRIMARY RESPONSIBILITY WITH ROUTERS IS TO

7    ENSURE THAT WE HAVE OUR TRAFFIC THAT GOES OUT TO THE

8    INTERNET OVER MULTIPLE CARRIERS, TO MAKE SURE THAT WE

9    ARE BALANCING OUR COMMITMENTS WITH THE CONTRACTS THAT WE

10   HAVE FOR THOSE, AS WELL AS TO ENSURE THAT THEY ARE

11   RUNNING WITHOUT ANY ERRORS.

12   Q.    DID YOU HAVE ANYTHING TO DO WITH SETTING UP THE

13   NETWORK INFRASTRUCTURE?

14   A.    YES.

15   Q.    AND WHAT WAS THAT?

16   A.    IT WAS THE ORIGINAL DESIGN OF THE NETWORK AS WELL

17   AS THE ORIGINAL CONFIGURATION OF THE ROUTERS IN THAT

18   NETWORK.

19   Q.    YOU DESIGNED IT?

20   A.    YES.

21   Q.    OKAY.   AND DID YOU HAVE ANYTHING TO DO WITH THE

22   DATABASE THAT WE HAVE HEARD REFERRED TO AS CPRO?

23   A.    YES.

24   Q.    WHAT WAS YOUR ROLE IN THAT?

25   A.    ORIGINALLY, WE HAD DEVELOPED CPRO, MYSELF AND ONE

1　OTHER PERSON, AND IT WAS TO CONTAIN CUSTOMER INFORMATION

2　THAT COMES ACROSS WITH AN ORDER.

3　Q.　WHAT SORT OF INFORMATION IS ON THE CPRO DATABASE?

4　A.　CPRO HOUSES LIKE THE CUSTOMER'S NAME, COMPANY

5　NAME, ADDRESS, DIFFERENT TYPES OF BILLING INFORMATION

6　FOR HOW THEY ARE PAYING FOR THEIR SERVICES.

7　Q.　ANYTHING ELSE?

8　A.　CPRO ALSO -- IT HAS AN ORDER ID AND WE REFERENCE

9　THE ACTUAL SERVER ITSELF BY THE IP ADDRESS.

10　Q.　I'M NOT SURE IF I UNDERSTOOD WHAT WAS JUST SAID.

11　CAN YOU EXPLAIN THAT A BIT?

12　A.　OH, SURE. SO EVERY SERVER THAT'S IN THE DATA

13　CENTER HAS A MAIN IP ADDRESS. IT'S KIND OF LIKE A

14　UNIQUE IDENTIFIER FOR THAT MACHINE. ONLY ONE MACHINE

15　WILL BE ABLE TO HAVE THAT IP ADDRESS AT A GIVEN TIME.

16　Q.　AND THE DATABASE KEEPS TRACK OF THAT MAIN IP

17　ADDRESS?

18　A.　THE DATABASE KEEPS TRACK OF THE CURRENT IP ADDRESS

19　THAT'S ON A LIVE SERVER.

20　Q.　DOES IT KEEP TRACK OF EXTRA IP ADDRESSES THAT

21　MIGHT GET ASSIGNED TO CUSTOMERS?

22　A.　YES. IF A CUSTOMER REQUIRES MORE THAN A MAIN IP

23　ADDRESS, ADDITIONAL IP ADDRESSES WILL BE ASSIGNED TO

24　THAT SERVER, AND THEY WILL BE TRACKED WITHIN CPRO.

25　Q.　DO YOU DO WORK WITHIN THE DATA CENTER ITSELF OR

1    SOMEWHERE ELSE?

2    A.    I WORK FROM HOME.

3    Q.    HOW DO YOU DO THAT?

4    A.    REMOTELY.

5          I'M NOT SURE I UNDERSTAND YOUR QUESTION.

6    Q.    SO YOU ARE ABLE TO ACCESS THE NETWORK FROM YOUR

7    HOME?

8    A.    YES, I ACCESS THE NETWORK FROM MY HOME USING MY

9    INTERNET CONNECTION AT HOME.

10   Q.    THAT WORKS OUT FOR YOU?  YOU DO WHAT YOU HAVE TO

11   DO?

12   A.    YES.

13   Q.    DO YOU DO ANY OTHER WORK OTHER THAN FOR AKANOC?

14   A.    YES.

15   Q.    AND WHAT SORT OF WORK IS THAT?

16   A.    I'M THE DIRECTOR OF NETWORK OPERATIONS.

17   Q.    FOR?

18   A.    WBS CONNECT.

19   Q.    WHAT'S THAT?

20   A.    IT'S A COMPANY THAT PROVIDES INTERNET ACCESS AND

21   DIFFERENT TYPES OF POINT-TO-POINT CONNECTIONS FOR

22   COMPANIES ACROSS THE COUNTRY, AND DIFFERENT AREAS OF THE

23   WORLD AS WELL.

24   Q.    AND HOW DOES THAT BUSINESS COMPARE WITH THE KIND

25   OF BUSINESS THAT AKANOC AND MANAGED SOLUTIONS OPERATE?

1    A.    WBS IS KIND OF IN THE PROVIDER SPACE, SO THEY ARE

2    GENERALLY LIKE AN ISP.  IF A COMPANY WANTS TO HAVE AN

3    INTERNET CONNECTION AT A DATA CENTER OR AT A CORPORATE

4    OFFICE, YOU KNOW, WE CAN HAVE A SOLUTION DRAWN UP THAT

5    WORKS ACROSS DIFFERENT VENDORS OR DIRECTLY WITHIN OUR

6    OWN NETWORK.

7    Q.    SO WHAT EXACTLY DO YOU DO FOR THEM?  DO YOU

8    MAINTAIN THE NETWORK LIKE YOU DO FOR AKANOC, OR

9    SOMETHING ELSE?

10              MS. WANG:  OBJECTION, YOUR HONOR.  RELEVANCE.

11              THE COURT:  OVERRULED.

12              YOU MAY ANSWER.

13              THE WITNESS:  YES.  I MANAGE PORTIONS OF THE

14   NETWORK WHENEVER THERE IS AN EMERGENCY, AS WELL AS

15   MANAGING THE OTHER TECHNICIANS THAT MAKE UP OUR 24/7

16   OPERATIONS GROUP.

17   BY MR. LOWE:

18   Q.    NOW, I WOULD LIKE TO DIRECT YOUR ATTENTION TO

19   EXHIBIT 1610.  THERE'S A -- YOU WILL SEE IT ON THE

20   SCREEN AND THERE'S ALSO A CHART BEHIND YOU, A COPY OF

21   IT.

22              DOES THIS, IN YOUR VIEW, PROPERLY REPRESENT A

23   SIMPLIFIED OUTLINE OF THE INTERNET?

24   A.    YES.

25   Q.    ALL RIGHT.  CAN YOU INDICATE WHERE IN THIS SORT OF

1    DIAGRAM AKANOC AND MANAGED SOLUTIONS FITS?

2    A.    SO AKANOC WOULD BE IN THE INTERNET SERVICE

3    PROVIDER AND SERVERS.

4    Q.    DOWN HERE IN THE MIDDLE OF THIS DIAGRAM?

5    A.    YES.

6    Q.    OKAY.  AND THE OTHER COMPANY THAT YOU WORK FOR,

7    WHERE IS THAT WITH RESPECT TO THE OTHER ELEMENTS OF THE

8    INTERNET?

9    A.    IN THE INTERNET BACKBONE.

10   Q.    SO YOU ARE DEALING WITH THIS (INDICATING) IN THE

11   CENTER?

12   A.    YES.

13   Q.    OKAY.  IS -- STRIKE THAT.

14         YOU INDICATED THAT YOU DEAL WITH ROUTERS FOR

15   AKANOC, MANAGE THEM.  IS THAT THE WORD YOU USED?

16   A.    YES.

17   Q.    AND IS THE ROUTER, FOR EXAMPLE, INDICATED HERE

18   (INDICATING), IS THIS SORT OF A SYMBOL OF A ROUTER IN

19   THE MIDDLE?

20   A.    WHERE?

21   Q.    LET ME SHOW YOU WHERE I AM POINTING (INDICATING).

22   A.    OH.  YES, THAT WOULD BE THE ROUTER.

23   Q.    OKAY.  AND WHAT IS THE FUNCTION OF THE ROUTER IN

24   THE AKANOC SYSTEM?

25   A.    SO THE ROUTER TAKES PACKETS THAT ARRIVE OVER THE

1    INTERNET AND THEY DELIVER THEM TO A DESIGNATION IP

2    ADDRESS.

3    Q.    AND HOW IS THAT DONE?

4    A.    VIA THE ROUTER HARDWARE.  SO THE ROUTER, ITSELF --

5    THERE IS A FORWARDING ENGINE THAT HAS A COPY OF

6    DIFFERENT WAYS TO REACH DIFFERENT TYPES OF IP ADDRESSES.

7    IT WILL HAVE A COPY OF LOCAL IP ADDRESSES THAT EXIST

8    EITHER WITHIN THE NETWORK OR A ROUTE TO, SAY, A MORE

9    SPECIFIC LOCATION.  SO IT ALSO CONTAINS EITHER A

10   SPECIFIC ROUTE OR A GENERAL ROUTE TO OTHER PORTIONS OF

11   THE INTERNET.

12   Q.    AND DO YOU PROGRAM THE ROUTER TO DO THAT?

13   A.    IN A WAY.  ITS CONFIGURATION -- AND THEY ARE A

14   VERY, VERY STANDARD CONFIGURATION.  SO YOU BASICALLY

15   TELL THE ROUTER THAT THIS GROUP OF IP ADDRESSES BELONGS

16   IN THIS DIRECTION, AND YOU FACE IT TOWARDS A PHYSICAL

17   CONNECTION EITHER TO ANOTHER ROUTER OR A SET OF SERVERS

18   OR A SWITCH.  FOR TRAFFIC THAT'S DESTINED FOR THE

19   INTERNET, WE HAVE A PROTOCOL CALLED BGP.

20   Q.    BGP?

21   A.    BGP.

22   Q.    WHAT DOES THAT MEAN?

23   A.    IT'S FOR BORDER GATEWAY PROTOCOL, AND IT'S HOW

24   ISP'S AND END SERVICE PROVIDERS COMMUNICATE THE IP

25   ADDRESSES THAT ARE EXISTING WITHIN THEIR NETWORKS.  SO

1    FOR AKANOC, THE IP ADDRESSES THAT AKANOC RECEIVED ARE

2    BEING ADVERTISED VIA BGP OUT TO THE DIFFERENT CARRIERS

3    THAT ARE CONNECTED.

4    Q.    WHAT DO YOU MEAN "ADVERTISED"?

5    A.    THE ROUTER ITSELF BASICALLY SAYS, YOU KNOW, "HI,

6    THESE ARE THE IP ADDRESSES THAT I HAVE GOT WITHIN MY

7    NETWORK," AND THE CARRIER ROUTER WILL SAY, "OKAY," AND

8    TAKE THEM.

9    Q.    WHAT'S A "CARRIER ROUTER"?

10   A.    SO A CARRIER WOULD BE THE ISP, BASICALLY THE

11   ENTITY THAT IS PROVIDING INTERNET ACCESS TO AKANOC.  SO

12   AKANOC PURCHASES CONNECTIONS TO THE INTERNET VIA THESE

13   DIFFERENT CARRIERS.

14   Q.    AND DO YOU KNOW WHO THOSE CARRIERS ARE FOR AKANOC?

15   A.    YES.  GLOBAL CROSSING AND COGENT.

16   Q.    SO WHEN YOU SAY THE ROUTER "ADVERTISES," THEY ARE

17   ADVERTISING TO COGENT OR GLOBAL CROSSING'S EQUIPMENT?

18   A.    YES.  IT'S A DIRECT COMMUNICATION WITH GLOBAL

19   CROSSING AND COGENT'S EQUIPMENT STATING THAT "THESE ARE

20   THE IP ADDRESSES THAT I HAVE WITHIN MY NETWORK; AND IF

21   YOU HAVE ANY PACKETS THAT ARE DESTINED FOR THESE IP

22   ADDRESSES, PLEASE SEND THEM TO ME."

23   Q.    AND WHAT DO THESE UPSTREAM PROVIDERS DO WITH THAT

24   INFORMATION, GLOBAL CROSSING OR COGENT?

25   A.    THEY WILL PROFLIGATE IT TO THEIR PEERS, WHO ARE

1    OTHER CARRIERS ON THE INTERNET, OTHER ISP'S.  AND AS IT

2    PROFLIGATES OUT, THE REST OF THE INTERNET WILL SEE THE

3    ROUTE TO AKANOC'S IP ADDRESSES.

4    Q.    THE ROUTERS YOU ARE TALKING ABOUT, DO THEY DEAL IN

5    NAMES OR NUMBERS OR BOTH?

6    A.    JUST IN NUMBERS.

7    Q.    JUST NUMBERS?

8    A.    YES.

9    Q.    SO HOW IS IT THAT A DOMAIN NAME GETS TO A

10   PARTICULAR LOCATION VIA A ROUTER?

11   A.    SO IF I'M SITTING IN FRONT OF MY COMPUTER AT HOME

12   AND I'M LOOKING FOR, SAY, AKANOC.COM, MY COMPUTER WILL

13   GO AND QUERY A DNS SERVER.

14   Q.    ON THIS EXAMPLE HERE, THIS CHART ON THE SCREEN IN

15   FRONT OF YOU, IS THIS THE DNS SERVER THAT YOU ARE

16   TALKING ABOUT?

17   A.    YES.  SO THE DNS SERVER WILL RETURN TO ME THE IP

18   ADDRESS THAT IS ASSOCIATED WITH THAT DOMAIN NAME.

19   Q.    RETURN TO YOU, THE USER, SITTING AT HOME?

20   A.    YES, TO MY COMPUTER THAT I'M SITTING IN FRONT OF

21   WILL RECEIVE AN IP ADDRESS FROM THE DNS SERVER, AND MY

22   COMPUTER WILL USE THAT IP ADDRESS TO FORM A REQUEST FOR

23   THE INFORMATION THAT I'M LOOKING FOR.  IF I AM TRYING TO

24   BROWSE TO WWW.AKANOC.COM, THEN I WILL SEND A REQUEST TO

25   AKANOC'S WEB SERVER BASED OFF OF THE IP ADDRESS THAT I

1  JUST RECEIVED.

2  Q.    SO THE ROUTER RECEIVES JUST THE IP ADDRESS?

3  A.    WHEN THAT REQUEST REACHES THE ROUTER, IT IS A

4  PACKET, AND IT HAS A SOURCE IP ADDRESS AND A DESIGNATION

5  IP ADDRESS, AND IT HAS SOME DATA.  THE DATA ITSELF IS

6  USED BY THE WEB SERVER, NOT BY THE ROUTER.

7  Q.    LET'S TALK ABOUT PACKETS.  WHAT DO YOU MEAN BY

8  THAT?

9  A.    SO A PACKET IS A BUNDLE OF INFORMATION AND IT HAS

10  A HEADER ON IT.  THE HEADER IS THE SOURCE IP ADDRESS,

11  THE DESIGNATION IP ADDRESS, AND ANY PARTICULAR PROTOCOL.

12  THE DATA ITSELF IS GENERALLY USED BY APPLICATIONS LIKE

13  INTERNET EXPLORER OR LIKE YOUR WEB SERVER.  THE HEADER

14  INFORMATION, WHICH IS THE IP ADDRESSES, ARE GENERALLY

15  USED FOR ROUTING PURPOSES.  SO THE ROUTER ITSELF WILL

16  LOOK AT A PACKET.  IT WILL SEE -- IT ONLY LOOKS AT THE

17  DESIGNATION IP ADDRESS AND WILL FORWARD THAT PACKET

18  TOWARDS THE DESIGNATION ADDRESS.

19  Q.    NOW, THE INFORMATION PASSING BETWEEN TWO COMPUTERS

20  ON THE INTERNET, IS ALL THE INFORMATION IN ONE PACKET?

21  A.    NO.  DEPENDING ON THE SIZE OF EITHER THE REQUEST

22  OR THE RESPONSE, THE PACKETS WILL GET FRAGMENTED, AND

23  THERE ARE STANDARD SIZES THAT ARE USED FOR DIFFERENT

24  TYPES OF CONNECTIONS FOR THE AMOUNT OF DATA THAT YOU

25  PASS IN A SINGLE PACKET.

1    Q.    WHO DECIDES HOW TO BREAK THESE PACKETS UP?

2    A.    THE ROUTER WILL.  IF THE ROUTER IS SET AT 1500

3    BYTES AS A MAXIMUM SIZE AND IT RECEIVES SOMETHING THAT'S

4    5,000 BYTES, THEN IT WILL FRAGMENT IT.

