1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                SAN JOSE DIVISION

4

LOUIS VUITTON MALLETIER,    )   C 07-03952 JW
5    S.A.,                        )
                                  )
6              Plaintiff,         )
                                  )   San Jose, CA
7                  vs.            )   August 26, 2009
                                  )
8    AKANOC SOLUTIONS, INC.,      )
     et al.,                      )
9                                 )
               Defendants.        )
10   _____)

11

               TRANSCRIPT OF PROCEEDINGS
12         BEFORE THE HONORABLE JAMES WARE
             UNITED STATES DISTRICT JUDGE
13

14

     A P P E A R A N C E S:
15

     For the Plaintiff:       Law Offices of
16                            J. Andrew Coombs
                              By:  J. ANDREW COOMBS
17                            ANNIE S. WANG
                              517 E. Wilson Avenue
18                            Suite 202
                              Glendale, CA  91206
19

     For the Defendants:      Gauntlett & Associates
20                            By:  JAMES A. LOWE
                              CHRISTOPHER G. LAI
21                            18400 Von Karman
                              Suite 300
22                            Irvine, CA  92612

23   Court Reporter:          PETER TORREANO, CSR
                              License Number C-7623
24

25
                                                        1

```
1     San Jose, California              August 26, 2009
2                    P R O C E E D I N G S
3           THE COURT:  We're on the record out of
4     the presence of the jury.  I asked Ms. Garcia to
5     ask you all to meet and confer to see if you
6     could reconcile any differences.  The report back
7     to me was that you were ready to proceed, that
8     you didn't find that there were any differences
9     that you could reconcile, but I couldn't believe
10    that.
11          MR. COOMBS:  There are some preliminary
12    issues that I think we're in agreement, but when
13    it gets to the substantive instructions I think
14    there are two or three areas of disagreement that
15    we probably do need to address with you.
16          THE COURT:  All right.  Now, it would
17    help if you have for me interlineation so that
18    you can show me what it is that you would wish me
19    to say other than what I'm planning to say.
20          MR. COOMBS:  All of the ones in which
21    there are agreement are on the first six pages,
22    and I have interlineated on my copy if Your Honor
23    would like to --
24          THE COURT:  Do you have similar?
25          MR. LOWE:  We've conferred on that
```

2

PETER TORREANO, CSR 7623

1    particular copy, Your Honor.  So we agree with

2    the interlineations on those six pages.

3             THE COURT:  Okay.

4             MR. LOWE:  It's the rest of it that's

5    the problem.

6             THE COURT:  What am I to make of the

7    highlighted portions?

8             MR. COOMBS:  Those are not related to

9    any interlineations.  Those are just my notations

10   as I read through it.  It's the ink marked either

11   in black or in blue ink.

12            THE COURT:  The spelling of Daumier.

13            MR. COOMBS:  It's actually "Damier."

14            THE COURT:  Damier.  So it D-A --

15            MR. COOMBS:  -- M-I-E-R.  Daumier is the

16   painter.  I made that mistake, too, Your Honor.

17            THE COURT:  I see a note not disputed.

18   Stipulated?

19            MR. COOMBS:  Well, there are certain

20   issues that were stipulated to in the pretrial

21   conference order.  However, I think that's come

22   out during the course of the trial.  So it's

23   probably not necessary to get into it and it

24   probably isn't necessary for you to modify the

25   instructions.                                    3

PETER TORREANO, CSR 7623

```
 1                    THE COURT:  All right.  So let me

 2     quickly ask one of my law clerks to give this to

 3     the supervising clerk and then she can make those

 4     changes and bring this back because counsel might

 5     need it.  All right?

 6                    So let's go to page -- that was pages 1

 7     through 6.

 8                    MR. COOMBS:  That's correct, Your Honor.

 9                    THE COURT:  Through 5.

10                    MR. LOWE:  Your Honor, if I may, I think

11     the -- it might speed things up if I explain what

12     the fundamental problems are with the

13     instructions.  Fundamentally, they misstate the

14     elements of the two claims, as I understand the

15     law.

16                    THE COURT:  So let's go to the first

17     claim.

18                    MR. COOMBS:  On pages 6 and 7, Your

19     Honor.

20                    THE COURT:  Yes.

21                    MR. LOWE:  These elements so far as --

22     that are listed on page 7 we don't think match

23     any of the law on the subject, the Grokster case

24     or -- in the Supreme Court or any of the Ninth

25     Circuit authority or any law that's been applied   4
```

1    by any court.

2           And, in fact, Your Honor, this Court has

3    previously discussed the elements in its ruling

4    on summary judgment and has listed what the

5    elements are in its order of December 23rd, 2008.

6           THE COURT:  You're both in agreement on

7    that, that the elements are misstated?

8           MR. COOMBS:  No, Your Honor.

9           THE COURT:  I'm sorry.  I just wanted

10   to know.

11          MR. COOMBS:  We do.  I'm sorry.

12          THE COURT:  So tell me what your

13   language is as to the elements.

14          MR. LOWE:  Well, Your Honor, we actually

15   have submitted a number of specific elements in

16   our proposed instructions and the Court has

17   those.  And I'd like to direct the Court's

18   attention to certain pages in there that I think

19   cover this material.

20          For example, page 33, the elements are

21   listed.  33 of our Defendants' proposed

22   supplemental jury instructions.

23          THE COURT:  Let me see if I can find

24   those.  You don't have a copy?

25          MR. COOMBS:  I have a copy here, Your

                                                    5

1    Honor, if it will do you some good.

2                 THE COURT:  So page 33 you want me to go

3    to?

4                 MR. LOWE:  Yes, Your Honor.  That's

5    fairly thick principally because there are also a

6    lot of annotations in there as to where the

7    language comes from.

8                 THE COURT:  All right.  So give me the

9    first element.

10                MR. LOWE:  I don't have a copy of that

11   in front of me, Your Honor, but I believe the --

12                THE COURT:  Oh, this is your copy.  I

13   don't want to have what you need.  Let me see if

14   I can find it.

15                Let's see.  I have proposed supplement

16   jury instructions?

17                MR. LOWE:  I believe that's correct,

18   Your Honor.

19                MR. COOMBS:  Which pages are you looking

20   at, Counsel?

21                MR. LOWE:  33 of ours.

22                THE COURT:  Elements -- it says

23   element 1, direct infringement.

24                MR. LOWE:  That's correct, Your Honor.

25                THE COURT:  There's no charge here of

                                                          6

1    direct infringement.

2            MR. LOWE:  Well, direct infringement is

3    necessary under the case law in order for someone

4    to be contributorily infringing.

5            THE COURT:  I understand that, but I

6    want to state the elements of contributory

7    infringement.

8            MR. LOWE:  Well, our understanding is

9    that the first element of contributory

10   infringement is direct infringement by a third

11   party.

12           THE COURT:  Yes.

13           MR. LOWE:  And there are various

14   questions, factual questions as to that point.

15   For example --

16           THE COURT:  Well, the second element I

17   can add the word "directly infringe."

18           MR. LOWE:  Well, Your Honor, there are

19   several subparts to this that these instructions

20   go through that we think have a bearing on this.

21           For example, the actual confusion, the

22   likelihood of confusion, the issue of all of

23   those elements -- all of those pieces that come

24   together to establish likelihood of confusion

25   have to be established.                        7

1          Additionally, there's the

2     extraterritoriality question which I think is

3     absolutely critical here because the evidence --

4          THE COURT:  Well, I just -- stick with

5     me.  I have language on page 7 which includes all

6     of the elements of direct infringement.

7     "Plaintiff must prove that a website of

8     Defendants' customers or some other successor in

9     interest to Defendants' customers knowingly and

10    intentionally used a mark in connection with the

11    offering for sale, sale or distribution of goods;

12    that the mark was counterfeit; that it was --

13    that is or was not a genuine mark applied to the

14    goods or authorized to be applied by the

15    Plaintiff and the use was likely to confuse or

16    deceive."

17         What element of direct infringement is

18    missing?

19         MR. LOWE:  Well, there's the extra

20    territoriality question, Your Honor.  Where did

21    this occur?  Did this, for example, occur in

22    commerce in the United States or in some fashion

23    that would affect the United States?

24         THE COURT:  All right.  Well, I can add

25    that.  So intentionally used a mark in connection  8

1    with the offer of sale or distribution of goods

2    in the United States.  That's what I want.  I

3    want you to annotate these to bring those

4    elements to bear.

5              "In the United States" or what was the

6    other language?

7              MR. LOWE:  Or in a way that would

8    substantially affect commerce in the United

9    States I believe is the case law language.

10             THE COURT:  All right.

11             MR. LOWE:  And, further, that there must

12   be -- there's a likelihood of confusion.

13             THE COURT:  I have that.

14             MR. LOWE:  Well, the language I think

15   that -- I think the likelihood of confusion needs

16   some further explanation.  For example,

17   discussion of the Sleekcraft factors or the

18   likelihood of confusion.  There is no discussion

19   of that in here.

20             THE COURT:  Is that a dispute in this

21   case?

22             MR. LOWE:  I think it is, Your Honor,

23   because our position is that there is no

24   confusion, there is no likelihood of confusion

25   because there are different channels of          9

PETER TORREANO, CSR 7623

1   distribution.  There are certainly major

2   different prices.  There's disclosure of the fact

3   that this is not a genuine product and so on.

4           THE COURT:  Where?

5           MR. LOWE:  In the evidence that's been

6   presented.

7           THE COURT:  No, no.  In the ads

8   themselves, it discloses that they are not

9   genuine products?

10          MR. LOWE:  Yes, Your Honor.

11  Mr. Livadkin testified that many of the websites

12  say we are selling replicas, we're not selling

13  genuine products.

14          THE COURT:  And so your argument would

15  be if you use a registered mark on a good that

16  you say is a replica, that is not a violation of

17  the trademark law?

18          MR. LOWE:  Yes, Your Honor.  Because

19  using a mark by itself is not per se violation of

20  the law.  The use of the mark must create a

21  likelihood of confusion.  Now, that could happen

22  when you're selling a replica or it might not.

23          THE COURT:  You can argue that.

24          MR. COOMBS:  Your Honor, you already

25  have in your instructions about the presumption

10

PETER TORREANO, CSR 7623

1    of confusion that arises with the use of

2    counterfeit marks.  We believe that's correct and

3    adequately covers it.

4              MR. LOWE:  Your Honor, if I may, that

5    particular instruction, we think that piece of

6    the instruction is absolutely wrong.  It is not

7    Ninth Circuit law.  It is not Supreme Court law.

8    It's not taken from the -- from the Lanham Act.

9              There is exactly one case in the United

10   States that has ever mentioned that.  It's a

11   Third Circuit case, Shakespeare versus Silstar,

12   and that case acknowledged that any discussion of

13   presumption is not the law outside of that

14   circuit.

15             THE COURT:  Well, let me go back to your

16   other point.  Don't jump just because counsel --

17   you shouldn't interject until I need you to.

18             So you want me to use the factors that

19   are in --

20             MR. LOWE:  Sleekcraft factors basically.

21             THE COURT:  So I will add those then.

22   That would satisfy you?

23             MR. LOWE:  Well, yes.  If the jury

24   understands --

25             THE COURT:  I'll add that then at page 8

PETER TORREANO, CSR 7623

1    between lines 2 and 3 under -- after I say

2    "likely to confuse or deceive."

3              MR. LOWE:  All right.  And, also, Your

4    Honor, we think that it is necessary to explain

5    to the jury that there is -- that the confusion,

6    likelihood of confusion must be probable and not

7    merely possible and we discussed that in --

8              THE COURT:  Likely to confuse is not the

9    standard?

10             MR. LOWE:  No.  Likelihood of

11   confusion.  There must be probable likelihood of

12   confusion.

13             THE COURT:  So the language that is in

14   the standard instruction is not likely to confuse

15   or deceive, but probably likely?

16             MR. LOWE:  Well, this relates to the

17   question of --

18             THE COURT:  Just give me the language.

19             MR. LOWE:  At page 36 of our proposed

20   instructions, some language that says likelihood

21   of confusion requires that the confusion be

22   probable, not simply a possibility.

23             THE COURT:  Yes, but what is that from?

24   I'm trying to get the language --

25             MR. LOWE:  What is that from?  That

                                                    12

1    is -- that particular language comes from <u>Murray</u>

2    <u>versus Cable National Broadcasting</u>, a Ninth

3    Circuit case, which says the confusion must be

4    probable, not simply a possibility.

5              THE COURT:  Well, but doesn't that --

6    isn't that what "likely" means?

7              MR. LOWE:  Well, this case discussed the

8    limitation on likelihood of confusion.

9              THE COURT:  Yes, but what else could it

10   mean other than "likely" means probably it

11   could?

12             MR. LOWE:  Well, we think that the jury

13   needs to understand that it's not merely a

14   possibility that somebody is going to --

15             THE COURT:  It doesn't use the word

16   "possible to confuse."  It says "likely to

17   confuse."  So that's rejected.  Move on to

18   others.

19             MR. LOWE:  So the next issue regarding

20   likelihood of confusion is that it must confound

21   an appreciable number of reasonably prudent

22   purchasers exercising ordinary care, and that's

23   Ninth Circuit language out of <u>Entrepreneur versus</u>

24   <u>Smith</u>.

25             THE COURT:  I'm not trying to capture

                                                        13

PETER TORREANO, CSR 7623

1    all of the language in various cases.  If you

2    have a standard instruction from either the Ninth

3    Circuit preferably or another circuit, I would be

4    pleased to consider that.  But I am not going

5    to -- and I often receive, as I have in this

6    case, voluminous instructions where various

7    courts have used various language.  And I can't

8    capture all of that language.

9         My job is to state the law.  If I

10   misstate the law, as you said earlier, I want to

11   get that correct, but every word like "likely" is

12   not something that I would wish to define.

13        Now, if the likely to confuse or deceive

14   is not good enough, if it only deceives a small

15   number of people and the law requires that I

16   instruct that it's got to be -- that the

17   Plaintiff has to prove some numerosity, I want to

18   instruct on that and what I'm asking you is to

19   show me that.

20        MR. LOWE:  Well, as I say, the case law

21   from the Ninth Circuit in that particular case

22   says that the likelihood has to affect an

23   appreciable number of people who are prudent in

24   exercising ordinary care.  Because likelihood of

25   confusion is obviously a complex term of art in

                                                  14

1    the law and a jury is not necessarily going to

2    understand.

3                    THE COURT:  What's your comment on

4    that?

5                    MR. COOMBS:  My comment on that is, to

6    the extent that an instruction on likelihood of

7    confusion is required, Sleekcraft has been used.

8    You've already indicated that you're going to

9    include it.

10                   THE COURT:  Is that included in that?

11                   MR. COOMBS:  And getting --

12                   THE COURT:  Sleekcraft factors.  Would

13   you, please?  Get me a copy of those factors.

14                   MR. COOMBS:  And coming back to Your

15   Honor's comment, which is what is required is

16   what's in Sleekcraft, going beyond that is

17   unnecessary and confusing and potentially

18   prejudicial to the extent that it might overstate

19   one factor as opposed to --

20                   THE COURT:  Do you disagree that if I

21   include the factors, that they won't include

22   language on that?  I don't have them in front of

23   me.  So I --

24                   MR. COOMBS:  I don't have them in front

25   of me either, but I think --

                                                    15

1        THE COURT: Let's wait for that. Let's

2    go on to other things. It's nine o'clock.

3        MR. LOWE: Your Honor, the other issue

4    has to do with -- let's see -- an element that I

5    think is necessary here -- excuse me.

6        The second -- the second element of

7    contributory infringement is that the Defendant

8    induced or directly controlled and monitored

9    infringement at specific websites. And I don't

10   think there's any reference to that in here.

11       THE COURT: That is not a statement of

12   law.

13       MR. LOWE: I think it is, Your Honor.

14   I'm sorry. I think that that's exactly what the

15   law says. In fact, this Court in this case has

16   said that.

17       THE COURT: Well, I might state that,

18   but that -- the standards for what you have to

19   prove for contributory trademark infringement are

20   not limited to websites. It seems to me that you

21   would wish me to comment on the evidence. And I

22   do state in my instruction that a web hosting

23   service provider is not liable for contributory

24   trademark infringement solely because the

25   provider does not monitor the content of websites

                                                    16

1    stored on its servers, but that is not to say

2    that there may not be circumstances under which

3    that company or person may not be liable for

4    contributory trademark infringement.

5               MR. LOWE:  Your Honor, our concern is

6    that the instructions suggest that almost any

7    website posting facility would be liable for any

8    kind of infringement as long as they got any kind

9    of notice and anybody is doing it.  We think

10   that's not the law.

11              And the Court -- this Court has

12   discussed that in its summary judgment order.  If

13   I might approach, I can give the court a copy of

14   this order.  And at page 8 you talk about -- I'm

15   sorry, not at page 8, but let me give you the

16   right page.

17              Page 14 you talk about what the elements

18   are, according to the Ninth Circuit.

19              If I may approach?

20              THE COURT:  Just a moment.

21              Now I have the Sleekcraft factors in

22   front of me.  I will ask my staff to incorporate

23   them in at the place.  The only difference I

24   would make is it always in those factors referred

25   to the defendant's use of the mark.  So I intend

17

PETER TORREANO, CSR 7623

1    to modify it to be defendant's customers' use of

2    the mark as I defined it because I do define it

3    as the customer's use or some successor of

4    interest use.

5              And it does seem to me that a lot of

6    these have to do with matters that are stipulated

7    to by the strength or weakness of the mark, but

8    to avoid further delay I will include those.  And

9    it does seem to me that it speaks to actual

10   confusion, some of which such as product line

11   expansion I don't think are necessary for the

12   case, but since you haven't given me a set that

13   you've agreed to I'll incorporate that.

14             So that would be pulled in and placed on

15   page 8 between lines 2 and 3.

16             And, therefore, I don't need to include

17   this appreciable number of people who are

18   exercising reasonable care that counsel was

19   suggesting that I should include.

20             I'm sorry.  You were speaking to a

21   different element.  What was that?

22             MR. LOWE:  The second element of

23   contributory trademark infringement, Your Honor,

24   universally recognized as Defendants induced or

25   directly controlled and monitored the

                                              18

PETER TORREANO, CSR 7623

1    infringement.

2              THE COURT:  Rejected.

3              MR. LOWE:  Your Honor, if I may --

4              THE COURT:  You may have circumstances

5    where you can contribute by inducing someone else

6    to do it, but I don't believe that that is a

7    statement of the law which says that you may only

8    be liable for contributory infringement if you

9    induce another to do it.

10             If they come to you already intending to

11   do it and you supply a service to facilitate

12   their doing so knowing that they are going to do

13   it and -- or continue doing it, that is

14   sufficient.  And move on to another factor, if

15   you wish.

16             You may reserve your argument about this

17   by simply tendering to the Court proposed

18   instructions that are contrary to those that I am

19   about to give because you're not going to

20   persuade me to change my statement of the law to

21   say that inducement is necessary.

22             MR. LOWE:  Well, Your Honor, I

23   apologize, but I would ask the Court to look at

24   its own language quoting the Inwood Labs case.

25             THE COURT:  There may be cases where

                                              19

1    inducement were involved -- inducement was

2    involved.  That does not mean that inducement is

3    the only thing and is a necessary element of

4    contributory infringement.

5           MR. LOWE:  As I understand the law, Your

6    Honor, the only other alternative, if it's not

7    inducement, is that a defendant directly control

8    and monitor infringement.

9           THE COURT:  That may be your argument,

10   but that's not the law.  This is a case where the

11   evidence is that someone came to a Defendant and

12   said your services are being used to infringe.

13   The argument is that the Defendant then turned a

14   blind eye to that and continued it.  Your

15   argument may be, no, he did not or they did not.

16   They took action.  But you can't argue that

17   coming to me I can ignore that because I didn't

18   induce this.

19           MR. LOWE:  Well, we'll have to take

20   exception.  We have, as I indicated earlier,

21   provided a set of instructions which we believe

22   incorporates this other language.

23           In going into the next parts, Your

24   Honor, apparently you're dealing with the issue

25   of willful blindness.  And at page 42 of our          20

PETER TORREANO, CSR 7623

1    proposed instructions we have an instruction

2    concerning willful blindness which we believe

3    tracks the law appropriately.  In other words,

4    there's a showing that the Defendant have

5    knowledge that they -- of specific infringement

6    and that they deliberately failed to investigate,

7    et cetera.

8              THE COURT:  Well, I did ask to have

9    on -- some new language incorporated here because

10   I did not have in this draft the standard.  And I

11   did ask my staff to modify this to incorporate

12   language that the standard of should have known

13   is an objective standard.  In other words, the

14   language will be that in judging whether or not a

15   Defendant should have known, you must apply the

16   standard of what a reasonable person under the

17   same or similar circumstances would do.

18             It's not a subjective standard as to

19   what a particular Defendant in this case did, and

20   you will see that language shortly.

21             Now, anything further?

22             MR. LOWE:  Yes, Your Honor.  If I may go

23   to the issue of contributory copyright

24   infringement?

25             THE COURT:  Yes.

                                                      21

1          MR. LOWE:  Once again we think the

2     elements are not appropriately stated in the

3     instructions at the present time.

4          This -- the way they are stated makes it

5     sound almost like it's an offense that could be

6     committed by anybody at any time without any

7     particular knowledge or intention.  But, first of

8     all, there is no discussion here of

9     extraterritoriality.

10         THE COURT:  Without any knowledge?  The

11    second element says "the Defendant knew or should

12    have known."  I don't want you to waste my time

13    by arguing that I am instructing the jury that no

14    knowledge would be sufficient.

15         MR. LOWE:  Well, "should have known" is

16    the problem and there must be some limit to the

17    should have known or the constructive knowledge,

18    and we think that -- that that's -- that what we

19    have to have is far more than just some

20    generalized knowledge and that's what I believe

21    the cases indicate.

