1  J. Andrew Coombs (SBN 123881)
   *andy@coombspc.com*
2  Annie S. Wang (SBN 243027)
   *annie@coombspc.com*
3  J. Andrew Coombs, A P. C.
   517 East Wilson Avenue, Suite 202
4  Glendale, California 91206
   Telephone:  (818) 500-3200
5  Facsimile:   (818) 500-3201

6  Attorneys for Plaintiff
   Louis Vuitton Malletier, S.A.
7

8

9                      UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

11  Louis Vuitton Malletier, S.A.,          )  Case No.: C 07 3952 JW
                                            )
12                         Plaintiff,       )  NOTICE OF MOTION AND
            v.                              )  MEMORANDUM OF PLAINTIFF LOUIS
13                                          )  VUITTON MALLETIER, S.A., RE ENTRY
    Akanoc Solutions, Inc., et al.,         )  OF PERMANENT INJUNCTION
14                                          )
                           Defendants.      )  Hearing Date:  January 25, 2010
15                                          )  Time:          9:00 a.m.
    _____        )  Court:         Hon. James Ware
16
           TO DEFENDANTS AND THEIR COUNSEL OF RECORD:

17         PLEASE TAKE NOTICE that on January 25, 2010 at 9:00 a.m., pursuant to the Court's

18  order, in the Courtroom of the Honorable James Ware, United States District Judge, located at

19  Courtroom 8, 4th Floor of the San Jose Division of the United States District Court for the Northern

20  District of California, located at 280 South First Street, San Jose, CA 95113, Plaintiff Louis

21  Vuitton Malletier, S.A. ("Louis Vuitton") will, and hereby does move for entry of a permanent

22  injunction against Defendants Akanoc Solutions, Inc., Managed Solutions Group, Inc. and Steve

23  Chen (collectively "Defendants").

24         The present motion is based upon this Notice of Motion, the Memorandum of Points and

25  Authorities attached hereto, the Declaration of J. Andrew Coombs and Exhibits attached thereto,

26

27

28
    LV v. Akanoc, et al.: Notice and Motion for Permanent Injunction

Dockets.Justia.com

1  filed concurrently herewith and upon such further and additional evidence and records as may be

2  presented to the Court at or before the hearing hereof.

3

4  Dated:  December 21, 2009                    J. ANDREW COOMBS, A Professional Corporation

5                                                        ___/s/ J. Andrew Coombs_____

6                                                        By:       J. Andrew Coombs
                                                                   Annie S. Wang
7                                                        Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

**INTRODUCTION**                                                                                     1

**ARGUMENT**                                                                                          2

A.   Abundant Evidence Adduced at Trial of Plaintiff's Rights, Defendants' Knowing
     Participation in Infringing Activity and Injury to Plaintiff, Demonstrates the Necessity of
     Injunctive Relief.                                                                               2

B.   The Injunctive Relief Sought By Plaintiff Is Proper as In Line With Applicable Legal
     Authority and Defendants' Own Agreements with Their Customers.                                   5

     **a.**   Injunctive Relief in Infringement Cases is Congressionally Mandated.                    5

     b.    Plaintiff Meets the Applicable Tests for Entry of an Injunction in This Case.             6

            1.   Louis Vuitton Has Suffered Irreparable Harm                                          6

            2.   Remedies Available at Law Are Inadequate to Compensate Louis Vuitton
                 for the Injury Suffered by Virtue of Defendants' Systematic Conduct                 8

            3.   The Balance of Hardships Weigh Heavily in Favor of Entry of an
                 Injunction                                                                           8

            4.   The Public Interest is Advanced, not "Disserved" by Entry of a Permanent
                 Injunction                                                                           9

C.   Notwithstanding the Propriety of a Broad Prohibitory Injunction, it is Within the Court's
     Discretion to Specify the Procedures Outlined in Louis Vuitton's Proposed Draft
     Injunction as Endorsed, though Never Implemented by Defendants and as
     Outlined by the DMCA.                                                                           11

     a.    The Proposed Injunction Tracks Defendants' Own Service Agreement.                         11

     b.    No DMCA Safe Harbor Applied to Defendants and Should Not Provide
           Any Means for Defendants to Avoid Entry of an Injunction.                                 12

     c.    Termination of Service Has Been Adopted By the Courts as a Correct Response to
           Repeat Infringement Notices in the DMCA Context as Part of The DMCA's
           Requirement to Implement A Policy, Something Defendants have Failed To Do.  13

**CONCLUSION**                                                                                       16

Declaration of J. Andrew Coombs                                                                     17

**TABLE OF AUTHORITIES**

**CONSTITUTION**

U.S. Const., art. I, § 8 ................................................................................................ 10

**CASES**

*A&M Records v. Napster, Inc., 284* F.3d 1091 (9th Cir. March 25, 2002) ........................................ 9

*Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 703 (D. Md. 2001) ............................... 15

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1840-41 (2006).............. 6-7

*MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007)................................. 8

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)............................................................................................................................6-8

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) ..................................... 6

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F. Supp. 2d 1146, 1176 (C.D. Cal. 2002)  ........... 15

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) ................ 6-7

*Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992)......................................... 7

**STATUTES**

15 U.S.C. § 1116 ............................................................................................................. 5

17 U.S.C. § 502 ............................................................................................................... 5

17 U.S.C. § 512 ......................................................................................................... 12-15

1

**INTRODUCTION**

2       Defendants – and each of them – are properly enjoined from further acts of contributory

3   infringement.  Given the evidence adduced at trial and the utter absence of any viable defense for

4   their persistent, knowing and willful conduct, this conclusion is unavoidable.

5       The only issue is, given the breadth of the Court's discretion, what form that injunction

6   should take.  Plaintiff Louis Vuitton Malletier, S.A. ("Louis Vuitton") respectfully submits that its

7   proposed form of injunction – first lodged with the Court on July 31, 2009 (Docket No. 188)

8   provides a workable and generous formulation given (a) the scope of the infringing activity

9   enabled through Defendants' acts despite repeated notice, and (b) the Defendants' own service

10  agreement which contemplate use of the tools outlined in Louis Vuitton's proposed draft

11  injunction.[1]

12       Between August 18, 2009, and August 25, 2009, the Court heard evidence from Louis

13  Vuitton and from Defendants concerning:

14   • Louis Vuitton's intellectual properties;

15   • Louis Vuitton's efforts to enforce its rights in those intellectual properties;

16   • the widespread, persistent and willful infringement of those intellectual property rights

17     on websites hosted by Defendants;

18   • the harm to Louis Vuitton from that systemic infringement;

19   • the efforts undertaken by Louis Vuitton to secure a stop to that infringement;

20   • the utter failure of Defendants to address Louis Vuitton's repeated efforts and notices of

21     infringement both before and pending this litigation.

22       Defendants' own response to Louis Vuitton's notices can be considered, at best, hapless

23  and negligent.  Sufficient evidence was introduced for the Court to conclude that the Defendants'

24  conduct was, instead, the deliberate result of a business plan to provide bulletproof hosting for

25  illegal behavior for some of their best customers – only underscored by Defendants specious

26  assertion that their business model is beyond the reach of the United States courts.

27

28

---

[1] For the Court's convenience a copy of the draft proposed injunction is attached hereto as Ex. G.

LV v. Akanoc, et al.: Notice and Motion for Permanent Injunction

- 1 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Upon conclusion of the testimony, the jury spent two days assessing the number of infringements to be found on Defendants' servers and the amount of damages to be awarded. Through the verdict, the jury spoke clearly and forcefully about Defendants' liability and willfulness providing the Court with clear guidance in the exercise of its discretion to award injunctive relief.  Despite this verdict, un-contradicted evidence filed with the Court demonstrates that the illegal infringement continued to be aided by Defendants' provision of Internet services and at domain names which were the subject of prior notices.  Declarations of J. Andrew Coombs, James A. Lowe and Steven Chen (Docket No.s 249-251)

The injunctive relief sought by Plaintiff in large part merely seeks to enforce and implement Defendants' stated policies.

## ARGUMENT

### A.  **Abundant Evidence Adduced at Trial of Plaintiff's Rights, Defendants' Knowing Participation in Infringing Activity and Injury to Plaintiff, Demonstrates the Necessity of Injunctive Relief.**

Louis Vuitton is the owner of famous trademarks, its ownership and the validity of which were not disputed by the Defendants at trial.

In the course of Louis Vuitton's enforcement efforts, described by Nikolay Livadkin, its in-house intellectual property counsel, several websites were identified, investigated and determined to be selling counterfeit Louis Vuitton merchandise.  Declaration of J. Andrew Coombs ("Coombs Decl.") at ¶ 3, Ex. B, Trial Transcript, Aug. 19, 2009 (hereinafter "Ex. B") p.81:6-82:16, 85:21-25. The unauthorized nature of the product sold on these websites, though questioned by Defendants, was not disputed and no contrary evidence was offered.

Louis Vuitton also offered evidence, uncontradicted by Defendants, concerning the injury it suffers from the infringement of its valuable intellectual properties and of the corporate resources employed to combat this scourge.  Coombs Decl. at ¶ 2, Ex. A, Trial Transcript, Aug. 18, 2009 (hereinafter "Ex. A") pp. 165:22-172:11.

Consistent with its standard enforcement procedures, Louis Vuitton caused demand letters to be written to the website operators and to the hosts of those websites.  Ex. B at pp. 69:5-9, 79:3-

14, 82:17-23.  In-house investigation revealed that the websites were hosted by Defendants and the demands were addressed to Defendants' attention.[2]  Louis Vuitton introduced evidence of at least eighteen pre-litigation notices, none of which resulted in "expeditious removal" or disabled access from Defendants' servers.[3]  None of the evidence, or facts revealed by that evidence, were contradicted by any evidence introduced by Defendants.

Louis Vuitton also offered evidence of additional notices transmitted after the litigation was filed concerning scores of additional websites, several of which were the subject of repeated notices.  Not only were these facts undisputed by Defendants, they were largely corroborated by Defendants' own Exhibit 1598, prepared by Defendant Chen, which summarized post-litigation notices and Defendants' purported responses to those notices.  Louis Vuitton offered evidence demonstrating that in several important respects, that summary was inaccurate based on other evidence produced by Defendants.  For example:

- One "notice" was actually a request for production of documents and not an assertion that the websites enumerated in the request were, at the time of the request, hosted on Defendants' servers, Ex. B, pp. 86:11-24;

---

[2] Although two early notices were addressed to a "spun-off" company controlled by Defendant Steve Chen's erstwhile partner Jacques Pham, this was due to the fact that those notices were addressed to Managed Solutions Group, Inc., which had no published website, no published terms of service and which had failed to timely update contact information in online WHOIS databases (despite an admitted contractual obligation to do so).  Coombs Decl. at ¶ 5, Ex. D, Trial Transcript, Aug. 21, 2009 (hereinafter "Ex. D") at pp. 168:24-169:17,180:18-20, Coombs Decl. at ¶ 6, Ex. E, Trial Transcript, Aug. 25. 2009 (hereinafter "Ex. E") at pp. 7:18-9:14, 81:19-83:5, 87:20-89:10.  This error was corrected in subsequent notices to Managed Solutions Group, Inc. and did not affect any of the notices transmitted to co-defendant Akanoc Solutions, Inc.  Ironically, given defendant Steve Chen's handling of the one pre-litigation notice he admitted to having received, it is clear that it made no difference whatsoever any of the notices were sent as they met with equal indifference and inaction.  Ex. D, pp. 198:20-201:13; Coombs Decl. at ¶ 4, Ex. C, Trial Transcript, August 20, 2009 (hereinafter "Ex. C") at pp. 129:16-131:13.

[3] Through a still unexplained failure to preserve evidence of any pre-litigation email communications, Defendants were unable to contradict any of Louis Vuitton's testimony concerning transmission, delivery or inaction in response to these numerous notices.  Ex. D at p. 146:10-23; 198:20-201:13.  Trial Exhibit 528, attached as Exhibit J, was an email communication about one website after the litigation was filed and raised serious questions about Defendant Chen's credibility and whether he believed Defendants had any responsibility to act in response to duly transmitted infringement notices addressed to his attention.  Coombs Decl. at ¶ 11, Ex. J.

1     • Different IP Addresses were essentially the same Main IP Address and same customer

2         despite Defendants' characterizations otherwise, Ex. E, pp. 31:8-32:18;

3     • One website "lovernike.com" was listed in Exhibit 1598 as "not functioning" around

4         11/29/09 when Defendants' other internal records indicated that it had been unplugged

5         by the Defendants on 11/30/09 after repeated abuse complaints, Ex. E, pp. 22:6-25:8;

6         and

7     • The information was also misleading in that it identified only "secondary" IP Addresses

8         that failed to reveal the recurring problem with just a few of Defendants' customers.

9         Ex. E, pp. 25:21-28:21, 59:21-60:14.

10     Defendants asserted that they "did all they could do", despite evidence demonstrating

11  otherwise, as evidenced by the following:

12     • More aggressive measures were undertaken by Defendants in response to complaints

13         lodged by other rights owners, like Microsoft – even before Louis Vuitton filed suit,

14         Ex. B at pp.194:20-195:21, 209:18-210:7, 221:6-223:3;

15     • More aggressive measures were undertaken by Defendants in response to other kinds of

16         complaints, Ex. B at pp. 225:22-226:5;

17     • Defendants rarely, if ever, imposed penalties at their disposal, Ex. B at p. 201:19-23;

18     • Defendants failed to comply with their own contractual obligations to maintain accurate

19         and timely data about themselves and about their customers on the publicly accessible

20         databases relied upon to transmit abuse notices, Ex. E at pp. 7:18-9:14, 81:19-83:5,

21         87:20-89:10;

22     • More aggressive measures were undertaken by them after the suit was filed by Louis

23         Vuitton in response to Louis Vuitton's complaints, Ex. E, pp. 20:23-22:5;

24     • Other ISPs, specifically including Defendants' competitors who also offered purported

25         "unmanaged" services did substantially more and were successful in insuring that abuse

26         complaints resulted in permanent removal of infringing offers from websites about

27         which they received notice, Ex. B at pp. 19:15-20:15, 182:23-184:5;

28

- Testimony by their own expert that domain name filtering is an available and reasonable technology to prevent repeat infringement at the same domain name, Ex. E, pp. 166:4-167:15; and

- Testimony by Defendants' own expert that "not more" than one week is a reasonable amount of time for response to notices to disable access to infringing content, Ex. E, p. 160:7-20.

The evidence was more than enough for the jury to find for Louis Vuitton on liability, to find a number of trademarks and copyrights infringed and to assess damages near the high end of the applicable range for statutory damages under both the Trademark Act and Copyright Act. Entry of a permanent injunction should follow accordingly.

## B. __The Injunctive Relief Sought By Plaintiff Is Proper as In Line With Applicable Legal Authority and Defendants' Own Agreements with Their Customers.__

### a. Injunctive Relief in Infringement Cases is Congressionally Mandated.

Each of Louis Vuitton's claims, for contributory copyright infringement and for contributory trademark infringement, separately provides for entry of a permanent injunction as among the arsenal of remedies expressly contemplated by Congress when enacting the applicable intellectual property protections.

> "The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or to prevent a violation, under subsection (a), (c), or (d) of section 1125 of title 15…."

15 U.S.C. § 1116 (a).

The Copyright Act, in materially similar language, specifies:

> "Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."

17 U.S.C. § 502 (a).

**b.  Plaintiff Meets the Applicable Tests for Entry of an Injunction in This Case.**

The Ninth Circuit has historically employed a two-part test to determine the availability of injunctive relief – in trademark and in copyright cases.

> "Preliminary injunctive relief is available to a party who demonstrates either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).

Although the Supreme Court's decision in *eBay, Inc. v. MercExchange*, has arguably changed this longstanding authority, the same result follows in this case regardless which standard employed by the Court.  In the *eBay* case, the Supreme Court clarified (in the context of a *permanent* injunction in a *patent* case) that a four part test should be employed to determine the availability of injunctive relief:

> "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1840-41 (2006).

Both tests are met as the evidence introduced at trial abundantly supports exercise of this Court's equitable jurisdiction to enter an injunction barring further infringement of Louis Vuitton's valuable trademarks and copyrights.

### 1.   Louis Vuitton Has Suffered Irreparable Harm.

The first factor of the *eBay* test requires that Louis Vuitton show it has suffered irreparable harm before an injunction may be granted*.  Id.*  Irreparable harm is not easily defined.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).  "According to the Fifth Circuit, '[b]y definition, 'irreparable injury' is that for which compensatory damages are unsuitable.'"  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1210

(C.D. Cal. 2007) *quoting from Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992).  The Tenth Circuit has defined "irreparable injury" as "harm…suffered when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits."  *Prairie Band*, 253 F.3d at 1250.  A defendant's probable inability to pay damages can show irreparable harm where an award of monetary damages is almost meaningless "where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant."[4]  *Id.* at 1217.

However, irreparable harm is easily proved in infringement cases.  *C.f. Grokster,* 518 F. Supp. 2d at 1215 ("irreparable harm may not be presumed but in run-of-the-mill copyright litigation, such proof should not be difficult to establish", quoting *Patry on Copyrights*).  Indeed, the ease with which irreparable harm is proved goes some way towards explaining why the presumption has enjoyed such a long life in intellectual property cases.  First among these is the inadequacy of monetary relief.

The inadequacy of monetary relief includes not only the inability to compensate for the harm caused by infringing conduct and the proliferation of fakes and knock-offs in the marketplace, but the inability to accurately quantify monetary damages.  The speculative nature of damages evidences the inadequacy of monetary relief resulting in additional irreparable harm supporting issuance of permanent injunction.  *Grokster*, *supra*, 518 F. Supp. 2d at 1219 (the first two factors "inevitably" overlap quoting from the Supreme Court decision in *eBay)*.

Even if this were not the case, the evidence identified additional forms of irreparable harm, admittedly not readily quantifiable including but not limited to:

(i)    Impairment of the exclusivity which accounts for a part of the premium

pricing which Louis Vuitton products enjoy, Ex. A at pp. 164:2-166:13;

---

[5] Significantly, although not yet filed, Defendants have announced their intention to challenge the jury's determination of statutory damages using every means available and have previously suggested that Defendants would be put out of business by an adverse damages determination.  All further serving to underscore the collection issue would also render monetary relief inadequate. Docket No. 217; Coombs Decl. at ¶ 7, Ex. F, Trial Transcript, Aug. 26, 2009 (hereinafter "Ex. F") at pp. 120:5-7, 130:21-23.

(ii)    Impairment of Louis Vuitton's strict control over production, distribution and marketing of product incorporating its trademarks, Ex. A at pp. 160:25-165:21; and

(iii)    The fostering of an international scheme to conceal the identity of counterfeiters and to enable offshore sellers to benefit from ready access to United States consumers.

Defendants repeated argument that Louis Vuitton has "failed" to show irreparable harm is incorrect and underscores the bankruptcy of their defense.

2.   <u>Remedies Available at Law Are Inadequate to Compensate Louis Vuitton for the Injury Suffered by Virtue of Defendants' Systematic Conduct.</u>

"[T]he requisite analysis for the second factor of the four-factor test inevitably overlaps with that of the first." *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007). Analysis of whether or not there is an adequate remedy at law will usually parallel the analysis of whether or not irreparable harm has occurred. *Grokster*, 518 F. Supp. 2d at 1219.

Defendants have enabled countless counterfeiters, most if not all based out of the United States, to carry out their illegal activity in a manner which complicates identification and facilitates global sales. This only compounds and magnifies the inadequacy of monetary relief otherwise present in more routine infringement cases where the damage to valuable intellectual properties is difficult to measure (and a significant part of the rationale for statutory damages in the first place).

3.   <u>The Balance of Hardships Weigh Heavily in Favor of Entry of an Injunction.</u>

The balance of hardship clearly weighs in favor of Louis Vuitton. Defendants can, like the vast majority of online service providers, conduct business in a manner which does not rely upon the pervasive activity of criminals. Louis Vuitton, on the other hand, depends upon the goodwill and exclusivity associated with its trademarks to engage in its business.

For this factor, "the Court must consider the hardships that might afflict the parties by the grant or denial of Plaintiffs' motion for a permanent injunction." *Id.* at 1220.

Finally, Defendants' argument that the balance of hardship tips in their favor and against Louis Vuitton appears to be predicated solely upon the thrice rejected argument that the Stored Communications Act prevents them from taking action to avoid illegal use of their hosting packages.  This patently absurd argument is predicated upon the assertion that Defendants cannot access websites (the accessibility of which by consumers is the predicate of Louis Vuitton's claims) without being subject to a *criminal* proscription designed to prevent wiretapping and eavesdropping.  This Court need not revisit this argument and, to the contrary, any adoption of those arguments at this time would contradict the Court's prior ruling overruling their objections to Magistrate Judge Lloyd's order expressly finding the objection inapplicable to publicly accessible websites.

Defendants' assertion, unsupported by any foundation or evidence that they "cannot" comply should carry no weight.  Even were the Court inclined to consider this unsupported assertion, prior Ninth Circuit authority holds that a Defendant who "cannot" operate within the bounds of applicable intellectual property laws must discontinue providing service.  In *A&M Records v. Napster, Inc., 284* F.3d 1091 (9th Cir. March 25, 2002), after repeated visits to the District Court and Ninth Circuit, the Ninth Circuit affirmed the district court's decision to force Napster to shut down, until it could comply with the preliminary injunction entered in that case. Should Defendants claim they are unable to comply with an injunction that requires them to follow the law, they should stop engaging in this business until they are able to do so.

4.   The Public Interest is Advanced, not "Disserved" by Entry of a Permanent Injunction.

When conducting public interest analysis, the court should be careful not to rely on any preconceived "categorical rules" with regard to the public interest.  *MercExchange, LLC,* 500 F. Supp. 2d at 586.  The fourth factor posits a negative: that the injunction does not "disserve" the public interest.   In other words, there is no burden on Louis Vuitton, except to rebut the suggestion that the public interest is harmed.

Nonetheless, Louis Vuitton has shown that the public interest is, in several separate respects, advanced through entry of the proposed injunction.

At its most fundamental, the proposed injunction advances the objectives of Congressionally mandated protections for trademark and copyright.  In the case of copyright, the founders recognized the important public interests addressed through the protection of original works in the United States Constitution.  U.S. Const., art. I, § 8.  The public interest advanced through trademark laws which prevent consumer confusion and protect the investment in brand goodwill are equally significant.

But acknowledging these broader underlying public interests does a disservice to the very specific public interests advanced through entry of the proposed injunction in this case.  For example, in addition to curtailing the proliferation of knock-offs and pirated goods, the proposed injunction will "level the playing field" and insure that the Defendants comport themselves with industry standards and are unable to defeat the protections and standards Congress contemplated when it passed the DMCA.  Entering the injunction as proposed by Plaintiff will insure Defendants are publicly accountable as Congress intended and in compliance with what Defendants' own expert describes as industry standards, and reflects meaningful implementation of their own contractual terms of service.

Moreover, Louis Vuitton has proposed an injunction which merely restates Defendants' underlying obligation – not to contributorily infringe Louis Vuitton's rights post entry of the injunction.  The injunction does not add to Defendants' legal obligations, it merely restates them and provides that they will be in contempt should they continue to act as they have in the past.

The injunction is drafted in a way to provide a specific, measurable and understandable procedure to be followed which also provides Defendants: (i) identifiable situations where the injunction will come into play (e.g., not until Defendants have been provided with actual written notice as provided by Louis Vuitton in the format specified by the injunction – which can track the DMCA), and (ii) specific procedures to be followed by Defendants in response to such notices which, if followed by them, will exonerate them from the underlying liability specified in the initial paragraph.

Of course, should Defendants prefer that the injunction contain no clarification of the circumstances in which they should come into play and the enumeration of no procedures to be

adopted in response to actual written notices, Louis Vuitton is prepared to accept the injunction which merely states the general prohibition against further acts of contributory infringement and leave it up to Defendants to manage their business in a manner that satisfies their legal obligations.

**C.** **Notwithstanding the Propriety of a Broad Prohibitory Injunction, it is Within the Court's Discretion to Specify the Procedures Outlined in Louis Vuitton's Proposed Draft Injunction as Endorsed, though Never Implemented by Defendants and as Outlined by the DMCA.**

**a.  The Proposed Injunction Tracks Defendants' Own Service Agreement.**

The evidence, however, should assist the Court in crafting an appropriate permanent injunction. Defendants' own service agreement states that intellectual property infringement is a violation of Defendants' terms of use. Coombs Decl. at ¶ 9, Ex. H, Trial Exhibit 21 (hereinafter "Ex. H") at Section I(B)(ii). The service agreement expressly provides for the responses provided for by Louis Vuitton's proposed draft permanent injunction. Compare Ex. H at Section "II) Violations (C)" with Docket No. 188. In particular, Defendants' own service agreement states that a violation of those terms of service (including copyright and trademark infringement) can result in any one of the following sanctions:

> "(i)     Warning the Customer;
> (ii)    Suspending the offending Customer from the Services.
> (iii)   Terminating the offending Customer from the Services.
> (iv)    Imposing fees or charges on the offending Customer account in accordance with the applicable service contract.
> (v)     Removing the offending content.
> (vi)    Taking other action in accordance with this Policy, the applicable service contract or applicable law."

Ex. H at Section "II) Violations (C)".

To the extent that the proposed form of injunction provides for identification of Defendants' customers, this is consistent with Defendants' own stated understanding of its contractual obligations to the American Registry for Internet Numbers. Ltd. (ARIN). Ex. E at pp.13:3-14:4.

The effect of permanently disabling particular domain names or terminating the accounts of infringers are levels of escalation of action that comport with industry standards as stated by

Defendants' own expert, Ex. E at pp. 161:3-165:3, is consistent with Louis Vuitton's experiences with other so-called "unmanaged" Internet hosts resulting in meaningful removal of offending content, Ex. B at pp. 19:18-20:15, 182:23-184:5, and both contractually and technologically feasible as attested to by Defendants' own expert, Ex. E at pp. 162:5-11, 166:4-167:1. As set forth in greater detail below, the contractual right of termination – which Defendants' are required to "reasonably implement" but which they have never implemented in response to an infringement notice – provides a separate, wholly independent means to insure there is no repetition of the infringing conduct.

Defendants' assertions that these steps are impractical, unworkable or unrealistic, are simply contradicted by their own Service Agreement and Acceptable Use policies, illustrative examples of which are attached hereto as Exhibits H and I (Trial Exhibits 21 and 609 respectively). The fact is, Defendants have numerous tools at their disposal to take the remaining steps contemplated by the Permanent Injunction, whether these are physical (shutting down specific servers); logical (programming filters into their router/firewall) or contractual (suspending or terminating customers liable for offensive behavior). To the extent specific measures Defendants adopt may require some form of cure provision in the draft injunction, Louis Vuitton believes such a cure provision can be incorporated, but to simply reject any attempt to mandate injunction language broadly consistent with Defendants' own policies illustrates that Defendants are either incapable or unwilling to implement procedures which are common across their industry and necessary to insure operation in conformity with applicable law (including but not limited to intellectual property infringement). Whether incapable or unwilling should have no bearing on Defendants' ultimate obligation to comply with applicable law and the terms of the any injunction eventually entered the Court.

### b.  No DMCA Safe Harbor Applied to Defendants and Should Not Provide Any Means for Defendants to Avoid Entry of an Injunction.

The appropriateness of injunctive relief is further supported by the facts adduced at trial concerning the DMCA safe harbor. 15 U.S.C. § 512. Defendants failed to meet their burden to

demonstrate eligibility for any limited safe harbor against injunctive relief under Louis Vuitton's claim for contributory copyright infringement:

- Defendants admittedly filed no notices designating an agent for service of notices under the DMCA with the Copyright Office at any time before the complaint was filed by Louis Vuitton, Ex. D, pp. 172:11-25, 174:14-22;

- Defendant Managed Solutions Group, Inc. still has no published terms of service as required by Section 512(i)(1) of the DMCA, Ex. D, pp. 168:24-169:5;

- Defendants' own expert conceded that websites which were the subject of multiple prior notices were publicly accessible and residing on Defendants' servers months later – even after the litigation was filed – and clearly not within the "reasonable" time frame for response as he indicated is the industry standard and as contemplated by the DMCA, Ex. E, pp. 160:7-20, 207:24-208:25; and

- Defendants' never "reasonably implemented" any policy to terminate repeat offenders as provided by Section 512(i)(1)(A), Ex. D., p. 196:24-197:11, Ex. E, p. 30:7-17.

The DMCA safe harbor cannot now be adopted by the Court as a defense against the relief requested by Louis Vuitton, the jury having expressly found in its special verdict that the Defendants are not eligible for the DMCA safe harbor.  Docket No. 235, Question 12.

