1   J. Andrew Coombs (SBN 123881)
    *andy@coombspc.com*
2   Annie S. Wang (SBN 243027)
    *annie@coombspc.com*
3   J. Andrew Coombs, A Prof. Corp.
    517 East Wilson Avenue, Suite 202
4   Glendale, California 91206
    Telephone:  (818) 500-3200
5   Facsimile:   (818) 500-3201

6   Attorneys for Plaintiff Louis
    Vuitton Malletier, S.A.
7

8                  UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

10

11  Louis Vuitton Malletier, S.A.,          )   Case No. C 07 3952 JW (HRLx)
                                            )
12                        Plaintiff,        )   REPLY OF PLAINTIFF TO
                                            )   DEFENDANTS' EVIDENTIARY
          v.                                )   OBJECTIONS TO COOMBS
13                                          )   DECLARATION IN SUPPORT OF
    Akanoc Solutions, Inc., et al.          )   MOTION FOR PERMANENT
14                                          )   INJUNCTION; DECLARATION AND
                          Defendants.       )   EXHIBITS IN SUPPORT
15                                          )
                                            )   Date:   January 25, 2010
16                                          )   Time:   9:00 a.m.
                                            )   Court:  Hon. James Ware
17  _____ )

18         Defendants' objections to the attachment of the trial record to Plaintiff's moving papers for

19  lack of authentication but their objections are properly overruled.

20         The sole authority relied upon by Defendants is factually inapplicable.  The transcript at

21  issue in, *see Orr v. Bank of America, NT & SA,* 285 F.3d 764, 775 (9th Cir. 2002) involved a

22  deposition transcript and not a transcript of proceedings held before the District Court and which

23  have, separately by filed by the Court Reports.

24         Trial transcripts are self-authenticating under Fed. R. Evid. 902(2) or (4).  In the

25  alternative, trial transcripts may be authenticated under Fed. R. Evid. 901(b)(4) or (7) according to

26  the following:

27         "(4) Distinctive characteristics and the like. Appearance, contents,
           substance, internal patterns, or other distinctive characteristics, taken in
           conjunction with circumstances.
28                                          …

Louis Vuitton v. Akanoc, et al.: Reply to Defs Objections to Trial        - 1 -
Transcripts

1

2         (7) Public records or reports. Evidence that a writing authorized by law
      to be recorded or filed and in fact recorded or filed in a public office, or a
      purported public record, report, statement, or data compilation, in any form, is
3     from the public office where items of this nature are kept."

4     Fed. R. Evid. 901(b)(4), (7).  The format of the trial transcript pages are unique as each

5     page bears the identifier of either the court reporter by name, "U.S" District Court" or

6     "U.S. Court Reporters" as well as the page number.  These documents are public records

7     that are authorized by law to be recorded or filed and in fact were recorded or filed.  28

8     USC § 753.   Defendants' objections should be overruled.

9         "The guiding principle is that proper authentication requires some sort of proof

10    that the document is what it purports to be."  *Sinotes-Cruz v. Gonzales*, 468 F.3d 1190,

11    1196 (9th Cir.  2006) *citing Iran v. INS*, 656 F.2d 469, 473 (9th Cir. 1981).  The pages

12    from the trial transcript on their face provide the necessary indicia of authenticity in their

13    format and content.  There has been no indication from Defendants that the transcript

14    excerpts have been altered or are incorrect.  The Court should overrule Defendants'

15    objections.

16        A similar result should follow under Fed. R. Evid. 902 which provides in part:

17        "(2) Domestic public documents not under seal. A document purporting to
      bear the signature in the official capacity of an officer or employee of any entity
18    included in paragraph (1) hereof, having no seal, if a public officer having a seal
      and having official duties in the district or political subdivision of the officer or
19    employee certifies under seal that the signer has the official capacity and that the
      signature is genuine.
20                                        …

21        (4)  Certified copies of public records. A copy of an official record or
      report or entry therein, or of a document authorized by law to be recorded or filed
22    and actually recorded or filed in a public office, including data compilations in
      any form, certified as correct by the custodian or other person authorized to make
23    the certification, by certificate complying with paragraph (1), (2), or (3) of this
      rule or complying with any Act of Congress or rule prescribed by the Supreme
24    Court pursuant to statutory authority."

25    Fed. R. Evid. 902(2) and (4).  Aside from the signature on the transcript of the Court Reporter

26    working in his or her official capacity as employed by the United States District Court, the trial

27    transcript has been filed and mandated under General Order No. 59 to be filed electronically.  28

28

USC § 753.  Docket Nos.254, 255, 260, 261, 262 and 263 being transcripts of proceedings held each day testimony was presented to the Court.  The court reporters involved in this matter have done so as required by Chief Judge Walker, The Judicial Counsel of the United States and Congress, satisfying the requirements of Fed. R. Evid. 902(2) and (4).

Most cases involving objections to trial transcripts on the grounds advanced by Defendants relate to the transcripts from other trials in other courts, not the transcript for the trial that took place before the presiding Court.  In any event, Defendants do not dispute the authenticity of the transcripts, and the documentation that Defendants require, is attached to the Declaration of J. Andrew Coombs attached hereto.  *Bonneau v. Clifton*, 215 F.R.D. 596, 601 (D. Or. 2003) (court overruling objection when additional pages were submitted in relation to a deposition transcript). Accepting Defendants' arguments and excluding the trial record under these circumstances would be to elevate form over substance, and would be particularly prejudicial given the lack of any discrepancy cited by Defendants.

Plaintiff was attempting to aid the Court in providing easier access to the same transcript that the Defendants are in possession and that have been filed with the Court by the court reporters. Plaintiff has already cited with specificity in its moving papers the portions of the transcript that it references and the witnesses that were testifying.  Excluding the trial record in this instance without applicable authority advanced by Defendants, would be improper.

Defendants' objections should be overruled in their entirety.


Dated:  January 11, 2010                    J. Andrew Coombs, A Professional Corp.


                                            ___/s/ J. Andrew Coombs_____
                                            By:    J. Andrew Coombs
                                                   Annie S. Wang
                                            Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

### DECLARATION OF J. ANDREW COOMBS

I, J. ANDREW COOMBS, declare as follows:

1.      I am an attorney at law, duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California.  I am an attorney for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff") in an action styled Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al.  I make this Declaration in support of Plaintiff's Reply to Defendants' Evidentiary Objections to Coombs Declaration.  Except as otherwise expressly stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows:

2.      Attached Exhibit A is a true and accurate copy of portions of Volume 1 of the certified court reporter's transcript from the Trial in this matter from August 18, 2009, of the trial testimony of Plaintiff's witness, Mr. Nikolay Livadkin.

3.      Attached Exhibit B is a true and accurate copy of portions of Volume 2 of the certified court reporter's transcript from the Trial in this matter from August 19, 2009, of the trial testimony of Plaintiff's witness Mr. Nikolay Livadkin and the deposition reading of Defendants' employee Ms. Juliana Luk.

4.      Attached Exhibit C is a true and accurate copy of portions of Volume 3 of the certified court reporter's transcript from the Trial in this matter from August 20, 2009, of the deposition reading of Defendant Steve Chen.

5.      Attached Exhibit D is a true and accurate copy of portions of Volume 4 of the certified court reporter's transcript from the Trial in this matter from August 21, 2009, of the trial testimony of Defendant Steve Chen.

6.      Attached Exhibit E is a true and accurate copy of portions of Volumes 8 and 9 of the certified court reporter's transcript from the Trial in this matter from August 25, 2009, of the trial testimony of Defendant Steve Chen and the trial testimony of Defendants' employee Mr. Andrew Cheng and Defendants' expert Mr. Richard Gralnik.

1         7.      Attached Exhibit F is a true and accurate copy of portions of the certified court

2  reporter's transcript from the Trial in this matter from August 26, 2009, of the Defendants' closing

3  argument as stated by Mr. Lowe.

4        I declare under penalty of perjury that the foregoing is true and correct under the laws of

5  the United States of America.

6        Executed this 11th day of January, 2010, at Glendale, California.

7

8                                   /s/ J. Andrew Coombs         
                                 J. ANDREW COOMBS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5    LOUIS VUITTON            )  C-07-03952-JW
     MALLETIER, S.A.,         )
6                             )  AUGUST 18, 2009
              PLAINTIFF,      )
7                             )  VOLUME 1
              V.              )
8                             )  PAGES 1 - 199
     AKANOC SOLUTIONS, INC.,  )
9    ET AL.,                  )
                              )
10            DEFENDANTS.      )
     _____  )
11

12

13         THE PROCEEDINGS WERE HELD BEFORE

14       THE HONORABLE UNITED STATES DISTRICT

15              JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:  J. ANDREW COOMBS
                         BY:  J. ANDREW COOMBS
18                            ANNIE S. WANG
                         517 E. WILSON AVENUE
19                       SUITE 202
                         GLENDALE, CALIFORNIA 91206
20

21   FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                         BY:  JAMES A. LOWE
22                            CHRISTOPHER G. LAI
                         18400 VON KARMAN
23                       IRVINE, CALIFORNIA 92612

24       (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                         CERTIFICATE NUMBER 8074

                                                        1

1

2       A P P E A R A N C E S: (CONT'D)

3

4       ALSO PRESENT:              LAW OFFICES OF J. ANDREW
                                    COOMBS
                                    BY:  RUTH ADLER, PARALEGAL
5                                  517 E. WILSON AVENUE
                                    SUITE 202
6                                  GLENDALE, CALIFORNIA 91206

7                                  LVMH FASHION GROUP
                                    BY:  NIKOLAY LIVADKIN
8                                  2 RUE DU PONT-NEUF 75001
                                    PARIS, FRANCE

9
                                    AKANOC SOLUTIONS, INC.
10                                 BY:  STEVE CHEN, PRESIDENT
                                    45535 NORTH PORT LOOP EAST
11                                 FREMONT, CALIFORNIA 94538

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        2

1                    INDEX OF PROCEEDINGS

2

3     PLAINTIFF'S OPENING STATEMENT P. 82

4     DEFENDANTS' OPENING STATEMENT P. 97

5

      FOR THE PLAINTIFF'S:
6

7     **NIKOLAY LIVADKIN**        DIRECT EXAMINATION P. 131

8

9                      INDEX OF EXHIBITS

10

                            IDENT.       EVIDENCE
11    PLAINTIFF'S:

12    451                                145
      74                                 170
13    75                                 177

