1    **GAUNTLETT & ASSOCIATES**
     David A. Gauntlett (SBN 96399)
2    James A. Lowe (SBN 214383)
     18400 Von Karman, Suite 300
3    Irvine, California  92612
     Telephone:     (949) 553-1010
4    Facsimile:     (949) 553-2050
     info@gauntlettlaw.com
5    jal@gauntlettlaw.com

6    Attorneys for Defendants
     Akanoc Solutions, Inc.,
7    Managed Solutions Group, Inc.
     and Steven Chen

8

9                  **UNITED STATES DISTRICT COURT**

10      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

11

12   LOUIS VUITTON MALLETIER, S.A.,      )   Case No.:  C 07-3952 JW
                                         )
13                      Plaintiff,       )   Hon. James Ware
                                         )
14          vs.                          )   **DEFENDANTS' MOTION TO DISMISS**
                                         )   **PURSUANT TO RULE 50 AND**
15                                       )   **ALTERNATIVELY FOR NEW TRIAL OR**
                                         )   **OTHER RELIEF PURSUANT TO RULE 59**
16   AKANOC SOLUTIONS, INC., et al.,     )
                                         )   Date:        February 22, 2010
17                      Defendants.      )   Time:        9:00 a.m.
                                         )   Ctrm:        8, 4th Floor
18                                       )
                                         )
19   _____)

20

21

22

23

24

25

26

27

28

Dockets.Justia.com

## TABLE OF CONTENTS

Page

I.   THE CASE SHOULD BE DISMISSED PURSUANT TO RULE 50 ................................. 1

II.  ALTERNATIVELY RULE 59 RELIEF SHOULD BE GRANTED ................................. 1

III. RULE 59 LEGAL STANDARDS ................................................................................ 2

IV.  VUITTON DID NOT PROVE DIRECT INFRINGEMENT ....................................... 3

    A.   Vuitton Did Not Prove Direct Trademark Infringement ............................. 3

        1.   Vuitton Did Not Prove that Its Trademarks were Used in Commerce ................................................................................... 4

            a.   The "Use" Alleged by Vuitton was Authorized by Vuitton, and Occurred Without Defendants' Servers or Network ................. 4

            b.   The "Use" Alleged Was Not Governed by the Lanham Act ........... 5

        2.   Vuitton Did Not Prove Likelihood of Confusion ........................... 7

    B.   Vuitton Did Not Show Direct Copyright Infringement ............................... 8

        1.   Vuitton's Copyrights Do Not Cover the Accused Images ........................ 8

            a.   The Copyrights Do Not Directly Cover the Accused Images .......... 8

            b.   The Accused Images are Not Derivative Works Covered by the Asserted Copyrights ................................................................. 9

            c.   The Closing Instructions Failed to Provide Guidance as to What is Covered by the Asserted Copyrights ................................. 10

        2.   There Was No Infringement Within the U.S. .................................. 10

V.   VUITTON DID NOT PROVE CONTRIBUTORY INFRINGEMENT ...................... 11

    A.   The Required Elements of Contributory Infringement ................................ 11

    B.   Vuitton Did Not Show Specific Knowledge of Infringement ....................... 12

    C.   Vuitton Admitted that Defendants Did Not Induce Infringement ..................... 14

    D.   Vuitton Did Not Show the Direct Control and Monitoring Required to Find Contributory Trademark Infringement ............................................... 14

        1.   No Evidence that Defendants Directly Control or Monitor the Means of Infringement .................................................................. 14

        2.   The Closing Instructions Fail to Enumerate Direct Control and Monitoring as a Necessary Element to Find Contributory Infringement .................................................................................... 16

3.      Defendants Cannot Be Liable for Contributory Infringement If Their Customers Use Their Services to "Facilitate" Infringement ......... 18

E.      Vuitton Did Not Show the Material Contribution Required to Find Contributory Copyright Infringement ..................................................... 19

F.      Defendants Presented Exculpatory Evidence But the Closing Instructions Did Not Allow the Jury to Consider It ..................................................... 21

VI.    STATUTORY DAMAGES WERE IMPROPERLY AWARDED ................................... 22

A.      The Jury Awarded Statutory Damages Far Above the Statutory Maximums ............................................................................................... 22

B.      The Confusing Trademark Damages Instructions Misstated the Law ................. 23

C.      Copyright Damages Instructions Misstated the Law ..................................... 25

D.      Statutory Damages Provisions Were Unconstitutional as Applied Here ............ 27

E.      The Statutory Damages Here Are Unconstitutional Punitive Damages ............. 29

1.      Defendants' Conduct Was Not Reprehensible ............................ 30

a.      No Physical Harm and No Threat to Health or Safety ................. 30

b.      No Intentional Harm .......................................................... 31

c.      No Financial Vulnerability of Plaintiff .................................. 31

d.      No Evidence of Reprehensible Conduct ................................. 31

2.      The Jury's Award Bears No Relation to Actual Harm .............................. 32

3.      Defendants Had No Fair Notice of Such Severe Penalties......................... 33

a.      The Damages Statutes Did Not Provide Fair Notice ..................... 33

b.      There is No Civil Liability for Defendants' Conduct ..................... 34

c.      Awards in Other Infringement Cases Provided No Notice .......... 35

d.      There Is No Criminal Liability for Defendants' Conduct ............. 36

F.      All of the *Gore* Guideposts Require the Damages in this Case be Vacated ........ 37

G.      Vacation of the Statutory Damages Awards Does Not Mandate a New Trial ............................................................................................. 37

H.      Granting a New Trial Will Not Provide Due Process ......................... 38

I.      Vuitton Is Entitled to No More Than Nominal Damages ..................... 39

VII.   DEFENDANT CHEN CANNOT BE PERSONALLY LIABLE ......................... 40

1

**VIII.   CONCLUSION**................................................................................................**42**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ............................................................. 12, 19, 26

*In Re Aimster Copyright Litig.*,
334 F.3d 643 (7th Cir. 2003) ...................................................................... 24, 26

*Atlantic Richfield Co. v. Arco Globus Int'l Co.*,
150 F.3d 189 (2d Cir. 1998) ................................................................................. 6

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975) ................................................................................. 5

*Bly v. Banbury Books, Inc.*,
638 F.Supp. 983 (E.D.Pa. 1986) ........................................................................ 26

*BMW of North America, Inc. v. Gore*,
517 U.S. 559 (1996) ...................................................... 27, 29, 30, 31, 32, 33, 38

*Childress v. Taylor*,
798 F.Supp. 981 (S.D.N.Y. 1992) ...................................................................... 33

*Coastal Abstract Service, Inc. v. First American Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) .............................................................................. 41

*Cooper Indus. v. Leatherman Tool Group, Inc.*,
532 U.S. 424 (2001) ..................................................................................... 29, 38

*CoStar Group, Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) .............................................................................. 11

*Cummings v. Connell*,
402 F.3d 936 (9th Cir. 2005) ........................................................................ 33, 39

*Doe v. Chao*,
306 F.3d 170 (4th Cir. 2002) .............................................................................. 39

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) .............................................................................. 7

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002) .............................................................................. 7

*Ets-Hokin v. Skyy Spirits, Inc.*,
225 F.3d 1068 (9th Cir. 2000) .............................................................................. 9

*Exxon Shipping Co. v. Baker*,
128 S.Ct. 2605 (2008) ................................................................................... 38, 39

*Fare Deals, Ltd. v. World Choice Travel.com, Inc.,*
180 F.Supp.2d 678 (D. Md. 2001) ............................................................. 15

*Feltner v. Columbia Pictures Television, Inc.,*
523 U.S. 340 (1998) ............................................................................... 28

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
76 F.3d 259 (9th Cir. 1996) ................................................ 14, 16, 18, 20, 34

*Giaccio v. State of Pa.,*
382 U.S. 399 (1966) ............................................................................... 28

*Harris v. Mexican Specialty Foods, Inc.*
564 F.3d 1301 (11th Cir. 2009) ................................................................ 34

*Honda Motor Co., Ltd. v. Oberg,*
512 U.S. 415 (1994) ........................................................................... 25, 27

*International Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.,*
252 F.3d 1274 (11th Cir. 2001) .................................................................. 6

*Johansen v. Combustion Engineering, Inc.,*
170 F.3d 1320 (11th Cir. 1999) ..................................................... 31, 34, 38

*Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.,*
285 F.3d 848 (9th Cir. 2002) ..................................................................... 3

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,*
150 F.3d 1042 (9th Cir. 1998) ................................................................ 7, 8

*Kolender v. Lawson,*
461 U.S. 352 (1983) ............................................................................... 28

*L.B. Industries, Inc. v. Smith,*
817 F.2d 69 (9th Cir. 1987) .................................................................. 40, 41

*Latimer v. Roaring Toyz, Inc.,*
574 F.Supp.2d 1265 (M.D. Fla. 2008) ........................................................ 9

*Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,*
285 F.3d 1146 (9th Cir. 2002) ................................................................. 37

*Little v. Streater,*
452 U.S. 1 (1981) .................................................................................. 28

*Los Angeles News Service v. Reuters Television Intern., Ltd.,*
149 F.3d 987 (9th Cir. 1998) ...................................................... 26, 32, 37, 39

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,*
591 F.Supp.2d 1098 (N.D. Cal. 2008) ........................................... 3, 15, 16

*Memphis Community School Dist. v. Stachura,*
477 U.S. 299 (1986) ........................................................................... 27, 39

*MGM Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) .................................................. 14, 24, 26

*Microsoft Corp. v. Black Cat Computer Wholesale, Inc.,*
  269 F.Supp.2d 118 (W.D.N.Y. 2002) ............................................................................... 35

*Microsoft Corp. v. Rechanik,*
  249 Fed.Appx. 476, 2007 WL 2859800 (7th Cir. 2007) ....................................... 35, 41

*Molski v. M.J. Cable, Inc.,*
  481 F.3d 724 (9th Cir. 2007) ........................................................................................... 2

*Montgomery Ward & Co. v. Duncan,*
  311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940) ......................................................... 3

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.,*
  467 F.Supp. 841 (N.D.Cal. 1979) ................................................................................... 41

*Murphy v. City of Long Beach,*
  914 F.2d 183 (9th Cir. 1990) ........................................................................................... 3

*New Line Cinema Corp. v. Russ Berrie & Co., Inc.*
  161 F.Supp.2d 293 (S.D.N.Y. 2001) .............................................................................. 26

*Nintendo of America, Inc. v. Dragon Pacific Intern.,*
  40 F.3d 1007 (9th Cir. 1994) ..................................................................................... 32, 36

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ........................................................................... 11, 14, 21

*Perfect 10, Inc. v. Visa Int'l Serv. Assoc.,*
  494 F.3d 788 (9th Cir. 2007) ....................................................... 5, 12, 14, 18, 19, 20, 21

*Philip Morris USA v. Williams,*
  549 U.S. 346 (2007) ................................................................................................... 27, 28

*Religious Technology Center v. Netcom On-Line Communication Services, Inc.,*
  907 F.Supp. 1361 (N.D. Cal. 1995) ............................................................................... 11

*Rexel, Inc. v. Rexel Int'l Trading Corp.,*
  540 F.Supp.2d 1154 (C.D. Cal. 2008) ............................................................................ 4

*Rodeo Collection, Ltd. v. West Seventh,*
  812 F.2d 1215 (9th Cir. 1987) ......................................................................................... 7

*Rodriguez v. Farm Stores Grocery, Inc.,*
  518 F.3d 1259 (11th Cir. 2008) ................................................................................. 25, 27

*Sega Enterprises Ltd. v. MAPHIA,*
  948 F.Supp. 923 (N.D.Cal. 1996) ............................................................................. 24, 26

*Sherman v. Kasotakis,*
  314 F. Supp. 2d 843 (N.D. Iowa 2004) ......................................................................... 38

*SHL Imaging, Inc. v. Artisan House, Inc.*,
   117 F.Supp.2d 301 (S.D.N.Y. 2000) ............................................................................... 9

*Sparaco v. Lawler, Matusky, Skelly Engineers LLP*,
   313 F.Supp.2d 247 (S.D.N.Y. 2004) ............................................................................. 39

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) ................................................................................... 29, 30, 32, 33

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952) ...................................................................................................... 5

*Sterling Drug, Inc. v. Bayer AG*,
   14 F.3d 733 (2d Cir. 1994) ............................................................................................ 6

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*,
   24 F.3d 1088 (9th Cir. 1994) ................................................................................. 10, 11

*Tiffany (NJ) Inc. v. EBay, Inc.*,
   576 F.Supp.2d 463 (S.D.N.Y. 2008) ........................................... 13, 15, 16, 18, 21, 24

*Tillman v. Freightliner, LLC*,
   247 Fed.Appx. 867, 2007 WL 2298037 (9th Cir. 2007) ...................................... 25, 27

*Totalplan Corp. v. Colborne*,
   14 F.3d 824 (2d Cir. 1994) ............................................................................................ 6

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985) ..................................................................................... 41

*United States E.E.O.C. v. W&O, Inc.*,
   213 F.3d 600 (11th Cir. 2000) ..................................................................................... 30

*United States v. Smith*,
   832 F.2d 1167 (9th Cir. 1987) ..................................................................................... 36

*United States v. Sultan*,
   115 F.3d 321 (5th Cir. 1997) ....................................................................................... 36

*United States v. Zemek*,
   634 F.2d 1159 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, *cert. denied*, 450 U.S. 985,
   *cert. denied*, 452 U.S. 905 ......................................................................................... 36

*Vanity Fair Mills, Inc. v. T. Eaton Co., Ltd.*,
   234 F.2d 633 (2d Cir. 1956) .......................................................................................... 6

*Wolf Designs, Inc. v. DHR Co.*,
   322 F.Supp.2d 1065 (C.D.Cal. 2004) .......................................................................... 40

**DOCKETED CASES**

*Harris v. Circuit City Stores, Inc.*,
   No. 07 C 2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008) ......................................... 39

*Louis Vuitton Malletier v. Flea Market, Inc.*,
    No. C 09-01062 CW, 2009 WL 1625946 (N.D. Cal. June 10, 2009) ...................................... 18, 34

*Microsoft Corp. v. V3 Solutions, Inc.*,
    No. 01 C 4693, 2003 WL 22038593 (N.D. Ill. August 28, 2003) .................................................... 35

