**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
James A. Lowe (SBN 214383)
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone:     (949) 553-1010
Facsimile:      (949) 553-2050
info@gauntlettlaw.com
jal@gauntlettlaw.com

Attorneys for Defendants
Akanoc Solutions, Inc.,
Managed Solutions Group, Inc.
and Steve Chen

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| LOUIS VUITTON MALLETIER, S.A., | ) Case No.: C 07-3952 JW |
| | ) |
| Plaintiff, | ) Hon. James Ware |
| | ) |
| vs. | ) **DEFENDANTS' RE-STATED MOTION** |
| | ) **FOR NEW TRIAL OR OTHER RELIEF** |
| | ) **PURSUANT TO RULE 59** |
| | ) |
| AKANOC SOLUTIONS, INC., et al., | ) Date:        February 22, 2010 |
| | ) Time:        9:00 a.m. |
| Defendants. | ) Ctrm:        8, 4th Floor |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

Page

I.   THE VERDICT MUST BE SET ASIDE ...................................................................... 1

II.  RULE 59 LEGAL STANDARDS ............................................................................... 1

III. VUITTON DID NOT PROVE DIRECT INFRINGEMENT ...................................... 2

    A.   Vuitton Did Not Prove Direct Trademark Infringement ............................... 2

        1.   Vuitton Did Not Prove that Its Trademarks were Used in Commerce ............................................................................................. 2

            a.   The "Use" Alleged by Vuitton was Authorized by Vuitton, and Occurred Without Defendants' Servers or Network ................ 3

            b.   The "Use" Alleged Was Not Governed by the Lanham Act ........... 4

        2.   Vuitton Did Not Prove Likelihood of Confusion ............................................. 5

    B.   Vuitton Did Not Show Direct Copyright Infringement ................................. 6

        1.   Vuitton's Copyrights Do Not Cover the Accused Images ......................... 6

            a.   The Copyrights Do Not Directly Cover the Accused Images .......... 7

            b.   The Images are Not Derivative Works Covered by the Copyrights ............................................................................................ 7

            c.   The Instructions Provided No Guidance on What is Covered .......................................................................................... 8

        2.   There Was No Infringement Within the U.S. ............................................. 8

IV.  VUITTON DID NOT PROVE CONTRIBUTORY INFRINGEMENT ......................... 9

    A.   Vuitton Did Not Show Specific Knowledge of Infringement ........................ 9

    B.   Vuitton Admitted that Defendants Did Not Induce Infringement ...................... 11

    C.   Vuitton Did Not Show Direct Control and Monitoring by Defendants ............... 11

        1.   No Evidence of Direct Control or Monitoring the Means of Infringement .......................................................................................... 11

        2.   No Instructions On Required Element of Direct Control and Monitoring ............................................................................................ 13

        3.   Defendants Cannot Be Liable for Contributory Infringement If Their Customers Use Their Services to "Facilitate" Infringement ......... 14

    D.   No Proof of Material Contribution For Contributory Copyright Infringement ................................................................................................... 15

E. Instructions Did Not Allow Jury to Consider Defendants' Exculpatory Evidence ........................................................................................................ 17

V. STATUTORY DAMAGES WERE IMPROPERLY AWARDED ................................. 18

 A. The Jury Awarded Statutory Damages Far Above the Statutory Maximums ........................................................................................................ 18

 B. The Confusing Trademark Damages Instructions Misstated the Law ............... 19

 C. Copyright Damages Instructions Misstated the Law ......................................... 21

 D. Statutory Damages Provisions Were Unconstitutional as Applied Here ............ 23

 E. The Statutory Damages Here Are Unconstitutional Punitive Damages ............. 24

  1. Defendants' Conduct Was Not Reprehensible ...................................... 25

   a. No Physical Harm and No Threat to Health or Safety ................ 25

   b. No Intentional Harm ................................................................... 26

   c. No Financial Vulnerability of Plaintiff ....................................... 26

   d. No Evidence of Reprehensible Conduct ...................................... 26

  2. The Jury's Award Bears No Relation to Actual Harm ............................. 27

  3. Defendants Had No Fair Notice of Such Severe Penalties ...................... 28

   a. The Damages Statutes Did Not Provide Fair Notice ................... 28

   b. There is No Civil Liability for Defendants' Conduct ................... 28

   c. Awards in Other Infringement Cases Provided No Notice .......... 29

   d. There Is No Criminal Liability for Defendants' Conduct ............ 30

 F. All of the *Gore* Guideposts Require the Damages in this Case be Vacated ........ 31

 G. Vacation of the Statutory Damages Awards Does Not Mandate a New Trial .................................................................................................................. 31

 H. Granting a New Trial Will Not Provide Due Process ......................................... 32

 I. Vuitton Is Entitled to No More Than Nominal Damages ................................... 32

VI. DEFENDANT CHEN NOT SHOWN TO BE PERSONALLY LIABLE ....................... 33

VII. CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) .................................................................. 9, 15, 21

*In Re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ........................................................................ 20, 21

*Atlantic Richfield Co. v. Arco Globus Int'l Co.*,
  150 F.3d 189 (2d Cir. 1998) ................................................................................ 4

*Bersch v. Drexel Firestone, Inc.*,
  519 F.2d 974 (2d Cir. 1975) ................................................................................ 4

*Bly v. Banbury Books, Inc.*,
  638 F.Supp. 983 (E.D.Pa. 1986) ........................................................................ 22

*BMW of North Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ...................................................... 22, 24, 25, 26, 27, 28, 32

*Childress v. Taylor*,
  798 F.Supp. 981 (S.D.N.Y. 1992) ...................................................................... 27

*Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*,
  173 F.3d 725 (9th Cir. 1999) .............................................................................. 35

*Cooper Indus. v. Leatherman Tool Group, Inc.*,
  532 U.S. 424 (2001) ...................................................................................... 24, 32

*CoStar Group, Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) ................................................................................ 9

*Cummings v. Connell*,
  402 F.3d 936 (9th Cir. 2005) ........................................................................ 27, 33

*Doe v. Chao*,
  306 F.3d 170 (4th Cir. 2002) .............................................................................. 33

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
  109 F.3d 1394 (9th Cir. 1997) .............................................................................. 6

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) .............................................................................. 5

*Ets-Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000) .............................................................................. 7

*Exxon Shipping Co. v. Baker*,
  128 S.Ct. 2605 (2008) ........................................................................................ 32

*Fare Deals, Ltd. v. World Choice Travel.com, Inc.,*
180 F.Supp.2d 678 (D. Md. 2001) ....................................................................... 12

*Feltner v. Columbia Pictures Television, Inc.,*
523 U.S. 340 (1998) ......................................................................................... 23

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
76 F.3d 259 (9th Cir. 1996) ............................................... 11, 13, 15, 16, 17, 28

*Giaccio v. State of Pa.,*
382 U.S. 399 (1966) ......................................................................................... 23

*Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.,*
955 F.2d 1143 (7th Cir. 1992) .......................................................................... 18

*Harris v. Mexican Specialty Foods, Inc.*
564 F.3d 1301 (11th Cir. 2009) ........................................................................ 28

*Honda Motor Co., Ltd. v. Oberg,*
512 U.S. 415 (1994) ......................................................................................... 21

*International Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.,*
252 F.3d 1274 (11th Cir. 2001) .......................................................................... 4

*Inwood Labs, Inc. v. Ives Labs., Inc.,*
456 U.S. 844 (1982) ....................................................... 10, 11, 13, 18

*Johansen v. Combustion Eng'g, Inc.,*
170 F.3d 1320 (11th Cir. 1999) ............................................... 25, 28, 32

*Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.,*
285 F.3d 848 (9th Cir. 2002) .............................................................................. 2

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,*
150 F.3d 1042 (9th Cir. 1998) ............................................................................ 6

*Kolender v. Lawson,*
461 U.S. 352 (1983) ......................................................................................... 23

*L.B. Indus., Inc. v. Smith,*
817 F.2d 69 (9th Cir. 1987) ....................................................................... 34, 35

*Latimer v. Roaring Toyz, Inc.,*
574 F.Supp.2d 1265 (M.D. Fla. 2008) ............................................................... 7

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.,*
285 F.3d 1146 (9th Cir. 2002) .......................................................................... 31

*Little v. Streater,*
452 U.S. 1 (1981) ............................................................................................. 23

*Los Angeles News Service v. Reuters Television Intern., Ltd.,*
149 F.3d 987 (9th Cir. 1998) ................................................................. 22, 27, 33

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
   591 F.Supp.2d 1098 (N.D. Cal. 2008) ........................................................ 2, 13

*Memphis Cmty. School Dist. v. Stachura*,
   477 U.S. 299 (1986) ................................................................................ 33

*Microsoft Corp. v. Black Cat Computer Wholesale, Inc.*,
   269 F.Supp.2d 118 (W.D.N.Y. 2002) .................................................... 20, 29, 30

*Microsoft Corp. v. Rechanik*,
   249 Fed.Appx. 476, 2007 WL 2859800 (7th Cir. 2007) .......................... 29, 34

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007) ................................................................... 1

*Montgomery Ward & Co. v. Duncan*,
   311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940) .................................. 2

*Murphy Tugboat Co. v. Shipowners & Merch. Towboat Co., Ltd.*,
   467 F.Supp. 841 (N.D.Cal. 1979) .......................................................... 34

*Murphy v. City of Long Beach*,
   914 F.2d 183 (9th Cir. 1990) ................................................................. 2

*New Line Cinema Corp. v. Russ Berrie & Co., Inc.*
   161 F.Supp.2d 293 (S.D.N.Y. 2001) ..................................................... 22

*Nintendo of Am., Inc. v. Dragon Pacific Int'l*,
   40 F.3d 1007 (9th Cir. 1994) ................................................................. 30

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ......................................................... 9, 11, 17

*Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*,
   494 F.3d 788 (9th Cir. 2007) .......................................... 3, 11, 14, 15, 16, 17

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ............................................................................ 22, 23

*Rexel, Inc. v. Rexel Int'l Trading Corp.*,
   540 F.Supp.2d 1154 (C.D. Cal. 2008) .................................................. 3

*Rodeo Collection, Ltd. v. West Seventh*,
   812 F.2d 1215 (9th Cir. 1987) ............................................................... 5

*Rodriguez v. Farm Stores Grocery, Inc.*,
   518 F.3d 1259 (11th Cir. 2008) ........................................................ 21, 23

*Sega Enterprises Ltd. v. MAPHIA*,
   948 F.Supp. 923 (N.D.Cal. 1996) ......................................................... 21

*Sherman v. Kasotakis*,
   314 F. Supp. 2d 843 (N.D. Iowa 2004) ................................................. 32

*SHL Imaging, Inc. v. Artisan House, Inc.*,
    117 F.Supp.2d 301 (S.D.N.Y. 2000) ......................................................................... 7

*Sparaco v. Lawler, Matusky, Skelly Engineers LLP*,
    313 F.Supp.2d 247 (S.D.N.Y. 2004) ........................................................................ 33

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................... 24, 25, 26, 28

*Steele v. Bulova Watch Co.*,
    344 U.S. 280 (1952) ................................................................................................. 4

*Sterling Drug, Inc. v. Bayer AG*,
    14 F.3d 733 (2d Cir. 1994) ...................................................................................... 4

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*,
    24 F.3d 1088 (9th Cir. 1994) ............................................................................... 8, 9

*Tiffany (NJ) Inc. v. EBay, Inc.*,
    576 F.Supp.2d 463 (S.D.N.Y. 2008) ........................................................ 10, 12, 20

*Tillman v. Freightliner, LLC*,
    247 Fed.Appx. 867, 2007 WL 2298037 (9th Cir. 2007) ................................. 21, 23

*Totalplan Corp. v. Colborne*,
    14 F.3d 824 (2d Cir. 1994) .................................................................................. 4, 5

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985) .............................................................................. 34

*U.S. E.E.O.C. v. W&O, Inc.*,
    213 F.3d 600 (11th Cir. 2000) .............................................................................. 25

*U.S. v. Smith*,
    832 F.2d 1167 (9th Cir. 1987) .............................................................................. 31

*U.S. v. Sultan*,
    115 F.3d 321 (5th Cir. 1997) ................................................................................ 30

*United States v. Zemek*,
    634 F.2d 1159 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, *cert. denied*, 450 U.S. 985,
    *cert. denied*, 452 U.S. 905 ................................................................................... 30

*Vanity Fair Mills, Inc. v. T. Eaton Co., Ltd.*,
    234 F.2d 633 (2d Cir. 1956) ................................................................................... 4

*Wolf Designs, Inc. v. DHR Co.*,
    322 F.Supp.2d 1065 (C.D.Cal. 2004) .................................................................. 34

