J. Andrew Coombs (SBN 123881)
andy@coombspc.com
Annie S. Wang (SBN 243027)
annie@coombspc.com
J. Andrew Coombs, A Prof. Corp.
517 E. Wilson Ave., Suite 202
Glendale, California 91206
Telephone:  (818) 500-3200
Facsimile:   (818) 500-3201

Attorneys for Plaintiff Louis
Vuitton Malletier, S.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

| | |
|---|---|
| Louis Vuitton Malletier, S.A.,<br><br>                    Plaintiff,<br><br>          v.<br><br>Akanoc Solutions, Inc., et al.<br><br>                    Defendants. | Case No. C 07 3952 JW<br><br>OPPOSITION OF PLAINTIFF LOUIS VUITTON MALLETIER, S.A. TO DEFENDANTS' MOTION FOR NEW TRIAL OR OTHER RELIEF PURSUANT TO RULE 59; DECLARATION AND EXHIBITS IN SUPPORT<br><br>Date:    February 22, 2010<br>Time:   9:00 a.m.<br>Court:  Hon. James Ware |

# **TABLE OF CONTENTS**

INTRODUCTION     1

ARGUMENT     2

I.    Plaintiff Met Its Burden and Proved All Elements of Its Claims.     2

     A.   The Elements for Direct Infringement Were met.     2
        1.   Infringing Trademark Use Was Satisfied by the Offers for and Sales of Counterfeit Product, Among Other things.     3
        2.   Abundant Evidence of Likelihood of Confusion Was Presented To Reach This Conclusion Multiple Ways.     4
        3.   Characterization of Images As Derivative Works is Unnecessary and Nonetheless Does Not Change Finding of Direct Copyright Infringement.     5
        4.   Copyright Infringement Occurred Through Sales of Pirated Goods Into The United States As Well As Their Display and Importation, Among Other Things.     6

     B.   The Elements for Contributory Infringement Were Satisfied.     7
        1.   Sufficient Evidence Was Presented of Defendants Specific and General Knowledge of Infringement Using Their Servers.     7
        2.   Defendant Had Ways to Control and Monitor Their Servers and Did So in Ways Which Evidenced Their Control Over Their Systems.     8
        3.   Defendants' Goods and Services Were Essential to the Underlying Infringement of Louis Vuitton's Rights.     9

II.    The Court's Jury Instructions Do Not Provide Support for Relief Under Rule.     10

     A.   Offering For Sale is One of Many Properly Noted Grounds To Find a Use in Commerce and Trademark Infringement.     11

     B.   The *Bulova* Factors are Not The Law in the Ninth Circuit and The Court Had No Obligation to Instruct Accordingly.     12

     C.   There Was No Prejudice on the Likelihood of Confusion Instruction as the *Sleekcraft* Factors Were Given to the Jury and the Confusion Was Obvious.     13

     D.   An Instruction On Whether The "Accused Images" Were Copyrightable Was Unnecessary and No Presuppositions Were Included in Terms of Sales.     13

     E.   Defendants' Objection Concerning The Level of Knowledge Is Contrary to Controlling Authority and Is Without Merit Given Court's Instruction.     14

     F.   The Court Instructed on Direct Control and Monitoring And There Was No Prejudice to Defendants.     15

     G.   Defendants' Claims Concerning Material Contribution Are Misplaced Given Court's Framing of Instructions Identifying Defendants' Services As the Material Contribution.     16

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)     - ii -

H.  The Jury Instructions in No Way Prevented the Jury From Considering Defendants' Actions and Even Included an Instruction on the DMCA Safeharbor Even Though Defendants Did Not Qualify. ........ 17

I.  The Jury Was Correctly Instructed on Statutory Damages. ........ 17

III.  The Award of Statutory Damages Was Carefully Calculated and The Enhanced Range for Willful Infringement was Recognized and Appreciated by The Thoughtful Jury. ........ 18

A.  Defendants Fail to Meet the Burden Upon Them to Show Damages Were Grossly Excessive or Monstrous. ........ 18

B.  Defendants Misstate the Basis Upon Which Statutory Damages Were Calculated. ........ 19

C.  Statutory Damages Were Not Unconstitutional as Applied. ........ 20

D.  Defendants Incorrectly Apply Authority Addressing Punitive Damages to Statutory Damages. ........ 22

IV.  Defendant Chen Was Properly Found Liable Based on His Personal Involvement In the Infringement. ........ 24

**CONCLUSION** ........ 25

Declaration of J. Andrew Coombs ........ 26

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)                                              - iii -

1

# **TABLE OF AUTHORITIES**

2

## **CASES**

3

A&M Records, Inc. v. Napster, Inc.,
239 F.3d 1004, 1020 (9th Cir. 2001) ......... 7

4

Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.,
944 F.2d 1446, 1456 (9th Cir. 1991) ......... 5

5

6

Albarran v. New Form, Inc.,
545 F.3d 702 (9th Cir. 2008) ......... 21

7

AMF, Inc. v. Sleekcraft Boats,
599 F.2d 341, 348-54 (9th Cir. 1979) ......... 5

8

9

Arizona v. California,
460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983) ......... 10

10

Atl. Recording Corp. v. Howell,
554 F. Supp. 2d 976, 985 (D. Ariz. 2008) ......... 3

11

Blanton v. Mobil Oil Corp.,
721 F.2d 1207, 1216 (9th Cir. 1983) ......... 18

12

13

BMW of North America v. Gore,
517 U.S. 559 (1996) ......... 22

14

Brookfield Communs. v. W. Coast Entm't Corp., supra,
174 F.3d 1036, 1056 (9th Cir. 1999) ......... 4-5

15

16

Chalmers v. City of Los Angeles,
762 F.2d 753, 760 (9th Cir. 1985) ......... 18

17

Christianson v. Colt Indus. Operating Corp.,
486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988) ......... 10

18

19

Columbia Pictures Industries Inc. v. Krypton Broadcasting of Birmingham, Inc.,
259 F.3d 1186, 1192, 1194 (9th Cir. 2001) ......... 20-24

20

Dream Games of Ariz., Inc. v. PC Onsite,
561 F. 3d 983, 992 (9th Cir. 2009) ......... 21-22

21

22

Ellison v. Robertson,
357 F.3d 1072, 1076 (9th Cir. 2004) ......... 7

23

Ets-Hokin v. Skyy Spirits, Inc.,
225 F.3d 1068, 1074-77 (9th Cir. 2000) ......... 6

24

25

F.W. Woolworth Co. v. Contemporary Arts,
334 U.S. 228, 223 (1952) ......... 23

26

Feltner v. Columbia Pictures Television,
523 U.S. 340, 355 (1998) ......... 20, 21

27

28

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)

- iv -

Finance Express LLC v. Nowcom Corp.,
564 F.Supp.3d 1160, 1172-1173 (C.D.Ca. 2008) .......... 4

Handgards, Inc. v. Ethicon, Inc.,
743 F.2d 1282, 1297 (9th Cir. 1984) .......... 18

Harris v. Emus Records Corp.,
743 F.2d 1329, 1335 (9th Cir. 1984) .......... 21

Henry v. Lehman Commer. Paper, Inc.,
471 F.3d 977, 1001 (9th Cir. 2006) .......... 18

Jeffries v. Wood,
114 F. 3d 1484, 1489 (9th Cir. 1997) .......... 10

Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.,
285 F. 3d 848, 853-854 (9th Cir. 2002) .......... 4-5, 13

Kiva Kitchen & Bath, Inc. v. Capital Distrib. Inc.,
319 Fed. Appx. 316 (5th Cir. April 2, 2009) .......... 21

L.A. News Serv. V. Reuters Television Int'l, Ltd.,
149 F.3d 987, 996 (9th Cir. 1998) .......... 21-22

Landes Constr. Co. v. Royal Bank of Canada,
833 F.2d 1365, 1372 (9th Cir. 1987) .......... 1

Levi Strauss & Co. v. Blue Bell, Inc.,
632 F.2d 817, 822 (9th Cir. 1980) .......... 5

Lindy Pen Co. v. Bic Pen Corp.,
796 F.2d 254, 256-57 (9th Cir. 1986) .......... 5

Los Angeles Memorial Coliseum Comm'n v. National Football League,
726 F.2d 1381, 1398 (9th Cir. 1981) .......... 11, 13

Los Angeles Memorial Coliseum Comm'n v. National Football League,
791 F.2d 1356, 1360 (9th cir, 1984) .......... 11-13, 18

Louis Vuitton Malletier v. The Flea Market, Inc.,
CV 09-1052 CW (N.D.Ca. June 10, 2009) .......... 10

Molski v. M.J. Cable, Inc.,
481 F.3d 724, 729 (9th Cir. 2007) .......... 1

Murphy Tugboat Co. v. Shipowners & Merch. Towboat Co., Ltd.
467 F. Supp. 841, 852 (N.D., Cal. 1979) .......... 25

New Form, Inc. v. Tekila Films, Inc.,
2009 U.S. App. LEXIS 24887, (9th Cir. Nov. 6, 2009) .......... 21

Novell, Inc. v. Unicom Sales, Inc., et al.,
No. C-03-2785 MMC, 2004 WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004) .......... 24

Olan Mills Inc. v. Linn Photo Co.,

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)

- v -

23 F.3d 1345, 1348 (8th Cir. 1994) .......................................................... 2

Passantino v. Johnson & Johnson Consumer Prods.,
212 F.3d 493, 510 n.15 (9th Cir. 2000) ................................................... 1

Payless Shoesource, Inc. v. Reebok Int'l Ltd.,
998 F.2d 980-90 (Fed. Cir. 1993) ............................................................ 5

Peer Int'l Corp. v. Pausa Records, Inc.,
909 F.2d 1332, 1336, 1337 (9th Cir. 1990) ...................................... 22, 24

Perfect 10, Inc. v. Amazon.com, Inc.,
508 F.3d 1146 (9th Cir. 2007) ................................................................. 7

Phillip Morris USA Inc. v. Felizardo,
2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ............. 5

Phillip Morris USA Inc. v. Shalabi,
352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) ........................................ 5

Playboy Enter., Inc. v. Netscape Communs. Corp.,
354 F.3d 1020, 1024 (9th Cir. 2004) ...................................................... 4

Reebok Int'l v. Marnatech Enters.,
970 F.2d 552, 554 (9th Cir.1992) .......................................................... 13

Rexel, Inc. v. Rexel Int'l Trading Corp.,
540 F. Supp. 2d 1154, 1161 (C.D. Cal. 2008) ........................................ 3

Ryan v. Carl Corp.,
23 F. Supp. 2d 1146, 1149 (N.D. Cal. 1998) .......................................... 3

Segal v. American Tel. & Tel. Co.,
606 F.2d 842, 845 (9th Cir. 1979) ........................................................ 10

Shaw v. Lindheim,
919 F.2d 1353, 1356 (9th Cir. 1990) ...................................................... 6

State Farm Mut. Auto Ins. Co. v. Cambpell,
538 U.S. 408, 416 (2003) .................................................................. 22-23

Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.,
74 F.3d 488 (4th Cir. 1996) .................................................................. 23

Tennant v. Peoria & Pekin Union Ry.,
321 U.S. 29, 35, 88 L. Ed. 520, 64 S. Ct. 409 (1944) ............................ 1

The Comm. for Idaho's High Desert, Inc. v. Yost,
92 F.3d 814, 823 (9th Cir. 1996) .......................................................... 24

Thomas v. Bible,
983 F.2d 152, 154 (9th Cir. 1993) ........................................................ 10

Tiffany (NJ) Inc. v. eBay, Inc.,
Case No. 08-3947-CV (2d Cir. 2008) .................................................... 15

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'           - vi -
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)

Tiffany (NJ) Inc. v. eBay, Inc.,
576 F. Supp. 2d 463, 510 (S.D.N.Y. 2008)                                          15

Timberline Lumber Co. v. Bank of America Nat. Trust and Savings Assoc.,
549 F.2d 597 (9th Cir. 1976)                                                       13

Transgo, Inc. v. Ajac Transmission Parts Corp.,
768 F.2d 1001, 1021 (9th Cir. 1985)                                              24-25

Tull v. United States,
481 U.S. 412, 95 L. Ed. 2d 365, 107 S. Ct. 1831 (1987)                             21

U.S. v. Alexander,
106 F.3d 874, 876 (9th Cir. 1997)                                                  10

U.S. v. Cuddy,
147 F.3d 1111, 1114 (9th Cir. 1998)                                                10

United States v. Candelaria,
704 F.2d 1129, 1132 (9th Cir. 1983)                                                11

Verizon California Inc. v. OnlineNIC, Inc.,
2009 U.S. Dist. LEXIS 84235 (N.D. Cal. Aug. 25, 2009)                              24

Wells Fargo & Co. v. Wells Fargo Express Co.,
556 F.2d 406, 428-429 (9th Cir. 1977)                                              12

Wolf Designs, Inc. v. DHR Co.,
322 F. Supp. 2d 1065, 1072 (C.D. Cal. 2004)                                        25

Yurman Design, Inc. v. PAJ, Inc.,
262 F.3d 101 (2d Cir. 2001)                                                      21, 23

**STATUTES**

15 U.S.C. § 1117(c) *et seq.*                                                 12, 17, 20

15 U.S.C. § 1127                                                                 2, 12

15 U.S.C. §1114 (1)(a)-(b)                                                         11

17 U.S.C. §106                                                                   6, 13

17 U.S.C. § 504(c) *et seq*                                                     20-21

17 U.S.C. § 1114(1)(a)                                                             3

Fed. R. Civ. P. 59                                                                25

**OTHER**

Curtis Loether,
415 U.S. 189, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974)                             21

Louis Vuitton v. Akanoc, et al.: Opposition to Defendants'          - vii -
Motion for New Trial or Other Relief Pursuant to Rule 59(a)
and (e)

1

2

## INTRODUCTION

3          The motion of Defendants Akanoc Solutions, Inc. ("Akanoc"), Managed Solutions Group, Inc.

4     ("MSG") and Steve Chen's ("Chen") (collectively "Defendants") for new trial or other relief should

5     be denied.  Defendants' proven failures to address the rampant illegal activities on their servers

6     despite repeated notice could lead to no result different from the jury's verdict.

7          Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff" or "Louis Vuitton") exceeded its burden of

8     proof to demonstrate (a) underlying direct infringement, (b) contributed to by Defendants' conduct

9     despite (c) repeated actual notice of such direct infringement.  Key elements of these claims were not

10    only undisputed by Defendants, but corroborated by their own exhibits and testimony.  After careful

11    deliberation, the jury entered a verdict for Louis Vuitton consistent with the Court's instruction, the

12    special verdict form they were asked to complete and the applicable law.  Defendants' continued

13    failure to understand the consequences their illegal conduct underscores the jury's wisdom.

14         Courts may grant a new trial or alter or amend a judgment "*only* if the verdict is contrary to the

15    clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of

16    justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (emphasis added) *citing*

17    *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

18    "Doubts about the correctness of the verdict are not sufficient grounds for a new trial: the trial court

19    must have a firm conviction that the jury has made a mistake."  *Landes Constr. Co. v. Royal Bank of*

20    *Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987) *citing Tennant v. Peoria & Pekin Union Ry.*, 321 U.S.

21    29, 35, 88 L. Ed. 520, 64 S. Ct. 409 (1944) ("Courts are not free to reweigh the evidence and set aside

22    the jury verdict merely because the jury could have drawn different inferences or conclusions or

23    because judges feel that other results are more reasonable.").  In light of the overwhelming evidence

24    adduced at trial supporting the verdict, Defendants' Motion should be denied in its entirety.

25

26

27

28

## ARGUMENT

### I.   Plaintiff Met Its Burden and Proved All Elements of Its Claims.

####    A.  The Elements for Direct Infringement Were Met.

Direct infringement was proved by the uncontroverted testimony of Louis Vuitton's in-house counsel concerning the offers for of counterfeit merchandise corroborated by investigations undertaken by Plaintiff's investigator and evidence from the infringing websites often indicating they were selling "replicas" or "mirror images" of Louis Vuitton's products.. *E.g.*, Declaration of J. Andrew Coombs ("Coombs Decl.") at ¶ 2, Trial Transcript, August 18, 2009 (hereinafter "Ex. A"), 114:4-24, 119:7-9, 173:13-175:2; *e.g.*, Coombs Decl. at ¶ 3, Trial Transcript, August 19, 2009 (hereinafter "Ex. B"), 24:6-12, 29:24-31:19, 74:18-75:19, 88:10-23, 91:14-94:20; Coombs Decl. at ¶ 4, Trial Transcript, August 20, 2009 (hereinafter "Ex. C"), 38:1-10; *e.g.*, Trial Ex. 63 at p. 7; *see also* Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, Docket No. 99, at 5:14-6:16 (testimony of Plaintiff's witnesses, that was repeated in large part at trial "may prove direct infringement of Plaintiff's valid marks by third-party's websites hosted by Defendants.").

Defendants' argument that Louis Vuitton authorized the use of its properties on counterfeit goods is completely without support.  Louis Vuitton never authorized any counterfeiter to steal from it:  Louis Vuitton does not authorize any third party to manufacture or distribute its goods.  Ex. A, 160:25-163:6.  That Louis Vuitton's investigator conducted investigations that included, in part, making buys from counterfeit websites he viewed in the United States, following the directions on those websites while hosted by Defendants, sometimes completing payment through the websites themselves (*e.g.,* lvbagz.com/watchnreplica.net) and had the unlawful goods shipped to the United States, is added evidence of infringement and "use in commerce" in the United States, not of any authorization for direct infringers to continue their campaign of theft.  Ex. C, 41:17-25, 49:22-25, 84:20-85:5; 15 U.S.C. § 1127.  Courts have held that such investigations do not constitute authorization and unauthorized copies made at the request of investigators are infringing. *Olan Mills*

*Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1348 (8th Cir. 1994); *Atl. Recording Corp. v. Howell,* 554 F.

Supp. 2d 976, 985 (D. Ariz. 2008); *Ryan v. Carl Corp*., 23 F. Supp. 2d 1146, 1149 (N.D. Cal. 1998).

It is the unauthorized nature of the goods and the acts of the infringer that gave rise to the direct

infringement.

### 1.   Infringing Trademark Use Was Satisfied by the Offers for and Sales of Counterfeit Product, Among Other Things.

Additional evidence of unauthorized use in the United States and specifically targeting the

United States was reflected in the trial exhibits.  To name just a few examples: (1) most all of the

websites were in English even if operated by non-U.S. or Chinese nationals; (2) shipping costs to the

United States were pre-calculated (Trial Ex. 63, 72.1, 360.1); (3) prices for the counterfeit products,

prices for discounts, prices for shipping and penalties were all expressed in US Dollars (Trial Ex.

72.1, 81, 98.3, 116, 163, 173, 210, 212, 360, 588, 590, 611, 613); (4) measures regarding seizure at

customs were specifically stated and included restocking fees in US Dollars (Trial Ex. 72.1); (5) some

websites included the trademarks of PayPal, FedEx, UPS, and other US companies on the pages

advertising counterfeit Louis Vuitton product (Trial Ex. 13 (attachments), 63, 63.2, 94, 163) and (6)

some websites specifically included links to "USA" specific EMS Tracking websites (Trial Ex. 356 p.

2).

The Lanham Act expressly captures "advertising" as a "use in commerce" which may

implicate liability under its provisions.  17 U.S.C. § 1114(1)(a)(person who, without consent of

owner, "use in commerce…for sale, distribution, **or** advertising" shall be liable.)  In the *Rexel* case

cited by Defendants, the plaintiff offered no evidence of any use by the alleged direct infringer, and

the defendants there submitted affirmative evidence that there was no use in commerce.  *Rexel, Inc. v.

Rexel Int'l Trading Corp.*, 540 F. Supp. 2d 1154, 1161 (C.D. Cal. 2008).  The District Court authority

in *Rexel* simply does not apply to the facts of this case.

Moreover, *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 853-854 (9th Cir. 2002) supports a finding of use in commerce in the context of counterfeiting.  The Ninth Circuit found that "'use in commerce" is not limited to sales, and that it "appears to contemplate a trading upon the goodwill of or association with the trademark holder."  Id. at 855.  The direct infringers' intentional use of Louis Vuitton's properties to sell knock offs either through manufacturing, advertising, distribution or sales, falls squarely within the rationale set forth by the Ninth Circuit to constitute a use in commerce.   Defendants' arguments regarding the sufficiency of the evidence regarding use in commerce, should be rejected.  Other governing authority has similarly held that offers for sale and simple promotional uses do constitute a use in commerce.

> "Although the Ninth Circuit has not directly addressed the question of  whether internet activity such as registering domain names, keying, or keyword stuffing constitutes "use in commerce" within the meaning of the Lanham Act, the court presumed without deciding that such activity met the standard . *See  Brookfield Communs. v. Coast Entm't Co.*, 174 F.3d 1036, 1053 (9th Cir. 1999)(finding that the plaintiff was entitled to a preliminary injunction with respect to infringing domain name registration and **keyword** stuffing because the plaintiff had shown the marks were protected and that there was a likelihood of confusion, without addressing the "**use in commerce**" requirement); *Playboy Enter., Inc. v. Netscape Communs. Corp.*, 354 F.3d 1020, 1024 (9th Cir. 2004)(noting that there was no dispute that the plaintiff held the marks in question and that defendant had used the marks in commerce by engaging in the practice of keying)."

*Finance Express LLC v. Nowcom Corp.*, 564 F.Supp.3d 1160, 1172-1173 (C.D.Ca. 2008).

### 2.   Abundant Evidence of Likelihood of Confusion Was Presented To Reach This Conclusion Multiple Ways.

The jury was properly and fully instructed on likelihood of confusion, such that there was no error or confusion in the jury's conclusion that a likelihood of confusion arose from the offer and sale of counterfeit merchandise bearing identical facsimiles of Louis Vuitton's trademarks on merchandise of precisely the same classes as are protected by Louis Vuitton's admitted registrations.  There was compelling evidence concerning likelihood of confusion apart from the presumption involving

counterfeits,[1]  based on a side by side comparison of the product.  The entire purpose of a knock off is to look like the real thing.  In these instances, it was not necessary, nor was it ever required, that Plaintiff present a consumer survey as Defendants suggest.  The jury was able to view and compare the fakes with authentic product.  The jury's finding was not against the clear weight of the evidence given the almost identical nature of the fakes to the authentic goods.

A jury determination based on observation is clearly contemplated by *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-54 (9th Cir. 1979).  "The law in the Ninth Circuit is clear that "post-purchase confusion," *i.e.*, confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion under the Lanham Act."  *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 854 (9th Cir. 2002) *citing Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991); *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980).  Endorsing the rationale that the confusion of non-purchasers observing the infringing item, is "no less injurious to the trademark owner's reputation than confusion on the part of the purchaser at the time of sale."  *Karl Storz Endoscopy-Am., Inc.*, 285 F.3d at 854 *citing Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 980-90 (Fed. Cir. 1993).  Therefore, the jury was able to find likelihood of confusion under multiple avenues by way of the presumption, by applying the *Sleekcraft* factors, or through its own visual comparison.  The jury's finding was soundly grounded by the evidence.

### 3.   Characterization of Images As Derivative Works is Unnecessary and Nonetheless Does Not Change Finding of Direct Copyright Infringement.

---

[1] *Brookfield Communs. v. W. Coast Entm't Corp.*, supra, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course."); *see Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254, 256-57 (9th Cir. 1986)  (reversing a district court's finding of no likelihood of confusion even though the six other likelihood of confusion factors all weighed against a finding of likelihood of confusion);  *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) citing *Phillip Morris USA Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004) ("However, "in cases involving counterfeit marks, it is unnecessary to perform the step-by-step examination . . . because counterfeit marks are inherently confusing.").

Defendants' argument that a work is not infringed because it is photographed or online is unsupported. It does not undermine the jury's finding of direct infringement.

Defendants do not dispute that copyright infringement requires (1) ownership of a valid copyright, and (2) copying of the protected elements of the work. *Shaw v. Lindheim*, 919 F.2d 1353, 1356 (9th Cir. 1990). In addition to the right to make derivative works in whatever form they may take, are the rights to copy and distribute the work. 17 U.S.C. §106. There was ample evidence Plaintiff's undisputed copyrights were reproduced without authorization on pirated merhandise, which merchandise was displayed and advertised for sale on commercial websites hosted by Defendants. *E.g.*, Trial Ex.s 67, 117, 129, 142, 63, 65, 70.1, 72.1, 75.1. Argument about whether or not the images were derivative works, is irrelevant, given the bundle of copy rights owned by Louis Vuitton.

Defendants' authority is instructive, though not for the reasons asserted by Defendants. First, *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074-77 (9th Cir. 2000) did not stand for the proposition that a photograph is an original work as Defendants' cite, but rather, it stated that "the creative decisions involved in producing a photograph may render it sufficiently original to be copyrightable…". *Id.* at 1077. The test is thus factual and Defendants' other non-binding citations from other district courts merely reflect case specific factual analyses. Second, as Defendants' cite in a footnote, the photographs at issue in *Ets-Hokin* were not determined to be derivative works because the underlying object was not itself copyrightable. 225 F.3d at 1080. This critical fact makes *Ets-Hokin,* and Defendants' argument based on *Ets-Hokin*, wholly inapplicable to this case as Louis Vuitton owns undisputed, valid and enforceable copyrights in works that were intentionally copied and used to sell pirated goods. In any event, the infringement determination did not depend solely on the website images.

### 4. Copyright Infringement Occurred Through Sales of Pirated Goods Into The United States As Well As Their Display and Importation, Among Other Things.

Application of U.S. copyright law is proper as argued in response to Defendants' Rule 50 motions.  Docket No. 213 and Docket No. 237 (filed concurrently herewith).  Defendants' view of the infringing acts involved in this case, ignoring importation, distribution and, magnifies the flaws in their argument.  Recast in this motion, these arguments are equally without merit.

Defendants' reliance on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007only highlights Defendants' liability.  There the prima facie test for a violation of the display right involving Google was called the "server test", and not by accident, as the test was whether the electronic information or copies that corresponded to copyrighted images were stored on Google's servers.  Id. at 1159-60.  Defendants, by their own admissions, meet the server test because they store the infringing data on their servers in San Jose, California.  Coombs Decl. at ¶ 6, Trial Transcript, August 25, 2009 (hereinafter "Ex. E"), 61:16-62:13.  Defendants seek out those that want to do business in the United States and control the data through their contractual and physical connections to the servers.  Coombs Decl. at ¶ 5 Trial Transcript August 21, 2009, (hereinafter "Ex. D") 166:1-168:23, 171:8-172:10.

**B.  The Elements for Contributory Infringement Were Satisfied.**

**1.  Sufficient Evidence Was Presented of Defendants Specific And General Knowledge of Infringement Using Their Servers.**

The jury was instructed on the proper standard of knowledge as endorsed by governing authority.  *E.g.,* Ninth Circuit Model Civil Jury Instruction "17.21 Derivative Liability—Contributory Infringement" (stating requisite knowledge standard as "knew or had reason to know" in copyright context) and "15.19 Derivative Liability–Contributory Infringement" (stating requisite knowledge standard as "knew or should have known" in trademark context); *see also Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.2004) *citing A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1020 (9th Cir. 2001).  Defendants' requirements that specific knowledge only is required, is just not the law.  However, there was abundant evidence concerning Defendants' specific knowledge, the most

irrefutable being Defendants' own Exhibit 1598, which outlined the multitude of repeated notices sent by Louis Vuitton and received by Defendants concerning the same websites.

