**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7 IN THE UNITED STATES DISTRICT COURT

8 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9 SAN JOSE DIVISION

10 Louis Vuitton Malletier, S.A.,                    NO. C 07-03952 JW

11        Plaintiff,                        **ORDER GRANTING IN PART AND
                                            DENYING IN PART DEFENDANTS'**
     v.                                     **POST-TRIAL MOTIONS; GRANTING**
12                                          **PLAINTIFF'S MOTION FOR A**
   Akanoc Solutions, Inc., et al.,          **PERMANENT INJUNCTION**
13
        Defendants.
14 _____/

15                          **I.  BACKGROUND**

16        In this case, Louis Vuitton Malletier, S.A. ("Plaintiff") claims that Akanoc Solutions, Inc.,

17 Managed Solutions Group, Inc., and Steven Chen (collectively, "Defendants") contributorily

18 infringed Plaintiff's registered trademarks and copyrights.  Plaintiff sought statutory damages and

19 injunctive relief.  The liability and damages issues were tried to a jury.  Plaintiff requested the Court

20 to award injunctive relief on the basis of the same evidence.

21        After close of the evidence, Defendants made timely Motions for Judgment as a Matter of

22 Law pursuant to Federal Rule of Civil Procedure 50(a).[1]  The Court took these Motions under

23 submission and submitted the liability and damages issues to the jury.  The verdict form provided for

24 findings as to each Defendant.  In the verdict, the jury found each Defendant liable for (1) willful

25 contributory infringement of 13 of Plaintiff's trademarks, and (2) willful contributory infringement

26 _____

27        [1]  (Defendants' Rule 50(a) Motion for Judgment as a Matter of Law Regarding: Contributory
   Copyright Infringement Claim, hereafter, "Motion Re Copyright," Docket Item No. 209;
28 Defendants' Rule 50(a) Motion for Judgment as a Matter of Law Regarding: Contributory
   Trademark Claim, hereafter, "Motion Re Trademark," Docket Item No. 210.)

of two of Plaintiff's copyrights.  (Verdict at 6-8, 10-12, Docket Item No. 235.)  The jury also found that Defendants were not entitled to the "safe harbor" provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201, *et seq.*  (<u>Id.</u> at 11-12.)  The jury awarded:  (1) statutory damages for contributory trademark infringement in the amount of $10,500,000 per Defendant, and (2) statutory damages for contributory copyright infringement in the amount of $300,000 per Defendant.  (<u>Id.</u> at 8-9, 12-13.)  Plaintiff has requested entry of judgment and has filed a Motion for Entry of Permanent Injunction.  (hereafter, "Motion re Permanent Injunction," Docket Item No. 256.)

Defendants have filed a timely Renewed Motion for Judgment as a Matter of Law with respect to both the copyright and trademark claims.  (<u>See</u> Docket Item No. 273.)  In the alternative, Defendants have also filed a Motion for New Trial pursuant to Federal Rule of Civil Procedure 59.[2]

The Court conducted a hearing on Plaintiff's Motion Re Permanent Injunction on January 25, 2010.  The Court conducted a hearing on all of Defendants' post-trial Motions on February 22, 2010.  This Order disposes of all pending post-trial Motions and addresses Plaintiff's entitlement to injunctive relief.

## II.  STANDARDS

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law ("JMOL").  Under Rule 50(a), "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense . . . ."  Fed. R. Civ. P.

---

[2]  (Defendants' Re-Stated Motion for New Trial or Other Relief Pursuant to Rule 59, hereafter, "Motion for New Trial," Docket Item Nos. 269, 272.)  Defendants' Motion for New Trial puts forth essentially the same grounds as the Rule 50 Motions as to contributory infringement, but also states additional grounds based on the assessment of statutory damages and personal liability against Defendant Chen.  To the extent that the Motions overlap, the Court will refer to each Motion as necessary.

In addition, for the reasons stated on record, the Court terminates Docket Item No. 215.

United States District Court
For the Northern District of California

1   50(a)(1); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).  The

2   motion must be made before the case is submitted to the jury.  Fed. R. Civ. P. 50(a)(2).

3          If, as was the case here, the court does not grant a motion for judgment made under Rule

4   50(a), the court is considered to have submitted the action to the jury subject to the court's later

5   deciding the legal questions raised by the motion.  Fed. R. Civ. P. 50(b).  The standard for granting a

6   renewed post-verdict JMOL is the same as the standard for granting a pre-submission JMOL under

7   Rule 50(a).  Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001).

8   A party is entitled to judgment as a matter of law if, under the governing law, there can be but one

9   reasonable conclusion as to the verdict, and that is, a finding in favor of the moving party.  (Id.)  The

10  court must draw all reasonable inferences in favor of the nonmoving party and should review all

11  evidence in the record.  Reeves, 530 U.S. at 150.

## III.  DISCUSSION

**A.   Defendants' Rule 50 Motion Re Contributory Copyright Infringement**

14         Defendants move for judgment on the grounds that (1) the evidence of direct infringement

15  was insufficient to support the jury verdict, (2) the evidence as to all other elements of contributory

16  infringement was insufficient, (3) the Court's Closing Instructions were inadequate, and (4)

17  Defendants qualify for the safe harbor provisions of the DMCA.  The Court addresses each ground

18  in turn.

### 1.   Direct Infringement

20         Defendants contend that they cannot be liable for contributory copyright infringement

21  because the acts of direct infringement (1) occurred extraterritorially, (2) are based on Defendants'

22  storage of digital images on their servers, which Defendants contend cannot be "copies" under the

23  Copyright Act, (3) were authorized by Plaintiff, (4) were a fair use of Plaintiff's copyrights, and (5)

24  the Closing Instructions allowing the jury to make findings unsupported by the evidence.[3]  Plaintiff

26         [3]  (Motion Re Copyright at 2-5; Defendants' Supplemental Rule 50(a) Brief on Impossibility
27  of Extraterritorial Copyright Infringement at 17-18, hereafter, "Suppl. Brief Re Copyright," Docket
    Item No. 244.)

28                                                    3

United States District Court

For the Northern District of California

contends that U.S. copyright law applies here because the direct infringement at issue occurred

within the U.S.—the importation of counterfeit goods and the copying and public display of digital

images of counterfeit goods on Defendants' servers—and that Defendants' other grounds are

meritless.[4]

Contributory copyright infringement requires an underlying direct copyright infringement by

a third party.  Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1170 (9th Cir. 2007).  To prove

direct copyright infringement, a plaintiff must show (1) ownership of the alleged infringed

copyright, and (2) that the alleged infringers violated an exclusive right granted under the Copyright

Act.  See 1159.  The Copyright Act provides the copyright holder with the exclusive rights to

reproduce, distribute, import, and publicly display the copyrighted work.  See 17 U.S.C. §§ 106,

602.

Here, Defendants are not challenging the first prong—Plaintiff's ownership of the

copyrights.  Rather, Defendants focus on whether any of Plaintiff's exclusive rights were violated.

### a.      Extraterritorial Scope of U.S. Copyright Law

At issue is the extent to which Defendants may be contributorily liable based on

extraterritorial acts of direct copyright infringement.

"[W]holly extraterritorial acts of infringement cannot support a claim under the Copyright

Act."  Subafilms, Ltd. v. MGM-Pathe Commc'ns Co., 24 F.3d 1088, 1095 (9th Cir. 1994) (en banc);

see also Los Angeles News Serv. v. Reuters Television Int'l, Ltd., 149 F.3d 987, 990 (9th Cir.

1998).  This follows from the "long-standing principle of American law that legislation of Congress,

unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the

United States."  Subafilms, 24 F.3d at 1095 (citing EEOC v. Arabian Am. Oil Co., 499 U.S. 244,

---

[4]  (Opposition of Plaintiff Louis Vuitton Malletier, S.A. to Defendants' Rule 50(a) Motion
for Judgment as a Matter of Law Regarding: Contributory Copyright Infringement Claim at 3-5,
hereafter, "Opposition Re Copyright," Docket Item No. 213; Supplemental Brief Re Applicability of
U.S. Copyright and Trademark Laws to California Based Web Hosting Defendants: Request for
Entry of Judgment at 3-7, hereafter, "Plaintiff Suppl. Brief," Docket Item No. 237.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

248 (1991)).  For the Copyright Act to apply, "at least one alleged infringement must be completed

entirely within the United States."  <u>Los Angeles News</u>, 149 F.3d at 990-91.

Unauthorized copying and public display of a copyrighted work within the United States

triggers the application of U.S. copyright law.  <u>See</u> <u>Los Angeles News</u>, 149 F.3d at 991; 17 U.S.C. §

106.  Additionally, unauthorized importation into the United States of copies acquired

extraterritorially triggers the application of U.S. copyright law.  <u>BMG Music v. Perez</u>, 952 F.2d 318,

319 (9th Cir. 1991) (citing 17 U.S.C. § 602(a)).