5    Q.    NOW, WHICH ROUTER ARE WE TALKING ABOUT?  WHOSE

6    ROUTER, MAYBE I SHOULD SAY.

7    A.    THE FIRST ROUTER THAT RECEIVES THE PACKET.  SO IF

8    I'M AT HOME AND I SEND A REQUEST OUT TO THE INTERNET OF,

9    YOU KNOW, 5,000 BYTES, CHANCES ARE THAT MY PROVIDER FOR

10   MY HOME CONNECTION WILL FRAGMENT THAT.

11   Q.    NOW, ON THIS EXHIBIT 1610, WE HAVE ILLUSTRATED --

12   LET'S SAY A RETAIL ISP, SUCH AS MAYBE COMCAST.

13   A.    YES.

14   Q.    WOULD THAT BE A FAIR REPRESENTATION?

15   A.    YES, COMCAST.

16   Q.    SO WHEN SOMETHING COMES FROM THIS USER, IT GOES TO

17   A ROUTER THAT'S OPERATED BY COMCAST, AND THAT ROUTER

18   BREAKS THE INFORMATION UP INTO SMALLER PACKETS?

19   A.    THAT'S CORRECT.

20   Q.    OKAY.  AND THEN WHAT?

21   A.    WELL, THE PACKETS WILL TRAVERSE THE LOAD-BALANCED

22   ROUTING TABLE THAT WAS GENERATED VIA BGP ANNOUNCEMENTS.

23   Q.    BVT?

24   A.    BGP.

25   Q.    BGP?

1    A.    YES.  AS THEY TRAVERSE, EACH ROUTER WILL SEND IT

2    CLOSER TO ITS DESIGNATION.  THERE'S NO WAY TO REALLY

3    KNOW HOW MANY ROUTERS ARE IN BETWEEN BUT, YOU KNOW, THEY

4    ALL SPEAK THAT KIND OF DYNAMIC ROUTING PROTOCOL.  SO AS

5    THE ADVERTISEMENTS PROFLIGATE, THE GROUP OF ROUTERS IN

6    THE INTERNET WILL RECEIVE THE ROUTE TO THAT DESIGNATION.

7    Q.    AND WE HAVE HEARD SOME TESTIMONY ABOUT HOPS.

8    A.    YES.

9    Q.    IS THAT RELATED TO WHAT YOU ARE TALKING ABOUT?

10   A.    SIMILAR.  HOPS ARE THE NUMBER OF ROUTERS THAT PASS

11   BETWEEN A SOURCE AND A DESIGNATION.  WHEN YOU ARE

12   TALKING ABOUT BGP, IT'S MORE ABOUT DIFFERENT

13   ORGANIZATIONS.  SO I MAY TRAVERSE -- AT HOME I USE

14   COMCAST, SO I WILL GO OUT TO COMCAST, COMCAST WILL

15   LIGHTLY PASS IT TO COGENT, COGENT WILL PASS IT TO

16   AKANOC.  IN BGP TERMS, THAT IS ONLY THREE A S HOPS

17   VERSUS THE, YOU KNOW, 12, 13 ACTUAL PHYSICAL ROUTERS

18   THAT THE INFORMATION WILL TRAVEL THROUGH.

19   Q.    OKAY.  AND THEN IT ARRIVES -- THESE PACKETS

20   ARRIVE, LET'S SAY, AT AKANOC AND IT HITS THE MAIN

21   ROUTER, AND WHAT DOES THAT ROUTER DO WITH IT?

22   A.    SO THE ROUTER HAS INFORMATION THAT WAS

23   PRECONFIGURED ABOUT WHICH DIRECTION OF A PARTICULAR IP

24   ADDRESS EXISTS.

25   Q.    YOU'RE SAYING WHICH SERVER?

1    A.    NOT EXACTLY WHICH SERVER, BUT WHICH PORT THE

2    INFORMATION SHOULD BE FORWARDED.  SO OFF OF A SINGLE

3    PORT ON A ROUTER, YOU CAN HAVE MULTIPLE SERVERS THAT

4    ACHIEVE THEIR CONNECTIVITY OFF OF THAT PORT.  YOU HAVE A

5    LAYER 2 SWITCH WHICH SITS BETWEEN THE ROUTER AND SERVERS

6    THAT CAN BASICALLY USE ANY IP ADDRESS THAT IS CONFIGURED

7    ON THAT PORT.  SO THE ROUTER ITSELF WILL ONLY KNOW THAT

8    I AM SENDING THIS TRAFFIC TO THIS PARTICULAR PORT.

9    Q.    JUST BY LOOKING AT THE ADDRESS?

10   A.    YES.

11   Q.    THE NUMBERS?

12   A.    YES.  IT'S LIKE A DIRECTORY.

13   Q.    OKAY.  AND WHAT HAPPENS IF THERE'S MORE THAN ONE

14   PACKET FOR THE MESSAGE THAT'S PASSING?

15   A.    THE ROUTER WILL FORWARD THEM, REGARDLESS OF THE

16   NUMBER OF PACKETS THAT'S IN A PARTICULAR COMMUNICATION.

17   IT IS UP TO THE APPLICATION TO ACCEPT ALL OF THE

18   DIFFERENT PACKETS AND REASSEMBLE.

19   Q.    SO MAYBE YOU CAN EXPLAIN THIS:  SOME SOFTWARE

20   SITTING ON A SERVER IS REASSEMBLING THE PACKETS?

21   A.    YES.

22   Q.    AND I BELIEVE YOU MENTIONED EARLIER A WEB SERVER;

23   IS THAT A SOFTWARE OR A HARDWARE THING?

24   A.    A WEB SERVER IS A PIECE OF SOFTWARE THAT SITS ON

25   A SERVER, ON A PHYSICAL SERVER.  NOT EVERY SERVER HAS A

1    WEB SERVER OR IT, SO IT'S SOMETHING THAT AN

2    ADMINISTRATOR OF THAT COMPUTER WOULD NEED TO INSTALL.

3    Q.    IS THIS SOMETHING THAT AKANOC OR MANAGED SOLUTIONS

4    INSTALLS, A WEB SERVER?

5    A.    THERE ARE TIMES.  I MEAN, THERE ARE CERTAIN

6    BUNDLED PACKAGES THAT HAVE DIFFERENT TYPES OF SOFTWARE

7    PREINSTALLED, BUT THEY ARE USUALLY NOT CONFIGURED.

8    Q.    SO WHEN A SERVER IS RENTED OUT TO A CUSTOMER, WHO

9    INSTALLS THE WEB SERVER, IF THEY ARE GOING TO BE TAKING

10   WEB INFORMATION?

11   A.    IF A CUSTOMER IS GOING TO BE RUNNING A WEB SERVER

12   ON THE PHYSICAL SERVER THEY LEASE, IT'S THEIR

13   RESPONSIBILITY TO INSTALL AND CONFIGURE.

14   Q.    AND YOU DON'T HAVE ANYTHING TO DO WITH THAT?

15   A.    NO.

16   Q.    SO THE WEB SERVER SOFTWARE IS ABLE TO RECOGNIZE

17   PACKETS AND PUT THEM TOGETHER AND DO SOMETHING WITH

18   THEM?

19   A.    YES.  THE WEB SERVER ITSELF WILL REASSEMBLE THE

20   PACKETS AND LOOK AT THE PARTICULAR REQUEST.  SO THAT

21   REQUEST IS BASICALLY ONLY RELEVANT TO "A" WEB SERVER.

22   IF IT WAS A DIFFERENT APPLICATION THAT RECEIVED THAT

23   REQUEST, IT WOULD LIKELY NOT KNOW WHAT TO DO WITH IT.

24   Q.    DO YOU KNOW -- AS YOU ARE SITTING THERE AT AKANOC

25   IN THE CAGE, OR EVEN SITTING AT HOME WATCHING OPERATIONS

1  ON YOUR COMPUTER, DO YOU KNOW WHAT'S GOING ON IN THOSE

2  SERVERS AND WHAT THE WEB SERVER SOFTWARE IS DOING WITH

3  ANY INFORMATION?

4  A.    NO.  THE ROUTER ONLY TELLS US INFORMATION ABOUT

5  THE AMOUNT OF DATA THAT'S GOING BY, NOT THE ACTUAL DATA.

6  Q.    WHY DO YOU CARE ABOUT THE AMOUNT?

7  A.    SO -- WE PAY FOR BANDWIDTH IN MEGABITS, SO WE ARE

8  ALWAYS WATCHING THE AMOUNT OF DATA THAT IS GOING BY

9  BECAUSE THAT DIRECTLY AFFECTS THE AMOUNT THAT WE PAY, AT

10 LEAST TO OUR CARRIERS.

11 Q.    AND IF A MESSAGE, LET'S SAY, IS QUERYING THE

12 SERVER SOFTWARE, THE WEB SERVER SOFTWARE -- LET'S SAY A

13 USER OUT THERE WANTS SOME INFORMATION ABOUT SOMETHING

14 THAT'S DIRECTED TO AN ADDRESS SITTING ON A SERVER, DO

15 YOU HAVE ANY CONTROL OVER WHAT INFORMATION GOES BACK OUT

16 THE OTHER DIRECTION?

17 A.    NO.  IT IS JUST ANOTHER PACKET THAT HAS A SOURCE

18 IP ADDRESS AND A DESIGNATION IP ADDRESS.  THE ROUTER

19 ITSELF WILL JUST FORWARD IT.

20 Q.    DO YOU FILTER CONTENT USING THE ROUTERS?

21 A.    NO.

22 Q.    NOW, YOU INDICATED A FEW MINUTES AGO THAT YOU, I

23 BELIEVE, SET UP AN ORDER SYSTEM AS PART OF THE DATABASE

24 WITHIN AKANOC?

25 A.    YES.

1    Q.    HOW DOES THAT WORK?

2    A.    SO A CUSTOMER WILL ARRIVE AT AKANOC'S WEBSITE.

3    THEY WILL SEE -- IF THEY SEE A PARTICULAR SERVER THAT

4    THEY ARE INTERESTED IN, THEY WILL CLICK ON IT AND AN

5    ORDER FORM WILL SHOW UP ON THEIR SCREEN.  THAT ORDER

6    FORM WILL CONTAIN INFORMATION LIKE A NAME, COMPANY NAME,

7    THE TYPE OF SERVER THAT THEY WANT AND THE OPERATING

8    SYSTEM THAT THEY WANT TO BE INSTALLED ON IT, AND A PLACE

9    FOR CREDIT CARD INFORMATION OR PAYPAL ADDRESS OR SOME

10   WAY THAT THEY WISH TO PAY FOR THE SERVER.

11   Q.    AND THEN WHAT IS DONE WITH THAT INFORMATION?

12   A.    THE INFORMATION IS SENT TO A DATABASE AND THEN --

13   Q.    WHAT DATABASE IS THAT?

14   A.    IT IS A PART OF CPRO.

15   Q.    OKAY.

16   A.    AND OUR BILLING DEPARTMENT WILL VERIFY IF THAT IS

17   A LEGITIMATE ORDER AND THE ORDER WILL BE PUT THROUGH FOR

18   PROVISION.

19   Q.    WHAT DO YOU MEAN "A LEGITIMATE ORDER"?

20   A.    LOTS OF TIMES, YOU KNOW, PEOPLE WILL GO TO A

21   WEBSITE AND JUST SUBMIT RANDOM DATA, WHETHER IT BE A

22   LEGITIMATE PERSON WHO WISHES TO ORDER A SERVER OR

23   SOMEBODY WITH, YOU KNOW, JUST KIND OF CLICKING AND

24   PUNCHING THINGS IN.  OTHER TIMES THERE IS, YOU KNOW,

25   PEOPLE PUTTING IN FALSE BILLING INFORMATION, AND THOSE

1    THINGS ARE VERIFIED BEFOREHAND.

2    Q.    HOW ARE THEY VERIFIED?

3    A.    I'M NOT SURE.

4    Q.    IT'S LIKE VERIFYING CREDIT CARD INFORMATION, IS

5    THAT WHAT YOU ARE TALKING ABOUT?

6    A.    YES.

7    Q.    NOW, ARE YOU FAMILIAR WITH -- ARE YOU FAMILIAR

8    WITH ARIN?

9    A.    YES.

10   Q.    AND WHAT IS THAT?

11   A.    ARIN IS AN INTERNET REGISTRY AND THEY ARE

12   RESPONSIBLE FOR ALLOCATING IP ADDRESSES TO ORGANIZATIONS

13   IN AMERICA.

14          THE COURT:  SOME OF THIS HAS BEEN COVERED AND

15   NOT CONTROVERSIAL, BUT I'LL PERMIT YOU.

16          MR. LOWE:  THAT WAS MERELY THE BACKGROUND,

17   YOUR HONOR.

18   BY MR. LOWE:

19   Q.    NOW, DO YOU KNOW WHETHER OR NOT AKANOC AND MANAGED

20   SOLUTIONS PROVIDES INFORMATION TO ARIN CONCERNING THE

21   USAGE OF IP ADDRESSES THAT ARE ASSIGNED TO IT?

22   A.    SO PER ARIN GUIDELINES WE ARE RESPONSIBLE FOR

23   KEEPING OUR WHOIS RECORDS UP TO DATE, AND THAT IS

24   PARTICULARLY, YOU KNOW, COMPANY INFORMATION OF AN

25   ORGANIZATION THAT IS UTILIZING AN IP ADDRESS.

1    Q.    NOW, WHAT DO YOU MEAN AN ORGANIZATION UTILIZING

2    IT?  ARE YOU TALKING ABOUT AKANOC OR A CUSTOMER OF

3    AKANOC, OR SOMETHING ELSE?

4    A.    A LITTLE OF BOTH.  SO WHEN ARIN ISSUES A BLOCK OF

5    IP ADDRESSES, THEY EXPECT THAT IF THE ISP WILL ASSIGN

6    THOSE TO THEIR CUSTOMERS, THAT THEY WILL ALSO PUT THE