22         But before I get to that, as I say, I

23    think the principal problem is that this doesn't

24    distinguish between some copyright infringement

25    that is going on outside the United States and

                                                        22

PETER TORREANO, CSR 7623

1   something that's going on within the United

2   States.  And, first of all, of course, you have

3   to have direct infringement.  And if something is

4   going on in China and the law is clear that there

5   is no --

6            THE COURT:  Excuse me.  Let me interrupt

7   you.  I will add, unless counsel objects, the

8   same language with respect to the territoriality

9   language that I added in the United States or in

10  a way that would substantially affect commerce in

11  the United States.

12           MR. COOMBS:  Your Honor, I have two

13  comments regarding that suggestion.  The first is

14  I assume then you're not proposing to include the

15  use in commerce aspect of the earlier language

16  because use in commerce is not a requirement as

17  you yourself noted yesterday afternoon in the

18  copyright concept.

19           THE COURT:  Yes.  Do I have that?

20           MR. COOMBS:  Yes.  It's in the United

21  States or in a way that would substantially

22  affect commerce in the United States.  So the

23  second clause would not be required.

24           THE COURT:  In the United States, then.

25           MR. COOMBS:  And then the second thing   23

PETER TORREANO, CSR 7623

```
1    is with respect to that language, I think it's
2    actually more correct to say in the trademark
3    instruction that it would have some effect on
4    commerce in the US, not substantial effect.  I
5    don't think substantial is what the law
6    requires.
7              THE COURT:  De minimus would do?
8              MR. COOMBS:  Yes, Your Honor.
9              MR. LOWE:  Your Honor, I think that
10   actually there is -- the law about this is a
11   little different between trademark and copyright
12   and while you may have a trademark -- trademark
13   infringement activity outside the United States
14   that might affect commerce in the United States
15   thereby giving the Lanham Act some authority over
16   it, the copyrighting law does not have that.
17              So it's clear from the cases that we've
18   cited to the Court that the action of a trademark
19   infringement must be wholly completed within the
20   United States.
21              THE COURT:  I was at actually
22   copyright.  And so at element No. 3 on page 10,
23   I'm adding "one or more Defendants' customers
24   used the services provided by the Defendants to
25   infringe Plaintiff's" -- it should be "copyright"
```

24

PETER TORREANO, CSR 7623

1    instead of "trademark" -- "or to facilitate by

2    infringement by another of Plaintiff's copyright

3    in the United States."

4             MR. LOWE:  Okay.  Thank you.

5             THE COURT:  Now, I do want to add to

6    that the factors that I gave you in the

7    contributory trademark infringement may be used

8    to determine knowledge with respect to

9    contributory copyright infringement, so that they

10   can use the five factors on page 8 in a similar

11   fashion.  Maybe I should say "the factors and

12   definition" because I will give a definition

13   having to do with objective standard.  All

14   right?

15            MR. LOWE:  Your Honor, the next element

16   we believe is necessary but missing is that the

17   Plaintiff prove that each Defendant had knowledge

18   of specific infringing conduct.  The law on this,

19   I think, is extremely clear, particularly in the

20   Ninth Circuit where this has come up many times.

21   And generalized knowledge of possible

22   infringement is not sufficient, but there has to

23   be some specific knowledge of the infringing

24   activity.

25            THE COURT:  What do you mean by

25

1    "specific knowledge"?

2         MR. LOWE:  Knowledge of a specific

3    infringement and then action that then relates to

4    action to cause or materially contribute to that

5    infringement, not just that we know that there's

6    infringement going on in the world and maybe

7    some --

8         THE COURT:  No, no, no.  It says "knew

9    or should have known that one of Defendants'

10   customers were infringing."  You want it to be

11   more specific than that?

12        MR. LOWE:  More specific.  That a

13   particular infringement has occurred and that

14   this Defendant, each Defendant has materially

15   contributed to that or induced or caused that

16   particular infringement.  So in this case, for

17   example, we have a lot of big evidence about --

18        THE COURT:  But the Defendant doesn't

19   have to induce it or cause it.  It's a

20   contributory claim.

21        MR. LOWE:  Well, Your Honor, I think

22   that the problem here is that the law actually

23   says that in a contributory infringement

24   situation it must be mentioned.

25        If I might briefly quote language from

26

PETER TORREANO, CSR 7623

1    MGM versus Grokster in the Supreme Court about

2    this very thing.  This is a contributory

3    infringement case.  It says:  "The rule on

4    inducement of infringement as developed in the

5    earlier cases is no different today.  Evidence of

6    active steps taken to encourage direct

7    infringement, such as advertising infringing use,

8    instructing how to engage in infringing use,

9    showing an affirmative attempt that the product

10   be used to infringe, and showing that the

11   infringement was encouraged, overcomes the law's

12   reluctance to find liability when a defendant

13   merely sells a commercial product suitable for

14   some lawful use."

15            Now, this gets back, of course, to the

16   Sony case and the other related cases.  Clearly

17   the Defendants' services do provide substantial

18   non-infringing uses and the evidence at best

19   shows that there is some infringing use.

20            But the law requires that the jury be

21   instructed that it has to be some active material

22   inducement or causation by the Defendants and not

23   just the happening without their knowledge or

24   happening without them taking some steps.  They

25   actually have to help it along.

27

PETER TORREANO, CSR 7623

1              THE COURT:  This would be a stronger

2      argument in a case where the evidence doesn't

3      show notice by a Plaintiff to the hosting company

4      and with the volume and frequency that is

5      involved here.  And it does appear to me that

6      I'll leave that to your argument that -- because

7      there have been, I thought, good evidence that

8      out of one particular customer who had 40 servers

9      and 1,000 names there were only nine incidents.

10             So you can argue that this is -- this

11     should not be contribution because they took

12     effective action when the de minimus number of

13     complaints were filed.

14             On the other hand, the Plaintiff has put

15     in correspondence and charts and diagrams with

16     long lists of cites, and it does seem to me that

17     I'm satisfied that that could serve as the basis

18     for the jury to find that there was actual notice

19     being given that a particular group of customers

20     were using this service as a matter of course for

21     purposes of infringement, and, therefore, that

22     changes the dynamics from a circumstance where

23     the lack of that notice might cause a different

24     reaction on the part of the web hoster.

25             I don't want to elevate the Defendants'

                                                      28

1    own policies to the force and effect of law, but

2    those policies do demonstrate an awareness that

3    its services can be used for illegal activity or

4    unlawful activity in a number of respects and

5    contractually binds the two parties, the hoster

6    and the user of the service, to restrict that.

7              And that's important in this -- in this

8    world now.  This is a -- we're at the cutting

9    edge of the law and perhaps your argument will

10   carry the day that the web hoster is not

11   responsible even under the noticed kind of

12   circumstances here to do more than it did in this

13   case, but that's a factual determination that the

14   jury can make.

15             My instructions on the law allow for

16   either one of you to win.  So I'm not going to

17   try to couch them so that the burden is higher on

18   anybody.  The burden is to prove that there was

19   knowledge and after that knowledge conduct.

20             MR. LOWE:  Your Honor, we think that

21   there has to be more than that.  There has to

22   active inducement.  For example --

23             THE COURT:  I've heard that argument.

24   I've rejected it.

25             MR. LOWE:  I appreciate that.

29

PETER TORREANO, CSR 7623

1          THE COURT:  It's now 20 after 9:00.  And

2     so if that's your only point, and you've well

3     made it, and I disagree that inducement to the

4     point that someone who is otherwise not inclined

5     to do it and so the contribution is to cause them

6     to do it as opposed to a circumstance where they

7     are regularly doing it and you know they are

8     regularly doing it and you provide the service

9     nevertheless to facilitate their continuing to

10    infringe.

11         MR. LOWE:  In that situation, Your

12    Honor, the alternative to inducement would be

13    providing material contribution to that

14    infringement.  And we certainly want to be able

15    to argue that the Defendants have not materially

16    contributed.  They have merely been offering a

17    content-neutral service that is misused by some

18    people, but there was no evidence of any material

19    contribution and active intent to help out these

20    infringers.

21         THE COURT:  Well, you see, that's where

22    the law, I think, is.  In the past there have

23    been cases where the contribution is supplying

24    something to the -- the infringer so that they

25    can infringe that's tangible, like giving them       30

1   the color or the paint or the paper or the

2   whatever.

3            Here you are correct.  The only thing

4   that the -- the Defendant supplies is a

5   content-neutral service.  The question becomes

6   how do you effectively protect intellectual

7   property in a world where content-neutral

8   providers provide a vehicle for the

9   infringement.  And it could well be that you'll

10  persuade the jury that that is -- the community

11  should reject that as a basis of liability.  That

12  is one of the issues that the jury will be asked

13  to decide here.

14           I haven't given you much of a comment

15  period, but I do need to terminate this entire

16  process.

17           As I said, what I hear is you arguing

18  that I should give the instructions that you

19  submitted to me.  My instructions reject that.

20  And so you have perfectly preserved on appeal

21  your ability to argue that the Court gave its own

22  instructions as opposed to mine, and mine were

23  correct, and the Court's were in error, so that

24  your rights are preserved on appeal.

25           MR. COOMBS:  Your Honor, I have only two

31

PETER TORREANO, CSR 7623

1    comments.  The first relates to the instruction

2    on the defense for copyright infringement, which

3    is a good segue seeing as it continues at the

4    bottom of the same page we were looking at,

5    page 10.

6            I think, you know, first, we're not

7    convinced this should go to the jury.  And if you

8    wish to construe this as a motion for judgment on

9    that affirmative defense, you may do so, but it's

10   very clear, for example, that the Defendants had

11   not complied with this act at the time the

12   lawsuit was filed.

13           THE COURT:  But that's an argument.

14   That's not an instruction.

15           MR. COOMBS:  To the extent the Court

16   does instruct on the issue, we believe the

17   instruction is incomplete.

18           THE COURT:  You give me the language you

19   want me to use.

20           MR. COOMBS:  We think that in the middle

21   of page 11 where it shows the burden on the

22   Defendants, it list three items.  We think there

23   are two additional ones that should be

24   identified.

25           THE COURT:  Do you have those written

                                                      32

PETER TORREANO, CSR 7623

1    out?

2                  MR. COOMBS:  Well, the first one is to

3    file a designation of an agent with the Copyright

4    Office for receipt of notifications of

5    infringement.

6                  THE COURT:  You don't have those written

7    out?

8                  MR. COOMBS:  I don't.  I'm reading from

9    the statute.

10                 THE COURT:  Ah.  Well --

11                 MR. COOMBS:  If you wish me to cite --

12                 THE COURT:  You're starting at line 12?

13                 MR. COOMBS:  I'm starting at line --

14   well, we could put it at the end of line 18,

15   which is by 1, 2, 3, and then you could just add

16   4, 5.

17                 THE COURT:  All right.  That said.  All

18   right.  "To avail itself of any of the four safe

19   harbors, the Defendants must prove they are

20   private service providers, they adopted

21   recently" -- "they adopted 'reasonably

22   implemented' and informed subscribers of a

23   policy.  They accommodated and did not interfere

24   with the 'standard technical measures' used by

25   copyright owners to identify and protect."

                                                    33

PETER TORREANO, CSR 7623

1          MR. COOMBS:  And (4) they designated an

2     agent to receive notifications of claimed

3     infringement with the Copyright Office.

4          THE COURT:  That's not an issue here

5     because they received the notice.

6          MR. COOMBS:  Well, to the extent they

7     are setting up an affirmative defense here

8     predicated upon that act, we have to be able to

9     show they were not, in fact, eligible for it

10    until at some point after the lawsuit was filed.

11         THE COURT:  Designated an agent.

12         MR. COOMBS:  And then (5) is that in

13    response to such notifications they expeditiously

14    remove the content complained of.

15         THE COURT:  Well, that's the problem

16    because removing the content is not within their

17    power.  I don't want to confuse the jury by

18    suggesting that removing the content -- they can

19    remove access to the content or they can --

20         MR. COOMBS:  Actually, if I may read the

21    provision in the statute, maybe that will address

22    Your Honor's issue.  "That upon obtaining such

23    knowledge acts expeditiously to remove or disable

24    access to the material."  That is the language of

25    512(c)(1)(A)(3), which is one of the safe

                                                    34

1    harbor -- the language tracks in the different

2    provisions on that respect only.

3              THE COURT:  All right.  I'll look at

4    that.

5              Anything else?

6              MR. COOMBS:  Yes.  The other issue is on

7    the statutory damages and I think this applies to

8    both trademark and copyright.  It appears to me

9    that the Court hasn't indicated to the jury what

10   factors they should consider in awarding

11   statutory damages.  And I know that there were

12   various instructions and, as you already pointed

13   out, voluminous, but I think there are three

14   elements that the jury should be considering in

15   awarding statutory damages under both acts.

16             One is the amount of actual damages as

17   we argued yesterday afternoon; the second is to

18   punish the Defendants; and the third is to deter

19   conduct on the part of third parties.

20             THE COURT:  Where do you draw that

21   language?

22             MR. COOMBS:  If Your Honor will give me

23   just a moment, I had it about a moment ago.  We

24   had submitted a proposed instruction No. 45

25   and with citations with some authority that

                                                    35

1    specifically related to trademark.  It's more

2    detailed obviously, but it encompasses those

3    three key considerations.

4              My concern, Your Honor, is simply

5    that --

6              THE COURT:  Well, I have that under --

7    on page 13, line 19 with respect to copyright

8    statutory damages.  So it does seem to me that

9    all I have to do is to add that if it's true that

10   its purpose is to penalize the infringer to deter

11   future violations.  I don't have actual damages

12   listed here because there wasn't any monetary

13   evidence of the amount of actual damages, but --

14             MR. COOMBS:  I guess my point then, Your

15   Honor, is there's not similar language in the

16   trademark instruction.

17             THE COURT:  All right.  I'll add -- I'll

18   look at that.

19             Anything else?

20             MR. COOMBS:  That would be it, Your

21   Honor.

22             MR. LOWE:  Your Honor, if I might make a

23   couple of comments about the damages issue.

24             THE COURT:  Yes.

25             MR. LOWE:  First of all, I don't think

                                                    36

PETER TORREANO, CSR 7623

1    the language about "penalize" and "deter" and so

2    forth is appropriate.

3              THE COURT:  Doesn't this come from a

4    standard instruction?

5              MR. LOWE:  I'm not aware of any.  There

6    are relatively few cases where this has gone to

7    the jury over the years.  I think the language

8    has been more general.

9              THE COURT:  Well, isn't that the point

10   of treble damages and those kinds of things, to

11   penalize?

12             MR. LOWE:  Well, it might be.  This

13   isn't treble damages.  This is neither -- the

14   statutory damages are an alternative to actual

15   damages because of the difficulty of proving

16   actual damages, for example.  And exactly what

17   the purposes are is, you know, perhaps a little

18   bit -- a little bit vague in the law.

19             THE COURT:  Your argument would be that

20   penalty and the deterrence comes from the

21   willfulness side but not from the statutory

22   damage side?

23             MR. LOWE:  I think that's correct, Your

24   Honor.

25             THE COURT:  What's your response to

                                                    37

1    that?

2              MR. COOMBS:  Well, the jury is being

3    asked to award damages based on alternate

4    measures, one for willfulness.  They need to be

5    able to consider these in connection with

6    determining first what range they should be

7    awarding and then within that range what number

8    they should be awarding.

9              THE COURT:  But Counsel's point is that

10   statutory damages are not necessarily punitive

11   damages, especially if I'm going to give an

12   instruction on the willfulness.  It seems -- I've

13   tried to look at this because there isn't much

14   guidance that I can find in the standard

15   instructions as to whether or not within the

16   statutory damages is a punitive element.

17             And it seems to me that clearly the

18   provision in the law for willfulness and treating

19   that as allowing a greater amount because of

20   willfulness must mean that the statutory damages

21   don't take those factors into consideration

22   because otherwise it would be double accounting.

23   "I want to punish you here and because you're

24   willful I want to punish you there."

25             And so I think that in making the law     38

1    here is what we're doing, because these are

2    instructions that will be challenged perhaps, if

3    there's a Plaintiff victory, I would prefer to

4    err on the side of leading language having to do

5    with penalizing and deterrence to the willfulness

6    side and not include it on the statutory damage

7    side.

8              MR. COOMBS:  Are you purporting to

9    remove it from the copyright instruction then?

10             THE COURT:  Just to put it -- because

11   both refer to willfulness and allow the jury to

12   award a greater amount if they find that the

13   conduct is willful, just to move it to there.

14             MR. COOMBS:  I think, Your Honor, if you

15   were to review, for example, the Nintendo case

16   that we discussed yesterday, that the Ninth

17   Circuit in discussing the availability of both

18   actual and statutory damages for the same

19   underlying acts with respect to copyright and

20   trademark does, in fact, talk about the punitive

21   purposes of statutory damages and that it would,

22   therefore, not be appropriate.

23             THE COURT:  Well, there are statutory

24   damages -- statutory just means the damages are

25   called out by statute.  There are treble damages    39

PETER TORREANO, CSR 7623

```
1        that are statutory, but they would be in the

2        nature of punitive damages.

3                    MR. COOMBS:  Well --

4                    THE COURT:  A thousand dollars per

5        violation seems to me, as Counsel argues, may

6        well be a substitute because I can't figure out

7        my actual damages.  And so it's designed to award

8        to me the dollars that I would otherwise have

9        been able to recover.

10                    MR. COOMBS:  It's also designed to allow

11       an award of a larger amount.  Just as in the

12       trademark context actual damages can be trebled

13       where willful, statutory damages can be in a

14       larger amount because willful.

15                    THE COURT:  Because willful.

16                    MR. COOMBS:  Right.

17                    THE COURT:  And so that's what I'm -- I

18       know that this is -- this leaves the jury with

19       the ability to include notions of punitives only

20       with respect to willfulness and creates an

21       opportunity for us to understand that if they

22       award any amount for statutory damages they are

23       not doing it to punish the Defendant but to award

24       to the Plaintiff the fair amount that they

25       believe should be awarded because of the damages   40
```

1    that it has suffered.

2              MR. COOMBS:  Well, Your Honor, before

3    you finally resolve this issue I think it might

4    be a good idea to return to the underlying model

5    instructions as it relates to trademark

6    infringement.

7              THE COURT:  I'll look at it.

8              MR. COOMBS:  Because I believe they do

9    talk to some extent --

10             THE COURT:  Yeah.  That's why I asked

11   that question, is this language from the model

12   instruction.  So I will look at that.

13             MR. COOMBS:  And then the last point,

14   Your Honor, and we can deal with it very quickly,

15   is we take the position that the measure of

16   damages here is not one infringement of each of

17   the intellectual properties based on Defendants'

18   conduct.  It is one infringement by underlying

19   customers.

20             THE COURT:  Yes.

21             MR. COOMBS:  And that it's joint and

22   several with those customers.  So multiple awards

23   are possible.

24             MR. LOWE:  Your Honor, may I make just

25   two brief comments?

                                                   41

PETER TORREANO, CSR 7623

1          THE COURT:  Let me interrupt you because
2     I do have to bring this to a close.
3          I was looking at the verdict form and I
4     do think that given the nature of the statutory
5     damages I would ask the jury to answer yes or no
6     with respect to the various marks.
7          I want you to know that because in your
8     closing you need to pay attention because there's
9     been lots of evidence of websites and pictures,
10    but I don't know that there's been a very careful
11    systematic showing that a mark has been used and
12    tying that to the frequency of use or whatever.
13         And it just seems to me that we risk
14    that the jury will say everything has been
15    infringed without any clear evidence that indeed
16    they were.  Dates and times have been used and it
17    was very frustrating for me not to have sort of a
18    summary chart which showed the use on the defense
19    side.
20         It was frustrating not to have any
21    identification to the customers and put that into
22    context with respect to dates and times and
23    notices to those various customers as opposed to
24    the web domain name, but they were directed to
25    customers.  But that was never put in any kind of

42

1      a summary chart for me and the jury.

2              So I haven't quite finished that part.

3      I'll quickly do that in a few minutes before I

4      summon the jury to read the instructions.  And so

5      it could be that you're going to have to make

6      your argument without the verdict form being in

7      front of you and them.

8              And then -- but I will try to -- it says

9      not less than $1,000 nor more than 200,000 per

10     counterfeit mark per type of good offered for

11     sale.

12             So I need to have that sort of have

13     those in mind and answer yes with respect to that

14     mark having been used and, yes, I'm going to

15     award this amount of money with respect to that

16     mark and no as to that mark and then totaled.

17     And I'll try to get that to you as quickly as I

18     can.

19             MR. LOWE:  Two things quickly, Your

20     Honor.

21             On the issue of determining statutory

22     damages, I think there is helpful language in a

23     recent Ninth Circuit case concerning this.  It's

24     Dream Games versus PC Onsite, 561 F.3d at 992, as

25     I said, this year, the Ninth Circuit.

                                              43

1           This is quoted in -- at page 2 and 3 of

2    our memorandum concerning statutory damages that

3    we previously filed, but what the language was

4    that the Ninth Circuit mentioned is that the jury

5    should be guided by, quote, "what is just in the

6    particular case considering the nature of the

7    copyright, circumstances of the infringement and

8    the like."

9           So what is just obviously is up to the

10   discretion of the jury and there are different

11   factors clearly we could argue.

12          THE COURT:  I probably have --

13          MR. LOWE:  I think that language might

14   be helpful.

15          THE COURT:  Yes.  I don't know that I

16   will use that, but I should go back to my

17   standard instructions which asks the jury in

18   setting damages to be reasonable, and those kinds

19   of words I think capture the essence of that.

20   I'll look at that.

21          MR. LOWE:  One final thing.  Concerning

22   the damages at page 12 at the bottom, you

23   indicate that -- or subparagraph 2 says there's

24   not more than $2 million per counterfeit mark,

25   et cetera.