Given the continued infringement occurring on Defendants' servers and the lack of voluntary action to stop it, Defendants are still ineligible for the DMCA defense and the injunction proposed by Plaintiff is necessary to force Defendants to simply comply with applicable law.

### c. Termination of Service Has Been Adopted By the Courts as a Correct Response to Repeat Infringement Notices in the DMCA Context as Part of The DMCA's Requirement to Implement A Policy, Something Defendants have Failed To Do.

That termination is not only possible but **required** of online service providers who seek to invoke the DMCA safe harbor is explicit in Section 512(i)(1)(A) of the Copyright Act:

"The limitations on liability established by this section shall apply to a service provider **only** if the service provider –

1

2

3

        (a) has adopted and **reasonably implemented**…a policy that
provides for the **termination** in appropriate circumstances
of subscribers and account holders of the service, provider's
system or network who are **repeat infringers**."

4   17 U.S.C. § 512(i)(1)(A)(emphasis supplied).

5         Louis Vuitton has demonstrated that the Defendants are not eligible for the limitation of

6   liability under that statute and, although one of the Defendant online service providers did publish

7   a policy for termination of repeat infringers, Louis Vuitton has also demonstrated that it has not at

8   any time reasonably implemented that policy.  Indeed, the testimony of Defendant Steve Chen on

9   the issue of DMCA compliance is telling in this respect.  Testifying about the significance of

10  designating an agent for service with the Copyright Office as specified in Section 512(c)(2), Mr.

11  Chen admitted his utter ignorance about the corresponding obligations.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

```
        25   Q:      And what is your understanding of the
                                                    175
        1    requirement under the act for the filing of the
        2    agent notification of the type that we're looking
        3    at right now?
        4    A:      To be honest with you, I don't really
        5    understand. I just know that it's a process that I
        6    need to do.
        7    Q:      Do you have any understanding of the
        8    requirement of the digital millennium copyright act
        9    to have a published terms of service?
        10   A:      I really don't understand that particular law
        11   per se.
        12   Q:      Okay. Do you have any understanding of what
        13   that law requires in response to notices of
        14   infringement transmitted according to its terms?
        15   A:      I don't really understand that law.
        16   Q:      Okay. Are you familiar with the term at all
        17   of expeditious removal?
        18   A:      No.
        19   Q:      So you don't have any understanding about a
        20   requirement that in response to a notice of
        21   infringement a web host or isp that wants to avail
        22   itself of that statute must expeditiously remove
        23   the infringing content that is the subject of the
        24   notice?
        25   A:      I don't understand the language inside or the
                                                    176
        1    language you just talk about.
        2            I'm only doing things is what industry
        3    people do every day.
```

28  Ex. D, pp. 174:25-176:3.

That "reasonable implementation" of a policy to terminate repeat infringers indicates that the contractual power to terminate should, in fact, be exercised, has been adopted by the Courts.  In *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F. Supp. 2d 1146, 1176 (C.D. Cal. 2002) the Court considered the appropriate response to otherwise appropriate notices transmitted under the DMCA where repeated notices were transmitted concerning the same underlying infringement.  The Court noted the applicable legislative history and concluded that termination may be an appropriate response in certain circumstances, specifically including those involving repeat offenses by the same users in a commercial context.

> "When confronted with "appropriate circumstances," however, such service providers should reasonably implement termination. See <u>17 U.S.C. § 512(i)</u>.  These circumstances would appear to cover, at minimum, instances where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users, particularly infringement of a willful and commercial nature. See H.R. Rep. 105-551(II), at 61."

*Id.,* 213 F. Supp. 2d at 1176.  *See, also, Costar Group, Inc. v. Loopnet, Inc*., 164 F. Supp. 2d 688, 703 (D. Md. 2001)(this requirement is designed so that flagrant repeat infringers, who "abuse their access to the Internet through disrespect for the intellectual property rights of others should know there is a realistic threat of losing … access." H.R. Rep. No. 105-551, Part 2, at 61.).

Defendants will no doubt trot out their exhausted and repeatedly rejected argument that the "infringers" are not their customers and, therefore, their customers should not be "penalized" for the unaddressed activities of those selfsame customers' alleged customers.  This argument should be rejected.

First, there is no evidence – one way or the other – about the businesses in which Defendants' alleged customers are engaged.  Defendants having repeatedly argued (and testified to) their purported ignorance about the nature of their customers' underlying business, cannot now set up a purported sub-distribution role concerning which there is no credible testimony or foundation.  Defendants consistently claimed ignorance at trial, for example:

```
4        Q:      How does this work then for somebody using
5                your servers going to somebody doing business with
6                your resellers?
7        A:      I don't really know their relationship, but I
```

8 turn over my service to my reseller and in turn
9 they may resell the whole thing to anybody that
10 actually operates the web site or some other
11 purpose or some other application.
12  I don't really know what my resellers do
13 when they receive a deployment.

Ex. D, p. 78:4-13.

5 Q: How do you know that, if you don't know what your
6 customers do with it?
7 A: Most of the customers that I deal with, we – I
8 deal with them at more like technical level, and they
9 are just hosting resellers.
10 Q: But you said you don't even know whether they are
11 doing websites as opposed to other Internet
12 applications.  How can you say they themselves are not
13 operating the websites or somebody working for them
14 operating the websites that are on their servers?
15 A: I didn't say they don't operate websites; I said I
16 don't know whether they operate a website or not.
17 Q: So it could be that they do in fact operate
18 websites that are on those servers?
19 A: Yes.

Ex. E, p. 11:5-19.

Moreover, even were there an admissible and credible distinction between Defendants'
anonymous customers and those anonymous customers' still more anonymous customers, that
distinction does not undermine the fundamental proposition that Defendants' terms of service
provide that they can terminate their direct customers for specified abuses of service and, to the
extent the Defendants' own customers have failed to take necessary steps to permanently disable
the infringing activity which was the subject of Louis Vuitton's notices of actual infringement,
those customers should be terminated.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court to enter a permanent
injunction in substantially the format of its submitted Proposed Permanent Injunction.

Dated:  December 21, 2009   J. ANDREW COOMBS, A Professional Corporation

          _____/s/ J. Andrew Coombs_____
          By:  J. Andrew Coombs
            Annie S. Wang
          Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

1

2

<u>**DECLARATION OF J. ANDREW COOMBS**</u>

3

I, J. ANDREW COOMBS, declare as follows:

4

1.     I am an attorney at law, duly admitted to practice before the Courts of the State of

5

California and the United States District Court for the Central District of California.  I am an

6

attorney for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff") in an action styled <u>Louis Vuitton</u>

7

<u>Malletier, S.A. v. Akanoc Solutions, Inc., et al.</u>  I make this Declaration in support of Plaintiff's

8

request that the Court enter a permanent injunction against Defendants Akanoc Solutions, Inc.,

9

Managed Solutions Group, Inc. and Steve Chen ("Defendants").  Except as otherwise expressly

10

stated to the contrary, I have personal knowledge of the following facts and, if called as a witness,

11

I could and would competently testify as follows:

12

2.     Attached Exhibit A is a true and accurate copy of portions of the trial transcript

13

from August 18, 2009.

14

3.     Attached Exhibit B is a true and accurate copy of portions of the trial transcript

15

from August 19, 2009.

16

4.     Attached Exhibit C is a true and accurate copy of portions of the trial transcript

17

from August 20, 2009.

18

5.     Attached Exhibit D is a true and accurate copy of portions of the trial transcript

19

from August 21, 2009.

20

6.     Attached Exhibit E is a true and accurate copy of portions of the trial transcript

21

from August 25, 2009.

22

7.     Attached Exhibit F is a true and accurate copy of portions of the trial transcript from

23

August 26, 2009.

24

8.     Attached Exhibit G is a true and accurate copy of Louis Vuitton's proposed draft

25

injunction filed on or about July 31, 2009, as Docket No. 188.

26

9.     Attached Exhibit H is a true and accurate copy of Trial Exhibit 21 ("Service

27

Agreement").

28

10.     Attached Exhibit I is a true and accurate copy of Trial Exhibit 609 ("Acceptable Use Policy").

11.     Attached Exhibit J is a true and accurate copy of Trial Exhibit 528 ("8/08/09 Chen email re ape168.com").

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this 21st day of December, 2009, at Glendale, California.


          /s/ J. Andrew Coombs
          J. ANDREW COOMBS

# EXHIBIT A

```
1    PRODUCT BEARING LOUIS VUITTON TRADEMARKS.

2             I BROUGHT THIS EXHIBIT 82.1 TO COMPARE TO

3    THE NONGENUINE.  THIS IS THE CLOSEST I COULD FIND

4    BECAUSE AGAIN IT'S A PRODUCT THAT WE DO NOT

5    MANUFACTURE ANYMORE.

6    BY MR. COOMBS:

7    Q    AND CAN YOU DESCRIBE FOR US HOW YOU CAN

8    IDENTIFY THE NONGENUINE ARTICLE AS NONGENUINE?

9    A    WELL, AGAIN, QUITE EASY.  THIS PLASTIC

10   PROTECTION OF THE METALLIC PARTS THAT I JUST

11   MENTIONED, THE BUCKLE HERE IS QUITE DIFFICULT TO

12   TURN AND TO CLOSE COMPARED TO THE GENUINE WHICH

13   WORKS VERY SMOOTHLY.

14            THE INTERIOR IS NOT THE SAME.  YOU WILL

15   SEE THE LINING IS NOT THE SAME.

16   Q    THE LINING.

17   A    THE LINING, SORRY.  THE QUALITY OF THE

18   METALLIC PARTS IS QUITE POOR.  THESE CARDS WHICH

19   PROBABLY ARE MADE TO LURE THE CUSTOMER THAT IT'S

20   NOT AN AUTHENTICITY CARD, WE DO NOT DO THESE CARDS.

21            THERE'S A LITTLE BOOKLET INSIDE WHICH IS

22   PRINTED NOT IN THE RIGHT WAY.  PART OF THE TEXT IS

23   ACTUALLY CUT SO THAT'S AN EASY WAY TO SEE THAT IT

24   DOESN'T COME FROM OUR COMPANY.

25   Q    I'LL GIVE YOU A SHORT BREAK FROM PRODUCT
```

160

1    IDENTIFICATION AND MOVE TO -- AND ASK YOU A LITTLE

2    MORE ABOUT THE MANUFACTURING DISTRIBUTION OF

3    GENUINE LOUIS VUITTON.  WHERE IS GENUINE LOUIS

4    VUITTON MADE?

5    A    LOUIS VUITTON PRODUCTS ARE MADE IN LOUIS

6    VUITTON'S OWN MANUFACTURING FACILITIES.  THERE ARE

7    14:  11 IN FRANCE, 2 IN SPAIN, AND 1 IN SAN DIMAS

8    IN CALIFORNIA.  THAT'S FOR LEATHER GOODS.

9         THERE'S ONE MANUFACTURING FACILITY IN

10   ITALY FOR SHOES AND IN SWITZERLAND FOR WATCHES.

11   Q    AND HOW MANY PEOPLE DOES LOUIS VUITTON EMPLOY

12   IN THE UNITED STATES.

13   A    IN THE UNITED STATES LOUIS VUITTON EMPLOYS

14   MORE THAN 1,300 PEOPLE AND MANY IN THE HEADQUARTERS

15   IN THE LOCAL COMPANY OF NEW YORK.

16        IN THE STORE CHAIN THERE ARE AROUND 100

17   STORES ACROSS THE UNITED STATES.  WE EMPLOY A

18   LITTLE BIT MORE THAN 300 PEOPLE IN THE WORKSHOP

19   PRODUCTION IN SAN DIMAS, CALIFORNIA, AND WE

20   EMPLOYED I THINK 30 PEOPLE I THINK IN THE CUSTOMER

21   SERVICE DEPARTMENT IN SAN FRANCISCO.

22   Q    AND ONCE LOUIS VUITTON PRODUCT IS

23   MANUFACTURED, HOW IS IT DISTRIBUTED?

24   A    ONCE LOUIS VUITTON PRODUCTS ARE MANUFACTURED,

25   THEY'RE DISTRIBUTED THROUGH ONE MAIN LOGISTICS

161

1    CENTER LOCATED IN THE SUBURBS OF PARIS AND FOR

2    THESE PRODUCTS MANUFACTURED IN CALIFORNIA, THEY'RE

3    DISTRIBUTED THROUGH THE LOGISTICS CENTER BASED IN

4    MEMPHIS.

5    Q    AND ARE THOSE LOGISTIC CENTERS OWNED BY LOUIS

6    VUITTON?

7    A    YES, THEY ARE.

8    Q    AND THEY'RE OPERATED BY THEM?

9    A    YES, THEY ARE.

10   Q    AND ARE THERE ANY OTHER LOGISTIC CENTERS FOR

11   LOUIS VUITTON PRODUCTS?

12   A    WELL, THERE ARE LOCAL REGIONAL STORAGE

13   FACILITIES, BUT I WOULDN'T CALL THEM LOGISTICS

14   CENTER.

15   Q    THE STORAGE CENTERS ARE OPERATED AND

16   MAINTAINED BY LOUIS VUITTON?

17   A    BY LOUIS VUITTON.

18   Q    SO ARE THERE ANY LICENSEES FOR LOUIS VUITTON

19   MERCHANDISE?

20   A    NO, THERE ARE NO LICENSEES.

21   Q    AND DOES LOUIS VUITTON USE WHOLESALERS TO

22   DISTRIBUTE ANY OF ITS MERCHANDISE?

23   A    NO.

24   Q    ARE THERE ANY INTERVENING THIRD PARTIES

25   BETWEEN THE LOUIS VUITTON OWNED PRODUCTION

162

U.S. COURT REPORTERS

EXHIBIT A

1    FACILITIES THAT YOU DESCRIBED AND THE CONSUMER

2    OTHER THAN LOUIS VUITTON ITSELF?

3    A    NO.  LOUIS VUITTON PRODUCTS ARE PRODUCED IN

4    OUR OWN MANUFACTURING FACILITIES AND ARE

5    DISTRIBUTED THROUGH A WHOLLY OWNED AND CONTROLLED

6    STORE CHAIN.

7    Q    AND CAN YOU DESCRIBE HOW THE STORE CHAIN IS

8    STRUCTURED?

9    A    THERE ARE AROUND 450 STORES AROUND THE WORLD

10   AND IN MOST OF THE CONTINENTS.

11   Q    AND HOW ABOUT DEPARTMENT STORES?

12   A    THERE ARE INDEED ALSO CORNERS IN HIGH-END

13   DEPARTMENT STORES.  THESE CORNERS ARE STAFFED BY

14   LOUIS VUITTON PERSONNEL.

15   Q    IS ANY FINISHED LOUIS VUITTON PRODUCT MADE IN

16   ASIA?

17   A    NO.

18   Q    DOES LOUIS VUITTON ASSIGN ITS TRADEMARKS TO

19   ANYONE ELSE?

20   A    NO.

21   Q    AND DOES IT SELL PRODUCT ON LINE?

22   A    YES, IT DOES BUT IN JUNE OF 2009 LOUIS VUITTON

23   PRODUCTS WERE SOLD ON TWO WEB SITES, ELUXURY.COM,

24   WHICH IS A WEB SITE BELONGING TO LOUIS VUITTON AND

25   LOUIS VUITTON'S OWN WEB SITE LOUISVUITTON.COM AND

163

EXHIBIT A

1    CURRENTLY LOUIS VUITTON IS SELLING OUR PRODUCTS.

2    Q    LOUIS VUITTON PRODUCTS ARE EXPENSIVE, ISN'T

3    IT?

4    A    YES, THEY ARE.

5    Q    AND WHY IS THAT?

6    A    WELL, LOUIS VUITTON'S PRODUCTS ARE, IF I CAN

7    SAY, A SYMBOL OF LUXURY.  WE -- OUR CUSTOMERS DREAM

8    ABOUT THE BEST PRODUCT, THE PERFECT PRODUCT, AND

9    THIS IS COSTLY.

10          LOUIS VUITTON, ONE OF THE KEYS TO LOUIS

11   VUITTON'S SUCCESS IS THE QUALITY, AND WE REQUIRE

12   THE HIGH QUALITY STANDARDS AT ANY LEVEL FROM THE

13   HEAD OFFICES THROUGH THE STORES AND MANUFACTURING

14   FACILITIES.

15          THERE ARE QUALITY CHECKS AND AT ALL

16   LEVELS OF THE PRODUCTION AND THEY'RE SUPPLEMENTED

17   BY SELF-CHECKS BY THE OPERATOR DURING THE VARIOUS

18   OPERATIONS THAT HE PERFORMS WHEN THE PRODUCTS HE'S

19   MADE.

20          THIS REQUIRES, OF COURSE, VERY CAREFUL

21   SELECTION OF RAW MATERIALS WHICH COST -- WHICH ARE

22   COSTLY.  SOME OF THE RAW MATERIALS SUCH AS THE

23   EXOTIC AND SOME EXOTIC LETTERS ARE EVEN SO RARE AND

24   SO DIFFICULT TO SOURCE THAT WHEN A CUSTOMER MAKES

25   AN ORDER FOR SUCH PRODUCT, HE NEEDS TO WAIT UNTIL

164

EXHIBIT A

1    THE PARTICULAR OR PIECE OF EXOTIC LEATHER IS

2    AVAILABLE COULD COME FROM -- IT'S DIFFICULT TO

3    SOURCE.

4    Q    SO IF LOUIS VUITTON CAN COMMAND SUCH A PRICE

5    FOR ITS PRODUCT WHY DOES IT CARE ABOUT THE

6    NONGENUINE PRODUCT THAT WE HAVE BEEN LOOKING AT?

7    A    WELL, I WASN'T --

8    Q    I'M SORRY.  DID I INTERRUPT?

9    A    WE ALSO MANUFACTURE IN COUNTRIES WITH HIGH

10   LABOR COSTS.  WE SHOULD BE PARTICULARLY IN EUROPE.

11   WE'RE PROBABLY AMONGST THE LAST COMPANIES THAT DO

12   NOT OUTSOURCE PRODUCTION IN LOW COST PRODUCTION

13   COUNTRIES PRECISELY BECAUSE WE NEED TO SOURCE THE

14   BEST QUALITY PRODUCT.

15   Q    SO --

16   A    ALSO THE SALE OF LUXURY GOODS REQUIRES QUITE

17   EXPENSIVE COMMUNICATION AND ADVERTISING CAMPAIGNS

18   WHICH IS THIS ADDITIONAL COST GOES TO THE END PRICE

19   OF THE PRODUCT.

20   Q    SO A CONSIDERABLE EXPENSE ON MARKETING?

21   A    YES.

22   Q    SO IF LOUIS VUITTON CAN COMMAND A PREMIUM

23   PRICE FOR ITS PRODUCT, THEN WHY DOES IT CARE ABOUT

24   THE NONGENUINE PRODUCT THAT YOU'VE BEEN LOOKING AT?

25   A    WELL, IT'S A BIG PROBLEM FOR US.  NOT ONLY

165

EXHIBIT A

1    BECAUSE IT'S A CUSTOMER WHO PURCHASES A NONGENUINE

2    PRODUCT WILL PROBABLY NOT BUY OUR PRODUCT, BUT ALSO

3    BECAUSE PEOPLE WHO HAVE -- WHO LOVE OUR PRODUCT SO

4    MUCH THAT THEY WOULD SAVE MONEY FOR A LONG TIME TO

5    BUY A BAG THAT THEY DREAMED FOR A LONG TIME, THEY

6    ARE GENUINELY DISGUSTED WHEN THEY SEE A CHEAP

7    IMITATIONS OF THIS BAG ALL OVER THE PLACE.

8             WE RECEIVE MANY, MANY COMPLAINTS OF SUCH

9    PEOPLE.

10   Q    SO HOW IS IT THAT LOUIS VUITTON IS HARMED BY

11   THESE NONGENUINE PRODUCTS.

12   A    THE IMAGE OF THE COMPANY AS A LUXURY BRAND

13   SUFFERS FROM THESE PRODUCTS.

14   Q    SO GIVEN THAT, WHAT DOES LOUIS VUITTON DO TO

15   ADDRESS THE PROBLEM -- WHEN WE TALK ABOUT

16   "NONGENUINE SALES" WE'RE TALKING ABOUT MERCHANDISE

17   THAT LOUIS VUITTON HAS NOT MADE; IS THAT CORRECT?

18   A    YES.

19   Q    AND SO WHAT DOES LOUIS VUITTON DO TO TRY TO

20   CURTAIL THE SALE OF SUCH MERCHANDISE?

21   A    LOUIS VUITTON EMPLOYS WITHIN THE INTELLECTUAL

22   PROPERTY DEPARTMENT 40 PEOPLE FULLY DEDICATED ON

23   THIS KIND OF ISSUES MAINTAINING OUR RIGHTS AND

24   ENFORCING THEM.

25             THIS TEAM OF 40 PEOPLE IS MAINLY BASED IN

                                                   166

EXHIBIT A

1    PARIS WITH LOCAL OFFICERS AROUND THE WORLD IN NEW

2    YORK, BUENOS AIRES, MULAN, DUBAI, HONG KONG, AND

3    TOKYO.

4    Q    AND WHAT KIND OF BUDGET DOES LOUIS VUITTON

5    ALLOCATE TO DEALING WITH THIS ISSUE ON AN ANNUAL

6    BASIS?

7    A    AROUND 15 MILLION EUROS PER YEAR WHICH WOULD

8    BE MORE THAN $20 MILLION.

9    Q    TURNING TO YOUR OFFICES AND HOW DID YOU LEARN

10   ABOUT LOUIS VUITTON DISTRIBUTION OF COUNTERFEITS?

11   A    THERE ARE SEVERAL INFORMATION ABOUT LOUIS

12   VUITTON DISTRIBUTION OF COUNTERFEITS.  THE ONE

13   SOURCE WE GET IS BY OUR CUSTOMERS.  OUR CUSTOMERS

14   CAN REACH OUR CUSTOMER SERVICE DEPARTMENTS BY PHONE

15   CALL OR AN E-MAIL AND THEY ACTUALLY DO SO VERY

16   OFTEN AND REPORT COUNTERFEIT SALES TO US.

17          WE ALSO EMPLOY AN EXTERNAL SERVICE

18   PROVIDER SPECIFICALLY FOR ONLINE DISTRIBUTION OF

19   COUNTERFEITS.  THIS COMPANY MAINTAINS THE DATABASE

20   FOR US OF COUNTERFEIT WEB SITES AND THIS DATABASE

21   IS UPDATED TWICE A MONTH WHERE NEW COUNTERFEIT WEB

22   SITES ARE ADDED.

23   Q    AND HOW DO CUSTOMERS COMPLAINTS ABOUT ONLINE

24   INFORMATION REACH YOUR OFFICE?

25   A    THEY REACH OUR OFFICE VIA OUR CUSTOMER SERVICE

                                                    167

EXHIBIT A

1    DEPARTMENT.

2              FOR EXAMPLE, WHEN AN E-MAIL IS RECEIVED

3    BY THE CSD, THE CSD WILL REPLY TO THE CUSTOMER AND

4    WILL COPY OUR INTELLECTUAL PROPERTY DEPARTMENT TO

5    THE E-MAIL.  RESPONSE TO THE CUSTOMER.

6    Q    SO YOUR OFFICE WOULD RECEIVE A COPY OF THE

7    RESPONSE BEING SENT TO THE CONSUMER?

8    A    YES.

9    Q    AND DOES YOUR OFFICE RETAIN THOSE REPORTS IN

10   THE NORMAL COURSE?

11   A    YES.

12   Q    DID YOU TAKE --

13   A    WE ALSO -- THERE ARE ALSO MANY CUSTOMERS WHO

14   COME TO THE STORES AND COMPLAIN ABOUT IT, IN THIS

15   CASE THE STORES THAT WOULD TRANSFER INFORMATION TO

16   US.

17             WE ALSO RECEIVE INFORMATION FROM A WIDE

18   NETWORK OF AGENTS AND INVESTIGATORS AND LAWYERS

19   AROUND THE WORLD WHO WORK WITH US.

20   Q    AND WHY DO CUSTOMERS COME INTO THE LOUIS

21   VUITTON STORES TO COMPLAIN ABOUT NONGENUINE

22   MERCHANDISE?

23   A    WELL, THAT HAS HAPPENED ON SEVERAL OCCASIONS

24   AND IT'S BECOMING A REAL PROBLEM FOR LOUIS VUITTON

25   BECAUSE IT ACTUALLY DIVERTS OUR STAFF FROM SELLING

                                                   168

EXHIBIT A

1    PRODUCTS TO AUTHENTICATING GOODS.

2           PEOPLE COME AND MAKE PURCHASES ON THE

3    INTERNET AND THINKING THAT THEY HAVE PURCHASED AN

4    AUTHENTIC LOUIS VUITTON ITEM AND ACTUALLY THEY

5    RECEIVE A FAKE SO THEY COME IN THE STORE AND THEY

6    ASK OUR STAFF TO AUTHENTICATE THE PRODUCT.

7           VERY OFTEN THE GOAL OF THIS

8    AUTHENTICATION IS TO ASK LOUIS VUITTON TO PROVIDE A

9    CERTIFICATE SO THAT THE CUSTOMER -- SO THAT THESE

10   PEOPLE GET A REFUND FROM THEIR CREDIT CARD OR FROM

11   COMPANIES SUCH AS PAY PAL.

12   Q    I THINK BY YOUR FEET THERE SHOULD BE A BINDER

13   OF VOLUME 1 AND IN IT EXHIBIT 74.  IF YOU COULD

14   TAKE A LOOK AT IT AND IDENTIFY IT FOR US.

15   A    EXHIBIT 74 IS A RESPONSE VIA E-MAIL BY OUR

16   CUSTOMER SERVICE DEPARTMENT TO A LOUIS VUITTON

17   CUSTOMER, AND WE HAVE BEEN BLIND COPIED ON THIS

18   E-MAIL.

19          IN THE HISTORY OF THE E-MAIL WE ACTUALLY

20   SEE THE ACTUAL COMPLAINT RECEIVED BY THE LOUIS

21   VUITTON CUSTOMER.

22   Q    AND THIS IS THE TYPE OF CUSTOMER COMPLAINT

23   THAT YOU WERE DESCRIBING EARLIER THAT IS ROUTINELY

24   COPIED, THE RESPONSE IS ROUTINELY COPIED TO YOUR

25   OFFICE?

                                                   169

EXHIBIT A

1      A    YES.

2      Q    AND IT'S A DOCUMENT THAT IS RETAINED IN THE

3      NORMAL COURSE OF YOUR --

4      A    YES.

5           MR. COOMBS:  I WOULD MOVE EXHIBIT 74 INTO

6      EVIDENCE.

7           THE COURT:  AGAIN, IT'S NOT NECESSARY TO

8      FORMALLY MOVE AS LONG AS THERE'S NO OBJECTION.  IF

9      YOU KNOW THERE'S A TENDERED OBJECTION -- BUT

10     OTHERWISE 74 IS IN EVIDENCE AND WILL BE

11     DISPLAYED.

12          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 74,

13               HAVING BEEN PREVIOUSLY MARKED FOR

14               IDENTIFICATION, WAS ADMITTED INTO

15               EVIDENCE.)

16          MR. COOMBS:  I APOLOGIZE.  CAN YOU READ

17     THE CONSUMER COMPLAINT THAT IS REFLECTED IN EXHIBIT

18     74?