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

1    PRODUCT BEARING LOUIS VUITTON TRADEMARKS.

2          I BROUGHT THIS EXHIBIT 82.1 TO COMPARE TO

3    THE NONGENUINE.  THIS IS THE CLOSEST I COULD FIND

4    BECAUSE AGAIN IT'S A PRODUCT THAT WE DO NOT

5    MANUFACTURE ANYMORE.

6    BY MR. COOMBS:

7    Q    AND CAN YOU DESCRIBE FOR US HOW YOU CAN

8    IDENTIFY THE NONGENUINE ARTICLE AS NONGENUINE?

9    A    WELL, AGAIN, QUITE EASY.  THIS PLASTIC

10   PROTECTION OF THE METALLIC PARTS THAT I JUST

11   MENTIONED, THE BUCKLE HERE IS QUITE DIFFICULT TO

12   TURN AND TO CLOSE COMPARED TO THE GENUINE WHICH

13   WORKS VERY SMOOTHLY.

14          THE INTERIOR IS NOT THE SAME.  YOU WILL

15   SEE THE LINING IS NOT THE SAME.

16   Q    THE LINING.

17   A    THE LINING, SORRY.  THE QUALITY OF THE

18   METALLIC PARTS IS QUITE POOR.  THESE CARDS WHICH

19   PROBABLY ARE MADE TO LURE THE CUSTOMER THAT IT'S

20   NOT AN AUTHENTICITY CARD, WE DO NOT DO THESE CARDS.

21          THERE'S A LITTLE BOOKLET INSIDE WHICH IS

22   PRINTED NOT IN THE RIGHT WAY.  PART OF THE TEXT IS

23   ACTUALLY CUT SO THAT'S AN EASY WAY TO SEE THAT IT

24   DOESN'T COME FROM OUR COMPANY.

25   Q    I'LL GIVE YOU A SHORT BREAK FROM PRODUCT

                                                      160

1    IDENTIFICATION AND MOVE TO -- AND ASK YOU A LITTLE

2    MORE ABOUT THE MANUFACTURING DISTRIBUTION OF

3    GENUINE LOUIS VUITTON.  WHERE IS GENUINE LOUIS

4    VUITTON MADE?

5    A    LOUIS VUITTON PRODUCTS ARE MADE IN LOUIS

6    VUITTON'S OWN MANUFACTURING FACILITIES.  THERE ARE

7    14:  11 IN FRANCE, 2 IN SPAIN, AND 1 IN SAN DIMAS

8    IN CALIFORNIA.  THAT'S FOR LEATHER GOODS.

9         THERE'S ONE MANUFACTURING FACILITY IN

10   ITALY FOR SHOES AND IN SWITZERLAND FOR WATCHES.

11   Q    AND HOW MANY PEOPLE DOES LOUIS VUITTON EMPLOY

12   IN THE UNITED STATES.

13   A    IN THE UNITED STATES LOUIS VUITTON EMPLOYS

14   MORE THAN 1,300 PEOPLE AND MANY IN THE HEADQUARTERS

15   IN THE LOCAL COMPANY OF NEW YORK.

16        IN THE STORE CHAIN THERE ARE AROUND 100

17   STORES ACROSS THE UNITED STATES.  WE EMPLOY A

18   LITTLE BIT MORE THAN 300 PEOPLE IN THE WORKSHOP

19   PRODUCTION IN SAN DIMAS, CALIFORNIA, AND WE

20   EMPLOYED I THINK 30 PEOPLE I THINK IN THE CUSTOMER

21   SERVICE DEPARTMENT IN SAN FRANCISCO.

22   Q    AND ONCE LOUIS VUITTON PRODUCT IS

23   MANUFACTURED, HOW IS IT DISTRIBUTED?

24   A    ONCE LOUIS VUITTON PRODUCTS ARE MANUFACTURED,

25   THEY'RE DISTRIBUTED THROUGH ONE MAIN LOGISTICS

                                                    161

1    CENTER LOCATED IN THE SUBURBS OF PARIS AND FOR

2    THESE PRODUCTS MANUFACTURED IN CALIFORNIA, THEY'RE

3    DISTRIBUTED THROUGH THE LOGISTICS CENTER BASED IN

4    MEMPHIS.

5    Q    AND ARE THOSE LOGISTIC CENTERS OWNED BY LOUIS

6    VUITTON?

7    A    YES, THEY ARE.

8    Q    AND THEY'RE OPERATED BY THEM?

9    A    YES, THEY ARE.

10   Q    AND ARE THERE ANY OTHER LOGISTIC CENTERS FOR

11   LOUIS VUITTON PRODUCTS?

12   A    WELL, THERE ARE LOCAL REGIONAL STORAGE

13   FACILITIES, BUT I WOULDN'T CALL THEM LOGISTICS

14   CENTER.

15   Q    THE STORAGE CENTERS ARE OPERATED AND

16   MAINTAINED BY LOUIS VUITTON?

17   A    BY LOUIS VUITTON.

18   Q    SO ARE THERE ANY LICENSEES FOR LOUIS VUITTON

19   MERCHANDISE?

20   A    NO, THERE ARE NO LICENSEES.

21   Q    AND DOES LOUIS VUITTON USE WHOLESALERS TO

22   DISTRIBUTE ANY OF ITS MERCHANDISE?

23   A    NO.

24   Q    ARE THERE ANY INTERVENING THIRD PARTIES

25   BETWEEN THE LOUIS VUITTON OWNED PRODUCTION

162

Exhibit A, Page 11

1    FACILITIES THAT YOU DESCRIBED AND THE CONSUMER

2    OTHER THAN LOUIS VUITTON ITSELF?

3    A    NO.  LOUIS VUITTON PRODUCTS ARE PRODUCED IN

4    OUR OWN MANUFACTURING FACILITIES AND ARE

5    DISTRIBUTED THROUGH A WHOLLY OWNED AND CONTROLLED

6    STORE CHAIN.

7    Q    AND CAN YOU DESCRIBE HOW THE STORE CHAIN IS

8    STRUCTURED?

9    A    THERE ARE AROUND 450 STORES AROUND THE WORLD

10   AND IN MOST OF THE CONTINENTS.

11   Q    AND HOW ABOUT DEPARTMENT STORES?

12   A    THERE ARE INDEED ALSO CORNERS IN HIGH-END

13   DEPARTMENT STORES.  THESE CORNERS ARE STAFFED BY

14   LOUIS VUITTON PERSONNEL.

15   Q    IS ANY FINISHED LOUIS VUITTON PRODUCT MADE IN

16   ASIA?

17   A    NO.

18   Q    DOES LOUIS VUITTON ASSIGN ITS TRADEMARKS TO

19   ANYONE ELSE?

20   A    NO.

21   Q    AND DOES IT SELL PRODUCT ON LINE?

22   A    YES, IT DOES BUT IN JUNE OF 2009 LOUIS VUITTON

23   PRODUCTS WERE SOLD ON TWO WEB SITES, ELUXURY.COM,

24   WHICH IS A WEB SITE BELONGING TO LOUIS VUITTON AND

25   LOUIS VUITTON'S OWN WEB SITE LOUISVUITTON.COM AND

163

Exhibit A, Page 12

1    CURRENTLY LOUIS VUITTON IS SELLING OUR PRODUCTS.

2    Q    LOUIS VUITTON PRODUCTS ARE EXPENSIVE, ISN'T

3    IT?

4    A    YES, THEY ARE.

5    Q    AND WHY IS THAT?

6    A    WELL, LOUIS VUITTON'S PRODUCTS ARE, IF I CAN

7    SAY, A SYMBOL OF LUXURY.  WE -- OUR CUSTOMERS DREAM

8    ABOUT THE BEST PRODUCT, THE PERFECT PRODUCT, AND

9    THIS IS COSTLY.

10            LOUIS VUITTON, ONE OF THE KEYS TO LOUIS

11   VUITTON'S SUCCESS IS THE QUALITY, AND WE REQUIRE

12   THE HIGH QUALITY STANDARDS AT ANY LEVEL FROM THE

13   HEAD OFFICES THROUGH THE STORES AND MANUFACTURING

14   FACILITIES.

15            THERE ARE QUALITY CHECKS AND AT ALL

16   LEVELS OF THE PRODUCTION AND THEY'RE SUPPLEMENTED

17   BY SELF-CHECKS BY THE OPERATOR DURING THE VARIOUS

18   OPERATIONS THAT HE PERFORMS WHEN THE PRODUCTS HE'S

19   MADE.

20            THIS REQUIRES, OF COURSE, VERY CAREFUL

21   SELECTION OF RAW MATERIALS WHICH COST -- WHICH ARE

22   COSTLY.  SOME OF THE RAW MATERIALS SUCH AS THE

23   EXOTIC AND SOME EXOTIC LETTERS ARE EVEN SO RARE AND

24   SO DIFFICULT TO SOURCE THAT WHEN A CUSTOMER MAKES

25   AN ORDER FOR SUCH PRODUCT, HE NEEDS TO WAIT UNTIL

164

Exhibit A, Page 13

1    THE PARTICULAR OR PIECE OF EXOTIC LEATHER IS

2    AVAILABLE COULD COME FROM -- IT'S DIFFICULT TO

3    SOURCE.

4    Q    SO IF LOUIS VUITTON CAN COMMAND SUCH A PRICE

5    FOR ITS PRODUCT WHY DOES IT CARE ABOUT THE

6    NONGENUINE PRODUCT THAT WE HAVE BEEN LOOKING AT?

7    A    WELL, I WASN'T --

8    Q    I'M SORRY.  DID I INTERRUPT?

9    A    WE ALSO MANUFACTURE IN COUNTRIES WITH HIGH

10   LABOR COSTS.  WE SHOULD BE PARTICULARLY IN EUROPE.

11   WE'RE PROBABLY AMONGST THE LAST COMPANIES THAT DO

12   NOT OUTSOURCE PRODUCTION IN LOW COST PRODUCTION

13   COUNTRIES PRECISELY BECAUSE WE NEED TO SOURCE THE

14   BEST QUALITY PRODUCT.

15   Q    SO --

16   A    ALSO THE SALE OF LUXURY GOODS REQUIRES QUITE

17   EXPENSIVE COMMUNICATION AND ADVERTISING CAMPAIGNS

18   WHICH IS THIS ADDITIONAL COST GOES TO THE END PRICE

19   OF THE PRODUCT.

20   Q    SO A CONSIDERABLE EXPENSE ON MARKETING?

21   A    YES.

22   Q    SO IF LOUIS VUITTON CAN COMMAND A PREMIUM

23   PRICE FOR ITS PRODUCT, THEN WHY DOES IT CARE ABOUT

24   THE NONGENUINE PRODUCT THAT YOU'VE BEEN LOOKING AT?

25   A    WELL, IT'S A BIG PROBLEM FOR US.  NOT ONLY

165

1    BECAUSE IT'S A CUSTOMER WHO PURCHASES A NONGENUINE

2    PRODUCT WILL PROBABLY NOT BUY OUR PRODUCT, BUT ALSO

3    BECAUSE PEOPLE WHO HAVE -- WHO LOVE OUR PRODUCT SO

4    MUCH THAT THEY WOULD SAVE MONEY FOR A LONG TIME TO

5    BUY A BAG THAT THEY DREAMED FOR A LONG TIME, THEY

6    ARE GENUINELY DISGUSTED WHEN THEY SEE A CHEAP

7    IMITATIONS OF THIS BAG ALL OVER THE PLACE.

8             WE RECEIVE MANY, MANY COMPLAINTS OF SUCH

9    PEOPLE.

10   Q    SO HOW IS IT THAT LOUIS VUITTON IS HARMED BY

11   THESE NONGENUINE PRODUCTS.

12   A    THE IMAGE OF THE COMPANY AS A LUXURY BRAND

13   SUFFERS FROM THESE PRODUCTS.

14   Q    SO GIVEN THAT, WHAT DOES LOUIS VUITTON DO TO

15   ADDRESS THE PROBLEM -- WHEN WE TALK ABOUT

16   "NONGENUINE SALES" WE'RE TALKING ABOUT MERCHANDISE

17   THAT LOUIS VUITTON HAS NOT MADE; IS THAT CORRECT?

18   A    YES.

19   Q    AND SO WHAT DOES LOUIS VUITTON DO TO TRY TO

20   CURTAIL THE SALE OF SUCH MERCHANDISE?

21   A    LOUIS VUITTON EMPLOYS WITHIN THE INTELLECTUAL

22   PROPERTY DEPARTMENT 40 PEOPLE FULLY DEDICATED ON

23   THIS KIND OF ISSUES MAINTAINING OUR RIGHTS AND

24   ENFORCING THEM.

25             THIS TEAM OF 40 PEOPLE IS MAINLY BASED IN

                                                    166

Exhibit A, Page 15

1    PARIS WITH LOCAL OFFICERS AROUND THE WORLD IN NEW

2    YORK, BUENOS AIRES, MULAN, DUBAI, HONG KONG, AND

3    TOKYO.

4    Q    AND WHAT KIND OF BUDGET DOES LOUIS VUITTON

5    ALLOCATE TO DEALING WITH THIS ISSUE ON AN ANNUAL

6    BASIS?

7    A    AROUND 15 MILLION EUROS PER YEAR WHICH WOULD

8    BE MORE THAN $20 MILLION.

9    Q    TURNING TO YOUR OFFICES AND HOW DID YOU LEARN

10   ABOUT LOUIS VUITTON DISTRIBUTION OF COUNTERFEITS?

11   A    THERE ARE SEVERAL INFORMATION ABOUT LOUIS

12   VUITTON DISTRIBUTION OF COUNTERFEITS.  THE ONE

13   SOURCE WE GET IS BY OUR CUSTOMERS.  OUR CUSTOMERS

14   CAN REACH OUR CUSTOMER SERVICE DEPARTMENTS BY PHONE

15   CALL OR AN E-MAIL AND THEY ACTUALLY DO SO VERY

16   OFTEN AND REPORT COUNTERFEIT SALES TO US.

17        WE ALSO EMPLOY AN EXTERNAL SERVICE

18   PROVIDER SPECIFICALLY FOR ONLINE DISTRIBUTION OF

19   COUNTERFEITS.  THIS COMPANY MAINTAINS THE DATABASE

20   FOR US OF COUNTERFEIT WEB SITES AND THIS DATABASE

21   IS UPDATED TWICE A MONTH WHERE NEW COUNTERFEIT WEB

22   SITES ARE ADDED.

23   Q    AND HOW DO CUSTOMERS COMPLAINTS ABOUT ONLINE

24   INFORMATION REACH YOUR OFFICE?

25   A    THEY REACH OUR OFFICE VIA OUR CUSTOMER SERVICE

167

1    DEPARTMENT.

2              FOR EXAMPLE, WHEN AN E-MAIL IS RECEIVED

3    BY THE CSD, THE CSD WILL REPLY TO THE CUSTOMER AND

4    WILL COPY OUR INTELLECTUAL PROPERTY DEPARTMENT TO

5    THE E-MAIL.  RESPONSE TO THE CUSTOMER.

6    Q    SO YOUR OFFICE WOULD RECEIVE A COPY OF THE

7    RESPONSE BEING SENT TO THE CONSUMER?

8    A    YES.

9    Q    AND DOES YOUR OFFICE RETAIN THOSE REPORTS IN

10   THE NORMAL COURSE?

11   A    YES.

12   Q    DID YOU TAKE --

13   A    WE ALSO -- THERE ARE ALSO MANY CUSTOMERS WHO

14   COME TO THE STORES AND COMPLAIN ABOUT IT, IN THIS

15   CASE THE STORES THAT WOULD TRANSFER INFORMATION TO

16   US.

17             WE ALSO RECEIVE INFORMATION FROM A WIDE

18   NETWORK OF AGENTS AND INVESTIGATORS AND LAWYERS

19   AROUND THE WORLD WHO WORK WITH US.

20   Q    AND WHY DO CUSTOMERS COME INTO THE LOUIS

21   VUITTON STORES TO COMPLAIN ABOUT NONGENUINE

22   MERCHANDISE?

23   A    WELL, THAT HAS HAPPENED ON SEVERAL OCCASIONS

24   AND IT'S BECOMING A REAL PROBLEM FOR LOUIS VUITTON

25   BECAUSE IT ACTUALLY DIVERTS OUR STAFF FROM SELLING

                                                   168

Exhibit A, Page 17

1    PRODUCTS TO AUTHENTICATING GOODS.

2              PEOPLE COME AND MAKE PURCHASES ON THE

3    INTERNET AND THINKING THAT THEY HAVE PURCHASED AN

4    AUTHENTIC LOUIS VUITTON ITEM AND ACTUALLY THEY

5    RECEIVE A FAKE SO THEY COME IN THE STORE AND THEY

6    ASK OUR STAFF TO AUTHENTICATE THE PRODUCT.

7              VERY OFTEN THE GOAL OF THIS

8    AUTHENTICATION IS TO ASK LOUIS VUITTON TO PROVIDE A

9    CERTIFICATE SO THAT THE CUSTOMER -- SO THAT THESE

10   PEOPLE GET A REFUND FROM THEIR CREDIT CARD OR FROM

11   COMPANIES SUCH AS PAY PAL.

12   Q    I THINK BY YOUR FEET THERE SHOULD BE A BINDER

13   OF VOLUME 1 AND IN IT EXHIBIT 74.  IF YOU COULD

14   TAKE A LOOK AT IT AND IDENTIFY IT FOR US.

15   A    EXHIBIT 74 IS A RESPONSE VIA E-MAIL BY OUR

16   CUSTOMER SERVICE DEPARTMENT TO A LOUIS VUITTON

17   CUSTOMER, AND WE HAVE BEEN BLIND COPIED ON THIS

18   E-MAIL.

19              IN THE HISTORY OF THE E-MAIL WE ACTUALLY

20   SEE THE ACTUAL COMPLAINT RECEIVED BY THE LOUIS

21   VUITTON CUSTOMER.

22   Q    AND THIS IS THE TYPE OF CUSTOMER COMPLAINT

23   THAT YOU WERE DESCRIBING EARLIER THAT IS ROUTINELY

24   COPIED, THE RESPONSE IS ROUTINELY COPIED TO YOUR

25   OFFICE?

169

Exhibit A, Page 18

1    A    YES.

2    Q    AND IT'S A DOCUMENT THAT IS RETAINED IN THE

3    NORMAL COURSE OF YOUR --

4    A    YES.

5          MR. COOMBS:  I WOULD MOVE EXHIBIT 74 INTO

6    EVIDENCE.

7          THE COURT:  AGAIN, IT'S NOT NECESSARY TO

8    FORMALLY MOVE AS LONG AS THERE'S NO OBJECTION.  IF

9    YOU KNOW THERE'S A TENDERED OBJECTION -- BUT

10   OTHERWISE 74 IS IN EVIDENCE AND WILL BE

11   DISPLAYED.

12          (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER 74,

13           HAVING BEEN PREVIOUSLY MARKED FOR

14           IDENTIFICATION, WAS ADMITTED INTO

15           EVIDENCE.)

16          MR. COOMBS:  I APOLOGIZE.  CAN YOU READ

17   THE CONSUMER COMPLAINT THAT IS REFLECTED IN EXHIBIT

18   74?

19          THE WITNESS:  THIS CUSTOMER REPORTS THE

20   WEB SITE ATOZBRAND, AND IT'S ONE OF THE WEB SITES

21   POSTED BY THE DEFENDANTS FOR WHICH THEY HAVE BEEN

22   NOTIFIED.  AND IT READS, "I AM SICK AND TIRED OF

23   COPIES OF YOUR PRODUCTS."

24          THE COURT:  LET ME INTERRUPT YOU BEFORE

25   YOU KEEP GOING.  IS THERE A WAY TO ZOOM IN ON THAT

170

Exhibit A, Page 19

1    EXHIBIT SO WE CAN SEE WHAT IS BEING READ?

2              MR. COOMBS:  IF YOU WOULD WAIT JUST A

3    MOMENT, SIR.

4              THE COURT:  ALL RIGHT.  GO AHEAD.  GO

5    AHEAD.

6              THE WITNESS:  "I'M SICK AND TIRED OF

7    COPIES OF YOUR PRODUCTS.  IT'S DESTROYED YOUR BRAND

8    WHICH MY WIFE AND I LIKE A LOT.  I DID FIND A BIG

9    PRODUCER AND SELLER IN CHINA.  IT LOOKS LIKE FAKES,

10   AND I HEREBY GIVE YOUR THE WEB PAGE WHICH I FOUND

11   THROUGH ALIBABA.COM."

12   Q    HAVE YOU FOLLOWED THAT WEB SITE?

13   A    YES.

14   Q    AND WHAT DO YOU KNOW ABOUT THAT WEB SITE?

15   A    THIS IS ONE OF THE WEB SITES ORIGINALLY BEFORE

16   THE COMPLAINT THAT WE ORIGINALLY COMPLAINED ABOUT

17   TO DEFENDANTS.

18   Q    WHAT IS THE OTHER REASONS THAT YOU DESCRIBE

19   REPORTS FROM YOUR OFFICE OF THE REPORTS OF ONLINE

20   MONITORING?  COULD YOU DESCRIBE FOR THE JURY HOW

21   THAT WORKS?

22   A    AS I SAID, LOUIS VUITTON IT HAS ITS OWN ONLINE

23   OFFER OF GOODS THROUGH THE WEB SITE

24   LOUISVUITTON.COM.  IT'S VERY IMPORTANT FOR US THAT

25   THIS WEB SITE HAVE A GOOD RANKING ON SEARCH ENGINES

                                              171

1    AND THAT ITS POSITIONS ON SEARCH ENGINES SUCH AS

2    YAHOO, GOOGLE, AND TWITTER IS NOT POLLUTED BY THE

3    COUNTERFEIT MERCHANDISE.

4         SO WE WOULD REGULARLY MONITOR SEARCH

5    ENGINES BY ACQUIRING THEM, SEARCH ENGINES OR SEARCH

6    TERMS SUCH AS LOUIS VUITTON AND MAKE SURE THAT NEXT

7    TO OUR WEB SITE THAT USUALLY APPEARS AT THE FIRST

8    POSITION THERE ARE NO OTHER OFFERS FOR COUNTERFEIT

9    GOODS.

10        IF THERE ARE SUCH, WE WOULD ACT AGAINST

11   THEM AS A PRIORITY.

12   Q    YOU MENTIONED THAT YOU RECEIVE REPORTS FROM

13   OUTSIDE VENDORS, INVESTIGATORS AND SO FORTH.  WHY

14   IS THAT?  DO YOU HAVE ANY UNDERSTANDING AS TO WHY

15   THEY BRING THOSE REPORTS TO YOUR ATTENTION?

16   A    WELL, AS I SAID, THEY ARE SERVICE PROVIDERS SO

17   SOME OF THEM WANT TO DO BUSINESS WITH US, AND,

18   THEREFORE, THEY TRY TO BE NICE BY SENDING US

19   INFORMATION.

20   Q    AND IS ROB HOLMES AN INVESTIGATIVE AGENCY ONE

21   OF THOSE VENDORS THAT YOU DEAL?

22   A    YES.

23   Q    AND HOW LONG HAVE YOU BEEN WORKING WITH

24   MR. HOLMES ON THE INVESTIGATION WITH ONLINE

25   INFRINGEMENT OF LOUIS VUITTON'S PROPERTIES?

                                              172

Exhibit A, Page 21

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5    LOUIS VUITTON              )  C-07-03952-JW
      MALLETIER, S.A.,          )
 6                               )  AUGUST 19, 2009
               PLAINTIFF,        )
 7                               )  VOLUME 2
               V.               )
 8                               )  PAGES 1 - 230
      AKANOC SOLUTIONS, INC.,    )
 9    ET AL.,                    )
                                 )
10             DEFENDANTS.       )
      _____    )
11

12            THE PROCEEDINGS WERE HELD BEFORE

13         THE HONORABLE UNITED STATES DISTRICT

14                   JUDGE JAMES WARE

15    A P P E A R A N C E S:

16    FOR THE PLAINTIFF:  J. ANDREW COOMBS
                          BY:  J. ANDREW COOMBS
17                             ANNIE S. WANG
                          517 E. WILSON AVENUE
18                        SUITE 202
                          GLENDALE, CALIFORNIA 91206
19

20    FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                          BY:  JAMES A. LOWE
21                             CHRISTOPHER G. LAI
                          18400 VON KARMAN
22                        IRVINE, CALIFORNIA 92612

23
           (APPEARANCES CONTINUED ON THE NEXT PAGE.)
24
      OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
25                             CERTIFICATE NUMBER 8074
```

1

1    A P P E A R A N C E S: (CONT'D)

2

     ALSO PRESENT:              LAW OFFICES OF J. ANDREW
3                               COOMBS
                                BY:  RUTH ADLER, PARALEGAL
4                               517 E. WILSON AVENUE
                                SUITE 202
5                               GLENDALE, CALIFORNIA 91206

6                               LVMH FASHION GROUP
                                BY:  NIKOLAY LIVADKIN
7                               2 RUE DU PONT-NEUF 75001
                                PARIS, FRANCE
8
                                AKANOC SOLUTIONS, INC.
9                               BY:  STEVE CHEN, PRESIDENT
                                45535 NORTH PORT LOOP EAST
10                              FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                           2

1                    INDEX OF PROCEEDINGS

2

3     **NIKOLAY LIVADKIN**        DIRECT EXAMINATION P. 4
                                  (RESUMED)
4                                 CROSS-EXAMINATION P. 103
                                  REDIRECT EXAMINATION P. 173
5                                 RECROSS-EXAMINATION P. 179
                                  FURTHER REDIRECT P. 182
6

7     **DEPOSITION READ OF JULIANA LUK** P. 186

8

9                      INDEX OF EXHIBITS

10    FOR THE PLAINTIFF'S:          MARKED          ADMITTED

11

12    75.1                                          29

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1    OF COPYRIGHT INFRINGEMENTS.

2             HOWEVER, IN PRACTICE IT'S ALSO USED FOR

3    THE IDENTIFICATION OF TRADEMARK IDENTIFICATIONS.

4    Q    AND APPROXIMATELY HOW MANY OF THESE LETTERS

5    GET SENT OUT ON A MONTHLY BASIS?

6    A    A HUNDRED PLUS.

7    Q    AND CAN YOU ESTIMATE FOR US THE RATE OF

8    RESPONSE THAT YOU RECEIVED FOR THESE LETTERS IN

9    TERMS OF SUCCESSFULLY REMOVING THE OFFERING THAT

10   ARE THE SUBJECT OF THE LETTERS?

11   A    FOR LETTERS SENT TO U.S. BASED WEB HOSTS THIS

12   RATE IS ALMOST 100 PERCENT.  SOMETIMES IT DOESN'T

13   WORK FOR THE FIRST -- AT THE FIRST ATTEMPT, BUT IT

14   USUALLY WORKS WITH A FOLLOW-UP LETTER.

15   Q    AND DO YOU HAVE EXPERIENCE TRANSMITTING

16   SIMILAR DEMANDS TO WHOLESALERS OF INTERNET CAPACITY

17   SUCH AS DEFENDANTS CLAIM TO BE HERE?

18   A    I HAVE INDEED EXPERIENCE WITH NOTIFYING

19   COMPETITORS TO DEFENDANTS, A COMPANY THAT HAS QUITE

20   SIMILAR ACTIVITY.

21   Q    AND DO YOU HAVE A SIMILAR RESPONSE TO THOSE AS

22   YOU HAVE HAD WITH DEFENDANTS, OR IS IT MORE GENERAL

23   CONSISTENT PRACTICE THAT YOU HAVE HAD WITH

24   DEFENDANTS?

25   A    WELL, IN THE BEGINNING WE HAVE HAD TROUBLE

                                                      19

Exhibit B, Page 26

1    OBTAINING ANY RESPONSE.  IT WAS A SIMILAR

2    EXPERIENCE TO THE ONE WE HAD WITH DEFENDANTS,

3    HOWEVER, AFTER A FEW THREATENING LETTERS THEY

4    STARTED COOPERATING WITH US.

5    Q    AND CAN YOU DESCRIBE THE NATURE OF THAT

6    COOPERATION?

7    A    WELL, THIS COMPANY HAS RESELLERS SUCH AS THE

8    ONES THAT THE DEFENDANTS HAVE SO WE WERE REFERRED

9    TO THE RESELLERS DIRECTLY.  WE OBTAINED THE CONTACT

10   INFORMATION OF THE RESELLERS AND WE SENT OUR

11   NOTIFICATION DIRECTLY TO THEM.

12         IN A FEW CASES, WE DID NOT RECEIVE ANY

13   COOPERATION FROM THE RESELLERS AND WE ASKED THIS

14   COMPANY TO DO SOMETHING ABOUT IT, AND THEY ACTUALLY

15   HELPED US.  THEY COOPERATED AND THEY -- I IMAGINE

16   THEY FORCED THEIR RESELLER TO COMPLY.

17         MR. LOWE:  EXCUSE ME.  EXCUSE ME.  IT

18   SOUNDS LIKE THE WITNESS IS ABOUT TO SPECULATE.

19         THE COURT:  SUSTAINED.  THE JURY WILL

20   DISREGARD THE ANSWER AFTER "I SUSPECT."  IT WAS

21   INTERRUPTED BY THE OBJECTION, BUT THERE WERE WORDS

22   SAID ABOUT THE SUSPICIONS ABOUT WHAT OCCURRED, AND

23   YOU SHOULD DISREGARD THAT.

24         GO AHEAD AND REASK ANOTHER QUESTION.

25   BY MR. COOMBS:

                                              20

```
1    Q    COULD YOU SCROLL DOWN.  AND WHAT NEXT DID YOU
2    DO IN CONNECTION WITH WENDY929?
3    A    I'M SORRY.  I CANNOT SEE.  I WOULD HAVE TO
4    REFER TO THE --
5    Q    HAVING DETERMINED THAT THE OFFERS WERE
6    COUNTERFEIT OR UNAUTHORIZED, WHAT DID YOU DO NEXT
7    WITH 929?
8    A    WELL, THE USUAL PROCEDURE WAS NOTIFY THE
9    OPERATOR AND THE WEB HOST.
10   Q    COULD YOU PULL UP EXHIBIT 63.2 AND ADVISE
11   WHETHER THAT WAS PART OF YOUR FURTHER
12   INVESTIGATION?  I'M SORRY.  64.2.
13   A    THIS IS A DOMAIN TOOLS PRINTOUT OF OCTOBER
14   30TH, 2006 SHOWING THAT THE WEB SITE WENDY929.NET
15   AND IT IS IDENTIFIED WITH DEFENDANTS AND FOR AKANOC
16   SOLUTIONS.
17   Q    AND YOU VERIFIED THE IP ADDRESS USING THE
18   ALTERNATIVE MECHANISMS THAT YOU DESCRIBED EARLIER?
19   A    THAT HAS BEEN DONE AND DOUBLE-CHECKED.
20   Q    AND WHAT DID YOU DO NEXT IN CONNECTION WITH
21   WENDY929?
22   A    I SENT NOTIFICATION TO THE WEB HOST.
23   Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT 60
24   AND TELL US WHAT THAT IS?
25   A    THIS IS A NOTIFICATION SENT TO MANAGED
```

69

```
1              THE COURT:  SUSTAINED.