*Motorola, Inc. v. Abeckaser*,
    No. 07-cv-3963 (CPS), 2009 WL 2568529 (E.D.N.Y. Aug. 5, 2009) .............................................. 32

*Symantec Corp. v. Logical Plus, Inc.*,
    No. C 06-7963, 2009 WL 3416178 (N.D. Cal. October 20, 2009) .............................................. 34, 41

*United States Media Corp. v. Edde Entertainment Corp.*,
    No. 94 CIV. 4849, 1998 WL 401532 (S.D.N.Y. July 17, 1998) .................................................... 24

**FEDERAL RULES AND STATUTES**

5 U.S.C. § 552a(g)(4) ....................................................................................................................... 39

15 U.S.C. § 1114 .......................................................................................................................... 3, 4

15 U.S.C. § 1117(c) ................................................................................................... 22, 24, 30, 32, 39

15 U.S.C. § 1117(c)(1) ...................................................................................................................... 23

15 U.S.C. § 1117(c)(2) ................................................................................................................. 22, 23

15 U.S.C. § 1127 ............................................................................................................................ 4, 5

15 U.S.C. § 1681n(a)(B) .................................................................................................................. 39

17 U.S.C. § 101 ................................................................................................................................... 9

17 U.S.C. § 106(2) ............................................................................................................................. 9

17 U.S.C. § 504(c)(2) ....................................................................................................................... 23

18 U.S.C. § 2 ................................................................................................................................... 36

Fed. R. Civ. P. 50 .............................................................................................................................. 1

Fed. R. Civ. P. 50(a) .......................................................................................................................... 1

Fed. R. Civ. P. 50(b) .......................................................................................................................... 1

Fed. R. Civ. P. 59 ..................................................................................................................... 1, 2, 38

Fed. R. Civ. P. 59(a) .......................................................................................................................... 1

Fed. R. Civ. P. 59(a)(1)(A) ................................................................................................................ 2

Fed. R. Civ. P. 59(e) .......................................................................................................................... 1

1

**OTHER AUTHORITIES**

2   H.R. REP. 104-556, 1996 U.S.C.C.A.N. 1074 (1996) ................................................... 30, 37

3   HOUSE REPORT NO. 104-556 ........................................................................... 30, 37

4   S. REP. 104-177 ......................................................................................... 33, 39

5   S. REP. 104-177 (1995) ................................................................................. 32, 39

6   SENATE REPORT NO. 104-177 .......................................................................... 32, 39

7   U.S. Constitution ............................................................................................. 30

8   U.S. Constitution, Fifth Amendment .................................................................... 28

9   U.S. Constitution, Seventh Amendment ............................................................. 28, 38

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **PLEASE TAKE NOTICE** that on February 22, 2010 at 9:00 a.m. in Courtroom 8 of this

2   courthouse Defendants Akanoc Solutions, Inc., Managed Solutions Group, Inc. and Steve Chen

3   (collectively "Defendants") will renew their motions for judgment as a matter of law and

4   alternatively move for a new trial or to alter or amend the judgment.  This motion is made pursuant

5   to Rules 50(b) and 59(a) and (e) of the Federal Rules of Civil Procedure and is based on this Notice

6   and the pleadings and documents on file in this lawsuit and on such other evidence as may be

7   presented at the hearing.

8   As provided by Rule 50(b) the Defendants hereby renew their motions made under Rule

9   50(a) and, for the reasons argued in those motions, move the Court to enter judgment for the

10   Defendants as a matter of law. As provided by Rule 59(a) the Defendants move in the alternative for

11   a new trial or, as provided by Rule 59(e) move to alter or amend any judgment based on the jury's

12   verdict.

13   **I.      THE CASE SHOULD BE DISMISSED PURSUANT TO RULE 50**

14   Pursuant to Fed. R. Civ. P. 50(a) the Defendants moved on August 20, 2009 at the close of

15   the Plaintiff's case in chief for dismissal of the contributory copyright infringement claim [Docket

16   No. 209] and dismissal of the contributory trademark infringement claim [Docket No. 210]. As

17   requested by the Court the Defendants filed supplemental brief on October 27, 2009 in support of

18   those motion [Docket Nos. 244 and 245]. Those pleadings and supporting documents are

19   incorporated herein by reference. The Court took those motions under submission.

20   As provided by Rule 50(b) the Defendants hereby renew their motions made under Rule

21   50(a) and, for the reasons argued in those motions, move the Court to enter judgment for the

22   Defendants as a matter of law, dismissing the case based upon the failure of Plaintiff Vuitton to

23   present evidence necessary to prove contributory infringement of trademark or copyright.

24   **II.     ALTERNATIVELY RULE 59 RELIEF SHOULD BE GRANTED**

25   While Vuitton can discern the most minute of discrepancies in a counterfeit purse, it has not

26   shown quite the same eye for detail towards the obvious flaws in its legal claims.  It is well settled

27   that, under either trademark or copyright law, there can be no contributory infringement without

28   direct infringement by another.  Here Vuitton cannot prove direct infringement because any alleged

1  misuse of its intellectual property occurred outside the United States, outside the purview of both the

2  Lanham Act and the Copyright Act. Vuitton apparently prefers U.S. courts to those in China.

3       Undaunted, Vuitton turns its wrath against Defendants.  Ignoring evidence showing that

4  Defendants have nothing to do with, and do not profit from, the alleged infringement, Vuitton

5  broadly alleged a conspiracy between them and the unidentified and admittedly unknown entities in

6  China accused of copying Vuitton's works and trademarks.  Defendants' only misfortune, other than

7  being an easy target of a rich French luxury goods empire, was their unwitting and indirect provision

8  of routine Internet services to those Chinese entities. This was, of course, grossly insufficient to

9  establish contributory liability of the Defendants.

10      Realizing the poor prognosis for real legal claims against Defendants, Vuitton proffered and

11  the Court adopted jury instructions that omitted several key elements required to prove Vuitton's

12  claims, including direct infringement by a third party, and whether Defendants (1) had knowledge of

13  specific instances thereof, (2) directly controlled and monitored the means of infringement (for

14  contributory trademark infringement), and (3) materially contributed to the infringement (for

15  contributory copyright infringement).  Vuitton's instructions misstate the law on contributory

16  infringement, and their adoption by the Court mandates a new trial.

17      With no actual damages shown by Vuitton, and little guidance on the issue of willfulness, the

18  jury muddled through the instructions, and awarded damages well in excess of even the maximum

19  statutory damages sought by Vuitton.  The damages award is clearly a misapplication of the statutory

20  damages provisions at issue, and thus unconstitutional.  This error also provides an independent

21  ground to overturn the judgment and to grant a new trial.

22  **III.    RULE 59 LEGAL STANDARDS**

23      Under Rule 59, the Court may grant a new trial "for any reason for which a new trial has

24  heretofore been granted in an action at law in federal court."  *See* Fed. R. Civ. P. 59(a)(1)(A).  A

25  motion for a new trial may be granted when the verdict is against the weight of the evidence, the

26  damages are excessive, or to prevent a miscarriage of justice. *See Molski v. M.J. Cable, Inc.*, 481

27  F.3d 724, 729 (9th Cir. 2007).  By granting a new trial, the district court can "set aside the verdict of

28  the jury, even though supported by substantial evidence, where, in his conscientious opinion, the

1    verdict is contrary to the clear weight of the evidence." *See Murphy v. City of Long Beach*, 914 F.2d

2    183, 187 (9th Cir. 1990).

3         A motion for a new trial may also be granted if there are "substantial errors in admission or

4    rejection of evidence or instructions to the jury." *See Montgomery Ward & Co. v. Duncan*, 311 U.S.

5    243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940).  Both erroneous jury instructions as well as the

6    failure to give adequate instructions are bases for a new trial.  *See Murphy*, 914 F.2d at 187.

7    **IV.    VUITTON DID NOT PROVE DIRECT INFRINGEMENT**

8         As this Court recognized in its summary judgment order, there can be no contributory

9    infringement without direct infringement by another, in both trademark and copyright contexts.

10   *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F.Supp.2d 1098, 1104 (N.D. Cal. 2008)

11   (citing *Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 795 & 807 (9th Cir. 2007)) ("All

12   theories of secondary liability for copyright and trademark infringement require some underlying

13   direct infringement by a third party."). But at trial Vuitton did not present any evidence of direct

14   infringement of its asserted trademarks or copyrights. Activities in China do not amount to

15   infringement under U.S. law and cannot support contributory infringement in the U.S. Without such

16   evidence, Vuitton's claims of contributory infringement against Defendants cannot stand. A French

17   plaintiff's suit in the United States about Chinese actions can establish no legal wrong here.

18        **A.    Vuitton Did Not Prove Direct Trademark Infringement**

19        The Lanham Act prohibits the "**use in commerce** … of a registered mark in connection with

20   the sale, offering for sale, distribution, or advertising of any goods or services … which … is **likely**

21   **to cause confusion**." 15 U.S.C. § 1114 (emphasis added); *see Karl Storz Endoscopy-America, Inc. v.*

22   *Surgical Tech., Inc.*, 285 F.3d 848, 853-54 (9th Cir. 2002) ("In order to prevail on its Lanham Act

23   claims … Storz must show that Surgi-Tech used Storz's trademark *in commerce* and that the use was

24   *likely to confuse* customers as to the source of the product [emphasis added]."govern).   But Vuitton

25   presented no trial evidence to meet either the "use in commerce" or the "likelihood of confusion"

26   elements of trademark infringement. Because Vuitton failed to prove direct trademark infringement,

27   the jury verdict of contributory infringement liability cannot stand.

28

1

### 1.  Vuitton Did Not Prove that Its Trademarks were Used in Commerce

2  The Lanham Act provides that a **trade**mark "shall be deemed to be used in commerce on

3  goods when it is placed in any manner on the goods ... and the goods are sold or transported in

4  commerce."  15 U.S.C. § 1127.[1]  *See Rexel, Inc. v. Rexel Int'l Trading Corp.*, 540 F.Supp.2d 1154,

5  1161 (C.D. Cal. 2008) (citing Section 1127 in its finding that the defendant's activities with respect

6  to certain trademarks fell short of the use in commerce required for the plaintiffs to prevail on

7  infringement).  Here Vuitton failed to prove that any of its trademarks were placed on goods sold or

8  transported in commerce in the United States without its authority.

9

### a.  The "Use" Alleged by Vuitton was Authorized by Vuitton, and Occurred Without Defendants' Servers or Network

10

11  Vuitton presented no evidence that any goods bearing its trademarks were sold or transported

12  in commerce in connection with any accused websites, other than attempting to pass off a few items

13  purchased by Vuitton's investigator as such evidence. The only "sale" or "distribution" of goods

14  shown by Vuitton were purchases made by Vuitton's investigator, Robert Holmes. But this evidence

15  was insufficient because all the acts occurred (i) with Vuitton's consent, (ii) without the use of

16  Defendant's services, (iii) outside the United States, and (iv) were transported to the United States

17  by common carriers at the specific direction of Vuitton in an effort to create evidence.

18  The Lanham Act only prohibits trademark use "without the consent of the registrant." *See* 15

19  U.S.C. § 1114.  All purchases shown at trial were made at Vuitton's specific instruction, and thus

20  were purchased and transported to the U.S. with Vuitton's express consent.  *See* Declaration of

21  James A. Lowe in support of this Motion, Exh. 1622, 41:9-42:15.[2]  Furthermore, Mr. Holmes made

22  those purchases *not* from any accused websites, but by sending e-mails through widely available free

23  e-mail accounts (such as gmail.com or hotmail.com) held by unknown person(s) in China, *without*

24  going through Defendants' servers or network, and by making payment through Western Union

25  money transfers having nothing to do with the Defendants. *See*, *e.g.*, *id.* at 43:7-48:9 & 72:21-25.

26

---

27  [1]In contrast, a **service** mark can be used in commerce through advertising, but a **trade**mark must be *affixed to goods* and then *sold or distributed* in commerce in order to be "used in commerce."

28  [2]All exhibits referenced herein are attached to the Declaration of James A. Lowe, filed concurrently herewith.

1    Even assuming, *arguendo*, that Mr. Holmes' purchases somehow represent an infringement of

2    Vuitton's trademark, Defendants had no control over the means of infringement, and cannot be held

3    liable for contributory infringement.  *See Visa*, 494 F.3d at 807 (citing *Lockheed Martin Corp. v.*

4    *Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).

5         These weaknesses in Vuitton's case were obscured by the Closing Instructions, which state

6    that infringement may be found if Defendants' customers "knowingly and intentionally used a mark

7    in connection with the *offering for sale*, sale, or distribution of goods in the United States."  *See* Doc.

8    227, 7:15-20 [emphasis added].  The inclusion of "offering for sale" in the instruction was erroneous

9    because **a use in commerce requires an actual sale or transport of goods**.  *See* 15 U.S.C. § 1127.

10   **An offer for sale**, without more, **does *not* constitute a use in commerce**.  This error was critical

11   because the accused websites represent, at most, mere offers for sale,[3] and thus cannot support

12   infringement liability.

13              **b.      The "Use" Alleged Was Not Governed by the Lanham Act**

14        Other than hosting the accused websites,[4] every act upon which Vuitton's claims are based

15   occurred outside the U.S. *without* any knowledge or involvement by Defendants.  The Lanham Act

16   was just *not* intended to govern those acts. The Lanham Act has extraterritorial reach only under

17   limited circumstances.

18        In *Steele v. Bulova Watch Co.*, 344 U.S. 280, 284-85 (1952), the Supreme Court applied the

19   Lanham Act to a U.S. citizen who, after learning that the Bulova mark was only registered in the

20   U.S, registered the same mark in Mexico, and sold fake Bulova watches in Mexico City. Central to

21   this decision was the fact that numerous fake Bulova watches sold by the defendant made their way

22   back into the U.S.  *Id.* at 285 & 288 ("Unlawful effects in this country … are often decisive."); *see*

23   *also Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 990 n.35 (2d Cir. 1975) ("This *effect* on

24   Bulova's business *within the U.S.* was *the direct and foreseeable result of defendant's activities* in

25

---

26   [3]However, the fact that Mr. Holmes made offers to buy the accused products via e-mail rather than from the accused websites evidences that those websites are not offers for sale, but mere advertising.