**DOCKETED CASES**

*Club 93, Inc. v. First Sec. Bank of Idaho, N.A.*,
    No. CV-95-00417, 1999 WL 310640 (9th Cir. May 7, 1999) ..................................... 32

*Harris v. Circuit City Stores, Inc.*,
    No. 07 C 2512, 2008 WL 400862 (N.D. Ill. Feb. 7, 2008) ........................................ 33

*Louis Vuitton Malletier v. Flea Market, Inc.*,
    No. C 09-01062 CW, 2009 WL 1625946 (N.D. Cal. June 10, 2009) .............................. 15, 28, 29

*Microsoft Corp. v. V3 Solutions, Inc.*,
    No. 01 C 4693, 2003 WL 22038593 (N.D. Ill. August 28, 2003) .................................... 30

*Motorola, Inc. v. Abeckaser*,
    No. 07-cv-3963 (CPS), 2009 WL 2568529 (E.D.N.Y. Aug. 5, 2009) ............................. 27

*Symantec Corp. v. Logical Plus, Inc.*,
    No. C 06-7963, 2009 WL 3416178 (N.D. Cal. October 20, 2009) ................................. 29, 35

*U.S. Media Corp. v. Edde Entm't Corp.*,
    No. 94 CIV. 4849, 1998 WL 401532 (S.D.N.Y. July 17, 1998) .................................. 20

**FEDERAL RULES AND STATUTES**

5 U.S.C. § 552a(g)(4) ........................................................................................................ 33

15 U.S.C. § 1114 ........................................................................................................ 2, 3

15 U.S.C. § 1117(c) ........................................................................................................ 19, 20, 27

15 U.S.C. § 1117(c)(1) ........................................................................................................ 19

15 U.S.C. § 1117(c)(2) ........................................................................................................ 19, 20

15 U.S.C. § 1127 ........................................................................................................ 3, 4

15 U.S.C. § 1681n(a)(B) ........................................................................................................ 33

17 U.S.C. § 101 ........................................................................................................ 7

17 U.S.C. § 106(2) ........................................................................................................ 7

17 U.S.C. § 504(c)(2) ........................................................................................................ 19

18 U.S.C. § 2 ........................................................................................................ 30

Fed. R. Civ. P. 59 ........................................................................................................ 1

Fed. R. Civ. P. 59(a) ........................................................................................................ 1

Fed. R. Civ. P. 59(e) ........................................................................................................ 1

**OTHER AUTHORITIES**

3 Nimmer, § 12.04[A][3][b] ........................................................................................................ 9

HOUSE REPORT NO. 104-556, 1996 U.S.C.C.A.N. 1074 (1996) .............................................. 25, 31

SENATE REPORT NO. 104-177 (1995) ................................................................................... 27, 33

U.S. Constitution, Fifth Amendment ..................................................................................... 23

1        **PLEASE TAKE NOTICE** that on February 22, 2010 at 9:00 a.m. in Courtroom 8

2    Defendants Akanoc Solutions, Inc., Managed Solutions Group, Inc. and Steve Chen (collectively

3    "Defendants") will move pursuant to Rule 59(a) and (e) for a new trial or to alter the judgment.

4        The verdict must be set aside because of a lack of evidence and erroneous instructions.

5    **I.     THE VERDICT MUST BE SET ASIDE**

6        Vuitton can discern minute flaws in a counterfeit purse, but has not shown have the same eye

7    for obvious flaws in its legal claims. It is well settled that, under trademark and copyright law, there

8    is no contributory infringement without direct infringement. Here Vuitton cannot prove direct

9    infringement because any alleged misuse of its intellectual property occurred outside the U.S. and

10   the reach of the Lanham and Copyright Acts. Apparently Vuitton prefers U.S. to Chinese courts.

11        Undaunted, Vuitton turned its wrath against Defendants. Ignoring evidence that Defendants

12   have nothing to do with and do not profit from the alleged infringement Vuitton asserts a secret

13   conspiracy between Defendants and unknown third parties in China accused of selling Vuitton

14   replica products. Defendants' only misfortune, other than being an easy target of a rich French

15   luxury goods empire, was their unwitting and indirect provision of Internet services to those Chinese

16   entities. This is grossly insufficient to establish contributory liability of the Defendants.

17        Apparently recognizing holes in the evidence, Vuitton proffered and the Court adopted jury

18   instructions that omitted key elements Vuitton had to prove, including direct infringement by a third

19   party, and whether Defendants (1) had knowledge of specific instances thereof, (2) directly

20   controlled and monitored the means of infringement, or (3) materially contributed to the

21   infringement. These instructions misstated the law and led to an unsustainable verdict.

22        With no proof of actual damages and misguidance on the issue of willfulness, the jury

23   fumbled through the instructions and awarded damages well above both the statutory maximums and

24   the $1M sought by Vuitton. These awards result from misapplication of the statutory damages

25   provisions at issue and are unconstitutional. This alone requires the jury verdict be vacated.

26   **II.    RULE 59 LEGAL STANDARDS**

27        Relief under Rule 59 may be granted when the verdict is against the weight of the evidence,

28   the damages are excessive, or to prevent a miscarriage of justice. *See Molski v. M.J. Cable, Inc.*, 481

F.3d 724, 729 (9th Cir. 2007). The Court may "set aside the verdict of the jury, even though supported by substantial evidence, where, in [its] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *See Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

A motion for a new trial may also be granted if there are "substantial errors in admission or rejection of evidence or instructions to the jury." *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). Both erroneous jury instructions as well as the failure to give adequate instructions are bases for a new trial. *See Murphy*, 914 F.2d at 187.

## III.   VUITTON DID NOT PROVE DIRECT INFRINGEMENT

As this Court has recognized, there can be no contributory trademark or copyright infringement without direct infringement by another. *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 591 F.Supp.2d 1098, 1104 (N.D. Cal. 2008) (citing *Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 795 & 807 (9th Cir. 2007)) ("All theories of secondary liability for copyright and trademark infringement require some underlying direct infringement by a third party."). Vuitton presented no evidence of direct infringement of its asserted trademarks or copyrights. Acts in China do not violate U.S. law and cannot support contributory infringement in the U.S. Without such evidence, Vuitton's claims of contributory infringement against Defendants cannot stand. A French plaintiff's suit in the United States about acts in China can establish no legal wrong here.

### A.   Vuitton Did Not Prove Direct Trademark Infringement

The Lanham Act prohibits the "**use in commerce** … of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services … **likely to cause confusion**." 15 U.S.C. § 1114 (emphasis added); *see Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 853-54 (9th Cir. 2002) ("In order to prevail on its Lanham Act claims … Storz must show that Surgi-Tech used Storz's trademark *in commerce* and that the use was *likely to confuse* customers as to the source of the product [emphasis added]."). But Vuitton presented no evidence of either a "use in commerce" or the "likelihood of confusion" elements. Because Vuitton did not prove direct trademark infringement, the contributory infringement verdict cannot stand.

#### 1.   Vuitton Did Not Prove that Its Trademarks were Used in Commerce

The Lanham Act provides that a **trade**mark "shall be deemed to be used in commerce on

2

1  goods when it is placed in any manner on the goods … and the goods are sold or transported in

2  commerce." 15 U.S.C. § 1127.[1]  *See Rexel, Inc. v. Rexel Int'l Trading Corp.*, 540 F.Supp.2d 1154,

3  1161 (C.D. Cal. 2008) (citing Section 1127 in its finding that the defendant's activities with respect

4  to certain trademarks fell short of the use in commerce required for the plaintiffs to prevail on

5  infringement).  Here Vuitton failed to prove that any of its trademarks were placed on goods sold or

6  transported in commerce in the United States without its authority.

7              **a.     The "Use" Alleged by Vuitton was Authorized by Vuitton, and
                        Occurred Without Defendants' Servers or Network**

8

9              Vuitton presented no evidence that any goods bearing its trademarks were sold or transported

10 in commerce in connection with any accused websites, other than a few items purchased by

11 Vuitton's investigator for trial.  But these purchases all the acts occurred (i) with Vuitton's consent,

12 (ii) without the use of Defendants' services, (iii) outside the United States, and (iv) were transported

13 to the U.S. by common carriers at the specific direction of Vuitton in an effort to create evidence.

14             The Lanham Act only prohibits trademark use "without the consent of the registrant."  *See* 15

15 U.S.C. § 1114.  All purchases shown at trial were made at Vuitton's specific instruction, and thus

16 were purchased and transported to the U.S. with Vuitton's express consent.  *See* Exh. 1622, 41:9-

17 42:15.[2]  Furthermore, Mr. Holmes made those purchases *not* from any accused websites, but by

18 sending e-mails through widely available free e-mail accounts (such as gmail.com or hotmail.com)

19 held by unknown person(s) in China, *without* going through Defendants' servers or network, and by

20 making payment through Western Union money transfers having nothing to do with the Defendants.

21 *See id.* at 43:7-48:9 & 72:21-25.  Even assuming, *arguendo*, that Mr. Holmes' purchases somehow

22 represent an infringement of Vuitton's trademark, Defendants had no control over the means of

23 infringement, and cannot be held liable for contributory infringement.  *See Visa*, 494 F.3d at 807

24 (citing *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).

25             These weaknesses in Vuitton's case were obscured by the Closing Instructions, which state

26

27 ------

[1]In contrast, a **service** mark can be used in commerce through advertising, but a **trade**mark must be *affixed to goods* and then *sold or distributed* in order to be "used in commerce."

28 [2]All exhibits referenced herein are attached to the Declaration of James A. Lowe in support of this Motion, filed concurrently herewith.

that infringement may be found if Defendants' customers "knowingly and intentionally used a mark in connection with the *offering for sale*, sale, or distribution of goods in the United States." *See* Doc. 227, 7:15-20 [emphasis added]. The inclusion of "offering for sale" in the instruction was erroneous because **a use in commerce requires an actual sale or transport of goods**. *See* 15 U.S.C. § 1127. **An offer for sale**, without more, **does *not* constitute a use in commerce**. This error was critical because the accused websites represent, at most, mere offers for sale.[3]

### b. The "Use" Alleged Was Not Governed by the Lanham Act

Other than hosting the accused websites,[4] every act upon which Vuitton's claims are based occurred outside the U.S. *without* any knowledge or involvement by Defendants. But the Lanham Act has extraterritorial reach only under limited circumstances.

In *Steele v. Bulova Watch Co.*, 344 U.S. 280, 284-85 (1952), the Supreme Court applied the Lanham Act to a U.S. citizen who, after learning that the Bulova mark was only registered in the U.S, registered the same mark in Mexico, and sold fake Bulova watches in Mexico City. Central to this decision was the fact that numerous fakes sold by the defendant made their way back into the U.S. *Id.* at 285 & 288 ("Unlawful effects in this country ... are often decisive."); *see also Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 990 n.35 (2d Cir. 1975) ("This effect on Bulova's business within the U.S. was the direct and foreseeable result of defendant's activities in Mexico.")

Since *Bulova*, every Circuit Court decision has applied a three factor test to determine whether the Lanham Act governs extraterritorial activity; whether "(1) the defendant's conduct had a substantial effect on U.S. commerce; (2) the defendant was a U.S. citizen ...; and (3) there was no conflict with trade-mark rights established under foreign law." *See*, *e.g.*, *Vanity Fair Mills, Inc. v. T. Eaton Co., Ltd.*, 234 F.2d 633, 642 (2d Cir. 1956).[5]

---

[3] However, the fact that Mr. Holmes made offers to buy the accused products via e-mail rather than from the accused websites evidences that those websites are not offers for sale, but mere advertising.

[4] Hosting a website, without more, cannot be an infringement because no trademarks were attached to goods sold or transported in commerce in the United States. *See* 15 U.S.C. § 1127.

[5] *See also Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 745 (2d Cir. 1994); *Totalplan Corp. v. Colborne*, 14 F.3d 824, 830 (2d Cir. 1994); *Atlantic Richfield Co. v. Arco Globus Int'l Co.*, 150 F.3d 189, 192 (2d Cir. 1998); *International Cafe, S.A.L. v. Hard Rock Cafe Int'l (U.S.A.), Inc.*, 252 F.3d 1274, 1278 (11th Cir. 2001).

1    In this case, Vuitton did not satisfy any of the three *Bulova* factors.  It admits that the identity

2    of the direct "infringers" are unknown, and has no proof regarding their citizenship.  *See* Exh. 1621,

3    143:5-144:21.  It presented no evidence that any activity connected with the accused websites had

4    *any* effect on U.S. commerce.  Indeed, Vuitton never showed that anyone within the U.S., other than

5    its own investigator doing so at its instruction, has even viewed the accused websites.  *See* Exh.