There is no basis for interfering with the jury's finding that the direct infringement was made possible by Defendants' provision of goods and services that were specifically marketed to those who wanted to business in the United States and further aided by Defendants' additional service of turning a blind eye to notices of infringement and violations of their own terms of service.  Ex. D, 165:23-168:23, 171:8-172:10, 196:24-197:11, see also Trial Ex. 583; Ex. E, 28:18-30:15.  The same customers were the subject of multiple notices adding to the knowledge component.  Ex. D, 196:24-197:11; Ex. E, 28:18-30:15.  There is no doubt that Defendants had reason to know and knew that counterfeit and pirated offers were located on their servers in their datacenter just a few blocks from the courthouse where the trial took place.  Ex. E, 62:9-13.  To say the jury's finding was contrary to the clear weight of the evidence that Defendants had knowledge specific and otherwise, improperly ignores the evidence.

### 2.   Defendants Had Ways to Control and Monitor Their Servers and Did So in Ways Which Evidenced Their Control Over Their Systems.

Defendants' "undisputed" statements that they had no power to remove offending conduct or otherwise disconnect access to infringing material on their servers is at odds with evidence adduced at trial and by Defendants' own admission that various steps (disabling IP and unplugging servers) were not taken and that other steps available to them (including enforcement of their own terms of service to fine, suspend and/or terminate users were never employed.  Trial Ex. 21, 1598.

Defendants had physical control of their servers and were able to disable and turn off the physical machines and parts thereof (IP Address, ports, etc.) that would have disconnected access to the infringing content, and were also contractually empowered to do a number of things including removing offensive content and terminating customers for violations of intellectual property infringement.  E.g., Trial Ex. 21; Ex. D, 166:1-168:23; Ex. E, 28:18-30:15.  The fact they did not take

measures at their disposal to address the rampant counterfeiting and piracy taking place on their

servers was apparent at trial by numerous notices from Louis Vuitton concerning the same websites of

which Defendants monitored, see Trial Ex. 1598; Ex. B, 170:24-171:14, copies of Defendants' own

servers years after the complaint was filed that contained websites that were the subject of multiple,

prior notices, see Trial Ex. 615, and testimony from Defendant Chen himself admitting that one of the

original websites from the complaint several years ago, was still hosted by Defendants at the time of

trial.  Trial Ex. 625; Ex. E, 4:5-7:6. Defendants chose not to exercise the many tools at their disposal

to address infringement on their servers and given their choice, and the consequences of that choice, it

can hardly be considered any miscarriage of justice.

### 3.  Defendants' Goods and Services Were Essential to the Underlying Infringement of Louis Vuitton's Rights.

Defendants' provided several goods and services which enabled the underlying unlawful

activity.  Defendant Chen testified at length about all of the specialized goods and services his

companies offered their customers.  Ex. D, 7:20-13:13 (special power, special air conditioning,

proximity to the internet backbone, language services, etc.).  However, the one service that made

Defendants truly special was that of being a bulletproof host; insulating and allowing unlawful

activity to continue as Defendants ignored abuse complaints and refused to penalize infringers.  Ex. C,

111:5-112:15, 124:14-128:3, 129:16-131:13;  Ex. D, 165:23-168:23, 171:8-172:10, 196:24-197:11;

Ex. E, 28:18-30:15.  Defendants provided a site and facility to promote uninterrupted infringement

and by their refusal to deal with infringing activities occurring on their systems.

Defendants' attempts to liken themselves to the "rote translation service" at issue in the

*Lockheed* case are unavailing factually as Defendants' hosting on their servers of the infringing data is

improperly discounted, but notwithstanding, this argument has already been expressly rejected by this

Court and constitutes law of the case.[2]  See Order Granting in Part and Denying in Part Defendants'

Motion for Summary Judgment, Docket No. 99, 16:14-17:5; *Christianson v. Colt Indus. Operating*

*Corp.*, 486 U.S. 800, 816, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988) ("As most commonly defined,

the [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages in the same case." ) (quoting *Arizona v.*

*California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 75 L. Ed. 2d 318 (1983)); *Jeffries v. Wood,* 114 F.3d

1484, 1489 (9th Cir. 1997); *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979).

Defendants' reliance upon *Louis Vuitton Malletier v. The Flea Market, Inc.* CV 09-1052 CW

(N.D.Ca. June 10, 2009) is misplaced.  First, it simply ruled that, as a matter of pleading, Plaintiff

failed to plead sufficient facts stating a claim against the owner (as distinct from operator) of a flea

market.   Not only did Louis Vuitton demonstrate in this case the active operational involvement of

Defendants, nowhere have Defendants adduced evidence that their customers were not the underlying

infringer as asserted in their motion: to the contrary, Defendant Chen admitted the Defendants' direct

customers could very well be the operators of the infringing websites.  Ex. E, 11:10-19.

Defendants arguments fail to meet their burden that the jury's decision was contrary to the

clear weight of the evidence, was based upon any false or perjurious evidence, or that a miscarriage of

justice would result.  The jury carefully considered all the evidence at trial and made no mistake.

Defendants' Motion should be denied.

## II.   The Court's Jury Instructions Do Not Provide Support for Relief Under Rule.

---

[2] "The law of the case doctrine provides that 'a court is generally precluded from reconsidering an issue that has already been decided by the same court…'"  *U.S. v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) *citing U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted); *see also Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  Both the Supreme Court and the 9th Circuit have held that the law of the case doctrine applies to trial courts and precludes them from reconsidering an issue they have already decided, absent one of the five criteria discussed in *Cuddy*. None of the exceptions to the doctrine apply to the Court's ruling on Defendants' Motion for Summary Judgment: 1) the first decision was not *clearly erroneous*; 2) there have been no intervening changes in the law; 3) the evidence is not substantially different; 4) no other changed circumstances exist; and 5) no manifest injustice would otherwise result. *Cuddy*, 147 F.3d at 1114.

"A trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented" when "evaluated in the context of the whole trial." *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th cir, 1984) *citing United States v. Marabelles*, 724 F.2d 1374, 1382-83 (9th Cir. 1984). "A party is not entitled to an instruction on its theory of the case if that theory lacks support either in law or in the record." *Los Angeles Memorial Coliseum Comm'n*, 791 F.2d at 1360 *citing e.g., Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1398 (9th Cir. 1981); *United States v. Candelaria*, 704 F.2d 1129, 1132 (9th Cir. 1983). The Court's instructions were tailored to the case and in many instances, actually added additional elements to Plaintiff's burden, not lessen its burden as Defendants claim.

## A. Offering For Sale is One of Many Properly Noted Grounds To Find a Use in Commerce and Trademark Infringement.

Defendants' objection to the inclusion of "offering for sale" of infringing goods to a finding of trademark infringement ignores controlling Ninth Circuit authority and the letter of the law. The Lanham Act states explicitly, that "offering for sale" a counterfeit item is not only grounds for liability but sufficient for an award of statutory damages:

> "(1) Any person who shall, without the consent of the registrant—
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, ***offering for sale***…of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> (b) reproduce, counterfeit…intended to be used in commerce upon or in connection with the sale, ***offering for sale***…of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided."

15 U.S.C. §1114 (1)(a)-(b) (emphasis added).

> "(c) …In a case involving the use of a counterfeit mark…in connection with the sale, ***offering for sale***, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under

subsection (a), an award of statutory damages for any such use in connection with the sale, ***offering for sale***, or distribution of goods or services in the amount of…"

15 U.S.C. §1117(c) (emphasis added); *see also* Plaintiff's Supplemental Brief Re Applicability of US Copyright and Trademark Laws to California Based Web Hosting Defendants; Request for Entry of Judgment, Docket No. 237, pp. 11-12.

Defendants' claim that Rule 59 relief is appropriate as the Court's instruction caused a miscarriage of justice, also falls flat.  Even if Defendants were correct and that a use in commerce were limited to an "actual sale or transport of goods," Defendants' Motion, Docket No. 272, p. 4:4 *citing* 15 U.S.C. § 1127, the trial record contained abundant evidence of several actual sales and importations of infringing goods into the United States through the testimony of Plaintiff's investigator and through the statements of the admitted exhibits themselves.  Ex. C, 41:17-25, 49:22-25, 84:20-85:5; Trial Ex. 13, 63, 63.2, 72.1, 81, 98.3, 94, 116, 163, 173, 210, 212, 356 p.2, 360, 360.1, 588, 590, 611).  Accordingly, even if correct on the merits, the instruction was not prejudicial.

### B.   The *Bulova* Factors are Not The Law in the Ninth Circuit and The Court Had No Obligation to Instruct Accordingly.

The Court not obligated to instruct on the conflicting law of other Circuits.  *Los Angeles Memorial Coliseum Comm'n*, 791 F.2d at 1360 (citations omitted).  Defendants cite Second and Eleventh Circuit decisions concerning "use in commerce", but this cannot be grounds for Rule 59 relief when the factors are not required in the Ninth Circuit.  To the contrary, the burden instructed by the Court, requiring that the infringement "would substantially affect commerce in the United States" was a higher burden than was necessary under Ninth Circuit authority, requiring only that those acts have "some" effect on commerce, and therefore operated **in favor** of Defendants.[3]  *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428 (9th Cir. 1977) (stating **"**although foreign activities

---

[3] Citation and further explanation concerning the applicable standard was included in Plaintiff's Opposition to Defendants' Motion for Judgment, Docket No. 214, and will not be repeated herein.  See also *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428-29 (9th Cir. 1977) for a list of considerations to consider extraterritorial application of the Lanham Act.

must of course have *some* effect on United States foreign commerce before they can be reached, we disagree with the district court's requirement that that effect must be "substantial." *Bulova* contains no such requirement."); *Reebok Int'l v. Marnatech Enters.,* 970 F.2d 552, 554 (9th Cir.1992); *Timberline Lumber Co. v. Bank of America Nat. Trust and Savings Assoc.,* 549 F.2d 597 (9th Cir. 1976). Most surprising is Defendants' objection to the very language they first proposed. Coombs Decl. at ¶ 7, Trial Transcript, August 26, 2009 (hereinafter "Ex. F"), 9:7-9.

### C. There Was No Prejudice on the Likelihood of Confusion Instruction as the *Sleekcraft* Factors Were Given to the Jury and the Confusion Was Obvious.

While obvious the knock offs offered on sites hosted by Defendants were likely to confuse, the jury was not required nor was it suggested that they rely on any presumption of a likelihood of confusion alone. The Court did instruct the jury on the *Sleekcraft* factors, Closing Instructions, Docket No. 227, pp. 8-9, and the jury was also well equipped to make the finding of likelihood of confusion based on their observations. *Karl Storz Endoscopy-Am., Inc.*, 285 F.3d at 854 (9th Cir. 2002). In this instance, Defendants were in no way "entitled to an instruction" requiring any kind of consumer survey, when no such survey was required by the law or by the facts of this case involving pure counterfeits. *Los Angeles Memorial Coliseum Comm'n*, 791 F.2d at 1360 *citing e.g., Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1398 (9th Cir. 1981). Therefore, the Court did not err in instructing the jury on likelihood of confusion and Defendants' Motion should be denied.

### D. An Instruction On Whether The "Accused Images" Were Copyrightable Was Unnecessary and No Presuppositions Were Included in Terms of Sales.

Any instruction that the website images must first be found derivative works was unnecessary as the unauthorized manufacture, reproduction, offering for sale, importation, distribution and sale of pirated copies is sufficiently supported by the law to find infringement. 17 U.S.C. §106.

The jury instructions did not presuppose any sales as constituting infringement alone and stated outright that copyright owners have the right to exclude others from "reproducing, preparing derivative works, distributing, performing, displaying, or using the work covered by copyright for a specific period of time."  Closing Instructions, Docket No. 227, p. 11:8-9.  In "selling" counterfeit Louis Vuitton products as the instructions state, any number of the exclusive rights could have been infringed including that of distributing, displaying reproducing and using the work in general.  There was no presupposition of sales and the evidence supported the jury's finding that Louis Vuitton's exclusive rights were wrongfully infringed by the website operators.

E.   <u>**Defendants' Objection Concerning The Level of Knowledge Is Contrary to Controlling Authority and Is Without Merit Given Court's Instruction.**</u>

As outlined above, the jury was instructed on the proper level of actual and constructive knowledge and that standard was easily met given the evidence adduced at trial.  However, the Defendants' complaints are further without merit given the Court's inclusion of language in the instructions that "Liability must be based upon proof that the service provider knew that its services were being used to infringe and then acting or failing to act in a way to allow the infringement to continue."  Closing Instructions, Docket No. 227, p. 10:23-26.  This was precisely the heightened level of knowledge that Defendants sought to interject.  Defendants' objections are thus without support because the elevated standard of knowledge they proposed was included in the instruction, even if contrary to controlling authority.

Furthermore, Defendants' reading of the instructions and the conclusions they draw from them are all attenuated speculation at best of what the Court was "invit[ing] the jury to infer" concerning even goods that were not using Louis Vuitton's trademarks.  Defendants' Moving Papers, Docket No. 272, p. 10:12-15.  There was no such inference suggested or even rationally connected as there was overwhelming evidence concerning Defendants knowledge of specific infringing websites and specific infringer customers, to all of which Defendants turned a blind eye.  *E.g.*, Trial Exhibit 1598;

1

2
Ex. D, pp. 165:23-168:23, 171:8-172:10, 196:24-197:11; Ex. E, pp. 28:18-30:15.  Defendants'

3
speculations hardly meet their burden to warrant relief under Rule 59 of any miscarriage of justice.

4
Defendants' reliance on a case currently on appeal in the Second Circuit, non-binding even if

5
the decision were to be affirmed, further supports a denial of the present motion.  *See Tiffany (NJ) v.*

6
*eBay, Inc.,* 576 F. Supp. 2d 463, 510 (S.D.N.Y. 2008) *on appeal Tiffany (NJ) Inc. v. eBay, Inc.,* Case

7
No. 08-3947-CV (2d Cir. 2008).  The case cited by Defendants is directly contrary to controlling

8
Ninth Circuit law and is instructive of the lack of merit to this motion in its entirety.[4]

9

10
### F.  The Court Instructed On Direct Control and Monitoring And There Was No

11
Prejudice to Defendants.

12
In light of the broad discretion afforded to the trial court to tailor jury instructions to a

13
particular case, and the instructions actually given in this case in light of the facts, there simply are no

14
grounds for Rule 59 relief.  The Court included specific instructions on the issues of control and

15
monitoring, separate from knowledge.  Closing Instructions, Docket No. 227, p. 10:21-26.  While the

16
Court also addressed control and exercise of that control separately in the instruction in an earlier

17
section, *Id.* at p. 10:14-16, it was not in any way eliminated because it was included more than once.

18
The contrary is true.

19

20
Defendants' objection that the Court should have included examples from cases that it has

21
already ruled factually dissimilar (*Lockheed*), are factually unrelated (*Visa*) or are not binding and

22
otherwise on appeal (*Tiffany*), is ludicrous.  Defendants' Moving Papers, Docket No. 272, p. 14:8-10.

23
The Court was under no obligation to include examples of such cases that would have only confused

24
the jury and misdirected attention away from the issues to be decided.  The Court correctly included

25
language such as "servers" to tailor the instructions to the case.  Defendants' suggestion that

26
Defendants' directly controlled and monitored the websites is making an unnecessary and again,

27

28

---

[4] Defendants' arguments about inducement are irrelevant as Plaintiff did not advance that theory of liability at trial and that is not the only means of finding contributory infringement.

confusing distinction when the infringing websites were hosted on Defendants' servers, a fact that was largely undisputed and corroborated by Defendants' own admissions and exhibits. *See* Trial Ex. 1598.

Defendants' complaints about the word "facilitate" are again based on speculation that it somehow sets a lower standard than is required. The jury was instructed on control and monitoring. Defendants' claims concerning a lack of privity with the infringers is without merit as Defendants admit that their customers could very well be the website operators. Ex. E, p. 11:10-19. The inclusion of the word "facilitate" did not erase the other instructions, and arguably, raised the standard by implying additional assistance to the infringers was necessary other than just control and monitoring. Plaintiff's burden was unnecessarily increased when the Court also included language concerning the "technical ability and feasibly of Defendants' terminating the use of its servers or services by a direct infringer, without affecting its provision of services to legitimate users," a completely new and additional element not previously required by existing case law. Closing Instructions, Docket No. 227, p. 10:16-19. Defendants' claim that Plaintiff's burden on this issue was decreased is contrary to the record.

### G.  **Defendants' Claims Concerning Material Contribution Are Misplaced Given Court's Framing of Instructions Identifying Defendants' Services As the Material Contribution.**

The Court was within its broad authority to frame the instruction on contributory copyright infringement to incorporate the services that constituted the material contribution. Closing Instructions, Docket No. 227, p. 12: 11-22. The jury's answer in the affirmative on these points incorporated the element of material contribution satisfying the applicable law. The jury's answer in the negative would have exonerated Defendants. Based on the evidence, the jury found that the websites used Defendants' services to infringe and were allowed to continue doing so despite notice meeting both the requirements of knowledge and material contribution. There was no error on this instruction and Defendants' motion should be denied.

**H.   The Jury Instructions in No Way Prevented the Jury From Considering Defendants'**
**Actions and Even Included an Instruction on the DMCA Safeharbor Even Though**
**Defendants Did Not Qualify.**

Nowhere in the jury instructions was the jury instructed not to consider the actions undertaken by Defendants.  If anything, the jury was asked to do the opposite.  Closing Instructions, Docket No. 227, p. 10:9-19.  The fact the jury disagreed with the Defendants as to what they could have, should have and did not do, is not any basis for Rule 59 relief.  The Court's inclusion of additional instruction concerning a "Defense to Copyright Infringement" was particularly generous, given the clear authority of the evidence that indicated Defendants did not comply with the statutory prerequisites. Defendants' claims that the jury was somehow precluded from considering their acts or possible defenses is simply untrue.  For this additional failed argument, Defendants' motion should be denied.

**I.   The Jury Was Correctly Instructed on Statutory Damages.**

The jury was properly and fully instructed on statutory damages.  Defendants' objections based on instruction which follows the language of the governing statutes are properly rejected.  There is no error in instructing the jury to award damages as the court finds "just" where this merely adopts applicable language enacted by Congress in 15 U.S.C. § 1117(c)(2).  Conversely, if there was any error in the willfulness instruction given to the jury, it operated in favor of Defendants by requiring a finding of willfulness as to **both** the underlying direct infringement and to Defendants' own conduct. As outlined, <u>supra</u>, an instruction that willfulness may be found where Defendants' contributory actions occurred after notice, is in accord with applicable principles and authorities.  Similarly, the Defendants' contention that substitution of the word "if" for "in the amount of" (because inconsistent with statutory language) is immaterial and, if anything, favored Defendants in that it provided an option (not exercised) to award no statutory damages.  Finally, as outlined <u>infra</u>, Defendants' objection to the instructions on quantum to be awarded under the Copyright Act is based on a

fundamental confusion on their part as between punitive damages (not at issue in this case) and statutory damages, upon which the jury was correctly instructed.

### III. The Award of Statutory Damages Was Carefully Calculated and The Enhanced Range for Willful Infringement was Recognized and Appreciated by The Thoughtful Jury.

#### A. Defendants Fail to Meet the Burden Upon Them to Show Damages Were Grossly Excessive or Monstrous.

"In reviewing a jury's damages award, its "finding of the amount of damages must be upheld unless the amount is 'grossly excessive or monstrous,' clearly not supported by the evidence, or 'only based on speculation or guesswork.'" *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1360 (9th cir, 1984) citing *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1297 (9th Cir. 1984) (quoting *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1216 (9th Cir. 1983). "Generally, a jury's award of damages is entitled to great deference…" *Henry v. Lehman Commer. Paper, Inc.*, 471 F.3d 977, 1001 (9th Cir. 2006). "An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985) (citations omitted).

In the present case, the jury asked the Court for further clarification on no less than four questions concerning the determination of damages. See Jury Notes, Docket No. 234. This is hardly suggestive of guesswork or speculation, but rather reflected the very careful consideration the jury took in assessing the number of trademarks at issue and the damages award to attach to each of those trademarks and copyrights. The Special Verdict form, modeled upon Defendants' own draft Special Verdict form in certain key respects (Docket No. 220, et seq.) provided separate spaces for each Defendant, and each Defendant having been found liable by the jury, was assessed a damages sum against it within the statutory scheme, and for trademarks, the prior statutory scheme. There was nothing grossly excessive about the award that fell within the Congressionally mandated damages regime for the number of properties and defendants at issue.

**B.  Defendants Misstate the Basis Upon Which Statutory Damages Were Calculated.**

Defendants' argument about statutory damages appears to be predicated upon a misstatement of the record and underlying facts.  The jury did not award statutory damages beyond the limit provided for by the relevant statutes.  As correctly stated in the Court's instructions to the jury, the jury found damages of $700,000 for each of fifteen trademarks the willful infringement of which was enabled by Defendants.  Docket No. 235.  This is below the $1,000,000 limit upon for each trademark upon which the jury was instructed and as admitted by Defendants in their motion.  Docket No. 272, 19:2-3.[5]  Similarly, the $150,000 awarded for each of two copyrights was also within the statutory parameters upon which the jury was correctly instructed.

Defendants err by conflating the liability of each of the three separate Defendants and incorrectly asserting the jury awarded the equivalent of $2,100,000 for each of the fifteen trademarks and $450,000 for each of the two copyrights.  This is, however, manifestly not what the jury did and, to the contrary, the verdict is consistent with the law, the facts, the instructions and the special verdict (including, ironically, the proposed form of special verdict submitted by Defendants).

The jury was asked to arrive at awards as to each of the three Defendants.  This format is consistent with the format submitted by Defendants in the numerous proposed special verdict forms submitted by Defendants during the course of trial.  Docket No. 220, et seq.  To later object that this format resulted in findings of separate liability should not be countenanced.  In any event, the verdict is correct.  Defendants have at no time indicated that the separate corporate existence of Akanoc Solutions, Inc. and Managed Solutions, Inc. should be disregarded.  Moreover, the evidence provided abundant evidence that each was engaged in assigning IP addresses to the underlying infringing

---

[5] In fact, the Defendants understate the applicable statutory maximum of $2,000,000 which went into effect during the pendency of the Action.   15 U.S.C. § 1117(c)(2).  It is not that the higher maximum did not apply (as asserted at footnote 20 of their Motion), only that Plaintiff stipulated to instruct the jury on the lower maximum to obviate any need for the jury to parse through the evidence to arrive at different determinations based on whether the underlying direct infringement occurred before or after the higher statutory maximum went into effect.

websites – sometimes the same websites at different times.  There was evidence upon which the jury could conclude that the corporate ISP defendants should each be held separately liable.

Similarly, even apart from Defendant Chen's interest as sole owner, sole officer and general manager of the corporate defendants, there was abundant evidence demonstrating his active involvement in the acts and omissions which contributed to the underlying direct infringement.  See, infra, re Chen's personal liability.

The jury award of $32,400,000 was consistent with statutory standards, the instructions and verdict form the jury was asked to submit and is neither 'grossly excessive' nor 'monstrous'.

## C. **Statutory Damages Were Not Unconstitutional as Applied.**

Defendants' constitutional law analysis is inapplicable and has been repeatedly rejected by the Courts.  Unlike punitive damages the statutory damages in question are subject to specified limits on the applicable award. Statutory damages are constitutional and the jury awarded damages within the applicable range of statutory damages provided by both the Lanham Act and the Copyright Act. Congress has provided clear standards to help a jury arrive at a just award by identifying several levels of culpability.  Innocent infringement, non-innocent infringement and willful infringement are assigned progressively higher ranges of damages that correspond with higher levels of culpability. *See, e.g.*, 17 U.S.C. § 504(c) *et seq.*; 15 U.S.C. § 1117(c) *et seq.*

Defendants' argument that statutory damages should not be decided by a jury has been rejected by governing Ninth Circuit authority, which authority Defendants fail to mention.   Defendants' argument was made and rejected in *Columbia Pictures Industries, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186 (9th Cir. 2001).  In *Columbia Pictures*, Feltner, the sole shareholder in the defendant company, appealed a jury award of more than $31 million dollars in statutory damages under the Copyright Act.  Feltner argued that the Supreme Court's decision in *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 355 (1998) invalidated the statutory damages provision of the Copyright Act.  The 9th Circuit responded:

1

2
This argument is not persuasive. . . . . In *Feltner* the Supreme Court held that § 504(c)
provides a remedy for copyright infringement, and the *Seventh Amendment* provides a
3
right to a jury trial when that remedy is at issue. This holding is consistent with the
4
Supreme Court's interpretation of other federal statutes that provide a remedy but
similarly fail to provide a jury trial. *See, e.g., Tull v. United States,* 481 U.S. 412, 95 L.
5
Ed. 2d 365, 107 S. Ct. 1831 (1987) (regarding civil penalties under the Clean Water
Act); *Curtis Loether,* 415 U.S. 189, 39 L. Ed. 2d 260, 94 S. Ct. 1005 (1974) (holding
6
that although it is not clear whether Section 812 of the Civil Rights Act of 1968
provides for a jury trial, a jury trial is provided by the *Seventh Amendment*).
7

8
*Columbia Pictures Industries, Inc.*, 259 F.3d at 1192. Jury awards of statutory damages are thus

9
constitutional and the "jury has wide discretion in setting the award" while "the district court

10
maintains its role as the evidentiary gatekeeper." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d

11
983, 993 (9th Cir. 2009). Further, since the *Feltner* and *Columbia Pictures* cases various courts have

12
conducted jury trials on the issue of statutory damages and such trials are indeed a common practice

13
under both the Lanham Act and Copyright Act. *See e.g., New Form, Inc. v. Tekila Films, Inc.*, 2009

14
U.S. App. LEXIS 24887, (9th Cir. Nov. 6, 2009); *Kiva Kitchen & Bath, Inc. v. Capital Distrib. Inc.*,

15
319 Fed. Appx. 316 (5th Cir. April 2, 2009); *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983

16
(9th Cir. 2009); *Albarran v. New Form, Inc*. 545 F.3d 702 (9th Cir. 2008); *Yurman Design, Inc. v.*

17
*PAJ, Inc.*, 262 F.3d 101 (2nd Cir. 2001).

18
Defendants' assertion that statutory damages can only be awarded with reference to proved

19
actual damages also ignores the record and applicable authority. Not only did Louis Vuitton prove

20
its actual harm, Defendants' argument is based upon their confusion between punitive damages with

21
statutory damages. As stated in the Court's own instructions, statutory damages serve additional

22
purposes of compensation and deterrence making Defendants' exclusive focus on the punitive

23
purpose (and corresponding reliance upon authorities addressing punitive damages) inappropriate.

24
The 9th Circuit has consistently held that statutory damages are recoverable without regard to any

25
actual damages and the amount of statutory damages awarded is "constrained only by the specified

26
maxima and minima." *L.A. News Serv. v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 996 (9th Cir.

27
1998) *quoting from Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984); *See also*

28

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,* 259 F.3d 1186, 1194 (9th Cir. 2001); *Peer Int'l Corp. v. Pausa Records, Inc.,* 909 F.2d 1332, 1337 (9th Cir. 1990).  Thus, a comparison of the statutory damages awarded to any actual damages suffered by Plaintiff is unnecessary and improper.

### D. Defendants Incorrectly Apply Authority Addressing Punitive Damages to Statutory Damages.

While statutory damages may also serve a punitive purpose, Defendants incorrectly apply the analytical framework in the Supreme Court's decisions in *BMW of North America v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Auto Insurance Co. v. Campbell*, 538 U.S. 408 (2003): "Statutory damages further [both] 'compensatory and punitive purposes,' and help 'sanction and vindicate the statutory policy of discouraging infringement.'"  *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009) *quoting from L.A. News Serv. V. Reuters Television Int'l*, 149 F.3d 987, 996 (9th Cir. 1998).