Here, the evidence established that Defendants' clients or their successors who owned or

operated websites hosted on Defendants' servers sold counterfeit goods to customers in the United

States.[5]  Plaintiff's investigator purchased numerous items from the websites hosted on Defendants'

servers.[6]  These goods were unauthorized replicas of Plaintiff's copyrighted works that were

imported into the United States.  (<u>See</u> Coombs Decl., Ex. B at 91:14-94:7.)  The importation is an

act of direct infringement that occurred within the U.S.  Contrary to Defendants' contention, the sale

or manufacture of the goods outside the U.S. *prior to importation* does not place the act of

importation beyond the reach of U.S. copyright law.  (<u>See</u> Motion Re Copyright at 2.)  Rather, the

Copyright Act specifically provides for infringement based solely on the act of importing goods

made or sold extraterritorially, if the making or selling of the goods in the U.S. would have infringed

a copyright—*e.g.*, counterfeit goods.  <u>See</u> 17 U.S.C. § 602.  Thus, the acts of direct infringement

were properly within the jurisdiction of the Copyright Act.

---

[5]  (<u>See</u> Declaration of J. Andrew Coombs, hereafter, "Coombs Decl.," Ex. B at 91:14-94:7, Docket Item No. 277.)

[6]  The Court rejects Defendants' contention that the Closing Instructions erred in permitting the jury to find that the websites hosted on Defendants' servers "sold" counterfeit products.  (Motion for New Trial at 8; Closing Instructions at 12:5-8, Docket Item No. 227.)  The evidence established that the websites provided specific instructions on how to complete a purchase of the counterfeit goods, which were followed by Plaintiff's investigator.  (<u>See</u> Declaration of James A. Lowe in Support of Defendants' Motion to Dismiss Pursuant to Rule 50 and Alternatively for a New Trial or Other Relief Pursuant to Rule 59, Ex. 1622 at 43:3-49:25, hereafter, "Lowe Decl.," Docket Item No. 270.)

**b.      Computer Data as "Copies" Under the Copyright Act**

At issue is whether digital image data stored on a computer may constitute a "copy" under the Copyright Act.

The Copyright Act defines "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.  "A photographic image is a work that is 'fixed in a tangible medium of expression,' for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device).  The image stored in the computer is the 'copy' of the work for purposes of copyright law."  Perfect 10, 508 F.3d at 1160.  "The computer owner shows a copy 'by means of a . . . device or process' when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer."  Id.

The Ninth Circuit has labeled this standard the "server test."  Id. at 1159.  Under the server test, "a computer owner that stores an image as electronic information and serves that electronic information directly to the user ('i.e., physically sending ones and zeroes over the [I]nternet to the user's browser,' . . . ) is displaying the electronic information in violation of a copyright holder's exclusive display right."  Id.  Thus, the test is whether the computer at issue *stores* the data and *serves* it to users.  Id.

Here, the evidence established that Defendants' servers stored and served the data, including pictures, used by the websites that offered counterfeit goods for sale to U.S. customers.  (See Coombs Decl., Ex. E at 62:9-13.)  For example, Plaintiff's investigator accessed the websites in the course of making purchases of counterfeit goods.[7]  (See Coombs Decl., Exs. B at 91:14-94:7, C at

---

[7]  Defendants' contention that any sales made to Plaintiff's investigator cannot constitute direct infringement because they were sales specifically authorized by Plaintiff is without merit, as several courts have rejected this exact contention.  See Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1348 (8th Cir. 1994); Atl. Recording Corp. v. Howell, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008); Ryan v. Carl Corp., 23 F. Supp. 2d 1146, 1149 (N.D. Cal. 1998).

United States District Court
For the Northern District of California

49:22-25.)  Under the server test, this evidence is sufficient to show that Defendants' servers stored "copies" under the meaning of the Copyright Act.

Further, the Court rejects Defendants' contention that the digital pictures of the counterfeit goods cannot constitute "copies" under the Copyright Act because Plaintiff's copyright covers only physical goods.  (See Motion for New Trial at 6-7.)  The Court finds no support for Defendants' position in the language of the Copyright Act, which requires only that copies of a copyrighted work be "fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.  The digital pictures stored on Defendants' servers fall squarely within the statutory language.  To find otherwise would render the protection of a copyright meaningless by permitting, for example, unauthorized digital copies of a paper photograph to be noninfringing simply because the copy is embodied in a different medium than the original work.[8]  Thus, the Court finds that the evidence was sufficient to support the jury's finding of direct copyright infringement.[9]

Accordingly, the Court DENIES Defendants' Motions as to direct copyright infringement.

---

[8]  The digital photographs stored and distributed from Defendants' servers are also unauthorized derivate works.  A "derivate work" is "a work based upon one or more preexisting works."  17 U.S.C. § 101.  The primary authority relied on by Defendants is inapposite because it involved a photograph of a non-copyrightable work.  See Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1081 (9th Cir. 2000).

Further, in light of the Court's finding that the jury had sufficient evidence to find that the computer images infringed Plaintiff's copyrights, the Court rejects Defendants' contention that the Closing Instructions to the jury improperly "invited the jury to find infringement even though the asserted copyrights do not cover the accused images."  (Motion for New Trial at 8.)

[9]  The Court rejects Defendants' contention that any Internet users within the U.S. who viewed the images on Defendants' servers were making a fair use of Plaintiff's copyrights.  (See Motion Re Copyright at 6-7.)  This contention is belied by the purpose of the "fair use" doctrine.  The fair use exception to a claim of copyright infringement "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."  Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1399 (9th Cir. 1997) (internal quotation marks and citation omitted).  However, the exception is limited to "the use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching. . ., scholarship, or research." 17 U.S.C. § 107.  The evidence shows that Defendants' actions of storing and distributing Plaintiff's copyrighted works on its servers on behalf of its customers are designed solely for Defendants and its customers' financial gains.  Thus, the fair use exception does not apply to the conduct at issue here.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## 2.     Contributory Copyright Infringement

Defendants move for judgment as to contributory copyright infringement on the grounds that (1) the evidence does not show that Defendants had knowledge of the direct infringement, (2) the evidence does not show that Defendants induced or materially contributed to the direct infringement, (3) the Court lacked personal jurisdiction over the direct infringers located in China, and (4) the Court's Closing Instructions failed to permit the jury to consider exculpatory evidence.  (Motion for New Trial at 9-18; Motion Re Copyright at 3-4, 8-10.)

Contributory copyright infringement requires (1) knowledge of another's infringement and (2) either (a) material contribution to the infringement or (b) inducement of the infringement. Perfect 10 v. Visa Int'l. Serv. Assoc. ("Visa"), 494 F.3d 788, 795 (9th Cir. 2007).

The Court examines the evidence as to each requirement in turn.

### a.     Knowledge

Defendants contend that the evidence as to their knowledge of the direct infringement was insufficient to support the jury's verdict on the grounds that (1) since direct infringement was not sufficiently proved, there could be no notice of direct infringement, and (2) the evidence did not show that Defendants had knowledge of specific acts of infringement.  (Motion Re Copyright at 8-9; Motion for New Trial at 9-11.)

Contributory liability for copyright infringement requires that the defendant "know or have reason to know" of direct infringement.  See A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1020 (9th Cir. 2001).  Actual knowledge of infringement exists where it can be shown by a defendant's conduct or statements that it actually knew of specific instances of direct infringement. See id.  Constructive knowledge exists where it can be shown a defendant should have known of the direct infringement.  Id.  Generally, "the copyright holder must provide the necessary documentation to show there is likely infringement."  Id. at 1021 (quoting Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc., 907 F. Supp. 1361, 1374 (N.D. Cal. 1995)).  "[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement."  Id. (citing Netcom, 907

F. Supp. at 1374). "[A]bsent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." Id.

Here, the evidence established that Defendants had ample notice of directly infringing activity occurring on dozens of websites hosted on Defendants' servers. (See Coombs Decl., Ex. E at 27:3-30:17.) Plaintiff sent many letter notices to Defendants identifying specific websites that were selling counterfeit goods infringing Plaintiff's copyrights. (See Coombs Decl., Exs. B at 94:21-25, E at 27:3-30:17; Lowe Decl., Ex. 1598.) Defendant Chen testified that these letters were often forwarded to Defendants' customers, but were ignored at times. (See Coombs Decl., Ex. C at 125:20-131:13.) Thus, the Court finds that the evidence was sufficient to support the jury's finding that Defendants knew or should have known of specific direct infringements occurring on their servers.[10]

### b.     Material Contribution

Defendants contend that the evidence adduced at trial was insufficient to show material contribution. (Motion Re Copyright at 9-10; Motion for New Trial at 15-17.)