7    CUSTOMER'S INFORMATION IN THE WHOIS DATABASE.

8    Q.    AND HOW IS THAT DONE AT AKANOC, MANAGED SOLUTIONS?

9    A.    AT AKANOC THERE IS A WHOIS SERVER, AND ARIN HAS

10   BASICALLY A LINK TO THAT WHOIS SERVER TO PULL THE

11   INFORMATION.

12   Q.    AND WHAT'S ON THIS WHOIS SERVER?

13   A.    THE WHOIS SERVER HAS THE COMPANY NAME AS WELL AS

14   THE CITY AND STATE OF A PARTICULAR ORGANIZATION THAT IS

15   RESPONSIBLE FOR THAT IP ADDRESS.  IF WE HAVE A CUSTOMER

16   THAT HAS IP'S FROM US ON ONE OF OUR SERVERS, THEN THAT

17   INFORMATION WILL GET PUBLISHED TO THE WHOIS SERVER.

18   Q.    TO THE WHICH SERVER?

19   A.    TO THE WHOIS SERVER.

20   Q.    THE WHOIS SERVER.  SO YOU ARE TALKING ABOUT

21   CUSTOMER INFORMATION FROM THE CPRO DATABASE THAT'S ON

22   THE WHOIS SERVER?

23   A.    YES.

24   Q.    IF SOMEONE WANTED TO FIND OUT WHO YOUR CUSTOMERS

25   ARE, COULD THEY FIND THAT OUT THROUGH A QUERY TO ARIN?

1    IN OTHER WORDS, COULD SOMEONE LOOK UP THROUGH ARIN AND

2    LINK TO YOUR WHOIS --

3    A.    YES.

4    Q.    -- SERVER INFORMATION ABOUT YOUR CUSTOMERS?

5    A.    YES.   THAT'S PUBLIC INFORMATION.

6    Q.    SO HOW WOULD THEY DO THAT?

7    A.    THERE IS A, I GUESS, WHOIS PROTOCOL THAT'S EITHER,

8    YOU KNOW, FROM A PARTICULAR COMPUTER OR FROM ARIN'S

9    WEBSITE.   YOU CAN GO AHEAD AND TYPE IN AN IP ADDRESS AND

10   IT WILL RETURN THE WHOIS INFORMATION FOR A PARTICULAR

11   IP.

12   Q.    OKAY.   NOW, LET'S GO BACK TO THE OPERATION OF THE

13   ISP HERE AND THE SERVERS.   IF SOMEONE HAS, AS YOU HAVE

14   DESCRIBED, ORDERED A SERVER, A PACKAGE SO-TO-SPEAK WITH

15   IPS'S AND BANDWIDTH -- IS THAT THE WAY IT'S SOLD?

16   A.    YES.

17   Q.    DO YOU HAVE ANY CONTROL OVER WHAT THEY DO WITH

18   THAT SERVER?

19   A.    NO.   OUR MODEL IS THAT A CUSTOMER RECEIVES A

20   DEDICATED SERVER, AND IN THE INDUSTRY TERMS A DEDICATED

21   SERVER IS, YOU KNOW, FULL ADMINISTRATIVE ACCESS.   SO THE

22   SERVER ITSELF WILL HAVE AN OPERATING SYSTEM INSTALLED, A

23   PASSWORD WILL BE SET, AND THAT PASSWORD WILL BE SENT TO

24   THE CUSTOMER.   AT THAT POINT IT IS AS IF, YOU KNOW, THE

25   CUSTOMER IS THE ONLY ADMINISTRATOR OF THAT SERVER.   IT

1   IS SIMILAR TO ANYBODY BUYING A COMPUTER FROM ANY

2   COMPUTER SHOP.  YOU WILL BE THE ADMINISTRATOR OF YOUR

3   OWN COMPUTER THERE.

4   Q.    SO EVEN THOUGH THEY DON'T TAKE IT HOME WITH THEM,

5   THEY RUN IT AS IF THEY HAD?

6   A.    YES.

7   Q.    SO CAN YOU GET ACCESS TO WHAT'S ON THAT SERVER

8   AFTER YOU HAVE GIVEN THE CUSTOMER YOUR PASSWORD?

9   A.    NOT WITHOUT THE CUSTOMER'S PASSWORD.

10  Q.    COULD YOU CHANGE THE PASSWORD?

11  A.    THERE ARE DIFFERENT TYPES OF SOFTWARE THAT, IF THE

12  CUSTOMER DOES LOSE THEIR PASSWORD, WE WOULD NEED TO SHUT

13  DOWN THE SERVER AND RUN A DIFFERENT TYPE OF SOFTWARE ON

14  IT THAT CAN RESET THE PASSWORD FOR THE CUSTOMER.

15  Q.    AND IF YOU DID THAT, WHAT HAPPENS TO THE CUSTOMER?

16  A.    WELL, THE CUSTOMER WOULD BE OFF LINE DURING THE

17  TIME THAT WE ARE RESETTING THE PASSWORD.  AT THAT POINT

18  WE WOULD ISSUE A NEW PASSWORD AND SEND THAT TO THE

19  CUSTOMER.

20  Q.    BUT IF YOU DIDN'T GIVE THE PASSWORD TO THE

21  CUSTOMER, WOULD THEY BE ABLE TO ACCESS THE SERVER THAT

22  THEY RENTED?

23  A.    NO.

24  Q.    DO YOU EVER MONITOR WHAT CUSTOMERS ARE DOING ON

25  THOSE SERVERS?

1    A.    NO.

2    Q.    WHY NOT?

3    A.    SO, PARTICULARLY, THE AMOUNT OF DATA THAT IS GOING

4    BY IS NOT REALLY ACCESSIBLE BY THE ROUTER, YOU KNOW.

5    THE ROUTER ITSELF ONLY SEES IP ADDRESSES AND IT WILL SEE

6    THAT THERE IS DATA, BUT WITHOUT ACTUALLY KNOWING, YOU

7    KNOW, PROTOCOLS AND OTHER THINGS, THE ROUTER ITSELF

8    DOESN'T SPEAK THOSE.  THE ROUTER ONLY SPEAKS BGP, AND IT

9    UNDERSTANDS THAT THERE'S A SOURCE DESIGNATION AND --

10   THERE'S A SOURCE IP ADDRESS AND A DESIGNATION IP

11   ADDRESS.  ITS JOB IS TO FORWARD TO THE DESIGNATION.

12   Q.    NOW, ONCE YOU HAVE RENTED A SERVER TO A CUSTOMER,

13   GIVEN THEM THE PASSWORD, WHAT IS THE PROCESS BY WHICH

14   THEY PUT PROGRAMS OR WHATEVER THEY ARE PUTTING -- DATA

15   OF ANY KIND ON THE SERVER?

16   A.    THAT WILL DEPEND ON THE CUSTOMER.  THERE ARE

17   VARIOUS APPLICATIONS THAT THE CUSTOMER CAN USE TO UPLOAD

18   INFORMATION TO THEIR SERVER.

19   Q.    CAN THEY INSTALL PROGRAMS ON THE SERVER?

20   A.    YES.

21   Q.    REMOTELY?

22   A.    YES.  WHEN THEY LOG IN TO THE SERVER, IT IS THE

23   SAME AS IF THEY WERE LOGGING INTO IT FROM HOME IN

24   GENERAL.  IF IT'S A WINDOWS SERVER, THEY WILL REMOTE IN

25   AND THEY WILL SEE A WINDOWS DESKTOP.  IF IT IS A LINUX

1   SERVER, THEN THEY WILL TERMINAL IN AND THEY WILL SEE A

2   LINUX TERMINAL, AT WHICH POINT THEY CAN USE IT AS IF

3   THEY WERE SITTING IN FRONT OF IT AS WELL.

4   Q.    AND THEN WHAT?  WHAT'S THE PHYSICAL PROCESS BY

5   WHICH THEY UPLOAD?

6   A.    AGAIN, THAT WILL DEPEND ON THE PARTICULAR USER AND

7   WHAT THEY ARE FAMILIAR WITH.  FOR EXAMPLE, THERE'S FTP

8   WHICH IS A PROTOCOL THAT THEY CAN USE TO UPLOAD, WHICH

9   IS VERY STANDARD AND WORKS, I BELIEVE, ON BOTH WINDOWS

10   AND ON LINUX.  THERE ARE OTHER ENCRYPTED METHODS AS

11   WELL, OR THEY COULD PULL UP AN INTERNET BROWSER AND

12   DOWNLOAD JUST AS IF THEY WERE AT HOME ON THAT COMPUTER.

13   Q.    NOW, THIS CHART WE HAVE BEEN SHOWING YOU, EXHIBIT

14   1610, SHOWS USERS DOWN HERE AT THE BOTTOM SOMETIMES

15   GOING THROUGH RESELLERS.  ASSUMING THAT ONE OF THESE

16   USERS WANTS TO UPLOAD INFORMATION TO A SERVER, DO THEY

17   ACTUALLY HAVE A DIRECT LINE LIKE THIS SUGGESTS OR DO

18   THEY HAVE TO GO THROUGH THE INTERNET BACKBONE AND ALL OF

19   THAT?

20   A.    ALL OF OUR CUSTOMERS WILL NEED TO GO THROUGH THE

21   INTERNET BACKBONE TO REACH THEIR SERVER.  THERE ARE NO

22   USERS THAT ARE DIRECTLY CONNECTED TO THEIR OWN SERVERS.

23   THIS IS A CLOSED FACILITY FOR PHYSICAL ACCESS.

24        MR. LOWE:  OKAY.  I HAVE NO FURTHER QUESTIONS,

25   YOUR HONOR.

1          THE COURT:  VERY WELL.

2          ANY CROSS?

3                  CROSS-EXAMINATION

4   BY MS. WANG:

5   Q.    GOOD MORNING, MR. CHENG.

6   A.    GOOD MORNING.

7   Q.    ISN'T IT CORRECT THAT WHEN YOU ARE ASSIGNING AN IP

8   ADDRESS, IT ONLY GETS ASSIGNED TO ONE CUSTOMER AT A

9   TIME?

10  A.    THAT'S CORRECT.

11  Q.    AND WHEN AN INTERNET USER IS TRYING TO ACCESS A

12  WEBSITE THAT IS ON ONE OF YOUR SERVERS, ISN'T AKANOC'S

13  SERVER THE FIRST HOP OUT?

14  A.    CAN YOU REPEAT THAT?

15  Q.    SURE.  WHEN INFORMATION IS BEING TRANSMITTED TO AN

16  INTERNET USER FROM DEFENDANT'S SERVERS, ISN'T THE FIRST

17  ROUTER OR HOP DEFENDANT'S ROUTER?

18  A.    SO THE FIRST HOP FROM A CUSTOMER SERVER WILL BE

19  AKANOC'S ROUTER.

20  Q.    AND YOU STATED EARLIER THAT THE ARIN WHOIS

21  DATABASE INFORMATION IS UPDATED BY AKANOC OR MSG; IS

22  THAT CORRECT?

23  A.    YES.

24  Q.    I'M GOING TO SHOW YOU --

25          THE COURT:  YOU MIGHT WANT TO BACK OUT A

1    LITTLE BIT.

2            MS. WANG:  IS IT FLASHING ON YOUR SCREENS AS

3    WELL?

4            THE COURT:  KEEP YOUR VOICE UP.

5    BY MS. WANG:

6    Q.    MR. CHENG, CAN YOU SEE THAT?

7    A.    YES.

8    Q.    AND WHAT DOES IT LIST AS MANAGED SOLUTIONS GROUP'S

9    CONTACT INFORMATION OR ADDRESS?

10   A.    IT'S A LITTLE BLURRY.

11           THE COURT:  IS THERE AN AUTOFOCUS BUTTON

12   THERE?

13           MS. WANG:  YEAH, I TRIED IT EARLIER, BUT --

14   YEAH.  SORRY, THAT IS ACTUALLY AUTOFOCUSED.

15           THE WITNESS:  IT LISTS 46750 FREMONT.

16   BY MS. WANG:

17   Q.    IS THAT A CORRECT ADDRESS FOR MANAGED SOLUTIONS

18   GROUP?

19   A.    I BELIEVE THAT IS A -- SOME TYPE OF ADDRESS.  IT

20   MIGHT BE THE REGISTERED ADDRESS FOR THE CORPORATION, I'M

21   NOT SURE.

22   Q.    COULD YOU READ THE DATE THERE?

23   A.    THAT SAYS "8/24/2009."

24   Q.    AND, MR. CHENG, YOU ALSO TESTIFIED THAT THE ARIN

25   WHOIS DATABASE WOULD REFLECT YOUR -- OR DEFENDANT'S

1    CUSTOMERS?

2    A.    YES.

3    Q.    AND THAT WOULD BE ACCORDING TO A SEARCH FOR A

4    PARTICULAR IP ADDRESS?

5    A.    YES.

6    Q.    I'M SHOWING YOU EXHIBIT 625, WHICH APPEARS TO BE A

7    WHOIS SEARCH FOR A PARTICULAR IP ADDRESS.

8          LOOKING AT THAT RESULT, CAN YOU TELL ME WHICH

9    CUSTOMER THAT IP ADDRESS BELONGED TO?

10   A.    I DON'T SEE ANY INFORMATION.

11          MS. WANG:  NO FURTHER QUESTIONS, YOUR HONOR.

12          THE COURT:  ANY FURTHER QUESTIONS?

13          MR. LOWE:  NO, YOUR HONOR.

14          THE COURT:  VERY WELL.  THE WITNESS IS

15   EXCUSED.

16          THANK YOU VERY MUCH.

17          CALL YOUR NEXT WITNESS.

18          MR. LOWE:  I CALL RICHARD GRALNIK.

19          (PAUSE IN PROCEEDINGS.)