                                                    44

1          I believe that's not necessarily

2    applicable here.  The law actually, I think, has

3    changed and the $2 million number is applicable,

4    as I understand it, only after October 18, 2008.

5    The case was -- the infringements they are

6    talking about occurred prior to that time.  So I

7    think it's really $1 million.

8               THE COURT:  All right.  Do you agree?

9               MR. COOMBS:  We don't agree, Your Honor,

10   but we're concerned about confusing the jury by

11   getting into different standards based on

12   different dates.  And to be honest with you, we

13   would probably agree just to reduce it to the

14   million dollars.

15              THE COURT:  Very well.  I'll do that.

16   Thank you.

17              (Recess taken.)

18              THE COURT:  Very well.  We're on the

19   record out of the presence of the jury.

20              I estimate that it's going to take me

21   about twenty minutes or so to go through these

22   and -- which means that if an hour each is taken

23   by you, that will take us past the noon hour.

24              I'd like to finish the argument before

25   noon and I'll tell the jury that perhaps we'll

45

1    just take a little longer morning session and

2    break at about 12:30 so that we don't have to

3    break in between.

4              Summon the jury.

5              MR. LOWE:  Your Honor, before you summon

6    the jury there is still this issue about whether

7    we get to call Mr. Livadkin to inquire about

8    Exhibit 1900.

9              THE COURT:  Oh, I'm sorry.  You should

10   have brought that up.

11             I went back to the in limines and it

12   does -- I'm satisfied that the questioning of

13   him, as I understand your proffer with respect to

14   sales, is irrelevant.  The Plaintiff counsel

15   reminded me there is a claim to damages but not

16   lost sales or lost revenue.

17             The damages are those that would be

18   inherent in the use of the mark, the confusion

19   that would be caused, but not necessarily tied to

20   any monetary damages.  And that's why their claim

21   is for statutory damages.

22             MR. LOWE:  We will need to close then.

23             THE COURT:  Say again?

24             MR. LOWE:  We will need to rest.

25             THE COURT:  Yes.  Summon the jury.    46

PETER TORREANO, CSR 7623

```
 1                    MR. LOWE:  One other quick question.

 2                    Does the Court intend to take a break in

 3          between the arguments briefly?

 4                    THE COURT:  Yes.

 5                    Summon the jury.

 6                    (Recess taken.)

 7                    THE COURT:  Members of the jury, I

 8          apologize for the delay, but it -- rather than

 9          work late into the night we chose to come in this

10          morning, but we didn't leave ourselves enough

11          time.

12                    There was the issue that I raised with

13          you yesterday as to whether or not there would be

14          further evidence based on my legal rulings.

15          There will be no further evidence.

16                    And at this time does defense rest?

17                    MR. LOWE:  The defense rests, Your

18          Honor.

19                    THE COURT:  And I asked earlier whether

20          or not the Plaintiff intended to call any

21          rebuttal evidence.

22                    And there is no rebuttal?

23                    MR. COOMBS:  That's correct, Your Honor.

24                    THE COURT:  Both sides have rested.

25                    There are certain legal motions that the
```

47

1     parties are privileged to make at the close of

2     all the evidence.  I'll presume that you've made

3     those motions.

4            If you want to make them, I'll give you

5     an opportunity when we take a break here today

6     and I'll consider that those motions have been

7     made at the close of all the evidence.

8            Have you given a set of the instructions

9     to the jury?

10           As you are receiving these let me just

11    give you a comment.  As I read through the

12    instructions I sometimes see things that I would

13    wish to change and I'll change my wording as I

14    read through them.

15           I'll try and follow that by making that

16    modification and giving you a revised set.  And

17    often there are things that occur during the

18    argument of counsel that will require me to go

19    back and give you further instructions.  And so

20    as I've said to you before, all of my

21    instructions are important, but these are the

22    instructions I'm going to give you here at the

23    beginning of the close of the case and before

24    argument.

25           Members of the jury, now that you have

                                                        48

1    heard all of the evidence, it's my duty to

2    instruct you on the law which applies to this

3    case.  Copies of these instructions have been

4    made available for you to consult.

5              As I have instructed you, it is your

6    duty to find the facts from all the evidence in

7    the case.  To those facts you must apply the law

8    as I give it to you.  You must follow the law as

9    I give it to you whether you agree with it or

10   not.

11             In deciding the case you must not be

12   influenced by any prejudices or sympathy.  This

13   means that you must decide the case solely on the

14   evidence before you and according to the law.

15   You will recall that you took an oath promising

16   to do so at the beginning of the case.

17             You must follow all of my instructions.

18   You must not single out some and ignore others;

19   they are all important.

20             The evidence from which you are to base

21   your verdict consists of:  The sworn testimony of

22   witnesses, both on direct and cross-examinations,

23   regardless of who called the witness; the

24   exhibits which have been received into evidence;

25   and the facts which have been admitted during

                                                    49

1    pretrial proceedings; and any facts to which the

2    lawyers have agreed or stipulated.

3              The deposition testimony of one or more

4    witnesses have been read or displayed.

5    Deposition testimony is given under oath.  You

6    should give it the same force and effect as

7    testimony given here in trial.

8              You must decide all the questions of

9    fact in this case from the evidence received in

10   this trial and not from any other source.  You

11   must not make any independent investigation of

12   the facts or the law or consider or discuss facts

13   as to which there is no evidence.  This means,

14   for example, you must not perform any research on

15   your own or consult reference works for

16   additional information.  You must also not

17   conduct any experiments.

18             If there is a conflict between the

19   testimony of one or more witnesses and that of

20   other witnesses, you may have to decide which

21   testimony to believe and which testimony not to

22   believe.  You may disbelieve all or any part of

23   any witness's testimony.  In making that

24   decision, you should take into account a number

25   of factors, including the following:

50

PETER TORREANO, CSR 7623

1              1.   Was the witness able to see, or

2      hear, or know the things about which that witness

3      testified?

4              2.   How well was the witness able to

5      recall and describe those things?

6              3.   What was the witness's manner while

7      testifying?

8              4.   Did the witness have an interest in

9      the outcome of this case or any bias or prejudice

10     concerning any party or any matter involved in

11     the case?

12             5.   How reasonable was the witness's

13     testimony when considered in light of all the

14     evidence in the case?

15             6.   Was the witness's testimony

16     contradicted by what that witness said or did at

17     another time, or by the testimony of other

18     witnesses, or by other evidence?

19             In deciding whether or not to believe a

20     witness, keep in mind that people sometimes

21     forget things.  You need to consider whether a

22     contradiction is an innocent lapse of memory or

23     an intentional falsehood, and that may depend

24     upon -- it may depend on whether it has to do

25     with an important fact or with only a small

                                                    51

1    detail.

2           The persuasiveness of the evidence

3    presented by each side does not necessarily

4    depend on the number of witnesses testifying on

5    one side or the other.  You must consider all the

6    evidence in the case, and you may decide that the

7    testimony of a smaller number of witnesses on one

8    side has greater persuasiveness than that of a

9    larger number on the other side.

10          You have heard testimony from

11   individuals who, because of education or

12   experience, have become experts in a particular

13   field.  The law permits experts to state opinions

14   about matters in the field of their expertise and

15   they are permitted to state the reasons for those

16   opinions.

17          Expert opinion testimony should be

18   judged just like any other testimony.  You may

19   accept it or reject it, and give it as much

20   weight as you think it deserves.  In deciding

21   whether to believe an expert's testimony, you

22   should consider the expert's training and

23   experience, the facts the expert relied on, and

24   the reasons for the expert's opinion.

25          Evidence may be direct or

                                                    52

1    circumstantial.  Direct evidence is testimony

2    about an event by a witness who personally saw or

3    heard or performed the event.  Circumstantial

4    evidence is indirect evidence about an event;

5    that is, it is direct evidence that one event

6    took place from which one can infer that another

7    event, which was not itself directly observed,

8    took place.

9          You are to consider both direct and

10   circumstantial evidence.  The law permits you to

11   consider direct and circumstantial evidence to be

12   of equal persuasiveness.  However, it is for you

13   to decide how much persuasive -- how persuasive

14   to consider any evidence.

15         Now, during the trial I have ordered

16   that evidence be stricken from the record and

17   instructed you to disregard the evidence.  When

18   you are deciding the case, you must not consider

19   evidence which I told you to disregard.

20         During your deliberations you will have

21   copies of the documentary evidence.  With respect

22   to electronic evidence, we will provide you with

23   a computer on which to view the exhibits.  I have

24   directed Ms. Garcia, the deputy clerk, to assist

25   you in understanding how to operate the

                                                    53

PETER TORREANO, CSR 7623

1    equipment.  You will also be provided with a list

2    of all exhibits which have been received in

3    evidence.  If you need additional equipment or

4    supplies, you may make a request by sending a

5    note.

6              The parties to this case include

7    corporations.  All parties are equal before the

8    law and a corporation is entitled to the same

9    fair and conscientious consideration by you as a

10   party.  Under the law, a corporation is

11   considered to be a person and like a person a

12   corporation is responsible for its conduct.

13             A corporation acts through its

14   employees, agents, directors, or officers.

15   During these instructions when I speak of the

16   conduct of Louis Vuitton Malletier, S.A., Akanoc

17   Solutions, Inc., Managed Solutions Group, Inc.,

18   MSGI, I am referring to the conduct of their

19   respective employees, agents, directors and

20   officers performed within the scope of their

21   authority.

22             You should decide the case as to each

23   Defendant separately.  However, in doing so you

24   might find that one person took actions on behalf

25   of more than one Defendant.  If so, you should

                                                    54

1    include each of those Defendants in your

2    decision.  Unless otherwise stated, the

3    instructions apply to all parties.

4         The Plaintiff is making two claims

5    against the Defendants:  Contributory trademark

6    infringement and contributory copyright

7    infringement.  If the Plaintiff proves all of the

8    elements of each claim, the Plaintiff is entitled

9    to your verdict as to each claim.

10        Louis Vuitton has the burden of

11   establishing that Defendants Akanoc, MSGI and

12   Steven Chen contributed to trademark and

13   copyright infringement by another company by a

14   preponderance of the evidence.  This means that

15   Louis Vuitton has to produce evidence which,

16   considered in light of all the facts, leads you

17   to believe that what Louis Vuitton claims is more

18   likely true than not true.

19        To put it differently, if you were to

20   imagine that the persuasiveness of evidence could

21   be weighed on scales, and you could put evidence

22   tending to prove, for example, the likelihood

23   that Akanoc, MSGI and Steven Chen contributed to

24   trademark and copyright infringement on one side

25   of the scales and evidence tending to prove the

                                              55

1          likelihood that these Defendants did not

2          contribute to trademark and copyright

3          infringement on the other side of the scales, the

4          evidence on the likelihood of contributory

5          infringement side would have to make the scale

6          tip in Louis Vuitton's favor.

7                    If you evaluate the evidence and you

8          find that the evidence is evenly balanced between

9          the two sides, your decision on contributory

10         copyright and trademark infringement must be in

11         favor of Akanoc, MSGI and Steven Chen.

12                    If you evaluate the evidence and you

13         decide that what Louis Vuitton claims is more

14         likely true than not true, in other words, if the

15         scales tip to Louis Vuitton's side, even

16         slightly, then your decision should be in favor

17         of Louis Vuitton.

18                    Plaintiff's first claim is for

19         contributory trademark infringement.  A trademark

20         is a word, a name, a symbol, a device or a

21         combination of them that indicates the source of

22         goods.  The owner of a trademark has the right to

23         exclude others from using that trademark.

24                    The trademark laws balance three

25         often-conflicting goals:

                                                          56

1                    1.  Protecting the public from being

2         misled about the nature and source of the goods

3         and services so that the consumer is not confused

4         or misled in the market;

5                    2.  Protecting the rights of a business

6         to identify itself to the public and its

7         reputation in offering goods and services to the

8         public; and

9                    3.  Protecting the public interest in

10        fair competition in the market.

11                   The balance of these policy objectives

12        vary from case to case because they may often

13        conflict.  Accordingly, each case must be decided

14        by examining its specific facts and circumstances

15        of which you are the judge.

16                   In my instructions I will identify types

17        of facts you are to consider in deciding if the

18        Defendants are liable to the Plaintiff for

19        contributory infringement of Plaintiff's

20        trademarks.

21                   One way for the Plaintiff to prove

22        trademark validity is to show that the trademark

23        is registered.  An owner of a trademark may

24        obtain a certificate of registration issued by

25        the United States Patent and Trademark Office and  57

1    may submit that certificate as evidence of the

2    validity and protectability of the trademark and

3    of the certificate holder's ownership of the

4    trademark covered by that certificate.

5            In this case you have received evidence

6    that the Plaintiff received registrations for the

7    trademarks identified during these proceedings,

8    including "Louis Vuitton," "LV" and "Damier,"

9    pattern trademarks and those -- and these

10   registrations are now incontestable under the

11   trademark laws.  This means that the Plaintiff's

12   registration of the trademark is conclusive

13   evidence of Plaintiff's ownership of those

14   trademarks and that the trademarks are valid and

15   protectable.

16           There is a presumption of a likelihood

17   of confusion or a likelihood of confusion as a

18   matter of law when the offending mark is a

19   counterfeit mark or a mark virtually identical to

20   a previously registered mark coupled with the

21   intent to pass off or borrow from established

22   goodwill.

23           In order to recover for contributory

24   trademark infringement you must find that

25   Plaintiff has proved by a preponderance of the

                                                    58

PETER TORREANO, CSR 7623

1    evidence the following:

2             No. 1.  Defendants sold web hosting and

3    Internet access services to some other persons or

4    companies or in the case of an individual

5    Defendant, owned or operated a company that sold

6    such services.  I will refer to individuals or

7    companies to whom Defendants sold web hosting and

8    Internet access services as "Defendants'

9    customers."

10            No. 2.  Defendants knew or should have

11   known that Defendants' customers were using

12   Defendants' services to directly infringe or to

13   facilitate infringement of Plaintiff's

14   trademarks.

15            No. 3.  One or more of Defendants'

16   customers used the services provided by

17   Defendants to infringe Plaintiff's trademark or

18   to facilitate infringement by another of

19   Plaintiff's trademarks.

20            And 4.  Plaintiff was damaged by the

21   infringement.

22            Now, in order to prove that "one or

23   more of Defendants' customers used the services

24   provided by Defendants to infringe Plaintiff's

25   trademark," Plaintiff must prove that a website    59

1    of Defendants' customers or some other successor

2    in interest to Defendants' customers knowingly

3    and intentionally used a mark in connection with

4    the offering for sale, sale or distribution of

5    goods in the United States or in a way that would

6    substantially affect commerce in the United

7    States; that the mark was counterfeit, that is,

8    it was not a genuine mark applied to the goods or

9    authorized to be applied to the goods applied by

10   the Plaintiff; and that the use was likely to

11   confuse or deceive.

12           You must consider whether the

13   Defendants' customers' use of the trademark is

14   likely to cause confusion about the source of the

15   Plaintiff's or the Defendants' customers' goods.

16   I will suggest some factors you should consider

17   in deciding this.

18           The presence or absence of any

19   particular factor that I suggest should not

20   necessarily resolve whether there is or there was

21   a likelihood of confusion because you must

22   consider all of the relevant evidence in

23   determining this.

24           As you consider the likelihood of

25   confusion, you should examine the following:

                                                    60

PETER TORREANO, CSR 7623

1              No. 1.  Strength or weakness of the

2     Plaintiff's mark.  The more the consuming public

3     recognizes the Plaintiff's trademark as an

4     indication of origin of the Plaintiff's goods,

5     the more likely it is that customers would be

6     confused about the source of the Defendants'

7     customers' goods if they use a similar mark.

8              No. 2.  Defendants' customers' use of

9     the mark.  If the Defendants' customers and

10    Plaintiff use their trademarks on the same,

11    related or complementary kinds of goods, there

12    may be a greater likelihood of confusion about

13    the source of the goods than otherwise.

14              3.  Similarity of Plaintiff's and

15    Defendants' customers' marks.  If the overall

16    impression created by the Plaintiff's trademark

17    in the marketplace is similar to that created by

18    the Defendants' customers' trademark in

19    appearance, there is a greater chance that

20    consumers are likely to be confused by

21    Defendants' customers' use of a mark.

22    Similarities in appearance weigh more heavily

23    than differences in finding the marks are

24    similar.

25              4.  Actual confusion.  If use by the

                                                    61

1    Defendants' customers of the Plaintiff's

2    trademark has led to instances of actual

3    confusion, this strongly suggests a likelihood of

4    confusion.  However, actual confusion is not

5    required for a finding of likelihood of

6    confusion.  Even if actual confusion did not

7    occur, the Defendants' customers' use of the

8    trademark may still be likely to cause

9    confusion.

10          As you consider whether the trademark

11   used by the Defendants' customers create for

12   consumers a likelihood of confusion with the

13   Plaintiff's trademark, you should weigh any

14   instances of actual confusion against the

15   opportunities for such confusion.  If the

16   instances of actual confusion have been

17   relatively frequent, you may find that there has

18   been substantial actual confusion.  If, by

19   contrast, there is a very large volume of sales,

20   but only a few isolated instances of actual

21   confusion, you may find that there has not been

22   substantial actual confusion.

23          5.  Defendants' customers' intent.

24   Knowing use by Defendants' customers of the

25   Plaintiff's trademark to identify similar goods

                                              62

1    may strongly show an intent to derive benefit

2    from the reputation of the Plaintiff's mark,

3    suggesting an intent to cause a likelihood of

4    confusion.

5           On the other hand, even in the absence

6    of proof that the Defendants' customers acted

7    knowingly, the use of Plaintiff's trademark to

8    identify similar goods may indicate a likelihood

9    of confusion.

10          6.  Marketing/advertising channels.  If

11   the Plaintiff's and Defendants' customers' goods

12   are likely to be sold in the same or similar

13   manner, such as on the Internet, stores or

14   outlets, or advertised in similar media, this may

15   increase the likelihood of confusion.

16          7.  Purchaser's degree of care.  The

17   more sophisticated the potential buyers of the

18   goods or the more costly the goods, the more

19   careful and discriminating the reasonably prudent

20   purchaser exercising ordinary caution may be.

21   They may be less likely to be confused by

22   similarities in Plaintiff's and Defendants'

23   customers' trademarks.

24          8.  Product line expansion.  When the

25   parties' products differ, you may consider how

63

PETER TORREANO, CSR 7623

1    likely the Plaintiff is to begin selling the

2    products for which the Defendants' customers are

3    using the Plaintiff's trademark.  If there is a

4    strong possibility of expanding into the other

5    party's market, there is a greater likelihood of

6    confusion.

7              To find that "Defendants knew or should

8    have known that Defendants' customers' were using

9    Defendants' services to infringe or to facilitate

10   infringement of the Plaintiff's trademark," you

11   must find that Plaintiff has proved that

12   Defendants had actual knowledge that one or more

13   of Defendants' customers were in the business of

14   themselves or of facilitating others to sell

15   goods using counterfeit marks and would use the

16   services purchased from Defendants for that

17   purpose or should have known that one or more of

18   Defendants' customers were doing so.

19             In making that judgment, you may

20   consider a number of factors, including the

21   following:

22             No. 1.  The timing, content and

23   frequency of notices provided to Defendants by

24   the owner of a mark that Defendants' services

25   were being used to infringe Plaintiff's

                                                    64

1    trademarks;

2              No. 2.  Actions or inaction by

3    Defendants after receiving notice that the

4    effectiveness of any action -- and the

5    effectiveness of any action with respect to the

6    provision of services by Defendants;

7              3.  Policies and practices by the

8    Defendants imposed on its customers with respect

9    to their using its services to infringe

10   trademarks of others;

11             4.  The degree of control that

12   Defendants could and did exercise over its

13   servers or services and the use of its servers or

14   services;

15             5.  The technical ability and

16   feasibility of Defendants terminating the use of

17   its servers or services by a direct infringer

18   without affecting its provision of services to

19   legitimate users.

20             Now, "knew or should have known"

21   standard is judged from the standpoint of what a

22   reasonable person would do under the same or

23   similar circumstances.

24             A web hosting server provider is not

25   liable for contributory trademark infringement

                                              65

1    solely because the provider does not monitor the

2    content of websites stored on its servers.

3    Liability must be based upon proof that the

4    service provider knew that its services were

5    being used to infringe and then acting or failing

6    to act in a way to allow the infringement to

7    continue.

8            It is no defense to contributory

9    trademark infringement or contributory copyright

10   infringement that termination of services to a

11   direct infringer could be circumvented by the

12   direct infringer switching to use the services of

13   some other company to continue direct

14   infringement.

15           The second claim, contributory copyright

16   infringement.  The owner of a copyright has the

17   right to exclude any other person from

18   reproducing, preparing derivative works,

19   distributing, performing, displaying, or using

20   the work covered by a copyright for a specific

21   period of time.

22           Copyrighted work can be a literary work,

23   musical work, dramatic work, pictorial work,

24   graphic work, as well as various other forms of

25   audio-visual works.  However, facts, ideas,

66

PETER TORREANO, CSR 7623

1    procedures, processes, systems, methods of

2    operation, concepts, principles or discoveries

3    cannot themselves be copyrighted.

4           The copyrighted work must be original.

5    An original work that closely resembles other

6    works can be copyrighted so long as the

7    similarity between the two works is not the

8    result of copying.

9           Copyright automatically exists in a work

10   the moment it is fixed in any tangible medium of

11   expression.  The owner of the copyright may

12   register the copyright by delivering to the

13   Copyright Office or the Library of Congress a

14   copy of the copyrighted work.  After examination

15   and a determination that the material deposited

16   constitutes copyrightable subject matter and that

17   the legal and formal requirements are satisfied,

18   the Registrar of Copyrights registers the work

19   and issues a certificate of registration to the

20   copyright owner.