19          THE WITNESS:  THIS CUSTOMER REPORTS THE

20     WEB SITE ATOZBRAND, AND IT'S ONE OF THE WEB SITES

21     POSTED BY THE DEFENDANTS FOR WHICH THEY HAVE BEEN

22     NOTIFIED.  AND IT READS, "I AM SICK AND TIRED OF

23     COPIES OF YOUR PRODUCTS."

24          THE COURT:  LET ME INTERRUPT YOU BEFORE

25     YOU KEEP GOING.  IS THERE A WAY TO ZOOM IN ON THAT

                                                    170

1    EXHIBIT SO WE CAN SEE WHAT IS BEING READ?

2              MR. COOMBS:  IF YOU WOULD WAIT JUST A

3    MOMENT, SIR.

4              THE COURT:  ALL RIGHT.  GO AHEAD.  GO

5    AHEAD.

6              THE WITNESS:  "I'M SICK AND TIRED OF

7    COPIES OF YOUR PRODUCTS.  IT'S DESTROYED YOUR BRAND

8    WHICH MY WIFE AND I LIKE A LOT.  I DID FIND A BIG

9    PRODUCER AND SELLER IN CHINA.  IT LOOKS LIKE FAKES,

10   AND I HEREBY GIVE YOUR THE WEB PAGE WHICH I FOUND

11   THROUGH ALIBABA.COM."

12   Q    HAVE YOU FOLLOWED THAT WEB SITE?

13   A    YES.

14   Q    AND WHAT DO YOU KNOW ABOUT THAT WEB SITE?

15   A    THIS IS ONE OF THE WEB SITES ORIGINALLY BEFORE

16   THE COMPLAINT THAT WE ORIGINALLY COMPLAINED ABOUT

17   TO DEFENDANTS.

18   Q    WHAT IS THE OTHER REASONS THAT YOU DESCRIBE

19   REPORTS FROM YOUR OFFICE OF THE REPORTS OF ONLINE

20   MONITORING?  COULD YOU DESCRIBE FOR THE JURY HOW

21   THAT WORKS?

22   A    AS I SAID, LOUIS VUITTON IT HAS ITS OWN ONLINE

23   OFFER OF GOODS THROUGH THE WEB SITE

24   LOUISVUITTON.COM.  IT'S VERY IMPORTANT FOR US THAT

25   THIS WEB SITE HAVE A GOOD RANKING ON SEARCH ENGINES

171

1    AND THAT ITS POSITIONS ON SEARCH ENGINES SUCH AS

2    YAHOO, GOOGLE, AND TWITTER IS NOT POLLUTED BY THE

3    COUNTERFEIT MERCHANDISE.

4           SO WE WOULD REGULARLY MONITOR SEARCH

5    ENGINES BY ACQUIRING THEM, SEARCH ENGINES OR SEARCH

6    TERMS SUCH AS LOUIS VUITTON AND MAKE SURE THAT NEXT

7    TO OUR WEB SITE THAT USUALLY APPEARS AT THE FIRST

8    POSITION THERE ARE NO OTHER OFFERS FOR COUNTERFEIT

9    GOODS.

10          IF THERE ARE SUCH, WE WOULD ACT AGAINST

11   THEM AS A PRIORITY.

12   Q    YOU MENTIONED THAT YOU RECEIVE REPORTS FROM

13   OUTSIDE VENDORS, INVESTIGATORS AND SO FORTH.  WHY

14   IS THAT?  DO YOU HAVE ANY UNDERSTANDING AS TO WHY

15   THEY BRING THOSE REPORTS TO YOUR ATTENTION?

16   A    WELL, AS I SAID, THEY ARE SERVICE PROVIDERS SO

17   SOME OF THEM WANT TO DO BUSINESS WITH US, AND,

18   THEREFORE, THEY TRY TO BE NICE BY SENDING US

19   INFORMATION.

20   Q    AND IS ROB HOLMES AN INVESTIGATIVE AGENCY ONE

21   OF THOSE VENDORS THAT YOU DEAL?

22   A    YES.

23   Q    AND HOW LONG HAVE YOU BEEN WORKING WITH

24   MR. HOLMES ON THE INVESTIGATION WITH ONLINE

25   INFRINGEMENT OF LOUIS VUITTON'S PROPERTIES?

172

EXHIBIT A

# EXHIBIT B

1  OF COPYRIGHT INFRINGEMENTS.

2       HOWEVER, IN PRACTICE IT'S ALSO USED FOR

3  THE IDENTIFICATION OF TRADEMARK IDENTIFICATIONS.

4  Q   AND APPROXIMATELY HOW MANY OF THESE LETTERS

5  GET SENT OUT ON A MONTHLY BASIS?

6  A   A HUNDRED PLUS.

7  Q   AND CAN YOU ESTIMATE FOR US THE RATE OF

8  RESPONSE THAT YOU RECEIVED FOR THESE LETTERS IN

9  TERMS OF SUCCESSFULLY REMOVING THE OFFERING THAT

10  ARE THE SUBJECT OF THE LETTERS?

11  A   FOR LETTERS SENT TO U.S. BASED WEB HOSTS THIS

12  RATE IS ALMOST 100 PERCENT.  SOMETIMES IT DOESN'T

13  WORK FOR THE FIRST -- AT THE FIRST ATTEMPT, BUT IT

14  USUALLY WORKS WITH A FOLLOW-UP LETTER.

15  Q   AND DO YOU HAVE EXPERIENCE TRANSMITTING

16  SIMILAR DEMANDS TO WHOLESALERS OF INTERNET CAPACITY

17  SUCH AS DEFENDANTS CLAIM TO BE HERE?

18  A   I HAVE INDEED EXPERIENCE WITH NOTIFYING

19  COMPETITORS TO DEFENDANTS, A COMPANY THAT HAS QUITE

20  SIMILAR ACTIVITY.

21  Q   AND DO YOU HAVE A SIMILAR RESPONSE TO THOSE AS

22  YOU HAVE HAD WITH DEFENDANTS, OR IS IT MORE GENERAL

23  CONSISTENT PRACTICE THAT YOU HAVE HAD WITH

24  DEFENDANTS?

25  A   WELL, IN THE BEGINNING WE HAVE HAD TROUBLE

19

1    OBTAINING ANY RESPONSE.  IT WAS A SIMILAR

2    EXPERIENCE TO THE ONE WE HAD WITH DEFENDANTS,

3    HOWEVER, AFTER A FEW THREATENING LETTERS THEY

4    STARTED COOPERATING WITH US.

5    Q    AND CAN YOU DESCRIBE THE NATURE OF THAT

6    COOPERATION?

7    A    WELL, THIS COMPANY HAS RESELLERS SUCH AS THE

8    ONES THAT THE DEFENDANTS HAVE SO WE WERE REFERRED

9    TO THE RESELLERS DIRECTLY.  WE OBTAINED THE CONTACT

10   INFORMATION OF THE RESELLERS AND WE SENT OUR

11   NOTIFICATION DIRECTLY TO THEM.

12        IN A FEW CASES, WE DID NOT RECEIVE ANY

13   COOPERATION FROM THE RESELLERS AND WE ASKED THIS

14   COMPANY TO DO SOMETHING ABOUT IT, AND THEY ACTUALLY

15   HELPED US.  THEY COOPERATED AND THEY -- I IMAGINE

16   THEY FORCED THEIR RESELLER TO COMPLY.

17        MR. LOWE:  EXCUSE ME.  EXCUSE ME.  IT

18   SOUNDS LIKE THE WITNESS IS ABOUT TO SPECULATE.

19        THE COURT:  SUSTAINED.  THE JURY WILL

20   DISREGARD THE ANSWER AFTER "I SUSPECT."  IT WAS

21   INTERRUPTED BY THE OBJECTION, BUT THERE WERE WORDS

22   SAID ABOUT THE SUSPICIONS ABOUT WHAT OCCURRED, AND

23   YOU SHOULD DISREGARD THAT.

24        GO AHEAD AND REASK ANOTHER QUESTION.

25   BY MR. COOMBS:

                                                    20

EXHIBIT B

1    Q    COULD YOU SCROLL DOWN.  AND WHAT NEXT DID YOU

2    DO IN CONNECTION WITH WENDY929?

3    A    I'M SORRY.  I CANNOT SEE.  I WOULD HAVE TO

4    REFER TO THE --

5    Q    HAVING DETERMINED THAT THE OFFERS WERE

6    COUNTERFEIT OR UNAUTHORIZED, WHAT DID YOU DO NEXT

7    WITH 929?

8    A    WELL, THE USUAL PROCEDURE WAS NOTIFY THE

9    OPERATOR AND THE WEB HOST.

10   Q    COULD YOU PULL UP EXHIBIT 63.2 AND ADVISE

11   WHETHER THAT WAS PART OF YOUR FURTHER

12   INVESTIGATION?  I'M SORRY.  64.2.

13   A    THIS IS A DOMAIN TOOLS PRINTOUT OF OCTOBER

14   30TH, 2006 SHOWING THAT THE WEB SITE WENDY929.NET

15   AND IT IS IDENTIFIED WITH DEFENDANTS AND FOR AKANOC

16   SOLUTIONS.

17   Q    AND YOU VERIFIED THE IP ADDRESS USING THE

18   ALTERNATIVE MECHANISMS THAT YOU DESCRIBED EARLIER?

19   A    THAT HAS BEEN DONE AND DOUBLE-CHECKED.

20   Q    AND WHAT DID YOU DO NEXT IN CONNECTION WITH

21   WENDY929?

22   A    I SENT NOTIFICATION TO THE WEB HOST.

23   Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT 60

24   AND TELL US WHAT THAT IS?

25   A    THIS IS A NOTIFICATION SENT TO MANAGED

69

1              THE COURT:  SUSTAINED.

2    BY MR. COOMBS:

3    Q    WHAT INVESTIGATION DID YOU DO IN RESPONSE TO

4    THE INFRINGEMENTS THAT YOU DETERMINED EXISTED ON

5    ATOZBRAND.COM?

6    A    WELL, I TRIED TO NOTIFY THE -- I HAD NOTIFIED

7    THE OPERATOR AND I TRIED ON SEVERAL OCCASIONS TO

8    NOTIFY THE WEB HOST MANAGED SOLUTIONS GROUP AND

9    AKANOC AS THE WEB SITE WAS MOVING FROM A SERVER

10   ASSIGNED TO MANAGED SOLUTIONS GROUP TO ITS SERVER

11   ASSIGNED TO AKANOC, VICE VERSA.

12              AND AS THERE WAS NO REACTION, I ASKED

13   YOUR OFFICE TO FILE A COMPLAINT AGAINST DEFENDANTS

14   MANAGED SOLUTIONS GROUP AND AKANOC.

15   Q    I WOULD ASK YOU TO TAKE A LOOK AT EXHIBIT 15

16   AND ASK YOU IF THAT IS PART OF THE DEMAND

17   CORRESPONDENCE THAT YOU JUST DESCRIBED?

18   A    YES.

19   Q    AND DID YOU RECEIVE ANY RESPONSE TO THAT

20   COMMUNICATION?

21   A    NO.

22   Q    AND SO YOU SENT A FOLLOW-UP LETTER THEREAFTER?

23   A    YES.

24   Q    AND I WOULD ASK YOU TO LOOK AT EXHIBIT 17.

25   AND IS THAT A COPY OF THE FOLLOW-UP THAT WAS

                                              79

1     THINK YOU MENTIONED EARLIER THAT YOU RECEIVED A

2     REPORT CONCERNING INFRINGEMENT AT THAT SITE.

3     A    I'M SORRY.

4     Q    ARE YOU FAMILIAR WITH THE WEB SITE BAG925.COM?

5     A    YES.

6     Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

7     72.1.  IS THAT A WEB SITE PRINTED ON OR ABOUT THE

8     DATE INDICATED?

9     A    IT HAS BEEN PRINTED OUT ON OCTOBER 9TH, 2006

10    IN MY OFFICE.  IT'S A PRINTOUT OF THE WEB SITE

11    BAG925.COM.

12    Q    AND WERE YOU ABLE TO DETERMINE WHETHER THE

13    PRODUCTS OFFERED WERE GENUINE?

14    A    THE PRODUCTS ARE NONGENUINE.

15    Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

16    73.2.

17    A    THIS IS A DOMAIN TOOLS PRINTOUT ON THE QUERY

18    FOR THE BAG925.COM PRINTED OUT ON OCTOBER 9TH,

19    2006.

20         IT TELLS US THAT THE WEB SITE HAS BEEN

21    POSTED BY AKANOC SOLUTIONS, INC.

22    Q    AND YOU SEPARATELY VERIFIED THE IP ADDRESS

23    INDICATED IN THE --

24         MR. LOWE:  OBJECTION, LEADING.

25         THE COURT:  SUSTAINED.

81

1    BY MR. COOMBS:

2    Q    DID YOU DO ANYTHING FURTHER TO VERIFY HOSTING

3    INFORMATION?

4    A    I DOUBLE-CHECKED THIS INFORMATION BY NETSCAN

5    TOOLS.

6    Q    NETSCAN TOOLS.

7         I WOULD ASK THE WITNESS TO LOOK AT

8    EXHIBIT 73.1?

9    A    THIS IS A DOMAIN TOOLS PRINTOUT OF A

10   HISTORICAL CHECK FOR THE HOSTING OF BAG925.COM

11   PRINTED OUT ON OCTOBER 3RD, 2008.

12   Q    AND I WOULD ASK THE WITNESS TO LOOK AT 73.3.

13   THAT IS ANOTHER PRINTOUT?

14   A    THAT'S ANOTHER PRINTOUT SHOWING THE HOSTING

15   HISTORY FOR BAG925.COM.  IT HAS BEEN PRINTED OUT IN

16   MY OFFICE ON JULY 24TH, 2008.

17   Q    AND IN RESPONSE TO YOUR INVESTIGATION, WHAT

18   DID YOU DO NEXT IN TERMS OF ADDRESSING THE SALE OF

19   NONGENUINE MERCHANDISE?  I DON'T MEAN AFTER THE

20   73.3, BUT AFTER YOU DETERMINED THAT THERE WAS

21   NONGENUINE MERCHANDISE, WHAT ACTION DID YOUR OFFICE

22   TAKE?

23   A    I CONTACTED THE WEB OPERATOR AND THE HOST.

24   Q    AND I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

25   2.  IS THAT A COPY OF THE FOLLOW UP OF THE HOST FOR

                                              82

1    WE FOLLOWED UP WITH A MORE FORMAL LETTER AND NO

2    RESPONSE.

3              THIS WEB SITE HAS ALSO MOVED SEVERAL

4    TIMES AND HAS CHANGED SEVERAL TIMES AND THE RANGE

5    ASSIGNED TO THE DEFENDANTS.

6    Q    AND I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

7    5 THAT HAS BEEN IDENTIFIED.

8    A    THIS IS A FOLLOW-UP LETTER SENT ON MARCH 19TH,

9    2007 SENT TO AKANOC SOLUTIONS, INC., ASKING THEM TO

10   RESPOND TO OUR FEBRUARY 21ST, 2007 LETTER.

11   Q    AND YOU RECEIVED NO RESPONSE TO THAT

12   COMMUNICATION?

13   A    NO, I DIDN'T.

14   Q    I WOULD ASK THE WITNESS -- DO YOU STILL HAVE

15   EXHIBIT 1598?

16   A    YES.

17   Q    THOSE ARE THE FIVE -- WE JUST TALKED ABOUT THE

18   FIVE WEB SITES THAT ARE INDICATED AT THE TOP;

19   CORRECT?

20   A    YES.

21   Q    DID LOUIS VUITTON CONTINUE TO IDENTIFY WEB

22   SITES INFRINGING LOUIS VUITTON INTELLECTUAL

23   PROPERTIES ON SERVERS THAT YOU DETERMINED WERE

24   OWNED BY THE DEFENDANTS?

25   A    YES.

85

1    Q    AND ARE THOSE REPORTS REFLECTED IN EXHIBIT

2    1598?

3    A    YES.

4    Q    YOU HAVE NO KNOWLEDGE OF THE SPECIFIC ACTION,

5    IF ANY, WAS TAKEN IN RESPONSE TO THE NOTICES THAT

6    WERE TRANSMITTED --

7            MR. LOWE:  EXCUSE ME.  OBJECTION.

8    LEADING.

9            THE COURT:  SUSTAINED.

10   BY MR. COOMBS:

11   Q    IS THIS -- YOU MENTIONED EARLIER THIS DOCUMENT

12   WAS INACCURATE IN RESPECT TO THE FIRST FIVE WEB

13   SITES LISTED ON THE EXHIBIT.  IS IT INACCURATE IN

14   ANY OTHER RESPECTS?

15   A    YES, IT'S -- IT GIVES US A LIST OF DOMAIN

16   NAMES AND A DATE ON WHICH THE DEFENDANTS HAVE

17   RECEIVED THEIR NOTIFICATION FROM OUR PART, HOWEVER,

18   TWO OF THE DATES DID NOT CORRESPOND TO ACTUAL

19   NOTIFICATION.

20   Q    WHICH DATES WERE THOSE?

21   A    MARCH 1ST, 2008 WAS A REQUEST FOR PRODUCTION.

22   Q    ACTUALLY THERE IS NO MARCH 1ST.  DO YOU MEAN

23   JANUARY 1ST?

24   A    OR JANUARY 3RD, 2008.

25   Q    THIS DOCUMENT WAS NOT PREPARED BY YOU; IS THAT

86

1    Q    WHAT ARIN REPORTS ARE YOU TALKING ABOUT?

2    A    I'M TALKING ABOUT IP WHOIS REPORTS OBTAINED

3    FROM ARIN.

4    Q    IS THERE AN EXHIBIT THAT WE HAVE SEEN TODAY

5    THAT CAME FROM ARIN?

6    A    TODAY?  NO.

7    Q    IN FACT, YOU HAVEN'T PRESENTED ANY ARIN

8    REPORT, HAVE YOU?

9    A    I BELIEVE THERE ARE MANY WITHIN THE EXHIBITS.

10   Q    HAVE WE SEEN ANY OF THEM IN THIS TRIAL?

11   A    YOU HAVEN'T DIRECTED ME TO ANY OF THEM.

12   Q    AND YOUR COUNSEL HASN'T EITHER; IS THAT RIGHT?

13   A    NO, BECAUSE THE DOMAIN TOOLS REPORT ARE

14   PROVIDING THE SAME INFORMATION.

15          MR. LOWE:  I THINK THAT'S ALL I HAVE,

16   YOUR HONOR.

17          THE COURT:  ANY QUESTIONS FROM THE

18   PLAINTIFF'S COUNSEL?

19          MR. COOMBS:  YOUR HONOR, JUST A COUPLE

20   THAT WILL HOPEFULLY HELP CLARIFY.

21              **FURTHER REDIRECT EXAMINATION**

22   BY MR. COOMBS:

23   Q    YOU INDICATED THAT LOUIS VUITTON HAS A -- HAS

24   WORKED OUT A WAY OF DEALING WITH THE RESELLER

25   SITUATION THROUGH SOFT LAYER WHICH YOU UNDERSTAND

                                                    182

EXHIBIT B

1    TO HAVE A SIMILAR SORT OF RELATIONSHIP WITH ITS

2    CUSTOMERS TO THE RELATION THAT THE DEFENDANT HAS

3    WITH ITS CUSTOMERS?

4    A    WELL, ACTUALLY WE FOUND OUT THAT SOME OF THEM

5    RESELLERS OR DOWNSTREAM PROVIDERS FOR SOFT LAYER

6    ARE THE SAME AS SOME OF THE DOWNSTREAM PROVIDERS OF

7    DEFENDANTS.

8    Q    AND DOES SOFT LAYER PROVIDE INFORMATION THAT

9    ALLOWS YOU TO CONTACT THE DOWNSTREAM PROVIDER

10   DIRECTLY?

11   A    SOFT LAYER HAS PROVIDED TO ARIN WHOIS -- HAS

12   PROVIDED IN ARIN WHOIS IP REPORT SUFFICIENT

13   INFORMATION ALLOWING US TO CONTACT DIRECTLY THE

14   DOWNSTREAM PROVIDER OR THE RESELLER.

15   Q    SO INSTEAD OF HAVING ABUSE@SOFTLAYER.COM AS A

16   CONTACT IN THAT CONTEXT, IT WOULD HAVE AN E-MAIL

17   SPECIFIC TO THE DOWNSTREAM PROVIDER?

18   A    YES.

19   Q    AND WHEN YOU COMMUNICATE WITH THE DOWNSTREAM

20   PROVIDER, YOU COMMUNICATE WITH THEM THE SAME WAY

21   YOU HAVE TESTIFIED TO EARLIER TODAY IN TERMS OF

22   DEALING WITH ISP'S?

23   A    YES, WE WOULD ADDRESS -- EXCUSE ME -- WE WOULD

24   ADDRESS OUR NOTIFICATION DIRECTLY TO THE DOWNSTREAM

25   PROVIDER.

183

U.S. COURT REPORTERS

EXHIBIT B

1              WE WOULD COPY SOFT LAYER TO THE E-MAIL

2      AND IF OUR LETTER IS IGNORED BY THE DOWNSTREAM

3      PROVIDER OR THE RESELLER, WE WOULD ADDRESS THE

4      SITUATION DIRECTLY WITH THE SOFT LAYER AND THAT'S

5      USUALLY ENOUGH TO SOLVE THE PROBLEM.

6      Q    THANK YOU.

7              I HAVE NO FURTHER QUESTIONS.

8              THE COURT:  VERY WELL.  YOU MAY STEP

9      DOWN.

10             THE WITNESS:  THANK YOU.

11             THE COURT:  CALL YOUR NEXT WITNESS.

12             MS. WANG:  YOUR HONOR, OUR NEXT WITNESS

13     WILL BE JULIANA LUK, AND WE'LL BE READING IT.

14             THE COURT:  VERY WELL, YOU'RE GOING TO DO

15     IT RESPONSIVELY?  SOMEONE WILL READ THE QUESTION

16     AND SOMEONE WILL READ THE ANSWER?

17             MS. WANG:  YES.

18             THE COURT:  SOMETIMES THE CASE IS THAT

19     THE WITNESS IS NOT HERE AND THE DEPOSITION WILL BE

20     READ TO YOU OF THAT WITNESS.  TO HAVE YOU FOLLOW

21     THAT, RATHER THAN HAVING TO HAVE YOU SAY QUESTION

22     AND ANSWER AND READ IT, SOMEONE IS GOING TO STAND

23     AT THE WITNESS STAND AND READ THE ANSWER AND

24     SOMEONE WILL STAND AT THE MICROPHONE AND READ THE

25     QUESTION.

                                                    184

1     Q    AND WHEN YOU SAY, "I UNPLUG IT," YOU SEND AN

2     E-MAIL TO SOMEONE AT AKANOC TO UNPLUG?

3     A    TO THE SUPPORT DEPARTMENT.

4     Q    TO SOMEONE AT THE SUPPORT DEPARTMENT TO UNPLUG

5     THAT SPECIFIC IP ADDRESS?

6     A    YES.

7     Q    AND WHAT KINDS OF SITUATIONS WOULD YOU DISCUSS

8     WITH STEVE IN YOUR JOB AT AKANOC?

9     A    MASSIVE SPAMMING, FRAUD EBAY SITES, MICROSOFT

10    COPYRIGHT INFRINGEMENT.

11    Q    DO YOU KNOW IF STEVE EVER RESPONDS TO E-MAILS

12    THAT ARE SENT TO THOSE ACCOUNTS?

13    A    HE DOES.

14    Q    ARE THERE ANY KINDS OF COMPLAINTS THAT YOU

15    FORWARD ON TO STEVE FOR HANDLING?

16    A    I DON'T REMEMBER.

17    Q    IS STEVE THE ONLY OTHER PERSON WHO HAS ACCESS

18    TO THE ACCOUNTS THAT YOU HANDLE FOR AKANOC?

19    A    I DON'T KNOW.

20    Q    YOU SAID SOMETHING ABOUT MICROSOFT COPYRIGHT

21    INFRINGEMENT COMPLAINTS?

22    A    YES.

23    Q    WAS THERE SOMETHING SPECIFIC ABOUT THOSE

24    COMPLAINTS THAT YOU FELT YOU NEEDED TO SPEAK TO

25    STEVE ABOUT?

                                                          194

1    A    MICROSOFT IS SO BIG SO I THINK IT'S JUST

2    SERIOUS.  I DON'T KNOW.

3    Q    THANK YOU.  WERE THERE ANY OTHER COMPLAINTS

4    FROM COMPANIES REGARDING COPYRIGHT INFRINGEMENT OR

5    TRADEMARK INFRINGEMENT THAT YOU FELT REQUIRED, YOU

6    KNOW, A DISCUSSION WITH STEVE OR ANYONE ELSE AT

7    AKANOC?

8    A    NO.

9    Q    IT WAS JUST THE MICROSOFT COMPLAINTS?

10   A    AND THE EBAY.

11   Q    SO YOU HAD STATED THAT YOU TALKED TO STEVE

12   ABOUT FRAUD EBAY COMPLAINTS AND MICROSOFT COPYRIGHT

13   INFRINGEMENT COMPLAINTS?

14   A    YES.

15   Q    AND IS THERE ANY OTHER REASON WHY YOU SPOKE TO

16   HIM ABOUT THESE COMPLAINTS SPECIFICALLY?

17   A    BECAUSE I KNOW MICROSOFT AND EBAY, THEY ARE

18   BIG.

19   Q    AND IS THAT THE ONLY REASON THAT YOU TALKED TO

20   STEVE ABOUT THESE COMPLAINTS?

21   A    YES.

22   Q    AND DO YOU EVER READ THE COMPLAINTS?

23   A    I DON'T READ THE WHOLE COMPLAINT LETTER.  I

24   ONLY TRY TO FIND THE DOMAIN NAME AND THE IP ADDRESS

25   SO I CAN FORWARD TO THE CUSTOMER.

195

```
1     A    I DON'T KNOW.
2     Q    DID YOU EVER REQUIRE ANY ONE OF YOUR CUSTOMERS
3     TO DO SOMETHING OTHER THAN RESOLVE IT WITHIN 24
4     HOURS?
5     A    NO.
6     Q    WOULD YOU EVER CHECK TO MAKE SURE THAT THEY
7     COMPLIED WITH YOUR REQUEST THAT THEY RESOLVED THE
8     PROBLEM WITHIN 24 HOURS?
9     A    NO.
10    Q    DID YOU EVER REVIEW ANY WEB SITE CONTENT TO
11    MAKE SURE THAT SOMETHING THAT SOMEONE WAS
12    COMPLAINING ABOUT WAS REMOVED?
13    A    NO.
14    Q    DID YOU EVER CHECK TO SEE IF A WEB SITE THAT
15    WAS THE SUBJECT OF A COMPLAINT HAD MOVED FROM ONE
16    IP ADDRESS TO ANOTHER IP ADDRESS WITHIN THE BLOCK
17    ASSIGNED TO AKANOC?
18    A    NO.
19    Q    ARE YOU FAMILIAR WITH THE $25 PENALTY FOR
20    VIOLATION OF YOUR AGREEMENTS WITH THE CUSTOMERS?
21    A    YES.
22    Q    AND WHEN WAS THAT PENALTY ENFORCED?
23    A    I DON'T THINK -- IT NEVER ENFORCED.
24    Q    DO YOU KNOW WHEN IT WAS SUPPOSED TO BE
25    ENFORCED?
```

201

EXHIBIT B

1    E-MAIL ADDRESS?

2    A    YES.

3    Q    AND HAVE YOU SEEN THIS LETTER BEFORE?

4    A    NO.

5    Q    YOU DON'T RECALL EVER SEEING THE LETTER?

6    A    NO, I DON'T THINK SO.

7    Q    WHEN YOU SEND MESSAGES TO OTHER PEOPLE, IS

8    YOUR "FROM" ADDRESS SECURITY@AKANOC.COM?

9    A    YES.

10   Q    ASK THE WITNESS TO REVIEW EXHIBIT 31 ATTACHED

11   TO THE DEPOSITION OF STEVEN CHEN AN E-MAIL BETWEEN

12   STEVE CHEN AND SECURITY DATED ON OR ABOUT SEPTEMBER

13   12TH, 2007?