2    BY MR. COOMBS:

3    Q    WHAT INVESTIGATION DID YOU DO IN RESPONSE TO

4    THE INFRINGEMENTS THAT YOU DETERMINED EXISTED ON

5    ATOZBRAND.COM?

6    A    WELL, I TRIED TO NOTIFY THE -- I HAD NOTIFIED

7    THE OPERATOR AND I TRIED ON SEVERAL OCCASIONS TO

8    NOTIFY THE WEB HOST MANAGED SOLUTIONS GROUP AND

9    AKANOC AS THE WEB SITE WAS MOVING FROM A SERVER

10   ASSIGNED TO MANAGED SOLUTIONS GROUP TO ITS SERVER

11   ASSIGNED TO AKANOC, VICE VERSA.

12             AND AS THERE WAS NO REACTION, I ASKED

13   YOUR OFFICE TO FILE A COMPLAINT AGAINST DEFENDANTS

14   MANAGED SOLUTIONS GROUP AND AKANOC.

15   Q    I WOULD ASK YOU TO TAKE A LOOK AT EXHIBIT 15

16   AND ASK YOU IF THAT IS PART OF THE DEMAND

17   CORRESPONDENCE THAT YOU JUST DESCRIBED?

18   A    YES.

19   Q    AND DID YOU RECEIVE ANY RESPONSE TO THAT

20   COMMUNICATION?

21   A    NO.

22   Q    AND SO YOU SENT A FOLLOW-UP LETTER THEREAFTER?

23   A    YES.

24   Q    AND I WOULD ASK YOU TO LOOK AT EXHIBIT 17.

25   AND IS THAT A COPY OF THE FOLLOW-UP THAT WAS
```

1    THINK YOU MENTIONED EARLIER THAT YOU RECEIVED A

2    REPORT CONCERNING INFRINGEMENT AT THAT SITE.

3    A    I'M SORRY.

4    Q    ARE YOU FAMILIAR WITH THE WEB SITE BAG925.COM?

5    A    YES.

6    Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

7    72.1.  IS THAT A WEB SITE PRINTED ON OR ABOUT THE

8    DATE INDICATED?

9    A    IT HAS BEEN PRINTED OUT ON OCTOBER 9TH, 2006

10   IN MY OFFICE.  IT'S A PRINTOUT OF THE WEB SITE

11   BAG925.COM.

12   Q    AND WERE YOU ABLE TO DETERMINE WHETHER THE

13   PRODUCTS OFFERED WERE GENUINE?

14   A    THE PRODUCTS ARE NONGENUINE.

15   Q    I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

16   73.2.

17   A    THIS IS A DOMAIN TOOLS PRINTOUT ON THE QUERY

18   FOR THE BAG925.COM PRINTED OUT ON OCTOBER 9TH,

19   2006.

20        IT TELLS US THAT THE WEB SITE HAS BEEN

21   POSTED BY AKANOC SOLUTIONS, INC.

22   Q    AND YOU SEPARATELY VERIFIED THE IP ADDRESS

23   INDICATED IN THE --

24        MR. LOWE:  OBJECTION, LEADING.

25        THE COURT:  SUSTAINED.

                                                    81

1    BY MR. COOMBS:

2    Q    DID YOU DO ANYTHING FURTHER TO VERIFY HOSTING

3    INFORMATION?

4    A    I DOUBLE-CHECKED THIS INFORMATION BY NETSCAN

5    TOOLS.

6    Q    NETSCAN TOOLS.

7            I WOULD ASK THE WITNESS TO LOOK AT

8    EXHIBIT 73.1?

9    A    THIS IS A DOMAIN TOOLS PRINTOUT OF A

10   HISTORICAL CHECK FOR THE HOSTING OF BAG925.COM

11   PRINTED OUT ON OCTOBER 3RD, 2008.

12   Q    AND I WOULD ASK THE WITNESS TO LOOK AT 73.3.

13   THAT IS ANOTHER PRINTOUT?

14   A    THAT'S ANOTHER PRINTOUT SHOWING THE HOSTING

15   HISTORY FOR BAG925.COM.  IT HAS BEEN PRINTED OUT IN

16   MY OFFICE ON JULY 24TH, 2008.

17   Q    AND IN RESPONSE TO YOUR INVESTIGATION, WHAT

18   DID YOU DO NEXT IN TERMS OF ADDRESSING THE SALE OF

19   NONGENUINE MERCHANDISE?  I DON'T MEAN AFTER THE

20   73.3, BUT AFTER YOU DETERMINED THAT THERE WAS

21   NONGENUINE MERCHANDISE, WHAT ACTION DID YOUR OFFICE

22   TAKE?

23   A    I CONTACTED THE WEB OPERATOR AND THE HOST.

24   Q    AND I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

25   2.  IS THAT A COPY OF THE FOLLOW UP OF THE HOST FOR

                                                    82

1    WE FOLLOWED UP WITH A MORE FORMAL LETTER AND NO

2    RESPONSE.

3              THIS WEB SITE HAS ALSO MOVED SEVERAL

4    TIMES AND HAS CHANGED SEVERAL TIMES AND THE RANGE

5    ASSIGNED TO THE DEFENDANTS.

6    Q    AND I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT

7    5 THAT HAS BEEN IDENTIFIED.

8    A    THIS IS A FOLLOW-UP LETTER SENT ON MARCH 19TH,

9    2007 SENT TO AKANOC SOLUTIONS, INC., ASKING THEM TO

10   RESPOND TO OUR FEBRUARY 21ST, 2007 LETTER.

11   Q    AND YOU RECEIVED NO RESPONSE TO THAT

12   COMMUNICATION?

13   A    NO, I DIDN'T.

14   Q    I WOULD ASK THE WITNESS -- DO YOU STILL HAVE

15   EXHIBIT 1598?

16   A    YES.

17   Q    THOSE ARE THE FIVE -- WE JUST TALKED ABOUT THE

18   FIVE WEB SITES THAT ARE INDICATED AT THE TOP;

19   CORRECT?

20   A    YES.

21   Q    DID LOUIS VUITTON CONTINUE TO IDENTIFY WEB

22   SITES INFRINGING LOUIS VUITTON INTELLECTUAL

23   PROPERTIES ON SERVERS THAT YOU DETERMINED WERE

24   OWNED BY THE DEFENDANTS?

25   A    YES.

                                                      85

1    Q    AND ARE THOSE REPORTS REFLECTED IN EXHIBIT

2    1598?

3    A    YES.

4    Q    YOU HAVE NO KNOWLEDGE OF THE SPECIFIC ACTION,

5    IF ANY, WAS TAKEN IN RESPONSE TO THE NOTICES THAT

6    WERE TRANSMITTED --

7         MR. LOWE:  EXCUSE ME.  OBJECTION.

8    LEADING.

9         THE COURT:  SUSTAINED.

10   BY MR. COOMBS:

11   Q    IS THIS -- YOU MENTIONED EARLIER THIS DOCUMENT

12   WAS INACCURATE IN RESPECT TO THE FIRST FIVE WEB

13   SITES LISTED ON THE EXHIBIT.  IS IT INACCURATE IN

14   ANY OTHER RESPECTS?

15   A    YES, IT'S -- IT GIVES US A LIST OF DOMAIN

16   NAMES AND A DATE ON WHICH THE DEFENDANTS HAVE

17   RECEIVED THEIR NOTIFICATION FROM OUR PART, HOWEVER,

18   TWO OF THE DATES DID NOT CORRESPOND TO ACTUAL

19   NOTIFICATION.

20   Q    WHICH DATES WERE THOSE?

21   A    MARCH 1ST, 2008 WAS A REQUEST FOR PRODUCTION.

22   Q    ACTUALLY THERE IS NO MARCH 1ST.  DO YOU MEAN

23   JANUARY 1ST?

24   A    OR JANUARY 3RD, 2008.

25   Q    THIS DOCUMENT WAS NOT PREPARED BY YOU; IS THAT

86

1    Q    WHAT ARIN REPORTS ARE YOU TALKING ABOUT?

2    A    I'M TALKING ABOUT IP WHOIS REPORTS OBTAINED

3    FROM ARIN.

4    Q    IS THERE AN EXHIBIT THAT WE HAVE SEEN TODAY

5    THAT CAME FROM ARIN?

6    A    TODAY?  NO.

7    Q    IN FACT, YOU HAVEN'T PRESENTED ANY ARIN

8    REPORT, HAVE YOU?

9    A    I BELIEVE THERE ARE MANY WITHIN THE EXHIBITS.

10   Q    HAVE WE SEEN ANY OF THEM IN THIS TRIAL?

11   A    YOU HAVEN'T DIRECTED ME TO ANY OF THEM.

12   Q    AND YOUR COUNSEL HASN'T EITHER; IS THAT RIGHT?

13   A    NO, BECAUSE THE DOMAIN TOOLS REPORT ARE

14   PROVIDING THE SAME INFORMATION.

15          MR. LOWE:  I THINK THAT'S ALL I HAVE,

16   YOUR HONOR.

17          THE COURT:  ANY QUESTIONS FROM THE

18   PLAINTIFF'S COUNSEL?

19          MR. COOMBS:  YOUR HONOR, JUST A COUPLE

20   THAT WILL HOPEFULLY HELP CLARIFY.

21               **FURTHER REDIRECT EXAMINATION**

22   BY MR. COOMBS:

23   Q    YOU INDICATED THAT LOUIS VUITTON HAS A -- HAS

24   WORKED OUT A WAY OF DEALING WITH THE RESELLER

25   SITUATION THROUGH SOFT LAYER WHICH YOU UNDERSTAND

                                              182

1    TO HAVE A SIMILAR SORT OF RELATIONSHIP WITH ITS

2    CUSTOMERS TO THE RELATION THAT THE DEFENDANT HAS

3    WITH ITS CUSTOMERS?

4    A    WELL, ACTUALLY WE FOUND OUT THAT SOME OF THEM

5    RESELLERS OR DOWNSTREAM PROVIDERS FOR SOFT LAYER

6    ARE THE SAME AS SOME OF THE DOWNSTREAM PROVIDERS OF

7    DEFENDANTS.

8    Q    AND DOES SOFT LAYER PROVIDE INFORMATION THAT

9    ALLOWS YOU TO CONTACT THE DOWNSTREAM PROVIDER

10   DIRECTLY?

11   A    SOFT LAYER HAS PROVIDED TO ARIN WHOIS -- HAS

12   PROVIDED IN ARIN WHOIS IP REPORT SUFFICIENT

13   INFORMATION ALLOWING US TO CONTACT DIRECTLY THE

14   DOWNSTREAM PROVIDER OR THE RESELLER.

15   Q    SO INSTEAD OF HAVING ABUSE@SOFTLAYER.COM AS A

16   CONTACT IN THAT CONTEXT, IT WOULD HAVE AN E-MAIL

17   SPECIFIC TO THE DOWNSTREAM PROVIDER?

18   A    YES.

19   Q    AND WHEN YOU COMMUNICATE WITH THE DOWNSTREAM

20   PROVIDER, YOU COMMUNICATE WITH THEM THE SAME WAY

21   YOU HAVE TESTIFIED TO EARLIER TODAY IN TERMS OF

22   DEALING WITH ISP'S?

23   A    YES, WE WOULD ADDRESS -- EXCUSE ME -- WE WOULD

24   ADDRESS OUR NOTIFICATION DIRECTLY TO THE DOWNSTREAM

25   PROVIDER.

                                              183

Exhibit B, Page 35

1           WE WOULD COPY SOFT LAYER TO THE E-MAIL

2     AND IF OUR LETTER IS IGNORED BY THE DOWNSTREAM

3     PROVIDER OR THE RESELLER, WE WOULD ADDRESS THE

4     SITUATION DIRECTLY WITH THE SOFT LAYER AND THAT'S

5     USUALLY ENOUGH TO SOLVE THE PROBLEM.

6     Q    THANK YOU.

7           I HAVE NO FURTHER QUESTIONS.

8           THE COURT:  VERY WELL.  YOU MAY STEP

9     DOWN.

10          THE WITNESS:  THANK YOU.

11          THE COURT:  CALL YOUR NEXT WITNESS.

12          MS. WANG:  YOUR HONOR, OUR NEXT WITNESS

13    WILL BE JULIANA LUK, AND WE'LL BE READING IT.

14          THE COURT:  VERY WELL, YOU'RE GOING TO DO

15    IT RESPONSIVELY?  SOMEONE WILL READ THE QUESTION

16    AND SOMEONE WILL READ THE ANSWER?

17          MS. WANG:  YES.

18          THE COURT:  SOMETIMES THE CASE IS THAT

19    THE WITNESS IS NOT HERE AND THE DEPOSITION WILL BE

20    READ TO YOU OF THAT WITNESS.  TO HAVE YOU FOLLOW

21    THAT, RATHER THAN HAVING TO HAVE YOU SAY QUESTION

22    AND ANSWER AND READ IT, SOMEONE IS GOING TO STAND

23    AT THE WITNESS STAND AND READ THE ANSWER AND

24    SOMEONE WILL STAND AT THE MICROPHONE AND READ THE

25    QUESTION.

                                            184

Exhibit B, Page 36

1    Q    AND WHEN YOU SAY, "I UNPLUG IT," YOU SEND AN

2    E-MAIL TO SOMEONE AT AKANOC TO UNPLUG?

3    A    TO THE SUPPORT DEPARTMENT.

4    Q    TO SOMEONE AT THE SUPPORT DEPARTMENT TO UNPLUG

5    THAT SPECIFIC IP ADDRESS?

6    A    YES.

7    Q    AND WHAT KINDS OF SITUATIONS WOULD YOU DISCUSS

8    WITH STEVE IN YOUR JOB AT AKANOC?

9    A    MASSIVE SPAMMING, FRAUD EBAY SITES, MICROSOFT

10   COPYRIGHT INFRINGEMENT.

11   Q    DO YOU KNOW IF STEVE EVER RESPONDS TO E-MAILS

12   THAT ARE SENT TO THOSE ACCOUNTS?

13   A    HE DOES.

14   Q    ARE THERE ANY KINDS OF COMPLAINTS THAT YOU

15   FORWARD ON TO STEVE FOR HANDLING?

16   A    I DON'T REMEMBER.

17   Q    IS STEVE THE ONLY OTHER PERSON WHO HAS ACCESS

18   TO THE ACCOUNTS THAT YOU HANDLE FOR AKANOC?

19   A    I DON'T KNOW.

20   Q    YOU SAID SOMETHING ABOUT MICROSOFT COPYRIGHT

21   INFRINGEMENT COMPLAINTS?

22   A    YES.

23   Q    WAS THERE SOMETHING SPECIFIC ABOUT THOSE

24   COMPLAINTS THAT YOU FELT YOU NEEDED TO SPEAK TO

25   STEVE ABOUT?

                                              194

Exhibit B, Page 37

1    A    MICROSOFT IS SO BIG SO I THINK IT'S JUST

2    SERIOUS.  I DON'T KNOW.

3    Q    THANK YOU.  WERE THERE ANY OTHER COMPLAINTS

4    FROM COMPANIES REGARDING COPYRIGHT INFRINGEMENT OR

5    TRADEMARK INFRINGEMENT THAT YOU FELT REQUIRED, YOU

6    KNOW, A DISCUSSION WITH STEVE OR ANYONE ELSE AT

7    AKANOC?

8    A    NO.

9    Q    IT WAS JUST THE MICROSOFT COMPLAINTS?

10   A    AND THE EBAY.

11   Q    SO YOU HAD STATED THAT YOU TALKED TO STEVE

12   ABOUT FRAUD EBAY COMPLAINTS AND MICROSOFT COPYRIGHT

13   INFRINGEMENT COMPLAINTS?

14   A    YES.

15   Q    AND IS THERE ANY OTHER REASON WHY YOU SPOKE TO

16   HIM ABOUT THESE COMPLAINTS SPECIFICALLY?

17   A    BECAUSE I KNOW MICROSOFT AND EBAY, THEY ARE

18   BIG.

19   Q    AND IS THAT THE ONLY REASON THAT YOU TALKED TO

20   STEVE ABOUT THESE COMPLAINTS?

21   A    YES.

22   Q    AND DO YOU EVER READ THE COMPLAINTS?

23   A    I DON'T READ THE WHOLE COMPLAINT LETTER.  I

24   ONLY TRY TO FIND THE DOMAIN NAME AND THE IP ADDRESS

25   SO I CAN FORWARD TO THE CUSTOMER.

195

Exhibit B, Page 38

1    A    I DON'T KNOW.

2    Q    DID YOU EVER REQUIRE ANY ONE OF YOUR CUSTOMERS

3    TO DO SOMETHING OTHER THAN RESOLVE IT WITHIN 24

4    HOURS?

5    A    NO.

6    Q    WOULD YOU EVER CHECK TO MAKE SURE THAT THEY

7    COMPLIED WITH YOUR REQUEST THAT THEY RESOLVED THE

8    PROBLEM WITHIN 24 HOURS?

9    A    NO.

10   Q    DID YOU EVER REVIEW ANY WEB SITE CONTENT TO

11   MAKE SURE THAT SOMETHING THAT SOMEONE WAS

12   COMPLAINING ABOUT WAS REMOVED?

13   A    NO.

14   Q    DID YOU EVER CHECK TO SEE IF A WEB SITE THAT

15   WAS THE SUBJECT OF A COMPLAINT HAD MOVED FROM ONE

16   IP ADDRESS TO ANOTHER IP ADDRESS WITHIN THE BLOCK

17   ASSIGNED TO AKANOC?

18   A    NO.

19   Q    ARE YOU FAMILIAR WITH THE $25 PENALTY FOR

20   VIOLATION OF YOUR AGREEMENTS WITH THE CUSTOMERS?

21   A    YES.

22   Q    AND WHEN WAS THAT PENALTY ENFORCED?

23   A    I DON'T THINK -- IT NEVER ENFORCED.

24   Q    DO YOU KNOW WHEN IT WAS SUPPOSED TO BE

25   ENFORCED?

201

1    E-MAIL ADDRESS?

2    A    YES.

3    Q    AND HAVE YOU SEEN THIS LETTER BEFORE?

4    A    NO.

5    Q    YOU DON'T RECALL EVER SEEING THE LETTER?

6    A    NO, I DON'T THINK SO.

7    Q    WHEN YOU SEND MESSAGES TO OTHER PEOPLE, IS

8    YOUR "FROM" ADDRESS SECURITY@AKANOC.COM?

9    A    YES.

10    Q    ASK THE WITNESS TO REVIEW EXHIBIT 31 ATTACHED

11    TO THE DEPOSITION OF STEVEN CHEN AN E-MAIL BETWEEN

12    STEVE CHEN AND SECURITY DATED ON OR ABOUT SEPTEMBER

13    12TH, 2007?

14    A    YES.

15    Q    DO YOU RECALL RECEIVING THIS E-MAIL FROM STEVE

16    CHEN?

17    A    I DON'T REMEMBER, NO.

18    Q    AND IF THE WITNESS CAN REVIEW THE MESSAGE

19    BEGINNING "THE RULE IS VERY CLEAR, WHEN WE HAVE A

20    COMPLAINT WITH CERTAIN WEB SITE, THAT WEB SITE

21    NEEDS TO BE OUT OF OUR NETWORK," AND ON UNTIL THE

22    SIGNATURE STEVEN.

23         DO YOU REMEMBER EVER RECEIVING ANY KIND

24    OF E-MAIL LIKE THIS FROM MR. CHEN?

25    A    I DON'T REMEMBER.

209

Exhibit B, Page 40

1    Q    DID STEVE EVER GIVE YOU ANY INSTRUCTION LIKE

2    THIS AS STATED IN THIS E-MAIL?

3    A    YES.

4    Q    AND HOW OFTEN WAS THAT?

5    A    VERY SELDOM.

6    Q    AND WHAT WAS THAT IN REGARD TO?

7    A    MICROSOFT, EBAY, PAY PAL SITES.

8    Q    I'M SORRY.  WAS IT YOUR TESTIMONY THAT YOU DID

9    NOT RECEIVE ANY COMPLAINTS FROM LOUIS VUITTON OR

10   THAT YOU COULD NOT REMEMBER IF YOU RECEIVED ANY

11   COMPLAINTS FROM LOUIS VUITTON?

12   A    TO ME NEVER SEEN THOSE LETTERS.

13   Q    WHEN YOU SAID THOSE LETTERS, YOU MEAN THE

14   LETTERS THAT I SHOWED YOU OR ANY LETTERS FROM LOUIS

15   VUITTON?

16   A    ANY.

17   Q    I WOULD ASK THE WITNESS TO REVIEW EXHIBIT 38

18   ATTACHED TO THE DEPOSITION OF STEVEN CHEN WHICH

19   APPEARS TO BE AN E-MAIL BETWEEN SECURITY AND STEVE

20   CHEN DATED SEPTEMBER 14TH, 2007.

21        DO YOU RECALL RECEIVING THIS E-MAIL FROM

22   STEVE CHEN?

23   A    YES.

24   Q    ON THE FIRST PAGE OF THE EXHIBIT THERE'S A

25   MESSAGE THAT IT IS AN IP ADDRESS AND IT SAYS

                                                       210

1    SERVER?

2    A    YES.

3    Q    AND WAS THAT BECAUSE THE CUSTOMER FAILED TO

4    RESPOND TO THE COMPLAINT ON SEPTEMBER 12, 2007?

5    A    YES.

6    Q    AND DID YOU HAVE TO ASK STEVE OR ANYBODY ELSE

7    BEFORE YOU MADE THE REQUEST TO HAVE THIS SERVER

8    UNPLUGGED?

9    A    REGARDING TO MICROSOFT OR EBAY OR PAY PAL

10   AROUND THAT TIME EVEN THE COUNTERFEIT WEB SITE I

11   CAN UNPLUG.

12   Q    DID YOU DO THAT ON A REGULAR BASIS?

13   A    NOT ON A REGULAR BASIS BECAUSE USUALLY I WOULD

14   CC COPY TO MR. CHEN.  SO IF HE UNPLUGGED, THEN I

15   DON'T HAVE TO TAKE ANY ACTION.

16   Q    BUT WAS IT YOUR PROCEDURE, STANDARD PROCEDURE

17   TO UNPLUG THE COUNTERFEIT WEB SITE?

18   A    AT THAT TIME, YES.

19   Q    AND DO YOU STILL UNPLUG COUNTERFEIT WEB SITES

20   AS YOU DESCRIBED?

21   A    YES.

22   Q    SO BEGINNING AROUND SEPTEMBER OF 2007 ALL OF

23   THE WAY TO THE PRESENT --

24   A    YES.

25   Q    -- WHEN YOU RECEIVE A COMPLAINT REGARDING

221

1    COUNTERFEIT WEB SITES, YOU UNPLUG THOSE?

2    A    I WOULD STILL SEND A COMPLAINT TO THE

3    CUSTOMER, CC COPY TO MR. CHEN AND THEN MOSTLY I

4    WOULD LEAVE IT TO HIM BECAUSE I DON'T -- I ONLY

5    WORK PART-TIME.  IF I HAPPEN TO KNOW THAT THE

6    CUSTOMER DIDN'T COMPLY, THEN I WILL UNPLUG IT BUT

7    MOSTLY I DON'T.

8              THE COURT:  HOW MUCH MORE DO YOU HAVE?

9    IT SOUNDS LIKE YOU ARE GOING TO NEED A LITTLE MORE

10   TIME.  IT LOOKS LIKE THERE'S ABOUT TEN PAGES.

11             MS. WANG:  ACTUALLY I HAVE THREE MORE

12   PAGES.

13             THE COURT:  THEN LET'S FINISH THIS UP SO

14   WE DON'T HAVE TO LOOK FORWARD TO COMING BACK AND

15   LISTENING.

16   BY MS. WANG:

17   Q    WHAT DO YOU MEAN BY IF YOU HAPPEN TO KNOW THAT

18   THE CUSTOMER DID NOT REPLY?

19   A    FOR EXAMPLE, IF ANOTHER COMPLAINT IS COMING

20   UP, I MEAN A LOT OF COMPLAINTS COMING IN, THEN I

21   KNOW THAT HE -- THE CUSTOMER DIDN'T COMPLY.  AND TO

22   MICROSOFT AND EBAY AND PAY PAL, THESE COMPANY I

23   KNOW THEY ARE VERY BIG, YOU KNOW, AND SO I WOULD

24   SEE IF THEY HAD ANY COMPLAINT COMING IN OR NOT.

25             SOMETIMES EBAY WOULD COME IN -- WITHIN

                                              222

Exhibit B, Page 43

1    TWO DAYS THEY WILL SENT ME TWO COMPLAINTS WITHIN

2    TWO DAYS THEN I KNOW THAT THE CUSTOMER DIDN'T

3    COMPLY SO I WILL SHUT THEM DOWN.

4    Q    WHEN YOU TALK ABOUT MICROSOFT AND EBAY AS

5    THESE BIG COMPANIES, WOULD YOU CONSIDER LOUIS

6    VUITTON A BIG COMPANY AS WELL?

7    A    I DON'T KNOW.

8    Q    HAVE YOU EVER HEARD OF LOUIS VUITTON?

9    A    NO.

10   Q    HAVE YOU EVER HEARD OF LV?

11   A    YEAH, FROM MY DAUGHTER.

12   Q    WHAT DO YOU KNOW ABOUT LV?

13   A    FROM MY DAUGHTER SAYING THAT SHE LIKES -- IS

14   IT HANDBAGS?  SOMETHING LIKE THAT?  I DON'T KNOW.

15   I NEVER BUY THAT.

16   Q    THE ONE PAGE E-MAIL DATED AUGUST 28TH FROM

17   SECURITY TO REBOOT@AKANOC.COM, DID YOU SEND THAT

18   E-MAIL?

19   A    YES.

20   Q    IT READS THAT DUE TO FAILURE TO RESPOND TO

21   NOTICES OVER 48 HOURS, PLEASE CONFIRM AND TKS.  YOU

22   TESTIFIED EARLIER THAT YOU USUALLY GIVE PEOPLE A 12

23   HOUR RESPONSE TIME AND SOMETIMES YOU GIVE THEM

24   LONGER LIKE 48 HOURS?

25   A    IF I RECEIVE MORE COMPLAINTS AFTER 12 HOURS OR

223

Exhibit B, Page 44

1    ABOUT WANTING TO KNOW WHICH COMPANY WERE

2    COMPLAINING AND YOUR RESPONSE TO BE THAT SHE DIDN'T

3    KNOW WHO WAS COMPLAINING?

4    A    I UNDERSTAND THAT.

5    Q    OKAY.  IS THERE AN INSTANCE WHERE YOU DID NOT

6    FORWARD THE COMPLAINT ON TO THE CUSTOMER?

7    A    I FORWARDED IT.  THEY DON'T UNDERSTAND.  IT'S

8    THEIR PROBLEM.  THEY DON'T UNDERSTAND WHAT I'M

9    FORWARDING TO THEM.

10   Q    OKAY.  SO IN THIS INSTANCE YOU HAD FORWARDED

11   THE COMPLAINT THAT YOU HAD RECEIVED TO NORAQ, AND

12   SHE WROTE BACK TO YOU THAT SHE WANTED TO KNOW WHICH

13   COMPANY WAS COMPLAINING; IS THAT CORRECT?

14   A    YES.

15   Q    AND THEN IN YOUR E-MAIL YOU WROTE, IT DOESN'T

16   MATTER WHO COMPLAINED.  CAN YOU TELL ME WHAT THAT

17   MEANS IN REFERENCE TO THIS CONVERSATION?

18   A    WELL, JUST AN ANSWER.  SHE WANTS TO KNOW OR

19   WHICH COMPANY IS COMPLAINING AND I JUST TELL HER,

20   IT DOESN'T MATTER.  ALL YOU HAVE TO DO IS TO REMOVE

21   ALL OF THE COMPLAINT WEB SITES OR DOMAINS.

22   Q    DO YOU TREAT SPAMHAUS COMPLAINTS DIFFERENTLY

23   THAN OTHER COMPLAINTS?

24   A    YES.

25   Q    AND HOW IS THAT?

225

Exhibit B, Page 45

1    A    BECAUSE I'M INSTRUCTED TO DO SO.

2    Q    WHAT ARE YOU INSTRUCTED TO DO?

3    A    WHENEVER SPAMHAUS SENDS US A COMPLAINT, WE

4    JUST UNPLUG THE SERVER AND DISCONTINUE THE SERVICE

5    TO THE CUSTOMER.

6    Q    NOW, IS EXHIBIT 50 AN E-MAIL DATED SEPTEMBER

7    15TH, 2007 FROM SECURITY TO SUPPORT@TOOMING.COM?

8    CAN YOU PLEASE REVIEW THAT?

9    A    YES.

10   Q    OKAY.  DID YOU WRITE THIS E-MAIL STARTING WITH

11   "DEAR SIR"?

12   A    YES.

13   Q    I'M SORRY.  WHEN YOU WRITE SOMETHING LIKE THE

14   SECOND NOTE FROM THIS COMPLAINANT, DOES THAT MEAN

15   YOU RECEIVED A PRIOR COMPLAINT FROM THE CUSTOMER

16   WITHIN THE PAST TWO OR THREE DAYS FROM SEPTEMBER

17   15TH?

18   A    YES.

19   Q    AND IT WRITES "MAKE SURE YOU KEEP ALL OF THE

20   RECORDS SO THAT IF THE AUTHORITIES NEEDS EVIDENCE,

21   WE CAN PROVIDE THEM," WHAT DID YOU MEAN BY THAT?

22   A    INSTRUCTION FROM STEVE.

23   Q    STEVE HAD TOLD YOU TO WRITE THAT TO THE

24   CUSTOMER?

25   A    YES, REGARDING FRAUD OR IDENTITY THEFT.

                                              226

CERTIFICATE OF REPORTER

    I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

    THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

**EXHIBIT C**

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5    LOUIS VUITTON              )  C-07-03952-JW
     MALLETIER, S.A.,           )
6                               )  AUGUST 20, 2009
               PLAINTIFF,       )
7                               )  VOLUME 3
               V.               )
8                               )  PAGES 1 - 267
     AKANOC SOLUTIONS, INC.,    )
9    ET AL.,                    )
                                )
10             DEFENDANTS.       )
     _____    )
11

12

13            THE PROCEEDINGS WERE HELD BEFORE

14         THE HONORABLE UNITED STATES DISTRICT

15                  JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:  J. ANDREW COOMBS
                         BY:  J. ANDREW COOMBS
18                            ANNIE S. WANG
                         517 E. WILSON AVENUE
19                       SUITE 202
                         GLENDALE, CALIFORNIA 91206
20

21   FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                         BY:  JAMES A. LOWE
22                            CHRISTOPHER G. LAI
                         18400 VON KARMAN
23                       IRVINE, CALIFORNIA 92612

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                          CERTIFICATE NUMBER 8074

                                                          1

1    A P P E A R A N C E S: (CONT'D)

2

3    ALSO PRESENT:              LAW OFFICES OF J. ANDREW
                                COOMBS
4                              BY:  RUTH ADLER, PARALEGAL
                                517 E. WILSON AVENUE
                                SUITE 202
5                              GLENDALE, CALIFORNIA 91206

6                              LVMH FASHION GROUP
                                BY:  NIKOLAY LIVADKIN
7                              2 RUE DU PONT-NEUF 75001
                                PARIS, FRANCE
8
                                AKANOC SOLUTIONS, INC.
9                              BY:  STEVE CHEN, PRESIDENT
                                45535 NORTH PORT LOOP EAST
10                             FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        2

INDEX OF PROCEEDINGS


**ROBERT HOLMES**              DIRECT EXAMINATION P. 11
                              CROSS-EXAMINATION P. 38
                              REDIRECT EXAMINATION P. 84

**DEPOSITION READ OF STEVEN CHEN** P. 87


**MICHAEL WILSON**            DIRECT EXAMINATION P. 167
                              CROSS-EXAMINATION P. 196
                              REDIRECT EXAMINATION P. 253
                              RECROSS-EXAMINATION P. 259


INDEX OF EXHIBITS

                              IDENT.        EVIDENCE


FOR THE PLAINTIFF:

65, 81, 116, 128, 141, 173, 185,
195, 210, 584, 586, 588 & 590          25

94, 95.3, 95.4, 95.5, 98.3, 99.3,
99.4, 99.5, 169, 160, 160.1, 160.2,
161, 162.1, 162.2, 163, 164, 164.1,
614.2, 165, 166, 166.1, 166.2, 212,
213.2, 213.3, 213.4, 286, 287, 287.1,
287.2, 353, 353.1, 353.2, 356, 357,
357.1, 360, 361, 361.1, 361.2, 402,
403, 403.1, 403.2, 404, 405, 405.1,
405.2, 406, 406.1 AND 406.2            31

97.2, 109 491                          35

3

           Exhibit C, Page 50

1    Q    WOULD HE FORWARD IT TO THE CUSTOMER OR TO

2    JULIANA LUK FOR HANDLING?

3    A    FORWARD IT TO SECURITY@AKANOC.

4    Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT ANY

5    OF THE LETTERS MARKED AS EXHIBITS 1, 2, 3, AND 4

6    WERE AT ANY TIME RECEIVED BY AKANOC?

7    A    I JUST NEVER SEEN IT.

8    Q    BUT DO YOU HAVE ANY REASON TO DISPUTE IT THAT

9    THEY WERE ACTUALLY RECEIVED?

10    A    NO.

11    Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT THE