27   [4]Operating an Internet Service Provider that hosts websites cannot be an infringement because no

28   trademarks were attached to goods sold or transported in commerce in the United States.  *See* 15 U.S.C. § 1127.

Mexico [emphasis added].")

Since *Bulova*, every Circuit Court decision has applied a three factor test to determine whether the Lanham Act governs extraterritorial activity; whether "(1) the defendant's conduct had a substantial effect on U.S. commerce; (2) the defendant was a U.S. citizen …; and (3) there was no conflict with trade-mark rights established under foreign law." *See*, *e.g.*, *Vanity Fair Mills, Inc. v. T. Eaton Co., Ltd.*, 234 F.2d 633, 642 (2d Cir. 1956).[5]

In this case, Vuitton did not satisfy any of the three *Bulova* factors.  It admits that the identity of the direct "infringers" are unknown, and has no proof regarding their citizenship.  *See* Exh. 1621, 143:5-144:21.  It presented no evidence that any activity connected with the accused websites had *any* effect on U.S. commerce.  Indeed, Vuitton never showed that anyone within the U.S., other than its own investigator doing so at its instruction, has even viewed the accused websites.  *See* Exh. 1622, 238:16-245:3 (discussing Exh. 1559).  And, needless to say, Vuitton never considered whether applying the Lanham Act here would conflict with any foreign law.

While the absence of one *Bulova* factor likely precludes the extraterritorial application of the Lanham Act, the absence of two is "certainly fatal."  *See Totalplan*, 14 F.3d at 831 (citing *Vanity Fair* at 643).  Vuitton offered no evidence to establish any *Bulova* factor, and therefore cannot show that any overseas act constitutes direct infringement.  Vuitton's speculation about actions or intentions of people in China cannot support application of the Lanham Act to actions in China.

Vuitton swept this fatal flaw in its case under the proverbial rug offered by the Closing Instructions, which state that infringement may be proven if "Defendants' customers knowingly and intentionally used a mark … in a way that *would* substantially affect commerce in the United States."  *See* Doc. 227, 7:15-21 (emphasis added).  Under *Bulova*, Vuitton must prove that such use *actually* had a substantial effect on U.S. commerce.  The instructions improperly invited the jury to *conjecture* that the conduct to which Vuitton objected had an effect on U.S. commerce, based on the apparent "use" of its trademarks on the accused website.  This error was further compounded by the

---

[5]*See also Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 745 (2d Cir. 1994); *Totalplan Corp. v. Colborne*, 14 F.3d 824, 830 (2d Cir. 1994); *Atlantic Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 (2d Cir. 1998); *International Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001).

1    failure of the Closing Instructions to consider the other two *Bulova* factors.

2                    **2.      Vuitton Did Not Prove Likelihood of Confusion**

3            Vuitton was required to prove likelihood of confusion as to the origin or source of goods to

4    prove direct infringement. It offered no evidence whatsoever to establish the likelihood of confusion

5    but improperly persuaded the Court to instruct the jury that the likelihood of confusion was

6    "presumed." That is simply contrary to controlling legal precedent. "Likelihood of confusion

7    requires that confusion be probable, not simply a possibility." *Rodeo Collection, Ltd. v. West*

8    *Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987). "To constitute trademark infringement, use of a mark

9    must be likely to confuse an appreciable number of people as to the source of the product."

10   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002). Vuitton failed to show that

11   anyone was likely to mistakenly believe that the accused products were sold by Vuitton. Rather, the

12   evidence showed that the accused websites expressly disclaimed Vuitton as the source of the accused

13   products, by advertising such products as "replicas." *See*, *e.g.*, Exh. 1620, 174:19-175:2. The only

14   evidence that Vuitton presented was a letter from a gentleman residing in *Denmark* who was merely

15   annoyed at the availability of replicas (presumably in Denmark). But even he expressed no

16   confusion. *See* Exh. 74. It is customary to prove likelihood of confusion by the use of customer

17   surveys but Vuitton made no effort to go to this trouble; it simply skipped this critical evidence.

18           Again, the Closing Instructions let Vuitton off the hook, by instructing the jury that there is

19   "a *presumption* of a likelihood of confusion … when the offending mark is a counterfeit mark, or a

20   mark virtually identical to a previously registered mark coupled with the intent to pass off or borrow

21   from established goodwill." *See* Doc. 227, 6:23-27 (emphasis added). This instruction is squarely

22   contrary to controlling law. The Ninth Circuit has reaffirmed that "proof of intent to cause

23   confusion is entitled to *great weight*, **not that it creates a presumption of confusion** that shifts the

24   burden of proof to the other party." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d

25   1042, 1052 n.11 (9th Cir. 1998) (citing *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837,

26   844-45 (9th Cir. 1987) (italics in original, bold added).[6]   Additionally Vuitton cannot even point to

27

28   _____
     [6]*See also Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997) ("The eight-factor *Sleekcraft* test is used in the Ninth Circuit to analyze the likelihood of

1    any evidence showing anyone's "intent to cause confusion," especially with websites referring to

2    "replicas." All Vuitton offered was speculation and argument but no evidence to prove it.

3        **B.      Vuitton Did Not Show Direct Copyright Infringement**

4            **1.      Vuitton's Copyrights Do Not Cover the Accused Images**

5        Vuitton asserts copyrights on two registered works: the "Multicolor Monogram – White

6    Print" and the "Multicolor Monogram – Black Print."  Both are listed as "Fabric/Leather Prints" and

7    "2-Dimensional Artwork" by the Copyright Office.  *See* Exhs. 449 & 450.

8        Vuitton's witnesses testified that unknown entities in China copied these works onto leather

9    and/or fabric, and then used such materials to produce allegedly counterfeit products.  *See* Exh.

10   1621, 142:7-144:21.  Then photographs of these products were taken by unknown persons in China

11   and uploaded by unknown persons in China to websites allegedly hosted on Defendants' servers.[7]

12   *See id*.  Vuitton never showed that Defendants had anything to do with the production or sale of

13   these products; rather, it objects to the presence on servers of digital data representing those

14   photographs. That is the entire basis of its claim of contributory infringement.

15           **a.      The Copyrights Do Not Directly Cover the Accused Images**

16       Vuitton overlooked a critical aspect in its claim — its asserted copyrights do *not* actually

17   cover the accused images.  The copyrights cover certain two-dimensional patterns on *leather or*

18   *fabrics*, but the accused images are *photographs* of three-dimensional *objects*, *e.g.*, handbags, shoes,

19   belts, etc.  Vuitton argues infringement in broad strokes in an attempt to conflate the three, but an

20   analysis of copyright law shows that its asserted copyrights do not cover the accused images. A

21   photograph is not a "counterfeit" Vuitton product; it is just a photograph (not a work of Vuitton) of a

22   product (not a work of Vuitton) that allegedly looks like a Vuitton product that has affixed to it the

23   leather/fabric pattern. Beyond these problems, there is also no photograph on the servers, just data.

24

25

26   _____
     confusion question in *all* trademark infringement cases [emphasis added].").

27   [7]Of course, only the corporate Defendants, *i.e.*, Akanoc and MSGI, owned and operated the servers.
     Defendant Chen was only the president and shareholder of these two corporations.  *See* Exh. 1622,

28   90:13-91:5 & 148:3-7.

**b.      The Accused Images are Not Derivative Works Covered by the Asserted Copyrights**

A photograph of an object is an original work entitled to copyright protection independent of the object depicted.  *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074-77 (9th Cir. 2000). Whether the photograph is also covered by the copyright on the depicted object, assuming that the latter is copyrightable, depends on whether the photograph is a derivative work based on that object. *Id*. at 1077 n.5; 17 U.S.C. § 106(2).  "But simply because photographs are in this colloquial sense 'derived' from their subject matter, it does not necessarily follow that they are derivative works under copyright law." *Ets-Hokin* at 1078.[8]

"A 'derivative work' is a work based upon one or more preexisting works … in which a work may be recast, transformed or adapted."  17 U.S.C. § 101.  Recent cases hold that a photograph of a copyrighted object is *not* a derivative work based thereupon because it does *not* involve any recasting, transformation or adaptation of the object depicted as required under Section 101.  *See*, *e.g.*, *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 306 (S.D.N.Y. 2000) ("A photograph of Jeff Koons' 'Puppy' sculpture … merely depicts that sculpture; it does *not* recast, transform, or adapt Koon's sculptural authorship."); *Latimer v. Roaring Toyz, Inc.*, 574 F.Supp.2d 1265, 1274-75 (M.D. Fla. 2008) ("Latimer has not altered Hathaway's artwork, recast it, or otherwise transformed it during the photographic process … such that it meets the criteria for a derivative work under copyright law.").

Here, crucially, Vuitton does *not* own, and has *not* asserted, any copyright in the objects depicted in the accused images, *e.g.*, handbags, shoes, belts, etc.  Even if it did, the accused images would *not* constitute derivative works based on those objects, and thus would *not* be covered by any copyright therein.  Nor does Vuitton own any copyright in the accused images themselves, because it did not author those images.  Simply put, there cannot be any copyright infringement here.

---

[8]In *Ets-Hokin*, the Ninth Circuit held that the photographs at issue were not derivative works as the object they depict, a Skyy vodka bottle, was not itself copyrightable. *See Ets-Hokin* at 1078-81.

c.   **The Closing Instructions Failed to Provide Guidance as to What is Covered by the Asserted Copyrights**

The Closing Instructions failed to consider any of the above issues, and merely asked the jury if it "find[s] that the various websites infringed Louis Vuitton's copyright in selling counterfeited Louis Vuitton products."  *See* Doc. 227, 12:5-7.  This invited the jury to find infringement even though the asserted copyrights do not cover the accused images.

The instructions also wrongly presupposed that the accused websites "sold" counterfeit Louis Vuitton products. This was squarely against the weight of the evidence. None of the accused websites have e-commerce capabilities and could not take orders for merchandise such as eBay.com or Amazon.com. *See* Exh. 1622, 46:16-47:2 & 49:22-52:9.   Rather, Mr. Holmes had to go to extraordinary lengths to order, pay for and arrange the shipment of the accused products from China. He used public e-mail to offer to purchase products, received order and purchase instructions in the same way, and paid for the goods by wiring money (at his local 7-11 Store) through Western Union to unknown entities in China.  *See id.* at 57:15-60:9. The purchases were consummated in China and the goods were shipped by unknown entities from China to addresses selected by Holmes.  *See id.* at 61:9-63:7.   The jury instructions erroneously assumed direct infringement even though none was shown.[9]  Vuitton persuaded the Court and the jury to adopt its presumptions in lieu of evidence.

### 2.   There Was No Infringement Within the U.S.

The main problem with Vuitton's copyright infringement claim is that all of the conduct it objects to occurred overseas.  Its two copyrighted fabrics were allegedly copied in China.  *See* Exh. 1621, 142:7-144:21.  The production of the alleged counterfeit products also occurred in China.  *See id*.  The sale and shipment of those products likewise occurred in China.[10]  *See id.* at 143:5-15; s*ee also* Exh. 1622, 61:9-63:7.   And, as discussed below, any "copying" of the accused images also occurred in China.

But the Copyright Act simply does not apply to overseas conduct.  *See Subafilms, Ltd. v.*

---

[9]If someone sells a vehicle upholstered with counterfeit Louis Vuitton fabric by placing an online classified ad on the San Jose Mercury News website, it would *not* mean that the San Jose Mercury News sold that vehicle, even if the San Jose Mercury News operates its own Internet servers.

[10]And Vuitton's only evidence shows that such transactions were authorized by Vuitton.

1    *MGM-Pathe Communications Co.*, 24 F.3d 1088, 1094 (9th Cir. 1994) ("Because the copyright laws

2    do not apply extraterritorially, each of the rights conferred under … Section 106 … must be read as

3    extending no farther than the United States' borders.").  Conduct outside the U.S. cannot serve as the

4    basis for contributory infringement within the U.S.

> Given the undisputed axiom that United States copyright law has no
> extraterritorial application, it would seem to follow necessarily that a
> primary activity outside the boundaries of the United States, not
> constituting an infringement cognizable under the Copyright Act,
> cannot serve as the basis for holding liable under the Copyright Act
> one who is merely related to that activity within the United States.

8    *Subafilms*, 24 F.3d at 1093 (citing 3 Nimmer, § 12.04[A][3][b] at 12-86).

10        Grasping at straws, Vuitton argues that the "copies" of the accused images on Defendants'

11   servers represent a direct infringement of its asserted copyrights in the U.S.  But its copyrights do

12   *not* cover the accused images.  Moreover, any unauthorized "copying" was done overseas, and

13   cannot constitute direct infringement which is actionable under the Copyright Act.

14        In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit

15   found that Google *directly* infringed certain copyrighted images by storing "electronic information"

16   corresponding to thumbnail versions of such images on its servers.  *See Amazon.com*, 508 F.3d at

17   1159-60.  This was premised on the fact that "Google *initiates* and *controls* the *storage* and

18   *communication* of these thumbnail images."  *See id.* at 1160 n.6 (emphasis added).  Here, in

19   substantial contrast, the entities that initiate and control the communication and storage of the

20   accused images onto Defendants' servers are unknown third parties who do so from China.  *See* Exh.

21   1621, 142:7-11.  Thus, to the extent that there was any copying, it was done overseas, and cannot

22   constitute infringement under the U.S. Copyright Act. So there is no direct infringement.[11]

## V.    VUITTON DID NOT PROVE CONTRIBUTORY INFRINGEMENT

### A.    The Required Elements of Contributory Infringement

25        To be liable for contributory trademark infringement, a defendant must have (1) intentionally

---

[11]Vuitton has not accused any Defendant of *direct* infringement.  But even if it did, the claim would be without merit.  An "ISP serving as a passive conduit for copyrighted material is not liable as a direct infringer."  *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 548 (4th Cir. 2004) (citing *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995)).

1   induced the primary infringer to infringe, or (2) continued to supply an infringing product to an

2   infringer with knowledge that the infringer is mislabeling the particular product supplied.  *See Visa*,

3   494 F.3d at 807 (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855, 102 S.Ct. 2182,

4   2189, 72 L.Ed.2d 606 (1982)).  When the defendant supplies a service rather than a product, liability

5   turns on "the extent of control exercised by the defendant over the third party's means of

6   infringement."  *See Lockheed* at 984.