6    1622, 238:16-245:3 (discussing Exh. 1559).  And, needless to say, Vuitton never considered whether

7    applying the Lanham Act here would conflict with any foreign law.

8    While the absence of one *Bulova* factor likely precludes the extraterritorial application of the

9    Lanham Act, the absence of two is "certainly fatal."  *See Totalplan*, 14 F.3d at 831 (citing *Vanity*

10   *Fair* at 643).  Vuitton offered no evidence to establish any *Bulova* factor, and therefore cannot show

11   that any overseas act constitutes direct infringement.  Its speculation about actions or intentions of

12   people in China cannot support application of the Lanham Act to acts carried out in China.

13   Vuitton swept this fatal flaw in its case under the proverbial rug offered by the Closing

14   Instructions, which state that infringement may be proven if "Defendants' customers knowingly and

15   intentionally used a mark … in a way that *would* substantially affect commerce in the United

16   States."  *See* Doc. 227, 7:15-21 (emphasis added).  Under *Bulova*, Vuitton must prove that such use

17   *actually* had a substantial effect on U.S. commerce.  The instructions improperly invited the jury to

18   *conjecture* that the conduct to which Vuitton objected had an effect on U.S. commerce, based on the

19   apparent "use" of its trademarks on the accused website.  This error was further compounded by the

20   failure of the Closing Instructions to consider the other two *Bulova* factors.

### 2.    Vuitton Did Not Prove Likelihood of Confusion

22   Vuitton was required to prove likelihood of confusion as to the origin or source of goods to

23   prove direct infringement.  "To constitute trademark infringement, use of a mark must be likely to

24   confuse an appreciable number of people as to the source of the product."  *Entrepreneur Media, Inc.*

25   *v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).  "Likelihood of confusion requires that confusion be

26   probable, not simply a possibility."  *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217

27   (9th Cir. 1987).  Vuitton failed to show that anyone was likely to mistakenly believe that the accused

28

1  products were sold by Vuitton.[6]  Rather, the evidence showed that the accused websites expressly

2  disclaimed Vuitton as the source of the accused products, by advertising such products as "replicas."

3  *See*, *e.g.*, Exh. 1620, 174:19-175:2.  While it is customary to prove likelihood of confusion by the

4  use of consumer surveys, Vuitton made no effort to do so and simply skipped this critical evidence.

5        The Instructions let Vuitton off the hook, by instructing the jury that there is "a *presumption*

6  of a likelihood of confusion … when the offending mark is a counterfeit mark, or a mark virtually

7  identical to a previously registered mark coupled with the intent to pass off or borrow from

8  established goodwill." *See* Doc. 227, 6:23-27 (emphasis added). This instruction is directly contrary

9  to controlling law. "[P]roof of intent to cause confusion is entitled to *great weight*, **not that it**

10 **creates a presumption of confusion** that shifts the burden of proof to the other party." *Kendall-*

11 *Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1052 n.11 (9th Cir. 1998) (italics in

12 original, bold added).[7] There can be no "intent to cause confusion" when websites refer to "replicas."

13      **B.      Vuitton Did Not Show Direct Copyright Infringement**

14            **1.      Vuitton's Copyrights Do Not Cover the Accused Images**

15       Vuitton asserts copyrights on two registered works, the "Multicolor Monograms."  Both are

16 listed as "Fabric/Leather Prints" and "2-Dimensional Artwork" by the Copyright Office.  *See* Exhs.

17 449 & 450.  Vuitton's witnesses testified that unknown entities in China copied these works onto

18 leather and/or fabric, and then used such materials to produce allegedly counterfeit products.  *See*

19 Exh. 1621, 142:7-144:21.  Then photographs of these products were taken by unknown persons in

20 China and uploaded by unknown persons in China to websites allegedly hosted on Defendants'

21 servers.[8]  *See id*.  Vuitton never showed that Defendants had anything to do with the production or

22 sale of these products; rather, it objects to the presence on servers of digital data representing those

---

[6]The only evidence that Vuitton presented was an e-mail from a gentleman residing in *Denmark* who was merely annoyed at the availability of replicas (presumably in Denmark); but even he expressed no confusion.  *See* Exh. 74.

[7]*See also Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1404 (9th Cir. 1997) ("The eight-factor *Sleekcraft* test is used in the Ninth Circuit to analyze the likelihood of confusion question in *all* trademark infringement cases [emphasis added].").

[8]Defendants Akanoc and MSGI owned and operated the servers.  Defendant Steven Chen was only the president and shareholder of these two corporations.  *See* Exh. 1622, 90:13-91:5 & 148:3-7.

photographs.  That is the entire basis of its claim of contributory infringement.

### a.        The Copyrights Do Not Directly Cover the Accused Images

Vuitton overlooked a critical aspect in its claim — its asserted copyrights do *not* actually cover the accused images.  The copyrights cover certain two-dimensional patterns on *leather or fabrics*, but the accused images are *photographs* of three-dimensional *objects*, *e.g.*, handbags, shoes, belts, etc.  Vuitton argues infringement in broad strokes in an attempt to conflate the three, but an analysis of copyright law shows that its asserted copyrights do not cover the accused images. An accused image is not a "counterfeit" Vuitton product; it is just a photograph (not a work of Vuitton) of an object (also not a work of Vuitton) that allegedly looks like a Vuitton product made from the copyrighted fabrics.  Beyond these problems, there is also no photograph on the servers, just data.

### b.        The Images are Not Derivative Works Covered by the Copyrights

A photograph of an object is an original work entitled to copyright protection independent of the object depicted.  *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074-77 (9th Cir. 2000). Whether the photograph is also covered by the copyright on the depicted object (assuming that the latter is copyrightable) depends on whether it is a derivative work based on that object.  *Id*. at 1077 n.5; 17 U.S.C. § 106(2).  "But simply because photographs are in this colloquial sense 'derived' from their subject matter, it does not necessarily follow that they are derivative works under copyright law."  *Ets-Hokin* at 1078.[9]

"A 'derivative work' is a work based upon one or more preexisting works … in which a work may be recast, transformed or adapted."  17 U.S.C. § 101.  Recent cases hold that a photograph of a copyrighted object is *not* a derivative work based thereupon because it does *not* involve any recasting, transformation or adaptation of the depicted object as required under Section 101.  *See*, *e.g.*, *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 306 (S.D.N.Y. 2000); *Latimer v. Roaring Toyz, Inc.*, 574 F.Supp.2d 1265, 1274-75 (M.D. Fla. 2008).

Here, crucially, Vuitton does *not* own, and has *not* asserted, any copyright in the objects depicted in the accused images, *e.g.*, handbags, shoes, belts, etc.  Even if it did, the accused images

---

[9]In *Ets-Hokin*, the Ninth Circuit held that the photographs at issue were not derivative works as the object they depict, a Skyy vodka bottle, was not itself copyrightable.  *See Ets-Hokin* at 1078-81.

would *not* constitute derivative works based on those objects, and thus would *not* be covered by any copyright therein.  Nor does Vuitton own any copyright in the accused images themselves, because it did not author those images.  Simply put, there cannot be any copyright infringement here.

### c.      The Instructions Provided No Guidance on What is Covered

The Closing Instructions failed to consider any of the above issues, and merely asked the jury if it "find[s] that the various websites infringed Louis Vuitton's copyright in selling counterfeited Louis Vuitton products." *See* Doc. 227, 12:5-7. This invited the jury to find infringement even though the asserted copyrights do not cover the accused images.

The instructions also wrongly presupposed that the accused websites "sold" counterfeit Louis Vuitton products.  This was squarely against the weight of the evidence.  The accused websites have no e-commerce capabilities, and could not take online orders for merchandise like Amazon.com. *See* Exh. 1622, 46:16-47:2 & 49:22-52:9.  Rather, Mr. Holmes had to go to extraordinary lengths to order, pay for and arrange the shipment of the accused products from China.  He used public e-mail to make offers to buy, received order and payment instructions in the same way, and paid for his purchases by wiring money (at his local 7-11 Store) through Western Union to unknown entities in China.  *See id*. at 57:15-60:9.  The purchases were consummated in China, and the goods were shipped by unknown entities from China to addresses selected by Holmes.  *See id*. at 61:9-63:7.  The jury instructions erroneously assumed direct infringement even though none was shown.[10]

### 2.      There Was No Infringement Within the U.S.

The main problem with Vuitton's copyright infringement claim is that all of the conduct it objects to occurred overseas.  Its two copyrighted fabrics were allegedly copied in China.  *See* Exh. 1621, 142:7-144:21.  The alleged counterfeit products were also produced there.  *See id*.  The sale and shipment of those products likewise occurred in China.[11]  *See id*. at 143:5-15; Exh. 1622, 61:9-63:7.  And, as discussed below, any "copying" of the accused images also occurred in China.

But the Copyright Act simply does not apply to overseas conduct.  *See Subafilms, Ltd. v.*

---

[10]If someone sells a counterfeit Louis Vuitton handbag by placing an online classified ad on the San Jose Mercury News website, it would *not* mean that the San Jose Mercury News sold that handbag, even if the San Jose Mercury News operates its own Internet servers.

[11]And Vuitton's only evidence shows that such transactions were authorized by Vuitton.

1   *MGM-Pathe Communications Co.*, 24 F.3d 1088, 1094 (9th Cir. 1994) ("Because the copyright laws

2   do not apply extraterritorially, each of the rights conferred under … Section 106 … must be read as

3   extending no farther than the United States' borders.").  Conduct outside the U.S. cannot constitute

4   direct infringement, or support contributory liability.  *Id*. at 1093; 3 Nimmer, § 12.04[A][3][b].

5       Grasping at straws, Vuitton argues that the "copies" of the accused images on Defendants'

6   servers represent a direct infringement of its asserted copyrights in the U.S.  But its copyrights do

7   *not* cover the accused images.  Even assuming that they do, any unauthorized "copying" was done

8   overseas, and cannot constitute infringement under the Copyright Act.

9       In *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit

10  found that Google *directly* infringed certain copyrighted images by storing "electronic information"

11  corresponding to thumbnail versions of such images on its servers.  *See Amazon.com* at 1159-60.

12  This was premised on the fact that "Google *initiates* and *controls* the *storage* and *communication* of

13  these thumbnail images." *See id*. at 1160 n.6 (emphasis added).  Here, in marked contrast, unknown

14  third parties in China are the ones that *initiate* and *control* the *communication* and *storage* of the

15  accused images onto Defendants' servers.  *See* Exh. 1621, 142:7-11.  Thus, to the extent that there

16  was any "copying," it was done overseas, and cannot constitute direct infringement.[12]

17  **IV.   VUITTON DID NOT PROVE CONTRIBUTORY INFRINGEMENT**

18       **A.   Vuitton Did Not Show Specific Knowledge of Infringement**

19       Under both trademark and copyright law, specific knowledge – *i.e.*, knowledge by a

20  defendant of the specific infringing activity by an alleged direct infringer – is required for a finding

21  of contributory infringement.  *See Lockheed* at 983 (discussing the infringement of the "Skunk

22  Works" service mark by specific domain names registered through defendant Network Solutions

23  ("NSI")); *Napster* at 1021 ("We agree that if a computer system operator learns of *specific infringing*

24  *material* available on his system and fails to purge such material from the system, the operator

25  knows of and contributes to direct infringement.  Conversely, absent any *specific information which*

26  _____

27  [12]Vuitton has not accused any Defendant of *direct* infringement.  But even if it did, the claim would
    be without merit.  An "ISP serving as a passive conduit for copyrighted material is not liable as a
    direct infringer."  *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 548 (4th Cir. 2004) (citing

28  *Religious Tech. Center v. Netcom On-Line Comm. Servs., Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995)).

1   *identifies infringing activity*, [he] cannot be liable for contributory infringement merely because the

2   structure of the system allows for the exchange of copyrighted material [emphasis added].").

3       Because Vuitton presented no evidence of either direct trademark or copyright infringement

4   within the U.S., Defendants could not possibly have had specific knowledge of any infringement.

5   Instead, Vuitton made general allegations regarding what it called "counterfeit products" sold on the

6   accused websites.  Such allegations are insufficient under the specific knowledge standard required

7   to find contributory infringement on the part of Defendants.