The Supreme Court's decisions in the *Gore* and *State Farm* cases were aimed at curtailing the use of excessive punitive damages where there is no upper maximum and the potential to be applied arbitrarily and often in addition to actual damages.  Statutory damages under the Copyright Act and Lanham Act are different from the type of punitive damages in *State Farm* and *Gore* because they are affirmatively authorized by Congress and Congress has carefully formulated the range of statutory damages and, in doing so, has pre-determined and published the maximum award possible.  Congress, in its formulation of statutory damages under the Copyright and Lanham Acts, has included specific ranges of damages for specific levels of culpability. Within those ranges of statutory damages "the jury has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the maxima and minima."  *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 992 (9th Cir. 2009) *quoting from Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990).  So long as the amount awarded is within the range of allowable

statutory damages, courts are extremely deferential to a jury's award of damages.  *See Columbia Pictures Industries Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186 (9th Cir. 2001); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co.*, 74 F.3d 488 (4th Cir. 1996); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).

Defendants contention that there was no evidence of actual harm is unsupported by the record, not only because Louis Vuitton did prove actual harm, there is no requirement of proof of actual damages; statutory damages are awarded as an alternative to actual damages and "[e]ven for noninjurious and unprofitable invasions of copyright" where the only requirement is that damages awarded fall "within statutory limits to sanction and vindicate the statutory policy."  *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 223 (1952).

Although the factors cited in *State Farm Mut. Auto Ins. Co. v. Cambpell*, 538 U.S. 408, 416 (2003) are not, the *Cambpell* factors speak to the propriety of the jury's award in this case.  These factors are (1) the reprehensibility of the defendants' conduct; (2) the ratio between the harm suffered and the award; and (3) the difference between the award and civil penalties authorized or imposed in comparable cases.

These factors all militate in favor of the award entered by the jury.

Defendants' still pretend not to understand just how reprehensible their conduct was.  The jury found not only the underlying infringement willful, but Defendants' own conduct.  The conduct was ongoing even during trial as attested to by Defendant Chen. Ex. E 3:5-7:11.  Despite repeated admitted notices by Louis Vuitton to Defendants, the receipt and adequacy of which was not disputed by Defendants, little or no action was taken.  Trial Ex. 1598.  Defendants' failure to apply their own terms of service, their mocking response to the Complaint and purported ignorance of applicable legal standards (as when Defendant Chen was examined about the Digital Millennium Copyright Act) all served to prove Defendants' reprehensible conduct. Ex. D, 203:11-204:24; 174:25-176:3.

1

2          Similarly, Defendants continue to reflect utter confusion about the difference between the

3   inability to prove specific quantum of harm from the existence and magnitude of actual harm.  The

4   experts agreed that hundreds of commercial websites were permitted to operate, even after service of

5   the Complaint in this matter without disruption or meaningful action by Defendants.  See, for

6   example, Exs. 604, 615, 616.  Each of these sites engaged in the sale of counterfeit merchandise that

7   attempted to duplicate, in some admittedly indeterminate amount, undermine the sales of legitimate

8   Louis Vuitton product which commands a substantial premium because of the rigorous production and

9   distribution controls deployed by Louis Vuitton.  Ex. A, 164:2-166:13.

10          Finally, although there are admittedly no cases which offer a direct comparison with

11  Defendants' wholesale conduct of hosting scores of commercial websites over a period of years,

12  including during the pendency of the litigation, there are numerous cases which support substantial

13  awards of statutory damages under the Copyright and Trademark Acts, all of which contradict

14  Defendants assertions to the contrary.  See, for example, *Peer Int'l Corp. v. Pausa Records, Inc.*, 909

15  F.2d 1332 (9th Cir. 1990) (copyright award of then maximum of $50,000 for each of 80 copyrights);

16  *Columbia Pictures Industries, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186 (9th

17  Cir. 2001)(copyright award of $72,000 for each of 440 infringements); *Verizon California Inc. v.

18  OnlineNIC, Inc.*, 2009 U.S. Dist. LEXIS 84235 (N.D. Cal. Aug. 25, 2009) (cybersquatting award of

19  over $31,000,000 based on $50,000 for each trademark);

20  ## IV.   <u>**Defendant Chen Was Properly Found Liable Based on His Personal Involvement In the**</u>
21       <u>**Infringement.**</u>

22          In the Ninth Circuit, a "corporate officer or director is, in general, personally liable for all torts

23  which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of

24  the corporation and not on his own behalf."  *The Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d

25  814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001,

26  1021 (9th Cir. 1985)); *see also Novell, Inc. v. Unicom Sales, Inc., et al.*, No. C-03-2785 MMC, 2004

WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004) (applying this principle to copyright claim).  Even the examples cited by Defendants, most of which are not binding on this Court, support the jury's finding that Defendant Chen's "specific acts" rose to the level of "unreasonable participation" and that his acts were the "guiding spirit in the alleged wrongdoing" adequate to hold him personally liable for contributory infringement.  *Transgo, Inc.*, 768 F.2d at 21; *Wolf Designs, Inc. v. DHR Co.,* 322 F. Supp. 2d 1065, 1072 (C.D. Cal. 2004); *Murphy Tugboat Co. v. Shipowners & Merch. Towboat Co., Ltd.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979).  Simply stated, there was very little of the infringing conduct that Defendant Chen did not have a hand in either directly or through his express instruction.

Defendant Chen was not only the General Manager and sole owner of the ISP Defendants, Ex. C, 88:3-20, 102:10-15, he was primarily responsible for handling abuse complaints and for instructing and overseeing his part-time employee who also handled abuse complaints.  Ex. B, 188:25-189:4, 226:19-227:20; Ex. C, 98:7-10; Ex. D, 117:7-118:24.  Defendant Chen was the principle decision maker as to enforcement or lack thereof of the ISP Defendants' contractual rights as he rarely if ever imposed any fees on violators, Ex. C, 111:5-112:15, and also refused to terminate recidivist infringing customers.  Ex. D, 196:24-197:11; Ex. E, 28:18-30:15.  Chen's liability is governed by what he did and what he did not do.  Defendant Chen was the central actor in the conduct that gave rise to this claim and that supported the jury's verdict.  He is thus, properly found personally liable.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests the Court deny Defendants' motion for relief under Fed. R. Civ. P. 59.

Dated:  February 1, 2010                    J. Andrew Coombs, A Professional Corp.

  /s/ J. Andrew Coombs
By:  J. Andrew Coombs
      Annie S. Wang
Attorneys for Plaintiff Louis Vuitton Malletier, S.A.

## DECLARATION OF J. ANDREW COOMBS

I, J. ANDREW COOMBS, declare as follows:

1.      I am an attorney at law, duly admitted to practice before the Courts of the State of California and the United States District Court for the Northern District of California.  I am an attorney for Plaintiff Louis Vuitton Malletier, S.A. ("Plaintiff") in an action styled <u>Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc., et al.</u>  Except as otherwise expressly stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows:

2.      Attached Exhibit A is a true and accurate copy of portions of Volume 1 of the certified court reporter's transcript from the Trial in this matter from August 18, 2009, of the trial testimony of Plaintiff's witness, Mr. Nikolay Livadkin.

3.      Attached Exhibit B is a true and accurate copy of portions of Volume 2 of the certified court reporter's transcript from the Trial in this matter from August 19, 2009, of the trial testimony of Plaintiff's witness Mr. Nikolay Livadkin and the deposition reading of Defendants' employee Ms. Juliana Luk.

4.      Attached Exhibit C is a true and accurate copy of portions of Volume 3 of the certified court reporter's transcript from the Trial in this matter from August 20, 2009, of the deposition reading of Defendant Steve Chen.

5.      Attached Exhibit D is a true and accurate copy of portions of Volume 4 of the certified court reporter's transcript from the Trial in this matter from August 21, 2009, of the trial testimony of Defendant Steve Chen.

6.      Attached Exhibit E is a true and accurate copy of portions of Volumes 8 and 9 of the certified court reporter's transcript from the Trial in this matter from August 25, 2009, of the trial testimony of Defendant Steve Chen.

7.      Attached Exhibit F is a true and accurate copy of portions of the certified court reporter's transcript from the Trial in this matter from August 26, 2009, of the proceedings of the Court which included argument and discussion concerning the jury instructions by counsel for Defendants, Mr. Lowe, and counsel for Plaintiff, Mr. Coombs.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this 1st day of February, 2010, at Glendale, California.

_____/s/ J. Andrew Coombs_____
J. ANDREW COOMBS

# Exhibit A

1             IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5    LOUIS VUITTON              )  C-07-03952-JW
     MALLETIER, S.A.,           )
6                               )  AUGUST 18, 2009
              PLAINTIFF,        )
7                               )  VOLUME 1
              V.                )
8                               )  PAGES 1 - 199
     AKANOC SOLUTIONS, INC.,    )
9    ET AL.,                    )
                                )
10            DEFENDANTS.        )
     _____   )
11

12

13           THE PROCEEDINGS WERE HELD BEFORE

14         THE HONORABLE UNITED STATES DISTRICT

15                  JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:  J. ANDREW COOMBS
                         BY:  J. ANDREW COOMBS
18                            ANNIE S. WANG
                         517 E. WILSON AVENUE
19                       SUITE 202
                         GLENDALE, CALIFORNIA 91206
20

21   FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                         BY:  JAMES A. LOWE
22                            CHRISTOPHER G. LAI
                         18400 VON KARMAN
23                       IRVINE, CALIFORNIA 92612

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074

                                                      1

1

2      A P P E A R A N C E S: (CONT'D)

3

       ALSO PRESENT:              LAW OFFICES OF J. ANDREW
4                                 COOMBS
                                  BY:  RUTH ADLER, PARALEGAL
5                                 517 E. WILSON AVENUE
                                  SUITE 202
6                                 GLENDALE, CALIFORNIA 91206

7                                 LVMH FASHION GROUP
                                  BY:  NIKOLAY LIVADKIN
8                                 2 RUE DU PONT-NEUF 75001
                                  PARIS, FRANCE
9
                                  AKANOC SOLUTIONS, INC.
10                                BY:  STEVE CHEN, PRESIDENT
                                  45535 NORTH PORT LOOP EAST
11                                FREMONT, CALIFORNIA 94538

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            2

1                    INDEX OF PROCEEDINGS

2

3    PLAINTIFF'S OPENING STATEMENT P. 82

4    DEFENDANTS' OPENING STATEMENT P. 97

5

     FOR THE PLAINTIFF'S:
6

7    **NIKOLAY LIVADKIN**        DIRECT EXAMINATION P. 131

8

9                     INDEX OF EXHIBITS

10

                              IDENT.        EVIDENCE
11   PLAINTIFF'S:

12   451                                    145
     74                                     170
13   75                                     177

14

15

16

17

18

19

20

21

22

23

24

25

                                                    3

1    ADDRESS. AND THEN THEY THEN ASK THAT ISP TO DO

2    SOMETHING ABOUT THIS PARTICULAR PROBLEM THAT THEY

3    HAVE.

4         BASICALLY WHAT THEY USUALLY DO IS SEND AN

5    E-MAIL SAYING "HI, WE'RE LOUIS VUITTON. WE OWN

6    TRADEMARKS AND COPYRIGHTS. WE THINK THAT

7    BIGWORLDSHOES.COM, OR WHOEVER, IS INFRINGING OUR

8    RIGHTS. PLEASE DO SOMETHING ABOUT IT."

9         WELL, OUR CLIENTS HAVE NO WAY OF KNOWING

10   WHETHER THAT'S TRUE OR NOT TRUE AND THEY'RE NOT

11   INTERESTED IN ARGUING ABOUT IT.

12        ALL THEY KNOW IS THAT THEY HAVE A

13   COMPLAINT AND THEY'RE GOING TO ASSUME THAT IT'S AN

14   ACCURATE COMPLAINT. THEY DON'T KNOW ANYTHING ABOUT

15   THE RELATIONSHIP BETWEEN BIG WORLD SHOES AND LOUIS

16   VUITTON, AND THEY DON'T HAVE TIME OR A METHOD TO

17   LOOK INTO THAT.

18        SO THEY SIMPLY ASSUME THAT THERE'S A

19   PROBLEM. THEY THEN NOTIFY THEIR CUSTOMER, THE

20   RESELLER, THE ONLY ONE THAT THEY DO KNOW. THEY

21   NOTIFY THE CUSTOMER, THIS IP ADDRESS IS ACCUSED OF

22   SELLING SOMETHING ON A WEB SITE THAT IS UPSETTING

23   LOUIS VUITTON OR SOMEBODY ELSE. PLEASE DO

24   SOMETHING ABOUT IT.

25        THAT CUSTOMER THEN HAS TO TALK TO THEIR

113

1    CUSTOMER AND TRY TO STOP THE PROBLEM, WHATEVER IT

2    IS.

3         IF IT DOESN'T WORK, IF THIS RESELLER

4    DOESN'T DO ANYTHING ABOUT IT, AND THE WEB SITE IS

5    STILL ACTIVE AFTER A DAY OR SO, OR IF THEY GET

6    ANOTHER COMPLAINT FROM LOUIS VUITTON SAYING THIS IS

7    STILL ACTIVE, YOU KNOW, WHAT HAVE YOU DONE ABOUT

8    IT, THEN THEY WILL TAKE SOME FURTHER ACTION.

9         AND THERE ARE ONLY A COUPLE OF ACTIONS

10   THAT THEY CAN TAKE.  ONE IS TO DISABLE THE IP

11   ADDRESS.  BUT AS YOU CAN SEE, BECAUSE SO MANY USERS

12   ARE ON A SINGLE IP ADDRESS, THERE WOULD BE

13   THOUSANDS OF USERS ON ONE IP ADDRESS, MAYBE SOME

14   ARE DOING E-MAILS OR GAMES OR WEB SITES AND SOME

15   ARE STORING DATA.  IT'S AN EXTREME MEASURE TO

16   DISABLE THAT IP ADDRESS BECAUSE YOU WANT TO HAVE A

17   LOT OF INNOCENT PEOPLE WHO HAVE BEEN HURT BY THAT

18   DISCONNECTION FROM THE INTERNET.

19        BUT IF THEY HAVE TO, THEY'LL DO THAT AND

20   FORCE ESSENTIALLY THEIR CUSTOMER TO GO TO THEIR

21   CUSTOMERS DOWN THE LINE AND DEAL WITH ALL OF THE

22   FALLOUT FROM THAT, BUT THEY TRY NOT TO DISRUPT

23   SERVICE THAT OFTEN UNLESS IT'S ABSOLUTELY

24   NECESSARY.

25        THE ONLY OTHER THING THEY CAN DO IS TO

114

1    THESE, AND THEY HAVE OFTEN TAKEN ACTION REPEATEDLY.

2         FOR EXAMPLE, THEY WILL GET A COMPLAINT

3    AND A TAKEDOWN AS THEY CALL IT, A LETTER OR E-MAIL

4    FROM THE RESELLERS.  AND IF THEY DO IT AGAIN

5    THEY'RE DISABLED, THE IP ADDRESS.  AND IF IT OCCURS

6    AGAIN, THEY'LL UNPLUG THE SERVER AND SO ON.

7         BUT THE SAME FOLKS KEEP COMING BACK IT

8    APPEARS, BIG WORLD SHOES AND MANY OTHERS THAT ARE

9    IN THE BUSINESS OF SELLING COUNTERFEITERS.

10        BUT THEY CAN'T STOP THEM FROM COMING

11   BACK.  THEY'RE NOT DOING BUSINESS WITH THESE

12   PEOPLE.  AND THEIR CUSTOMERS ARE NOT DOING BUSINESS

13   WITH THESE PEOPLE EITHER.  IT'S JUST FURTHER DOWN

14   THE LINE.

15        SO WE'RE GOING TO SHOW YOU A SUMMARY OF

16   ALL OF THE ACTIONS THAT HAVE BEEN TAKEN ABOUT ALL

17   OF THE COMPLAINTS FROM LOUIS VUITTON.

18        COUNSEL SUGGESTED THAT THERE WAS A --

19   THAT NOTHING HAPPENED UNTIL THIS LAWSUIT WAS FILED,

20   BUT I THINK THE EVIDENCE WILL SHOW OTHERWISE

21   BECAUSE WHEN THIS LAWSUIT WAS FILED, THEY ACTUALLY

22   WERE COMPLAINING ABOUT ONLY FIVE IP OR DOMAINS.

23        AT THE TIME THE CASE WAS FILED, FOUR OF

24   THOSE DOMAINS WERE NO LONGER ON THEIR IP ADDRESSES.

25   AND THE FIFTH ONE WASN'T OPERATING AT ALL ON

119

Exhibit A

1    PRODUCT BEARING LOUIS VUITTON TRADEMARKS.

2         I BROUGHT THIS EXHIBIT 82.1 TO COMPARE TO

3    THE NONGENUINE. THIS IS THE CLOSEST I COULD FIND

4    BECAUSE AGAIN IT'S A PRODUCT THAT WE DO NOT

5    MANUFACTURE ANYMORE.

6    BY MR. COOMBS:

7    Q    AND CAN YOU DESCRIBE FOR US HOW YOU CAN

8    IDENTIFY THE NONGENUINE ARTICLE AS NONGENUINE?

9    A    WELL, AGAIN, QUITE EASY. THIS PLASTIC

10   PROTECTION OF THE METALLIC PARTS THAT I JUST

11   MENTIONED, THE BUCKLE HERE IS QUITE DIFFICULT TO

12   TURN AND TO CLOSE COMPARED TO THE GENUINE WHICH

13   WORKS VERY SMOOTHLY.

14        THE INTERIOR IS NOT THE SAME. YOU WILL

15   SEE THE LINING IS NOT THE SAME.

16   Q    THE LINING.

17   A    THE LINING, SORRY. THE QUALITY OF THE

18   METALLIC PARTS IS QUITE POOR. THESE CARDS WHICH

19   PROBABLY ARE MADE TO LURE THE CUSTOMER THAT IT'S

20   NOT AN AUTHENTICITY CARD, WE DO NOT DO THESE CARDS.

21        THERE'S A LITTLE BOOKLET INSIDE WHICH IS

22   PRINTED NOT IN THE RIGHT WAY. PART OF THE TEXT IS

23   ACTUALLY CUT SO THAT'S AN EASY WAY TO SEE THAT IT

24   DOESN'T COME FROM OUR COMPANY.

25   Q    I'LL GIVE YOU A SHORT BREAK FROM PRODUCT

160

1    IDENTIFICATION AND MOVE TO -- AND ASK YOU A LITTLE

2    MORE ABOUT THE MANUFACTURING DISTRIBUTION OF

3    GENUINE LOUIS VUITTON.  WHERE IS GENUINE LOUIS

4    VUITTON MADE?

5    A    LOUIS VUITTON PRODUCTS ARE MADE IN LOUIS

6    VUITTON'S OWN MANUFACTURING FACILITIES.  THERE ARE

7    14: 11 IN FRANCE, 2 IN SPAIN, AND 1 IN SAN DIMAS

8    IN CALIFORNIA.  THAT'S FOR LEATHER GOODS.

9         THERE'S ONE MANUFACTURING FACILITY IN

10   ITALY FOR SHOES AND IN SWITZERLAND FOR WATCHES.

11   Q    AND HOW MANY PEOPLE DOES LOUIS VUITTON EMPLOY

12   IN THE UNITED STATES.

13   A    IN THE UNITED STATES LOUIS VUITTON EMPLOYS

14   MORE THAN 1,300 PEOPLE AND MANY IN THE HEADQUARTERS

15   IN THE LOCAL COMPANY OF NEW YORK.

16        IN THE STORE CHAIN THERE ARE AROUND 100

17   STORES ACROSS THE UNITED STATES.  WE EMPLOY A

18   LITTLE BIT MORE THAN 300 PEOPLE IN THE WORKSHOP

19   PRODUCTION IN SAN DIMAS, CALIFORNIA, AND WE

20   EMPLOYED I THINK 30 PEOPLE I THINK IN THE CUSTOMER

21   SERVICE DEPARTMENT IN SAN FRANCISCO.

22   Q    AND ONCE LOUIS VUITTON PRODUCT IS

23   MANUFACTURED, HOW IS IT DISTRIBUTED?

24   A    ONCE LOUIS VUITTON PRODUCTS ARE MANUFACTURED,

25   THEY'RE DISTRIBUTED THROUGH ONE MAIN LOGISTICS

161

Exhibit A

1    CENTER LOCATED IN THE SUBURBS OF PARIS AND FOR

2    THESE PRODUCTS MANUFACTURED IN CALIFORNIA, THEY'RE

3    DISTRIBUTED THROUGH THE LOGISTICS CENTER BASED IN

4    MEMPHIS.

5    Q    AND ARE THOSE LOGISTIC CENTERS OWNED BY LOUIS

6    VUITTON?

7    A    YES, THEY ARE.

8    Q    AND THEY'RE OPERATED BY THEM?

9    A    YES, THEY ARE.

10   Q    AND ARE THERE ANY OTHER LOGISTIC CENTERS FOR

11   LOUIS VUITTON PRODUCTS?

12   A    WELL, THERE ARE LOCAL REGIONAL STORAGE

13   FACILITIES, BUT I WOULDN'T CALL THEM LOGISTICS

14   CENTER.

15   Q    THE STORAGE CENTERS ARE OPERATED AND

16   MAINTAINED BY LOUIS VUITTON?

17   A    BY LOUIS VUITTON.

18   Q    SO ARE THERE ANY LICENSEES FOR LOUIS VUITTON

19   MERCHANDISE?

20   A    NO, THERE ARE NO LICENSEES.

21   Q    AND DOES LOUIS VUITTON USE WHOLESALERS TO

22   DISTRIBUTE ANY OF ITS MERCHANDISE?

23   A    NO.

24   Q    ARE THERE ANY INTERVENING THIRD PARTIES

25   BETWEEN THE LOUIS VUITTON OWNED PRODUCTION

162

1    FACILITIES THAT YOU DESCRIBED AND THE CONSUMER

2    OTHER THAN LOUIS VUITTON ITSELF?

3    A    NO.  LOUIS VUITTON PRODUCTS ARE PRODUCED IN

4    OUR OWN MANUFACTURING FACILITIES AND ARE

5    DISTRIBUTED THROUGH A WHOLLY OWNED AND CONTROLLED

6    STORE CHAIN.

7    Q    AND CAN YOU DESCRIBE HOW THE STORE CHAIN IS

8    STRUCTURED?

9    A    THERE ARE AROUND 450 STORES AROUND THE WORLD

10   AND IN MOST OF THE CONTINENTS.

11   Q    AND HOW ABOUT DEPARTMENT STORES?

12   A    THERE ARE INDEED ALSO CORNERS IN HIGH-END

13   DEPARTMENT STORES.  THESE CORNERS ARE STAFFED BY

14   LOUIS VUITTON PERSONNEL.

15   Q    IS ANY FINISHED LOUIS VUITTON PRODUCT MADE IN

16   ASIA?

17   A    NO.

18   Q    DOES LOUIS VUITTON ASSIGN ITS TRADEMARKS TO

19   ANYONE ELSE?

20   A    NO.

21   Q    AND DOES IT SELL PRODUCT ON LINE?

22   A    YES, IT DOES BUT IN JUNE OF 2009 LOUIS VUITTON

23   PRODUCTS WERE SOLD ON TWO WEB SITES, ELUXURY.COM,

24   WHICH IS A WEB SITE BELONGING TO LOUIS VUITTON AND

25   LOUIS VUITTON'S OWN WEB SITE LOUISVUITTON.COM AND

163

1    CURRENTLY LOUIS VUITTON IS SELLING OUR PRODUCTS.

2    Q    LOUIS VUITTON PRODUCTS ARE EXPENSIVE, ISN'T

3    IT?

4    A    YES, THEY ARE.

5    Q    AND WHY IS THAT?

6    A    WELL, LOUIS VUITTON'S PRODUCTS ARE, IF I CAN

7    SAY, A SYMBOL OF LUXURY.  WE -- OUR CUSTOMERS DREAM

8    ABOUT THE BEST PRODUCT, THE PERFECT PRODUCT, AND

9    THIS IS COSTLY.

10            LOUIS VUITTON, ONE OF THE KEYS TO LOUIS

11    VUITTON'S SUCCESS IS THE QUALITY, AND WE REQUIRE

12    THE HIGH QUALITY STANDARDS AT ANY LEVEL FROM THE

13    HEAD OFFICES THROUGH THE STORES AND MANUFACTURING

14    FACILITIES.

15            THERE ARE QUALITY CHECKS AND AT ALL

16    LEVELS OF THE PRODUCTION AND THEY'RE SUPPLEMENTED

17    BY SELF-CHECKS BY THE OPERATOR DURING THE VARIOUS

18    OPERATIONS THAT HE PERFORMS WHEN THE PRODUCTS HE'S

19    MADE.

20            THIS REQUIRES, OF COURSE, VERY CAREFUL

21    SELECTION OF RAW MATERIALS WHICH COST -- WHICH ARE

22    COSTLY.  SOME OF THE RAW MATERIALS SUCH AS THE

23    EXOTIC AND SOME EXOTIC LETTERS ARE EVEN SO RARE AND

24    SO DIFFICULT TO SOURCE THAT WHEN A CUSTOMER MAKES

25    AN ORDER FOR SUCH PRODUCT, HE NEEDS TO WAIT UNTIL

164

1    THE PARTICULAR OR PIECE OF EXOTIC LEATHER IS

2    AVAILABLE COULD COME FROM -- IT'S DIFFICULT TO

3    SOURCE.

4    Q    SO IF LOUIS VUITTON CAN COMMAND SUCH A PRICE

5    FOR ITS PRODUCT WHY DOES IT CARE ABOUT THE

6    NONGENUINE PRODUCT THAT WE HAVE BEEN LOOKING AT?

7    A    WELL, I WASN'T --

8    Q    I'M SORRY.  DID I INTERRUPT?

9    A    WE ALSO MANUFACTURE IN COUNTRIES WITH HIGH

10   LABOR COSTS.  WE SHOULD BE PARTICULARLY IN EUROPE.

11   WE'RE PROBABLY AMONGST THE LAST COMPANIES THAT DO

12   NOT OUTSOURCE PRODUCTION IN LOW COST PRODUCTION

13   COUNTRIES PRECISELY BECAUSE WE NEED TO SOURCE THE

14   BEST QUALITY PRODUCT.

15   Q    SO --

16   A    ALSO THE SALE OF LUXURY GOODS REQUIRES QUITE

17   EXPENSIVE COMMUNICATION AND ADVERTISING CAMPAIGNS

18   WHICH IS THIS ADDITIONAL COST GOES TO THE END PRICE

19   OF THE PRODUCT.

20   Q    SO A CONSIDERABLE EXPENSE ON MARKETING?

21   A    YES.

22   Q    SO IF LOUIS VUITTON CAN COMMAND A PREMIUM

23   PRICE FOR ITS PRODUCT, THEN WHY DOES IT CARE ABOUT

24   THE NONGENUINE PRODUCT THAT YOU'VE BEEN LOOKING AT?

25   A    WELL, IT'S A BIG PROBLEM FOR US.  NOT ONLY

165

1     BECAUSE IT'S A CUSTOMER WHO PURCHASES A NONGENUINE

2     PRODUCT WILL PROBABLY NOT BUY OUR PRODUCT, BUT ALSO

3     BECAUSE PEOPLE WHO HAVE -- WHO LOVE OUR PRODUCT SO

4     MUCH THAT THEY WOULD SAVE MONEY FOR A LONG TIME TO

5     BUY A BAG THAT THEY DREAMED FOR A LONG TIME, THEY

6     ARE GENUINELY DISGUSTED WHEN THEY SEE A CHEAP

7     IMITATIONS OF THIS BAG ALL OVER THE PLACE.

8             WE RECEIVE MANY, MANY COMPLAINTS OF SUCH

9     PEOPLE.

10    Q    SO HOW IS IT THAT LOUIS VUITTON IS HARMED BY

11    THESE NONGENUINE PRODUCTS.

12    A    THE IMAGE OF THE COMPANY AS A LUXURY BRAND

13    SUFFERS FROM THESE PRODUCTS.

14    Q    SO GIVEN THAT, WHAT DOES LOUIS VUITTON DO TO

15    ADDRESS THE PROBLEM -- WHEN WE TALK ABOUT

16    "NONGENUINE SALES" WE'RE TALKING ABOUT MERCHANDISE

17    THAT LOUIS VUITTON HAS NOT MADE; IS THAT CORRECT?

18    A    YES.

19    Q    AND SO WHAT DOES LOUIS VUITTON DO TO TRY TO

20    CURTAIL THE SALE OF SUCH MERCHANDISE?

21    A    LOUIS VUITTON EMPLOYS WITHIN THE INTELLECTUAL

22    PROPERTY DEPARTMENT 40 PEOPLE FULLY DEDICATED ON

23    THIS KIND OF ISSUES MAINTAINING OUR RIGHTS AND

24    ENFORCING THEM.

25            THIS TEAM OF 40 PEOPLE IS MAINLY BASED IN

                                                    166

1    A    I HAVE BEEN WORKING WITH MR. HOLMES SINCE

2    2003.