Contributory infringement "liability exists if the defendant engages in personal conduct that encourages or assists the infringement" activity. A&M Records, 239 F.3d at 1019. Under this standard, knowingly providing the "site and facilities" for infringing activity is a material contribution. Fonovisa v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996); see also Ellison v. Robertson, 357 F.3d 1072, 1078 (9th Cir. 2004). In the Internet context, where "a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." Napster,

---

[10] Defendants' contention that they cannot be contributorily liable because the Court lacked personal jurisdiction over direct infringers in China misapprehends the requirements of contributory liability and is without support in the case law. (See Motion Re Copyright at 3-4.) The Court unquestionably had personal jurisdiction over Defendants, who conducted their business and maintained their physical facilities in San Jose, California, and who the jury ultimately found liable. (See Coombs Decl., Ex. D at 12:17-21.) The direct infringers were not parties to this case and Defendants offer no credible reason why personal jurisdiction over third party direct infringers would be necessary to a finding of contributory liability against Defendants.

United States District Court
For the Northern District of California

239 F.3d at 1022. Computer system operators can be liable where, knowing that specific infringing materials are present on their systems and able to take "simple measures" to limit infringement, they continue to provide access to the infringing materials. Perfect 10, 508 F.3d at 1172. Thus, although liability for contributory infringement exists for an operator of a computer system that is being used, knowingly, for infringing activity, liability does not extend to the owner of the equipment who is not an operator.

Here, the evidence at trial established that Defendant Managed Solutions Group, Inc., owned servers that were operated by Defendant Akanoc Solutions, Inc., and its principal, Defendant Steve Chen, to host websites that advertised and sold goods containing Plaintiff's copyrights. There was no evidence that Defendant Managed Solutions Group, Inc. sold domain names or operated the servers. Accordingly, the Court GRANTS Defendant Managed Solutions Group, Inc.'s Motion for Judgment as a Matter of Law.[11]

With respect to the operator Defendants, Defendant Chen testified that under his management and control, Defendant Akanoc Solutions provided servers with data storage, routers, and data bandwidth to the websites. (See Coombs Exs. D at 17:20-13:13, 172:3-10, E at 62:9-13.) There was also evidence that Defendants continued to host those websites despite receiving notice from Plaintiff of particular websites that engaged in such conduct. (See Coombs Decl., Exs. C at 125:20-131:13, E at 27:3-30:17; Lowe Decl., Ex. 1598.) Defendant Chen also testified that he rarely used several of the tools at his disposal to punish or deter the operation of the counterfeiting websites on Defendants' servers. (See Coombs Decl., Exs. C at 111:5-112:15, D at 167:15-168:23.) Thus, the Court finds that the jury had sufficient evidence to find for Plaintiff against these Defendants on this issue of material contribution.[12]

---

[11] Unless otherwise indicated, all further references in this Order to Defendants will be to Akanoc Solutions, Inc., and Steve Chen.

[12] The Court rejects Defendants' contention that they are entitled to judgment because the Closing Instructions did not use the words "material contribution" or provide examples of material contribution from specific cases. (See Motion for New Trial at 17.) First, the Court's instructions tracked the Ninth Circuit Model Civil Jury Instructions for contributory copyrights infringement.

Having examined the evidence regarding the elements of contributory copyright infringement, the Court finds that the jury had sufficient evidence to find for Plaintiff against the operator Defendants on this issue. Accordingly, the Court DENIES Defendants' Motion Re Copyright and Motion for New Trial as to contributory copyright infringement.

### 3. Digital Millennium Copyright Act

Defendants contend that they are entitled to judgment as to contributory copyright infringement because the evidence showed that Defendants were entitled to the "safe harbor" provision of the DMCA. (Motion Re Copyright at 10-11.)

The Digital Millennium Copyright Act established certain safe harbors to "provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." Perfect 10, Inc. v. CCBill LLC ("CCBill"), 488 F.3d 1102, 1109 (9th Cir. 2007) (citing 17 U.S.C. §§ 512(a)-(d)) (other citation omitted). These safe harbors are available to "service providers," which are defined as "entit[ies] offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A).

The DMCA safe harbor provisions provide an affirmative defense to a claim of copyright infringement. Perfect 10, 508 F.3d at 1158. When they apply, the safe harbors do not affect the question of liability, but merely limit the available remedies against a defendant that qualifies for such protection. See CCBill, 488 F.3d at 1109. "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j)." Perfect 10, 508 F.3d at 1158.

---

Second, viewed in the context of the entire trial, the Closing Instructions adequately and fairly covered the issues presented and permitted the jury to make an intelligent and reasoned determination of liability. See U.S. v. Marabelles, 724 F.2d 1374, 1382-83 (9th Cir. 1984).

United States District Court

For the Northern District of California

To be eligible for any of the four safe harbors under the DMCA, a service provider must first meet the threshold conditions set out in Section 512(i), including the requirement that the service provider:

> [H]as adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

CCBill, 488 F.3d at 1109 (citing 17 U.S.C. § 512(i)(1)(A)).  A service provider "implements" a policy "if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications."  Id.  "[A]n implementation is reasonable if, under appropriate circumstances, the service provider terminates users who repeatedly or blatantly infringe copyright." Id.  Additionally, a service provider cannot be eligible for the safe harbor provisions of the DMCA until "the service provider has designated an agent to receive notifications of claimed infringement." 17 U.S.C. § 512(c)(2).

Here, the evidence established that Defendants designated an agent with the Copyright Office on November 30, 2007, approximately four months after the case was filed.  (See Coombs Decl., Ex. D at 172:11-25.)  At a minimum, Defendants would not be able to claim the protection of the safe harbor provisions prior to designating an agent.  Furthermore, evidence that Defendants had reasonably implemented a policy to terminate repeat infringers was limited, at best.  For example, Defendant Chen, the designated agent for Defendants, testified that he did not understand the DMCA's requirements as to maintaining or implementing the required policy.  (See Coombs Decl., Ex. D at 174:23-176:1.)  Other evidence indicated that Defendants had not terminated certain repeat offenders.  (See Coombs Decl., Exs. C at 111:5-112:20, D at 196:2-197:11, E at 28:18-30:17.)  Thus, the Court finds that the jury had sufficient evidence to find for Plaintiff on the issue of the applicability of the safe harbor provisions of the DMCA.

Accordingly, the Court DENIES Defendants' Motion Re Copyright as to this ground.  In sum, the Court DENIES Defendants' Rule 50 Motion Re Contributory Copyright Infringement.

United States District Court

For the Northern District of California

**B.     Defendants' Rule 50 Motion Re Contributory Trademark Infringement**

Defendants move for judgment as a matter of law as to contributory trademark infringement on the grounds that (1) the evidence of direct infringement was insufficient to support the jury's verdict, (2) the evidence as to all other elements of contributory infringement was insufficient, and (3) the Court's Closing Instructions were inadequate.  (Motion Re Trademarks at 2-13; Motion for New Trial at 2-5, 9-14.)  The Court addresses each ground in turn.

### 1.     Direct Infringement

Defendant contends that it cannot be liable for contributory trademark infringement because the acts of direct infringement (1) occurred extraterritorially, and (2) the evidence otherwise failed to show use in commerce and likelihood of confusion.  (Motion Re Trademarks at 2-9.)

Contributory trademark infringement requires that there be an underlying direct trademark infringement by a third party.  Visa, 494 F.3d at 807.  To prove direct trademark infringement, a plaintiff must show (1) ownership of a valid mark, and (2) that the alleged infringer's use of the mark "is likely to cause confusion, or to cause mistake, or to deceive" consumers.  KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005) (citing 15 U.S.C. § 1114(1)(a) & (b)).

Here, Defendants are not challenging the first prong—Plaintiff's ownership of the trademarks.  Rather, Defendants focus on whether the evidence supports the jury's finding that use of the mark was likely to cause confusion, mistake, or to deceive consumers.

### a.     Extraterritorial Scope of U.S. Trademark Law

At issue is the extent to which Defendants may be contributorily liable based on extraterritorial acts of direct trademark infringement.

"[T]he Supreme Court has stated that the Lanham Act provides a 'broad jurisdictional grant' that extends to 'all commerce which may lawfully be regulated by Congress.'"  Ocean Garden, Inc. v. Marktrade Co., Inc., 953 F.2d 500, 503 (9th Cir. 1991) (citing Steele v. Bulova Watch Co., 344 U.S. 280, 283, 286 (1952)).  "[T]he Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal anti-trust laws set forth in Timberlane."