20          THE COURT:  IS THERE SOMEONE WHO HAS SUMMONED

21   HIM?

22          MR. LOWE:  I BELIEVE SO.  HE IS STANDING IN

23   THE HALL.

24          THE COURT:  COME ALL THE WAY FORWARD HERE AND

25   BE SWORN BY THE CLERK.

1          THE CLERK:  WOULD YOU PLEASE RAISE YOUR RIGHT

2     HAND.

3                    RICHARD GRALNIK,

4     BEING CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS,

5     HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED

6     AS FOLLOWS:

7          THE CLERK:  PLEASE BE SEATED.

8          WOULD YOU PLEASE STATE YOUR FULL NAME, AND

9     SPELL YOUR LAST NAME.

10         THE WITNESS:  MY NAME IS RICHARD GRALNIK.  MY

11    LAST NAME IS SPELLED G-R-A-L-N-I-K.

12                    DIRECT EXAMINATION

13    BY MR. LOWE:

14    Q.   WHAT IS YOUR BUSINESS ADDRESS, SIR?

15    A.   MY BUSINESS ADDRESS IS 5870 WEST JEFFERSON

16    BOULEVARD, SUITE A, LOS ANGELES, CALIFORNIA, 90016.

17    Q.   AND WHAT BUSINESS IS LOCATED AT THAT ADDRESS?

18    A.   THE NAME OF THE COMPANY IS ONLINE SECURITY.

19    Q.   AND WHAT IS YOUR POSITION WITH ONLINE SECURITY?

20    A.   I AM A SENIOR FORENSIC INVESTIGATOR.

21    Q.   AND HAVE YOU BEEN RETAINED BY THE DEFENSE AS AN

22    EXPERT WITNESS IN THIS CASE?

23    A.   YES, I HAVE.

24    Q.   CAN YOU TELL US HOW LONG YOU HAVE BEEN WORKING IN

25    THE COMPUTER INDUSTRY, FIRST OF ALL?

1   A.    I HAVE WORKED IN THE COMPUTER INDUSTRY SINCE 1981.

2   Q.    THAT'S ABOUT HOW MANY YEARS?

3   A.    ABOUT 27 YEARS, 28 YEARS.

4   Q.    WHAT WAS YOUR TRAINING IN THE COMPUTER INDUSTRY,

5   INITIALLY?

6   A.    MY INITIAL TRAINING WAS AS A COMPUTER PROGRAMMER.

7   Q.    AND THEN WHAT?

8   A.    AND FROM THERE I WENT INTO NETWORKING, COMPUTER

9   NETWORKS.

10  Q.    WHAT SORT OF NETWORKING EXPERIENCE AND TRAINING

11  HAVE YOU HAD CONCERNING THE INTERNET?

12  A.    CONCERNING THE INTERNET, I HAVE HAD TRAINING ON

13  ROUTERS.  I HAVE HAD TRAINING ON THE DESIGN AND

14  IMPLEMENTATION OF A LARGE AMOUNT OF DATABASE NETWORKS.

15  I HAVE DESIGNED VARIOUS SIZE NETWORKS THAT WERE BOTH

16  WIDE AND LOCAL AREA.

17  Q.    CAN YOU BRIEFLY DEFINE WIDE AREA AND LOCAL AREA

18  NETWORKS?

19  A.    A WIDE AREA NETWORK IS BASICALLY A NETWORK THAT

20  INVOLVES LONG DISTANCE CONNECTIONS, ALTHOUGH IT CAN EVEN

21  BE A SHORT DISTANCE IF IT INVOLVES CROSSING PUBLIC

22  THOROUGHFARES.  BOTH AREA NETWORKS ARE TYPICALLY THOUGHT

23  OF AS ONES THAT ARE IN A SINGLE BUILDING.

24  Q.    WHAT SORT OF WORK DO YOU DO -- WELL, WHY DON'T YOU

25  GO THROUGH YOUR HISTORY, IF YOU WILL, IN THE COMPUTER

1  INDUSTRY.  VERY BRIEFLY, WHAT SORT OF WORK HAVE YOU

2  DONE?

3  A.    I STARTED OUT AS A PROGRAMMER.  I WORKED FOR A

4  COUPLE YEARS DOING PROGRAMMING ORIGINALLY ON IBM

5  PERSONAL COMPUTERS.  I THEN WORKED ON IBM MAINFRAMES AS

6  A PROGRAMMER.  I THEN WORKED FOR AN INTERNATIONAL

7  COMPUTER VENDOR NAMED CRIME COMPUTER AND I WORKED FOR

8  THEM INITIALLY AS A TECHNICAL CONSULTANT IN DATABASES

9  AND TRADITIONAL PROGRAMMING LANGUAGES.

10           I THEN MOVED INTO COMPUTER NETWORKS AND BECAME

11  THE SPECIALIST OF THE WESTERN UNITED STATES ON

12  NETWORKING.  I WENT FROM THERE TO A COMPANY IN LOS

13  ANGELES TO A CONSULTING COMPANY THAT DESIGNED AND BUILT

14  AND DID EVALUATIONS OF VARIOUS SIZE NETWORKS, TYPICALLY

15  ROUTER-BASED NETWORKS.  THAT COMPANY GRADUALLY CHANGED

16  INTO A SOFTWARE COMPANY, AND I WROTE THE DOCUMENTATION

17  AND TRAINED ON A NETWORK MANAGEMENT APPLICATION.

18           AND FROM THERE I WENT INTO INFORMATION

19  SECURITY FOR A COUPLE OF YEARS, AND THEN MOVED INTO

20  COMPUTER FORENSICS.

21  Q.    WHAT DO YOU DO IN THE COMPUTER FORENSICS FIELD?

22  A.    A VARIETY OF THINGS.  MOST OF THE CASES INVOLVE

23  ANALYSIS OF DIFFERENT KINDS OF COMPUTER STORAGE DEVICES

24  AND ESTABLISHING VALIDITY OF INFORMATION ON THOSE

25  DEVICES.  OTHER CASES INVOLVE DIFFERENT KINDS OF

1  COMPUTER TECHNOLOGY WHERE AN EVALUATION AND

2  UNDERSTANDING OF THE TECHNOLOGY IS NECESSARY TO DEFEND

3  WHATEVER IS BEING DONE WITH THOSE COMPUTERS IN COURT.

4  Q.    CAN YOU TELL US BRIEFLY ABOUT YOUR EDUCATION,

5  FORMAL EDUCATION?

6  A.    I HAVE A DEGREE IN ECONOMICS FROM THE UNIVERSITY

7  OF CALIFORNIA IN SANTA BARBARA THAT WAS AWARDED IN 1981

8  THAT INVOLVED THREE YEARS OF STUDY IN ENGLAND.  AND I

9  HAVE A CERTIFICATE OF DATA PROCESSING FROM A JUNIOR

10  COLLEGE IN TORRANCE, EL CAMINO COLLEGE.

11  Q.    ARE YOU AFFILIATED WITH ANY PROFESSIONAL

12  ORGANIZATIONS?

13  A.    YES, I AM.

14  Q.    WHAT ARE THOSE?

15  A.    I'M A MEMBER OF THE HIGH TECH CRIME INVESTIGATOR

16  ASSOCIATION.  I'M A MEMBER OF THE INFORMATION SYSTEMS

17  SECURITY ASSOCIATION.  I AM A MEMBER OF THE FBI NATIONAL

18  MEMBERS ALLIANCE.  THEY CHANGED IT -- I FORGOT WHAT THEY

19  CALLED IT ORIGINALLY; THEY CHANGED THE NAME.

20  Q.    HAVE YOU EVER TESTIFIED AS AN EXPERT WITNESS IN

21  ANY LAWSUIT?

22  A.    YES, I HAVE.

23  Q.    APPROXIMATELY HOW OFTEN HAVE YOU BEEN RETAINED AS

24  AN EXPERT WITNESS AND PROVIDED SOME SORT OF TESTIMONY IN

25  COMPUTER FORENSICS?

1    A.    IT VARIES AS FAR AS TIMING.   IN THE LAST FIVE

2    YEARS, I HAVE WORKED ON PROBABLY A COUPLE HUNDRED CASES.

3    I HAVE TESTIFIED IN DEPOSITIONS ON A DOZEN OR SO OF

4    THOSE.   I HAVE TESTIFIED IN TWO JURY TRIALS BEFORE THIS,

5    AND I HAVE TESTIFIED IN AN ARBITRATION.

6    Q.    HAVE YOU EVER ACTED AS AN EXPERT WITNESS IN

7    FEDERAL COURT PROCEEDINGS?

8    A.    YES, I HAVE.

9    Q.    AND IN WHAT OTHER COURTS?

10   A.    CALIFORNIA STATE SUPERIOR COURTS, STATE OF

11   ARKANSAS SUPERIOR COURT, AND A COUPLE OTHERS I DON'T

12   REMEMBER.

13   Q.    OKAY.   IN THE COURSE OF YOUR WORK, HAVE YOU BECOME

14   FAMILIAR WITH INTERNET SERVICE PROVIDERS?

15   A.    YES, I HAVE.

16   Q.    AND WHAT IS YOUR UNDERSTANDING OF WHAT AN INTERNET

17   SERVICE PROVIDER IS OR DOES?