21          In this case Louis Vuitton alleges that

22   Akanoc, MSGI and Steven Chen have contributed to

23   the infringement of its valid copyrights.

24          The copyrighted works involved in this

25   trial are:  A multicolor monogram on black print,

67

1       which is Exhibit 450, and a multicolor monogram

2       on white print, which is Exhibit 449.

3              If you find that the various websites

4       infringed Louis Vuitton's copyright in selling

5       counterfeit Louis Vuitton products, you may

6       proceed to consider the Plaintiff's claim that

7       the Defendants contributorily infringed that

8       copyright.

9              In order to recover for a contributory

10      copyright infringement you must find that

11      Plaintiff has proved by a preponderance of the

12      evidence the following:

13             No. 1.  Defendant sold web hosting and

14      Internet access services to some other persons or

15      companies or in the case of an individual

16      Defendant, owned or operated a company that sold

17      such services.  I will refer to individuals or

18      companies to whom Defendants sold web hosting and

19      Internet access services as "Defendants'

20      customers."

21             No. 2.  Defendants knew or should have

22      known that Defendants' customers were using

23      Defendants' services to infringe or to facilitate

24      infringement of Plaintiff's copyright.

25             3.  One or more of Defendants' customers   68

PETER TORREANO, CSR 7623

1    used the services provided by Defendants to

2    infringe Plaintiff's copyright or to facilitate

3    infringement by another of Plaintiff's copyrights

4    in the United States.

5         4.   Plaintiff was damaged by the

6    infringement.

7         The factors and definition I gave you in

8    the instructions on contributory trademark

9    infringement may be used to infer knowledge with

10   respect to contributory copyright infringement.

11        Even if you find that Defendants'

12   customers use Defendants' services to sell

13   products that infringe Plaintiff's copyrights,

14   Defendants are entitled to rely on the "safe

15   harbor" provisions of the Digital Millenium,

16   Title II, entitled Online Copyright Infringement

17   Liability Limitation Act as a defense.  I believe

18   that should be the Digital Millenium Copyright

19   Act.  That's what the C stands for in that

20   initial.

21        This provision enables qualified service

22   providers to limit their liability for claimed

23   copyright infringement.  These safe harbors

24   provide protection from liability for:

25   Transitory digital network communications;

69

1    systems caching; information residing on systems

2    or networks at the direction of users; and

3    information location tools.

4         To avail itself of any of the four safe

5    harbor provisions, Defendants must prove by a

6    preponderance of the evidence that:

7         No. 1.  They are service providers;

8         No. 2.  They adopted, reasonably

9    implemented and informed subscribers of a policy

10   providing that they may, in appropriate

11   circumstances, terminate the accounts of repeat

12   infringers;

13        3.  They accommodated and did not

14   interfere with standard technical measures used

15   by copyright owners to identify or protect

16   copyrighted works;

17        4.  They designated an agent to receive

18   notification of claimed infringement by making

19   available through its services, including on its

20   website in a location accessible to the public

21   and by providing to the Copyright Office,

22   substantially the following information:

23        A.  The name, address, phone number, and

24   electronic mail address of the agent;

25        B.  Other contact information which the   70

1    Registerer of Copyrights may deem appropriate;

2              And 5.  Upon notification of claimed

3    infringement, they responded expeditiously to

4    remove, or disable access to, the material that

5    is claimed to be infringing or to be the subject

6    of infringing activity.

7              "Service provider" means a provider of

8    online services or network access, or the

9    operator of facilities therefor, and includes an

10   entity offering the transmission, routing or

11   providing of connections for digital online

12   communications, between or among points specified

13   by a user, of material of the user's choosing,

14   without modification of the content of the

15   material as sent or received.

16             "Reasonably implemented policy" means

17   that the service provider has a working

18   notification system, a procedure for dealing with

19   DMCA-compliant notifications, and if it does not

20   actively prevent copyright owners from collecting

21   information needed to issue such notifications.

22             An implementation is reasonable if,

23   under appropriate circumstances, the service

24   provider terminates users who repeatedly or

25   blatantly infringe copyright.

                                                    71

1          "Standard technical measures" are

2     defined as "technical measures that are used by

3     copyright owners to identify or protect

4     copyrighted works," and:

5          1.  Have been developed pursuant to a

6     broad consensus of copyright owners and service

7     providers in an open, fair, voluntary

8     multi-industry standards process; and

9          2.  Are available to any person on

10    reasonable and nondiscriminatory terms; and

11         3.  Do not impose substantial costs on

12    service providers or substantial burdens on their

13    systems or networks.

14         I will instruct you about the measure of

15    damages.  By instructing you on damages, I'm not

16    suggesting which party should win on any issue.

17         If you find for the Plaintiff on the

18    Plaintiff's contributory trademark infringement

19    claim, you must determine the Plaintiff's

20    damages.  The Plaintiff seeks a statutory damage

21    award established by Congress for each work

22    infringed.

23         In a case involving the use of a

24    counterfeit mark in connection with the sale or

25    distribution of goods or services, the Plaintiff

72

1    is entitled to statutory damages if:

2              1.  Not less than $1,000 or more than

3    $200,000 per counterfeit mark per type of goods

4    or services sold, offered for sale, or

5    distributed as the Court considers just; or

6              2.  If you find that the use of the

7    counterfeit mark was willful, not more than

8    $1 million per counterfeit mark per type of goods

9    or services sold, offered for sale or

10   distributed.

11             The Defendants are liable for willful

12   contributory infringement if you find that the

13   Plaintiff has proved by a preponderance of the

14   evidence at least one of the following:

15             No. 1.  Defendants acted in bad faith;

16             2.  Defendants acted with deliberate

17   disregard for Plaintiff's trademark rights; or

18             3.  Defendants acted with intent that

19   Defendants' customers infringe the Plaintiff's

20   trademarks.

21             If you find for the Plaintiff on

22   Plaintiff's contributory copyright infringement

23   claim, you must determine the Plaintiff's

24   damages.  The Plaintiff seeks a statutory damage

25   award established by Congress for each work

PETER TORREANO, CSR 7623

1    infringed.  Its purpose is to penalize the

2    infringer and to deter future violations of the

3    copyright laws.  The amount you may award as

4    statutory damages is not less than $750 nor more

5    than $30,000 for each work you conclude was

6    infringed.

7            However, if you find the infringement

8    was innocent, you may award as little as $200 for

9    each work innocently infringed.

10           An infringement is considered innocent

11   when the Defendant proved both of the following

12   elements by a preponderance of the evidence:

13           No. 1.  The Defendants were not aware

14   that their acts contributed to infringement of

15   Plaintiff's copyright; and

16           2.  Defendants had no reason to believe

17   that their acts contributed to an infringement of

18   Plaintiff's copyright.

19           If you find that the infringement was

20   willful, you may award as much as $150,000 for

21   each work willfully infringed.  An infringement

22   is considered willful when the Plaintiff has

23   proved both of the following elements by a

24   preponderance of the evidence:

25           No. 1.  Defendants engaged in acts that

74

PETER TORREANO, CSR 7623

1    contributed to the infringement of Plaintiff's

2    copyright; and

3              2.  Defendants knew that those acts

4    contributed to the infringement of Plaintiff's

5    copyright.

6              I will now permit counsel for the

7    parties to make their closing arguments.  Counsel

8    for the Plaintiff will make a closing argument,

9    followed by the closing argument by counsel for

10   the Defendants.  If Plaintiff's counsel does not

11   use all of the allotted time, counsel for the

12   Plaintiff will be permitted a brief rebuttal

13   argument.

14             And then I'll have some brief additional

15   instructions for you with respect to the conduct

16   of your deliberations.  And I'll also have an

17   opportunity then to comment on the verdict form

18   which I'm still preparing for you.

19             Because of the delay in our getting

20   started, instead of taking our normal break at

21   noon, in order to allow each side about an hour

22   for their argument, we may go a little beyond

23   noon, but we will take a break in between the two

24   arguments.

25             Should you need a break during the

                                                  75

1    course of the argument, restroom break or

2    something of that kind, we want you to be

3    comfortable.  So raise your hand and let us know

4    and we'll take a break even in the course of the

5    argument.  I hope that that won't be necessary.

6              At this point do you need a break to set

7    up the courtroom for your argument?

8              MR. COOMBS:  No, I don't believe so,

9    Your Honor.

10             MR. LOWE:  Very well.  The Court will

11   call on Plaintiff's counsel for closing argument.

12             MR. COOMBS:  Thank you, Your Honor.

13   Good morning, ladies and gentlemen.

14             And thank you again for the time that

15   you've taken to consider the evidence in

16   connection with Louis Vuitton's claims for

17   contributory infringement by the Defendants in

18   this matter.

19             Some things not showing up yet?

20             JUROR:  No.  We just were requesting a

21   bathroom break very quickly.

22             THE COURT:  That's okay.  I should have

23   anticipated that.

24             MR. COOMBS:  Better now than in a few

25   minutes.

                                                    76

PETER TORREANO, CSR 7623

1                THE COURT:  Why don't we give you five

2      minutes before we start.  So we'll come back in

3      five minutes.

4                (Recess taken.)

5                THE COURT:  Ready to resume?

6                MR. LOWE:  Yes, Your Honor.

7                THE COURT:  Summon the jury.

8                (The following proceedings were held in

9      open court in the presence of the jury:)

10               THE COURT:  Very well.  You may proceed,

11     Counsel.

12               MR. COOMBS:  Thank you, Your Honor.

13               And again thank you and good morning.

14               You'll recall that at the beginning of

15     the case I told you that this was a simple case.

16     And before you think I'm crazy I want to explain

17     to you again why I think it's a simple case.

18               I agree with you that we're talking

19     about intangible properties and we're talking

20     about them in the virtual world and because of

21     that you've had to be introduced to a whole new

22     language over the course of a few days.  And that

23     can make it seem kind of complicated at times and

24     on the Court's urging I think we've provided help

25     with that with the glossary that you've been

                                                        77

1      provided.

2               But the case may also seem more

3      complicated than it really is because the

4      Defendants in this case keep wanting us to walk

5      down some side alleys that really don't have much

6      to do with the issue that you are expected to

7      decide according to the Court's instructions.

8               Some of the issues that have been talked

9      about and are very interesting have some

10     relationship to the issues that you're going to

11     be asked to decide, have been asked to decide,

12     are things like the domain name registration

13     system, things like where is the infringement

14     occurring, what is -- what's happening in the

15     United States as opposed to somewhere else, what

16     happens when a website switches from one of the

17     Defendant's servers to someone else's servers.

18               Interesting issues.  I'm sure you're

19     going to hear more about them in the Defendants'

20     closing statement, but in the final analysis

21     these issues do not change the fundamental issues

22     that I mentioned to you in the opening statement,

23     which is that this is about what the Defendants

24     could have done, should have done, didn't do and,

25     as we've seen during the trial, still aren't

                                                      78

1     doing.

2               Now, yesterday during Mr. Chen's

3     testimony you heard some references to an

4     apartment building.  And in a way we're walking

5     down these laneways, but really we should be

6     walking towards the apartment building that

7     Mr. Lowe has been setting up as a metaphor for

8     Defendants' business.

9               And the point is that that apartment

10    building is the Defendants' business, not

11    Apartment 10B.  Apartment 10B may be a server, it

12    may be a website, whatever.  But the point is I

13    think the evidence demonstrates that the amount

14    of infringing activity that's going on using the

15    Defendants' equipment, using the Defendants'

16    servers a mere couple blocks from here is such

17    that the whole building is infested with

18    something that needs to be addressed.

19              Now, when you think of it in those terms

20    it's pretty clear that we can't just let that

21    happen.  If this building were next door to you

22    and it was full of criminals, it was loud noise

23    every night, it was flooding, it was not

24    maintained according to health standards, we'd

25    all say, of course, something has to be done.     79

PETER TORREANO, CSR 7623

1          And, in fact, it's not just up to the

2     law to deal with it.  If you're a neighbor of

3     such a building, you have rights, too.  You have

4     an ability to bring a claim for nuisance or deal

5     with the problem through various mechanisms.

6          And that's essentially what Louis

7     Vuitton is trying to do in this case, to try to

8     make sure that the owner of that apartment

9     building, the Defendants here, live up to the

10    standards that are expected of people who are

11    engaged in that business.

12         What's interesting here, though, is that

13    Mr. Chen has put his business sort of like on a

14    city border to kind of make it more difficult.

15    He's trying to say, "Well, I'm on the border

16    between the United States and China and,

17    therefore, we're not really subject to US law."

18         But I think it's reasonable to infer

19    that if we were sitting in a Chinese court he'd

20    be saying the same thing.  "If you have this

21    issue, you should be talking to me in San Jose."

22         We're talking to him here in San Jose

23    and we should expect you to sort of look to the

24    issues in terms of the huge amount of illegal

25    conduct that's going on using his servers and

                                                80

1    continuing to use those servers after repeated

2    notices from Louis Vuitton.

3         When you're thinking about the evidence

4    that I'm going to briefly outline for you this

5    morning you should always keep in mind the

6    distinction between what was going on before

7    August of 2007 and after.

8         Remember, August 2007 is the date

9    Mr. Chen was served with process whether that was

10   August 20th, as he first said, August 15th, as

11   was indicated by the proof of service, or August

12   8th when he was corresponding with his customer

13   about one of the websites that was listed in the

14   complaint.  But you'll see that the service of

15   the complaint acted as a trigger for different

16   action, more action, but still not enough action.

17        Now, you'll remember Mr. Lowe in his

18   opening statement said that we were mistaken in

19   this case because his clients aren't the

20   problem.  He said that the Defendants are doing

21   everything that they possibly can to try to help

22   Louis Vuitton and other people in similar

23   businesses to avoid the sale of knockoffs on the

24   Internet.

25        And yet yesterday you heard Mr. Chen

81

PETER TORREANO, CSR 7623

1   say, "Oh, these are business decisions.  I'm not

2   concerned with these.  I just forward them on.  I

3   don't handle them as seriously as everything

4   else.  That should be something between whoever

5   it is doing the underlying wrongful act and Louis

6   Vuitton.  I wash my hands of it."

7            That is not doing everything you can.

8   And Mr. Lowe's suggestion to you that they are I

9   think demonstrates that they know they are not

10   doing what the law requires.

11           Now, of course, we've also heard

12   testimony from Ms. Luft that if you're a big

13   company that they are somewhat scared of like

14   Microsoft, in your case we'll do more.

15           So I mentioned that you have to draw

16   this distinction between before August 2007 and

17   after it.  And on the screen is a chart you have

18   not yet seen.  And I apologize.  There's a fair

19   bit of detail, but I think it conveys the

20   essential point, which is that from roughly

21   October 2006 to August of 2007 Louis Vuitton

22   transmitted 19 demands to the Defendant saying

23   please deal with this.

24           And at the bottom, and I know you can't

25   read it, but you can see that some of the

                                                   82

PETER TORREANO, CSR 7623

1    websites are indicated in red ink.  Those are the

2    ones that are not the subject of the first

3    notification.  They are the subject of the second

4    or a third or a fourth notification and the

5    problem persisted.

6              We do know one thing, actually.  I

7    misspoke.  Mr. Chen did say he remembered one of

8    the letters, the one that was sent in April of

9    2007 from Miles.  He remembers it because it was

10   sent to his home as well as to the office.  We

11   hadn't heard anything from him from any of the

12   notices that were sent to his office.

13             So what did he do with the one he does

14   remember?  He stuck it on that pile that had been

15   sitting there for several months already

16   gathering dust.  We still don't know what

17   happened to that letter.  And, of course, I think

18   it's reasonable to infer that no action was taken

19   in response to any of the demands that were sent

20   before August 20th -- or August of 2007.

21             But even after -- 592.

22             Even after the lawsuit and one would

23   hope additional incentive to try and address the

24   problem and discourage this illegal use -- and

25   remember, Mr. Chen has agreed this is a violation

83

1    of law, it's a violation of its terms and service

2    and even a crime, but somehow he still thinks

3    it's just a business dispute.

4          But even at this point one would think

5    there would be more incentive to try and

6    cooperate with Louis Vuitton write to owners, as

7    Mr. Lowe suggested in his opening statement, you

8    can see here that in response to the letter of

9    July, one IP, one customer had 100 websites

10   offering counterfeit Louis Vuitton product and a

11   few months later in response to another letter in

12   January, same customer, same server and many of

13   the same websites still being on Mr. Chen's

14   servers.

15         Have they told you what they did?

16   Nothing.  All they do is send the note to the

17   customer, "please deal with it."  And you know

18   what they do?  They move it from one extra IP to

19   another.  And Mr. Chen has testified these things

20   are sort of freely available.  They can contact

21   up and get more extra IP any old time they want

22   as part of the package that he offers.

23         So what is the "could have" that they

24   should have done?  21.

25         We've talked about their terms of

PETER TORREANO, CSR 7623

1    service, we've heard Mr. Chen's testimony about

2    their terms of service, and we've seen that they

3    send a warning to the customer.

4              Can you just scroll down?  I think it's

5    towards the end of the documents where you have

6    the various remedies.

7              No.  Next page.  Keep going.

8              One more.

9              Okay.  Thank you.

10             So in paragraph C, warning the customer,

11   we know they do that or at least after August of

12   2007 before we filed the lawsuit.  We're not

13   clear that they did even that.

14             The next provisions, though, have not

15   really been invoked by the Defendants in any of

16   the numerous cases that they themselves admit.

17   Remember, we've looked at Exhibit 1598.  We've

18   seen that since August of 2007 Louis Vuitton has

19   sent repeated notices with numerous websites

20   listed in those notices and the Defendants -- the

21   only thing that's escalated, contrary to

22   Mr. Gralnik's testimony, is the amount of

23   infringing activity.

24             And why is that?  That's because the

25   only thing that ever happens is a warning.  And,    85

1    yes, they sometimes disable or unplug, but

2    Mr. Chen made fairly clear that he does that to

3    sort of get the customer's attention.  He's not

4    really suspending and he's not removing content,

5    which are among the other remedies that he has.

6            All he's doing is just saying, "Hey, I

7    didn't hear from you in response to my warning."

8    This will make sure he gets back to me.  And in

9    some cases they do.  And that's good.  As I said

10   in my opening statement, we applaud the

11   improvement.  We just wish there were more.

12            And as I said in my opening statement,

13   we think they do this because they have a

14   business model that works for them.  I think the

15   amount of this activity demonstrates that it's of

16   value to them to have this added service.

17            They may not provide other services or

18   they may, or that's sort of irrelevant in a

19   manner of speaking, but the one thing they can

20   distinguish themselves from in this body of I

21   think Mr. Lowe said hundreds of ISPs in the

22   United States is the fact that they can help

23   website operators on their servers avoid

24   responding to abuse complaints.

25            Now, the judge has explained to you in

86

PETER TORREANO, CSR 7623

1    discharging your duties that you need to weigh

2    the evidence.  And he said that if the scale tips

3    to the Louis Vuitton side even slightly, your

4    decision should be in favor of Louis Vuitton.

5    Interestingly, I see that the Court has a statue

6    of Lady Justice.

7              You're all familiar with the image of

8    the blindfolded woman who holds a scale.  And the

9    blindfold is the impartiality that the judge

10   referred to in his instructions, and the scale is

11   that burden.

12             And we are all used to criminal cases

13   where we talk about beyond a reasonable doubt,

14   but in this case it's a civil case and it's

15   preponderance of the evidence, which means if

16   it's equal and you put a feather on one side,

17   then you have to rule for the party on where the

18   feather falls.  We obviously think we go way

19   beyond the feather, but that's the balance that

20   needs to be weighed here.

21             Now, the concept of weighing evidence

22   also comes up in connection with how much weight

23   you assign to documents, testimony, demonstrative

24   evidence, physical evidence, anything else that's

25   part of the record that you're entitled to

                                              87

1    consider in this case.

2              And you heard the Court say that you can

3    consider such factors as whether the witness has

4    an interest in the outcome of the case, how

5    reasonable was the witness's testimony and

6    whether it was contradicted by other evidence.

7              And we suggest to you that these factors

8    indicate that Mr. Chen's testimony should not be

9    accorded any considerable weight or should be

10   severely discounted because of the kinds of

11   issues that we've seen during the course of his

12   testimony.

13             But, unfortunately, it doesn't only

14   taint Mr. Chen's testimony.  You will remember

15   that when Mr. Gralnik testified, he said he

16   didn't really have any background on these issues

17   until he was retained as an expert in this case.

18   And he talked about what he had done and the

19   significant part of it consisted of an interview

20   with Mr. Chen.

21             Well, if Mr. Chen under oath is --

22   raises issues without being under oath, as I'm

23   sure he was when he was talking to Mr. Gralnik,

24   we have to question whether the assumptions and

25   facts that Mr. Gralnik was relying on to come to

88

1    his conclusions should be accorded the same

2    weight as well.

3            Now, Louis Vuitton has, as I already

4    indicated, we think met and exceeded its burden

5    and we think that part of it is due to the fact

6    that many of the elements that the Court has

7    described to you are basically undisputed here.

8            The trademark certificates that are

9    given conclusive weight have been admitted into

10   evidence.  The copyright certificates have been

11   admitted into evidence.  And the Defendants don't

12   dispute Louis Vuitton's ownership of these

13   rights.  They don't effectively dispute the value

14   of these rights.

15           There's no real dispute about

16   confusion.  The counterfeit products are intended

17   to play off of Louis Vuitton's marks.  And, in

18   fact, in this respect the Defendants try to have

19   their cake and eat it, too.  I think they are

20   going to suggest to you that, well, when it says

21   that it's a knockoff on a website, then the

22   person who's buying it must know that it's a

23   knockoff and is, therefore, not confused.

24           But the test isn't that.  The test is

25   likelihood of confusion.  And there's two things

89

1    to say in response to that.  First, the

2    Defendants can't then also say, "Well, it's hard

3    to tell Louis Vuitton.  We can't tell."  And,

4    second, the person who buys it, whether deceived

5    or not, is not the only measure.  That's why it's

6    called likelihood of confusion.