14   A    YES.

15   Q    DO YOU RECALL RECEIVING THIS E-MAIL FROM STEVE

16   CHEN?

17   A    I DON'T REMEMBER, NO.

18   Q    AND IF THE WITNESS CAN REVIEW THE MESSAGE

19   BEGINNING "THE RULE IS VERY CLEAR, WHEN WE HAVE A

20   COMPLAINT WITH CERTAIN WEB SITE, THAT WEB SITE

21   NEEDS TO BE OUT OF OUR NETWORK," AND ON UNTIL THE

22   SIGNATURE STEVEN.

23        DO YOU REMEMBER EVER RECEIVING ANY KIND

24   OF E-MAIL LIKE THIS FROM MR. CHEN?

25   A    I DON'T REMEMBER.

                                                    209

1    Q    DID STEVE EVER GIVE YOU ANY INSTRUCTION LIKE

2    THIS AS STATED IN THIS E-MAIL?

3    A    YES.

4    Q    AND HOW OFTEN WAS THAT?

5    A    VERY SELDOM.

6    Q    AND WHAT WAS THAT IN REGARD TO?

7    A    MICROSOFT, EBAY, PAY PAL SITES.

8    Q    I'M SORRY.  WAS IT YOUR TESTIMONY THAT YOU DID

9    NOT RECEIVE ANY COMPLAINTS FROM LOUIS VUITTON OR

10   THAT YOU COULD NOT REMEMBER IF YOU RECEIVED ANY

11   COMPLAINTS FROM LOUIS VUITTON?

12   A    TO ME NEVER SEEN THOSE LETTERS.

13   Q    WHEN YOU SAID THOSE LETTERS, YOU MEAN THE

14   LETTERS THAT I SHOWED YOU OR ANY LETTERS FROM LOUIS

15   VUITTON?

16   A    ANY.

17   Q    I WOULD ASK THE WITNESS TO REVIEW EXHIBIT 38

18   ATTACHED TO THE DEPOSITION OF STEVEN CHEN WHICH

19   APPEARS TO BE AN E-MAIL BETWEEN SECURITY AND STEVE

20   CHEN DATED SEPTEMBER 14TH, 2007.

21        DO YOU RECALL RECEIVING THIS E-MAIL FROM

22   STEVE CHEN?

23   A    YES.

24   Q    ON THE FIRST PAGE OF THE EXHIBIT THERE'S A

25   MESSAGE THAT IT IS AN IP ADDRESS AND IT SAYS

                                                     210

```
1    SERVER?

2    A    YES.

3    Q    AND WAS THAT BECAUSE THE CUSTOMER FAILED TO

4    RESPOND TO THE COMPLAINT ON SEPTEMBER 12, 2007?

5    A    YES.

6    Q    AND DID YOU HAVE TO ASK STEVE OR ANYBODY ELSE

7    BEFORE YOU MADE THE REQUEST TO HAVE THIS SERVER

8    UNPLUGGED?

9    A    REGARDING TO MICROSOFT OR EBAY OR PAY PAL

10   AROUND THAT TIME EVEN THE COUNTERFEIT WEB SITE I

11   CAN UNPLUG.

12   Q    DID YOU DO THAT ON A REGULAR BASIS?

13   A    NOT ON A REGULAR BASIS BECAUSE USUALLY I WOULD

14   CC COPY TO MR. CHEN.  SO IF HE UNPLUGGED, THEN I

15   DON'T HAVE TO TAKE ANY ACTION.

16   Q    BUT WAS IT YOUR PROCEDURE, STANDARD PROCEDURE

17   TO UNPLUG THE COUNTERFEIT WEB SITE?

18   A    AT THAT TIME, YES.

19   Q    AND DO YOU STILL UNPLUG COUNTERFEIT WEB SITES

20   AS YOU DESCRIBED?

21   A    YES.

22   Q    SO BEGINNING AROUND SEPTEMBER OF 2007 ALL OF

23   THE WAY TO THE PRESENT --

24   A    YES.

25   Q    -- WHEN YOU RECEIVE A COMPLAINT REGARDING
```

221

EXHIBIT B

1    COUNTERFEIT WEB SITES, YOU UNPLUG THOSE?

2    A    I WOULD STILL SEND A COMPLAINT TO THE

3    CUSTOMER, CC COPY TO MR. CHEN AND THEN MOSTLY I

4    WOULD LEAVE IT TO HIM BECAUSE I DON'T -- I ONLY

5    WORK PART-TIME.  IF I HAPPEN TO KNOW THAT THE

6    CUSTOMER DIDN'T COMPLY, THEN I WILL UNPLUG IT BUT

7    MOSTLY I DON'T.

8              THE COURT:  HOW MUCH MORE DO YOU HAVE?

9    IT SOUNDS LIKE YOU ARE GOING TO NEED A LITTLE MORE

10   TIME.  IT LOOKS LIKE THERE'S ABOUT TEN PAGES.

11             MS. WANG:  ACTUALLY I HAVE THREE MORE

12   PAGES.

13             THE COURT:  THEN LET'S FINISH THIS UP SO

14   WE DON'T HAVE TO LOOK FORWARD TO COMING BACK AND

15   LISTENING.

16   BY MS. WANG:

17   Q    WHAT DO YOU MEAN BY IF YOU HAPPEN TO KNOW THAT

18   THE CUSTOMER DID NOT REPLY?

19   A    FOR EXAMPLE, IF ANOTHER COMPLAINT IS COMING

20   UP, I MEAN A LOT OF COMPLAINTS COMING IN, THEN I

21   KNOW THAT HE -- THE CUSTOMER DIDN'T COMPLY.  AND TO

22   MICROSOFT AND EBAY AND PAY PAL, THESE COMPANY I

23   KNOW THEY ARE VERY BIG, YOU KNOW, AND SO I WOULD

24   SEE IF THEY HAD ANY COMPLAINT COMING IN OR NOT.

25             SOMETIMES EBAY WOULD COME IN -- WITHIN

222

EXHIBIT B

1    TWO DAYS THEY WILL SENT ME TWO COMPLAINTS WITHIN

2    TWO DAYS THEN I KNOW THAT THE CUSTOMER DIDN'T

3    COMPLY SO I WILL SHUT THEM DOWN.

4    Q    WHEN YOU TALK ABOUT MICROSOFT AND EBAY AS

5    THESE BIG COMPANIES, WOULD YOU CONSIDER LOUIS

6    VUITTON A BIG COMPANY AS WELL?

7    A    I DON'T KNOW.

8    Q    HAVE YOU EVER HEARD OF LOUIS VUITTON?

9    A    NO.

10   Q    HAVE YOU EVER HEARD OF LV?

11   A    YEAH, FROM MY DAUGHTER.

12   Q    WHAT DO YOU KNOW ABOUT LV?

13   A    FROM MY DAUGHTER SAYING THAT SHE LIKES -- IS

14   IT HANDBAGS?  SOMETHING LIKE THAT?  I DON'T KNOW.

15   I NEVER BUY THAT.

16   Q    THE ONE PAGE E-MAIL DATED AUGUST 28TH FROM

17   SECURITY TO REBOOT@AKANOC.COM, DID YOU SEND THAT

18   E-MAIL?

19   A    YES.

20   Q    IT READS THAT DUE TO FAILURE TO RESPOND TO

21   NOTICES OVER 48 HOURS, PLEASE CONFIRM AND TKS.  YOU

22   TESTIFIED EARLIER THAT YOU USUALLY GIVE PEOPLE A 12

23   HOUR RESPONSE TIME AND SOMETIMES YOU GIVE THEM

24   LONGER LIKE 48 HOURS?

25   A    IF I RECEIVE MORE COMPLAINTS AFTER 12 HOURS OR

223

1     ABOUT WANTING TO KNOW WHICH COMPANY WERE

2     COMPLAINING AND YOUR RESPONSE TO BE THAT SHE DIDN'T

3     KNOW WHO WAS COMPLAINING?

4     A    I UNDERSTAND THAT.

5     Q    OKAY.  IS THERE AN INSTANCE WHERE YOU DID NOT

6     FORWARD THE COMPLAINT ON TO THE CUSTOMER?

7     A    I FORWARDED IT.  THEY DON'T UNDERSTAND.  IT'S

8     THEIR PROBLEM.  THEY DON'T UNDERSTAND WHAT I'M

9     FORWARDING TO THEM.

10    Q    OKAY.  SO IN THIS INSTANCE YOU HAD FORWARDED

11    THE COMPLAINT THAT YOU HAD RECEIVED TO NORAQ, AND

12    SHE WROTE BACK TO YOU THAT SHE WANTED TO KNOW WHICH

13    COMPANY WAS COMPLAINING; IS THAT CORRECT?

14    A    YES.

15    Q    AND THEN IN YOUR E-MAIL YOU WROTE, IT DOESN'T

16    MATTER WHO COMPLAINED.  CAN YOU TELL ME WHAT THAT

17    MEANS IN REFERENCE TO THIS CONVERSATION?

18    A    WELL, JUST AN ANSWER.  SHE WANTS TO KNOW OR

19    WHICH COMPANY IS COMPLAINING AND I JUST TELL HER,

20    IT DOESN'T MATTER.  ALL YOU HAVE TO DO IS TO REMOVE

21    ALL OF THE COMPLAINT WEB SITES OR DOMAINS.

22    Q    DO YOU TREAT SPAMHAUS COMPLAINTS DIFFERENTLY

23    THAN OTHER COMPLAINTS?

24    A    YES.

25    Q    AND HOW IS THAT?

225

1    A    BECAUSE I'M INSTRUCTED TO DO SO.

2    Q    WHAT ARE YOU INSTRUCTED TO DO?

3    A    WHENEVER SPAMHAUS SENDS US A COMPLAINT, WE

4    JUST UNPLUG THE SERVER AND DISCONTINUE THE SERVICE

5    TO THE CUSTOMER.

6    Q    NOW, IS EXHIBIT 50 AN E-MAIL DATED SEPTEMBER

7    15TH, 2007 FROM SECURITY TO SUPPORT@TOOMING.COM?

8    CAN YOU PLEASE REVIEW THAT?

9    A    YES.

10   Q    OKAY.  DID YOU WRITE THIS E-MAIL STARTING WITH

11   "DEAR SIR"?

12   A    YES.

13   Q    I'M SORRY.  WHEN YOU WRITE SOMETHING LIKE THE

14   SECOND NOTE FROM THIS COMPLAINANT, DOES THAT MEAN

15   YOU RECEIVED A PRIOR COMPLAINT FROM THE CUSTOMER

16   WITHIN THE PAST TWO OR THREE DAYS FROM SEPTEMBER

17   15TH?

18   A    YES.

19   Q    AND IT WRITES "MAKE SURE YOU KEEP ALL OF THE

20   RECORDS SO THAT IF THE AUTHORITIES NEEDS EVIDENCE,

21   WE CAN PROVIDE THEM," WHAT DID YOU MEAN BY THAT?

22   A    INSTRUCTION FROM STEVE.

23   Q    STEVE HAD TOLD YOU TO WRITE THAT TO THE

24   CUSTOMER?

25   A    YES, REGARDING FRAUD OR IDENTITY THEFT.

226

# EXHIBIT C

1    Q    WOULD HE FORWARD IT TO THE CUSTOMER OR TO

2    JULIANA LUK FOR HANDLING?

3    A    FORWARD IT TO SECURITY@AKANOC.

4    Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT ANY

5    OF THE LETTERS MARKED AS EXHIBITS 1, 2, 3, AND 4

6    WERE AT ANY TIME RECEIVED BY AKANOC?

7    A    I JUST NEVER SEEN IT.

8    Q    BUT DO YOU HAVE ANY REASON TO DISPUTE IT THAT

9    THEY WERE ACTUALLY RECEIVED?

10   A    NO.

11   Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT THE

12   SITES REFERRED TO IN THOSE LETTERS WERE IN FACT

13   HOSTED ON SERVERS AT AKANOC'S FACILITY?

14   A    WE -- I DEFINITELY HAVE NO IDEA WHERE THOSE

15   WEB SITES POINTED TO AT THAT TIME.

16   Q    I'LL MARK AS 6 A LETTER DATED APRIL 20, 2007

17   AND ASK THE WITNESS IF HE HAS SEEN THAT.

18   A    I HAVE NO RECOLLECTION OF THIS.

19   Q    AND WOULD YOU HAVE ANY WAY OF DETERMINING

20   WHETHER OR NOT THIS LETTER WAS, IN FACT, RECEIVED

21   BY YOU ON OR ABOUT THE DATED IT BEARS?

22   A    I REMEMBER I RECEIVED ONE OF THIS FROM YOUR

23   OFFICE AND I TOOK IT TO THE OFFICE AND SINCE IT'S

24   CONCERNING AKANOC, SO I PRETTY MUCH JUST PUT IT IN

25   THE PILE.

                                              129

1    Q    SO WHEN YOU SAY YOU TOOK IT TO THE OFFICE,

2    THAT'S BECAUSE THE ONONDAGA DRIVE S IS YOUR HOME

3    ADDRESS?

4    A    THAT'S CORRECT.

5    Q    AND SO DO YOU RECALL RECEIVING A LETTER AT

6    YOUR HOME?

7    A    YES.

8    Q    CONCERNING LOUIS VUITTON?

9    A    YES.

10   Q    WHEN YOU SAY YOU TOOK IT TO YOUR OFFICE AND

11   PUT IT ON A PILE, WHAT DOES THAT MEAN?

12   A    I MEAN PUT IT ON THE DESK.

13   Q    WHOSE DESK?

14   A    THAT PARTICULAR -- THAT EMPTY DESK I WAS

15   TALKING ABOUT BECAUSE THAT WAS, AT THE TIME THAT

16   WAS THE PLACE THAT WE PUT ALL OF THIS TYPE OF

17   LETTERS.

18   Q    AND TO YOUR KNOWLEDGE WHAT HAPPENED WITH THE

19   LETTER AFTER YOU PUT IT ON THE DESK?

20   A    THERE WERE -- THERE WERE TOO MANY PEOPLE

21   TRYING TO SHARE THE WORKLOAD OVER THERE SO I HAVE

22   NO IDEA.

23   Q    OKAY.  TO THE EXTENT THAT I UNDERSTAND THAT

24   YOU CAN'T SAY WHAT HAPPENED WITH THIS LETTER, BUT

25   IN TERMS OF AKANOC'S POLICIES AND PROCEDURES, WHAT

130

```
 1    SHOULD HAVE HAPPENED WITH THE LETTER AFTER IT WAS
 2    PUT ON THE DESK?
 3    A    WE -- VERY, VERY SELDOM THAT WE RECEIVE
 4    COMPLAINT THROUGH E-MAIL, I MEAN, THROUGH REGULAR
 5    MAILS.  SO MOST OF THE ABUSE ISSUES WERE ALL
 6    REVOLVED IN THE E-MAIL FORMAT.  SO THIS TYPE OF
 7    E-MAILS -- I MEAN, THROUGH REGULAR MAILS -- I MEAN,
 8    LETTERS ACTUALLY SOMETHING FROM, LIKE, THINGS LIKE
 9    SUBPOENA WE NEED TO RESPOND, OR SOMETHING LIKE COME
10    IN FROM LEGAL AUTHORITY, WE NEED TO RESPOND.  BUT
11    GENERAL COMPLAINTS, WE JUST DON'T HAVE A LOT OF
12    EXPERIENCE WITH IT AND WE DON'T HAVE ANY MECHANISM
13    TO TAKE CARE OF LETTER COMPLAINTS.
14    Q    SO THERE WAS NO REAL POLICY TO HANDLE --
15         THE COURT:  LET ME INTERRUPT YOU.  IT
16    DIDN'T SOUND YOU WERE GOING TO FINISH IN A MINUTE
17    OR TWO AND YOU PROMISED US AN HOUR AND WE'VE BEEN
18    GOING FOR ABOUT 45 MINUTES.
19         LET'S TAKE A LUNCH BREAK, AND WE'LL COME
20    BACK AT 1:00 O'CLOCK.
21         (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)
22
23
24
25
```

131

EXHIBIT C

# EXHIBIT D

1     THIS ROW DOWN HERE ON THIS CHART

2   REPRESENTS RESELLERS OF SERVICES; IS THAT RIGHT?

3   A   YES.

4   Q   HOW DOES THIS WORK THEN FOR SOMEBODY USING

5   YOUR SERVERS GOING TO SOMEBODY DOING BUSINESS WITH

6   YOUR RESELLERS?

7   A   I DON'T REALLY KNOW THEIR RELATIONSHIP, BUT I

8   TURN OVER MY SERVICE TO MY RESELLER AND IN TURN

9   THEY MAY RESELL THE WHOLE THING TO ANYBODY THAT

10  ACTUALLY OPERATES THE WEB SITE OR SOME OTHER

11  PURPOSE OR SOME OTHER APPLICATION.

12     I DON'T REALLY KNOW WHAT MY RESELLERS DO

13  WHEN THEY RECEIVE A DEPLOYMENT.

14  Q   SO IF YOU HAVE A RESELLER THAT YOU TESTIFIED

15  ABOUT, THEY CONTROL THE SERVER?

16  A   IN SOME CASES YES AND IN SOME CASES NO.  I

17  HAVE SEEN IF I HAD A COMPLAINT TO MY RESELLER, MY

18  CONSENT -- MY RESELLER MAY COME BACK WITH THAT I

19  FORWARDED THE INFORMATION TO -- I FORWARDED THE

20  COMPLAINT TO MY CUSTOMER, OR THEY MAY COME BACK AND

21  SAY, WE ONLY TAKE ACTION ON IT.  WHAT DOES THAT

22  MEAN?  WHETHER THEY TALK TO THEIR END USER OR NOT,

23  I DON'T KNOW.

24  Q   SO YOU DON'T CONTROL THE SERVER.  MAYBE THE

25  RESELLER DOES OR MAYBE -- THEIR CUSTOMER DOES?

78

EXHIBIT D

1    ANYTHING AFTER THAT IS A CLEAR RECORD.

2    Q    SO FROM JUNE 2007 ON?

3    A    THAT IS CORRECT.

4    Q    AND IF YOU HAD GOTTEN THE COMPLAINT PRIOR TO

5    JUNE OF 2007, WOULD YOUR PRACTICE IN HANDLING THAT

6    COMPLAINT BEEN ANY DIFFERENT THAN THE WAY YOU

7    TESTIFIED HERE TODAY?

8    A    NO.  AT THAT TIME WE DON'T HAVE A LAWSUIT.  WE

9    WOULD KEEP GOING EXACTLY THE SAME WAY.

10   Q    DO YOU HAVE ANY IDEA WHY THE IP ADDRESSES FOR

11   THESE -- LET'S ASSUME THAT LOUIS VUITTON THOUGHT

12   THAT THERE -- THAT THESE DOMAINS, THESE WEB SITES

13   WERE BEING HOSTED ON YOUR SERVERS AND THAT'S WHY

14   THEY FILED A LAWSUIT.  DO YOU HAVE ANY IDEA WHY

15   THEY WERE NO LONGER ON YOUR RANGE OR THEY WERE NOT

16   FUNCTIONING AT THE TIME OF THE LAWSUIT?

17   A    SOMEBODY MUST HAVE DONE SOMETHING TO TRIGGER

18   THE IP FROM CHANGING.

19   Q    SOMETHING CAUSED SOMETHING TO CAUSE THE IP TO

20   CHANGE?

21   A    MOST LIKELY WE SEE SOMETHING AND WE FORWARD IT

22   TO THE CUSTOMER AND THE CUSTOMER DECIDES TO MOVE IT

23   AROUND.

24   Q    NOW I WANT TO DROP DOWN TO A NUMBER OF THESE

25   ENTRIES AND TRY TO FOCUS ON THE ONES THAT

                                              146

1    TO INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS; IS

2    THAT ALSO NOT CORRECT?

3    A    THAT IS CORRECT.

4    Q    AND IT ALSO PROVIDES FOR IMPOSING FEES UNDER

5    PARAGRAPH SUB 4; IS THAT ALSO NOT CORRECT?

6    A    THAT'S CORRECT.

7    Q    AND IT DOESN'T ACTUALLY SPECIFY A MINIMUM OR

8    MAXIMUM IN THE NUMBER AMOUNT OF FEES THAT CAN BE

9    IMPOSED; IS THAT ALSO THE CASE?

10   A    THAT'S CORRECT.

11   Q    AND IT ALSO SAYS THAT AKANOC RESERVES THE

12   RIGHT TO REMOVE THE OFFENDING CONTENT UNDER SUB.

13   5, IS THAT ALSO NOT THE CASE?

14   A    THAT'S CORRECT.

15   Q    AND ALL OF THESE TOOLS THAT ARE PROVIDED FOR

16   BY YOUR OWN CONTRACT HAVE BEEN PART OF THAT

17   CONTRACT SINCE AKANOC STARTED DOING BUSINESS?

18   A    THAT IS CORRECT.

19   Q    AND THEY HAVE BEEN WITHIN THE ARSENAL OF

20   AKANOC'S CONTRACTUAL RIGHTS TO DEAL WITH COPYRIGHT

21   AND TRADEMARK INFRINGEMENT FROM 2003 AND 2004

22   WHENEVER AKANOC FIRST STARTED DOING BUSINESS?

23   A    THAT IS CORRECT.

24   Q    AND NOW, ONE THING I HAVEN'T SEEN IS TERMS OF

25   THE SERVICE AGREEMENT OR ACCEPTABLE USE POLICY FOR

168

EXHIBIT D

1    MANAGED SOLUTIONS GROUP.  IS THERE ONE?

2    A    NO, THERE WAS NOT SIMPLY BECAUSE OF --

3              THE COURT:  YOU WEREN'T ASKED -- YOU WERE

4    JUST ASKED WAS THERE?

5              THE WITNESS:  NO.

6    BY MR. COOMBS:

7    Q    DOES MANAGED SOLUTIONS GROUP MAINTAIN A WEB

8    SITE?

9    A    NO.

10   Q    AND HAS IT EVER MAINTAINED A WEB SITE SINCE

11   MANAGED SOLUTIONS GROUP SPLIT OFF FROM MANAGED?

12   A    NO.

13   Q    AND DOES IT HAVE ONE TODAY?

14   A    NO.

15   Q    DOES YOUR CUSTOMERS HAVE A RELATIONSHIP WITH

16   MANAGED?

17   A    IT DOES NOT.

18   Q    AND THAT'S TRUE IF THE IP IS OWNED BY MANAGED

19   SOLUTIONS GROUP?

20   A    THAT'S CORRECT.

21   Q    AND SO IT'S A GENERAL PUBLIC THAT IS LOOKING

22   AT A WEB SITE THAT IS WITHIN THE MANAGED SOLUTIONS

23   GROUP BLOCK OF IP NUMBERS, IT WOULD APPEAR THAT

24   MANAGED SOLUTIONS GROUP IS, IN FACT, THE OWNER OR

25   OPERATOR OR THE ISP WEB HOST OF THE APPLICABLE WEB

                                              169

1    LOCATING WITH YOUR SERVERS HERE IN SAN JOSE?

2    A    THAT'S CORRECT.

3    Q    SO IN ADDITION TO THE FACT THAT YOU PROVIDE

4    THE SERVERS, THE ROUTERS, THE BANDWIDTH THAT YOU

5    WERE TESTIFYING TO THIS MORNING, THERE'S ALSO THE

6    FACT THAT THE BASIC CONNECTIVITY THAT AKANOC OFFERS

7    THAT ENHANCES BASICALLY THE INTERNET EXPERIENCES

8    FOR PEOPLE THAT ARE VISITING HOSTING SITES ON YOUR

9    SERVERS?

10   A    THAT IS CORRECT.

11   Q    LET'S ACTUALLY TALK ABOUT THE DIGITAL

12   MILLINEUM COPYRIGHT ACT FOR JUST A MOMENT.  I THINK

13   IT'S EXHIBIT 54 FOR ONE OF THE INTERIM DESIGNATION

14   OF THE DEFENDANTS; IS THAT CORRECT?

15   A    YES.

16   Q    AND CAN YOU TELL ME WHAT DATE THAT WAS FILED

17   ON?

18            THE COURT:  IF THERE'S A DATE ON THE

19   DOCUMENT I'LL HAVE YOU SCROLL DOWN TO THE DATE

20   LINE.

21            THE WITNESS:  NOVEMBER 30TH, 2007.

22   BY MR. COOMBS:

23   Q    AND THAT WAS AFTER THE LAWSUIT WAS FILED AND

24   SERVED ON AKANOC SOLUTIONS?

25   A    I BELIEVE SO.

                                                  172

1    Q    AND DOES HE HAVE ANYTHING TO DO WITH IT NOW?

2    A    NO.

3    Q    AND HAS HE HAD ANYTHING TO DO WITH IT FOR THE

4    LAST THREE YEARS?

5    A    NO.

6    Q    AND SO WHO, IF NOT YOU -- ARE YOU

7    SUGGESTING -- STRIKE THAT.

8              ARE YOU SUGGESTING THAT MR. PHAM

9    CONTINUED TO HAVE A RESPONSIBILITY TO FILE THE

10   DESIGNATION?

11   A    NO.

12   Q    SO WHO DID?

13   A    ME.

14   Q    OKAY.  AND DID YOU FILE ONE BEFORE ROUGHLY

15   NOVEMBER OF 2007?

16   A    NO.

17   Q    SO IT'S THE FIRST ONE FOR BOTH OF THE

18   CORPORATE DEFENDANTS?

19   A    YES.

20   Q    OKAY.  THANK YOU.  AND THESE ARE BOTH AGAIN

21   AFTER THE LAWSUIT WAS FILED BY LOUIS VUITTON?

22   A    THAT'S CORRECT.

23   Q    NOW, YOU ARE DESIGNEE UNDER THAT ACT?

24   A    THAT'S CORRECT.

25   Q    AND WHAT IS YOUR UNDERSTANDING OF THE

                                                174

1    REQUIREMENT UNDER THE ACT FOR THE FILING OF THE

2    AGENT NOTIFICATION OF THE TYPE THAT WE'RE LOOKING

3    AT RIGHT NOW?

4    A    TO BE HONEST WITH YOU, I DON'T REALLY

5    UNDERSTAND.  I JUST KNOW THAT IT'S A PROCESS THAT I

6    NEED TO DO.

7    Q    DO YOU HAVE ANY UNDERSTANDING OF THE

8    REQUIREMENT OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

9    TO HAVE A PUBLISHED TERMS OF SERVICE?

10   A    I REALLY DON'T UNDERSTAND THAT PARTICULAR LAW

11   PER SE.

12   Q    OKAY.  DO YOU HAVE ANY UNDERSTANDING OF WHAT

13   THAT LAW REQUIRES IN RESPONSE TO NOTICES OF

14   INFRINGEMENT TRANSMITTED ACCORDING TO ITS TERMS?

15   A    I DON'T REALLY UNDERSTAND THAT LAW.

16   Q    OKAY.  ARE YOU FAMILIAR WITH THE TERM AT ALL

17   OF EXPEDITIOUS REMOVAL?

18   A    NO.

19   Q    SO YOU DON'T HAVE ANY UNDERSTANDING ABOUT A

20   REQUIREMENT THAT IN RESPONSE TO A NOTICE OF

21   INFRINGEMENT A WEB HOST OR ISP THAT WANTS TO AVAIL

22   ITSELF OF THAT STATUTE MUST EXPEDITIOUSLY REMOVE

23   THE INFRINGING CONTENT THAT IS THE SUBJECT OF THE

24   NOTICE?

25   A    I DON'T UNDERSTAND THE LANGUAGE INSIDE OR THE

175

1    LANGUAGE YOU JUST TALK ABOUT.

2              I'M ONLY DOING THINGS IS WHAT INDUSTRY

3    PEOPLE DO EVERY DAY.

4    Q    HAVE YOU ASSIGNED -- OTHER THAN MS. LUK ABOUT

5    WHOM WE HAVE TALKED ABOUT A LITTLE BIT OVER THE

6    LAST COUPLE DAYS, HAVE YOU ASSIGNED ANY

7    RESPONSIBILITY FOR HANDLING THESE INFRINGEMENT

8    NOTICES TO ANYONE ELSE AT EITHER AKANOC OR MANAGED

9    SOLUTIONS GROUP?

10   A    AGAIN BEFORE THE SEPARATION?  EVEN AFTER THE

11   SEPARATION FOR QUITE SOME TIME WE EVEN HAVE MORE

12   STAFF HANDLING THE BUSINESS.  THERE WERE TWO OTHER

13   GENERAL CLERK THAT THEY WERE MORE INTENT TO HANDLE

14   THIS TYPE OF WORK.

15   Q    OKAY.  I'M SORRY.  I'M GETTING A LITTLE

16   CONFUSED AND IF I AM, I'M SURE -- I HOPE I'M NOT

17   THE ONLY ONE SO LET'S TALK ABOUT THE SEPARATION

18   THAT YOU'RE REFERRING TO.

19              YOU HEARD A LITTLE DEPOSITION TESTIMONY

20   ABOUT IT, BUT MAYBE WE CAN CLEAR UP A COUPLE OF

21   THINGS.

22              WHEN MANAGE SOLUTIONS BUSINESS STARTED

23   BUSINESS IN ABOUT WHAT YEAR?

24   A    END OF 2003.

25   Q    AND AT THAT TIME YOU WERE NOT THE SOLE OWNER?

176

EXHIBIT D

1    GROUP DIDN'T HAVE A WEB SITE SO IT WASN'T PUBLISHED

2    ON A WEB SITE.  AND IT WASN'T PUBLISHED WITH THE

3    COPYRIGHT OFFICE, SO IT WASN'T PUBLISHED WITH

4    THE --

5    A    THAT'S RIGHT.

6    Q    AND THERE'S NOTHING THE AKANOC SOLUTIONS --

7    AKANOC.COM WEB SITE THAT TALKS ABOUT IT; IS THAT

8    CORRECT?

9    A    THAT'S RIGHT.

10   Q    AND WAS IT ANYWHERE ELSE?

11   A    IF I CAN REMEMBER DEFINITELY THAT ARIN RECORD

12   WE HAVE CHANGED -- ANY TYPE OF FORMAL RECORD WE

13   WOULD NEED TO CHANGE WE WOULD CHANGE.

14   Q    BUT MANAGE.COM WAS, IN FACT, THE WEB SITE FOR

15   MANAGED SOLUTION GROUP UP UNTIL AT LEAST MR. PHAM

16   UNTIL 2004?

17   A    THAT'S CORRECT.

18   Q    AND MANAGED SOLUTIONS GROUP HAD NO WEB SITE

19   PRESENCE AFTER THE SEPARATION FROM MANAGE.COM?

20   A    NO.

21   Q    AND MANAGE.COM, THEIR PLACE OF BUSINESS ALSO

22   MOVED, DID IT NOT?  THEY MOVED TO NEW JERSEY I

23   THINK?

24   A    I THINK OVER TIMES THEY -- JACK PHAM SOLD THE

25   BUSINESS TO ANOTHER GENTLEMAN NAMED JOHN MEARS OR

180

EXHIBIT D

1    A    I HAVE NO IDEA.

2    Q    AND WE'LL PUT UP THE NEXT ONE THAT COMES NEXT

3    FROM MARCH 3, '08 AND THIS, TOO, IS A -- IS ANOTHER

4    TAKEDOWN NOTICE -- THAT'S THE TAKEDOWN NOTICE

5    REFERRING TO ESTARBIZ ON 3-3; IS THAT CORRECT?

6    A    YES.

7    Q    AND IT'S TO MR. WANG KIYO; IS THAT CORRECT?

8    A    YES.

9    Q    AND IT'S CONCERNING THE SAME DOMAIN NAME

10   ESTARBIZ.COM?

11   A    YES.

12   Q    AND IT CONCERNS THE SAME --

13   A    THIS ONE --

14   Q    I DIDN'T MEAN TO INTERRUPT.  BUT MY ONLY

15   QUESTION IS THAT IT'S THE SAME IP ADDRESS AS

16   REFLECTED ON THE PREVIOUS EXHIBITS?

17   A    YES.

18   Q    AND THAT SUGGESTS TO ME AT LEAST THAT THAT WEB

19   SITE WAS IN OPERATION FROM NOVEMBER OF 2007 AND

20   UNTIL MARCH OF 2008.  DO YOU HAVE A DIFFERENT

21   CONCLUSION?

22   A    CAN YOU PUT THE LAST?  THE FIRST THING I SAID

23   IS THAT YOUR SERVER HAS BEEN UNPLUGGED.

24   Q    MR. CHEN, I DIDN'T ASK YOU WHAT THE E-MAIL

25   SAID.  I ASKED YOU WHETHER THE ESTARBIZ WAS ON THE

                                                      196

1    SAME SERVER WITH THE SAME CUSTOMER FROM NOVEMBER OF
2    2007 UNTIL MARCH OF 2008?
3    A    YES.
4    Q    NOW, IS MR. WANG KIYO STILL A CUSTOMER OF
5    AKANOC SOLUTIONS?
6    A    MAYBE.
7    Q    YOU DON'T KNOW?
8    A    I DON'T KNOW.
9    Q    YOU NEVER TOOK ANY ACTION TO TERMINATE HIM AS
10   A CUSTOMER?
11   A    I DON'T HAVE A REASON TO TERMINATE HIM.
12   Q    SO IN SPITE OF THE LITIGATION AND IN SPITE OF
13   ALL OF THE DEMANDS THAT ARE GOING ON, THIS SITE CAN
14   STAY UP FOR FOUR MONTHS AND THE ONLY THING YOU CAN
15   DO IS UNPLUG THE SERVER.  AND DO YOU KNOW WHAT
16   HAPPENED TO THE SERVER AFTER HE UNPLUGGED IT?
17   A    AS I PREVIOUSLY SAID, I HAVE NO WAY OF
18   KNOWING.  THE ONLY THING I CAN BE IN CONTROL OF IS
19   UNPLUG THE SERVER.
20   Q    NOW, LET'S BACK UP FOR A MOMENT AND GO BACK TO
21   PAGE 1 OF 1598 AND THE FIVE WEB SITES THAT WERE
22   LISTED IN THE COMPLAINT WHICH YOU INDICATE HERE WAS
23   SERVED ON YOU ON AUGUST 20TH, 2007.  DO YOU SEE
24   THAT?
25   A    YES.