12    SITES REFERRED TO IN THOSE LETTERS WERE IN FACT

13    HOSTED ON SERVERS AT AKANOC'S FACILITY?

14    A    WE -- I DEFINITELY HAVE NO IDEA WHERE THOSE

15    WEB SITES POINTED TO AT THAT TIME.

16    Q    I'LL MARK AS 6 A LETTER DATED APRIL 20, 2007

17    AND ASK THE WITNESS IF HE HAS SEEN THAT.

18    A    I HAVE NO RECOLLECTION OF THIS.

19    Q    AND WOULD YOU HAVE ANY WAY OF DETERMINING

20    WHETHER OR NOT THIS LETTER WAS, IN FACT, RECEIVED

21    BY YOU ON OR ABOUT THE DATED IT BEARS?

22    A    I REMEMBER I RECEIVED ONE OF THIS FROM YOUR

23    OFFICE AND I TOOK IT TO THE OFFICE AND SINCE IT'S

24    CONCERNING AKANOC, SO I PRETTY MUCH JUST PUT IT IN

25    THE PILE.

129

1    Q    SO WHEN YOU SAY YOU TOOK IT TO THE OFFICE,

2    THAT'S BECAUSE THE ONONDAGA DRIVE S IS YOUR HOME

3    ADDRESS?

4    A    THAT'S CORRECT.

5    Q    AND SO DO YOU RECALL RECEIVING A LETTER AT

6    YOUR HOME?

7    A    YES.

8    Q    CONCERNING LOUIS VUITTON?

9    A    YES.

10   Q    WHEN YOU SAY YOU TOOK IT TO YOUR OFFICE AND

11   PUT IT ON A PILE, WHAT DOES THAT MEAN?

12   A    I MEAN PUT IT ON THE DESK.

13   Q    WHOSE DESK?

14   A    THAT PARTICULAR -- THAT EMPTY DESK I WAS

15   TALKING ABOUT BECAUSE THAT WAS, AT THE TIME THAT

16   WAS THE PLACE THAT WE PUT ALL OF THIS TYPE OF

17   LETTERS.

18   Q    AND TO YOUR KNOWLEDGE WHAT HAPPENED WITH THE

19   LETTER AFTER YOU PUT IT ON THE DESK?

20   A    THERE WERE -- THERE WERE TOO MANY PEOPLE

21   TRYING TO SHARE THE WORKLOAD OVER THERE SO I HAVE

22   NO IDEA.

23   Q    OKAY.  TO THE EXTENT THAT I UNDERSTAND THAT

24   YOU CAN'T SAY WHAT HAPPENED WITH THIS LETTER, BUT

25   IN TERMS OF AKANOC'S POLICIES AND PROCEDURES, WHAT

130

1    SHOULD HAVE HAPPENED WITH THE LETTER AFTER IT WAS

2    PUT ON THE DESK?

3    A    WE -- VERY, VERY SELDOM THAT WE RECEIVE

4    COMPLAINT THROUGH E-MAIL, I MEAN, THROUGH REGULAR

5    MAILS.  SO MOST OF THE ABUSE ISSUES WERE ALL

6    REVOLVED IN THE E-MAIL FORMAT.  SO THIS TYPE OF

7    E-MAILS -- I MEAN, THROUGH REGULAR MAILS -- I MEAN,

8    LETTERS ACTUALLY SOMETHING FROM, LIKE, THINGS LIKE

9    SUBPOENA WE NEED TO RESPOND, OR SOMETHING LIKE COME

10   IN FROM LEGAL AUTHORITY, WE NEED TO RESPOND.  BUT

11   GENERAL COMPLAINTS, WE JUST DON'T HAVE A LOT OF

12   EXPERIENCE WITH IT AND WE DON'T HAVE ANY MECHANISM

13   TO TAKE CARE OF LETTER COMPLAINTS.

14   Q    SO THERE WAS NO REAL POLICY TO HANDLE --

15           THE COURT:  LET ME INTERRUPT YOU.  IT

16   DIDN'T SOUND YOU WERE GOING TO FINISH IN A MINUTE

17   OR TWO AND YOU PROMISED US AN HOUR AND WE'VE BEEN

18   GOING FOR ABOUT 45 MINUTES.

19           LET'S TAKE A LUNCH BREAK, AND WE'LL COME

20   BACK AT 1:00 O'CLOCK.

21           (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

22

23

24

25

                                                    131

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

**EXHIBIT D**

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5    LOUIS VUITTON              )  C-07-03952-JW
     MALLETIER, S.A.,          )
6                              )  AUGUST 21, 2009
              PLAINTIFF,       )
7                              )  VOLUME 4
              V.               )
8                              )  PAGES 1 - 208
     AKANOC SOLUTIONS, INC.,   )
9    ET AL.,                   )
                               )
10            DEFENDANTS.       )
     _____  )
11

12

13           THE PROCEEDINGS WERE HELD BEFORE

14         THE HONORABLE UNITED STATES DISTRICT

15                  JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:  J. ANDREW COOMBS
                         BY:  J. ANDREW COOMBS
18                            ANNIE S. WANG
                         517 E. WILSON AVENUE
19                       SUITE 202
                         GLENDALE, CALIFORNIA 91206
20
     FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
21                       BY:  JAMES A. LOWE
                              CHRISTOPHER G. LAI
22                       18400 VON KARMAN
                         IRVINE, CALIFORNIA 92612
23

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                         CERTIFICATE NUMBER 8074

                                                          1

1    A P P E A R A N C E S: (CONT'D)

2

3    ALSO PRESENT:              LAW OFFICES OF J. ANDREW
                                COOMBS
4                               BY:  RUTH ADLER, PARALEGAL
                                517 E. WILSON AVENUE
                                SUITE 202
5                               GLENDALE, CALIFORNIA 91206

6                               LVMH FASHION GROUP
                                BY:  NIKOLAY LIVADKIN
7                               2 RUE DU PONT-NEUF 75001
                                PARIS, FRANCE
8
                                AKANOC SOLUTIONS, INC.
9                               BY:  STEVE CHEN, PRESIDENT
                                45535 NORTH PORT LOOP EAST
10                              FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

          Exhibit D, Page 56

1                    INDEX OF PROCEEDINGS

2

     FOR THE DEFENDANTS:
3

4

     **STEVEN CHEN**              DIRECT EXAMINATION P. 5
5                                CROSS-EXAMINATION P. 165

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              3

1        THIS ROW DOWN HERE ON THIS CHART

2   REPRESENTS RESELLERS OF SERVICES; IS THAT RIGHT?

3   A    YES.

4   Q    HOW DOES THIS WORK THEN FOR SOMEBODY USING

5   YOUR SERVERS GOING TO SOMEBODY DOING BUSINESS WITH

6   YOUR RESELLERS?

7   A    I DON'T REALLY KNOW THEIR RELATIONSHIP, BUT I

8   TURN OVER MY SERVICE TO MY RESELLER AND IN TURN

9   THEY MAY RESELL THE WHOLE THING TO ANYBODY THAT

10  ACTUALLY OPERATES THE WEB SITE OR SOME OTHER

11  PURPOSE OR SOME OTHER APPLICATION.

12        I DON'T REALLY KNOW WHAT MY RESELLERS DO

13  WHEN THEY RECEIVE A DEPLOYMENT.

14  Q    SO IF YOU HAVE A RESELLER THAT YOU TESTIFIED

15  ABOUT, THEY CONTROL THE SERVER?

16  A    IN SOME CASES YES AND IN SOME CASES NO.  I

17  HAVE SEEN IF I HAD A COMPLAINT TO MY RESELLER, MY

18  CONSENT -- MY RESELLER MAY COME BACK WITH THAT I

19  FORWARDED THE INFORMATION TO -- I FORWARDED THE

20  COMPLAINT TO MY CUSTOMER, OR THEY MAY COME BACK AND

21  SAY, WE ONLY TAKE ACTION ON IT.  WHAT DOES THAT

22  MEAN?  WHETHER THEY TALK TO THEIR END USER OR NOT,

23  I DON'T KNOW.

24  Q    SO YOU DON'T CONTROL THE SERVER.  MAYBE THE

25  RESELLER DOES OR MAYBE -- THEIR CUSTOMER DOES?

                                              78

1      ANYTHING AFTER THAT IS A CLEAR RECORD.

2      Q    SO FROM JUNE 2007 ON?

3      A    THAT IS CORRECT.

4      Q    AND IF YOU HAD GOTTEN THE COMPLAINT PRIOR TO

5      JUNE OF 2007, WOULD YOUR PRACTICE IN HANDLING THAT

6      COMPLAINT BEEN ANY DIFFERENT THAN THE WAY YOU

7      TESTIFIED HERE TODAY?

8      A    NO.  AT THAT TIME WE DON'T HAVE A LAWSUIT.  WE

9      WOULD KEEP GOING EXACTLY THE SAME WAY.

10     Q    DO YOU HAVE ANY IDEA WHY THE IP ADDRESSES FOR

11     THESE -- LET'S ASSUME THAT LOUIS VUITTON THOUGHT

12     THAT THERE -- THAT THESE DOMAINS, THESE WEB SITES

13     WERE BEING HOSTED ON YOUR SERVERS AND THAT'S WHY

14     THEY FILED A LAWSUIT.  DO YOU HAVE ANY IDEA WHY

15     THEY WERE NO LONGER ON YOUR RANGE OR THEY WERE NOT

16     FUNCTIONING AT THE TIME OF THE LAWSUIT?

17     A    SOMEBODY MUST HAVE DONE SOMETHING TO TRIGGER

18     THE IP FROM CHANGING.

19     Q    SOMETHING CAUSED SOMETHING TO CAUSE THE IP TO

20     CHANGE?

21     A    MOST LIKELY WE SEE SOMETHING AND WE FORWARD IT

22     TO THE CUSTOMER AND THE CUSTOMER DECIDES TO MOVE IT

23     AROUND.

24     Q    NOW I WANT TO DROP DOWN TO A NUMBER OF THESE

25     ENTRIES AND TRY TO FOCUS ON THE ONES THAT

146

1    TO INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS; IS

2    THAT ALSO NOT CORRECT?

3    A    THAT IS CORRECT.

4    Q    AND IT ALSO PROVIDES FOR IMPOSING FEES UNDER

5    PARAGRAPH SUB 4; IS THAT ALSO NOT CORRECT?

6    A    THAT'S CORRECT.

7    Q    AND IT DOESN'T ACTUALLY SPECIFY A MINIMUM OR

8    MAXIMUM IN THE NUMBER AMOUNT OF FEES THAT CAN BE

9    IMPOSED; IS THAT ALSO THE CASE?

10   A    THAT'S CORRECT.

11   Q    AND IT ALSO SAYS THAT AKANOC RESERVES THE

12   RIGHT TO REMOVE THE OFFENDING CONTENT UNDER SUB.

13   5, IS THAT ALSO NOT THE CASE?

14   A    THAT'S CORRECT.

15   Q    AND ALL OF THESE TOOLS THAT ARE PROVIDED FOR

16   BY YOUR OWN CONTRACT HAVE BEEN PART OF THAT

17   CONTRACT SINCE AKANOC STARTED DOING BUSINESS?

18   A    THAT IS CORRECT.

19   Q    AND THEY HAVE BEEN WITHIN THE ARSENAL OF

20   AKANOC'S CONTRACTUAL RIGHTS TO DEAL WITH COPYRIGHT

21   AND TRADEMARK INFRINGEMENT FROM 2003 AND 2004

22   WHENEVER AKANOC FIRST STARTED DOING BUSINESS?

23   A    THAT IS CORRECT.

24   Q    AND NOW, ONE THING I HAVEN'T SEEN IS TERMS OF

25   THE SERVICE AGREEMENT OR ACCEPTABLE USE POLICY FOR

Exhibit D, Page 60

1    MANAGED SOLUTIONS GROUP.  IS THERE ONE?

2    A    NO, THERE WAS NOT SIMPLY BECAUSE OF --

3              THE COURT:  YOU WEREN'T ASKED -- YOU WERE

4    JUST ASKED WAS THERE?

5              THE WITNESS:  NO.

6    BY MR. COOMBS:

7    Q    DOES MANAGED SOLUTIONS GROUP MAINTAIN A WEB

8    SITE?

9    A    NO.

10   Q    AND HAS IT EVER MAINTAINED A WEB SITE SINCE

11   MANAGED SOLUTIONS GROUP SPLIT OFF FROM MANAGED?

12   A    NO.

13   Q    AND DOES IT HAVE ONE TODAY?

14   A    NO.

15   Q    DOES YOUR CUSTOMERS HAVE A RELATIONSHIP WITH

16   MANAGED?

17   A    IT DOES NOT.

18   Q    AND THAT'S TRUE IF THE IP IS OWNED BY MANAGED

19   SOLUTIONS GROUP?

20   A    THAT'S CORRECT.

21   Q    AND SO IT'S A GENERAL PUBLIC THAT IS LOOKING

22   AT A WEB SITE THAT IS WITHIN THE MANAGED SOLUTIONS

23   GROUP BLOCK OF IP NUMBERS, IT WOULD APPEAR THAT

24   MANAGED SOLUTIONS GROUP IS, IN FACT, THE OWNER OR

25   OPERATOR OR THE ISP WEB HOST OF THE APPLICABLE WEB

169

1    LOCATING WITH YOUR SERVERS HERE IN SAN JOSE?

2    A    THAT'S CORRECT.

3    Q    SO IN ADDITION TO THE FACT THAT YOU PROVIDE

4    THE SERVERS, THE ROUTERS, THE BANDWIDTH THAT YOU

5    WERE TESTIFYING TO THIS MORNING, THERE'S ALSO THE

6    FACT THAT THE BASIC CONNECTIVITY THAT AKANOC OFFERS

7    THAT ENHANCES BASICALLY THE INTERNET EXPERIENCES

8    FOR PEOPLE THAT ARE VISITING HOSTING SITES ON YOUR

9    SERVERS?

10   A    THAT IS CORRECT.

11   Q    LET'S ACTUALLY TALK ABOUT THE DIGITAL

12   MILLINEUM COPYRIGHT ACT FOR JUST A MOMENT.  I THINK

13   IT'S EXHIBIT 54 FOR ONE OF THE INTERIM DESIGNATION

14   OF THE DEFENDANTS; IS THAT CORRECT?

15   A    YES.

16   Q    AND CAN YOU TELL ME WHAT DATE THAT WAS FILED

17   ON?

18        THE COURT:  IF THERE'S A DATE ON THE

19   DOCUMENT I'LL HAVE YOU SCROLL DOWN TO THE DATE

20   LINE.

21        THE WITNESS:  NOVEMBER 30TH, 2007.

22   BY MR. COOMBS:

23   Q    AND THAT WAS AFTER THE LAWSUIT WAS FILED AND

24   SERVED ON AKANOC SOLUTIONS?

25   A    I BELIEVE SO.

172

1    Q    AND DOES HE HAVE ANYTHING TO DO WITH IT NOW?

2    A    NO.

3    Q    AND HAS HE HAD ANYTHING TO DO WITH IT FOR THE

4    LAST THREE YEARS?

5    A    NO.

6    Q    AND SO WHO, IF NOT YOU -- ARE YOU

7    SUGGESTING -- STRIKE THAT.

8             ARE YOU SUGGESTING THAT MR. PHAM

9    CONTINUED TO HAVE A RESPONSIBILITY TO FILE THE

10   DESIGNATION?

11   A    NO.

12   Q    SO WHO DID?

13   A    ME.

14   Q    OKAY.  AND DID YOU FILE ONE BEFORE ROUGHLY

15   NOVEMBER OF 2007?

16   A    NO.

17   Q    SO IT'S THE FIRST ONE FOR BOTH OF THE

18   CORPORATE DEFENDANTS?

19   A    YES.

20   Q    OKAY.  THANK YOU.  AND THESE ARE BOTH AGAIN

21   AFTER THE LAWSUIT WAS FILED BY LOUIS VUITTON?

22   A    THAT'S CORRECT.

23   Q    NOW, YOU ARE DESIGNEE UNDER THAT ACT?

24   A    THAT'S CORRECT.

25   Q    AND WHAT IS YOUR UNDERSTANDING OF THE

                                                      174

1   REQUIREMENT UNDER THE ACT FOR THE FILING OF THE

2   AGENT NOTIFICATION OF THE TYPE THAT WE'RE LOOKING

3   AT RIGHT NOW?

4   A    TO BE HONEST WITH YOU, I DON'T REALLY

5   UNDERSTAND.  I JUST KNOW THAT IT'S A PROCESS THAT I

6   NEED TO DO.

7   Q    DO YOU HAVE ANY UNDERSTANDING OF THE

8   REQUIREMENT OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

9   TO HAVE A PUBLISHED TERMS OF SERVICE?

10  A    I REALLY DON'T UNDERSTAND THAT PARTICULAR LAW

11  PER SE.

12  Q    OKAY.  DO YOU HAVE ANY UNDERSTANDING OF WHAT

13  THAT LAW REQUIRES IN RESPONSE TO NOTICES OF

14  INFRINGEMENT TRANSMITTED ACCORDING TO ITS TERMS?

15  A    I DON'T REALLY UNDERSTAND THAT LAW.

16  Q    OKAY.  ARE YOU FAMILIAR WITH THE TERM AT ALL

17  OF EXPEDITIOUS REMOVAL?

18  A    NO.

19  Q    SO YOU DON'T HAVE ANY UNDERSTANDING ABOUT A

20  REQUIREMENT THAT IN RESPONSE TO A NOTICE OF

21  INFRINGEMENT A WEB HOST OR ISP THAT WANTS TO AVAIL

22  ITSELF OF THAT STATUTE MUST EXPEDITIOUSLY REMOVE

23  THE INFRINGING CONTENT THAT IS THE SUBJECT OF THE

24  NOTICE?

25  A    I DON'T UNDERSTAND THE LANGUAGE INSIDE OR THE

175

1    LANGUAGE YOU JUST TALK ABOUT.

2             I'M ONLY DOING THINGS IS WHAT INDUSTRY

3    PEOPLE DO EVERY DAY.

4    Q    HAVE YOU ASSIGNED -- OTHER THAN MS. LUK ABOUT

5    WHOM WE HAVE TALKED ABOUT A LITTLE BIT OVER THE

6    LAST COUPLE DAYS, HAVE YOU ASSIGNED ANY

7    RESPONSIBILITY FOR HANDLING THESE INFRINGEMENT

8    NOTICES TO ANYONE ELSE AT EITHER AKANOC OR MANAGED

9    SOLUTIONS GROUP?

10   A    AGAIN BEFORE THE SEPARATION?  EVEN AFTER THE

11   SEPARATION FOR QUITE SOME TIME WE EVEN HAVE MORE

12   STAFF HANDLING THE BUSINESS.  THERE WERE TWO OTHER

13   GENERAL CLERK THAT THEY WERE MORE INTENT TO HANDLE

14   THIS TYPE OF WORK.

15   Q    OKAY.  I'M SORRY.  I'M GETTING A LITTLE

16   CONFUSED AND IF I AM, I'M SURE -- I HOPE I'M NOT

17   THE ONLY ONE SO LET'S TALK ABOUT THE SEPARATION

18   THAT YOU'RE REFERRING TO.

19             YOU HEARD A LITTLE DEPOSITION TESTIMONY

20   ABOUT IT, BUT MAYBE WE CAN CLEAR UP A COUPLE OF

21   THINGS.

22             WHEN MANAGE SOLUTIONS BUSINESS STARTED

23   BUSINESS IN ABOUT WHAT YEAR?

24   A    END OF 2003.

25   Q    AND AT THAT TIME YOU WERE NOT THE SOLE OWNER?

                                            176

1    GROUP DIDN'T HAVE A WEB SITE SO IT WASN'T PUBLISHED

2    ON A WEB SITE.  AND IT WASN'T PUBLISHED WITH THE

3    COPYRIGHT OFFICE, SO IT WASN'T PUBLISHED WITH

4    THE --

5    A    THAT'S RIGHT.

6    Q    AND THERE'S NOTHING THE AKANOC SOLUTIONS --

7    AKANOC.COM WEB SITE THAT TALKS ABOUT IT; IS THAT

8    CORRECT?

9    A    THAT'S RIGHT.

10   Q    AND WAS IT ANYWHERE ELSE?

11   A    IF I CAN REMEMBER DEFINITELY THAT ARIN RECORD

12   WE HAVE CHANGED -- ANY TYPE OF FORMAL RECORD WE

13   WOULD NEED TO CHANGE WE WOULD CHANGE.

14   Q    BUT MANAGE.COM WAS, IN FACT, THE WEB SITE FOR

15   MANAGED SOLUTION GROUP UP UNTIL AT LEAST MR. PHAM

16   UNTIL 2004?

17   A    THAT'S CORRECT.

18   Q    AND MANAGED SOLUTIONS GROUP HAD NO WEB SITE

19   PRESENCE AFTER THE SEPARATION FROM MANAGE.COM?

20   A    NO.

21   Q    AND MANAGE.COM, THEIR PLACE OF BUSINESS ALSO

22   MOVED, DID IT NOT?  THEY MOVED TO NEW JERSEY I

23   THINK?

24   A    I THINK OVER TIMES THEY -- JACK PHAM SOLD THE

25   BUSINESS TO ANOTHER GENTLEMAN NAMED JOHN MEARS OR

180

Exhibit D, Page 66

1    A    I HAVE NO IDEA.

2    Q    AND WE'LL PUT UP THE NEXT ONE THAT COMES NEXT

3    FROM MARCH 3, '08 AND THIS, TOO, IS A -- IS ANOTHER

4    TAKEDOWN NOTICE -- THAT'S THE TAKEDOWN NOTICE

5    REFERRING TO ESTARBIZ ON 3-3; IS THAT CORRECT?

6    A    YES.

7    Q    AND IT'S TO MR. WANG KIYO; IS THAT CORRECT?

8    A    YES.

9    Q    AND IT'S CONCERNING THE SAME DOMAIN NAME

10   ESTARBIZ.COM?

11   A    YES.

12   Q    AND IT CONCERNS THE SAME --

13   A    THIS ONE --

14   Q    I DIDN'T MEAN TO INTERRUPT.  BUT MY ONLY

15   QUESTION IS THAT IT'S THE SAME IP ADDRESS AS

16   REFLECTED ON THE PREVIOUS EXHIBITS?

17   A    YES.

18   Q    AND THAT SUGGESTS TO ME AT LEAST THAT THAT WEB

19   SITE WAS IN OPERATION FROM NOVEMBER OF 2007 AND

20   UNTIL MARCH OF 2008.  DO YOU HAVE A DIFFERENT

21   CONCLUSION?

22   A    CAN YOU PUT THE LAST?  THE FIRST THING I SAID

23   IS THAT YOUR SERVER HAS BEEN UNPLUGGED.

24   Q    MR. CHEN, I DIDN'T ASK YOU WHAT THE E-MAIL

25   SAID.  I ASKED YOU WHETHER THE ESTARBIZ WAS ON THE

                                                        196

1   SAME SERVER WITH THE SAME CUSTOMER FROM NOVEMBER OF
2   2007 UNTIL MARCH OF 2008?
3   A   YES.
4   Q   NOW, IS MR. WANG KIYO STILL A CUSTOMER OF
5   AKANOC SOLUTIONS?
6   A   MAYBE.
7   Q   YOU DON'T KNOW?
8   A   I DON'T KNOW.
9   Q   YOU NEVER TOOK ANY ACTION TO TERMINATE HIM AS
10  A CUSTOMER?
11  A   I DON'T HAVE A REASON TO TERMINATE HIM.
12  Q   SO IN SPITE OF THE LITIGATION AND IN SPITE OF
13  ALL OF THE DEMANDS THAT ARE GOING ON, THIS SITE CAN
14  STAY UP FOR FOUR MONTHS AND THE ONLY THING YOU CAN
15  DO IS UNPLUG THE SERVER.  AND DO YOU KNOW WHAT
16  HAPPENED TO THE SERVER AFTER HE UNPLUGGED IT?
17  A   AS I PREVIOUSLY SAID, I HAVE NO WAY OF
18  KNOWING.  THE ONLY THING I CAN BE IN CONTROL OF IS
19  UNPLUG THE SERVER.
20  Q   NOW, LET'S BACK UP FOR A MOMENT AND GO BACK TO
21  PAGE 1 OF 1598 AND THE FIVE WEB SITES THAT WERE
22  LISTED IN THE COMPLAINT WHICH YOU INDICATE HERE WAS
23  SERVED ON YOU ON AUGUST 20TH, 2007.  DO YOU SEE
24  THAT?
25  A   YES.

197

1    Q    AND JUST SO I'M CLEAR, YOU HAVE NO INFORMATION

2    REGARDING THE STATUS OF APRIL168.COM AT ANY TIME

3    BEFORE AUGUST 20TH, 2007?

4    A    I JUST DON'T REMEMBER IT.

5    Q    YOU DON'T HAVE ANY EVIDENCE THAT YOU DID

6    ANYTHING IN CONNECTION WITH THE DOMAIN NAME OF

7    AUGUST 20TH, 2007?  DO YOU HAVE ANY --

8         THE COURT:  YOU INTERRUPTED HIS ANSWER.

9    I WASN'T SURE IF YOU WANTED TO WITHDRAW YOUR

10   QUESTION OR NOT, BUT YOU DID ASK A QUESTION AND HE

11   STARTED TO ANSWER.

12        MR. COOMBS:  I'M SORRY.  I THOUGHT HE WAS

13   NOT CLEAR ON THE QUESTION, AND SO I WAS TRYING TO

14   REPHRASE.

15        THE WITNESS:  IF I HAVE -- IF IT'S IN MY

16   REGULAR BUSINESS OPERATION, I CAN CHECK MY E-MAIL

17   LOG TO SEE WHETHER THE COMPLAINT COMES IN, WHETHER

18   I HAVE FOLDING OF THE COMPLAINT.

19   BY MR. COOMBS:

20   Q    I THINK YOU TESTIFIED THAT YOU CHECKED YOUR

21   E-MAIL LOG IN PREPARATION OF EXHIBIT 1598?  NO?

22   DID I MISUNDERSTAND THAT?

23   A    1598 IS A SUMMARY REPORT BASED ON A PARTICULAR

24   DATE THAT I RECEIVED INFORMATION AND WHAT I DID TO

25   IT, AND I PULLED ALL OF THE E-MAILS AND THIS IS THE

198

1     SUMMARY OF ALL OF THE E-MAILS.

2     Q    SO AGAIN, MY UNDERSTANDING IS I THINK FROM

3     YOUR TESTIMONY IS THAT 8-20-07 IS THE DATE THAT YOU

4     WERE SERVED WITH THE COMPLAINT IN THIS MATTER; IS

5     THAT CORRECT?

6     A    THAT IS CORRECT.

7     Q    AND THERE IS NO ENTRY FOR APE168.COM BEFORE

8     AUGUST 20TH, 2007; IS THAT CORRECT?

9     A    NO.

10    Q    AND THERE'S NO RELATING ACTIVITY RELATING TO

11    ATOZBRAND.COM FROM AUGUST 20TH, 2007; IS THAT

12    CORRECT?

13    A    I DON'T KNOW.

14    Q    I'M LOOKING AT 1598.  IS THERE ANY INDICATIONS

15    THAT AKANOC SOLUTIONS DID ANYTHING IN RESPONSE TO A

16    REPORT OF INFRINGEMENT ON ATOZBRAND.COM AT ANY TIME

17    BEFORE THEY WERE SERVED WITH THE COMPLAINT IN THIS

18    MATTER?

19    A    I DON'T KNOW BECAUSE I HAVEN'T SEARCHED.

20    Q    IS THERE ANYTHING INDICATED -- OH, I'M SORRY.

21    WHEN YOU PREPARED THIS, YOU WERE ASKED NOT TO

22    SEARCH FOR ANYTHING CONCERNING ANY ACTIVITY BEFORE

23    THE COMPLAINT WAS FILED, IS THAT WHAT I UNDERSTAND?

24    A    WHEN I ASKED THIS PARTICULAR INFORMATION, IT

25    STARTED ON THE 8-20 -- 8 -- AUGUST 20, 2007.

199

1            WE START BUILDING BECAUSE OF THE ENTRIES

2    STARTED -- THE COMPLAINT THAT I HAVE BEEN SERVED,

3    IT'S STARTING BACK THEN SO WE START BUILDING

4    INFORMATION BASED ON THAT.

5    Q    SO YOU WERE NOT INTERESTED IN ANY OF THE

6    ACTIVITY WHICH ACTUALLY LED TO THE FILING OF THE

7    COMPLAINT IN THE FIRST PLACE?

8    A    I MAY HAVE RESEARCHED THAT IN THE PAST, BUT

9    IT'S NOT FOR THIS PARTICULAR REPORT.

10   Q    AND DO YOU HAVE ANY RECOLLECTION OF THE

11   RESULTS OF THE RESEARCH THAT YOU DID IN THE PAST?

12   A    I THINK I HAVE SOMETHING.

13   Q    AND WHAT IS IT?  WHY IS IT NOT HERE?

14   A    HOW CAN I REMEMBER TWO YEARS AGO?  BUT I DID

15   RESEARCH IT.

16   Q    HAVE YOU PRODUCED ANYTHING IN THIS ACTION

17   REFLECTING ANY RESPONSE BY AKANOC OR MANAGED

18   SOLUTIONS GROUP TO ANY LOUIS VUITTON COMPLAINT

19   CONCERNING ANY ONE OF THE FIVE WEB SITES LISTED

20   HERE?

21   A    YES.

22   Q    AND WHAT WAS THAT?

23   A    SOME OF THE E-MAIL IF I CAN FIND, SOME OF THE

24   ACTIONS THAT I THINK IS RELATED TO THE COMPLAINT

25   ITSELF.

Exhibit D, Page 71

1    Q    YOU HAVE A SPECIFIC RECOLLECTION OF E-MAILS

2    DESPITE THE SERVER CRASH WE HAD TALKED ABOUT

3    EARLIER?

4    A    NO, BECAUSE ANYTHING -- THE E-MAIL RECORD THAT

5    WE HAVE, THE E-MAIL LOG THAT WE HAVE IS JUNE 15TH

6    AND AFTER.

7              AND JUNE 15TH, '07 AND AFTER

8    EVERYTHING -- AND I DID SEARCH THAT PERIOD OF TIME

9    AND THERE IS NOTHING IN IT.

10   Q    SO THERE IS NO EVIDENCE, NO E-MAIL TRAFFIC IN

11   PARTICULAR, RELATING TO ANYTHING CONCERNING THESE

12   FIVE WEB SITES BEFORE JUNE OF 2007?

13   A    THAT IS CORRECT.

14   Q    OKAY.  SO WHAT IS THERE REGARDING ACTIVITY

15   BETWEEN JUNE OF 2007 AND AUGUST 20TH, 2007?  WHY

16   HAVEN'T WE SEEN IT?

17   A    THE ANALYSIS I WAS DOING I THINK IS BASED ON

18   THE EVIDENCE THAT YOU PROVIDE OF CERTAIN COMPLAINTS

19   COMES IN, AND I WAS TRYING TO FIGURE OUT WHAT IS

20   THE IP CHANGE HISTORY BASED ON YOUR COMPLAINT.

21   Q    WELL, YOU WERE HERE YESTERDAY WHEN I WAS

22   READING FROM YOUR DEPOSITION TESTIMONY ABOUT ALL OF

23   THE COMPLAINTS THAT LOUIS VUITTON HAD SENT FROM

24   OCTOBER OF 2006 UNTIL APRIL OF 2007 AND IN RESPONSE

25   TO THOSE QUESTIONS YOU SAID YOU HAD NO

                                                     201

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

# EXHIBIT E

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4


 5
     LOUIS VUITTON MALLETIER, S.A.,  )
 6                                   )   C-07-03952 JW (HRL)
                  PLAINTIFF,         )
 7                                   )   AUGUST 25, 2009
       V.                            )
 8                                   )   VOLUMES 8 AND 9
     AKANOC SOLUTIONS, INC.,         )
 9   MANAGED SOLUTIONS GROUP, INC.,  )   PAGES 1 - 231
     STEVEN CHEN AND DOES 1 THROUGH  )
10   10, INCLUSIVE,                  )
                                     )
11                DEFENDANTS.        )
     _____)
12

13              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES WARE
14            UNITED STATES DISTRICT JUDGE

15
     A P P E A R A N C E S:
16
     OR THE PLAINTIFFS:  J. ANDREW COOMBS, A PROF. CORP.
17                         BY:  J. ANDREW COOMBS, ESQ.
                                ANNIE S. WANG, ESQ.
18                         517 E. WILSON AVE., SUITE 202
                           GLENDALE, CA  91206
19                         TEL:  (818) 500-3200

20   ALSO APPEARING:       RUTH ADLER
                           NIKOLAY LIVADKIN
21
     FOR THE DEFENDANTS:  GAUNTLETT & ASSOCIATES
22                         BY:  JAMES A. LOWE, ESQ.
                           18400 VON KARMAN, SUITE 300
23                         IRVINE, CA  92612
                           TEL:  (949) 553-1010
24
     OFFICIAL REPORTER PRO TEM:   JANA L. RIDENOUR, CSR
25                                LICENSE NUMBER 9302
```