7        In the copyright context, "one who, with knowledge of the infringing activity, induces,

8   causes or materially contributes to the infringing conduct of another, may be held liable as a

9   contributory copyright infringer."  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th

10  Cir. 2001).

11       **B.    Vuitton Did Not Show Specific Knowledge of Infringement**

12       Under both trademark and copyright law, specific knowledge – *i.e.*, knowledge by a

13  defendant of the specific infringing activity by an alleged direct infringer – is required for a finding

14  of contributory infringement.  *See Lockheed* at 983 (discussing the infringement of the "Skunk

15  Works" service mark by specific domain names registered through defendant Network Solutions

16  ("NSI")); *Napster* at 1021 ("We agree that if a computer system operator learns of *specific infringing*

17  *material* available on his system and fails to purge such material from the system, the operator

18  knows of and contributes to direct infringement.  Conversely, absent any *specific information which*

19  *identifies infringing activity*, [he] cannot be liable for contributory infringement merely because the

20  structure of the system allows for the exchange of copyrighted material [emphasis added].").

21       Because Vuitton presented no evidence of either direct trademark or copyright infringement

22  within the U.S., Defendants could not possibly have had specific knowledge of any infringement.

23  Instead, Vuitton made general allegations regarding what it called "counterfeit products" sold on the

24  accused websites. Those allegations are insufficient under the specific knowledge standard required

25  to find contributory infringement on the part of Defendants.

26       Unfortunately, the Closing Instructions allowed Vuitton to evade this requirement.  They

27  state, in relevant part:

28            To find that Defendants knew or should have know that Defendants'

> customers were using Defendants' services to infringe or to facilitate infringement of Plaintiff's trademark, you must find that Plaintiff has proved that Defendants had actual knowledge that one or more of Defendants' customers were *in the business of* themselves or *facilitating others* to *sell goods using counterfeit marks* and would use the services purchased from Defendants for that purpose …

*See* Doc. 227, 9:24-10:4 [emphasis added].  The instructions improperly invited the jury to infer that Defendants could have reasonably anticipated *specific instances* where Vuitton's trademarks were infringed from *general knowledge* regarding the sale of counterfeit goods, including counterfeit goods using trademarks *not* owned by Vuitton.  This type of inference was expressly forbidden by the Supreme Court in *Inwood* at 854 n.13, ¶ 2 (emphasis added).

> Justice White's concern is based on a statement by the Court of Appeals that the generic manufacturers *"could reasonably anticipate"* illegal substitution of their drugs.  If the Court of Appeals had relied upon that statement to define the controlling legal standard, the court indeed would have applied a "watered down" and incorrect standard.

Allowing such an inference here was a clear error. General allegations of infringement cannot be relied upon to meet the specific knowledge requirement.  *See Tiffany (NJ) Inc. v. EBay, Inc.*, 576 F.Supp.2d 463, 510 (S.D.N.Y. 2008).

> In sum, neither precedent nor policy supports Tiffany's contention that *generalized allegations* of infringement provide defendants with knowledge or a reason to know of the infringement. …   Instead, courts have required a much high showing that a defendant knew or had reason to know of **specific instances of actual infringement.** [Emphasis added.]

The instructions here eviscerated the specific knowledge requirement, and created an erroneous basis for finding Defendants liable for contributory infringement.

Although this instruction was found under the section of the Closing Instructions relating to the first claim for contributory *trademark* infringement, it also tainted the jury's finding with respect to the second claim for contributory *copyright* infringement, as the instructions state that the "factors and definitions … in the instructions on contributory trademark infringement may be used to infer knowledge with respect to contributory copyright infringement."  *See* Doc. 227, 12:23-25.  This instruction thereby allowed contributory liability to be found in both claims even though Vuitton presented no evidence to satisfy the specific knowledge requirement.

**C.      Vuitton Admitted that Defendants Did Not Induce Infringement**

Under both trademark and copyright law, contributory infringement may be shown if a defendant induces a third party to infringe.  Such inducement may take the form of an improper suggestion or invitation to infringe.  *See Inwood* at 852-53.  It may also be shown by "clear expression or other affirmative steps taken to foster infringement."  *See Visa*, 494 F.3d at 800.  "Under *Grokster*, an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement."  *See Amazon.com*, 508 F.3d at 1171 (citing *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005)).

Here, Vuitton has neither accused Defendants of inducing infringement, nor made such a showing.  In fact, Vuitton admitted it had no evidence that Defendants induced infringement.  *See generally* Exh. 1621, 153-161.

**D.      Vuitton Did Not Show the Direct Control and Monitoring Required to Find Contributory Trademark Infringement**

**1.      No Evidence that Defendants Directly Control or Monitor the Means of Infringement**

Liability for contributory trademark infringement, when the defendant supplies a service used by a third party, turns on "the *extent* of control exercised by the defendant over the third party's means of infringement."  *See Lockheed* at 984 (emphasis added) (citing *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1148-49 (7th Cir. 1992); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996)).  "For liability to attach, there must be *direct* control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark."  *See Visa*, 494 F.3d at 807 (emphasis added) (citing *Lockheed* at 984).

Several cases have examined what constitute "direct control and monitoring" in the Internet context.  In *Visa*, the Ninth Circuit suggests that this can be shown by "the power to remove infringing material from these websites or directly stop their distribution over the Internet."  *See id*. In this case, however, it is undisputed that Defendants do *not* have the power to remove the accused images from the accused websites.  Defendants presented undisputed evidence that, pursuant to their standard procedure, upon the rental of a server, administrative rights to access and control the server

1   are given solely to the customer.  *See* Exh. 1623, 50:24-53:5.  Thus, the customer has sole control

2   over the server, and Defendants cannot remove specific content on the server.[12]  Nor do Defendants

3   have the power to *directly* stop the distribution of either the accused websites or the accused images.

4   As Defendants testified, they have only two ways to disable access – by either (1) disabling an IP

5   address corresponding to the domain name of an accused website or (2) unplugging an entire server

6   – *both* of which would also disable access to numerous other legitimate websites.  *See* Exh. 1622,

7   77:12-78:6 & 116:20-117:18.

8        In *Tiffany*, the court found that eBay had direct control over the means of infringement used

9   by third parties to infringe Tiffany's marks.  *See Tiffany* at 506.  This finding was premised on four

10   facts: (1) eBay retains "significant control" over the transactions conducted through eBay; (2) eBay

11   has "actively promoted" the sale of Tiffany jewelry on eBay, by advertising merchandise on eBay,

12   Google, and Yahoo, and by telling eBay sellers that Tiffany is a moneymaking keyword; (3) eBay

13   profits from the listing of items and successful completed transactions; and (4) eBay maintains

14   "significant control" over the listings on eBay.  *See id.* at 506-07.  There was also evidence that eBay

15   monitors the listings.  *See id.* at 507 ("The fraud engine screens listings and removes items that use

16   specific terms in the listing description.").  In contrast, the Defendants here had no control over any

17   transactions involving the alleged counterfeit Vuitton products.[13]  They did not promote the sale of

18   Vuitton products (authorized or counterfeit), or profit from the sale or the offering for sale of such

19   items.  *See* Exh. 1621, 155:9-24.  Lastly, they have no control over, and do not monitor, the content

20   of the accused websites.  *See* Exh. 1623, 50:24-56:20.

21        This case is analogous to *Lockheed*.  In *Lockheed*, the defendant NSI "translates the domain

22   name combination to the registrant's IP Address and *routes the information or command to the*

23   *corresponding computer*."  *See Lockheed* at 984 (emphasis added).  Here, "Defendants physically

24   host websites on their servers and *route Internet traffic to and from those websites*."  *See Akanoc,*

25

---

26   [12]*See also Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F.Supp.2d 678, 689 (D. Md. 2001) (finding no direct control and monitoring where defendant had no authority to control the operations of the accused website).

27   [13]Vuitton's own evidence showed that the transactions in which the alleged counterfeit products

28   were purchased were authorized by Vuitton and occurred without Defendants' servers or network.

591 F.Supp.2d at 1112 (emphasis added).   The only distinction is that, in this case, the accused websites are hosted on Defendants' servers.[14]   However, both *Lockheed* and *Fonovisa* (on which *Lockheed* relies) focus on the extent of control over **the means of infringement** by the respective defendant,[15] ***not* where** the alleged infringing material was located.[16]   The alleged means of infringement here are photographs generated from a website. Defendants have no control over the accused photographs or the websites, and are not liable for contributory infringement merely because the accused websites may be found on Defendants' servers.   Defendants' service, like that provided by NSI, is a "rote" Internet service which "does not entail the kind of direct control and monitoring required to justify an extension of the 'supplies a product' requirement" for a finding of contributory infringement.   *Lockheed* at 985.

Tiffany properly illustrates the application of *Lockheed*.   The *Tiffany* court, after outlining the framework of contributory infringement set forth in *Lockheed*, found that "eBay exercises *sufficient control and monitoring* over its website such that it fits squarely within the *Fonovisa* and *Hard Rock Cafe* line of cases."   *See Tiffany* at 505-06 (emphasis added).   *Lockheed* and *Tiffany* teach that it is the "direct control and monitoring" of the "means of infringement" which justifies the following of *Fonovisa* and *Hard Rock* to impose contributory liability, rather than analogizing such means to the real property aspect of these two cases to constructively show control and monitoring.

### 2.   The Closing Instructions Fail to Enumerate Direct Control and Monitoring as a Necessary Element to Find Contributory Infringement

Contributory infringement may be found if a defendant (i) supplies an infringing product (ii) with knowledge that a third party is using it to infringe a plaintiff's mark.   *See Inwood* at 855. *Lockheed* extended the "supplies a product" requirement, and held that it may be satisfied if the defendant directly controls and monitors the means of infringement, i.e., if the defendant provides a

---

[14]A service which the Court views as "the Internet equivalent of leasing real estate" after discussing *Fonovisa* and *Lockheed*.  *See Akanoc*, 591 F.Supp.2d at 1112.

[15]*See Fonovisa*, 76 F.3d at 262.

[16]Furthermore, Vuitton's asserted intellectual property rights do not cover the accused images. Unlike *Hard Rock* and *Fonovisa*, Defendants here do not have possession or custody of any alleged infringing materials.

service that the third party uses to directly infringe, and there is direct control and monitoring by the defendant of the third party's use of the service. *See Lockheed* at 984-85. So, direct control and monitoring is an entirely separate and distinct element of contributory infringement from the element of knowledge.

However, the Closing Instructions fail to distinguish between the two elements. Instead, to the extent that control is addressed at all, it is conflated with the instructions on knowledge:

> In making that judgment [as to whether Defendants had knowledge that their customers were using their service to infringe Plaintiff's trademark], you may consider a number of factors, including the following: …
>
> (4) The degree of control that Defendants could and did exercise over its servers or services and the use of its servers or services; …

*See* Doc. 227, 9:24-10:19. But the two elements are separate, and one cannot be inferred from the other, as implied and permitted by the above instruction. Instead, pursuant to *Lockheed*, the jury should have been instructed that it must find that Defendants *directly* control and monitor a third party's use of their services in order to find contributory infringement. The instructions should have also provided guidance as to what constitutes direct control and monitoring, with examples from *Lockheed*, *Visa*, and *Tiffany*. With proper instructions the jury could not find that the Defendants directly controlled and monitored any websites that allegedly infringed Vuitton's property rights.

The above instruction also erred by including "servers," which impermissibly broadened the definition of the "means of infringement." The critical issue here is whether Defendants directly control and monitor a third party's use of their services, and *not* whether they directly control and monitor their actual servers. (Logically, the former does *not* necessarily follow from the latter.) Thus, the question should have been whether Defendants directly controlled and monitored the accused websites, because it is only the "use" of the mark on the accused websites that could even potentially constitute infringement.

> Where domain names are used to infringe, the infringement does not result from NSI's publication of the domain name list, *but from the registrant's use of the name on a web site* … in connection with goods or services.

*See Lockheed* at 985 (emphasis added) (citing decision below at 985 F.Supp. 949, 958 (C.D. Cal.

1  1997)).  *See also Visa*, 494 F.3d at 807 (finding that the instrumentality of infringement at issue was

2  not Visa's computer network, but the accused websites); *Tiffany* at 506 (finding that "eBay exercises

3  sufficient control and monitoring *over its website* such that it fits squarely within the *Fonovisa* and

4  *Hard Rock Cafe* line of cases [emphasis added].").   There was simply no evidence here that

5  Defendants directly controlled or monitored the accused websites and Defendants cannot be liable

6  for contributory infringement.

7        **3.        Defendants Cannot Be Liable for Contributory Infringement If Their
                      Customers Use Their Services to "Facilitate" Infringement**

8

9        The Closing Instructions further erred by allowing the jury to find Defendants liable for

10  contributory infringement if their customers have used their services to "facilitate infringement of

11  Plaintiff's trademark."  *See* Doc. 227, 7:8-14 & 8:25-26.  The term "facilitate" sets a much lower

12  standard than the required direct control and monitoring, especially in view of (i) the absence of any

13  definition of the term, and (ii) the lack of guidance as to what constitutes direct control.

14        In the present case, it is undisputed that there is no privity between Defendants and the third

15  parties accused of infringement.  *See* Exh. 1621, 153:22-154:6 & 155:13-16.  None of Defendants'

16  customers (*i.e.*, the resellers) have been accused of direct infringement.  Hence, it is all the more

17  important for the instructions to emphasize that direct control and monitoring is necessary to find

18  contributory infringement on the part of Defendants.

19        Even if the rental of server space were "the Internet equivalent of leasing real estate," this

20  case is much more akin to *Malletier* than to *Fonovisa*.  In *Fonovisa*, contributory liability was found

21  because the defendant was more than "an absentee landlord," but actually promoted and controlled

22  the swap meet it operated.  *See Fonovisa*, 76 F.3d at 262.  Conversely, in *Malletier*, the property

23  owner was "separate and distinct" from the flea market operator, and had no specific, direct control

24  over the flea market's tenants.  *See Louis Vuitton Malletier v. Flea Market, Inc.*, No. C 09-01062

25  CW, 2009 WL 1625946, at *2 (N.D. Cal. June 10, 2009).  The *Malletier* court held:

26              No case supports the proposition that a property owner may be liable
                for contributory trademark infringement if it only leases property to a
27              separate and distinct entity, which in turn operates a flea market and
                rents space to a vendor, which in turn infringes trademarks.