8       However, the Instructions allowed Vuitton to evade this requirement, instructing the jury to

9   "find that Defendants knew … that Defendants' customers were using Defendants' services to

10  infringe … Plaintiff's trademark [if] Defendants had actual knowledge … Defendants' customers

11  were *in the business of … sell[ing] goods using counterfeit marks* …"  *See* Doc. 227, 9:24-10:4

12  (emphasis added).  The instructions invited the jury to infer that Defendants could have reasonably

13  anticipated *specific instances* where Vuitton's trademarks were infringed from *general knowledge*

14  regarding the sale of counterfeit goods, including counterfeit goods using trademarks *not* owned by

15  Vuitton.  This inference was forbidden by *Inwood Labs, Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982).

16          Justice White's concern is based on a statement by the Court of
            Appeals that the generic manufacturers *"could reasonably anticipate"*
17          illegal substitution of their drugs.  If the Court of Appeals had relied
            upon that statement to define the controlling legal standard, the court
18          indeed would have applied a "watered down" and incorrect standard.

19  *Inwood* at 854 n.13, ¶ 2 (emphasis added).  Allowing such an inference here was a clear error.  The

20  specific knowledge requirement cannot be based on general allegations of infringement.  *See Tiffany*

21  *(NJ) Inc. v. EBay, Inc.*, 576 F.Supp.2d 463, 510 (S.D.N.Y. 2008) (emphasis added):

22          In sum, neither precedent nor policy supports Tiffany's contention that
            generalized allegations of infringement provide defendants with
23          knowledge or a reason to know of the infringement. … Instead,
            courts have required a much higher showing that a defendant knew or
24          had reason to know of **specific instances of actual infringement.**

25  The instructions here eviscerated the specific knowledge requirement, and created an erroneous basis

26  for finding Defendants liable for contributory infringement.

27      Although this instruction was found under the section of the Closing Instructions relating to

28  the first claim for contributory *trademark* infringement, it also tainted the jury's finding with respect

to the second claim for contributory *copyright* infringement, as the instructions state that the "factors and definitions … in the instructions on contributory trademark infringement may be used to infer knowledge with respect to contributory copyright infringement." *See* Doc. 227, 12:23-25.  This instruction thereby allowed contributory liability to be found in both claims even though Vuitton presented no evidence to satisfy the specific knowledge requirement.

### B.      Vuitton Admitted that Defendants Did Not Induce Infringement

Under both trademark and copyright law, contributory infringement may be shown if a defendant induces a third party to infringe.  Such inducement may take the form of an improper suggestion or invitation to infringe.  *See Inwood* at 852-53.  "Under *Grokster*, an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement."  *See Amazon.com*, 508 F.3d at 1171 (citing *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)).

Vuitton did not accuse Defendants of inducing infringement.  In fact, Vuitton admitted it had no evidence that Defendants induced infringement.  *See generally* Exh. 1621, 153-161.

### C.      Vuitton Did Not Show Direct Control and Monitoring by Defendants

#### 1.      No Evidence of Direct Control or Monitoring the Means of Infringement

Liability for contributory trademark infringement, when the defendant supplies a service used by a third party, turns on "the *extent* of control exercised by the defendant over the third party's means of infringement."  *See Lockheed* at 984 (emphasis added) (citing *Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1148-49 (7th Cir. 1992); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996)).  "For liability to attach, there must be *direct* control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark."  *See Visa*, 494 F.3d at 807 (emphasis added) (citing *Lockheed* at 984).

Several cases have considered what constitutes Internet "direct control and monitoring." *Visa* suggests that this can be shown by "the power to remove infringing material from these websites or directly stop their distribution over the Internet."  *See id*.  In this case, however, it is undisputed that Defendants do *not* have the power to remove the accused images from the accused websites. Defendants presented undisputed evidence that, pursuant to their standard procedure, upon the rental

of a server, administrative rights to access and control the server are given solely to the customer. *See* Exh. 1623, 50:24-53:5. Thus, the customer has sole control over the server, and Defendants cannot remove specific content on the server.[13] Nor do Defendants have the power to *directly* stop the distribution of either the accused websites or the accused images. As Defendants testified, they have only two ways to disable access – by either (1) disabling an IP address corresponding to the domain name of an accused website or (2) unplugging an entire server – *both* of which would also disable access to numerous other legitimate websites. *See* Exh. 1622, 77:12-78:6 & 116:20-117:18.

In *Tiffany*, the court found that eBay had direct control over the means of infringement used by third parties to infringe Tiffany's marks. *See Tiffany* at 506. This finding was premised on four facts: (1) eBay retains "significant control" over the transactions conducted through eBay; (2) eBay has "actively promoted" the sale of Tiffany jewelry on eBay, by advertising merchandise on eBay, Google, and Yahoo, and by telling eBay sellers that Tiffany is a moneymaking keyword; (3) eBay profits from the listing of items and successful completed transactions; and (4) eBay maintains "significant control" over the listings on eBay. *See id.* at 506-07. There was also evidence that eBay monitors the listings. *See id.* at 507 ("The fraud engine screens listings and removes items that use specific terms in the listing description."). In contrast, the Defendants here had no control over any transactions involving the alleged counterfeit Vuitton products.[14] They did not promote the sale of Vuitton products (authorized or counterfeit), or profit from the sale or the offering for sale of such items. *See* Exh. 1621, 155:9-24. Lastly, they have no control over, and do not monitor, the content of the accused websites. *See* Exh. 1623, 50:24-56:20.

*Tiffany* properly illustrates the application of *Lockheed*. The *Tiffany* court, after outlining the framework of contributory infringement set forth in *Lockheed*, found that "eBay exercises *sufficient control and monitoring* over its website such that it fits squarely within the *Fonovisa* and *Hard Rock Cafe* line of cases." *See Tiffany* at 505-06 (emphasis added). *Lockheed* and *Tiffany* teach that it is

---

[13] *See also Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F.Supp.2d 678, 689 (D. Md. 2001) (finding no direct control and monitoring where defendant had no authority to control the operations of the accused website).

[14] Vuitton's own evidence showed that the transactions in which the alleged counterfeit products were purchased were authorized by Vuitton and occurred without Defendants' servers or network.

1    the "direct control and monitoring" of the "means of infringement" which justifies the following of

2    *Fonovisa* and *Hard Rock* to impose contributory liability, rather than analogizing such means to the

3    real property aspect of these two cases to constructively show control and monitoring.

4            This case is analogous to *Lockheed*.  In *Lockheed*, the defendant NSI "translates the domain

5    name combination to the registrant's IP Address and *routes the information or command to the*

6    *corresponding computer*."  *See Lockheed* at 984 (emphasis added).  Here, "Defendants physically

7    host websites on their servers and *route Internet traffic to and from those websites*."  *See Akanoc*,

8    591 F.Supp.2d at 1112 (emphasis added).  The only distinction is that the accused websites in this

9    case are hosted on Defendants' servers.[15]  However, both *Lockheed* and *Fonovisa* focus on the

10   **extent of control** over the means of infringement,[16] ***not* where** the alleged infringing material was

11   located.[17]  The alleged means of infringement here are the accused websites.  Defendants have no

12   control over the accused websites or their content, and are not liable for contributory infringement

13   merely because the accused websites may be found on their servers.  Defendants' service, like that

14   provided by NSI, is a "rote" Internet service which "does not entail the kind of direct control and

15   monitoring required to justify" a finding of contributory infringement.  *See Lockheed* at 985.

16           **2.        No Instructions On Required Element of Direct Control and Monitoring**

17           Contributory infringement may be found if a defendant (i) supplies an infringing product (ii)

18   with knowledge that a third party is using it to infringe a plaintiff's mark.  *See Inwood* at 855.

19   *Lockheed* held that the "supplies a product" requirement may be satisfied if the defendant directly

20   controls and monitors the means of infringement, *i.e.*, if the defendant provides a service that the

21   third party uses to directly infringe, and there is direct control and monitoring by the defendant of the

22   third party's use of the service.  *See Lockheed* at 984-85.  So, direct control and monitoring is an

23   entirely separate and distinct element of contributory infringement from the element of knowledge.

24           However, the Closing Instructions fail to distinguish between the two elements.  Instead, to

---

[15]A service which the Court views as "the Internet equivalent of leasing real estate" after discussing *Fonovisa* and *Lockheed*.  *See Akanoc*, 591 F.Supp.2d at 1112.

[16]*See Lockheed* at 984; *Fonovisa* at 262.

[17] Vuitton's intellectual property rights do not cover the accused images.  Unlike *Hard Rock* and *Fonovisa*, Defendants here do not have possession or custody of any alleged infringing materials.

1    the extent that control is addressed at all, it is conflated with the instructions on knowledge:

2           In making that judgment [as to whether Defendants had knowledge
            that their customers were using their service to infringe Plaintiff's
3           trademark], you may consider a number of factors, including …
            (4) The degree of control that Defendants could and did exercise over
4               its servers or services and the use of its servers or services; …

5    *See* Doc. 227, 9:24-10:19.  But the two elements are separate, and one cannot be inferred from the

6    other, as implied and permitted by the above instruction. Instead, pursuant to *Lockheed*, the jury

7    should have been instructed that it must find that Defendants *directly* control and monitor a third

8    party's use of their services in order to find contributory infringement.  The instructions should have

9    also provided guidance as to what constitutes direct control and monitoring, with examples from

10   *Lockheed*, *Visa*, and *Tiffany*. With proper instructions the jury could not find that the Defendants

11   directly controlled and monitored any websites that allegedly infringed Vuitton's property rights.

12          The instruction also erred by including "servers," impermissibly broadening the definition of

13   the "means of infringement." The critical issue here is whether Defendants directly control and

14   monitor a third party's use of their services, and *not* whether they directly control and monitor their

15   actual servers. (the former does *not* logically follow from the latter.)  Thus, the question should have

16   been whether Defendants directly controlled and monitored the accused websites, because it is only

17   the "use" of the mark on the accused websites that could even potentially constitute infringement.

18          [T]he infringement does not result from NSI's publication of the
            domain name list, *but from the registrant's use of the name on a web
19          site* … in connection with goods or services.

20   *See Lockheed* at 985 (emphasis added) (citing decision below at 985 F.Supp. 949, 958 (C.D. Cal.

21   1997)).  *See also Visa*, 494 F.3d at 807 (finding that the instrumentality of infringement at issue was

22   not Visa's computer network, but the accused websites); *Tiffany* at 506 (finding that "eBay exercises

23   sufficient control and monitoring *over its website* such that it fits squarely within the *Fonovisa* and

24   *Hard Rock Cafe* line of cases [emphasis added].").  Here, there was simply no evidence here that

25   Defendants directly controlled or monitored the accused websites.

26          **3.      Defendants Cannot Be Liable for Contributory Infringement If Their
                      Customers Use Their Services to "Facilitate" Infringement**
27

28          The Closing Instructions further erred by allowing the jury to find Defendants liable for

1   contributory infringement if their customers have used their services to "facilitate infringement of

2   Plaintiff's trademark." *See* Doc. 227, 7:8-14 & 8:25-26.  The term "facilitate" sets a much lower

3   standard than the required direct control and monitoring, especially in view of (i) the absence of any

4   definition of the term, and (ii) the lack of guidance as to what constitutes direct control.  Here, it is

5   undisputed that there is no privity between Defendants and the third parties accused of infringement.

6   *See* Exh. 1621, 153:22-154:6 & 155:13-16.  None of Defendants' customers (*i.e.*, the resellers) have

7   been accused of direct infringement.  Hence, it is all the more important for the jury instructions to

8   emphasize that direct control and monitoring is necessary to find contributory infringement.

9        Even if the rental of server space were "the Internet equivalent of leasing real estate," this

10  case is much more akin to *Malletier* than to *Fonovisa*.  In *Fonovisa*, contributory liability was found

11  because the defendant was more than "an absentee landlord," but actually promoted and controlled

12  the swap meet it operated.  *See Fonovisa*, 76 F.3d at 262.  Conversely, in *Malletier*, the property

13  owner was "separate and distinct" from the flea market operator, and had no specific, direct control

14  over the flea market's tenants.  *See Louis Vuitton Malletier v. Flea Market, Inc.*, No. C 09-01062

15  CW, 2009 WL 1625946, at *2 (N.D. Cal. June 10, 2009).  The *Malletier* court held:

16              No case supports the proposition that a property owner may be liable
            for contributory trademark infringement if it only leases property to a
17              separate and distinct entity, which in turn operates a flea market and
            rents space to a vendor, which in turn infringes trademarks.

18

19  *See id.* at *3.  Likewise, the evidence adduced at trial demonstrates that Defendants here only rent

20  server space to their customers, (customers that are other ISPs, not the alleged direct "infringers"),

21  and have no relation with, or control over, the alleged direct "infringers."  Thus, the evidence does

22  not permit contributory liability on the part of Defendants.

23              **D.      No Proof of Material Contribution For Contributory Copyright Infringement**

24        Contributory copyright infringement may only be found if a defendant, with knowledge of

25  the infringing activity, materially contributes to the infringing conduct of another. *Napster* at 1019.