3    Q    COULD YOU ESTIMATE HOW MANY CASES HAVE YOU

4    WORKED ON WITH MR. HOLMES?

5    A    HUNDREDS.

6    Q    AND HAVE YOU EVER HAD THE OCCASION TO USE

7    MR. HOLMES' REPORTS IN THE RESULT OF A CRIMINAL

8    INVESTIGATION?

9              MR. LOWE:  I'M GOING TO OBJECT.  THAT'S

10   LEADING.

11             THE COURT:  SUSTAINED.

12   BY MR. COOMBS:

13   Q    WHAT DOES YOUR OFFICE DO UPON RECEIPT OF ONE

14   OF THE KINDS OF COMPLAINTS THAT YOU JUST DESCRIBED?

15   A    WE WOULD -- AS A FIRST STEP WE WOULD CHECK THE

16   INFORMATION.  WE WOULD VERIFY IF THE GOODS ARE

17   INDEED NONGENUINE AND IF THIS IS THE CASE, WE WOULD

18   PROCEED FURTHER BY CREATING A FILE.

19             WE WOULD CAREFULLY DOCUMENT THE CONTENT

20   OF THE WEB SITE ITSELF BY EITHER PRINTING OUT THE

21   CONTENT OR SAVING AN ADDITIONAL COPY, BUT I WOULD

22   SAY MOST OF THE TIMES PRINTING OUT EVERYTHING.

23             WE WOULD SECURE EVIDENCE ABOUT HOSTING.

24   Q    WHEN YOU SAY THAT YOU REVIEW THE SITE TO

25   DETERMINE WHETHER OR NOT THE OFFERS ARE INFRINGING,

173

1    HOW IS IT THAT YOU CAN TELL FROM LOOKING AT A WEB

2    SITE ONLINE WHETHER OR NOT THE OFFERS ARE VIOLATING

3    LOUIS VUITTON'S INTELLECTUAL PROPERTY RIGHTS?

4    A    WELL, IT'S QUITE EASY.  ACTUALLY WITH THIS

5    SPECIFICITY OF OUR PRODUCTS, AS YOU CAN SEE MOST OF

6    OUR PRODUCTS BEAR OUR TRADEMARKS.  THEY'RE VISIBLE.

7         AND THESE COMBINED WITH THE FACT THAT WE

8    HAVE GONE THROUGH EXTENSIVE TRAINING, WE'RE ABLE TO

9    RECOGNIZE MOST OF THE TIMES FROM LOOKING AT THE

10   PICTURE, BUT THERE ARE SEVERAL OTHER ELEMENTS THAT

11   INDICATE THAT WE'RE IN THE PRESENCE OF COUNTERFEIT

12   GOODS.  THAT WOULD BE THE PRICE.  THAT WOULD ALSO

13   BE THE QUANTITIES OFFERED FOR SALE.

14        BECAUSE OF THE TIGHT CONTROL THAT LOUIS

15   VUITTON EXERCISES ON THE DISTRIBUTION OF ITS

16   PRODUCTS, IT'S VIRTUALLY IMPOSSIBLE THAT A WEB SITE

17   WOULD HAVE THE POSSIBILITY OF OFFERING HIGH VOLUMES

18   OF AUTHENTIC GOODS.

19   Q    ANYTHING ELSE ABOUT THE CONTENT OF THE WEB

20   SITE THAT HELPS YOU DETERMINE WHETHER OR NOT THE

21   OFFERS ARE FOR GENUINE MERCHANDISE OR NOT?

22   A    MOST OF THOSE WEB SITES ACTUALLY DISCLOSE THAT

23   THEY DEAL WITH FAKES.

24   Q    AND HOW DO THEY DO THAT?

25   A    THEY EITHER REFER TO THE PRODUCTS AS A REPLICA

174

1    OR MIRROR IMAGE OR FAKE OR THEY CLAIM THEY'RE NOT

2    AFFILIATED IN ANY WAY WITH THE TRADEMARK OWNER.

3    Q    AND YOU THEN SAID THAT YOU WENT ON TO DOCUMENT

4    OR BUILD A FILE BY DOCUMENTING THE INFRINGEMENT.

5         CAN YOU DESCRIBE WHAT DOCUMENTING THE

6    INFRINGEMENT INVOLVES?

7    A    WE WOULD PRINT OUT ALL OF THE RELEVANT PAGES

8    OF THE WEB SITE.

9    Q    IS THIS SOMETHING THAT YOU DO OR SOMETHING

10   THAT YOUR STAFF DOES?

11   A    IN THE BEGINNING WHEN I WAS HIRED, AS I SAID,

12   I WAS ALONE SO I WAS DOING IT MYSELF.

13        CURRENTLY MY ASSISTANTS ARE DOING THAT

14   AND EVERYTHING IS VERIFIED BY ME IN THE END.

15   Q    AND IF YOU WOULD TAKE A -- I THINK THERE'S A

16   BINDER UP THERE MARKED 2 THAT AS AN EXHIBIT 75, AND

17   I WOULD ASK THE WITNESS TO TAKE A LOOK AT THAT.

18   A    I'M SORRY, THE NUMBER AGAIN?

19   Q    75.  I THINK IT'S NEAR THE FRONT OF THE

20   BINDER.

21        MR. LOWE:  YOUR HONOR, BEFORE COUNSEL

22   SHOWS THIS TO THE JURY, WE DO HAVE AN OBJECTION TO

23   THIS.

24        THE WITNESS:  THAT'S A PRINTOUT OF THE

25   WEB SITE ESHOES99.COM.

175

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

Exhibit A

# Exhibit B

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5    LOUIS VUITTON              )  C-07-03952-JW
     MALLETIER, S.A.,           )
6                               )  AUGUST 19, 2009
                 PLAINTIFF,     )
7                               )  VOLUME 2
                 V.             )
8                               )  PAGES 1 - 230
     AKANOC SOLUTIONS, INC.,    )
9    ET AL.,                    )
                                )
10               DEFENDANTS.    )
     _____    )
11

12            THE PROCEEDINGS WERE HELD BEFORE

13         THE HONORABLE UNITED STATES DISTRICT

14                   JUDGE JAMES WARE

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF: J. ANDREW COOMBS
                        BY:  J. ANDREW COOMBS
17                           ANNIE S. WANG
                        517 E. WILSON AVENUE
18                      SUITE 202
                        GLENDALE, CALIFORNIA 91206
19

20   FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                         BY:  JAMES A. LOWE
21                            CHRISTOPHER G. LAI
                         18400 VON KARMAN
22                       IRVINE, CALIFORNIA 92612

23

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)
24

     OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
25                            CERTIFICATE NUMBER 8074

                                                          1

1    A P P E A R A N C E S: (CONT'D)

2

3    ALSO PRESENT:              LAW OFFICES OF J. ANDREW
                                COOMBS
4                              BY:  RUTH ADLER, PARALEGAL
                                517 E. WILSON AVENUE
                                SUITE 202
5                              GLENDALE, CALIFORNIA 91206

6                              LVMH FASHION GROUP
                                BY:  NIKOLAY LIVADKIN
7                              2 RUE DU PONT-NEUF 75001
                                PARIS, FRANCE
8
                                AKANOC SOLUTIONS, INC.
9                              BY:  STEVE CHEN, PRESIDENT
                                45535 NORTH PORT LOOP EAST
10                             FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                    INDEX OF PROCEEDINGS

2

3      **NIKOLAY LIVADKIN**          DIRECT EXAMINATION P. 4
                                   (RESUMED)
4                                  CROSS-EXAMINATION P. 103
                                   REDIRECT EXAMINATION P. 173
5                                  RECROSS-EXAMINATION P. 179
                                   FURTHER REDIRECT P. 182
6

7      **DEPOSITION READ OF JULIANA LUK** P. 186

8

9                      INDEX OF EXHIBITS

10     FOR THE PLAINTIFF'S:          MARKED          ADMITTED

11

12     75.1                                         29

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                             3

1    WHICH IS IN BY STIPULATION.  I DON'T KNOW IF YOU

2    HAVE A COPY UP THERE.  I DO HAVE AN EXTRA COPY FOR

3    YOU.

4              THE COURT:  GO AHEAD.

5    BY MR. COOMBS:

6    Q    HAVE YOU SEEN THAT DOCUMENT BEFORE?

7    A    YES.

8    Q    AND CAN YOU DESCRIBE WHAT IT IS?

9    A    IT SAYS, "THE SUMMARY OF MSG/AKANOC RESPONSES

10   TO COMPLAINTS."

11             AND IT'S A LIST OF THE COUNTERFEIT WEB

12   SITES THAT WE HAVE EXPLAINED ABOUT TO DEFENDANTS.

13   Q    HOW MANY PAGES IS THE DOCUMENT?

14   A    THE DOCUMENT IS 20 PAGES.

15   Q    AND IS IT ACCURATE?

16   A    NOT REALLY.

17   Q    LOOKING AT ONLY THE FIRST PAGE FOR THE MOMENT,

18   CAN YOU SAY WHY YOU BELIEVE IT'S INACCURATE?

19   A    WELL, THE FIRST FIVE WEB SITES IT SAYS NOTICE

20   DATE AUGUST 20TH, 2007.  THESE ARE THE FIVE WEB

21   SITES THAT WE HAVE BEEN COMPLAINING ABOUT SINCE

22   2006 AND BEGINNING OF 2007.

23             SO DEFENDANTS HAVE NOT RECEIVED THE

24   NOTICE ON AUGUST 20TH.

25   Q    SO, FOR EXAMPLE, THE FOURTH ONE ON THE LIST IS

                                                        24

1    PRINTED OUT FROM WHAT YOU PERSONALLY VIEWED ON YOUR

2    SCREEN," I UNDERSTAND THAT YOU HAVE AN OBJECTION TO

3    THAT, BUT I'LL PERMIT YOU TO MOVE SPEEDILY TO

4    DISPLAY THAT TO THE JURY.

5         IF IT'S NOT A DOCUMENT OF THAT KIND AND

6    HE GOT IT FROM SOME OTHER PLACE, THEN YOU NEED TO

7    LAY A FOUNDATION AND DON'T DISPLAY IT UNTIL YOU

8    HAVE.

9         AND THE WAY THAT IT WOULD HELP US IS TO

10   SAY TO YOUR TECHNICIAN, "DON'T DISPLAY THIS YET,"

11   OR SAY TO THE WITNESS "I WANT YOU TO LOOK AT A

12   PAPER COPY," BEFORE YOU DISPLAY IT LAY A FOUNDATION

13   AND THEN WE CAN DISPLAY IT.

14        MR. COOMBS:  THANK YOU, YOUR HONOR.

15        (WHEREUPON, PLAINTIFF'S EXHIBIT NUMBER

16        75.1, HAVING BEEN PREVIOUSLY MARKED FOR

17        IDENTIFICATION, WAS ADMITTED INTO

18        EVIDENCE.)

19   BY MR. COOMBS:

20   Q    SO WHEN WAS EXHIBIT 75.1 PRINTED OUT?

21        THE COURT:  YOU DID THAT IN THE

22   FOUNDATION.  DON'T BACK UP.  LET'S MOVE FORWARD.

23   BY MR. COOMBS:

24   Q    AND DOES -- CAN YOU DESCRIBE WHAT THE CONTENT

25   OF EXHIBIT 75.1 IS?

29

1    A    THE FIRST PAGE SHOWS A CERTAIN NUMBER OF SHOES

2    BEARING THE LOUIS VUITTON TRADEMARKS.  THOSE SHOES

3    ARE NOT GENUINE.

4         THE SECOND PAGE DISPLAYS A CERTAIN NUMBER

5    OF BAGS BEARING THE LOUIS VUITTON TRADEMARKS.

6    THOSE BAGS ARE NOT GENUINE.

7         SAME FOR THE FOLLOWING PAGE.  SAME FOR

8    THE FOLLOWING PAGE.  SAME FOR THE FOLLOWING PAGE.

9         I'M SORRY.  COULD YOU GO BACK TO THE

10   PREVIOUS PAGE?

11        YES.  ON THIS PAGE IT DISPLAYS A NUMBER

12   OF BELTS BEARING THE LOUIS VUITTON TRADEMARKS.

13   THOSE BELTS ARE NOT GENUINE.

14        ON THE NEXT PAGE YOU CAN SEE A CERTAIN

15   NUMBER OF SUNGLASSES BEARING THE LOUIS VUITTON

16   TRADEMARKS.  THOSE SUNGLASSES ARE NONGENUINE.

17        THE FOLLOWING PAGE DISPLAYS A WAY TO

18   COMMUNICATE WITH THE WEB SITE OPERATOR.  IT SAYS

19   "ORDER ON LINE."