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Id. (citing Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n, 549 F.2d 597 (9th Cir. 1976)).  Under Timberlane, "there are three criteria that must be considered: (1) there must be some effect on American foreign commerce; (2) the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; (3) the interest of and links to American foreign commerce must be sufficiently strong in relation to those of other nations."  Id.

With regard to the first two factors, the sale of infringing goods in a foreign country that causes financial harm to a plaintiff in the U.S. provides a sufficient effect on commerce to invoke Lanham Act jurisdiction.  Id.  The third factor is analyzed as a balance of seven sub-factors:

> (1) the degree of conflict with foreign law or policy, (2) the nationality or allegiance of the parties and the locations or principal places of business of corporations, (3) the extent to which enforcement by either state can be expected to achieve compliance, (4) the relative significance of effects on the United States as compared with those elsewhere, (5) the extent to which there is explicit purpose to harm or affect American commerce, (6) the foreseeability of such effect, and (7) the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

Id. (citing Star-Kist Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1395 (9th Cir. 1985)).  The third factor favors finding jurisdiction under the Lanham Act unless there has been a "determination by [a] foreign court that the defendant has a legal right to use the marks, and that those marks do not infringe the plaintiff's mark."  See id. at 503-04.

Here, Plaintiff presented evidence that the websites operating on Defendants' servers in the U.S. sold counterfeit goods that were imported into the U.S. for delivery to U.S. customers.  (See Coombs Decl., Exs. B at 30:1-31:2, 88:10-94:25, C at 49:22-25, 84:20-85:85:5, E at 62:9-13.)  Plaintiff also presented evidence about the economic harm that they suffer as a result of the sale of such counterfeit goods.  (See id., Ex. A at 161:5-166:24.)  For example, Plaintiff presented testimony that it loses customers to sellers of counterfeit goods and suffers reputational harm when current or potential customers observe counterfeit versions of Plaintiff's products in the marketplace.  (See id., Ex. A at 165:22-166:24.)  This evidence is sufficient to satisfy the first two factors of the test for Lanham Act jurisdiction.  As to the third factor, there was no evidence that a foreign jurisdiction had determined that Defendants or the direct infringers had a legal right to use Plaintiff's trademarks.  Rather, the evidence that the infringing activity was directed to U.S. consumers favors

14

United States District Court

For the Northern District of California

1   jurisdiction under the third factor.  Moreover, although Plaintiff is headquartered in France, the

2   evidence showed that Plaintiff maintains a substantial presence in the United States (including

3   California), employing over 1,300 people in a manufacturing facility, a distribution center, a

4   regional headquarters, a customer service center, and many retail stores.  (See Coombs Decl., Ex. A

5   at 161:3-163:14.)  This evidence is sufficient to satisfy the third factor for Lanham Act jurisdiction.

6   Thus, the Court finds that the direct infringement at issue was properly within the jurisdictional

7   reach of the Lanham Act.[13]

8           Accordingly, the Court DENIES Defendants' Motion Re Trademarks as to this ground.

9              **b.**      **Use in Commerce and Likelihood of Confusion**

10          Defendants contend that the evidence did not establish that Plaintiff's trademarks were used

11   in commerce as required for a finding of direct trademark infringement or that any such use was

12   likely to confuse consumers.  (Motion Re Trademarks at 2-5; Motion for New Trial at 2-3.)

13          To be liable for trademark infringement under the Lanham Act, a person must "(1) use in

14   commerce (2) any word, false designation of origin, false or misleading description, or

15   representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of

16   his or another person's goods or services."  Freecycle Network, Inc. v. Oey, 505 F.3d 898, 902 (9th

17   Cir. 2007) (citing 15 U.S.C. § 1125(a)).  The "use in commerce" must be "in connection with the

18   sale, offering for sale, distribution, or advertising of any goods or services."  15 U.S.C. § 1114(1)(a).

19   A mark is "used in commerce" in connection with goods when the mark is "placed in any manner on

20   the goods or their containers or the displays associated therewith or on the tags or labels affixed

21   thereto, . . . or on the documents associated with the goods or their sale."  15 U.S.C. § 1127.  A mark

22

23   _____

24        [13] The Court rejects Defendants' contention that the Closing Instructions misstated the law
regarding the extraterritorial scope of U.S. trademark law.  (See Motion for New Trial at 5.)  Rather,
the Court's Instructions tracked Ninth Circuit law and provided the jury with adequate guidance in

25   light of the trial as a whole.  (See Closing Instructions at 7.)
        Additionally, for the same reasons as articulated in Section III.A.2.b, the Court rejects

26   Defendants' contention that they cannot be liable for contributory trademark infringement because
the Court lacked personal jurisdiction over direct infringers in China.  (See Motion Re Trademarks

27   at 7-8.)

28                                    15

1   is "used in commerce" in connection with services when the mark is "used or displayed in the sale

2   or advertising of services and the services are rendered in commerce . . . ." Id.

3        "The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the

4   similarity of the marks is likely to confuse customers about the source of the products." Freecycle,

5   505 F.3d at 902.  Courts examine a nonexclusive set of factors to determine likelihood of confusion:

6   (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of

7   actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be

8   exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of

9   expansion of the product lines.  AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

10   When virtually identical marks are used with identical products or services, "likelihood of confusion

11   [follows] as a matter of course."  Brookfield Commc'ns, Inc. v. West Coast Enter. Corp., 174 F.3d

12   1036, 1056 (9th Cir. 1999).

13        Here, the evidence established that websites hosted on Defendants' servers advertised,

14   offered for sale and sold a variety of counterfeit goods imitating Plaintiff's products.  (See Coombs

15   Decl., Exs. B at 30:1-31:2, 88:10-94:25, C at 49:22-25, 84:20-85:85:5, E at 62:9-13.)  The displays

16   on the website were in connection with the sale of the counterfeit goods.  The counterfeit products

17   were advertised and sold as "replicas" of Plaintiff's products—*i.e.*, they aimed to look exactly like

18   Plaintiff's genuine products.  (See Coombs Decl., Ex. A at 174:1-175:2.)  This supports a finding

19   that the websites and counterfeit goods were likely to confuse consumers.  The jury heard testimony

20   regarding the sales as well as the differences between the counterfeit goods and Plaintiff's genuine

21   products.[14]  (See id., Ex. B at 30:1-31:2, 88:10-94:25.)  The jury also had before them the trademarks

22   allegedly infringed by the websites and counterfeit products.  (See Trial Exs. 451-65.)  Under this

23   evidence, the jury found direct trademark infringement—a use in commerce of Plaintiff's marks in a

24   _____

25        [14]  For the same reasons as articulated in Section III.A.1.b, the Court rejects Defendants'
    contention that sales to Plaintiff's investigator cannot constitute direct trademark infringement
26   because they were "authorized."  (See Motion Re Trademarks at 2-3, 9; Defendants' Supplemental
    Rule 50(a) Brief on Non-Application of Lanham Act to Extraterritorial Trademark Infringement at
27   22-23, hereafter, "Suppl. Brief Re Trademarks," Docket Item No. 245.)

28                                                    16

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   manner likely to confuse consumers.[15]  Drawing all reasonable inferences in favor of Plaintiff as the

2   nonmoving party, the Court finds that the evidence was sufficient to support the jury's finding in

3   Plaintiff's favor on the issue of direct infringement.[16]

4   **2.      Contributory Trademark Infringement**

5   Defendants move for judgment on the grounds that (1) the evidence was insufficient to show

6   that Defendants knew of the direct infringement, (2) the evidence was insufficient to show that

7   Defendants were in a position to control and monitor the directly infringing activity, and (3) the

8   Court's Closing Instructions failed to permit the jury to consider exculpatory evidence.  (Motion Re

9   Trademarks at 10-14; Motion for New Trial at 9-14.)

10  "The tests for secondary trademark infringement are . . . more difficult to satisfy than those

11  required to find secondary copyright infringement."  Visa, 494 F.3d at 806.  "To be liable for

12  contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary

13  infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge

14  that the infringer is mislabeling the particular product supplied."  Id. at 807 (citing Inwood Labs.,

15  Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 (1982)).  Where a defendant supplies a service rather than

16  a product, "[d]irect control and monitoring of the instrumentality used by a third party to infringe the

17  plaintiff's mark [satisfies the] 'supplies a product' requirement for contributory infringement."

18  Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 984 (9th Cir. 1999).  Additionally,

19  a host who permits others to use his premises but remains "wilfully blind" to their directly infringing

20  acts may be held liable as a contributory infringer.  See Fonovisa, Inc. v. Cherry Auction, Inc., 76

21  F.3d 259, 265 (9th Cir. 1996).

---

[15]  The Court rejects Defendants' contention that the Closing Instructions were defective for failure to include an instruction on the Sleekcraft factors.  (See Motion for New Trial at 5-6; Suppl. Brief Re Trademarks at 23.)  To the contrary, the Closing Instructions included a set of factors for the jury to consider in determining likelihood of confusion that were nearly identical to the Sleekcraft factors.  (See Closing Instructions at 8-9.)  These instructions gave the jury ample guidance in light of the trial as a whole.