18   A.    MY UNDERSTANDING OF AN INTERNET SERVICE PROVIDER

19   IS A COMPANY THAT GIVES -- THAT MAKES ACCESS TO THE

20   INTERNET AVAILABLE FOR OTHER COMPANIES IN VARIOUS WAYS,

21   SOMETIMES BY PROVIDING MACHINES THAT ARE CONNECTED TO

22   THE INTERNET THAT COMPANIES CAN USE FOR THEIR OWN

23   PURPOSES, SOMETIMES BY PROVIDING THE ABILITY TO PUT A

24   SERVICE ON THE INTERNET, SUCH AS A WEBSITE.

25          MR. LOWE:   YOUR HONOR, I BELIEVE THAT WE HAVE

1    STIPULATED TO THE ADMISSION OF EXHIBIT 1612,

2    MR. GRALNIK'S CV?

3             THE COURT:  YES.  YOU MAY DISPLAY IT.

4             CV'S ARE NOT EVIDENCE, BUT SOMETIMES IT'S

5    CONVENIENT FOR YOU, RATHER THAN HAVE THE WITNESS GO

6    THROUGH HIS CV AND TESTIFY ABOUT IT, TO DISPLAY IT,

7    AND I WILL ALLOW THAT.

8    BY MR. LOWE:

9    Q.   WHAT WERE YOU ENGAGED BY THE DEFENDANTS TO DO IN

10   THIS CASE, GENERALLY SPEAKING?

11   A.   I WAS ENGAGED BY THE DEFENDANTS IN THIS CASE TO

12   LOOK AT THE NATURE OF THEIR BUSINESS AS A HOSTING

13   PROVIDER AND TO COMPARE THEM TO OTHER SIMILAR TYPES OF

14   BUSINESSES AND TO ESTABLISH, I GUESS, THE COMMONALITY OF

15   THAT KIND OF BUSINESS MODEL ON THE INTERNET, AND ALSO TO

16   LOOK AT THEIR ABUSE RESPONSE, POLICIES AND PROCEDURES,

17   AND COMPARE THOSE TO OTHER COMPANIES IN SIMILAR

18   BUSINESS.

19   Q.   AND IN DOING THAT, WHAT SORT OF INFORMATION DID

20   YOU RELY UPON?

21   A.   THE INFORMATION I RELIED ON INCLUDED INTERVIEWS

22   WITH EMPLOYEES AT AKANOC, RESEARCH I DID ON OTHER

23   COMPANIES IN THE INDUSTRY THAT ARE OTHER HOSTING

24   COMPANIES AND -- I'M SORRY, IN ISP'S, LOOKING AT THEIR

25   BUSINESS MODELS, LOOKING AT THE WAY THAT THEY WORK WITH

1   RESELLERS AND PROVIDE ALL KINDS OF HOSTING SERVICES, AND

2   TO EVALUATE THEIR VARIOUS POLICIES FOR ABUSE RESPONSE.

3   Q.   CAN YOU LOOK AT EXHIBIT 1543, PLEASE.

4        CAN YOU TELL US WHAT THIS IS?

5   A.   THIS IS A DIAGRAM OF A MAP THAT WAS CREATED OF A

6   SECTION OF THE INTERNET USING A PROGRAM THAT SENT

7   TRAFFIC TO 20,000 DIFFERENT SITES ON THE INTERNET AND

8   MAPPED THE LOCATIONS -- WELL, THE PATHS THROUGHOUT THOSE

9   LOCATIONS, SPECIFICALLY.

10  Q.   AND IS THIS ALL OF THE INTERNET THAT'S SHOWN ON

11  THIS MAP?

12  A.   NO.  NOT EVEN CLOSE.

13  Q.   WHAT IS IT, AS YOU UNDERSTAND IT, DOES IT SHOW?

14  A.   MY UNDERSTANDING IS IT SHOWS -- I THINK I SAID

15  BEFORE, 20,000 DIFFERENT SITES IN THE UNITED STATES,

16  SWEDEN, I THINK THE U.K. AND ITALY, AND THEN THE REST OF

17  IT IS KIND OF LUMPED TOGETHER.

18  Q.   AND WHAT ARE ALL OF THESE LITTLE LINES AND

19  BRANCHES, LOOKS LIKE A SNOWFLAKE OR SOMETHING, BUT NOT

20  QUITE?

21  A.   IT'S MY UNDERSTANDING THAT THESE ARE BASICALLY

22  PATHS THROUGH THE INTERNET TO THE VARIOUS SITES THAT

23  WERE CONTACTED.

24  Q.   HOW MANY -- HOW LARGE IS THE INTERNET?

25  A.   I'M NOT SURE I CAN ANSWER THAT.  IT'S WORLDWIDE.

1    Q.    AND YOU SAID THERE WERE 20,000 SITES THAT WERE

2    BEING QUERIED TO CREATE THIS PARTICULAR DOCUMENT, THIS

3    PARTICULAR PICTURE.  DO YOU KNOW HOW MANY SITES THERE

4    ARE ON THE INTERNET?

5    A.    I DON'T KNOW IF ANYONE KNOWS THE ANSWER TO THAT

6    QUESTION.  THERE ARE MILLIONS.

7    Q.    I WOULD LIKE YOU TO LOOK BRIEFLY AT EXHIBIT 1610,

8    THIS CHART BEHIND YOU, AND WE WILL PUT IT ON THE SCREEN

9    AS WELL.

10             CAN YOU TELL ME WHAT THAT IS?

11   A.    THIS IS SORT OF A FLOWCHART OF THE SERIES OF STEPS

12   THAT OCCUR BEHIND THE SCENES WHEN A USER WANTS TO

13   CONNECT TO A WEBSITE ON THE INTERNET.

14   Q.    AND, JUST ROUGHLY, CAN YOU TELL US WHAT THE STEPS

15   ARE FOR SOME USER TO CONNECT TO SOMEBODY ON THE

16   INTERNET?

17   A.    YES.  TYPICALLY WHAT THE USER WILL SEE, OF COURSE,

18   IS ON THEIR COMPUTER SCREEN, AND THEY WILL TYPE IN THE

19   NAME OF THE WEBSITE ON THEIR BROWSER, FOR EXAMPLE.  WHAT

20   HAPPENS BEHIND THE SCENES IS THAT THE FIRST THING THE

21   COMPUTER HAS TO DO IS FIND OUT WHAT'S CALLED THE IP

22   ADDRESS OF THAT SITE.  THE INTERNET DOESN'T USE SITE

23   NAMES LIKE GOOGLE.COM OR AKANOC.COM TO COMMUNICATE OVER

24   THE INTERNET.  ALL THE DIFFERENT SITES HAVE ADDRESSES

25   ASSIGNED TO THEM BY THE PHONE NUMBER.  YOU DON'T CALL

1   SOMEONE BY NAME, YOU CALL THE PHONE NUMBER, AND THE

2   INTERNET WILL TRANSLATE THE NAME YOU REQUESTED INTO

3   WHAT'S CALLED THEIR IP ADDRESS THROUGH A PROCESS USING

4   WHAT'S CALLED THE DOMAIN NAME SERVICE, AND THAT'S STEPS

5   ONE THROUGH FOUR -- ONE THROUGH THREE HERE.

6   Q.    SO THE DOMAIN NAME SERVICE IS, FOR EXAMPLE,

7   REFLECTED HERE IN THE TOP RIGHT CORNER OF THIS CHART --

8   DIAGRAM?

9   A.    YES.

10   Q.    OKAY.   THEN WHAT HAPPENS?

11   A.    ONCE YOUR COMPUTER KNOWS THE IP ADDRESS OF THE

12   SITE THAT YOU WANT TO TALK TO, IT WILL THEN SEND DATA TO

13   THAT SITE, AND HOW IT GETS THERE IS BASICALLY DEPENDING

14   ON THE INTERNET.

15        WHAT WILL HAPPEN IS THAT YOUR SYSTEM WILL SEND

16   A REQUEST, WHATEVER TYPE OF ACTION YOU TRY TO DO, SEND

17   THAT KIND OF DATA OVER THE INTERNET.   IT WILL BE SENT TO

18   THE IP ADDRESS THAT WAS RETURNED BY THE DNS RESPONSE BY

19   WHATEVER PATH MAKES THE MOST SENSE AT THAT TIME, AND

20   THAT PATH CAN CHANGE AT ANY TIME.   THERE'S NO FIXED

21   ROUTE THROUGH THE INTERNET FROM ONE POINT TO ANY OTHER

22   POINT -- IT'S CONSTANTLY CHANGING -- AND THE NETWORK

23   ITSELF WILL DECIDE ON THE BEST WAY TO ROUTE YOUR PACKET

24   FROM YOUR LOCATION TO THE DESIGNATION.

25        ONCE IT REACHES THE DESIGNATION, THE COMPUTER

1    ON THE OTHER SIDE WILL RECEIVE IT, PROCESS IT, AND SEND

2    BACK THE RESPONSE, WHICH MAY OR MAY NOT TAKE THE SAME

3    PATH BACK TO YOU THAT YOUR PACKET TOOK TO THEM.

4    Q.    ALL RIGHT.  NOW, HERE IN THE CENTER OF THIS

5    PARTICULAR EXHIBIT IS SOMETHING REFERRED TO AS THE

6    "INTERNET BACKBONE."  CAN YOU TELL US WHAT THAT IS?