7             If I buy this and I give it to -- I

8    won't give it to anybody, but I give to it

9    somebody.  The recipient does not know that it's

10   not Louis Vuitton.  The person who sees me pull

11   it out of my jacket pocket when I go to buy

12   something in the store doesn't know.  They see

13   shoddy inferior merchandise that they are used to

14   holding up to the high standards that are also

15   undisputed in this case.  The quality controls

16   that Mr. Livadkin has testified to are undisputed

17   here.

18             There's no real dispute that these

19   websites were infringing.  You have the

20   documentary evidence, printouts of websites,

21   products you can take a look at.  This activity

22   all occurred through various websites from ape168

23   to bigworldshoes to any number of other domains

24   that reference you to those websites and I

25   haven't heard any indication that there's any

                                                    90

1    dispute about that.

2           And Exhibit 1598 shows us there's no

3    real dispute that these websites were, in fact,

4    hosted on the Defendants' servers, which, as I

5    already indicated, are right here in San Jose.

6           1598 shows us the activity continued

7    after notice was given to the Defendants about

8    the activity.  And not just once or twice.  This

9    is a pervasive, systematic, ongoing over years

10   now infringement of Louis Vuitton's valuable

11   rights.

12          Now, Mr. Lowe in his opening statement

13   said, "Gosh.  You know, there are over a hundred

14   million websites in the world.  My clients don't

15   know what Bigworldshoes.com is doing."  But if

16   you look at Exhibit 1598 and you scroll down to

17   Bigworldshoes, you'll see that Louis Vuitton told

18   them not once, not twice, not three times, but

19   four times.  And then they have the temerity to

20   come in here and say, "Gosh, we don't know what

21   they're doing."

22          Now, the instructions also tell you that

23   you can consider whether or not the Defendants

24   should have known about that conduct.  And,

25   frankly, we don't think you have to get there to    91

1    make a finding in favor of Louis Vuitton.

2           But as the judge indicated, the factors

3    on should have known also demonstrate that they

4    should have dealt with this problem, things like

5    the frequency of the notice, the fact that in

6    response to those notice, either no action was

7    taken or minimal action was taken and that their

8    own policies, which we were looking at earlier on

9    the screen, largely remain unimplemented.  And,

10   in fact, Mr. Chen's testimony he's stated that he

11   doesn't even really understand what those

12   policies mean.

13          Now, the Court read an instruction on

14   the Defendants' only defense in this action, the

15   Digital Millennium Copyright Act which was passed

16   by Congress when the Internet was really just

17   getting going and it was passed to create a kind

18   of shield.

19          It's a typical Washington compromise

20   that companies that carry the data over the

21   Internet wanted to have some kind of immunity

22   from potential liability and for that they

23   negotiated a procedure to deal with those kinds

24   of infringements.  And there are various

25   requirements associated with that law in order to   92

1    be eligible for that immunity.

2            Now, we've already heard -- and you've

3    heard the elements, and I'm not going to repeat

4    what the Court has already said, but one of them

5    was filing an agent with the copyright office,

6    and we've already heard that the Defendants did

7    not do that until after this lawsuit was filed.

8            Again, we applaud them.  It's an

9    improvement, although based on Mr. Chen's

10   testimony I'm not sure how much of an improvement

11   because it's not clear to me that he understands

12   what the Act was for and what obligations follow

13   if you want to avail yourself of that immunity.

14           You have to publish information about

15   your policies and your agent on your website, but

16   we've heard Mr. Chen testify the Managed

17   Solutions Group still doesn't have a website.  So

18   even if there's an arguable application of the

19   defense, it does not apply to that Defendant.  It

20   is only as to copyright.  We have a contributory

21   trademark claim.  It is not a defense to that

22   claim.

23           And then finally, as the Court

24   explained, in order to avail yourself of the

25   defense, you have to reasonably implement your

                                              93

PETER TORREANO, CSR 7623

1    policies and you have to expeditiously remove in

2    response to notices.  I don't see it.  I'm

3    sorry.  I mean, they get notices.  They get

4    repeated notices.

5              We looked, I think, last week at

6    Eastarbiz as just an example from the notices

7    sent in November, and that site was still up, the

8    same IP with the same customer doing the same

9    illegal activity about four months after Louis

10   Vuitton first notified them of the site.

11             That under no scenario constitutes

12   reasonably expeditious disabling of access or

13   removal of the content.  And in fact, you heard

14   Mr. Gralnik yesterday say that a few days to a

15   week is more consistent with the industry

16   practices with which he became familiar during

17   the course of his preparation.

18             So that leads to the question of

19   damages.  And I find it -- I accept the fact that

20   we're not talking about, well, we lost a sale

21   here because there was a sale of this bag here to

22   somebody else.  But that does not mean that Louis

23   Vuitton didn't suffer damages.

24             You heard Mr. Livadkin testify about the

25   very long history of Louis Vuitton, the very

                                                    94

1    rigorous controls that it exercises and the high

2    regard within which it's held and the way that it

3    strictly controls the distribution of the product

4    to preserve its image as a luxury product.

5            And you also heard him explain how

6    that's undermined by the proliferation of cheap,

7    shoddy counterfeits.  That alone is an enormous

8    harm to a company like Louis Vuitton that is

9    based upon the premium that it can derive from

10   the value that people seek in the merchandise and

11   in the strict control of its distribution.

12           To say that we can't say how much that's

13   worth based on the conduct in this case doesn't

14   mean it didn't happen and it's not something we

15   need to show.  All we need to show is that the

16   damages occurred.

17           But the damages aren't even limited to

18   that.  The damages are the damages in the way we

19   are perceived by our existing customers who, as

20   Mr. Livadkin testified, save up to buy this

21   merchandise and then are disappointed when they

22   see some shoddy knockoffs that sort of depletes

23   the value of the very special product that

24   they've worked hard to buy, and it deceives the

25   public.

                                              95

1          Again, whether or not somebody is

2    deceived off a website, and some no doubt are, as

3    Mr. Livadkin testified, the fact is that

4    downstream purchasers and the general public here

5    is deceived.  And, frankly, there would not even

6    be -- this argument wouldn't be considered if we

7    were talking about some other kinds of

8    merchandise.

9          The Defendants in this respect try to

10   have it both ways.  Again, they say we're not

11   injured because sites are obviously selling the

12   counterfeit, but then, on the other hand, they

13   say it's too difficult for us to tell if it's

14   counterfeit.

15         So one more reason why we shouldn't do

16   anything in response to notices where we tell

17   them it's counterfeit and we tell them under

18   penalty of perjury.  And they have not indicated

19   a single case where anyone has ever come back in

20   response to a notice from Louis Vuitton saying,

21   whoops, they made a mistake.  This is good

22   product.

23         Now, the Court outlined the Plaintiff's

24   request for statutory damages in this case and

25   the range of damages that are provided for by the   96

1    Trademark Act and the Copyright Act.  And we

2    think that, you know, given the number of

3    underlying infringements, given the repeated

4    notices, given the inaction and studied

5    indifference of the Defendants, the willful

6    blindness to the activity that's just pervasive

7    on their servers that you'll have no difficulty,

8    no difficulty whatsoever in coming to the

9    conclusion that their activity was willful.

10        And remember, willful reckless disregard

11   is just -- you know, you can't do this.  But

12   given the number of notices that the Defendants

13   have received, there's really no question that

14   that's the case.

15        Given all of this, you could award a

16   large verdict in favor of Louis Vuitton, but

17   given the purposes of statutory damages, which

18   are to compensate the Defendant, to punish it and

19   to deter others from engaging in the same

20   activity, we think that an award of not less than

21   a million dollars is an appropriate award.  And

22   you can come to that conclusion in a number of

23   different ways.

24        You've heard the Court explain that the

25   maximum award for willful infringement of a

                                            97

PETER TORREANO, CSR 7623

1    trademark is a million dollars.  You can find one

2    trademark infringement and award a million

3    dollars for that one.  You can break it down and

4    find ten.  You can find more and then just

5    multiply it out or you can mix and match because

6    the Copyright Act provides for a certain amount

7    and the Trademark Act provides for a certain

8    amount.

9          But the important point here is, as

10   you've heard from Mr. Livadkin, this is unique to

11   these Defendants.  Louis Vuitton deals with

12   numerous ISPs around the United States over the

13   course of any given year.  It even deals with

14   ISPs that are situated into a business model very

15   similar to the Defendants.

16          And notwithstanding that, these are the

17   only Defendants with whom they seem to have this

18   problem.  And if the message isn't sent this is

19   an unacceptable way of doing business, the risk

20   is that this could become more prevalent, that

21   others will recognize or accept that they, too,

22   can be willfully ignorant, studiedly indifferent,

23   recklessly disregard illegal activity.

24          And it wouldn't necessarily be limited

25   to copyright or trademark infringement.  We've          98

PETER TORREANO, CSR 7623

1    heard that the servers are used for pornography

2    and spam and who knows what else, but in the

3    context of a global telecommunications system

4    like the Internet to be able to sort of say, "I'm

5    not part of the jurisdiction in which I'm located

6    and you can't touch me," runs the risk of blowing

7    that activity out of all proportion.

8           We're not trying to put the Defendants

9    out of business here.  We just need to send a

10   message that this is not an acceptable way of

11   doing business.  It's what you could have done,

12   should have done.  It's what everyone else does.

13   It's what they don't do.

14          Now, I mentioned that there's some

15   additional steps they could take earlier on, and

16   we talked about, for example, removal of

17   offending content, fines, suspension and

18   termination.  And I know that removal of

19   offending content, there was a considerable

20   amount of testimony on the subject, but it is

21   something provided for by their own contract.

22          You heard Mr. Wilson testify that as

23   long as they have physical possession of the

24   machine, they have an ability to deal with it.

25   We know that when they want to get the

                                            99

1    information from a customer, they can.  And we

2    know that if a customer is not willing to give

3    them the access, then they risk the more

4    aggressive -- the more aggressive forms of

5    punishment.

6           So, in other words, it seems logical to

7    me if I'm a customer of the Defendants and the

8    Defendants come to me and say, "Look, you've got

9    a bad site.  We need access to make sure that's

10   disabled and gone or we're going to have to

11   unplug your server," I think they are going to

12   give access so you can remove the content.

13          So the whole issue about passwords and

14   so forth, again, it's another one of those

15   laneways, but I don't think we really need to

16   decide that for purposes of concluding that the

17   contract is in the right.  They have the physical

18   ability, and the contract also gives them

19   alternate mechanisms, should they choose to

20   employ them, and they clearly haven't.

21          In fact, they haven't even tried.

22   There's not been one word here from anybody from

23   the Defendants to suggest that they've taken any

24   steps to do the things that their contract allows

25   them to do.
                                                        100

1          Now, we've also heard a little bit of

2     testimony on suspension and termination of

3     customers and the potential ramifications for

4     innocent users, but I personally find it a little

5     ironic that the Defendants are more concerned

6     about these innocent users than their customers.

7          And I come back to the point I just

8     made, which is that if I'm a customer and I have

9     this web server with who knows how many websites

10    located on it, that I'm not eager to cooperate

11    and deal with the problem so that I don't

12    jeopardize the position of the other innocent

13    subusers, assuming they are.

14         And remember, Mr. Chen testified that in

15    the end, for all he knows, because he doesn't

16    really know his customers, they could be the

17    counterfeiters themselves, which may explain why

18    it really doesn't matter.  But the point is that

19    if the Defendants were motivated, and they so far

20    haven't been, there's plenty they could do,

21    should do and still haven't.

22         They don't do what the industry does.  I

23    mentioned earlier what Mr. Livadkin had testified

24    to about his experience with other ISPs.  We've

25    talked about what he's testified to with respect

101

PETER TORREANO, CSR 7623

1       to his direct competitor.  I think it was

2       SoftLayer that was identified in cross.

3               The Defendants aren't serious.  They're

4       not reasonable, and, contrary to the defense

5       counsel's assertion, they have not done nearly

6       all the things that are available to them.

7               On the other hand, Louis Vuitton is

8       doing the only thing that is available to them.

9       You heard that they send letters to all of these

10      websites.  You heard that they have challenges in

11      conducting enforcement in China where many of

12      them appear to be located.

13              And so when an entity like the

14      Defendants is trying to create a bridge to avoid

15      responsibility for this kind of illegal activity,

16      this is where Louis Vuitton has to look.

17              And the Defendants are situated

18      differently from the other entities you've heard

19      about.  And when the Defendants had to chart

20      with how -- with a simplified outline of the

21      Internet.  And, as you heard from Mr. Gralnik,

22      except for the user, all of the other points on

23      that chart are like milliseconds short.

24              They are transient communications that

25      do not reside where -- where it's located.  They

102

PETER TORREANO, CSR 7623

1    do not provide the same subject as the Defendants

2    where this content is permanently resident.  And

3    when I say "permanently resident," it's stayed

4    there and it seems to stay there no matter how

5    often you tell them, no matter how often it gets

6    moved around to different IP numbers that only

7    the Defendants can use.

8              Now, we're not asking the Defendants to

9    police the Internet.  The whole issue of content

10   monitoring, you don't need to go there.  I'm only

11   talking about the things they could have done,

12   should have done and didn't do in response to

13   very specific complaints about named websites

14   that were in numerous demands that are part of

15   the record before you.

16             Thank you very much.

17             THE COURT:  Very well.  Do you need a

18   break to set up the courtroom for your argument?

19             MR. LOWE:  No, Your Honor.

20             THE COURT:  Very well.  At this point

21   then the Court will call on defense counsel for

22   closing argument.

23             MR. LOWE:  Good morning, ladies and

24   gentlemen.

25             I, first of all, want to thank you on

103

1    behalf of the Defendants for your attention.

2    This has been a difficult case, I know, and all

3    cases are because you'd rather be doing something

4    else.  And this has been difficult because of all

5    the technical testimony that you've had to

6    endure, and you've probably heard a lot more

7    about how the Internet works than anybody really

8    wanted to know, but we needed to talk about those

9    things in order to give you the proper

10   background.

11            There's an old joke that I'm reminded of

12   by the actions of Louis Vuitton in this case.

13   Someone is talking down the street and they see

14   someone scrambling around on their knees under a

15   streetlight.  They are looking for something.

16   And they go to the person and they say, "What are

17   you looking for?"

18            And the guy says, "Well, I'm looking for

19   my keys.  I lost my car keys."

20            So the fellow says, "Well, where did you

21   lose them?"

22            And he points.  "Over there."

23            The guy says, "Well, why aren't you

24   looking over there?"

25            "Well, because the light is better

                                                    104

1    here."

2           This lawsuit is brought because Louis

3    Vuitton wants to sue somebody in the United

4    States for something that's going on in China.

5    The light is better here.  They want to blame the

6    Defendants for things that the Defendants didn't

7    do and can't really control.

8           The Internet is a complex entity, as you

9    know.  There are people out there doing things

10    they shouldn't be doing.  There are people who

11    are infringing trademarks and copyrights of Louis

12    Vuitton, and we certainly don't dispute that they

13    have a right to protect their marks.  We don't

14    dispute that this infringement, this

15    counterfeiting as it's sometimes called, is a bad

16    thing.  We just think they are looking in the

17    wrong place.

18           So it's fine for Mr. Livadkin, for

19    example, to be talking about how they make their

20    bags and all the care and the fact that they want

21    to be the symbol of luxury in the world and that

22    they really are upset about the fact that people

23    see knockoff bags, but the question is not how

24    proud they are of the mark.

25           The question is have they met the

105

1     elements of proving contributory infringement on

2     the trademark and copyrights by the Defendants in

3     this case.

4            You know, it's ironic where we are

5     here.  We're in the 21st century talking about

6     new technology that has made any number of

7     businesses possible only in the last 10 or 20

8     years, including the Defendants' business, and

9     the irony is that Louis Vuitton's history relied

10    upon taking advantage of new technology.

11           Remember Mr. Livadkin talked about how

12    they were able to start selling their bags and

13    other products, their suitcases, et cetera,

14    because of the development of the steam engines

15    and railroads and automobiles and steamships, and

16    at every stage of the Industrial Revolution you

17    might say they were able to increase their

18    business activity because they could take

19    advantage of the new technology that's going on

20    and sell more product.

21           And they are still selling more

22    product.  They've been active, very active for

23    what?  150 years or so.

24           The irony is they are now complaining

25    about the march of technology.  They don't like

106

1    the Internet.  They don't like the fact that it

2    makes it possible for somebody on the other side

3    of the world to market products, make products

4    and sell them anonymously, you might say, in

5    order to infringe their marks.

6            They haven't adapted to this new

7    technology and they are upset about it.  Or

8    perhaps they have adapted by saying, "Well, we'll

9    adopt the 20th century model.  Let sue somebody.

10   We can't deal with these problems.  We'll just

11   find someone to sue.  And where better to do it

12   than in Silicon Valley and let's try to scare the

13   ISPs to death by awarding a large sum of money

14   against a small Internet service provider.  Let's

15   put this country, the United States, out of the

16   business of dealing with the rest of the world in

17   China or elsewhere by coming here to the heart of

18   Silicon Valley and saying you can't run your

19   business because somebody out there -- we don't

20   know who they are -- somebody out there is

21   infringing our marks."

22           We think that is not fair.  It is not

23   reasonable.  It is not just.  And this community

24   should not allow this to happen, to have a French

25   company come to California to complain about

107

1    something that's going on in China.  And that's

2    really what this is about.

3         Have they gone to China?  Yes.  It is

4    not our problem if the Chinese authorities don't

5    do everything that Louis Vuitton wants them to

6    do.  It is not our problem there are nearly

7    2 billion people in China that can be doing

8    things they don't like.  It is not our

9    responsibility to protect Louis Vuitton from

10   everybody on the Internet.

11        We can only do what we can do here, and

12   if they get by with this claim, sort of a

13   cutting-edge claim they are making that copyright

14   and trademark infringement is the legal

15   responsibility of an Internet service provider,

16   where does it stop?  Is everybody out of

17   business?  Who gets sued next?

18        How about Western Union, the people that

19   their investigator used to transmit orders

20   through?  How about UPS who actually delivered

21   the bags?  How about the US Postal Service that

22   Mr. Holmes said he got the bags through?

23        How about the people that run the data

24   center down the street?  After all, they are

25   providing facilities for the Internet service

                                                    108

PETER TORREANO, CSR 7623

1    provider to provide the customers who deal with

2    other people who are doing something that Louis

3    Vuitton doesn't like.  Where's the cutoff?

4         The question here is what is it that is

5    reasonable for the Defendants to be doing under

6    these circumstances.  That's what the law

7    requires you to figure out.  And so you're doing

8    something in a lot of ways that nobody has ever

9    been asked to do before because, frankly, no one

10   has ever made the kind of claim, so far as I

11   know, that Louis Vuitton is making given the new

12   technology that's happening and that's being used

13   in this case.

14        One thing I'd like to comment on briefly

15   and that is any time in a lawsuit that lawyers

16   are making arguments like I am or like Mr. Coombs

17   is, our comments are not evidence.  When we say

18   this is what someone said we're just using our

19   own memory.  We're just trying hopefully to be

20   accurate about it and to tell you what we think

21   we heard here in this courtroom and what we think

22   is important.

23        But you must rely upon your own memory

24   and what you actually heard here in the courtroom

25   and not what one of the lawyers says.  And that's    109

1    important for this reason:  It seems to me that

2    what Mr. Coombs -- Mr. Coombs is talking about is

3    evidence that I haven't heard in this case.  He

4    is drawing conclusions based upon a lack of

5    evidence.

6              There is a lot of wishful thinking going

7    on on the part of Louis Vuitton and its attorneys

8    because they haven't presented evidence showing

9    the responsibility of the Defendants in this

10   case.  But, please, don't reply upon what I have

11   to say.  I'll try to tell you what I think I

12   heard and what I think is important, as he did.

13   But we need to have you rely upon your own -- on

14   your own memory from your hearing.

15             I'd like to talk about the evidence or

16   lack of it.

17             A few years ago there were some

18   commercials being run on television between some

19   hamburger sellers and there was a complaint that

20   somebody out there selling hamburgers didn't have

21   much meat in their burgers.  They were selling

22   big burgers with a small amount of meat and one

23   of their competitors had a fairly effective

24   advertising campaign based upon the phrase

25   "Where's the beef?"  I think a few years later

110

1    even some politicians used that term.

2              But I'd like to raise that same argument

3    here.  Where's the beef?

4              Let's talk about what they haven't

5    shown.  They have talked a lot about counterfeit

6    bags.  You've got a lot of bags here, but they

7    really don't count in a lot of ways.  They don't

8    show any connection with the Defendants.  None.

9    Not a single bag on this table has any connection

10   with the Defendants.  In fact, there is no

11   connection that's been shown between anybody

12   who's making and selling counterfeit products or

13   infringing products and the Defendants.

14             In fact, Louis Vuitton has not

15   identified a single person who is directly

16   infringing their marks.  Have we heard any

17   testimony about anybody who's doing this, let

18   alone how that person is connected with anybody

19   with the Defendants?  No.  Not a word.

20             We have heard about domain names, and

21   these are just made-up names that somebody has

22   registered with some international agency.

23   Mr. Coombs suggests that there is some kind of

24   connection here, that, as he put it, the

25   Defendants have this business on a border and

                                             111

1    they are encouraging somehow people to do

2    business with them because it's easy to infringe

3    in the United States by using their technology

4    and their equipment.

5              Of course, there's not a word of

6    testimony to support that presumption or that

7    suggestion or that implication.  None.

8              You may remember that Mr. Livadkin,

9    representative of Louis Vuitton, testified -- I

10   asked him a number of questions about certain

11   evidence that he had or didn't have and he said

12   he didn't have any evidence, Louis Vuitton had no

13   evidence of any connection between the Defendants

14   and any infringers.  *Nada.*

15             Mr. Livadkin said they have no evidence

16   that the Defendants ever had any advance

17   knowledge of any infringement on their servers.