197

1    Q    AND JUST SO I'M CLEAR, YOU HAVE NO INFORMATION

2    REGARDING THE STATUS OF APRIL168.COM AT ANY TIME

3    BEFORE AUGUST 20TH, 2007?

4    A    I JUST DON'T REMEMBER IT.

5    Q    YOU DON'T HAVE ANY EVIDENCE THAT YOU DID

6    ANYTHING IN CONNECTION WITH THE DOMAIN NAME OF

7    AUGUST 20TH, 2007?  DO YOU HAVE ANY --

8         THE COURT:  YOU INTERRUPTED HIS ANSWER.

9    I WASN'T SURE IF YOU WANTED TO WITHDRAW YOUR

10   QUESTION OR NOT, BUT YOU DID ASK A QUESTION AND HE

11   STARTED TO ANSWER.

12        MR. COOMBS:  I'M SORRY.  I THOUGHT HE WAS

13   NOT CLEAR ON THE QUESTION, AND SO I WAS TRYING TO

14   REPHRASE.

15        THE WITNESS:  IF I HAVE -- IF IT'S IN MY

16   REGULAR BUSINESS OPERATION, I CAN CHECK MY E-MAIL

17   LOG TO SEE WHETHER THE COMPLAINT COMES IN, WHETHER

18   I HAVE FOLDING OF THE COMPLAINT.

19   BY MR. COOMBS:

20   Q    I THINK YOU TESTIFIED THAT YOU CHECKED YOUR

21   E-MAIL LOG IN PREPARATION OF EXHIBIT 1598?  NO?

22   DID I MISUNDERSTAND THAT?

23   A    1598 IS A SUMMARY REPORT BASED ON A PARTICULAR

24   DATE THAT I RECEIVED INFORMATION AND WHAT I DID TO

25   IT, AND I PULLED ALL OF THE E-MAILS AND THIS IS THE

198

EXHIBIT D

1    SUMMARY OF ALL OF THE E-MAILS.

2    Q    SO AGAIN, MY UNDERSTANDING IS I THINK FROM

3    YOUR TESTIMONY IS THAT 8-20-07 IS THE DATE THAT YOU

4    WERE SERVED WITH THE COMPLAINT IN THIS MATTER; IS

5    THAT CORRECT?

6    A    THAT IS CORRECT.

7    Q    AND THERE IS NO ENTRY FOR APE168.COM BEFORE

8    AUGUST 20TH, 2007; IS THAT CORRECT?

9    A    NO.

10   Q    AND THERE'S NO RELATING ACTIVITY RELATING TO

11   ATOZBRAND.COM FROM AUGUST 20TH, 2007; IS THAT

12   CORRECT?

13   A    I DON'T KNOW.

14   Q    I'M LOOKING AT 1598.  IS THERE ANY INDICATIONS

15   THAT AKANOC SOLUTIONS DID ANYTHING IN RESPONSE TO A

16   REPORT OF INFRINGEMENT ON ATOZBRAND.COM AT ANY TIME

17   BEFORE THEY WERE SERVED WITH THE COMPLAINT IN THIS

18   MATTER?

19   A    I DON'T KNOW BECAUSE I HAVEN'T SEARCHED.

20   Q    IS THERE ANYTHING INDICATED -- OH, I'M SORRY.

21   WHEN YOU PREPARED THIS, YOU WERE ASKED NOT TO

22   SEARCH FOR ANYTHING CONCERNING ANY ACTIVITY BEFORE

23   THE COMPLAINT WAS FILED, IS THAT WHAT I UNDERSTAND?

24   A    WHEN I ASKED THIS PARTICULAR INFORMATION, IT

25   STARTED ON THE 8-20 -- 8 -- AUGUST 20, 2007.

199

1          WE START BUILDING BECAUSE OF THE ENTRIES

2     STARTED -- THE COMPLAINT THAT I HAVE BEEN SERVED,

3     IT'S STARTING BACK THEN SO WE START BUILDING

4     INFORMATION BASED ON THAT.

5     Q    SO YOU WERE NOT INTERESTED IN ANY OF THE

6     ACTIVITY WHICH ACTUALLY LED TO THE FILING OF THE

7     COMPLAINT IN THE FIRST PLACE?

8     A    I MAY HAVE RESEARCHED THAT IN THE PAST, BUT

9     IT'S NOT FOR THIS PARTICULAR REPORT.

10     Q    AND DO YOU HAVE ANY RECOLLECTION OF THE

11     RESULTS OF THE RESEARCH THAT YOU DID IN THE PAST?

12     A    I THINK I HAVE SOMETHING.

13     Q    AND WHAT IS IT?  WHY IS IT NOT HERE?

14     A    HOW CAN I REMEMBER TWO YEARS AGO?  BUT I DID

15     RESEARCH IT.

16     Q    HAVE YOU PRODUCED ANYTHING IN THIS ACTION

17     REFLECTING ANY RESPONSE BY AKANOC OR MANAGED

18     SOLUTIONS GROUP TO ANY LOUIS VUITTON COMPLAINT

19     CONCERNING ANY ONE OF THE FIVE WEB SITES LISTED

20     HERE?

21     A    YES.

22     Q    AND WHAT WAS THAT?

23     A    SOME OF THE E-MAIL IF I CAN FIND, SOME OF THE

24     ACTIONS THAT I THINK IS RELATED TO THE COMPLAINT

25     ITSELF.

EXHIBIT D

1   Q    YOU HAVE A SPECIFIC RECOLLECTION OF E-MAILS

2   DESPITE THE SERVER CRASH WE HAD TALKED ABOUT

3   EARLIER?

4   A    NO, BECAUSE ANYTHING -- THE E-MAIL RECORD THAT

5   WE HAVE, THE E-MAIL LOG THAT WE HAVE IS JUNE 15TH

6   AND AFTER.

7        AND JUNE 15TH, '07 AND AFTER

8   EVERYTHING -- AND I DID SEARCH THAT PERIOD OF TIME

9   AND THERE IS NOTHING IN IT.

10  Q    SO THERE IS NO EVIDENCE, NO E-MAIL TRAFFIC IN

11  PARTICULAR, RELATING TO ANYTHING CONCERNING THESE

12  FIVE WEB SITES BEFORE JUNE OF 2007?

13  A    THAT IS CORRECT.

14  Q    OKAY.  SO WHAT IS THERE REGARDING ACTIVITY

15  BETWEEN JUNE OF 2007 AND AUGUST 20TH, 2007?  WHY

16  HAVEN'T WE SEEN IT?

17  A    THE ANALYSIS I WAS DOING I THINK IS BASED ON

18  THE EVIDENCE THAT YOU PROVIDE OF CERTAIN COMPLAINTS

19  COMES IN, AND I WAS TRYING TO FIGURE OUT WHAT IS

20  THE IP CHANGE HISTORY BASED ON YOUR COMPLAINT.

21  Q    WELL, YOU WERE HERE YESTERDAY WHEN I WAS

22  READING FROM YOUR DEPOSITION TESTIMONY ABOUT ALL OF

23  THE COMPLAINTS THAT LOUIS VUITTON HAD SENT FROM

24  OCTOBER OF 2006 UNTIL APRIL OF 2007 AND IN RESPONSE

25  TO THOSE QUESTIONS YOU SAID YOU HAD NO

                                              201

# EXHIBIT E

1   2009.

2   Q.   ALL RIGHT.  THANK YOU.

3        SO BOTH BAG925.COM AND WWW.BAG925.COM APPEAR TO BE

4   HOSTED ON DEFENDANT'S SERVERS AS ESSENTIALLY TODAY; IS

5   THAT CORRECT?

6   A.   YES, THAT'S CORRECT.

7   Q.   AND THAT'S BORNE OUT BY THE OTHER PORTION OF THE

8   EXHIBIT I HAVE MARKED, WHICH IS NOW IN FRONT OF YOU, AND

9   WHICH HAS THE WHOIS ARIN RESULT FOR THAT IP ADDRESS;

10  CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   NOW, ON THAT PORTION OF THE REPORT YOU WILL SEE

13  RA ABUSE HANDLE -- I'M SORRY, R ABUSE HANDLE, R TECH

14  HANDLE OR ABUSE HANDLE OR TECH HANDLE.  CAN YOU TELL US

15  WHAT THOSE REFER TO?

16  A.   "ABUSE" IS FOR ABUSE ISSUE TECH; "TECH HANDLE" IS

17  FOR TECH -- TECH ISSUES.

18  Q.   SO, AS I UNDERSTOOD YOUR TESTIMONY, THE

19  INFORMATION PERTAINING TO THOSE HANDLES SHOULD BE

20  CONTACT -- CURRENT CONTACT INFORMATION FOR MANAGED

21  SOLUTIONS GROUP; IS THAT CORRECT?

22  A.   THAT IS CORRECT.

23  Q.   SO IT SHOULD BE -- I THINK YOU SAID ABUSE.MANAGER

24  SG-INC.COM FOR THE E-MAIL ADDRESS?

25  A.   YES.

EXHIBIT E

1    Q.    AND THAT WOULD BE THE NORTHPOINT LOOP ADDRESS IN

2    FREMONT FOR THE MAILING ADDRESS; IS THAT CORRECT?

3    A.    THAT'S CORRECT.

4    Q.    OKAY.  NOW, LET'S MARK AS 626 A ONE-PAGE ARIN

5    WHOIS DATABASE SEARCH FOR THE HANDLE ABUSE 429-ARIN.

6          MR. LOWE:  EXCUSE ME, YOUR HONOR.  I OBJECT TO

7    THIS.  WE HAVE NOT SEEN THESE EXHIBITS BEFORE.  THEY

8    WERE NOT PROVIDED IN DISCOVERY.  APPARENTLY, THEY HAVE

9    BEEN CREATED IN THE LAST DAY OR TWO.

10         THE COURT:  EVEN IF YOU ARE USING IT FOR

11   IMPEACHMENT, PROVIDE COUNSEL WITH THE DOCUMENTS YOU ARE

12   USING IN THIS EXAMINATION.

13         MR. COOMBS:  MY APOLOGY.

14         MR. LOWE:  I WOULD ASK HE HAND US ALL THE

15   DOCUMENTS HE INTENDS TO USE TODAY SO WE DON'T SEE THEM

16   ON THE SCREEN FOR THE FIRST TIME TODAY.

17         THE COURT:  OF COURSE.  THAT IS A COURTESY TO

18   DO THAT, COUNSEL.

19         MR. COOMBS:  YES, YOUR HONOR.  I APOLOGIZE.

20         (WHEREUPON, EXHIBIT 626 WAS MARKED FOR

21         IDENTIFICATION.)

22   BY MR. COOMBS:

23   Q.    NOW, CAN YOU TELL ME WHAT MAILING ADDRESS IS

24   INDICATED ON THAT WHO -- I'M SORRY, ARIN SEARCH RESULT?

25         THE COURT:  MAILING ADDRESS OR E-MAIL?

U.S. DISTRICT COURT                    8

EXHIBIT E

1    BY MR. COOMBS:

2    Q.   I'M SORRY.  THAT'S NOT THE ONE I WAS PUTTING UP.

3    THIS IS 626.  LET ME ZOOM IT OUT A BIT.

4         CAN YOU TELL ME WHAT THAT IS, MR. CHEN?

5    A.   IT LOOKS LIKE IT IS THE OLD ADDRESS WHEN WE FIRST

6    SET UP THE COMPANY, THE 46750 FREMONT BOULEVARD.

7    Q.   NOW, AS I UNDERSTOOD YOUR TESTIMONY, MANAGED

8    SOLUTIONS GROUP AKANOC, THEY HAVEN'T BEEN AT THAT

9    ADDRESS FOR MANY YEARS NOW?

10   A.   MANY YEARS.

11   Q.   AND I'LL JUST SCROLL UP, IF I CAN, AND CAN YOU

12   READ THE DATE THAT APPEARS AT THE BOTTOM RIGHT-HAND

13   CORNER OF THAT PAGE?

14   A.   AUGUST 24, 2009.

15   Q.   THANK YOU.

16        BAG925.COM, THAT WAS IN THE ORIGINAL COMPLAINT

17   SERVED IN AUGUST OF 2007; CORRECT?

18   A.   EXCUSE ME?

19   Q.   THAT WAS ONE OF THE --

20        THE COURT:  "THAT" BEING -- SAY THE NAME

21   AGAIN.

22   BY MR. COOMBS:

23   Q.   BAG925.COM WAS ONE OF THE WEBSITES THAT WAS

24   ALLEGED IN THE ORIGINAL COMPLAINT SERVED ON YOU IN

25   AUGUST OF 2007?

EXHIBIT E

```
 1    SAY THEY THEMSELVES AREN'T THE ONES OPERATING THE
 2    WEBSITES HOSTED ON YOUR SERVERS?
 3    A.    WHAT'S THAT GOT TO DO WITH -- I LOST THE QUESTION
 4    BECAUSE THE WEBSITE HAS NOTHING TO DO WITH MY CUSTOMER.
 5    Q.    HOW DO YOU KNOW THAT, IF YOU DON'T KNOW WHAT YOUR
 6    CUSTOMERS DO WITH IT?
 7    A.    MOST OF THE CUSTOMERS THAT I DEAL WITH, WE -- I
 8    DEAL WITH THEM AT MORE LIKE TECHNICAL LEVEL, AND THEY
 9    ARE JUST HOSTING RESELLERS.
10    Q.    BUT YOU SAID YOU DON'T EVEN KNOW WHETHER THEY ARE
11    DOING WEBSITES AS OPPOSED TO OTHER INTERNET
12    APPLICATIONS.  HOW CAN YOU SAY THEY THEMSELVES ARE NOT
13    OPERATING THE WEBSITES OR SOMEBODY WORKING FOR THEM
14    OPERATING THE WEBSITES THAT ARE ON THEIR SERVERS?
15    A.    I DIDN'T SAY THEY DON'T OPERATE WEBSITES; I SAID I
16    DON'T KNOW WHETHER THEY OPERATE A WEBSITE OR NOT.
17    Q.    SO IT COULD BE THAT THEY DO IN FACT OPERATE
18    WEBSITES THAT ARE ON THOSE SERVERS?
19    A.    YES.
20    Q.    IT COULD BE THAT SOMEBODY CONNECTED WITH THEM
21    OPERATES THOSE WEBSITES ON THOSE SERVERS?
22    A.    MAYBE.
23    Q.    COULD BE A FAMILY MEMBER, FOR EXAMPLE?
24    A.    MAYBE.
25    Q.    NOW, IN YOUR DIRECT TESTIMONY, YOU SPOKE A LITTLE
```

U.S. DISTRICT COURT                    11

```
 1    16,000 TO JACQUES PHAM.  JACQUES, J-A-C-Q-U-E-S, PHAM,

 2    P-H-A-M.

 3    Q.    LET'S PULL UP EXHIBIT 25.

 4          I'LL ASK MS. ADLER TO TURN TO PAGE 2, AND

 5    SCROLL DOWN TO PARAGRAPH 5-B.

 6          CAN YOU READ PARAGRAPH 5-B FOR US, MR. CHEN?

 7    A.    "APPLICANT IS RESPONSIBLE FOR THE TIMELY AND

 8    ACCURATE MAINTENANCE OF DIRECTORY SERVICES DATA AS WELL

 9    AS ANY ORGANIZATION TO WHICH IT FURTHER SUBDELEGATES

10    NUMBER RESOURCES."

11    Q.    I UNDERSTAND THAT TO MEAN THAT THE ENTITY TO WHICH

12    IP ADDRESSES ARE ALLOCATED IS REQUIRED TO MAINTAIN

13    CORRECT CONTACT INFORMATION IN THE ARIN DATABASE; IS

14    THAT YOUR UNDERSTANDING AS WELL?

15    A.    YES.

16    Q.    AND THAT APPLIES WHETHER OR NOT THE NAMES HAVE

17    BEEN SUBDELEGATED OR ASSIGNED OR ALLOCATED TO SOMEONE

18    ELSE ACTUALLY USING THE IP ADDRESSES?

19    A.    I DON'T UNDERSTAND THE WORD OF "SUBDELEGATE."

20    Q.    WELL, AS I UNDERSTAND IT, THE DEFENDANTS WILL

21    ASSIGN IP ADDRESSES TO THEIR CUSTOMERS.  WE WERE JUST

22    TALKING ABOUT THAT.

23    A.    THAT'S RIGHT.

24    Q.    AND I UNDERSTAND THAT TO BE SUBDELEGATING.

25    A.    YES.
```

EXHIBIT E

```
 1    Q.    SO THAT THIS CLAUSE WOULD APPLY REGARDLESS OF

 2    WHETHER OR NOT THE DEFENDANTS ARE ASSIGNING IP ADDRESSES

 3    TO THEIR CUSTOMERS?

 4    A.    THAT'S CORRECT.

 5              (WHEREUPON, EXHIBIT 627 WAS MARKED FOR

 6              IDENTIFICATION.)

 7    BY MR. COOMBS:

 8    Q.    OKAY.  I HAVE JUST MARKED AS 627 A FOUR-PAGE

 9    PRINTOUT FROM THE KNOWLEDGE BASE ON THE ARIN WEBSITE.

10    JUST FOCUSING ON THE TOP FIRST PARAGRAPH OF THAT

11    PRINTOUT, COULD YOU READ THE FIRST -- THE SENTENCE THAT

12    ENDS ON THE FOURTH LINE OF THAT?

13    A.    THE FOURTH LINE?

14    Q.    COULD YOU READ THE FIRST FOUR LINES OF THAT

15    PORTION?  MAYBE IT WOULD BE EASIER IF I DID IT THIS WAY.

16    I HAVE HIGHLIGHTED A PORTION OF THIS.  COULD YOU JUST

17    READ THIS FOR US?  COULD YOU READ IT INTO THE RECORD,

18    PLEASE.  COULD YOU READ IT OUT LOUD?

19    A.    "ARIN'S STEWARDSHIP OF INTERNET NUMBER" --

20              THE COURT:  WHY DON'T YOU READ IT?  DON'T --

21    YOU HAVE THE DOCUMENT.  YOU ARE MUCH BETTER ABLE TO

22    SEE IT.

23              MR. COOMBS:  YES.  THANK YOU, YOUR HONOR.

24    BY MR. COOMBS:

25    Q.    I'M READING FROM EXHIBIT 627 AND THE FIRST PORTION
```

```
 1    COPYRIGHT OFFICE AFTER THE LITIGATION WAS FILED?
 2    A.    SHOULDN'T CHANGE ANYTHING.
 3    Q.    OKAY.  YOU REMEMBER THAT I TOOK YOUR DEPOSITION,
 4    MR. CHEN, IN APRIL OF 2008?
 5    A.    YES.
 6    Q.    OKAY.  I'M GOING TO READ TO YOU SOME QUESTIONS AND
 7    ANSWERS AND ASK YOU IF THESE QUESTIONS AND ANSWERS WERE
 8    IN FACT GIVEN AT THAT DEPOSITION.
 9              "QUESTION:" --
10              AND THIS IS BEGINNING AT PAGE 194.
11              MR. LOWE:  EXCUSE ME, YOUR HONOR.  PERHAPS WE
12    COULD PROVIDE THE WITNESS WITH A COPY?
13              MR. COOMBS:  I'M SORRY.  DO YOU HAVE THE
14    ORIGINAL?
15              MR. LOWE:  GIVE US A MOMENT.
16              (WITNESS PROVIDED A COPY OF THE DEPOSITION.)
17              MR. COOMBS:  IN VOLUME I -- I'M SORRY, VOLUME
18    II, PAGE 194 --
19              THE WITNESS:  PAGE WHAT?
20              MR. COOMBS:  194.
21              THE WITNESS:  LINE?
22    BY MR. COOMBS:
23    Q.  BEGINNING AT LINE 5:
24              "QUESTION:  NOW, IF THAT HAPPENS,
25              DO YOU DO ANYTHING YOURSELF OR
```

EXHIBIT E

```
 1          DOES MANAGED SOLUTIONS DO

 2          ANYTHING TO VERIFY THAT THE

 3          OFFENDING SITE WAS IN FACT

 4          REMOVED AS REPRESENTED BY THE

 5          CUSTOMER?"

 6          "ANSWER:  THE NEWEST PROCEDURE

 7          THAT WE IMPOSE RIGHT NOW IS

 8          QUITE SIMPLE.  WE WANT EVERYBODY

 9          TO MAKE SURE THE DOMAIN NAME

10          DOES NOT RESULT TO OUR IP SO WE

11          JUST NEED TO PING.  IF IT'S

12          STILL WITHIN OUR IP, THEN WE

13          WILL CONSIDER IT STILL THERE;

14          IF IT'S NOT, THEN WE WOULD

15          REVIVE THE IP.  THAT'S THE

16          NEWEST PROCEDURE THAT WE HAVE

17          RIGHT NOW."

18          "QUESTION:  WHEN WAS THAT

19          PROCEDURE IMPLEMENTED?"

20          "ANSWER:  PROBABLY FEBRUARY,

21          MARCH."

22          "QUESTION:  OF 2008?"

23          "ANSWER:  OF 2008.  THAT'S

24          CORRECT."

25          WERE THOSE QUESTIONS ASKED AND ANSWERS GIVEN
```

U.S. DISTRICT COURT                    21

EXHIBIT E

1    DURING YOUR DEPOSITION?

2    A.    YES.

3    Q.    AND I THINK FEBRUARY/MARCH OF 2008 WAS AFTER THE

4    COMPLAINT IN THIS ACTION, WAS IT NOT?

5    A.    YES.

6    Q.    THANK YOU.

7          LET'S TURN BACK TO 1598, PLEASE.  AND IF WE

8    COULD SCROLL DOWN TO PAGE 3 TO THE ENTRY FOR

9    LOVERNIKE.COM.

10         DO YOU SEE THAT ENTRY, MR. CHEN?

11   A.    YES.

12   Q.    AND IN THAT, YOU INDICATE THAT THE WEBSITE WAS NOT

13   FUNCTIONING; IS THAT CORRECT?

14   A.    THAT'S CORRECT.

15   Q.    AND THIS WAS BASED ON A STUDY OF YOUR E-MAIL LOGS;

16   IS THAT CORRECT?

17   A.    THAT'S CORRECT.

18   Q.    SO TELL ME, WHAT DO YOU DO -- HOW IS IT THAT YOU

19   COME TO THE CONCLUSION THAT A WEBSITE IS NOT FUNCTIONAL?

20   A.    TRY TO PING -- TRY TO USE A BROWSER TO GET INTO

21   THE WEBSITE.

22   Q.    IF A WEBSITE IS FUNCTIONING, YOU CAN LOOK AT IT

23   LIKE ANYBODY ELSE; IS THAT CORRECT?

24   A.    THAT'S CORRECT.

25   Q.    SO, BASICALLY, YOU ARE SAYING IT RETURNS THE KIND

U.S. DISTRICT COURT                    22

EXHIBIT E

1    OF ERROR MESSAGES THAT WE HAVE HEARD FROM OTHER

2    WITNESSES DURING THE CASE?

3    A.    THAT'S CORRECT.

4    Q.    "PAGE NOT FOUND" OR SOMETHING TO THAT EFFECT?

5    A.    THAT IS CORRECT.

6    Q.    SO THIS INDICATES THAT ON OR SOON AFTER THE 26TH

7    OF NOVEMBER, THE WEBSITE LOVERNIKE.COM WAS NOT

8    FUNCTIONING; IS THAT CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    CAN YOU TELL US WHAT DATE THAT CHECK WAS DONE?

11   A.    SHOULD BE ON THE 26TH OR SOMEWHERE AROUND THERE,

12   IN THE TWO DAYS.

13   Q.    LOOKS AS THOUGH, WHERE YOU DID FIND THE WEBSITE ON

14   YOUR SERVERS, THAT A TAKEDOWN NOTICE WAS SENT ON THE

15   29TH; CORRECT?  IF YOU LOOK ABOVE AND BELOW "LOVERNIKE,"

16   YOU WILL SEE A FEW THAT SAY "TAKEDOWN NOTICE SENT ON

17   11/29." DO YOU SEE THOSE?