Exhibit E, Page 74

1

2                    <u>EXAMINATION INDEX</u>

3    **STEVEN CHEN**

         CROSS BY MR. COOMBS (CONTINUED) . . . . .   4
4        REDIRECT BY MR. LOWE . . . . . . . . .  47
         FURTHER REDIRECT BY MR. LOWE . . . . . .  62

5

6    **ANDREW CHENG**
         DIRECT BY MR. LOWE . . . . . . . . . .  65
         CROSS BY MS. WANG . . . . . . . . . . .  87

7

8    **RICHARD GRALNIK**
         DIRECT BY MR. LOWE . . . . . . . . . .  90
         CROSS BY MR. COOMBS . . . . . . . . . . 155
9        REDIRECT BY MR. LOWE . . . . . . . . . 177
         RECROSS BY MR. COOMBS . . . . . . . . . 200
10       FURTHER REDIRECT BY MR. LOWE . . . . . . 210
         FURTHER RECROSS BY MR. COOMBS . . . . . . 215

11

12

13

14

15                     <u>EXHIBIT INDEX</u>

16                              IDENT.        EVIDENCE

17   PAGE 4                      625
     PAGE 8                      626
18   PAGE 14                     627
     PAGE 230       (ALL DOMAIN TOOLS REPORTS ARE ADMITTED)

19

20

21

22

23   REPORTER NOTE:  ALL QUOTED EXCERPTS IN THIS TRANSCRIPT
     WERE REPORTED AND TYPED "AS READ."

24

25

1    2009.