28

*See id*. at \*3.  Likewise, the evidence adduced at trial demonstrates that Defendants here only rent server space to their customers, (customers that are other ISPs, not the alleged direct "infringers"), and have no relation with, or control over, the alleged direct "infringers."  Thus, the evidence does not permit contributory liability on the part of Defendants.

### E.    Vuitton Did Not Show the Material Contribution Required to Find Contributory Copyright Infringement

Contributory copyright infringement may be found if a defendant "with knowledge of the infringing activity, … materially contributes to the infringing conduct of another."  *See Napster* at 1019.

In *Visa*, the Ninth Circuit held that material contribution may be found if, among other factors, a defendant's service allow users to locate and obtain infringing material or assists in the distribution of infringing content.  *See Visa*, 494 F.3d at 796-97 (discussing *Amazon.com*, *Napster*, and *Grokster*).  It noted that "[t]he search engines in *Amazon.com* [*i.e.*, Google] provided links to specific infringing images," and that "Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access the infringing materials."  *Id*. (citing *Amazon.com*, 508 F.3d at 729).  It further noted that "the administrators of the Napster and Grokster programs *increased the level of infringement by providing a centralized place* … where infringing works could be collected, sorted, found, and bought, sold, or exchanged [emphasis added].")

Conversely, Defendants here do *not* help users locate or obtain the accused images.  They do *not* provide a centralized place where counterfeit Vuitton goods, or even the accused images, can be obtained.  They merely rent server space to their customers, who rent to other customers, who in turn host the accused websites, that are in turn operated by others.  *See* Exh. 1621, 153:18-154:25.  The accused infringers (even assuming someone in China can be said to "infringe" any U.S. rights) is therefore three steps removed from the Defendants. Vuitton showed no closer connection. Nor do Defendants *substantially* assist in the distribution of either the goods or the images.  At trial, Vuitton did not show that anyone within the U.S., other than its own investigator, has even viewed the accused websites.  *See* Exh. 1622, 238:16-245:3 discussing Exh. 1559.

1    Vuitton would undoubtedly argue that, by renting server space in which the accused images

2    are found, Defendants provide the "sites and facilities" for infringement.  However, even assuming,

3    *arguendo*, that those images infringe Vuitton's intellectual property rights, the mere rental of server

4    space does *not* constitute the provision of such "sites and facilities."  In *Fonovisa*, the defendant flea

5    market provided the "sites and facilities" for infringement by engaging in a "mutual enterprise of

6    infringement" with the direct infringers.  *See Visa*, 494 F.3d at 798 (citing *Fonovisa*, 76 F.3d at 264).

7    It also "reap[ed] substantial financial benefits" directly from the sale of counterfeit recordings.  *See*

8    *Fonovisa*, 76 F.3d at 263.  In contrast, Vuitton presented no shred of evidence that any Defendant

9    was engaged in any mutual enterprise with any third party, never mind the alleged direct infringers.

10   Vuitton's argument was based on the frankly racist implication that because Steve Chen is of

11   Chinese origin and because the Chinese are "known counterfeiters," Chen and the corporate

12   Defendants must be conspiring together to provide "bulletproof" hosting services for Chinese

13   infringers. But this scurrilous assertion was entirely unsupported by evidence. Instead the evidence

14   showe that the Defendants derived no benefit from the sale of "counterfeit" Vuitton goods.  *See* Exh.

15   1621, 155:9-24.

16   In *Napster*, the Ninth Circuit held that the designer and distributor of the Napster software

17   provided the "sites and facilities" for infringement because it was "expressly engineered to enable

18   the easy exchange of pirated music and was widely so used."  *See Visa*, 494 F.3d at 798-99 (citing

19   *Fonovisa*, 76 F.3d at 1020 n.5). Such a characterization obviously does not apply to Defendants here.

20   Even Vuitton admitted that the accused websites are far outnumbered by the legitimate websites and

21   content on Defendants' servers.  *See* Exh. 1622, 77:18-78:23.

22   The Closing Instructions again saved Vuitton by omitting the "material contribution" element

23   altogether. The jury was never informed that Vuitton was obligated to prove "material contribution."

24   The instructions on contributory copyright infringement only discuss knowledge.  *See* Doc. 227,

25   11:5-12:25.  This is clear error, allowing Vuitton to win by misrepresentation of the law. The

26   instructions should have (i) expressly stated that contributory copyright infringement may only be

27   found if Defendants materially contributed to the direct infringement of Plaintiff's copyrights, and

28   (ii) provided guidance as to what constitutes material contribution, with examples from *Visa*,

1   *Fonovisa*, *Amazon.com*, and *Napster* such as proffered by Defendants.

2   **F.   Defendants Presented Exculpatory Evidence But the Closing Instructions Did Not Allow the Jury to Consider It**

3

4   Under *Inwood*, liability for contributory trademark infringement is found only if a defendant

5   *continues* to supply the means of infringement to a third party after learning of the third party's use

6   thereof to infringe.  *See Visa*, 494 F.3d at 807 (emphasis added).  Courts "have *routinely* declined to

7   impose liability where a defendant, once it possesses sufficient knowledge, takes '*appropriate steps*'

8   to cut off the supply of its product or service to the infringer."  *See Tiffany* at 516 (emphasis added).

9   Likewise, the Ninth Circuit held that contributory copyright infringement may be found only if a

10  defendant, after learning of specific infringing material, "could take *simple measures* to prevent

11  further [direct infringement], and failed to take such steps."  *See Amazon.com*, 508 F.3d at 1171-72

12  (emphasis added).  It also directed the district court, on remand, to examine "whether there are

13  *reasonable and feasible means* for Google to refrain from providing access to infringing images."

14  *See id.* at 1173 (emphasis added).  Thus, if the defendant takes reasonable and feasible measures to

15  prevent further infringement, such action exculpates it from contributory liability.

16  The evidence at trial shows that Defendants, after receiving notice of specific instances of

17  alleged infringement from Vuitton, took reasonable steps to curb access to the accused websites.

18  First, Defendants would ping the domain name of an accused website to see if it was hosted on one

19  of their servers.  *See* Exh. 1623, 94:2-96:25.[17]  If it was, Defendants would forward the complaint to

20  the customer who rented the server.  *See id.*  If the customer did not respond, Defendants would

21  disable the corresponding IP address.  *See id.* at 115:4-15.  For repeated offenses, they would unplug

22  the entire server.  *See id.* at 120:8-122:9.  Although Vuitton may desire that Defendants take more

23  proactive steps to help Vuitton police its intellectual property, the law simply does not impose such a

24  duty on Defendants.  *See Hard Rock* at 1149 ("no affirmative duty to take precautions against the

25  sale of counterfeits [or] to seek out and prevent violations"); *Tiffany* at 515 (holding that "eBay is

26  under no affirmative duty to ferret out potential infringement"); *Inwood* at 854 n.13 (no duty for

27  

---

28  [17]Very often, the accused websites Vuitton complained of were not even hosted on Defendants' servers.  *See id.* at 107:11-110:24 (discussing Exh. 1613) & 138:15-140:21 (discussing Exh. 1598).

1   defendant distributor to anticipate direct infringement by downstream retailers).

2       Although the jury was instructed to consider Defendants' actions or inaction after receiving

3   notice of infringement, as well as Defendants' technical ability and feasibility to terminate the use of

4   their services by a direct infringer, these instructions were again conflated with those on Defendants'

5   knowledge regarding infringement. *See* Doc. 227, 9:24-10:19.  However, as the above discussion on

6   *Inwood*, *Visa*, *Tiffany*, and *Amazon.com* shows, whether a defendant takes exculpatory action needs

7   to be considered *only after* it learns of the infringement.  Therefore, exculpatory action is a separate

8   element from knowledge, rather than a factor under knowledge.  Crucially, the jury was *not* told that

9   Defendants would *not* be liable for contributory infringement if they took reasonable steps to curb

10  access to the accused websites even if they has knowledge of specific infringement.[18]  This was clear

11  error.

12  **VI.  STATUTORY DAMAGES WERE IMPROPERLY AWARDED**

13      **A.  The Jury Awarded Statutory Damages Far Above the Statutory Maximums**

14      A runaway jury awarded excessive trademark and copyright statutory damages, damages that

15  are multiples of the maximum permitted by the statutes. This award was not based on the evidence

16  but must have been the result of passion and prejudice, aided by erroneous instructions and made

17  possible by unconstitutional statutory schemes as applied here that provided the jury no standards for

18  its damage awards. The damage awards must be set aside.

19      The jury awarded almost twice the maximum trademark statutory damages allowable.

20  The maximum statutory award for each trademark per class of goods willfully infringed is

21  $1,000,000.[19]  15 U.S.C. § 1117(c).  The verdict form identifies seventeen marks per class of goods

22  infringed.  [Doc. No. 235 at 3:1-5:28 (listing marks per class) and 6:1-24 (identifying infringed

23  marks)]  For seventeen marks per class infringed, the maximum statutory award in any case is

24  $17,000,000.  The jury here awarded $31,500,000.  *Id.* at 8:12-9:5.  Dividing the actual award by the

25

---

26  [18]Thus, even if the jury found that Defendants took such steps, it would not have known how to correctly apply this fact under the proper framework for contributory infringement.

27  [19]For the period relevant here, 15 U.S.C. § 1117(c)(2) provided for a maximum award of $1,000,000

28  per mark per class of goods willfully infringed.  The statute was later amended to provide a maximum of $2,000,000 per mark per class of goods willfully infringed.

1   maximum possible shows an actual-to-maximum ratio of 1.85-to-1, nearly double the maximum.

2       The jury also awarded three times the maximum copyright statutory damages allowable.

3   The maximum statutory award for each copyright willfully infringed is $150,000.  17 U.S.C. §

4   504(c)(2).  The verdict form identifies two works infringed.  [Doc. No. 235 at 10:10-16]  For two

5   works infringed, the maximum statutory award in any case is $300,000.  The jury here awarded

6   $900,000.  *Id.* at 12:20-13:8.  Dividing the actual award by the maximum possible shows an actual-

7   to-maximum ratio of 3-to-1, triple the maximum possible award.

8              **B.      The Confusing Trademark Damages Instructions Misstated the Law**

9       The trademark statutory damages award in an amount nearly double the statutory maximum

10  amount in this case is unsustainable because the jury instructions were confusing and misconstrued

11  the law.    The *jury* was instructed that "the Plaintiff is entitled to statutory damages [o]f: (1) not less

12  than $1,000 or more than $200,000 per counterfeit mark . . . as the *court* considers just."  [Doc. No.

13  227 at 15:9-12] (emphasis added).  This direct quote from 15 U.S.C. § 1117(c)(1) referring to the

14  Court could only serve to confuse a jury.  Whether it suggested the jury should disregard the

15  instruction on non-willful infringement or speculate as to what the "court considers just," none can

16  know.  That the jury may not have invoked this language does not negate the harm caused by it,

17  particularly in light of the improper instruction regarding the adjacent instruction on willful

18  infringement.

19      The instruction regarding willful infringement [Doc. No. 227 at 15:13-15] misconstrued the

20  law in at least two ways.  **First**, it omitted the only statutory constraint present in both Sections

21  1117(c)(1) *and* (c)(2): requiring an award within the statutory range "as the court considers just."

22  Where the restraining language was present in the instruction on "non-willful" infringement but

23  absent in as to "willful" infringement, it suggested the jury had free reign to arrive at any number for

24  willful infringement – "just" or not.  This would explain the shocking trademark award nearly

25  double the statutory maximum.

26      **Second**, the portion of the willful infringement instruction that tracks the language of Section

27  1117(c)(2) merely relies on a jury finding "that the use of the counterfeit mark was willful."  Merely

28  quoting the statute again misconstrues the law because Congress addressed *direct* infringement

1    there; *contributory* trademark infringement is a judge-created doctrine with added elements. *Tiffany*

2    *(NJ) Inc. v. eBay, Inc.,* 576 F.Supp.2d 463, 502 (S.D.N.Y. 2008).  It may be that third parties in

3    China intended to use Vuitton's marks on replica purses made in China. But such conduct in China

4    does not violate the Lanham Act, as discussed above.  Even if there had been actual infringement of

5    U.S. trademark rights in China (and there was not), that would not make *Defendants'* alleged

6    contributory infringement willful.  Compare for example Vuitton's representative's testimony that

7    there was no evidence that Defendants controlled, directed, participated in, profited from, or

8    encouraged third party counterfeiting (Exh. 1621, 155:9-161:15) with defendants' conduct in *MGM*

9    *Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 930 (2005) or *In Re Aimster Copyright Litig.*, 334 F.3d

10   643, 655 (7th Cir. 2003) ("Far from doing anything to discourage repeat infringers…   Aimster

11   invited them to do so, [and] showed them how . . . "); *Sega Enterprises Ltd. v. MAPHIA,* 948

12   F.Supp. 923, 936 (N.D.Cal. 1996); see also *United States Media Corp. v. Edde Entertainment Corp.*,

13   No. 94 CIV. 4849, 1998 WL 401532, at *9 (S.D.N.Y. July 17, 1998) (jointly liable infringer in the

14   same action is not liable for portion of award above maximum for *non-willful* infringement when

15   larger award is due to joint tortfeasor's *willful* infringement), citing *Fitzgerald Pub. Co. v. Baylor*

16   *Pub. Co., Inc*. 807 F.2d 1110, 1116 (2nd Cir. 1986) and 4 M. Nimmer on Copyright § 14.04[E][2][d]

17   at 14-78 n.168 (1993).[20]

18        Lastly, both the non-willful and willful trademark instructions were preceded by the

19   instruction: "the Plaintiff is entitled to statutory damages *if.*"[21]   [Doc. No. 277 at 15:9 (emphasis

20   added)]  The statute actually provides that "the plaintiff may elect . . . an award of statutory damages

21   . . . *in the amount of*."  Section 1117(c) (emphasis added).  Replacing "in the amount of" with the

22   _____

23   [20]Where the jury instruction refers to willful *use*, the subsequent instruction regarding willful
     *contributory infringement* [Doc. No. 227 at 15:16-24] does not cure the error even if it accurately
     reflects the higher standard.  If anything, it compounds the error because its separate definition using

24   disparate language contrasts with the instruction on copyright damages.  The copyright instruction
     introduces and defines "innocent infringement" in the same paragraph with the same verbiage [Doc.