26        In *Visa*, the Ninth Circuit held that material contribution may be found if, among other

27  factors, a defendant's service allow users to locate and obtain infringing material or assists in the

28  distribution of infringing content.  *See Visa*, 494 F.3d at 796-97 (discussing *Amazon.com*, *Napster*,

and *Grokster*).  It noted that "[t]he search engines in *Amazon.com* [*i.e.*, Google] provided links to specific infringing images," and that "Google substantially assists websites to distribute their infringing copies to a worldwide market and assists a worldwide audience of users to access the infringing materials."  *Id.* (citing *Amazon.com*, 508 F.3d at 729).  It further noted that "the administrators of the Napster and Grokster programs *increased the level of infringement by providing a centralized place* … where infringing works could be collected, sorted, found, and bought, sold, or exchanged [emphasis added].")

Conversely, Defendants here do *not* help users locate or obtain the accused images.  They do *not* provide a centralized place where counterfeit Vuitton goods, or even the accused images, can be obtained.  They merely rent server space to their customers, who in turn host the accused websites that are created and operated by others.  *See* Exh. 1621, 153:18-154:25.  The accused infringers (even assuming someone in China can be said to "infringe" any U.S. rights) is therefore three steps removed from the Defendants.  Vuitton showed no closer connection.  Nor do Defendants *substantially* assist in the distribution of either the goods or the images.  At trial, Vuitton did not show that anyone within the U.S., other than its own investigator, has even viewed the accused websites.  *See* Exh. 1622, 238:16-245:3 discussing Exh. 1559.

Vuitton would undoubtedly argue that, by renting server space in which the accused images are found, Defendants provide the "sites and facilities" for infringement.  However, even assuming, *arguendo*, that those images infringe Vuitton's intellectual property rights, the mere rental of server space does *not* constitute the provision of such "sites and facilities."  In *Fonovisa*, the defendant flea market provided the "sites and facilities" for infringement by engaging in a "mutual enterprise of infringement" with the direct infringers.  *See Visa*, 494 F.3d at 798 (citing *Fonovisa*, 76 F.3d at 264).  It also "reap[ed] substantial financial benefits" directly from the sale of counterfeit recordings.  *See Fonovisa*, 76 F.3d at 263.  In contrast, Vuitton presented no shred of evidence that any Defendant was engaged in any mutual enterprise with any third party, never mind the alleged direct infringers.  Vuitton's claims were based on the frankly racist insinuation that because (i) Steven Chen is of Chinese origin, and (ii) the Chinese are "known counterfeiters," Defendants must be conspiring with the infringers to provide "bulletproof" hosting services for them.  But this scurrilous assertion was

1   entirely unsupported by evidence.  Instead the evidence showed that the Defendants derived no

2   benefit whatsoever from the sale of "counterfeit" Vuitton goods.  *See* Exh. 1621, 155:9-24.

3         In *Napster*, the Ninth Circuit held that the designer and distributor of the Napster software

4   provided the "sites and facilities" for infringement because it was "expressly engineered to enable

5   the easy exchange of pirated music and was widely so used."  *See Visa*, 494 F.3d at 798-99 (citing

6   *Fonovisa*, 76 F.3d at 1020 n.5).  Such a characterization obviously does not apply to Defendants

7   here.  Even Vuitton admitted that the accused websites are far outnumbered by the legitimate

8   websites and content on Defendants' servers.  *See* Exh. 1622, 77:18-78:23.

9         The Closing Instructions again saved Vuitton by omitting the "material contribution" element

10  altogether, and never informed the jury that Vuitton was obligated to prove "material contribution."

11  The instructions on contributory copyright infringement only discuss knowledge.  *See* Doc. 227,

12  11:5-12:25.  This is clear error, allowing Vuitton to win by misrepresentation of the law.  The

13  instructions should have (i) expressly stated that contributory copyright infringement may only be

14  found if Defendants materially contributed to the direct infringement of Vuitton's copyrights, and

15  (ii) provided guidance as to what constitutes material contribution, with examples from *Visa*,

16  *Fonovisa*, *Amazon.com*, and *Napster* such as proffered by Defendants.

17        **E.      Instructions Did Not Allow Jury to Consider Defendants' Exculpatory Evidence**

18        Under *Inwood*, liability for contributory trademark infringement is found only if a defendant

19  *continues* to supply the means of infringement to a third party after learning of the third party's use

20  thereof to infringe.  *See Visa*, 494 F.3d at 807 (emphasis added).  Courts "have *routinely* declined to

21  impose liability where a defendant, once it possesses sufficient knowledge, takes '*appropriate steps*'

22  to cut off the supply of its product or service to the infringer."  *See Tiffany* at 516 (emphasis added).

23  Likewise, the Ninth Circuit held that contributory copyright infringement may be found only if a

24  defendant, after learning of specific infringing material, "could take *simple measures* to prevent

25  further [direct infringement], and failed to take such steps."  *See Amazon.com*, 508 F.3d at 1171-72

26  (emphasis added).  It also directed the district court, on remand, to examine "whether there are

27  *reasonable and feasible means* for Google to refrain from providing access to infringing images."

28  *See id*. at 1173 (emphasis added).  Thus, if the defendant takes reasonable and feasible measures to

prevent further infringement, such action exculpates it from contributory liability.

The evidence at trial shows that Defendants, after receiving notice of specific instances of alleged infringement from Vuitton, took reasonable steps to curb access to the accused websites. First, Defendants would ping the domain name of an accused website to see if it was hosted on one of their servers. *See* Exh. 1623, 94:2-96:25.[18] If it was, Defendants would forward the complaint to the customer who rented the server. *See id.* If the customer did not respond, Defendants would disable the corresponding IP address. *See id.* at 115:4-15. For repeated offenses, they would unplug the entire server. *See id.* at 120:8-122:9. Although Vuitton may desire that Defendants take more proactive steps to help Vuitton police its intellectual property, the law simply does not impose such a duty on Defendants. *See Hard Rock* at 1149 ("no affirmative duty to take precautions against the sale of counterfeits [or] to seek out and prevent violations"); *Tiffany* at 515 (holding that "eBay is under no affirmative duty to ferret out potential infringement"); *Inwood* at 854 n.13 (no duty for defendant distributor to anticipate direct infringement by downstream retailers).

While the jury was instructed to consider Defendants' actions or inaction after receiving notice of infringement, as well as Defendants' technical ability and feasibility to terminate the use of their services by a direct infringer, these instructions were again conflated with those on Defendants' knowledge regarding infringement. *See* Doc. 227, 9:24-10:19. However, as the above discussion on *Visa*, *Tiffany*, and *Amazon.com* shows, whether a defendant takes action needs to be considered *only after* it learns of the infringement. Exculpatory action is a separate element from knowledge, rather than a factor under knowledge. Crucially, the jury was *not* told that Defendants would *not* be liable for contributory infringement if they took reasonable steps to curb access to the accused websites even if they had knowledge of specific infringement.[19] This was clear error.

## V.  STATUTORY DAMAGES WERE IMPROPERLY AWARDED

### A.  The Jury Awarded Statutory Damages Far Above the Statutory Maximums

The trademark and copyright awards in this case, multiples of the statutory maximums, must

---

[18]Very often, the accused websites Vuitton complained of were not even hosted on Defendants' servers. *See id.* at 107:11-110:24 (discussing Exh. 1613) & 138:15-140:21 (discussing Exh. 1598).

[19]Thus, even if the jury found that Defendants took such steps, it would not have known how to correctly apply this fact under the proper framework for contributory infringement.

18

1   be set aside.  They are not supported by evidence, but resulted from erroneous instructions and the

2   unconstitutional application of laws that provided no guidance to the jury as to reasonable awards.

3       The jury awarded almost twice the maximum trademark statutory damages allowable.  The

4   maximum statutory award for each trademark per class of goods willfully infringed is $1,000,000.[20]

5   15 U.S.C. § 1117(c).  For seventeen marks per class infringed [Doc. No. 235 at 3:1-5:28 (listing

6   marks per class) and 6:1-24 (identifying infringed marks)], the maximum possible award was

7   $17,000,000.  The jury awarded $31,500,000.  *Id*. at 8:12-9:5.  Dividing the actual award by the

8   maximum possible yields a ratio of 1.85-to-1, nearly double the maximum.

9       The jury also awarded three times the maximum copyright statutory damages allowable.

10  The maximum statutory award for each copyright willfully infringed is $150,000.  17 U.S.C. §

11  504(c)(2).  For two works infringed [Doc. No. 235 at 10:10-16], the maximum possible award was

12  $300,000.  The jury awarded $900,000.  *Id*. at 12:20-13:8.  Dividing the actual award by the

13  maximum possible yields a ratio of 3-to-1, triple the maximum possible award.

**B.      The Confusing Trademark Damages Instructions Misstated the Law**

15      The jury's trademark statutory damages award nearly double the statutory maximum is

16  unsustainable because the jury instructions were confusing and misstated law.  The instruction on

17  non-willful infringement told the *jury* Vuitton was "entitled to statutory damages . . . as the *court*

18  considers just."  [Doc. No. 227 at 15:9-12] (emphasis added).  This quote from 15 U.S.C. §

19  1117(c)(1) could only confuse a jury: it suggests the jury may disregard non-willful infringement

20  instruction or speculate as to what the "court considers just."  This was misleading even if the jury

21  did not invoke the instruction, particularly in contrast with the instruction on *willful* infringement.

22      The instruction regarding willful infringement [Doc. No. 227 at 15:13-15] misconstrued the

23  law in at least two ways.  **First**, it omitted the only constraint present in both Sections 1117(c)(1)

24  *and* (c)(2): requiring an award "as the court considers just."  The constraint was included in the

25  instruction on non-willful infringement but absent as to willful infringement, suggesting any award

26  for willful infringement, "just" or not, is proper.  This explains the award near double the maximum.

27  _____

28  [20]For the relevant period, 15 U.S.C. § 1117(c)(2) provided a maximum award of $1,000,000 per
mark per class of goods willfully infringed.  This maximum was later increased to $2,000,000.

1    **Second**, the willful infringement instruction quotes Section 1117(c)(2), asking whether "the

2    use of the counterfeit mark was willful."   Merely quoting the statute again misconstrues the law

3    because Congress addressed *direct* infringement there; *contributory* trademark infringement is a

4    judge-created doctrine with added elements.  *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F.Supp.2d 463, 502

5    (S.D.N.Y. 2008).  Perhaps third parties willfully used Vuitton's marks on replica purses in China.

6    Such extraterritorial conduct is not a Lanham Act violation, as discussed above.  Even if it were, the

7    third parties' willful "use" would not make *Defendants'* alleged contribution willful.  Compare for

8    example Vuitton's representative's testimony that there was no evidence that Defendants controlled,

9    directed, participated in, profited from, or encouraged third party counterfeiting (Exh. 1621, 155:9-

10   161:15) with defendants' conduct in *Microsoft Corp. v. Black Cat Computer Wholesale, Inc*., 269

11   F.Supp.2d 118, 123-24 (W.D.N.Y. 2002) or *In Re Aimster Copyright Litig*., 334 F.3d 643, 655 (7th

12   Cir. 2003) ("Far from doing anything to discourage repeat infringers…  Aimster invited them to do

13   so, [and] showed them how . . . ").  Defendants are not liable for enhanced damages for non-willful

14   conduct even if direct infringers' conduct was willful.  See *U.S. Media Corp. v. Edde Entm't Corp.*,

15   No. 94 CIV. 4849, 1998 WL 401532, at *9 (S.D.N.Y. July 17, 1998), citing *Fitzgerald Pub. Co. v.*

16   *Baylor Pub. Co., Inc*. 807 F.2d 1110, 1116 (2nd Cir. 1986).[21]

17   Lastly, both the non-willful and willful trademark instructions were preceded by the

18   confusing instruction: "the Plaintiff is entitled to statutory damages *if*."  [Doc. No. 277 at 15:9

19   (emphasis added)]  The statute actually provides for statutory damages "*in the amount of*."  Section

20   1117(c) (emphasis added).  Replacing a limiter with a conditional compounds the errors above,

21   suggesting statutory damages were unavailable if the court awarded damages of $1,000 to $200,000,

22   or the jury awarded under $1,000,000 (perhaps why it awarded more).  This has no basis in the law.

23   The erroneous instruction severely prejudiced Defendants.  Where, as here, confusing

24   instructions provide wrong legal standards and result in awards beyond the possible maximum, the

25   _____

26   [21]The reference to willful *use* is compounded, not cured by the subsequent instruction on willful
     *contributory infringement*.  [Doc. No. 227 at 15:16-24]  The separate definition and disparate
27   language contrasts with the copyright damages instruction, which introduces and defines "innocent
     infringement" in the same paragraph with the same verbiage (same for "willful" contributory
28   copyright infringement – but the test is incorrect).  *Id*. at 16:8-11, 16:16-24.  Question No. 6 of the
     verdict form [Doc. No. 235 8:1-3] also gives the wrong test, so does not correct the error.