20        THE COURT:  WE CAN SEE THAT.  YOU DON'T

21   HAVE TO DESCRIBE IT.

22        THE WITNESS:  RIGHT.  THE NEXT PAGE

23   PROVIDES CONTACT E-MAIL ADDRESSES FOR THE E-MAIL

24   OPERATORS AS WELL AS TELEPHONE NUMBERS.

25        THE PAGE CURRENTLY DISPLAYED PROVIDES

30

1    INFORMATION ABOUT HOW TO PAY FOR GOODS THAT ARE ON

2    THIS WEB SITE.  THAT'S THE END.

3    BY MR. COOMBS:

4    Q    AND YOU SAID THAT THE OFFERS WERE NONGENUINE.

5    HOW WAS IT THAT YOU COULD TELL THAT FROM REVIEWING

6    THE WEB SITE?

7    A    FROM REVIEWING THE PICTURES.

8    Q    AND WHAT WAS IT ABOUT THE PICTURES THAT TOLD

9    YOU THAT THEY WERE NONGENUINE?

10   A    WELL, IF WE GO BACK TO THE SUNGLASSES, FOR

11   EXAMPLE, WE DO NOT MANUFACTURE SUCH CASES.  THERE

12   IS SOME SORT OF TISSUE TO CLEAN THE SUNGLASSES

13   DISPLAYING THE LV LOGO AND THE LOUIS VUITTON

14   TRADEMARK.  WE DO NOT SELL SUCH PIECES.

15        I ALSO DO NOT RECOGNIZE THE MODEL

16   SUNGLASSES DISPLAYED.

17        AS FOR THE BELTS, THE LAST TWO BELTS I DO

18   NOT RECOGNIZE AS MODELS.

19        SHOULD I GO FURTHER?

20   Q    NO.  I THINK THAT'S SUFFICIENT.

21        I ASK THE WITNESS TO TURN TO EXHIBIT 16

22   OR TURN TO AND DISPLAY A COPY.  IT SHOULD BE IN

23   VOLUME 1 FOR YOU.

24   A    ALL RIGHT.

25   Q    AND CAN YOU DESCRIBE WHAT EXHIBIT 16 IS?

31

1    A    I ACTUALLY ASKED ROB HOLMES TO PROVIDE ME WITH

2    CONTACT INFORMATION ABOUT THE HOST, AND I TOLD HIM

3    THAT I HAD SENT A LETTER BY REGISTERED E-MAIL TO

4    ONE ADDRESS IN FREMONT AND THAT THIS LETTER HAS

5    COME BACK UNDELIVERED BY DHL.  AND SO I ASKED HIM

6    TO FIND A NEW ONE WHERE I CAN DELIVER MY FOLLOW-UP

7    LETTER.

8              AND HE CAME BACK TO ME WITH AN ADDRESS --

9              THE COURT:  JUST A MOMENT.  LET'S SEE IF

10   THERE'S A QUESTION ABOUT THAT.

11   BY MR. COOMBS:

12   Q    I'D LIKE TO SHOW THE WITNESS A BAG THAT WAS

13   MARKED AND WE LOOKED AT YESTERDAY EXHIBIT 67.

14   A    UM --

15             THE COURT:  JUST A MOMENT.  WHAT'S THE

16   QUESTION?

17   BY MR. COOMBS:

18   Q    YOU'VE SEEN THIS BAG BEFORE?

19   A    YES.

20   Q    AND IT WAS DELIVERED -- WELL, WHAT'S YOUR

21   UNDERSTANDING OF THE ORIGIN OF THE BAG?

22   A    THIS IS A BAG THAT HAS BEEN PURCHASED BY ROB

23   HOLMES FROM THE WEB SITE WENDY929.NET.

24   Q    AND DO YOU HAVE AN UNDERSTANDING OF WHEN THAT

25   PURCHASE WAS MADE?

74

1      A     YES.

2      Q     AND WHEN?

3      A     IN -- THE PRODUCT HAS BEEN DELIVERED TO ROB

4      HOLMES ON JUNE 26TH, 2007.

5      Q     AND THIS WAS AFTER THE VARIOUS NOTICES

6      CONCERNING WENDY929 ABOUT WHAT YOU JUST TESTIFIED?

7      A     YES.  AS I PREVIOUSLY MENTIONED FOLLOWING

8      SEVERAL UNSUCCESSFUL NOTIFICATIONS AND TO

9      DEFENDANTS, THE NEXT STEP WOULD BE TO SECURE

10     EVIDENCE FOR LEGAL ACTION AND THIS PURCHASE WAS

11     DONE WITH THIS GOAL.

12     Q     NOW, YOU MENTIONED WEB SITE ATOZBRAND.  IS

13     THAT A WEB SITE WHICH YOUR OFFICE HAS INVESTIGATED?

14     A     YES.

15     Q     AND YOU INVESTIGATED IT USING THE STEPS THAT

16     YOU DESCRIBED EARLIER?

17     A     YES, ALL OF THEM FIND WEB SITES THAT WERE

18     SUBJECT TO INITIAL COMPLAINTS.  WE HAVE ORDERED

19     PURCHASES FROM THESE WEB SITES THROUGH ROB HOLMES.

20     Q     I WOULD ASK THE WITNESS TO LOOK AT EXHIBIT 70?

21     A     17 OR 70?

22     Q     70.  I GUESS TODAY IT'S MY PROBLEM HAVING TO

23     ARTICULATE.

24           THE COURT:  WHAT IS YOUR QUESTION?

25     BY MR. COOMBS:

75

1   A    WHAT HAS HAPPENED ON A FEW OCCASIONS IS THAT

2   AT THE TIME WHEN THE WEB HOSTS RECEIVE OUR

3   NOTIFICATION AND ACTUALLY VERIFIES THE INFORMATION

4   IN OUR LETTER, THE WEB SITE IS NOT HOSTED ANYMORE

5   ON THIS IP ADDRESS BECAUSE IT HAS CHANGED, EITHER

6   HOSTING HAS CHANGED OR THE WEB SITE OPERATOR HAS

7   TAKEN THE WEB SITE DOWN FOLLOWING OUR NOTIFICATION

8   WHICH DOES NOT MEAN THAT THE INFORMATION CONTAINING

9   MY LETTER WAS WRONG.

10  Q    IS THE DOMAIN NAME BIGWORLDSHOES.COM ONE OF

11  THE MAIN NAMES THAT HAVE BEEN THE SUBJECT OF

12  NOTIFICATIONS BY LOUIS VUITTON?

13  A    YES.

14  Q    LET ME SHOW YOU EXHIBIT 589.

15          THE COURT:  WHAT IS YOUR QUESTION?

16  BY MR. COOMBS:

17  Q    CAN YOU TELL US WHETHER THOSE ARE AUTHENTIC

18  LOUIS VUITTON MERCHANDISE?

19  A    THESE SNEAKERS ARE NONGENUINE.

20  Q    AND CAN YOU TELL US WHY?

21  A    BECAUSE THEY DO NOT -- OR WE HAVEN'T

22  MANUFACTURED THIS PARTICULAR MODEL.  ALSO THE -- WE

23  DO NOT USE SHOE BOXES.

24  Q    AND I'D ASK THE WITNESS TO TURN TO EXHIBIT 7.

25  HAVE YOU SEEN THIS LETTER BEFORE?

                                                    88

1    CONNECTION WITH YOUR INVESTIGATION OF THE WEB SITE

2    BIGWORLDSHOES.COM?

3    A    THIS ACTUALLY HAS BEEN GENERATED BY OUR

4    INVESTIGATOR.

5    Q    AND THAT'S MR. HOLMES?

6    A    YES.

7             THE COURT:  IS HE SCHEDULED AS A WITNESS?

8             MR. COOMBS:  YES, HE IS.

9             THE COURT:  LET'S GO BACK TO IT WHEN HE'S

10   HERE AND MOVE TO ANY NEW AREA THAT YOU HAVE WITH

11   THIS WITNESS.

12            MR. COOMBS:  OKAY.  THANK YOU, YOUR

13   HONOR.

14   Q    I'D LIKE TO SHOW THE WITNESS EXHIBIT 117.  AND

15   CAN YOU TELL US WHETHER THAT'S AN AUTHENTIC LOUIS

16   VUITTON MERCHANDISE?

17   A    THIS IS A NONGENUINE MERCHANDISE.  IT HAS BEEN

18   PURCHASED BY OUR INVESTIGATOR ROB HOLMES ON THE WEB

19   SITE GUCCIFENDI.COM.

20   Q    I'M GOING TO SHOW THE WITNESS EXHIBIT 129.

21   CAN YOU TELL US IF THAT IS GENUINE LOUIS VUITTON

22   MERCHANDISE?

23   A    NO, THIS IS NOT GENUINE MERCHANDISE.  IT HAS

24   BEEN PURCHASED BY OUR INVESTIGATOR ROB HOLMES ON

25   THE WEB SITE INNIKE.COM.

91

1    Q    I'M GOING TO SHOW THE WITNESS EXHIBIT 192 AND

2    ASK HIM IF THIS IS COUNTERFEIT?

3    A    THIS IS A NONGENUINE ITEM.  BOTH OUR

4    INVESTIGATOR ROB HOLMES ON THE WEB SITE

5    SOAPPAREL.COM, SOAPPAREL.COM, S-O-A-P-P-A-R-E-L,

6    DOT COM.

7    Q    I'M GOING TO SHOW THE EXHIBIT 591 AND ASK HIM

8    TO IDENTIFY IT AND TELL US WHETHER IT'S A GENUINE

9    ITEM?

10   A    THIS IS A NONGENUINE ITEM BY ROB HOLMES, OUR

11   INVESTIGATOR, ON THE WEB SITE BAPESKY.COM,

12   B-A-P-E-S-K-Y, DOT COM.

13   Q    I'LL SHOW THE WITNESS EXHIBIT 186 AND ASK THE

14   WITNESS TO IDENTIFY IT FOR US AND LET US KNOW IF

15   IT'S AN AUTHENTIC ITEM?

16   A    THIS IS A NONGENUINE ITEM BOUGHT BY OUR

17   INVESTIGATOR ON THE WEB SITE RRGNL.COM.

18   Q    I'LL ASK THE WITNESS TO LOOK AT EXHIBIT 142

19   AND IDENTIFY IT AND LET US KNOW WHETHER IT'S

20   AUTHENTIC MERCHANDISE?

21   A    THIS IS A NONGENUINE ITEM BOUGHT BY OUR

22   INVESTIGATOR ROB HOLMES ON THE WEB SITE

23   LUXURY2US.COM, L-U-X-U-R-Y, THE DIGIT 2, U-S, DOT

24   COM.

25   Q    I WILL ASK THE WITNESS TO LOOK AT EXHIBIT 211

92

1    AND IDENTIFY IT AND LET US KNOW WHETHER IT'S

2    AUTHENTIC?

3    A     THIS IS A NONGENUINE WATCH PURCHASED BY OUR

4    INVESTIGATOR ON THE WEB SITE WATCHNREPLICA.NET AND

5    WATCHNREPLICA.NET, W-A-T-C-H-N-R-E-P-L-I-C-A, DOT

6    NET.

7    Q     I'D ASK THE WITNESS TO LOOK AT EXHIBIT 587 AND

8    IDENTIFY IT AND LET US KNOW WHETHER IT'S

9    COUNTERFEIT.

10   A     THAT'S A NONGENUINE ITEM BOUGHT BY OUR

11   INVESTIGATOR ON THE ESHOES99.NET.

12   Q     AND I'LL ASK YOU TO LOOK AT EXHIBIT 82 AND

13   IDENTIFY IT AND LET US KNOW WHETHER IT'S AUTHENTIC?

14   A     THAT'S A NONGENUINE ITEM BOUGHT BY OUR

15   INVESTIGATOR ROB HOLMES ON THE WEB SITE

16   BAG4SELL.COM, SPELLED B-A-G-4-S-E-L-L, DOT COM.

17   DIGIT 4.

18   Q     AND THE SAME QUESTIONS WITH RESPECT TO 196,

19   IDENTIFY AND LET US KNOW WHETHER IT'S AUTHENTIC.

20   A     THAT'S A NONGENUINE ITEM BOUGHT BY OUR

21   INVESTIGATOR ON THE WEB SITE SUNNY7SHOES.COM,

22   S-U-N-N-Y, THE DIGIT 7, S-H-O-E-S, DOT COM.

23   Q     ALMOST DONE.  EXHIBIT 175, WHAT IS IT AND IS

24   IT A LEGITIMATE PRODUCT?

25   A     IT'S A NONGENUINE PRODUCT BOUGHT BY OUR

93

1    INVESTIGATOR ROB HOLMES ON THE WEB SITE

2    PICKYOURGOODS.COM, P-I-C-K-Y-O-U-R-G-O-O-D-S, DOT

3    COM.

4    Q    AND FINALLY EXHIBIT 585.

5    A    THAT'S A NONGENUINE ITEM BOUGHT BY OUR

6    INVESTIGATOR ROB HOLMES ON THE WEB SITE

7    SUNNY7SHOES.COM.

8    Q    HAVE YOU AT ANY TIME AS PART OF THE

9    INVESTIGATION OF THE DEFENDANTS INSTRUCTED A

10   PURCHASE OF LOUIS VUITTON PRODUCT FROM A WEB SITE

11   WHICH PROVED NOT TO BE AN AUTHORIZED -- I'M

12   SORRY -- NOT TO BE INAUTHENTIC?

13   A    CAN YOU REPEAT YOUR QUESTION?

14   Q    YOU'VE INSTRUCTED SEVERAL PURCHASES IN

15   CONNECTION WITH YOUR INVESTIGATION OF THE

16   DEFENDANTS; IS THAT CORRECT?

17   A    YES.

18   Q    HAVE ANY OF THEM PROVED TO BE LEGITIMATE LOUIS

19   VUITTON MERCHANDISE?

20   A    NO, NONE OF THEM.

21   Q    NOW, YOU'VE MENTIONED 77 SHOES.  WAS IT A

22   SUBJECT OF A DEMAND TO THE DEFENDANTS?

23   A    YES, IT'S A WEB SITE THAT HAS BEEN HOSTED BY

24   THE DEFENDANTS.  THIS WEB SITE WAS SUBJECT TO THE

25   LETTER SENT FROM YOUR OFFICE ON NOVEMBER 26, 2007.

94

1    INFRINGE OR SELL INFRINGING PRODUCTS COULD SET UP A

2    WEB SITE WITH ANY SORT OF NAME, ABCD OR XYZ DOT

3    COM, OR THOSE SORTS OF THINGS?

4    A    THAT'S TRUE.

5    Q    SO YOU CAN'T TELL BY THE NAME OF THE WEB SITE

6    WHETHER IT'S SELLING COUNTERFEIT PRODUCTS?

7    A    WELL, THE WEB SITE -- IF THE WEB SITE NAME IS

8    REPLICAVUITTON.COM, DOT NET OR WHATEVER.

9    Q    WELL, IF IT DOESN'T HAVE THE COMPANY NAME IN

10   IT, IT'S GOING TO BE DIFFICULT TO KNOW WHETHER THAT

11   PARTICULAR WEB SITE SELLS IT WITHOUT PARTICULARLY

12   LOOKING AT THE WEB SITE; RIGHT?

13   A    ONLY FROM LOOKING AT THE DOMAIN NAME, NO,

14   UNLESS IT SPECIFICALLY INDICATES THAT THE WEB SITE

15   DEALS WITH THE REPLICAS OF OUR TRADEMARKS.

16   Q    ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE THAT

17   THE DEFENDANTS HAVE MONITORED ANY OF THE WEB SITES

18   THAT ARE AT ISSUE IN THIS CASE?

19   A    CAN YOU REPEAT YOUR QUESTION?

20   Q    YES.  ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE

21   THAT THE DEFENDANTS, ANY OF THEM, MONITORED ANY OF

22   THE WEB SITES THAT ARE AT ISSUE IN THIS CASE IN

23   ORDER TO SEE WHAT THEY'RE SELLING?

24   A    I DO HAVE EVIDENCE.

25   Q    AND WHAT EVIDENCE IS THAT?

170

1      A      A DOCUMENT PRODUCED BY THE DEFENDANTS AS

2      EXHIBIT 1598.

3      Q      AND THAT EXHIBIT SHOWS ACTION TAKEN AFTER

4      RECEIVING COMPLAINTS OF INFRINGING CONDUCT THAT

5      THEY GET FROM YOUR COMPANY?

6      A      AFTER RECEIVING COMPLAINTS OR AT THEIR OWN

7      INITIATIVE.

8      Q      ALL RIGHT.  BUT DOESN'T THAT DOCUMENT JUST

9      INDICATE WHETHER A PARTICULAR WEB SITE AT A

10     PARTICULAR DATE IS USING AN IP ADDRESS THAT IS

11     ASSIGNED TO ONE OF THE DEFENDANT COMPANIES?

12     A      IT SHOWS THAT THE DEFENDANTS HAVE MONITORED

13     THE HOSTING STATUS OF THESE DOMAIN NAMES -- OF

14     THESE WEB SITES.  SORRY.

15     Q      AND HOW DOES IT SHOW THE HOSTING STATUS?  WHAT

16     DO YOU MEAN BY THAT?

17     A      WELL, THEY VERIFY WHETHER THE WEB SITE IS

18     HOSTED BY THEM AND THEY HAVE TAKEN FURTHER ACTION.

19     Q      SO WHAT YOU SEE ON THAT IS IF YOU GET A

20     COMPLAINT, WHAT YOU SEE ON EXHIBIT 1598, IF THEY

21     GET A COMPLAINT ABOUT A PARTICULAR WEB SITE, THEY

22     WILL CHECK TO SEE WHETHER THAT WEB SITE IS USING AN

23     IP ADDRESS THAT IS ASSIGNED TO THEM; IS THAT RIGHT?

24     A      I BELIEVE SO.

25     Q      AND THEN THEY WILL DETERMINE IF IT IS, WHAT

171

1    SOLUTIONS?

2    A    OH, BECAUSE I WORKED FOR MR. CHEN BEFORE.

3    Q    AND WHAT DID HE TELL YOU THE JOB IS GOING TO

4    BE?

5    A    WHEN I RECEIVE COMPLAINTS, I WILL JUST SEND IT

6    TO THE CUSTOMER.

7    Q    DO YOU HAVE A TITLE AT AKANOC?

8    A    NO.

9    Q    HAVE YOU DONE THE SAME JOB THROUGHOUT YOUR

10   TIME AT AKANOC?

11   A    YES.

12   Q    WHICH IS RECEIVE COMPLAINTS AND SEND THEM TO

13   CUSTOMERS?

14   A    YES.

15   Q    ALL RIGHT.  YOU WORK OUT OF YOUR HOME?

16   A    YEAH, CHINO HILLS.

17   Q    IN CHINO HILLS.  SO HAVE YOU EVER BEEN TO THE

18   BUSINESS OFFICE, HOME OFFICE OF AKANOC --

19   A    NO.

20   Q    -- SOLUTIONS?

21   A    NO.

22   Q    AND DO YOU EVER TRAVEL TO ANY OFFICES OF

23   AKANOC?

24   A    NO.

25   Q    AND IN YOUR JOB AT AKANOC, DO YOU REPORT TO

188

1    ANYONE?

2    A    TO STEVE CHEN.

3    Q    AND ANYONE ELSE?

4    A    NO.

5    Q    DO YOU EVER COMMUNICATE WITH ANYONE ELSE AT

6    AKANOC?

7    A    TO THE SUPPORT DEPARTMENT.

8    Q    AND WHAT DO YOU COMMUNICATE WITH THE SUPPORT

9    DEPARTMENT?

10   A    TO UNPLUG THE CUSTOMERS IP.

11   Q    AND DO YOU HAVE ANY TECHNICAL KNOWLEDGE AS

12   REQUIRED FOR THE JOB THAT YOU DO?

13   A    NO.

14   Q    DO YOU RECEIVE INSTRUCTION FROM STEVE OR

15   ANYONE ELSE AT AKANOC REGARDING YOUR POSITION?

16   A    YES.

17   Q    AND WHAT KINDS OF INSTRUCTIONS DO YOU RECEIVE?

18   A    SEND A COMPLAINT LETTER TO CUSTOMER, THAT'S

19   IT.

20   Q    AND HOW MANY HOURS DO YOU WORK FOR AKANOC IN A

21   WEEK?

22   A    A WEEK?  TEN.

23   Q    AND HOW IS THAT SPLIT UP OVER THE WEEK?

24   A    EACH DAY TWO HOURS.

25   Q    IS THAT MONDAY THROUGH FRIDAY?

                                                    189

1    A    BECAUSE I'M INSTRUCTED TO DO SO.

2    Q    WHAT ARE YOU INSTRUCTED TO DO?

3    A    WHENEVER SPAMHAUS SENDS US A COMPLAINT, WE

4    JUST UNPLUG THE SERVER AND DISCONTINUE THE SERVICE

5    TO THE CUSTOMER.

6    Q    NOW, IS EXHIBIT 50 AN E-MAIL DATED SEPTEMBER

7    15TH, 2007 FROM SECURITY TO SUPPORT@TOOMING.COM?

8    CAN YOU PLEASE REVIEW THAT?

9    A    YES.

10   Q    OKAY.  DID YOU WRITE THIS E-MAIL STARTING WITH

11   "DEAR SIR"?

12   A    YES.

13   Q    I'M SORRY.  WHEN YOU WRITE SOMETHING LIKE THE

14   SECOND NOTE FROM THIS COMPLAINANT, DOES THAT MEAN

15   YOU RECEIVED A PRIOR COMPLAINT FROM THE CUSTOMER

16   WITHIN THE PAST TWO OR THREE DAYS FROM SEPTEMBER

17   15TH?

18   A    YES.

19   Q    AND IT WRITES "MAKE SURE YOU KEEP ALL OF THE

20   RECORDS SO THAT IF THE AUTHORITIES NEEDS EVIDENCE,

21   WE CAN PROVIDE THEM," WHAT DID YOU MEAN BY THAT?

22   A    INSTRUCTION FROM STEVE.

23   Q    STEVE HAD TOLD YOU TO WRITE THAT TO THE

24   CUSTOMER?

25   A    YES, REGARDING FRAUD OR IDENTITY THEFT.

226

1    Q    SO WITH CASES OF FRAUD OR IDENTITY THEFT YOU

2    WERE GIVEN SPECIFIC INSTRUCTIONS?

3    A    AROUND THAT TIME ON OR BEFORE SEPTEMBER

4    MR. CHEN INSTRUCTED ME TO BE MORE CAREFUL ON THESE

5    FRAUD THINGS SO I WOULD CC COPY TO HIM AND HE WOULD

6    TAKE CARE OF IT.  SO I HAVE TO BE VERY STRAIGHT TO

7    THE CUSTOMERS.

8    Q    SO AROUND THIS TIME IN SEPTEMBER OF 2007 YOU

9    STATED THAT YOU WERE GIVEN SPECIFIC INSTRUCTIONS

10   ABOUT CERTAIN KINDS OF COMPLAINTS.  YOU SAID FRAUD

11   AND COUNTERFEITING.  WERE THERE ANY KINDS OF

12   COMPLAINTS THAT YOU WERE GIVEN SPECIFIC

13   INSTRUCTIONS?

14   A    PORN SITES, TERRORIST SITES, ALL OF THOSE

15   ILLEGAL ISSUES.

16   Q    AND SINCE 2007, AND SINCE SEPTEMBER OF '07,

17   YOU HAVE FOLLOWED THOSE INSTRUCTIONS RELATING TO

18   FRAUD, COUNTERFEIT, THESE ILLEGAL WEB SITES?

19   A    MOST OF THE TIME BUT MOST OF THE TIME I WILL

20   CC THESE TO MR. CHEN.

21   Q    SO YOU'RE TELLING THE CUSTOMER TO KEEP ALL OF

22   THE RECORDS.  DO YOU KEEP ALL OF THE RECORDS AS

23   WELL?

24   A    NO.

25              MS. WANG:  AND THAT'S THE END OF THE

227

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

Exhibit B

# Exhibit C

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5    LOUIS VUITTON              )  C-07-03952-JW
     MALLETIER, S.A.,          )
6                              )  AUGUST 20, 2009
               PLAINTIFF,      )
7                              )  VOLUME 3
            V.                 )
8                              )  PAGES 1 - 267
     AKANOC SOLUTIONS, INC.,   )
9    ET AL.,                   )
                               )
10             DEFENDANTS.     )
     _____  )
11

12

13          THE PROCEEDINGS WERE HELD BEFORE

14         THE HONORABLE UNITED STATES DISTRICT

15                 JUDGE JAMES WARE

16   A P P E A R A N C E S:

17   FOR THE PLAINTIFF:  J. ANDREW COOMBS
                         BY:  J. ANDREW COOMBS
18                            ANNIE S. WANG
                         517 E. WILSON AVENUE
19                       SUITE 202
                         GLENDALE, CALIFORNIA 91206
20

21   FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                         BY:  JAMES A. LOWE
22                            CHRISTOPHER G. LAI
                         18400 VON KARMAN
23                       IRVINE, CALIFORNIA 92612

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                         CERTIFICATE NUMBER 8074

                                                        1

1    A P P E A R A N C E S: (CONT'D)

2

     ALSO PRESENT:              LAW OFFICES OF J. ANDREW
3                               COOMBS
                                BY:  RUTH ADLER, PARALEGAL
4                               517 E. WILSON AVENUE
                                SUITE 202
5                               GLENDALE, CALIFORNIA 91206

6                               LVMH FASHION GROUP
                                BY:  NIKOLAY LIVADKIN
7                               2 RUE DU PONT-NEUF 75001
                                PARIS, FRANCE
8
                                AKANOC SOLUTIONS, INC.
9                               BY:  STEVE CHEN, PRESIDENT
                                45535 NORTH PORT LOOP EAST
10                              FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

1                    INDEX OF PROCEEDINGS

2


3    **ROBERT HOLMES**          DIRECT EXAMINATION P. 11
                                CROSS-EXAMINATION P. 38
4                               REDIRECT EXAMINATION P. 84

5    **DEPOSITION READ OF STEVEN CHEN** P. 87

6

7    **MICHAEL WILSON**         DIRECT EXAMINATION P. 167
                                CROSS-EXAMINATION P. 196
                                REDIRECT EXAMINATION P. 253
8                               RECROSS-EXAMINATION P. 259

9

10                     INDEX OF EXHIBITS

                            IDENT.      EVIDENCE
11

12   FOR THE PLAINTIFF:

13   65, 81, 116, 128, 141, 173, 185,
     195, 210, 584, 586, 588 & 590          25
14
     94, 95.3, 95.4, 95.5, 98.3, 99.3,
15   99.4, 99.5, 169, 160, 160.1, 160.2,
     161, 162.1, 162.2, 163, 164, 164.1,
16   614.2, 165, 166, 166.1, 166.2, 212,
     213.2, 213.3, 213.4, 286, 287, 287.1,
17   287.2, 353, 353.1, 353.2, 356, 357,
     357.1, 360, 361, 361.1, 361.2, 402,
18   403, 403.1, 403.2, 404, 405, 405.1,
     405.2, 406, 406.1 AND 406.2            31
19
     97.2, 109 491                         35
20

21

22

23

24

25

                                              3

1    Q    IN THE COURSE OF THE INVESTIGATIONS THAT YOU

2    DID FOR THIS CASE, HOW MANY WEB SITES DID YOU

3    REVIEW?

4    A    IN GENERAL?

5    Q    FOR THIS CASE?

6    A    FOR THIS CASE PROBABLY HUNDREDS.

7    Q    DID YOU EVER REVIEW A WEB SITE THAT WASN'T

8    SELLING COUNTERFEIT OR PRODUCT HOSTED BY THE

9    DEFENDANTS?

10   A    I DID NOT, NO.

11         THE COURT:  NO FURTHER QUESTIONS?

12         MS. WANG:  NO FURTHER QUESTIONS, YOUR

13   HONOR.

14         THE COURT:  ALL RIGHT.  YOU MAY

15   CROSS-EXAMINE.

16                **CROSS-EXAMINATION**

17   BY MR. LOWE:

18   Q    MR. HOLMES, I NEED TO ASK YOU A FEW QUESTIONS

19   ABOUT SOME OF THESE EXHIBITS THAT HAVE BEEN MOVED

20   INTO EVIDENCE AND PARTICULARLY TALK ABOUT YOUR

21   METHOD OF MAKING PURCHASES.

22         IS IT CORRECT TO SAY THAT IN ALL OF THE

23   CASES THAT COUNSEL WAS ASKING YOU ABOUT WHERE YOU

24   MADE PURCHASES ON BEHALF OF LOUIS VUITTON THAT YOU

25   DID THAT ON BEHALF OF LOUIS VUITTON AT THEIR

                                                      38

1    A    ROUGHLY WE CHARGE ANYWHERE BETWEEN $150 TO

2    $600.