[16]  The Court rejects Defendants' unsupported contention that "storage of compute code on an Internet server is not use in commerce."  (Motion Re Trademarks at 4.)  It is beyond dispute that the evidence showed far more than mere "storage of computer code."

17

United States District Court

For the Northern District of California

For the reasons stated above, the Court finds the evidence insufficient with respect to Managed Solutions Group, Inc., the owner of the equipment. However, the evidence was sufficient to show that the operator Defendants knew of the direct infringement occurring on websites hosted on their servers.[17] (See Section III.A.2.a.) The evidence also established that Defendants were in a position to directly control and monitor the instrumentality (the servers) used by the third party direct infringers.[18] Specifically, Defendants had numerous tools at their disposal for monitoring their servers and terminating abusive users. For example, Defendants had the ability to suspend a particular user, disable IP addresses used by a particular website or, if necessary, unplug a server that contained the data for a particular website. (See Trial Ex. 21; Lowe Decl., Exs. 1598, 1622 at 116:20-117:18; Coombs Decl., Exs. B at 170:20-171:14, D at 167:15-168:13.) Under this evidence, along with the evidence of direct infringement, the jury found for Plaintiff on the issue of contributory trademark infringement. The Court finds that the evidence was sufficient to support the jury's verdict on this issue.[19]

---

[17] The evidence was also sufficient to show that Defendants were "willfully blind" to the direct infringement in light of the large number of infringement notices that they received. (See Lowe Decl., Ex. 1598.)

[18] The Court has previously determined that Defendants supply a service, rather than a product. (See Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment at 15-17, Docket Item No. 99.) Thus, the Court applies the "direct control and monitoring" standard. Lockheed, 194 F.3d at 984.

[19] The Court rejects Defendants' contention that the Closing Instructions were defective for failure to state that direct control and monitoring is a required element of contributory trademark infringement. (See Motion for New Trial at 13-14.) To the contrary, the Closing Instructions directed the jury to consider control and monitoring and provided adequate guidance to the jury in light of the entire trial. (See Closing Instructions at 10.)
    Similarly, the Court rejects Defendants' contention that the jury was not given adequate instructions regarding consideration of any actions that Defendants took after becoming aware of infringing activity on their servers. (See Motion for New Trial at 18.) The Court finds that the instructions specifically allowed the jury to consider Defendants' action or inaction after receiving notice of trademark infringement. (Closing Instructions at 10.) On this issue, no further instruction was required under Ninth Circuit law. See Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1360 (9th Cir. 1986) ("A party is not entitled to an instruction on its theory of the case if that theory lacks support either in law or in the record.").

United States District Court

For the Northern District of California

1    Accordingly, the Court GRANTS Judgement as a Matter of Law to Defendant Managed

2 Solutions Group Inc., and DENIES the operator Defendants' Motion Re Trademarks and Motion for

3 New Trial as to contributory trademark infringement.

4 **C.    Defendants' Alternative Motion for a New Trial**

5    In the alternative, Defendants move for a new trial on several grounds: (1) insufficiency of

6 evidence as to contributory copyright infringement, (2) insufficiency of evidence as to contributory

7 trademark infringement, (3) improper and unconstitutional statutory damages award, and (4)

8 improper assessment of personal liability as to Defendant Chen.  Since the Court has already

9 addressed the first two issues raised by Defendants in the context of the Rule 50 Motions,[20] the

10 Court will only consider the constitutionality of the statutory damages award and Defendant Chen's

11 liability.

12    Rule 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial

13 by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in

14 the courts of the United States."  Fed. R. Civ. P. 59(a)(1).  As is apparent from the text, Rule 59 does

15 not specify the grounds on which a motion for a new trial may be granted.  See Zhang v. Am. Gem

16 Seafoods, Inc., 339 F.3d 1020, 1035 (9th Cir. 2003).  The court is "bound by those grounds that have

17 been historically recognized."  Id.  Historically recognized grounds for a new trial include, but are

18 not limited to, claims "that the verdict is against the weight of the evidence, that the damages are

19 excessive, or that, for other reasons, the trial was not fair to the party moving."  Montgomery Ward

20 & Co. v. Duncan, 311 U.S. 243, 251 (1940); see also Passantino v. Johnson & Johnson Consumer

21 Prods., 212 F.3d 493, 510 n.15 (9th Cir. 2000).

22    Under Rule 59(a), a new trial may be granted to all or any parties on all or part of the issues,

23 after trial.  A partial new trial is proper only if the issue to be retried is "so distinct and separable

24 from the others that a trial of it alone may be had without injustice."  Gasoline Prods. Co. v.

25 Champlin Refining Co., 283 U.S. 494, 500 (1931); Pumphrey v. K.W. Thompson Tool Co., 62 F.3d

26 _____

27    [20]  (See Sections III.A, B.)  The alternative motion for a new trial is moot as Defendant
Managed Solutions Group, Inc.

28                                                                    19

1128, 1133 (9th Cir. 1995).  A partial new trial solely on damages may be ordered so long as it does

not involve a tangled or complex fact situation that makes it unfair to determine damages apart from

liability.  Wharf v. Burlington N. R.R. Co., 60 F.3d 631, 638 (9th Cir. 1995) (no injustice resulting

from retrial on damages only, without reopening liability issues).

In a motion for a new trial, the trial judge has discretion to weigh the evidence and assess the

credibility of witnesses.  Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 190 (9th Cir.

1989).  However, the court does not have to weigh the evidence under Rule 59 in the light most

favorable to the prevailing party.  Landes Constr. Co. v. Royal Bank of Can., 833 F.2d 1365, 1371

(9th Cir. 1987).

### 1. Statutory Damages

Defendants move for judgment on the grounds that (1) the statutory damages exceeded the

statutory maximums, (2) the statutory damages were unconstitutional as applied, and (3) the Closing

Instructions misstated the law regarding statutory damages.  (See Motion for New Trial at 23.)  The

Court addresses each ground in turn.

### a. Whether the Statutory Damages Exceeded the Statutory Maximum

At issue is whether the statutory damages awarded by the jury exceeded the maximum

allowed under the relevant statutes.

"In reviewing a jury's damages award, [courts] must uphold the jury's finding of the amount

of damages unless the amount is grossly excessive or monstrous, clearly not supported by the

evidence, or only based on speculation or guesswork."  Los Angeles Mem'l Coliseum, 791 F.2d at

1360 (citations and quotations omitted).  Statutory damages for willful copyright infringement may

be awarded at a rate of up to $150,000 per violation.  See 17 U.S.C. § 504(c)(2).  Statutory damages

for willful trademark infringement may be awarded at a rate of up to $1,000,000 "per counterfeit

mark per type of goods or services sold, offered for sale, or distributed, as the court considers just." 15 U.S.C. § 1117(c)(2).[21]

Here, the jury awarded statutory damages of $10,500,000 per Defendant for willful contributory infringement of 13 of Plaintiff's trademarks. (Verdict at 8-9.) The jury also awarded statutory damages of $300,000 per Defendant for willful contributory copyright infringement of two of Plaintiff's copyrights. (Id. at 12-13.) This amounts to approximately $807,692 per trademark per Defendant and $150,000 per copyright per Defendant. Thus, the damages awarded for willful infringement were within the statutory maximums.[22]

Accordingly, the Court DENIES Defendants' Motion for New Trial as to this ground.

### b. Whether the Damages Statutes were Unconstitutional as Applied

Defendants contend that the damages statutes are unconstitutional as applied on the grounds that (1) the statutes violated Defendants' due process right under the Fifth Amendment because they lack adequate language to guide a jury in applying the statutes, and (2) the damages awarded were unconstitutionally excessive punitive damages. (See Motion for New Trial at 23-33.) The Court addresses each ground in turn.

### i. Application of the Damages Statutes by the Jury

At issue is whether the Court erred in allowing the jury to determine the amount of statutory damages under the Copyright Act and Lanham Act.

"The right to a jury trial includes the right to have a jury determine the amount of statutory damages . . . ." Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 353 (1998). Although

---

[21] On October 13, 2008, the willful statutory damages provision was amended by raising the limit on statutory damages for willful infringement from $1,000,000 to $2,000,000. However, the parties agreed to apply the pre-October 13, 2008 statute in this case. (See Motion for New Trial at 19; Opposition of Plaintiff Louis Vuitton Malletier, S.A. to Defendants' Motion for New trial or Other Relief Pursuant to Rule 59 at 19, hereafter, "Opposition Re New Trial," Docket Item No. 277.)