7    A.    THE INTERNET BACKBONE IS SORT OF A GENERIC TERM

8    FOR THE HIGHER-LEVEL TRAFFIC ROUTES AROUND THE WORLD.

9          TYPICALLY, WHAT WILL HAPPEN IS IF SOMEONE HAS

10   A CONNECTION TO THEIR OFFICE IN THEIR HOME, IT WILL BE

11   CONNECTED TO A HIGHER-TIER CARRIER IN THE INTERNET, AND

12   THEN THE TRAFFIC WILL GO FROM THAT LEVEL TO WHATEVER

13   LEVEL IT NEEDS TO TAKE TO GET TO THE FINAL DESTINATION.

14   IT COULD BE LOCALLY WITHIN A PARTICULAR CITY; IT COULD

15   BE INTERNATIONAL; IT COULD BE ANYWHERE.

16          AND THE ROUTERS ON THE INTERNET THAT KEEP

17   TRACK OF THE DIFFERENT PATHS THAT ARE AVAILABLE FROM ONE

18   POINT TO ANOTHER WILL DETERMINE THE BEST WAY FOR YOUR

19   DATA TO THE DESIGNATION, AND THEN THE RESPONSE CAN THEN

20   BE MAPPED BY THE SAME OPTION.

21   Q.    IS THE PERSON, LET'S SAY SITTING HERE SENDING A

22   MESSAGE TO SOMEBODY ELSE ON THE INTERNET -- SEEKING

23   INFORMATION FROM SOMEBODY ELSE ON THE INTERNET --

24   ANALOGOUS TO MAILING A LETTER, OR NOT?

25   A.    YOU COULD LOOK AT IT THAT WAY AS A COMPARISON,

1   YES.

2   Q.   WOULD YOU PLEASE TAKE A LOOK AT EXHIBIT 1544.

3   TELL US WHAT THIS IS.

4   A.   THIS IS A DIAGRAM THAT IS SIMILAR TO THE PREVIOUS

5   DIAGRAM. IT'S ON MORE OF AN INFRASTRUCTURE LEVEL THAN A

6   FLOWCHART, BUT IT DOES ALSO SHOW A SIMILAR KIND OF LOGIC

7   INVOLVED IN DATA CROSSING THE INTERNET.

8   Q.   CAN YOU BRIEFLY DESCRIBE WHAT IT'S SHOWING?

9   A.   WHAT IT WILL SHOW IS A PERSON ON THEIR SYSTEM

10   TRYING TO ACCESS A PARTICULAR WEBSITE. THEIR REQUESTS

11   WILL GO TO A SERVER, WHICH WILL TURN THE -- ACTUALLY

12   TRANSLATE THE NAME THAT THEY REQUESTED INTO THE IP

13   ADDRESS OF THE COMPUTER THAT ACTUALLY PROVIDES THAT

14   PARTICULAR SERVICE OR HAS THAT PARTICULAR FACILITY ON

15   IT. AND THEN THE TRAFFIC FROM THE USER TO THE ACTUAL

16   SITE, ONCE THE IP ADDRESS HAS BEEN DETERMINED, WILL

17   CROSS THE INTERNET THROUGH ANY NUMBER OF POSSIBLE PATHS

18   TO REACH THE DESIGNATION, WHICH IS IN THE LOWER

19   RIGHT-HAND CORNER -- IN THIS CASE IT'S A WEBSITE DATA

20   CENTER.

21         AND THEN THE TRAFFIC GOING BACK THE OTHER WAY

22   AGAIN WILL GO BACK BY WHATEVER PATH MAKES THE MOST SENSE

23   AT THE TIME.

24   Q.   IS IT APPROPRIATE TO THINK ABOUT THE INTERNET AND

25   THE WORLD WIDE WEB AS THE SAME THING?

1    A.    THEY ARE NOT THE SAME THING.

2    Q.    HOW ARE THEY DIFFERENT?

3    A.    THE INTERNET IS -- WELL, IT'S REFERRED TO AS A

4    NETWORK OF NETWORKS, BUT THE WORLD WIDE WEB IS JUST ONE

5    FUNCTION THAT'S AVAILABLE ON THE INTERNET.  THE INTERNET

6    DOES ALL SORTS OF OTHER -- PROVIDES A LOT OF OTHER KINDS

7    OF DATA SERVICES BESIDES THE WORLD WIDE WEB ITSELF.

8    THESE DAYS TO MANY PEOPLE, BECAUSE THEY TEND TO DO SO

9    MANY THINGS THROUGH THE WEB, IT SEEMS TO BE SYNONYMOUS,

10   BUT THE WORLD WIDE WEB IS A SUBSET OF THE INTERNET; IT'S

11   ONE PARTICULAR SOFTWARE SERVICE AVAILABLE ON THE

12   INTERNET.

13   Q.    IS THE WORLD WIDE WEB OR WEB TRAFFIC A MAJOR PART

14   OF INTERNET OPERATIONS OF TRAFFIC, AS FAR AS YOU KNOW?

15   A.    TO MY KNOWLEDGE, NO, IT'S NOT.

16   Q.    WOULD YOU LOOK AT EXHIBIT 1545 AND TELL US WHAT

17   THAT REPRESENTS?

18   A.    THIS IS A SERIES OF BAR CHARTS SHOWING A BREAKDOWN

19   OF THE TYPE OF INTERNET TRAFFIC THAT IS SEEN ON THE

20   INTERNET BY CATEGORY.

21   Q.    IN DIFFERENT YEARS?

22   A.    YES, FOR 2008.  2009 AND 2010 ARE PROJECTED.

23   Q.    SO JUST VERY BRIEFLY, IT'S INDICATING A VARIETY OF

24   SERVICES IN ROUGH QUANTITY OF USAGE OF THE INTERNET?

25   A.    YES.

1   Q.    SO HOW MUCH IN 2008, APPROXIMATELY, OF ALL

2   INTERNET USAGE, WAS WEB AND E-MAIL TRAFFIC?

3   A.    BASED ON THIS GRAPH, I WOULD SAY ABOUT 20, 25

4   PERCENT.

5   Q.    CAN YOU TELL US YOUR UNDERSTANDING OF AN IP

6   ADDRESS?

7   A.    AN IP ADDRESS IS A NETWORK ADDRESS OR IDENTIFIER

8   GIVEN TO A PARTICULAR COMPUTER ON A NETWORK.

9   Q.    AND WHO ASSIGNS THOSE ADDRESSES?

10  A.    DEPENDING ON THE NETWORK, THE ADDRESSES ARE

11  TYPICALLY ASSIGNED BY AN ADMINISTRATOR.

12  Q.    AND IS THERE -- ARE THERE ORGANIZATIONS THAT DO

13  THIS, OR HOW IS IT DONE?

14  A.    IP ADDRESS ASSIGNMENT ON THE INTERNET, I'M JUST --

15  IT'S A LITTLE CONFUSING BECAUSE IP ADDRESSES REALLY

16  APPLY TO COMPUTERS ON A NETWORK IN GENERAL.  YOU DON'T

17  HAVE TO BE ON THE INTERNET TO HAVE AN IP ADDRESS, SO

18  THAT MIGHT BE WHERE THE CONFUSION COMES IN.

19  Q.    SO LET'S FOCUS ON INTERNET, IP ADDRESSES ON THE

20  INTERNET, FOR THE MOMENT.  WHO ASSIGNS THOSE?

21  A.    IP ADDRESS ASSIGNMENT ON THE INTERNET IS

22  CONTROLLED BY THE TOP LEVEL OF THAT ORGANIZATION CALLED

23  THE INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS.

24  THAT ORGANIZATION THEN HAS DELEGATED RESPONSIBILITY FOR

25  IP ADDRESSES AROUND THE WORLD TO FIVE DIFFERENT

1    ORGANIZATIONS CALLED REGIONAL INTERNET REGISTRIES.

2    THOSE REGISTRIES, IN TURN, ASSIGN BLOCKS OF ADDRESSES TO

3    ISP'S, AND ISP'S THEN ASSIGN IP ADDRESSES FOR SPECIFIC

4    MACHINES TO PARTICULAR COMPUTERS.

5    Q.    THIS FIRST ORGANIZATION YOU TALKED ABOUT, IS IT

6    ALSO KNOWN AS ICANN?

7    A.    YES, IT IS.

8    Q.    AND WHO MAKES THE RULES FOR THE USE OF IP

9    ADDRESSES?

10   A.    THE RULES FOR HOW THEY ARE ASSIGNED ON THE

11   INTERNET ARE BASICALLY DEFINED BY ICANN.

12   Q.    HOW DOES AN IP ADDRESS RELATE TO A DOMAIN NAME, IF

13   AT ALL?

14   A.    AN IP ADDRESS YOU COULD THINK OF AS BEING THE

15   TELEPHONE NUMBER OF THE COMPUTER WHERE YOU HAVE A

16   PERSON'S NAME.  OF COURSE, MY TELEPHONE HAS MY NAME ON

17   IT, BUT WHEN YOU WANT TO CALL ME, YOU CALL MY TELEPHONE

18   NUMBER.  BY THE SAME LOGIC, A COMPUTER WILL HAVE A NAME

19   ASSOCIATED WITH IT, SOMETIMES MORE THAN ONE NAME,

20   BECAUSE THESE ARE FOR PEOPLE TO THINK OF NAMES IN TERMS

21   OF NUMBERS.  BUT COMPUTERS THINK IN TERMS OF NUMBERS,

22   AND DATA ON THE INTERNET IS ADDRESSED AND TRANSMITTED

23   BASED ON THOSE NUMBERS.

24            SO THE RELATIONSHIP BETWEEN A DOMAIN NAME SUCH

25   AS GOOGLE.COM AND AN IP ADDRESS, WHATEVER ADDRESS

1    HAPPENS TO BE ASSIGNED, WILL BE AN ASSOCIATION OF THE

2    TWO WHERE ONE REPLACES THE OTHER, DEPENDING ON WHETHER

3    YOU ARE TALKING ON A HUMAN LEVEL OR A COMPUTER LEVEL.

4    Q.    AND DOMAIN NAMES, HOW ARE THEY REGULATED OR

5    ASSIGNED?

6    A.    DOMAIN NAMES, AGAIN, AT THE HIGHEST LEVEL ARE

7    UNDER THE COORDINATION AND CONTROL OF ICANN, BUT THAT,

8    IN TURN, IS DELEGATED TO A SERIES THAT ARE CALLED

9    REGISTRIES.

10   Q.    NOT THE SAME AS, FOR EXAMPLE, ARIN, OR THESE

11   REGIONAL NUMBER REGISTRIES?

12   A.    NO.    THE NUMBER REGISTRIES ARE RESPONSIBLE FOR IP

13   ADDRESSES, WHAT ARE CALLED AUTONOMOUS SYSTEM NUMBERS.

14   Q.    JUST THE NUMBERS?

15   A.    JUST THE ADDRESSES, YES.

16   Q.    WELL, NUMBER ADDRESSES WE ARE TALKING ABOUT?

17   A.    YES.

18   Q.    OKAY.    AND A DIFFERENT SET OF ORGANIZATIONS DEALS

19   WITH DOMAIN NAMES, BUT THEY ARE STILL UNDER THE CONTROL

20   OF ICANN?

21   A.    YES, THE DOMAIN NAMES ARE UNDER THE CONTROL OF A

22   SERIES OF WHAT ARE CALLED REGISTRIES AT THE HIGHEST

23   LEVEL.    FOR EXAMPLE, THE DOT-COM DOMAIN IS UNDER THE

24   CONTROL OF A COMPANY CALLED VERISIGN, AND VERISIGN HAS

25   AN AGREEMENT WITH ICANN TO ADMINISTER THE DOT-COM

1   DOMAIN, THE TOP LEVEL DOMAIN. AND THEN ICANN -- I'M

2   SORRY. THEN VERISIGN, IN TURN, CAN REGISTER WHAT ARE

3   CALLED REGISTRARS. REGISTRY, REGISTRARS; IT'S GOING TO

4   GET WORSE.

5           AND THE REGISTRIES ARE THE ONES THAT ACTUALLY

6   WILL TAKE REQUESTS FOR A DOMAIN NAME TO BE ASSIGNED,

7   CHECK TO MAKE SURE THAT THE NAME IS UNIQUE AND THAT IT

8   MEETS THE NAMING GUIDELINES, AS FAR AS WHAT'S ALLOWED