18   They got notice after things were there,

19   sometimes inaccurate notice, but they got notice

20   afterwards, and that's what we'll talk about in a

21   bit, but no notice or knowledge that they had --

22   that somebody was intending to go on their

23   servers and infringe in any specific case.

24             There was no evidence presented by the

25   Plaintiff about the ability to stop any

                                                    112

1    infringement by the people who are actually doing

2    it.  There's no contradiction that the Defendants

3    cannot monitor these websites because of legal

4    reasons and because of technical reasons.  They

5    can't see what's on their servers and they can't

6    break into the servers without a court order to

7    do that.

8           On the other hand, contrary to what

9    Mr. Coombs has suggested, the Defendants have

10   taken every reasonable step to stop this

11   infringing activity.  We're not in favor of it.

12   They are not in favor of it.  They don't make a

13   nickel on it.  They rent out packages of servers

14   and IP addresses and bandwidth for what?  50, 80,

15   $100 a month.  That's all they get.

16          They don't get more because they are

17   renting to people who are selling infringing

18   products.  They don't get any money because

19   someone sells an infringing product.  They don't

20   get a penny out of any bag that's sold.  They

21   don't get anything except big headaches.

22          Mr. Chen talked about the hours every

23   day he spends having to deal with these kinds of

24   complaints and he has another person that he has

25   to hire to deal with these complaints.  Surely

                                                    113

1      he'd prefer to be elsewhere doing something

2      else.

3              So why would a person want to be in this

4      business so that they are causing all these

5      problems for themselves?  I can't imagine.

6              Mr. Coombs wants to suggest that there

7      is some business model that they've created that

8      encourages infringers to come here and do

9      business with them.  Have you heard any testimony

10     about that?  Has any document shown that?  The

11     answer is clearly no.

12             But they have taken every action that

13     they know how to take and they take it over and

14     over and over again.  We've heard a great deal of

15     testimony about that.  We have heard from

16     Mr. Wilson, the expert retained by the Plaintiff,

17     that the policies and procedures followed by the

18     Defendants are entirely consistent with industry

19     standards.  They are doing everything that

20     everybody else in the industry does.

21             He had no complaint about that except

22     that he thought those procedures maybe ought to

23     be written down somewhere.  Now, I don't think

24     that matters, but he didn't have any dispute with

25     the procedures.

                                                    114

PETER TORREANO, CSR 7623

1              Mr. Gralnik testified that after his

2    research ended into the industry he concluded

3    that the Defendants are doing everything and

4    exactly the same thing that every other ISP in

5    the country does, the biggest ones to ones his

6    size.  There was no contradiction to that

7    testimony.

8              Now, Mr. Coombs suggests that there

9    is -- that they're not doing enough.  They

10   haven't done anything, some of the other phrases

11   that he used, but the evidence actually

12   contradicts that argument.

13             And what's some of the evidence?  Well,

14   one item of evidence is a document that you will

15   have, and you've been seeing and hearing

16   testimony about it.  It's Exhibit 1598.  It's a

17   summary prepared by Mr. Chen based upon his

18   e-mail records, all of which have been given to

19   the Defendants, to show complaints he got from

20   Louis Vuitton and what action he took on getting

21   those complaints.

22             And this goes on for 20 pages, I

23   believe, or thereabouts, and it is true that

24   there were multiple complaints about certain

25   websites.

                                                115

1           Contrary to what Mr. Coombs suggests,

2     however, every time that there is a complaint

3     there is action taken except in one case.  And

4     there are a lot of these cases, not just one, but

5     in a lot of cases the complaint comes in and it's

6     a false alarm.  It is a false complaint, perhaps

7     not intentionally, but when Louis Vuitton, for

8     example, sends a letter or an e-mail to the

9     defense -- to the Defendants, very frequently the

10    website or the domain name that they are talking

11    about is not using an IP address that is assigned

12    to any of the Defendants.

13          And if you look through this document,

14    you'll see it over and over and over again.  Over

15    and over again.  So he keeps getting these

16    notices.  It's not in our range.  Nothing to do.

17    Nothing he can do.

18          Or it's not a functional website at

19    all.  I can't find it anywhere.  It's not

20    registered.  It's not listed anywhere on the

21    Internet.

22          But when he does find one, when he does

23    get a notice about one that is a functioning

24    website, and it is then using their -- one of

25    their IP addresses, they take action.  Contrary

116

1    to Mr. Coombs' suggestion doing nothing, they

2    take action.  Either -- they generally start with

3    sending a notice to their customer saying, "We

4    have a complaint.  Please take care of it."

5         And Mr. Chen explained that he doesn't

6    try to judge whether Louis Vuitton is right or

7    wrong.  He doesn't know about these things.  He

8    doesn't know whether the bags are legitimate,

9    illegitimate.  He knows nothing about counterfeit

10   products.

11        He assumes that Louis Vuitton is

12   correct.  He presumes that there is a problem

13   and, therefore, takes action.  He doesn't sit

14   around saying, "Well, I wonder if there really is

15   infringement.  Maybe I won't do anything this

16   week."  That's not the evidence.

17        The evidence is he gets a complaint and

18   he acts on it.  He sends that off to his

19   customer, the only people he really knows, and

20   tells them, "We have a complaint.  Make it go

21   away.  Take this off our system."  And most of

22   the time that works.

23        If it doesn't work or if he gets a

24   complaint again about that, he can take two other

25   actions.  One is to disable the IP address.  Just

117

1    basically cancel the IP address so anybody using

2    that IP address is no longer on the Internet.

3            Or the most extreme action is to unplug

4    the server, an entire server.  And you heard that

5    servers have multiple IP addresses assigned to

6    them and each of the IP addresses has multiple

7    users potentially.  It might be one, but more

8    often it's many of them using the same IP

9    address.

10           And we've heard testimony from the

11   Plaintiff's own witnesses that sometimes in

12   excess of 100 websites, for example, are using

13   one IP address.  So he will disable the IP

14   address, stopping whatever is going on or, if it

15   happens again and again, unplug the server.

16           Now, what does this case come down to in

17   Louis Vuitton's -- in Louis Vuitton's point of

18   view?  What is their real complaint?  Their

19   complaint is you didn't terminate any customers,

20   as if that's actually a reasonable thing to do.

21   We suggest it is not a reasonable thing to do.

22   Instead the actions that have been taken are

23   reasonable and have been effective.

24           Let me ask you this to think about:  Has

25   Louis Vuitton identified any customer that should

118

1    be terminated other than Alice Chen?  I suggest

2    the answer is no.

3          Did they have the ability to do that?

4    Yes, because of two things.  Number one, they've

5    had the SEEPro database that lists all the

6    customer information.  So they could identify a

7    customer just like they did Alice Chen and say

8    you should have terminated this one or that one.

9          And they could have gone -- even without

10   asking they could have gone to the ARIN

11   Whois website that is linked to the SEEPro

12   database for customer information and see it

13   directly.

14         Now, one of the things that Louis

15   Vuitton could have done other than just filing a

16   lawsuit or complaining with various letters is

17   they could have sent a notice of complaint to the

18   Defendants' customer directly because through the

19   ARIN database they have that customer

20   information.

21         They have the name of the customer using

22   that IP address and their -- at least their

23   e-mail just like they do for the Defendants.  We

24   didn't hear any testimony they ever tried that.

25   They never looked at the ARIN database, according

119

1    to their testimony.  Never looked at it.

2            Now, why is that?  I would suggest that

3    it's easier to complain about somebody in Silicon

4    Valley than it is to send a notice to somebody

5    else.  It's easier and more effective if you can

6    put somebody in Silicon Valley out of business by

7    putting together a gotcha case.  "Oh, we sent you

8    letters and nothing happened or it came back."

9            There is no requirement, no legal basis

10   for them to suggest or to argue to you that the

11   only way they can avoid liability is to terminate

12   customers.

13           Let's talk about the Alice Chen

14   situation for a moment.  At the time the

15   complaints from Louis Vuitton that we're talking

16   about here were made -- and I think that

17   Plaintiff identified seven or eight particular

18   complaints that happened to be dealing with IP

19   addresses that had been assigned to the

20   businesses associated with Alice Chen.

21           But Alice Chen was renting 100 servers

22   at the time approximately, according to Mr. Chen,

23   and had approximately a thousand IP addresses,

24   and you could have 100 websites, for example, on

25   each of those IP addresses, which would be a

                                                    120

1    million websites.

2              Seven or eight complaints out of a

3    million?  Does that really amount to some

4    infestation or huge amount of infringement?  I

5    suggest not.

6              And that's -- that is the worst case

7    they can come up with.  That's the maximum

8    problem they can deal with.  They say, "Well, if

9    you've got seven complaints out of a possible

10   million or maybe only out of a possible thousand,

11   you've got to get rid of that customer.

12   Otherwise, we're going to sue you, ask for a

13   million dollars and try to put you out of

14   business."

15             Is that fair?  Is it reasonable?  I

16   suggest it is not.

17             Have they suggested to you, have they

18   had any testimony that anybody else in the

19   business has ever done that?  There's not a word

20   of testimony about it.  Not a word.

21             Now, it is true that these acceptable

22   use policies do provide for termination,

23   suspension and so on.  Mr. Chen explained why he

24   doesn't do that.  Because these people are

25   cooperative with him.  If he asks them to do

                                              121

1    something, to take down a problem website or to

2    disable a server, they do that.

3           Now, why do they keep coming back?

4    Because that's really the problem here, isn't

5    it?

6           It's like the Defendants have to play

7    the old carnival game of Whac-A-Mole.  You know

8    how that works?  Where, you know, if something

9    pops up, you have to take a hammer and knock it

10   down and then another one pops up over here and

11   you have to get that one and then you have to get

12   this one over here and just try to keep up with

13   these things popping out of the holes in order to

14   win the game.  And you have to move awfully fast

15   to do it, but it never stops.  They just keep

16   popping up all over the place.

17          Now, what you see, for example, from

18   Exhibit 1598 is that some of these come back to

19   bother Louis Vuitton, and they make complaints

20   about it.  They send notices out and the

21   Defendants check on it again and it's not on

22   their -- on their IP address or the website isn't

23   functional.

24          Now, maybe at a later time it will be

25   functional, but they don't have to monitor.

                                                    122

PETER TORREANO, CSR 7623

1          There's no requirement for them to do that.  And

2     I'm not even suggesting that's necessary.  But

3     let's look at the five websites they complained

4     about in the original complaint.  These are

5     ape168, AtoZBrand, Bag925, eshoes99 and Wendy929.

6               The first four of those at the time this

7     lawsuit was filed approximately were not using an

8     IP address in the Defendants' range.  In other

9     words, they were using somebody else's IP

10    address.  And the fifth one wasn't functional at

11    all.  There was no such website on the Internet.

12              Now, Mr. Coombs has presented some

13    evidence and no doubt will argue that there is --

14    there were earlier complaints that are not shown

15    on here.  And that's true because this only deals

16    with the e-mails that were available from June of

17    2007 on because there was a server crash long

18    before this case got filed.

19              But the fact that when they first

20    checked on it the IP address was not using one of

21    the Defendants' addresses, the website was not

22    using one of the Defendants' addresses indicates

23    that if they ever had used the Defendants'

24    address, the Defendants had done something to get

25    rid of it.  That's why on the 20th of August,

                                                    123

1       they are all -- you know, four of the five are

2       gone and the fifth one isn't operating at all.

3              Now, we get another complaint from Louis

4       Vuitton about those five.  All of them they

5       complained about again at different times.  But,

6       for example, the complaint they received on

7       January 3rd of '08 on ape168, AtoZBrand and --

8       for example, those ones.  Let's talk about those

9       two.

10             When they got the complaint, it was,

11      number one, using a different IP address, not the

12      one they were using originally.  And, number two,

13      it was not an IP address in the range of the

14      Defendants, not.

15             Bag925 hadn't changed their IP address,

16      but it still wasn't using an IP address that

17      belonged to the Defendants, not in their range.

18             Eshoes99 was not using an IP address in

19      their range.

20             Now, Wendy929, this time the website was

21      actually functional, but it was using a different

22      IP address than the first time.  And the

23      Defendants did what they normally would do and

24      that's send a take-down notice.  And when it was

25      next checked on January 3rd it wasn't

                                                          124

1    functional.  So that was obviously -- obviously

2    effective.

3         Eshoes99 is a particular problem because

4    it obviously keeps coming back and back and back

5    to haunt Louis Vuitton.  So the first time they

6    complained about it in August it wasn't in their

7    range.  The second time they complained about it

8    in November of '07 it wasn't in the Defendants'

9    range.

10        The third time it was using a different

11   IP address.  It was not in the Defendants'

12   range.  And the fourth time it was using yet a

13   different IP address.  This time it was in the

14   Defendants' range.  They sent a take-down notice

15   and unplugged the server that day.  And yet

16   Mr. Coombs has the temerity to tell you they

17   aren't doing anything about this.

18        Now, where is the evidence to support

19   that argument?

20        One of the interesting things about the

21   evidence is that no person has ever testified

22   from this stand, no one has ever testified about

23   the proposed solution to the problem that

24   Mr. Coombs has offered to you.  No one has ever

25   said they should terminate.

                                          125

1          Why is that?  Because nobody thinks

2    that's a reasonable thing to do apparently.

3    Louis Vuitton hasn't done that.  Their experts

4    haven't done it.  Nobody has said that.

5          Instead the experts agree that what the

6    Defendants do is a reasonable thing.  And,

7    frankly, unplugging servers and eliminating IP

8    addresses from use is effective termination

9    except he's saying, well, maybe there's some --

10   somebody out there that has a lot of these and

11   you ought to go terminate them.  But no one has

12   said, oh, you should have terminated Alice Chen,

13   for example, and he hasn't identified anybody

14   else.

15          And contrary to his argument,

16   Mr. Livadkin I think it was testified that, you

17   know, they get cooperation from other ISPs.  But

18   he could only identify one single ISP in the

19   United States, I guess, that -- that he could

20   even think about who had cooperated with Louis

21   Vuitton.

22          So where is the example of what they

23   ought to be doing?  It doesn't exist.  Actually,

24   what he said about that was they gave us the

25   information so we could go complain to their

                                              126

1    resellers.  Well, they've had that information in

2    the database from the Defendants and they've had

3    that information from ARIN, and we haven't heard

4    a word about why they didn't do anything with

5    that information.

6            So we have not tried to interfere with

7    them.  We've tried to cooperate with them and

8    spent the last couple of years going through this

9    over and over and over again.  And they keep

10   sending lists of domain names that they think

11   something should be done about.  And most of the

12   time you'll see take-down notices are sent

13   immediately and the rest of the time servers are

14   unplugged, IP addresses are eliminated.

15           And you just won't see in this or in any

16   evidence they've presented anything showing that

17   any website, any domain name about which they've

18   complained has been ignored.

19           Mr. Coombs says they do nothing.  I beg

20   to differ.

21           This is our evidence.  Theirs is

22   non-existent.

23           Now, there are other problems with their

24   case aside from the fact that we have shown as

25   best we can tell maximum effort to deal with this

127

1    problem that exists, not because of anything we

2    do, not because of any money we make, not because

3    of any desire to help infringers.  It just exists

4    because the world is a complex place and there

5    are a lot of bad people out there who want to

6    infringe trademarks, I suppose.

7                We have heard testimony from

8    Mr. Livadkin about a very few products that were

9    purchased, and we've heard testimony from

10   Mr. Holmes about very few products, roughly a

11   dozen, let's say.  Maybe it was less.  Maybe it

12   was eleven.  And Mr. Livadkin testified that

13   products that he asked Mr. Holmes to purchase

14   were in his words "not genuine."

15               That is the -- that's essentially the

16   only evidence we've heard about any

17   infringement.

18               Now, Mr. Livadkin has testified about a

19   very few instances where he looked at a website

20   and he saw thumbnail pictures, for example, and

21   he didn't believe from his observation that they

22   were genuine.  In fact, he assumed that they were

23   not genuine and part of that was because they

24   said they were just replicas.

25               But let's get back to the non-genuine

128

PETER TORREANO, CSR 7623

1    product that we've heard some testimony about and

2    no doubt you will have a chance to examine.

3              How did this come about?  Why was it

4    that these products entered the United States in

5    the first place?  They entered the United States

6    because Mr. Livadkin sitting in Paris calls

7    Mr. Holmes who's sitting in Dallas and tells him

8    to order this product from this website from

9    China and have it delivered to California.  Why?

10   So he can create some jurisdiction here.

11             Did anybody in California order it?

12   No.  Who authorized this purchase from China?

13   Louis Vuitton Malletier.  That is not an

14   unauthorized import into the United States of

15   anything.  When the trademark and copyright owner

16   directs someone on their payroll to order

17   something from overseas, that is authorized.

18   They are entitled to do that.

19             Why didn't Mr. Livadkin have it

20   delivered to Paris?  Well, they didn't want to

21   sue them in Paris.  Why didn't he have it

22   delivered to Dallas?  He doesn't want to sue

23   people in Dallas.  He wants to sue people here.

24   So Mr. Holmes creates mail drops, as he called

25   them, confidential addresses or whatever.

129

1              So every single purchase was authorized

2       by the owner of the trademark, by the owner of

3       the copyright, done at their express direction,

4       delivered from China to the United States so that

5       they can come here to this court and say here

6       they are, look how bad all this activity is.

7              Have they ever shown a single shred of

8       evidence that any customer outside of Louis

9       Vuitton has ever bought any product from these

10      websites in the United States?  No.  Not

11      anybody.

12             Now, if it were really such a big

13      problem and they really did have all these

14      complaints about this, surely they could have

15      done that.  Now, they did show us one complaint.

16      One complaint.  Not of a customer -- not somebody

17      who bought a product, but some guy in Denmark

18      who's complaining about some website in China.

19      And that has to do with the United States how?

20      It doesn't.

21             So they are just trying to create

22      evidence so that they can blame the Defendants,

23      so they can put them out of business, so they can

24      scare the rest of Silicon Valley and the rest of

25      the technology industry into not doing business

                                              130

1    outside the United States because after all

2    someone might be doing bad things and you might

3    get sued.

4            Now, there's another interesting issue

5    about the way these purchases were made.  There's

6    no evidence that any of these purchases were made

7    through the servers operated by the Defendants.

8    It's not even clear that they -- that at the time

9    Mr. Holmes saw the product on the Internet or

10   when Mr. Livadkin saw the product on the Internet

11   it was even using the servers.  Maybe it was.

12   Maybe it wasn't.  But these websites move around

13   a lot.

14           And, by the way, that moving around a

15   lot is established by their own domain tools

16   reports with reverse IP history, for example,

17   showing how they change frequently sometimes, you

18   know, every week, sometimes every couple months.

19   They change perhaps because people are chasing

20   them.  Maybe they change because people are --

21   you know, they are just trying to get ahead of

22   somebody else who's about to complain about

23   them.

24           But Mr. Holmes' purchases had nothing

25   whatever to do with the Defendants.  And yet we

                                                    131

1    have all this evidence here to prejudice you,

2    frankly, against the Defendants saying look at

3    all the bad stuff that these people did.

4            Well, what happened?  Mr. Holmes was

5    instructed by Louis Vuitton to make a purchase.

6    He goes down to the 7-Eleven store, buys -- well,

7    let's back up a moment.

8            How does he do this?  He can't

9    communicate to the people selling these products

10   through the servers or through the websites

11   even.  The websites do not allow direct

12   communication to the sellers.  Instead they tell

13   you send an e-mail to such and such an address,

14   and the e-mail goes through Yahoo or Yahoo China

15   or Gmail or somebody else, MSN.

16           He sends them an e-mail saying "I'd like

17   to buy such and such a protect."  He doesn't know

18   who he's even sending it to or where.  He

19   presumes it's China.  And he gets an e-mail back

20   from some unknown person, a different person

21   usually, that says, well, if you want this

22   product, you need to send us money through

23   Western Union or some other source.  One of them

24   was through another bank in China you had to set

25   up an account perhaps with.

                                                    132

1          So he goes down then to the 7-Eleven

2     store and he buys a Western Union money thing and

3     has it sent to somebody he doesn't know in

4     China.  And then eventually somebody else in

5     China from a different address ships him a bag

6     through some delivery service and eventually goes

7     into US mail and it goes into some mail drop that

8     he has.

9          What's that's got to do with the

10    Defendants?  Nothing, nothing.

11          This is not like buying something on

12    Amazon.  It is not like buying something through

13    any normal e-commerce site where you give them a

14    credit card and they facilitate this.  It's not

15    like eBay.  It's not like anything we would

16    normally deal with.

17          Frankly, anybody buying something that

18    way is taking a big risk that their money is just

19    going to go into a hole somewhere.  They don't

20    know who they are dealing with.  They don't know

21    what's going to happen to it.  They don't know if

22    they are going to get any products.  But if --

23    some people are going to do that for various

24    reasons.

25          So all of the bags that were purchased

133

1    here really are phony evidence against the

2    Defendants.  The entire transaction in those

3    cases took place in the People's Republic of

4    China, not in the United States.  The order was

5    placed in China.  The money was delivered in

6    China.  The product was manufactured in China.

7    The sale was consummated in China.  The agreement

8    was made in China and it was shipped from China.

9         The instructions that you will see, the

10   judge has read to you and you'll read it further,

11   tell you that copyright infringement and

12   trademark infringement which you find, if any,

13   has to occur in the United States.  There wasn't

14   any.  Not on those sales.  Nothing happened until

15   it was all over with and Vuitton had them dumped

16   into the United States.

17        There is no evidence that anybody in the

18   United States has ever bought anything from any

19   of these websites, let alone through any servers

20   operated by the Defendants.