18   A.    YES.

19   Q.    IT SUGGESTS TO ME, AT LEAST, THAT YOU LOOKED AT

20   THESE WEBSITES BETWEEN THE 26TH, WHEN THE LETTER WAS

21   SENT, AND THE 29TH, WHEN THE TAKEDOWN NOTICES WERE SENT.

22   IS THAT A REASONABLE INTERPRETATION?

23   A.    IT'S A BIG BATCH SO I MUST HAVE WORKED ON IT IN --

24   IN THAT COUPLE DAYS.

25   Q.    OKAY.  BUT BY THE 29TH, YOU HAD LOOKED AT

U.S. DISTRICT COURT              23

1    LOVERNIKE.COM AND CONCLUDED IT DID NOT ACTUALLY RESULT

2    IN A WEBSITE?

3    A.    THAT IS CORRECT.

4    Q.    CAN WE PULL UP EXHIBIT 616 AND SCROLL TO PAGE 14.

5    SCROLL DOWN.

6          DO YOU SEE THE HIGHLIGHTED ENTRIES,

7    PARTICULARLY THE FIRST ONE ON 11/30?  CAN YOU READ TO US

8    THE ENTRY BESIDE THE 133131 TICKET NUMBER?

9    A.    133131?

10   Q.    CORRECT.

11   A.    "133131, UNPLUGGED PER STEVE DUE TO COUNTERFEIT

12   PRODUCT, THIRD COMPLAINT WWW.LOVERNIKE.COM,

13   205.209.185.226."

14   Q.    THAT DOMAIN NAME IS THE SAME DOMAIN NAME WE WERE

15   JUST TALKING ABOUT; CORRECT?

16   A.    THAT IS CORRECT.

17   Q.    THAT SUGGESTS THAT THE WEBSITE WAS IN FACT

18   FUNCTIONAL ON THE 30TH OF NOVEMBER; IS THAT NOT CORRECT?

19   A.    IF IT'S AFTER THE UNPLUGGED, THEN IT WILL NOT BE

20   FUNCTION.

21   Q.    IN FACT, WHEN YOU SAY "WEBSITE NOT FUNCTIONAL," IT

22   WAS ONLY NOT FUNCTIONAL BECAUSE YOU HAD IN FACT

23   UNPLUGGED THE SERVER ON WHICH THE WEBSITE WAS FOUND?

24   A.    MAY.  THE RECORD IS JUST SHOWING AT THAT

25   PARTICULAR TIME IT WAS NOT FUNCTION.  WHETHER I DID

1   ANYTHING TO IT, I HAVE NO RECOLLECTION.

2   Q.   WELL, DOESN'T THIS INDICATE THAT YOU UNPLUGGED IT

3   BECAUSE LOVERNIKE.COM WAS ON THE SERVER AT THAT TIME?

4   A.   RIGHT.

5   Q.   THANK YOU.

6        YOU DON'T ACTUALLY UNPLUG SERVERS IF THE

7   WEBSITE IS NOT THERE, DO YOU?

8   A.   IF WEBSITE IS NOT THERE, THEN I DON'T NEED TO.

9   Q.   NOW, HOW MANY -- THERE'S A LIST THAT WE HAVE,

10  ABOUT THREE OR FOUR PAGES.  YOU MAY WANT TO TURN -- I

11  THINK YOU HAVE A BINDER WITH 1598 IN IT.

12       BUT THERE WERE SEVERAL TAKEDOWN NOTICES SENT

13  ON THE 29TH IN RESPONSE TO THE NOVEMBER 26TH LETTER; IS

14  THAT NOT CORRECT?

15  A.   COULD YOU REPEAT A QUESTION?

16  Q.   IF YOU LOOK AT PAGES -- FROM THE BOTTOM OF PAGE 1

17  UNTIL PAGE 5, YOU WILL SEE A LIST OF DOMAIN NAMES THAT

18  WERE THE SUBJECT OF THE NOVEMBER 26TH LETTER.  DO YOU

19  SEE THAT?

20  A.   YES.

21  Q.   AND YOU WILL SEE THAT SEVERAL OF THEM WERE THE

22  SUBJECT OF TAKEDOWN NOTICES SENT ON NOVEMBER 29TH.  DO

23  YOU SEE THAT?

24  A.   THAT'S CORRECT.

25  Q.   HOW MANY OF THOSE WERE SENT TO THE SAME CUSTOMER?

1    A.    I HAVE NO RECOLLECTION.

2    Q.    ALL RIGHT.  MAYBE WE CAN HELP YOU WITH THAT.

3          LET'S PULL UP EXHIBIT 550.  IF YOU COULD

4    SCROLL JUST TO THE HEADER.  OOPS.

5          YOU SEE THAT THAT IS SENT TO ZHONGHH; CORRECT?

6    A.    YES.

7    Q.    AND I THINK YOU TESTIFIED FRIDAY THAT ZHONGHH IS

8    ALICE CHEN'S ACCOUNT; IS THAT CORRECT?

9    A.    YES.

10   Q.    AND IT SAYS THAT YOU'VE RECEIVED A COMPLAINT

11   REGARDING SERVER 204.16.193.107 MAIN IP 204.13.69.210.

12   YOU SEE THAT?

13   A.    YES.

14   Q.    AND IT'S REGARDING THE WEBSITE BAG4SELL.COM?

15   A.    THAT'S CORRECT.

16   Q.    SO THAT'S ONE THAT WAS SENT TO MS. CHEN.

17         LET'S TURN TO EXHIBIT 554, AND LET'S EXPAND

18   THE HEADER ON THIS ONE.

19         THAT'S ALSO SENT TO ZHONGHH; CORRECT?

20   A.    THAT'S CORRECT.

21   Q.    AND THAT'S THE SAME DAY?

22   A.    YES.

23   Q.    AND IT'S SENT CONCERNING MAIN IP -- THIS IS A

24   SLIGHTLY DIFFERENT MAIN IP; IT'S 205.209.136.90?

25   A.    THAT'S CORRECT.

EXHIBIT E

1   Q.   SO IT'S TWO THAT WERE SENT ON THE SAME DAY TO

2   MS. CHEN.

3            LET'S TURN TO EXHIBIT 555.

4            NOW, ON FRIDAY I THINK YOU SAID CHENDAN IS

5   ALSO MS. CHEN; IS THAT CORRECT?

6   A.   YES.

7   Q.   SO THAT'S THREE NOTICES THAT WERE SENT ON

8   NOVEMBER 29TH TO MS. CHEN; CORRECT?

9   A.   YES.

10  Q.   THAT'S CONCERNING DREAMYSHOES; CORRECT?

11  A.   CORRECT.

12  Q.   LET'S TURN TO 557.

13           THIS ONE WAS SENT TO ZHONGHH AS WELL?

14  A.   YES.

15  Q.   MS. CHEN?

16  A.   YES.

17  Q.   ON NOVEMBER 29TH; CORRECT?

18  A.   YES.

19  Q.   LET'S TURN TO EXHIBIT 559.

20           THIS ONE IS BEING SENT TO ZHONGHH AS WELL, SO

21  THAT'S MS. CHEN ON NOVEMBER 29TH AS WELL; IS THAT

22  CORRECT?

23  A.   YES.

24  Q.   AND LET'S TURN TO 560.

25           THAT'S TO CHENDAN, MS. CHEN, AGAIN?

U.S. DISTRICT COURT                 27

EXHIBIT E

```
1    A.    YES.

2    Q.    AND THAT'S NOVEMBER 29TH, 2007.

3          AND LET'S TURN TO EXHIBIT 562.

4          THAT'S ZHONGHH; THAT'S MS. CHEN, AGAIN?

5    A.    YES.

6    Q.    DIFFERENT WEBSITE; CORRECT?

7    A.    YES.

8    Q.    AND THAT'S THE SAME DAY?

9    A.    YES.

10   Q.    LET'S TURN TO 564.

11         MS. CHEN AGAIN ON THE SAME DAY CONCERNING YET

12   ANOTHER WEBSITE, CORRECT?

13   A.    YES.

14   Q.    LET'S TURN TO 582.

15         ZHONGHH AGAIN, NOVEMBER 29TH, 2007, CONCERNING

16   PRO-JORDAN?

17   A.    YES.

18   Q.    SO I HAVE GOT NINE NOTICES SENT TO ONE CUSTOMER

19   CONCERNING NINE DIFFERENT WEBSITES ON SEVERAL DIFFERENT

20   EXTRA IP NUMBERS?

21   A.    YES.

22   Q.    WOULD IT SURPRISE YOU TO KNOW THAT YOU SENT NINE

23   NOTICES TO ANOTHER ONE OF YOUR CUSTOMERS THAT SAME DAY

24   CONCERNING NINE DIFFERENT WEBSITES ON NINE DIFFERENT

25   EXTRA IP'S CONTROLLED BY THEM?
```

1    SUMMARY OF ALL THE E-MAILS THAT I SENT OUT.

2    Q.    MR. CHEN, I -- MAYBE I WAS NOT CLEAR ON MY

3    QUESTION.  DID YOU FINE MS. CHEN BECAUSE OF THIS

4    EXTENSIVE INFRINGEMENT THAT WAS IDENTIFIED ON HER SERVER

5    ON NOVEMBER 27TH?

6    A.    IF I VERIFY --

7    Q.    MR. CHEN, DID YOU FINE -- DID YOU IMPOSE ANY KIND

8    OF MONEY PENALTY ON MS. CHEN FOR THE VARIOUS

9    INFRINGEMENTS THAT WERE ON HER SERVER AT THE END OF

10   NOVEMBER 2007?

11   A.    NO.

12   Q.    DID YOU SUSPEND MS. CHEN -- I MEAN THE CUSTOMER,

13   MS. CHEN -- AS A RESULT OF THE VARIOUS INFRINGEMENTS

14   IDENTIFIED ON HER SERVER AT THE END OF NOVEMBER, 2007?

15   A.    NO.

16   Q.    DID YOU TERMINATE HER?

17   A.    NO.

18   Q.    OF COURSE NOT.

19          THE COURT:  DON'T -- YOUR COMMENT IS

20   ARGUMENTATIVE.

21          MR. COOMBS:  I'M SORRY.

22   BY MR. COOMBS:

23   Q.    LET'S GO BACK TO EXHIBIT 554.

24          THIS IS ONE OF THE E-MAILS WE WERE JUST

25   LOOKING AT, AND IT'S BUYMYSHOES.NET WHICH IS LOCATED ON

U.S. DISTRICT COURT                    30

```
 1    IP 205.209.136.90, MAIN IP 205.209.136.90.  SO THEY ARE
 2    THE SAME IP NUMBER, ACTUALLY, AREN'T THEY?
 3    A.    YES.
 4    Q.    AND THIS IS THAT EXTRA MAIN ISSUE WE WERE TALKING
 5    ABOUT A LITTLE EARLIER?
 6    A.    NO, THIS IS JUST ONE IP.  THIS IS ON THEIR MAIN
 7    IP.
 8    Q.    AND IF WE GO BACK TO 1598, ON THE TOP OF PAGE 2
 9    YOU WILL SEE THE FIRST ENTRY IS BUYMYSHOES.NET AND IT
10    INDICATES A TAKEDOWN NOTICE SENT ON NOVEMBER 29TH, 2007.
11    DO YOU SEE THAT?
12    A.    YES.
13    Q.    AND THE TAKEDOWN NOTICE REFERRED TO THERE IS THE
14    E-MAIL THAT WE WERE JUST LOOKING AT; IS THAT NOT
15    CORRECT?
16    A.    THAT'S CORRECT.
17    Q.    LET'S LOOK AT EXHIBIT 564.
18          NOW, THAT IS ALSO HOSTED ON THE SAME MAIN IP;
19    IS THAT CORRECT?
20    A.    YES.
21    Q.    WHEN YOU SAY IN THE NEXT LINE "DIFFERENT IP," ARE
22    YOU TALKING ABOUT THE "EXTRA IP" OR THE "MAIN IP"?  IF
23    YOU LOOK NEXT TO -- ON THE LINE CONCERNING
24    BUYMYSHOES.NET, IT SAYS, YOU KNOW, "1/3/08, DIFFERENT IP
25    NOTICE SENT" -- "TAKEDOWN NOTICE SENT 1/14/08."  DO YOU
```

EXHIBIT E

1    SEE THAT.

2    A.    WE ONLY CHECK THE --

3    Q.    I'M JUST ASKING YOU IF YOU SEE THE ENTRY I'M

4    REFERRING TO.

5    A.    WHAT DO YOU WANT ME TO LOOK AT?

6              THE COURT:   THE CURSOR IS NOT IN THE RIGHT

7    COLUMN.  IT'S THE NEXT -- THAT COLUMN.

8    BY MR. COOMBS:

9    Q.    DO YOU SEE WHERE IT SAYS "1/3/08, DIFFERENT IP"?

10   A.    YES.

11   Q.    IS THE DIFFERENT IP THERE A DIFFERENT EXTRA IP OR

12   A DIFFERENT MAIN IP?

13   A.    DIFFERENT IP FOR THE DOMAIN ITSELF.

14   Q.    SO THE MAIN IP, IN FACT, COULD BE THE SAME?

15   A.    I DON'T KNOW.

16   Q.    YOU DON'T KNOW -- BECAUSE YOU ARE REALLY ONLY

17   LOOKING AT THE EXTRA IP?

18   A.    YES.

19   Q.    NOW, LET'S PULL UP EXHIBIT 557 THAT WE WERE

20   LOOKING AT A MOMENT AGO.

21              THIS IS ONE OF THE NOTICES TO MS. CHEN ON

22   NOVEMBER 29TH; CORRECT?

23   A.    YES.

24   Q.    AND IT'S THE MAIN IP ENDING IN DOT NINE ZERO.

25              LET'S LOOK AT EXHIBIT 549.  LET'S ENLARGE THE

U.S. DISTRICT COURT                    32

EXHIBIT E

1   PICK UP FROM THE AVAILABLE POOL THAT WE CAN ASSIGN THOSE

2   IP ATTACHED TO THAT PARTICULAR MAIN IP.  SO WITH A

3   ROUTER, WE CAN ALWAYS CHANGE THE EXTRA IP.

4           THE COURT:  SO THAT AT THE ROUTER, THEN, IF

5   SOMEONE IS USING AN EXTRA IP IN A WAY THAT YOU WOULD

6   WISH TO DISABLE THAT IP ADDRESS, YOU COULD DO THAT AT

7   THE ROUTER?

8           THE WITNESS:  YES.

9           THE COURT:  AND YOU ARE ABLE ALSO TO GO TO THE

10  SERVER AND DISABLE THE ENTIRE SERVER?

11          THE WITNESS:  YES.  THAT'S BASICALLY

12  DISCONNECT THE NETWORK CABLE.

13          THE COURT:  AND THERE WERE OCCASIONS ALSO WHEN

14  YOU WOULD YOURSELF GO ONTO THE INTERNET USING A BROWSER

15  LIKE ANY MEMBER OF THE PUBLIC WOULD TO SEE WHAT WAS AT A

16  PARTICULAR DOMAIN NAME?

17          THE WITNESS:  YES.

18          THE COURT:  BUT YOU COULDN'T DO THAT FROM

19  WITHIN YOUR OWN SERVER SYSTEM?

20          THE WITNESS:  NO.

21          THE COURT:  THE FINAL QUESTION THAT I HAVE,

22  AND IT HAS TO DO WITH 1598, WHICH WE HAVE BEEN USING --

23  AND ACTUALLY, IT'S UP ON THE SCREEN STILL.

24          ONE OF THE PARTIES ASKED ABOUT YOUR CUSTOMERS.

25  THIS SHOWS A COMPLAINT THAT IS ADDRESSED AND INDEXED BY

1    THE VARIOUS DOMAIN NAMES.  DID YOU EVER TAKE THE VARIOUS

2    DOMAIN NAMES AND CROSS-REFERENCE THEM TO YOUR CUSTOMER

3    LIST TO DECIDE WHETHER OR NOT YOU HAD A CUSTOMER THAT

4    WAS REGULARLY INVOLVED IN COMPLAINTS?

5              THE WITNESS:  NOT REALLY.  THIS IS SOMETHING

6    THAT WE PUT TOGETHER FOR THE PRESENTATION.

7              THE COURT:  ALL RIGHT.  NOW, DO YOU HAVE A

8    CUSTOMER LIST?

9              THE WITNESS:  IT'S IN OUR DATABASE.

10             THE COURT:  ALL RIGHT.  BUT YOU DON'T HAVE IT

11   HERE FOR US?  YOU HAVEN'T PRODUCED A CUSTOMER LIST SO WE

12   COULD SEE A LIST OVER A PERIOD OF TIME OF WHO YOUR

13   CUSTOMERS WERE?

14             THE WITNESS:  NO.

15             THE COURT:  AND DID YOU EVER HISTORICALLY

16   SEARCH FOR DOMAIN NAMES IN YOUR CUSTOMER LIST TO SEE

17   WHICH CUSTOMERS WERE ASSOCIATED WITH WHICH DOMAIN

18   NAMES?

19             THE WITNESS:  I CAN ONLY -- I ONLY KNOW ONE

20   CUSTOMER FROM CHINA THAT THEY ARE ACTUALLY A DOMAIN

21   REGISTRAR, AND THEY MIGHT HAVE -- THEY MIGHT ASSOCIATE

22   TO A LOT OF DOMAINS THEMSELVES.  THE REST OF THE

23   CUSTOMERS, AS I KNOW, THEY ALL RESELLERS; THEY DON'T OWN

24   DOMAIN NAMES THEMSELVES.

25             THE COURT:  I SEE.  BUT THERE WOULD BE AN

EXHIBIT E

```
 1    THINGS ARE VERIFIED BEFOREHAND.

 2    Q.    HOW ARE THEY VERIFIED?

 3    A.    I'M NOT SURE.

 4    Q.    IT'S LIKE VERIFYING CREDIT CARD INFORMATION, IS

 5    THAT WHAT YOU ARE TALKING ABOUT?

 6    A.    YES.

 7    Q.    NOW, ARE YOU FAMILIAR WITH -- ARE YOU FAMILIAR

 8    WITH ARIN?

 9    A.    YES.

10    Q.    AND WHAT IS THAT?

11    A.    ARIN IS AN INTERNET REGISTRY AND THEY ARE

12    RESPONSIBLE FOR ALLOCATING IP ADDRESSES TO ORGANIZATIONS

13    IN AMERICA.

14             THE COURT:  SOME OF THIS HAS BEEN COVERED AND

15    NOT CONTROVERSIAL, BUT I'LL PERMIT YOU.

16             MR. LOWE:  THAT WAS MERELY THE BACKGROUND,

17    YOUR HONOR.

18    BY MR. LOWE:

19    Q.    NOW, DO YOU KNOW WHETHER OR NOT AKANOC AND MANAGED

20    SOLUTIONS PROVIDES INFORMATION TO ARIN CONCERNING THE

21    USAGE OF IP ADDRESSES THAT ARE ASSIGNED TO IT?

22    A.    SO PER ARIN GUIDELINES WE ARE RESPONSIBLE FOR

23    KEEPING OUR WHOIS RECORDS UP TO DATE, AND THAT IS

24    PARTICULARLY, YOU KNOW, COMPANY INFORMATION OF AN

25    ORGANIZATION THAT IS UTILIZING AN IP ADDRESS.
```

EXHIBIT E

```
1    Q.    NOW, WHAT DO YOU MEAN AN ORGANIZATION UTILIZING

2    IT?  ARE YOU TALKING ABOUT AKANOC OR A CUSTOMER OF

3    AKANOC, OR SOMETHING ELSE?

4    A.    A LITTLE OF BOTH.  SO WHEN ARIN ISSUES A BLOCK OF

5    IP ADDRESSES, THEY EXPECT THAT IF THE ISP WILL ASSIGN

6    THOSE TO THEIR CUSTOMERS, THAT THEY WILL ALSO PUT THE

7    CUSTOMER'S INFORMATION IN THE WHOIS DATABASE.

8    Q.    AND HOW IS THAT DONE AT AKANOC, MANAGED SOLUTIONS?

9    A.    AT AKANOC THERE IS A WHOIS SERVER, AND ARIN HAS

10   BASICALLY A LINK TO THAT WHOIS SERVER TO PULL THE

11   INFORMATION.

12   Q.    AND WHAT'S ON THIS WHOIS SERVER?

13   A.    THE WHOIS SERVER HAS THE COMPANY NAME AS WELL AS

14   THE CITY AND STATE OF A PARTICULAR ORGANIZATION THAT IS

15   RESPONSIBLE FOR THAT IP ADDRESS.  IF WE HAVE A CUSTOMER

16   THAT HAS IP'S FROM US ON ONE OF OUR SERVERS, THEN THAT

17   INFORMATION WILL GET PUBLISHED TO THE WHOIS SERVER.

18   Q.    TO THE WHICH SERVER?

19   A.    TO THE WHOIS SERVER.

20   Q.    THE WHOIS SERVER.  SO YOU ARE TALKING ABOUT

21   CUSTOMER INFORMATION FROM THE CPRO DATABASE THAT'S ON

22   THE WHOIS SERVER?

23   A.    YES.

24   Q.    IF SOMEONE WANTED TO FIND OUT WHO YOUR CUSTOMERS

25   ARE, COULD THEY FIND THAT OUT THROUGH A QUERY TO ARIN?
```

U.S. DISTRICT COURT                    82

EXHIBIT E

1    IN OTHER WORDS, COULD SOMEONE LOOK UP THROUGH ARIN AND

2    LINK TO YOUR WHOIS --

3    A.    YES.

4    Q.    -- SERVER INFORMATION ABOUT YOUR CUSTOMERS?

5    A.    YES.  THAT'S PUBLIC INFORMATION.

6    Q.    SO HOW WOULD THEY DO THAT?

7    A.    THERE IS A, I GUESS, WHOIS PROTOCOL THAT'S EITHER,

8    YOU KNOW, FROM A PARTICULAR COMPUTER OR FROM ARIN'S

9    WEBSITE.  YOU CAN GO AHEAD AND TYPE IN AN IP ADDRESS AND

10   IT WILL RETURN THE WHOIS INFORMATION FOR A PARTICULAR

11   IP.

12   Q.    OKAY.  NOW, LET'S GO BACK TO THE OPERATION OF THE

13   ISP HERE AND THE SERVERS.  IF SOMEONE HAS, AS YOU HAVE

14   DESCRIBED, ORDERED A SERVER, A PACKAGE SO-TO-SPEAK WITH

15   IPS'S AND BANDWIDTH -- IS THAT THE WAY IT'S SOLD?

16   A.    YES.

17   Q.    DO YOU HAVE ANY CONTROL OVER WHAT THEY DO WITH

18   THAT SERVER?

19   A.    NO.  OUR MODEL IS THAT A CUSTOMER RECEIVES A

20   DEDICATED SERVER, AND IN THE INDUSTRY TERMS A DEDICATED

21   SERVER IS, YOU KNOW, FULL ADMINISTRATIVE ACCESS.  SO THE

22   SERVER ITSELF WILL HAVE AN OPERATING SYSTEM INSTALLED, A

23   PASSWORD WILL BE SET, AND THAT PASSWORD WILL BE SENT TO

24   THE CUSTOMER.  AT THAT POINT IT IS AS IF, YOU KNOW, THE

25   CUSTOMER IS THE ONLY ADMINISTRATOR OF THAT SERVER.  IT

U.S. DISTRICT COURT                    83

```
 1              THE COURT:  VERY WELL.

 2              ANY CROSS?

 3                    CROSS-EXAMINATION

 4   BY MS. WANG:

 5   Q.    GOOD MORNING, MR. CHENG.

 6   A.    GOOD MORNING.

 7   Q.    ISN'T IT CORRECT THAT WHEN YOU ARE ASSIGNING AN IP

 8   ADDRESS, IT ONLY GETS ASSIGNED TO ONE CUSTOMER AT A

 9   TIME?

10   A.    THAT'S CORRECT.

11   Q.    AND WHEN AN INTERNET USER IS TRYING TO ACCESS A

12   WEBSITE THAT IS ON ONE OF YOUR SERVERS, ISN'T AKANOC'S

13   SERVER THE FIRST HOP OUT?

14   A.    CAN YOU REPEAT THAT?

15   Q.    SURE.  WHEN INFORMATION IS BEING TRANSMITTED TO AN

16   INTERNET USER FROM DEFENDANT'S SERVERS, ISN'T THE FIRST

17   ROUTER OR HOP DEFENDANT'S ROUTER?

18   A.    SO THE FIRST HOP FROM A CUSTOMER SERVER WILL BE

19   AKANOC'S ROUTER.

20   Q.    AND YOU STATED EARLIER THAT THE ARIN WHOIS

21   DATABASE INFORMATION IS UPDATED BY AKANOC OR MSG; IS

22   THAT CORRECT?

23   A.    YES.

24   Q.    I'M GOING TO SHOW YOU --

25              THE COURT:  YOU MIGHT WANT TO BACK OUT A
```

```
 1   LITTLE BIT.

 2           MS. WANG:  IS IT FLASHING ON YOUR SCREENS AS

 3   WELL?

 4           THE COURT:  KEEP YOUR VOICE UP.

 5   BY MS. WANG:

 6   Q.    MR. CHENG, CAN YOU SEE THAT?

 7   A.    YES.

 8   Q.    AND WHAT DOES IT LIST AS MANAGED SOLUTIONS GROUP'S

 9   CONTACT INFORMATION OR ADDRESS?

10   A.    IT'S A LITTLE BLURRY.

11           THE COURT:  IS THERE AN AUTOFOCUS BUTTON

12   THERE?

13           MS. WANG:  YEAH, I TRIED IT EARLIER, BUT --

14   YEAH.  SORRY, THAT IS ACTUALLY AUTOFOCUSED.

15           THE WITNESS:  IT LISTS 46750 FREMONT.

16   BY MS. WANG:

17   Q.    IS THAT A CORRECT ADDRESS FOR MANAGED SOLUTIONS

18   GROUP?

19   A.    I BELIEVE THAT IS A -- SOME TYPE OF ADDRESS.  IT

20   MIGHT BE THE REGISTERED ADDRESS FOR THE CORPORATION, I'M

21   NOT SURE.

22   Q.    COULD YOU READ THE DATE THERE?

23   A.    THAT SAYS "8/24/2009."

24   Q.    AND, MR. CHENG, YOU ALSO TESTIFIED THAT THE ARIN

25   WHOIS DATABASE WOULD REFLECT YOUR -- OR DEFENDANT'S
```

EXHIBIT E

```
1    CUSTOMERS?

2    A.    YES.

3    Q.    AND THAT WOULD BE ACCORDING TO A SEARCH FOR A

4    PARTICULAR IP ADDRESS?

5    A.    YES.

6    Q.    I'M SHOWING YOU EXHIBIT 625, WHICH APPEARS TO BE A

7    WHOIS SEARCH FOR A PARTICULAR IP ADDRESS.

8              LOOKING AT THAT RESULT, CAN YOU TELL ME WHICH

9    CUSTOMER THAT IP ADDRESS BELONGED TO?

10   A.    I DON'T SEE ANY INFORMATION.

11             MS. WANG:  NO FURTHER QUESTIONS, YOUR HONOR.

12             THE COURT:  ANY FURTHER QUESTIONS?

13             MR. LOWE:  NO, YOUR HONOR.

14             THE COURT:  VERY WELL.  THE WITNESS IS

15   EXCUSED.

16             THANK YOU VERY MUCH.

17             CALL YOUR NEXT WITNESS.

18             MR. LOWE:  I CALL RICHARD GRALNIK.

19             (PAUSE IN PROCEEDINGS.)

20             THE COURT:  IS THERE SOMEONE WHO HAS SUMMONED

21   HIM?

22             MR. LOWE:  I BELIEVE SO.  HE IS STANDING IN

23   THE HALL.

24             THE COURT:  COME ALL THE WAY FORWARD HERE AND

25   BE SWORN BY THE CLERK.
```

```
 1              CONNECTION WITH ANY OF THESE
 2              ACCEPTABLE USE VIOLATIONS?"
 3              "ANSWER:  NO."
 4         WERE THOSE QUESTIONS ASKED AND THOSE ANSWERS
 5    GIVEN DURING YOUR DEPOSITION?
 6    A.    YES, THEY WERE.
 7    Q.    THANK YOU.
 8              NOW, DURING YOUR DIRECT EXAMINATION, YOU SAID
 9    THAT IN YOUR DISCUSSION WITH, I THINK YOU SAID EIGHT
10    OTHER ISP'S, YOU DEVELOPED NO INFORMATION THAT THERE WAS
11    A FORMAL OR SPECIFIC TIME FRAME FOR RESPONSE TO ABUSE
12    COMPLAINTS; IS THAT CORRECT?
13    A.    YES, IT IS.
14    Q.    BUT I THINK YOU DID IDENTIFY THAT THERE WAS A
15    REASONABLE TIME THAT -- SORT OF AN OUTER LIMIT, MAXIMUM
16    TIME, THAT THESE ISP'S TENDED TO ADHERE TO; IS THAT NOT
17    THE CASE?
18    A.    I BELIEVE SO.
19    Q.    AND WHAT WAS THAT TIME FRAME?
20    A.    I THINK MY ANSWER WAS A FEW DAYS TO A WEEK.
21    Q.    NORMALLY, MOST OF THE ISP'S WITH WHOM YOU TALKED
22    TO, OTHER THAN THE DEFENDANTS, WOULD RESPOND TO AN ABUSE
23    COMPLAINT WITHIN A FEW DAYS TO A WEEK?
24    A.    THEY DIDN'T GIVE ME SPECIFIC TIMETABLES.  THEY DID
25    SAY THAT THEY WOULD FOLLOW UP AND EITHER HAVE AN
```