2    Q.    ALL RIGHT.  THANK YOU.

3          SO BOTH BAG925.COM AND WWW.BAG925.COM APPEAR TO BE

4    HOSTED ON DEFENDANT'S SERVERS AS ESSENTIALLY TODAY; IS

5    THAT CORRECT?

6    A.    YES, THAT'S CORRECT.

7    Q.    AND THAT'S BORNE OUT BY THE OTHER PORTION OF THE

8    EXHIBIT I HAVE MARKED, WHICH IS NOW IN FRONT OF YOU, AND

9    WHICH HAS THE WHOIS ARIN RESULT FOR THAT IP ADDRESS;

10   CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    NOW, ON THAT PORTION OF THE REPORT YOU WILL SEE

13   RA ABUSE HANDLE -- I'M SORRY, R ABUSE HANDLE, R TECH

14   HANDLE OR ABUSE HANDLE OR TECH HANDLE.  CAN YOU TELL US

15   WHAT THOSE REFER TO?

16   A.    "ABUSE" IS FOR ABUSE ISSUE TECH; "TECH HANDLE" IS

17   FOR TECH -- TECH ISSUES.

18   Q.    SO, AS I UNDERSTOOD YOUR TESTIMONY, THE

19   INFORMATION PERTAINING TO THOSE HANDLES SHOULD BE

20   CONTACT -- CURRENT CONTACT INFORMATION FOR MANAGED

21   SOLUTIONS GROUP; IS THAT CORRECT?

22   A.    THAT IS CORRECT.

23   Q.    SO IT SHOULD BE -- I THINK YOU SAID ABUSE.MANAGER

24   SG-INC.COM FOR THE E-MAIL ADDRESS?

25   A.    YES.

```
1    Q.    AND THAT WOULD BE THE NORTHPOINT LOOP ADDRESS IN
2    FREMONT FOR THE MAILING ADDRESS; IS THAT CORRECT?
3    A.    THAT'S CORRECT.
4    Q.    OKAY.  NOW, LET'S MARK AS 626 A ONE-PAGE ARIN
5    WHOIS DATABASE SEARCH FOR THE HANDLE ABUSE 429-ARIN.
6          MR. LOWE:  EXCUSE ME, YOUR HONOR.  I OBJECT TO
7    THIS.  WE HAVE NOT SEEN THESE EXHIBITS BEFORE.  THEY
8    WERE NOT PROVIDED IN DISCOVERY.  APPARENTLY, THEY HAVE
9    BEEN CREATED IN THE LAST DAY OR TWO.
10         THE COURT:  EVEN IF YOU ARE USING IT FOR
11   IMPEACHMENT, PROVIDE COUNSEL WITH THE DOCUMENTS YOU ARE
12   USING IN THIS EXAMINATION.
13         MR. COOMBS:  MY APOLOGY.
14         MR. LOWE:  I WOULD ASK HE HAND US ALL THE
15   DOCUMENTS HE INTENDS TO USE TODAY SO WE DON'T SEE THEM
16   ON THE SCREEN FOR THE FIRST TIME TODAY.
17         THE COURT:  OF COURSE.  THAT IS A COURTESY TO
18   DO THAT, COUNSEL.
19         MR. COOMBS:  YES, YOUR HONOR.  I APOLOGIZE.
20         (WHEREUPON, EXHIBIT 626 WAS MARKED FOR
21          IDENTIFICATION.)
22   BY MR. COOMBS:
23   Q.    NOW, CAN YOU TELL ME WHAT MAILING ADDRESS IS
24   INDICATED ON THAT WHO -- I'M SORRY, ARIN SEARCH RESULT?
25         THE COURT:  MAILING ADDRESS OR E-MAIL?
```

1     BY MR. COOMBS:

2     Q.    I'M SORRY.  THAT'S NOT THE ONE I WAS PUTTING UP.

3     THIS IS 626.  LET ME ZOOM IT OUT A BIT.

4              CAN YOU TELL ME WHAT THAT IS, MR. CHEN?

5     A.    IT LOOKS LIKE IT IS THE OLD ADDRESS WHEN WE FIRST

6     SET UP THE COMPANY, THE 46750 FREMONT BOULEVARD.

7     Q.    NOW, AS I UNDERSTOOD YOUR TESTIMONY, MANAGED

8     SOLUTIONS GROUP AKANOC, THEY HAVEN'T BEEN AT THAT

9     ADDRESS FOR MANY YEARS NOW?

10    A.    MANY YEARS.

11    Q.    AND I'LL JUST SCROLL UP, IF I CAN, AND CAN YOU

12    READ THE DATE THAT APPEARS AT THE BOTTOM RIGHT-HAND

13    CORNER OF THAT PAGE?

14    A.    AUGUST 24, 2009.

15    Q.    THANK YOU.

16              BAG925.COM, THAT WAS IN THE ORIGINAL COMPLAINT

17    SERVED IN AUGUST OF 2007; CORRECT?

18    A.    EXCUSE ME?

19    Q.    THAT WAS ONE OF THE --

20              THE COURT:  "THAT" BEING -- SAY THE NAME

21    AGAIN.

22    BY MR. COOMBS:

23    Q.    BAG925.COM WAS ONE OF THE WEBSITES THAT WAS

24    ALLEGED IN THE ORIGINAL COMPLAINT SERVED ON YOU IN

25    AUGUST OF 2007?

1   SAY THEY THEMSELVES AREN'T THE ONES OPERATING THE
2   WEBSITES HOSTED ON YOUR SERVERS?
3   A.    WHAT'S THAT GOT TO DO WITH -- I LOST THE QUESTION
4   BECAUSE THE WEBSITE HAS NOTHING TO DO WITH MY CUSTOMER.
5   Q.    HOW DO YOU KNOW THAT, IF YOU DON'T KNOW WHAT YOUR
6   CUSTOMERS DO WITH IT?
7   A.    MOST OF THE CUSTOMERS THAT I DEAL WITH, WE -- I
8   DEAL WITH THEM AT MORE LIKE TECHNICAL LEVEL, AND THEY
9   ARE JUST HOSTING RESELLERS.
10  Q.    BUT YOU SAID YOU DON'T EVEN KNOW WHETHER THEY ARE
11  DOING WEBSITES AS OPPOSED TO OTHER INTERNET
12  APPLICATIONS.  HOW CAN YOU SAY THEY THEMSELVES ARE NOT
13  OPERATING THE WEBSITES OR SOMEBODY WORKING FOR THEM
14  OPERATING THE WEBSITES THAT ARE ON THEIR SERVERS?
15  A.    I DIDN'T SAY THEY DON'T OPERATE WEBSITES; I SAID I
16  DON'T KNOW WHETHER THEY OPERATE A WEBSITE OR NOT.
17  Q.    SO IT COULD BE THAT THEY DO IN FACT OPERATE
18  WEBSITES THAT ARE ON THOSE SERVERS?
19  A.    YES.
20  Q.    IT COULD BE THAT SOMEBODY CONNECTED WITH THEM
21  OPERATES THOSE WEBSITES ON THOSE SERVERS?
22  A.    MAYBE.
23  Q.    COULD BE A FAMILY MEMBER, FOR EXAMPLE?
24  A.    MAYBE.
25  Q.    NOW, IN YOUR DIRECT TESTIMONY, YOU SPOKE A LITTLE

1    16,000 TO JACQUES PHAM.  JACQUES, J-A-C-Q-U-E-S, PHAM,

2    P-H-A-M.

3    Q.    LET'S PULL UP EXHIBIT 25.

4          I'LL ASK MS. ADLER TO TURN TO PAGE 2, AND

5    SCROLL DOWN TO PARAGRAPH 5-B.

6          CAN YOU READ PARAGRAPH 5-B FOR US, MR. CHEN?

7    A.    "APPLICANT IS RESPONSIBLE FOR THE TIMELY AND

8    ACCURATE MAINTENANCE OF DIRECTORY SERVICES DATA AS WELL

9    AS ANY ORGANIZATION TO WHICH IT FURTHER SUBDELEGATES

10   NUMBER RESOURCES."

11   Q.    I UNDERSTAND THAT TO MEAN THAT THE ENTITY TO WHICH

12   IP ADDRESSES ARE ALLOCATED IS REQUIRED TO MAINTAIN

13   CORRECT CONTACT INFORMATION IN THE ARIN DATABASE; IS

14   THAT YOUR UNDERSTANDING AS WELL?

15   A.    YES.

16   Q.    AND THAT APPLIES WHETHER OR NOT THE NAMES HAVE

17   BEEN SUBDELEGATED OR ASSIGNED OR ALLOCATED TO SOMEONE

18   ELSE ACTUALLY USING THE IP ADDRESSES?

19   A.    I DON'T UNDERSTAND THE WORD OF "SUBDELEGATE."

20   Q.    WELL, AS I UNDERSTAND IT, THE DEFENDANTS WILL

21   ASSIGN IP ADDRESSES TO THEIR CUSTOMERS.  WE WERE JUST

22   TALKING ABOUT THAT.

23   A.    THAT'S RIGHT.

24   Q.    AND I UNDERSTAND THAT TO BE SUBDELEGATING.

25   A.    YES.

1   Q.   SO THAT THIS CLAUSE WOULD APPLY REGARDLESS OF

2   WHETHER OR NOT THE DEFENDANTS ARE ASSIGNING IP ADDRESSES

3   TO THEIR CUSTOMERS?

4   A.   THAT'S CORRECT.

5         (WHEREUPON, EXHIBIT 627 WAS MARKED FOR

6         IDENTIFICATION.)

7   BY MR. COOMBS:

8   Q.   OKAY.  I HAVE JUST MARKED AS 627 A FOUR-PAGE

9   PRINTOUT FROM THE KNOWLEDGE BASE ON THE ARIN WEBSITE.

10   JUST FOCUSING ON THE TOP FIRST PARAGRAPH OF THAT

11   PRINTOUT, COULD YOU READ THE FIRST -- THE SENTENCE THAT

12   ENDS ON THE FOURTH LINE OF THAT?

13   A.   THE FOURTH LINE?

14   Q.   COULD YOU READ THE FIRST FOUR LINES OF THAT

15   PORTION?  MAYBE IT WOULD BE EASIER IF I DID IT THIS WAY.

16   I HAVE HIGHLIGHTED A PORTION OF THIS.  COULD YOU JUST

17   READ THIS FOR US?  COULD YOU READ IT INTO THE RECORD,

18   PLEASE.  COULD YOU READ IT OUT LOUD?

19   A.   "ARIN'S STEWARDSHIP OF INTERNET NUMBER" --

20        THE COURT:  WHY DON'T YOU READ IT?  DON'T --

21   YOU HAVE THE DOCUMENT.  YOU ARE MUCH BETTER ABLE TO

22   SEE IT.

23        MR. COOMBS:  YES.  THANK YOU, YOUR HONOR.

24   BY MR. COOMBS:

25   Q.   I'M READING FROM EXHIBIT 627 AND THE FIRST PORTION

1   COPYRIGHT OFFICE AFTER THE LITIGATION WAS FILED?

2   A.    SHOULDN'T CHANGE ANYTHING.

3   Q.    OKAY.  YOU REMEMBER THAT I TOOK YOUR DEPOSITION,

4   MR. CHEN, IN APRIL OF 2008?

5   A.    YES.

6   Q.    OKAY.  I'M GOING TO READ TO YOU SOME QUESTIONS AND

7   ANSWERS AND ASK YOU IF THESE QUESTIONS AND ANSWERS WERE

8   IN FACT GIVEN AT THAT DEPOSITION.

9              "QUESTION:" --

10             AND THIS IS BEGINNING AT PAGE 194.

11             MR. LOWE:  EXCUSE ME, YOUR HONOR.  PERHAPS WE

12   COULD PROVIDE THE WITNESS WITH A COPY?

13             MR. COOMBS:  I'M SORRY.  DO YOU HAVE THE

14   ORIGINAL?

15             MR. LOWE:  GIVE US A MOMENT.

16             (WITNESS PROVIDED A COPY OF THE DEPOSITION.)

17             MR. COOMBS:  IN VOLUME I -- I'M SORRY, VOLUME

18   II, PAGE 194 --

19             THE WITNESS:  PAGE WHAT?

20             MR. COOMBS:  194.

21             THE WITNESS:  LINE?

22   BY MR. COOMBS:

23   Q.  BEGINNING AT LINE 5:

24             "QUESTION:  NOW, IF THAT HAPPENS,

25             DO YOU DO ANYTHING YOURSELF OR

U.S. DISTRICT COURT                    20

```
 1              DOES MANAGED SOLUTIONS DO

 2              ANYTHING TO VERIFY THAT THE

 3              OFFENDING SITE WAS IN FACT

 4              REMOVED AS REPRESENTED BY THE

 5              CUSTOMER?"

 6              "ANSWER:  THE NEWEST PROCEDURE

 7              THAT WE IMPOSE RIGHT NOW IS

 8              QUITE SIMPLE.  WE WANT EVERYBODY

 9              TO MAKE SURE THE DOMAIN NAME

10              DOES NOT RESULT TO OUR IP SO WE

11              JUST NEED TO PING.  IF IT'S

12              STILL WITHIN OUR IP, THEN WE

13              WILL CONSIDER IT STILL THERE;

14              IF IT'S NOT, THEN WE WOULD

15              REVIVE THE IP.  THAT'S THE

16              NEWEST PROCEDURE THAT WE HAVE

17              RIGHT NOW."

18              "QUESTION:  WHEN WAS THAT

19              PROCEDURE IMPLEMENTED?"

20              "ANSWER:  PROBABLY FEBRUARY,

21              MARCH."

22              "QUESTION:  OF 2008?"

23              "ANSWER:  OF 2008.  THAT'S

24              CORRECT."

25         WERE THOSE QUESTIONS ASKED AND ANSWERS GIVEN
```

1   DURING YOUR DEPOSITION?

2   A.   YES.

3   Q.   AND I THINK FEBRUARY/MARCH OF 2008 WAS AFTER THE

4   COMPLAINT IN THIS ACTION, WAS IT NOT?

5   A.   YES.

6   Q.   THANK YOU.

7        LET'S TURN BACK TO 1598, PLEASE.  AND IF WE

8   COULD SCROLL DOWN TO PAGE 3 TO THE ENTRY FOR

9   LOVERNIKE.COM.

10       DO YOU SEE THAT ENTRY, MR. CHEN?

11  A.   YES.

12  Q.   AND IN THAT, YOU INDICATE THAT THE WEBSITE WAS NOT

13  FUNCTIONING; IS THAT CORRECT?

14  A.   THAT'S CORRECT.

15  Q.   AND THIS WAS BASED ON A STUDY OF YOUR E-MAIL LOGS;

16  IS THAT CORRECT?

17  A.   THAT'S CORRECT.

18  Q.   SO TELL ME, WHAT DO YOU DO -- HOW IS IT THAT YOU

19  COME TO THE CONCLUSION THAT A WEBSITE IS NOT FUNCTIONAL?

20  A.   TRY TO PING -- TRY TO USE A BROWSER TO GET INTO

21  THE WEBSITE.

22  Q.   IF A WEBSITE IS FUNCTIONING, YOU CAN LOOK AT IT

23  LIKE ANYBODY ELSE; IS THAT CORRECT?

24  A.   THAT'S CORRECT.

25  Q.   SO, BASICALLY, YOU ARE SAYING IT RETURNS THE KIND

1    OF ERROR MESSAGES THAT WE HAVE HEARD FROM OTHER

2    WITNESSES DURING THE CASE?

3    A.    THAT'S CORRECT.

4    Q.    "PAGE NOT FOUND" OR SOMETHING TO THAT EFFECT?

5    A.    THAT IS CORRECT.

6    Q.    SO THIS INDICATES THAT ON OR SOON AFTER THE 26TH

7    OF NOVEMBER, THE WEBSITE LOVERNIKE.COM WAS NOT

8    FUNCTIONING; IS THAT CORRECT?

9    A.    THAT'S CORRECT.

10   Q.    CAN YOU TELL US WHAT DATE THAT CHECK WAS DONE?

11   A.    SHOULD BE ON THE 26TH OR SOMEWHERE AROUND THERE,

12   IN THE TWO DAYS.

13   Q.    LOOKS AS THOUGH, WHERE YOU DID FIND THE WEBSITE ON

14   YOUR SERVERS, THAT A TAKEDOWN NOTICE WAS SENT ON THE

15   29TH; CORRECT?  IF YOU LOOK ABOVE AND BELOW "LOVERNIKE,"

16   YOU WILL SEE A FEW THAT SAY "TAKEDOWN NOTICE SENT ON

17   11/29." DO YOU SEE THOSE?

18   A.    YES.

19   Q.    IT SUGGESTS TO ME, AT LEAST, THAT YOU LOOKED AT

20   THESE WEBSITES BETWEEN THE 26TH, WHEN THE LETTER WAS

21   SENT, AND THE 29TH, WHEN THE TAKEDOWN NOTICES WERE SENT.

22   IS THAT A REASONABLE INTERPRETATION?

23   A.    IT'S A BIG BATCH SO I MUST HAVE WORKED ON IT IN --

24   IN THAT COUPLE DAYS.

25   Q.    OKAY.  BUT BY THE 29TH, YOU HAD LOOKED AT

U.S. DISTRICT COURT                    23

1    LOVERNIKE.COM AND CONCLUDED IT DID NOT ACTUALLY RESULT

2    IN A WEBSITE?

3    A.    THAT IS CORRECT.

4    Q.    CAN WE PULL UP EXHIBIT 616 AND SCROLL TO PAGE 14.

5    SCROLL DOWN.

6          DO YOU SEE THE HIGHLIGHTED ENTRIES,

7    PARTICULARLY THE FIRST ONE ON 11/30?  CAN YOU READ TO US

8    THE ENTRY BESIDE THE 133131 TICKET NUMBER?

9    A.    133131?

10   Q.    CORRECT.

11   A.    "133131, UNPLUGGED PER STEVE DUE TO COUNTERFEIT

12   PRODUCT, THIRD COMPLAINT WWW.LOVERNIKE.COM,

13   205.209.185.226."

14   Q.    THAT DOMAIN NAME IS THE SAME DOMAIN NAME WE WERE

15   JUST TALKING ABOUT; CORRECT?

16   A.    THAT IS CORRECT.

17   Q.    THAT SUGGESTS THAT THE WEBSITE WAS IN FACT

18   FUNCTIONAL ON THE 30TH OF NOVEMBER; IS THAT NOT CORRECT?

19   A.    IF IT'S AFTER THE UNPLUGGED, THEN IT WILL NOT BE

20   FUNCTION.

21   Q.    IN FACT, WHEN YOU SAY "WEBSITE NOT FUNCTIONAL," IT

22   WAS ONLY NOT FUNCTIONAL BECAUSE YOU HAD IN FACT

23   UNPLUGGED THE SERVER ON WHICH THE WEBSITE WAS FOUND?

24   A.    MAY.  THE RECORD IS JUST SHOWING AT THAT

25   PARTICULAR TIME IT WAS NOT FUNCTION.  WHETHER I DID

1    ANYTHING TO IT, I HAVE NO RECOLLECTION.

2    Q.    WELL, DOESN'T THIS INDICATE THAT YOU UNPLUGGED IT

3    BECAUSE LOVERNIKE.COM WAS ON THE SERVER AT THAT TIME?

4    A.    RIGHT.

5    Q.    THANK YOU.

6          YOU DON'T ACTUALLY UNPLUG SERVERS IF THE

7    WEBSITE IS NOT THERE, DO YOU?

8    A.    IF WEBSITE IS NOT THERE, THEN I DON'T NEED TO.

9    Q.    NOW, HOW MANY -- THERE'S A LIST THAT WE HAVE,

10   ABOUT THREE OR FOUR PAGES.  YOU MAY WANT TO TURN -- I

11   THINK YOU HAVE A BINDER WITH 1598 IN IT.

12         BUT THERE WERE SEVERAL TAKEDOWN NOTICES SENT

13   ON THE 29TH IN RESPONSE TO THE NOVEMBER 26TH LETTER; IS

14   THAT NOT CORRECT?

15   A.    COULD YOU REPEAT A QUESTION?

16   Q.    IF YOU LOOK AT PAGES -- FROM THE BOTTOM OF PAGE 1

17   UNTIL PAGE 5, YOU WILL SEE A LIST OF DOMAIN NAMES THAT

18   WERE THE SUBJECT OF THE NOVEMBER 26TH LETTER.  DO YOU

19   SEE THAT?

20   A.    YES.

21   Q.    AND YOU WILL SEE THAT SEVERAL OF THEM WERE THE

22   SUBJECT OF TAKEDOWN NOTICES SENT ON NOVEMBER 29TH.  DO

23   YOU SEE THAT?

24   A.    THAT'S CORRECT.

25   Q.    HOW MANY OF THOSE WERE SENT TO THE SAME CUSTOMER?

```
1    A.    I HAVE NO RECOLLECTION.

2    Q.    ALL RIGHT.  MAYBE WE CAN HELP YOU WITH THAT.

3          LET'S PULL UP EXHIBIT 550.  IF YOU COULD

4    SCROLL JUST TO THE HEADER.  OOPS.

5          YOU SEE THAT THAT IS SENT TO ZHONGHH; CORRECT?

6    A.    YES.

7    Q.    AND I THINK YOU TESTIFIED FRIDAY THAT ZHONGHH IS

8    ALICE CHEN'S ACCOUNT; IS THAT CORRECT?

9    A.    YES.

10   Q.    AND IT SAYS THAT YOU'VE RECEIVED A COMPLAINT

11   REGARDING SERVER 204.16.193.107 MAIN IP 204.13.69.210.

12   YOU SEE THAT?

13   A.    YES.

14   Q.    AND IT'S REGARDING THE WEBSITE BAG4SELL.COM?

15   A.    THAT'S CORRECT.

16   Q.    SO THAT'S ONE THAT WAS SENT TO MS. CHEN.

17         LET'S TURN TO EXHIBIT 554, AND LET'S EXPAND

18   THE HEADER ON THIS ONE.

19         THAT'S ALSO SENT TO ZHONGHH; CORRECT?

20   A.    THAT'S CORRECT.

21   Q.    AND THAT'S THE SAME DAY?

22   A.    YES.

23   Q.    AND IT'S SENT CONCERNING MAIN IP -- THIS IS A

24   SLIGHTLY DIFFERENT MAIN IP; IT'S 205.209.136.90?

25   A.    THAT'S CORRECT.
```