25   No. 227 at 16:8-11] and does the same for "willful" contributory copyright infringement (though the
     enunciated test is incorrect).  [Doc. No. 227 at 16:16-24]  Nor does Question No. 6 of the verdict

26   form [Doc. No. 235 8:1-3] correct the error.  That question would have to be answered yes in many
     instances not constituting willful contributory infringement.  For example: if third party infringers

27   found utility in using Defendants' servers and Defendants intentionally provided ISP services.

28   [21]Given the statutory language of 15 U.S.C. 1117(c), that the jury was not aware of, "if" appears to
     have simply been a typographical error.

1   conditional "if" compounds the instructions' other errors.  Taken together, the word "if" suggests

2   Vuitton could only receive statutory damages *if* the Court determined damages were between $1,000

3   or $200,000 or *if* the jury found the direct infringers intentionally used Vuitton's marks, causing

4   damages of $1,000,000 or less.  This reading is reasonable under the instructions' flawed language

5   but does not come close to the actual statutory language.

6        The erroneous instruction severely prejudiced Defendants. Where, as here, confusing

7   instructions provide the wrong legal standard and result in awards beyond the possible maximum,

8   the awards demonstrate the jury is "less [like] a tipsy coachman [nonetheless] arriving at the right

9   destination," and more like a "blind one who ends up at the wrong place." *Rodriguez v. Farm Stores*

10  *Grocery, Inc.*, 518 F.3d 1259, 1268, 1270 (11th Cir. 2008).  This is underscored by the trademark

11  award not only above the statutory maximum, but more than 30 times the combined $1,000,000

12  award requested by Vuitton.  See Exh. 1623, 97:15-23; *see also Tillman v. Freightliner, LLC*, 247

13  Fed.Appx. 867, 869, 2007 WL 2298037, at *2 (9th Cir. 2007) (error not to reduce award merely

14  "four times the amount requested by plaintiff's counsel").[22]  The jury was blind; its "chariot wound

15  up at the wrong house.  We can neither chart its course nor let stand its destination." *Rodriguez* 518

16  F.3d at 1270.  The award cannot stand.

17        **C.        Copyright Damages Instructions Misstated the Law**

18        The copyright statutory damages award in this case is also unsustainable where the jury

19  instructions effectively required the jury to find *any* contributory infringement was willful and

20  therefore the Defendants should be punished. This might account for copyright damages a multiple

21  of the maximum allowed by the Copyright Act.

22        The jury was wrongly instructed that Defendants committed willful contributory

23  infringement if they "engaged in acts that contributed to infringement . . . and . . . knew that those

24  acts contributed to the infringement."   [Doc. No. 227 at 16:16-24]   This improperly equates

25  "knowing contributory infringement" with "willful contributory infringement."  But knowledge is an

---

[22]The award well beyond what Vuitton requested also infects the jury's findings on liability, already
tainted by erroneous instructions on willfulness, among others. *See Honda Motor Co., Ltd. v. Oberg*,
512 U.S. 415, 425 n.4 (1994) (that judges infer passion and prejudice from the amount of awards
"has been recognized in many opinions of this Court").

element of contributory infringement in the first instance. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001). Willful contributory infringement requires more culpable conduct. See *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005); *In Re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) ("Far from doing anything to discourage repeat infringers . . . Aimster invited them to do so, [and] showed them how . . . "); *Sega Enterprises Ltd. v. MAPHIA*, 948 F.Supp. 923, 936 (N.D.Cal. 1996). Vuitton's in-house counsel testified there was no evidence that Defendants controlled, directed, participated in, profited from, or encouraged third party counterfeiting. See, e.g., Exh. 1621, 155:9-161:15. Equating knowledge with willfulness erases the distinction between intentional wrongdoers and more innocent infringers by converting every contributory infringer – one with mere "knowledge" – into a willful infringer. The jury's verdict and award demonstrate this fate befell Defendants. Not even Vuitton argued to the jury that the evidence showed Defendants were intentional wrongdoers. They merely wished Defendants would do "more." [Exh. 1623, 81:14:16, 86:6-11] Vuitton's vitriolic rhetoric regarding Defendants' alleged conspiracy to harbor pirates has only made its debut recently.

The jury was also wrongly instructed that the "purpose [of statutory damages] is to penalize the infringer and deter future violations of the copyright laws." [Doc. No. 227 at 16:3-5] Copyright statutory damages are *also* intended to compensate, a purpose "at least equally important" as punishment. *See, e.g.*, *Bly v. Banbury Books, Inc.*, 638 F.Supp. 983, 987 (E.D.Pa. 1986); *Los Angeles News Service v. Reuters Television Intern., Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (Copyright "awards of statutory damages serve both compensatory and punitive purposes.") (quotations and citations omitted).

And "statutory damages should bear some relation to the actual damages suffered." *Bly*, 638 F. Supp. at 987; *see also New Line Cinema Corp. v. Russ Berrie & Co., Inc.* 161 F.Supp.2d 293, 303 (S.D.N.Y. 2001), citing *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 670 F.Supp. 1133, 1140 (E.D.N.Y. 1987). The jury was not informed regarding these or other important limitations on statutory damages. Nor was the jury instructed about limitation on punitive damages, though it was explicitly instructed to award them to "deter future violations of the copyright laws" regardless of where, when, how or by whom. [Doc. No. 227 at 16:3-5] Such instructions to penalize a defendant

are simply contrary to controlling law.

The Supreme Court has unequivocally required jury instructions that punitive damages cannot reach conduct by non-parties or causing harm to non-parties. *Philip Morris USA v. Williams*, 549 U.S. 346, 349-57 (2007) (exhaustively discussing proper scope of punitive damages and jury instructions on same); *see also BMW of North America, Inc. v. Gore*, 517 U.S. 559, 609 (1996) (defendant cannot be punished for *its own* conduct not at issue). A limiting instruction was required where Vuitton's in-house counsel testified extensively on global counterfeiting and related issues having nothing to do with Defendants (e.g., whole families locked in sweatshops with dizzying chemical fumes [Exh. 1620, 159:1-14]), or even Vuitton (e.g., counterfeit Nike and Microsoft products [*id.* at 136:19-137:4]). See also, e.g., *id.* at 134:10-135-18 & 165:25-169:11; Exh. 1621, 144:4-145:24. The improper mandate to punish Defendants was only magnified by the inescapable – but incorrect – finding that Defendants engaged in *willful* contributory infringement due to mere *knowledge* that unidentified "counterfeiters" were abusing Defendants' services. Willful infringers, after all, should be punished more harshly. *Gore*, 517 U.S. at 580; *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 (1986).

Defendants have unquestionably been prejudiced by the erroneous jury instructions on copyright damages. The instructions lowered the standard for a heightened damages award then gave the jury *carte blanche* to punish Defendants without any respect for limitations on statutory or punitive damages. This might explain why the jury awarded a total of more than 34 times the $1,000,000 requested by Vuitton. *See* Exh. 1624, 97:15-23. The unchecked award, well above both the statutory maximums and Vuitton's request, cannot stand. See *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268, 1270 (11th Cir. 2008) (misguided award beyond maximum); *Tillman*, 247 Fed.Appx. at 869 (district court erred in not reducing award just "four times the amount requested by plaintiff's counsel, which is evidence of passion and prejudice").

### D. Statutory Damages Provisions Were Unconstitutional as Applied Here

As applied in this case, the statutory damages awards under the Lanham Act and the Copyright Act violate the Due Process Clause of the Fifth Amendment of the Constitution. The unconstitutional statutory damage awards must be set aside here even if the underlying statutes are

1   generally valid.  *Little v. Streater*, 452 U.S. 1, 16-17 (1981).  The problem with the statutory damage

2   awards here is the complete lack of standards in the statutes for determining them, the consequent

3   impossibility of properly instructing a jury,[23] and the resulting excessive and unreasonable awards by

4   what amounted to a "runaway jury."  Due process requires that laws provide meaningful standards to

5   guide their application.  *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).  Otherwise, they are

6   unconstitutionally void.  *Id*.  The void-for-vagueness doctrine applies not only to laws prohibiting

7   conduct but also to laws vesting juries with discretion to fix an award.  See *Giaccio v. State of Pa*.,

8   382 U.S. 399 (1966); *see also Philip Morris USA v. Williams*, 549 U.S. 346, 349-57 (2007) (failure

9   to instruct jury it could not punish defendants for conduct outside scope of case violated due

10  process).  In *Giacco*, the Supreme Court addressed a state law that "simply sa[id] the jurors 'shall

11  determine, by their verdict, whether * * * the defendant shall pay the costs' " of proceedings.  *Id*. at

12  403.  The Court found that the law did "not even begin to meet" due process requirements because it

13  contained "no standards at all, nor does it place any conditions of any kind upon the jury's power to

14  impose costs."  *Id*.   Exactly the same is true here.  Congress has provided no standard to help a jury

15  arrive at a "just" award.  The awards here, well beyond the statutory maximums, demonstrate a jury

16  out of control due to the unconstitutional application of law.

17          One reason that the statutory damage statutes are unconstitutional as applied here is that the

18  statutes were never written by Congress with the intent that a *jury* would apply them; they were

19  intended originally to be applied by federal judges expected to use their training, experience, wisdom

20  and discretion to award reasonable damages.  This plan was disrupted.  In *Feltner v. Columbia*

21  *Pictures Television, Inc*., 523 U.S. 340, 355 (1998), the Supreme Court held that "the Seventh

22  Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages…

23  including the amount itself."  But Congress did not thereafter amend either the Lanham or Copyright

24  Acts to properly guide juries.

25          Vuitton compounded the problem when it failed to present any evidence upon which to base

26  rational statutory damage awards, objected to the introduction of evidence that would have militated

27

28  _____
    [23](Even absent the errors in the jury instructions here present.)

against a significant award, and vigorously opposed jury instructions that would have provided the jury with more detailed guidance on liability and damages. Contributing to a sort of "perfect storm" of standardless statutes, inadequate instructions, and no evidence whatsoever about damages, Vuitton ensured the statutes would be applied unconstitutionally. Vuitton's overreaching trial conduct caused the problem and it must bear the full consequences.

While statutory damages can appropriately be awarded to approximate real damages, they cannot be based on pure speculation by jury members. Vuitton asked for $1 million in damages but the jury awarded $34.2 million. *See* Exh. 1623, 97:15-23. This underscores the jury's improperly induced passion, speculation and lack of guidance. Statutory damages statutes were unconstitutionally applied in this case. The awards based thereon must be vacated.

### E.      The Statutory Damages Here Are Unconstitutional Punitive Damages

The statutory damages awards in this case are subject to constitutional limits on civil punishment. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Gore,* 517 U.S. at 574. "Due Process . . . prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003).

Vuitton presented no evidence of actual harm (other than psychic) from any infringement and certainly nothing caused by the Defendants' alleged contributory infringement. But "compensatory damages redress concrete loss caused by the defendant's wrongful conduct . . . [while] punitive damages . . . are aimed at deterrence and retribution." *Campbell,* 538 U.S. at 416; *see also Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432 (2001). So the jury's awards – beyond both the copyright and trademark statutory maximums – are purely punitive. The instructions regarding copyright damages made this explicit. [Doc. No. 227 at 16:3-5] The awards are thus subject to due process limits on punitive damages.

The Supreme Court has identified three guideposts to use in evaluating whether a damage award comports with due process: (1) the reprehensibility of defendant's conduct; (2) the ratio between harm suffered and the award; and (3) the difference between the award and civil penalties

1   authorized or imposed in comparable cases.  *Campbell* at 418, citing *Gore* at 575.  The awards here

2   cannot be justified under the three guideposts. So the awards violate the U.S. Constitution.

### 1.   Defendants' Conduct Was Not Reprehensible

4       The Defendants' alleged conduct was not shown to be knowing and certainly not shown to be

5   intentional.  If liability was established, it must be improperly based on a strict liability or negligence

6   view.  There is no evidence whatsoever of aggravating or "reprehensible conduct."    But

7   reprehensibility is "[t]he most important indicium" of whether an award is unconstitutionally

8   excessive.  *Campbell*, 538 U.S. at 419.  Courts look to the following aggravating factors to

9   determine whether conduct is particularly reprehensible: (1) whether the harm suffered was purely

10  economic, rather than physical; (2) whether a defendant evinced indifference or reckless disregard

11  for the health and safety of others; (3) whether harm was intentionally inflicted; and (4) whether the

12  target was financially vulnerable.  *See, e.g.*, *United States E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614

13  (11th Cir. 2000), citing *Gore*, 517 U.S. at 576.

### a.   No Physical Harm and No Threat to Health or Safety

15      Any alleged harm suffered by Vuitton was purely economic.  It neither caused nor threatened

16  to cause any physical harm.  And Defendants' alleged conduct did not evince disregard for the health

17  and safety of others.  This is not true in all infringement cases, as evidenced by the legislative history

18  of 15 U.S.C. § 1117(c), demonstrating Congress' concern for "serious health and safety hazards

19  caused by []counterfeiting" such as "bogus birth controls pills" that caused pain and unusual

20  bleeding, "substandard counterfeited infant formula," "[c]ounterfeit machine parts and brake pads

21  [that] have been linked to fatal automobile, aviation and helicopter crashes . . . [or] counterfeit parts

22  [] discovered in jet engines, bridge joints and fasteners in areas of nuclear facilities responsible for

23  preventing meltdowns."    HOUSE REPORT NO. 104-556 H.R. REP. 104-556, *3, 1996

24  U.S.C.C.A.N. 1074, 1076 (1996).  Producing counterfeit baby formula and parts needed to prevent

25  nuclear meltdown is reprehensible.  Defendants' alleged contribution to the sale of knockoff purses

26  is not.