1    jury is "less [like] a tipsy coachman [nonetheless] arriving at the right destination," and more like a

2    "blind one who ends up at the wrong place."  *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d

3    1259, 1268, 1270 (11th Cir. 2008).  This is underscored by the trademark award above the statutory

4    maximum *and* more than 30 times the combined $1,000,000 award Vuitton requested.  See Exh.

5    1623, 97:15-23; *see also Tillman v. Freightliner, LLC*, 247 Fed.Appx. 867, 869, 2007 WL 2298037,

6    at *2 (9th Cir. 2007) (error not to reduce award just "four times the amount requested by plaintiff's

7    counsel").[22]  The jury was blind; its "chariot wound up at the wrong house.  We can neither chart its

8    course nor let stand its destination."  *Rodriguez* 518 F.3d at 1270.  The award cannot stand.

9    ### C.    Copyright Damages Instructions Misstated the Law

10           The copyright statutory damages award in this case is also unsustainable where the jury

11   instructions effectively required the jury to find *any* contributory infringement was willful and to

12   punish the Defendants.  This might explain copyright damages three times the statutory maximum.

13           The jury was wrongly instructed that Defendants committed willful contributory

14   infringement if they "engaged in acts that contributed to infringement . . . and . . . knew that those

15   acts contributed to the infringement."  [Doc. No. 227 at 16:16-24]  This equates "knowing" with

16   "willful".   But knowledge is required even for non-willful contributory infringement.  *A&M*

17   *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001).  Willful contribution requires

18   more culpable conduct.  See *In Re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) ("Far

19   from doing anything to discourage repeat infringers . . . Aimster invited them to do so, [and] showed

20   them how  . . . ");  *Sega Enterprises Ltd. v. MAPHIA*, 948 F.Supp. 923, 936 (N.D.Cal. 1996).

21   Equating knowledge with willfulness erases the distinction between intentional wrongdoers and

22   more innocent infringers by converting every contributor – one with "knowledge" – into a willful

23   infringer.  This fate befell Defendants.  Vuitton's in-house counsel testified there was no evidence

24   Defendants controlled, directed, participated in, profited from, or encouraged any counterfeiting.

25   Exh. 1621, 155:9-161:15.  Not even Vuitton argued to the jury the evidence showed Defendants

26

---

27   [22]The award well beyond what Vuitton requested also infects the jury's liability verdict, already
     tainted by erroneous instructions on willfulness, among others. *See Honda Motor Co., Ltd. v. Oberg*,
28   512 U.S. 415, 425 n.4 (1994) (the amount of a jury award can infer passion and prejudice).

1   were intentional wrongdoers.  They merely wanted Defendants to do "more."  [Exh. 1623, 81:14:16,

2   86:6-11]  Vuitton's vitriolic rhetoric about harboring pirates has only recently debuted.

3        The jury was also wrongly instructed that the "purpose [of statutory damages] is to penalize

4   the infringer and deter future violations of the copyright laws."  [Doc. No. 227 at 16:3-5]  Copyright

5   statutory damages are *also* meant to compensate, a purpose "at least equally important" as

6   punishment.  *Bly v. Banbury Books, Inc.,* 638 F.Supp. 983, 987 (E.D.Pa. 1986); *Los Angeles News*

7   *Service v. Reuters Television Intern., Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (copyright "statutory

8   damages serve both compensatory and punitive purposes.") (quotations, citations omitted).

9        And "statutory damages should bear some relation to the actual damages suffered."  *Bly* at

10  987; *see also New Line Cinema Corp. v. Russ Berrie & Co., Inc.*  161 F.Supp.2d 293, 303 (S.D.N.Y.

11  2001), citing *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 670 F.Supp. 1133, 1140 (E.D.N.Y.

12  1987).   The jury was not informed regarding these or other important limitations on statutory

13  damages.  Nor was the jury instructed about limitation on punitive damages, though it was explicitly

14  instructed to award them to "deter future violations of the copyright laws" regardless of where,

15  when, how or by whom.  [Doc. No. 227 at 16:3-5]  This is contrary to controlling law.

16       The Supreme Court has unequivocally required jury instructions that punitive damages

17  cannot reach conduct by non-parties or causing harm to non-parties.  *Philip Morris USA v. Williams*,

18  549 U.S. 346, 349-57 (2007) (exhaustively discussing proper scope of punitive damages and jury

19  instructions on same); *see also BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 609 (1996)

20  (defendant cannot be punished for *its own* conduct not at issue).  A limiting instruction was required

21  where Vuitton's in-house counsel testified extensively on global counterfeiting and related issues

22  unrelated to Defendants (e.g., families locked in sweatshops with dizzying chemical fumes [Exh.

23  1620, 159:1-14]), or even Vuitton (e.g., counterfeit Nike and Microsoft products [*id.* at 136:19-

24  137:4]).  See also, e.g., *id.* at 134:10-135-18 & 165:25-169:11; Exh. 1621, 144:4-145:24.  The

25  mandate to punish was magnified by the inescapable – but incorrect – finding that Defendants were

26  *willful* contributory infringers (merely based on knowledge) warranting enhanced damages.

27       Defendants have unquestionably been prejudiced by the erroneous jury instructions on

28  copyright damages.  The instructions lowered the standard for a heightened award then gave the jury

1    *carte blanche* to punish Defendants without any respect for limitations on statutory or punitive

2    damages.  This might explain the jury's combined awards of more than 32 times the $1,000,000

3    Vuitton requested.  *See* Exh. 1624, 97:15-23.  The unchecked award cannot stand. See *Rodriguez v.*

4    *Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1268, 1270 (11th Cir. 2008) (misguided award beyond

5    maximum); *Tillman*, 247 Fed.Appx. at 869 (district court erred in not reducing award just "four

6    times the amount requested by plaintiff's counsel, which is evidence of passion and prejudice").

7              **D.        Statutory Damages Provisions Were Unconstitutional as Applied Here**

8              As applied in this case, the statutory damages awards under the Lanham and Copyright Acts

9    violate the Due Process Clause of the Fifth Amendment of the Constitution.  The unconstitutional

10   statutory damage awards must be set aside even if the underlying statutes are generally valid.  *Little*

11   *v. Streater*, 452 U.S. 1, 16-17 (1981).  The problem is that the statutes provide zero standards for

12   determining statutory damages, the consequent impossibility of properly instructing a jury, and the

13   resulting excessive awards by a "runaway jury."  Due process requires that laws provide meaningful

14   standards to guide their application.  *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).  Else, they

15   are unconstitutionally void for vagueness.  *Id.*  This applies both to laws prohibiting conduct and to

16   laws vesting juries with discretion to fix an award.  See *Giaccio v. State of Pa.*, 382 U.S. 399 (1966);

17   *see also Philip Morris USA v. Williams*, 549 U.S. 346, 349-57 (2007) (due process requires

18   standards to guide jury in awarding punitive damages).  In *Giacco*, the Supreme Court addressed a

19   state law that "simply sa[id] the jurors 'shall determine, by their verdict, whether * * * the defendant

20   shall pay the costs' " of proceedings.  *Id.* at 403.  This law did "not even begin to meet" due process

21   requirements because it contained "no standards at all, nor does it place any conditions of any kind

22   upon the jury's power to impose costs."  *Id.*  The same is true here.  Congress gave no standard to

23   help a jury arrive at a "just" award.  The awards here typify the unconstitutional application of law.

24             One reason for the laws were unconstitutionally applied here is that Congress never intended

25   a *jury* would apply them; they were to be applied by federal judges guided by their training,

26   experience, wisdom and discretion to award reasonable damages.  This plan was disrupted.  In

27   *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998), the Supreme Court held

28   there is a "right to a jury trial on all issues pertinent to an award of statutory damages… including

the amount itself."  But Congress has not yet amended the Lanham or Copyright Acts to guide juries.

Vuitton compounded the problem when it did not present evidence upon which to base rational awards, objected to evidence militating against significant awards, and vigorously opposed jury instructions providing more guidance on liability and damages.  Contributing to a "perfect storm" of standardless statutes, inadequate instructions, and no evidence about damages, Vuitton ensured the statutes would be applied unconstitutionally.  It alone must bear the consequences.

Statutory damages can appropriately be awarded to approximate real damages, but they cannot be based on pure speculation by jury members.  Vuitton asked for $1 million in damages but the jury awarded $32.4 million.  *See* Exh. 1623, 97:15-23.  This underscores the jury's improperly induced passion, speculation and lack of guidance.  Statutory damages statutes were unconstitutionally applied in this case.  The awards based thereon must be vacated.

### E.     The Statutory Damages Here Are Unconstitutional Punitive Damages

The statutory damages awards in this case are subject to constitutional limits on civil punishment.  The Constitution requires "that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Gore,* 517 U.S. at 574.  "Due Process . . . prohibits the imposition of grossly excessive or arbitrary punishments."  *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416 (2003).

Vuitton presented no evidence of actual harm (other than psychic) from any infringement and certainly nothing caused by the Defendants' alleged contributory infringement.  But "compensatory damages redress concrete loss caused by the defendant's wrongful conduct . . . punitive damages . . . are aimed at deterrence and retribution."  *Campbell,* 538 U.S. at 416; *see also Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432 (2001).  So the jury's awards – both beyond the relevant maximums – are purely punitive.  The instructions regarding copyright damages made this explicit.  [Doc. No. 227 at 16:3-5]  These punitive awards are subject to due process limits.

The Supreme Court has identified three guideposts for evaluating whether a damage award comports with due process: (1) the reprehensibility of defendant's conduct; (2) the ratio between harm suffered and the award; and (3) the difference between the award and civil penalties authorized or imposed in comparable cases.  *Campbell* at 418, citing *Gore* at 575.  The awards here cannot be

justified under the three guideposts.  So the awards violate the U.S. Constitution.

### 1.  Defendants' Conduct Was Not Reprehensible

There is no evidence that Defendants' conduct was reprehensible.  But reprehensibility is "[t]he most important indicium" of whether an award is unconstitutionally excessive.  *Campbell*, 538 U.S. at 419.  Courts look to the following aggravating factors to determine whether conduct is particularly reprehensible: (1) whether the harm suffered was purely economic, rather than physical; (2) whether defendant evinced indifference or reckless disregard for the health and safety of others; (3) whether harm was intentionally inflicted; and (4) whether the target was financially vulnerable. *See, e.g.*, *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614 (11th Cir. 2000), citing *Gore* at 576.

### a.  No Physical Harm and No Threat to Health or Safety

Any alleged harm caused by Defendants was purely economic.  They neither caused nor threatened any physical harm.  Nor did they evince disregard for the health and safety of others. This contrasts with counterfeiting cases cited by Congress, when it expressed concern for "serious health and safety hazards caused by []counterfeiting" such as "bogus birth controls pills" that caused pain and unusual bleeding, "substandard counterfeited infant formula," "[c]ounterfeit machine parts and brake pads [that] have been linked to fatal automobile, aviation and helicopter crashes . . . [or] counterfeit parts [] discovered in jet engines, bridge joints and fasteners in areas of nuclear facilities responsible for preventing meltdowns."  HOUSE REPORT NO. 104-556, *3, 1996 U.S.C.C.A.N. 1074, 1076 (1996).  Producing counterfeit baby formula and nuclear reactor parts is reprehensible. Defendants' alleged contribution to the sale of knockoff purses is not.

This distinction "reflects the accepted view that some wrongs are more blameworthy than others."  *Gore,* 517 U.S. at 575-76.  The 11th Circuit made this point when it applied *Gore* in considering the constitutionality of a statutory damages award for environmental contamination. *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1337 (11th Cir. 1999).  The court noted the reprehensibility of a defendants' conduct indicates whether an award within a statutory range is proper.  "For example," a fine of $100,000 would not be reasonable "if the defendant had emptied a bottle of soda pop into a Georgia stream."  *Id*.  There is no evidence Defendants acted reprehensibly.

1

**b.      No Intentional Harm**

2    There is no evidence that Defendants *did* anything intending to contribute to infringement, let

3    alone intentionally cause Vuitton economic harm.   Instead, taking the hypothetical in *Johansen*,

4    Defendants' conduct amounts only to trying but failing to retrieve a soda pop bottle Defendants'

5    customer's customer threw into a stream.   The undisputed evidence showed that the Defendants

6    spent considerable effort to stop unknown third parties from abusing Defendants' ISP services.  And

7    it was effective in all cases.  Vuitton could only argue that Defendants should have tried harder or

8    worked faster to disable IP addresses or unplug servers.   Defendants' passive "contribution" to

9    another's contributory infringement was simply not reprehensible.