3    Q    PER BUY?

4    A    YES, FOR THE SERVICE.

5    Q    FOR SORT OF THE LITPAK THAT YOU PROVIDE THEM?

6    A    YES.  FOR THE LITPAK PER SE.  IF WE WERE JUST

7    ASSIGNED TO CONDUCT A PURCHASE, WE WOULD CHARGE

8    ABOUT $250, THAT WOULD BE OUR FEES PLUS EXPENSES.

9    Q    NOW, ISN'T IT TRUE THAT OF ALL OF THE SITES

10   THAT YOU TESTIFY FOR ABOUT MAKING BUYS FOR YOU,

11   THAT YOU DIDN'T -- LET ME REPHRASE THIS.

12         AS TO EACH OF THE SITES THAT YOU DID BUYS

13   FOR LOUIS VUITTON, DID THEY DIRECT YOU TO ORDER

14   MERCHANDISE TO BE DELIVERED TO YOU IN THE UNITED

15   STATES?

16   A    THAT IS WHERE I'M LOCATED.

17   Q    DID LOUIS VUITTON DIRECT YOU TO HAVE

18   MERCHANDISE DELIVERED TO YOU IN THE UNITED STATES?

19   A    THEY NEVER SPECIFICALLY ASKED ME TO DELIVER IT

20   INTO THE UNITED STATES.

21   Q    DID YOU EVER TALK TO THEM ABOUT WHERE IT WAS

22   GOING TO BE DELIVERED?

23   A    I DON'T RECALL SO.

24   Q    WHY WAS IT DELIVERED INTO THE UNITED STATES?

25   A    BECAUSE THAT'S WHERE I'M LOCATED.

41

Exhibit C

1       WERE TO MAKE A PURCHASE ON THEIR OTHER -- SO WHAT

2       THEY'RE SAYING IS A WEB SITE OWNED BY THE SUBJECT,

3       NOT SOMEONE ELSE.  I DON'T KNOW WHERE YOU GOT THAT.

4       Q    WELL, HOW DID YOU KNOW IT WAS OWNED BY THEM?

5       A    THAT'S WHAT THEY TOLD US.

6       Q    WELL, THEY TOLD YOU WHAT EXACTLY?

7       A    I HAVE AN E-MAIL.

8       Q    DO YOU HAVE AN E-MAIL?

9       A    NOT IN THIS EXHIBIT.

10      Q    SO YOUR CONCLUSION WAS THAT THEY REFERRED YOU

11      TO THIS OTHER SITE?

12      A    BECAUSE THEY TOLD US IT WAS THEIR OTHER SITE.

13      Q    BUT YOU DON'T HAVE ANY DOCUMENTATION FOR THAT?

14      A    NOT IN THIS EXHIBIT.

15      Q    AND YOU TRIED TO MAINTAIN ALL OF YOUR

16      DOCUMENTS IN THESE LITIGATION REPORTS, DON'T YOU?

17      A    NO, NOT ALL OF OUR DOCUMENTS ARE IN A

18      LITIGATION -- A LIT PACKET.

19      Q    OKAY.  IN ANY CASE, LET'S FOLLOW THIS PROCESS

20      A LITTLE FURTHER.

21      A    SURE.

22      Q    HOW DID YOU MAKE THE PURCHASE FROM

23      WATCHNREPLICA.NET?

24      A    WE USED THE SHOPPING CART SYSTEM ON THE WEB

25      SITE.

                                                        49

1    OPERATOR TO ENGAGE IN INFRINGING USE OF SERVERS OR

2    TO SELL INFRINGING PRODUCTS?

3    A    COULD YOU REPEAT THE QUESTION. I DIDN'T KNOW

4    IF I SHOULD ANSWER YES OR NO TO THAT.

5    Q    ISN'T IT TRUE THAT YOU HAVE NO EVIDENCE THAT

6    ANY OF THE THREE DEFENDANTS INSTRUCTED WEB SITE

7    OPERATORS TO ENGAGE IN INFRINGING USE OF SERVERS OR

8    TO SELL INFRINGING PRODUCTS?

9    A    IT IS TRUE.

10   Q    THAT YOU HAVE NO EVIDENCE?

11   A    THAT THEY INSTRUCTED SOMEONE TO DO.

12   Q    NO EVIDENCE THAT THEY INSTRUCTED?

13   A    YES, SIR.

14   Q    THANK YOU.

15         I HAVE NO FURTHER EVIDENCE?

16         THE COURT:  ANY REDIRECT?

17         MS. WANG:  BRIEFLY.

18                   **REDIRECT EXAMINATION**

19   BY MS. WANG:

20   Q    MR. HOLMES, EARLIER YOU TALKED ABOUT

21   LVBAGZ.NET AND WHO HOSTED LVBAGZ DURING YOUR

22   INVESTIGATION?

23   A    THE DEFENDANTS.

24   Q    AND WHO HOSTED WATCHNREPLICA?

25   A    THE DEFENDANTS.

                                                        84

1    Q    AND WITH RESPECT TO THE BUYS THAT YOU MADE,

2    DID YOU ACTUALLY REVIEW A PRODUCT THAT YOU VIEWED

3    ON THE WEB SITE, THE CORRESPONDING WEB SITES LISTED

4    ON THE TEXT?

5    A    YES, IN ALL OF THOSE CASES.

6    Q    AND BRIEFLY, COULD WE BRING UP EXHIBIT 109 AND

7    CAN YOU PLEASE REFER TO PAGE 6.  CAN YOU TELL ME

8    WHO THAT IS?

9    A    THIS IS AN IP WHO IS REVEALING THE IP ADDRESS

10   204.16.192.77 SHOWING THE DEFENDANTS AS TO WHOM

11   THIS IP ADDRESS WAS ASSIGNED.

12   Q    AND HOW MANY ADDRESSES ARE ON THAT IP ADDRESS?

13   A    ONE -- ACTUALLY TWO TOTAL.  ONE OTHER SITE IT

14   SAYS HERE.

15            MS. WANG:  NO OTHER QUESTIONS.

16            THE COURT:  I MISSED TO WHERE THE

17   REFERENCE IS TO THE DEFENDANT IS ON THAT PAGE.

18            THE WITNESS:  AKANOC SOLUTIONS, INC.

19            THE COURT:  I'M JUST MISSING WHERE THAT

20   WORD -- WHERE THOSE WORDS SHOW UP AS TO WHERE I'M

21   LOOKING.

22            THE WITNESS:  OH, THE PAGE IS WRONG.

23   BY MS. WANG:

24   Q    WHAT PAGE ARE YOU LOOKING AT?

25   A    SHE HAS THE REVERSE IPO.

                                               85

1    SOLUTIONS, INC.?

2    A    YES.

3    Q    AND DO YOU HAVE A ROLE IN CONNECTION WITH

4    AKANOC SOLUTIONS, INC.?

5    A    I'M THE GENERAL MANAGER.

6    Q    GENERAL MANAGER.  AND HOW LONG HAVE YOU BEEN

7    GENERAL MANAGER?

8    A    SINCE THE FIRST DAY.  PROBABLY SEPTEMBER,

9    OCTOBER OF 2004.

10   Q    AND CAN YOU BRIEFLY DESCRIBE FOR ME YOUR

11   RESPONSIBILITIES, WHAT FUNCTIONS YOU PERFORM AS

12   GENERAL MANAGER OF AKANOC SOLUTIONS?

13   A    I OVERSEE THE WHOLE OPERATION.  SO IN OUR

14   BUSINESS BASICALLY YOU RUN THE NETWORK, THE SALES

15   DEPARTMENT DEALING WITH THE CUSTOMER, AND THAT'S

16   PRETTY MUCH IT.

17   Q    DO YOU HAVE AN OWNERSHIP INTEREST IN AKANOC?

18   A    YES.

19   Q    AND WHAT IS THAT OWNERSHIP INTEREST?

20   A    I'M THE SOLE OWNER OF AKANOC.

21   Q    AND WHAT IS THE RELATIONSHIP OF AKANOC

22   SOLUTIONS TO A WEB SITE INDICATED UNDER THE NAME

23   DEDIWEBHOST.COM?

24   A    DEDIWEBHOST.COM IS A BRAND NAME OF AKANOC.

25   Q    SO IT DOES BUSINESS THROUGH THAT WEB SITE?

88

1    TECHNICAL, THAT THIS PROBLEM IS NOT FROM, NOT FROM

2    MY SERVER, SOMETHING LIKE THAT EFFECT, AND I WOULD

3    MORE OR LESS LIKE LOOK AT -- INTO THE ISSUE.  IF I

4    DON'T UNDERSTAND, THEN I WILL ASK, YOU KNOW, MAYBE

5    ANDREW OR PATRICK OR SOMEBODY ELSE BEING THEY ARE

6    MORE TECHNICAL THAN MYSELF.

7    Q    IS IT FAIR FOR ME TO CONCLUDE THAT YOU WILL

8    SOMETIMES HANDLE THE SECURITY DESK YOURSELF WHEN

9    MS. LUK IS UNAVAILABLE --

10   A    YES.

11   Q    -- AND NOT WORKING?

12         MR. COOMBS:  LINE 9.

13         THE WITNESS:  THAT'S CORRECT.

14   BY MR. COOMBS:

15   Q    DOES IT EVER DOES GET ASSIGNED TO PATRICK OR

16   ANDREW AS WELL?

17   A    NO.

18   Q    AND HAS AKANOC EVER OPERATED OUT OF ANY

19   LOCATIONS OTHER THAN THE TWO YOU'VE IDENTIFIED THE

20   ONE IN FREMONT AND THE ONE IN SAN JOSE?

21   A    NO.

22   Q    DOES IT EVER LEASE SERVER CAPACITY FROM OTHER

23   COMPANIES?

24   A    NO.

25   Q    CAN YOU GIVE ME THE ADDRESS OF THE LOCATION IN

98

Exhibit C

1    WHEN WE HAVE AKANOC.COM AND WE ACTUALLY DECIDE TO

2    TO SEPARATE IN A PEACEFUL WAY HE CAN STILL RUN HIS

3    OWN BUSINESS AND WE CAN THE BACK UP, THE BACK END

4    SUPPORT.

5            SO COLOALACARTE CAME FROM A TOTALLY

6    DIFFERENT TYPE OF BUSINESS MODEL WHICH IS NOT

7    OFFERING A COMPLETE PACKAGE.  THAT'S WHY

8    COLOALACARTE CAME FIRST SO WE DON'T HAVE THE

9    CONFLICT OF INTEREST BETWEEN MSG AND AKANOC.

10   Q    ARE YOU ALSO A GENERAL MANAGER OF MANAGED

11   SOLUTIONS?

12   A    YES, THAT'S CORRECT.

13   Q    AND DO YOU OWN 100 PERCENT OF THE SHARES IN

14   MANAGED SOLUTIONS?

15   A    AT THIS POINT, YES.

16   Q    DOES AKANOC HAVE A WRITTEN AGREEMENT WITH

17   ARIN?

18   A    I DON'T KNOW.  I MEAN, BASICALLY IT'S -- WE

19   APPLY IP'S, THEY ASSIGN IP'S.

20           I DON'T EVEN KNOW IF THERE'S ANY TYPE OF

21   AGREEMENTS.

22   Q    AKANOC FIRST OBTAINED IP -- WHEN YOU SAY IP

23   YOU MEAN NUMERIC IP ADDRESSES; CORRECT?

24   A    THAT'S CORRECT.

25   Q    SO WHEN WE USE THAT TERM, THAT'S WHAT WE'LL

                                                    102

1    Q    OKAY.  SO USING THE AKANOC NETWORK YOU CAN

2    PULL UP THE DATA ON ANY PARTICULAR SERVER, THIS

3    GRAPH THAT YOU'RE REFERRING TO?

4    A    YES.

5    Q    WHAT IS THE CURRENT PENALTY FEE?

6    A    I DON'T EVEN KNOW BECAUSE VERY, VERY SELDOM

7    THAT WE ACTUALLY GET INTO SO-CALLED PENALTY.  I

8    DON'T WANT TO CALL IT PENALTY MYSELF BECAUSE A LOT

9    OF TIMES -- WELL, LET'S SAY A CUSTOMER SAYS, OH,

10   YEAH, YOU JUST UNPLUG IT AND I RESPOND BACK TO YOU

11   AND THEN YOU NEED TO REPLUG IT.

12        IN THAT CASE, YOU KNOW, YOU WANT TO

13   PENALIZE ME FOR $25 OR SOMETHING.  YOU KNOW, I

14   ALWAYS EXPLAIN TO THEM THAT IT TAKES PEOPLE TO GO

15   INTO THE CAGE TO DO THE PHYSICAL WORK, DOCUMENT

16   EVERYTHING, IT'S JUST PROCESS FEE SO.

17   Q    I DON'T MEAN TO HOLD -- I DON'T MEAN TO HOLD

18   YOU TO THE TERM PARTICULARLY?

19   A    RIGHT.

20   Q    BUT WHATEVER THAT FEE IS, IT'S NOT $25?

21   A    I DON'T RECALL.  I DON'T KNOW.  BECAUSE I

22   VERY, VERY, VERY SELDOM THAT I RUN -- I

23   PERSONALLY -- I NEVER, I NEVER CHARGE ANYBODY

24   ANYTHING.  I PERSONALLY DON'T.  I HAVE SEEN JULIANA

25   FIGHTING WITH CUSTOMERS THAT YOU NEED TO GIVE ME

111

1    $25 OTHERWISE I WON'T REPLUG YOU SIMPLY BECAUSE

2    THAT CUSTOMER IS JUST BAD.

3    Q    THIS MORNING YOU MENTIONED THAT -- EARLIER

4    THIS MORNING YOU MENTIONED HTAT YOU WOULD FORWARD

5    ABUSE COMPLAINTS TO THE CUSTOMER AND THAT GENERALLY

6    THAT WOULD BE THE END OF IT UNLESS THERE WAS SOME

7    REPETITION?

8    A    RIGHT.

9    Q    WOULD IT BE YOUR PRACTICE TO IMPOSE A PENALTY

10   IF YOU DID HAVE THAT KIND OF REPETITION?

11   A    EVEN IF WE UNPLUG VERY, VERY, VERY SELDOM DO

12   WE CHARGE CUSTOMER.

13   Q    ARE THERE SPECIFIC PROCEDURES WHERE YOU WILL

14   IMPOSE THE PENALTY?

15   A    NOT REALLY.  VERY, VERY DISCRETIONARY.

16   Q    LET ME TRY IT AGAIN.  OTHER THAN FORWARDING

17   ABUSE COMPLAINTS OR SOMETIMES ASSESSING THAT FEE,

18   ARE THERE ANY OTHER ACTIONS THAT AKANOC HAS TAKEN

19   AGAINST ITS CUSTOMERS FOR BREACH OF THE AUP?

20   A    TERMINATING THE CUSTOMER.

21   Q    AND WHAT DOES THAT ENTAIL?  HOW DO YOU

22   TERMINATE A CUSTOMER?

23   A    UNPLUG.  JUST TELL CUSTOMER WE DON'T WANT YOU

24   AS A CUSTOMER.

25   Q    YOU SAID UNPLUG.  WHAT DOES THAT MEAN?

112

1    NO RECOLLECTION.

2    Q    OKAY.  AGAIN, THE ABUSE@AKANOC.COM IS THE LINK

3    TO THE E-MAIL TO WHICH ABUSE COMPLAINTS WERE

4    DIRECTED AT AKANOC?

5    A    YES.

6    Q    AND THAT WAS A MAILBOX HANDLED EITHER BY YOU

7    OR JULIANA LUK --

8    A    YES.

9    Q    -- AT THAT TIME.

10        AND THE ADDRESS AT THE TOP OF THE PAGE

11   THE 45535 NORTHPORT LOOP.  IS THAT THE ADDRESS FOR

12   AKANOC SOLUTIONS?

13   A    THAT IS CORRECT.

14   Q    AND DOES AKANOC SOLUTIONS RECEIVE INFRINGEMENT

15   NOTICES BY POST AS OPPOSED TO E-MAIL?

16   A    VERY SELDOM.

17   Q    AND ARE THOSE MAINTAINED BY AKANOC?  ARE THOSE

18   KEPT?

19   A    WE HAD A PERIOD OF TIME I WOULD SAY STARTING

20   JULY 2006 WE WERE MERGING TWO DATA CENTERS TOGETHER

21   BECAUSE THE OTHER DATA CENTER LEASE IS UP AND WE

22   DECIDED TO MERGE IT TOGETHER.  AND AT THE SAME TIME

23   WE ARE GRADUALLY LOSING BUSINESS TO MANAGED.COM ALL

24   OF THE WAY TO FEBRUARY TO APRIL, SOMEWHERE AROUND

25   THERE, THAT MANAGED.COM WAS SOLD TO WEBHOSTPLUS AND

124

1    THEY MADE A PHYSICAL MOVE FROM EVERYTHING OUT FROM

2    US.

3              SO WE -- DURING THE WHOLE PERIOD OF TIME

4    THE COMPANY IS MORE OR LESS IN TURMOIL BECAUSE

5    WE'RE LOSING BUSINESS.  WE'RE HAVING A LOT OF

6    OVERHEAD EXPENSE AND THINGS LIKE THAT.

7              AT THE TIME WE WERE LOSING -- WE WERE

8    ALSO LOSING STAFFS, INTERNAL STAFFS WHO I THINK AT

9    THE TIME THERE WERE JOE, THERE WAS CHI, AND THERE

10   WAS SOME OTHER PERSON THAT WAS ACTUALLY HANDLING

11   MAILS.

12             SO FOR THAT PERIOD OF TIME THERE WERE

13   MAILS THAT GETS IN, RECEIVED BY -- YOU KNOW, WE HAD

14   THE SECOND FLOOR.  SO THE FIRST FLOOR HAS A GENERAL

15   RECEPTIONIST.

16             SHE MAY HAVE RECEIVED A LETTER AND SIGNED

17   UP FOR THAT.  AND THEN EVENTUALLY IT'S DELIVERED TO

18   UPSTAIRS AND THEN IT MIGHT SIT ON A DESK AND

19   WHATNOT.

20             SO I THINK THAT WAS THE TIME THAT A LOT

21   OF MAIL WAS NOT EVEN BEING OPENED, NOBODY REALLY

22   PAID ATTENTION TO IT.

23   Q    THAT'S NOT TRUE OF E-MAIL, THOUGH.  THAT'S

24   JUST HARD COPY MAIL?

25   A    YES, THAT'S CORRECT.

                                                  125

1    Q    AND THE PERIOD YOU'RE TALKING ABOUT IS THE

2    FALL OF 2006?

3    A    TO THE MIDDLE OF, I WOULD SAY, ABOUT JULY,

4    AUGUST TIMEFRAME BECAUSE I REMEMBER THAT AUGUST OF

5    2006 THAT WAS THE LEASE UP, SO WE WERE MOVING -- AM

6    I RIGHT?  2003, '4, '5, '6?  YES, 2006.  THAT WAS

7    THE TIME THAT WE WERE MOVING AND EVERYTHING.

8    Q    AND UNTIL WHEN?

9    A    TO I THINK IT'S APRIL, MARCH, OR APRIL THAT

10   WEBHOSTPLUS MOVED EVERYTHING OUT.

11   Q    AND THAT WAS MARCH OR APRIL OF 2007?

12   A    THAT'S CORRECT.

13   Q    AND THE HANDLING OF HARD COPY CORRESPONDENCE

14   OF WHAT YOU DESCRIBED, THAT WOULD APPLY EVEN IF IT

15   CAME BY SOME KIND OF COURIER LIKE FEDERAL EXPRESS

16   OR DHL; IS THAT RIGHT?

17   A    YES, AT THE TIME.

18   Q    AND THE PROCEDURE FOR RESPONDING TO A NOTICE

19   OF INFRINGEMENT LIKE THE ONE EVIDENCED BY EXHIBIT 2

20   IS THE SAME AS YOU HAVE ALREADY DESCRIBED WITH

21   RESPECT TO EXHIBIT 1?

22   A    YES.

23   Q    AND DO YOU EVER HAVE A PRACTICE OF APPLYING TO

24   INDIVIDUALS OR COMPANIES THAT SEND ABUSE COMPLAINTS

25   LIKE THOSE EVIDENCED BY EXHIBITS 1 OR 2?

126

1    A    VERY SELDOM.  VERY SELDOM.

2    Q    I'LL MARK AS 3 A LETTER DATED FEBRUARY 19TH.

3    HAVE YOU SEEN THAT BEFORE?

4    A    NO, NOT -- I DON'T HAVE ANY RECOLLECTION.

5    Q    IS THERE ANY WAY THAT YOU COULD DETERMINE

6    WHETHER OR NOT AKANOC RECEIVED THAT CORRESPONDENCE

7    ON OR ABOUT THE DATE IT BEARS?

8    A    NO.

9    Q    NOW, ON THIS PARTICULAR ONE IT SAYS UP IN THE

10   TOP BY EXPRESS MAIL?  DO YOU SEE THAT?

11   A    YES.

12   Q    BUT CONSISTENT WITH WHAT YOU SAID BEFORE, THIS

13   WAS DURING A PERIOD OF TURMOIL AT THE COMPANY --

14   A    YES.

15   Q    -- AND SO THERE WAS NOBODY LOOKING AT THE

16   MAIL; IS THAT RIGHT?

17   A    THAT'S MOST LIKELY TRUE.

18   Q    AND WHAT HAPPENED TO THE MAIL THAT WAS

19   RECEIVED DURING THAT TIMEFRAME?

20   A    THERE WAS A DESK THAT HAD ONE OF THE GIRLS

21   USED TO SIT AND EVERYTHING JUST PILED UP THERE.

22   Q    WAS IT EVER OPENED OR FILED AWAY?  WHAT WAS

23   DONE WITH IT?

24   A    I DON'T RECALL.  SOME COMES IN AS A LETTER

25   FORM.  IT MAY HAVE OPENED BY SOMEBODY THAT JUST

127

Exhibit C

1    WANT TO, WANT TO KNOW WHERE TO PUT IT.  BUT ONCE IT

2    SITS ON THAT DESK, THEN IT'S VIRTUALLY NOBODY

3    WATCHING IT.

4    Q    MARK AS 4 A LETTER DATED FEBRUARY 21, 2007.

5    A    SAME THING, I HAVE NO RECOLLECTION.

6    Q    AND DOES AKANOC OPERATE AN E-MAIL ADDRESS

7    INFO@AKANOC.COM?

8    A    IT SHOULD.

9    Q    AND WHO IS RESPONSIBLE FOR LOOKING AT THE

10   CONTENTS OF THAT MAILBOX?

11   A    INFO WOULD -- I THINK INFO WAS FORWARDED TO

12   SALES@AKANOC.

13   Q    THAT WOULD BE WILL LONE?

14   A    WILL LONE.

15   Q    AND AGAIN, THE DATE OF THIS LETTER IS AT A

16   TIME WHEN THE COMPANY WAS IN SOME TURMOIL?

17   A    YES.

18   Q    AND CONCERNING THE RECEIPT OF HARD COPY

19   CORRESPONDENCE?

20   A    YES, THAT'S CORRECT.

21   Q    AND DO YOU HAVE ANY UNDERSTANDING OF WHAT WILL

22   LONE WOULD DO WITH SUCH CORRESPONDENCE, HAD HE

23   RECEIVED, ON FEBRUARY 21, 2007?

24   A    IF THE E-MAIL ISSUE -- IF IT'S A SECURITY OR

25   ABUSE CONCERN, THEN HE WOULD JUST FORWARD IT.

128

1    Q    WOULD HE FORWARD IT TO THE CUSTOMER OR TO

2    JULIANA LUK FOR HANDLING?

3    A    FORWARD IT TO SECURITY@AKANOC.

4    Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT ANY

5    OF THE LETTERS MARKED AS EXHIBITS 1, 2, 3, AND 4

6    WERE AT ANY TIME RECEIVED BY AKANOC?

7    A    I JUST NEVER SEEN IT.

8    Q    BUT DO YOU HAVE ANY REASON TO DISPUTE IT THAT

9    THEY WERE ACTUALLY RECEIVED?

10   A    NO.

11   Q    AND DO YOU HAVE ANY REASON TO DISPUTE THAT THE

12   SITES REFERRED TO IN THOSE LETTERS WERE IN FACT

13   HOSTED ON SERVERS AT AKANOC'S FACILITY?

14   A    WE -- I DEFINITELY HAVE NO IDEA WHERE THOSE

15   WEB SITES POINTED TO AT THAT TIME.

16   Q    I'LL MARK AS 6 A LETTER DATED APRIL 20, 2007

17   AND ASK THE WITNESS IF HE HAS SEEN THAT.

18   A    I HAVE NO RECOLLECTION OF THIS.

19   Q    AND WOULD YOU HAVE ANY WAY OF DETERMINING

20   WHETHER OR NOT THIS LETTER WAS, IN FACT, RECEIVED

21   BY YOU ON OR ABOUT THE DATED IT BEARS?

22   A    I REMEMBER I RECEIVED ONE OF THIS FROM YOUR

23   OFFICE AND I TOOK IT TO THE OFFICE AND SINCE IT'S

24   CONCERNING AKANOC, SO I PRETTY MUCH JUST PUT IT IN

25   THE PILE.

129

1    Q    SO WHEN YOU SAY YOU TOOK IT TO THE OFFICE,

2    THAT'S BECAUSE THE ONONDAGA DRIVE S IS YOUR HOME

3    ADDRESS?

4    A    THAT'S CORRECT.

5    Q    AND SO DO YOU RECALL RECEIVING A LETTER AT

6    YOUR HOME?

7    A    YES.

8    Q    CONCERNING LOUIS VUITTON?

9    A    YES.

10   Q    WHEN YOU SAY YOU TOOK IT TO YOUR OFFICE AND

11   PUT IT ON A PILE, WHAT DOES THAT MEAN?

12   A    I MEAN PUT IT ON THE DESK.

13   Q    WHOSE DESK?

14   A    THAT PARTICULAR -- THAT EMPTY DESK I WAS

15   TALKING ABOUT BECAUSE THAT WAS, AT THE TIME THAT

16   WAS THE PLACE THAT WE PUT ALL OF THIS TYPE OF

17   LETTERS.

18   Q    AND TO YOUR KNOWLEDGE WHAT HAPPENED WITH THE

19   LETTER AFTER YOU PUT IT ON THE DESK?

20   A    THERE WERE -- THERE WERE TOO MANY PEOPLE

21   TRYING TO SHARE THE WORKLOAD OVER THERE SO I HAVE

22   NO IDEA.

23   Q    OKAY.  TO THE EXTENT THAT I UNDERSTAND THAT

24   YOU CAN'T SAY WHAT HAPPENED WITH THIS LETTER, BUT

25   IN TERMS OF AKANOC'S POLICIES AND PROCEDURES, WHAT

                                              130

1    SHOULD HAVE HAPPENED WITH THE LETTER AFTER IT WAS

2    PUT ON THE DESK?

3    A    WE -- VERY, VERY SELDOM THAT WE RECEIVE

4    COMPLAINT THROUGH E-MAIL, I MEAN, THROUGH REGULAR

5    MAILS.  SO MOST OF THE ABUSE ISSUES WERE ALL

6    REVOLVED IN THE E-MAIL FORMAT.  SO THIS TYPE OF

7    E-MAILS -- I MEAN, THROUGH REGULAR MAILS -- I MEAN,

8    LETTERS ACTUALLY SOMETHING FROM, LIKE, THINGS LIKE

9    SUBPOENA WE NEED TO RESPOND, OR SOMETHING LIKE COME

10   IN FROM LEGAL AUTHORITY, WE NEED TO RESPOND.  BUT

11   GENERAL COMPLAINTS, WE JUST DON'T HAVE A LOT OF

12   EXPERIENCE WITH IT AND WE DON'T HAVE ANY MECHANISM

13   TO TAKE CARE OF LETTER COMPLAINTS.

14   Q    SO THERE WAS NO REAL POLICY TO HANDLE --

15          THE COURT:  LET ME INTERRUPT YOU.  IT

16   DIDN'T SOUND YOU WERE GOING TO FINISH IN A MINUTE

17   OR TWO AND YOU PROMISED US AN HOUR AND WE'VE BEEN

18   GOING FOR ABOUT 45 MINUTES.

19          LET'S TAKE A LUNCH BREAK, AND WE'LL COME

20   BACK AT 1:00 O'CLOCK.

21          (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

22

23

24

25

131

Exhibit C

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

Exhibit C

# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5     LOUIS VUITTON              )  C-07-03952-JW
       MALLETIER, S.A.,           )
 6                                )  AUGUST 21, 2009
                 PLAINTIFF,       )
 7                                )  VOLUME 4
                   V.             )
 8                                )  PAGES 1 - 208
       AKANOC SOLUTIONS, INC.,    )
 9     ET AL.,                    )
                                  )
10               DEFENDANTS.      )
       _____    )
11

12

13            THE PROCEEDINGS WERE HELD BEFORE

14           THE HONORABLE UNITED STATES DISTRICT

15                   JUDGE JAMES WARE

16     A P P E A R A N C E S:

17     FOR THE PLAINTIFF:  J. ANDREW COOMBS
                           BY:  J. ANDREW COOMBS
18                              ANNIE S. WANG
                           517 E. WILSON AVENUE
19                         SUITE 202
                           GLENDALE, CALIFORNIA 91206
20

21     FOR THE DEFENDANTS: GAUNTLETT & ASSOCIATES
                           BY:  JAMES A. LOWE
22                              CHRISTOPHER G. LAI
                           18400 VON KARMAN
23                         IRVINE, CALIFORNIA 92612