[22] The Court rejects Defendants' contention that the Closing Instructions misstated the law regarding statutory damages. (See Motion for New Trial at 19-22.) As with Defendants' other challenges to the instructions, the Court finds that the jury received wholly adequate instructions that tracked the statutory damages language and provided the jury with ample guidance in light of the trial as a whole.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Feltner was decided in the context of the Copyright Act, the Supreme Court did not indicate that its rationale was tied to anything specific to that Act. Indeed, at least one circuit court has specifically held that Feltner applies to statutory damages under the Lanham Act as well. See Bar-Meir v. North American Die Casting Ass'n, 55 Fed. Appx. 389, 390-91 (8th Cir. 2003). "If statutory damages are elected, the jury has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." Dream Games of Arizona, Inc. v. PC Onsite, 561 F.3d 983, 992 (9th Cir. 2009).

Here, Defendant concedes that Feltner permits a jury to determine the amount of statutory damages, but contends that "Congress has not yet amended the Lanham or Copyright Acts to guide juries." (See Motion for New Trial at 23-24.) In light of clear law permitting juries to decide the amount of statutory damages under both the Copyright Act and Lanham Act, the Court finds that Defendants' contention is without support. Thus, the Court finds that it did not err in permitting the jury to determine the amount of statutory damages.

### ii.     Whether the Damage Award was Unconstitutionally Excessive

At issue is whether the amount of statutory damages awarded by the jury constituted an unconstitutionally excessive punitive damage award.

"Because awards of statutory damages serve both compensatory and punitive purposes, a plaintiff may recover statutory damages 'whether or not there is adequate evidence of the actual damages suffered by plaintiff or of the profits reaped by defendant . . . .'" Los Angeles News, 149 F.3d at 996. The amount to be awarded is "constrained only by the specified maxima and minima." Id. "A statutorily prescribed penalty violates due process rights 'only where the penalty prescribed is so severe and oppressive as to be wholly disproportion[ate] to the offense and obviously unreasonable.'" U.S. v. Citrin, 972 F.2d 1044, 1051 (9th Cir. 1992) (quoting St. Louis, Iron Mt. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919)).

Courts routinely reject substantive due process challenges to statutory damage awards. See Verizon California Inc. v. Onlinenic, Inc., No. C 08-2832 JF, 2009 WL 2706393, at *7 (N.D. Cal. Aug. 25, 2009) (finding that a statutory damages award of $33.15 million at $50,000 per violation of

United States District Court

For the Northern District of California

the Anti-cybersquatting Consumer Protection Act did not violate due process in light of evidence that the defendant registered and monetized at least 663 domain names that were confusingly similar to the plaintiff's trademarks); Centerline Equip. Corp. v. Banner Personnel Serv., Inc., 545 F. Supp. 2d 768, 777 (N.D. Ill. 2008) (rejecting the defendant's contention that a 30,000:1 ratio between potential statutory damages and actual harm to the plaintiff would violate due process); see also Zomba Enters., Inc. v. Panorama Records, Inc., 491 F.3d 574, 586-88 (6th Cir. 2007) (finding that an award against the defendant under the Copyright Act in a ratio of 44:1 in statutory damages to compensatory damages was not sufficiently oppressive to constitute a violation of due process).

The Court is aware of only three cases in this district where a court found that the amount of statutory damages requested by a plaintiff would violate the defendant's due process rights. In Facebook, Inc. v. Wallace, the defendant had "engaged in a phishing and spamming scheme that ha[d] compromised the accounts of a substantial number of Facebook users." No. C 09-798 JF, 2009 WL 3617789, at *1 (N.D. Cal. Oct. 29, 2009). After the defendant defaulted, the plaintiff sought a default judgment of statutory damages in the amount of $4,264,425,900 under the CAN-SPAM Act and $3,247,500,000 for violations of Cal. Bus. & Prof. Code § 22948.2. Id. at *2. Although the court found that the defendant's acts were egregious, it was "not persuaded that an award of statutory damages in excess of seven billion dollars is proportionate to [the defendant's] offenses." Id. Thus, the court awarded a default judgment in the total sum of $711,237,650. Id.

The other two cases both involved considerations particular to the class certification context.[23] In Azoiani, the court denied a motion for class certification where the plaintiff sought statutory damages of $100 to $1000 per violation that would result in a class recovery between $423

---

[23] See Azoiani v. Love's Travel Stops and Country Stores, Inc., No. EDCV 07-90 ODW (OPx), 2007 WL 4811627 (C.D. Cal. Dec. 18, 2007); Price v. Lucky Strike Entm't, Inc., No. CV 07-960-ODW(MANx), 2007 WL 4812281 (C.D. Cal. Aug. 31, 2007). Since these cases involved claims for statutory damages under the same statute, the Court will discuss Azoiani and will note where Price differs in any substantive regard.

23

United States District Court

For the Northern District of California

million and $4 billion.[24]  The plaintiff sought recovery under the Fair and Accurate Credit

Transactions Act ("FACTA") for defendant's alleged failure to remove expiration dates from credit

and debit card receipts.  2007 WL 4811627, at *1.  The court found that certifying a class with that

amount of damages at issue, in light of the type of violation alleged, would run contrary to the

Advisory Committee Notes to Federal Rule of Civil Procedure 23(b)(3), which states that a court's

"determination with respect to class certification should not bring about other undesirable results."

Id. at *4.  Specifically, the court found that "putting a company out of business for failing to excise

the expiration dates from credit card receipts[,] especially without proof of actual harm, is the type

of undesirable result that the Advisory Committee and the Ninth Circuit warned against."  Id. at *5.

Thus, the Court finds Azoiani and Price are distinguishable because they involved concerns relevant

to the class certification process.  Further, the statutory damages provisions in this case provide for

damages of up to $1 million per trademark violation, in comparison to the $100 to $1000 damages

range under FACTA.

Here, Defendants have not shown that the award of statutory damages was "so severe and

oppressive as to be wholly disproportionate to the offense and obviously unreasonable."  The jury

awarded $10,800,000 per Defendant—an amount of damages within the statutory ranges provided in

the Copyright Act and the Lanham Act.  (See Section III.C.1.)  Contrary to Defendants' contention,

there is no requirement that the jury base the award on any evidence of actual damages suffered by

Plaintiff.  (See Motion for New Trial at 24.)  Defendants have not cited any case, and the Court is

not aware of one, where a court found a due process violation under analogous facts.  Further, this

amount does not approach the size of the $7 billion requested and found to be problematic in

Facebook.  Thus, in light of the jury's finding of willful infringement of 13 trademarks and two

---

[24]  2007 WL 4811627, at *5.  The potential class award at issue in Price was "between $3.3 and $33 million."  2007 WL 4812281, at *4.

United States District Court

For the Northern District of California

1   copyrights, the Court finds that the jury's award of statutory damages was fully permissible and not

2   excessive under Ninth Circuit law.[25]

3       Accordingly, the Court DENIES Defendants' Motion for New Trial on the ground of

4   statutory damages.

5       **2.    Defendant Chen's Personal Liability**

6       Defendants contend that Defendant Chen cannot be held personally liable for contributory

7   copyright infringement and contributory trademark infringement because he acted only in his

8   capacity as an officer of the corporate Defendants.  (Motion for New Trial at 33-35.)

9       "[A] corporate officer or director is, in general, personally liable for all torts which he

10  authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the

11  corporation and not on his own behalf."  Comm. for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814,

12  823 (9th Cir. 1996).  "Cases which have found personal liability on the part of corporate officers

13  have typically involved instances where the defendant was the 'guiding spirit' behind the wrongful

14  conduct, . . . or the 'central figure' in the challenged corporate activity."  Davis v. Metro

15  Productions, Inc., 885 F.2d 515, 523 n.10 (9th Cir. 1989).

16      Under such circumstances, both the corporation and the officers or directors who participated

17  in the tortious conduct may be held liable.  See Moseley v. U.S. Appliance Corp., 155 F.2d 25, 27

18  (9th Cir. 1946); Pai Corp. v. Integrated Sci. Solutions, Inc., No. C-06-5349 JSW, 2007 WL 1229329,

19  at *9 (N.D. Cal. Apr. 25, 2007).  "When a corporation infringes in obedience to the command of an

20  officer with power to cause the corporation to commit or refrain from committing the infringing act,

21

22      [25]  The Court finds that Defendants' reliance on Gore's "ratio" between punitive and
    compensatory damages is misplaced because Gore dealt with (1) purely punitive damage awards that
23  were (2) unconstrained by statute and (3) were awarded on top of, and as a multiple of,
    compensatory damages.  See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562-67 (1996).  "[R]atios
24  between actual or potential damages and punitive damages—ratios that are at the heart of Gore . . .
    —simply do not apply in the context of statutory damages."  Verizon California Inc., 2009 WL
25  2706393, at *7; but see In re Napster, Inc. Copyright Litigation, No. C MDL-00-1369 MHP, C
    04-1671 MHP, 2005 WL 1287611, at *10-11 (N.D. Cal. June 1, 2005) (citing Gore and later cases
26  for the proposition that an award of statutory damages may violate due process if the amount of the
    award is "out of all reasonable proportion" to the actual harm caused by a defendant's conduct).
27  The Court finds that the jury's award in this case is not out of all reasonable proportion.