9   AND THE CHARACTERS THAT CAN BE IN A NAME. IT WILL --

10  THE REGISTRAR ITSELF WILL ALSO GET THE INFORMATION ABOUT

11  THE REGISTRANT. THE PERSON IN THE COMPANY THAT WANTS TO

12  REGISTER THE NAME HAS TO IDENTIFY THEMSELVES, SO THE

13  REGISTRANT WILL PROVIDE THE REGISTRAR WITH INFORMATION

14  ABOUT THEMSELVES AND REQUEST A PARTICULAR DOMAIN NAME,

15  WHICH THE REGISTRAR WILL THEN PUT INTO THE REGISTRY.

16  Q.   NOW, DO THESE NAMES ALL HAVE TO BE UNIQUE?

17  A.   YES, THEY DO.

18  Q.   ARE THERE ANY SPECIAL RULES FOR WHAT YOU CAN HAVE

19  AS A DOMAIN NAME? COULD YOU HAVE ABCD123?

20  A.   THE RULES ON WHAT IS A LEGAL DOMAIN NAME BASICALLY

21  ONLY CONSIDER THE LENGTH OF THE NAME AND THE CHARACTERS

22  THAT ARE ALLOWED TO BE IN THE NAME, SO ANY MIXTURE OF

23  LETTERS AND NUMBERS, FOR EXAMPLE, AS LONG AS IT'S NOT

24  ALREADY ASSIGNED TO SOMEBODY ELSE, IS A VALID DOMAIN

25  NAME.

1   Q.    NOW, WHAT SORT OF ORGANIZATIONS ACT AS REGISTRAR

2   OF DOMAIN NAMES?

3   A.    ANY NUMBER OF COMPANIES CAN BE REGISTRARS.  IT'S A

4   MATTER OF SIGNING UP TO BE ONE, AND IT'S A BUSINESS, BUT

5   IT'S JUST A MATTER OF SIGNING YOURSELF UP WITH THE

6   APPROPRIATE REGISTRY.

7   Q.    ARE THERE ANY MAJOR ONES THAT YOU COULD IDENTIFY

8   THAT WE MIGHT RECOGNIZE?

9   A.    THE BIGGEST ONE IS CALLED GO DADDY; THAT'S THE

10  LARGEST SINGLE REGISTRAR.  THERE ARE QUITE A FEW OTHERS.

11  I THINK IN THE UNITED STATES THERE ARE OVER 500 OF THEM.

12  Q.    AND OTHERS AROUND THE WORLD?

13  A.    YES.

14  Q.    BUT ALL OF THEM ASSIGNING DOT-COM DOMAIN NAMES

15  ULTIMATELY HAVE TO GO TO VERISIGN TO GET APPROVAL OR

16  AUTHORIZATION?

17  A.    YES, THEY DO.  THAT'S RIGHT.

18  Q.    AND ARE THERE OTHER ENDINGS OF DOMAIN NAMES OTHER

19  THAN DOT-COM?

20  A.    YES, THERE ARE.

21  Q.    SUCH AS?

22  A.    DOT-COM, DOT-NET, DOT-GOV, DOT-INFO, DOT-ORG.

23  THOSE ARE THE MAIN -- WHAT ARE CALLED GENERIC TOP-LEVEL

24  DOMAINS.  THERE ARE ALSO WHAT ARE CALLED COUNTRY CODE

25  TOP-LEVEL DOMAINS; FOR EXAMPLE, DOT-US, DOT-CA FOR

1  CANADA, DOT-UK. SO PRETTY MUCH EVERY COUNTRY HAS A

2  TWO-LETTER SUFFIX OR IDENTIFIER ASSIGNED TO IT, AND THAT

3  BECOMES THE COUNTRY CODE TOP-LEVEL DOMAIN.

4          AND THERE'S A REGISTRY -- I'M SORRY,

5  REGISTRAR -- I BEG YOUR PARDON -- I'M SORRY, I WAS RIGHT

6  THE FIRST TIME -- REGISTRY FOR EACH OF THOSE AS WELL.

7  Q.   AND ARE THOSE REGISTRIES DIFFERENT THAN, FOR

8  EXAMPLE, VERISIGN?

9  A.   IN TERMS OF WHAT THEY DO, THEY ARE REALLY NOT.

10 Q.   ARE THEY DIFFERENT LEGAL ENTITIES, AS FAR AS YOU

11 KNOW?

12 A.   AS FAR AS I KNOW, YES. VERISIGN IS RESPONSIBLE

13 FOR A NUMBER OF TOP-LEVEL DOMAINS, BUT THERE ARE OTHER

14 COMPANIES OR ORGANIZATIONS THAT HANDLE ONES BEYOND THE

15 ONES THAT VERISIGN HAS.

16 Q.   CAN YOU BE AN ISP AND A REGISTRAR OF DOMAIN NAMES?

17 A.   YES, YOU CAN.

18 Q.   DO YOU HAVE TO BE?

19 A.   NO.

20 Q.   DOES EVERY ISP HAVE TO BE A REGISTRAR?

21 A.   NO.

22 Q.   IS IT COMMON OR UNCOMMON FOR AN ISP TO BE A

23 REGISTRAR?

24 A.   IT'S NOT UNCOMMON. THERE'S AN OVERLAPPING OF

25 COMPLIMENTARY FUNCTION TO THE TWO ROLES. I MEAN, THE

1   ISP ASSIGNS THE IP ADDRESS, AND THE REGISTRAR REGISTERS

2   THE DOMAIN NAME AND NEEDS TO KNOW THE IP ADDRESS THAT

3   WAS GIVEN TO THE DOMAIN NAME, AND SO IT MAKES SENSE FOR

4   ONE ORGANIZATION TO HANDLE BOTH FUNCTIONS.

5   Q.    SO SOME OF THEM MAY OFFER SORT OF ONE-STOP

6   SHOPPING FOR PEOPLE TO GET BOTH?

7   A.    YES.

8   Q.    NOW, I BELIEVE YOU INDICATED WHEN YOU WERE

9   DISCUSSING THIS CHART THAT THERE IS A -- WHEN YOU SAY

10  YOU ARE A USER SEEKING TO GO SOMEPLACE AND YOU HAVE A

11  DOMAIN NAME, YOU INDICATED THAT YOU GO TO A DOMAIN NAME

12  RESOLVER OR DOMAIN NAME SERVER HERE.

13        HOW DO THOSE SERVERS GET THE INFORMATION IN

14  ORDER TO TRANSLATE THE NAME INTO A NUMBER?

15  A.    THE DOMAIN NAME SERVER INFORMATION IS PUT ON THE

16  DOMAIN SERVER BY THE REGISTRAR WHEN THEY REGISTER A

17  DOMAIN NAME.  PART OF THEIR FUNCTION IS TO GET

18  INFORMATION ABOUT THE COMPANY BEHIND THE DOMAIN NAME AND

19  PUT THAT INFORMATION INTO THE DOMAIN NAME SERVICE

20  DATABASES.

21  Q.    DOES ANYONE ELSE HAVE ACCESS TO DO THAT, OTHER

22  THAN THE REGISTRAR WHO HANDLES THAT PARTICULAR NAME?

23  A.    THEY ARE THE FINAL CONTROLLER OF THE INFORMATION,

24  ALTHOUGH THEY ALLOW PEOPLE TO GO IN AND CORRECT

25  INFORMATION ON THEIR OWN BEHALF.

1    Q.    NOW, WHAT IS A WEBSITE?

2    A.    A WEBSITE IS A -- GENERIC DEFINITION FOR IT IS A

3    DOCUMENT.  I DON'T KNOW A WAY TO EXPLAIN THIS.  A

4    WEBSITE WOULD BE A SET OF INFORMATION ABOUT A PARTICULAR

5    TOPIC THAT'S ACCESSIBLE THROUGH A WEB BROWSER USING

6    ASSOCIATED PROTOCOLS.

7    Q.    IS A WEBSITE ALWAYS RESIDENT ON A PARTICULAR ISP

8    OR A PARTICULAR SERVER WITHIN AN ISP?

9    A.    A WEBSITE WILL RUN ON A PARTICULAR COMPUTER WHERE

10   IT'S ACTUALLY LOCATED.  OF COURSE, IT DEPENDS ON WHOSE

11   WEBSITE IT IS.

12   Q.    IS IT ALWAYS ONE PACKAGE OF INFORMATION OR NOT?

13   A.    NOT NECESSARILY, NO.

14   Q.    WHY IS THAT?

15   A.    A WEBSITE IS USUALLY A COLLECTION OF WEB PAGES,

16   AND THE INDIVIDUAL PAGES ARE IN TURN COLLECTIONS OF TEXT

17   AND VIDEO AND IMAGES AND ALL SORTS OF OTHER KINDS OF

18   DIFFERENT BITS AND PIECES, AND THOSE PIECES MAY OR MAY

19   NOT ACTUALLY BE ON THE SAME COMPUTER.

20         FOR EXAMPLE, A WEB PAGE COULD HAVE A LINK TO

21   ANOTHER WEBSITE AND PULL INFORMATION FROM ANOTHER

22   WEBSITE AT THE TIME THAT YOU HAVE THE PAGE DISPLAYED ON

23   YOUR COMPUTER.  IT'S CALLED A "LIVE LINK."  SO THE

24   INFORMATION ON A WEB PAGE CAN ACTUALLY COME FROM A

25   VARIETY OF SOURCES AND IT'S ALL PULLED TOGETHER FOR

1  DISPLAY IN THE BROWSER.

2  Q.    SO IF I AM ASKING FOR, LET'S SAY GOOGLE.COM LIKE

3  THIS CHART SUGGESTS, IS THERE ANY WAY FOR ME TO KNOW

4  THAT THE INFORMATION IS COMING FROM A PARTICULAR SERVER

5  OR MORE THAN ONE SERVER?

6  A.    NOT REALLY.  THE INFORMATION ABOUT WHAT'S ACTUALLY

7  ON THE PAGE IS DEFINED THROUGH A LANGUAGE CALLED THE

8  HYPERTEXT MARKUP LANGUAGE AND THAT INFORMATION IS

9  USUALLY VISIBLE IF YOU WANT TO LOOK AT IT THROUGH YOUR

10  BROWSER AND DISPLAY THE SOURCE BEHIND IT, BUT IF YOU ARE

11  JUST LOOKING AT A WEB PAGE ITSELF AND WHAT COMES UP ON

12  YOUR SCREEN, THERE'S USUALLY NOTHING THERE TO INDICATE

13  WHERE ANY PARTICULAR IMAGE OR WORD OR ANYTHING ELSE ON

14  THE PAGE ACTUALLY ORIGINATED.

15  Q.    SO YOU MIGHT BE ABLE TO LOOK AT -- I THINK THE

16  LETTERS ARE "HTML" FOR THIS HYPERTEXT MARKUP LANGUAGE?

17  A.    YES, THAT'S TRUE.

18  Q.    SO A USER COULD LOOK AT THAT TO TRY TO FIGURE OUT

19  SOMETHING ABOUT THE SOURCE OF THE INFORMATION?

20  A.    IT WOULD GIVE US SOME IDEA, YES.

21  Q.    WHAT DO YOU MEAN "SOME IDEA"?  DO YOU FIND OUT THE

22  SOURCE OR NOT?

23  A.    WELL, IT WILL SHOW YOU, FOR EXAMPLE, THE PATH TO A

24  PARTICULAR PICTURE, THE TEXT IT ASSUMES THAT WILL BE IN

25  THE HTML PAGE, AND THERE MAY BE REFERENCES TO OTHER

1   SITES OR OTHER OUTSIDE LOCATIONS, BUT IT WON'T

2   PARTICULARLY BE SAYING WHERE THAT PARTICULAR OTHER

3   COMPUTER WILL BE, FOR EXAMPLE.  IT WILL REFER TO IT BY

4   NAME, GENERALLY.

5           MR. LOWE:  YOUR HONOR, I'M GOING TO GO INTO A

6   NEW TOPIC.  WOULD THIS BE A GOOD TIME TO TAKE A BREAK?

7           THE COURT:  CERTAINLY.  ALL RIGHT.  WE ARE

8   ABOUT THE NOON HOUR.

9           WE WILL COME BACK TO THIS MATTER AT 1 O'CLOCK.

10          REMEMBER MY ADMONITIONS.

11          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

12   HELD IN OPEN COURT, OUT OF THE PRESENCE OF THE JURY:)

13          THE COURT:  YOU MAY STEP DOWN.

14          WE ARE OUT OF THE PRESENCE OF THE JURY.

15          WHAT'S YOUR ESTIMATION FOR THE AFTERNOON?

16          MR. LOWE:  WELL, I WOULD ESTIMATE, YOUR HONOR,