21        There's an interesting piece of

22   information that came out of Mr. Wilson's

23   investigations concerning bigworldshoes.com, and

24   that had to do with the rebuilding of this

25   website based upon a review of some servers from

                                              134

1    the Defendants.  You'll recall it took him ten or

2    twenty hours to do that, but eventually he

3    rebuilt this website, found logs, et cetera, that

4    were on there and he found a number of hits to

5    this website.

6              None of those hits came from the United

7    States.  None of them.  They came from France.

8    They came from China.  They came from Canada.

9    They came from other countries, Great Britain,

10   The Netherlands, et cetera.  No evidence shown in

11   those charts that Mr. Wilson talked about showed

12   any hits from the US.  And that's the only, the

13   only website that was rebuilt from information

14   from the Defendants' servers.

15             So once again it doesn't show any

16   activity in the United States other than

17   someone is -- someone is contacting a server.

18             Let's talk about what's going on in the

19   United States, if anything.  At most the

20   Plaintiff can say that there is something on the

21   servers here in San Jose that constitutes

22   trademark infringement or copyright

23   infringement.

24             And what is that something?  Well, it's

25   a website, they say, that is hosted using a

                                                    135

1    server rented to somebody else that's sitting

2    here.  Is there a picture on that website?  Is

3    there a picture on the server?  Is there

4    something that the Defendants could see?  No.

5              What you have are a bunch of bits of

6    data.  And Mr. Gralnik testified about that.  You

7    saw exhibits of what it actually looks like on

8    the server.  They don't know what's on the

9    server.  They have no way of knowing what's on

10   the server.  And yet it really is not in any

11   tangible form that's viewable by anybody looking

12   at the server or by any means that's within the

13   power of the Defendants.

14             The only way that you would see

15   something that is sitting on that server is if

16   someone in Topeka, Kansas, for example, happens

17   to call up their web browser and they happen to

18   access this website and through the complexity of

19   the Internet that transaction is routed here to

20   San Jose and then routed back to their -- their

21   desktop in -- or laptop in Topeka.  And using the

22   web browsing software on the user's computer it

23   will reconstruct these bits into a picture.

24             So can you truly say that there's

25   anything happening here in San Jose other than

                                                        136

PETER TORREANO, CSR 7623

1      transient transmission of information or storage

2      of information that cannot be viewed in its

3      native form by anybody, any human person?

4              You need special software, browser

5      software, some such thing.  Otherwise, if they

6      looked at it on a hard drive in San Jose, it

7      would just be maybe in hexadecimal form or

8      something.  But there's no real connection.

9              And we would submit that is not an

10     infringement of a copyright as it sits on the

11     server.  It's just bits and pieces -- bits of

12     data in magnetic form actually.  It's not a

13     picture.  It's not like there's, you know, some

14     physical object stored on there, not a physical

15     photograph stored on there, not an order form

16     stored on there.  There's nothing except

17     electronic information.

18             It's sometimes hard for us to understand

19     how all of this works, but the reality is that

20     until that information is translated by a user,

21     there is no there there.  And you heard from

22     Mr. Gralnik as well that oftentimes these

23     websites don't all reside in one place.  They may

24     be spread around and they will cause information

25     to be drawn from various other places.

137

1          Now, there is another big problem you

2     need to consider.  We've heard a lot of testimony

3     about a lot of different websites, but you

4     haven't really heard anything connecting them to

5     the Defendants or you haven't heard them

6     connected to an infringer or you haven't heard

7     them connected to a purchase of a bag or you

8     haven't heard them connected to a notice.

9          You've just got -- you know, he wants to

10    talk about this infestation of websites, but they

11    haven't established what those websites are.

12    They put one together, one, bigworld shoes.com.

13    And that one wasn't doing anything in the US,

14    according to them.

15          What you have is a lot of random

16    information.  We sent notices.  We bought bags.

17    We looked at something on domain tools.  Where is

18    the chain connecting any of these things?  Where

19    is the chain connecting any of it to the

20    Defendants?  We submit there isn't any.

21          What they would love to have you think

22    is that because there are so many websites out

23    there and it looks like there might be some on

24    the server here and we've sent a lot of letters

25    to people here, there must be something going

138

1    on.  Where there's smoke, there's fire kind of

2    thing.  But they just haven't made the

3    connections.  Nor have they necessarily

4    established that there is infringement going on

5    on all these websites.

6           They want you to assume all of these

7    websites are infringing.  Where's the testimony

8    about that?

9           Well, we had occasional testimony that

10   someone looked at a picture on the Internet

11   through their web browser in Paris or someplace

12   or maybe in Dallas and we have some evidence that

13   someone bought a bag and we have some evidence

14   that people sent some letters, but some of these

15   things were in odd order.

16          For example, you buy the bag, Mr. Holmes

17   in some cases buys the bag before any notice gets

18   sent, or you send notices and all the take-down

19   activity occurs and then you buy a bag.

20          How does that show that the infringing

21   activity was going on on the server after notice

22   was given?  They haven't made those connections.

23   But even if they had, it's not enough to show

24   infringement of the -- of the copyright,

25   contributory infringement, I should say, of the

139

1      copyright, and it doesn't show infringement --

2      contributory infringement of the trademark.

3              Let me briefly talk about some of the

4      elements which you have to deal with in terms of

5      making a decision as to whether the Defendants

6      are liable here.  The judge has given you

7      instructions that include elements of each of

8      these claims that are being made.

9              For example, for trademark --

10     contributory trademark infringement, the judge

11     has instructed you that the Defendants knew or

12     should have known that their customers were using

13     their services to directly infringe or facilitate

14     infringement of the trademark.

15             Well, as I talked about, we haven't

16     really got any evidence of any knowledge prior to

17     the time it happened.  All we have is they sent a

18     notice, action was taken, sent a notice, action

19     was taken, et cetera.  If it was ever there in

20     the first place, because often it wasn't.

21             Or should have known is what Mr. Coombs

22     would like to talk about I'm sure next.  And that

23     is under all the circumstances is it reasonable

24     that they would have known if they had only given

25     it any thought or they'd done what a reasonable

                                                    140

1     person would do or something.

2              There's no evidence of that.  None.

3     None of their witnesses have ever said, "If they

4     had only done X, they would have seen Y.  If they

5     had done this, we wouldn't have that."  And you

6     can't blame the Defendants simply because

7     somebody whom they don't know is dealing with a

8     customer of theirs and is doing something

9     improper.

10             That's not an objective way of looking

11    at this, not part of the objective standard that

12    they have to meet.

13             They haven't shown, as I say, if any of

14    these bags were sold in the United States.  They

15    haven't shown that the trademarks were used in

16    the United States in commerce.  For example, in

17    order to -- just talking about trademarks, for

18    example.

19             You have to actually use a trademark in

20    commerce.  You can't just put it on your wall and

21    that's trademark infringement.  It has to be used

22    to show some connection between the person

23    wrongfully using it and something they are trying

24    to sell or advertise.  And, of course, the

25    Defendants aren't selling anything or advertising

141

1    anything.  It's only potentially these folks that

2    they don't know somewhere out there on the

3    Internet.

4            And that commerce has to occur in the

5    United States or substantially affect commerce in

6    the United States.  We don't have any evidence of

7    that.  None.

8            On the claim of contributory copyright

9    infringement, there are other elements similar,

10   but they are different -- somewhat different

11   elements.  And, for example, they have to show,

12   the Plaintiff has to show that the Defendants

13   knew or should have known that the customers were

14   using services to infringe copyrights.

15           But they had no knowledge.  There's no

16   evidence they had any knowledge.  If they got a

17   notice, they terminated the service.  They didn't

18   get the notice and say, "Oh, let's go out and

19   help these people along."  And once again that

20   has to happen in the United States.

21           Now, there's another element to both of

22   these, both of these points, the fourth element,

23   and that is that the Defendants have to have been

24   damaged -- not the Defendants, the Plaintiff,

25   Louis Vuitton, has to have been damaged.  There

                                                    142

1    is no evidence that Louis Vuitton lost a single

2    sale as a consequence of any of this infringing

3    activity going on anywhere in the world.

4    Nothing.

5         Now, they might want you to assume that

6    they would have sold more product if someone

7    wasn't buying these bags.  You can just as easily

8    assume they sold more bags and it hasn't affected

9    them at all.  But let's talk about the reality of

10   this whole business.

11        Louis Vuitton is selling bags for a

12   couple thousand, $5,000 a piece.  I know nothing

13   about handbags, but that seems an awfully high

14   price to me.  So if I were going to buy these

15   bags, I would be very careful about how I do it.

16   I'd want to make sure it is, in fact, genuine.

17   And there would be a lot of things I might look

18   at to consider whether it was really a genuine

19   bag or not.  And this goes to the whole

20   instruction about likelihood of confusion that

21   the judge was reading to you.

22        So if you find on the Internet somebody

23   offering to sell a bag, oh, say, for $100 or

24   $200, and you know that they really -- the real

25   ones sell for a couple thousand dollars or more,

143

1    is there any possibility that you would be

2    confused?  Is there any likelihood of confusion

3    on the part of a reasonable prudent purchaser of

4    a bag?  Clearly the answer is no.

5            That's one of the elements they need to

6    show for contributory copyright -- contributory

7    trademark infringement, that even to establish to

8    direct infringement of that trademark they would

9    have to show that there's on the part of the

10   consuming public the likelihood of confusion

11   based upon all the circumstances.  And the judge

12   read a bunch of these factors that can be

13   considered in determining likelihood of

14   confusion.

15           One of them is the price.  And if I'm

16   getting something that normally sells for

17   thousands of dollars for a hundred or so, I

18   couldn't rationally be confused.  I couldn't

19   reasonably be confused about that and it is

20   not -- of course, it doesn't matter what I would

21   think personally, but what matters is what a

22   reasonable person under those circumstances would

23   think.  No possibility of confusion.

24           What really is going on here is there

25   are two markets for these kinds of products.  You

144

1    have people who want the symbol of luxury in the

2    world and they will buy a Louis Vuitton bag.  I

3    submit there aren't very many people who actually

4    can do that.

5            And then there are people who want a

6    knockoff because they think they are pretty or

7    whatever.  Do they really think they are genuine

8    product?  Of course not.  And are they likely to

9    buy a genuine product?  Probably not.

10           For example, if one of these bags is

11   bought by some teenager, does she know that it's

12   genuine, not genuine?  Of course, she knows it's

13   not genuine.  Does she care?  No.  Is she likely

14   to buy a real bag?  No.  It's just not going to

15   happen.

16           So you have, you know, very vast

17   differences in the two markets.

18           Now, I know Mr. Livadkin said, "No, no.

19   It's all one market.  Everybody wants a Louis

20   Vuitton bag and they are all going to save up

21   their money and buy a big one from us."  They're

22   thousands of dollars and all of that.

23           I'm sorry.  That's just not a rational

24   way to think.  They want only a few people in the

25   world to buy the bags so they can feel really

                                                    145

PETER TORREANO, CSR 7623

1    nice about having spent so much money on a

2    handbag.  That keeps Louis Vuitton in business.

3    But the people buying these things don't affect

4    them whatsoever.  They just can't.  They would

5    never buy the real product.  They are not going

6    to do it.

7              So the question is have they suffered

8    damages from anything associated with this other

9    than hurt feelings?  Which I suggest is not

10   damages.  Yeah, they prefer that everybody only

11   did business with them.  And there are a lot of

12   things that people would prefer, but that doesn't

13   make them damages in any -- in any legal sense.

14             Have they established any evidence

15   they've lost anything?  No.  Have they

16   established any evidence that people have stopped

17   buying Louis Vuitton products because of it?

18   No.  Have they established any evidence that

19   their customers are harmed in any fashion except

20   psychically because some young girl buys a cheap

21   bag?  No.  They simply want you to assume there

22   are damages.

23             But here's a huge hole in their case.

24   They have no evidence of damages from the sale of

25   any of these products.  Nothing.  And they have

                                                    146

PETER TORREANO, CSR 7623

1    the burden of proof on that.

2              Now, that element about damages, it has

3    to do with proving the claim, both trademark

4    infringement and copyright infringement, and

5    contributory versions of those.  There are

6    separate instructions dealing with them, assuming

7    you actually found some liability.  We suggest

8    you should not do so.

9              But even if you found some liability,

10   then there's the question about what damages

11   should you award as statutory damages.  And you

12   need to -- if you ever got to that point, you'd

13   have to find some just amount.  That would be in

14   your discretion, but it would have to be on a

15   reasonable basis.

16             Mr. Coombs asked for a million dollars.

17   Has he explained why?  No.  Oh, maybe he

18   suggested it would punish the Defendants.  It

19   might deter others, i.e., "we don't want to put

20   them out of business.  We just want to get their

21   attention," I think was the phrase he used.

22             Yeah, their attention would be, "How

23   soon do we have to move out of the data center?"

24   They're gone.

25             And then what happens to the next ISP?  147

1       Their attention will be gotten, wouldn't it?

2       Because Vuitton would no doubt send a letter out

3       saying, "Look at what we did to Akanoc.  You

4       could be next."  That, I suggest, is the only

5       basis for having a million dollars in damages.

6               We suggest, however, that there is no

7       basis for damages whatsoever.

8               Would it make any difference, would it

9       make any difference if they did put them out of

10      business other than scaring everybody else in the

11      industry?  The testimony is no because these

12      infringers move around all the time.  So is it

13      going to deter an infringer?  No.  Is it going to

14      deter anybody?  Probably not.

15              It just gets other people in trouble

16      because the people who are selling knockoff bags

17      are going to keep selling knockoff bags from

18      China.  And if Vuitton can't deal with China,

19      that's too bad, but that's -- that's going to go

20      on.

21              And, frankly, they've in a sense created

22      their own problem because of their own success.

23      Obviously if you have such a high markup on

24      products, you're going to encourage people to

25      sell knockoffs.  That would be true of any kind

148

1       of product any time in history because clearly

2       you have a lot of folks who probably figure "I

3       can make this bag a lot cheaper than Louis

4       Vuitton and I bet I can find somebody to buy it."

5       So they are going to keep going on that way.

6              And the Internet is not going to shrink

7       unless all the -- or a lot of the ISPs in the

8       United States get put out of business and then

9       they actually maybe have to go offshore and go

10      to -- I don't know -- Canada, Mexico, Costa Rica,

11      whatever.  They'll keep doing it, the knockoff

12      artists.  But what will have happened is that you

13      will have essentially destroyed the ISP business

14      as it exists in Silicon Valley today.

15             And then who goes next?  "How about

16      Western Union?  Let's go sue them."  "How about

17      the Post Office?  After all, they delivered these

18      bags."

19             I wanted to talk for a moment about

20      the -- the whole idea of trying to stop this

21      trade and we've heard some apartment analogies

22      and other kinds of things, but, you know,

23      let's -- and I think we even talked briefly about

24      this with Mr. Gralnik about a highway situation.

25      If you look at the Internet as being a highway,

                                                        149

1    how do you figure out that something is moving

2    down the highway, whether it's a virtual product

3    in electronic firm or a real product?

4              And let's assume that you have somebody

5    who's claiming that there's a -- they believe

6    that there is someone -- they don't know who they

7    are, but there's someone coming down this road,

8    and they are going to be bringing a shipment of

9    counterfeit bags into San Jose and they want

10   somebody to stop it.  So what do you do?

11             You block all the highways.  You set up

12   road blocks, checkpoints, and you have to inspect

13   every car that goes through.  Soon this -- the

14   highways wouldn't function at all.  And you do

15   that just because you have someone complaining

16   that someone is doing something illegal using the

17   highways.

18             If you're talking about an apartment

19   building, let's say that the Defendants are like

20   someone who is a developer and you build

21   apartment buildings and you, you know, lease them

22   out to somebody who's going to run them.  Take an

23   apartment building and let say it's like a

24   server.

25             And that apartment building has multiple

1   floors.  They have floors like an IP address and

2   then there are a bunch of apartments on that

3   floor.  Maybe we can talk about those as, oh,

4   websites.  There are various ways you could look

5   at this.

6           So you're the developer like the

7   Defendants here and you get a complaint from

8   somebody saying, "There's something going on over

9   there in that building.  We don't know who it is,

10  but we think it might be in apartment, oh, 10B."

11          So what do you do?  You go and complain

12  to whoever is running the building.  Right?  Just

13  like they complain to their resellers.

14          The reseller then goes to somebody who's

15  renting apartment 10B and says, "You've got to

16  stop this."

17          What happens if that doesn't work?

18  Well, according to their theory, you terminate

19  the deal with the guy who's running the apartment

20  building.  Or maybe you just empty a floor, make

21  sure that, you know, nobody is on that floor

22  again, can't use that floor because, after all,

23  somebody -- we don't know who it is -- is doing

24  bad things down in that apartment.

25              Pretty soon everybody is out of

151

1     business.  But the truth is the people running

2     the apartment building, the developer of the

3     apartment building, none of them know that the

4     bad stuff is going on and have no way to really

5     stop it other than try to identify it, try to

6     complain and, if need be, you know, empty a

7     floor.  And that's been done in this case over

8     and over and over again.

9              Or you have someone -- let's say, to use

10    a different analogy, you have someone who is

11    running a self-storage unit.  You just rent out

12    space in the self-storage unit.  People put stuff

13    in there that's illegal, Louis Vuitton bags that

14    are knockoffs, for example.

15             Does the guy running the building know

16    this?  Of course not.  Is he liable for it

17    because it's sitting in that building, just like

18    he might be sitting on information about it on

19    his Internet server?  I suggest the answer is

20    clearly no.  You go after the people who are

21    doing the bad stuff.  You don't go after somebody

22    who just happens to be convenient, somebody you

23    can easily sue.

24             THE COURT:  I'm going to have you bring

25    your argument to a close.

                                                      152

1           MR. LOWE:  Thank you, Your Honor.

2           Ladies and gentlemen, we really do

3    appreciate your attention today and this past

4    week.  We believe that the Defendant has

5    presented more than sufficient evidence and that

6    the Plaintiff has presented essentially no

7    evidence to prove the elements necessary here to

8    show liability of these Defendants for

9    contributory trademark or copyright infringement,

10   let alone any damages.  So we ask you when you go

11   back to deliberate, think about whether this is

12   fair and just and do the right thing.

13          Thank you.

14          THE COURT:  I promised you about 12:30,

15   but Counsel only used about half of his time.  So

16   I will permit you a brief rebuttal argument, if

17   you wish.

18          MR. COOMBS:  Thank you, Your Honor.

19          This is why there are eight of you.

20   There are times I wasn't sure I was in the same

21   courtroom as Mr. Lowe, but you'll have an

22   opportunity to compare your notes and come to

23   your own conclusions.  And fortunately, you'll

24   also have an opportunity to do that with respect

25   to the Court's jury instructions.  And in that

                                            153

PETER TORREANO, CSR 7623

1    respect, I will just quote one portion of what

2    was read to you this morning with the Court's

3    permission.

4          "It is no defense to contributory

5    trademark infringement or contributory copyright

6    infringement that termination of services to a

7    direct infringer could be circumvented by the

8    direct infringer switching to use of the services

9    of some other company or to continue direct

10   infringement."

11         So the argument about the ease with

12   which some of these counterfeiters can move from

13   the Defendants' servers to someone else is not an

14   excuse for the Defendants failing to do what we

15   know from the terms of service you looked at

16   again this morning what we know they can do.

17         Similarly, you've heard some discussion

18   about likelihood of confusion and Mr. Lowe talked

19   about the price point and how could anybody

20   reasonably be confused.

21         You heard Mr. Livadkin's testimony on

22   the subject.  And I'm not going to restate it

23   again for you, but the fact of the matter is that

24   it's not only the confusion of the buyer.  It is

25   the likelihood of confusion in the objective

                                              154

1    consumer.  And the instructions that were read to

2    you this morning contain a number of

3    considerations which includes the strength of the

4    mark, which is effectively undisputed here.

5             This mark -- these marks have been with

6    us for a long time.  They are internationally

7    known and command an enormous premium in the

8    marketplace.  They use the mark on identical

9    goods.  This is the same product that Louis

10   Vuitton sells.

11            The Plaintiff's and Defendants'

12   customers are the same.  They both market through

13   the Internet.  And, as I said, Mr. Livadkin's

14   testimony will go to the issue of whether or not

15   the customers overlap.  Are there some that are

16   not confused or deceived by the counterfeit

17   product that's being offered?  I'm certain of

18   it.  But are there others who think they try to

19   snag a deal?  I'm sure there are those as well.

20            What were the Defendants' customers'

21   intent?  Is there really any question that the

22   Defendants' customers were trying to knock off

23   the Defendants' marks?  These are not serious

24   arguments, nor are there arguments based on the

25   territoriality of this activity.

                                                    155

PETER TORREANO, CSR 7623

1               We've heard plenty of testimony here

2     over the course of the past couple of weeks about

3     how these servers are located a couple of blocks

4     away.  Sorry.

5               The sale of the goods is not the only

6     act of infringement.  Now, first of all, Mr. Lowe

7     would have you believe this is it.  All of these

8     websites, they sold the 14 products to Mr. Holmes

9     and none other.  And that's not a reasonable

10    inference from the evidence and it's not a

11    reasonable inference from the Defendants' own

12    statements.

13              And in that respect I'm going to refer

14    you to I believe it was Exhibit 533, but that is

15    the exhibit in which the Defendants say that they

16    are marketing their services to China resellers

17    and customers who want access to the US market.

18              Let's not be fooled by this.  It's the

19    United States consumer that is the target of the

20    illegal activity that is rampant on the

21    Defendants' servers.

22              But Mr. Lowe's argument is flawed in

23    another respect.  You do not infringe only by

24    selling.  In the case of copyright, for example,

25    you infringe by displaying.  So the images, which

156

PETER TORREANO, CSR 7623

1    I could not see, Mr. Livadkin could not see,

2    Mr. Holmes could not see or Mr. Chen could not

3    see, are all located on the Defendants' servers.