EXHIBIT E

```
 1    INVESTIGATION OR TAKE ONE OF THE STEPS THAT I TALKED
 2    ABOUT BEFORE IN RESPONSE TO AN ABUSE COMPLAINT.
 3    Q.    NOW, YOU SPOKE ALSO ABOUT ESCALATION OF REMEDIES
 4    AGAINST REPEATED INFRINGERS -- I'M SORRY, REPEATED
 5    ABUSERS.  WE ARE NOT LIMITING IT TO INFRINGERS.  WELL,
 6    THAT'S WHAT I HAVE IN MY NOTES.
 7            AND AS I UNDERSTAND IT, YOU KNOW, THE FIRST
 8    OBVIOUS LEVEL OF RESPONSE IS JUST A WARNING, "STOP IT.
 9    IF YOU DON'T STOP IT, SOMETHING MORE SERIOUS IS GOING TO
10    HAPPEN."  IS THAT CORRECT?
11    A.    YES.
12    Q.    AND THAT'S A POLICY THAT'S PRETTY CONSTANT, AND
13    IN FACT IT'S A POLICY OF THE DEFENDANTS HERE AS WELL; IS
14    IT NOT?
15    A.    YES.
16    Q.    AND IF THAT WARNING DOES NOT RESULT IN A REMOVAL
17    OF THE ABUSIVE CONDUCT, THEN THE NOTION IS THAT THE NEXT
18    LEVEL WILL BE A MORE SEVERE SANCTION THAN A MERE
19    WARNING.  ISN'T THAT ALSO TRUE?
20    A.    YES.
21    Q.    AND THAT'S A POLICY THAT SEEMED TO BE ADOPTED
22    PRETTY UNIVERSALLY AMONGST THE OTHER EIGHT ISP'S THAT
23    YOU SPOKE WITH?
24    A.    YES.  THESE POLICIES I LOOKED -- WE LOOKED AT
25    THEIR ESCALATION PROCEDURES.  IN MANY CASES THEY ARE
```

1   ACTUALLY IDENTICAL TASKS, FOR EXAMPLE, OF ALL THESE

2   UNDER THE SAME CONTRACT.

3   Q.   VERY SIMILAR TO THE ONES THE DEFENDANTS HAVE HERE?

4   A.   YES.

5   Q.   SO IT WOULD BE REASONABLE TO CONCLUDE THAT THE

6   DEFENDANTS HAVE THE SAME TOOLS AT THEIR DISPOSAL THAT

7   THESE OTHER ISP'S HAVE?

8   A.   YES.

9   Q.   WHICH INCLUDE MONEY PENALTIES, SUSPENSION,

10  TERMINATION, AND SO FORTH?

11  A.   YES.

12  Q.   IN FACT, I THINK THEY ALSO HAVE "REMOVAL OF THE

13  OFFENDING CONTENT" AS AN ADDITIONAL PROVISION IN THEIR

14  ACCEPTABLE RESPONSE; IS THAT NOT ALSO TRUE?

15  A.   I DON'T RECALL THAT.  I WOULD HAVE TO LOOK AT THE

16  LIST.

17  Q.   NOW, I THINK YOU SAID --

18           AND I WOULD ASK TO PULL UP EXHIBIT 1576.

19           NOW, ON YOUR DIRECT YOU SAID THAT, BASED ON

20  YOUR INVESTIGATION, NONE OF THE ISP'S WILL MONITOR

21  ACTIVITY ON THEIR SERVERS; IS THAT CORRECT?

22  A.   I THINK I SAID THEY DON'T MONITOR CONTENT.

23  Q.   DON'T MONITOR CONTENT.  THANK YOU FOR YOUR

24  CORRECTION.

25           NOW, HOSTGATOR, WHICH IS THE COMPANY WHOSE

1   POLICIES I PUT UP IN FRONT OF YOU IN 1576, THAT WAS ONE

2   OF THE COMPANIES YOU SPOKE WITH?

3   A.   YES.

4   Q.   IT'S ONE OF THE COMPANIES THAT DOESN'T MONITOR

5   CONTENT, ACCORDING TO YOUR TESTIMONY?

6   A.   THAT'S RIGHT.

7   Q.   I WOULD ASK YOU TO TURN TO PAGE 2 OF 1576, AND IF

8   YOU COULD SCROLL DOWN A LITTLE OVER HALFWAY TO THE

9   SENTENCE THAT BEGINS WITH THE WORD "RESELLERS," AND I

10   WOULD ASK YOU TO READ THAT SENTENCE INTO THE RECORD,

11   PLEASE, MR. GRALNIK.

12   A.   "EXAMPLES OF UNACCEPTABLE MATERIAL" --

13   Q.   NO, NO.  I'M SORRY.  I'M SORRY.  WE ARE PROBABLY

14   LOOKING AT A DIFFERENT PORTION.  YOU COULD READ FOR A

15   LONG TIME IF YOU READ THE WHOLE THING.

16        IS IT NOT COMING UP?

17        MS. WANG:  YES.

18   BY MR. COOMBS:

19   Q.   YOU HAVE A HARD COPY THERE AS WELL?

20   A.   YES, I DO.

21   Q.   SO THAT YOU ARE AT THE SAME PLACE EVERYBODY ELSE

22   WILL BE WHEN IT COMES UP ON THE SCREEN, IF YOU GO DOWN

23   ON THE "TERMS OF SERVICE" A LITTLE OVER HALFWAY, THERE'S

24   ONE SENTENCE, ONE INDENTED SENTENCE THERE THAT SAYS

25   "RESELLERS."  DO YOU SEE THAT?  IT'S ABOUT TWO LINES.

1    A.    YES.

2    Q.    AND I THINK WE HAVE IT UP ON THE SCREEN NOW.

3          LET'S TURN TO THE NEXT PAGE AND SCROLL DOWN,

4    AND PERHAPS ENLARGE IT A LITTLE BIT.

5          AND IF YOU COULD READ THAT FOR US?

6          THE COURT:  WHAT DO YOU WANT TO ENLARGE IT

7    FOR?

8          THE WITNESS:  "RESELLERS, WE WILL

9             SUSPEND THE SITE IN QUESTION AND

10            WILL NOTIFY YOU SO YOU MAY

11            TERMINATE THE ACCOUNT.  WE WILL

12            FURTHER MONITOR YOUR ACTIVITY.

13            MORE THAN ONE INFRACTION OF THIS

14            TYPE MAY RESULT IN THE IMMEDIATE

15            TERMINATION OF YOUR ACCOUNT."

16   BY MR. COOMBS:

17   Q.    THAT'S THE KIND OF ESCALATION YOU WERE TALKING

18   ABOUT IN YOUR DIRECT EXAMINATION, ISN'T IT?

19   A.    SUSPENSION IS ONE OF THE OPTIONS.

20   Q.    WELL, ACTUALLY THE WORD HERE IS "TERMINATION."

21   A.    WELL, TERMINATION IS ALSO ON THE LIST.

22   Q.    TERMINATION IS PROBABLY THE ULTIMATE SANCTION,

23   ISN'T IT?  I THINK MOST OF THESE ARE -- WHAT DID YOU

24   CALL THEM? -- SORT OF THE STANDARD LANGUAGE FOR TERMS OF

25   SERVICE THAT STARTS WITH A WARNING AND THEN RUNS THROUGH

1    A SERIES.  AND ISN'T TERMINATION THE ULTIMATE FINAL

2    SANCTION THAT'S PROVIDED FOR BY THESE POLICIES?

3    A.    I THINK THAT'S LAST ON THE LIST.

4    Q.    IS THERE ANY MORE DRASTIC SANCTION THAT YOU CAN

5    THINK OF?

6    A.    OFFHAND, NO.

7    Q.    BUT YET YOU NEVER SPOKE WITH MR. CHEN ABOUT

8    WHETHER HE EVEN USED THAT SANCTION WITH RESPECT TO ABUSE

9    COMPLAINTS RECEIVED BY THE DEFENDANTS; IS THAT CORRECT?

10   A.    I DON'T RECALL EXACTLY WHAT THE CONVERSATION

11   CONSISTED OF.  I DO HAVE NOTES THAT I TOOK DURING THE

12   CONVERSATION.

13   Q.    WELL, I WILL REFER YOU BACK TO PAGE 38 OF YOUR

14   DEPOSITION TRANSCRIPT, WHICH I THINK WE READ A MOMENT

15   AGO.  AND I WILL JUST READ THE FIRST PART OF IT AGAIN,

16   BEGINNING AT LINE 2:

17                "QUESTION:  DID YOU HAVE ANY

18                UNDERSTANDING THAT THEY EVER

19                TERMINATED A CUSTOMER IN

20                CONNECTION WITH ANY OF THE

21                ABUSE COMPLAINTS REFERRED TO?"

22                "ANSWER:  I DON'T RECALL WE

23                DISCUSSED THAT HAVING BEEN

24                DONE."

25                WAS THAT QUESTION ASKED AND THAT ANSWER GIVEN

U.S. DISTRICT COURT          165

EXHIBIT E

1  DURING YOUR DEPOSITION?

2  A.    YES, IT WAS, EXCEPT I DON'T RECALL THE ENTIRE

3  CONVERSATION.

4  Q.    NO, THAT'S FINE.  I WANT TO MAKE SURE WE HAVE THE

5  COMPLETE RECORD ON THESE ISSUES.

6        NOW, I THINK IN YOUR DIRECT YOU TESTIFIED A

7  LITTLE BIT ABOUT CONTENT FILTERING AND DOMAIN NAME

8  FILTERING AND YOU MADE A DISTINCTION.  YOU TALKED AT

9  SOME LENGTH ABOUT THIS RAW DATA, THE BITS THAT REPRESENT

10  THE UNDERLYING DATA ON A PARTICULAR SERVER AND THE

11  CHALLENGES THAT ARE ATTACHED TO TRYING TO FILTER THAT

12  CONTENT, BUT THEN YOU ALSO TALKED ABOUT TOOLS THAT ARE

13  AVAILABLE TO ACTUALLY BLOCK SPECIFIC WEBSITES LOCATED AT

14  SPECIFIC DOMAIN NAMES; ISN'T THAT CORRECT?

15  A.    YES.

16  Q.    OKAY.  AND THAT, IN FACT, THAT TOOL EXISTS AND IS

17  A FAIRLY SIMPLE TOOL THAT'S USED IN MANY INTERNET

18  ROUTERS.  I THINK YOU MENTIONED CORPORATE ROUTERS IN

19  PARTICULAR THAT WANT TO BLOCK CERTAIN KINDS OF CONTENT

20  THAT MIGHT UNDERMINE EMPLOYEE EFFICIENCY, AS AN EXAMPLE?

21  A.    YES.

22  Q.    OKAY, SO THAT'S A TOOL.  IT'S FAIRLY WIDELY USED,

23  ACTUALLY?

24  A.    IN APPROPRIATE CIRCUMSTANCES, I IMAGINE IT WOULD

25  BE, YES.

EXHIBIT E

1    Q.    AND IT'S A TOOL THAT I ASSUME IS PROGRAMMABLE.

2    FOR EXAMPLE, THE PEOPLE WHO OPERATE THE ROUTER IN THIS

3    BUILDING MIGHT BLOCK A DIFFERENT WEBSITE FROM THE PEOPLE

4    WHO OPERATE THE ROUTER AT ADOBE DOWN THE STREET?

5    A.    YES.

6    Q.    AND THEY DO THAT BECAUSE WHOEVER IS RESPONSIBLE

7    FOR PROGRAMMING THE ROUTER WILL INPUT SPECIFIC

8    PROVISIONS, EITHER BY DOMAIN NAME OR BY OTHER CRITERIA,

9    HOWEVER IT'S DONE?

10   A.    YES.

11   Q.    SO THAT'S SOMETHING THAT THE DEFENDANTS CAN DO:

12   THEY CAN AT THE ROUTER LEVEL INPUT SPECIFIC DOMAIN NAMES

13   AND SAY THESE DOMAIN NAMES DON'T RESOLVE TO A SERVER

14   WITHIN THEIR NETWORK?

15   A.    THEY CAN MAKE A LIST, YES.

16   Q.    NOW, WHEN YOU WERE I THINK GOING OVER THE 1610

17   CHART, YOU WERE TALKING ABOUT ALL OF THE OTHER PLAYERS

18   THAT ARE INVOLVED IN THE TRANSMISSION OF COMMUNICATIONS

19   OVER THE INTERNET:  THE INTERNET USER'S ISP, THE DOMAIN

20   NAME RESOLVER, THE BACKBONE, THE DIFFERENT ROUTERS ALONG

21   THE WAY THAT GET YOU TO YOUR ULTIMATE DESIGNATION.  DO

22   YOU RECALL THAT?

23   A.    YES.

24   Q.    NOW, IT'S MY UNDERSTANDING THAT BETWEEN THE

25   INTERNET USER AND THE ULTIMATE DESIGNATION, THESE ARE

U.S. DISTRICT COURT          167

1    A.    NO.

2    Q.    OKAY.  TELL ME WHY I AM WRONG.  I'M SORRY, I MUST

3    HAVE MISSED SOMETHING.

4    A.    WHEN I DID THIS SPREADSHEET, I WAS LOOKING

5    SPECIFICALLY FOR SITES THAT WERE, NUMBER ONE, LISTED IN

6    EITHER OF THOSE TWO DOCUMENTS, THE JANUARY 30TH LETTER

7    OR THE FIRST AMENDED COMPLAINT, AND COMPARING THAT

8    AGAINST THE LIST OF THE WEBSITES THAT WERE FOUND OR THE

9    FILES -- CONTENTS OF THE WEBSITES THAT WERE FOUND ON THE

10   FIVE SERVERS THAT WERE IMAGED BY MR. WILSON FROM

11   GUIDANCE SOFTWARE.  AND THE SECOND COLUMN SHOWS WHETHER

12   OR NOT THE PARTICULAR ONE ON THAT ROW IS ONE OF THE

13   SITES THAT WAS LISTED IN ONE OF THOSE TWO DOCUMENTS.

14        ALL THE SITES ON THE SPREADSHEET ARE ONES THAT

15   I FOUND ON THOSE DRIVE IMAGES, BUT UNLESS THERE'S A

16   "YES" IN THAT COLUMN OR "BOTH" FOR WHATEVER PARTICULAR

17   DOCUMENT I MENTIONED, THAT PARTICULAR SITE WAS NOT ONE

18   OF THE ONES LISTED.

19        I ORIGINALLY STARTED OUT MAKING THE

20   SPREADSHEET BY GOING FROM THE TOP TO THE BOTTOM IN

21   ALPHABETICAL ORDER AND LOOKING THEM UP.  THEN I REALIZED

22   PART-WAY THROUGH THAT THERE WAS NO POINT TO THAT, SO I

23   STOPPED.

24   Q.    NOW I UNDERSTAND.

25        GOING BACK TO THE FIRST TWO PAGES OF THE

U.S. DISTRICT COURT                    207

EXHIBIT E

1    EXHIBIT WHERE WE HAVE, I THINK, THE FIRST -- ROUGHLY

2    LOOKS LIKE ABOUT 10 OR 15 DOMAINS ARE INDICATED AS BEING

3    INCLUDED IN THE FIRST AMENDED COMPLAINT, AND THEN THE

4    BETTER PART OF -- THE REST OF PAGE 1 AND THE FIRST HALF

5    OF PAGE 2 ARE ALL ONES WHICH WERE ADDRESSED IN THE

6    JANUARY 30 LETTER BETWEEN COUNSEL; IS THAT CORRECT?

7    A.    YES.

8    Q.    AND THEN THERE ARE A FEW MORE THAT WERE BOTH IN

9    THE FIRST AMENDED COMPLAINT AND IN THAT LETTER BETWEEN

10   COUNSEL; CORRECT?

11   A.    YES.

12   Q.    AND, IN FACT, TURN TO PAGE 2 AND SCROLL DOWN WHERE

13   IT BEGINS BIGWORLDSHOES.COM.  I'M SORRY, PAGE -- IT'S

14   PAGE 2.  IT'S PAGE 3 ON THE SPREADSHEET.

15           OKAY.  YOU CAN SCROLL A LITTLE FURTHER DOWN.

16           SO THERE'S A HANDFUL OF DOMAIN NAMES HERE THAT

17   ARE INDICATED THAT ARE SHOWN AS BEING BOTH IN THE FIRST

18   AMENDED COMPLAINT AND IN THE JANUARY 30TH LETTER; IS

19   THAT CORRECT?

20   A.    YES.

21   Q.    AND AS TO AT LEAST SOME OF THEM, THEY WERE STILL

22   UP AND OPERATING ON AKANOC SERVERS AS OF JUNE 26, 2009

23   WHEN YOU UNDERTOOK THIS INVESTIGATION?

24   A.    NO, I CAN'T SAY THEY WERE "STILL UP"; THEY WERE UP

25   AT THAT TIME.

EXHIBIT E

# EXHIBIT F

1        to their testimony.  Never looked at it.

2                Now, why is that?  I would suggest that

3        it's easier to complain about somebody in Silicon

4        Valley than it is to send a notice to somebody

5        else.  It's easier and more effective if you can

6        put somebody in Silicon Valley out of business by

7        putting together a gotcha case.  "Oh, we sent you

8        letters and nothing happened or it came back."

9                There is no requirement, no legal basis

10       for them to suggest or to argue to you that the

11       only way they can avoid liability is to terminate

12       customers.

13               Let's talk about the Alice Chen

14       situation for a moment.  At the time the

15       complaints from Louis Vuitton that we're talking

16       about here were made -- and I think that

17       Plaintiff identified seven or eight particular

18       complaints that happened to be dealing with IP

19       addresses that had been assigned to the

20       businesses associated with Alice Chen.

21               But Alice Chen was renting 100 servers

22       at the time approximately, according to Mr. Chen,

23       and had approximately a thousand IP addresses,

24       and you could have 100 websites, for example, on

25       each of those IP addresses, which would be a

                                                      120

PETER TORREANO, CSR 7623
EXHIBIT F

Page 107

1           So every single purchase was authorized

2       by the owner of the trademark, by the owner of

3       the copyright, done at their express direction,

4       delivered from China to the United States so that

5       they can come here to this court and say here

6       they are, look how bad all this activity is.

7           Have they ever shown a single shred of

8       evidence that any customer outside of Louis

9       Vuitton has ever bought any product from these

10      websites in the United States?  No.  Not

11      anybody.

12          Now, if it were really such a big

13      problem and they really did have all these

14      complaints about this, surely they could have

15      done that.  Now, they did show us one complaint.

16      One complaint.  Not of a customer -- not somebody

17      who bought a product, but some guy in Denmark

18      who's complaining about some website in China.

19      And that has to do with the United States how?

20      It doesn't.

21          So they are just trying to create

22      evidence so that they can blame the Defendants,

23      so they can put them out of business, so they can

24      scare the rest of Silicon Valley and the rest of

25      the technology industry into not doing business

                                                130

1    outside the United States because after all

2    someone might be doing bad things and you might

3    get sued.

4              Now, there's another interesting issue

5    about the way these purchases were made.  There's

6    no evidence that any of these purchases were made

7    through the servers operated by the Defendants.

8    It's not even clear that they -- that at the time

9    Mr. Holmes saw the product on the Internet or

10   when Mr. Livadkin saw the product on the Internet

11   it was even using the servers.  Maybe it was.

12   Maybe it wasn't.  But these websites move around

13   a lot.

14             And, by the way, that moving around a

15   lot is established by their own domain tools

16   reports with reverse IP history, for example,

17   showing how they change frequently sometimes, you

18   know, every week, sometimes every couple months.

19   They change perhaps because people are chasing

20   them.  Maybe they change because people are --

21   you know, they are just trying to get ahead of

22   somebody else who's about to complain about

23   them.

24             But Mr. Holmes' purchases had nothing

25   whatever to do with the Defendants.  And yet we

                                                    131

**EXHIBIT G**

1   J. Andrew Coombs (SBN 123881)
    *andy@coombspc.com*

2   Annie S. Wang (SBN 243027)
    *annie@coombspc.com*

3   J. Andrew Coombs, A. Prof. Corp.
    517 East Wilson Avenue, Suite 202

4   Glendale, California 91206
    Telephone:    (818) 500-3200

5   Facsimile:    (818) 500-3201

6   Attorneys for Plaintiff Louis
    Vuitton Malletier, S.A.

7

8                       UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

10

11  Louis Vuitton Malletier, S.A.,           )   Case No. C 07 3952 JW
                                             )
12                     Plaintiff,            )   [PROPOSED] PERMANENT
                v.                           )   INJUNCTION
13                                           )
    Akanoc Solutions, Inc., Managed Solutions )
14  Group, Inc., Steve Chen and Does 1 through 10, )
    inclusive,                               )
15                                           )
                       Defendants.           )
16  _____)

17        WHEREAS a jury was empanelled and trial proceedings held in the matter of Louis Vuitton

18  Malletier, S.A. v. Akanoc Solutions, Inc., et al. (the "Action") beginning August 18, 2009;

19        WHEREAS trial in Action concluded with entry of a verdict for Plaintiff Louis Vuitton

20  Malletier, S.A. ("Plaintiff" or "Louis Vuitton") and against Defendants Akanoc Solutions, Inc.,

21  Managed Solutions Group, Inc. and Steve Chen (collectively "Defendants") on Plaintiff's claims

22  for contributory trademark infringement and contributory copyright infringement;

23        NOW, THEREFORE, the Court finds as follows:

24     1)  This Court has jurisdiction over the parties to this action and over the subject matter hereof

25  pursuant to the Lanham Act, 15 U.S.C. § 1051, et seq., the Copyright Act 17 U.S.C. § 101 *et seq.*,

26  and 28 U.S.C. §§ 1331, 1338 and 1367.  Service of process was properly made against the

27  Defendants.

28

Louis Vuitton v. Akanoc, et al.: [Proposed] Permanent Injunction

2)  Louis Vuitton owns the pertinent rights in and to the trademarks listed in Exhibit A attached hereto and incorporated herein by this reference.  The trademarks identified in Exhibit A are collectively referred to herein as the "Louis Vuitton Trademarks."

3)  Louis Vuitton owns the pertinent rights in the copyrights listed in Exhibit B attached hereto and incorporated herein by this reference.  The copyrights identified in Exhibit B are collectively referred to herein as the "Louis Vuitton Copyrights."  The Louis Vuitton Trademarks and Louis Vuitton Copyrights are collectively referred to herein as the "Louis Vuitton Properties."

4)  Defendants have, with notice, unlawfully contributed to the infringement of the Louis Vuitton Properties through the continued provision of Internet hosting and routing services to direct infringers.

NOW, THEREFORE the Court ORDERS that the Defendants and their agents, servants, employees and all persons in active concert and participation with them who receive actual notice of the Injunction are hereby:

a)       Restrained and enjoined from knowingly infringing the Louis Vuitton Properties, either directly or contributorily, in any manner, including generally, but not limited to manufacturing, importing, advertising, offering for sale, selling or distributing any unauthorized product which features any of the Louis Vuitton Properties, copies of the Louis Vuitton Properties or confusingly similar reproductions of the Louis Vuitton Properties ("Unauthorized Products") or, hosting websites that are engaged in the manufacture, import, advertisement, offer for sale, sale or distribution of Unauthorized Products;

b)       Defendants will not be found in violation of paragraph (a) of this Injunction if they strictly comply with paragraphs (i)-(v), and their applicable subparts, as follows:

(i)      Defendants maintain accurate and up to date contact information for the purpose of receiving notifications of intellectual property infringements (including but not limited to current and valid email and physical addresses, telephone and facsimile

Louis Vuitton v. Akanoc, et al.: [Proposed] Permanent Injunction

numbers), which shall be published on their website(s) and timely recorded with the United States Copyright Office; and

(ii)    Defendants obtain and publish on their website(s) complete and accurate contact information for the purpose of receiving notifications of intellectual property infringements (including but not limited to name, current and valid email and physical addresses, telephone and facsimile numbers if any) for their customers; and

(iii)    Defendants publish terms of service on their website(s) and specifically notice that infringement of the Louis Vuitton Properties or any of them, may be the subject of action within the Defendants' discretion to terminate such infringement and to insure that it is not resumed on servers or using facilities owned by Defendants or services provided by Defendants; and

(iv)    Upon receipt of any notice of infringement of the Louis Vuitton Properties or any of them, Defendants:

    1.    promptly acknowledge receipt of such notice of Complaint;

    2.    assign a tracking number to be used in connection with correspondence pertaining to said Complaint;

    3.    notify their customer(s) of the Complaint within twenty-four (24) hours of receipt and, if activity complained of is still accessible on any server owned by Defendants, or any of them, seventy-two (72) hours after customer notification:

        (a)    disable access to the infringing content; and

        (b)    bar further access to the domain name on any server owned by Defendant(s) or any of them; and

(v)    Take such additional action as provided by Defendants' terms of service if activity complained of resumes on any server owned by Defendant(s), or any of them, after complying with paragraph (iv), including suspension or termination of the customer

EXHIBIT G

as may be required to accomplish a permanent stop to the complained of infringing

activity.

5)  This Injunction shall be deemed to have been served upon the Defendants and each of them at the time of its execution by the Court.

6)  The Court finds there is no just reason for delay in entering this Injunction and, pursuant to Rule 54(a) of the Federal Rules of Civil Procedure, the Court directs immediate entry of this Injunction against the Defendants.

7)  The Court shall retain jurisdiction of this action to entertain such further proceedings and to enter such further orders as may be necessary or appropriate to implement and enforce the provisions of this Injunction.


DATED:

_____
                                                            Hon. James Ware
                                                            United States District Court Judge

PRESENTED BY:

J. Andrew Coombs, A Prof. Corp.

By:___/s/ J. Andrew Coombs_____
            J. Andrew Coombs
            Annie S. Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

Louis Vuitton v. Akanoc, et al.: [Proposed] Permanent Injunction

# EXHIBIT A

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) in a Circle Design | 286,345 |  | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 297,594 |  | 18 |
| LOUIS VUITTON | 1,045,932 | LOUIS VUITTON | 18 |
| Louis Vuitton (Interlocked Letters) Design | 1,519,828 |  | 18 |
| LOUIS VUITTON MALLETIER A PARIS in Rectangle Design | 1,615,681 | LOUIS VUITTON MALLETIER A PARIS | 16, 18 |
| Louis Vuitton (Interlocked Letters) on Epi Leather Design | 1,655,564 |  | 18 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Pattern Design | 1,770,131 |  | 25 |

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| Louis Vuitton (Interlocked Letters) Design | 1,794,905 |  | 16, 25 |
| Louis Vuitton (Interlocked Letters) and Monogram Canvas Design | 1,875,198 |  | 16 |
| Louis Vuitton (Interlocked Letters) | 1,938,808 |  | 14, 24 |
| LOUIS VUITTON World Mark | 1,990,760 | LOUIS VUITTON | 14, 16, 18, 24, 25 |
| Louis Vuitton (Interlocked Letters) Design | 2,291,907 |  | 34 |
| LOUIS VUITTON | 2,303,212 | LOUIS VUITTON | 34 |
| Louis Vuitton (Interlocked Letters) Design | 2,361,695 |  | 25 |

EXHIBIT G

| TRADEMARK | REGISTRATION NUMBER | TRADEMARK PICTURE | CLASS OF GOODS |
|---|---|---|---|
| LOUIS VUITTON PARIS and Damier (pattern design) | 2,378,388 |  | 18 |

EXHIBIT G

# EXHIBIT B

| Copyright | Reg. No. | Date Published | Date Registered |
|---|---|---|---|
| Multicolor Monogram – Black Print | VA 1-250-121 | 12/18/02 | 06/24/04 |
| Multicolor Monogram – White Print | VA 1-250-120 | 12/18/02 | 06/24/04 |

Louis Vuitton v. Akanoc, et al.: [Proposed] Permanent Injunction        - 8 -

**EXHIBIT H**

This Service Agreement governs customer's purchase and use, in any manner, of all services, including Dedicated and Managed Hosting, as described in the Order Form, ordered by customer and accepted by Akanoc Solutions, Inc. and describes the terms and conditions that apply to such purchase and use of the Services. Akanoc Solutions, Inc. reserves the right to change or modify any of the terms and conditions contained in this Agreement, the Addendum and any policy or guideline incorporated by reference at any time and from time to time in its sole discretion, and to determine whether and when any such changes apply to both existing or future customers. Any modification will be effective upon posting of the revisions on our site.