Exhibit E, Page 88

1   Q.   SO IT'S TWO THAT WERE SENT ON THE SAME DAY TO

2   MS. CHEN.

3            LET'S TURN TO EXHIBIT 555.

4            NOW, ON FRIDAY I THINK YOU SAID CHENDAN IS

5   ALSO MS. CHEN; IS THAT CORRECT?

6   A.   YES.

7   Q.   SO THAT'S THREE NOTICES THAT WERE SENT ON

8   NOVEMBER 29TH TO MS. CHEN; CORRECT?

9   A.   YES.

10   Q.   THAT'S CONCERNING DREAMYSHOES; CORRECT?

11   A.   CORRECT.

12   Q.   LET'S TURN TO 557.

13            THIS ONE WAS SENT TO ZHONGHH AS WELL?

14   A.   YES.

15   Q.   MS. CHEN?

16   A.   YES.

17   Q.   ON NOVEMBER 29TH; CORRECT?

18   A.   YES.

19   Q.   LET'S TURN TO EXHIBIT 559.

20            THIS ONE IS BEING SENT TO ZHONGHH AS WELL, SO

21   THAT'S MS. CHEN ON NOVEMBER 29TH AS WELL; IS THAT

22   CORRECT?

23   A.   YES.

24   Q.   AND LET'S TURN TO 560.

25            THAT'S TO CHENDAN, MS. CHEN, AGAIN?

1    A.    YES.

2    Q.    AND THAT'S NOVEMBER 29TH, 2007.

3          AND LET'S TURN TO EXHIBIT 562.

4          THAT'S ZHONGHH; THAT'S MS. CHEN, AGAIN?

5    A.    YES.

6    Q.    DIFFERENT WEBSITE; CORRECT?

7    A.    YES.

8    Q.    AND THAT'S THE SAME DAY?

9    A.    YES.

10   Q.    LET'S TURN TO 564.

11         MS. CHEN AGAIN ON THE SAME DAY CONCERNING YET

12   ANOTHER WEBSITE, CORRECT?

13   A.    YES.

14   Q.    LET'S TURN TO 582.

15         ZHONGHH AGAIN, NOVEMBER 29TH, 2007, CONCERNING

16   PRO-JORDAN?

17   A.    YES.

18   Q.    SO I HAVE GOT NINE NOTICES SENT TO ONE CUSTOMER

19   CONCERNING NINE DIFFERENT WEBSITES ON SEVERAL DIFFERENT

20   EXTRA IP NUMBERS?

21   A.    YES.

22   Q.    WOULD IT SURPRISE YOU TO KNOW THAT YOU SENT NINE

23   NOTICES TO ANOTHER ONE OF YOUR CUSTOMERS THAT SAME DAY

24   CONCERNING NINE DIFFERENT WEBSITES ON NINE DIFFERENT

25   EXTRA IP'S CONTROLLED BY THEM?

1    SUMMARY OF ALL THE E-MAILS THAT I SENT OUT.

2    Q.   MR. CHEN, I -- MAYBE I WAS NOT CLEAR ON MY

3    QUESTION.  DID YOU FINE MS. CHEN BECAUSE OF THIS

4    EXTENSIVE INFRINGEMENT THAT WAS IDENTIFIED ON HER SERVER

5    ON NOVEMBER 27TH?

6    A.   IF I VERIFY --

7    Q.   MR. CHEN, DID YOU FINE -- DID YOU IMPOSE ANY KIND

8    OF MONEY PENALTY ON MS. CHEN FOR THE VARIOUS

9    INFRINGEMENTS THAT WERE ON HER SERVER AT THE END OF

10   NOVEMBER 2007?

11   A.   NO.

12   Q.   DID YOU SUSPEND MS. CHEN -- I MEAN THE CUSTOMER,

13   MS. CHEN -- AS A RESULT OF THE VARIOUS INFRINGEMENTS

14   IDENTIFIED ON HER SERVER AT THE END OF NOVEMBER, 2007?

15   A.   NO.

16   Q.   DID YOU TERMINATE HER?

17   A.   NO.

18   Q.   OF COURSE NOT.

19        THE COURT:  DON'T -- YOUR COMMENT IS

20   ARGUMENTATIVE.

21        MR. COOMBS:  I'M SORRY.

22   BY MR. COOMBS:

23   Q.   LET'S GO BACK TO EXHIBIT 554.

24        THIS IS ONE OF THE E-MAILS WE WERE JUST

25   LOOKING AT, AND IT'S BUYMYSHOES.NET WHICH IS LOCATED ON

U.S. DISTRICT COURT                    30

1    IP 205.209.136.90, MAIN IP 205.209.136.90.  SO THEY ARE

2    THE SAME IP NUMBER, ACTUALLY, AREN'T THEY?

3    A.    YES.

4    Q.    AND THIS IS THAT EXTRA MAIN ISSUE WE WERE TALKING

5    ABOUT A LITTLE EARLIER?

6    A.    NO, THIS IS JUST ONE IP.  THIS IS ON THEIR MAIN

7    IP.

8    Q.    AND IF WE GO BACK TO 1598, ON THE TOP OF PAGE 2

9    YOU WILL SEE THE FIRST ENTRY IS BUYMYSHOES.NET AND IT

10   INDICATES A TAKEDOWN NOTICE SENT ON NOVEMBER 29TH, 2007.

11   DO YOU SEE THAT?

12   A.    YES.

13   Q.    AND THE TAKEDOWN NOTICE REFERRED TO THERE IS THE

14   E-MAIL THAT WE WERE JUST LOOKING AT; IS THAT NOT

15   CORRECT?

16   A.    THAT'S CORRECT.

17   Q.    LET'S LOOK AT EXHIBIT 564.

18         NOW, THAT IS ALSO HOSTED ON THE SAME MAIN IP;

19   IS THAT CORRECT?

20   A.    YES.

21   Q.    WHEN YOU SAY IN THE NEXT LINE "DIFFERENT IP," ARE

22   YOU TALKING ABOUT THE "EXTRA IP" OR THE "MAIN IP"?  IF

23   YOU LOOK NEXT TO -- ON THE LINE CONCERNING

24   BUYMYSHOES.NET, IT SAYS, YOU KNOW, "1/3/08, DIFFERENT IP

25   NOTICE SENT" -- "TAKEDOWN NOTICE SENT 1/14/08."  DO YOU

1    SEE THAT.

2    A.    WE ONLY CHECK THE --

3    Q.    I'M JUST ASKING YOU IF YOU SEE THE ENTRY I'M

4    REFERRING TO.

5    A.    WHAT DO YOU WANT ME TO LOOK AT?

6          THE COURT:  THE CURSOR IS NOT IN THE RIGHT

7    COLUMN.  IT'S THE NEXT -- THAT COLUMN.

8    BY MR. COOMBS:

9    Q.    DO YOU SEE WHERE IT SAYS "1/3/08, DIFFERENT IP"?

10   A.    YES.

11   Q.    IS THE DIFFERENT IP THERE A DIFFERENT EXTRA IP OR

12   A DIFFERENT MAIN IP?

13   A.    DIFFERENT IP FOR THE DOMAIN ITSELF.

14   Q.    SO THE MAIN IP, IN FACT, COULD BE THE SAME?

15   A.    I DON'T KNOW.

16   Q.    YOU DON'T KNOW -- BECAUSE YOU ARE REALLY ONLY

17   LOOKING AT THE EXTRA IP?

18   A.    YES.

19   Q.    NOW, LET'S PULL UP EXHIBIT 557 THAT WE WERE

20   LOOKING AT A MOMENT AGO.

21          THIS IS ONE OF THE NOTICES TO MS. CHEN ON

22   NOVEMBER 29TH; CORRECT?

23   A.    YES.

24   Q.    AND IT'S THE MAIN IP ENDING IN DOT NINE ZERO.

25          LET'S LOOK AT EXHIBIT 549.  LET'S ENLARGE THE

1    PICK UP FROM THE AVAILABLE POOL THAT WE CAN ASSIGN THOSE

2    IP ATTACHED TO THAT PARTICULAR MAIN IP.  SO WITH A

3    ROUTER, WE CAN ALWAYS CHANGE THE EXTRA IP.

4            THE COURT:  SO THAT AT THE ROUTER, THEN, IF

5    SOMEONE IS USING AN EXTRA IP IN A WAY THAT YOU WOULD

6    WISH TO DISABLE THAT IP ADDRESS, YOU COULD DO THAT AT

7    THE ROUTER?

8            THE WITNESS:  YES.

9            THE COURT:  AND YOU ARE ABLE ALSO TO GO TO THE

10   SERVER AND DISABLE THE ENTIRE SERVER?

11           THE WITNESS:  YES.  THAT'S BASICALLY

12   DISCONNECT THE NETWORK CABLE.

13           THE COURT:  AND THERE WERE OCCASIONS ALSO WHEN

14   YOU WOULD YOURSELF GO ONTO THE INTERNET USING A BROWSER

15   LIKE ANY MEMBER OF THE PUBLIC WOULD TO SEE WHAT WAS AT A

16   PARTICULAR DOMAIN NAME?

17           THE WITNESS:  YES.

18           THE COURT:  BUT YOU COULDN'T DO THAT FROM

19   WITHIN YOUR OWN SERVER SYSTEM?

20           THE WITNESS:  NO.

21           THE COURT:  THE FINAL QUESTION THAT I HAVE,

22   AND IT HAS TO DO WITH 1598, WHICH WE HAVE BEEN USING --

23   AND ACTUALLY, IT'S UP ON THE SCREEN STILL.

24           ONE OF THE PARTIES ASKED ABOUT YOUR CUSTOMERS.

25   THIS SHOWS A COMPLAINT THAT IS ADDRESSED AND INDEXED BY

1    THE VARIOUS DOMAIN NAMES.  DID YOU EVER TAKE THE VARIOUS

2    DOMAIN NAMES AND CROSS-REFERENCE THEM TO YOUR CUSTOMER

3    LIST TO DECIDE WHETHER OR NOT YOU HAD A CUSTOMER THAT

4    WAS REGULARLY INVOLVED IN COMPLAINTS?

5            THE WITNESS:  NOT REALLY.  THIS IS SOMETHING

6    THAT WE PUT TOGETHER FOR THE PRESENTATION.

7            THE COURT:  ALL RIGHT.  NOW, DO YOU HAVE A

8    CUSTOMER LIST?

9            THE WITNESS:  IT'S IN OUR DATABASE.

10           THE COURT:  ALL RIGHT.  BUT YOU DON'T HAVE IT

11   HERE FOR US?  YOU HAVEN'T PRODUCED A CUSTOMER LIST SO WE

12   COULD SEE A LIST OVER A PERIOD OF TIME OF WHO YOUR

13   CUSTOMERS WERE?

14           THE WITNESS:  NO.

15           THE COURT:  AND DID YOU EVER HISTORICALLY

16   SEARCH FOR DOMAIN NAMES IN YOUR CUSTOMER LIST TO SEE

17   WHICH CUSTOMERS WERE ASSOCIATED WITH WHICH DOMAIN

18   NAMES?

19           THE WITNESS:  I CAN ONLY -- I ONLY KNOW ONE

20   CUSTOMER FROM CHINA THAT THEY ARE ACTUALLY A DOMAIN

21   REGISTRAR, AND THEY MIGHT HAVE -- THEY MIGHT ASSOCIATE

22   TO A LOT OF DOMAINS THEMSELVES.  THE REST OF THE

23   CUSTOMERS, AS I KNOW, THEY ALL RESELLERS; THEY DON'T OWN

24   DOMAIN NAMES THEMSELVES.

25           THE COURT:  I SEE.  BUT THERE WOULD BE AN

1    THINGS ARE VERIFIED BEFOREHAND.

2    Q.    HOW ARE THEY VERIFIED?

3    A.    I'M NOT SURE.

4    Q.    IT'S LIKE VERIFYING CREDIT CARD INFORMATION, IS

5    THAT WHAT YOU ARE TALKING ABOUT?

6    A.    YES.

7    Q.    NOW, ARE YOU FAMILIAR WITH -- ARE YOU FAMILIAR

8    WITH ARIN?

9    A.    YES.

10   Q.    AND WHAT IS THAT?

11   A.    ARIN IS AN INTERNET REGISTRY AND THEY ARE

12   RESPONSIBLE FOR ALLOCATING IP ADDRESSES TO ORGANIZATIONS

13   IN AMERICA.

14          THE COURT:  SOME OF THIS HAS BEEN COVERED AND

15   NOT CONTROVERSIAL, BUT I'LL PERMIT YOU.

16          MR. LOWE:  THAT WAS MERELY THE BACKGROUND,

17   YOUR HONOR.

18   BY MR. LOWE:

19   Q.    NOW, DO YOU KNOW WHETHER OR NOT AKANOC AND MANAGED

20   SOLUTIONS PROVIDES INFORMATION TO ARIN CONCERNING THE

21   USAGE OF IP ADDRESSES THAT ARE ASSIGNED TO IT?

22   A.    SO PER ARIN GUIDELINES WE ARE RESPONSIBLE FOR

23   KEEPING OUR WHOIS RECORDS UP TO DATE, AND THAT IS

24   PARTICULARLY, YOU KNOW, COMPANY INFORMATION OF AN

25   ORGANIZATION THAT IS UTILIZING AN IP ADDRESS.

1    Q.    NOW, WHAT DO YOU MEAN AN ORGANIZATION UTILIZING

2    IT?  ARE YOU TALKING ABOUT AKANOC OR A CUSTOMER OF

3    AKANOC, OR SOMETHING ELSE?

4    A.    A LITTLE OF BOTH.  SO WHEN ARIN ISSUES A BLOCK OF

5    IP ADDRESSES, THEY EXPECT THAT IF THE ISP WILL ASSIGN

6    THOSE TO THEIR CUSTOMERS, THAT THEY WILL ALSO PUT THE

7    CUSTOMER'S INFORMATION IN THE WHOIS DATABASE.

8    Q.    AND HOW IS THAT DONE AT AKANOC, MANAGED SOLUTIONS?

9    A.    AT AKANOC THERE IS A WHOIS SERVER, AND ARIN HAS

10   BASICALLY A LINK TO THAT WHOIS SERVER TO PULL THE

11   INFORMATION.

12   Q.    AND WHAT'S ON THIS WHOIS SERVER?

13   A.    THE WHOIS SERVER HAS THE COMPANY NAME AS WELL AS

14   THE CITY AND STATE OF A PARTICULAR ORGANIZATION THAT IS

15   RESPONSIBLE FOR THAT IP ADDRESS.  IF WE HAVE A CUSTOMER

16   THAT HAS IP'S FROM US ON ONE OF OUR SERVERS, THEN THAT

17   INFORMATION WILL GET PUBLISHED TO THE WHOIS SERVER.

18   Q.    TO THE WHICH SERVER?

19   A.    TO THE WHOIS SERVER.

20   Q.    THE WHOIS SERVER.  SO YOU ARE TALKING ABOUT

21   CUSTOMER INFORMATION FROM THE CPRO DATABASE THAT'S ON

22   THE WHOIS SERVER?

23   A.    YES.

24   Q.    IF SOMEONE WANTED TO FIND OUT WHO YOUR CUSTOMERS

25   ARE, COULD THEY FIND THAT OUT THROUGH A QUERY TO ARIN?

1    IN OTHER WORDS, COULD SOMEONE LOOK UP THROUGH ARIN AND

2    LINK TO YOUR WHOIS --

3    A.    YES.

4    Q.    -- SERVER INFORMATION ABOUT YOUR CUSTOMERS?

5    A.    YES.   THAT'S PUBLIC INFORMATION.

6    Q.    SO HOW WOULD THEY DO THAT?

7    A.    THERE IS A, I GUESS, WHOIS PROTOCOL THAT'S EITHER,

8    YOU KNOW, FROM A PARTICULAR COMPUTER OR FROM ARIN'S

9    WEBSITE.   YOU CAN GO AHEAD AND TYPE IN AN IP ADDRESS AND

10   IT WILL RETURN THE WHOIS INFORMATION FOR A PARTICULAR

11   IP.

12   Q.    OKAY.   NOW, LET'S GO BACK TO THE OPERATION OF THE

13   ISP HERE AND THE SERVERS.   IF SOMEONE HAS, AS YOU HAVE

14   DESCRIBED, ORDERED A SERVER, A PACKAGE SO-TO-SPEAK WITH

15   IPS'S AND BANDWIDTH -- IS THAT THE WAY IT'S SOLD?

16   A.    YES.

17   Q.    DO YOU HAVE ANY CONTROL OVER WHAT THEY DO WITH

18   THAT SERVER?

19   A.    NO.   OUR MODEL IS THAT A CUSTOMER RECEIVES A

20   DEDICATED SERVER, AND IN THE INDUSTRY TERMS A DEDICATED

21   SERVER IS, YOU KNOW, FULL ADMINISTRATIVE ACCESS.   SO THE

22   SERVER ITSELF WILL HAVE AN OPERATING SYSTEM INSTALLED, A

23   PASSWORD WILL BE SET, AND THAT PASSWORD WILL BE SENT TO

24   THE CUSTOMER.   AT THAT POINT IT IS AS IF, YOU KNOW, THE

25   CUSTOMER IS THE ONLY ADMINISTRATOR OF THAT SERVER.   IT

```
1              THE COURT:  VERY WELL.

2              ANY CROSS?

3                    CROSS-EXAMINATION

4    BY MS. WANG:

5    Q.    GOOD MORNING, MR. CHENG.

6    A.    GOOD MORNING.

7    Q.    ISN'T IT CORRECT THAT WHEN YOU ARE ASSIGNING AN IP

8    ADDRESS, IT ONLY GETS ASSIGNED TO ONE CUSTOMER AT A

9    TIME?

10   A.    THAT'S CORRECT.

11   Q.    AND WHEN AN INTERNET USER IS TRYING TO ACCESS A

12   WEBSITE THAT IS ON ONE OF YOUR SERVERS, ISN'T AKANOC'S

13   SERVER THE FIRST HOP OUT?

14   A.    CAN YOU REPEAT THAT?

15   Q.    SURE.  WHEN INFORMATION IS BEING TRANSMITTED TO AN

16   INTERNET USER FROM DEFENDANT'S SERVERS, ISN'T THE FIRST

17   ROUTER OR HOP DEFENDANT'S ROUTER?

18   A.    SO THE FIRST HOP FROM A CUSTOMER SERVER WILL BE

19   AKANOC'S ROUTER.

20   Q.    AND YOU STATED EARLIER THAT THE ARIN WHOIS

21   DATABASE INFORMATION IS UPDATED BY AKANOC OR MSG; IS

22   THAT CORRECT?

23   A.    YES.

24   Q.    I'M GOING TO SHOW YOU --

25              THE COURT:  YOU MIGHT WANT TO BACK OUT A
```

```
 1   LITTLE BIT.
 2            MS. WANG:  IS IT FLASHING ON YOUR SCREENS AS
 3   WELL?
 4            THE COURT:  KEEP YOUR VOICE UP.
 5   BY MS. WANG:
 6   Q.   MR. CHENG, CAN YOU SEE THAT?
 7   A.   YES.
 8   Q.   AND WHAT DOES IT LIST AS MANAGED SOLUTIONS GROUP'S
 9   CONTACT INFORMATION OR ADDRESS?
10   A.   IT'S A LITTLE BLURRY.
11            THE COURT:  IS THERE AN AUTOFOCUS BUTTON
12   THERE?
13            MS. WANG:  YEAH, I TRIED IT EARLIER, BUT --
14   YEAH.  SORRY, THAT IS ACTUALLY AUTOFOCUSED.
15            THE WITNESS:  IT LISTS 46750 FREMONT.
16   BY MS. WANG:
17   Q.   IS THAT A CORRECT ADDRESS FOR MANAGED SOLUTIONS
18   GROUP?
19   A.   I BELIEVE THAT IS A -- SOME TYPE OF ADDRESS.  IT
20   MIGHT BE THE REGISTERED ADDRESS FOR THE CORPORATION, I'M
21   NOT SURE.
22   Q.   COULD YOU READ THE DATE THERE?
23   A.   THAT SAYS "8/24/2009."
24   Q.   AND, MR. CHENG, YOU ALSO TESTIFIED THAT THE ARIN
25   WHOIS DATABASE WOULD REFLECT YOUR -- OR DEFENDANT'S
```

1    CUSTOMERS?

2    A.    YES.

3    Q.    AND THAT WOULD BE ACCORDING TO A SEARCH FOR A

4    PARTICULAR IP ADDRESS?

5    A.    YES.

6    Q.    I'M SHOWING YOU EXHIBIT 625, WHICH APPEARS TO BE A

7    WHOIS SEARCH FOR A PARTICULAR IP ADDRESS.

8          LOOKING AT THAT RESULT, CAN YOU TELL ME WHICH

9    CUSTOMER THAT IP ADDRESS BELONGED TO?

10   A.    I DON'T SEE ANY INFORMATION.

11          MS. WANG:  NO FURTHER QUESTIONS, YOUR HONOR.

12          THE COURT:  ANY FURTHER QUESTIONS?

13          MR. LOWE:  NO, YOUR HONOR.

14          THE COURT:  VERY WELL.  THE WITNESS IS

15   EXCUSED.

16          THANK YOU VERY MUCH.

17          CALL YOUR NEXT WITNESS.

18          MR. LOWE:  I CALL RICHARD GRALNIK.

19          (PAUSE IN PROCEEDINGS.)

20          THE COURT:  IS THERE SOMEONE WHO HAS SUMMONED

21   HIM?

22          MR. LOWE:  I BELIEVE SO.  HE IS STANDING IN

23   THE HALL.

24          THE COURT:  COME ALL THE WAY FORWARD HERE AND

25   BE SWORN BY THE CLERK.

1          CONNECTION WITH ANY OF THESE

2          ACCEPTABLE USE VIOLATIONS?"

3          "ANSWER:  NO."