27      Distinguishing between merely economic and other harms "reflects the accepted view that

28  some wrongs are more blameworthy than others." *Gore,* 517 U.S. at 575-76.  The 11th Circuit made

**MOTION TO DISMISS
– C 07-3952 JW**

1   this point when it applied *Gore* in considering the constitutionality of statutory damages in an

2   environmental contamination case. *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320,

3   1337 (11th Cir. 1999). The court noted the reprehensibility of a defendants' conduct indicates the

4   propriety of an award within a range limited by statute. "For example," a fine of $100,000 would

5   not be reasonable "if the defendant had emptied a bottle of soda pop into a Georgia stream." *Id*.

6   There is no evidence of reprehensibility in the Defendants' alleged conduct.

### b.   No Intentional Harm

8   There is no evidence that Defendants *did* anything intending to contribute to infringement, let

9   alone intentionally cause Vuitton economic harm. Instead, taking the hypothetical in *Johansen*,

10  Defendants' conduct amounts only to trying but failing to retrieve a soda pop bottle Defendants'

11  customer's customer threw into a stream. The undisputed evidence showed that the Defendants spent

12  considerable effort to stop the customers of customers from abusing the ISP services it provided.

13  And it was effective in all cases. Vuitton could only argue that Defendants should have tried harder

14  or worked faster to disable IP addresses or unplug servers. Defendants' passive "contribution" to

15  another's contributory infringement was simply not reprehensible.

### c.   No Financial Vulnerability of Plaintiff

17  Vuitton is anything but financially vulnerable. To the contrary; it claims to sell some of the

18  most expensive luxury goods in the world and has enjoyed consistent double-digit growth in its sales

19  of luxury goods – even in China – during the worst global recession in memory. Vuitton has opulent

20  stores and an army of lawyers to protect it. Vuitton successfully kept away from the jury evidence of

21  its continuing strong financial success. It cannot pretend to be financially vulnerable. This factor

22  does not support a finding of reprehensible conduct.

### d.   No Evidence of Reprehensible Conduct

24  The Defendants did nothing except provide content-neutral Internet communications services

25  that happened to be abused by unknown parties who are not even their customers. The Defendants

26  had no role in or advance knowledge of any infringing activities and did everything reasonably

27  possible to stop infringing activities after receiving notices from Vuitton. They did not promote,

28  induce, advise, or profit from any infringement by customers of customers. Vuitton only complains

1   that they should stop doing any business with any Chinese ISP reseller about whose customers

2   Vuitton complained.

3        Even "conduct [] sufficiently reprehensible to give rise to tort liability, and even a modest

4   award of exemplary damages does not establish the high degree of culpability that warrants a

5   substantial" award of a punitive nature.  *Gore*, 517 U.S. at 580.  As in *Gore* at 576, "none of the

6   aggravating factors associated with particularly reprehensible conduct is present."  Where "the

7   absence of all of them renders any award suspect," the $32,400,000.00 awards here are wholly

8   unreasonable and must be vacated.  *Campbell*, 538 U.S. at 419.

9           **2.**     **The Jury's Award Bears No Relation to Actual Harm**

10       The statutory damages awards in this case are punitive in nature and have no relation to any

11   actual harm.  The second guidepost, *Gore* at 575, requires evaluation of the ratio between the actual

12   or potential harm and the punitive award.  Where copyright and trademark statutory damages contain

13   both a compensatory and punitive component,[24] this guidepost is followed by comparing the punitive

14   component to its compensatory component.

15       Vuitton presented no evidence of *any* harm justifying the award here. This is not a case

16   "where a particularly egregious act has resulted in only a small amount of economic damages"

17   justifying an award substantially greater than the actual harm.  *Gore*, 517 U.S. at 582.  Nor does

18   Vuitton deserve a substantial award because "the injury is hard to detect," *id.*, or because it lacks

---

19

20  [24]Copyright "awards of statutory damages serve both compensatory and punitive purposes."  *Los Angeles News Service v. Reuters Television Intern., Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (quotations and citations omitted); see also *Nintendo of America, Inc. v. Dragon Pacific Intern.*, 40

21  F.3d 1007, 1011 (9th Cir. 1994) ("The punitive and deterrent purposes [of statutory damages] explain the heightened maximum award . . . per infringement. . . . Thus, statutory damages may

22  serve completely different purposes than actual damages."); *Motorola, Inc. v. Abeckaser*, No. 07-cv-3963 (CPS), 2009 WL 2568529, at *2 (E.D.N.Y. Aug. 5, 2009) ("Under the Copyright Act, a

23  statutory damages award serves both compensatory and punitive purposes.  [Citation.]  Factors considered by courts in determining a just award include the revenues lost by the plaintiff; the profits

24  reaped and expenses avoided by the infringer . . . ").

25  Congress' explicit purpose behind the trademark statutory damages provision at issue, 15 U.S.C. § 1117(c), was to "strengthen[] the hand of businesses **harmed** by counterfeiters by . . . providing

26  stronger civil **penalties** against counterfeiters, including . . . statutory damage awards . . ."  SENATE REPORT NO. 104-177   S. REP. 104-177, *2 (1995) (bold emphasis added); see also

27  STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS 141 Cong. Rec. S12079-03, S12085 ("The option to elect statutory damages in counterfeit cases ensures that

28  trademark owners and adequately **compensated** and that counterfeiters are justly **punished**. . .") (bold emphasis added).

1   "adequate evidence" due to "deception routinely practiced by counterfeiters" that "willfully

2   deflate[d] the level of counterfeiting actually engaged in."  S. REP. 104-177, *10.  Nor did Vuitton

3   even request the jury to determine the actual harm to which the statutory award was tethered, or that

4   any actual harm occurred. This is doubtless because Vuitton could not show any financial harm, lost

5   sales, actual confusion, or any objective evidence of actual damages. So there is no compensatory

6   component to the statutory damage awards in this case and the punitive component – i.e., the whole

7   award[25] – bears absolutely no relation to any actual harm.

8          Where there are no actual damages, no compensatory damages and no actual harm that can

9   be compared to the punitive damages in order to determine their reasonableness, the punitive

10  damage award is unsupported under this *Gore* guidepost. The appropriate remedy for a technical

11  violation that does not cause harm is not punitive damages, but nominal damages.  *Cummings v.*

12  *Connell*, 402 F.3d 936, 942-43 (9th Cir. 2005).

13                 **3.      Defendants Had No Fair Notice of Such Severe Penalties**

14         The Defendants had no fair notice that by conducting a legitimate ISP business they faced the

15  incomprehensible statutory awards in this case.   The third guidepost, *Gore*, 517 U.S. at 574,

16  compares the challenged award to penalties authorized or imposed in similar cases to determine

17  whether "a person receive[d] fair notice not only of the conduct that will subject him to punishment,

18  but also of the severity of the [potential] penalty."  *See Campbell*, 538 U.S. at 428. There is no

19  similar case in American jurisprudence; the liability verdict and damages awards are unprecedented.

20  This underscores Defendants' lack of notice and undercuts the punitive damage award.

21                   **a.      The Damages Statutes Did Not Provide Fair Notice**

22         The mere fact that a statute sets forth minimum and maximum awards for a given offense

23  does not give fair notice as to the potential penalty for particular conduct. *Johansen v. Combustion*

24  *Engineering, Inc.*, 170 F.3d 1320, 1337 (11th Cir. 1999).  This is especially true when, as under the

25  Lanham Act, the statutory maximum award is one thousand times the minimum. *Cf. Harris v.*

26  *Mexican Specialty Foods, Inc.*  564 F.3d 1301, 1312 (11th Cir. 2009) (notice as to magnitude of

27

28  [25]*See, e.g., Childress v. Taylor,* 798 F.Supp. 981, 997 (S.D.N.Y. 1992) (statutory award was
    primarily punitive).

1   potential penalty not inherently lacking where potential penalty "is limited to a *narrow*, statutorily-

2   established range" of $100 to $1,000) (emphasis added).  A defendant who has committed harmless

3   (even if technically "willful") infringement is not on notice of a legitimate statutory damages award

4   at – or here, *over* – $1M per infringed mark, rather than $1,000.  Defendants had no notice of

5   potential awards over one thousand times the minimum.

### b.        There is No Civil Liability for Defendants' Conduct

7        More significantly, in similar civil cases, *no award was warranted* because conduct similar

8   to Defendants' *could not even support liability* for contributory infringement, let alone ruinous

9   damages.  *See Louis Vuitton Malletier v. Flea Market, Inc.*, No. C 09-01062, 2009 WL 1625946

10  (N.D. Cal. June 10, 2009).

11       In *Flea Market*, defendants leased their property to a flea market operator, who in turn leased

12  spaces to vendors who engaged in infringement.  This sharply contrasted with the "willfully blind"

13  contributory infringer in *Fonovisa*[26] because "the defendant [in *Fonovisa*] both owned and operated

14  the market."  *Flea Market*, 2009 WL 1625946, at *2.  On those facts, the *Flea Market* court

15  dismissed the complaint because "[n]o case supports the proposition that a property owner may be

16  liable for contributory trademark infringement if it only leases property to a separate and distinct

17  entity, which in turn operates a flea market and rents space to a vendor, which in turn infringes

18  trademarks."  *Id.* at *3.  The facts in *Flea Market* are closely analogous because the Defendants here

19  merely rent servers to their customers, who in turn rent them to third parties, who in turn allegedly

20  infringed Vuitton's intellectual properties.  The case also exemplifies Vuitton's overreaching.

21       Similarly in *Symantec Corp. v. Logical Plus, Inc.*, No. C 06-7963, 2009 WL 3416178 (N.D.

22  Cal. October 20, 2009), defendants were alleged to have "hosted the website that [the direct

23  infringer] sold its merchandise through, []supplied to [the infringer] products that [they] then sold,"

24  and the infringer "used an email address hosted by" defendants.  *Id.* at *7.  Because defendants were

25  accused of providing *services* to the direct infringers, the court properly applied the "direct control

26  and monitoring" test but still held it was not satisfied.  *Id.* at *8.  Just as plaintiff in *Symantec* failed

28  [26]*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996).

1    to demonstrate "direct control and monitoring of the instrumentality used by a third party to

2    infringe," Vuitton has here failed to prove any direct control and monitoring.

3          Where conduct closely analogous to Defendants' cannot even support liability, Defendants

4    could not be on notice of the $32,400,000.00 award.

5                        **c.        Awards in Other Infringement Cases Provided No Notice**

6          Even damage awards in infringement cases with more egregious facts (that actually support

7    liability) did not provide Defendants with fair notice of the awards in this case.

8    For example, in *Microsoft Corp. v. Rechanik*, a defendant had previously been found liable to the

9    tune of $1M for selling purported Microsoft software he purchased at suspiciously low prices, but

10   refusing to stop when he learned the products were counterfeit.  249 Fed.Appx. 476, 477, 2007 WL

11   2859800, at *1 (7th Cir. 2007).  He closed up shop only to start a new company doing exactly the

12   same thing.  *Id*.  Microsoft sued again and the defendant was found liable on summary judgment for

13   contributing to his new company's direct copyright and trademark infringement.  *Id*. at *1-2.  This

14   repetitious conduct led to a combined damages award of just $880,000 (just 2.5% of the jury award

15   here).  *Id*. at *1.  In a very similar case, defendants sold at least 8,922 units of software they knew to

16   be counterfeit, consisting of at least sixteen Microsoft product suites.  *Microsoft Corp. v. Black Cat*

17   *Computer Wholesale, Inc*., 269 F.Supp.2d 118, 120-22 (W.D.N.Y. 2002).  Even the more substantial

18   statutory damages awards there, $510,000 for copyright and $900,000 for trademark, are dwarfed by

19   the awards here (over 24 times higher).  *Id*.

20         Nor do cases awarding per mark or per copyright damages come close to the awards here.  In

21   yet another Microsoft case, defendants faced heightened statutory damages for their willful

22   copyright and trademark infringement.  *Microsoft Corp. v. V3 Solutions, Inc*., No. 01 C 4693, 2003

23   WL 22038593, at *14-16 (N.D. Ill. August 28, 2003).  The court recognized that "statutory damages

24   . . . should be sufficient to deter future violations by defendants, *but not unduly large considering*

25   *that Microsoft suffered little, if any, actual injury*.  Accordingly, we will award Microsoft statutory

26   damages of $5,000 per copyright (for seven copyrights) and $5,000 per trademark (for seven

27   trademarks), for a total statutory damages[ ]award of $70,000."  *Id*. at *16 (emphasis added).  An

28   identical $5,000 per copyright and trademark was also awarded for the infringing sale of 3,100

1    counterfeit Nintendo cartridges.  *Nintendo of America, Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007,

2    1009-11 (9th Cir. 1994).  Even after trebling the copyright damages for willful infringement, both

3    awards totaled just $248,000.  *Id*. at 1109-10.

4            Awards of $880,000, $1,410,000, $70,000 and $248,000 against direct sellers of counterfeit

5    merchandise in no way notified Defendants that their passive conduct related to third parties'

6    asserted "counterfeiting" in another country could lead to awards totaling $32,400,000.00 where

7    there was no evidence that anyone sold anything within the U.S., except to Vuitton's own agent for

8    litigation purposes.

9                       **d.       There Is No Criminal Liability for Defendants' Conduct**

10           Criminal laws provided no notice of the awards here because there is no criminal liability for

11   conduct similar to Defendants.'  The standard for criminal aiding and abetting of trademark

12   counterfeiting or copyright infringement is even higher than the standard for civil contributory

13   infringement.  "**To convict a defendant as an aider and abetter,** the government must show that

14   the defendant's act contributed to the execution of the criminal activity **and that he intended to aid**

15   **in its commission.** [Citation.]"  *United States v. Sultan*, 115 F.3d 321, 325 n.4 (5th Cir. 1997) (guilt

16   for aiding and abetting counterfeiting require proof beyond reasonable doubt that defendant knew

17   parts were counterfeit) (bold emphasis added).  This principal applies generally to aiding and

18   abetting cases under 18 U.S.C. § 2, whether trademark, copyright or other.  See, *e.g., United States v.*

19   *Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980) ("Conviction as an aider and abettor requires proof the

20   defendant willingly associated himself with the venture and participated therein as something he

21   wished to bring about."), *cert. denied*, 450 U.S. 916, *cert. denied*, 450 U.S. 985, *cert. denied*, 452

22   U.S. 905; *United States v. Smith*, 832 F.2d 1167, 1170 (9th Cir. 1987) (intent to aid and abet

23   "requires proof that [a defendant] '**shared in the criminal intent** of the principal' ") (emphasis

24   added), citing *Hernandez v. United States*, 300 F.2d 114, 123 (9th Cir. 1962).  If this were a criminal

25   case, the government would have to prove beyond a reasonable doubt at least (1) that the alleged

26   primary infringers' conduct constituted a crime, (2) that Defendants shared the primary infringers'

27   intent and (3) that Defendants actively and intentionally participated in the venture wishing to make

28   it succeed.