10

**c.      No Financial Vulnerability of Plaintiff**

11    Vuitton is anything but financially vulnerable. To the contrary; it claims to sell some of the

12    most expensive luxury goods in the world and has enjoyed consistent double-digit growth in its sales

13    of luxury goods – even in China – during the worst global recession in memory.  Vuitton has opulent

14    stores and an army of lawyers to protect it.  Vuitton successfully kept away from the jury evidence

15    of its continuing strong financial success.  This factor does not support a finding of reprehensibility.

16

**d.      No Evidence of Reprehensible Conduct**

17    The Defendants did nothing except provide content-neutral Internet communications services

18    that were abused by unknown parties who are not even their customers.  The Defendants had no role

19    in or advance knowledge of any infringing activities and did everything reasonably possible to stop

20    infringing activities after receiving notices from Vuitton.  They did not promote, induce, advise, or

21    profit from any infringement by customers of customers.  Vuitton only complains that they should

22    stop doing any business with any Chinese ISP reseller about whose customers Vuitton complained.

23    Even "conduct [] sufficiently reprehensible to give rise to tort liability, and even a modest

24    award of exemplary damages does not establish the high degree of culpability that warrants a

25    substantial" award of a punitive nature.  *Gore*, 517 U.S. at 580.  As in *Gore* at 576, "none of the

26    aggravating factors associated with particularly reprehensible conduct is present."   Where "the

27    absence of all of them renders any award suspect," the $32,400,000.00 awards here are wholly

28    unreasonable and must be vacated.  *Campbell*, 538 U.S. at 419.

### 2.   The Jury's Award Bears No Relation to Actual Harm

The statutory damages awards in this case are punitive in nature and have no relation to any actual harm.  The second guidepost, *Gore* at 575, looks to the ratio between the actual or potential harm and the punitive award.  Where copyright and trademark statutory damages both compensate and punish,[23] this guidepost is followed by comparing the punitive and compensatory components.

Vuitton presented no evidence of *any* harm justifying the award here.  This is not a case "where a particularly egregious act has resulted in only a small amount of economic damages" justifying an award substantially greater than the actual harm.  *Gore*, 517 U.S. at 582.  Nor does Vuitton deserve a substantial award because "the injury is hard to detect," *id.*, or because it lacks "adequate evidence" due to "deception routinely practiced by counterfeiters" that "willfully deflate[d] the level of counterfeiting actually engaged in."  SENATE REPORT NO. 104-177, *10. Nor did Vuitton even request the jury to determine actual harm.  This is doubtless because Vuitton could not show any financial harm, lost sales, actual confusion, or any objective evidence of actual damages.  So there is no compensatory component to the statutory damage awards in this case and the punitive component – i.e., the whole award[24] – bears absolutely no relation to any actual harm.

Where there are no actual (even if unquantifiable) damages, no compensatory damages and no actual harm that can be compared to the punitive damages in order to determine their reasonableness, the punitive damage award is unsupported under this *Gore* guidepost. The appropriate remedy for a technical violation that does not cause harm is not punitive damages, but nominal damages.  *Cummings v. Connell*, 402 F.3d 936, 942-43 (9th Cir. 2005).

---

[23]*Los Angeles News Service v. Reuters Television Intern., Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (copyright "statutory damages serve both compensatory and punitive purposes") (quotations, citations omitted); *Motorola, Inc. v. Abeckaser*, No. 07-cv-3963 (CPS), 2009 WL 2568529, at *2 (E.D.N.Y. Aug. 5, 2009) ("Copyright Act[] statutory damages award serves both compensatory and punitive purposes.  [Citation.]  Factors considered by courts in determining a just award include the revenues lost by the plaintiff; the profits reaped and expenses avoided by the infringer . . . ").

In providing statutory damages under 15 U.S.C. § 1117(c), Congress intended to "strengthen[] the hand of businesses **harmed** by counterfeiters by . . . providing stronger civil **penalties** against counterfeiters"  SENATE REPORT NO. 104-177  S. REP. 104-177, *2 (1995) (emphasis added); see also 141 Cong. Rec. S12079-03, S12085) ("statutory damages . . . ensure[] that trademark owners are adequately **compensated** and that counterfeiters are justly **punished**") (emphasis added).

[24]*Childress v. Taylor,* 798 F.Supp. 981, 997 (S.D.N.Y. 1992) (statutory award primarily punitive).

1

### 3.   Defendants Had No Fair Notice of Such Severe Penalties

2   The Defendants had no fair notice that conducting a legitimate ISP business exposed them to

3   the incomprehensible statutory awards in this case.  The third guidepost, *Gore*, 517 U.S. at 574,

4   compares the challenged award to penalties authorized or imposed in similar cases to determine

5   whether "a person receive[d] fair notice not only of the conduct that will subject him to punishment,

6   but also of the severity of the [potential] penalty."  *See Campbell*, 538 U.S. at 428.  There is no

7   similar case in American jurisprudence; the liability verdict and damages awards are unprecedented.

8   This underscores Defendants' lack of notice and undercuts the punitive damage award.

9

### a.   The Damages Statutes Did Not Provide Fair Notice

10   The mere fact that a statute provides a fixed range of awards for a given offense does not

11   give fair notice as to the potential penalty for particular conduct.  *Johansen v. Combustion Eng'g,*

12   *Inc.*, 170 F.3d 1320, 1337 (11th Cir. 1999).  This is especially true when, as under the Lanham Act,

13   the statutory maximum award is one thousand times the minimum.  *Cf. Harris v. Mexican Specialty*

14   *Foods, Inc.*  564 F.3d 1301, 1312 (11th Cir. 2009) (notice of potential penalty not inherently lacking

15   when "limited to a *narrow*, statutorily-established range" of $100 to $1,000) (emphasis added).  A

16   defendant who has committed harmless (even if technically "willful") infringement is not on notice

17   of a legitimate statutory damages award at – or here, *over* – $1M per infringed mark, rather than

18   $1,000.  Defendants had no notice of the awards in this case.

19

### b.   There is No Civil Liability for Defendants' Conduct

20   Significantly, in similar cases, *no award was warranted* because conduct similar to

21   Defendants' *could not even support liability*, let alone ruinous damages. *See Louis Vuitton Malletier*

22   *v. Flea Market, Inc.*, No. C 09-01062, 2009 WL 1625946 (N.D. Cal. June 10, 2009).

23   In *Flea Market*, defendants leased their property to a flea market operator, who in turn leased

24   spaces to vendors who engaged in infringement.  This sharply contrasted with the "willfully blind"

25   contributory infringer in *Fonovisa*[25] because "the defendant [in *Fonovisa*] both owned and operated

26   the market."  *Flea Market*, 2009 WL 1625946, at *2.  On those facts, the *Flea Market* court

27

28   [25]*Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996).

1  dismissed the complaint because "[n]o case supports the proposition that a property owner may be

2  liable for contributory trademark infringement if it only leases property to a separate and distinct

3  entity, which in turn operates a flea market and rents space to a vendor, which in turn infringes

4  trademarks." *Id*. at *3. The facts in *Flea Market* are closely analogous. Defendants merely rent

5  servers to their customers, who in turn rent them to third parties, who in turn allegedly infringed

6  Vuitton's intellectual properties. The case also exemplifies Vuitton's overreaching.

7  Similarly, in *Symantec Corp. v. Logical Plus, Inc*., No. C 06-7963, 2009 WL 3416178 (N.D.

8  Cal. October 20, 2009), defendants were alleged to have "hosted the website that [the direct

9  infringer] sold its merchandise through, []supplied to [the infringer] products that [they] then sold,"

10  and the infringer "used an email address hosted by" defendants. *Id*. at *7. Because defendants were

11  accused of providing *services* to the direct infringers, the court applied the "direct control and

12  monitoring" test and held it was not satisfied. *Id*. at *8. Vuitton, just like in *Symantec,* has failed to

13  demonstrate "direct control and monitoring of the instrumentality used by a third party to infringe."

14  Where conduct closely analogous to Defendants' cannot even support liability, Defendants

15  were not on notice of potential $32,400,000.00 awards.

16  **c. Awards in Other Infringement Cases Provided No Notice**

17  Even damage awards in infringement cases with more egregious facts (that actually support

18  liability) did not provide Defendants with fair notice of the awards here. For example, in *Microsoft*

19  *Corp. v. Rechanik*, a defendant was previously held liable to the tune of $1M for selling purported

20  Microsoft products he purchased at suspiciously low prices and refusing to stop when he learned

21  they were counterfeit. 249 Fed.Appx. 476, 477, 2007 WL 2859800, at *1 (7th Cir. 2007). He closed

22  up shop only to start a new company doing the exact same thing. *Id*. Microsoft sued again and the

23  defendant was found liable on summary judgment for contributing to his new company's direct

24  copyright and trademark infringement. *Id*. at *1-2. This repetitious conduct led to a combined

25  damages award of just $880,000 (2.7% of the award here). *Id*. at *1. In a very similar case,

26  defendants sold 8,922 units of software they knew to be counterfeit, including at least sixteen

27  Microsoft product suites. *Microsoft Corp. v. Black Cat Computer Wholesale, Inc*., 269 F.Supp.2d

28  118, 120-22 (W.D.N.Y. 2002). Even the higher statutory damages awards there, $510,000 for

1    copyright and $900,000 for trademark, are dwarfed by the awards here (over 23 times higher).  *Id.*

2            Nor do per mark or per copyright damage awards come close to the awards here.  In yet

3    another Microsoft case, defendants faced heightened statutory damages for their willful copyright

4    and trademark infringement.  *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01 C 4693, 2003 WL

5    22038593, at *14-16 (N.D. Ill. August 28, 2003).  The court recognized that "statutory damages . . .

6    should be sufficient to deter future violations by defendants, *but not unduly large considering that*

7    *Microsoft suffered little, if any, actual injury*.  Accordingly, we will award Microsoft statutory

8    damages of $5,000 per copyright (for seven copyrights) and $5,000 per trademark (for seven

9    trademarks), for a total statutory damages[ ]award of $70,000."  *Id.* at *16 (emphasis added).  An

10   identical $5,000 per copyright and trademark was also awarded for the infringing sale of 3,100

11   counterfeit Nintendo cartridges.  *Nintendo of Am., Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1009-

12   11 (9th Cir. 1994).  Even after trebling the copyright damages for willful infringement, both awards

13   totaled just $248,000.  *Id.* at 1109-10.

14           Awards of $880,000, $1,410,000, $70,000 and $248,000 against direct sellers of counterfeit

15   merchandise in no way notified Defendants that their passive conduct related to third parties' alleged

16   "counterfeiting" in China could lead to awards totaling $32,400,000.00; particularly absent evidence

17   that anyone sold anything within the U.S., except to Vuitton's own agent for litigation purposes.

18                   **d.     There Is No Criminal Liability for Defendants' Conduct**

19           Criminal laws provided no notice of the awards here because there is no criminal liability for

20   conduct similar to Defendants.'   The standard for criminal aiding and abetting of trademark

21   counterfeiting or copyright infringement is even higher than for civil contributory infringement.  "**To**

22   **convict a defendant as an aider and abettor,** the government must show that the defendant's act

23   contributed to the execution of the criminal activity **and that he intended to aid in its commission.**

24   [Citation.]"  *U.S. v. Sultan*, 115 F.3d 321, 325 n.4 (5th Cir. 1997) (guilt for aiding and abetting

25   counterfeiting require proof beyond reasonable doubt that defendant knew parts were counterfeit)

26   (emphasis added).  This principal applies generally to aiding and abetting cases under 18 U.S.C. § 2,

27   whether trademark, copyright or other.  See, *e.g., United States v. Zemek*, 634 F.2d 1159, 1174 (9th

28   Cir. 1980) ("Conviction as an aider and abettor requires proof the defendant willingly associated

1   himself with the venture and participated therein as something he wished to bring about."), *cert.*

2   *denied*, 450 U.S. 916, *cert. denied*, 450 U.S. 985, *cert. denied*, 452 U.S. 905; *U.S. v. Smith*, 832 F.2d

3   1167, 1170 (9th Cir. 1987) (intent to aid and abet "requires proof that [a defendant] '**shared in the**

4   **criminal intent** of the principal' ") (emphasis added), citing *Hernandez v. U.S.*, 300 F.2d 114, 123

5   (9th Cir. 1962).   If this were a criminal case, the government would have to prove beyond a

6   reasonable doubt at least (1) that the alleged primary infringers' conduct constituted a crime, (2) that

7   Defendants shared the primary infringers' intent and (3) that Defendants actively and intentionally

8   participated in the venture wishing to make it succeed.