24         (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25     OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                           CERTIFICATE NUMBER 8074
```

1

1      A P P E A R A N C E S: (CONT'D)

2

       ALSO PRESENT:              LAW OFFICES OF J. ANDREW
3                                 COOMBS
                                  BY:  RUTH ADLER, PARALEGAL
4                                 517 E. WILSON AVENUE
                                  SUITE 202
5                                 GLENDALE, CALIFORNIA 91206

6                                 LVMH FASHION GROUP
                                  BY:  NIKOLAY LIVADKIN
7                                 2 RUE DU PONT-NEUF 75001
                                  PARIS, FRANCE
8
                                  AKANOC SOLUTIONS, INC.
9                                 BY:  STEVE CHEN, PRESIDENT
                                  45535 NORTH PORT LOOP EAST
10                                FREMONT, CALIFORNIA 94538

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          2

へ

1                    INDEX OF PROCEEDINGS

2

   FOR THE DEFENDANTS:
3

4

**STEVEN CHEN**                DIRECT EXAMINATION P. 5
5                             CROSS-EXAMINATION P. 165

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        3

1    REGISTRATION INFORMATION.

2    Q    FOR WHAT COMPANY?

3    A    THIS IS FOR AKANOC SOLUTIONS, INC.

4    Q    THANK YOU.  WHAT IS THE NATURE OF THE BUSINESS

5    FOR MANAGED SOLUTIONS GROUP AND AKANOC SOLUTIONS?

6    A    WE ARE IN GENERAL TERMS WE CALL A WEB HOSTING

7    BUSINESS.  IT'S A SEGMENT OF INTERNET SERVICE

8    PROVIDER.  SO IT'S A SEGMENT OF THE ISP INDUSTRY.

9              AND WHAT WE DO BASICALLY IS PROVIDE A

10   DATA CENTER ENVIRONMENT WITH A SERVER OR WITH

11   OPERATIONS SYSTEM AVAILABLE TO THE SERVER, AND WE

12   TURN IT OVER TO OUR CUSTOMER FOR REMOTE MANAGEMENT.

13   Q    DO AKANOC AND MANAGED SOLUTIONS GROUP WORK

14   TOGETHER IN THIS BUSINESS?

15   A    MANAGED SOLUTIONS GROUP, INC., CURRENTLY IS

16   HOLDING THE ASSET, THE HARD ASSET OF ALL OF THE

17   EQUIPMENTS AND AS FAR AS THE OPERATION IS CONCERNED

18   IT'S BASICALLY AKANOC SOLUTIONS GROUP, INC.,

19   PERSONNEL.

20   Q    AND WHAT DO YOU HAVE TO HAVE TO BE IN THE

21   INTERNET SERVICE PROVIDER BUSINESS SUCH AS YOU ARE?

22   WHAT RESOURCES DO YOU HAVE TO HAVE?

23   A    FIRST WE NEED TO BE IN A DATA CENTER

24   ENVIRONMENT.  SO DATA CENTER ENVIRONMENT IS

25   DIFFERENT THAN REGULAR BUSINESS OFFICE.

                                                    7

1          IT DOES HAVE MANY -- A LOT OF THE -- MANY

2     OF THE INTERNET BANDWIDTH PROVIDERS INTO THE SAME

3     DATA CENTER.

4          SO THEN YOU HAVE CONNECTION TO THE

5     OUTSIDE WORLD.  AND YOU HAVE BACKUP POWERS, NOT

6     LIKE THE REGULAR POWER LIKE WE HAVE AT HOME.

7     Q    SPECIAL POWER?

8     A    SPECIAL POWER ARRANGEMENTS.  YOU HAVE UPS

9     WHICH IS AN INTERRUPTED POWER SUPPLY AND YOU HAVE

10    DIESEL ENGINE BACKUP FOR THAT PURPOSE.  SO ALL OF

11    THAT IS ON THE POWER SIDE.

12         AND YOU HAVE SPECIAL COOLING

13    ENVIRONMENTS, BIG AIR CONDITIONING UNITS FOR

14    COOLING DOWN ALL OF THE EQUIPMENTS.

15    Q    AND WHAT ELSE DO YOU HAVE TO HAVE?

16    A    FROM THERE YOU NEED PERSONNEL.  SO WE PROVIDE

17    24-7 ON-SITE SERVICE.  SO WE CONSTANTLY HAVE PEOPLE

18    MANNING ALL OF THE EQUIPMENTS AND FROM THERE YOU

19    NEED TO HAVE SERVERS AND ROUTERS.

20    Q    AND WHAT ARE SERVERS?

21    A    SERVERS BASICALLY IS A -- JUST LIKE A PC BUT

22    IT LOOKS DIFFERENT.  IT'S SHAPED IN A FORM THAT

23    SAVES SPACE BECAUSE IN DATA CENTER IT'S -- THE

24    SPACE IS VERY IMPORTANT.  YOU CAN'T HAVE THE

25    REGULAR BOX LIKE THE PC.

8

Exhibit D

1          USUALLY THE STACK OF MACHINES WE PUT IN

2     40 MACHINES IN ONE STACK.  THERE'S NO WAY THAT THE

3     REGULAR PC CAN GET INTO THAT TYPE OF DENSITIES.

4          SO THERE ARE SPECIAL TYPE OF HARDWARES

5     THAT WORK PRETTY MUCH THE SAME AS THE REGULAR PC

6     BUT DIFFERENT IN MECHANICAL FORM.

7     Q    AND YOU PUT THEM IN RACKS; IS THAT RIGHT?

8     A    YES, AND FOR SPACE MANAGEMENT.

9     Q    AND WHAT ELSE DO YOU NEED TO OPERATE AN ISP,

10    WHAT OTHER EQUIPMENT?

11    A    A ROUTER.  BASICALLY IT'S JUST LIKE OTHER

12    PEOPLE TESTIFIED YESTERDAY.  IT'S THE MAIN GATEWAY

13    AT THE FRONT, AND SO WHATEVER COMES IN THROUGH THAT

14    GATEWAY, IT IS DISTRIBUTED TO ANY SPECIFIC

15    EQUIPMENT THAT HAS THAT PARTICULAR IP ADDRESS.

16    Q    HOW MANY ROUTERS DO YOU USE IN YOUR BUSINESS

17    AT THE DATA CENTER?

18    A    HOW MANY ROUTERS?  BUT MANY.  IT'S JUST ONE

19    THAT IS PERFORMING AS THE GATEWAY.  THE REST IS

20    MORE LIKE A BACKUP OR THE SECONDARY ROUTING

21    PURPOSE.

22          SO WE SEND ONE BIG CHUNK TO -- WELL,

23    LET'S PUT IT THIS WAY, A BIG POST OFFICE VERSUS A

24    LOCAL POST OFFICE.

25    Q    OKAY.

                                                    9

1    A    SO IT GOES THROUGH THE BIG ONE AND THEN

2    THROUGH THE SECONDARY ONE AND THEN GOES TO THE

3    MACHINE.

4    Q    OKAY.  SO THE BIG ONE YOU'RE TALKING ABOUT,

5    ALL OF THE COMMUNICATION COMING IN GOES THROUGH ONE

6    BIG ROUTER?

7    A    THAT'S CORRECT.

8    Q    WHAT ELSE DO YOU NEED TO OPERATE AN INTERNET

9    SERVICE PROVIDER BUSINESS?

10   A    WE COVERED FACILITY.  WE COVERED THE

11   BANDWIDTH.  WE COVERED THE SERVERS.

12   Q    WELL, LET'S TALK ABOUT THE BANDWIDTH FOR A

13   MOMENT.  WHAT DO YOU MEAN BY BANDWIDTH?

14   A    BANDWIDTH IS JUST LIKE AT HOME IF YOU HAVE

15   INTERNET CONNECTIONS AND YOU GO THROUGH PEOPLE LIKE

16   AT & T AND GO THROUGH PEOPLE LIKE COMCAST, BUT IN

17   DATA CENTER ENVIRONMENT IT'S JUST VERY BIG PIPE

18   INSTEAD OF PEOPLE USE AT HOME BECAUSE WE HANDLE A

19   LOT OF TRAFFIC THROUGH THAT BIG PIPE.

20   Q    WHEN YOU TALK ABOUT A BIG PIPE, WHAT IS GOING

21   THROUGH THIS PIPE?

22   A    A LOT OF DATA.

23   Q    DATA?

24   A    IN ELECTRONIC FORM BUT FOR PEOPLE WHO IT'S

25   EASY TO UNDERSTAND, IT'S JUST LIKE WATER GOING

10

Exhibit D

1    THROUGH THE PIPE AND THERE'S DIFFERENT MEASURE OF

2    THE PIPE OR THE WATER ITSELF.

3    Q    DIFFERENT SIZES OF PIPE SO TO SPEAK ARE

4    AVAILABLE?

5    A    NO, NOT EXACTLY.  IT'S A BIG PIPE THAT

6    EVERYTHING CAN GO -- RUN THROUGH THAT PIPE.

7         SO IT'S IN MORE OR LESS LIKE IN A CONTROL

8    FORM OR WHATEVER GOES THROUGH THAT PIPE, IT ALL

9    GOES THROUGH ALTOGETHER.

10   Q    THE ELECTRONIC DATA?

11   A    YES, THE ELECTRONIC DATA.

12   Q    HOW IS THAT MEASURED AS IT GOES THROUGH THE

13   PIPE?  JUST TELL US HOW YOU TALK ABOUT THE QUANTITY

14   OF DATA GOING THROUGH THE PIPE?

15   A    WE MEASURE BY THE SIZE OF THE PIPE THAT ARE

16   PROVIDED.  BUT WHEN WE DISTRIBUTE TO OUR CUSTOMER

17   WHO USE INDIVIDUAL SERVERS, MORE OR LESS WE MEASURE

18   BY THE VOLUME.

19   Q    THE VOLUME?

20   A    THE VOLUME.  SO THEN EACH INDIVIDUAL SERVER IS

21   CALCULATED BY A CERTAIN VOLUME BASED ON THE DATA

22   THAT THEY TRANSMIT.

23   Q    THE AMOUNT -- THE VOLUME OF DATA?

24   A    YES.

25   Q    AND ARE YOU TALKING ABOUT VOLUME OF DATA BY

11

1      DAY OR BY MONTH OR WHAT?

2      A    WE CALCULATE IT BY MONTH.

3      Q    AND HOW IS IT MEASURED?  WHAT IS THE UNIT OF

4      MEASURE FOR THE VOLUME DATA THAT YOU USE?

5      A    IN GIGABYTE.  A BYTE IS EIGHT LITTLE BITS.  SO

6      WHEN WE CALCULATE THE SIZE OF THE PIPE WE CALCULATE

7      BY MEGABITS.  IN BITS.

8           BUT THEN WHEN EIGHT BITS IS ONE BYTE.  SO

9      WHEN WE CALCULATE BY VOLUME, THEN IT BECOMES BYTE.

10     Q    SO WHEN YOU TALK ABOUT MEGABYTES, IS THAT A

11     MILLION BYTES?

12     A    MEGABYTES IS A MILLION BYTES, YES.

13     Q    AND ALL RIGHT.  AND A GIGABYTE IS HOW MANY?

14     A    ONE THOUSAND TIMES A MEGABYTE.

15     Q    A BILLION BYTES THEN?

16     A    BILLION, YES.

17     Q    WHERE ARE YOU PHYSICALLY LOCATED?  WHERE IS

18     THE BUSINESS PHYSICALLY LOCATED?

19     A    TWO BLOCKS FROM HERE.  50 SOUTH MARKET STREET.

20     Q    SAN JOSE, CALIFORNIA?

21     A    SAN JOSE, CALIFORNIA, THAT'S CORRECT.

22     Q    AND WHAT IS LOCATED AT THAT ADDRESS?

23     A    THAT BUSINESS IS ONE OF THE MAIN HUBS OF ALL

24     OF THE TELECOMMUNICATIONS BUSINESS.  AT & T IS

25     THERE.  ALL OF THE BIG GUYS YOU NAME IT ARE THERE.

                                                    12

1    IT'S CALLED MAY WEST BUILDING.

2              BACK IN BOSTON THERE'S ONE CALLED MAY

3    EAST.  SO THAT'S THE TWO COMMUNICATION HUB THAT IS

4    IN THE BUILDING.  OTHER THAN THAT IS I.R.S.

5    Q    SO YOU'RE LOCATED IN ONE OF THE LARGEST DATA

6    CENTERS IN THE UNITED STATES?

7    A    I DON'T WANT TO SAY THE LARGEST, BUT I CAN

8    CERTAINLY SAY ONE OF THE MOST IMPORTANT MAIN HUBS.

9    Q    WHY IS IT AN IMPORTANT MAIN HUB?

10   A    SPECIFICALLY BECAUSE THAT PUTS US IN A

11   POSITION THAT VERY CLOSE TO THE SO-CALLED

12   BACKBONES.  SO TO US ONE HUB WE'RE INTO THE MAJOR

13   INTERNET CONNECTIONS INTO THE BIG CLUBS PER SE.

14   Q    IS THIS A LARGE BUILDING?

15   A    YES, FAIRLY LARGE.  I THINK IT'S 16 STORIES.

16   Q    AND NOTHING IN THERE BUT DATA CENTERS?

17   A    DATA CENTERS ARE.

18   Q    AND I.R.S.?

19   A    YES.

20   Q    AND GOOD COMPANY.  WHO DO YOU GET YOUR

21   INTERNET CONNECTION?  WHO IS YOUR UPSTREAM INTERNET

22   PROVIDER?

23   A    BANDWIDTH WISE WE HAVE GLOBAL PROCESSING AND

24   COGENT COMMUNICATIONS.

25   Q    GLOBAL PROCESSING AND COGENT COMMUNICATIONS.

                                              13

1    WEB SITES?

2    A    NO, I'M NOT INVOLVED IN ANY WEB SITE AT ALL.

3    Q    DOES IT CREATE PROBLEMS FOR YOU WHEN YOU GET

4    COMPLAINTS LIKE THIS?

5    A    YES, SAVE ME A LOT OF THE HEAVY MIND DEALING

6    WITH THESE TYPE OF COMPLAINTS.

7    Q    NOW, YOU TESTIFIED ABOUT JULIANA LUK HANDLING

8    SOME OF THE COMPLAINTS.  HOW DO YOU DETERMINE

9    WHETHER SHE HANDLES THEM OR YOU DO?

10   A    AS I SAID, WE MONITOR THE SAME E-MAIL ACCOUNT,

11   AND SO THERE WERE TWO THINGS FAIRLY EASY TO SEE

12   WHEN THEY FORWARDED THINGS OUT OR NOT.

13            ONE IS IF SHE FORWARDED ANYTHING TO THE

14   COMPLAINEE, THEN THERE WOULD BE A MARK ON THE

15   SUBJECT LINE THAT IT SHOWS IT'S BEEN FORWARDED AND

16   ALSO THAT WE TAKE DOWN THE IN BOUND E-MAIL NUMBERS

17   AS REFERENCE SO THAT IF CUSTOMERS RESPOND OR

18   ANYTHING, WE CAN EASILY FIND THAT E-MAIL TO THE

19   ORIGINAL COMPLAINT AND WE CAN WORK ON IT.

20            SO IF SHE WENT THROUGH EVERYTHING BEFORE

21   ME, THEN I GET TO PICK UP THE REST OF IT.

22            AND SOMETIMES IF I SEE SOMETHING

23   IMPORTANT, THEN I WOULD STEP IN AND GET IT DONE

24   BEFORE SHE NOTICES IT AND SAME THING TO THAT EFFECT

25   SHE WOULD DO ON THE OTHER SIDE.

                                                    117

1    Q    AND NOW, HAVE YOU GIVEN HER WRITTEN

2    INSTRUCTIONS ABOUT WHAT TO DO?

3    A    ORIGINALLY, YES, WHEN I STARTED TRAINING HER

4    HOW TO DO THE JOB AND WHAT SPECIFICALLY SHE NEEDED

5    TO DO.

6            AND AT CERTAIN TIMES SHE START DOING MORE

7    AND MORE, INCLUDING EVEN, INCLUDING UNPLUGGING

8    CUSTOMER AND WHATNOT, AND TO THE POINT THAT

9    SOMETIMES, BECAUSE SHE'S NOT TECHNICAL ENOUGH TO

10   UNDERSTAND WHETHER SHE SHOULD REALLY UNPLUG

11   CUSTOMERS.  SO IT BECOMES A BURDEN OF IS ARGUMENT

12   OF WORKING WITH THE CUSTOMER SO TO THE POINT THAT I

13   GAVE HER VERY STRICT INSTRUCTIONS THAT UNLESS YOU

14   ARE 100 PERCENT SURE OF SOMETHING THAT IS -- THAT

15   YOU KNOW HOW TO HANDLE IT, THEN JUST LEAVE THE --

16   BRING IT TO MY ATTENTION, AND I WILL TAKE CARE OF

17   IT FROM THERE.

18            SO SOMETHING LIKE IF SHE SEES 30, 50

19   SPANS FROM ONE SERVER IN A VERY SHORT PERIOD OF

20   TIME, SHE WILL UNPLUG IT OR NOW SHE KNOWS THAT

21   SHE'S CAPABLE OF LOOKING AT THE DATA AND MAKE THAT

22   DECISION.

23            SOMETHING THAT NEEDS TECHNICAL ANALYSIS,

24   THEN SHE JUST LEAVES IT TO ME.

25   Q    AFTER YOU GET A COMPLAINT FROM SOMEONE OR

                                                118

1    LEGALLY WOULD DO, WHICH COULD BE A MATTER OF LAW.

2    AND ALTHOUGH HE'S TESTIFYING HERE ABOUT THESE

3    PRACTICES, I WANT YOU TO UNDERSTAND THAT THIS IS

4    HIS TESTIMONY ABOUT WHAT HE UNDERSTANDS THAT HE CAN

5    DO.

6    BY MR. LOWE:

7    Q    NOW, DO YOU -- HOW WELL DO YOU KNOW YOUR MAIN

8    CUSTOMERS THAT YOU DEAL WITH?

9    A    MOST OF THE BIGGER RESELLERS FROM CHINA I HAVE

10   DIRECT E-MAIL COMMUNICATION WITH THEM OR DUE TO

11   EITHER SECURITY WORK OR TECHNICAL WORK.

12   Q    AND HAVE YOU BEEN ABLE TO DETERMINE WHETHER

13   CUSTOMERS ARE TRUSTWORTHY AND ARE ABLE TO DO WHAT

14   THEY NEED TO DO TO PREVENT PROBLEMS?

15   A    MOST LIKELY THEY ARE JUST LIKE US, THEY ARE

16   RESELLERS.

17            SO THEY ARE PRETTY MUCH THE SAME AS US.

18            THEY ARE BEING HIT FROM THE ABUSER PER

19   SE.

20   Q    VICTIMIZED BY THE SAME ABUSER?

21   A    YES.

22   Q    AND DO THEY IN A SENSE HAVE TO GO THROUGH THE

23   SAME PROCESS THAT YOU GO THROUGH WHEN THEY GET

24   COMPLAINTS?

25   A    THAT IS CORRECT.

                                                     123

1    HEARD ABOUT TODAY?

2    A    NO, WE DO NOT.

3    Q    DO YOU KNOW WHO THE PEOPLE ARE WHO ARE SELLING

4    THESE COUNTERFEIT PRODUCTS?

5    A    NO, WE DON'T.

6    Q    THANK YOU.  NOW, DO YOU HAVE ANY IDEA OF A

7    BETTER WAY FOR SOMEONE LIKE LOUIS VUITTON TO STOP

8    COUNTERFEITERS FROM SELLING ON THE INTERNET?

9    A    AS I WAS COMMENTING MANY TIMES, THIS IS A VERY

10   SIMPLE SOLUTION.  THE SINGLE BREAKAGE OF THE

11   CONNECTION IS THE NAME SERVER.

12          IF YOU COMPLAIN TO DOMAIN NAME REGISTRAR

13   AND LET THEM BLOCK THE ACCESS TO THE DOMAIN SERVERS

14   TO ACCESS THE DOMAIN SERVER THEN THEY KNOCK OUT

15   THAT DOMAIN NAME RIGHT AWAY.

16   Q    SO ON EXHIBIT 1610 THE REGISTRAR IS RIGHT UP

17   HERE; IS THAT RIGHT?

18          MR. COOMBS:  YOUR HONOR, IT LACKS

19   FOUNDATION AND CALLS FOR A LEGAL CONCLUSION.

20          THE WITNESS:  THAT'S RIGHT.

21          THE COURT:  WELL, IT DOES SEEM TO ME THAT

22   IT'S BEYOND THE COMPETENCY OF THE WITNESS TO

23   TESTIFY AS TO WHETHER OR NOT LAWFULLY AND FACTUALLY

24   THE SOLUTION IS ONE THAT COMPLIES WITH AND WOULD

25   NOT BE VIOLATIVE OF VARIOUS LEGAL PRINCIPLES, AND

                                            164

1    SO I'LL SUSTAIN THE OBJECTION.

2              HIS MAIN CONCERN IS NOT TO BE THE SOURCE

3    OF CURING THE PROBLEM.  HE'S NOT BEEN CHALLENGED

4    WITH NOT COMING UP WITH A SOLUTION.  HE'S BEING

5    CHALLENGED ON THE CLAIMS THAT ARE BEING MADE.

6    BY MR. LOWE:

7    Q    MR. CHEN, DO YOU THINK THAT THERE'S ANYTHING

8    THAT YOU CAN DO BEYOND WHAT YOU HAVE BEEN DOING

9    THAT WOULD STOP THE INFRINGEMENT OF PRODUCTS THAT

10   LOUIS VUITTON IS COMPLAINING ABOUT?

11   A    NO, WE HAD NO WAY OF KNOWING WHEN, WHERE, HOW

12   A DOMAIN NAME WOULD GET INTO OUR NETWORK.

13   Q    THANK YOU.

14              I HAVE NO FURTHER QUESTIONS AT THIS TIME,

15   YOUR HONOR.

16                    **CROSS-EXAMINATION**

17   BY MR. COOMBS:

18   Q    LET ME SEE, MR. CHEN, IF WE CAN AGREE ON A

19   COUPLE OF THINGS.  COUNTERFEITING IS WRONG; RIGHT?

20   A    YES.

21   Q    AND IT'S AGAINST THE LAW?

22   A    YES.

23   Q    AND IT'S AGAINST THE POLICY OF AKANOC

24   SOLUTIONS, IS THAT NOT ALSO CORRECT?

25   A    THAT'S CORRECT.

                                                    165

Exhibit D

1    Q    I'D LIKE TO PULL UP EXHIBIT 21 IF I MAY.  I

2    THINK EARLIER YOU WERE TALKING ABOUT THIS DOCUMENT

3    BEING THE SERVICE AGREEMENT BETWEEN AKANOC AND ITS

4    CUSTOMERS; IS THAT CORRECT?

5    A    THAT'S CORRECT.

6    Q    AND TURNING TO PAGE 5 OF 6 OF THE EXHIBIT,

7    THAT'S THE ACCEPTABLE USE POLICY THAT FORMS PART OF

8    THE SERVICE AGREEMENT; IS THAT NOT ALSO CORRECT?

9    A    CORRECT.

10   Q    AND UNDER THE TERMS OF THAT POLICY IT

11   PROVIDES, AMONG OTHER THINGS, THAT IT IS A -- IT IS

12   PROHIBITED TO USE A SERVICE IN A WAY THAT VIOLATES

13   APPLICABLE LAW IN PARAGRAPH 4, B SUB 4; IS THAT

14   CORRECT?

15   A    YES.

16   Q    AND IT'S ILLEGAL TO USE IT UNDER SUBPARAGRAPH

17   B 3 TO USE IT TO MISAPPROPRIATE AGAINST COPYRIGHTS

18   AND TRADEMARKS; IS THAT ALSO CORRECT?

19   A    THAT'S CORRECT.

20   Q    AND SO THIS IS A BREACH OF YOUR CUSTOMERS WITH

21   AKANOC IF THIS CONDUCT OCCURS ON ITS SERVICE; IS

22   THAT ALSO CORRECT?

23   A    THAT'S CORRECT.

24   Q    NOW, EARLIER YOU STARTED TO TESTIFY ABOUT

25   CONTRACTUAL RIGHTS, THIS THEN GOES ON TO SPECIFY

                                                    166

1    WHAT THE CONSEQUENCES FOR VIOLATION OF THOSE

2    ACCEPTABLE USE POLICIES ARE; IS THAT ALSO NOT TRUE?

3    A    THAT'S TRUE.

4    Q    AND THAT'S IN PARAGRAPH 2 ON THE FOLLOWING

5    PAGE; IS THAT NOT TRUE?  SCROLLING DOWN TO

6    PARAGRAPH C.

7            DO YOU SEE THAT?

8    A    YES.

9    Q    AND THIS PROVIDES FOR CERTAIN TOOLS AT

10   AKANOC'S DISPOSAL TO DEAL WITH A VIOLATION OF THE

11   ACCEPTABLE USE POLICY, INCLUDING THE INFRINGEMENT

12   OF INTELLECTUAL PROPERTIES THAT WE WERE JUST

13   TALKING ABOUT?

14   A    THAT'S RIGHT.

15   Q    AND AMONG THE TOOLS THAT IT PROVIDES IS C 1,

16   WARNING TO CUSTOMER?

17   A    CORRECT.

18   Q    AND IT PROVIDES IN SUB 2 SUSPENDING THE

19   OFFENDING CUSTOMER?

20   A    THAT'S CORRECT.

21   Q    AND IT PROVIDES IN 3 TERMINATING THE OFFENDING

22   CUSTOMER?

23   A    THAT'S CORRECT.

24   Q    AND SO TERMINATING THE CUSTOMER IS AN

25   AVAILABLE OPTION FOR AKANOC SOLUTIONS IN RESPONSE

                                                    167

1       TO INTELLECTUAL PROPERTY INFRINGEMENT CLAIMS; IS

2       THAT ALSO NOT CORRECT?

3       A    THAT IS CORRECT.

4       Q    AND IT ALSO PROVIDES FOR IMPOSING FEES UNDER

5       PARAGRAPH SUB 4; IS THAT ALSO NOT CORRECT?

6       A    THAT'S CORRECT.

7       Q    AND IT DOESN'T ACTUALLY SPECIFY A MINIMUM OR

8       MAXIMUM IN THE NUMBER AMOUNT OF FEES THAT CAN BE

9       IMPOSED; IS THAT ALSO THE CASE?

10      A    THAT'S CORRECT.

11      Q    AND IT ALSO SAYS THAT AKANOC RESERVES THE

12      RIGHT TO REMOVE THE OFFENDING CONTENT UNDER SUB.

13      5, IS THAT ALSO NOT THE CASE?

14      A    THAT'S CORRECT.

15      Q    AND ALL OF THESE TOOLS THAT ARE PROVIDED FOR

16      BY YOUR OWN CONTRACT HAVE BEEN PART OF THAT

17      CONTRACT SINCE AKANOC STARTED DOING BUSINESS?

18      A    THAT IS CORRECT.

19      Q    AND THEY HAVE BEEN WITHIN THE ARSENAL OF

20      AKANOC'S CONTRACTUAL RIGHTS TO DEAL WITH COPYRIGHT

21      AND TRADEMARK INFRINGEMENT FROM 2003 AND 2004

22      WHENEVER AKANOC FIRST STARTED DOING BUSINESS?

23      A    THAT IS CORRECT.

24      Q    AND NOW, ONE THING I HAVEN'T SEEN IS TERMS OF

25      THE SERVICE AGREEMENT OR ACCEPTABLE USE POLICY FOR

168

1    HERE IN THE UNITED STATES?

2    A    NOT NECESSARILY JUST FOR ASIA.  IT'S JUST

3    CLOSE TO THE BACKBONE.

4    Q    BUT YOU HAVE AT LEAST IN THE PAST MARKETED THE

5    AKANOC SERVICES TO CLIENTS I THINK IN CHINA; IS

6    THAT CORRECT?

7    A    THAT'S CORRECT.

8    Q    I'D ASK THE WITNESS TO TAKE A LOOK AT EXHIBIT

9    583.  CAN YOU TELL US WHAT THAT IS, MR. CHEN?

10   A    THAT'S THE COMPANY PROFILE FROM THE AKANOC WEB

11   SITE IN ENGLISH.

12   Q    AND HAS THAT OR SOMETHING LIKE THAT BEEN ON

13   THE AKANOC WEB SITE FOR A PERIOD OF TIME?

14   A    YES.

15   Q    AND IF YOU GO DOWN TO THE BOTTOM OF THE FIRST

16   PAGE THERE IS WHY IS IT SO HARD TO VISIT CHINA WEB

17   SITES FROM FOREIGN COUNTRIES.  DO YOU SEE THAT?

18   A    YES.

19   Q    AND THERE'S AN EXPLANATION OF PROBLEMS WITH

20   BANDWIDTH, A SLOW TRAFFIC WITHIN THE CHINA FIRE

21   WALL.  DO YOU SEE THAT?

22   A    YES.

23   Q    AND THAT IS PART OF THE VALUE ADDED THAT

24   AKANOC CAN OFFER TO BUSINESSES BASED IN CHINA IN

25   PARTICULAR AND AN INCENTIVE OR BENEFIT FOR THEM IN

171

1    LOCATING WITH YOUR SERVERS HERE IN SAN JOSE?

2    A    THAT'S CORRECT.

3    Q    SO IN ADDITION TO THE FACT THAT YOU PROVIDE

4    THE SERVERS, THE ROUTERS, THE BANDWIDTH THAT YOU

5    WERE TESTIFYING TO THIS MORNING, THERE'S ALSO THE

6    FACT THAT THE BASIC CONNECTIVITY THAT AKANOC OFFERS

7    THAT ENHANCES BASICALLY THE INTERNET EXPERIENCES

8    FOR PEOPLE THAT ARE VISITING HOSTING SITES ON YOUR

9    SERVERS?

10   A    THAT IS CORRECT.

11   Q    LET'S ACTUALLY TALK ABOUT THE DIGITAL

12   MILLINEUM COPYRIGHT ACT FOR JUST A MOMENT.  I THINK

13   IT'S EXHIBIT 54 FOR ONE OF THE INTERIM DESIGNATION

14   OF THE DEFENDANTS; IS THAT CORRECT?

15   A    YES.

16   Q    AND CAN YOU TELL ME WHAT DATE THAT WAS FILED

17   ON?

18            THE COURT:  IF THERE'S A DATE ON THE

19   DOCUMENT I'LL HAVE YOU SCROLL DOWN TO THE DATE

20   LINE.

21            THE WITNESS:  NOVEMBER 30TH, 2007.

22   BY MR. COOMBS:

23   Q    AND THAT WAS AFTER THE LAWSUIT WAS FILED AND

24   SERVED ON AKANOC SOLUTIONS?

25   A    I BELIEVE SO.

172

1    Q    DO YOU HAVE ANY QUESTION IN YOUR MIND ABOUT

2    THAT?

3    A    FOR AKANOC?  NO.

4    Q    OKAY.  WAS THE DESIGNATION FOR AGENT OF

5    SERVICE FOR MANAGED SOLUTIONS FILED AT OR ABOUT THE

6    SAME TIME AS THE EXHIBIT 54 DESIGNATION?

7    A    I DID FILE ONE MYSELF, BUT I DON'T KNOW

8    WHETHER MY PREVIOUS EX-PARTNER, IF HE DID ANY

9    FILING AT ALL.

10   Q    SO JUST SO I'M CLEAR, THERE MAY HAVE BEEN SOME

11   FILING IN CONNECTION WITH WHAT BECAME THE

12   MANAGED.COM BUSINESS BUT OTHER THAN THAT THE TWO

13   THAT HAVE BEEN MARKED AS EXHIBITS THAT YOU LOOKED

14   AT ARE THE FIRST DESIGNATIONS FILED BY THE

15   DEFENDANTS IN THIS ACTION; IS THAT CORRECT?  AT

16   LEAST SINCE THE SPLIT WITH MR. PHAM WHICH OCCURRED

17   THREE OR FOUR YEARS AGO?

18   A    THAT'S CORRECT.

19   Q    SO FROM ABOUT 2004 UNTIL LATE 2007, THERE WAS

20   NO DESIGNEE FILED WITH THE COPYRIGHT OFFICE FOR

21   EITHER OF THE CORPORATE DEFENDANTS HERE?

22   A    AS I SAID, I PERSONALLY HANDLE AKANOC ACCOUNTS

23   SO I KNOW THAT'S DEFINITELY TRUE.

24   Q    WHO HANDLED MANAGED SOLUTIONS GROUP?

25   A    FROM THE BEGINNING IT WAS JACK PHAM.

173

1    Q    AND DOES HE HAVE ANYTHING TO DO WITH IT NOW?

2    A    NO.

3    Q    AND HAS HE HAD ANYTHING TO DO WITH IT FOR THE

4    LAST THREE YEARS?

5    A    NO.

6    Q    AND SO WHO, IF NOT YOU -- ARE YOU

7    SUGGESTING -- STRIKE THAT.

8              ARE YOU SUGGESTING THAT MR. PHAM

9    CONTINUED TO HAVE A RESPONSIBILITY TO FILE THE

10   DESIGNATION?

11   A    NO.

12   Q    SO WHO DID?

13   A    ME.

14   Q    OKAY.  AND DID YOU FILE ONE BEFORE ROUGHLY

15   NOVEMBER OF 2007?

16   A    NO.

17   Q    SO IT'S THE FIRST ONE FOR BOTH OF THE

18   CORPORATE DEFENDANTS?

19   A    YES.

20   Q    OKAY.  THANK YOU.  AND THESE ARE BOTH AGAIN

21   AFTER THE LAWSUIT WAS FILED BY LOUIS VUITTON?

22   A    THAT'S CORRECT.

23   Q    NOW, YOU ARE DESIGNEE UNDER THAT ACT?

24   A    THAT'S CORRECT.

25   Q    AND WHAT IS YOUR UNDERSTANDING OF THE

174

1    REQUIREMENT UNDER THE ACT FOR THE FILING OF THE

2    AGENT NOTIFICATION OF THE TYPE THAT WE'RE LOOKING

3    AT RIGHT NOW?

4    A    TO BE HONEST WITH YOU, I DON'T REALLY

5    UNDERSTAND.  I JUST KNOW THAT IT'S A PROCESS THAT I

6    NEED TO DO.

7    Q    DO YOU HAVE ANY UNDERSTANDING OF THE

8    REQUIREMENT OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

9    TO HAVE A PUBLISHED TERMS OF SERVICE?

10   A    I REALLY DON'T UNDERSTAND THAT PARTICULAR LAW

11   PER SE.

12   Q    OKAY.  DO YOU HAVE ANY UNDERSTANDING OF WHAT

13   THAT LAW REQUIRES IN RESPONSE TO NOTICES OF

14   INFRINGEMENT TRANSMITTED ACCORDING TO ITS TERMS?

15   A    I DON'T REALLY UNDERSTAND THAT LAW.

16   Q    OKAY.  ARE YOU FAMILIAR WITH THE TERM AT ALL

17   OF EXPEDITIOUS REMOVAL?

18   A    NO.

19   Q    SO YOU DON'T HAVE ANY UNDERSTANDING ABOUT A

20   REQUIREMENT THAT IN RESPONSE TO A NOTICE OF

21   INFRINGEMENT A WEB HOST OR ISP THAT WANTS TO AVAIL

22   ITSELF OF THAT STATUTE MUST EXPEDITIOUSLY REMOVE

23   THE INFRINGING CONTENT THAT IS THE SUBJECT OF THE

24   NOTICE?

25   A    I DON'T UNDERSTAND THE LANGUAGE INSIDE OR THE

                                                    175

1    LANGUAGE YOU JUST TALK ABOUT.

2            I'M ONLY DOING THINGS IS WHAT INDUSTRY

3    PEOPLE DO EVERY DAY.

4    Q    HAVE YOU ASSIGNED -- OTHER THAN MS. LUK ABOUT

5    WHOM WE HAVE TALKED ABOUT A LITTLE BIT OVER THE

6    LAST COUPLE DAYS, HAVE YOU ASSIGNED ANY

7    RESPONSIBILITY FOR HANDLING THESE INFRINGEMENT

8    NOTICES TO ANYONE ELSE AT EITHER AKANOC OR MANAGED

9    SOLUTIONS GROUP?

10   A    AGAIN BEFORE THE SEPARATION?  EVEN AFTER THE

11   SEPARATION FOR QUITE SOME TIME WE EVEN HAVE MORE

12   STAFF HANDLING THE BUSINESS.  THERE WERE TWO OTHER

13   GENERAL CLERK THAT THEY WERE MORE INTENT TO HANDLE

14   THIS TYPE OF WORK.

15   Q    OKAY.  I'M SORRY.  I'M GETTING A LITTLE

16   CONFUSED AND IF I AM, I'M SURE -- I HOPE I'M NOT

17   THE ONLY ONE SO LET'S TALK ABOUT THE SEPARATION

18   THAT YOU'RE REFERRING TO.

19           YOU HEARD A LITTLE DEPOSITION TESTIMONY

20   ABOUT IT, BUT MAYBE WE CAN CLEAR UP A COUPLE OF

21   THINGS.

22           WHEN MANAGE SOLUTIONS BUSINESS STARTED

23   BUSINESS IN ABOUT WHAT YEAR?

24   A    END OF 2003.

25   Q    AND AT THAT TIME YOU WERE NOT THE SOLE OWNER?

                                                    176

1    A    I HAVE NO IDEA.

2    Q    AND WE'LL PUT UP THE NEXT ONE THAT COMES NEXT

3    FROM MARCH 3, '08 AND THIS, TOO, IS A -- IS ANOTHER

4    TAKEDOWN NOTICE -- THAT'S THE TAKEDOWN NOTICE

5    REFERRING TO ESTARBIZ ON 3-3; IS THAT CORRECT?

6    A    YES.

7    Q    AND IT'S TO MR. WANG KIYO; IS THAT CORRECT?

8    A    YES.

9    Q    AND IT'S CONCERNING THE SAME DOMAIN NAME

10   ESTARBIZ.COM?

11   A    YES.

12   Q    AND IT CONCERNS THE SAME --

13   A    THIS ONE --

14   Q    I DIDN'T MEAN TO INTERRUPT.  BUT MY ONLY

15   QUESTION IS THAT IT'S THE SAME IP ADDRESS AS

16   REFLECTED ON THE PREVIOUS EXHIBITS?

17   A    YES.

18   Q    AND THAT SUGGESTS TO ME AT LEAST THAT THAT WEB

19   SITE WAS IN OPERATION FROM NOVEMBER OF 2007 AND

20   UNTIL MARCH OF 2008.  DO YOU HAVE A DIFFERENT

21   CONCLUSION?

22   A    CAN YOU PUT THE LAST?  THE FIRST THING I SAID

23   IS THAT YOUR SERVER HAS BEEN UNPLUGGED.

24   Q    MR. CHEN, I DIDN'T ASK YOU WHAT THE E-MAIL

25   SAID.  I ASKED YOU WHETHER THE ESTARBIZ WAS ON THE

196

1    SAME SERVER WITH THE SAME CUSTOMER FROM NOVEMBER OF

2    2007 UNTIL MARCH OF 2008?

3    A    YES.

4    Q    NOW, IS MR. WANG KIYO STILL A CUSTOMER OF

5    AKANOC SOLUTIONS?

6    A    MAYBE.

7    Q    YOU DON'T KNOW?

8    A    I DON'T KNOW.

9    Q    YOU NEVER TOOK ANY ACTION TO TERMINATE HIM AS

10   A CUSTOMER?

11   A    I DON'T HAVE A REASON TO TERMINATE HIM.

12   Q    SO IN SPITE OF THE LITIGATION AND IN SPITE OF

13   ALL OF THE DEMANDS THAT ARE GOING ON, THIS SITE CAN

14   STAY UP FOR FOUR MONTHS AND THE ONLY THING YOU CAN

15   DO IS UNPLUG THE SERVER.  AND DO YOU KNOW WHAT

16   HAPPENED TO THE SERVER AFTER HE UNPLUGGED IT?

17   A    AS I PREVIOUSLY SAID, I HAVE NO WAY OF

18   KNOWING.  THE ONLY THING I CAN BE IN CONTROL OF IS

19   UNPLUG THE SERVER.

20   Q    NOW, LET'S BACK UP FOR A MOMENT AND GO BACK TO

21   PAGE 1 OF 1598 AND THE FIVE WEB SITES THAT WERE

22   LISTED IN THE COMPLAINT WHICH YOU INDICATE HERE WAS

23   SERVED ON YOU ON AUGUST 20TH, 2007.  DO YOU SEE

24   THAT?

25   A    YES.

197

Exhibit D

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE RODRIGUEZ, CSR, CRR
CERTIFICATE NUMBER CSR 8074

Exhibit D

**Exhibit E**

1        UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4

5

LOUIS VUITTON MALLETIER, S.A.,  )
6                               )    C-07-03952 JW (HRL)
                PLAINTIFF,      )
7                               )    AUGUST 25, 2009
  V.                            )
8                               )    VOLUMES 8 AND 9
AKANOC SOLUTIONS, INC.,         )
9  MANAGED SOLUTIONS GROUP, INC., )   PAGES 1 - 231
STEVEN CHEN AND DOES 1 THROUGH  )
10  10, INCLUSIVE,              )
                                )
11              DEFENDANTS.     )
_____)
12

13         TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE JAMES WARE
14         UNITED STATES DISTRICT JUDGE

15

A P P E A R A N C E S:
16

OR THE PLAINTIFFS:  J. ANDREW COOMBS, A PROF. CORP.
17                   BY:  J. ANDREW COOMBS, ESQ.
                         ANNIE S. WANG, ESQ.
18                   517 E. WILSON AVE., SUITE 202
                     GLENDALE, CA  91206
19                   TEL:  (818) 500-3200

20  ALSO APPEARING:      RUTH ADLER
                         NIKOLAY LIVADKIN
21

FOR THE DEFENDANTS:  GAUNTLETT & ASSOCIATES
22                   BY:  JAMES A. LOWE, ESQ.
                     18400 VON KARMAN, SUITE 300
23                   IRVINE, CA  92612
                     TEL:  (949) 553-1010
24

OFFICIAL REPORTER PRO TEM:   JANA L. RIDENOUR, CSR
25                           LICENSE NUMBER 9302

Exhibit E

1

2                    ## EXAMINATION INDEX

3     **STEVEN CHEN**
           CROSS BY MR. COOMBS (CONTINUED) . . . . .   4
4          REDIRECT BY MR. LOWE . . . . . . . . .   47
           FURTHER REDIRECT BY MR. LOWE . . . . . .   62
5
      **ANDREW CHENG**
6          DIRECT BY MR. LOWE . . . . . . . . . .   65
           CROSS BY MS. WANG . . . . . . . . . . .   87
7
      **RICHARD GRALNIK**
8          DIRECT BY MR. LOWE . . . . . . . . . .   90
           CROSS BY MR. COOMBS . . . . . . . . . .   155
9          REDIRECT BY MR. LOWE . . . . . . . . .   177
           RECROSS BY MR. COOMBS . . . . . . . . .   200
10         FURTHER REDIRECT BY MR. LOWE . . . . . .   210
           FURTHER RECROSS BY MR. COOMBS . . . . . .   215
11

12

13

14

15                     ## EXHIBIT INDEX

16                              IDENT.        EVIDENCE

17    PAGE 4                      625
      PAGE 8                      626
18    PAGE 14                     627
      PAGE 230      (ALL DOMAIN TOOLS REPORTS ARE ADMITTED)
19

20

21

22

23    REPORTER NOTE:  ALL QUOTED EXCERPTS IN THIS TRANSCRIPT
      WERE REPORTED AND TYPED "AS READ."
24

25