28

United States District Court

For the Northern District of California

1    and when that officer participates in and contributes to the infringement, they are in the eye of the

2    law joint tortfeasors and both are liable, in the same or in different measures according to the

3    circumstances, for the injuries they have jointly inflicted upon the one whose rights they have jointly

4    invaded." Hitchcock v. Am. Plate Glass Co., 259 F. 948, 953 (3d Cir. 1919).

5          Here, the evidence established that Defendant Chen had nearly complete control over

6    Defendants' operations.  He was the general manager and sole owner of the corporate Defendants.

7    (See Coombs Decl., Ex. C at 88:3-20, 102:10-15.)  He also held the principal decision-making

8    authority as to responding to infringement notices, and he instructed his part-time employee

9    regarding how to respond to such notices.  (See id., Exs. B. 188:25-189:19, 226:19-227:20, C at

10   98:7-10, D at 117:7-118:24.)  Moreover, he was the designated agent under the DMCA for receiving

11   infringement notices and decided whether or not to terminate offending customers.  (See id., Exs. D

12   at 172:11-25, 174:8-24, 196:2-197:11, E at 28:10-30:17.)  Under this evidence, Defendant Chen was

13   clearly the "'central figure' in the challenged corporate activity," for which both he and the

14   corporate Defendants could be held liable.  See Davis, 885 F.2d at 523 n.10; Pai Corp., 2007 WL

15   1229329, at *9.

16         Further, the Court finds that the entry of Judgment as a Matter of Law in favor of Managed

17   Solutions Group, Inc., is not a basis for altering the jury's findings with respect to Defendant Chen.

18   There was no evidence of separate conduct on the part of Defendant Chen with respect to Managed

19   Solutions Group, Inc.  Thus, the Court finds that the jury had sufficient evidence to find in Plaintiff's

20   favor on the issue of Defendant Chen's personal liability.[26]

21         Accordingly, the Court DENIES Defendants' Motion for New Trial as to this ground.  In

22   sum, the Court DENIES Defendants' Motion for a New Trial.

_____

23

24   [26] The Court rejects Defendants' contention, raised in its Reply brief, that the Closing
     Instructions gave the jury insufficient guidance on the issue of Defendant Chen's liability.  (See
25   Defendants' Reply on Motion for Rule 59 Relief at 15, Docket Item No. 278.)  The jury was
     instructed to consider the acts of each Defendant in light of the elements of each claim, and the
26   Verdict form further guided the jury by requiring them to apportion damages amongst each of the
     three Defendants.  (See Closing Instructions at 4; Verdict at 9, 13.)  Thus, the Court finds that in
27   light of the trial as a whole, the jury received sufficient guidance regarding Defendant Chen's
     liability.

28

United States District Court

For the Northern District of California

**D.      Plaintiff's Motion Re Permanent Injunction**

Plaintiff moves for entry of a permanent injunction on the grounds that (1) the statutes that the jury found Defendants violated expressly provide for injunctive relief, (2) Plaintiff demonstrated at trial that it has met all four factors of the applicable test for a permanent injunction.  (Motion Re Permanent Injunction at 5-6.)  Defendants respond that Plaintiff is not entitled to an injunction because, *inter alia*, it cannot demonstrate that it will suffer irreparable harm if an injunction does not issue, but even if an injunction is appropriate here, Plaintiff's proposed injunction is impossible to comply with, overbroad, and vague.[27]

Title 15 U.S.C. section 1116(a) provides:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

The Copyright Act also provides that courts with appropriate jurisdiction may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502.

**1.      Injunctive Relief Factors**

The Supreme Court recently clarified that courts should apply the traditional four-factor test when deciding whether to grant injunctive relief.  In eBay v. MercExchange, LLC,[28] the Court found as follows:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering

---

[27] (See Defendants' Opposition to Vuitton's Motion for a Permanent Injunction, hereafter, "Opposition Re Permanent Injunction," Docket Item No. 257.)  Although the injunction the Court enters is different from the proposal submitted by Plaintiff, because the Court's injunction contains many of the same elements as the Plaintiff's proposal, the Court addresses each of Defendants' objections.

[28] 547 U.S. 388, 391 (2006).  Although eBay was decided in the context of a patent infringement dispute, neither party in this case disputes that it is the appropriate standard here.

the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

The Court applies the four factors here to determine whether a permanent injunction should issue.

### a.    Irreparable Injury

Plaintiff contends that Defendants' violative actions have caused irreparable harm in three ways: (1) impairing the exclusivity which accounts for a part of the premium pricing which Louis Vuitton products enjoy; (2) impairing Louis Vuitton's strict control over production, distribution, and marketing of products incorporating its trademarks; and (3) fostering an international scheme to conceal the identity of counterfeiters and enabling offshore sellers to benefit from ready access to U.S. consumers.  (Motion Re Permanent Injunction at 7-8.)

"The concept of irreparable harm, unfortunately, 'does not readily lend itself to definition.'" Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001) (internal citation omitted).  The Fifth Circuit has defined irreparable injury as "that for which compensatory damages are unsuitable."  Wildmon v. Berwick Universal Pictures, 983 F.2d 21, 24 (5th Cir. 1992). The Tenth Circuit has alternatively defined irreparable injury as harm that is "suffered when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits."  Prairie Band, 253 F.3d at 1250 (internal quotation marks and citations omitted).

Although after eBay, irreparable harm may not be presumed solely based on the fact of past infringement, "[i]n the run-of-the-mill copyright litigation, such proof should not be difficult to establish."  Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d 1197, 1214-15 (C.D. Cal. 2007).  "Thus, [p]laintiffs may establish an irreparable harm stemming from the infringement (*e.g.*, loss of market share, reputational harm)."  Id.

28

Here, Plaintiff points to the following trial testimony of Nikolay Livadkin to support its contention that Defendants' violative actions cause irreparable harm by impairing the exclusivity of its product:[29]

> Q: So if Louis Vuitton can command a premium price for its product, then why does it care about the nongenuine product that you've been looking at?
> A: Well, it's a big problem for us. Not only because it's a customer who purchases a nongenuine product will probably not buy our product, but also because people who have–who love our product so much that they would save money for a long time to buy a bag that they dreamed for a long time, they are genuinely disgusted when they see a cheap imitations of this bag all over the place.
> We receive many complaints of such people.
> Q: So how is it that Louis Vuitton is harmed by these nongenuine products?
> A: The image of the Company as a luxury brand suffers from these products.

(Declaration of J. Andrew Coombs, hereafter, "Coombs Decl. Re Permanent Injunction," Motion Re Permanent Injunction, Ex. A at 165:22-166:13, Docket Item No. 256.)

Plaintiff further points to the following trial testimony of Nikolay Livadkin to support its contention that Defendants' violative actions also cause irreparable harm by impairing Plaintiff's ability to maintain strict controls over production, distribution, and marketing of products incorporating its trademark:

> Q: So are there any licensees for Louis Vuitton?
> A: No, there are no licensees.
> Q: And does Louis Vuitton use wholesalers to distribute any of its merchandise?
> A: No.
> Q: Are there any intervening third parties between the Louis Vuitton owned production facilities that you described and the consumer other than Louis Vuitton itself?
> A: No. Louis Vuitton products are produced in our own manufacturing facilities and are distributed through a wholly owned and controlled store chain.
> . . . .

---

[29] Defendants filed an Evidentiary Objection to the Coombs Declaration in Support of Plaintiff's Motion for a Permanent Injunction. (Docket Item No. 259.) Defendants object on the ground that the trial transcripts attached to the Coombs Declaration are "unauthenticated and unidentified." (Id. at 1.) Federal Rules of Evidence 902 provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to" domestic public documents not under seal or certified copies of public records. Although the transcript copies that Plaintiff attached to the Coombs Declaration associated with the Motion did not contain the court reporter's certification, Plaintiff provided transcript copies that contained the court reporter's certification in the Coombs Declaration associated with its Reply to Defendants' Evidentiary Objections. (See Docket Item No. 265.) Thus, the Court finds that there are sufficient indicia of authenticity to admit the transcripts as evidence for purposes of this Motion. Furthermore, Defendants do not point to any indication that the trial transcripts that Plaintiff provides are incorrect or altered in any way. Accordingly, the Court OVERRULES Defendants' Evidentiary Objection.