17   THAT I MAYBE HAVE ABOUT AN HOUR'S WORTH OF DIRECT

18   EXAMINATION OF THIS WITNESS.  I HAVE NEVER BEEN GOOD AT

19   THESE ESTIMATES, BUT THAT'S MY ROUGH IDEA, AND OBVIOUSLY

20   THERE'S CROSS-EXAMINATION.

21          THE COURT:  DO YOU HAVE A FURTHER WITNESS?

22          MR. LOWE:  POSSIBLY, YOUR HONOR.  I WANTED TO

23   RAISE AN ISSUE ABOUT RECALLING MR. LIVADKIN OUTSIDE OF

24   THE PRESENCE OF THE JURY.

25          THE COURT:  DO YOU HAVE A REBUTTAL CASE?

1    MR. COOMBS: NOT AT THIS POINT, YOUR HONOR.

2    THE COURT: SO IT SOUNDS LIKE WE WOULD USE THE

3  REST OF THE DAY WITH EVIDENCE, BUT IT DOESN'T SOUND LIKE

4  THERE WILL BE FURTHER TESTIMONY TOMORROW MORNING.

5    MR. LOWE: POSSIBLY NOT, IF THIS GOES

6  RELATIVELY QUICKLY, AS I EXPECT.

7    THE COURT: SO I WILL -- WHAT I WILL EXPECT IS

8  THAT WHAT I SHOULD DO IS WORK HERE DURING THE NOON HOUR

9  TO GET YOU A DRAFT OF INSTRUCTIONS AND BE PREPARED TO

10  REVIEW THOSE WITH YOU AT 4 O'CLOCK WITH THE IDEA THAT I

11  INSTRUCT FOR THE ARGUMENT TOMORROW MORNING, OR SOMEPLACE

12  CLOSE TO TOMORROW MORNING.

13    WHEN WE START, I WILL INSTRUCT THE JURY AND

14  TALK THIS AFTERNOON ABOUT HOW MUCH TIME TO ALLOW YOU FOR

15  THE ARGUMENT, AND THE CASE WILL BE SENT TO THE JURY

16  AFTER THAT.

17    MR. COOMBS: THAT'S FINE, YOUR HONOR.

18    YOUR HONOR, THERE WAS ONE OTHER ISSUE. WE

19  FILED A MOTION OPPOSING MR. GRALNIK'S TESTIMONY.

20    THE COURT: WHEN WAS THAT?

21    MR. COOMBS: YESTERDAY, WITH A COURTESY COPY.

22    THE COURT: YOU GAVE A COURTESY COPY TO

23  MS. GARCIA?

24    MS. WANG: TO THE CLERK.

25    MR. COOMBS: I GUESS IT WENT TO THE CLERK

1    DOWNSTAIRS.

2         THE COURT:  YOU NEED TO GET IT TO ME.  THE

3    BUREAUCRACY DOWNSTAIRS MAY NOT WORK.

4         YOU MAY STEP DOWN.

5         A QUESTION FROM THE JURY IS:  CAN MULTIPLE

6    ADMINISTRATIVE PASSWORDS BE SET FOR ONE SERVER?  AND SO

7    YOU MIGHT WANT TO CLARIFY THAT IN THE COURSE OF YOUR

8    EXAMINATION.  AND IF IT CAN, WHAT HAS BEEN THE POLICY OF

9    AKANOC WITH RESPECT TO ASSIGNING MULTIPLE ADMINISTRATIVE

10   PASSWORDS TO A SINGLE SERVER?

11        AGAIN, MS. GARCIA WILL REVISE THE TIME SHEETS.

12   IN VIEW OF YOUR TIME ESTIMATES HERE, YOU WON'T USE SOME

13   OF THE TIME THAT YOU HAVE, BUT THAT'S ALWAYS GOOD IN

14   TERMS OF THE JURY.

15        AND WITH RESPECT TO THIS WITNESS AS WE COME

16   BACK THIS AFTERNOON, THERE'S A REPEAT OF MUCH OF WHAT

17   WE'VE HEARD, AND I UNDERSTAND THAT, BUT I WILL ASK YOU

18   TO WORK MORE EXPEDITIOUSLY TOWARD ANY EXAMINATION HE

19   MADE OF THE DEFENDANTS' OR THE PLAINTIFF'S CASE AND GET

20   TO HIS OPINIONS.

21        MR. LOWE:  THAT WAS MY INTENTION.

22        (RECESS FROM 12:02 P.M. TO 1:04 P.M.)

23        THE CLERK:  PLEASE REMAIN SEATED.  COME TO

24   ORDER.

25        THE COURT:  READY TO RESUME?

1          MR. LOWE:  YES, YOUR HONOR.

2          THE COURT:  SUMMON THE JURY.

3          (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

4     HELD IN OPEN COURT, IN THE PRESENCE OF THE JURY:)

5          THE COURT:  VERY WELL.  YOU MAY RESUME YOUR

6     EXAMINATION.

7          MR. LOWE:  IF IT PLEASE THE COURT.

8               **DIRECT EXAMINATION (CONTINUED)**

9     BY MR. LOWE:

10    Q.    MR. GRALNIK, IN CONNECTION WITH INTERNET SERVERS,

11    ARE YOU FAMILIAR WITH THE TERM "ROOT ACCESS"?

12    A.    YES, I AM.

13    Q.    WHAT DOES THAT MEAN?

14    A.    ROOT ACCESS IS ADMINISTRATIVE CONTROL OF THE

15    SYSTEM.  IF SOMEONE HAS ROOT ACCESS, THEY CAN BASICALLY

16    DO ANYTHING THEY WANT WITH THE MACHINE.

17    Q.    IS THAT TRUE OF ALL COMPUTERS, EVERY COMPUTER HAS

18    ROOT ACCESS, SO TO SPEAK?

19    A.    I DON'T KNOW IF EVERY COMPUTER IN THE WHOLE WORLD.

20    THERE ARE DIFFERENT NAMES FOR IT AS WELL.  AN

21    ADMINISTRATOR HAS ROOT ACCESS.  MOST SYSTEMS HAVE SOME

22    KIND OF OVERRIDING ADMINISTRATIVE CONTROL WHERE THEY CAN

23    DO ANYTHING ON THE SYSTEM.

24    Q.    AND IS THAT A PASSWORD-PROTECTED ACCESS,

25    TYPICALLY?

1    A.    HOPEFULLY.

2    Q.    CAN YOU HAVE MORE THAN ONE ADMINISTRATIVE PASSWORD

3    TO GAIN ROOT ACCESS TO A SERVER AT A TIME?

4    A.    NOT TYPICALLY, NO.

5    Q.    WHY NOT?

6    A.    ROOT ACCESS IS USUALLY INTENDED FOR A SPECIFIC

7    PERSON OR VERY LIMITED GROUP OF PEOPLE, AND YOU WANT TO

8    PROTECT IT AS CAREFULLY AS YOU CAN.  HAVING MORE THAN

9    ONE PASSWORD FOR ANY ACCOUNT MEANS THERE CAN BE MORE

10   THAN AN INTENDED NUMBER OF PEOPLE ABLE TO ACCESS THAT

11   PARTICULAR ROLE.

12   Q.    SO IF A CUSTOMER OF AN INTERNET SERVICE PROVIDER

13   IS RENTING A SERVER, FOR EXAMPLE, WOULD YOU NORMALLY

14   HAVE MORE THAN ONE ADMINISTRATIVE PASSWORD TO CONTROL

15   THAT COMPUTER?

16          (OVERLAPPED TALKING.)

17   A.    I'M SORRY.  NOT USUALLY, NO.

18          THE COURT:  WELL, LET ME JUST CLARIFY THIS

19   BECAUSE IT DID COME FROM ONE OF OUR JURORS.

20          I TAKE IT THAT YOU CAN HAVE AN ADMINISTRATIVE

21   PASSWORD THAT MORE THAN ONE PERSON CAN KNOW?

22          THE WITNESS:  THAT'S CORRECT, YOUR HONOR.

23          THE COURT:  SO THAT MULTIPLE PEOPLE CAN THEN

24   ACCESS IT.  AND THEN IF THERE IS AN ADMINISTRATIVE

25   PASSWORD THAT ONLY ONE PERSON KNOWS, THAT ONE PERSON IS

1    THE ONLY ONE WHO CAN ACCESS THE COMPUTER AT THE

2    ADMINISTRATIVE LEVEL?

3            THE WITNESS:  IT IS POSSIBLE TO HAVE MORE THAN

4    ONE ADMINISTRATOR SET UP.  PEOPLE WITH MORE THAN ONE

5    ACCOUNT CAN HAVE ADMINISTRATIVE PRIVILEGES.  BUT

6    GENERALLY SPEAKING, ONE ACCOUNT, ONE PASSWORD.

7            THE COURT:  AND IT IS POSSIBLE TO GIVE TO A

8    USER WHO IS NOT THE ADMINISTRATOR THE SAME POWERS AS THE

9    ADMINISTRATOR WITH A SEPARATE PASSWORD?

10           THE WITNESS:  YES.

11           THE COURT:  BUT WHEN YOU SAY "NOT NORMALLY,"

12   THAT'S NOT NORMAL SECURITY, TO HAVE MORE THAN ONE PERSON

13   WITH ADMINISTRATIVE RIGHTS AND TO GIVE TO SUB-USERS FULL

14   ADMINISTRATIVE RIGHTS?

15           THE WITNESS:  I DON'T THINK IT'S A GOOD IDEA.

16           THE COURT:  BUT IT IS POSSIBLE?

17           THE WITNESS:  IT IS POSSIBLE, YES.

18           THE COURT:  GO AHEAD.

19   BY MR. LOWE:

20   Q.   IN YOUR EXPERIENCE ON INTERNET SERVERS, IS IT

21   CUSTOMARY FOR ANYONE TO GIVE AWAY MULTIPLE PASSWORDS, OR

22   JUST HAVE THE ONE ADMINISTRATIVE PASSWORD?

23   A.   FROM AN INFORMATION SECURITY POINT OF VIEW, YOU

24   WANT TO KEEP THAT AS TIGHTLY CONTROLLED AS POSSIBLE, SO

25   YOU ARE NOT LIKELY TO GIVE IT OUT TO A GROUP OF PEOPLE.

1   Q.   IF YOU HAVE A CUSTOMER WITH AN ISP, FOR EXAMPLE,

2   THAT HAS RENTED A SERVER FOR SOME PERIOD OF TIME AND

3   THEY HAVE BEEN GIVEN THE ONLY ADMINISTRATIVE PASSWORD

4   FOR THAT, IS THERE ANOTHER WAY FOR THE PERSON WHO

5   PHYSICALLY HAS CUSTODY OF THE MACHINE TO GAIN ACCESS TO

6   IT WITHOUT THE PERMISSION OF THE CUSTOMER?

7   A.   IF THE CUSTOMER HAS ROOT ACCESS AND CONTROL OF THE

8   SYSTEM, THEY CAN ACTUALLY LOCK OUT THE IN ROUTE OF THE

9   MACHINE.  IN MANY CASES THERE ARE WAYS TO OVERRIDE THAT,

10  OR TO BYPASS IT, BUT IN STANDARD USAGE, WHOEVER HAS ROOT

11  ACCESS CAN LOCK EVERYBODY ELSE OUT.

12  Q.   SO SOMEBODY MIGHT GET IN BY HACKING INTO THE

13  COMPUTER, SO TO SPEAK?

14  A.   THERE'S ALWAYS A POSSIBILITY OF BEING HACKED,

15  SURE.

16  Q.   ARE YOU FAMILIAR WITH THE TERMS OF MANAGED AND

17  UNMANAGED SERVERS WITHIN AN INTERNET SERVICE

18  ENVIRONMENT, INTERNET SERVICE PROVIDER ENVIRONMENT?

19  A.   YES, I AM.

20  Q.   AND WHAT IS THE DIFFERENCE BETWEEN THEM?

21  A.   TYPICALLY, A MANAGED SYSTEM IS ONE WHERE THE ISP

22  OR THE HOSTING COMPANY ACTUALLY WILL TAKE CARE OF THE

23  SYSTEM -- THEY WILL BE RESPONSIBLE FOR UPGRADES AND

24  ADD-ONS; THEY WILL DO THE ADMINISTRATION OF THE

25  SYSTEM -- WHEREAS, AN UNMANAGED SYSTEM IS ONE WHERE THE