4         Do not be distracted.  This is another

5    laneway.  Yes, the box itself is data and, as you

6    heard from Mr. Gralnik, the content of those

7    servers can be viewed by players.  You know, you

8    could open the box and you'll see a disk.

9         Well, nobody is talking about that.  Of

10   course, that in itself, that disk is not an

11   infringement.  It's what it contains.  And it is

12   not realistic to talk about data on a server

13   being just the magnetic polarity of the zeros and

14   ones that are represented by computer code.

15        The fact is all of these servers have

16   installed operating systems.  And you heard

17   Mr. Gralnik testify that the way you would view

18   the content of the server with access to the

19   operating systems Mr. Chen and the Defendants

20   supply is to see the kind of file structure that

21   was represented in Exhibit 593.31.  Thank you.

22        So take a look at 593.31.  That's what

23   somebody is going to look at and they are going

24   to look at it through something you heard about

25   earlier called the KVM.  I don't know if you'll

157

1    remember, but there was discussion from Mr. Chen

2    about -- was it Ms. Luk?  I'm sorry.

3              But in any event, about KVMs, keyboard,

4    video, mouse, and then remote, keyboard, video,

5    mouse.  And what that is is the hardware that's

6    required to take a look at the contents of the

7    server.  Their customers can do it from China.

8    The Defendants can do it from their own cage.

9              Now, Mr. Lowe made some arguments about

10   termination not being a reasonable solution, and,

11   if we were saying to you that that's the first

12   thing they should do, I'd agree with it.  In

13   fact, if it was the second thing I said they

14   should do, I'd agree with it.  But it's not.

15   It's what their own expert witness testified to.

16             He testified to an escalation of

17   remedies and, if termination is the only thing

18   that can result in an end to this rampant illegal

19   activity, then so be it.

20             I don't think we need to feel sorry for

21   the customer at that point.  They've had a chance

22   based on warning.  They've had a chance based on

23   removing content.  They've had a chance based on

24   fines.  They've had a chance based on

25   suspension.  What's left?  Well, of course you

158

1    terminate.  I'm not suggesting that's good, best,

2    advisable, but it is, according to the

3    Defendants' own terms of use and, according to

4    their own expert, the ultimate sanction if

5    nothing else secures compliance with the

6    Defendants' own terms of service.

7             Mr. Lowe commented on the issue of

8    contacting customers and you'll remember when we

9    were talking about Mr. Livadkin's testimony.

10   Now, he did testify about his communication with

11   a large number of ISPs.  One was singled out

12   because it's in a business like one of the

13   Defendants here.  It basically resells capacity

14   supposedly to users in China.

15             That company in response to Louis

16   Vuitton's demands now does two things.  And you

17   can go back and take a look at his testimony if

18   you need clarification on this.  It was in his --

19   his redirect at the very end of his testimony.

20   He said first that that company, SoftLayer,

21   provides customer contact information to them,

22   not through ARIN and not through any other

23   source, directly.  So they have the same reliable

24   information to contact the customer that

25   SoftLayer has.

                                              159

PETER TORREANO, CSR 7623

1          And this is the thing Mr. Lowe didn't

2     mention:  And if that communication from Louis

3     Vuitton does not result in a resolution of the

4     abuse complaint, SoftLayer then takes action and

5     the activity stops.  And the result is they do

6     not have the problem on those servers that they

7     have on the Defendants' servers.

8          Now, Mr. Lowe suggests, "Well, they can

9     look at ARIN, can't they?"  And, of course, we

10    can.  You can, too.  Yesterday Mr. Cheng was

11    examined on the ARIN content information from

12    Bag925.  We'll come back to that in a moment, but

13    the contact information.

14         Okay.  Do you see any customer

15    information on it?  Did the Defendants introduce

16    these detailed ARIN customer records that they're

17    talking about?  I haven't seen them, but maybe

18    that's why Mr. Lowe and I were in a different

19    courtroom.

20         Now, can we pull up 1598 again.

21         Mr. Lowe said we got the complaint on

22    the 20th of August and the problem must have been

23    solved because, look, the four sites were gone

24    and one site wasn't functional.  But we know

25    that's not really the case because you'll

                                                   160

1    remember when Mr. Chen took the stand, we were

2    looking at an e-mail, and that's Exhibit 528, I

3    believe.  And in that e-mail, ape168, one of

4    those five websites, was pretty obviously on his

5    servers.

6            Now, conveniently he was corresponding

7    from a rocklogic.com e-mail address, but we

8    managed to get a copy of that e-mail.  And that

9    e-mail shows, I think, that ape168 was pretty

10   clearly on their servers when he first heard

11   about the case and that whatever actions may or

12   may not have been taken before that time were

13   clearly ineffective.

14           But you remember, also, that when I

15   pressed Mr. Chen on this issue he admitted that

16   he could not at that point say that these other

17   sites were not also on his servers at the time he

18   first heard about the case.

19           So despite what Mr. Lowe has just told

20   you in his closing argument, for all we know --

21   well, we know one of them was definitely on,

22   ape168, and for all we know the other four were

23   as well and that none of whatever actions may or

24   may not have been taken were effective to address

25   the 19 Louis Vuitton complaints that preceded the      161

PETER TORREANO, CSR 7623

1    filing of this complaint.

2             We're not talking one or two complaints

3    catching them by surprise.  We're talking about a

4    prolonged, deliberate patient effort to try and

5    get them to do what everyone else does.

6             Mr. Lowe also said something about one

7    site not functional with respect to Wendy929.

8    And whatever issues there may be with respect to

9    that one complaint, I want to refer you back to

10   the testimony about loverNike.com, which is also

11   on Exhibit 1598 and in which the Defendant

12   reports to us that the website wasn't functional,

13   but that if you go to look at Exhibit -- is it

14   613?  605?  615, which is the extract from the

15   Defendants' own SEEPro records, he's unplugging

16   that site the very next day.

17            That's a discrepancy I don't understand,

18   but it does suggest to me that when he's telling

19   us something is not functional, he may not be

20   telling us what's actually the case.

21            So having considered all of the

22   evidence, we're confident that in the end you

23   will come to a conclusion that the Defendants

24   should be held accountable for contributory

25   trademark infringement and contributory copyright    162

1    infringement, and that you will award an

2    appropriate amount of statutory damages to ensure

3    that his activity does not continue.

4              Thank you for your attention.

5              THE COURT:  Very well.

6              Members of the jury, when you retire you

7    should elect one member of the jury as your

8    presiding juror.  That person will preside over

9    the deliberations and speak for you here in

10   court.  You will then decide the case with your

11   fellow jurors to reach agreement, if you can do

12   so.  Your verdict must be unanimous.

13             Each of you must decide the case for

14   yourself but should do so only after you've

15   considered all the evidence, discussed it fully

16   with the other jurors and listened to the views

17   of your fellow jurors.  Do not be afraid to

18   change your opinion if the discussion persuades

19   you that you should, but do not come to a

20   decision simply because other jurors think it is

21   right.

22             It is important that you attempt to

23   reach a unanimous verdict, but, of course, only

24   if each of you can do so after having made your

25   own conscientious decision.  Do not change an

163

PETER TORREANO, CSR 7623

1    honest belief about the weight and the effect of

2    the evidence simply to reach a verdict.

3            Now, during the course of your

4    deliberations you may take rest breaks or lunch

5    breaks as you wish.  Since we will be standing by

6    pending your deliberations, please send us a note

7    as to what your schedule will be.  During any

8    break do not deliberate further upon the case.

9    Cease all deliberations until your presiding

10   juror has brought you back into session with all

11   of you present.

12           If it becomes necessary during your

13   deliberations to communicate with me, you will

14   find a form for that purpose included in the

15   materials sent into the jury room.  Any one of

16   you may communicate with me by filling out the

17   form.  You can bring it into my chambers, give it

18   to me or a member of my staff.

19           No member of the jury should ever

20   attempt to communicate with me except by a signed

21   writing; and I will communicate with any member

22   of the jury on anything concerning the case only

23   in writing or orally here in open court.

24           Remember you're not to tell anyone,

25   including me, how the jury stands numerically or

164

1    otherwise until after you've reached a unanimous

2    verdict or have been discharged.

3            I will shortly confer with counsel about

4    the verdict form.  Let me just tell you what it

5    will look like.  You will find that there are a

6    series of questions, and each claim, contributory

7    copyright claim and contributory trademark claim,

8    will be divided into questions.

9            Sometimes the question may look very

10   similar, but they are -- because the elements of

11   each claim are sometimes similar, but you must

12   answer each of them.  And you may find on one

13   claim and not find on another or find on both as

14   I've instructed you.

15            You will also find that there is a

16   place for you to indicate your finding with

17   respect to each Defendant.  And, again, it could

18   be that you will find with respect to one or more

19   or all of the Defendants.  That's a matter for

20   you to decide.

21            When it comes to the question of

22   damages, again, you will have a place to indicate

23   your finding with respect to all of the

24   Defendants or each of them.  I tell you in the

25   course of the instructions to ignore any

PETER TORREANO, CSR 7623

1        Defendant for which you've answered no to a

2        previous question which removes that Defendant

3        from your consideration.

4              And you will find that there are italics

5        instructions that guide you to the various

6        questions so that sometimes your answer will

7        require you to skip the question that follows.

8        Sometimes it will require that you proceed to the

9        next question.

10             If you have any questions about the

11       verdict form itself, feel free to send out a note

12       asking the Court to give you further directions

13       with respect to the verdict form.

14             I've given Ms. Garcia permission to give

15       you logistical instructions so that she can

16       assist you as I indicated with respect to using

17       the equipment, any matters that have to do with

18       your comfort and to give to us your various

19       requests.  Otherwise, we lock the -- we don't

20       lock you in, but we close the door to the jury

21       room.  Your deliberations are confidential and

22       you are not to be disturbed.

23             At this point I will ask Ms. Garcia to

24       take charge of the jury to conduct them to the

25       jury room for purposes of commencing their

                                                          166

PETER TORREANO, CSR 7623

1     deliberations.  I'll send in the official verdict

2     form as well as copies shortly.

3                 (The following proceedings were held in

4     open court out of the presence of the jury:)

5                 THE COURT:  I need to -- we're out of

6     the presence of the jury.  I need to go to my

7     chambers and print out a copy of the verdict

8     form.  So rather than take off immediately for

9     lunch I'll ask you to stand by so that you can

10    take a look at it.  I'm sure that the jury itself

11    will go to lunch here fairly soon, but if you

12    would stand by.

13                 To the extent you wish to leave the

14    environs of the courtroom while the jury is

15    deliberating, let me give you one caution.  It is

16    my practice whenever I receive a note from the

17    jury to come into the courtroom to alert you to

18    the question.

19                 If you're not here or if you don't have

20    someone who is here, I will assume that you are

21    waiving your right to be consulted with respect

22    to the question and the Court will proceed to

23    determine how to respond to the question because

24    my goal would be to keep the jury deliberating

25    and I wouldn't want to delay that because the

167

1       attorneys are absent from the courtroom.

2               I'm sure you could work that out further

3       with Ms. Garcia when she's done with her

4       logistical work with the jury.

5               I will give you an opportunity in the

6       course of the afternoon, if you let Ms. Garcia

7       know it, to go back on the record for the purpose

8       of making post-evidence motions.  I indicated I

9       would permit that and I do want to honor that.

10              Any other matters out of the presence of

11      the jury before I start to work on the verdict

12      form?

13              MR. COOMBS:  No, Your Honor.

14              MR. LOWE:  No, Your Honor.

15              THE COURT:  All right.  I'll see you in

16      a moment.

17              (Recess taken.)

18              THE COURT:  We're on the record out of

19      the presence of the jury.  I had an opportunity

20      to review with counsel the verdict form.  They

21      made certain interlineations, most of which were

22      noncontroversial.  And the Court is preceding to

23      make them, but there was one objection that the

24      Plaintiffs wished to make that I will call on

25      Plaintiff's counsel now.

168

1          MR. COOMBS:  Thank you, Your Honor.

2          Actually two.  One we discussed was the

3     question 2 where it says substantially affect

4     commerce in the United States, and the Timberline

5     case which speaks to that issue in the Ninth

6     Circuit uses the words "some effect in the United

7     States."

8          But more importantly, in questions -- I

9     think it's 4 on the trademark construction and

10    question 10, if I'm not mistaken, on the

11    copyright instructions.  There is sort of an

12    additional element, as it were, included in the

13    statement of the elements required to be approved

14    by Plaintiffs which I think goes beyond existing

15    law to which we object.

16         And in particular, that's the language

17    that speaks to the last clause, "and the

18    Defendants had reasonable means to withdraw its

19    services so that their services could not be used

20    to directly infringe, but Defendants continued to

21    provide the services to the customer."  And I

22    believe that's similar language that tracks in

23    question 10.  We'd object in both places.

24         THE COURT:  Very well.  As I explained,

25    this is a case that gives the Court concern

169

1    because this is not a case where goods or

2    services that are infringing or that are

3    contributing to an infringement are visible to

4    the alleged contributing infringer, and,

5    therefore, it is important under these

6    circumstances to the Court that it is post-notice

7    conduct which is the basis on which to find

8    contributory infringement, that is, notice by

9    someone to the Defendant that there is

10   infringement.

11           And it's also important given the nature

12   of the facility here, which is a -- in a sense a

13   facility which is available for legitimate uses

14   and is undifferentiated in many respects from

15   legitimate uses and non-legitimate uses, that the

16   Plaintiff carry the burden of proving that the

17   infringement can be -- the contribution can be

18   withheld without affecting legitimate use.

19           And I actually in my instructions gave

20   instructions to the effect that no service

21   provider should be expected to monitor or take

22   steps that are beyond controlling the infringing

23   use and reasonable steps are required.

24           And so that -- although that precise

25   language is not taken from the instruction, it

170

PETER TORREANO, CSR 7623

1    characterizes what I think the Plaintiff has to

2    prove.  And indeed I believe there's evidence to

3    support Plaintiff's argument that there were

4    reasonable means to withdraw services so that the

5    services could not be used to directly infringe

6    but still preserving the right to legitimate

7    users.

8            More important is the language that the

9    Defendant continued to provide its services to

10   the customer.  For me it is that post-notice

11   having the ability to control either

12   contractually or otherwise or technically and yet

13   not taking that step so that the contribution is

14   to continuing infringement.

15           Does the defense counsel wish to speak

16   to this?

17           MR. LOWE:  No, Your Honor.  I think that

18   given the instructions the Court has given, I

19   think that that's certainly an appropriate

20   minimal thing to have for these verdict forms.

21           THE COURT:  Did you wish to speak

22   further to the verdict form?  You indicated you

23   had some objections that were beyond this.

24           MR. LOWE:  Yes, Your Honor.  We would

25   object to the verdict forms because we believe

                                                    171

PETER TORREANO, CSR 7623

1        that they don't properly reflect the elements,

2        and we have made that argument in connection with

3        the jury instructions and we simply reassert the

4        same argument.

5                 THE COURT:  Very well.  Give me a moment

6        to get my staff started on this and I did want to

7        stay on the record.

8                 Still out of the presence of the jury.

9        At the close of the case I indicated that I would

10       recognize motions for judgment.  It is necessary

11       in order to make a motion for judgment after the

12       verdict to have made it prior to the verdict, and

13       I didn't want -- given the delay we had in

14       starting this morning, I didn't want to stop to

15       have you make your legal motions.

16                We can take time for that, but I did

17       want to give you the opportunity and I indicated

18       I would recognize the motions that were made at

19       the close of the evidence.

20                Does the Plaintiff have a motion?

21                MR. COOMBS:  Yes, Your Honor.  We would

22       move for judgment as a matter of law on the

23       Plaintiff's claims.  We believe the evidence

24       amply demonstrates the elements of the claims for

25       both contributory trademark and contributory

                                                      172

PETER TORREANO, CSR 7623

1    copyright infringement, or in the alternative, we

2    would move that the affirmative defense of the

3    Digital Millenium Copyright Act as being not

4    available to the Defendant.

5              THE COURT:  Does defense have a motion?

6              MR. LOWE:  Yes, Your Honor.  We have

7    previously filed motions under Rule 50(a) at the

8    close of the Plaintiff's case and we would now

9    move under Rule 50(b) for a directed verdict as

10   to all of the claims in favor of the Defendants

11   and against the Plaintiff on the same grounds and

12   for the same reasons that we set forth in our

13   earlier motion.

14             THE COURT:  I will give you an

15   opportunity actually to provide me with written

16   motions to flesh out your motion.  There is a

17   matter that I would benefit from having more

18   particular briefing on and that is the argument

19   that came up actually during the closing argument

20   and perhaps otherwise having to do with the

21   territorial nexus.

22             This is a case where I believe the

23   evidence establishes that the Defendant operated

24   servers and other electronic equipment in the

25   United States and that the evidence is that users

173

PETER TORREANO, CSR 7623

1    of those services stored on those servers and

2    utilized the routers and other electronic devices

3    in a fashion which could support a finding of

4    direct trademark and copyright infringement.

5            The question that I am not as

6    comfortable with is whether or not the mere

7    storage of the information on servers in the

8    United States is in and of itself sufficient to

9    constitute -- to satisfy the nexus.

10           With respect to copyright, of course,

11   the owner of a copyright can control the

12   copying.  At some point someone allegedly copied

13   the work and then converted that copy to a

14   digital form which is then stored.

15           Now, there wasn't any evidence that I

16   can recall as to where that copy was made that

17   was ultimately stored.  It seems to me that the

18   Copyright Act could apply to that original copy,

19   but my question has to do with the storage of

20   that copy.

21           Now, the copy was stored, as the

22   evidence revealed, in a computer code that is not

23   synonymous with the copy.  It is -- can be

24   converted by electronic equipment and programs

25   back into the copy so you can see it.

                                                    174

1          So the question becomes while it's

2     stored on the medium in the computer's

3     possession -- the Defendants' possession, is that

4     a violation of the law or must there be evidence

5     that it is accessed in a fashion which then

6     converts it from its computer form to a readable

7     form before the copyright infringement takes

8     place and back to the interstate part of -- or

9     the territorial nexus, must that conversion --

10    must that be proof that that conversion to an

11    image that displays the work take place in the

12    United States.

13         The same kind of problem is presented

14    with respect to the trademark.  The mark itself

15    is an expression in a form of a medium.  It is

16    copied and stored electronically as part of these

17    various web pages allegedly on Defendants'

18    servers and routers and transferred around.  And

19    so I use the same parallel language.

20         Now, this is a circumstance where there

21    were actual purchases.  I would wish to have you

22    brief on whether or not those purchases qualify

23    for conduct in the United States given the timing

24    and the nature of those purchases.

25         So far as the Court is concerned, I

                                                      175

PETER TORREANO, CSR 7623

1    didn't look back to see whether supplemental

2    pleadings or anything like that would have made

3    that evidence irrelevant given the timing of the

4    purchase.  It just seemed to me that they were

5    circumstantial evidence of purchases or

6    commercial activity that took place during the

7    period of time of the complaint.

8              Be that as it may, it does seem to me

9    that the defense raises a fair question with

10   respect to the burden that the Plaintiff has is

11   whether or not the storage of the material in

12   whatever form on the server satisfies the nexus

13   or must there be something more and, if so, what

14   is that more and whether it was done, proved, in

15   the context of this case.

16             I don't mean to ask you to comment on

17   that now.  I just wanted to throw it out to have

18   you think about it.  There may be other matters

19   that are the basis of your -- of your motions

20   beyond the interstate -- or the territorial

21   nexus.  I keep calling it "interstate" but

22   territorial nexus.

23             I know I've heard your argument with

24   respect -- the defense argument with respect to

25   the liability of a web hosting service given the

                                                    176

PETER TORREANO, CSR 7623

1     fact that its clients supply it with information

2     which is not visibly to it a violation, and I'm

3     satisfied that there is a basis for contributory

4     infringement once it knows, however, that that

5     information is infringing trademarks and

6     copyrights.

7              But the interstate -- but the national

8     nexus part of it is something I need help on.

9              MR. COOMBS:  Conflict of law is always

10    challenging.

11             THE COURT:  Say again?

12             MR. COOMBS:  Conflict of law is always

13    challenging.

14             THE COURT:  Yes.  Okay?

15             MR. COOMBS:  Do you have a timeline in

16    mind when you would like to receive that?

17             THE COURT:  Oh.  No, I don't.  But I

18    would ask you to meet and confer.  This may be

19    all academic after the verdict.  So these are

20    anticipating that there is a verdict to which

21    these motions would now be renewed.

22             And so perhaps what I'll ask my staff to

23    do is once we have a verdict, if we get one,

24    we'll talk about any motions having to do with

25    that because I will assume that your motions just

                                                    177

1    made are under submission to the Court and I'll

2    wait for the verdict before I make any ruling.

3                MR. COOMBS:  Thank you, Your Honor.

4                MR. LOWE:  Thank you, Your Honor.

5                (Recess taken.)

6                (Court adjourned for the day.)

7

8                        ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

178

PETER TORREANO, CSR 7623

1                CERTIFICATE OF REPORTER

2

3

4

5            I, Peter Torreano, Pro Tempore Court

6    Reporter of the United States District Court for

7    the Northern District of California, 280 South

8    First Street, San Jose, California, do hereby

9    certify:

10           That the foregoing transcript is a true

11   and correct transcript of the proceedings had in

12   Louis Vuitton Malletier, S.A. versus Akanoc

13   Solutions, Inc., et al., Case No. C-07-03952-JW,

14   dated August 26, 2009; that I reported the same

15   in stenotype to the best of my ability, and

16   thereafter had the same transcribed by

17   computer-aided transcription as herein appears.

18

19

20

21

22                         /s/

23                         _____

                           PETER TORREANO, CSR
24                         License Number C-7623

25
                                                    179

PETER TORREANO, CSR 7623