Akanoc Solutions, Inc. may post changes or modifications to referenced policies and guidelines without notice to you. Your continued use of the Services following Akanoc Solutions, Inc. posting of any changes or modifications will constitute your acceptance of such changes or modifications. IF CUSTOMER DOES NOT AGREE TO THE TERMS OF ANY MODIFICATION, DO NOT CONTINUE TO USE THE SERVICES AND IMMEDIATELY NOTIFY AKANOC SOLUTIONS, INC. OF YOUR TERMINATION OF THIS AGREEMENT IN THE MANNER DESCRIBED BELOW.

1. This Agreement shall be for an "Initial Term" of thirty (30) days for all services -- including Dedicated and Managed Hosting. Customer agrees to all terms and conditions of services provided by Akanoc Solutions, Inc., beginning upon receipt by fax, e-mail, or express mail.

2. **All charges for Services (including installation and professional support fees) are non-refundable and must be paid in advance according to the then current price applicable to the Services.** Upon registration for Dedicated and Managed hosting, customer must choose to pay for the Services either by credit card or upon your receipt of an invoice. If customer chooses to pay by credit card upon registering for Dedicated Hosting services, customer thereby authorizes Akanoc Solutions, Inc. to charge your credit or debit card to pay for any charges that may apply to your account. Customer agrees that Akanoc Solutions, Inc. may accumulate any supplemental charges, as described in the Order Form, incurred by you in your use of the Services ("Supplemental Charges") until such charges exceed $20 and then charge your card. Customer must notify Akanoc Solutions, Inc. of any changes to your card account (including, without limitation, applicable account number or cancellation or expiration of the account), your billing address, or any information that may prohibit Akanoc Solutions, Inc. from charging your account.

Akanoc Solutions, Inc. may also send periodic invoices to customer for any applicable Supplemental Charges associated with your use of the Services. Customer agrees to pay to Akanoc Solutions, Inc. the amount indicated in each invoice by the due date reflected on the invoice. If customer fails to pay any fees and taxes within three (3) days from applicable due date for credit card or invoice payments, a late payment fee of **$10.00** become payable by you to Akanoc Solutions, Inc. In addition, customer's failure to fully pay all fees and taxes within five (5) days after the applicable due date will be deemed a material breach of this Agreement, justifying Akanoc Solutions, Inc. suspension of its performance of the Services and/or termination of this Agreement. Customer is responsible for any fees associated with reinstated of Services. Any such termination would not relieve customer from paying past due fees plus interest. In the event of collection enforcement, customer will be liable for any costs associated with such collection, including, without limitation, reasonable attorneys' fees, court costs and collection agency fees.

3. This Agreement will be automatically renewed (the "Renewal Term") at the end of the Initial Term for the same period as the Initial Term unless you provide Akanoc Solutions, Inc. with notice of termination either (a) at least thirty (30) days prior to the end of the Initial Term or the Renewal Term, whichever is then applicable.

4. Initial payment is due upon activation of account. Activation takes effect on the date of receipt of payment, and will be renewed automatically for identical successive periods. Any changes made to the customer's package shall be billed accordingly.

5. All orders are subject to acceptance by Akanoc Solutions, Inc. An order will be deemed accepted by our company when confirmation of the order is sent to the customer. We may refuse to accept any order, or delay acceptance awaiting completion of conditions the company may choose to exercise. Such refusal of such conditions may not be unreasonable, however, and Managed.com agrees to provide the customer with reasonable notice by E-mail or fax of any intent to delay or decline the acceptance of any order.

6. Akanoc Solutions, Inc. reserves the right to suspend the customer's account and services without notice should there be any problems with the customers method of payment. This includes expired credit cards, declined credit cards, inactive credit cards, and invalid checks.

7. Bandwidth utilization will be monitored via MRTG and calculated by the following method: Monthly Avg. In + Monthly Avg. Out / 8 Bits x 60 seconds x 60 minutes x 24 hours x 30.5 days = Total Data Transfer (GB).

8. Customer will be responsible for all server management and administration related issues. Available managed services include: OS restore, software installation, hardware installation, kernel / apache recompile, and security

△  (π) EXHIBIT 21
DATE: 4-8-08
WITNESS: S. Chen
PAGE 1 OF 6
J. WHITACRE, CSR

(patches) update. Standard service tickets will be processed within 3-5 days. Managed services fees are charged at $50 per hour. For priority (immediate) services, professional (remote hand) support is available at $75.00 per hour with a one (1) hour minimum requirement.

9. Akanoc Solutions, Inc. reserve the right to levy a penalty fee of **$10.00** per violation of the Acceptable Use Policy and Service Agreement.

10. Each port is set at 10Mbps. The bandwidth package for all subsequent months will be 1,000GB per server. In the event of over-usage, customers will incurred a fee of $0.50 / 1GB for the aforementioned server.

11. In accordance with ARIN guidlines, each server is allocated with 4 IP's with no exceptions. You may request to obtain the remaining 6 ips to be part of your IP space as long as valid justification per ARIN regulations is suppported. Same terms and conditions apply for the request of 10 additional IP's at the cost of $10.00 per month. Each server is allowed 20 IP's maximum. Please contact service@managed.com to request for ARIN's valid justification form.

12. Cpanel / WHM and Windows 2003 (web edition) special pricing is only available to new server orders activated after November 2004. The license fees for servers activated before the aforementioned date is still $19.95 per month for each license key.

13. Each customer is required to utilize available network bandwidth so as to allow for reasonable network performance by all Akanoc Solutions, Inc. Because bandwidth is a shared resource, excessive consumption of network bandwidth can interfere with or completely prevent normal network performance for other servers. Persistent, high-volume use of bandwidth-intensive tools and applications can and does prevent other users from being able to access the network.

## II. Taxes

Akanoc Solutions, Inc. shall not be liable for any taxes or other fees to be paid in accordance with or related to purchases made from the customer or Akanoc Solutions, Inc. servers. Customer also agrees to take full responsibility for all taxes and fees of any nature associated with any such products sold.

## III. Material & Products

1. Akanoc Solutions, Inc. will exercise no control whatsoever over the content of the information passing through the network or on the customer's web sites. Akanoc Solutions, Inc. makes no warranties or guarantees of any kind, whether expressed or implied for the service it is providing. Akanoc Solutions, Inc. also disclaims any warranty of merchantability or fitness for particular purpose and will not be responsible for any damages that may be suffered by the customer, including loss of data resulting from delays, non-deliveries or service interruptions or gaps by any cause or errors or omissions of the customer. Akanoc Solutions, Inc. is not responsible for any loss, erasure, or corruption of customer's data or files whatsoever. Use of any information obtained by way of Akanoc Solutions, Inc. is at the customer's own risk, and the company specifically denies any responsibility for the accuracy or quality of information obtained through its services. Network connectivity represents the speed of connection to our network and does not represent guarantees of available end to end bandwidth.

Akanoc Solutions, Inc. expressly limits its damages to the customer for any non-accessibility time or other down time to the pro-rate monthly charge during the system unavailability. Akanoc Solutions, Inc. specifically denies any responsibilities for any damages arising from a consequence of such unavailability. In the event that this material is not "server-ready", Akanoc Solutions, Inc. may, at its option and at any time, reject this material, including but not limited to after it has been put on our servers. Akanoc Solutions, Inc. agrees to notify customer immediately of our refusal of the material and afford customer the opportunity to amend or modify the material to satisfy the needs and/or requirements of the company. If the customer fails to modify the material, as directed by Akanoc Solutions, Inc., within a reasonable period of time, which shall be determined between the parties themselves, the Agreement shall be terminated.

## IV. Uptime Guarantee

Akanoc Solutions, Inc. guarantees that our network will be available 99.9% (no more than 45 minutes) of the time in a given month excluding scheduled maintenance. In the event that our network is inaccessible for more than one hour during any thirty (30) days period, each customer will automatically be granted an additional 100GB of data transfer free of charge for the following month as compensation for the aforementioned downtime. Network uptime includes functioning of all network infrastructure including routers, switches and cabling. Network downtime exists when a particular customer is unable to transmit and receive data and Akanoc Solutions, Inc.

△    π  EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE__2____OF__6____
J. WHITACRE, CSR

records such failure in the Akanoc Solutions, Inc. trouble ticket system. Network downtime is measured from the time the trouble ticket is opened by a customer to the time the server is once again able to transmit and receive data.

## V. Warranties & Representations

Customer warrants, represents, and covenants to Akanoc Solutions, Inc. that (a) you are at least eighteen (18) years of age; (b) you possess the legal right and ability to enter into this Agreement; (c) you will use the Services only for lawful purposes and in accordance with this Agreement and all applicable policies and guidelines; (d) you will be financially responsible for the use of your account; (e) you have acquired or will acquire all authorizations necessary for hypertext links to third-party Web sites or other content; (f) you have verified or will verify the accuracy of materials distributed or made available for distribution via the Services, including, without limitation, your content, descriptive claims, warranties, guarantees, nature of business, and address where business is conducted, and (g) your content does not and will not infringe or violate any right of any third party (including any intellectual property rights) or violate any applicable law, regulation or ordinance.

## VI. Trademarks & Copyrights

* Customer warrants that it has the right to use the applicable trademarks, if any.
* Akanoc Solutions, Inc. may request the right to use such trademarks in connection with our service.
* Customer will review such a request promptly, and not unreasonably withhold such permission.

## VII. Termination

This Agreement may be terminated by Akanoc Solutions, Inc., without cause and without notice to the other party, in the event that Akanoc Solutions, Inc. believes, in its sole discretion, that continuing to provide service to such party would be harmful to the business or reputation of Akanoc Solutions, Inc. In such event, Akanoc Solutions, Inc. will have no liability to the other party. Furthermore, , Akanoc Solutions, Inc. may terminate the service under this Agreement at any time, without penalty, if the customer fails to comply with the terms of this Agreement. It is the customer's responsibility to point your domain to another service provider upon termination, cancellation or discontinuation of service.

## VIII. Limited Liability

1. Customer expressly agrees that use of Akanoc Solutions, Inc. Servers is at customer's sole risk. Neither the company, its employees, agents, resellers, third party information providers, merchants licensers or the like, warrant that Akanoc Solutions, Inc. service will not be interrupted or be error free; nor do they make any warranty as to the results that might be obtained from the use of the Server service or as to the accuracy, or reliability of any information service or merchandise contained in or provided through our network, unless otherwise expressly stated in this Agreement. Customer also acknowledge and accept that any damages will be limited to no more than 100% of the previous month's invoice.

2. Under no circumstances, including negligence, shall Managed.com, its officers, agents or any one else be liable for any direct, indirect, incidental, special or consequential damages that result from the use of or inability to use our service; or that results from mistakes, omissions, interruptions, deletion of files, errors, defects, delays in operation, or transmission or any failure of performance, whether or not limited to acts of God, communication failure, theft, destruction or unauthorized access to Managed.com records, programs or services. Customer hereby acknowledges that this paragraph shall apply to all contents on all servers.

## IX. Indemnification

Customer agrees that it shall defend, indemnify, save and hold Akanoc Solutions, Inc. harmless from any demands, liabilities, losses, costs and claims, including reasonable attorneys fees, ("Liabilities") asserted against the company, its agents, its customers, servants officers and employees, that may arise or result from any service provided or performed or agreed to be performed or any product sold by the customer, its agents, employees or assigns. Customer agrees to defend, indemnify and hold harmless Akanoc Solutions, Inc. against Liabilities arising out of (i) any injury to person or property caused by any products sold or otherwise distributed in connection with our servers; (ii) any material supplied by the customer infringing or allegedly infringing on the proprietary rights of a third party; (iii) copyright infringement and (iv) any defective product which customer sold on Akanoc Solutions, Inc. servers.

## X. Partial Invalidity

△ 𝜋 EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE _3_ ___OF _6_
J. WHITACRE, CSR

If any provision of this agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions shall nevertheless remain in full force and effect. Akanoc Solutions, Inc. and Customer agree to renegotiate in good faith any term held invalid and to be bound by mutually agreed substitute provision.

## XI. Disputes

The parties shall try to resolve all disputes that might arise out of this agreement in a spirit of cooperation without formal procedures. Any dispute which cannot be so resolved (other than the collection of money due on unpaid invoices) and other than the injunctive relief referred to in paragraph 10 shall be subject to arbitration upon written demand of either party. Arbitration shall take place in Santa Clara County, California. The arbitration will take place before an arbitration panel chosen as follows: The parties shall each choose an arbitrator, and the two arbitrators shall choose a third arbitrator and determine the third arbitrator's pay. Each party shall have one veto over the choice of the third arbitrator. The three arbitrators shall schedule an informal proceeding, hear the arguments, and decide the matter by secret majority vote. Unless the arbitrators decide otherwise, each party shall pay the costs of its own arbitrator, and shall pay half of the other costs of the arbitration proceeding.

Each party shall have the right to have the proceedings transcribed. The arbitrators will not have the authority to award punitive damages or any other form of relief not contemplated in the contract. The majority of arbitrators shall render a written opinion setting forth the basis on which they arrived at the decision regarding each issue submitted to arbitration; the dissenting arbitrator, if any, shall not issue a dissenting opinion. Regarding each issue submitted to arbitration, the decision will be final and binding only to the extent it is accompanied by a written explanation of the basis upon which it was arrived at. Judgment upon the award, if any, rendered by the arbitrators may be entered in any court having jurisdiction.

Should any legal action permissible under this agreement be taken to enforce the conditions and terms of this agreement, in particular the right to collect money due on unpaid invoices, the prevailing party shall be entitled to recover reasonable legal fees and expenses incurred at the trial and appellate levels.

## XII. Confidentiality

Customer acknowledges that by reason of their relationship, both customer and Akanoc Solutions, Inc. may have access to certain products, information and materials relating to the other party's business, which may include business plans, customers, software technology, and marketing plans that are confidential and of substantial value to either party, respectively, and which value would be impaired if such information were disclosed to third parties. Consequently, both Akanoc Solutions, Inc. and customer agree that it will not use in any way for its own account or for the account of any third party, nor disclose to any third party, any such information revealed to it by either party, as the case may be.

Customer and Akanoc Solutions, Inc. further agree that it will take every appropriate precaution to protect the confidentiality of such information. In the event of termination of this agreement, there shall be no use or disclosure by either party of any such confidential information in its possession, and all confidential documents shall be returned to the rightful owner, or destroyed. The provisions of this section shall survive the termination of the agreement for any reason. Upon any breach or threatened breach of this section, either party shall be entitled to injunctive relief, which relief will not be contested by the customer or Akanoc Solutions, Inc.

## XIII. Notices

Except with respect to service of process as set forth in paragraph, all notices may be sent by e-mail, fax, or express mail to the e-mail address, fax number, or address most recently provided and will be effective upon transmission. Evidence of successful transmission shall be retained.

Δ    π   EXHIBIT_____
DATE:_____
WITNESS:_____
PAGE___4___OF___6___
J. WHITACRE, CSR

EXHIBIT H

The purpose of this Acceptable Use Policy is to enhance the quality of the Services and to protect Akanoc Solutions, Inc. customers, and the Internet community as a whole, from illegal, irresponsible, or disruptive Internet activities. This Policy applies to each Customer and its employees, agents, contractors or other users of such Customer who obtain Services from Akanoc Solutions, Inc.. Each User should use common sense and good judgment in connection with the Services.

**I) Prohibited Uses**

A. Utilize the Services to send mass unsolicited e-mail to third parties.

B. Utilize the Services in connection with any illegal activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to copy material from third parties (including text, graphics, music, videos or other copyrightable material) without proper authorization.

(ii) Utilize the Services to misappropriate or infringe the patents, copyrights, trademarks or other intellectual property rights of any third party.

(iii) Utilize the Services to traffic in illegal drugs, illegal gambling, obscene materials or other any products or services that are prohibited under applicable law.

(iv) Utilize the Services in any manner that violates applicable law.

C. Utilize the Services in connection with any tortious or actionable activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to publish or disseminate information that (A) constitutes slander, libel or defamation, (B) publicizes the personal information or likeness of a person without that person's consent or (C) otherwise violates the privacy rights of any person.

(ii) Utilize the Services to threaten persons with bodily harm, to make harassing or abusive statements or messages, or to solicit the performance of acts or services that are illegal under applicable law.

D. Utilize the Services in connection with any other disruptive or abusive activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to cause denial of service attacks against Akanoc Solutions, Inc. or other network hosts or Internet users or to otherwise degrade or impair the operation of Akanoc Solutions, Inc. servers and facilities or the servers and facilities of other network hosts or Internet users.

(ii) Utilize the Services to subvert, or assist others in subverting, the security or integrity of any Akanoc Solutions, Inc. systems, facilities or equipment.

(iii) Utilize the Services to gain unauthorized access to the computer networks of Akanoc Solutions, Inc. or any other person.

(iv) Utilize the Services to provide passwords or access codes to persons not authorized to receive such materials by the operator of the system requiring the password or access code.

(v) Utilize the Services to (A) forge the signature or other identifying mark or code of any other person, (B) impersonate or assume the identity or any other person, or (C) engage in any other activity (including "spoofing") to attempt to deceive or mislead other persons regarding the true identity of the User (excluding the use of anonymous remailer or Internet nicknames).

(vi) Utilize the Services to distribute or post any virus, worm, Trojan horse, or computer code intended to disrupt services, destroy data, destroy or damage equipment, or disrupt the operation of the Services.

(vii) Utilize the Services to conduct port scans or other invasive procedures against any server (except any server for which the User is an authorized system administrator).

$\triangle$   $\pi$   EXHIBIT_____
DATE:_____
WITNESS:_____  ___ __
PAGE____5____OF___ 6
J. WHITACRE, CSR

(viii) Utilize the Services to distribute, advertise or promote software or services that have the primary purpose of encouraging or facilitating unsolicited commercial e-mail or spam.

(ix) Utilize the Services to solicit or collect, or distribute, advertise or promote, e-mail address lists for the purpose of encouraging or facilitating unsolicited commercial e-mail or spam.

(x) Akanoc Solutions, Inc. has no restrictions on contents.  Adult materials, MP3s, games, and audio/video streaming are permitted. However, customers are strictly prohibited from using egg-drops, IRC bots, warez materials and shell hosting services on Akanoc Solutions, Inc. regular network. IRC BOT controllers are not allowed on both networks.

(xi) Utilize the Services in any other manner to interrupt or interfere with the Internet usage of other persons.

## II) Violations

Akanoc Solutions, Inc. expressly disclaims any obligation to monitor its Customers and other Users with respect to violations of this Policy. Akanoc Solutions, Inc. has no liability or responsibility for the actions of any of its Customers or other Users or any content any User may post on any Web site. Akanoc Solutions, Inc. reserve the right to levy a penalty fee of **$10.00** per violation of the Acceptable Use Policy and Service Agreement.

A. Reporting Non-Copyright Violations. Akanoc Solutions, Inc. encourages Users to report violations of this policy by e-mail to: **abuse@akanoc.com**, including in any such report the name of the offending domain and the type of abuse (i.e. spam, illegal acts, harassment, etc.) in the "subject" field of the e-mail.

B. Reporting Copyright Violations. Akanoc Solutions, Inc. complies with the Digital Millennium Copyright Act ("DMCA"). Akanoc Solutions, Inc. encourages Users to report an alleged copyright infringement involving a user by sending a notice to: **abuse@akanoc.com**

C. If Akanoc Solutions, Inc. learns of a violation of this Policy, we will respond to the customer and may, in our sole discretion, take any of the following actions, in accordance with the severity and duration of the violation:

(i) Warning the Customer.

(ii) Suspending the offending Customer from the Services.

(iii) Terminating the offending Customer from the Services.

(iv) Imposing fees or charges on the offending Customer account in accordance with the applicable service contract.

(v) Removing the offending content.

(vi) Taking other action in accordance with this Policy, the applicable service contract or applicable law.

D. Each customer is required to utilize available network bandwidth so as to allow for reasonable network performance by all Akanoc Solutions, Inc. users. Because bandwidth is a shared resource, excessive consumption of network bandwidth can interfere with or completely prevent normal network performance for other servers. Persistent, high-volume use of bandwidth-intensive tools and applications can and does prevent other users from being able to access the network.

Each port is set at 10Mbps. Non un-metered servers that use 10Mbps for more than 20 minutes or longer and/or consistently causing performance problems will be disconnected from the network to prevent such activities from obstructing network access for other users. Customer will also be responsible for all fees related to excessive bandwidth usage of $0.50/1GB.

## III) Reservation of Rights

Akanoc Solutions, Inc. reserves the right to cooperate with appropriate legal authorities in investigations of claims of illegal activity involving Akanoc Solutions, Inc. Services, Customers and other Users. Akanoc Solutions, Inc. reserves all other rights to respond to violations of this Policy to the extent of applicable law and in accordance with any applicable contractual obligations.

△   π   EXHIBIT____21____
DATE:_____
WITNESS:_____
PAGE____6____OF____6____
J. WHITACRE, CSR

EXHIBIT H

# EXHIBIT I

Untitled Document                                    file:///C:/Documents%20and%20Settings/Michael.Wilson/My%20Docum

The purpose of this Acceptable Use Policy is to enhance the quality of the Services and to protect Akanoc Solutions, Inc. customers, and the Internet community as a whole, from illegal, irresponsible, or disruptive Internet activities. This Policy applies to each Customer and its employees, agents, contractors or other users of such Customer who obtain Services from Akanoc Solutions, Inc.. Each User should use common sense and good judgment in connection with the Services.

**I) Prohibited Uses**

A. Utilize the Services to send mass unsolicited e-mail to third parties.

B. Utilize the Services in connection with any illegal activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to copy material from third parties (including text, graphics, music, videos or other copyrightable material) without proper authorization.

(ii) Utilize the Services to misappropriate or infringe the patents, copyrights, trademarks or other intellectual property rights of any third party.

(iii) Utilize the Services to traffic in illegal drugs, illegal gambling, obscene materials or other any products or services that are prohibited under applicable law.

(iv) Utilize the Services in any manner that violates applicable law.

C. Utilize the Services in connection with any tortious or actionable activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to publish or disseminate information that (A) constitutes slander, libel or defamation, (B) publicizes the personal information or likeness of a person without that person's consent or (C) otherwise violates the privacy rights of any person.

(ii) Utilize the Services to threaten persons with bodily harm, to make harassing or abusive statements or messages, or to solicit the performance of acts or services that are illegal under applicable law.

D. Utilize the Services in connection with any other disruptive or abusive activity. Without limiting the general application of this rule, Users may not:

(i) Utilize the Services to cause denial of service attacks against Akanoc Solutions, Inc. or other network hosts or Internet users or to otherwise degrade or impair the operation of Akanoc Solutions, Inc. servers and facilities or the servers and facilities of other network hosts or Internet users.

(ii) Utilize the Services to subvert, or assist others in subverting, the security or integrity of any Akanoc Solutions, Inc. systems, facilities or equipment.

(iii) Utilize the Services to gain unauthorized access to the computer networks of Akanoc Solutions, Inc. or any other person.

(iv) Utilize the Services to provide passwords or access codes to persons not authorized to receive such materials by the operator of the system requiring the password or access code.

(v) Utilize the Services to (A) forge the signature or other identifying mark or code of any other person, (B) impersonate or assume the identity or any other person, or (C) engage in any other activity (including "spoofing") to attempt to deceive or mislead other persons regarding the true identity of the User (excluding the use of anonymous remailer or Internet nicknames).

(vi) Utilize the Services to distribute or post any virus, worm, Trojan horse, or computer code intended to disrupt services, destroy data, destroy or damage equipment, or disrupt the operation of the Services.

(vii) Utilize the Services to conduct port scans or other invasive procedures against any server (except any server for which the User is an authorized system administrator).

(viii) Utilize the Services to distribute, advertise or promote software or services that have the primary purpose of encouraging or facilitating unsolicited commercial e-mail or spam.

(ix) Utilize the Services to solicit or collect, or distribute, advertise or promote, e-mail address lists for the purpose of encouraging or facilitating unsolicited commercial e-mail or spam.



PLAINTIFF'S
EXHIBIT
609

Case5:07-cv-03952-JW Document256 Filed12/21/09 Page138 of 140

Untitled Document                                                file:///C:/Documents%20and%20Settings/Michael.Wilson/My%20Docum...

(x) Akanoc Solutions, Inc. has no restrictions on contents. Adult materials, MP3s, games, and audio/video streaming are permitted. However, customers are strictly prohibited from using egg-drops, IRC bots, warez materials and shell hosting services on Akanoc Solutions, Inc. regular network. IRC BOT controllers are not allowed on both networks.

(xi) Utilize the Services in any other manner to interrupt or interfere with the Internet usage of other persons.

**II) Violations**

Akanoc Solutions, Inc. expressly disclaims any obligation to monitor its Customers and other Users with respect to violations of this Policy. Akanoc Solutions, Inc. has no liability or responsibility for the actions of any of its Customers or other Users or any content any User may post on any Web site. Akanoc Solutions, Inc. reserve the right to levy a penalty fee of **$10.00** per violation of the Acceptable Use Policy and Service Agreement.

A. Reporting Non-Copyright Violations. Akanoc Solutions, Inc. encourages Users to report violations of this policy by e-mail to: **abuse@akanoc.com**, including in any such report the name of the offending domain and the type of abuse (i.e. spam, illegal acts, harassment, etc.) in the "subject" field of the e-mail.

B. Reporting Copyright Violations. Akanoc Solutions, Inc. complies with the Digital Millennium Copyright Act ("DMCA"). Akanoc Solutions, Inc. encourages Users to report an alleged copyright infringement involving a user by sending a notice to: **abuse@akanoc.com**

C. If Akanoc Solutions, Inc. learns of a violation of this Policy, we will respond to the customer and may, in our sole discretion, take any of the following actions, in accordance with the severity and duration of the violation:

(i) Warning the Customer.

(ii) Suspending the offending Customer from the Services.

(iii) Terminating the offending Customer from the Services.

(iv) Imposing fees or charges on the offending Customer account in accordance with the applicable service contract.

(v) Removing the offending content.

(vi) Taking other action in accordance with this Policy, the applicable service contract or applicable law.

D. Each customer is required to utilize available network bandwidth so as to allow for reasonable network performance by all Akanoc Solutions, Inc. users. Because bandwidth is a shared resource, excessive consumption of network bandwidth can interfere with or completely prevent normal network performance for other servers. Persistent, high-volume use of bandwidth-intensive tools and applications can and does prevent other users from being able to access the network.

Each port is set at 10Mbps. Non un-metered servers that use 10Mbps for more than 20 minutes or longer and/or consistently causing performance problems will be disconnected from the network to prevent such activities from obstructing network access for other users. Customer will also be responsible for all fees related to excessive bandwidth usage of $0.50/1GB.

**III) Reservation of Rights**

Akanoc Solutions, Inc. reserves the right to cooperate with appropriate legal authorities in investigations of claims of illegal activity involving Akanoc Solutions, Inc. Services, Customers and other Users. Akanoc Solutions, Inc. reserves all other rights to respond to violations of this Policy to the extent of applicable law and in accordance with any applicable contractual obligations.

# EXHIBIT J

| From: | steve chen [steve@racklogic.com] |
|---|---|
| Sent: | Wednesday, August 08, 2007 3:05 PM |
| To: | Security (E-mail) |
| Subject: | FW: 204.16.197.27 removed from 204.13.69.170 main IP; we are being suited by LV for hosting this website, ape168.com |

FYI, stupid LV instead of suit ape168, they suit us. damn!

> -----Original Message-----
> From:        steve chen
> Sent: Wednesday, August 08, 2007 3:04 PM
> To:    steve chen; 'zhonghh@it5.cn'; 'chendan@it5.cn'
> Cc:    'Willlone ( E-mail) '
> Subject:      RE: 204.16.197.27 removed from 204.13.69.170 main IP;
> we are being suited by LV for hosting this website, ape168.com
>
> Do not let this guy stay here with LV trademark.
> Steve
>
> -----Original Message-----
> From:        steve chen
> Sent: Wednesday, August 08, 2007 2:51 PM
> To:    'zhonghh@it5.cn'; 'chendan@it5.cn'
> Cc:    Willlone ( E-mail)
> Subject:        204.16.197.27 removed from 204.13.69.170 main IP; we
> are being suited by LV for hosting this website, ape168.com
>
>

PLAINTIFF'S
EXHIBIT
528

1

Exhibit E                                Page 347