4          WERE THOSE QUESTIONS ASKED AND THOSE ANSWERS

5     GIVEN DURING YOUR DEPOSITION?

6     A.   YES, THEY WERE.

7     Q.   THANK YOU.

8          NOW, DURING YOUR DIRECT EXAMINATION, YOU SAID

9     THAT IN YOUR DISCUSSION WITH, I THINK YOU SAID EIGHT

10    OTHER ISP'S, YOU DEVELOPED NO INFORMATION THAT THERE WAS

11    A FORMAL OR SPECIFIC TIME FRAME FOR RESPONSE TO ABUSE

12    COMPLAINTS; IS THAT CORRECT?

13    A.   YES, IT IS.

14    Q.   BUT I THINK YOU DID IDENTIFY THAT THERE WAS A

15    REASONABLE TIME THAT -- SORT OF AN OUTER LIMIT, MAXIMUM

16    TIME, THAT THESE ISP'S TENDED TO ADHERE TO; IS THAT NOT

17    THE CASE?

18    A.   I BELIEVE SO.

19    Q.   AND WHAT WAS THAT TIME FRAME?

20    A.   I THINK MY ANSWER WAS A FEW DAYS TO A WEEK.

21    Q.   NORMALLY, MOST OF THE ISP'S WITH WHOM YOU TALKED

22    TO, OTHER THAN THE DEFENDANTS, WOULD RESPOND TO AN ABUSE

23    COMPLAINT WITHIN A FEW DAYS TO A WEEK?

24    A.   THEY DIDN'T GIVE ME SPECIFIC TIMETABLES.  THEY DID

25    SAY THAT THEY WOULD FOLLOW UP AND EITHER HAVE AN

1    INVESTIGATION OR TAKE ONE OF THE STEPS THAT I TALKED

2    ABOUT BEFORE IN RESPONSE TO AN ABUSE COMPLAINT.

3    Q.    NOW, YOU SPOKE ALSO ABOUT ESCALATION OF REMEDIES

4    AGAINST REPEATED INFRINGERS -- I'M SORRY, REPEATED

5    ABUSERS.  WE ARE NOT LIMITING IT TO INFRINGERS.  WELL,

6    THAT'S WHAT I HAVE IN MY NOTES.

7          AND AS I UNDERSTAND IT, YOU KNOW, THE FIRST

8    OBVIOUS LEVEL OF RESPONSE IS JUST A WARNING, "STOP IT.

9    IF YOU DON'T STOP IT, SOMETHING MORE SERIOUS IS GOING TO

10   HAPPEN."  IS THAT CORRECT?

11   A.    YES.

12   Q.    AND THAT'S A POLICY THAT'S PRETTY CONSTANT, AND

13   IN FACT IT'S A POLICY OF THE DEFENDANTS HERE AS WELL; IS

14   IT NOT?

15   A.    YES.

16   Q.    AND IF THAT WARNING DOES NOT RESULT IN A REMOVAL

17   OF THE ABUSIVE CONDUCT, THEN THE NOTION IS THAT THE NEXT

18   LEVEL WILL BE A MORE SEVERE SANCTION THAN A MERE

19   WARNING.  ISN'T THAT ALSO TRUE?

20   A.    YES.

21   Q.    AND THAT'S A POLICY THAT SEEMED TO BE ADOPTED

22   PRETTY UNIVERSALLY AMONGST THE OTHER EIGHT ISP'S THAT

23   YOU SPOKE WITH?

24   A.    YES.  THESE POLICIES I LOOKED -- WE LOOKED AT

25   THEIR ESCALATION PROCEDURES.  IN MANY CASES THEY ARE

1    ACTUALLY IDENTICAL TASKS, FOR EXAMPLE, OF ALL THESE

2    UNDER THE SAME CONTRACT.

3    Q.   VERY SIMILAR TO THE ONES THE DEFENDANTS HAVE HERE?

4    A.   YES.

5    Q.   SO IT WOULD BE REASONABLE TO CONCLUDE THAT THE

6    DEFENDANTS HAVE THE SAME TOOLS AT THEIR DISPOSAL THAT

7    THESE OTHER ISP'S HAVE?

8    A.   YES.

9    Q.   WHICH INCLUDE MONEY PENALTIES, SUSPENSION,

10   TERMINATION, AND SO FORTH?

11   A.   YES.

12   Q.   IN FACT, I THINK THEY ALSO HAVE "REMOVAL OF THE

13   OFFENDING CONTENT" AS AN ADDITIONAL PROVISION IN THEIR

14   ACCEPTABLE RESPONSE; IS THAT NOT ALSO TRUE?

15   A.   I DON'T RECALL THAT.  I WOULD HAVE TO LOOK AT THE

16   LIST.

17   Q.   NOW, I THINK YOU SAID --

18          AND I WOULD ASK TO PULL UP EXHIBIT 1576.

19          NOW, ON YOUR DIRECT YOU SAID THAT, BASED ON

20   YOUR INVESTIGATION, NONE OF THE ISP'S WILL MONITOR

21   ACTIVITY ON THEIR SERVERS; IS THAT CORRECT?

22   A.   I THINK I SAID THEY DON'T MONITOR CONTENT.

23   Q.   DON'T MONITOR CONTENT.  THANK YOU FOR YOUR

24   CORRECTION.

25          NOW, HOSTGATOR, WHICH IS THE COMPANY WHOSE

1    POLICIES I PUT UP IN FRONT OF YOU IN 1576, THAT WAS ONE

2    OF THE COMPANIES YOU SPOKE WITH?

3    A.   YES.

4    Q.   IT'S ONE OF THE COMPANIES THAT DOESN'T MONITOR

5    CONTENT, ACCORDING TO YOUR TESTIMONY?

6    A.   THAT'S RIGHT.

7    Q.   I WOULD ASK YOU TO TURN TO PAGE 2 OF 1576, AND IF

8    YOU COULD SCROLL DOWN A LITTLE OVER HALFWAY TO THE

9    SENTENCE THAT BEGINS WITH THE WORD "RESELLERS," AND I

10   WOULD ASK YOU TO READ THAT SENTENCE INTO THE RECORD,

11   PLEASE, MR. GRALNIK.

12   A.   "EXAMPLES OF UNACCEPTABLE MATERIAL" --

13   Q.   NO, NO.  I'M SORRY.  I'M SORRY.  WE ARE PROBABLY

14   LOOKING AT A DIFFERENT PORTION.  YOU COULD READ FOR A

15   LONG TIME IF YOU READ THE WHOLE THING.

16          IS IT NOT COMING UP?

17          MS. WANG:  YES.

18   BY MR. COOMBS:

19   Q.   YOU HAVE A HARD COPY THERE AS WELL?

20   A.   YES, I DO.

21   Q.   SO THAT YOU ARE AT THE SAME PLACE EVERYBODY ELSE

22   WILL BE WHEN IT COMES UP ON THE SCREEN, IF YOU GO DOWN

23   ON THE "TERMS OF SERVICE" A LITTLE OVER HALFWAY, THERE'S

24   ONE SENTENCE, ONE INDENTED SENTENCE THERE THAT SAYS

25   "RESELLERS."  DO YOU SEE THAT?  IT'S ABOUT TWO LINES.

1    A.    YES.

2    Q.    AND I THINK WE HAVE IT UP ON THE SCREEN NOW.

3          LET'S TURN TO THE NEXT PAGE AND SCROLL DOWN,

4    AND PERHAPS ENLARGE IT A LITTLE BIT.

5          AND IF YOU COULD READ THAT FOR US?

6          THE COURT:  WHAT DO YOU WANT TO ENLARGE IT

7    FOR?

8          THE WITNESS:  "RESELLERS, WE WILL

9              SUSPEND THE SITE IN QUESTION AND

10             WILL NOTIFY YOU SO YOU MAY

11             TERMINATE THE ACCOUNT.  WE WILL

12             FURTHER MONITOR YOUR ACTIVITY.

13             MORE THAN ONE INFRACTION OF THIS

14             TYPE MAY RESULT IN THE IMMEDIATE

15             TERMINATION OF YOUR ACCOUNT."

16   BY MR. COOMBS:

17   Q.    THAT'S THE KIND OF ESCALATION YOU WERE TALKING

18   ABOUT IN YOUR DIRECT EXAMINATION, ISN'T IT?

19   A.    SUSPENSION IS ONE OF THE OPTIONS.

20   Q.    WELL, ACTUALLY THE WORD HERE IS "TERMINATION."

21   A.    WELL, TERMINATION IS ALSO ON THE LIST.

22   Q.    TERMINATION IS PROBABLY THE ULTIMATE SANCTION,

23   ISN'T IT?  I THINK MOST OF THESE ARE -- WHAT DID YOU

24   CALL THEM? -- SORT OF THE STANDARD LANGUAGE FOR TERMS OF

25   SERVICE THAT STARTS WITH A WARNING AND THEN RUNS THROUGH

1    A SERIES.  AND ISN'T TERMINATION THE ULTIMATE FINAL

2    SANCTION THAT'S PROVIDED FOR BY THESE POLICIES?

3    A.    I THINK THAT'S LAST ON THE LIST.

4    Q.    IS THERE ANY MORE DRASTIC SANCTION THAT YOU CAN

5    THINK OF?

6    A.    OFFHAND, NO.

7    Q.    BUT YET YOU NEVER SPOKE WITH MR. CHEN ABOUT

8    WHETHER HE EVEN USED THAT SANCTION WITH RESPECT TO ABUSE

9    COMPLAINTS RECEIVED BY THE DEFENDANTS; IS THAT CORRECT?

10   A.    I DON'T RECALL EXACTLY WHAT THE CONVERSATION

11   CONSISTED OF.  I DO HAVE NOTES THAT I TOOK DURING THE

12   CONVERSATION.

13   Q.    WELL, I WILL REFER YOU BACK TO PAGE 38 OF YOUR

14   DEPOSITION TRANSCRIPT, WHICH I THINK WE READ A MOMENT

15   AGO.  AND I WILL JUST READ THE FIRST PART OF IT AGAIN,

16   BEGINNING AT LINE 2:

17              "QUESTION:  DID YOU HAVE ANY

18              UNDERSTANDING THAT THEY EVER

19              TERMINATED A CUSTOMER IN

20              CONNECTION WITH ANY OF THE

21              ABUSE COMPLAINTS REFERRED TO?"

22              "ANSWER:  I DON'T RECALL WE

23              DISCUSSED THAT HAVING BEEN

24              DONE."

25              WAS THAT QUESTION ASKED AND THAT ANSWER GIVEN

1   DURING YOUR DEPOSITION?

2   A.    YES, IT WAS, EXCEPT I DON'T RECALL THE ENTIRE

3   CONVERSATION.

4   Q.    NO, THAT'S FINE.  I WANT TO MAKE SURE WE HAVE THE

5   COMPLETE RECORD ON THESE ISSUES.

6           NOW, I THINK IN YOUR DIRECT YOU TESTIFIED A

7   LITTLE BIT ABOUT CONTENT FILTERING AND DOMAIN NAME

8   FILTERING AND YOU MADE A DISTINCTION.  YOU TALKED AT

9   SOME LENGTH ABOUT THIS RAW DATA, THE BITS THAT REPRESENT

10  THE UNDERLYING DATA ON A PARTICULAR SERVER AND THE

11  CHALLENGES THAT ARE ATTACHED TO TRYING TO FILTER THAT

12  CONTENT, BUT THEN YOU ALSO TALKED ABOUT TOOLS THAT ARE

13  AVAILABLE TO ACTUALLY BLOCK SPECIFIC WEBSITES LOCATED AT

14  SPECIFIC DOMAIN NAMES; ISN'T THAT CORRECT?

15  A.    YES.

16  Q.    OKAY.  AND THAT, IN FACT, THAT TOOL EXISTS AND IS

17  A FAIRLY SIMPLE TOOL THAT'S USED IN MANY INTERNET

18  ROUTERS.  I THINK YOU MENTIONED CORPORATE ROUTERS IN

19  PARTICULAR THAT WANT TO BLOCK CERTAIN KINDS OF CONTENT

20  THAT MIGHT UNDERMINE EMPLOYEE EFFICIENCY, AS AN EXAMPLE?

21  A.    YES.

22  Q.    OKAY, SO THAT'S A TOOL.  IT'S FAIRLY WIDELY USED,

23  ACTUALLY?

24  A.    IN APPROPRIATE CIRCUMSTANCES, I IMAGINE IT WOULD

25  BE, YES.

```
1    Q.    AND IT'S A TOOL THAT I ASSUME IS PROGRAMMABLE.
2    FOR EXAMPLE, THE PEOPLE WHO OPERATE THE ROUTER IN THIS
3    BUILDING MIGHT BLOCK A DIFFERENT WEBSITE FROM THE PEOPLE
4    WHO OPERATE THE ROUTER AT ADOBE DOWN THE STREET?
5    A.    YES.
6    Q.    AND THEY DO THAT BECAUSE WHOEVER IS RESPONSIBLE
7    FOR PROGRAMMING THE ROUTER WILL INPUT SPECIFIC
8    PROVISIONS, EITHER BY DOMAIN NAME OR BY OTHER CRITERIA,
9    HOWEVER IT'S DONE?
10   A.    YES.
11   Q.    SO THAT'S SOMETHING THAT THE DEFENDANTS CAN DO:
12   THEY CAN AT THE ROUTER LEVEL INPUT SPECIFIC DOMAIN NAMES
13   AND SAY THESE DOMAIN NAMES DON'T RESOLVE TO A SERVER
14   WITHIN THEIR NETWORK?
15   A.    THEY CAN MAKE A LIST, YES.
16   Q.    NOW, WHEN YOU WERE I THINK GOING OVER THE 1610
17   CHART, YOU WERE TALKING ABOUT ALL OF THE OTHER PLAYERS
18   THAT ARE INVOLVED IN THE TRANSMISSION OF COMMUNICATIONS
19   OVER THE INTERNET:  THE INTERNET USER'S ISP, THE DOMAIN
20   NAME RESOLVER, THE BACKBONE, THE DIFFERENT ROUTERS ALONG
21   THE WAY THAT GET YOU TO YOUR ULTIMATE DESIGNATION.  DO
22   YOU RECALL THAT?
23   A.    YES.
24   Q.    NOW, IT'S MY UNDERSTANDING THAT BETWEEN THE
25   INTERNET USER AND THE ULTIMATE DESIGNATION, THESE ARE
```

1    A.    NO.

2    Q.    OKAY.  TELL ME WHY I AM WRONG.  I'M SORRY, I MUST

3    HAVE MISSED SOMETHING.

4    A.     WHEN I DID THIS SPREADSHEET, I WAS LOOKING

5    SPECIFICALLY FOR SITES THAT WERE, NUMBER ONE, LISTED IN

6    EITHER OF THOSE TWO DOCUMENTS, THE JANUARY 30TH LETTER

7    OR THE FIRST AMENDED COMPLAINT, AND COMPARING THAT

8    AGAINST THE LIST OF THE WEBSITES THAT WERE FOUND OR THE

9    FILES -- CONTENTS OF THE WEBSITES THAT WERE FOUND ON THE

10   FIVE SERVERS THAT WERE IMAGED BY MR. WILSON FROM

11   GUIDANCE SOFTWARE.  AND THE SECOND COLUMN SHOWS WHETHER

12   OR NOT THE PARTICULAR ONE ON THAT ROW IS ONE OF THE

13   SITES THAT WAS LISTED IN ONE OF THOSE TWO DOCUMENTS.

14          ALL THE SITES ON THE SPREADSHEET ARE ONES THAT

15   I FOUND ON THOSE DRIVE IMAGES, BUT UNLESS THERE'S A

16   "YES" IN THAT COLUMN OR "BOTH" FOR WHATEVER PARTICULAR

17   DOCUMENT I MENTIONED, THAT PARTICULAR SITE WAS NOT ONE

18   OF THE ONES LISTED.

19          I ORIGINALLY STARTED OUT MAKING THE

20   SPREADSHEET BY GOING FROM THE TOP TO THE BOTTOM IN

21   ALPHABETICAL ORDER AND LOOKING THEM UP.  THEN I REALIZED

22   PART-WAY THROUGH THAT THERE WAS NO POINT TO THAT, SO I

23   STOPPED.

24   Q.    NOW I UNDERSTAND.

25          GOING BACK TO THE FIRST TWO PAGES OF THE

1   EXHIBIT WHERE WE HAVE, I THINK, THE FIRST -- ROUGHLY

2   LOOKS LIKE ABOUT 10 OR 15 DOMAINS ARE INDICATED AS BEING

3   INCLUDED IN THE FIRST AMENDED COMPLAINT, AND THEN THE

4   BETTER PART OF -- THE REST OF PAGE 1 AND THE FIRST HALF

5   OF PAGE 2 ARE ALL ONES WHICH WERE ADDRESSED IN THE

6   JANUARY 30 LETTER BETWEEN COUNSEL; IS THAT CORRECT?

7   A.   YES.

8   Q.   AND THEN THERE ARE A FEW MORE THAT WERE BOTH IN

9   THE FIRST AMENDED COMPLAINT AND IN THAT LETTER BETWEEN

10  COUNSEL; CORRECT?

11  A.   YES.

12  Q.   AND, IN FACT, TURN TO PAGE 2 AND SCROLL DOWN WHERE

13  IT BEGINS BIGWORLDSHOES.COM.  I'M SORRY, PAGE -- IT'S

14  PAGE 2.  IT'S PAGE 3 ON THE SPREADSHEET.

15       OKAY.  YOU CAN SCROLL A LITTLE FURTHER DOWN.

16       SO THERE'S A HANDFUL OF DOMAIN NAMES HERE THAT

17  ARE INDICATED THAT ARE SHOWN AS BEING BOTH IN THE FIRST

18  AMENDED COMPLAINT AND IN THE JANUARY 30TH LETTER; IS

19  THAT CORRECT?

20  A.   YES.

21  Q.   AND AS TO AT LEAST SOME OF THEM, THEY WERE STILL

22  UP AND OPERATING ON AKANOC SERVERS AS OF JUNE 26, 2009

23  WHEN YOU UNDERTOOK THIS INVESTIGATION?

24  A.   NO, I CAN'T SAY THEY WERE "STILL UP"; THEY WERE UP

25  AT THAT TIME.

1

2                    CERTIFICATE OF REPORTER

3

4

5              I, JANA L. RIDENOUR, OFFICIAL REPORTER PRO TEM

6    IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

7    DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN

8    JOSE, CALIFORNIA, DO HEREBY CERTIFY:

9              THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE

10   AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN LOUIS

11   VUITTON MALLETIER, S.A., V. AKANOC SOLUTIONS, INC.,

12   MANAGED SOLUTIONS GROUP, INC., STEVEN CHEN AND DOES 1

13   THROUGH 10, INCLUSIVE, CASE NO. C-07-03952 JW (HRL),

14   DATED AUGUST 25, 2009; THAT I REPORTED THE SAME IN

15   STENOTYPE AND TRANSCRIBED THE SAME BY COMPUTER-AIDED

16   TRANSCRIPTION TO THE BEST OF MY ABILITY AS HEREIN

17   APPEARS.

18              DATED THIS ___4th___ DAY OF DECEMBER, 2009.

19

20

21

22              _Jana L. Ridenour, CSR # 9302_
                JANA L. RIDENOUR, CSR
                OFFICIAL REPORTER PRO TEM
23              LICENSE NUMBER 9302

24
                        **CERTIFIED COPY**
25

# EXHIBIT F

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

LOUIS VUITTON MALLETIER,    )    C 07-03952 JW
S.A.,                       )
                            )
        Plaintiff,          )
                            )    San Jose, CA
            vs.             )    August 26, 2009
                            )
AKANOC SOLUTIONS, INC.,     )
et al.,                     )
                            )
        Defendants.         )
_____)

COPY

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES WARE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Plaintiff:        Law Offices of
                          J. Andrew Coombs
                          By:  J. ANDREW COOMBS
                          ANNIE S. WANG
                          517 E. Wilson Avenue
                          Suite 202
                          Glendale, CA   91206

For the Defendants:       Gauntlett & Associates
                          By:  JAMES A. LOWE
                          CHRISTOPHER G. LAI
                          18400 Von Karman
                          Suite 300
                          Irvine, CA   92612


Court Reporter:           PETER TORREANO, CSR
                          License Number C-7623

1

1    to their testimony.  Never looked at it.

2            Now, why is that?  I would suggest that

3    it's easier to complain about somebody in Silicon

4    Valley than it is to send a notice to somebody

5    else.  It's easier and more effective if you can

6    put somebody in Silicon Valley out of business by

7    putting together a gotcha case.  "Oh, we sent you

8    letters and nothing happened or it came back."

9            There is no requirement, no legal basis

10   for them to suggest or to argue to you that the

11   only way they can avoid liability is to terminate

12   customers.

13           Let's talk about the Alice Chen

14   situation for a moment.  At the time the

15   complaints from Louis Vuitton that we're talking

16   about here were made -- and I think that

17   Plaintiff identified seven or eight particular

18   complaints that happened to be dealing with IP

19   addresses that had been assigned to the

20   businesses associated with Alice Chen.

21           But Alice Chen was renting 100 servers

22   at the time approximately, according to Mr. Chen,

23   and had approximately a thousand IP addresses,

24   and you could have 100 websites, for example, on

25   each of those IP addresses, which would be a

                                                    120

PETER TORREANO, CSR 7623    Exhibit F, Page 114

1          So every single purchase was authorized

2     by the owner of the trademark, by the owner of

3     the copyright, done at their express direction,

4     delivered from China to the United States so that

5     they can come here to this court and say here

6     they are, look how bad all this activity is.

7          Have they ever shown a single shred of

8     evidence that any customer outside of Louis

9     Vuitton has ever bought any product from these

10    websites in the United States?  No.  Not

11    anybody.

12         Now, if it were really such a big

13    problem and they really did have all these

14    complaints about this, surely they could have

15    done that.  Now, they did show us one complaint.

16    One complaint.  Not of a customer -- not somebody

17    who bought a product, but some guy in Denmark

18    who's complaining about some website in China.

19    And that has to do with the United States how?

20    It doesn't.

21         So they are just trying to create

22    evidence so that they can blame the Defendants,

23    so they can put them out of business, so they can

24    scare the rest of Silicon Valley and the rest of

25    the technology industry into not doing business

                                              130

PETER TORREANO, CSR 7623     Exhibit F, Page 115

1    outside the United States because after all

2    someone might be doing bad things and you might

3    get sued.

4           Now, there's another interesting issue

5    about the way these purchases were made.  There's

6    no evidence that any of these purchases were made

7    through the servers operated by the Defendants.

8    It's not even clear that they -- that at the time

9    Mr. Holmes saw the product on the Internet or

10   when Mr. Livadkin saw the product on the Internet

11   it was even using the servers.  Maybe it was.

12   Maybe it wasn't.  But these websites move around

13   a lot.

14          And, by the way, that moving around a

15   lot is established by their own domain tools

16   reports with reverse IP history, for example,

17   showing how they change frequently sometimes, you

18   know, every week, sometimes every couple months.

19   They change perhaps because people are chasing

20   them.  Maybe they change because people are --

21   you know, they are just trying to get ahead of

22   somebody else who's about to complain about

23   them.

24          But Mr. Holmes' purchases had nothing

25   whatever to do with the Defendants.  And yet we

131

PETER TORREANO, CSR 7623

Exhibit F, Page 116

1          CERTIFICATE OF REPORTER

2

3

4

5          I, Peter Torreano, Pro Tempore Court

6     Reporter of the United States District Court for

7     the Northern District of California, 280 South

8     First Street, San Jose, California, do hereby

9     certify:

10         That the foregoing transcript is a true

11    and correct transcript of the proceedings had in

12    Louis Vuitton Malletier, S.A. versus Akanoc

13    Solutions, Inc., et al., Case No. C-07-03952-JW,

14    dated August 26, 2009; that I reported the same

15    in stenotype to the best of my ability, and

16    thereafter had the same transcribed by

17    computer-aided transcription as herein appears.

18

19

20

21

22                    /s/

23    _____

24             PETER TORREANO, CSR
               License Number C-7623
25

                                              179

PETER TORREANO, CSR 7623            Exhibit F, Page 117