1      But the alleged primary infringers' extraterritorial conduct was not a violation of U.S. civil

2  law, let alone criminal law. Nor did Vuitton provide *any* evidence of these third parties' intent.  Even

3  assuming Defendants' customers' customers had the requisite criminal intent, Defendants did not

4  come close to "sharing in [that] intent" or "participating" in their conduct.  So the potential criminal

5  penalty for Defendants' conduct is *no penalty at all*.  Criminal penalties gave no notice that

6  Defendants could face a $32,400,000.00 penalty. So this guidepost does not support the award of

7  any punitive damages.

8      **F.      All of the *Gore* Guideposts Require the Damages in this Case be Vacated**

9      Because all of the *Gore* guideposts strongly demonstrate that the statutory damages awards in

10  this case are grossly excessive and unconstitutional, the awards must be thrown out.  Defendants'

11  conduct was not reprehensible, especially in light of specific counterfeiting examples cited by

12  Congress in providing statutory damages to both compensate an punish.  See, e.g., HOUSE

13  REPORT NO. 104-556 H.R. REP. 104-556, *3, 1996 U.S.C.C.A.N. 1074, 1076 (1996) (counterfeit

14  baby formula and nuclear reactor parts; *Los Angeles News Service v. Reuters Television Intern., Ltd*.,

15  149 F.3d 987, 996 (9th Cir. 1998) (copyright statutory damages both compensate and punish);

16  STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS 141 Cong. Rec.

17  S12079-03, S12085) (trademark statutory damages both compensate and punish).  The award bears

18  absolutely no relation to actual harm, especially where Vuitton provided no evidence it *actually*

19  *suffered harm*.  Finally, conduct similar to Defendants' has never supported liability in similar civil

20  cases, let alone criminal liability.

21      Defendants' conduct simply is not punishable. The statutory awards doing nothing but

22  punishing the defendants must be vacated.

23      **G.      Vacation of the Statutory Damages Awards Does Not Mandate a New Trial**

24      Vuitton has no right to a new trial even though the unconstitutional damages awards must be

25  vacated.  *Leatherman Tool Group, Inc. v. Cooper Industries, Inc*., 285 F.3d 1146, 1151-52 (9th Cir.

26  2002) (reducing constitutionally excessive award without new trial), citing *Johansen v. Combustion*

27  *Engineering, Inc*., 170 F.3d 1320, 1331-32 (11th Cir. 1999).  This is because "a constitutionally

28  reduced award is not a traditional remittitur at all. It is not discretionary, and the court's authority to

1  do so does not lie in Rule 59." *Johansen*, 170 F.3d at 1331-32.[27]

2      *Johansen* at 1332 explained that "no new trial need be offered as the Supreme Court itself

3  recognized in *BMW* [*of North America, Inc. v. Gore*, 517 U.S. 559, 586.]"  The Supreme Court later

4  agreed that no new trial is required in the case of excessive damages. *Cooper Industries, Inc. v.*

5  *Leatherman Tool Group, Inc*., 532 U.S. 424, 437 (2001) ("Because the jury's award of punitive

6  damages does not constitute a finding of 'fact,' appellate review of the district court's determination

7  that an award is consistent with due process does not implicate the Seventh Amendment . . . .").

8          **H.      Granting a New Trial Will Not Provide Due Process**

9      There is no basis upon which Vuitton can have a new trial on damages that would not present

10  the same problem of a random speculative damage award.  Without any guidance, the jury's decision

11  is simply a roll of the dice (or however jury members come up with a random number, perhaps based

12  on how some jury members feel that day).   This impermissibly leaves Defendants "at large,

13  wandering in deserts of uncharted discretion . . . [where a jury's] only restraint beyond a core sense

14  of fairness is the due process limit" due to a lack of guidelines.  *Exxon Shipping Co. v. Baker*, 128

15  S.Ct. 2605, 2628 (2008).

16      Vuitton presented no evidence of any "actual damages," or any way to even estimate

17  damages; Vuitton presented no evidence of harm whatsoever, not a single sale of a product in the

18  United States, not a single lost sale anywhere in the world, not a single dollar of lost revenue, no

19  decline in product sales, no advertising expenses, nothing. Vuitton merely sought to punish

20  defendants it regarded as existentially offensive. Not a scintilla of real damage evidence was

21  presented.  The jury had nothing on which to base a statutory damage award.  Even if it had, no

22  standard exists to guide the jury to an award that would not be arbitrary.  See *Exxon*, 128 S. Ct. at

23  2629.

24

25

26  [27]*See also Club 93, Inc. v. First Sec. Bank of Idaho, N.A*., o. CV-95-00417, 1999 WL 310640, at *8
   (9th Cir. May 7, 1999), citing *Central Office Telephone, Inc. v. American Telephone & Telegraph*
27  *Co*., 108 F.3d 981 (9th Cir. 1997), *rev'd on other grounds*, 524 U.S. 214 (1998); *Sherman v.*
   *Kasotakis*, 314 F. Supp. 2d 843, 867-68 (N.D. Iowa 2004) (futher discussing the distinction between
28  reductions of constitutionally excessive awards and remittitur).

## I.   Vuitton Is Entitled to No More Than Nominal Damages

Vuitton is entitled to no more than nominal damages because it did not prove any actual harm.  Statutory damages, which serve to compensate and punish, are not merely statutorily enhanced nominal damages.  Instead, the laws permitting statutory damages are intended to compensate *actual damages* that cannot be quantified.  *Sparaco v. Lawler, Matusky, Skelly Engineers LLP,* 313 F.Supp.2d 247, 253 (S.D.N.Y. 2004) (copyright).[28]  A lack of actual harm is not the same as harm that is difficult to quantify.[29]

Where there is no evidence of actual harm, only nominal – not compensatory or punitive damages – are appropriate. *Cummings v. Connell*, 402 F.3d 936, 942-43 (9th Cir. 2005), citing *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 308 (1986).  This makes copyright and trademark statutory damages, meant to compensate and punish,[30] inappropriate as well.  Awarding only nominal damages in this case "remains true to the principle that **substantial damages should be awarded only to compensate actual injury or, in the case of exemplary or punitive damages, to deter or punish malicious deprivations of rights**." *Memphis Community*, 477 U.S. at 308 n.11 (emphasis added) (quotations and citations omitted).  Vuitton presented no evidence of actual harm or damage.  Certainly no evidence of "malicious deprivations of rights."  Vuitton is entitled to nominal damages of $1.00 at the most.

---

[28]S. REP. 104-177, *10 (trademark statutory damages appropriate where there is a dearth of "adequate evidence" due to "deception routinely practiced by counterfeiters" which obscure the extent of actual damages); SENATE REPORT NO. 104-177  S. REP. 104-177, *2 (1995) (§ 1117(c) "strengthens the hand of businesses **harmed** by counterfeiters. . .") (bold emphasis added).

[29]*Cf. Doe v. Chao*, 306 F.3d 170, 176-79, 181 (4th Cir. 2002) (plaintiff must prove some actual damage to receive statutory minimum award under for willful violation where 5 U.S.C. § 552a(g)(4) provides "actual damages sustained . . . but in no case . . . less than the sum of $1,000"; "An award of merely nominal damages means that a plaintiff has not shown 'actual injury.' "); with *Harris v. Circuit City Stores, Inc*., No. 07 C 2512, 2008 WL 400862, at *2 (N.D. Ill. Feb. 7, 2008) (no actual damages need be proven for willful violation where 15 U.S.C. § 1681n(a)(B) provides "actual damages sustained by the consumer . . . **or** $1,000, whichever is greater).

[30]*See, e.g., Los Angeles News Service v. Reuters Television Intern., Ltd*., 149 F.3d 987, 996 (9th Cir. 1998) (Copyright "awards of statutory damages serve both compensatory and punitive purposes.") (quotations and citations omitted); STATEMENTS ON INTRODUCED BILLS AND JOINT RESOLUTIONS 141 Cong. Rec. S12079-03, S12085) ("The option to elect statutory damages in counterfeit cases ensures that trademark owners and adequately **compensated** and that counterfeiters are justly **punished .** . . ." (bold emphasis added)).

1   **VII.   DEFENDANT CHEN CANNOT BE PERSONALLY LIABLE**

2          There is no evidence Defendant Steve Chen engaged in acts giving rise to personal liability

3   for the corporate Defendants' alleged contributory infringement.  "It is an established principle of

4   corporations law that corporate directors are not liable merely by virtue of their office for fraud or

5   other tortious wrongdoing committed by the corporation. . . .  Instead, to be held liable a corporate

6   director must *specifically direct, actively participate in, or knowingly acquiesce* in the fraud or other

7   wrongdoing of the corporation. . . .  *See . . . Transgo, Inc. v. Ajac Transmission Parts Corp*., 768

8   F.2d 1001, 1021 (9th Cir. 1985)."  *L.B. Industries, Inc. v. Smith*, 817 F.2d 69, 71 (9th Cir. 1987)

9   (emphasis added) (citations omitted).

10         But Steve Chen did not himself engage in any unlawful conduct.  He did not personally assist

11  "counterfeiters" in copying Vuitton's products. He supplied no merchandise. He did nothing to

12  promote the sale of those products.  He did not instruct anybody – employee, third party, or

13  otherwise – to disguise the nature of the alleged infringement.  He did not, by any act, attempt to

14  bestow a benefit upon the corporate Defendants by contributing to any infringement.  Nor did he

15  even know whether particular websites, though offering Vuitton "replica" handbags, were breaking

16  any U.S. law.  Even if it were fact that the corporate Defendants were engaging in contributory

17  infringement by hosting third parties' websites on their servers, and Steve Chen knew of that fact,

18  "mere knowledge of tortious conduct by the corporation is not enough to hold a director or officer

19  liable for the torts of the corporation absent other 'unreasonable participation' in the unlawful

20  conduct by the individual."  *Wolf Designs, Inc. v. DHR Co*., 322 F.Supp.2d 1065, 1072 (C.D.Cal.

21  2004).

22         Instead Steve Chen worked hard to stop all instances of allegedly infringing websites from

23  using the corporations' services or servers. The evidence is undisputed that he was successful in

24  doing so. See Exh. "1598" detailing his successful efforts directing the corporations in terminating

25  services to alleged infringers after Vuitton gave them notice. This exhibit demonstrates that under

26  Steve Chen's direction the corporate defendants responded repeatedly and promptly to Vuitton

27  complaints over a sixteen month period to complaints about one hundred ninety-three allegedly

28  infringing websites using Defendants' servers, although many of the Vuitton notices were about

1   websites not using Defendants' servers. This substantial effort was in addition to his regular work for

2   the corporations.  Vuitton presented no evidence of any culpable conduct by Steve Chen.

3          "Personal liability must be founded upon *specific acts* by the individual."  *Murphy Tugboat*

4   *Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F.Supp. 841, 852 (N.D.Cal. 1979)

5   (emphasis added) (adopted and quoted by the Ninth Circuit in *Transgo*, 768 F.2d at 1021).  Vuitton

6   has not shown Defendant Chen personally engaged in any specific act of infringement.  *Cf.*

7   *Microsoft Corp. v. Rechanik*, 2007 WL 2859800, at *1-2 (owner found liable for selling counterfeit

8   software through one company started a second company and encouraged it to do the exact same

9   thing); *Transgo*, 768 F.2d at 1020-21 (individual defendant was personally "instrumental" in

10  assisting third party to copy original parts, marketing copies as originals, and personally instructed

11  an employee to omit copier's name from packaging and instructions); *Coastal Abstract Service, Inc.*

12  *v. First American Title Ins. Co*., 173 F.3d 725, 734 (9th Cir. 1999) (individual defendant personally

13  liable where he personally made the statement constituting false advertising and "sought by his

14  statements to divert business from [plaintiff] to [his own company]"); *Symantec Corp.*, 2009 WL

15  3416178, at *3-4 (individual defendant sold goods he knew to be counterfeit).  Instead, Defendant

16  Chen responded to a constant flow of infringement notices, including Vuitton's, forwarding them to

17  resellers, disabling IP addresses and unplugging their servers if they responded inadequately.

18  Holding him personally liable is contrary to the "consistently stated [rule] that a corporate executive

19  will not be held vicariously liable, merely by virtue of his office, for the torts of his corporation."

20  *Murphy Tugboat* at 852; see also *L.B. Industries* at 71.  And it undermines a central purpose of the

21  corporate form: limiting liability.  Defendant Chen cannot be personally liable where he did nothing

22  to participate in, encourage, induce or contribute to any infringement.

23          There is no evidence that Steve Chen did anything to induce infringement or that he

24  materially contributed to any direct infringement.  He received no money from any infringer (nor did

25  the corporate Defendants).  Instead Chen made every reasonable effort to stop all infringing activity.

26  Even if Vuitton could honestly claim that Chen's personal efforts were inadequate to stop all

27  infringing activity as quickly as Vuitton might have preferred (there was no such evidence), this does

28  not establish any basis for personal liability for contributory infringement.

1    The jury verdict against Defendant Chen cannot stand because it has no evidentiary basis.

2  **VIII.   CONCLUSION**

3    The Court should grant a judgment as a matter of law to Defendants dismissing the Vuitton

4  complaint because the jury could not reasonably have found liability or damages based on the law

5  and the lack of evidence to support liability or damages. Alternatively the Court should at least set

6  aside the jury verdict that is against the weight of the evidence and where the damages are excessive

7  and to prevent a miscarriage of justice.  Alternatively the Court can grant a new trial.

9  Dated:  _January 19, 2010                        **GAUNTLETT & ASSOCIATES**

11                                               By:      s/James A. Lowe_____
                                                          David A. Gauntlett
12                                                         James A. Lowe

13                                               Attorneys for Defendants
                                                 Akanoc Solutions, Inc.,
14                                               Managed Solutions Group, Inc.,
                                                 and Steven Chen