9          But the alleged primary infringers' extraterritorial conduct was not a violation of U.S. civil

10  law, let alone criminal law.   Nor did Vuitton provide *any* evidence of these third parties' intent.

11  Even assuming Defendants' customers' customers had the requisite criminal intent, Defendants did

12  not come close to "sharing in [that] intent" or "participating" in their conduct.   So the potential

13  criminal penalty for Defendants' conduct is *no penalty at all*.   Criminal penalties gave no notice that

14  Defendants could face a $32,400,000.00 penalty.

15         Because neither the statutes, nor similar civil or criminal cases provided notice as to the

16  awards here, the third Gore guidepost weighs heavily against those awards.

17  ### F.   All of the *Gore* Guideposts Require the Damages in this Case be Vacated

18         Because all of the *Gore* guideposts strongly demonstrate that the statutory damages awards in

19  this case are grossly excessive and unconstitutional, the awards must be thrown out.   Defendants'

20  conduct was not reprehensible, especially in light of specific counterfeiting examples cited by

21  Congress.   See, e.g., HOUSE REPORT NO. 104-556, *3, 1996 U.S.C.C.A.N. 1074, 1076 (1996)

22  (counterfeit baby formula and nuclear reactor parts).   The award bears absolutely no relation to

23  actual harm, especially where Vuitton provided no evidence it *actually suffered harm*.   Finally,

24  conduct similar to Defendants' does not support liability, let alone the damages awards here.

25         Defendants' conduct is not punishable.   The punitive statutory awards must be vacated.

26  ### G.   Vacation of the Statutory Damages Awards Does Not Mandate a New Trial

27         Vuitton has no right to a new trial even though the unconstitutional damages awards must be

28  vacated.   *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1151-52 (9th Cir.

1   2002) (reducing constitutionally excessive award without new trial), citing *Johansen v. Combustion*

2   *Eng'g, Inc.*, 170 F.3d 1320, 1331-32 (11th Cir. 1999).  This is because "a constitutionally reduced

3   award is not a traditional remittitur at all.  It is not discretionary, and the court's authority to do so

4   does not lie in Rule 59."  *Johansen*, 170 F.3d at 1331-32.[26]

5        *Johansen* at 1332 explained that "no new trial need be offered as the Supreme Court itself

6   recognized in *BMW* [*of North Am., Inc. v. Gore*, 517 U.S. 559, 586.]"  The Supreme Court later

7   agreed that no new trial is required in the case of excessive damages. *Cooper Indus., Inc. v.*

8   *Leatherman Tool Group, Inc.*, 532 U.S. 424, 437 (2001) ("jury's award of punitive damages does not

9   constitute a finding of 'fact,' appellate review . . . does not implicate the Seventh Amendment").

10       **H.      Granting a New Trial Will Not Provide Due Process**

11       There is no basis upon which Vuitton can have a new trial on damages that would cure the

12   problem of a random speculative damage award.  Without any guidance, the jury's decision is

13   simply a roll of the dice (or perhaps a reflection of how some jury members feel that day).  This

14   would impermissibly leave Defendants "at large, wandering in deserts of uncharted discretion . . .

15   [where a jury's] only restraint beyond a core sense of fairness is the due process limit" due to a lack

16   of guidelines.  *Exxon Shipping Co. v. Baker*, 128 S.Ct. 2605, 2628 (2008).

17       Vuitton presented no evidence of any "actual damages," or any way to even estimate

18   damages; Vuitton presented no evidence of harm whatsoever, not a single sale of a product in the

19   United States, not a single lost sale anywhere in the world, not a single dollar of lost revenue, no

20   decline in product sales, no advertising expenses, nothing.  Vuitton merely sought to punish

21   defendants it regarded as existentially offensive.  Not a scintilla of real damage evidence was

22   presented.  The jury had nothing on which to base a statutory damage award.  Even if it had, there is

23   no standard to guide the jury to an award that would not be arbitrary. See *Exxon*, 128 S. Ct. at 2629.

24       **I.      Vuitton Is Entitled to No More Than Nominal Damages**

25       Vuitton is entitled to no more than nominal damages because it did not prove any actual

---

26  [26]*See also Club 93, Inc. v. First Sec. Bank of Idaho, N.A.*, No. CV-95-00417, 1999 WL 310640, at *8

27  (9th Cir. May 7, 1999), citing *Cent. Office Tel., Inc. v. Am. Tel. & Tel. Co.*, 108 F.3d 981 (9th Cir.
    1997), *rev'd on other grounds*, 524 U.S. 214 (1998); *Sherman v. Kasotakis*, 314 F. Supp. 2d 843,

28  867-68 (N.D. Iowa 2004) (discussing distinction between constitutional reductions and remittitur).

1    harm.   Statutory damages, which serve to compensate and punish, are not merely statutorily

2    enhanced nominal damages.   Instead, the laws permitting statutory damages are intended to

3    compensate *actual damages* that cannot be quantified.   *Sparaco v. Lawler, Matusky, Skelly*

4    *Engineers LLP,* 313 F.Supp.2d 247, 253 (S.D.N.Y. 2004) (copyright); SENATE REPORT NO. 104-

5    177, *10 (1995) (trademark statutory damages address dearth of "adequate evidence" due to

6    "deception" which obscures extent of actual damages); SENATE REPORT NO. 104-177, *2 (1995)

7    (trademark).  A lack of actual harm is not the same as harm that is difficult to quantify.[27]

8         Where there is no evidence of actual harm, only nominal – not compensatory or punitive

9    damages – are appropriate. *Cummings v. Connell*, 402 F.3d 936, 942-43 (9th Cir. 2005), citing

10   *Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 308 (1986).   This makes copyright and

11   trademark statutory damages, meant to compensate and punish,[28] inappropriate as well.   Awarding

12   only nominal damages in this case "remains true to the principle that **substantial damages should**

13   **be awarded only to compensate actual injury or, in the case of exemplary or punitive damages,**

14   **to deter or punish malicious deprivations of rights**." *Memphis Cmty.*, 477 U.S. at 308 n.11

15   (emphasis added) (quotations, citations omitted).   Vuitton presented no evidence of actual harm or a

16   "malicious deprivations of rights."  Vuitton is entitled to nominal damages of $1.00 at the most.

17   **VI.   DEFENDANT CHEN NOT SHOWN TO BE PERSONALLY LIABLE**

18        There is no evidence Defendant Steve Chen engaged in acts giving rise to personal liability

19   for the corporate Defendants' alleged contributory infringement.   "It is an established principle . . .

20   that corporate directors are not liable merely by virtue of their office for fraud or other tortious

21   wrongdoing committed by the corporation. . . .   Instead, to be held liable a corporate director must

22   specifically direct, actively participate in, or knowingly acquiesce in the fraud or other wrongdoing

---

23   [27]*Cf. Doe v. Chao*, 306 F.3d 170, 176-79, 181 (4th Cir. 2002) (actual harm required for statutory
24   minimum award where 5 U.S.C. § 552a(g)(4) provides "actual damages sustained . . . but in no case
     . . . less than the sum of $1,000"; "An award of merely nominal damages means that a plaintiff has
25   not shown 'actual injury.' "); with *Harris v. Circuit City Stores, Inc*., No. 07 C 2512, 2008 WL
     400862, at *2 (N.D. Ill. Feb. 7, 2008) (no actual damages required where 15 U.S.C. § 1681n(a)(B)
26   provides "actual damages sustained by the consumer . . . **or** $1,000, whichever is greater).

27   [28]*See, e.g., Los Angeles News Service v. Reuters Television Intern., Ltd*., 149 F.3d 987, 996 (9th Cir.
     1998) (copyright "statutory damages serve both compensatory and punitive purposes.") (quotations,
28   citations omitted); 141 Cong. Rec. S12079-03, S12085) (trademark "statutory damages . . . ensure[]
     that trademark owners and adequately compensated and that counterfeiters are justly punished**")**.

1  of the corporation. . . .  *See . . . Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021

2  (9th Cir. 1985)."  *L.B. Indus., Inc. v. Smith*, 817 F.2d 69, 71 (9th Cir. 1987) (citations omitted).

3       Steve Chen did not personally engage in any unlawful conduct.  He did not personally assist

4  "counterfeiters" in copying Vuitton's products.  He supplied no merchandise.  He did not promote

5  any sale.  He did not instruct anybody to conceal any infringement.  He did not, by any act, attempt

6  to bestow a benefit upon the corporate Defendants by contributing to any infringement.  Nor did he

7  even know if particular websites were breaking U.S. laws by offering Vuitton "replica" handbags.

8  Even if it were fact that the corporate Defendants were engaging in contributory infringement by

9  hosting third parties' websites on their servers, and Steve Chen knew of that fact, "mere knowledge

10  of tortious conduct by the corporation is not enough to hold a director or officer liable for the torts of

11  the corporation absent other 'unreasonable participation' in the unlawful conduct by the individual."

12  *Wolf Designs, Inc. v. DHR Co.*, 322 F.Supp.2d 1065, 1072 (C.D.Cal. 2004).

13       Steve Chen worked hard to stop all instances of allegedly infringing websites from using the

14  corporations' services or servers.  The evidence is undisputed that he was successful in doing so.

15  See Exh. "1598" detailing his successful efforts directing the corporations in terminating services to

16  alleged infringers after Vuitton gave them notice.  This exhibit demonstrates that under Steve Chen's

17  direction the corporate Defendants responded repeatedly and promptly to Vuitton complaints over a

18  sixteen month period to complaints about one hundred ninety-three allegedly infringing websites

19  using Defendants' servers, although many of the Vuitton notices were about websites not using

20  Defendants' servers.  This substantial effort was in addition to his regular work for the corporations.

21  Vuitton presented no evidence of any culpable conduct by Steve Chen.

22       "Personal liability must be founded upon *specific acts* by the individual."  *Murphy Tugboat*

23  *Co. v. Shipowners & Merch. Towboat Co., Ltd.*, 467 F.Supp. 841, 852 (N.D.Cal. 1979) (emphasis

24  added) (adopted and quoted by the Ninth Circuit in *Transgo*, 768 F.2d at 1021).  Vuitton has not

25  shown Defendant Chen personally engaged in any specific act of infringement.  *Cf. Microsoft Corp.*

26  *v. Rechanik*, 2007 WL 2859800, at *1-2 (owner found liable for selling counterfeit software through

27  one company started a second company and encouraged it to do the exact same thing); *Transgo*, 768

28  F.2d at 1020-21 (defendant personally "instrumental" in assisting third party to copy original parts,

1   marketing copies as originals, and personally instructed employee to omit copier's name from

2   packaging and instructions); *Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725,

3   734 (9th Cir. 1999) (defendant personally made the statement constituting false advertising and in

4   order "to divert business from [plaintiff] to [his own company]"); *Symantec Corp.*, 2009 WL

5   3416178, at *3-4 (defendant sold goods he knew to be counterfeit).  Instead, Defendant Chen

6   responded to a constant flow of infringement notices, including Vuitton's, forwarding them to

7   resellers, disabling IP addresses and unplugging their servers if they responded inadequately.

8   Holding him personally liable is contrary to the "consistently stated [rule] that a corporate executive

9   will not be held vicariously liable, merely by virtue of his office, for the torts of his corporation."

10   *Murphy Tugboat* at 852; see also *L.B. Indus.* at 71.  And it undermines a central purpose of the

11   corporate form: limiting liability.  Defendant Chen cannot be personally liable where he did nothing

12   to participate in, encourage, induce or contribute to any infringement.

13         There is no evidence that Steve Chen did anything to induce infringement or that he

14   materially contributed to any direct infringement.  He received no money from any infringer (nor did

15   the corporate Defendants).  Instead Chen made every reasonable effort to stop all infringing activity.

16   Even if Chen's personal efforts were inadequate to stop all infringing activity as quickly as Vuitton

17   wanted (there was no such evidence), this does not establish any basis for personal liability.

18         The jury verdict against Defendant Chen cannot stand because it has no evidentiary basis.

19   **VII.   CONCLUSION**

20         The Court should set aside the jury verdict as against the weight of the evidence and because

21   of excessive and unconstitutional damages to prevent a miscarriage of justice; else, it should grant a

22   new trial.

23   Dated:  _January 21, 2010               **GAUNTLETT & ASSOCIATES**

24                                   By:     s/James A. Lowe

25                                       David A. Gauntlett

                                          James A. Lowe

26                                 Attorneys for Defendants

                                Akanoc Solutions, Inc.,

27                               Managed Solutions Group, Inc.,

                                and Steve Chen

28