```
 1   SAN JOSE, CALIFORNIA                    AUGUST 25, 2009

 2                   P R O C E E D I N G S

 3           (WHEREUPON, AT 9:05 A.M., THE FOLLOWING

 4   PROCEEDINGS WERE HELD IN OPEN COURT, OUT OF THE PRESENCE

 5   OF THE JURY:)

 6           THE COURT:  GOOD MORNING, ALL.

 7           I HAVE TWO STUDENTS IN THE BACK.  YOU WERE

 8   SUPPOSED TO GET INTO CHAMBERS AND LET US KNOW WHEN YOU

 9   WERE HERE.  COME FORWARD.  COME TO THE SIDEBAR.

10           (WHEREUPON, A DISCUSSION WAS HELD AT THE

11   SIDEBAR, NOT HEREIN REPORTED.)

12           THE COURT:  READY TO RESUME?

13           MR. COOMBS:  YES, YOUR HONOR.

14           THE COURT:  SUMMON THE JURY.

15           (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE

16   HELD IN OPEN COURT, IN THE PRESENCE OF THE JURY:)

17           THE COURT:  GOOD MORNING, MEMBERS.  I HOPE YOU

18   HAD A PLEASANT TIME OFF.  NO?

19           WELL, YOU MAY RESUME YOUR EXAMINATION.

20           MR. COOMBS:  THANK YOU, YOUR HONOR.

21                       STEVEN CHEN,

22   BEING CALLED AS A WITNESS ON BEHALF OF THE DEFENDANTS,

23   HAVING BEEN PREVIOUSLY DULY SWORN, WAS EXAMINED AND

24   TESTIFIED FURTHER AS FOLLOWS:

25   ///
```

CROSS-EXAMINATION (CONTINUED)

1  BY MR. COOMBS:

2  Q.   GOOD MORNING, MR. CHEN.

3  A.   GOOD MORNING.

4  Q.   WHEN WE BROKE FRIDAY AFTERNOON, I THINK WE WERE

5  SPEAKING ABOUT THAT 8168.COM.  I THINK YOU SEE ANOTHER

6  IP DOMAIN NAME BAG925.COM.

7        YOU SEE THAT, MR. CHEN?

8  A.   YES.

9  Q.   AND DOES THAT -- IS IT CORRECT THAT WAS ONE OF THE

10 DOMAIN NAMES THAT WAS ALLEGED IN THE COMPLAINT THAT YOU

11 HAD SAID WAS SERVED ON YOU ON THE 20TH, BUT IN FACT ON

12 THE 15TH?

13 A.   YES.

14 Q.   NOW, SEE IF THAT WORKS.  ALL RIGHT.

15        (WHEREUPON, EXHIBIT 625 WAS MARKED FOR

16        IDENTIFICATION.)

17        NOW, I'M PUTTING UP ON THE SCREEN A DOCUMENT

18 THAT WE WILL MARK AS EXHIBIT 626 -- I'M SORRY, 625 --

19 AND ASK YOU, MR. CHEN:  DOES THAT APPEAR TO BE A PING

20 RESPONSE REGARDING THE DOMAIN NAME WWW.BAG925.COM?

21 A.   YES.

22 Q.   AND IT APPEARS IT WAS DONE YESTERDAY; CORRECT?

23 A.   IT WAS DONE YESTERDAY?

24 Q.   YES.

Exhibit E

1    A.    I DON'T KNOW.

2    Q.    OKAY.  WELL, I'LL ASK YOU:  THE IP ADDRESS

3    THAT'S IDENTIFIED THERE, IT'S A LITTLE HAZY, BUT

4    205.209.137.172, THAT'S AN IP ADDRESS ASSIGNED TO

5    MANAGED SOLUTIONS GROUP?

6    A.    THAT IS CORRECT.

7    Q.    THAT WOULD CREATE THAT DOMAIN NAME, AND THAT

8    WEBSITE AT THAT DOMAIN NAME IS CURRENTLY HOSTED ON A

9    SERVER OWNED BY MANAGED SOLUTIONS GROUP?

10   A.    YES.

11   Q.    AND THAT IS PART OF THE AKANOC SOLUTIONS SERVICES

12   PROVIDED TO ITS CUSTOMERS?

13   A.    YES.

14          MR. LOWE:  OBJECTION, YOUR HONOR.  IT LACKS

15   FOUNDATION AS TO DATE.  I DON'T BELIEVE THERE'S A DATE

16   YOU CAN SEE.

17          THE COURT:  I PRESUME COUNSEL WAS REFERRING TO

18   SOMETHING ON THE DOCUMENT FOR THE DATE, BUT I'LL SUSTAIN

19   THE OBJECTION.

20          IT DOES APPEAR TO ME, HOWEVER, THAT THE

21   QUESTION ASKS WHETHER OR NOT THAT DOMAIN NAME IS WITHIN

22   THE GROUP ASSIGNED TO THAT COMPANY, AS I UNDERSTAND IT,

23   AND THAT CAN BE ANSWERED "YES" OR "NO," IRRESPECTIVE OF

24   THE DATE OF THIS DOCUMENT.  BUT IT IS FAIR, SINCE YOU

25   REFERRED TO IT AS HAVING BEEN DONE YESTERDAY, TO CLARIFY

1    WHERE THAT DATE CAN BE DISCERNED FROM THE DOCUMENT.

2              MR. COOMBS:  THANK YOU, YOUR HONOR.

3              I'M SORRY, YOUR HONOR, IT APPEARS THAT I HAD

4    THE FIRST PAGE AS THE SECOND PAGE, SO I WILL PULL THE UP

5    THE SECOND PAGE AND PUT IT UP ON THE MONITOR.

6    BY MR. COOMBS:

7    Q.   THIS IS A PING FOR BAG925.COM, AND I BELIEVE YOU

8    SAID FROM YOUR DIRECT TESTIMONY YOU PING WITH THE

9    WWW DOT-DOMAIN NAME, AND WITHOUT IT YOU COULD GET

10   DIFFERENT RESULTS; CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   AND, IN FACT, AS AN EXCESSIVE CAUTION ON YOUR

13   PART, YOU DO BOTH WHEN YOU ARE CHECKING WHETHER A DOMAIN

14   IS HOSTED ON ONE OF THE SERVERS OWNED BY THE DEFENDANTS?

15   A.   THAT'S CORRECT.

16   Q.   AND A SECOND PAGE HERE REFLECTS A DIFFERENT PING

17   FOR THAT 925.COM; CORRECT?

18   A.   YES, THAT'S CORRECT.

19   Q.   AND IT INDICATES THE SAME IP ADDRESS AS FOR

20   WWW.BAG925.COM; CORRECT?

21   A.   THAT'S RIGHT.

22   Q.   AND THAT PING REPORT TOWARD THE TOP -- AND I HOPE

23   I DON'T MOVE THIS AROUND TOO MUCH.  CAN YOU TELL ME WHAT

24   DATE IS INDICATED WHERE MY PEN IS POINTED?

25   A.   IT'S BLURRY, BUT IT LOOKS LIKE IT'S AUGUST 25,

1    2009.

2    Q.    ALL RIGHT.   THANK YOU.

3         SO BOTH BAG925.COM AND WWW.BAG925.COM APPEAR TO BE

4    HOSTED ON DEFENDANT'S SERVERS AS ESSENTIALLY TODAY; IS

5    THAT CORRECT?

6    A.    YES, THAT'S CORRECT.

7    Q.    AND THAT'S BORNE OUT BY THE OTHER PORTION OF THE

8    EXHIBIT I HAVE MARKED, WHICH IS NOW IN FRONT OF YOU, AND

9    WHICH HAS THE WHOIS ARIN RESULT FOR THAT IP ADDRESS;

10   CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    NOW, ON THAT PORTION OF THE REPORT YOU WILL SEE

13   RA ABUSE HANDLE -- I'M SORRY, R ABUSE HANDLE, R TECH

14   HANDLE OR ABUSE HANDLE OR TECH HANDLE.   CAN YOU TELL US

15   WHAT THOSE REFER TO?

16   A.    "ABUSE" IS FOR ABUSE ISSUE TECH; "TECH HANDLE" IS

17   FOR TECH -- TECH ISSUES.

18   Q.    SO, AS I UNDERSTOOD YOUR TESTIMONY, THE

19   INFORMATION PERTAINING TO THOSE HANDLES SHOULD BE

20   CONTACT -- CURRENT CONTACT INFORMATION FOR MANAGED

21   SOLUTIONS GROUP; IS THAT CORRECT?

22   A.    THAT IS CORRECT.

23   Q.    SO IT SHOULD BE -- I THINK YOU SAID ABUSE.MANAGER

24   SG-INC.COM FOR THE E-MAIL ADDRESS?

25   A.    YES.

1   SAY THEY THEMSELVES AREN'T THE ONES OPERATING THE

2   WEBSITES HOSTED ON YOUR SERVERS?

3   A.   WHAT'S THAT GOT TO DO WITH -- I LOST THE QUESTION

4   BECAUSE THE WEBSITE HAS NOTHING TO DO WITH MY CUSTOMER.

5   Q.   HOW DO YOU KNOW THAT, IF YOU DON'T KNOW WHAT YOUR

6   CUSTOMERS DO WITH IT?

7   A.   MOST OF THE CUSTOMERS THAT I DEAL WITH, WE -- I

8   DEAL WITH THEM AT MORE LIKE TECHNICAL LEVEL, AND THEY

9   ARE JUST HOSTING RESELLERS.

10  Q.   BUT YOU SAID YOU DON'T EVEN KNOW WHETHER THEY ARE

11  DOING WEBSITES AS OPPOSED TO OTHER INTERNET

12  APPLICATIONS.  HOW CAN YOU SAY THEY THEMSELVES ARE NOT

13  OPERATING THE WEBSITES OR SOMEBODY WORKING FOR THEM

14  OPERATING THE WEBSITES THAT ARE ON THEIR SERVERS?

15  A.   I DIDN'T SAY THEY DON'T OPERATE WEBSITES; I SAID I

16  DON'T KNOW WHETHER THEY OPERATE A WEBSITE OR NOT.

17  Q.   SO IT COULD BE THAT THEY DO IN FACT OPERATE

18  WEBSITES THAT ARE ON THOSE SERVERS?

19  A.   YES.

20  Q.   IT COULD BE THAT SOMEBODY CONNECTED WITH THEM

21  OPERATES THOSE WEBSITES ON THOSE SERVERS?

22  A.   MAYBE.

23  Q.   COULD BE A FAMILY MEMBER, FOR EXAMPLE?

24  A.   MAYBE.

25  Q.   NOW, IN YOUR DIRECT TESTIMONY, YOU SPOKE A LITTLE

1    A.    YES.

2    Q.    AND THAT'S NOVEMBER 29TH, 2007.

3          AND LET'S TURN TO EXHIBIT 562.

4          THAT'S ZHONGHH; THAT'S MS. CHEN, AGAIN?

5    A.    YES.

6    Q.    DIFFERENT WEBSITE; CORRECT?

7    A.    YES.

8    Q.    AND THAT'S THE SAME DAY?

9    A.    YES.

10   Q.    LET'S TURN TO 564.

11         MS. CHEN AGAIN ON THE SAME DAY CONCERNING YET

12   ANOTHER WEBSITE, CORRECT?

13   A.    YES.

14   Q.    LET'S TURN TO 582.

15         ZHONGHH AGAIN, NOVEMBER 29TH, 2007, CONCERNING

16   PRO-JORDAN?

17   A.    YES.

18   Q.    SO I HAVE GOT NINE NOTICES SENT TO ONE CUSTOMER

19   CONCERNING NINE DIFFERENT WEBSITES ON SEVERAL DIFFERENT

20   EXTRA IP NUMBERS?

21   A.    YES.

22   Q.    WOULD IT SURPRISE YOU TO KNOW THAT YOU SENT NINE

23   NOTICES TO ANOTHER ONE OF YOUR CUSTOMERS THAT SAME DAY

24   CONCERNING NINE DIFFERENT WEBSITES ON NINE DIFFERENT

25   EXTRA IP'S CONTROLLED BY THEM?

1   A.   NO.

2   Q.   DID YOU TAKE ANY ACTION CONCERNING THIS EXTENSIVE

3   INFRINGEMENT OCCURRING ON MS. CHEN'S SERVERS ALL AT ONE

4   TIME, OTHER THAN SENDING THE NOTICES THAT ARE DESCRIBED

5   HERE?

6   A.   WE HOLD THE SAME PRINCIPLE.  IF THEY DON'T

7   RESPOND, WE DO WHAT WE NEED TO DO; IF THEY RESPOND IN

8   ANY WAY OF RESOLVING THE ISSUE, WE VERIFY THAT.  THAT'S

9   WHAT WE CAN DO.

10   Q.   SO THE ANSWER IS "NO"?  YOU ASSUME THAT SHE

11   RESPONDED, AND THAT WAS THE END OF THE MATTER?

12   A.   WE DON'T ASSUME.  WE VERIFY IT.

13   Q.   OKAY.  SO WHAT DID YOU DO TO VERIFY THAT THESE

14   WEBSITES WERE IN FACT DEALT WITH AS PROPOSED IN THE

15   VARIOUS EXHIBITS WE HAVE JUST LOOKED AT?

16   A.   LOOKING AT NOVEMBER BATCH, THAT'S THE FIRST TIME

17   IN MY LIFE, IN MY HOSTING BUSINESS LIFE, THAT I EVER

18   RECEIVED A BIG BATCH OF COMPLAINTS AND DOMAINS ALL AT

19   THE SAME TIME.  SO FOR THIS PARTICULAR BATCH WILL COME

20   OUT THE INFORMATION THAT I DO HAVE EVERYTHING THAT I

21   SENT OUT, AND SO I DID NOT TAKE LIKE THE SECOND BATCH,

22   THEN I START DOCUMENTING WHAT I DID EXACTLY FOR

23   FOLLOW-UP.

24         SO THE FIRST BATCH I HAVE NO RECOLLECTION, BUT

25   AT LEAST THIS SHOWS IF I SENT OUT THIS DOCUMENTS, IT'S A

Exhibit E

1    SUMMARY OF ALL THE E-MAILS THAT I SENT OUT.

2    Q.    MR. CHEN, I -- MAYBE I WAS NOT CLEAR ON MY

3    QUESTION.  DID YOU FINE MS. CHEN BECAUSE OF THIS

4    EXTENSIVE INFRINGEMENT THAT WAS IDENTIFIED ON HER SERVER

5    ON NOVEMBER 27TH?

6    A.    IF I VERIFY --

7    Q.    MR. CHEN, DID YOU FINE -- DID YOU IMPOSE ANY KIND

8    OF MONEY PENALTY ON MS. CHEN FOR THE VARIOUS

9    INFRINGEMENTS THAT WERE ON HER SERVER AT THE END OF

10   NOVEMBER 2007?

11   A.    NO.

12   Q.    DID YOU SUSPEND MS. CHEN -- I MEAN THE CUSTOMER,

13   MS. CHEN -- AS A RESULT OF THE VARIOUS INFRINGEMENTS

14   IDENTIFIED ON HER SERVER AT THE END OF NOVEMBER, 2007?

15   A.    NO.

16   Q.    DID YOU TERMINATE HER?

17   A.    NO.

18   Q.    OF COURSE NOT.

19          THE COURT:  DON'T -- YOUR COMMENT IS

20   ARGUMENTATIVE.

21          MR. COOMBS:  I'M SORRY.

22   BY MR. COOMBS:

23   Q.    LET'S GO BACK TO EXHIBIT 554.

24          THIS IS ONE OF THE E-MAILS WE WERE JUST

25   LOOKING AT, AND IT'S BUYMYSHOES.NET WHICH IS LOCATED ON

Exhibit E

1   ASSOCIATION BETWEEN THE CUSTOMER AND A DOMAIN NAME EVEN

2   IF THEY RESOLD IT?  IN OTHER WORDS, YOUR SERVER WOULD BE

3   MADE AVAILABLE TO YOUR CUSTOMER, AND THEY COULD POST TO

4   THAT SERVER THEIR OWN CONTENT OR THEY COULD SELL THEIR

5   ABILITY TO POST CONTENT TO SOMEONE ELSE, AND THAT THIRD

6   PERSON COULD SAVE INFORMATION TO THE SERVER; IS THAT

7   CORRECT?

8           THE WITNESS:  NO.  THE DOMAIN IS OWNED BY THE

9   DOMAIN OPERATORS OR THE DOMAIN OWNERS SO ANYBODY CAN GO

10  TO DOMAIN REGISTRAR AND REGISTER THEIR DOMAINS.  THAT

11  DOMAIN IS THEN -- IF YOU RENT A SERVER WITH AN IP

12  ADDRESS, THAT DOMAIN THEN BE PUT ON THAT PARTICULAR IP

13  ADDRESS.  SO IT'S NOT -- IT'S NOT THE IP OWNER OWNING

14  THE DOMAIN.  THE DOMAIN CAN GO ANYWHERE YOU WANT TO PUT

15  ON IT.

16          THE COURT:  BUT I'M TRYING TO CLARIFY WHAT IS

17  ACTUALLY ON YOUR SERVER.  YOUR SERVER WOULD HAVE -- AS

18  YOU HAVE TALKED ABOUT -- THE DESCRIPTION OF YOUR

19  SERVICES.  WOULD IT HAVE A HARD DISK DRIVE?

20          THE WITNESS:  YES.

21          THE COURT:  INFORMATION COULD BE SAVED ON THAT

22  DISK DRIVE?

23          THE WITNESS:  YES.

24          THE COURT:  WHEN YOUR SERVICE IS GIVEN TO ONE

25  OF YOUR CUSTOMERS, THAT CUSTOMER WOULD THEN HAVE THE

1    ABILITY TO SAVE INFORMATION ONTO THAT DISK, WHICH WOULD

2    BE ACCESSIBLE USING THE INTERNET?

3            THE WITNESS:  YES.

4            THE COURT:  OR THAT CUSTOMER, INSTEAD OF

5    ACTUALLY SAVING INFORMATION THEMSELVES, COULD SELL THE

6    RIGHT TO STORE INFORMATION TO YET A THIRD PERSON, WHICH

7    WOULD BE STORED ON YOUR SERVERS?

8            THE WITNESS:  YES.

9            THE COURT:  IF THERE WERE COUNTERFEIT GOODS

10   BEING ADVERTISED, THE LOCATION OF THE INFORMATION THAT

11   WOULD BE SEEN ON THE INTERNET WOULD BE ON THE HARD DISK

12   THAT IS ON YOUR SERVER?

13           THE WITNESS:  YES.

14           THE COURT:  THANK YOU.  I HAVE NO FURTHER

15   QUESTIONS OF THE WITNESS.

16           DO EITHER OF YOU WISH TO CLARIFY, BASED ON THE

17   COURT'S QUESTIONS?

18           MR. LOWE:  I DO HAVE A COUPLE OF QUESTIONS.

19           THE COURT:  VERY WELL.

20               **FURTHER REDIRECT EXAMINATION**

21   BY MR. LOWE:

22   Q.    MR. CHEN, THE COURT, I THINK, INITIALLY ASKED YOU

23   IF YOU CAN DISABLE A DOMAIN NAME.  CAN YOU DO THAT?

24   A.    NO.

25   Q.    WHY?

**Exhibit E**

1

2                    CERTIFICATE OF REPORTER

3

4

5          I, JANA L. RIDENOUR, OFFICIAL REPORTER PRO TEM

6    IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

7    DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN

8    JOSE, CALIFORNIA, DO HEREBY CERTIFY:

9          THAT THE FOREGOING TRANSCRIPT IS A FULL, TRUE

10   AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HAD IN LOUIS

11   VUITTON MALLETIER, S.A., V. AKANOC SOLUTIONS, INC.,

12   MANAGED SOLUTIONS GROUP, INC., STEVEN CHEN AND DOES 1

13   THROUGH 10, INCLUSIVE, CASE NO. C-07-03952 JW (HRL),

14   DATED AUGUST 25, 2009; THAT I REPORTED THE SAME IN

15   STENOTYPE AND TRANSCRIBED THE SAME BY COMPUTER-AIDED

16   TRANSCRIPTION TO THE BEST OF MY ABILITY AS HEREIN

17   APPEARS.

18          DATED THIS _4th_ DAY OF DECEMBER, 2009.

19

20

21                    _Jana L. Ridenour, CSR # 9302_

22                    JANA L. RIDENOUR, CSR
                      OFFICIAL REPORTER PRO TEM
23                    LICENSE NUMBER 9302

24
                      **CERTIFIED COPY**
25

Exhibit E

# Exhibit F

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

   LOUIS VUITTON MALLETIER,    )   C 07-03952 JW
5  S.A.,                       )
                               )
6             Plaintiff,       )
                               )   San Jose, CA
7                  vs.         )   August 26, 2009
                               )
8  AKANOC SOLUTIONS, INC.,     )
   et al.,                     )
9                              )
              Defendants.      )
10 _____)

11

12                  TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE JAMES WARE
12               UNITED STATES DISTRICT JUDGE

13

14

   A P P E A R A N C E S:
15

   For the Plaintiff:         Law Offices of
16                            J. Andrew Coombs
                              By:  J. ANDREW COOMBS
17                            ANNIE S. WANG
                              517 E. Wilson Avenue
18                            Suite 202
                              Glendale, CA  91206
19

   For the Defendants:        Gauntlett & Associates
20                            By:  JAMES A. LOWE
                              CHRISTOPHER G. LAI
21                            18400 Von Karman
                              Suite 300
22                            Irvine, CA  92612

23 Court Reporter:            PETER TORREANO, CSR
                              License Number C-7623
24

25
                                                        1

1      with the offer of sale or distribution of goods

2      in the United States.  That's what I want.  I

3      want you to annotate these to bring those

4      elements to bear.

5                "In the United States" or what was the

6      other language?

7                MR. LOWE:  Or in a way that would

8      substantially affect commerce in the United

9      States I believe is the case law language.

10               THE COURT:  All right.

11               MR. LOWE:  And, further, that there must

12     be -- there's a likelihood of confusion.

13               THE COURT:  I have that.

14               MR. LOWE:  Well, the language I think

15     that -- I think the likelihood of confusion needs

16     some further explanation.  For example,

17     discussion of the Sleekcraft factors or the

18     likelihood of confusion.  There is no discussion

19     of that in here.

20               THE COURT:  Is that a dispute in this

21     case?

22               MR. LOWE:  I think it is, Your Honor,

23     because our position is that there is no

24     confusion, there is no likelihood of confusion

25     because there are different channels of          9

PETER TORREANO, CSR 7623          **Exhibit F**

1                    CERTIFICATE OF REPORTER

2

3

4

5            I, Peter Torreano, Pro Tempore Court

6    Reporter of the United States District Court for

7    the Northern District of California, 280 South

8    First Street, San Jose, California, do hereby

9    certify:

10            That the foregoing transcript is a true

11   and correct transcript of the proceedings had in

12   Louis Vuitton Malletier, S.A. versus Akanoc

13   Solutions, Inc., et al., Case No. C-07-03952-JW,

14   dated August 26, 2009; that I reported the same

15   in stenotype to the best of my ability, and

16   thereafter had the same transcribed by

17   computer-aided transcription as herein appears.

18

19

20

21

22                         /s/

23                         _____

                           PETER TORREANO, CSR
24                         License Number C-7623

25
                                                    179

PETER TORREANO, CSR 7623                    Exhibit F