29

Q: Is any finished Louis Vuitton product made in Asia?
A: No.
Q: And does it sell product on line?
A: Yes, it does but in June 2009 Louis Vuitton products were sold on two web sites, eluxury.com, which is a web site belonging to Louis Vuitton and Louis Vuitton's own web site louisvuitton.com and currently selling our products.
Q: Louis Vuitton products are expensive, isn't it?
A: Yes, they are.
Q: And why is that?
A: Well, Louis Vuitton's products are, if I can say, a symbol of luxury.  We–our customers dream about the best product, the perfect product, and this is costly.

(Id. at 162:18-164:9.)

With respect to Plaintiff's contention that Defendants' actions impair the exclusivity of Plaintiff's products, the trial testimony sufficiently establishes that the presence of counterfeit products in the market dilutes the exclusivity of Plaintiff's products in a manner that could not easily be compensated with monetary damages.  Since Plaintiff's business depends in large measure on its image as a luxury product, the Court finds that Defendants' role in facilitating the wide availability of cheap counterfeits causes irreparable harm to Plaintiff.

Similarly, the trial testimony supports Plaintiff's contention that Defendants' actions impair Plaintiff's ability to maintain strict controls over production, distribution, and marketing of their products.  By maintaining such strict controls, Plaintiff can maintain very high standards of quality and promote an image of itself as an expensive luxury item.  Since interference with Plaintiff's ability to promote itself as an expensive luxury item is the kind of harm that is difficult to measure or quantify, the Court finds that Defendants' role in providing a platform for the production, distribution, and marketing of counterfeit goods causes irreparable harm to Plaintiff.[30]

Accordingly, the Court finds that Plaintiff has adequately demonstrated the irreparable harm factor of the eBay test.

---

[30] Since the Court finds that Plaintiff suffered irreparable harm, the Court declines to address Plaintiff's contention regarding Defendants' role in fostering an international scheme to conceal the identity of counterfeiters and enabling offshore sellers to benefit from ready access to U.S. consumers.  The Court notes, however, that Plaintiff has not provided support in the trial record for this contention.

United States District Court

For the Northern District of California

**b.      Inadequacy of Remedy at Law**

Defendants contend that since statutory damages are available for copyright and trademark infringement, adequate compensatory relief will always be available to Plaintiff.  (Opposition Re Permanent Injunction at 14.)

"[T]he requisite analysis for the [adequate remedy at law] factor . . . inevitably overlaps with that of the [irreparable harm factor]."  MercExchange, LLC v. eBay, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007).  "A legal remedy is inadequate if it would require a 'multiplicity of suits.'"  Grokster, 518 F. Supp. 2d at 1220.

For the reasons discussed in the previous section, the Court finds that Plaintiff has adequately demonstrated that Defendants' conduct causes harm to Plaintiff that is not easily quantifiable, specifically injury to Plaintiff's image as a purveyor of expensive luxury items and its ability to control the production, distribution, and marketing of its products.  While it is true that Plaintiff could theoretically file one lawsuit after another seeking monetary compensation in the form of statutory damages for any future infringement, the necessity of such a multiplicity of suits to enforce its legal rights demonstrates that legal remedies are inadequate here.

Accordingly, the Court finds that Plaintiff has sufficiently demonstrated the inadequacy of legal remedies factor of the eBay test.

**c.      Balance of Hardships**

At issue is whether the balance of hardships weights in favor of granting an injunction in this case.

In weighing this factor, "the [c]ourt must consider the hardships that might afflict the parties by the grant or denial of [Plaintiff's] motion for a permanent injunction."  Grokster, 518 F. Supp. 2d at 1220.

The Court finds that granting an appropriate injunction here would merely require Defendants to enforce their own terms of use policy and come into compliance with federal statutes that a jury has found that Defendants violated.  On the other hand, denying an injunction would create a situation in which Plaintiff could only enforce its intellectual property rights by seeking

statutory damages.  Considering that Plaintiff does not even license its products to other companies, this would constitute a substantial hardship to Plaintiff.

Accordingly, the Court finds that the balance of hardships weighs in favor of granting the injunction.

### d.   The Public Interest

At issue is whether granting an injunction would serve the public interest.

"[T]he public interest is [] served when the rights of copyright holders are protected against acts likely constituting infringement."  Perfect 10 v. Google, Inc., 416 F. Supp. 2d 828, 859 (C.D. Cal. 2006) (overruled on other grounds); see also Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983).

Here, the jury has already found that Defendants contributorily infringe Plaintiff's copyrights and trademarks.  Thus, the Court finds that an injunction protecting Plaintiff's intellectual property against Defendants' acts of contributory infringement would serve the public interest.

In sum, the Court finds that all four eBay factors weigh in favor of issuing an injunction here. Thus, the issue becomes whether Plaintiff's proposed injunction should issue, or whether some modified version of the proposed injunction would be more appropriate.

### 2.   Impossibility of Compliance

Defendants contend that it would be "technically impossible" for them to comply with the terms of Plaintiff's proposed injunction.  (Opposition Re Permanent Injunction at 1.)  More specifically, Defendants contend that the broad language of the injunction would require Defendants to monitor all of the websites that they host in order to identify those websites which contain infringing content, and to then cause those websites to cease their infringing activity, tasks which Defendants claim are not possible given current technological limitations.  (Id. at 1-10.)

Defendants raise legitimate concerns.  However, the injunction that will be issued by the Court will enjoin Defendants from "knowingly" infringing activity.  Consistent with Plaintiff's proposed injunction, the injunction to be issued by the Court will provide that Defendants will only be found in violation after notice and an opportunity to cure the violation.  To facilitate compliance,

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

the injunction does require Defendants to maintain records and to publish its terms of use. However, the injunction does not require Defendants to constantly monitor websites they are hosting to identify those with infringing content.

Accordingly, the Court finds that the proposed injunction would not subject Defendants to requirements that are impossible to comply with or to implement.[31]

### 3.    Overbreadth and Vagueness

Defendants contend that Plaintiff's proposed injunction is overbroad and vague in violation of the Federal Rules of Civil Procedure and the Constitution. (Opposition Re Permanent Injunction at 21-22.)

For the reasons described in the previous section, the Court finds that the injunction provides a clear and discrete series of actions that Defendants must take to comply. Since Defendants are only required to take action against an infringing customer upon notice from Plaintiff, there is no danger that Defendants will find themselves in violation of the injunction due to the actions of a third party of which they were unaware.

Accordingly, the Court finds that the proposed injunction is not overbroad or vague.

### 4.    Digital Millennium Copyright Act Safe Harbor

Defendants contend that any injunction that adopts the language proposed by Plaintiff would violate the restrictions on injunctions provided in the DMCA. (Opposition Re Permanent Injunction at 24-25.)

The DMCA limits the liability of service providers when certain conditions have been met. See 17 U.S.C. § 512. One of these conditions is that the service provider must have "designated an agent to receive notifications of claimed infringement." Id. § 512(c)(2). Furthermore, a service provider must have "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service

---

[31] The Court also notes that Defendants do not offer an alternative proposal which would alleviate any of their impossibility concerns.

provider's system or network who are repeat infringers." <u>Id.</u> § 512(i)(1)(A).  When these conditions are met, a court may grant injunctive relief only in a form that is provided in the statute.  <u>Id.</u> § 512(j).

First, as a preliminary matter, the DMCA only provides safe harbor for infringement of copyrights.  Second, the jury specifically found that Defendants did not qualify for the liability limitations provided in the DMCA for the copyrights infringement.  (Verdict at 11:21-12:4.)  Since the jury also found that Defendants contributorily infringed Plaintiff's trademarks, the DMCA limitations on liability do not apply here.

In sum, the Court GRANTS Plaintiff's Motion for Entry of Permanent Injunction.  The terms of the proposed injunction submitted by Plaintiff will be modified by the Court consistent with this Order.

## IV.  CONCLUSION

The Court has disposed of all post-trial motions currently pending before it.  Judgment shall be entered accordingly.

Dated: March 19, 2010

_____
JAMES WARE
United States District Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Annie S Wang annie@coombspc.com
Brian S. Edwards bedwards@houser-law.com
David A. Gauntlett info@gauntlettlaw.com
J. Andrew Coombs andy@coombspc.com
James A. Lowe info@gauntlettlaw.com

**Dated: March 19, 2010**                      **Richard W. Wieking, Clerk**


                                            **By:_____/s/ JW Chambers_____**
                                                **Elizabeth Garcia**
                                                **Courtroom Deputy**

**United States District Court**
For the Northern District of California